FILED

2023 May-08  PM 02:38
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **IN RE:  BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406)** | **Master File No. 2:13-CV-20000-RDP** **This document relates to Provider-Track cases.** **[REDACTED VERSION OF SEALED FILING]** |

**DEFENDANTS' SUPPLEMENTAL CLASS CERTIFICATION
BRIEF PURSUANT TO THE COURT'S NOVEMBER 17, 2022 ORDER**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ....................................................................................................................3

    I.    Providers' Motion for Class Certification and Dr. Haas-Wilson's Model .............3

    II.    The Blues' Opposition to Providers' Motion for Class Certification ....................6

    III.    The Blue Plans' Two-Sided Platforms ..................................................................7

RELEVANT LEGAL PRINCIPLES .....................................................................................14

    I.    Rule 23 Requirements .........................................................................................14

    II.    Antitrust Impact .................................................................................................15

ANALYSIS OF THE COURT'S QUESTIONS......................................................................16

    I.    Providers' Proposed Classes Cannot Be Certified Because Providers
              Ignore the Connection Between Subscriber Premiums and Provider
              Reimbursement Rates. ........................................................................................16

              A.    *Amex* and Its Progeny...............................................................................17

              B.    Blue Plans Are Two-Sided Platforms with Significant Indirect
                     Network Effects. ..........................................................................22

              C.    Regardless of the Two-Sided Market Definition, Providers Have
                     Failed To Demonstrate Antitrust Impact ....................................................25

               D.    Providers' "17 Fundamental Differences" Are Incorrect and
                     Irrelevant. ...................................................................................32

    II.    Not All Putative Members of Providers' Rule 23(b)(3) Classes Have
              Article III Standing as Required by *Drazen* ........................................................46

CONCLUSION....................................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<small>C</small>ASES

*In re Agric. Chems. Antitrust Litig.*,
No. 94-40216-MMP, 1995 WL 787538 (N.D. Fla. Oct. 23, 1995) ........................................29

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018) ..........................................................................................16

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)...............................................................................................16, 22

*Belcher Oil Co. v. Fla. Fuels, Inc.*,
749 F. Supp. 1104 (S.D. Fl. 1990) ................................................................................16

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)....................................................................................................19

*Brown v. Electrolux Home Prods. Inc.*,
817 F.3d 1225 (11th Cir. 2016) ....................................................................................15

*Competitive Enter. Inst. v. FTC*,
970 F.3d 372 (D.C. Cir. 2020) .....................................................................................20

*Cordoba v. DIRECTV, LLC*,
942 F.3d 1259 (11th Cir. 2019) ....................................................................................49

*In re Delta Dental Antitrust Litig.*,
484 F. Supp. 3d 627 (N.D. Ill. 2020) ......................................................................35, 36

*Drazen v. Pinto*,
41 F.4th 1354 (11th Cir. 2022) ............................................................................. passim

*Epic Games, Inc. v. Apple Inc.*,
559 F. Supp. 3d 898 (N.D. Cal. 2021) ...........................................................................20

*Griffin v. Dugger*,
823 F.2d 1476 (11th Cir. 1987) ....................................................................................47

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008).....................................................................................15, 49

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) .......................................................................................21

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    202 F.R.D. 12 (D.D.C. 2001)...........................................................................15

*Mandeville Island Farms v. Am. Crystal Sugar Co.*,
    334 U.S. 219 (1948).........................................................................................21

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*,
    No. 14-md-02541, 2018 WL 4241981 (N.D. Cal. Sept. 3, 2018).....................19

*Nguyen v. Raymond James & Assocs., Inc.*,
    No. 8:20-cv-195-CEH-AAS, 2022 WL 4553068 (M.D. Fl. Aug. 12, 2022)....................49, 50

*In re Niaspan Antitrust Litig.*,
    464 F. Supp. 3d 678 (E.D. Pa. June 3, 2020)..................................................48

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018)............................................................................ passim

*In re Photochromic Lens Antitrust Litig.*,
    MDL No. 2173, 2014 WL 1338605 (M.D. Fla. Apr. 3, 2014) .........................29, 31

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, MDL No. 1869,
    725 F.3d 244 (D.C. Cir. 2013).........................................................................29

*SC Innovations, Inc. v. Uber Techs., Inc.*,
    No. 18-cv-07440-JCS, 2020 WL 2097611 (N.D. Cal. May 1, 2020)...............20, 21

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,
    421 F. Supp. 3d 12 (E.D. Pa. 2019)..........................................................15, 25, 29

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021).................................................................................47, 49

*U.S. Airways v. Sabre Holdings Corp.*,
    938 F.3d 46 (2d Cir. 2019).............................................................................20, 21

*United States v. Am. Express Co.*,
    838 F.3d 179 (2d Cir. 2016)...........................................................................19, 41

*United States v. Am. Express Co.*,
    88 F. Supp. 3d 143 (E.D.N.Y. 2015) ....................................................40, 41, 44, 45

*United States v. Anthem, Inc.*,
    236 F. Supp. 3d 171 (D.D.C. 2017).................................................................21

*United States v. Charlotte Mecklenburg Hosp. Auth.*,
    No. 3:16-cv-00311, Doc. No. 38 (W.D.N.C. Oct. 25, 2016)............................37

*Valley Drug Co. v. Geneva Pharm., Inc.*,
350 F.3d 1181 (11th Cir. 2003) .........................................................................15, 31

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................................................................................................14

*West Penn Allegheny Health Sys., Inc. v. UPMC*,
627 F.3d 85 (3d Cir. 2010)........................................................................................21

**STATUTES & RULES**

Fed. R. Civ. P. 12 .................................................................................................................35

Fed. R. Civ. P. 23(a) ...........................................................................................................14

Fed. R. Civ. P. 23(b) ............................................................................................... passim

**OTHER AUTHORITIES**

Alex Stein, *Healthcare Intermediaries*, REGULATION 29(4) 20 (2006).........................35

Andre Boik, *Essays on Uniform Pricing and Vertical Contracts in Two-Sided Markets*,
Ph.D. Dissertation, University of Toronto (2014) ....................................................35

Attila Ambrus & Rossella Argenziano, *Asymmetric Networks in Two-Sided Networks*,
AMERICAN ECONOMIC JOURNAL:  MICROECONOMICS 1(1) (2009) ...........................34

Bronwyn Howell, *Unveiling 'Invisible Hands': Competition in Two-Sided Health Care
Markets*, Working Paper (April 2007) (New Zealand Institute for the Study of
Competition and Regulation)....................................................................................34

Bruno Jullien, Alessandro Pavan & Marc Rysman, *Two-Sided Markets, Pricing, and
Network Effects*, HANDBOOK OF INDUSTRIAL ORGANIZATION 485 (2021)..............33

Charles E. Phelps, *Health Economics* 315 (6th ed. 2018) ...........................................27

David Bardey & Jean-Charles Rochet, *Competition Among Health Plans: A Two-Sided
Market Approach*, J. OF ECONS. & MGMT STRATEGY 19(2) 435 (2010)................................33

David S. Evans & Richard Schmalensee, *Paying with Plastic: The Digital Revolution in
Buying and Borrowing*, The MIT PRESS 1999 1st ed.)..........................................45

David S. Evans & Richard Schmalensee, *Markets With Two-Sided Platforms*, 1 ISSUES IN
COMPETITION L. & Pol'y 667....................................................................................17

David S. Evans, *Multisided Platform Businesses*, NBER WORKING PAPER, Appendix
(2013), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2214252 ..............34

Eva Lee & Jinha Lee, *Competition Strategy for Healthcare Insurance Plans*, 2020 IEEE INTERNATIONAL CONFERENCE ON BIOINFORMATICS AND BIOMEDICINE (2020) .....................35

Guillaume Roger, *Two-Sided Competition with Vertical Differentiation*, 120 J. OF ECONS. 193 (2016)..................................................................................................................35

Herbert Hovenkamp, *Platforms and the Rule of Reason:  The* American Express *Case*, 2019 Colum. Bus. L. Rev. 35 (2019)..............................................................36, 37

Kate Ho & Robin Lee, *Insurer Competition in Health Care Markets* 85 ECONOMETRICA, no. 2, Mar. 2017.............................................................................................7

Mario Pezzino & Giacomo Pignataro, *Competition in the Health Care Market: A 'Two-Sided' Approach*, Working Paper (2008) (University of Manchester and University of Cantania) ..........................................................................................................34

Martha Samuelson, Nikita Piankov & Brian Ellman (2012) "Assessing the Effects of Most-Favored National Clauses", *ABA Section of Antitrust Law, Spring Meeting 2012* (Mar. 28, 2012) ...................................................................................................35

Martin Gaynor, Kate Ho & Robert Town, *The Industrial Organization of Health-Care Markets*, 53 J. of Econ. Literature (2015)................................................................27

Robin S. Lee, *Vertical Integration and Exclusivity in Platform and Two-Sided Markets*, AMERICAN ECONOMIC REVIEW 103(7) (2013) .........................................................34

Soheil Ghili, *Network Formation and Bargaining in Vertical Markets: The Case of Narrow Networks in Health Insurance* (Jan. 9, 2023) ......................................27, 34

Yuliia Mel'nyk *Health Economics: A Two-Sided Approach*, (2008) (Master's Thesis, Universitat Autónoma de Barcelona)......................................................................34

## CITATION CONVENTIONS

| Amex | American Express Corporation | |
| --- | --- | --- |
| Blue Plans | Blue Cross and Blue Shield Plans | |
| Blues | Blue Cross Blue Shield Association, together with the Blue Cross and Blue Shield Plans | |
| Providers | Provider Plaintiffs | |
| Subscribers | Subscriber Plaintiffs | |
| Renewed Mot. at __ | Oct. 9, 2020 Provider Plaintiffs' Renewed Motion for Class Certification | Doc. 2604 |
| Opp. at __ | Oct. 9, 2020 Defendants' Opposition to Providers' Renewed Motion for Class Certification | Doc. 2606 |
| Providers' Br. at __ | Provider Plaintiffs' Brief Regarding Two-Sided Platforms and *Drazen v. Pinto* | Doc. 3025 |
| Aug. 9, 2022 Order at __ | Aug. 9, 2022 Opinion and Order on Provider Plaintiffs' Motion for Partial Summary Judgment re: Group Boycott Claims | Doc. 2934 |
| Nov. 17, 2022 Order at __ | Nov. 17, 2022 Order Regarding Additional Briefing Relevant to Class Certification | Doc. 3006 |
| Evans Rpt. ¶ __ | Dec. 2, 2020 Report of Dr. David Evans | Exhibit 1[1] |
| Haas-Wilson Rpt. ¶ __ | Apr. 15, 2019 Report of Dr. Deborah Haas-Wilson | Doc. 2454-6 |
| Pakes Rpt. ¶ __ | Apr. 15, 2019 Report of Dr. Ariel Pakes | Doc. 2453-24 |
| Frech Rpt. ¶ __ | May 1, 2019 Report of Dr. H.E. Frech | Doc. 2454-3 |
| Ordover Rpt. ¶ __ | July 15, 2019 Report of Dr. Janusz Ordover | Doc. 2565-48 |
| Murphy Rpt. ¶ __ | July 15, 2019 Report of Dr. Kevin Murphy | Doc. 2485 |
| Tucker Rpt. ¶ __ | Feb. 1, 2021 Report of Dr. Catherine Tucker | Doc. 3025-1 |

---

[1] Dr. Evans' report, which was previously submitted as Doc. 2777-8, has been reattached as Exhibit 1 to the evidentiary submission accompanying this brief.

## PRELIMINARY STATEMENT

The Court's November 17, 2022 Order asked the parties to address two important questions with respect to Providers' motion for class certification:

1. "Is the Market for Healthcare Financing a Two-Sided Platform?"; and

2. "Do All Putative Class Members have Article III Standing?"

(Nov. 17, 2022 Order at 1, 3.)  The answers to those questions are:  (1) Yes, the Blues operate two-sided platforms with significant indirect network effects, though the Court need not decide this issue to deny class certification; and (2) No, Providers cannot meet their burden of showing that all class members suffered damages, as required by *Drazen v. Pinto*, 41 F.4th 1354 (11th Cir. 2022).  For those reasons, among many others, the Court should deny class certification because Providers cannot carry their burden of establishing class-wide antitrust injury.

As the Court correctly observed, "[i]n seeking class certification, Providers have the burden to show that they can prove by common evidence that all class members suffered an injury—or antitrust impact—from the alleged antitrust violation(s)."  (Nov. 17, 2022 Order at 1.) Importantly, this showing of common proof is required *regardless* of the standard of review that applies to Providers' claims; that is, a showing of antitrust injury is required for *per se* claims as well as rule of reason claims.  Here, Providers advance a model that is not capable of proving antitrust injury through evidence that is common to all providers in their purported classes.  The Court's two questions illustrate why.

*First*, the market here is two-sided.  Dr. David Evans, the country's leading scholar on two-sided markets and who the Supreme Court cited more than a dozen times in *Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ("*Amex*"), testified in discovery (and is prepared to do so again at a class certification hearing) that the Blues are two-sided platforms that exhibit significant indirect network effects.  This two-sided platform encompasses both providers *and*

*subscribers* in a single market.  As such, the relevant economic question is whether Providers can prove subcompetitive rates based on a two-sided price that considers the impact of *both* provider reimbursement *and* subscriber premiums on that price.  To the extent the Court concludes that "the appropriate time to properly define the relevant market is now" (Nov. 17, 2022 Order at 2), this market is plainly two-sided (*see infra* Analysis § I.B).  None of Providers' supposed "17 fundamental differences" changes this conclusion.  (*See infra* Analysis § I.D.)

But the Court does not have to define the relevant market at this stage in order to deny class certification.  That is because Providers stake their entire class certification motion on a model of purported "class-wide harm" that is deficient, no matter how the market is defined.  Among many other problems (highlighted in depth in Defendants' Opposition to Providers' Renewed Motion for Class Certification (Doc. 2606)), Providers' economic model does not allow for the possibility that changes in provider reimbursement rates will have *any effect whatsoever* on subscriber premiums.  This is contrary to the economic reality, as this Court already observed:  regardless of whether the market is defined as one- or two-sided, provider reimbursement rates have "at least some effect" on subscriber premiums.  (Aug. 9, 2022 Order at 8 (citing Evans Rpt.).)  Those effects on subscriber premiums, in turn, have at least some effects on the volume of patients providers treat and the prices providers receive.  But Providers' model ignores all of that, as Providers' own expert (and proponent of this model), Dr. Deborah Haas-Wilson, concedes.  This is in stark contrast to the model previously put forward by Subscribers in the Subscriber Track, which at least attempted to consider the interdependencies between provider reimbursements and subscriber premiums (even though Subscribers, like Providers, also disputed that the relevant market is two-sided).  Because Providers' model does not even attempt to consider *any* impact on subscriber premiums, their model is not economically reliable to prove

antitrust impact and cannot support certification of Providers' putative classes.  That is true as a matter of Rule 23 class action requirements, not *Amex* market definition:  this fundamental economic error leaves Providers with no measure of classwide evidence to support class certification, regardless of market definition.  (*See infra* Analysis § I.C.)  And, again, this fatal defect in Providers' model cannot be waved away with the response that two-sided principles are limited to rule of reason claims.  The Court's question goes to whether plaintiffs can demonstrate common injury to the class and thereby succeed in their certification motion.  Antitrust injury does not depend upon which standard of review applies;  it is required under *both* the *per se* and rule of reason standards.

Second, under the Eleventh Circuit's recent decision in *Drazen*, *all* putative damages class members, including each and every absent class member, must have suffered quantifiable damages to have Article III standing.  Providers fail this requirement too.  For their putative hospital class, Providers' own model demonstrates that many putative damages class members have not been injured at all.  And Providers offer no evidence of any harm whatsoever to their putative non-hospital class.  In light of these issues, individualized questions of standing are likely to predominate over the common issues, contrary to Rule 23.  Because Providers have not carried their burden to demonstrate that each member of their putative classes has been damaged, their motion to certify their damages classes must be denied.  (*See infra* Analysis § II.)

## BACKGROUND

### I.        Providers' Motion for Class Certification and Dr. Haas-Wilson's Model

Providers' operative motion for class certification, filed October 9, 2020 (Doc. 2604), seeks to certify four classes of Alabama providers:  (i) an acute care hospital provider class under Federal Rule of Civil Procedure 23(b)(2); (ii) an acute care hospital provider class under Rule 23(b)(3) (together, the "Hospital Class"); (iii) a non-acute care hospital provider class

under Rule 23(b)(2); and (iv) a non-acute care hospital provider class under Rules 23(b)(3) and (c)(4) (together, the "Non-Hospital Class"). (Renewed Mot. at 1–3.) Providers' theory of classwide harm is that every putative class member has been harmed by the challenged Blue rules in two ways: (i) through lower reimbursement rates for the services they have provided; and (ii) through various non-price dimensions relevant to the provision of healthcare services. (*Id.* at 25–26.)

Providers did not submit any evidence or expert empirical analysis of alleged harm for the Non-Hospital Class. (Mar. 2021 Haas-Wilson Dep. 62:10–72:21; Frech Rpt. ¶ 33; *see* Defendants' Br. in Supp. of June 21, 2021 Partial S.J. Mot. (Dkt. 2751) ¶ 4.) Providers' only model of harm, proffered by Dr. Haas-Wilson, purports to calculate how much higher *hospital* reimbursement rates would be in the absence of the challenged Blue rules. At a high-level, Dr. Haas-Wilson's model operates in two parts: *First*, it uses states with existing Blue-on-Blue competition (such as California, Pennsylvania, New York, Idaho and Washington) to predict how much BCBS-AL's market share might decline if another Blue entered the state. (Haas-Wilson Rpt. ¶¶ 450, 463.) *Second*, it looks at the average relationship between insurer concentration and hospital reimbursement rates nationwide in order to predict how much Alabama hospital rates might increase if BCBS-AL's market share declined. (*Id*. ¶¶ 436, 439, 444, Ex. VIII.9–12.) In making that prediction about hospital rates, Dr. Haas-Wilson holds everything on the subscriber side constant: she assumes that subscriber premiums would stay the same with a second Blue Plan in Alabama, and that the number of Blue subscribers in Alabama would not change at all. And critically, Dr. Haas-Wilson's model ignores any possible effect that higher reimbursement rates would have on the subscribers who would need to foot that bill (and thus ignores any corresponding impact that would have on providers). Dr. Haas-Wilson

testified that her "work has been on the prices paid to providers.  I have not focused on the prices paid by subscribers." (Mar. 2021 Haas-Wilson Dep. 66:5–8.)  And Dr. Daniel Slottje, who purports to calculate damages based on Dr. Haas-Wilson's economic model, testified that he "do[es] not have an opinion" about "how much premiums paid by subscribers would have changed, absent the challenged conduct". (Mar. 2021 Slottje Dep. 51:15–52:6.)  In other words, by their own admission, Providers' experts did not even attempt to model or to measure how higher provider reimbursement rates would impact subscriber premiums, and what that impact on subscriber premiums would, in turn, do to Blue membership, utilization of medical services and, ultimately, overall reimbursement to providers. (*See* Evans Rpt. ¶ 115.)

Providers' approach is in stark contrast to what Subscribers' expert, Dr. Ariel Pakes, did in the Subscriber Track.  Dr. Pakes



(Pakes Rpt. ¶ 228 (emphasis added).)  Unlike Dr. Haas-Wilson's economic model, Dr. Pakes testified that his model "

(May 2019 Pakes Dep. 250:9–251:25.)  Notably, Dr. Pakes recognized this

(*See, e.g.*, May 2019 Pakes Dep. 252:15–256:21 (

); *see also* May 2019 Rubinfeld Dep. 122:5–11.)

But on this critical "interdependence", Providers' model is silent.

II.     **The Blues' Opposition to Providers' Motion for Class Certification**

The Blues opposed Providers' motion for class certification on October 9, 2020. (*See* Opp. (Doc. 2606).)  Among other things, the Blues argued that Providers could not satisfy the predominance requirement under Rule 23(b)(3) for their putative damages classes because Providers' sole proposed method of proving class-wide injury—Dr. Haas-Wilson's model—is fundamentally flawed.  (Opp. at 27–30.)  Dr. Haas-Wilson's model is incapable of establishing class-wide injury for several reasons, including:

- The model assumes, contrary to the record evidence and without any support, that any new Blue entrant would enter Alabama on a state-wide basis and contract with *each and every member* of the proposed hospital class—and thus that every hospital in Alabama would be affected by a new Blue entry *in exactly the same way*, no matter the size or location of the hospital, or any other individualized factors.  (*Id.* at 29–32.)

- The model ignores critical ways in which the Blue rules affect different providers differently, such as providers located in contiguous counties that already have multiple Blue contracting opportunities.  (*See id.* at 12, 30–35.)

- The model presumes that more competition between insurers *always results* in higher reimbursement rates *for all providers*, without regard to market-specific factors that affect whether an individual provider could benefit from additional insurer competition, such as health plans developing narrow networks that omit entirely certain providers in order to lower costs.  (*Id.* at 41–42.)

- The model is deliberately designed to mask these differences by estimating only an *average* relationship between insurer-share and reimbursement rates (for all insurers, all geographic areas, and all hospitals nationwide)—and therefore *assumes* the critical question of class-wide impact.  (*Id.* at 18–24, 45–53.)

In fact, when Dr. Haas-Wilson's averages are disaggregated, Providers' own model suggests that 60% of Alabama hospitals would receive *lower rates in the but-for world*. (*Id.* at 47–48.)  In other words, Dr. Haas-Wilson's model confirms that most putative class members *suffered no antitrust injury whatsoever*.  This is true, even considering the provider side of the market in isolation, as Dr. Haas-Wilson admittedly did.  (*Id.*; *see* Mar. 2021 Haas-Wilson Dep. 66:5–8.)

6

But the flaws in Dr. Haas-Wilson's model do not stop there.  Each of these flaws is compounded by the fact that Dr. Haas-Wilson does not even attempt to account for the subscriber side of the market, as set forth above.  (Opp. at 41.)  And it is not only that she fails to model the Blue Plans as a formal two-sided transaction platform.  Even assuming a more traditional (one-sided) market definition, she has no input for subscribers at all.  (Evans Rpt. ¶¶ 141–46; *see* Mar. 2021 Haas-Wilson Dep. 66:5–8.)  As discussed below, this defies common sense; is contrary to abundant economic literature; is belied by the discovery record; and runs counter to what experts for every other party in the MDL—both for the Blues and for Subscribers—have testified is appropriate and economically sound.  (*See* Ordover Rpt. ¶ 39; Evans Rpt. ¶¶ 141–46; May 2019 Pakes Dep. 250:19–251:25; Kate Ho & Robin Lee, *Insurer Competition in Health Care Markets*, 85 ECONOMETRICA 379 (2017); *see also infra* pp. 26–30).)

### III.    The Blue Plans' Two-Sided Platforms

These flaws in Dr. Haas-Wilson's model are even more pronounced in the context of two-sided markets.  Dr. Evans has testified in this case that the Blues do, in fact, operate two-sided platforms.  Dr. Evans has carefully examined the Blues' businesses and concluded that they offer products and services to two distinct but interdependent groups:  providers and subscribers.  Greater participation on one side of the market makes the platform more valuable to participants on the other side, and this holds true in both directions (*i.e.*, providers care about the volume of subscribers, and subscribers care about the volume of providers), as explained in more detail below.  Blue Plans thus operate two-sided platforms that exhibit significant indirect network effects, as those terms are used in the relevant economic literature.  (*See* Evans Rpt. (Ex. 1 to Evidentiary Submission); July 15, 2019 Evans Rpt. (Doc. 2565-53))  Failing to account for and model this reality is an independent flaw that renders Dr. Haas-Wilson's model fundamentally unreliable.

**Provider Effects.** Providers experience significant indirect network effects because providers value being part of the network of health plans that have more subscribers.[1] Having a larger base of subscribers covered by a health plan means that more people will need care from providers, and this larger base increases the likelihood that a subscriber will need the *particular* type of care that the provider offers.  (Evans Rpt. ¶¶ 63, 75.)  As Dr. Evans explains:

> A health insurance plan that has more enrollees near the hospital is more likely to have an enrollee, such as a person that needs emergency hip replacement, that requires the available capacity, such as a surgical team for hip replacement and a bed for the stay. And a hospital can expand capacity with more confidence that it can do so profitably when it has access to a plan with more enrollees.

(*Id.* ¶ 63.)  Access to a large potential patient population is particularly important to major hospitals, as major hospitals have substantial fixed costs (*e.g.*, space, specialized equipment, staffing) and so must utilize their capacity at a high rate to remain profitable.  (*Id.* ¶ 62.)  Because providers recognize the value of a large population of subscribers, they are often willing to grant larger discounts to health insurance plans—*i.e.*, accept lower reimbursement rates—that offer access to more subscribers and give them greater certainty of demand.  It simply "makes economic sense for health care providers to charge lower reimbursement rates in return for the expectation of having greater volume to cover their costs."  (*Id.* ¶¶ 63, 79–80.)  Providers' own experts concede the point:  Dr. Haas-Wilson testified that providers often "agree to lower prices in return for more potential patients" (Mar. 2021 Haas-Wilson Dep. 220:8–16), and Dr. H.E. Frech testified that "providers may agree to greater discounts on their rates to access patient volume" (Jan. 2021 Frech Dep. 231:20–232:4).

---

[1] For the purposes of this brief, "health plans", "subscribers" and similar terms refer to both fully insured and self-funded business.

The fact that providers benefit from larger subscriber pools is not merely a matter of economic logic.  The record is replete with evidence from providers themselves that they value accessing a large base of subscribers.  For instance, providers have testified in this action that:

- ███████████████████████████████████████ (R. Willis (Community Health Systems 30(b)(6)) Dep. 50:19–51:2);

- ███████████████████████████████████████ (B. Spence (Lee Memorial Health System 30(b)(6)) Dep. 118:24–119:12);

- Insurers get on providers' "radar for volume" because it is not profitable to deal with an insurer that is "[t]oo small"—*i.e.*, less than five percent of the providers' business (B. Eisemann (Crenshaw Community Hospital 30(b)(6)) Dep. 131:8–132:15); and

- Conversely, provider facilities fail if they have "[l]ow patient volume" (T. McLendon (Evergreen Medical Center 30(b)(6)) Dep. 49:10–50:9).

The Blues' competitors agree.  For example, non-Blue health plan executives testified that:

- ███████████████████████████████████████ (J. Caldwell (Alliant Health Plans 30(b)(6)) Dep. 77:5–13);

- ███████████████████████████████████████ (R. El Gomayel (Aetna 30(b)(6)) Dep. 94:17–95:6);

- ███████████████████████████████████████ (D. Findlay (Humana 30(b)(6)) Dep. 39:9–13);

- ███████████████████████████████████████ (*id.* at 125:15–21); and

- ███████████████████████████████████████ (K. Anderson (Moda Health 30(b)(6)) Dep. 60:20–61:13).

9

The fixed cost of contracting with various health plans is another example of indirect network effects experienced by healthcare financing platforms like the Blue Plans.  A provider incurs negotiating and administrative costs for each individual health plan with which it contracts.  (Evans Rpt. ¶ 66.)  Because the expected profit for a subscriber from a plan "is smaller for smaller plans after accounting for these fixed costs", providers will, as a result, "require higher reimbursement rates from smaller plans".  (*Id.*)  Accordingly, providers have testified that:

- They must account for the "administrative burden" and costs of the "extra paperwork . . . front office and billing staff" in deciding whether to accept additional health plans (P. Gaspar (Gaspar Physical Therapy 30(b)(6)) Dep. 69:24–70:14);

- ████████████████████████████████████████████ (G. May (Stanford Health Care 30(b)(6)) Dep. 138:5–139:7); and

- ████████████████████████████████████████████ (C. Fair (Huntsville Hospital Health System 30(b)(6)) Dep. 80:9–82:4).

Simply put, Providers are willing to accept lower reimbursement rates in exchange for access to more patients.  (Evans Rpt. ¶¶ 79–80.)

**Subscriber Effects.**  On the other side of the platform, subscribers to Blue Plans also experience indirect network effects because subscribers and other Blue members place substantial value on having access to more—and more relevant—providers.  (Evans Rpt. ¶ 57.) People seeking medical services often want to obtain most services conveniently, near their home or work.  They value having access to the specific hospitals or physicians that match their personal preferences and medical needs.  (*Id.*)  They also value maintaining access to physicians with whom they already have a relationship.  Subscribers "value provider networks that give them a greater chance of having access to providers they desire when they need them".  (*Id.*) Thus, subscribers value access to a denser provider network as it provides easier access to

healthcare and increases their chances of finding a relevant provider.  (*Id.* ¶¶ 58–61.)  Even

Providers' expert, Dr. Haas-Wilson, admits that "subscribers tend to prefer provider networks

with greater breadth and depth".  (Haas-Wilson Rpt. ¶ 168.)

   This common-sense conclusion is borne out by the economic evidence.  Empirical

studies have quantified how subscribers "put a substantial premium on broader networks".

(Evans Rpt. ¶ 59 (citing a study finding that "the willingness to pay for the broadest network . . .

over the narrowest network . . . ranged from $56 to $123 per month"); *id.* (citing another study's

finding that "the average willingness to pay was $45.83 per month" for every 17.4 percent

increase in network breadth).)  Beyond the studies, the record is replete with evidence from

industry participants that subscribers—both employers and individual enrollees—place

significant value on having access to a denser provider network.  Subscribers have testified that:

- ██████████████████████████████████████ (M. Latham (Dollar General 30(b)(6)) Dep. 76:10–17);

- ██████████████████████████████████████████ (P. Groux (Perdido Beach Resort 30(b)(6)) Dep. 80:4–18);

- ██████████████████████████████████████ L. Davis (Fort McClellan Credit Union 30(b)(6)) Dep. 68:3–69:12); and

- ██████████████████████████████████████ (R. Abbott (Willis Towers Watson 30(b)(6)) Dep. 78:1–14).

   The Blues' competitors agree, and have testified that:

- ██████████████████████████████████████████ (R. Brouillette (Assurant Health 30(b)(6)) Dep. 45:22–24);

- ██████████████████████████████████████████ (J. Wedin (United Health 30(b)(6)) Dep. 189:12–190:2); and

- ████████████████████████████████████████████████████
████████████████████████████████ (*id.* 193:10–194:4 (discussing University
of Alabama-Birmingham Hospital)).

When the Blue Cross Blue Shield Association conducted a study of why Blue
Plans win or lose group subscriber accounts, the Association found that one of the primary
reasons Plans win was "broad networks".  (*See* HCSC-E006977661 at 664 (reporting key
findings of 2014 study); *id.* at 670 ("Besides price, strength of network was the competition's
greatest weakness when competing against [Blue Plans].").)  A similar study found that in 51 out
of 78 cases, the Blue Plan's provider network was cited as a reason the Plan won the account.
(BCBSA00823822 at 824 (slide 7 summarizing findings of 2006 study).)  In fact, the Blues'
competitors have received ████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

Given this reality, it is unsurprising that narrower network products are generally
cheaper than broad network ones.  ████████████████████████████
████████████████████████████████████ Evans Rpt. ¶ 79 ("Some
health insurers offer subscribers access to a narrow network involving a limited and selected
group of providers.  The health insurer negotiates lower reimbursement rates for those providers
in return for the greater patient demand resulting from enrollees having fewer provider choices.
The health insurer is then able to offer subscribers lower premiums which compensates them for
having access to a narrower network of providers."); ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

*   *   *

12

These indirect network effects running in both directions across the Blue Plans' platforms are not an accident.  They exist because the Blue Plans' business model solves a basic economic problem—transaction costs when these two groups come together.  The more participants there are on each side of the platform, the better able the Blue Plans are to drive down transaction costs for the benefit of both sides.  In terms of helping subscribers, Blue Plans negotiate provider reimbursement rates that are predictable and aggregated across large populations of subscribers.  (Evans Rpt. ¶¶ 71, 73.)  That benefits subscribers, who lack complete information on market prices of medical services and who may have limited ability to seek out the best price, particularly in an emergency, or to obtain a reasonable price on their own.  (*Id.* ¶ 71.)  And because the bulk of medical costs is covered by the Blue Plan, subscribers do not need complete information about the actual, itemized costs of services.  And in terms of helping providers, they are relieved of the need to negotiate prices, payment terms and collections on a patient-by-patient basis; and the more in-network members, the more efficient the operation for the provider.  (Evans Rpt. ¶¶ 52–53, 66, 71, 73; *see* Mar. 2021 Haas-Wilson Dep. 90:6–14.)  Providers also benefit from the "increase[d] demand for medical services" that results when Plans with large subscriber pools are able to "provide more cost-effective insurance which increases the demand for enrollment".  (Evans Rpt. ¶ 72.)  Finally, Blue Plans have tools that match the two sides, for example, by helping subscribers search for in-network providers via the Association's "Provider Finder" tool, which reduces frictions that might otherwise prevent subscribers and providers from finding each other.  (*Id.* ¶ 74.)

The result of these various factors is significant indirect network effects that tie prices across both sides of the platform together.  Consequently, if a Blue Plan pays higher reimbursement rates to providers, they must also raise subscriber premiums to cover those costs.

(*Id.* ¶¶ 76–77.)  Higher premiums, however, may cause some subscribers to leave the platform, which then makes the network less valuable to providers due to lower demand for medical services.  (*Id.* ¶¶ 94, 115, 141.)  This results in providers choosing not to participate in the platform and to go out-of-network with the Blues.  (*See id.* ¶¶ 86–87; *see* Ordover Rpt. ¶ 44.)  This, in turn, causes the platform to lose value to subscribers (Evans Rpt. ¶¶ 84–85), and the downward spiral—what is sometimes labeled the "vicious cycle"—continues on and on (*see id.* ¶ 21, 33).  For this reason, when determining the prices they pay to providers and the fees they charge to subscribers, Blue Plans must find the optimal balance to encourage participation on both sides.  (*Id.* ¶ 35.)  The Blue Plans' competitors agree ██████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████  (B. Roberts (Harvard Pilgrim Health Care 30(b)(6)) Dep. 123:19–124:9; *see also* R. ElGomayel (Aetna 30(b)(6)) Dep. 160:6–21 (noting there is ████████████████████████████████████████████████████████ ███████████████████████  (former Aetna official)); B. West (Oscar 30(b)(6)) Dep. 30:15–31:1 (agreeing ████████████████████████████████████████████████████████ ████████████████████████).)  Ultimately, economic theory, record evidence, empirical data and common sense all point to the same conclusion:  the existence of indirect network effects in this market.

## RELEVANT LEGAL PRINCIPLES

### I.      Rule 23 Requirements

Class certification "is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites" of Rule 23 are satisfied.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quotation marks omitted).  Rule 23(a) sets forth four prerequisites for certification:  (1) numerosity, (2) commonality, (3) adequacy and (4) typicality.  Fed. R. Civ. P.

23(a).  Damages classes must also satisfy the requirements of Rule 23(b)(3), which prevent any

class from being certified unless "questions of law or fact common to class members

predominate over any questions affecting only individual members".  Fed. R. Civ. P. 23(b)(3).

      "The party seeking class certification has a burden of *proof*, not a burden of

pleading, [and] must affirmatively demonstrate his compliance with Rule 23 by proving that the

requirements are *in fact* satisfied."  *Brown v. Electrolux Home Prods. Inc.*, 817 F.3d 1225, 1233

(11th Cir. 2016) (internal citation and quotation marks omitted).  A plaintiffs' "[f]ailure to

establish any one of [Rule 23(a)'s] four factors and at least one of the alternative requirements of

Rule 23(b) precludes class certification."  *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d

1181, 1187 (11th Cir. 2003).

## II.    Antitrust Impact

      Plaintiffs seeking class certification in an antitrust case must specifically "show

that they can prove by common evidence that the class members suffered an injury—or antitrust

impact—from the antitrust violation".  *In re Suboxone (Buprenorphine Hydrochloride &*

*Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 55–56 (E.D. Pa. 2019).  Providers do not dispute

that they have this burden.  (Providers' Br. at 35; Renewed Mot. at 23.)  "In antitrust cases,

impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance

requirement because it is an element of the claim that may call for individual, as opposed to

common, proof."  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311–12 (3d Cir. 2008)

as amended (Jan. 16, 2009); *see also In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D.

12, 29 (D.D.C. 2001) (at class certification, "plaintiffs must prove that antitrust impact, or the

fact of injury, [is] common to the class and predominate[s]").  "Deciding this issue calls for the

district court's rigorous assessment of the available evidence and the method or methods by

which plaintiffs propose to use the evidence to prove impact at trial."  *Hydrogen Peroxide*, 552

F.3d at 312. This inquiry is important at class certification and cannot be delayed until trial. *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 54 (1st Cir. 2018) (rejecting plaintiffs' argument that "at trial, they will prove 'class-wide impact' with the testimony of their expert . . . and with defendants' own documents and admissions").

Importantly, a showing of antitrust injury is required regardless of the standard of review—that is, a plaintiff must demonstrate antitrust injury for *per se* claims as well as for claims evaluated under the rule of reason. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342–44 (1990) ("The *per se* rule is a method of determining whether § 1 of the Sherman Act has been violated, but it does not indicate whether a private plaintiff has suffered antitrust injury and thus whether he may recover damages . . . . The need for this showing [of antitrust injury] is at least as great under the per se rule as under the rule of reason"); *Belcher Oil Co. v. Fla. Fuels, Inc.*, 749 F. Supp. 1104, 1107 (S.D. Fl. 1990) ("[P]er se antitrust violations are not actionable by private plaintiffs absent a showing of antitrust injury." (citing *Atl. Richfield*, 495 U.S. at 348–50)).

## ANALYSIS OF THE COURT'S QUESTIONS

I.   **Providers' Proposed Classes Cannot Be Certified Because Providers Ignore the Connection Between Subscriber Premiums and Provider Reimbursement Rates.**

The Court's first question is "whether the market for healthcare financing is a two-sided platform that exhibits strong indirect network effects". (Nov. 17, 2022 Order at 2–3.) It clearly is. The plain economic reality is that what happens on the subscriber side matters to providers, and vice versa. (*See infra* Analysis § I.B.) But, under well-established Rule 23 precedent, the Court need not decide at this stage whether healthcare financing is a two-sided platform for purposes of market definition under *Amex*. That is because Providers made a much more basic error: they did not model *any* harm or damages that account for even the slightest

16

change in price or demand for subscribers.  That error precludes a showing of class-wide antitrust impact—regardless of how the Court defines the market, and regardless of standard of review.  (*See infra* Analysis § I.C.)  Rather than address this fatal flaw, Providers spend dozens of pages reciting irrelevant or inaccurate distinctions from the credit card market in an attempt to distinguish the Supreme Court's binding authority in *Amex*.  Nothing Providers say changes the economic reality that changes in reimbursements to providers affect subscriber premiums, which in turn affect enrollment.  The antitrust analysis must be driven by those commercial realities. (*See infra* Analysis § I.D.)

### A.      *Amex* **and Its Progeny**

The Supreme Court's decision in *Amex*, and the caselaw that has followed it, provides the roadmap to the Court's first question:  whether the market for healthcare financing is a two-sided platform that exhibits strong indirect network effects.  *Amex* begins with the principle that the Sherman Act antitrust analysis is about "actual market realities", not about "formalistic distinctions".  138. S. Ct. at 2285 (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 466–67 (1992)).  In *Amex*, the Supreme Court considered and rejected the government's attempt to analyze one side of the credit card market in isolation because it did not reflect actual commercial realities for two-sided credit card networks.  Providers cite with apparent approval a commentator who referred to this binding Supreme Court precedent as "the worst antitrust decision in many decades" (Providers' Br. at 42), probably because they have made the very same mistake the Supreme Court found to be fatal.

Citing repeatedly to Dr. Evans, the Supreme Court in *Amex* explained that "a two-sided platform offers different products or services to two different groups who both depend on the platform to intermediate between them."  *Amex*, 138 S. Ct. at 2280 (citing Evans & Schmalensee, *Markets With Two-Sided Platforms*, 1 Issues in Competition L. & Pol'y 667

(2008); Evans & Noel, *Defining Antitrust Markets When Firms Operate Two-Sided Platforms*, 2005 COLUM. BUS. L. REV. 667, 668 (2005)).  "Two-sided platforms differ from traditional markets" because "two-sided platforms often exhibit what economists call 'indirect network effects.'"  *Id.* (citing Evans & Schmalensee at 667).  The commercial reality is simple:  "Indirect network effects exist where the value of the two-sided platform to one group of participants depends on how many members of a different group participate."  *Id.* (citing Evans & Schmalensee, MATCHMAKERS: THE NEW ECONOMICS OF MULTISIDED PLATFORMS 25 (2016)).  "In other words, the value of the services that a two-sided platform provides increases as the number of participants on both sides of the platform increases."  *Id.* at 2281.

   *Amex* underscores that indirect network effects have a real, practical effect on antitrust price analysis.  The touchstone of Sherman Act analysis is whether restraints on competition "decrease output", which can occur where firms charge "anticompetitive prices".  *Id.* at 2283, 2288.  When a market is two-sided, this price analysis must include pricing on both sides.  This is because "[t]o ensure sufficient participation, two-sided platforms must be sensitive to the prices that they charge each side."  *Id.* at 2281 (citing Evans & Schmalensee 675; Evans & Noel 680).  "Due to indirect network effects, two-sided platforms cannot raise prices on one side without risking a feedback loop of declining demand."  *Id.* at 2285 (citing Evans & Schmalensee 674–75; Evans & Noel 680–81).  For example, the Supreme Court explained:

> Raising the price on side A risks losing participation on that side, which decreases the value of the platform to side B.  If participants on side B leave due to this loss in value, then the platform has even less value to side A—risking a feedback loop of declining demand.  Two-sided platforms therefore must take these indirect network effects into account before making a change in price on either side.

*Id.* at 2281 (citing Evans & Schmalensee 675; Evans & Noel 680–81).

For this reason, looking only at price on one side can lead to erroneous conclusions: "the fact that two-sided platforms charge one side a price that is below or above cost reflects differences in the two sides' demand elasticity, not market power or anticompetitive pricing." *Id.* at 2285–86. "Price increases on one side of the platform likewise do not suggest anticompetitive effects without some evidence that they have increased the overall cost of the platform's services." *Id.* at 2286. Thus, the Supreme Court found, "courts must include both sides of the platform—merchants and cardholders—when defining the credit-card market." *Id.* Any antitrust price analysis then must look to and account for prices on both sides. "Any other analysis would lead to 'mistaken inferences' of the kind that 'could chill the very conduct the antitrust laws are designed to protect.'" *Id.* at 2287 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226 (1993)). This holds true, regardless of whether the alleged restraint is among parties with vertical or horizontal relationship. *See United States v. Am. Express Co.*, 838 F.3d 179, 195 n.42 (2d Cir. 2016) ("[B]ecause we apply the rule of reason to both vertical and horizontal restraints, we find that any such distinction is without meaningful difference to the antitrust analysis in this case."), *aff'd sub nom.*, *Amex*, 138 S. Ct. 2274.[2]

In the five years since the Supreme Court's decision, courts have applied *Amex* in finding that two-sided markets exist across a range of industries. For example, a federal district

---

[2] Despite Providers' arguments to the contrary (*see* Providers' Br. at 35–37, 39–40), nothing in *Amex* suggests that the market definition analysis differs based on whether the relationship between parties is vertical or horizontal. (*See* Defendants' Opp. to Providers' Mot. for Partial Summ. J. (Doc. 2752).) And while some courts have *not* applied *Amex* in cases with horizontal restraints, they have not rested on this false distinction in doing so. *See In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, No. 14-md-02541, 2018 WL 4241981, at *4–5 (N.D. Cal. Sept. 3, 2018) (declining to apply *Amex* where defendants' expert provided no economic evidence that defendants operated a two-sided platform). Moreover, while *Amex* noted that, in certain *per se* cases, courts may "not need to precisely define the relevant market to conclude that these agreements were anticompetitive", *see* 138 S. Ct. at 2285 n.7, that has nothing to do with proof of *antitrust injury*, which is required for all antitrust claims (regardless of type) and which Providers' model cannot show on a classwide basis.

court found that Apple's App Store is a two-sided platform, serving iPhone owners who use applications on one side and developers of those iPhone applications on the other. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1016–17 (N.D. Cal. 2021). Applying *Amex*, the court noted that the market was two-sided with strong indirect network effects because "a price increase would reduce consumer demand for apps, which in turn would make app sales less profitable for developers, and developers may in turn react by reallocating engineering or marketing resources even if they do not leave the platform entirely". *Id.* at 964. Another federal district court analyzed the Uber ridesharing service as a two-sided platform that brings together drivers with passengers seeking rides. *SC Innovations, Inc. v. Uber Techs., Inc.*, No. 18-cv-07440-JCS, 2020 WL 2097611, at *9 (N.D. Cal. May 1, 2020). In another case, the D.C. Circuit observed "that broadband Internet providers operate within a two-sided market, with consumers at one end and edge providers at the other". *Competitive Enter. Inst. v. FTC*, 970 F.3d 372, 384 (D.C. Cir. 2020) (citation omitted). And in *U.S. Airways v. Sabre Holdings Corp.*, the Second Circuit vacated a jury verdict where the jury had been improperly instructed to determine for itself whether the platform was one-sided or two-sided. 938 F.3d 46, 57–58 (2d Cir. 2019). The Second Circuit concluded that the relevant platform was two-sided as a matter of law because it "offer[ed] different services to different groups of customers—to airlines, access to travel agents; to travel agents, flight and pricing information—and . . . connect[ed] travel agents to airlines in simultaneous transactions". *Id.*

Although *Amex* was decided in the context of market definition, courts have also applied these basic economic principles in the context of antitrust damages. For example, courts have specifically recognized that any model of antitrust damages in a two-sided market must

account for prices and price effects on both sides.[3]  Indeed, this was precisely the Second

Circuit's holding in *Sabre*:  "In a market encompassing both sides of the platform, then, if prices

charged to travel agents are less—or incentive payments made are greater—than those that

would be observed in a competitive market, then that difference must be accounted for in

determining US Airways's damages, if any."  *Id.* at 59.  The Second Circuit reached this

conclusion because "[i]n a two-sided platform, the payments made by Sabre to travel agents

would therefore necessarily reduce any damages US Airways might receive:  Two-sided

damages must, in this case, then, be lower than one-sided damages would have been."  *Id.*

Similarly, in *SC Innovations*, the court held that the plaintiff's damages model properly

"addressed both sides" of Uber's two-sided platform, because it accounted for commissions Uber

allegedly withheld from drivers, as well as alleged passenger price discrimination.  *See* 2020 WL

2097611, at *9.

       This two-sided analysis has an especially important role in a *per se* case, where

defendants' limited available defenses still include failure to prove antitrust damages.  "The *per*

*se* rule is a method of determining whether Section 1 of the Sherman Act has been violated, but it

does not indicate whether a private plaintiff has suffered antitrust injury and thus whether he may

recover damages . . . The need for this showing is at least as great under the *per se* rule as under

---

[3] Providers try to avoid this conclusion by citing cases they claim establish that a seller who can prove it was paid a sub-competitive rate by a cartel has established antitrust injury.  (*See* Providers' Br. at 36–37.) However, the conduct in those cases took place in one-sided markets (or where the parties did not contest whether the market was two-sided), in which the rate at issue was necessarily a one-sided price; those cases were also decided years before the Supreme Court's decision in *Amex*.  *See Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 222 (1948) (a single market for sugar beets); *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989 (9th Cir. 2000) (analyzing a single "milk market" with "defendants as buyers and the plaintiffs as sellers"); *see also West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 104 (3d Cir. 2010) (analyzing a market as single-sided pre-*Amex* where defendants did not contest that the market was two-sided).  And the same is true of the Anthem-Cigna merger (see Providers' Br. at 18–19), which was enjoined in 2017, before *Amex* was decided, *see United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 181 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017).

the rule of reason". *Atl. Richfield*, 495 U.S. at 341–44.  As such, principles from *Amex* are

necessary to determine whether a plaintiff operating in a two-sided market has in fact suffered an

antitrust injury or can prove quantifiable damages.

> **B.      Blue Plans Are Two-Sided Platforms with Significant Indirect Network Effects.**

**Two-Sided Platforms.**  Blue Plans operate "two-sided platforms" because they

"offer[] different products or services to two different groups who both depend on the platform

to intermediate between them".  *Amex*, 138 S. Ct. at 2280.  Blue Plans serve two unique groups,

providers and subscribers, just like the credit card networks in *Amex* that serve merchants and

cardholders.  Blue Plans enter into contracts with providers, such as a hospital or physician

group, which collectively become the Plans' provider network.  (Evans Rpt. ¶¶ 48, 51.)  The

same is true for Amex, which enters into card acceptance agreements with merchants to build a

network of accepting merchants across the country.  *See Amex*, 138 S. Ct. at 2282 (describing

Amex's network of "3.4 million merchants at 6.4 million locations").  Blue Plans also sign up

large numbers of subscribers, to whom the Blue Plans provide a range of services:  Blue Plans

make payments to providers on behalf of subscribers, provide insurance, handle administrative

functions and offer a host of ancillary services.  (Evans Rpt. ¶¶ 51–56.)  Amex attracts a

nationwide network of cardholders by "extend[ing] them credit, which allows them to make

purchases without cash and to defer payment until later", and "offering rewards such as cash

back, airline miles, or gift cards".  *Amex*, 138 S. Ct. at 2280–81.

When a Blue Plan member seeks treatment, he or she obtains "medical services

from the provider, and not from the health insurance plan".  (Evans Rpt. ¶ 48.)  That, again, is

like Amex:  the cardholder buys a good or receives a service directly from the merchant; Amex

facilitates the interaction, but the merchant and cardholder interact directly.  *Amex*, 138 S. Ct. at

2279–80.  When providing services, the provider submits a medical claim for the Blue Plan to evaluate and pay, which gives providers a reliable stream of patients and payments.  (Evans Rpt. ¶ 49.)  Similarly, the merchant submits payment information to the credit card network, which then reimburses the merchant based on contractual terms and at an agreed-upon discount.  *Amex*, 138 S. Ct at 2280.

**Indirect Network Effects.**  In *Amex*, the Supreme Court held that two-sided market analysis was required for markets in which two-sided platforms competed so long as indirect network effects were not "weak", as they are in the market for newspaper advertising (because readers generally do not like more ads).  138 S. Ct. at 2286.  Here, there is little question that indirect network effects are deep and significant for all participants.  All else equal, providers prefer a health plan with more subscribers, and subscribers prefer a health plan with more providers.  As explained in detail above, economic theory and record evidence support that common-sense conclusion.

Powerful indirect network effects exist on the provider side because providers value having access to more subscribers.  (*See supra* Background § III.)  A substantial portion of a provider's costs are fixed at least in the near term—for instance, to meet a diverse set of medical needs, hospitals invest in beds, hospital space, equipment, staffing and other resources.  (Evans Rpt. ¶ 62 (internal citations omitted).)  The ability of a hospital to operate a profitable (or even viable) business depends on how well the hospital can utilize this capacity.  (*Id.*)  If the hospital can increase its number of patients, it can achieve higher utilization and generate more revenues to cover its fixed costs.  (*Id.*; *see also* J. Caldwell (Alliant Health Plans 30(b)(6)) Dep. 77:5–13 ███████████████████████████████████████████████

███████ ).)  Thus, healthcare providers value access to as many subscribers as possible.  (*E.g.*,

Evans Rpt. ¶ 62.)  Accordingly, as providers and insurers have both testified, providers are

willing to charge lower reimbursement rates in return for access to greater subscriber volume.

(*E.g.*, *id.* ¶ 63, *supra* Background § III.)  This is, yet again, like Amex:  a credit card "is more

valuable to merchants when more cardholders use it" and thus, merchants are willing to pay a fee

for every credit card transaction in exchange for having access to a broad cardholder network.

*Amex*, 138 S. Ct. at 2281.

       Strong indirect network effects also flow on the subscriber side because

subscribers highly value access to more and more relevant providers.  (*See supra*

Background § III.)  Patients prefer to receive medical services near where they live or work and

value having access to particular physicians and hospitals depending on their medical needs and

personal preferences.  (*E.g.*, Evans Rpt. ¶ 57.)  Subscribers dislike losing access to providers

with whom they have pre-existing relationships.  (*E.g.*, *id.*)  Denser provider networks increase

the likelihood that patients will have access to the providers they want to use.  (*E.g.*, *id.* ¶ 58.)

Similarly, as explained by the Supreme Court in *Amex*, cardholders demand that their credit card

networks have a wide network of relevant merchants.  138 S. Ct. at 2281 ("A credit card . . . is

more valuable to cardholders when more merchants accept it." (citing Evans & Noel at 686–87)).

       Because Providers have not met their burden at class certification, the Court need

not decide to perform a detailed analysis of indirect network effects at this stage.  However, were

the Court to embark upon that analysis, the existence of indirect network effects may be

presumed in this case because Blue Plans, like Amex, operate a special type of two-sided

platform:  a two-sided *transaction* platform.  "These platforms facilitate a single, simultaneous

transaction between participants."  *Id.* at 2286.  Here, a provider cannot render medical care

without the subscriber simultaneously receiving that care.  (Evans Rpt. ¶¶ 82–83.)  At their core,

Blue Plans are in the business of facilitating healthcare for their members.  And "[t]he actual purchase and delivery of medical services from hospitals and physicians is almost always simultaneous."  (*Id.* ¶ 83.)  A doctor cannot perform surgery without a patient receiving it, and the Blue Plan is in the business of making that interaction possible.

Like a credit card network (where consumers pay for the purchased item sometime after the transaction), the payment for healthcare services does not occur at the same time as the simultaneous exchange.  (*Id.* ¶¶ 89–90.)  But what matters is the timing of the exchange of medical services—the doctor treating the patient—which always occurs simultaneously.  Thus, under the *Amex* framework, Blue Plans are not only two-sided platforms with significant indirect network effects; they are two-sided transaction platforms.

### C.    Regardless of the Two-Sided Market Definition, Providers Have Failed To Demonstrate Antitrust Impact

Providers' motion for class certification should be denied regardless of whether the Court finds that the Blues operate a "two-sided platform", because Providers have no way of showing class-wide injury under any market definition.

At class certification, Providers "must. . . show that they can prove by common evidence that the class members suffered an injury—or antitrust impact—from the antitrust violation.  *See Suboxone*, 421 F. Supp. 3d at 55.  Demonstrating impact "is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement".  *Id.* (quoting *Hydrogen Peroxide*, 552 F.3d at 311–12); *see id.* ("Deciding this issue calls for the district court's rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial.").  Here, Providers have attempted to make this showing through the expert model of Dr. Haas-Wilson.  Thus, the critical question

for the Court at this stage is whether Dr. Haas-Wilson's model can reliably demonstrate class-wide injury.  The answer to that question is "no", regardless of how the market is defined.

Dr. Haas-Wilson's model does not have any input to account for the impact of provider payments on subscriber premiums; indeed, the model ignores altogether the integral relationship between the two.  (*See, e.g.*, Mar. 2021 Haas-Wilson Dep. 66:5–8 ("[M]y work has been on the prices paid to providers.  I have not focused on the prices paid by subscribers for the purchase of healthcare financing services."); *see also* Mar. 2021 Slottje Dep. 51:15–52:6 ("I do not have an opinion" about "how much premiums paid by subscribers would have changed, absent the challenged conduct"); Nov. 17, 2022 Order at 2 (recognizing that Providers' experts did not "consider any effect of Provider reimbursement rates on the premiums Subscribers pay").)  This is not a battle of the experts, where Dr. Haas-Wilson has done *something* to account for this key inter-relationship, and the Blues are arguing that "something" is insufficient (as was the case with the Subscriber-side Pakes model).  Rather, despite admitting that providers often "agree to lower prices in return for more potential patients" (Mar. 2021 Haas-Wilson Dep. 220:8–16), Dr. Haas-Wilson has nevertheless offered a model with no subscriber-related input whatsoever.  Indeed, she has deliberately designed her model to hold the subscriber assumptions constant *regardless of what happens with providers*.  (*See* Mar. 2021 Haas-Wilson Dep. 66:5–8; Mar. 2021 Slottje Dep. 51:15–52:6; Nov. 17, 2022 Order at 2.)  Under Providers' model, provider reimbursement rates could skyrocket to unprecedented amounts, and the Blue Plans would trudge along charging the exact same premiums without losing a single subscriber.

However, the "business reality of health insurers" is that subscriber premiums and provider reimbursement rates are inextricably linked. (Evans Rpt. ¶ 81.)[4] Whether or not that relationship is labeled "significant indirect network effects" in the formal two-sided market sense, there is at least *some* relationship between the two, as this Court has aptly recognized. (*See, e.g.*, Aug. 9, 2022 Order at 8–9 ("Provider reimbursement rates have *at least some effect* on Subscriber premiums", regardless of whether the market is defined as one- or two-sided) (emphasis added).) Indeed, there can be no reasonable dispute that provider reimbursement rates and subscriber premiums are interrelated. (*See id.*; Evans Rpt. ¶ 76 ("[T]here is extensive evidence that subscriber premiums and provider reimbursement rates are highly interrelated. Providers and health insurers recognize that higher reimbursement rates lead to higher premiums."); Charles E. Phelps, *Health Economics* 315 (6th ed. 2018) (explaining the symbiotic relationship between provider reimbursement rates and subscriber premiums); Martin Gaynor, Kate Ho & Robert Town, *The Industrial Organization of Health-Care Markets*, 53 J. of Econ. Literature 235, 235–84 (2015) (surveying the literature on interrelated pricing); *see also* Soheil Ghili, *Network Formation and Bargaining in Vertical Markets: The Case of Narrow Networks in Health Insurance* (Jan. 9, 2023) (Yale Univ., Working Paper) (discussing bargaining between insurers and providers).) Even Providers have recognized this connection. (*See* Haas-Wilson Rpt. ¶ 289 (describing "the chicken-and-egg problem of insurer–provider negotiations: providers are generally willing to offer the most competitive rates to insurers with a large market share; however, to gain market share an insurer needs to offer low premiums (and to do so sustainably, must have competitive provider rates)" (quoting economist Leemore S. Dafny)); *id.* ¶ 422(b)

---

[4] Indeed, as the Blues' expert Dr. Kevin Murphy pointed out, paying the rates outlined in Dr. Haas-Wilson's model would quickly bankrupt BCBS-AL if it did not drastically increase premiums. (Murphy Rpt. ¶ 368.)

("[W]hen a commercial buyer agrees to 'channel' more patients to a particular GAC hospital, the hospital may agree to lower prices.").)  And other health plans have recognized ▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ (*See, e.g.*, B. Roberts (Harvard Pilgrim Health Care 30(b)(6)) Dep. 123:19–124:9 (Harvard Pilgrim Health Care executive testifying that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉); B. West (Oscar 30(b)(6)) Dep. 30:15–31:1 (former CFO of Oscar testifying that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉).)

And the point is not just that provider reimbursement rates are an input into subscriber premiums, as Providers suggest.  (*See* Providers' Br. at 34.)  The flaw in Providers' model is deeper:  when provider prices change, the pricing and demand on the subscriber side change too, which reverberates—or "feeds back"—to demand on the provider side.  (*See* Evans Rpt. ¶¶ 76–81; Mar. 2021 Haas-Wilson Dep. 220:8–16; *see Amex*, 138 S. Ct. at 2281.)  For example, a hospital might think that higher reimbursement rates mean more profitability.  But that is not necessarily the case.  If, as a result of higher provider reimbursement, a health plan passes on the rate increase to subscribers in the form of higher premiums, copays and/or deductibles, subscribers may in turn seek fewer services or drop out of the health plan entirely; ultimately, this will reduce the amount of healthcare transactions between the hospital and the insurers' patients and may even lower the hospital's profitability.  (Evans Rpt. ¶¶ 141–46.)  At the end of the day, the hospital's contract rates may be higher, but the health plan's network is less valuable to the hospital.  (*Id.* ¶ 192.)  That is why providers often accept lower reimbursement rates from an insurer in order to access a higher volume of patients:  it generates higher revenues that more than offset any "harm" from lower rates.  (*Id.* ¶¶ 64–65.)

A model that ignores this connection is not reliable and cannot support class certification.  *See In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 254 (D.C. Cir. 2013) ("It is not enough to submit a questionable model" to show injury, "[o]therwise, 'at the class certification stage, *any* method of measurement [of damages] is acceptable so long as it can be applied classwide"); *id.* at 255 (explaining that Rule 23 "commands" a "hard look at the soundness of statistical models that purport to show predominance" and vacating class certification decision due to an economic defect in plaintiffs' damages model); *In re Agric. Chems. Antitrust Litig.*, No. 94-40216-MMP, 1995 WL 787538, at *4 (N.D. Fla. Oct. 23, 1995) (declining to certify class where expert "merely assumed—as Plaintiffs counsel advise[d] him to do—that [antitrust] impact existed, never stopping to consider numerous critical facts suggesting the contrary"); *In re Photochromic Lens Antitrust Litig.*, MDL No. 2173, 2014 WL 1338605, at *22 (M.D. Fla. Apr. 3, 2014) (declining to certify class where expert model could not establish impact for a majority of the class); *see also Suboxone*, 421 F. Supp. 3d at 55.  This is true as a matter of basic economic principles, not any formal two-sided market definition.  (Ordover Rpt. ¶¶ 48–51.)

Tellingly, the Subscriber plaintiffs ███████████████████████████ ██████████████████████████████ (May 2019 Rubinfeld Dep. 122:5–11), and yet their experts recognized the need for an economic model that accounted for the interrelationship of provider reimbursement rates and subscriber premiums.  Subscribers' expert, Dr. Pakes, utilized a structural economic model to account for the effect on ███████████████████ █████████████████████████████ and that attempted to take into account both sides of the market.  (Pakes Rpt. ¶ 228; *see also id.* ¶ 183; May 2019 Pakes Dep. 250:11–251:25 (testifying that his structural model ████████████████████████████████

29

██████████████████████████████████████████████████████

████████████████████████████████████████████

████).)  Dr. Pakes' model concluded that ████████████████████████████

████████████.  He found that █████████████████████████████████

█████████████████████████████.  (*See* Pakes Rpt. ¶¶ 214–26, 247–67;

Ordover Rpt. ¶ 414.)  Subscribers thus recognized what Providers refuse to acknowledge:  any

reliable model attempting to demonstrate impact must account for both subscribers and

providers—regardless of how the market is defined.  Although Dr. Pakes' model had its own

flaws (*see* Opp. at 62–75), it at least did not pretend that a fundamental market reality does not

exist.

For these same reasons, Providers' argument that the only thing that matters in

measuring antitrust impact is how the alleged conduct affected the price to an individual

provider, "without adjusting for potential benefits" to any other participant, also misses the mark.

(Providers' Br. at 35.)  Providers' model does not—indeed, *cannot*—show antitrust impact *to*

*providers*, because it entirely misses how changes on the subscriber side will reverberate back on

the individual providers themselves.  Put differently, the point of a subscriber input is not to look

at subscribers for the sake of subscribers; it is to be sure the model can reliably measure the

impact *on providers themselves*.  (Ordover Rep. ¶¶ 48–49.)  By failing to have any subscriber

input, Providers' model cannot show class-wide antitrust impact in any economically reliable

way and, therefore, cannot support class certification.

This is all the more true given that Dr. Haas-Wilson's model is built on averages

that obscure this very shortcoming.  By estimating only an *average* relationship between insurer-

share and reimbursement rates, Dr. Haas-Wilson's model hides that at least some providers

would be worse off in the face of higher provider reimbursement rates—for example, because those specific providers would no longer be in-network with *any* Blue as Blue Plans develop narrower networks to keep their premiums (and costs) at acceptable levels.  (Ordover Rpt. ¶¶ 293–301.)  She also ignores that, given the economic reality just described, some provider reimbursements might go down significantly in the but-for world, even while others might go up.  (*Id.* ¶¶ 248–60.)  These are independent flaws in Dr. Haas-Wilson's model, but they become more egregious when coupled with the decision to disregard any subscriber-side input.  And "the potential for economic winners and losers to emerge from the same putative class precludes class certification."  *In re Photochromic Lens*, 2014 WL 1338605, at *54; *see also Valley Drug Co.*, 350 F.3d at 1191 (if some "class members appear to benefit from the effects of the conduct alleged to be wrongful by the named plaintiffs because their net economic situation is better off" without the challenged conduct, class certification "would be inappropriate").

Finally, backed into a corner, Providers argue that "[i]f the Blues . . . want to have their cake and eat it too by proving that their conspiracy actually *benefitted* the Subscribers, then the Eleventh Circuit should vacate the order approving the Subscriber settlement".  (Providers' Br. at 3, 45–46.)  This is a non-sequitur.  Subscribers claimed they were harmed by the challenged conduct, and presented an economic model that took into account *both* subscriber premiums and provider reimbursement rates.  Using that model, Subscribers argued that ███

████████████████████████████████████████████████████████████

███████████████  (*See* Pakes Rpt. ¶¶ 214–26, 247–67.)  While the Blues disagree that Subscribers suffered harm and challenged Subscribers' model on a number of grounds, the parties ultimately reached a settlement that the Court approved (and to which Providers did not object).  But looking at the Subscriber model now only highlights the central shortcoming in

Providers' analysis:  as Subscribers' model suggests, when the relationship between reimbursement rates and subscriber premiums is properly accounted for, providers may have *benefitted* from the very rules they challenge.

> **D.** **Providers' "17 Fundamental Differences" Are Incorrect and Irrelevant.**

Providers spend more than half their brief detailing 17 supposed "fundamental differences" between healthcare financing and credit cards.  (Providers' Br. at 3–25.)  Most of these "differences" are invented and have nothing to do with what makes a market two-sided under *Amex*.  Others are demonstrably wrong as a matter of fact.  And none of them changes Providers' fundamental problem:  they have no method of establishing classwide injury that matches the economic reality of the relevant market in this case, no matter how it is defined.  As a result, these "differences" are distractions that the Court can ignore at this stage.  Should the Court wade into these issues, the Blues respond to them as follows.

> **1.** **Widespread Recognition (No. 1)**

Providers' first and most prominent argument is that "the market for healthcare financing is not widely recognized as a two-sided platform".  (*See* Providers' Br. at 3–7.)  We know that is wrong because Providers themselves took the exact opposite position in *Amex* itself. The American Medical Association ("AMA"), "the largest professional association of physicians, residents, and medical students in the United States", submitted an amicus brief in *Amex* arguing that "[p]hysicians often contract with health insurers that operate two-sided platforms".  *See* Brief for The American Medical Association and Ohio State Association as *Amici Curiae* in Support of Petitioners at 1, 7, *Amex*, 138 S. Ct. 2274 (No. 16-1454).  The first argument section (*id.* at 9–11), leaves no doubt about the AMA's position:  "Healthcare services

operate on networks or 'platforms' with two sets of distinct users transacting in different

markets," *id.* at 9.  According to the AMA:

> Physicians contract with health insurers to supply medical services to the health-insurer members as part of healthcare provider networks that health insurers assemble.  Health-insurance plans, in turn, contract with physicians and other healthcare providers to form provider networks that will assure that the health insurers' members can access necessary and quality medical services at certain negotiated rates.

*Id.* at 7–8 (citing 1996 Department of Justice and Federal Trade Commission Statements of

Antitrust Enforcement Policy in Healthcare No. 8, at 81 (Aug. 1996)).  The AMA's argument

was that, *because* health insurers operate two-sided platforms, the Supreme Court would be

changing existing healthcare antitrust analysis if, as a general rule, it required antitrust analysis

across both sides of two-sided platforms:  "If this Court adopts the Second Circuit's framework,

it may require a government, physician, or patient plaintiff to show competitive harm in

healthcare by netting out harm to one group of consumers with potential benefits to another

group."  *Id.* at 14.  Providers cannot seriously contend that no one thinks of the health insurance

market as two-sided, when Providers themselves warned the Supreme Court that it is.

The academic literature also recognizes that health insurers operate in a two-sided

market.  Dr. Jean-Charles Rochet, who co-authored the two foundational papers on two-sided

platforms in 2003 and 2005, published work nearly 15 years ago analyzing the two-sided nature

of health insurance markets.  *See* David Bardey & Jean-Charles Rochet, *Competition Among

Health Plans: A Two-Sided Market Approach*, J. OF ECONS. & MGMT STRATEGY 19(2) 435, 437

(2010) ("[H]ealth insurance markets are characterized by indirect network externalities between

providers and policyholders' sides.").  And the *Handbook of Industrial Organization*, an

authoritative economics reference text, gives health insurance as its very first example of a two-

sided market.  *See* Bruno Jullien, Alessandro Pavan & Marc Rysman, *Two-Sided Markets,*

*Pricing, and Network Effects*, *in* HANDBOOK OF INDUSTRIAL ORGANIZATION 485, 487 (2021)

("Platforms are prevalent in many markets: health insurance companies, for example, mediate

between consumers and care providers . . . .").

Providers argue that, before this case, Dr. Evans did not consider health insurance

plans to be two-sided platforms.  (Providers' Br. at 4.)  That, too, is wrong.  A decade ago,

Dr. Evans authored a paper identifying a lengthy collection of published scholarship in the field,

including numerous academic works analyzing health insurance as a two-sided market.  *See, e.g.*,

David S. Evans & Richard Schmalensee *The Antitrust Analysis of Multisided Platform*

*Businesses*, NBER WORKING PAPER, Appendix (2013), available at

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2214252.[5]  Dr. Evans, like countless other

scholars, considers health insurers to be two-sided platforms.  *See, e.g.*, Soheil Ghili, *Network*

*Formation and Bargaining in Vertical Markets: The Case of Narrow Networks in Health*

*Insurance* at 516 ("This type of simplifying assumption (or stronger versions of it) has been

made in the literature to ease the computation of models of bargaining on two-sided markets"

(citations omitted)); Robin S. Lee, *Vertical Integration and Exclusivity in Platform and Two-*

*Sided Markets*, AMERICAN ECONOMIC REVIEW 103(7) 2960, 2960 (2013) ("In many networked

industries, consumers visit, join, or adopt a platform or intermediary—such as a hardware

device, content distribution service, payment system, or health insurance network—in order to

access that platform's set of complementary goods and services."); Attila Ambrus & Rossella

---

[5] In that paper, Dr. Evans cited several works that dealt expressly with healthcare markets as two sided including:  Bronwyn Howell, *Unveiling 'Invisible Hands': Competition in Two-Sided Health Care Markets*, Working Paper (April 2007) (New Zealand Institute for the Study of Competition and Regulation); Yuliia Mel'nyk *Health Economics: A Two-Sided Approach*, (2008) (Master's Thesis, Universitat Autónoma de Barcelona); Mario Pezzino & Giacomo Pignataro *Competition in the Health Care Market: A 'Two-Sided' Approach*, Working Paper (2008) (University of Manchester and University of Cantania).

Argenziano, *Asymmetric Networks in Two-Sided Networks*, AMERICAN ECONOMIC JOURNAL: MICROECONOMICS 1(1) 17, 22 (2009) ("In the US health insurance market, the vast majority of the population is enrolled in some form of managed care plan, which acts as a platform connecting health care providers and patients."); Alex Stein, *Healthcare Intermediaries*, REGULATION 29(4) 20, 20–21 (2006) ("[T]he [medical care organization] intermediates between doctors and patients—a characteristic identifying it as a platform in a two-sided market.").[6]

With the academic literature and their own Supreme Court brief against them, Providers cite an Illinois district court's denial of a motion to dismiss in a case about dental insurance. *See In re Delta Dental Antitrust Litig.*, 484 F. Supp. 3d 627, 631 (N.D. Ill. 2020). But in *Delta Dental*, *the parties actually agreed that dental insurance companies operated two-sided platforms*; the dispute at the pleading stage (where, of course, a plaintiff's allegations are taken as true) was whether indirect network effects in that market were significant. *See id.* at 637 n.2 ("Plaintiffs appear to agree [with Defendants] that the dental insurance market operates a two-sided platform."). The district court reached the unremarkable conclusion that, because the plaintiffs had alleged that "any indirect network effects that exist in the market are minimal", their allegations must be accepted as true at the Rule 12 stage: "no judgment can be made at this

---

[6] The list goes on. *See, e.g.*, Eva Lee & Jinha Lee, *Competition Strategy for Healthcare Insurance Plans*, 2020 IEEE INTERNATIONAL CONFERENCE ON BIOINFORMATICS AND BIOMEDICINE (2020) ("We develop a theoretical framework for a two-sided market structure to model the competition between a Preferred Provider Organization (PPO) and a Health Maintenance Organization (HMO). Both health plans compete to attract policyholders and providers"); Guillaume Roger, *Two-Sided Competition with Vertical Differentiation*, 120 J. OF ECONS. 193, 193 (2016) ("This paper studies duopoly in which two-sided platforms compete in differentiated products in a two-sided market. . . . The model may find applications in the media, internet trading platforms, search engine competition, social media or even health insurance (HMO/PPO)."); Andre Boik, *Essays on Uniform Pricing and Vertical Contracts in Two-Sided Markets*, Ph.D. Dissertation, University of Toronto (2014) ("These markets are common examples of two-sided markets since, for example[,] . . . health insurers connect patients with medical providers."); Martha Samuelson, Nikita Piankov & Brian Ellman (2012) "Assessing the Effects of Most-Favored National Clauses", *ABA Section of Antitrust Law, Spring Meeting 2012* (Mar. 28, 2012) ("Examples of two-sided markets include . . . health care systems where providers and patients interact through insurance companies".).

stage regarding the significance of any indirect network effects, which may or may not require a two-sided market analysis". *Id.* at 640. In *Delta Dental*, the question of a two-sided market definition "[wa]s not a dispute that can be resolved at [the motion to dismiss] stage". *Id.* at 638. As this Court's November 17 Order recognizes, analysis at the class certification stage is different. (Nov. 17, 2022 Order at 2–3.)

Indeed, Subscribers, whose counsel also represents the plaintiffs in *Delta Dental,* have observed that the *Delta Dental* decision says little about ongoing issues in this MDL. As Subscriber Class counsel David Boies explained in defending their settlement, "the Delta Dental system is neither the BCBS system nor indistinguishable from it", and "the decision merely denied a motion to dismiss and addressed only the threshold question whether the allegations of the plaintiffs' complaint had stated a claim under the Sherman Act". (Subscribers' Post-Hearing Reply Br. at 16 (Doc. 2880).)[7]

Finally, Providers resort to a handful of writings that, as it turns out, are on the wrong side of history. Providers claim that antitrust professor Herbert Hovenkamp "explain[ed] why health insurance is not a two-sided platform under *Amex*." (Providers' Br. at 6 (citing Herbert Hovenkamp, *Platforms and the Rule of Reason: The* American Express *Case*, 2019 COLUM. BUS. L. REV. 35, 42, 54, 85–87 (2019).) But Professor Hovenkamp submitted an *unsuccessful* amicus brief in *Amex* in support of the government, which argued that the relevant market could not be defined as a two-sided market platform. Since losing that argument, Professor Hovenkamp has

---

[7] Though the decision can be put to the side for many other reasons, the "transaction platform" analysis in *Delta Dental* was also legally erroneous. Based on pleaded facts, the court noted that the dental insurance market lacked "the 'key feature' of a transaction platform: simultaneity of the exchange", because "consumers of dental services typically pay insurers fixed premiums at regular intervals, regardless of when or even whether they visit the dentist", while "insurers reimburse dental providers based on the goods and services they actually provide to patients". *Delta Dental*, 484 F. Supp. 3d at 637. As explained elsewhere (*see infra* at 44), that is also true of the two-sided credit card market in *Amex* and is actually consistent with two-sidedness.

maintained that *Amex* was wrongly decided.[8] *See* Brief for 28 Professors of Antitrust Law as *Amici Curiae* Supporting Petitioners at 17–18, *Amex*, 138 S. Ct. 2274 (No. 16-1454); *see* Hovenkamp, *Platforms and the Rule of Reason*, at 90 (describing *Amex* as an "economic 'misfire'" resulting from the Supreme Court "abandon[ing] fundamental economics in its haste to encounter something new"). Similarly, the Department of Justice that argued that the hospital system in *Charlotte Mecklenburg* operated within a one-sided market (Providers' Br. at 6), was the very same department that argued (unsuccessfully) to the Supreme Court that the market in *Amex* was one-sided, *see United States v. Charlotte Mecklenburg Hosp. Auth.*, No. 3:16-cv-00311, Doc. No. 38 at 4–5 (W.D.N.C. Oct. 25, 2016). Likewise, the fact that amici States in *Amex* observed that, if Amex's argument prevailed, two-sided analysis might be extended to health insurance actually supports the Blues' position, not Providers'. (*See* Providers' Br. at 6–7 (citing Brief for the States of New York *et al.* as *Amici Curiae* in Support of Petitioners, *Amex*, 138 S. Ct. 2274 (No. 15-1454)).)

### 2.    <u>Transaction Costs and Volume (Nos. 4–7)</u>

Providers next argue that the Blues cannot be two-sided because, unlike the operators of other two-sided platforms, the Blue Plans supposedly seek to minimize the number of interactions, impose additional transaction costs, and put minimal effort into matching providers and subscribers. (*See* Providers' Br. at 7–15.) These arguments boil down to the premise that the Blues are intent on increasing transaction costs to reduce transactions between subscribers and providers. No health insurer could survive with that model, and it is antithetical to how the Blues do business.

---

[8] Moreover, Providers misread Professor Hovenkamp, who actually *agrees* that health insurance networks are two-sided platforms, and disputes only that they are *transaction* platforms. *See* Hovenkamp *Platforms and the Rule of Reason*, at 42, 85–86.

If an insurer makes it more difficult for members to visit and receive treatment from providers, subscribers will take their business elsewhere and providers will decline to be in network.  (*See, e.g.*, Jan. 2021 Evans Dep. 167:4–168:1 ("[T]he platform has an incentive to reduce these frictions in order to increase the value . . . of the platform.").)  For example, Providers list "[p]rior authorization" requirements as a "strategy" Blue Plans supposedly use to reduce transactions.  (Providers' Br. at 11–12.)  In fact, preauthorization—which is an industry practice, not unique to the Blues—"is a mechanism that . . . lead[s] to a more efficient platform" because health plans use it to solve a collective action problem.  (Jan. 2021 Evans Dep. 168:17–21.)  As a general rule, subscribers benefit from the existence of guardrails that ensure medical services are paid for only where they are appropriate.  (*See id.* 169:11–22 ("Individually, people might have an incentive to engage in certain behavior, but if they all do that or many of them do that, then that reduces the . . . value to them.  And the platform comes along and it figures out a way to come up with a set of rules that . . . generally makes everyone . . . better off.  And in that sense . . . it is reducing impediments.").)  Providers concede that Blue Plans take steps to spur interactions by "encourag[ing] preventative care visits, such as annual physicals, mammograms, and flu shots, which are often fully covered."  (Providers' Br. at 12.)  That Blue Plans work to cultivate healthy, sustainable use of their platforms does not make them one-sided; it means they try to balance and advance the interests of subscribers and providers alike.

The record also shows that Blue Plans devote substantial resources to improving the ability of their subscribers to access their provider networks, including by processing claims and payments.  (Evans Rpt. ¶ 53; BCBSAL_0000143422.)  These payment services include ensuring that charges are for covered services, correspond to the terms the provider has agreed to in their contract, are consistent with the terms and conditions of the contract and are otherwise

valid and reimbursable.  (Evans Rpt. ¶ 53; BCBSAL_0000143422.)  Providers are simply wrong to suggest that, without Blue Plans, the only thing a patient would need to do is "call[] your Provider for an appointment, and fill[] out medical forms".  (Providers' Br. at 13.)  Without platforms like the Blue Plans, the only patients who would make those calls and fill out those forms would be the vanishingly small number who would pay whatever price a provider sees fit to charge, for whatever services the provider says are necessary.

　　　　　If, as Providers argue, the Blues were in the business of reducing transactions and the Blues had outsized market power, one would expect the output of medical reimbursements to decline.  Yet the opposite has occurred—between 1998 and 2014, even as the Blues instituted rules and practices that Providers have challenged, the volume of total medical reimbursements has continued to grow at high rates.  (Evans Rpt. ¶¶ 158–59).  *See also Amex*, 138 S. Ct. at 2288–89 ("Where . . . output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand." (citation omitted)).

　　　　　Providers' same criticisms could be levied against Amex and other two-sided platforms.  Many two-sided platforms have rules limiting interactions that jeopardize the total value of the product.  Amex, for example, imposes strict limits on how much cardholders can spend and whether cardholders may use their card for a transaction, as many cardholders simply lack the income, credit score, or payment history to make large purchases (such as a "$25,000 diamond necklace" (Providers' Br. at 9)).[9]  Amex also has merchant prohibitions, fraud controls,

---

[9] *See What Is a Credit Card Limit and How Is It Determined*, AMERICAN EXPRESS (Dec. 17, 2020), https://www.americanexpress.com/ca/en/articles/life-with-amex/learn/what-is-credit-limit; *No Preset Spending Limit*, AMERICAN EXPRESS, https://www.americanexpress.com/en-us/banking/lending/lending-options/no-preset-spending-limit.html.

and a system for transaction reversals.[10]  Similarly, Facebook, Twitter and YouTube all enforce policies that limit the number and types of interactions in which its users can engage.  (*See* Jan. 2021 Evans. Dep. 153:21–156:25.)

At bottom, Providers' argument misunderstands the business of two-sided platforms.  Platform operators do not seek to maximize (or minimize) the number of transactions, nor do all platform operators attempt to profit on every transaction.  Instead, they seek to maximize the value obtained from providing the service, and limiting some transactions in the short run may advance that goal.  So, too, with health plans.  If health plans had no restrictions on what providers could charge or the services they provide, no preventive healthcare programming and no controls to monitor or reject fraudulent claims, the product would become unattractive and prohibitively expensive.

### 3.    Indirect Network Effects (Nos. 10–12, 14)

Providers' next set of "differences" is that Blue Plans do not exhibit strong indirect network effects.  That is wrong for all the reasons explained above.[11]  (*See supra* Background § III; Analysis § I.B.)  But Providers' core complaint is not about true indirect network effects at all; instead, Providers complain that the Blues do not create "value for Providers" because Blue Plans "cite their volume of Subscribers as a tool for driving down

---

[10] Moreover, in the *Amex* district court litigation, American Express merchants also claimed (like Providers here) that the platform increased the cost of transactions by preventing merchants from using cheaper payment methods and charging them high transaction fees.  *United States v. Am. Express Co.*, 88 F. Supp. 3d 143, 221–22 (E.D.N.Y. 2015), *rev'd and rem'd* 838 F.3d 179 (2d Cir. 2016).

[11] As a response to the clear presence of strong indirect network effects, Providers make a passing attempt to *Daubert* Dr. Evans' convexity analysis in seven sentences.  (Providers' Br. at 29–30.)  That is not only insufficient, it is also unnecessary.  The Court does not need to rely upon Dr. Evans' convexity model, which was offered as yet another method to demonstrate the flaws in Haas-Wilson's approach; it does, however, need to decide whether it can rely upon *Providers'* model, which it plainly cannot, for reasons having nothing to do with Dr. Evans' convexity analysis.

Provider reimbursement rates". (Providers' Br. at 18.) The same was true in *Amex*. The fact that "merchants would prefer not to pay the higher fees" has nothing to do with the existence of powerful indirect network effects. *Amex*, 138 S. Ct. at 2283.

In fact, the *Amex* "plaintiffs stake[d] their entire case on proving that Amex's agreements increase merchant fees." *Id.* The *Amex* district court decision (and the trial that preceded it) was chock-full of complaints from merchants that Amex used its large cardholder base as bargaining leverage. *See Am. Express Co.*, 88 F. Supp. 3d at 192–95 ("[T]he degree to which its cardholders insist on using their Amex cards affords the network significant power over merchants."). But, as the Second Circuit explained, "[c]ardholder insistence results not from market power, but instead from competitive benefits on the cardholder side of the platform and the concomitant competitive benefits to merchants who choose to accept Amex cards." *Am. Express Co.*, 838 F.3d at 202. "Cardholder insistence is exactly what makes it worthwhile for merchants to accept Amex cards—and thus cardholder insistence is exactly what makes it worthwhile for merchants to pay the relatively high fees that Amex charges." *Id.* at 203. Or, as the Supreme Court put it, "[f]ocusing on merchant fees alone misses the mark" because "Amex's increased merchant fees reflect increases in the value of its services and the cost of its transactions, not an ability to charge above a competitive price". *Amex*, 138 S. Ct. at 2287–88.

The dynamic is no different here. Of course, all else equal, Providers want higher reimbursements. But all else is not equal. On the other side of the Blue Plans' platforms, subscribers must pay the cost of care. Providers are willing to accept reimbursement rates at a level that provides them access to more patients, so long as they make up in volume what they might lose in per-unit price. (*See*, *e.g.*, Evans Rpt. ¶ 64; *see* Mar. 2019 Haas-Wilson Dep. 221:8–16 (explaining that providers often "agree to lower prices in return for more potential

patients"); Jan. 2021 Frech. Dep. 231:20–32:3 (agreeing that "providers may agree to greater discounts on their rates to access patient volume").)  That makes Blue Plans paradigmatic two-sided platforms that "must find the balance of pricing that encourages the greatest number of matches" between providers and subscribers.  *Amex*, 138 S. Ct. at 2286.

### 4.    **The Remaining Differences**

Providers' other "differences" are similarly meritless.

**No. 2.**  Providers argue that "two-sided platforms view groups on both sides of the platform as customers".  (Providers' Br. at 7.)  This is pure semantics.  There is no legal or economic requirement that a two-sided platform call both sides "customers".  Nor could there be, because Amex itself would not satisfy this standard.  Amex uses the term "customer" only for its cardholder members, not its merchants.  *See* American Express Co., Annual Report at 1–4 (Form 10-K) (Feb. 10, 2023).[12]  Similarly, Providers say Costco calls its shoppers "members" (Providers' Br. at 7–8), but Amex has "members" too (American Express Co., Annual Report at 1 (Form 10-K) (Feb. 10, 2023)) ("We maintain direct relationships with both our Card Members (as a card issuer) and merchants (as an acquirer)").  Unlike Costco, which operates physical stores where members have no interactions with suppliers (Costco Wholesale Corp., Annual Report at 3 (Form 10-K) (Oct. 5, 2022)), the Blues facilitate direct interactions between members and providers (Evans Rpt. ¶¶ 57, 92).

In any event, the Blues do in fact view both subscribers and providers as customers.  *See, e.g.*, BCBSA00414346, '355 (internal System strategy documents discussing

---

[12] The same is true of other prominent two-sided platforms that Providers cite in their brief.  *See, e.g.*, Uber Tech., Inc., Annual Report (Form 10-K) at 4 (Feb. 21, 2023) ("We connect consumers ('Rider(s)') with independent providers of ride services ('Mobility Driver(s)') for ridesharing services"); (Twitter, Inc., Annual Report at 6–7 (Form 10-K) (Feb. 16, 2022) (describing Twitter platform users as "people and businesses" and advertisers as "customers").

provider-facing benefits of various planned System improvements); BCBSA01434304, '357 (Blues' provider customer satisfaction surveys describing providers as customers). Indeed, the very fact that the Blues conduct satisfaction surveys of *both* subscribers and providers illustrates that the Blues view both as customers. Providers' suggestion that the Blues view providers as mere input suppliers is, thus, wrong, and their cherry-picked statements do not prove otherwise.

**No. 3.** Providers argue that a platform cannot be two-sided if it allows parties on one side to interact with firms that do not participate in the platform. Of course, Blue Plan members can be treated by out-of-network doctors under the terms of many benefit contracts. But Providers do not explain how that affects the economic reality of the platform, or the existence of indirect network effects—because it does neither. It also is not unique to health plans: PayPal, for example, which Providers agree is a two-sided platform, allows its merchants to accept payments via traditional credit cards from consumers who do not have a PayPal account.[13]

**Nos. 8–9.** Providers assert that health insurers "do little to match Providers and Subscribers" because "the Blues' 'Provider Finder' tool" is not as robust as Uber's app for matching drivers to riders. (Providers' Br. at 15.) This is another distraction: to be two-sided, Blue Plans need not be similar in every way to a particular two-sided platform of Providers' choosing. American Express also has nothing that resembles the algorithmic matching system Uber uses. Instead, much like the Blues, American Express has a website where members can go to find in-network merchants. *See e.g.*, *Find Stores & Retailers in the United States that*

---

[13] *See, e.g.*, *How do I accept credit cards with Checkout using the Guest Checkout option?*, PAYPAL, https://www.paypal.com/us/cshelp/article/how-do-i-accept-credit-cards-with-checkout-using-the-guest-checkout-option-ts1623.

*Accept Amex*, AMERICAN EXPRESS, https://www.americanexpress.com/en-us/maps.  Amex does not, for example, provide merchant reviews or restaurant recommendations.

**No. 13.**  Providers argue that Blue Plans do not facilitate simultaneous transactions because "in the exam room or the operating room, the insurer is nowhere to be found." (Providers' Br. at 21.)  Providers again miss the point.  A patient could use an Amex card to cover their co-pay, but Amex would not appear in the exam or operating room, either.  In fact, that is the point of a two-sided platform, and what distinguishes it from a traditional merchant like a grocery store:  the role of the platform is to help the two sides come together, and then get out of their way.  The time when the platform charges and collects is immaterial:  "the platform may decide to impose fees before, after, or contemporaneously with the transaction", and "[t]he two parties that enter into a transaction do not necessarily incur charges for using the platform at the same time." (Evans Rpt. ¶ 44.)

**No. 15.**  Providers argue that, for transaction platforms, the price of the transaction should be "easily identifiable". (Providers' Br. at 22.)  But there is no "easy-to-identify price" test in the Supreme Court's decision.  If there were, Amex might have failed.  The district court in the *Amex* litigation found, in part because of the complexity of valuing membership fees, membership rewards and merchant discounts, "the evidentiary record d[id] not include a reliable measure of the two-sided price charged by American Express that correctly or appropriately accounts for the network's expenses on the cardholder side of the platform, from which the court might draw comparisons to Visa and MasterCard's pricing". *See Am. Express Co.*, 88 F. Supp. 3d at 199 n.30.  Indeed, the government argued that the difficulty in ascertaining the price was somehow a justification for treating the market as one-sided. *See* Brief for the United States as Respondent Supporting Petitioners at 48, *Amex*, 138 S. Ct. 2274 (No. 16-1454)

(arguing that, because of "the complexity of Amex's system of cardholder rewards and the difficulty of quantifying some of those rewards", the government "should not be faulted for failing to calculate with precision a measure of Amex's pricing that Amex itself could not reliably provide").

Providers' concession does make one fact clear:  Providers have not done any of the work necessary to determine an appropriate measure of the two-sided price in this case. Providers bear this burden, under any standard of review, to prove the existence of antitrust injury on a class-wide basis.  Providers try to shift this burden to Dr. Evans, but he simply observed that Dr. Haas-Wilson had not "provided any evidence that the challenged conduct resulted in higher total prices".  (Evans Rpt. ¶ 162.)  Providers' argument here underscores that Providers have not put forward an adequate economic model, and have no basis to certify a class.

**No. 16.**  Providers also argue that transaction platforms can compete only with other transaction platforms.  (Providers' Br. at 24.)  This is not true—if a two-sided transaction platform faces competition from one-sided firms, the platform does not cease being a two-sided transaction platform.  For instance, two-sided ride-sharing services like Lyft and Uber are transaction platforms that compete against one-sided taxi companies, and two-sided credit cards such as American Express compete with single-sided store cards.[14]  *Am. Express Co.*, 88 F. Supp. 3d at 164; David S. Evans & Richard Schmalensee, *Paying with Plastic: The Digital Revolution in Buying and Borrowing*, THE MIT PRESS 130–32 (1999 1st ed.).

---

[14] The Supreme Court's statement—that "[o]nly other two-sided platforms can compete with a two-sided platform *for transactions*"—is not what Providers make it out to be.  *Amex*, 138 S. Ct. at 2287 (emphasis added).  That simply means, in order to connect two different groups of consumers for a transaction, a firm must operate a two-sided platform.  That is true, and it is what Blue Plans do.  Notably, in support of that sentence, the Supreme Court cited a source that itself cites back to Dr. Evans.  And Dr. Evans testified that "only other two-sided platforms can literally compete with a platform for transactions as those terms are used in the . . . literature.  But it is . . . possible to organize a business in a different way that has the possibility to impose a competitive constraint . . . on the two-sided platform."  (Jan. 2021 Evans Dep. 84:16–85:2.)  That happens in credit cards just as it does in healthcare financing.  (*Id.* 85:3–88:2.)

**No. 17.**  Finally, Providers claim that the only service that transaction platforms can supply is a transaction.  (Providers' Br. at 25.)  This, too, is invented from thin air.  Amex supplies many products to cardholders and merchants. Amex extends lines of credit, offers warranties, provides free credit score reports and recommendations on how to improve one's credit score, access to ticket presales and card member-only events, baggage insurance while traveling, free delivery for purchases made at many online stores, cell phone protection, and purchase protection for stolen or damaged items.[15]  If your favorite player changes teams, Amex will buy you a new jersey.[16]  Amex also supplies various data products and strategy services to its merchants.[17]  That the Blues offer other products, too, is beside the point.

## II.  Not All Putative Members of Providers' Rule 23(b)(3) Classes Have Article III Standing as Required by *Drazen*

The Court's second question is whether "all putative class members have Article III standing" (Nov. 17, 2022 Order at 3), in light of the Eleventh Circuit's observation in *Drazen* that "[e]very class member must have Article III standing in order to recover individual damages".  41 F.4th at 1360 (citation omitted).  The answer is no; they do not.  Providers hardly

---

[15] *See e.g.*, *Extended Warranty,* AMERICAN EXPRESS, https://global.americanexpress.com/card-benefits/detail/extended-warranty/platinum; *MyCredit Guide*, AMERICAN EXPRESS, https://www.americanexpress.com/us/credit-cards/features-benefits/free-credit-score; *Score Goals*, AMERICAN EXPRESS, https://www.americanexpress.com/us/credit-cards/features-benefits/free-credit-score/score-goals; *American Express Experiences*, AMERICAN EXPRESS, https://global.americanexpress.com/entertainment/home; *Baggage Insurance Plan*, AMERICAN EXPRESS, https://www.americanexpress.com/us/credit-cards/features-benefits/policies/baggage-insurance-plan-terms.html; *ShopRunner*, AMERICAN EXPRESS, https://www.americanexpress.com/us/credit-cards/features-benefits/shoprunner; *Cell Phone Protection Frequently Asked Questions*, AMERICAN EXPRESS, https://www.americanexpress.com/content/dam/amex/us/credit-cards/features-benefits/policies/pdf/Cell_Phone_Protection_FAQs_3.01.22.pdf; *How American Express Purchase Protection Works*, https://www.americanexpress.com/en-us/credit-cards/credit-intel/purchase-protection/.

[16] *E.g.*, *Amex Jersey Assurance*, NBA STORE, https://store.nba.com/jersey-assurance/.

[17] *See* American Express Co., Annual Report (Form 10-K) at 3 (Feb. 10, 2023)).

46

address this question.  (Providers' Br. at 47–48.)  And the answer provides an independent bar to certification of any of their proposed damages classes.

In *Drazen*, the plaintiff alleged a violation of the Telephone Consumer Protection Act of 1991 based on unwanted text messages and telephone calls.  *Id.* at 1356.  The parties agreed to a class damages settlement, which the district court approved.  But the Eleventh Circuit reversed, finding "the class definition does not meet Article III standing requirements".  *Id.* at 1359.  That holding flowed from the foundational principle that, "[t]o recover individual damages, all plaintiffs within the class definition must have standing".  *Id.* at 1361 (citing *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021)).  Standing "goes to the heart" of a court's jurisdiction:  without it, a court lacks the ability to hear the issues or controversies before it.  *Id.* at 1362.  Thus, in the Eleventh Circuit, an analysis of standing is a threshold requirement for Rule 23 class certification.  *Id.*; *see also Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987).  In *Drazen*, that required reversal of class certification because the proposed class included individuals who received "a single unwanted text message", which "is not sufficient to meet the concrete injury requirement for standing".  41 F.4th at 1362.  Providers' proposed damages classes suffer the same flaw.

As the party invoking federal jurisdiction, Providers bear the burden to demonstrate Article III standing.  *TransUnion*, 141 S. Ct. at 2208.  Providers have failed to meet their burden and certification of their putative damages classes should be denied as a result.[18]

*First*, with respect to their 23(b)(3) Hospital Class, Providers claim to have satisfied Article III by calculating damages "based on low reimbursement rates" for every class

---

[18] Because *Drazen*'s holding is limited to damages classes, Defendants focus this discussion on the implications of *Drazen* to Providers' 23(b)(3) damages classes.  While not the subject of this briefing, Providers' 23(b)(2) injunctive relief classes also fail for reasons set forth in the Blues' Opposition to Providers' Renewed Motion for Class Certification.  (*See* Opp. at 58–61.)

member.  (Providers' Br. at 47.)  But Providers can prove no such thing—and have not even set out to do so.  Rather, as discussed above (*supra* Analysis § I.C) and detailed in the Blues' Opposition (Opp. at 27–53), Providers' impact model demonstrates only the *average impact* on reimbursement rates for acute care hospitals in the entire United States.  Far from conducting individualized inquiries as required to satisfy *Drazen*, Providers' expert Dr. Haas-Wilson estimated the relationship between market concentration and reimbursement rates *on average*. (*See supra* Analysis § I.C; Opp. at 18–24.)  Dr. Haas-Wilson acknowledged that her impact model only "illustrate[s] the relationship between the ***average*** [insurer market share] and the *average*. . . hospital prices paid by [insurers]".  (Haas-Wilson Rpt. ¶ 414 (emphases added).) Providers' model of averages does not even attempt to address whether each putative class member, in fact, suffered any actual injury, and—instead—risks "hid[ing] several groups of uninjured class members who cannot be easily identified".  *In re Niaspan Antitrust Litig.*, 464 F. Supp. 3d 678, 726 (E.D. Pa.) (denying class certification).  Indeed, when the Blues' expert corrected Dr. Haas-Wilson's model to appropriately account for individualized effects of insurer market share on reimbursement rates, the results show that over 60% of hospitals in Alabama would have actually received *lower* reimbursement rates as a result of increased entry.  (Ordover Rpt. ¶¶ 248–55.)  In other words, even assuming Dr. Haas-Wilson's model and data are correct, Providers' model cannot show that all—or even most—of the putative hospital class members in Alabama were harmed.  Thus, this case is just like *Drazen*:  whether or not the average plaintiff received enough unwanted texts to suffer an injury, the proposed class definition included some who suffered no harm.  So too here, and "[a]ny class definition that includes members who would never have standing under our precedent is a class definition that cannot stand".  *Drazen*, 41 F.4th at 1362.

*Second*, with respect to Providers' putative 23(b)(3) Non-Hospital Class, Providers concede that they have not even attempted to establish Article III standing. (*See* Providers' Br. at 47 ("Providers have not quantified damages for the [Non-Hospital Provider Class].").) Recognizing this failure, Providers instead assert that this class "suffered the same class-wide injury" as the 23(b)(3) Hospital Class. (Providers' Br. at 48.) But "[s]tanding is not dispensed in gross". *TransUnion*, 141 S. Ct. at 2208. Rather, Providers "must demonstrate standing for *each claim* that they press". *Id*. (emphasis added); *see also In re Hydrogen Peroxide*, 552 F.3d at 318 (to demonstrate classwide impact, "[a] party's assurance to the court that it intends or plans to meet the requirements is insufficient"). Providers have not even attempted to do so here.

Moreover, certification of any of the Rule 23(b)(3) classes should be denied for a separate but related reason—the individualized standing inquiry required by *Drazen* is likely to predominate over common issues in the case. As the *Drazen* Court underscored, whether absent class members can establish standing may be "exceedingly relevant" to the Rule 23 predominance analysis. *Drazen*, 41 F.4th at 1362 (quoting *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1273 (11th Cir. 2019)). This is because when many members of the putative class have not suffered actual injury, individualized questions of standing are likely to predominate over the common issues in the case, contrary to Rule 23. *See Drazen*, 41 F.4th at 1362; *Cordoba*, 942 F.3d at 1276 ("[A] class should not be certified if it is apparent that it contains a *great many* persons who have suffered no injury at the hands of the defendant.").

*Nguyen v. Raymond James & Assocs., Inc.* is instructive. No. 8:20-cv-195-CEH-AAS, 2022 WL 4553068 (M.D. Fl. Aug. 12, 2022). In evaluating the plaintiff's class certification motion, the *Nguyen* court underscored that *Drazen* "emphasized [the Eleventh

Circuit's] prior instruction to district courts to consider whether the individualized issue of standing will predominate over the common issues in the case before certifying a class." *Id*. Ultimately, the court found that the "[p]laintiff ha[d] not established that all class members have suffered an injury in fact such that they have standing, or whether the individual issue of standing would predominate over common issues in the case." *Id.* (citing *Cordoba*, 942 F.3d at 1277, and *Drazen*, 41 F.4th at 1362).  Because individualized issues of standing will predominate over common questions for Providers' putative damages class as well, the same result is warranted here.

With respect to Providers' proposed 23(b)(2) classes, Providers claim that members suffered a "loss in choice" that "will justify certification of a class seeking injunctive relief." (Providers' Br. at 47.)  That fails for all the reasons the Blues have described.  (*See e.g.*, Opp. at 26 (quoting Jan. 2021 Frech Dep. at 6); *id*. at 58–62 (explaining that Providers' own model shows winners and losers that create conflicts among the class and create a lack of cohesion necessary for a (b)(2) class); *id.* at 54 ("Providers' . . . expert testified that he had not concluded that all hospitals in Alabama suffered a reduction in choice, admitting 'that would be quite an analysis that would get you to all [hospitals].'").)

## CONCLUSION

The Blues respectfully request this Court deny Providers' motion to certify their proposed classes.  The Blues also respectfully request a hearing to address these and other important issues presented by Providers' motion for class certification.

Dated:  May 8, 2023

Respectfully submitted,

*/s/ Karin A. DeMasi*
Evan R. Chesler
Karin A. DeMasi
Lauren R. Kennedy
Helam Gebremariam
David H. Korn
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019
Tel: (212) 474-1000
Fax: (212) 474-3700
echesler@cravath.com
kdemasi@cravath.com
lkennedy@cravath.com
hgebremariam@cravath.com
dkorn@cravath.com

*Lead Counsel for the Blue Cross Blue Shield System; Counsel for Defendants Blue Cross Blue Shield Association; Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Arizona, Inc.; GuideWell Mutual Holding Corporation; Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross and Blue Shield of North Carolina; BlueCross BlueShield of Tennessee, Inc.; California Physicians' Service d/b/a Blue Shield of California; CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.; Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii); Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for*

*Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Triple-S Management Corporation; Triple-S Salud, Inc.*

Craig A. Hoover
E. Desmond Hogan
Justin Bernick
Elizabeth Jose
W. David Maxwell
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC  20004
Tel: (202) 637-5600
Fax: (202) 637-5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com
justin.bernick@hoganlovells.com
elizabeth.jose@hoganlovells.com
david.maxwell@hoganlovells.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc., and all of its named subsidiaries in this action; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon*

John D. Martin
Lucile H. Cohen
Travis A. Bustamante

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE, JORDAN, RATLIFF &
BRANDT, LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL  35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendants Blue Cross Blue Shield Association; Blue Cross and Blue Shield of Arizona, Inc.; CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Health; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark BCBSD Inc.; California Physicians' Service d/b/a Blue Shield of California; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Hawaii*

NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC  29201
Tel: (803) 255-9421
Fax: (803) 256-7500
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc.,
and all of its named subsidiaries in this action;
Louisiana Health Service & Indemnity Company
(Blue Cross and Blue Shield of Louisiana);
BCBSM, Inc. (Blue Cross and Blue Shield of
Minnesota); Blue Cross and Blue Shield of South
Carolina; Horizon Healthcare Services, Inc.
(Horizon Blue Cross and Blue Shield of New
Jersey); Blue Cross & Blue Shield of Rhode
Island; Blue Cross and Blue Shield of Vermont;
Cambia Health Solutions, Inc.; Regence Blue
Shield of Idaho; Regence Blue Cross Blue Shield
of Utah; Regence Blue Shield of Washington);
Regence Blue Cross Blue Shield of Oregon; Blue
Cross & Blue Shield of Mississippi, a Mutual
Insurance Company; Wellmark of South Dakota,
Inc. (Wellmark Blue Cross and Blue Shield of
South Dakota); Wellmark, Inc. (Wellmark Blue
Cross and Blue Shield of Iowa); Hawaii Medical
Service Association (Blue Cross and Blue Shield of
Hawaii); Triple-S Salud, Inc; Defendants Blue
Cross and Blue Shield of Florida, Inc.; Blue Cross
and Blue Shield of Massachusetts, Inc.; BlueCross
BlueShield of Tennessee, Inc.*

Cavender C. Kimble
BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203-4642
Tel: (205) 226-3437
Fax: (205) 488-5860
ckimble@balch.com

*Counsel for Anthem, Inc., f/k/a WellPoint, Inc.,
and all of its named subsidiaries in this action;
Blue Cross and Blue Shield of North Carolina;*

*Medical Service Association (Blue
Cross and Blue Shield of Hawaii)*

Carl S. Burkhalter
John Thomas A. Malatesta, III
MAYNARD COOPER & GALE PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza
Birmingham, AL  35203
Tel: (205) 254-1000
Fax: (205) 254-1999
cburkhalter@maynardcooper.com
jmalatesta@maynardcooper.com

Pamela B. Slate
HILL CARTER FRANCO COLE &
BLACK, P.C.
425 South Perry Street
Montgomery, AL  36104
Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

*With Cravath, Swaine & Moore LLP,
counsel for Defendant Blue Cross Blue
Shield of Alabama*

Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
jzeiger@kirkland.com

*Counsel for Defendants Health Care
Service Corporation, an Illinois Mutual
Legal Reserve Company, including its
divisions Blue Cross and Blue Shield of
Illinois, Blue Cross and Blue Shield of
Texas, Blue Cross and Blue Shield of
New Mexico, Blue Cross and Blue
Shield of Oklahoma, and Blue Cross and
Blue Shield of Montana; Caring for
Montanans, Inc., f/k/a Blue Cross and*

*Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Blue Cross and Blue Shield of South Carolina; Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Blue Cross and Blue Shield of Vermont; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield (of Washington); Regence Blue Cross Blue Shield of Oregon*

Gwendolyn Payton
KILPATRICK TOWNSEND & STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA  98101
Tel: (206) 626-7714
Fax: (206) 299-0414
gpayton@kilpatricktownsend.com

*Counsel for Defendants Premera Blue Cross, d/b/a Premera Blue Cross Blue Shield of Alaska*

Brian K. Norman
SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, TX  75234
Tel: (214) 987-1745
Fax: (214) 521-9033
bkn@snlegal.com

H. James Koch
ARMBRECHT JACKSON LLP
RSA Tower, 27th Floor
11 North Water Street
Mobile, AL  36602
Tel: (251) 405-1300
Fax: (251) 432-6843
hjk@ajlaw.com

*Blue Shield of Montana, Inc.; Highmark Health; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark BCBSD Inc.; Highmark Western and Northeastern New York Inc.*

Jonathan M. Redgrave
REDGRAVE, LLP
4800 Westfields Blvd., Suite 250
Chantilly, VA  20151
Tel: (703) 592-1155
Fax: (612) 332-8915
jredgrave@redgravellp.com

*Additional Counsel for HCSC and Highmark Defendants and California Physicians' Service d/b/a Blue Shield of California*

Todd M. Stenerson
Brian C. Hauser
SHEARMAN & STERLING LLP
401 9th Street, N.W., Suite 800
Washington, DC  20004
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@shearman.com
brian.hauser@shearman.com

Rachel Mossman Zieminski
SHEARMAN & STERLING LLP
2601 Olive Street, Suite 1700
Dallas, TX 75201
Tel: (214) 271-5777
Fax: (214) 271-5778
rachel.zieminski@shearman.com

Sarah L. Cylkowski
Thomas J. Rheaume, Jr.
BODMAN PLC
1901 Saint Antoine Street
6th Floor at Ford Field
Detroit, MI  48226
Tel: (313) 259-7777

*Counsel for Defendants CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.*

M. Patrick McDowell
Norman E. "Benje" Bailey. Jr.
BRUNINI, GRANTHAM, GROWER
& HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS  39201
Tel: (601) 948-3101
Fax: (601) 960-6902
pmcdowell@brunini.com

Cheri D. Green
BLUE CROSS & BLUE SHIELD OF
MISSISSIPPI, A MUTUAL INSURANCE
COMPANY
P.O. Box 1043
Jackson, MS  39215
Tel: (601) 932-3704
cdgreen@bcbsms.com

*Counsel for Defendant Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company*

Alan D. Rutenberg
FOLEY & LARDNER LLP
3000 K Street, N.W., Suite 600
Washington, DC 20007
Tel: (202) 672-5491
Fax: (202) 672-5399
arutenberg@foley.com

*Counsel for Defendant USAble Mutual Insurance Company, d/b/a Arkansas Blue Cross and Blue Shield and as Blue Advantage Administrators of Arkansas*

Robert K. Spotswood
Michael T. Sansbury
Joshua K. Payne
Jess R. Nix
Morgan B. Franz

Fax: (734) 930-2494
scylkowski@bodmanlaw.com
trheaume@bodmanlaw.com

Andy P. Campbell
A. Todd Campbell
Yawanna N. McDonald
CAMPBELL PARTNERS LLC
505 North 20th Street, Suite 1600
Birmingham, AL  35203
Tel: (205) 224-0750
Fax: (205) 224-8622
andy@campbellpartnerslaw.com
todd@campbellpartnerslaw.com
yawanna@campbellpartnerslaw.com

*Counsel for Defendant Blue Cross and Blue Shield of Michigan*

John DeQ. Briggs
Jeny M. Maier
AXINN, VELTROP & HARKRIDER,
LLP
1901 L Street, N.W.
Washington, DC  20036
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com
jmaier@axinn.com

Kail J. Jethmalani
AXINN, VELTROP & HARKRIDER
LLP
114 W. 47th Street
New York, NY 10036
Tel: (212) 728-2200
Fax: (212) 728-2201
kjethmalani@axinn.com

Stephen A. Rowe (ASB-3804-E65S)
Aaron G. McLeod (ASB-8589-A57M)
ADAMS AND REESE LLP
1901 6th Avenue North, Suite 3000
Birmingham, AL 35203
Tel: (205) 250-5080
Fax: (205) 250-5034

SPOTSWOOD SANSOM & SANSBURY LLC
Financial Center
505 20th Street North, Suite 700
Birmingham, AL  35203
Tel: (205) 986-3620
Fax: (205) 986-3639
rks@spotswoodllc.com
msansbury@spotswoodllc.com
jpayne@spotswoodllc.com
jnix@spotswoodllc.com
mfranz@spotswoodllc.com

*Counsel for Defendant Capital Blue Cross*


Robert R. Riley, Jr.
RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL  35209
Tel: (205) 879-5000
Fax: (205) 879-5901
rob@rileyjacksonlaw.com

*Counsel for Defendants Blue Cross and Blue
Shield of Florida, Inc.; Blue Cross and Blue Shield
of Massachusetts, Inc.; BlueCross BlueShield
of Tennessee, Inc.*


Edward S. Bloomberg
John G. Schmidt Jr.
Anna Mercado Clark
PHILLIPS LYTLE LLP
One Canalside
125 Main Street
Buffalo, NY 14203-2887
Telephone No. (716) 847-8400
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com
aclark@phillipslytle.com


Morris Wade Richardson (ASB-8581-S78M)
Charles Todd Grimes (ASB-3224-S77C)
RICHARDSON CLEMENT PC
22 Inverness Center Parkway, Suite 500
Birmingham, AL 35242
Tel: (205) 729-7000

steve.rowe@arlaw.com
aaron.mcleod@arlaw.com

*Counsel for Defendants Independence
Hospital Indemnity Plan, Inc. f/k/a
Independence Blue Cross; Independence
Health Group, Inc.*


Kathleen Taylor Sooy
Tracy A. Roman
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004
Tel: (202) 624-2500
Fax: (202) 628-5116
ksooy@crowell.com
troman@crowell.com


Sarah Gilbert
Honor Costello
CROWELL & MORING LLP
590 Madison Avenue, 20th Floor
New York, NY 10022
Tel: (212) 223-4000
Fax: (212) 223-4134
sgilbert@crowell.com
hcostello@crowell.com


John M. Johnson
Brian P. Kappel
LIGHTFOOT FRANKLIN & WHITE
LLC
The Clark Building
400 20th Street North
Birmingham, AL  35203
Tel: (205) 581-0700
Fax: (205) 581-0799
jjohnson@lightfootlaw.com
bkappel@lightfootlaw.com


*Counsel for Defendants Blue Cross and
Blue Shield of Nebraska; GoodLife
Partners, Inc.; Blue Cross of Idaho
Health Service, Inc.; Blue Cross and
Blue Shield of Kansas, Inc.; Blue Cross
and Blue Shield of Kansas City;*

Fax: (205) 905-7009
wade@richardson.law
charley@richardson.law

*Attorneys for Defendants Excellus Health Plan,
Inc., d/b/a Excellus BlueCross BlueShield and
Lifetime Healthcare, Inc.*

*HealthyDakota Mutual Holdings; Blue
Cross Blue Shield of North Dakota; and
Blue Cross Blue Shield of Wyoming*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 8, 2023, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

<u>/s/ <em>Mark M. Hogewood</em></u><br>
Mark M. Hogewood