FILED
2023 Dec-21 PM 03:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| | **}** | |
| **IN RE:  BLUE CROSS BLUE SHIELD** | **}** | |
| | **}** | **Master File No.:  2:13-CV-20000-RDP** |
| **ANTITRUST LITIGATION** | **}** | |
| **(MDL NO.: 2406)** | **}** | This order relates to the Provider Track |
| | **}** | |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on Defendants' Motion for Summary Judgment on Providers' Damages Claims as Time-Barred and Speculative. (Doc. # 2758). The Motion has been fully briefed (Docs. # 2762, 2798, 2823). For the reasons discussed below, Defendants' Motion is due to be denied.

### I.     Background

The Blue Plans are 36 independent health insurance companies. (Doc. # 2063 at 7). The Blue Cross and Blue Shield Association is led by a Chief Executive Officer and President who, together with an executive team, are responsible for the day-to-day operations of the Association. (Doc. # 2063 at 8). The Blue Plans are governing members of the Association. (Doc. # 2063 at 7). The Association's Board of Directors is comprised of the CEO of each of the Member Plans plus the CEO of the Association. (Doc. # 2063 at 8).

Each Member Plan has agreed to be bound by the Association Rules. (Doc. # 2063 at 7). The Association's bylaws, which establish the rules and structure of the Association, provide that the Plans may amend or repeal the bylaws, and adopt new bylaws, by vote of three-fourths of all Regular Members and three-fourths of the total then current weighted votes of all Regular Members. (Doc. # 2785-4 at 3, 24).

In the Fourth Amended Complaint, Providers assert claims based on two alleged conspiracies: (1) a Market Allocation Conspiracy (Doc. # 1083 at 119); and (2) a Price-Fixing and Boycott Conspiracy (*Id.* at 123). The features of the Blue System that Providers challenge -- service areas, out-of-area contracting rules, and the BlueCard program -- have been well known to medical providers for a number of decades before this lawsuit was filed. (Docs. # 2762 at 9; 2798 at 10).

In the 1980s, prior to the adoption of the BlueCard program, BCBS-AL contracted with twenty-nine providers in counties contiguous to Alabama. (Doc. # 2063 at 17). The BlueCard program was developed in 1992. (Doc. # 2063 at 15-16). Under BlueCard, Blue Plans were required to make their local provider discounts available to all Blue Members, even if they lived in another Plan's service area. (Doc. # 2063 at 15-16). In 1995, Member Plans adopted a license standard requiring all Plans to participate in BlueCard. (Doc. # 2063 at 16). At some point, BCBS-AL stopped directly contracting with those providers in counties contiguous to Alabama. (Doc. # 2063 at 17).

At least by the mid-1990s, each Blue Plan had signed a License Agreement with the Association. (Docs. # 1352-49 through 1352-128, 2063 at 9). Each of these License Agreements identifies an exclusive "service area" where a Member Plan may use the Blue Marks. (Docs. # 1352-49 through 1352-128; 1432 at 11, 19-20; 2063 at 9).

Providers first brought the claims asserted in this case on July 24, 2012. (N.D. Al. Case No. 12-cv-02532-RDP, Doc. # 1). Providers identified the beginning of the period from which they seek to recover damages as July 24, 2008. (Docs. # 2762 at 10; 2798 at 10).

In relation to their service area damages claim, Providers identify the lack of a hypothetical blocked entrant (*i.e.*, a second Blue) as damaging them and, although they did not

pinpoint the timing of this hypothetical blocked entry, they concede it would have happened sufficiently before 2008 so that any potential Blue entrant would have grown to full competitive strength by the start of the class period in 2008. (Docs. # 2762 at 11; 2798 at 10).

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id*. at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id*. at 324.

The substantive law will identify which facts are material and which are irrelevant. See *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty*., 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

The court notes that the standard of review on a motion for summary judgment differs depending on whether the party moving for summary judgment bears the burden of proof on the claim at issue. As the Sixth Circuit has noted:

> When the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial. But where the moving party has the burden–the plaintiff on a claim for relief or the defendant on an affirmative defense–his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.

*Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). "Where the movant also bears the burden of proof on the claims at trial, it 'must do more than put the issue into genuine doubt; indeed, [it] must remove genuine doubt from the issue altogether.'" *Franklin v. Montgomery Ctv., Md.*, 2006 WL 2632298, at *5 (D. Md. Sept. 13, 2006) (quoting *Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 164 (4th Cir. 1999)) (alteration in original).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear … that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.    Analysis

In their Motion, Defendants argue that (1) the statute of limitations bars Providers' damages claims, and (2) a jury cannot award the billions in damages Providers seek based solely

4

on what they characterize as the speculation and guesswork that Providers' damages theory requires. (Doc. # 2762).

Providers respond that (1) the Blues' motion rests on a fundamental mistake about the Providers' theory of damages, (2) Providers' claims are timely because they arise from injuries inflicted within the limitations period, and (3) Providers' damages calculations come from a multiple regression model, not "speculation and guesswork." (Doc. # 2798).

Defendants reply that Providers' damages claims are (1) time-barred because they flow from pre-limitations period events, and (2) speculative. (Doc. # 2823).

### A. There is at least a question of fact regarding whether Providers claims are timely.

Defendants argue that Providers' damages are based on blocked entry occurring decades ago such that the hypothetical entrant would have grown to full competitive strength by the start of the class period, *i.e.* 2008. (Doc. # 2762 at 29). Therefore, they contend, Providers' damages claims are time barred. (*Id.*) Providers assert that Defendants misunderstand their damages models, and that they have "multiple theories of damages that do not assume 'blocked entry.'" (Doc. # 2798 at 18).

Defendants' argument ignores a key fact: in addition to claims based on a Market Allocation Conspiracy, Providers have also asserted claims regarding a Price-Fixing and Boycott Conspiracy involving BlueCard. (Doc. # 1083 at 221, 224, 226). "[I]n the case of a 'continuing [] price-fixing conspiracy, [] each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'" *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (quoting 2 P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 338b, p. 145 (rev. ed. 1995) (footnote omitted)); *see also Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 828 (11th Cir. 1999) (concluding that if plaintiffs

purchased milk at a higher or fixed price after the price fixing conspiracy, that purchase would constitute an overt act that injured them). So, "[a] cause of action would accrue with each purchase and a new statutory period would begin to run." *Morton's Mkt.,* 198 F.3d at 828 (citing *Zenith Radio Corp. v. Hazeltine Research*, 401 U.S. 321, 338 (1971)); *see also Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) ("[E]ach time a defendant sells its price-fixed product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act.").[1] Providers were paid based on reimbursement rates that they allege were suppressed by BlueCard during the limitations period. Therefore, Providers' damages claims based on the alleged Price-Fixing and Boycott Conspiracy are not time-barred.

To back up a moment, "[a] cause of action for an antitrust violation 'accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.'" *Bray v. Bank of Am. Corp*., 784 F. App'x 738, 740 (11th Cir. 2019) (quoting *Zenith*, 401 U.S. at 338). "In the context of an alleged 'continuing conspiracy to violate antitrust laws,' a new cause of action accrues "after the defendant commits (1) an overt act in furtherance of the antitrust conspiracy or (2) an act that by its very nature constitutes a 'continuing antitrust violation.'" *Bray*, 784 F. App'x at 740-41 (quoting *Morton's Mkt.*, 198 F.3d at 827-28 (in turn citing *Zenith*, 401 U.S. at 338))). As the Eleventh Circuit has "stressed[,] '[i]t remains clear [] that a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action.'" *Bray*, 784 F. App'x at 741 (quoting *Poster Exch., Inc. v. Nat'l Screen Serv.*

---

[1] In *Morton's Market,* "whether the conspiracy continued into the limitations period by virtue of continued sales at fixed prices [was] a genuine question for trial." 198 F.3d at 829.

*Corp.*, 517 F.2d 117, 128 (5th Cir. 1975)[2] (remanding for additional factfinding about an injurious act during the limitations period)).

Providers argue that their claims based on the alleged Market Allocation Conspiracy are timely because they arise from "injuries inflicted within the Limitations Period." (Doc. # 2798 at 18). They explain that their damages are "based on the difference between the price the hospitals were paid for their services and the price they would have been paid in the absence of these conspiracies." (*Id.*). The question, though, is whether there was a new injurious act or an overt act in furtherance of the Market Allocation Conspiracy within the limitations period.

In the price fixing context, there is clear, binding authority that a sale within the limitations period at a price affected by a prior price fixing conspiracy is an overt act that restarts the limitations period. *Morton's Mkt*, 198 F.3d at 828. In the market allocation context, it is less clear what overt act might restart the limitations period. However, using this price fixing precedent as an analogy, it is as tautological as it is true that either renegotiating with or being paid allegedly suppressed reimbursement rates by an insurer whose market share has allegedly been artificially inflated by a market allocation conspiracy (or earlier blocked entry) would be an overt injurious act. *See Snow v. Align Tech., Inc*., 586 F. Supp. 3d 972, 980 (N.D. Cal. 2022), supplemented, 2022 WL 468703 (N.D. Cal. Feb. 16, 2022) ("This logic applies with equal force" in the market allocation context). Thus, to the extent that Providers either negotiated with the Blues regarding reimbursement rates or were paid allegedly suppressed reimbursement rates within the limitations period, their claims regarding the Market Allocation Conspiracy would be timely. Alternatively, any changes to the rules, regulations, or license agreements that are a part

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

of the alleged Market Allocation Conspiracy made during the limitations period could also constitute an injurious act restarting the limitations period.

Because there is at least a question of fact regarding whether Defendants committed new injurious acts within the limitations period, Defendants are not entitled to summary judgment based on the timeliness of Providers' claims.

### B.    It is for a jury to determine whether Providers' damages are speculative.

Defendants further argue that they are entitled to summary judgment because Providers' damages claims are "wrapped in impermissible guesswork and speculation." (Doc. # 2762 at 8). Defendants contend that "[g]iven how insurers actually decide to enter markets in the real world, no record evidence exists that any other Blue was ready, willing, and able to enter Alabama—or even could profitably enter Alabama." (*Id.*).

Providers respond that not all of their damages models assume entry into Alabama, but for those that do, their experts have provided estimates based on a multiple regression analysis of data "whose accuracy the Blues do not question." (Doc. # 2798 at 8).

Defendants reply that "regressions are only as good as the assumptions that go into them" and "the underlying assumptions have no record basis." (Doc. # 2823 at 14).

Defendants argue that Providers' damages model is speculative because it does not reflect the reality that insurers generally pick and choose which markets in a state to enter because the markets are not all equally profitable and insurers generally do not enter the whole state. (Doc. # 2823 at 14-15). However, in this context, the argument misses the point. The hypothetical entrant in Providers' damages model is not a national insurer, but rather another Blue Plan. As Defendants have previously argued, ESAs were necessary in the creation of the Blues' unique product, *i.e.*, a product that is offered in "all areas of all fifty states." (Doc. # 2063 at 43 (citing

Doc. # 1432 at 17)). The Blues are permitted to take inconsistent positions in litigation. But, the fact that they have taken this particular position establishes that Providers' experts' assumption that the hypothetical Blue entrant would enter all areas of the state is not "entirely speculative." (Doc. # 2823 at 15).

As to whether another Blue would have been willing to enter Alabama, there is evidence in the record that in 2015, fifteen of the Blue Plans were within the top twenty-five insurers in the United States as measured by total membership. (Doc. # 2063 at 19). To be sure, Anthem was the second largest insurer in the country by membership and it held Blue Cross and/or Blue Shield licenses in fourteen different states. (*Id.*). HCSC was either the fourth or fifth largest insurer in the country by membership and it held Blue Cross and Blue Shield licenses in five states. (*Id.*). Other Blue Plans are among the top ten insurers by membership. (*Id.* at 20). And, within this district (and within this state), Blue Cross and Blue Shield of Alabama is the largest insurer in Alabama, and the sixteenth largest insurer in the nation by membership. (*Id.*).

When speaking about Anthem's proposed merger with Cigna, and in relation to the prospect of competing for national accounts outside of its fourteen-state service area, a representative of Anthem testified as follows:

> [O]ur current market is confined to the 14 states. We have the Blue Cross/Blue Shield license, and we have any number of customers and consultants that express an interest in working with us, and we're prohibited from doing that. To be able to go from – I know we're a national plan. We're a national plan that operates in 14 states. To be an [sic] national plan that operates in 50 states and have unfettered access, without asking permission to have a conversation with a prospect, would be – I don't know – exhilarating, I would say.

(Doc. # 945-1 at 3). Another Blue Plan CEO reported that "without service areas, 'there would be open warfare.'" (Doc. # 2063 at 13 (citing Doc. # 1350-24 at 2)).

9

Thus, there is evidence in the record that supports Providers' experts' assumption that, without ESAs, there would be another Blue Plan willing and able to compete in Alabama and enter into markets in the entire state. That is, Providers *have* "presented a disputed factual issue in regard to the existence of a willing and able competitor that would have entered the relevant market but for [Defendants'] exclusionary practices." *Sunbeam Television Corp. v. Nielsen Media Rsch., Inc.*, 711 F.3d 1264, 1273 (11th Cir. 2013).

As to the effectiveness of the hypothetical entrant's estimated success, Dr. Haas-Wilson compared the incumbent Blue Plan's homed share in markets without any Blue-on-Blue competition to the incumbent Blue Plans' homed share in markets with limited Blue-on-Blue competition. (Doc. # 2454-6, ¶ 449). She found that the average homed share of Blue Plans in markets with limited Blue-on-Blue competition is 34.2 percent lower than the average homed share of the Blue Plans in markets without Blue-on-Blue competition. (*Id*. at ¶ 459).

As for modeling prices and impact, among other reports, Dr. Haas-Wilson relied not only on annual data published by the American Hospital Association (AHA), the Center for Medicare & Medicaid Services (CMS), the U.S. Health Resources and Services Administration, and the Bureau of Labor Statistics (BLS) (*Id*. at ¶¶ 439-442), but also on claims databases produced by Defendants (*Id.* at ¶¶ 442-449) and the Health Care Cost Institute ("HCCI") with data from enrollees of Aetna, UnitedHealthcare, and Humana Plans. (*Id.* at ¶¶ 449-450). She then performed a multiple regression analysis. "[M]ultiple regression analysis [is] a methodology that is well-established as reliable." *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 566 (11th Cir. 1998) (citing *Askew v. City of Rome*, 127 F.3d 1355, 1365 n. 2 (11th Cir. 1997)); *see also In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 387-88 (M.D. Fla. 2018) (collecting cases approving of multiple regression analysis).

Because Providers' damages model is not speculative and is not based on guesswork, a jury could determine that it is reliable. Therefore, Defendants are not entitled to summary judgment on Providers' damages claims on this basis.

## IV.    Conclusion

Because there remain genuine issues as to (1) whether Providers' have alleged new injurious acts with regard to their various claims within the limitations period, and (2) the reliability of Providers' damages models, Defendants' Motion for Summary Judgment on Providers' Damages Claims as Time-Barred and Speculative (Doc. # 2758) is **DENIED**.

**DONE** and **ORDERED** this December 21, 2023.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE