FILED
2023 Dec-22  AM 09:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD | } | |
| | } | **Master File No.:  2:13-CV-20000-RDP** |
| ANTITRUST LITIGATION | } | |
| (MDL NO.: 2406) | } | This order relates to the Provider Track |
| | } | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the court on Provider Plaintiffs' Motion for Partial Summary Judgment on the Defendants' Single Entity Defense. (Doc. # 2748). The Motion has been fully briefed (Docs. # 2801, 2820) and, in 2018, the court previously considered the issue of Defendants' single entity defense in relation to cross motions for summary judgment by Subscriber Plaintiffs and the Blues. (Doc. # 2063 at 1, 30-35). For the reasons discussed below, Providers' Motion is due to be denied.

**I.      Background**

The Blue Plans are 36 independent health insurance companies. (Doc. # 2063 at 7). The Blue Cross and Blue Shield Association itself does not underwrite any insurance policies. (*Id.*). The Association is led by a Chief Executive Officer and President who, together with an executive team, are responsible for the day-to-day operations of the Association. (Docs. # 1352-39 at 46-47; 1352-6; 2063 at 8). The Association's Board of Directors is comprised of the CEO of each of the Member Plans plus the CEO of the Association. (Docs. # 1432 at 18; 1352-6, 2063 at 8).

The Association's bylaws, which establish the rules and structure of the Association, provide that the Plans may amend or repeal the bylaws, and adopt new bylaws, by vote of three-

fourths of all Regular Members and three-fourths of the total then current weighted votes of all Regular Members. (Doc. # 2785-4 at 3, 24). The Blue Plans are governing members of the Association. (Doc. # 2063 at 7).

Shortly after Congress passed the Lanham Act in 1946, the predecessors in interest to the present-day Association made applications to federally register the Blue Cross and the Blue Shield trademarks. (Docs. # 1353-28–1353-29, 1353-31–1353-47). The U.S. Patent and Trademark Office issued federal trademark registrations to those organizations in 1952. (Docs. # 1350-36, 1350-37, 1350-38, 1350-40–1350-42, 1353-30). For each of the Federal Marks, the Association's predecessors submitted, and the U.S. Patent and Trademark Office acknowledged, affidavits of incontestability pursuant to 15 U.S.C. § 1605. (Doc. # 2808-1–2808-7).

The Federal Marks remained the exclusive property of these national organizations until the merger that formed the Association in 1982. Since then, the Association has owned the Federal Marks. (Docs. # 2801 at 10-11; 2820 at 6-7). The Association grants licenses to the Blue Plans to use the Blue Marks. (Doc. # 2063 at 9). Each of the License Agreements identifies an exclusive "service area" where a Member Plan may use the Blue Marks. (Docs. # 1352-49 through 1352-128; 1432 at 11, 19-20; 2063 at 9). The majority of the Plans' service areas are exclusive, meaning that they do not overlap with another Plan's service area. (Doc. # 2063 at 11). In some cases, however, Blue Plans have overlapping service areas. (Doc. # 2063 at 11).

Under the License Agreements, subject to certain exceptions related to National Accounts and Government Programs, the Plans agreed that a "Plan may not use the Licensed Marks and Name outside the Service Area []." (Docs. # 1432 at 11, 20; 1352-127; 1352-49 through 1352-128; 2063 at 9).  Under the License Agreements, the Association's rules, or both, a Plan may not bid on a National Account headquartered outside its service area using the Blue Marks unless the

Plan in whose service area the National Account is headquartered agrees to "cede" the right to bid. (Doc. # 2063 at 19).

Under the License Agreements, the Association's rules, or both, a Plan generally may not develop a provider network or contract with a healthcare provider outside its service area for services to be provided under the Blue Marks. (Doc. # 2063 at 10). A Plan may contract with a healthcare provider in a county contiguous to the Plan's service area under certain conditions and for limited purposes. (*Id*.). A Plan may contract with certain types of providers nationwide, such as laboratories, durable medical equipment providers, and specialty pharmacies, but medical professionals, hospitals, and outpatient facilities are not among these types of providers. (*Id*.).

The License Agreements may be amended by a vote three-fourths of the Plans and three-fourths of the total then current weighted vote of all Plans. (Doc. # 1350-3 at 4).

The former National Best Efforts Rule, implemented in 2005 and in effect until April 27, 2021, required a Plan to derive at least sixty-six and two-thirds percent (66 2/3%) of its national health insurance revenue from its Blue brand. (Docs. # 2063 at 18; 2735-33). Under that Rule, any health revenue a Blue Plan may have generated from services offered under any non-Blue brand was limited in relation to its Blue branded health revenue. (Docs. # 2063 at 18; 2735-33).

Plaintiffs have pointed to a number of items in the Rule 56 record that they assert undercut the Blues' argument that they are a single entity. For example, on or about April 5, 1993, Roger G. Wilson, Senior Vice President, General Counsel, and Corporate Secretary of the Association, sent a memorandum to "Holders, Service Mark Use Manual." (Doc. # 2785-2). The memorandum addresses new regulations adopted by the Association's Board of Directors. (Doc. # 2785-2 at 2). The memorandum explains that Chapter 19 of the new regulations prohibits any "public communications" that "refer to the Blue Cross and Blue Shield system as a single entity

unless the materials also adequately disclose that it is composed of independent Plans" or "refer to the Blue Cross or Blue Shield organization or system without a specific indication that it is composed of independent plans." (Doc. # 2785-2 at 3).

Another example is an untitled document dated January 14, 2008 discussing "Our Advantages" and "Our Disadvantages" produced by Arkansas Blue Cross and Blue Shield stated the following as a "Disadvantage" in its effort to win business from Wal-Mart: "We aren't really a single entity to contract with and [Wal-Mart] knows this." (Doc. # 2787-2 at 2). The same document states, "Only HCSC [another Blue that also had part of Wal-Mart's business] may be able to maintain some of these margins once the battle begins and a single fratricide emerges." (Doc. # 2787-2 at 2).

Finally, in 2012, the Association prepared a presentation to a "CEO Workgroup" called "Consumer Market: Strategic Brand and Marketing Plan." (Doc. # 2787-1). Among the slides in this presentation was one titled, "But the single entity model is not a good analogy for the Blue system." (Doc. # 2787-1 at 8).

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id*. at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -

- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id*. at 324.

The substantive law will identify which facts are material and which are irrelevant. See *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty*., 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

The court notes that the standard of review on a motion for summary judgment differs depending on whether the party moving for summary judgment bears the burden of proof on the claim at issue. As the Sixth Circuit has noted:

> When the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial. But where the moving party has the burden–the plaintiff on a claim for relief or the defendant on an affirmative defense–his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.

*Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). "Where the movant also bears the burden of proof on the claims at trial, it 'must do more than put the issue into genuine doubt; indeed, [it] must remove genuine doubt from the issue altogether.'" *Franklin v. Montgomery Ctv., Md*., 2006 WL 2632298, at *5 (D. Md. Sept. 13, 2006) (quoting *Hoover Color Corp. v. Bayer Corp*., 199 F.3d 160, 164 (4th Cir. 1999)) (alteration in original).

5

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear … that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.   Analysis

Providers argue that they are entitled to summary judgment on the Blues' "single entity" defense for two reasons. (Doc. # 2748 at 4). First, based on the three documents discussed above from 1993, 2008, and 2012, Providers argue that "[t]he Association Admits That It Is Not a Single Entity." (*Id*. at 7). Second, Providers argue that "Allocating Territory or Restricting Output Among Potential Competitors Can Never Be the Work of a Single Entity." (*Id*. at 9).

The Blues respond by arguing that (1) Providers have presented nothing to justify the court revisiting this issue; (2) the Blues have made no admissions relevant to the single entity defense; (3) the Blues act as a single entity to govern the Federal Marks; (4) Providers' concession that the association is like the NFL proves the Blues' point; and (5) the court would actually be justified in entering judgment *for the Blues* based on the Single-Entity Defense. (Doc. # 2801).

In reply, the Providers argue that (1) this is their first motion for summary judgment on this issue; (2) the three documents show that the Association has disclaimed single-entity status for the very function for which the Blues claim it now; (3) the Supreme Court has made clear

6

that allocating territories and restricting output through a licensee-controlled licensor are coordinated actions; and (4) in any event, the Blues are still not entitled to summary judgment on this issue. (Doc. # 2820).

The court addresses the arguments advanced by the parties below.

**A.      Whether the Association has admitted it is not a single entity for the relevant function.**

As the court has previously noted, and to reiterate the relevance of the single entity issue,

> [t]o state a claim under Section 1, a plaintiff must plead two elements: (1) that the defendant was involved in an agreement; and (2) that the agreement unreasonably restrained interstate or foreign trade. [*Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 186 (2010)]. "The question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade." *Id*. "The meaning of the term 'contract, combination . . . or conspiracy' is informed by the 'basic distinction' in the Sherman Act 'between concerted and independent action' that distinguishes § 1 of the Sherman Act from § 2." *Id*. at 190 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984)) (internal quotation marks omitted). Under *Copperweld*, <u>in certain circumstances, distinct legal entities are incapable of concerted action for the purposes of Section 1 and must be viewed as a single entity</u>. 467 U.S. at 771.

(Doc. # 2063 at 30) (emphasis added). "In the context of Sherman Act § 1 claims, the [single entity] doctrine is a defense to a claim of a conspiracy which requires the agreement of two or more entities 'in competitive reality' to take unlawful action." *In re Mushroom Direct Purchaser Antitrust Litig.*, 54 F. Supp. 3d 382, 390 (E.D. Pa. 2014) (citing *Am. Needle*, 560 U.S. at 196).

To support their argument that the Association has disclaimed single-entity status for the very function for which the Blues claim it now, Providers argue that three documents, including a 2012 slide presentation to a "CEO Workgroup" called "Consumer Market: Strategic Brand and Marketing Plan" discussing that the Blues are not a single entity, constitute admissions that the Blues are not a "single entity" for purposes of this antitrust defense.  (Doc. # 2748 at 7). In the 2012 slide, Providers argue, the Blues "disclaimed any comparison between itself and sports

7

leagues, contrary to its position now that it governs the Blue marks the way the NFL governs the NFL marks." (Doc. # 2748 at 7).

However, nothing about the 2012 slide or the other documents indicates that they were prepared to discuss the Blues' status in relation to a Sherman Act § 1 claim. Thus, these documents, alone, simply do not represent admissions that the Blues can never be viewed as a single entity. *Copperweld* made clear that whether distinct legal entities can be viewed as a single entity depends on the circumstances. 467 U.S. at 771; *see also Chicago Pro. Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 95 F.3d 593, 600 (7th Cir. 1996) ("we do not rule out the possibility that an organization such as the NBA is best understood as one firm when selling broadcast rights to a network in competition with a thousand other producers of entertainment, but is best understood as a joint venture when curtailing competition for players who have few other market opportunities.").

Moreover, in pleadings and in litigation, parties are permitted to take alternative and even inconsistent positions. *PNC Bank, Nat'l Ass'n v. Rain Lily S., Inc.*, 2020 WL 5880874, at *3 (M.D. Fla. May 28, 2020) ("Federal courts in the Eleventh Circuit have followed Rule 8(d) in concluding that a party may plead alternative and even inconsistent claims."); *see also Hyskaj v. New York New York Pizza, LLC*, 2018 WL 7458261, at *6 (M.D. Fla. Nov. 14, 2018) (ruling plaintiff was permitted to plead alternative and inconsistent claims alleging contradictory reasons for his termination); *Joseph v. Chronister*, 2019 WL 8014507, at *9 (M.D. Fla. Jan. 3, 2019) (rejecting defendant's argument that claims should be dismissed based on internally inconsistent factual allegations); *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1175 (11th Cir. 2014) ("It is a well-settled rule of federal procedure that plaintiffs may assert alternative and contradictory theories of liability.").

In this context, Providers are not entitled to summary judgment on the single entity defense.

**B.      What is the appropriate function to consider in relation to the single entity defense?**

In *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, the Fifth Circuit confirmed that a functional approach under *American Needle* is appropriate. 776 F.3d 321, 327 (5th Cir. 2015). In their Motion, Providers appear to argue that the court erred in its prior decision applying this function-by-function analysis by assessing the function put forward by the Blues, *i.e.* governance of the Blue Marks and trademark enforcement. Providers argue that the relevant functions are actually allocating territory and restricting output through the now-discontinued National Best Efforts ("NBE") rule. (Doc. # 2748 at 6). But, this argument ignores that it is the Blues' defense to articulate and present.

**i.      The alleged territorial allocation function.**

The Rule 56 evidence previously considered by the court showed that:

> certain Plans initially developed "individual" trademark rights. Then, the Plans purposefully integrated those "individual" assets into the separate Cross and Shield predecessors. [] Later, those entities applied for and received nationwide, federal trademark registrations and "licensed" the Marks back to the Plans employing ESAs based on the areas where the Plans previously used the Marks.

> Only in 1982, with the merger of the Blue Cross and Blue Shield Associations, did the Marks even arguably come under the control of a single entity. [] Around that time, Defendants formed a single entity and deliberately consolidated undisputedly separate Marks into that entity.

(Doc. # 2063 at 32-33). The License Agreements under which the Blue Plans may use the Federal Marks identify the exclusive "service area" where a Plan may use its Marks. (Docs. # 1352-49 through 1352-128; 1432 at 11, 19-20; 2063 at 9). Thus, the Blues contend, the territorial allocations of which Providers complain are inextricably linked with governance of the Blue Marks and/or trademark enforcement.

9

However, as this court previously noted, "it is not dispositive that the teams have organized and own a legally separate entity that centralizes the management of their intellectual property." *Am. Needle*, 560 U.S. at 197 (quoting *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598 (1951)). *American Needle* held that "the NFL and its teams might, *in some instances*, be capable of concerted action in violation of the Sherman Act." *Washington v. Nat'l Football League*, 880 F. Supp. 2d 1004, 1006 (D. Minn. 2012) (emphasis added) (citing *Am. Needle*, 560 U.S. at 202-03).

As to the facts of this case, however,

> Plaintiffs have [] presented sufficient evidence to create a genuine issue of material fact as to the validity and/or enforceability of the Marks, and it is the licensing of these Marks that constitutes the "function" for which Defendants claim single entity status. There is also evidence that, among the Plans, even with respect to this particular "function," there are deep disagreements about whether service areas based on the Marks should be exclusive.

(Doc. # 2063 at 33). Thus, "it is genuinely disputed whether even related to this applicable function -- enforcing trademarks -- Defendants are acting as a single entity." (*Id*. at 35).

Because there is a genuine issue of material fact as to whether Defendants are acting as a single entity with regard to licensing the marks and allocating territories, the court cannot say as a matter of law whether Defendants' conduct can or cannot be shielded by the single entity defense.

### ii.    The former output restriction function.

Providers argue that, "[w]ith respect to the National Best Efforts rule, the single-entity defense is even weaker." (Doc. # 2748 at 11). The Blues assert that this argument of Providers "must [] fail" and "is [] irrelevant." (Doc. # 2801 at 17).

This court has already determined that "the National Best Efforts rule is an output restriction." (Doc. # 2063 at 47). Subsequent to that ruling, the Blues eliminated the Rule. In

relation to the prior motions for summary judgment, this court already found that "there is nothing in the Rule 56 record which indicates that there is any valid connection between trademark rights and the National Best Efforts rule." (*Id*. at 46). However, under Providers' Fourth Amended Complaint, it would be inappropriate to view the output restriction of NBE as a separate function for purposes of the single entity defense.

In the Fourth Amended Complaint, Providers assert claims based on two alleged conspiracies: (1) a Market Allocation Conspiracy (Doc. # 1083 at 119); and (2) a Price-Fixing and Boycott Conspiracy (*Id*. at 123, 170-77). No separate output restriction conspiracy has been alleged. (Doc. # 1083). Providers allege that "Defendants' agreements to limit competition and not contract with providers based on geographic Service Areas are referred to in this complaint as the 'BCBS Market Allocation Conspiracy.'" (*Id*. at ¶ 323). They further allege that "[t]he agreed-to restrictions on the ability of the Blues to generate revenue outside of their specified Service Areas constitute agreements to divide and allocate geographic markets[.]" (*Id*. at ¶ 301). Providers have also explicitly taken the position that "NBE is part of the 'Market Allocation Conspiracy' described in the Complaint." (Doc. # 2747 at 25). Therefore, according to Providers' Fourth Amended Complaint, the functions of market allocation and revenue restrictions go hand-in-hand. Thus, the single entity defense cannot be parsed out separately relative to the functions of allocating territory and restricting output.

### C. Courts have concluded, since *American Needle*, that antitrust defendants can be a single entity with regard to certain functions but not others.

As this court previously noted, "*American Needle* left open the question of how the case would have been decided if decisions by the NFLP regarding the jointly owned NFL trademarks had been at issue. 560 U.S. at 201." (Doc. # 2063 at 33). Following *American Needle*, more recent cases have held, with regard to the licensing of collectively owned property (which no one

entity can do alone) that the NFL may constitute a single entity. *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 114 (S.D. N.Y. 2015) (dismissing Section 1 claim regarding collectively owned intellectual property as a matter of law); *Washington v. Nat'l Football League*, 880 F.Supp.2d 1004, 1006 (D. Minn. 2012) ("The NFL and its teams can conspire to market each teams' individually owned property, but not property the teams and the NFL can only collectively own."). Thus, a jury could conclude that the Blue Plans are a single entity for purposes of licensing the Blue Marks owned by the Association because no one Blue Plan could do that alone.

## IV.   Conclusion

Under the facts of this case, the court cannot say as a matter of law whether Defendants' conduct can be shielded by the single entity defense. Because there remain genuine issues of material fact as to whether Defendants operate as a single entity as to the enforcement of the Blue Marks and the alleged market allocation, Provider Plaintiffs' Motion for Partial Summary Judgment on the Defendants' Single Entity Defense (Doc. # 2748) is **DENIED**.

**DONE** and **ORDERED** this December 22, 2023.

R. DAVID PROCTOR
UNITED STATES DISTRICT JUDGE