FILED

2024 Jan-31  PM 05:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD    } | |
| } | **Master File No.:  2:13-CV-20000-RDP** |
| **ANTITRUST LITIGATION**    } | |
| **(MDL NO.: 2406)**    } | This order relates to the Provider Track |

## MEMORANDUM OPINION AND ORDER

This matter is before the court on Defendants' Motion for Summary Judgment on (1) All Claims Advanced by Non-General Acute Care Hospital Providers and (2) Any Claims Based on Blue System Rules Other Than ESAs or BlueCard for Failure to Demonstrate Injury or Damages. (Doc. # 2750). The Motion has been fully briefed. (Docs. # 2751, # 2797, # 2819). For the reasons discussed below, the Motion is due to be denied.

## I.    Background

Providers' analysis of injury and damages is found in the models prepared by their experts, Dr. Deborah Haas-Wilson, Dr. Daniel J. Slottje, and Dr. H.E. Frech, III. (Docs. # 2751 at 7-8, # 2797 at 7). Dr. Frech performed extensive empirical analysis, reviewing the documentary history of the Blues, deposition transcripts in this litigation, and other sources. (*Id.*). Dr. Haas-Wilson and Dr. Slottje performed quantitative analyses of injury and damages. (*Id.*).

Dr. Haas-Wilson's conclusion is that, absent the At-Issue Agreements, out-of-area Blue Plans would have entered Alabama and begun selling insurance or contracting with providers (or both) using their Blue brands. (Doc. # 2454-6 at ¶¶ 16, 21). She further opined that the At-Issue Agreements limited choice, increased the contracting leverage that BCBS-AL has in its interactions with Providers, and allowed BCBS-AL to obtain lower contracted prices with

Providers. (*Id.* at ¶ 21). Dr. Frech also analyzed the use of "Most Favored Nation" clauses to reduce provider reimbursements and deter competition, as well as the Blues' refusal to honor assignments of benefits in order to pressure providers to join the Blues' networks. (Doc. # 2454-3 at ¶¶ 337-48, 353).

Dr. Haas-Wilson presents seven hypothetical scenarios in support of her theories. (Doc. 2454-6 at ¶¶ 470-72, 475). In each scenario, Dr. Haas-Wilson posits that some combination of Blue System rules will be declared illegal, and she identifies what she believes the impact of eliminating that combination of rules would be on Providers. (*Id.* at ¶¶ 472, 475-76, 491-542).

Dr. Haas-Wilson's assessment of harm applies only to General Acute Care Hospitals, and cannot be applied to other types of healthcare providers because of "data limitations." (*Id.* at ¶¶ 469-70, 488 & n.660; Doc. # 2564-67 at 62-66). Providers do not have a statistical method for calculating class-wide damages for Non-Hospital Providers. (Doc. # 2696-1 at 113). However, Dr. Frech analyzed the economic impact of the Blues' conduct on all Providers, including Non-Hospital Providers. (Doc. # 2454-3 at 337-48, 353).[1]

Dr. Haas-Wilson defines the At-Issue Agreements as the Market Allocation Agreements on Blue-Branded Provider Contracting, Market Allocation Agreements on Selling Blue-Branded Healthcare Financing Services, Price Fixing, and Output Restrictions on Unbranded Business (the best efforts rules). (Doc. # 2454-6 at ¶ 77). However, the only Blue System rules for which she

---

[1] In their brief, Defendants address eight named Provider Plaintiffs in the streamlined provider action that are not general acute care hospitals. (Doc. # 2751 at 9). In February 2022, the court granted Certain Defendants' Motion for Partial Summary Judgment (Doc. # 2753) and entered final judgment in favor of Defendants on the claims asserted by Plaintiffs Charles H. Clark III, M.D., Robert W. Nesbitt, M.D., Luis R. Pernia, M.D., Corey Musselman, M.D., Julie McCormick, M.D., L.L.C., Harbir Makin, M.D., Hillside Family Medicine, LLC, Ear, Nose & Throat Consultants and Hearing Services, P.L.C., and Kathleen Cain, M.D. (Doc. # 2903). Therefore, only five of the named Provider Plaintiffs addressed by Defendants remain Plaintiffs in the Streamlined Actions: Jerry L. Conway, D.C.; North Jackson Pharmacy, Inc.; Janine Nesin, P.T., D.P.T., O.C.S.; Joseph D. Ackerson, Ph.D.; and Matthew Caldwell, M.D. (Docs. # 2751 at 9; # 2797 at 6, n.1; # 2903).

attempted to quantify economic impact are the ESA rules in the Blue license agreements (the "Market Allocation Agreements on Contracting" and "Market Allocation Agreements on Selling") and the BlueCard program (the alleged "Price Fixing Agreements"). (Doc. # 2454-6 at ¶¶ 77, 78 & n.169, ¶ 91 & n.191, ¶ 474). Providers have not attempted to quantify the economic impact to their business, if any, from any other feature of the Blue System, including the now-eliminated National Best Efforts ("NBE") rule. (Docs. # 2454-6 at ¶¶ 474, 548-49; # 2564-67 at 305-307). Although Dr. Haas-Wilson opines that the Output Restriction Agreements on Unbranded Business likely enhanced BCBS-AL's homed share, lowered prices, and harmed providers in Alabama, she did not quantify any such impact, nor did Dr. Frech. (Docs. # 2454-3 at ¶¶ 321-330; # 2454-6 at ¶¶ 548-551).

In Providers' damages model, Providers' damages expert, Dr. Slottje, took Dr. Haas-Wilson's assessment of harm in her seven hypothetical scenarios and extrapolated from each an estimate of damages. (Docs. # 2454-14 at ¶¶ 50, 80, 88; # 2564-69 at 124). As a result, Dr. Slottje's damages calculations share the same limitations as Dr. Haas-Wilson's model: they only apply to General Acute Care Hospitals Providers and do not quantify damages from any feature of Defendants' business other than ESAs and BlueCard. (Docs. # 2773-2; # 2454-14 at ¶¶ 7, 9, 35(a), 91).

But importantly, Providers' evidence of antitrust impact and harm is not limited to its experts' reports and testimony. For example, Plaintiff Joseph D. Ackerson, Ph.D., a neuropsychologist, testified that the Blues' agreements have "unfairly limit[ed] the people that are competing for [his] services in order to contract with [him]" and that he believes this has had "a significant impact on [his] income [because he has] to see so many more patients now than [he] did before to try to keep paying the bills and make ends meet." (Doc. # 2844-1 at 186). He further

testified that psychologists "have to accept whatever Blue Cross decides they're going to pay or just not see any Blue Cross patients." (*Id*. at 190).

Plaintiff Matthew Caldwell, M.D., a family medicine physician, testified that he believed the Blues' agreements mean that "[t]here's not enough competition[,]" that he desired to negotiate with Blue Plans around the country for higher reimbursement rates, but that he was unable do to so. (Doc. # 2842-2 at 98).

Former Plaintiff Charles H. Clark III, M.D., a neurosurgeon, testified that his practice's "reimbursement rate by Blue Cross gradually ratcheted down over the years." (Doc. # 2844-2 at 236). He testified that his "base charge rate [is] basically the same as it was in 1985." (*Id*. at 239). He further testified that he would like the opportunity to "negotiate separately with [other] Blue Cross Blue Shield plans." (*Id*. at 238). And, he testified that he "know[s] that [some of his] friends in other states are paid more than [him] for doing the same thing" because "Blue Cross of Alabama is probably on the lower [reimbursement] scale of Blue Cross companies." (*Id*. at 271-72). The administrative director of Dr. Clark's practice, Robby Carruba, testified that the practice's reimbursement rates from BCBS-AL have either held steady or dropped since 2011. (Doc. # 2844-3 at 66-76). Only in one or two instances of durable medical equipment (DME) was Carruba aware of a reimbursement rate going up. (*Id*. at 67).

Plaintiff Jerry L. Conway, D.C., a retired chiropractor, testified that when he was in practice in Alabama, his compensation was low compared to chiropractors in California. (Doc. # 2842-5 at 63).

Former Plaintiff Robert W. Nesbitt, M.D., an anesthesiologist with a specialty in pain management, testified that he was aware that reimbursement rates in states surrounding Alabama, such as Georgia and Tennessee, are "higher than what [they are] here in Alabama" and that his

reimbursement rate is going down." (Doc. # 2844-4 at 362, 388-89). He noted that physicians in Alabama are "one of the lowest, if not the lowest, reimbursed group of physicians in the country." (*Id*. at 362-63). He further noted that he would "love to negotiate with" out of state Blues Plans. (*Id*. at 364).

Plaintiff Janine Nesin, P.T., D.P.T., O.C.S., a physical therapist, testified that she considered leaving BCBS-AL's network in 2015 because her reimbursement rates had not increased since 2000. (Doc. # 2844-5 at 33, 219). She stated that BCBS-AL "hold[s] way too much of the market share" such that providers like her "don't have any negotiating power." (*Id*. at 220).

Plaintiff North Jackson Pharmacy's corporate representative, Brian Hicks, testified that its reimbursement rates from BCBS-AL have gone down over the past ten years. (Doc. # 2842-8 at 92-93). He testified that he hoped if the pharmacy was given the opportunity to negotiate, it would receive higher reimbursement rates. (*Id*. at 183).

Former Plaintiff Luis R. Pernia, M.D., a plastic surgeon, testified that his reimbursements from BCBS-AL, including (for example) those for medically necessary breast reduction surgeries, have decreased. (Doc. # 2842 at 189-90). This has caused him to have to cut back on expenses, go without a paycheck, and reduce his staff from "seven employees to two and a half." (*Id*. at 309). He testified that he would like the option to negotiate with out of state Blue plans on reimbursement rates "because there are states that are close" and he "see[s] quite a number of their patients." (*Id*. at 269-70).

None of these Plaintiffs, however, testified that they would, in fact, receive higher reimbursement rates from any other Blue Plan if it was allowed to operate in Alabama. (*See, e.g.*, Docs. # 2839-2 at 151-52; # 2839-3 at 52, 237; # 2839-4 at 129-30; # 2839-5 at 364-65; # 2839-6 at 116-17; 2839-8 at 281).

Applying economic theory to the underlying data, Providers' expert Dr. Haas-Wilson has opined that the At-Issue Agreements "have reduced prices paid to Alabama healthcare providers." (Doc. # 2454-6 at ¶¶ 322-53, 455-64). More specifically, she stated that "BCBS-AL's increased contracting leverage associated with the Market Allocation Agreements on Selling has resulted in lower prices paid to providers." (*Id.* at ¶ 331). Dr. Frech also testified that the Blues' territorial market allocation agreements "reduce[] competition for provider services and consequently, the prices paid for health care services are reduced thus harming all or substantially all providers." (Doc. # 2454-3 at ¶ 393).

In interviews conducted by the Association in which questions about ESAs were asked, Plan CEOs stated that ESAs create "[l]arger market share because other Blues stay out and do not fragment the market" (Doc. # 1350-22 at 3), and this allows for aggressive bargaining by the Blues. (Doc. # 1350-23 at 3).

Dr. Haas-Wilson opined that, but for the Blues' agreements not to compete, one or more additional Blue Plans would have competed in Alabama. (*Id.* at ¶ 325). As of 2016, nine Plans other than BCBS-AL had at least 10,000 members who resided in Alabama: Anthem (150,912); HCSC (97,497); Highmark (45,234); BlueCross BlueShield of Tennessee (37,111); Blue Cross Blue Shield of Michigan (29,579); USAble Mutual Insurance Company (Arkansas) (22,705); BCBSM (Minnesota) (16,834); Horizon Healthcare Services (New Jersey) (11,357); and Blue Cross and Blue Shield of North Carolina (10,192). (Docs. # 1350 at 17-18; 1432 at 17).

As to whether another Blue would have been willing to enter Alabama, when speaking about Anthem's proposed merger with Cigna, and in relation to the prospect of competing for national accounts outside of its fourteen-state service area, an Anthem representative testified in other litigation as follows:

> [O]ur current market is confined to the 14 states. We have the Blue Cross/Blue Shield license, and we have any number of customers and consultants that express an interest in working with us, and we're prohibited from doing that. To be able to go from – I know we're a national plan. We're a national plan that operates in 14 states. To be an [sic] national plan that operates in 50 states and have unfettered access, without asking permission to have a conversation with a prospect, would be – I don't know – exhilarating, I would say.

(Doc. # 945-1 at 3). Another Blue Plan CEO reported that "without service areas, 'there would be open warfare.'" (Doc. # 2063 at 13 (citing Doc. # 1350-24 at 2)).

In the 1980s, prior to the adoption of the BlueCard program, BCBS-AL contracted with twenty-nine providers in counties contiguous to Alabama. (Doc. # 1350-33 at 3-5). At some point, BCBS-AL stopped directly contracting with those providers. (*Id*.). Under BlueCard, Plans are required to make their local provider discounts available to all Blue Members, even if they live in another Plan's service area. (Doc. # 1352-44 at 56).

## II.     Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id*. at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id*. at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts

and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

The court notes that the standard of review on a motion for summary judgment differs depending on whether the party moving for summary judgment bears the burden of proof on the claim at issue. As the Sixth Circuit has noted:

> When the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial. But where the moving party has the burden–the plaintiff on a claim for relief or the defendant on an affirmative defense–his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.

*Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). "Where the movant also bears the burden of proof on the claims at trial, it 'must do more than put the issue into genuine doubt; indeed, [it] must remove genuine doubt from the issue altogether.'" *Franklin v. Montgomery Ctv., Md*., 2006 WL 2632298, at *5 (D. Md. Sept. 13, 2006) (quoting *Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 164 (4th Cir. 1999)) (alteration in original).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003)

(quoting *Anderson*, 477 U.S. at 251-52) (internal quotations omitted); *see also LaRoche v. Denny's, Inc*., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear … that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.  Analysis

In their Motion, Defendants argue that, to establish liability based on an antitrust conspiracy, Providers must demonstrate both that they were harmed by Defendants' actions and put forward a reliable estimate of the amount of damage caused. (Doc. # 2751 at 7). They contend that a number of the Provider Plaintiffs' claims fail to satisfy these basic requirements and, therefore, judgment on those claims must be entered in Defendants' favor. (*Id*.). Defendants assert that, for all Providers other than General Acute Care Hospitals, Providers have put forward no method for assessing harm or damages whatsoever. (*Id*.). Moreover, they argue that Providers cannot maintain any claims to the extent they are based on any rule other than ESAs or BlueCard because their damages model is expressly based solely on those two rules, and does not estimate damages for the now-eliminated NBE rule or for any other Blue System rules. (*Id*.).

Providers respond that, to prevail on their motion, Defendants must prove beyond any genuine dispute that each of the Non-Hospital Providers have suffered no injury or damages, and that no Non-Hospital Providers have been injured or damaged by any Blue System rules other than ESAs or BlueCard. (Doc. # 2797 at 6). Providers point out that the Non-Hospital Providers have provided deposition testimony about their alleged damages. (*Id*.). Providers further explain that their experts provided reports and testimony regarding how the Blue rules, including ESAs, BlueCard, and other rules and practices, have injured and damaged all Providers, hospital and non-hospital. (*Id*.). They explain that the Rule 56 evidence supports their claim that they suffered

9

injuries, including price harms (such as reduced reimbursements) and non-price harms (such as the lack of choice). (*Id*.).

A.      **Claims Asserted in Providers' Consolidated Fourth Amended Complaint**

In relation to the prioritized Alabama proceedings, the named Provider Plaintiffs have asserted the following claims "*on behalf of themselves* and on behalf of a class of Alabama healthcare providers" (Doc. #  1083 at ¶ 449):

i.       a claim for Injunctive Relief under Section 16 of the Clayton Act, 15 U.S.C. § 26 regarding Defendants' Market Allocation Conspiracy and their Price Fixing and Boycott Conspiracy (*Id*. at ¶ 461);

ii.      a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest (The Per Se Market Allocation Conspiracy) (*Id*. at ¶ 467);

iii.     a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest (The Per Se Price Fixing and Boycott Conspiracy) (*Id*. at ¶ 472);

iv.      a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest (Quick Look Claim for Market Allocation Conspiracy) (*Id*. at ¶ 478);

v.       a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest (Quick Look Claim for Price Fixing and Boycott Conspiracy) (*Id*. at ¶ 488);

vi.      a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest (Rule of Reason Claims for Market Allocation Conspiracy) (*Id*. at ¶ 498);

vii.     a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest (Rule of Reason Claims for Price Fixing and Boycott Conspiracy) (*Id*. at ¶ 503);

viii.    a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest (Monopsonization) (*Id*. at ¶ 508);

ix.      a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest (Attempted Monopsonization) (*Id*. at ¶ 515); and

x.      a claim under Section 4 of the Clayton Act, 15 U.S.C. § 15, for threefold or trebled damages and interest (Conspiracy to Monopsonize) (*Id*. at ¶ 515).

Providers base their claims on two conspiracies: the Market Allocation Conspiracy  and the Price Fixing and Boycott Conspiracy. (Doc. # 1083 at ¶¶ 317-338). Providers define the "Market Allocation Conspiracy" as "Defendants' agreements to limit competition and not contract with providers based on geographic Service Areas." (*Id*. at ¶ 323). The "Price Fixing and Boycott Conspiracy" is defined to include the following programs: "a) Transfer Program; b) Inter-Plan Teleprocessing System (ITS); c) Blue Card Program; d) National Accounts Programs; e) National Associate Agreement for Blue Cross and Blue Shield Licenses effective April 14, 2003; and f) Inter-Plan Medicare Advantage Program." (*Id*. at ¶ 326).

The only allegations regarding Defendants' "best efforts rules" are found in paragraph 15 of the Fourth Amended Complaint. (*Id*. at ¶ 15). Providers identify the non-Blue revenue restriction agreement as one of the five anticompetitive agreements addressed in the Fourth Amended Complaint. (*Id*.).

Although Providers assert class claims in their Fourth Amended Complaint and have moved for class certification on certain claims and issues, they have *not* moved for certification of a damages class on behalf of Non-General Acute Care Hospital Providers. (Doc. # 2797 at 13). These Providers seek damages on an individual basis and injunctive relief on a class-wide basis. (*Id*. at 13-14).

## B.      Antitrust Principles

Section Four of the Clayton Act creates a private right of action for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ..., and shall recover threefold the damages by him sustained." 15 U.S.C. § 15(a). Section 16 of the Clayton Act provides in part that "[a]ny person, firm, corporation, or association

shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . .." 15 U.S.C. § 26.

"To have antitrust standing, a party must do more than meet the basic 'case or controversy' requirement that would satisfy constitutional standing; instead, the party must show that it satisfies a number of 'prudential considerations aimed at preserving the effective enforcement of the antitrust laws.'" *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010) (quoting *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991)). The Eleventh Circuit "employ[s] a two-prong test for antitrust standing under § 4 of the Clayton Act: [the] first [of which is that] the plaintiff must have alleged an antitrust injury." *Palmyra Park Hosp.*, 604 F.3d at 1299.

The Supreme Court has defined "antitrust injury" as:

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."

*Id*. (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977) (in turn quoting *Zenith Radio Corp. v. Hazeltine Research*, 395 U.S. 100, 125 (1969))) (alteration in original).

In *Palmyra Park Hosp.*, the court listed the harms that the plaintiff had alleged to be the result of a tying arrangement: "less competition for the tied products, which means higher prices and fewer choices for consumers." *Id*. at 1303. The court explained that "[t]his is precisely the type of harm that we allow plaintiffs to vindicate through the antitrust laws." *Id.* (citing *Mun. Utils. Bd. of Albertville v. Ala. Power Co.*, 934 F.2d 1493, 1500 (11th Cir. 1991) (finding an antitrust injury when an exclusive service-area arrangement limited the plaintiffs' "ability to compete for future customers by excluding them from territories where they formerly competed")).

### C.        Whether Providers Have Presented Proof of Antitrust Injury

Defendants argue that they are entitled to summary judgment "on each of the Non-Hospital Plaintiffs' claims because Providers have put forward no proof of injury or damages as to these plaintiffs." (Doc. # 2751 at 12). They base this argument on the fact that Providers' expert Dr. Haas-Wilson did not quantify damages for the Non-Hospital Providers. (*Id*.). However, as Providers point out, they do not plan to pursue money damages on a class-wide basis for the Non-Hospital Providers and, in any event, Defendants have ignored the individual Providers' deposition testimony regarding their alleged damages. (Doc. # 2797 at 13-15). Providers also argue that they are entitled to injunctive relief without regard to a damages model.

"Antitrust injuries come in two basic forms. First, anticompetitive conduct is injurious if it results in higher prices.[] Second, anticompetitive conduct is injurious if it limits consumer options." *Laumann v. Nat'l Hockey League*, 105 F. Supp. 3d 384, 396-97 (S.D.N.Y. 2015) (citing *Ross v. Bank of America*, 524 F.3d 217, 226 (2d Cir. 2008) (concluding that reductions in "consumer choice" and the "equality of [ ] services offered" are antitrust injuries); *United States v. Visa USA*, 344 F.3d 229, 243 (2d Cir. 2003) (explaining that restraints that discourage firms from "design[ing] ... their products more competitively" can give rise to antitrust injury); and *Laumann v. National Hockey League*, 907 F.Supp.2d 465, 480 (S.D. N.Y. 2012) ("Reduced consumer choice ... when [it is] the result of an anticompetitive practice, constitute[s] antitrust injury.")).

"Anticompetitive effects are those that harm consumers. Think increased prices, decreased output, or lower quality goods. Eliminating potential competition is, by definition, anticompetitive." *Impax Laboratories, Inc. v. F.T.C.*, 994 F.3d 484, 492 (5th Cir. 2021). "The Supreme Court has opined that one form of antitrust injury is 'coercive activity that prevents its

13

victims from making free choices between market alternatives.'" *Ross v. Bank of Am., N.A.(USA)*, 524 F.3d 217, 222 (2d Cir. 2008) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983); *see also Lucasys Inc. v. PowerPlan, Inc*., 576 F. Supp. 3d 1331, 1351 (N.D. Ga. 2021) ("'[A] dominant firm's restraints on the innovations of others goes to the heart of antitrust policy ....'" (citing Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 704d (4th ed. 2015) at 234)). "A plaintiff may assert antitrust injury from '[c]oercive activity that prevents [consumers] from making free choices between market alternatives,' *as well as* restraints that artificially erect barriers to market entry and protect lower quality products." *CollegeNET, Inc. v. Common Application, Inc*., 711 F. App'x 405, 406-07 (9th Cir. 2017) (citing *Glen Holly Entm't, Inc. v. Tektronix, Inc*., 352 F.3d 367, 374-75 (9th Cir. 2003) and quoting *Amarel v. Connell*, 102 F.3d 1494, 1509 (9th Cir. 1996)) (emphasis added).

Providers have not provided an expert report quantifying money damages for the Non-Hospital Providers, but that does not mean that they have failed to present any evidence of antitrust injury. Certain Non-Hospital Providers testified regarding how the Market Allocation Agreements and the Price Fixing Agreements affected them. They testified that these rules eliminate contracting options for them, and they would like the option to negotiate with other out of area Blues. Dr. Frech has presented expert testimony that, due to the Blues' Market Allocation Agreements On Contracting, other Blue plans based outside of Alabama cannot contract with Alabama providers and must purchase services of local providers through BCBS-AL, and that this directly reduces providers' choices of health plans with which to contract. (Doc. # 2454-3 at ¶ 17). Dr. Haas-Wilson has presented expert testimony that the Blues' agreements not to compete in Alabama have inflated BCBS-AL's market share and increased its bargaining leverage, resulting

14

in lower reimbursement rates paid to Providers. (Doc. # 2454-6 at ¶¶ 331-32). Moreover, "[section] 16 of the Clayton Act, 15 U.S.C. § 26, which was enacted by the Congress to make available equitable remedies previously denied private parties, invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of 'threatened' injury." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969). Providers have presented evidence that they have suffered more than just threatened injury. Indeed, they have presented evidence of actual injury as a result of the alleged conspiracies.

The court concludes that there are genuine issues of material fact regarding the Non-Hospital Providers' proof of antitrust injury, damages, and threatened injury resulting from Defendants' Market Allocation Conspiracy and the Price Fixing and Boycott Conspiracy. Therefore, Defendants' Motion for Summary Judgment on the issue of whether there is sufficient proof of the Non-Hospital Providers' antitrust injury is due to be denied.

### D. Rules Other than ESAs and BlueCard

Defendants argue that they are entitled to summary judgment on any Non-Hospital Provider claim based on NBE or any Blue rule other than ESAs and BlueCard. (Doc. # 2751 at 15). But that argument is divorced from the way Providers have actually pled their claims in this case.

In the Fourth Amended Complaint, Providers have based their claims on a Market Allocation Conspiracy and on a Price Fixing and Boycott Conspiracy. (Doc. # 1083). "No separate output restriction conspiracy has been alleged." (Doc. # 3093 at 11 (citing Doc. # 1083)). Rather, NBE is included in the At-Issue Agreements that make up the Market Allocation Conspiracy. Providers allege that "[t]he agreed-to restrictions on the ability of the Blues to generate revenue outside of their specified Service Areas constitute agreements to divide and allocate geographic

15

markets[.]"  (Doc. # 1083 at ¶ 301). Providers have also explicitly taken the position that "NBE is part of the 'Market Allocation Conspiracy' described in the Complaint." (Doc. # 2747 at 25).[2]

That NBE is a part of the Market Allocation Conspiracy is consistent with the court's analysis in its Standard of Review Opinion. There, the court:

> emphasize[d] that it analyzes the Blues' agreement as a whole to determine the appropriate standard of review. In other words, the court declines to examine the Blues' ESAs, best efforts rules, or brand restrictions in isolation where the Rule 56 evidence reveals that the Blues, through the Association, enacted new and unique aggregate competitive restrictions on top of the ESAs during the 1990s and 2000s.

(Doc. # 2063 at 22). In declining to view the particular rules in isolation, the court also specifically "expresse[d] no view about whether the ESAs alone qualify as a per se Sherman Act violation." (*Id*.). The court concluded that "Plaintiffs have presented evidence of an aggregation of competitive restraints -- namely, the adoption of ESAs and, among other things, best efforts rules -- which, considered together, constitute a per se violation of the Sherman Act." (*Id*. at 37).

More recently, the court held that "it would be inappropriate to view the output restriction of NBE as a separate function for purposes of the single entity defense." (Doc. # 3093 at 11). The court also noted that  "according to Providers' Fourth Amended Complaint, the functions of market allocation and revenue restrictions go hand-in-hand." (*Id*.).

---

[2] Interestingly, Providers' experts have not taken the same approach. For example, in her report, Dr. Haas-Wilson addresses the Output Restrictions on Unbranded Business separately. (Doc. # 2454-6 at 229). Her conclusion is that "The Output Restrictions on Unbranded Business have likely (1) reduced the number of Blue Plans selling unbranded healthcare financing services in Alabama," (2) "enhanced BCBS-AL's homed share, lowered prices, and harmed providers in Alabama," and (3) "harmed providers in Alabama through lower prices." (*Id*. at 229-230).

In a separate section titled "Quantifying Harm from the Output Restriction Agreements on Unbranded Business," Dr. Haas-Wilson states, "data do not exist to undertake an empirical analysis (similar to empirical analysis based on the homed share model) to predict how BCBS AL's contracting share would have been different in a but-for world without the Output Restriction Agreements on Unbranded Business." (Doc. # 2454-6 at 363, ¶ 550).

Dr. Frech also analyzed Output Restrictions on Unbranded Business separately from Market Allocation Agreements on Contracting and Selling and the Price Fixing and Boycott Agreements. (Doc. # 2454-3 at 110-123). He broadly concluded that NBE "heavily restrict[ed] unbranded competition by new licensees." (*Id*. at ¶¶ 321-330).

16

Therefore, because NBE and other rules have a role in the alleged Market Allocation Conspiracy and/or the alleged Price Fixing and Boycott Conspiracy, Defendants are not entitled to summary judgment separating out NBE and these other rules as standalone claims.

**IV.    Conclusion**

For all of the reasons discussed above, Defendants' Motion for Summary Judgment on (I) All Claims Advanced by Non-General Acute Care Hospital Providers and (II) Any Claims Based on Blue System Rules Other Than ESAs or BlueCard for Failure to Demonstrate Injury or Damages (Doc. # 2750) is **DENIED**.

**DONE** and **ORDERED** this January 31, 2024.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE