IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |
|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD<br><br>ANTITRUST LITIGATION<br>(MDL NO.: 2406) | Master File No.:  2:13-CV-20000-RDP<br><br>This order relates to the Provider Track |

**MEMORANDUM OPINION AND ORDER**

This matter is before the court on Provider Plaintiffs' Memorandum of Law in Support of Motion for Partial Summary Judgment on Defendants' Claim to Common-Law Trademark Rights. (Doc. # 2749). This issue is relevant because Defendants have taken the position that "[Section] 1 of the Sherman Act does not apply to Plaintiffs' per se claims [because] service areas derive from independently acquired common-law trademark rights, not any unlawful agreement." (Doc. # 1353). The Motion has been fully briefed. (Docs. # 2800, 2821). For the reasons discussed below, the Motion is due to be denied.

**I.      Background**

In 1934, the St. Paul Hospital Plan began using a Blue Cross symbol in Minnesota. (Docs. # 1349 at 11; 1431 at 15; 1435 at 11). It did not use the Blue Cross Mark in any other part of the country, and it did not allow or encourage any other Blue Plan to use the Blue Cross Mark in any different territory. (Doc. # 1353-4 at 22, 27-28, 30).

The first use of the Blue Shield Mark, in 1939, was by the Western New York Plan, located in Buffalo, New York. (Doc. # 1350-35 at 2). The Buffalo Plan used the Blue Shield Mark exclusively in Western New York. It did not use the Blue Shield Mark in any other part of the

country, nor did it allow or encourage any other Blue Plan to use the Blue Shield Mark in any different territory. (Doc. # 1353-5 at 38, 40).

Over time, other Plans began using these same symbols in parts of the country other than Minnesota and Western New York. (*Id.*; Docs. # 1349 at 11; 1353-4 at 27-31, 38, 40; 1353-5 at 38, 40; 1431 at 15; 1435 at 12). There were no license agreements either between the St. Paul and Buffalo Plans, on the one hand, or the remaining Blue Plans using the marks, on the other. (Docs. # 1350-28 at 39; 1353-7 at 26, 63-64).

"In the 1930s and 1940s, Plans other than St. Paul and Buffalo began using the Blue Cross and/or Blue Shield Marks in distinct geographies around the country." (Docs. # 1353-7 at 26-27, 62-64; 2735-5 at 5; 2735-10 at 6; 1551-3 at 35-38, 73-74). By the beginning of 1938, there were thirty-eight plans using the Blue Cross Marks. (Doc. # 1353-4 at 23). By 1939, the American Hospital Association ("AHA") issued "Standards for Non-Profit Hospital Service Plans," which provided that member plans may "identify the plan by using the seal of the [AHA] superimposed upon a blue cross." (Doc. # 1350-13 at 6).

By the beginning of 1946, thirty-two plans were using the Blue Shield Marks. (Doc. # 1353-5 at 35). In 1946, the American Medical Association ("AMA") "announced tentative standards of approval for medical plans" that provided member plans were "entitled to display the Seal of Acceptance of the [AMA] on their contracts and literature," which was a circle within which a Blue Shield is emblazoned with a caduceus and the letters "A.M.A." (Docs. # 1353-5 at 36; 1353-6 at 82-83). The Associated Medical Care Plans ("AMCP"), which administered this program, stated that approved members were "entitled to use the term 'Blue Shield' and the officially adopted Blue Shield symbol." (Doc. # 1353-20 at 16).

Shortly after Congress passed the Lanham Act in 1946, the predecessors in interest to the present-day Association made applications to federally register the Blue Cross and the Blue Shield trademarks. (Docs. # 1353-28, 1353-29, 1353-31–1353-47). "On December 13, 1947, the Blue Shield Medical Care Plans (the 'National Organization') formally adopted the Shield Mark as the official service mark for the Organization." (Docs. # 1350-35 at 2; 1353-48). Thereafter, in 1950, Blue Shield Medical Care Plans applied for federal registration of the Blue Shield Mark. (Docs. # 1353-46; 1353-48; 2063 at 6). In 1947 and 1948, the AHA applied for and received federal registrations for the Blue Cross Mark after member Plans voted that the AHA should "proceed with registration of the words 'Blue Cross', 'Blue Cross Plan', and the Blue Cross symbol." (Doc. # 2735-4 at 9-10).

The 1952 Blue Shield "pooling agreement" ("1952 License Agreement") acknowledged that, prior to the incorporation of the National Organization, several members had adopted and used, in both intra-state and interstate, a service mark consisting of the words "Blue Shield," which were either used alone or in conjunction with a symbol in the shape of a shield, colored blue. (Doc. # 1353-48 at 2-3).

The 1954 Blue Cross license agreement ("1954 License Agreement") acknowledged that, "as a result of their use of the words BLUE CROSS and the design of a blue cross with respect to prepayment plans for hospital care and related services, certain INDIVIDUAL PLANS hereto subscribing have developed certain territorial rights with respect to the words BLUE CROSS and the design of a blue cross in the particular areas served by such PLANS." (Doc. # 1353-50 at 2-3).

BCBS-AL used both Blue Marks on a state-wide, exclusive basis before the Marks were federally registered and before there were written license agreements with exclusive service areas. (Docs. # 1353-4 at 29; 1353-5 at 38; 2735-16 at 94-95, 98).

**II.     Legal Standard**

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id*. at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *Id*. at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. for Bibb Cty*., 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id*. at 249.

The court notes that the standard of review on a motion for summary judgment differs depending on whether the party moving for summary judgment bears the burden of proof on the claim at issue. As the Sixth Circuit has noted:

> When the moving party does not have the burden of proof on the issue, he need show only that the opponent cannot sustain his burden at trial. But where the moving party has the burden–the plaintiff on a claim for relief or the defendant on

4

>an affirmative defense–his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.

*Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting William W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). "Where the movant also bears the burden of proof on the claims at trial, it 'must do more than put the issue into genuine doubt; indeed, [it] must remove genuine doubt from the issue altogether.'" *Franklin v. Montgomery Cty., Md.*, 2006 WL 2632298, at *5 (D. Md. Sept. 13, 2006) (quoting *Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 164 (4th Cir. 1999)) (alteration in original).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear … that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

**III.  Analysis**

In their Motion, Providers argue that Defendants had no "'independently acquired trademark rights' to exclude other plans from their 'service areas'" because (1) they never had such rights and (2) the original users engaged in "naked licensing" at common law that "resulted in the abandonment of rights in the mark." (Doc. # 2749 at 4). Alternatively, they argue "that only the original users of the Blue Marks, the St. Paul plan and the Buffalo plan, independently acquired common-law trademark rights, with the rest of the Blues being licensees at most." (*Id.*).

5

Defendants respond that Providers' Motion is "built on a fundamental misunderstanding of common law trademark rights and a disregard for the record." (Doc. # 2800 at 8). They assert that "'naked licensing' requires the existence of a license agreement; Providers do not (and cannot) claim there was ever a license agreement between the first users of the Blue Marks and other Blue Plans" and "[t]hat alone defeats their 'naked licensing' theory." (*Id.*). Defendants also argue that "there [was no]thing unusual or problematic about different Blue Plans using the Blue Marks in different parts of the country: this is exactly how geographically-limited trademark rights [were] acquired and exercised at common law." (*Id.*).

In reply, Providers argue that because use of the Blue Marks "was undisputedly undertaken with the permission of the first users of the Marks, [] no Blue Plan, other than the St. Paul and Buffalo Plans, ever had a common-law right to exclude others from using the Blue Marks in their own territory." (Doc. # 2821 at 6).

The court begins with a review of certain common law trademark principles. "At common law, trademark ownership is acquired by actual use of the mark *in a given market*." *Emergency One, Inc. v. Am. Fire Eagle Engine Co*., 332 F.3d 264, 267 (4th Cir. 2003) (citing *United Drug Co. v. Theodore Rectanus Co*., 248 U.S. 90, 97-98 (1918)) (emphasis added); *see also Tally-Ho, Inc. v. Coast Cmty. Coll. Dist*., 889 F.2d 1018, 1022 (11th Cir. 1989). "At common law, therefore, the exclusive right to use a mark is 'limited to areas where [the mark] had been used and the claimant of the mark had carried on business.'" *Emergency One*, 332 F.3d at 268 (quoting *Armand's Subway, Inc. v. Doctor's Assocs., Inc.,* 604 F.2d 849, 849 (4th Cir. 1979)); *see also Spartan Food Sys., Inc. v. HFS Corp*., 813 F.2d 1279, 1282 (4th Cir. 1987) ("The common law rights are restricted to the locality where the mark is used and to the area of probable expansion."). "[T]he owner of common-law trademark rights in an unregistered mark is not entitled [to enforce

6

its priority] in those localities where it has failed to establish actual use of the mark." *Id*. (citing *Spartan Food*, 813 F.2d at 1282-84).

In contrast, "registration of a trademark under the Lanham Act 'creates a presumption that the registrant is entitled to use the registered mark throughout the nation.'" *Id*. at 269 (quoting *Draeger Oil Co. v. Uno-Ven Co*., 314 F.3d 299, 302 (7th Cir. 2002)).

"The first to use a mark on a product or service in a particular geographic market, the senior user, acquires rights in the mark in that market." *Tally-Ho*, 889 F.2d at 1023. However, "[u]nder the *Tea Rose/Rectanus* doctrine,[1] 'the first user of a common law trademark may not oust a later user's good faith use of an infringing mark in a market where the first user's products or services are not sold.'" *Emergency One*, 332 F.3d at 271 (quoting *Nat'l Ass'n for Healthcare Commc'ns, Inc. v. Cent. Ark. Area Agency on Aging, Inc*., 257 F.3d 732, 735 (8th Cir. 2001)). "In other words, 'a junior user, who in good faith adopted a mark for use at a place remote from the place of senior use of a similar mark, has a right to continue its use of the mark superior to the right of the senior user.'" *Id*. (quoting *Spartan Food*, 813 F.2d at 1282). "Thus, even though a junior user is, by definition, not the first to ever use a mark, it may assert the exclusive right to use a mark in a particular area (1) if the area was 'geographically remote' from the senior user's market at the time that the junior user appropriated the mark and (2) if the junior user was acting in good faith at the time." *Id.* Therefore, there is legal support for the proposition that service areas (the right to exclude) could have derived from independently acquired common-law trademark rights.

Providers do not address these issues, but rather jump straight into their argument that Defendants abandoned their marks because they engaged in "naked licensing." (Doc. # 2749 at 7).

---

[1] *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 415-16 (1916) and *United Drug Co. v. Theodore Rectanus Co*., 248 U.S. 90, 97-98 (1918).

"A naked license is a trademark licensor's grant of permission to use its mark without attendant provisions to protect the quality of the goods or services provided under the licensed mark." *Exxon Corp. v. Oxxford Clothes, Inc*., 109 F.3d 1070, 1075-76 (5th Cir. 1997) (citing *Moore Business Forms, Inc. v. Ryu*, 960 F.2d 486, 489 (5th Cir. 1992) and *Taco Cabana Intern., Inc. v. Two Pesos, Inc*., 932 F.2d 1113, 1121 (5th Cir. 1991), *aff'd*, 505 U.S. 763 (1992)). "A trademark owner's failure to exercise appropriate control and supervision over its licensees *may* result in an abandonment of trademark protection for the licensed mark." *Oxxford Clothes, Inc*., 109 F.3d at 1075 (citing *Moore*, 960 F.2d at 489) (emphasis added); *see also Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 293 F. Supp. 892, 918 (S.D. N.Y. 1968) ("a 'naked' license *may* be the basis for an inference of abandonment where the licensor maintains no control over the quality of goods made by the licensee") (citation omitted, emphasis added), *aff'd as modified*, 433 F.2d 686 (2nd Cir. 1970), *cert. denied*, 403 U.S. 905 (1971).

"However, not all agreements authorizing use of a protected mark may be categorized as 'licenses.'" *Oxxford Clothes, Inc*., 109 F.3d at 1076. Rather, "some agreements which allow another party use of the subject mark constitute 'consent-to-use' agreements and not licenses." *Id.* (citing *Moore*, 960 F.2d at 489 and *American Foods, Inc. v. Golden Flake, Inc*., 312 F.2d 619, 623-624 (5th Cir. 1963)).[2] "Such a consensual agreement '[i]s not an attempt to transfer or license the use of a trademark [] but fixes and defines the existing trademark of each [so] that confusion and infringement may be prevented.'" *Id*. at 1076 (quoting *Waukesha Hygeia Mineral Springs Co. v. Hygeia Sparkling Distilled Water Co*., 63 F. 438, 441 (7th Cir. 1894)). "Acquiescence to one's

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

use of a trademark is analogous to an implied license to use the mark." *Coach House Rest., Inc. v. Coach & Six Restaurants, Inc.*, 934 F.2d 1551, 1563 (11th Cir. 1991).

"Acquiescence is an equitable defense that denotes active consent by a senior user to another's use of the mark." *Coach House,* 934 F.2d at 1558. "While abandonment results in a loss of rights as against the whole world, [] acquiescence is a personal defense which merely results in a loss of rights as against one defendant." *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir. 1984) (citation omitted). "[A]cquiescence operates to estop a senior user's trademark claim against a junior user's use of the mark unless there is inevitable confusion between the marks." *Coach House*, 934 F.2d at 1564.

"'[T]he existence of acquiescence creates a legal duty on the part of the senior user to respect the junior user's mark and to avoid creating confusion with it.'" *SunAmerica Corp. v. Sun Life Assur. Co. of Canada*, 77 F.3d 1325, 1330 (11th Cir. 1996) ("*SunAmerica II*") (quoting *SunAmerica v. Sun Life Assur. Co.*, 24 U.S.P.Q.2d 1505, 1506 (11th Cir. 1992) ("*SunAmerica* I")). "'Insofar as the senior user's and junior user's rights and duties respecting one another are concerned, acquiescence causes both users' marks to 'stand in parity.'" *SunAmerica II*, 77 F.3d at 1334 (quoting *SunAmerica I*, 24 U.S.P.Q.2d at 1511). "'After acquiescence, the senior user and junior user must treat one another's marks with equal dignity.'" *Id.* (quoting *SunAmerica I*, 24 U.S.P.Q.2d at 1511). Thus, there is also legal support for the proposition that another's use of a common law trademark in a geographically remote market does not necessarily indicate that the senior user engaged in "naked licensing" and abandoned its mark.

There is also some factual support in the record for the idea that individual Blue Plans—other than St. Paul and Buffalo—also developed rights to the Marks at common law. (*See* Doc. # 2933 at 7-8) ("[H]ere, the Blue Plans had at least some sort of preexisting common law trademark

9

rights to the Blue Marks before the License Agreements memorialized or settled those rights"). In fact, "Providers have not disputed that other Blues had the common-law right to use the Marks." (Doc. # 2821 at 13). Rather, Providers argue, "[the junior Blue Plans] did not [] have an independently developed right to exclude others because they were licensees." (*Id*.). But, there is no record evidence supporting the existence of any licenses between the St. Paul and Buffalo plans and the other Blue plans.

By 1938, there were thirty-eight plans using the Blue Cross Marks. (Doc. # 1353-4 at 23). By 1946, thirty-two plans were using the Blue Shield Marks. (Doc. # 1353-5 at 35). Providers jump to the conclusion that the St. Paul and Buffalo Plans issued licenses for this use based on evidence that they encouraged other plans to use the marks (generally in other areas). But, Providers have not pointed to any Rule 56 evidence indicating that any of this use was licensed.

Use of the same mark in different markets does not necessarily indicate the existence of a license. "At common law [] the exclusive right to use a mark is 'limited to areas where [the mark] had been used and the claimant of the mark had carried on business.'" *Emergency One*, 332 F.3d at 268. And, "not all agreements authorizing use of a protected mark may be categorized as 'licenses.'" *Oxxford Clothes, Inc*., 109 F.3d at 1076. "Acquiescence [] denotes active consent by a senior user to another's use of the mark." *Coach House,* 934 F.2d at 1558. Here, based on the record evidence, there remains a question of fact regarding whether there were licenses or mere acquiescence between the St. Paul and Buffalo Plans and the other plans using the marks in other markets.

**IV.     Conclusion**

Because there are genuine issues of material fact regarding whether St. Paul and Buffalo (1) acquiesced in these other Plans' use of the Marks in other markets, or (2) granted licenses

without appropriate controls, Provider Plaintiffs' Motion for Partial Summary Judgment on Defendants' Claim to Common-Law Trademark Rights (Doc. # 2749) is **DENIED**.

**DONE** and **ORDERED** this January 31, 2024.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE