FILED
2024 Feb-08 PM 12:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

[PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 22-13051

_____

IN RE: BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION
MDL 2406

_____

2:13-cv-20000-RDP

GALACTIC FUNK TOURING, INC.,

AMERICAN ELECTRIC MOTOR SERVICES, INC.,

CB ROOFING, LLC,

PEARCE, BEVILL, LEESBURG, MOORE, P.C.,

PETTUS PLUMBING & PIPING, INC., et al.,

                                      Plaintiffs-Appellees,

TOPOGRAPHIC, INC.,

EMPLOYEE SERVICES INC.,

HOME DEPOT U.S.A., INC.,

JENNIFER COCHRAN,

2                 Opinion of the Court                 22-13051

AARON CRAKER,
DAVID G. BEHENNA,

                              Interested Parties-Appellants,

*versus*

ANTHEM, INC.,
EXCELLUS HEALTH PLAN, INC.,
d.b.a. Excellus BlueCrossBlueShield,
PREMERA BLUE CROSS,
BLUE CROSSBLUE SHIELD OF ARIZONA,
HEALTH CARE SERVICE CORPORATION, et al.,

                              Defendants-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:13-cv-20000-RDP

_____

Before WILLIAM PRYOR, Chief Judge, ABUDU, Circuit Judge, and
BARBER,[*] District Judge.

_____

[*] Honorable Thomas P. Barber, United States District Judge for the Middle
District of Florida, sitting by designation.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to determine whether the district court abused its discretion in approving a settlement agreement for a multi-district antitrust class action against the Blue Cross Blue Shield Association and its member plans. One objector, Home Depot U.S.A., Inc., contends that the settlement violates public policy by releasing prospective antitrust claims and violates due process and class-action rules by allowing the same counsel and class representatives to represent both an injunctive class and a damages class. Another objector, Topographic, Inc., argues that the district court misapplied the law and clearly erred in its factual findings in allocating the settlement fund between different groups of claimants. A third objector, David Behenna, contends that the district court erred in determining that the class counsels' fees were reasonable. And the final objectors, Jennifer Cochran and Aaron Craker, argue that the district court erred in allowing the settlement to treat the unclaimed settlement funds of employers differently than the unclaimed funds of employees and in approving a plan of distribution that fails to address the employers' disbursement obligations under the Employee Retirement Income Security Act of 1974 (ERISA). Because the district court did not abuse its discretion, we affirm.

## I. BACKGROUND

The Blue Cross Blue Shield Association is a national health insurance company that owns and licenses its federal trademarks to local member plans and affiliated entities. The Association, its

member plans, and the affiliated entities together make up what is known colloquially as Blue Cross.

Over a decade ago, subscribers who bought health insurance filed a class action against Blue Cross, alleging that it violated the Sherman Antitrust Act, 15 U.S.C. §§ 1–3, by restricting the member plans' ability to compete. The initial complaint sought to certify a class action and was the first of many filed across the country. *See* Complaint, *Cerven v. Blue Cross & Blue Shield of North Carolina*, No. 5:12-cv-17 (W.D.N.C. Feb. 7, 2012). Healthcare providers also filed antitrust claims against Blue Cross.

The actions against Blue Cross were consolidated in multi-district litigation in the Northern District of Alabama and split into two tracks: one for subscribers and another for providers. This appeal concerns the subscriber-track litigation. In their consolidated complaint, the subscribers alleged that Blue Cross allocated geographic territories, limited member plans' competition by mandating a minimum percentage of business under the Blue Cross brand for each member doing business inside and outside their territories, restricted the right of member plans to be sold to companies outside the Association, and agreed to other ancillary restraints on competition. The subscribers sought money damages, treble damages, restitution, and injunctive relief.

In 2018, the district court granted partial summary judgment for the subscribers, ruling that, under section 1 of the Sherman Act, a per se standard applied to Blue Cross's alleged "aggregation of competitive restraints." *In re Blue Cross Blue Shield Antitrust Litig.*,

308 F. Supp. 3d 1241, 1267 (N.D. Ala. 2018). This ruling treated the challenged aggregated restraints as "necessarily illegal." *Id.* at 1259 (quoting *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007)). The district court did not rule on the standard that would govern individual restraints if considered separately. *Id.* at 1258.

Amid the ongoing litigation, the subscriber-track plaintiffs and Blue Cross began settlement discussions. Starting in 2017, a court-appointed special master assisted with the negotiations and held dozens of meetings and conference calls. The parties reached a settlement agreement after years of negotiations.

The settlement agreement divided the subscriber-track plaintiffs into two groups: a damages class under Federal Rule of Civil Procedure 23(b)(3) and an injunctive relief class under Rule 23(b)(2). The damages class includes "All Individual Members (excluding dependents and beneficiaries), Insured Groups (including employees, but excluding non-employee Members), and Self-Funded Accounts (including employees, but excluding non-employee Members) that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product." The injunctive class includes "all Individual Members, Insured Groups, Self-Funded Accounts, and Members that purchased, were covered by, or were enrolled in a Blue-Branded Commercial Health Benefit Product sold, underwritten, insured, administered, or issued by any Settling Individual Blue Plan during the Settlement Class Period." The two classes almost completely overlap in membership.

The main difference is that the injunctive class includes beneficiaries and dependents of employees, and the damages class does not.

The damages class and the injunctive class include both "fully insured accounts" and "self-funded accounts." Fully insured accounts buy health insurance from Blue Cross, which as the insurer pays enrollees' medical costs, bears the risk that enrollees' claims will exceed premiums, controls the benefits structure, makes coverage decisions, and provides administrative services. The settlement class period for the fully insured claimants is February 7, 2008, through October 16, 2020.

Self-funded accounts do not buy health insurance. They instead purchase administrative services and unbundled products like vision, dental, and stop-loss insurance from Blue Cross. Self-funded accounts self-insure for healthcare costs, so the employer, not Blue Cross, pays for its employees' healthcare costs at Blue Cross rates. The self-funded account employees might contribute to their premiums or to the cost of the products purchased by their employer. The parties and the district court refer to the self-funded claimants as "self-funded," "self-insured," and "ASOs" interchangeably. In July 2019, self-funded counsel and a self-funded claimants' class representative were appointed to represent separately the self-funded claimants during the settlement negotiations. The settlement class period for the self-funded claimants is September 1, 2015, through October 16, 2020.

The parties first negotiated injunctive relief that requires Blue Cross to make structural reforms to increase competition

between its members. The structural changes include eliminating the "National Best Efforts Requirement," which restricted the member plans' ability to market under other brands; allowing member plans to submit competing bids that were previously prohibited; restricting the application of the "Local Best Efforts Requirement," which required each member plan to generate a certain percentage of its revenue within its geographic service area using the Blue Cross brand; restricting the conditions that Blue Cross may place on acquisitions of member plans; eliminating several restrictions that Blue Cross had placed on contracts between self-funded accounts and healthcare providers; and restricting Blue Cross's ability to include "Most Favored Nation-Differential" clauses in contracts with providers. Other features of Blue Cross's structure, like the Exclusive Service Area policy, are allowed to remain in place post-settlement. The settlement agreement also establishes a monitoring committee to oversee compliance with the structural changes dictated by the agreement. The monitoring committee is charged with mediating certain disputes and reviewing certain rule changes that Blue Cross may make during the five-year monitoring period following approval of the settlement.

The parties next negotiated relief for the damages class that creates a common fund of $2.67 billion to pay damages, provide for notice and administration, and pay attorneys' fees and costs. The subscribers engaged Kenneth Feinberg, a respected mediator in the field of settlement allocations, to help determine an appropriate allocation of the settlement fund between the fully insured claimants and the self-funded claimants. The settlement provides a plan of

distribution that allocates 93.5 percent of the net settlement fund to the fully insured claimants and 6.5 percent to the self-funded claimants. This allocation is based on several factors, including the relative volume of payments by the fully insured claimants and the self-funded claimants, the strength of their respective claims, the shorter self-funded damages period, and the premiums paid for fully insured coverage in contrast with the administrative fees charged for self-funded accounts.

The plan of distribution provides a method for calculating damages for each kind of claimant. For fully insured claimants, the actual premiums paid by individual members and insured groups will be used to determine the pro-rata share of the fully insured claimants' net settlement fund for each member and group. Individuals collect all their pro-rata share. The damages for fully insured groups, which include employers and employees, require further calculations. For fully insured groups in which the employer makes a claim and no employees do so, the employer will receive that group's entire pro-rata distribution. If any employee makes a claim, the group's pro-rata share must be allocated between the employer and any claiming employees. The settlement agreement does not relieve employers of any ERISA obligations, including any fiduciary obligation to distribute claims proceeds to their employees.

Because both fully insured employers and employees can bear a portion of the burden of the premiums paid, the plan of distribution includes a default option for apportioning premiums

between fully insured employers and employees. Employees may decline to consent to the default option if they paid a higher contribution percentage than the default option and can provide proof supporting that higher percentage to the settlement administrator for approval. If an employee files a claim but his employer does not, the employee will receive credit for only his portion of the premium. Any money not claimed by employees is reallocated back to the employer. Any money not claimed by an employer is reallocated back to the fully insured claimants' net settlement fund.

For self-funded claimants, disbursements are allocated between employers and employees based on the estimated share of the administrative fees paid by each. The plan of distribution also creates a default option for self-funded accounts from which employees may opt out by presenting proof that they paid more money than the default option provides. The settlement agreement does not relieve self-funded employers from any ERISA obligations they have when distributing settlement funds to employees.

In addition to paying damages, the settlement fund pays attorneys' fees and costs. The parties agreed that the subscribers' counsel could seek a combined fee and expense award up to 25 percent of the $2.67 billion settlement fund. Counsel filed a petition seeking that full amount, with the attorneys' fees accounting for 23.47 percent and incurred expenses accounting for the remainder. This request was supported by a declaration of counsel, a

declaration by the special master, and two expert reports that attested that the requested award was reasonable.

In exchange for the relief described above, the subscribers, on the effective date, release all claims "based upon, arising from, or relating in any way to" (i) the "factual predicates of the Subscriber Actions" as described in the relevant subscriber-track complaints from the beginning of time through the effective date; (ii) "any issue raised in any of the Subscriber Actions by pleading or motion;" or (iii) "mechanisms, rules, or regulations" adopted by Blue Cross that are "within the scope" of the settlement's structural relief provisions and "approved through the Monitoring Committee Process during the Monitoring Period."

Post-settlement, subscribers may still sue Blue Cross, depending on the claim and whether the subscriber opted out of the agreement. Subscribers retain their right to pursue claims relating to coverage, benefits, and administration of claims that are not "based in whole or in part on the factual predicates of the Subscriber Actions or any other component" of the released claims. Those opting out of the settlement may bring claims for individual injunctive or declaratory relief, except that injunctive class opt-outs may not seek indivisible injunctive relief. A self-funded claimant who opts out retains the right to seek some individual injunctive or declaratory relief as defined by the settlement agreement.

After the subscribers moved for final approval of the settlement agreement, the district court conducted a two-day fairness hearing and heard arguments in support of the agreement and

from objectors. Home Depot, a self-funded claimant and an opt-out from the damages class, objected to the scope of the release on the ground that it permits illegal conduct and violates public policy. Topographic, a self-funded claimant, objected to the allocation percentages between the fully insured claimants and the self-funded claimants as well as the self-funded claimants' shorter class period of five years.

The district court held another hearing to consider the Topographic objection to the allocation and allowed expert testimony and cross-examination. Before that hearing, Topographic sought to discover communications between the fully insured claimants' counsel and the self-funded claimants' economic expert witness, Dr. Joseph R. Mason. The district court denied the discovery request based on the common-interest privilege.

Individual class members also raised objections. Behenna, an individual class member, objected to the attorneys' fees request and argued that the settlement required the district court to use the lodestar methodology to determine the reasonableness of the attorneys' fees because the subscribers' claims arose under a fee-shifting statute and because the case was not a common fund case. Cochran and Craker, employees of fully insured employers, objected to the plan of distribution allocating unclaimed employee funds to their employer.

Finally, the Department of Labor, a nonparty, filed a statement of interest in response to the proposed settlement agreement. The Department did not object to the settlement, but it expressed

concerns that the settlement agreement might affect employers' and plan fiduciaries' obligations under ERISA. Specifically, the Department was concerned that the settlement did not account for ERISA at all.

The district court overruled all objections, rejected the concern raised by the Department of Labor, and approved the settlement agreement. In a separate order, it approved the subscriber counsel's attorneys' fees and expenses request. The district court also determined that there was "no just reason for delay in the entry of [the] Final Order and Judgment" and severed the subscriber action from unrelated, still-pending claims in the provider track litigation. The district court certified its order for appeal under Federal Rule of Civil Procedure 54(b). *See Jenkins v. Prime Ins.*, 32 F.4th 1343, 1345 (11th Cir. 2022) (permitting appealable judgment as to fewer than all claims).

## II. STANDARD OF REVIEW

We review the approval of a class action settlement agreement for abuse of discretion. *Day v. Persels & Assocs.*, 729 F.3d 1309, 1316 (11th Cir. 2013). Because "determining the fairness of the settlement is left to the sound discretion of the trial court, we will not overturn its decision absent a *clear* showing of abuse of that discretion." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1273 (11th Cir. 2021) (alteration adopted) (citations and internal quotation marks omitted). "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that

are clearly erroneous." *Chi. Trib. Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1309 (11th Cir. 2001).

## III. DISCUSSION

We divide our discussion into four parts. First, we address the issues raised by Home Depot. Second, we address the issues raised by Topographic. Third, we address Behenna's appeal. And last, we address the issues raised by Cochran and Craker.

### A. *Home Depot*

Home Depot makes three arguments on appeal. It first argues that release of prospective claims violates public policy, perpetuates clearly illegal conduct, and exceeds the identical-factual-predicate doctrine. It next argues that allowing the injunctive class and the damages class to be represented by the same counsel and class representatives violates Federal Rule of Civil Procedure 23(a) and the Due Process Clause of the Fifth Amendment. And it finally contends that intraclass conflicts within the injunctive class violate Rule 23(a). None of these arguments persuade us that the district court abused its discretion.

#### 1. The District Court Did Not Err by Approving the Release of the Injunctive Class Members' Claims.

We reject Home Depot's arguments that the district court abused its discretion when it approved the release provision of the settlement agreement. First, no public policy prohibits prospective releases in antitrust cases. Second, the release does not perpetuate clearly illegal conduct. Third, the release provision permissibly

releases only claims based on an identical factual predicate to the underlying litigation.

### a. The Release Does Not Violate Public Policy.

Home Depot argues that the release provision violates public policy because the antitrust laws depend on private enforcement, and prospective releases undermine that regime. But releases of future claims are an important part of many settlement agreements. *See, e.g.*, *Adams v. S. Farm Bureau Life Ins.*, 493 F.3d 1276, 1286 (11th. Cir. 2007); *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 247–48 (2d Cir. 2011); *Oswald v. McGarr*, 620 F.2d 1190, 1198 (7th Cir. 1980). And releases are commonly approved and enforced in class actions. *See Fager v. CenturyLink Commc'ns., LLC*, 854 F.3d 1167, 1176 (10th Cir. 2016) ("[I]nherent in the nature of a class-action settlement is the release of the claims of every class member (except those who opt out).").  The antitrust context is no different.

We have approved prospective releases of antitrust claims. For example, in *In re Managed Care*, 756 F.3d 1222, 1235–37 (11th Cir. 2014), we affirmed the approval of a settlement agreement that included a release of future antitrust claims arising from the same conduct. We have also reversed a refusal to enforce a "broad" release that extended to "any and all causes of action . . . of whatever kind, source, or character that are related to matters addressed in the class action, including antitrust and other statutory and common law claims." *Thomas v. Blue Cross and Blue Shield Ass'n*, 594 F.3d 814, 822 (11th Cir. 2010) (internal quotation marks omitted). And

our predecessor court upheld the approval of an antitrust settlement that included a release of future claims. *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 234 (5th Cir. Unit B 1982). It mentioned the importance of "total peace" for defendants in any settlement and stated that the release of future claims was important for the antitrust settlement at issue specifically. *Id.* at 238.

Our sister circuits have approved and enforced prospective releases in antitrust cases too. The Second Circuit has approved broad releases in antitrust settlement agreements and explained that "[b]road class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country." *Wal-mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106 (2d Cir. 2005). The Seventh Circuit has also approved releases in antitrust settlements when the release involved claims based on conduct central to the underlying litigation, even if they were ongoing after the effective date of the settlement agreement. *See, e.g.*, *MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 161 F.3d 443, 448–49 (7th Cir. 1998). Public policy does not categorically prohibit releases of future antitrust claims.

Home Depot cites authorities that rejected releases for overbreadth, but those authorities are inapposite. For example, in one decision, the Supreme Court rejected a release in an international commercial arbitration agreement that completely barred the application of the Sherman Act. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 616 (1985). The Court said that if

the choice-of-law clause in the arbitration agreement worked in tandem with the choice-of-forum clause to require all antitrust claims to be decided under Swiss law instead of the Sherman Act, it would constitute "a prospective waiver of a party's right to pursue statutory remedies for antitrust violations" that would be "against public policy." *Id.* at 637 n.19. The Court was concerned about the complete absence of a statutory remedy for any antitrust violation: it was possible that, under the arbitration agreement, the Sherman Act would never apply, no matter what the antitrust claims were or when they accrued. The Court did not hold that *every* prospective release of antitrust claims would violate public policy; it stated only that categorically barring parties from seeking relief under the Sherman Act regardless of the underlying claim would violate public policy. Similarly, in *Redel's Inc. v. General Elec. Co.*, our predecessor court held that a general release in a franchise agreement could not bar antitrust claims arising after the effective date of the agreement because of public policy concerns. 498 F.2d 95, 99–100 (5th Cir. 1974). The release in *Redel's* was broad—it released "all claims, demands, contracts, and liabilities." *Id.* at 98 (internal quotation marks omitted). And the court held that if it were to bar claims arising from later antitrust violations without any factual or temporal limitation, the release would violate public policy. *Id.* at 99.

The release in this appeal is limited and affects the rights of only some private individuals to sue Blue Cross, and it does not affect public enforcement of the antitrust laws. Private enforcement is only one mechanism by which federal antitrust laws may

be vindicated. The government may also enforce the antitrust laws against companies like Blue Cross. 15 U.S.C. §§ 15a, 15c, 15f. And the settlement agreement does not bar the Department of Justice or state attorneys general from pursuing civil claims or criminal charges against Blue Cross. Home Depot's concern that the release will undermine the enforcement of the antitrust laws is overstated.

### b. The Release Does Not Perpetuate Clearly Illegal Conduct.

Home Depot argues that the settlement should not have been approved because it perpetuates "clearly illegal conduct" by allowing the continuation of the Exclusive Service Area policy. In the antitrust context, a settlement agreement may perpetuate conduct when its illegality is uncertain. *Bennett v. Behring Corp.*, 737 F.2d 982, 987 (11th Cir. 1984). The classification of the conduct is crucial.

Under section 1 of the Sherman Act, two standards govern the review of challenged conduct: the per se rule and the rule of reason. *Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 457–58 (1986). Conduct governed by the per se rule "unequivocally" violates the Sherman Act. *Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1562 (11th Cir. 1983). Per se violations clearly restrain competition. *Id.* at 1561. The "rule of reason," in contrast, governs conduct that does not per se violate the Act. *Ind. Fed'n of Dentists*, 476 U.S. at 457–58. "Under the rule of reason, the test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it

is such as may suppress or even destroy competition." *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996) (quoting *Chi. Bd. of Trade v. United States*, 246 U.S. 231, 238 (1918) (internal quotation marks omitted)). Conduct subject to the rule of reason does not necessarily violate the Sherman Act: a plaintiff must prove its anticompetitive effect. *Id.* So long as the conduct perpetuated under a settlement agreement does not per se violate antitrust law, the settlement may be approved, even if the perpetuated conduct might not withstand scrutiny under the rule of reason. *Bennett*, 737 F.2d at 987.

The district court did not abuse its discretion. Home Depot offers no evidence that the Exclusive Service Area policy is a per se violation of the Sherman Act. It instead argues that the district court already ruled that the Exclusive Service Area policy is subject to the per se rule. But the district court never made that ruling. It ruled only that the *aggregation* of all the challenged restraints constituted a per se violation of antitrust law; it did not rule that any individual restraint constituted a per se violation. Because Blue Cross materially changed its system by adding procompetitive features and eliminating some anticompetitive features, the district court concluded that the post-settlement system, which included the Exclusive Service Area policy, would not be clearly illegal. Its perpetuation was "no bar to approval." *Id.*

### c. The Release Covers Only Claims Based on an Identical Factual Predicate.

Home Depot argues that the settlement exceeds the limits of the identical-factual-predicate doctrine because it releases claims arising from "any issue raised in any of the Subscriber Actions by pleading or motion" and from "mechanisms, rules, or regulations" by the individual plans and the Association, within the scope of the settlement agreement as approved by the monitoring committee. Home Depot argues that this language exceeds the identical factual predicate because it requires only some overlap with a fact or issue raised in the litigation.

In its review of a settlement, "a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 377 (1996) (citation and internal quotation marks omitted). Under the identical-factual-predicate doctrine, a settlement agreement may release claims that share a common nucleus of operative fact with the claims in the underlying litigation. *See Adams*, 493 F.3d at 1289. In practice, the doctrine mirrors res judicata: a release may lawfully bar later actions arising from the same cause as the settled litigation. *TVPX ARS, Inc. v. Genworth Life and Annuity Ins.*, 959 F.3d 1318, 1325 (11th Cir. 2020). We have recognized that res judicata applies not only to the precise legal theory presented in the previous litigation but to all legal theories and claims arising out of a common nucleus of fact. *Trustmark Ins. v. ESLU, Inc.*, 299 F.3d 1265, 1270 n.3 (11th Cir. 2002).

The district court did not abuse its discretion. The release it approved is no broader than other releases we have approved. We have approved settlement agreements releasing claims "in any way related" to the factual predicate of the underlying litigation. *Thomas*, 594 F.3d at 817 (requiring the district court to enforce a release provision that "released and forever discharged" "all causes of action," including antitrust claims, "that are, were or could have been asserted against any of the Released Parties by reason of, arising out of, or in any way related to any of the facts, acts, events, transactions, occurrences, courses of conduct, business practices, representations, omissions, circumstances or other matters referenced in the Action"); *see also In re Managed Care*, 756 F.3d at 1226 (holding that the district court did not abuse its discretion in enforcing a release that discharged all claims "based on" the releasing party's prior conduct). So too here.

The settlement agreement limits the release to claims arising from the factual predicates of the subscriber action. It defines released claims as those "based upon, arising from, or relating in any way to: (i) the factual predicates of the Subscriber Actions . . . (ii) any issue raised in any of the Subscriber Actions by pleading or motion; or (iii) mechanisms, rules, or regulations by the Settling Individual Blue Plans and [the Association] within the scope of" the relief awarded to the injunctive class. This language cabins the scope of the release. The release does not extend beyond claims arising from the common nucleus of operative fact: all the released claims either were raised or could have been raised during the litigation that preceded the settlement. The release does not bar any

claims that could not have been litigated before settlement or any claims related to conduct that was not challenged in the underlying lawsuit.

> 2.  The District Court Did Not Err by Approving a Settlement in Which the Same Named Plaintiffs and Counsel Represented Both the Injunctive Class and the Damages Class.

Home Depot next argues that the settlement violates Rule 23 and the Due Process Clause because the same named plaintiffs and counsel represented the injunctive class and the damages class when the classes had competing settlement priorities. *See* FED. R. CIV. P. 23(a)(4); U.S. CONST. amend. V. Rule 23(a)(4) and the Due Process Clause require adequate representation of settlement class members by the named representatives and counsel. Home Depot argues that the representation of the injunctive class was *inherently* inadequate because of the shared representation. We disagree.

Our precedents do not categorically prohibit the same plaintiffs and counsel from representing an injunctive relief class and a damages class. Minor conflicts are not enough to render representation inadequate: the conflict must be "substantial" and "fundamental" to the specific issues in controversy. *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (citation and internal quotation marks omitted). "A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Id.*

Home Depot fails to identify any substantial conflict between the settlement classes. It points out that the Rule 23(b)(2)

22                          Opinion of the Court                    22-13051

class would receive injunctive relief and the Rule 23(b)(3) class would receive distributions from the settlement fund. But it never explains why this difference is "fundamental." *Id.* Unlike the two subclasses in *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 233–34 (2d Cir. 2016), on which Home Depot relies, the classes' memberships here are virtually identical. Considering that most of the class members were eligible for both injunctive and monetary relief, it does not follow that the class representatives and counsel had any incentive to trade away injunctive relief in favor of damages. *Compare In re Checking Acct. Overdraft Litig.*, No. 20-13367, 2022 WL 472057, at *4–5 (11th Cir. Feb. 16, 2022) (holding that common representation was adequate when different classes of plaintiffs were injured in the same way by the same conduct), *with In re Payment Card*, 827 F.3d at 235 (holding that representation was inadequate when there was little overlap between the Rule 23(b)(2) class and the Rule 23(b)(3) class). Given the near-complete overlap in class membership, Home Depot also does not offer any evidence that one class was harmed by conduct that benefitted the other. Because there was no fundamental conflict of interest between the representatives and the classes, the district court did not abuse its discretion.

3.  Home Depot Forfeited Arguments about Intraclass Conflict.

Home Depot also argues that intraclass conflicts within the injunctive class violated Rule 23. The subscriber-proponents moved to strike those arguments because they were not made in the opening brief. We will not consider issues that a party fails to

brief adequately. "A party fails to adequately brief a claim when he does not plainly and prominently raise it, for instance by devoting a discrete section of his argument to those claims." *Sapuppo v. Allstate Floridian Ins.*, 739 F.3d 678, 681 (11th Cir. 2014) (citation and internal quotation marks omitted). If a party makes only passing references to an issue in its statement of the case or its summary of the argument in the opening brief, the issue is considered abandoned. *Id.* at 681–82. We will not consider arguments advanced by appellants for the first time in a reply brief. *Id.* at 683.

We agree that Home Depot abandoned these arguments by only briefly referencing potential intraclass conflicts in the summary of the argument in its opening brief. Home Depot did not devote a discrete section of its opening brief to developing the arguments. Each section Home Depot devoted to the adequacy of representation in its opening brief addresses only conflicts between the two classes, not conflicts *within* the classes. Yet Home Depot's reply brief devotes nine pages to potential intraclass conflicts. Because those arguments were not developed in its opening brief, we will not consider them. We grant the subscriber-proponents' motion to strike.

### B.  Topographic

Topographic challenges the allocation of the settlement funds. It argues that the district court misapplied Rule 23(e)(2)(D) and made erroneous findings in approving the allocation, and it contends that the district court abused its discretion when it approved a shorter damages period for the self-funded claimants. It

challenges the approval of the fund percentage allocated to the self-funded claimants. And it argues that the settlement fund should have been allocated to all claimants on the same basis. None of these arguments persuade us that the district court abused its discretion.

1.  The District Court Applied the Correct Scrutiny to the Settlement Allocation.

Topographic contends that the district court failed to apply the correct scrutiny to the settlement allocation. It argues that the district court misapplied Rule 23(e)(2)(D) as amended because it approved a facially unequal allocation. It also contends that the district court based its approval of the allocation on inadequate evidence and erred in relying on Dr. Mason's expert report. Topographic contends that, in approving the allocation, the district court also erroneously found that self-funded claimants purchased only administrative services from Blue Cross. And Topographic argues that the district court erred when it denied discovery of emails between Dr. Mason and the fully insured claimants' counsel. We address each argument in turn.

a.   The District Court Adhered to Rule 23(e)(2).

Topographic argues that the facially unequal allocation between the fully insured claimants and the self-funded claimants establishes that the district court misapplied Rule 23(e)(2)(D), which requires class members to be treated equitably. *See* FED. R. CIV. P. 23(e)(2)(D) ("If the proposal would bind class members, the court may approve it only after a hearing and only on finding that

it is fair, reasonable, and adequate after considering whether . . . the proposal treats class members equitably relative to each other."). But the text of the amended rule requires equity, not equality, and treating class members equitably does not necessarily mean treating them all equally.

Topographic highlights that some of our sister circuits have explained that since Rule 23(e)(2) was amended, a settlement should not be given a presumption of reasonableness whenever it is the product of an arm's-length negotiation. *See, e.g.*, *Moses v. N.Y. Times Co.*, 79 F.4th 235, 243 (2d Cir. 2023); *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 n.12 (9th Cir. 2019). Although we have not interpreted the 2018 amendment, we have recognized that "the district court should consider the impact of Congress' 2018 amendments" to Rule 23(e) when applying it. *Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243, 1261 (11th Cir. 2023). But the district court did not presume that the allocation was reasonable because it was negotiated at arm's length.

The district court instead reviewed the allocation under each subpart of Rule 23(e)(2). It found that the class members were adequately represented in the light of counsel's experience, vigorous advocacy over the course of the litigation, and diligent efforts to obtain discovery and engage expert witnesses. *See* FED. R. CIV. P. 23(e)(2)(A). It determined that the settlement was negotiated at arm's length because there was no evidence of collusion and counsel worked diligently through multiple impasses with the special master and mediators to achieve resolution. *See id.* at 23(e)(2)(B).

The district court then analyzed the adequacy of relief, considering the costs, risks, and potential delay of trial and appeal, the effectiveness of distributing relief to the class, and the reasonableness of the requested attorneys' fees. *See id.* at 23(e)(2)(C). It considered the length and expense of continued litigation, the efficacy of the plan of distribution, the opportunity for claimants to participate, and the retention of an outside firm to process claims. And the district court found that no collateral agreements needed to be identified for Rule 23(e)(2)(C)(iv). Finally, the district court ruled that the proposal treats class members equitably relative to each other, as required by Rule 23(e)(2)(D). It considered the differences between the self-funded claimants and the fully insured claimants like differing litigation risks, incurred costs, and claim strengths before concluding that the two were treated equitably. The district court did not presume that the settlement was reasonable because it was negotiated at arm's length.

Topographic argues that the district court abused its discretion because our precedent requires settlement proponents to meet a heightened evidentiary burden under *Holmes v. Cont'l Can Co.*, 706 F.2d 1144 (11th Cir. 1983). But Topographic misunderstands that precedent. Although we have stated that "a disparate distribution favoring the named plaintiffs requires careful judicial scrutiny into whether the settlement allocation is fair to the absent members of the class," *id.* at 1148, we have not extended this rule to all unequal distributions of settlement allocations. We impose a heightened burden only when named plaintiffs receive a benefit at the expense of the absent class members. *Id.* at 1147–48.

There is no *Holmes* issue here: the self-funded claimants were represented by their own counsel and class representatives in the settlement negotiations and received some compensation from the settlement. Although the settlement agreement's allocation is facially unequal, it is not facially unfair. The district court did not abuse its discretion.

### b. The District Court Had Evidentiary Support for the Settlement Allocation.

Topographic next argues that the district court approved the settlement allocation based on inadequate evidence and erroneous factual findings. It contends that the allocation could not be approved without a separate analysis of damages for the self-funded claimants. But "when there are subclasses, each independently represented, an allocation formula may be negotiated without each subclass undertaking extensive analysis of its relative damages *if* the available evidence is, at the time of the negotiations, insufficient to indicate a need for it." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 219 (5th Cir. 1981). The self-funded claimants were represented by separate counsel during the settlement negotiations, and Topographic offers no evidence of a need for a separate analysis. Topographic also points to no caselaw suggesting that a separate analysis for the self-funded claimants was necessary.

Topographic argues that the district court abused its discretion in approving the settlement allocation without evidentiary support. In approving a settlement agreement, the district court must undertake an analysis of the facts and the law relevant to the

proposed compromise and support its conclusions "by memorandum opinion or otherwise in the record." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). The district court must provide us a basis for reviewing the exercise of its discretion. *Holmes*, 706 F.2d at 1147.

Topographic accuses the district court of adopting the representations of class counsel and the mediator without evidentiary support. But the district court cited extensive evidence to support its finding that the allocation was reasonable because of the comparative strengths of each class's antitrust claims and relative competitiveness of the fully insured market. For example, the district court cited several exhibits establishing that fully insured accounts are four to ten times more profitable than self-funded accounts. It also pointed to evidence that self-funded accounts were often loss-leaders for Blue Cross. It relied on expert testimony that the self-funded market was significantly more competitive, more price sensitive, and less capable of sustaining overcharges than the fully insured market. These facts supported the comparative strength of the fully insured claimants' underlying antitrust claims. The district court based its decision on more than the assurances of counsel and the mediator.

c. The District Court Did Not Abuse its Discretion in
Relying on Dr. Mason's Expert Report.

Topographic argues that the district court abused its discretion in relying on the expert report of Dr. Joseph Mason, an economist, in its approval of the settlement allocation. Topographic contends that Dr. Mason's report lacks evidentiary support and

that the district court needed to justify its reliance on Dr. Mason's report over the other experts. We disagree.

Dr. Mason's report has an evidentiary basis. The record, including evidence from Blue Cross about the differences between the fully insured market and the self-funded market, supports Dr. Mason's conclusions. For example, the record contains documents from Blue Cross that establish differences in profitability between fully insured accounts and self-funded accounts, as well as documents that establish differences between the fully insured market and the self-funded market. And contrary to Topographic's argument, Dr. Mason's report was not based on the assumption that self-funded accounts purchase only administrative services from Blue Cross. In his report, Dr. Mason used four proxy methods to analyze the relative costs borne by the two classes of claimants. In addition to directly comparing fully insured accounts' premiums with self-funded accounts' administrative fees, the analysis compared the relative net revenue, overcharge differentials, operating gain differentials, and revenue-per-member growth differences between fully insured and self-funded accounts. The record belies any assertion that Dr. Mason's report depended solely on comparing administrative fees with fully insured premiums. The district court also explained why it credited Dr. Mason's testimony. It recounted Dr. Mason's credentials and experience and cited evidence supporting his expert opinions.

Topographic argues that the district court failed to discuss the Topographic expert's report, and that the failure to do so led to

a series of errors. But choosing to credit one expert opinion over another is within the sound discretion of the district court. *Battle v. United States*, 419 F.3d 1292, 1299 (11th Cir. 2005) ("[A] district court does not clearly err simply by crediting one opinion over another where other record evidence exists to support the conclusion." (citation omitted)). The district court cited evidence that supported its decision to credit Dr. Mason's report, which is all our precedent required it to do. *See In re Corrugated Container*, 643 F.2d at 215.

### d. The District Court Did Not Erroneously Find that Self-Funded Claimants Pay Only Administrative Fees.

Topographic argues next that the district court erroneously found that self-funded claimants pay only administrative fees. Topographic asserts that some self-funded claimants also purchase other unbundled services like dental, vision, or stop-loss insurance from Blue Cross. It contends that this factual error was central to the approval of the settlement agreement. Several state insurance departments as *amici curiae* echo this concern. They worry that the district court's opinion could be misconstrued as ruling that stop-loss insurance is not insurance, which could cast doubt on the states' authority to regulate stop-loss insurance products.

The district court made no error when it described the differences between the two groups of claimants. It did not rule that self-funded claimants pay only claims processing fees or that stop-loss insurance is not insurance. Instead, it described the distinction between the fully insured claimants and the self-funded claimants:

one buys full-service health insurance, and the other does not. Self-funded accounts are often called "administrative services only" or "ASOs"—in fact, the self-funded claimants are sometimes referred to as "the ASOs" in the briefing.

Even if the district court's statement were a factual finding, it is not clear how the "finding that [the] Self-Funded [Claimants] 'purchased administrative services only,' not 'insurance' or other ancillary services," was central to the approval of the settlement. Nothing in the record suggests that the district court's analysis would have changed even if it had defined self-funded accounts as those that purchased administrative services, stop-loss insurance, dental insurance, vision insurance, and other unbundled products. What matters is whether there is a difference between the markets in which the fully insured claimants and self-funded claimants participated. Because the fully insured claimants purchased full-service health insurance from Blue Cross, they paid premiums and other charges that the self-funded claimants did not. That some self-funded claimants purchased additional unbundled products does not change that reality. So even if the statement that the self-funded claimants "purchased administrative services only" were a finding, it was not central to the approval of the settlement and was not reversible error.

e. <u>The District Court Correctly Denied the Self-
Funded Objectors' Discovery Request under the
Common-Interest Privilege.</u>

The district court also did not abuse its discretion when it denied the self-funded objectors' request to discover communications between the fully insured claimants' counsel and Dr. Mason under the common-interest privilege, which applies when "multiple clients share a common interest about a legal matter." *United States v. Almeida*, 341 F.3d 1318, 1324 (11th Cir. 2003) (citations and internal quotation marks omitted). The privilege "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989). "The need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter." *Almeida*, 341 F.3d at 1324 (citations and internal quotations omitted). The common-interest privilege requires only "a substantially similar legal interest," *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 365 (3d Cir. 2007), not a "complete unity of interests among the participants," *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003). And "it may apply where the parties' interests are adverse in substantial respects." *Id.*

The district court did not abuse its discretion when it denied the self-funded objectors' discovery request based on the common-

interest privilege. The self-funded objectors sought to discover communications between their expert, Dr. Mason, and the fully insured claimants' counsel to determine "Fully Insured [Claimants'] counsel's input into the Mason Report." The self-funded claimants and the fully insured claimants had a substantially similar interest in the litigation against Blue Cross and in the settlement negotiations. That the details of the settlement put them in adverse positions does not undermine their broader mutual interest.

Even if the district court misapplied the common-interest privilege, we would not overturn its decision without any proof that the application harmed the self-funded objectors. "[W]e will not overturn discovery rulings unless . . . [the] ruling resulted in substantial harm to the appellant's case." *Harrison v. Culliver*, 746 F.3d 1288, 1297 (11th Cir. 2014) (citation and internal quotation marks omitted). On appeal, Topographic makes no showing of harm. It instead suggests that there *could have been* collusion between Dr. Mason and the fully insured claimants' counsel and that discovery could have unearthed it. But Topographic admitted to the district court that there was no evidence of collusion and that it did not believe collusion tainted the settlement. The district court did not abuse its discretion when it denied the objectors' discovery request.

2.  The District Court Did Not Abuse its Discretion when It
     Approved the Self-Funded Claimants' Shorter
     Damages Period.

Topographic argues that the district court abused its discretion in approving the self-funded claimants' five-year damages period while also approving the fully insured claimants' 12.5-year damages period. The shorter damages period, Topographic contends, is based on the erroneous determination that the self-funded claimants did not join the litigation until September 1, 2015. Topographic argues that the original subscriber complaint notified Blue Cross of the self-funded claimants' damages claims, and so the self-funded claimants are entitled to a damages period dating to 2008—the same starting date as the fully insured claimants. And even if self-funded accounts were not included in the *Cerven* damages class, Topographic argues that because the *Cerven* complaint included claims for injunctive relief brought on behalf of the self-funded accounts, the ruling that the self-funded claimants' later request for damages did not relate back under Federal Rule of Civil Procedure 15(c) was erroneous.

Whether the self-funded claimants' damages period dates to 2008 depends on whether the self-funded claimants were included in the *Cerven* complaint. Under Rule 15(c), the original complaint must put the defendants on notice of the claims being asserted. *Makro Cap. of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1260 (11th Cir. 2008); FED. R. CIV. P. 15(c). Topographic cites record evidence that could be read to suggest that Blue Cross had notice of the self-

funded claimants' damages claims, and the proponents of the set-tlement agreement offer contrary evidence. But what matters is whether any *pleading* gave Blue Cross notice of the self-funded claimants' request for damages.

The *Cerven* complaint does not include self-funded accounts in its definition of the damages class. It defines the damages class as "[a]ll persons or entities who . . . have paid health insurance premi-ums to [Blue Cross North Carolina] for individual or small group full-service commercial health insurance." *See* Complaint, *Cerven*, No. 5:12-cv-17. Self-funded accounts do not buy "full-service com-mercial health insurance" from Blue Cross and do not pay health insurance premiums. The damages class, as defined in the com-plaint, did not include self-funded claimants, and it did not give Blue Cross notice of the self-funded claimants' potential claims for damages.

Topographic argues that even if self-funded accounts were not included in the damages class of the *Cerven* complaint, self-funded accounts were included in the injunctive class, which should have put Blue Cross on notice that self-funded accounts could later seek damages. But the injunctive class definition also does not clearly include self-funded accounts. The complaint de-fines the injunctive class as "[a]ll persons or entities . . . who are currently insured by any health insurance plan that is currently a party to a license agreement with [Blue Cross] that restricts the abil-ity of that health insurance plan to do business outside of any geo-graphically defined area." Although some self-funded accounts

purchase insurance products like stop-loss insurance from Blue Cross, they are not "insured" for healthcare. Self-funded accounts pay their own costs for employee healthcare. In other words, instead of having Blue Cross pay for healthcare costs, self-funded accounts pay for administrative services and to obtain insurer rates with healthcare providers. The self-funded employers pay their employees' healthcare costs. It is not clear from the *Cerven* complaint's definition of the injunctive class that self-funded accounts are included because they are not necessarily "insured by [a] health insurance plan."

Other parts of the *Cerven* complaint confirm that self-funded accounts were not included in the damages or injunctive classes. The complaint defines self-funded accounts as those that purchase only administrative services, highlighting the difference between self-funded and fully insured accounts. In its description of the anticompetitive structure that it attacks, the complaint never mentions stop-loss insurance or other unbundled products. That the *Cerven* complaint attacks "the Blue structure" is not enough for the self-funded claimants' damages claims to relate back. The complaint did not put Blue Cross on notice that the self-funded claimants would seek damages, and the complaint did not challenge anticompetitive conduct in the self-funded market. *See Caron v. NCL (Bahamas), Ltd.*, 910 F.3d 1359, 1368 (11th Cir. 2018) (finding that the plaintiffs' new claim did not relate back because the original complaint "did not put [the defendant] on notice" that the new claim "could be relevant to the case"). The district court did not abuse its discretion in ruling that the self-funded claimants' request

for damages did not relate back to the *Cerven* complaint and in approving a settlement allocation with a shorter damages period for them.

### 3.   The District Court Did Not Abuse its Discretion in Approving the 6.5 Percent Allocation for the Self-Funded Claimants.

Topographic also argues that the 6.5 percent settlement allocation for the self-funded claimants was based on "an arbitrary, retrospective 50% discount on top of the truncated class period." Approving the 6.5 percent allocation on top of a shorter damages period, according to Topographic, "halv[ed] the Self-Funded [Claimants'] damages allocation a second time." Topographic argues that the district court made three errors in approving the allocation: (1) its approval was based on the clearly erroneous finding that self-funded plans arrived late to the litigation, (2) it approved the application of the 50 percent discount factor without legal or factual support, and (3) it failed to scrutinize the unequal treatment of the self-funded claimants compared with the fully insured claimants.

Topographic is wrong on all three points. First, as we have explained, the district court did not err when it ruled that the self-funded claimants "arrived late to the litigation" because they were not included in either class in the *Cerven* complaint. Second, the argument that there is no "legal or factual support" for the discount is a gross misstatement. The discount, which Dr. Mason applied in his expert report, reflects that the self-funded claimants, had they

been forced to litigate independently without the benefit of the work done by the fully insured claimants, would have faced many years of uncertain and expensive litigation. And the self-funded claimants had comparatively weaker antitrust claims because of the relative competitiveness of the self-funded market. These facts support the approval of the allocation. *See, e.g.*, *In re Corrugated Container*, 643 F.2d at 220; *In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2005); *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 179, 183 (2d Cir. 1987). The district court did not abuse its discretion.

### 4. The District Court Did Not Abuse Its Discretion when It Allocated the Settlement Fund Between the Claimants.

Finally, Topographic argues that instead of dividing the claimants into classes and allocating the settlement fund between them, the settlement should have been distributed to all subscribers on the same basis. Topographic contends that the district court created a "fundamental intra-class conflict" by creating two subclasses. *See Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 188–89 (3d Cir. 2012).

But the inverse is true. There might have been a fundamental intraclass conflict had the district court *not* created a subclass for self-funded accounts. The self-funded claimants and the fully insured claimants incurred different costs during the litigation, and their respective antitrust claims involved different markets. Had the district court not divided them into two subclasses, the potentially adverse interests of the self-funded accounts and the fully

insured accounts could have led to a conflict of interest. *See id.* at 189–90.

In any event, dividing a class with potentially adverse interests into subclasses is within the sound discretion of the trial court. *See Califano v. Yamasaki*, 442 U.S. 682, 703 (1979); *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am., AFL-CIO*, 803 F.2d 878, 880 (6th Cir. 1986). And the record supports the conclusion that the self-funded claimants and the fully insured claimants had at least potentially adverse interests. The district court did not abuse its discretion in dividing them into subclasses.

### C. Behenna

Behenna, a *pro se* class member, argues that the district court erred in not applying a bifurcated analysis when determining the reasonableness of the attorneys' fees award. Because Behenna failed to raise this issue before the district court, it is forfeited. And even if the issue were not forfeited, the district court did not abuse its discretion.

#### 1. Behenna Forfeited the Bifurcated Analysis Issue.

Behenna contends that the district court erred in failing to analyze separately attorneys' fees for billings related to injunctive relief and billings related to damages when approving the attorneys' fees in the settlement agreement. He argues that the district court should have used the lodestar methodology to assess appropriate fees for work related to the injunctive relief and then used the common fund doctrine to assess appropriate fees for work

related to the monetary relief. But Behenna forfeited that issue by failing to raise it in the district court.

If a party tries to raise an issue for the first time on appeal, we ordinarily will not consider it. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004). Behenna made two objections in the district court: first, that the lodestar methodology should be used to determine the subscriber counsel's fee, and second, that the case is not a common fund action. Neither objection hinted at the bifurcated analysis that Behenna now requests. Indeed, his objection that the settlement is not a common fund case directly contradicts his argument on appeal that the district court should have applied a common fund analysis to the damages-related attorneys' fees.

  2.   Alternatively, the District Court Did Not Abuse its Discretion.

Even if the bifurcated analysis issue were not forfeited, the district court did not abuse its discretion. Behenna contends that a bifurcated analysis was necessary because fee-shifting statutory awards are subject to the lodestar methodology, and Section 16 of the Clayton Act, which governs the injunctive class's claims, is a fee-shifting statute. But whether the claim arose under a fee-shifting statute "is of no consequence." *In re Equifax*, 999 F.3d at 1279 n.24. What matters is the kind of fund that the settlement agreement creates. *See In re Home Depot Inc.*, 931 F.3d 1065, 1082 (11th Cir. 2019) ("Where there has been a settlement, the basis for the statutory fee has been discharged, and it is only the fund that remains." (citation and internal quotation marks omitted)). The settlement agreement

created a common fund. And, in this context, our precedents make clear that the percentage-of-the-fund methodology should be used to determine the reasonableness of attorneys' fees. *See In re Equifax*, 999 F.3d at 1280; *see also Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991). The district court did not abuse its discretion in using the percentage-of-the-fund analysis, not the lodestar methodology or some combination of the two.

The district court also correctly applied the percentage-of-the-fund doctrine. In a common fund settlement, attorneys' fees "shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Camden I*, 946 F.2d at 774. Courts typically award fees of 20 to 30 percent of the common fund, *see In re Home Depot*, 931 F.3d at 1076, and view the mean of that range—25 percent—as a rough benchmark, *Camden I*, 946 F.2d at 775. If a fee award falls between 20 and 25 percent, it is presumptively reasonable. *See Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1242 (11th Cir. 2011). If the fee exceeds 25 percent, the district court must assess the reasonableness of the percentage using the 12 *Johnson* factors. *See Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), *abrogated on other grounds by Blanchard v. Bergeron*, 489 U.S. 87 (1989). The actual fee sought by the subscribers' counsel was 23.47 percent of the common fund. Even though this fee fell within the range of reasonableness, *Faught*, 668 F.3d at 1242, the district court reviewed the percentage under the *Johnson* factors. As a cross-check, the district court then used the lodestar to confirm the reasonableness of the percentage. The *Johnson* factors and the lodestar cross-check confirmed that a fee award of 23.47

percent was reasonable. That thorough analysis followed our precedents and was not an abuse of discretion.

### D. Cochran and Craker

Cochran and Craker make two arguments on appeal. First, they argue that the plan of distribution violates Rule 23(e)(2)(D) because the unequal distribution of unclaimed funds suggests inadequacy of representation for the employees of fully insured employers. Second, they argue that the district court abused its discretion in failing to address ERISA concerns raised by the settlement agreement. We address these arguments in turn.

### 1. The Plan of Distribution Does Not Violate Rule 23(e)(2)(D).

The district court did not abuse its discretion in approving a distribution of unclaimed funds that differently allocates the unclaimed funds of the fully insured employers and the unclaimed funds of those employers' employees. Cochran and Craker argue that the settlement agreement's plan of distribution is fundamentally unfair because it reallocates the unclaimed funds of fully insured employers back into the settlement fund to be distributed on a pro-rata basis to other fully insured claimants but reallocates the unclaimed funds of the employees to the employers. This distribution scheme, Cochran and Craker argue, suggests an adequacy of representation issue under Rule 23(e).

The premise of Cochran and Craker's critique of the plan of distribution—that it is fundamentally unfair—is false. Cochran and Craker argue that the district court abused its discretion in approving the plan of distribution despite Rule 23(e)(2)(D)'s requirement

that all class members be treated equitably relative to each other. That some class members' unclaimed funds are treated differently than others, they argue, is inherently inequitable and shows that the employees of fully insured employers were not adequately represented. But like Topographic, Cochran and Craker conflate the terms "equitably" and "equally." The plan of distribution undoubtedly treats funds unclaimed by employers differently than the funds unclaimed by their employees, but the record shows that the plan of distribution was fair and reasonable.

The fully insured employers bore a heavier monetary burden than their employees because most employers paid a portion of their employees' premiums. And some employees of fully insured employers did not pay *any* portion of the premiums for their health insurance coverage. The plan of distribution might be unequal, but it is not inequitable.

Cochran and Craker also fail to show that the employees of the fully insured employers were not adequately represented or that the district court abused its discretion in not creating a separate subclass for the employees. A conflict of interest must be based on differences in the economic interests of class representatives and unnamed class members, and the conflict must be so clear and substantial that it is "fundamental" to the issues in controversy. *Valley Drug Co.*, 350 F.3d at 1189 (citation and internal quotation marks omitted). Neither requirement is satisfied here.

The alleged inequity is not between class representatives and absent class members. It is between fully insured employers—

only some of whom are class representatives—and their employees. There is no fundamental conflict between these two groups. Dividing them into subclasses would be necessary only if they had divergent interests. *See In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009). But the district court made clear that the subscriber class representatives share the same interests as absent class members, assert the same or substantially similar claims stemming from a common event, and share the same kinds of injuries. Because fully insured employers made more payments to Blue Cross on behalf of their employees and both employers and employees were subject to the same Blue Cross health insurance plans, it is hard to see how these two groups would have divergent interests requiring separate representation.

### 2. ERISA Is No Impediment to Approving the Settlement Agreement.

Cochran and Craker also echo the concern of the Department of Labor that the settlement agreement may affect the duties that employers and plan fiduciaries have under ERISA. They argue that because the plan of distribution does not expressly instruct employers to comply with ERISA, its silence could lead to violations when the settlement proceeds are disbursed. But as the district court explained, nothing in the settlement agreement changes ERISA rights: the order approving the settlement states that "all ERISA duties still apply" and that "all ERISA fiduciaries must comply with those duties." Plans and employees retain their rights to

22-13051                Opinion of the Court                45

sue under ERISA. The fear of a speculative violation is no reason to reject the settlement.

## IV. CONCLUSION

We **AFFIRM** the judgment approving the settlement agreement.