FILED
2024 Aug-28 PM 02:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

IN RE BLUE CROSS BLUE SHIELD          CASE NO. 2:13-cv-20000-RDP

ANTITRUST LITIGATION MDL 2406

_____

ANESTHESIA ASSOCIATES OF ANN          CASE NO. 2:23-cv-461-RDP
ARBOR, PLLC,

                    Plaintiff,

v.

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

                    Defendant.

*   *   *   *   *   *   *

**TRANSCRIPT OF STATUS CONFERENCE**

*   *   *   *   *   *   *

BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES DISTRICT JUDGE, at Birmingham, Alabama, on Wednesday, August 21, 2024, commencing at 9:03 a.m. via videoconference.

Proceedings reported by stenographic court reporter, transcript produced using computer-aided transcription.

**Transcript prepared by:**
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter

APPEARANCES VIA
VIDEOCONFERENCING:

SPECIAL MASTER:          Edgar C. Gentle III
                         Attorney at Law
                         GENTLE TURNER SEXTON & HARBISON
                         501 Riverchase Parkway East, Suite 100
                         Hoover, Alabama 35244

                         David Barillari
                         W. Tucker Brown
                         Sarah Cylkowski
                         Karin DeMasi
                         Hannah Dwyer
                         Katherine Harbison
                         Des Hogan
                         Mark Hogewood
                         Elizabeth Jose
                         Edith M. Kallas
                         Lauren R. Kennedy
                         Chris Kimble
                         Victoria Lu
                         Rudolph Makupson
                         Alexandra Markel
                         Nikol Oyandich
                         Dennis G. Pantazis
                         Henry Quillen
                         Barry A. Ragsdale
                         Jonathan Schiller
                         John Schmidt
                         Patrick Sheehan
                         Todd M. Stenerson
                         Derek Sutton
                         Joe R. Whatley, Jr.
                         Mark White
                         Kirk Wood
                         Rachel Mossman Zieminski

THE COURT: All right. We're here in our Blue Cross Blue Shield MDL but specifically here in Case 23-cv-461, which is Anesthesia Associates of Ann Arbor versus Blue Cross Blue Shield of Michigan.

I think -- I could be wrong, but this is, if not our only -- one of our only nonclass cases that have been centralized, it was tagged last year to come to the Court. And it looks to me like it -- the reason it was tagged was the fifth -- the Count 5 of the amended complaint filed back in 2022 in the Eastern District of Michigan, I think it was, had a market allocation conspiracy claim.

Am I right so far on just kind of getting the background on this case?

MR. STENERSON: Yes, Your Honor. Todd Stenerson for Blue Cross Blue Shield of Michigan. All of the other claims in the complaint have been dismissed by Judge Berg in Michigan, so the only remaining count related to copycat Conway allegations, which is why it was tagged. And there was many years of -- Judge Berg dismissed the other non-Conway claims three separate times in Michigan. So it was there for a while, but it got to you when all that was left was the tail of the dog, so to speak.

THE COURT: Okay. And, Todd, it looks like you had filed a counterclaim that was dismissed on antitrust injury or standing grounds and you were trying to -- there was a

question about whether that ought to be certified under Rule 54(b).  And I don't think that was ever ruled on one way or the other.  Am I right there?

MR. STENERSON:  Yes.  So the -- so, yes, we did file a counterclaim.  He found that we alleged a proper cartel but we weren't the proper plaintiff.  But that was after he had already dismissed the plaintiffs' original claims.  We did not move to certify.  The plaintiffs moved to certify their claims under 54(b), and then we replied with a conditional that we think it can all wait, but if it goes up, it should all go up.

THE COURT:  Yeah.  In other words, if they get to go, we get to go with them on a cross appeal?

MR. STENERSON:  Yes, sir.

THE COURT:  All right.  And that just -- that's technically still pending, although it's not gaveled on our -- it didn't get flagged as a pending motion when we received the case, although that's a -- I guess a pending issue.

MR. STENERSON:  Yes.  It's fully briefed, not yet decided, not yet argued.  But if we deal with Count 5 and it's dismissed, then there will be finality under 1291 in the district court and the parties can, in their discretion, pursue an appeal or not.

THE COURT:  And your argument on Count 5 primarily is that it's barred by the Love release?  And I'm just curious, is this -- have you-all had any meet-and-confers about this

and is there a disagreement about whether Love operates to bar the conspiracy claim here?

MR. STENERSON:  So the short answer is we filed an answer, obviously.  We raised the releases as an affirmative defense.  I believe -- this is my -- my memory is a little fuzzy, but I believe we had a meet-and-confer about the affirmative defenses years ago, nothing very substantive.  And, you know, frankly, Judge, the Michigan court never entered a discovery schedule because of all the dismissals.  And it got down here and we didn't ask for a discovery schedule.  And I thought A4 was going to go away.  So we've not subsequently discussed Love with the plaintiffs.

THE COURT:  So who's speaking on behalf of A4 today?

MR. BARILLARI:  Good morning, Your Honor.  This is David Barillari at Boies Schiller Flexner on behalf of A4.

THE COURT:  All right.

MR. BARILLARI:  With me is my colleague, Jonathan Schiller.

THE COURT:  Hey, Karen, go ahead and mute, if you don't mind.  Thank you.

All right.  So, David, thank you.  David, are you -- I mean, Boies Schiller, I know, was in the -- I think they were in the Love litigation/Musselman litigation on behalf of subscribers, so I know you didn't get all the way to the settlement that was reached.  And I don't remember all the

details in front of the judge about why that happened, but seems like you-all ought to have some idea about whether -- how Love operates with respect to your claim.

MR. BARILLARI:  So, Your Honor, you know, thank you for raising the issue.  You know, our position is that A4's claims are not barred by the Love settlement and that the allegations in A4's amended complaint presents a significantly different set of facts than those that were presented to Judge Moreno and to Your Honor in the disputes arising around the applicability of the Love settlement.

In short, the Love settlement does not apply here because even if A4 would be considered a member of the Love class, A4 was not in a position, could not have brought the claims it is bringing now during the Love period.  And that comes down to specifics about A4's complaint and about Michigan and about Blue Cross Blue Shield of Michigan.

When the Love settlements took place -- that was around 2005 to 2008, Your Honor -- Blue Cross Blue Shield of Michigan was not the entity that it is today.  Blue Cross Blue Shield of Michigan was a state-sanctioned monopoly in the state of Michigan.  Blue Cross Blue Shield of Michigan operated with a variety of privileges that the State provided it that insulated it from competitive forces.  And A4's claims currently, it's A4's standing, arise from its dealings with Blue Cross Blue Shield of Michigan and its allegations that

Blue Cross Blue Shield of Michigan has engaged in anticompetitive conduct with the result that it is able to pay below competitive rates.

During the Love period, however, Blue Cross Blue Shield of Michigan already had insulation from paying competitive rates.  Its rates were set in a public utility-like fashion, approved by the state commissioner, not just the rates that it would charge the subscribers but rates that would be paid to doctors and hospitals.  It also enjoyed other privileges, such as being exempt from certain taxes that other health insurers had to pay.  And in return, Blue Cross Blue Shield of Michigan served as the insurer of last resort in Michigan.  Now, this was before the Affordable Care Act. At the time, insurers, if they wanted to, could simply not provide health insurance if they didn't think that a person was insurable.  Blue Cross Blue Shield of Michigan had a different mandate.  It was to insure all comers, and in exchange, the State of Michigan gave it unique privileges not available to any other insurance company that allowed it to operate in a fiscally efficient manner while insuring the otherwise and uninsurable, which meant that it was also being insulated from competitive pressures that were felt by other health insurers in Michigan.

Now, all this changed in 2013 after the Love settlements.  In 2013, the State of Michigan removed the

special privileges that applied to Blue Cross Blue Shield of Michigan.  It removed its status as the insurer of last resort, and Blue Cross Blue Shield of Michigan, for the first time in its history, was being treated like any other health insurer.  The state-sanctioned monopoly was gone.

Our allegations are that, notwithstanding the loss of the state-sanctioned monopoly power, Blue Cross Blue Shield of Michigan engaged in anticompetitive conduct that permitted it -- or that allowed it to undertake illegal monopoly power and which it then used to injure our plaintiff -- our client.

And so that's -- that is a fundamental distinction between what Your Honor and Judge Moreno were presented with and what arose in our complaint.  We allege in our complaint that these changes in 2013 created substantial differences in the markets for healthcare in Michigan.  It, you know, turned them on their head in such a way that the facts here have been so modified from what they were in 2005 to 2008 that the general collateral estoppel principles would not apply.  So that is --

THE COURT:  Well, do you disagree, though, with the proposition that what you have remaining is your claim in the fifth cause of action in this amended complaint?

MR. BARILLARI:  I believe that the -- I would frame it slightly differently, Your Honor.  I would agree that the remaining causes of action that we have are those that are

based on the allegations of the Blues conspiracy.  And I believe that we have multiple causes of action --

THE COURT:  So you also -- yeah, I'm just trying -- I'm sorry.  I didn't mean to -- I did mean to interrupt you, but -- so you're -- Todd, do you agree that they still have Section 2 monopsony claims left over after Judge Berg's rulings?

MR. STENERSON:  I do not.  And I don't think that's their position either, Your Honor, but maybe I'm wrong.

THE COURT:  Well, let's find out from David.

MR. BARILLARI:  Well, I will -- I will double-check the order on the motion to strike, but our understanding was that we were pursuing the monopsony claim under the theory that monopsony power had been illegally acquired by dint of the Blues conspiracy.

THE COURT:  Well, there's a chance in this vast, sprawling litigation I may not have remembered exactly what I ruled on a few years back.  I certainly don't remember what Judge Berg ruled on a few years back.  So I guess that's the starting point is trying to determine, okay, what's left?

I thought the reason the panel tagged this case and sent it to me was the only remaining claim was the Section 1 claim in Count 5, which, as I read it, paragraphs 207 through 211, sounds a lot like the theory that the providers have been pursuing in the MDL, that is, that there was a horizontal

conspiracy among Blues nationwide, there were other output restrictions, and the effect of all that was to restrict the amount of revenue generated by not just non- -- by non-Blue subsidiaries but also cabining -- agreeing to cabin each other into markets and not to compete with each other.  And it seems to me like that was exactly the claim I was dealing with in the MDL and still -- I still am.  So I guess that's the first question is, what claims are left?

Sounds like we need some briefing, because I don't think we're going to sort all this out on this phone call. And I think the briefing ought to address two things; okay? First, what is A4's claim -- claims, if any -- as appropriate, left in the case?  And two, how does the Love release interact or affect those claims?

Anybody disagree that that's the right two-step question to ask here?

MR. BARILLARI:  No, Your Honor.

MR. STENERSON:  I agree, Your Honor.  I just might add very briefly, Blue Cross Blue Shield of Michigan was a defendant in Love.  They existed in Love, and A4 was within the scope of the class released in Love.

Interesting arguments about the state action, fun fact, Your Honor, we tried that argument when the Department of Justice sued us, and it didn't work in 2010, so -- but we'll get to that.

THE COURT:  So before all those privileges/immunities were stripped from you in 2013, you tried to make the same argument.  And who were you in front of?

MR. STENERSON:  Judge Hood, Chief Judge Hood at the time.  And the DOJ sued us on most-favored-nations provisions.  And we brought a state action defense that we were not subject to the antitrust laws, and Judge Hood found otherwise.

THE COURT:  So Judge Hood and I have also had a sharing of, as it were, the breast-implant case.  She had the bankruptcy defendants up there that got split out of the MDL from Judge Pointer, and when I wrapped it up, I was working with her somewhat on some -- landing the planes in different directions.  But -- and I finally got to meet her once upon a time in a judges' meeting, so that was nice.  All right.

MR. STENERSON:  This is not a fun fact, but we had the last argument on COVID before the courts closed down in front of Judge Hood all day and it was surreal.

THE COURT:  Yeah.  As the world was closing down around you, you're still in federal court arguing your case.

MR. STENERSON:  That's all I do, Judge.  That's all I do.

THE COURT:  All right.  Well, let's talk about timing on the briefing and, you know, kind of protocol, procedures on the briefing.  Seems to me it's the defendant's motion to dismiss based upon -- or, you know, I guess I'll take judicial

-- can take judicial notice of certain things.  So are you contemplating, Todd, a motion to dismiss?

MR. STENERSON:  Either a 12(c) or a summary judgment, but --

THE COURT:  Yeah.  Okay.  When do you think -- 21 days sufficient to get that filed?

MR. STENERSON:  Yeah, 21 days is fine.  If I could, though, Your Honor, 21 days after the plaintiffs make clear what their claims are, because I thought we had agreement on that.

THE COURT:  Okay.  Well, I wasn't going to be persnickety about this, but I'm looking at paragraph 207 of the amended complaint.  A4 realleges and incorporates by reference the allegations set forth in the foregoing paragraphs.  Judge Tjoflat would not like that.

So I'm wondering, if we're going to go through all this 9 yards, should we let them amend the complaint to state what is currently the claim and give you a better target to aim at?

MR. STENERSON:  That's one possibility.  The procedure posturing in front of Judge Berg is we did move to strike all of their allegations that didn't relate to Conway and Judge Berg granted that motion.  And so there is a -- there is a set of specific allegations notwithstanding some incorporation language that is there and, you know, I think that's their --

that's all they have at this point.

THE COURT:  Well, I guess the question, though, is, would it be easier for the Court and the parties, but particularly the Court, Judge Proctor, not Judge Berg, to not have a motion to strike, an order granting a motion to strike, an amended complaint, and then a motion all across my desk trying to figure out what the active allegations are, what the operative allegations are, and just letting David amend, consistent with Judge Berg's order on the motion to strike, to state what he contends the claims remaining are and then that'll give you a better target to file a motion on.

MR. STENERSON:  Yes, Your Honor.  I'd like that, you know, on the condition consistent with Judge Berg's order, because I don't want to see what comes out of the swamp otherwise.

THE COURT:  Yeah, I'm not interested in reconsidering what Judge Berg ruled on already in the underlying case, so it would be what is left after Judge Berg's order striking certain allegations in the amended complaint, a second amended complaint that focuses in on the remaining claims only.

And then how -- David, how much time will you need to file something like that?

MR. BARILLARI:  I think the 21 days that Your Honor mentioned earlier.

THE COURT:  That'll work for you?  I'll give you more

if you think you need more, I mean, because I realize you want to measure twice and cut once on that.

MR. BARILLARI:  Well, then, 30 days.  I think --

THE COURT:  30 days?  Okay.  30 days from today you give me an amended complaint.  21 days after that, Todd, your motion will be due.  I think you can start working on it now.

MR. STENERSON:  Yeah, that's fine, Your Honor.

THE COURT:  And then, David, 14 or 21 days after that for opposition?

MR. BARILLARI:  You know, we would -- well, I'll say this, Your Honor --

THE COURT:  I think the lawyer response is 21 days, of course, Judge.  That's the longer period.

MR. BARILLARI:  This is not -- this is the first time the parties have been engaging on this issue.  You know, not knowing specifically what arguments will be raised, I'd appreciate 21.

THE COURT:  Yeah, so 21 is sufficient.  I mean, I'm in a good mood today.  You could probably push me past 21.

MR. BARILLARI:  I don't like to push judges, Your Honor.

THE COURT:  You probably could nudge me past 21.  If 21's fine with you, that's that we'll go with, 21, and then seven days for the reply.  So that means this -- that means we'll have this all wrapped up in about, you know -- I don't

know -- you do the math -- about 75, 80 days we'll have this under submission.

MR. STENERSON:  Thank you, Your Honor.

THE COURT:  I was told there would be no math.

Okay.  What else do we need to take up in the A4 case?

MR. STENERSON:  I think it's implicit in what you've said, Your Honor, but we obviously would like a complete stay of all of their proceedings until this issue is resolved.

THE COURT:  I think that makes sense.  I mean, can we just agree to that?  I don't think I need to do -- it's not like we're saying things that are -- we don't have this big momentum where there's all of this going on behind the scenes. You've been -- you were deprioritized under our MDL order.

So I don't like to tell you, David, that you're not a priority, but you're not a priority until we figure out what your claims are.

MR. BARILLARI:  That is fine with us, Your Honor.

THE COURT:  Okay.  All right.  Anything else I need to take up from any direction?

MR. STENERSON:  Not from me, Your Honor.

THE COURT:  All right.  Very well.  Well, we'll wait to hear from you-all.  We'll get an order out with this -- got it all down, Sally?  Okay.  We'll get an order out that reminds everyone what the deadlines and tasks are going to be, and I hope you-all have a good rest of the week.  I will see a

number of you, I guess, in California next week; right?

IN UNISON: Yes, Your Honor.

THE COURT: Very well. Take care.

IN UNISON: Thank you, Your Honor.

(Adjourned accordingly at 9:24 a.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated: August 27, 2024

*Pamela G. Weyant*
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter