FILED

2024 Sep-18 PM 02:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION


IN RE BLUE CROSS BLUE SHIELD     CASE NO. 2:13-cv-20000-RDP

ANTITRUST LITIGATION MDL 2406


\*   \*   \*   \*   \*   \*   \*

**FINAL AMENDED TRANSCRIPT OF STATUS CONFERENCE**

\*   \*   \*   \*   \*   \*   \*


BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES

DISTRICT JUDGE, at San Francisco, California, on Wednesday,

August 28, 2024, commencing at 9:07 a.m.


Proceedings reported by stenographic court reporter, transcript
produced using computer-aided transcription.


**Transcript prepared by:**
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter

APPEARANCES:

SPECIAL MASTER:          Edgar C. Gentle III
                         Attorney at Law
                         GENTLE TURNER SEXTON & HARBISON
                         501 Riverchase Parkway East, Suite 100
                         Hoover, Alabama 35244

PARTICIPANTS:            David Boies
                         Swathi Bojedla
                         Katherine Brown
                         W. Tucker Brown
                         Carl Burkhalter
                         Sarah L. Cylkowski
                         Brittany Dejong
                         Karin DeMasi
                         Jay DeSanto
                         Michael C. Dodge
                         Augusta Dowd
                         Linda G. Flippo
                         Lillian Grossbard
                         Katherine A. Harbison
                         Michelle Heikka
                         Megan Jones
                         Lauren R. Kennedy
                         James P. Kleinberg
                         Marisa Livesay
                         Jonathan S. Mann
                         David Markewitz
                         Alexandra Markel
                         Hope Marshall
                         Daniel L. Ottaunick
                         Dennis G. Pantazis
                         Henry Quillen
                         Cindy Reichline
                         Patrick Ryan
                         Todd Stenerson
                         Joe R. Whatley, Jr.
                         J. Mark White
                         Kirk Wood
                         Jeff Zieger
                         Rachel Zieminski

(Proceedings commenced at 9:07 a.m.)

THE COURT:  Good morning, everyone.  And we do have some listen-only telephone subscribers, if I may use that term.  We're in In Re Blue Cross Blue Shield Antitrust Litigation MDL 2406, our Case No. 13-cv-20,000.

The Court is in San Francisco today for two reasons:  First, there's been a commitment along the way that we would spread out the status conferences and not have them all in Birmingham so we could -- this is the first chance we give our West Coast lawyers a chance not to have to travel across country.

And second, I also -- the main thing we're -- the only thing we're taking up at the status conference is what I understood to be a discovery dispute that the parties have with some nonparties in the Prime litigation, and I wanted to give the Prime plaintiffs' attorneys full access to come be heard before the Court on the discovery dispute.

So who's here for Prime plaintiffs?

MR. RYAN:  Good morning, Your Honor.

THE COURT:  Yeah, thank you.

(Reporter clarification.)

(Comments in low tones.)

THE COURT:  All right.  Welcome.  And we have our provider counsel here.  The Blues are here.  Subscribers are represented.  So I think we've got a full house, for the most

part.

My understanding, though, is the dispute has been substantially narrowed.  Am I understanding this correctly?

MR. WHATLEY:  It's been narrowed --

(Comments in low tones.)

THE COURT:  Okay.  So exactly what are the document requests currently at issue?  Let me just -- let's start there.  Let's figure out where the parties are in terms of what's been requested, and then I'd like to put those in two buckets, what's contested and what's not contested in terms of those requests.

(Comments in low tones.)

(Reporter clarification.)

THE COURT:  Hey, Joe, if you just want to stay seated, they can give you something to speak into.  Yeah, I just got a note from Sally that she can't hear anybody.  But now she'll be able to that people are at microphones.  She could hear me.  She couldn't hear the --

MR. WHATLEY:  Is this mic on?

THE COURT:  It is.

MR. WHATLEY:  Judge, we weren't served with the document request, as you know.  They were -- we're not party to the litigation out here.  We weren't served with them.  I can tell you what the documents are that I believe are at issue as opposed to going -- I think the --

THE COURT:  Well, let me ask you this:  Wouldn't it be better to hear from the parties in the case who are negotiating and then have you weigh in on what your objections would be to that production?

MR. WHATLEY:  That's -- that's fine with us, Your Honor.  We did get from the Blues -- we did get from the Blues what their request is, whether we would consent to things, and I was about to go through the issues where we don't consent.

THE COURT:  Okay.

MR. WHATLEY:  But I'm glad to follow whatever procedure you want.

THE COURT:  Just by bucket, though, I received a copy of the Blues' reply in support of sustaining the objection to the discovery referee's recommendation in the Prime case, and it looks like there are two categories that the Blues are willing to produce but they realize -- at least they've represented that they have to get permission or consent or a court order under our protective order to do it:  the Blues' MDL expert reports as produced to the plaintiffs in the ASO opt-out class cases, and the second category is the MDL deposition transcripts of the non-Blue -- nondefendant Blues. Is that still the two buckets we're looking at?

MS. KENNEDY:  That is correct, Your Honor.

THE COURT:  Now, there's some minutia within each of those buckets, and that may be where Joe is standing up.

MR. WHATLEY:  Actually, Judge, there are two other buckets.  We think there are four buckets based on the --

THE COURT:  Well, that's why I said let's start off with the -- if we can get them on the record saying those are the two buckets, it doesn't really matter what a nonparty thinks the dispute might be.

MR. WHATLEY:  Well, they asked us to consent on four different buckets is the reason I'm --

THE COURT:  All right.  Well, then we'll clarify that in a minute.

MR. WHATLEY:  Okay.

THE COURT:  Let me ask the Prime plaintiffs, is that the two buckets?

(Comments in low tones.)

(Reporter clarification.)

THE COURT:  So the Blues deponents, including the nondefendant Blues.  Okay.

(Comments in low tones.)

THE COURT:  Now, would those be the under-seal filings or the redacted filings?  Because there's a difference.

(Comments in low tones.)

THE COURT:  Okay.  Explain that to me.

(Comments in low tones.)

(Reporter clarification.)

THE COURT:  Okay.  Is your microphone on, by the way?

(Comments in low tones.)

THE COURT:  Okay.  All right.  So there we go.  All right.  So that is a third bucket.

MS. LIVESAY:  Correct.  And then a bucket that we don't believe implicates any of providers' work would be the data from third parties such as Optum, which the underlying insurers who contributed the data at issue have already consented to that production, but our understanding is that the providers have objected to its production.

THE COURT:  Okay.

MS. LIVESAY:  I think that covers all of the buckets.

THE COURT:  All right.  So let me just categorize those, then, to make sure I'm tracking with you.  One is the Blues' MDL expert reports, no other expert reports, as produced to the plaintiffs in the ASO opt-out cases before me.

MS. LIVESAY:  Correct.

THE COURT:  Okay.  Second, the MDL deposition transcripts of Blues and nondefendant Blues, including any exhibits thereto.

MS. LIVESAY:  Correct.  However, if any of those exhibits originated with providers or subscribers, we would expect those to be redacted.

THE COURT:  All right.  So in other words, if they are -- if there's confidential materials, work product, it would be all right to redact those.

MS. LIVESAY:  From the plaintiff.

THE COURT:  From the -- yeah.  So you're not interested in getting that.

MS. LIVESAY:  Right.

THE COURT:  Okay.  Third is data from third parties presumably obtained in the MDL by subpoena and particularly with respect to those third parties that have consented to the production of their data.  And I take it there's a finite list that we could look at to see who those are?

MS. LIVESAY:  Yes, correct.

THE COURT:  All right.  And then the fourth is any filings in the MDL, including exhibits, and that would be under-seal exhibits on anything that would be a motion that is decisional, motion for summary judgment --

MS. LIVESAY:  Right.

THE COURT:  -- Daubert motion, things like that.

MS. LIVESAY:  Yes, Your Honor.

THE COURT:  Okay.  I think I have the four categories.

(Comments in low tones.)

THE COURT:  Okay.  You need a microphone.  I'm sorry.  Well, your voice may carry but it may not carry all the way back to Birmingham.

MS. KENNEDY:  The only item that I wanted to clarify is I do not believe that they have asked for the exhibits with the MDL deposition transcripts.  I had understood that the

request was for the transcripts themselves, similar to what ASO plaintiffs requested in the ASO case pending before Your Honor, so not the exhibits, although --

THE COURT:  Any problem with given them exhibits so long as it's not under-seal material, though?

MS. KENNEDY:  I think the only issue there, Your Honor, is we have already produced to the plaintiffs every item of the unstructured -- all of our unstructured productions from the MDL, so they should already have those materials in their possession.  So I'm not sure there's any to go through and cull out for nonparty information.

THE COURT:  Well, except as they're tracking through the depositions, it may be helpful for them to have the actual exhibits and they're not having to go to a -- some, you know, custodian structured data to say, Oh, this must be what this witness is referring to.  I take it that's -- would be one interest.

MR. RYAN:  In order to understand the transcripts, we need to have the exhibits.

THE COURT:  You'd like to know what document the deponent has before them as they're testifying?

MR. RYAN:  Right.  And in order to make an admission useful at our trial, for example, if the Blues admitted to something, and the admission relates to a specific exhibit, there is going to be a foundational issue if we don't have the

exhibit that was marked at the deposition.

THE COURT:  And it seems to me that that's just a matter of -- so there may be an evidentiary reason but also a convenience reason just to understand the testimony.  Any objection to -- I realize you didn't understand you'd agree to that, but any problem with agreeing to that now?

MS. KENNEDY:  No, Your Honor.  That's fine.  It's just it's not within the scope of what we have been discussing thus far.  But I understand the request and I understand the reasoning, Your Honor.

THE COURT:  Well, if I was Judge Wise, I would say, yeah, let's -- I think it makes sense, if we're going to produce that, to have the -- particularly if it's redacted and it's not revealing any confidential material or work product, to have the exhibit accompany the deposition transcripts so that everyone's clear what the testimony is and what was before the deponent as the deponent was giving the testimony, okay?  So that makes sense to me.

Okay.  Now, I think, Joe, you're up.  This is the agreement that the nonparties and the Blues have reached in the Prime litigation.  Now, let me be clear, the reason I did the standstill order was I think there's at least an argument -- and I didn't want to prejudge the argument but, look, one of the things the discovery referee just did not address in any way, shape, or form -- and I was, quite frankly, surprised

that the discovery referee didn't address it -- was the fact that in complex litigation, multidistrict litigation -- this is the largest private enforcement action I think ever filed under the Sherman Act, the -- I think there's plenty of case law saying that the transferee court or court, if not an MDL, has the jurisdiction over the res of the discovery report. Now, that doesn't end the debate, but that means we're not potted plants where it doesn't matter what the Court thinks or what the providers think.

The second thing is, just from an equity standpoint, tens of millions of dollars have been spent developing some of these expert reports and things like that, so when those were in play, I was concerned that there may be a free-rider problem. And, of course, everybody here is familiar with the Edgar Winter group, right? Put your hand up if you know the Edgar Winter group. What's the big hit of Edgar Winter?

MR. BROWN: "Frankenstein."

THE COURT: Well, yeah, but in the context of this. What's the -- this one actually has a vocalist. "Frankenstein" was just instrumental, right? Okay. "Free Ride." Okay. Come on and take a free ride, come on and take it by my side, come on and take a free ride.

So there's a free-rider problem here that other courts besides this one have recognized when it comes to strangers to the MDL. And it usually comes up in the context of this --

and this is not an issue in this case, in our MDL, but -- it comes up where you have opt-outs that go settle their case and somebody says, Well, no, you -- there has to be some kind of holdback.  That's not been anything the courts have entertained or the parties have asked for, but there are different rides at the carnival.  This is a different ride at the carnival, and this ride is going and getting MDL discovery materials and using it in the case through, kind of, a side door.

Now, I'm glad to hear from you, Joe, now, about what you think might relate to that particular ride at the carnival.

MR. WHATLEY:  Yes, sir, Judge, and I appreciate that. I thought, before your statements, we might spend time talking about AnMed and -- something we talked about 14 years ago.

THE COURT:  Yeah.  See, you've been on the other side of this and you had to litigate that all the way up to the Eleventh Circuit.

MR. WHATLEY:  Exactly.

THE COURT:  But I -- the one that's more apropos that I've been involved with that went to the Eleventh Circuit was American Home Shield --

MR. WHATLEY:  Exactly.

THE COURT:  -- where state court lawyers in San Diego decided they wanted to litigate it -- after I preliminarily

approved a settlement, they decided they wanted to litigate the Rule 23 issues in state court and told the state court in San Diego that doesn't count, that's in Alabama court, which that went over real well with me.

But all that to say, I think I've got a pretty good handle on where the All Writs Act and the Anti-Injunction Act starts, but --

MR. WHATLEY:  We agree, and I think I can just avoid that discussion.

THE COURT:  Yeah.  I don't think you have to educate me on that.

MR. WHATLEY:  There was -- from what we had understood to be at issue today, there's been some slight modifications, and maybe I could state that.

THE COURT:  No, there's pretty substantial modifications, though, right, on -- they're no longer seeking your expert report.  They're no longer seeking your work product in certain areas.

MR. WHATLEY:  Well, but they are seeking our work product in others, but I'll get to that.  For example, we had understood that they were seeking the motions and briefs we filed, and I gather they're no longer doing that, that they're only seeking the Blues motion.

THE COURT:  That's what I just heard.

MR. WHATLEY:  And -- but going through the list,

Judge, and what I'd really like to focus on as an example is the nonparty data that was discussed.  But going through the list, first, in terms of the defendants' expert reports, it should come as no surprise that there are many quotes and many descriptions in those reports of what our experts said and did, and we think in order to eliminate the production of our work product and our experts' work product, you have to redact those.  That's number one.

THE COURT:  So your first argument is the Court should direct that any references to your expert reports or substance be redacted from the reports?

MR. WHATLEY:  Yes, sir.  Otherwise they're getting through, I guess, the back back door what otherwise they not -- they're not entitled to get.

I'm going to come back last to the depositions, but if I could talk to the third-party data for just a minute --

THE COURT:  So let me ask you this.  On the third-party data, it seems to me that if the third parties have consented, then if I'm Judge Wise, I'm, like, well, if a party in my litigation already has third-party data, that could easily be discovered through subpoena, but that's a process, and those third parties don't object to providing it through this alternative way.  In fact, they would prefer that.  That way they don't have to respond to a subpoena.  Why not permit that alternative production of the third-party data

so long as there's consent from the third party?

MR. WHATLEY:  Judge, the problem is not the production.  The problem is the free-rider issue.

THE COURT:  Okay.

MR WHATLEY:  And let me get into that with what we've done.

Go forward.

Judge, there's a PowerPoint up.  I guess now I'm -- now I'm -- we went through and you'll recall -- and I'm sure Judge Putnam recalls even more -- your magistrate judge --

THE COURT:  He would.  He would.

MR. WHATLEY:  -- and your Special Master will recall it because he's going to be -- he's going to come up in this process -- that back in 2016 we started the process -- we filed a -- we didn't get this.  They didn't just voluntarily produce this.

THE COURT:  You had to litigate the subpoenas.

MR. WHATLEY:  We had to litigate the subpoenas.  In fact, we had to litigate it over roughly two years to do that.

And go forward to the next one, Tucker.

After we had initially filed a motion, it continued on into 2017 with both us and the defendants litigating, but we were actively litigating.

And go forward, Tucker.

And then in Discovery Order No. 44, Judge Putnam

issued the motion to compel.  He required them to produce the data, but he also was going to require us to pay for it.

And go forward, Tucker, to slide five.

And so after even further litigation on this, through April, he ordered that we pay money to Optum Insight, which was the holder of the data, for their share of the production.

Now, Judge, let's stop right there, and it really supports what you already said about the res.  And we paid, at that point, over $31,000.  Actually, we didn't pay it.  Your Special Master paid it.  Your Special Master paid it from a fund that, under your orders -- of course, we were doing all of this under your organizational orders, but --- we funded the litigation fund that the Special Master has overseen and administered.  And your Special Master paid out over $31,000 of our money as the initial payment on that data.

THE COURT:  I was going to pay the Special Master paid it.  I can't imagine Ed paid that out of his pocket.

MR. WHATLEY:  No, sir, he paid it out of our funds --

THE COURT:  He's committed to you-all but not that committed.

MR. WHATLEY:  Unfortunately, not.  But he paid it, and this was all under your administration, so to speak.  It's all under -- every bit of this was done under the organization and structure that you ordered.

Go to slide six.

Continued on into the summer of 2017 where we continued to have issues about it.  We continued to file motions and briefs and have issues.

And go to slide seven.

Finally, in August of 2017, Judge Putnam ordered that we pay an additional amount of money, and he ordered $100,000 each to be paid to Aetna, Humana, and United, who, even though Optum is a subsidiary of United, was holding onto the data.  This was data from Aetna, Humana and United.  And at that point, the subscriber plaintiffs -- and I'm not raising any issue about that-- decided, We're not going to participate in that.  Our experts felt we needed the data and they didn't.

THE COURT:  Can I interrupt you for a moment?

MR. WHATLEY:  Sure.

THE COURT:  The 31 -- just north of 31, that was split by providers and subscribers?

MR. WHATLEY:  That was what we paid.

THE COURT:  Okay.  That's what I was trying to figure out.  So subscribers paid something on top of that that they participated?

MR. WHATLEY:  I'm not sure.

MS. JONES:  I don't recall it.  I don't think he did.

THE COURT:  Megan doesn't think he did.

MR. WHATLEY:  But I know on this one -- I know on this one we paid, through the fund administered by your Special

Master, another $150,000 to get the process going.

And then if you go forward to slide eight.

It continued on -- the motions and the briefing continued on into -- well, into 2018, in fact, through much of 2018, but Judge Putnam finally ordering an additional 121,000 and change to Aetna and 169,000 and change to Humana.  And again, we paid half of that.  We paid another probably 61,000, another roughly 85,000 in addition to that to get the data.

THE COURT:  Now, is -- when you say another 60,000, another 85,000, are you -- that is your share of the third bullet point on Discovery Order No. 91?

MR WHATLEY:  Yes, sir, just half of each amount.

THE COURT:  All right.

MR. WHATLEY:  So you see how much money -- we get paid a significant amount of money to get this data.  It's not like we got it for free.

And if you go to the next bullet point.

In fact, we went back and calculated --

THE COURT:  So right now I'm at about 175,000.

MR. WHATLEY:  I think it's a lot more than that.

THE COURT:  More than that?  Let's see.  A hundred plus -- go back one -- plus -- oh, yeah, 145 plus another 31. So try -- let's say 275.

MR. WHATLEY:  Plus 150.

THE COURT:  Plus 150.  Okay.  So 425.

MR. WHATLEY:  That was -- that was how much we paid out.

THE COURT:  All right.

MR. WHATLEY:  And in addition to that, we spent over 1800 hours litigating this issue.

THE COURT:  Which would be about a million-dollar loadstar.

MR. WHATLEY:  About a million-dollar loadstar.  So that's what happened.  I mean, they were -- they were fighting the holders of the data, which, after we won the motions in front of Judge Putnam --

THE COURT:  But to be clear, though, that is a lot more data than we're talking about in terms of this production, right?

MR. WHATLEY:  No.

THE COURT:  This is all related to this particular production, you think?

MR. WHATLEY:  It's my understanding that that is the data -- the data that I referenced in this PowerPoint is the data that Prime is asking -- the nonparty data that Prime --

THE COURT:  You think it's an apple and an apple?

MR. WHATLEY:  I think so.

THE COURT:  Lauren, do you know?

MS. KENNEDY:  My colleague will address that.  So, yes to the data, but I think that you're also talking about the

documents that they produced, and the insurers produced documents as well as data.

THE COURT:  That's what I was wondering, if there wouldn't be a lot of structured data that was not part of the -- what you've agreed to turn over to Prime plaintiffs if you get the consent or order to do it.

MS. GROSSBARD:  So, correct.  The only -- the issue that we have right now is --

THE COURT:  Is just the documents.

MS. GROSSBARD:  -- is just the data, the HCCI and Optum data.

THE COURT:  Okay.  That's what I'm getting at.  I didn't -- when we went through these four buckets, I didn't hear anything about data.  I heard about documents attached to filings, documents attached to depositions.

MS. GROSSBARD:  Correct.

THE COURT:  And --

MS. GROSSBARD:  The reason, Your Honor, is it's a separate issue.  There is an outstanding motion to compel discovery materials from the MDL that you have the bucket list from, and there is a separate issue that both Plaintiffs and Defendants in the Prime case have served subpoenas on the insurers for this data and also Plaintiffs have served document requests for the data on us.  So in other words, it's not at issue in the motion that prompted providers' request to

modify the protective order, but it's another issue in the Prime litigation on discovery.

THE COURT:  Yeah.  But that's a separate subpoena in the Prime case.  That's -- that doesn't affect me if there's a direct subpoena in the Prime case to a third party, is it -- does it?

MS. GROSSBARD:  So the subpoena -- we have a subpoena to them.  Plaintiffs have a subpoena to the insurers, but there's also a document request from Plaintiffs to us.

THE COURT:  Yeah.  That's -- I'm dealing with the document request directly --

MS. GROSSBARD:  Correct.  There is a document request from Plaintiffs to us for the HCCI/Optum data.

THE COURT:  Okay.

MR. RYAN:  Your Honor, may I address this?

THE COURT:  You may.  Why wouldn't we just simplify this by saying if you want HCCI or Optum Insight data, send a subpoena and don't try to go through the side door to get that from the MDL?

MR. RYAN:  Your Honor, what happened is the individual insurers, they -- rather than produce the data directly, which is expensive for them, they would prefer us to get the data from these third parties who just have the data already.  And so they've authorized us to get it from these third parties.

THE COURT:  Okay.  So they're trying to save a buck,

too.

MR. RYAN:  They're trying to save a lot of money.

THE COURT:  All right.

MR. RYAN:  So they would like -- they've authorized these third parties that have their data to produce it.  We're -- so, yes, we could force the insurers to reproduce data, which is very expensive --

THE COURT:  Yeah.  And, so, to be clear, in Judge Wise's case, if you were to send a subpoena, you would have to pay the cost of getting that data.

MR. RYAN:  If we wanted that individual -- which we do not --

THE COURT:  Let's pretend like the MDL doesn't exist and you want this data.  If you were to want this data, you'd send a subpoena to HCCI and Optum and say, Give us your data.  And then you'd work out --

MR. RYAN:  We did.

THE COURT:  -- some -- okay.  But their response was, Rather than get it from us, get it from the Blues because we've already produced this.

MR. RYAN:  Yes.  And the fee shifting in California is very different on federal --

THE COURT:  Tell me -- that's what I'm getting at. Tell me about that.

MR. RYAN:  It's highly unlikely that the Court --

Judge Wise would order us to pay for that even if --

THE COURT:  She would require a third party to pay for it?

MR. RYAN:  She would require them to pay for it unless they met very strenuous requirements, and I don't think they can meet them here based on what we know about the work they've already done to gather this data.  It's just a far less burden for them to have us get it -- it's sitting on a shelf on Optum Insight, so --

THE COURT:  It seems like it would be a lot less expensive, if they already have a record of what they've produced, to just reproduce it.  I could be wrong but --

MR. RYAN:  They say it's not.

THE COURT:  Well, they're not here.  I don't know.  I can't really assess the credibility of that claim.

MR. RYAN:  The other thing is it requires a lot more expense for everyone concerned if it's not the data from the third party --

THE COURT:  Yeah, I understand that.  But what I'm getting at is somebody's got to pay.  So my -- so when I went off to my first clerkship -- and I grew up pretty modestly -- I called my dad the first week and said, You always told me there's no such thing as a free lunch.  I don't think you're right.  I got a bunch of free lunches this week.  And he said, Son, you don't understand the principle.  It's not whether

it's free to you if somebody has to pay for it.  So somebody's paying for that lunch you ate.

So what we're talking about here is somebody's going to pay for this production, right?  And what your third-party friends are saying is, We didn't have to pay for it before; under California rules, we'd have to pay for it now.  We'd prefer not to do that.  Why don't you just get it from somebody else so we don't have to pay for it?  Am I right?  That's basically their position.

MS. GROSSBARD:  So, Your Honor, I would just jump in for HCCI/Optum.  They have said to us that they don't have that data that exists in the MDL and that they also --

THE COURT:  They no longer have the data or --

MS. GROSSBARD:  Correct.

THE COURT:  Yeah, so, I mean, they had the data.

MR. RYAN:  This is not MDL --

MS. GROSSBARD:  Yeah.  They produced it --

THE COURT:  Well, it is -- you're getting data that was produced in the MDL.  If you're getting it from the defendants, who got it as part of this production that was paid for by the providers in the MDL, then it's data that was produced in the MDL, unless I'm missing something here.

MS. GROSSBARD:  We understand that they don't have it, that we -- that it exists in the MDL.

THE COURT:  Pronouns don't help me.  "They" meaning --

MS. GROSSBARD:  HCCI and Optum.

THE COURT:  But they had it once --

MS. GROSSBARD:  Correct.

THE COURT:  -- and they produced it --

MS. GROSSBARD:  Correct.

THE COURT:  -- and they say, We can't -- we can no longer capture that data?

MS. GROSSBARD:  Correct.

THE COURT:  Okay.  All right.  Well, okay.  That's an issue.  So we'll figure that out.  Put that to the side.  But that's -- is that a little bit of an outlier than some other data is most -- for the most part this data's available by subpoena if it were -- if there was a subpoena sent?  Or do we know?

MS. GROSSBARD:  Are there other sources for the data?

THE COURT:  No.  In other words, Optum, would Optum have the data?  Would other third parties have the data sought if there was a request for that data?

MS. GROSSBARD:  Some of the insurers may still have it themselves but in the underlying data centers.

THE COURT:  When you say "insurers" -- I'm talking about the targets of the subpoena, the requests from the third parties themselves.  So you're saying they would have it?

MS. GROSSBARD:  Correct.  So there's also been subpoenas served on United, Humana, and Aetna.

THE COURT:  Right.

MS. GROSSBARD:  And they, too, have pointed to the data that's been produced in the MDL and would like to consent to its reproduction.

THE COURT:  Okay.  Got you.  All right.

All right.  Joe, back to you.

MR. WHATLEY:  But, Judge, the one thing that's without dispute is that data only exists because we paid a lot of money for it.

THE COURT:  Yes.

MR. WHATLEY:  And that is what they're trying to get. They're trying to get the exact data that we used in the process that our experts relied upon, and they're trying to get that exact data.  I'd also point out, Judge, because there was a reference to documents produced by these, we understood that, for example, there's an agreement to produce the United depositions -- deposition -- that would have -- those documents were used and included in exhibits to the insurer depositions.  So now we're even getting to that.  But going forward on --

THE COURT:  Well, and so the other question I have bouncing around in the back of my mind is this question: Seems like there's a distinction between things that were purely discovery in the MDL and never floated up to the point of being relied upon for any decisional request to the Court,

summary judgment, Daubert, and those things that were part, that were attached to an actual publicly filed motion that the Court was asked to make a decision on that would have affected the merits of the case.

And so I'm -- I'm kind of going back to, okay, what can be protected under a protective order.  Generally speaking, things that are relied upon on a summary judgment motion or a Daubert motion or at trial are going to receive less protection from a proprietary standpoint, for example, than things that were just discovery, third parties of the parties.  With me so far?

MR. WHATLEY:  I'm with you.

THE COURT:  And I wonder if, on those items -- even though you paid for it, I wonder if there's an analogy that says if you relied upon it, it's in the public domain and they can get it at least in a redacted format.

MR. WHATLEY:  Well, Judge, if you go back to first principles, go back to what our motion asked for, what we're asking is that you be the decision-maker, which I think you inherently are, with respect to documents and information protected by -- covered under your protective order, the confidential stuff.  And clearly, there's some stuff that's public record.  They -- the Blues -- I mean the public filings in the case, public transcripts in the case.  Those -- a lot of those have been produced.  And we haven't objected to their

production because they are public.  But we --

THE COURT:  So that's the first point I'm making is anything that's on the public -- on CM/ECF, on Pacer, obviously, I don't know that they need a request from the Blues.  They just need credentials to get into Pacer and they can print it off; right?  Or downloaded?

MR. WHATLEY:  I believe so.  You may be --

THE COURT:  That may be a Tucker question.

MR. WHATLEY:  Judge, I'm 71 years old, so it's not fair to ask that question, but --

THE COURT:  This is -- in June, I was on a panel with Arthur Miller on AI and he asked me, Do you think you have the technical background to understand artificial intelligence? And I said, Well, my adult children think that it's hilarious that I have been often asked to speak about AI around the country.  I think it's hilarious they're my adult children.

MR. WHATLEY:  Well, I think Arthur -- I think Arthur is in his 90s, so that's ironic.

THE COURT:  He's sharp as a tack, though.

MR. WHATLEY:  He is.

THE COURT:  All right.  So back to your point.

MR. WHATLEY:  Back to my point, Judge, and that's on these depositions, many of which are not in the public record, and here's what happened on the depositions.  They want to get the depositions that we, after reviewing millions and millions

of documents, prepared for, often traveled to, all provider lawyers, all over the country, took the depositions.  Again, your Special Master paid for the transcripts through -- from -- with our money and including --

THE COURT:  And the video depositions, yes.

MR. WHATLEY:  Exactly.  And again, despite all that work, which dwarfs the 1800 hours, they now want to get all those depositions for free.  And again, those were -- those depositions, they would not exist if we hadn't spent the probably at least tens of thousands and probably hundreds of thousands of hours both preparing for them and taking them, and now they want them for free.

There's also -- there are also some filings, going back to your question, Judge, about what's in the public record and what's not, there's some things that continued to be sealed that were filed in support of class certification, for example, the Alabama class certification motion.  But all of that -- much of that, or quite a bit of that, is still not public record.

THE COURT:  Well, why would the Prime plaintiffs have any interest at all in the Alabama class certification motion is a good question?

MR. WHATLEY:  Because they got a hospital in Gadsden.

THE COURT:  Okay.  That's in this case?

MR. WHATLEY:  Yes, sir.

MS. KENNEDY:  Can I just ask a clarification, Your Honor, because I thought it was really helpful when you started with the four buckets.  And I do think, based on what I heard, that there may have been some further narrowing just today, which is I at least understand that right now, in terms of deposition transcripts, Prime plaintiffs are seeking only the deposition transcripts of the Blues at this point, no other deposition transcripts.  Is that correct?

MR. RYAN:  That's correct.  The co-conspirators, alleged co-conspirators --

THE COURT:  So we don't have to worry about all these third-party subpoenas for depositions.

MR. RYAN:  Right.

MS. KENNEDY:  And then the next bucket -- I had understood in terms of the -- what we're now calling the unredacted filings that Prime plaintiffs are seeking only the Blues, and I think it was previously the summary judgment filings, so you want only the Blues' summary judgment filings unredacted to show only Blue information; is that correct?

THE COURT:  And everything else could be redacted that would show Plaintiffs' information -- plaintiff provider --

MR. RYAN:  Plaintiff provider information can be redacted, yes.

THE COURT:  Okay.

MS. KENNEDY:  Do we have consent not to redact

subscriber information?

THE COURT:  And for subscriber information.  That's why Megan had -- hand shot up.  Could you get a microphone?

MS. JONES:  I have one point of clarification.  Are you asking for any of the expert depositions of Plaintiffs' or Defendants' experts?  Are you asking for -- yes.

THE COURT:  Only Defendant experts.

MS. JONES:  And if our expert reports are attached to that --

MS. LIVESAY:  We do not want your expert reports.

MS. JONES:  Thank you.

THE COURT:  Okay.  Progress.

MS. LIVESAY:  Can I also just backtrack to the Optum discussion?  My understanding is that the Optum data was created by HCCI in the ordinary course of business, that was a function of what HCCI does.  So I'm not understanding how that data would not exist without the MDL.

THE COURT:  Well, what Lauren's told me is HCCI says they don't have it anymore, they can't recapture it.

MR. RYAN:  But they didn't create it for the MDL.  They created it in the ordinary course of business.  And when it was acquired, it wasn't specially done for the MDL, so it's just like another document.

THE COURT:  I understand.  But they may not -- their document retention policies, how far they went back, they may

not be able to -- what I understand, what I'm being told -- Lauren, I don't know if this is right -- is they told you they're not sure they can capture the same scope of documents data that was produced before.

MR. RYAN:  Our point is that it doesn't implicate all of those costs that were put up on the screen, because this is data that was created by this organization.

THE COURT:  Well, then you can just go get it from HCCI.

MR. RYAN:  But they don't have it anyplace.

THE COURT:  Well, that's what I just said.

MR. RYAN:  The fact it exists in the MDL doesn't make it work product of the Plaintiff lawyers.  It just happens to be there.  That's the implication.

THE COURT:  Well, hold on.  Hold on.  If they paid a bunch of money for it, are you saying that that just doesn't count?

MR. RYAN:  No, they didn't pay money for that is what we're saying.

THE COURT:  Well, hold on, hold on.  Time out. Everybody take it down a thousand here.  Let's just communicate and not advocate.  They didn't pay money for what? For the production of that data?

MS. LIVESAY:  The creation of that data.

THE COURT.  No, but the production of the data, they

paid for it.

MS. LIVESAY:  But we've also been meeting and conferring for over a year with the individual insurers, HCCI, Optum --

THE COURT:  Well, look --

MS. LIVESAY:  Wait.  Can I just make one clarification?

THE COURT:  Okay.  Make your point, but I'm your audience.  I would think you would want to defer to some questions I have, but go ahead.

MS. LIVESAY:  We aren't seeking data from the individual insurers that I think is the majority of the costs that he put in the PowerPoint.  That's all.

THE COURT:  Okay.  I'm with you so far, I think, although I think the devil's in the details here and I just don't have a very strong basis to understand these -- what's in each of these buckets.  I've got an idea about how we might deal with that that I'll reveal later, but for right now, I don't -- I don't think it's a distinction that makes a difference to say the providers didn't pay for them to create or have this data.  The providers only paid to have the data produced.

Obviously, the data you're wanting is what was already produced.  And what I would say to you is the simplest thing for all this would be, particularly if you don't have to pay

for it, just go get the data and the documents from a third party just like they did.  Do -- the same thing they did in their case, do in your case.  But the problem you're saying is they're telling you, We can't produce that now, right?

MR. RYAN:  Part of what you said is absolutely correct.

THE COURT:  What part isn't?

MR. RYAN:  The part about the individual insurer data that was the bulk of those costs, we're not talking about that.  We're just talking about the HCCI piece that --

THE COURT:  Well, so we may have to prorate the costs to understand what was actually expended to get this information.

MR. RYAN:  That's a significantly smaller amount.

THE COURT:  May be.

MR. RYAN:  Yeah.  I just want to --

THE COURT:  So let me ask you this.  Cut to the chase a little bit here.  Why wouldn't I just say this dispute has made crystal clear to the Court that we need to amend the protective order?  We're going to amend the protective order and we're going to say that the information can be produced to a third party under two conditions:  one, without any further order of the Court, if there's consent of all parties; and two, if there's not consent of all parties and it's still in dispute, you can bring the dispute to the Court and the Court

will decide what gets produced and what doesn't.  Okay?
That's the first concept.

Anybody -- let's put aside our friends who are strangers to the MDL.  Anybody in the MDL think that this should not be something the Court will do?

MS. KENNEDY:  So I agree, Your Honor, with just one clarification.  I assume when you say consent of all parties, you mean similar to your current injunction, consent of all parties who have an interest in that material?

THE COURT:  Yeah, right.

MS. KENNEDY:  So the Blues, for example, would be free to give opt-out Plaintiffs, if we decide that was most efficient, our MDL documents in our data production.

THE COURT:  Absolutely.

MS. KENNEDY:  Thank you.

THE COURT:  Consent of the party who has an interest in the information, who has the -- okay.  Okay.  And it may be we have to -- maybe I'd let you-all wordsmith it a little bit, put Tucker to work and you to work and Megan to work on wordsmithing how the order reads to make sure that we have the right consent and don't have superfluous consent requirements, but -- and if there's not -- if there's still objection, you bring it to me and I resolve it.

Anybody disagree, if we can get the language right, that that's the correct thing to do in the MDL?  Because this

-- this may not be an issue peculiar to the Prime litigation. We haven't had any opt-outs other than the Prime plaintiffs seek this information, but if we do, we don't want to reinvent the wheel every time we have something like that.  We ought to have a good protocol in place where our third-party friends are treated fairly but the parties are treated fairly, okay?  That's the first thing.

Under that scenario, it seems to me what I would just direct you-all to do is just go meet and confer about this and see if you can gain their consent.  I don't -- I don't think -- and again, I'm not ruling on this, I'm just telling you what I'm -- what my sense is right now.  I don't think the discovery referee's recommendation makes any sense at all.  I mean, he -- as I've said before, did not even really hear from the providers, did he?

MR. WHATLEY:  He never -- he had no communication with them.

THE COURT:  And my understanding -- you may correct the record on this, but they've told me in their filings in my case that you wouldn't even discuss your request to the Blues with them when they were trying to be heard on this.  Am I -- is that correct?  All right.  But they said that you -- they were trying to get heard on this and they couldn't penetrate the impenetrable wall of communications that were taking place in the Prime litigation on this.  Again, neither here nor

there right now.  We're not going to fix blame.

And what I would say to my provider and subscriber friends is I know there's some hard feelings about how you feel you were treated on this.  Don't let those get in the way of withholding unreasonably any consent.  Let's work -- let's try to work this out.  It's always best, and I think I speak for Judge Wise here -- and look, to be clear -- let me say one more thing -- I'm putting Judge Wise in a wholly different category than the discovery referee, because I don't think she's weighed in on this.  Nothing I'm saying implicates the Court.  I am very much a federalism principle judge.  I think there is a line and I should not interfere with state court litigation.  But when you are coming in trying to get information that my parties have used blood and treasure to get, then that does implicate things and I've got to at least figure out what the equitable thing to do is.  And it may be as simple as, you know, trying to get an agreement about what a fair contribution to the common -- what the investment already made to get these materials would be if you're interested in these materials.  I don't think any of these materials are California-specific that would have been structured data or confidential data or expert reports or anything like that.  So there --

MS. LIVESAY:  No, Your Honor.

THE COURT:  But I take it you're not

California-specific necessarily in your litigation here; is that right?

MR. RYAN:  National.

THE COURT:  Yeah, right, right.  So -- but I think that's where we are is you're wanting to get for free or wanting to defer -- your third parties that you're dealing with are wanting to defer the costs back to the people that have already produced this information.  They don't want to pay any extra to do it.  But if the MDL didn't exist and you wanted this information, you'd go get it through a subpoena; right?

All right.  Now, I think you're on stronger ground, not necessarily it's winning ground but stronger ground, if you can show, for example, that HCCI just can't reproduce this data.

MR. RYAN:  They cannot.

THE COURT:  Okay.  That's the representation I have. I have no reason to disagree with that.  But the point is, is I think that gives you maybe a greater right in the state court litigation with Judge Wise to go get it from the defendants.  That doesn't answer the question of whether you can get it through the MDL, though.  Understand what I'm saying?

MR. RYAN:  I understand.

THE COURT:  So any -- do you have any pushback at this

point on the protocol I've just laid out that -- figure out what you really need and want and what you're willing to do to reimburse them for that.  And if you can't reach an agreement about that, then you're free to come back to me and say, Judge, it's unfair, they're either charging too much or we shouldn't have to pay.  But it seems to me the right protocol would be for you-all to try to work that out between yourselves to begin with and then come to me if there is a dispute about -- after a meet-and-confer.

MR. RYAN:  I would love to sit down today, if possible, with everybody concerned and see if we can work something out.

THE COURT:  Except me, because my point is I'm not going to be involved until you-all have a good faith effort to meet and confer.  And then if there's a dispute -- and I take it it won't -- if it gets resolved today, hallelujah, I'm -- I am down with that idea.  Something tells me it's not necessarily going to get all ironed out today.  But if it does, great.  If it doesn't, keep working and then come back with me.

MR. RYAN:  If you wouldn't mind, I would like to make a point about --

THE COURT:  Maybe better, make a legal point.

MR. RYAN:  It is related.  So happy to sit down.  Just want to make it clear, you know, if we can reach a

negotiation, we're not consenting the All Writs Act applies to the situation. I just want to make that clear.

THE COURT: But here's the thing. You don't have to consent. That's my call.

MR. RYAN: I know, but I don't want --

THE COURT: And you know what? I'm trying to avoid that call because of federalism. I don't want to -- I don't want to bring the weight of the federal judiciary behind this. I want there to be just a bare opportunity.

Now, look, here's the thing. You don't have to consent, but you better understand as you negotiate that that's at least in the realm of outcomes that you could be looking at.

MR. RYAN: I understand. I just wanted to be clear by entering negotiations I'm not saying I agree.

THE COURT: That's fine. Now, let me ask you this, though, because this is one of the things I was -- if this was contested today, and it sounds like it's not necessarily -- it's going to be contested but we might be able to put off to another day a decision. And what I would do is extend the same courtesy to you. At a minimum, we would this by Zoom. You're not going to have to come to Birmingham or New York or Chicago or wherever else -- D.C. -- where we've met these [sic]. We would hold down the costs and give you full right to participate, you know, in any hearing that we have on this

if there is a dispute, okay?  Fair?

MR. RYAN:  Yes.

THE COURT:  But understand that -- and you don't have to agree with this, but I think you have to deal with this -- I do think that this material is something that is a res, R-E-S, that I have jurisdiction over and my vote counts, subject to an appeal to the Eleventh Circuit if you disagree with any ultimate ruling I have.

Now, if you -- you know, here's the problem that I dealt with in America Home Shield -- I don't expect you to know anything about that case --

MR. RYAN:  I do.

THE COURT:  Well, then you might know this.  The initial -- I was trying to be judicially modest in how we went about that, so the first thing I did was just enjoined the plaintiffs from going forward with Rule 23 claims under California's version of Rule 23 while I was considering whether to approve the settlement.  Pretty clear that was innative jurisdiction to determine whether or not to approve the settlement.

By the way, historically, what happened was I deferred to the state court initially.  There was a preliminary approval of a nationwide class in San Diego in the state court, and much to my plaintiffs' counsel's chagrin, I told them we're standing down with the federal litigation until we

see whether there's going to be an approval of a nationwide class in the San Diego Superior Court. I guess it was superior court. So I deferred to the state.

The judge ultimately, in that case, rejected the parties' settlement, said it was only fair to the lawyers, not for the class members, and the parties went about litigating. Then my lawyers came in to me, American Home Shield's lawyers, and the plaintiffs' counsel in my class, putative class, and said we'd like to take a shot at negotiating a new deal. And I told them, I'm not going to say you can't go do that, but there's three rules: One, this better not become a reverse option, in other words, it's not going to be bare minimum; two, you'd better get a third-party mediator that approves every part of the process because we're under a microscope now; and three, bring it to me, but there's no guarantees that I'm going to approve it because I've already got concerns about American Home Shield and how they've gone about trying to settle this case in state court.

To my surprise, they came back with a very fair settlement. At least it looked like that. And I preliminarily approved it. That's when the state court lawyers in San Diego went back in and tried to start litigating the Rule 23 claims under my settlement. I said, You can't do that. So that was, again, I thought, judicially modest.

Then they went back to the state court and said, Judge, we don't want to litigate our Rule 23 claims. We don't agree that that court has jurisdiction, but we just don't want to have a fight. You have this very unique consumer relief, private attorney general enforcement mechanism. They said, We're just going to use that, which is essentially litigating on behalf of the class de facto. So I entered a second order, because the Court gave them free rein to go start that.

So then I enjoined the state court and the parties from going forward with any claims like that. I said, If you have an opt-out, you can litigate that individual opt-out's claims but not any claims on behalf of class members. Ironically, the Eleventh Circuit reversed me on the second one. They shouldn't have. They didn't have appellate jurisdiction to even review the second one, but they said that I should have just taken those Plaintiffs' lawyers from San Diego straight into contempt proceedings, not clarified or modified my injunction.

All that to say, I think, when I've had these skirmishes come up, I really try to bend over backwards to be fair to state litigants who are not before me, but I expect you-all to be fair with me, too, okay? So all that to say, let's see if we can do this. If I end up having to -- if I end up enjoining it for some reason, you understand that your recourse would be to take me to the Eleventh Circuit then,

right?  That would be your way you would --

MR. RYAN:  That would not be my preference.  My --

THE COURT:  I think that's the only thing you're left with, though.  You'd have to go convince the Eleventh Circuit that I didn't have jurisdiction.  You can't go convince a state court in California that I didn't have jurisdiction over it.

MR. RYAN:  Of course.

THE COURT:  We just -- yeah, so we understand that.

MR. RYAN:  The case that you described is a quintessential example going all the way back -- in competing class action, there are overlapping parties because it's the same putative subclasses or classes in play.  It's not an individual opt-out case.  This is an individual case that is not truly an opt-out case.  We're representing two hospitals and --

THE COURT:  I thought you-all opted out in 2021 on the -- only some subscribers opted out.  But you're also representing providers --

MR. RYAN:  Right.

THE COURT:  -- that are not opt out right now.

MR. RYAN:  Right.  They're individual -- but they're individual plaintiffs.  So there's an opt-out component, but the primary component is the provider --

THE COURT:  Yeah, there's no question this is a

different -- to the extent there's an intersection, it's a different intersection.  This is an intersection between class members being represented in two different forums, but it is -- it may be an intersection over your trying to get what is common-benefit confidential material through a side door. That's the question.

MR. RYAN:  So I think, Your Honor, regardless of how we work this out, it would benefit from supplemental authority on this issue just to --

THE COURT:  Be glad to.  Look, so -- and I think you're exactly right.  I like the way you put it, if we can't work this out.  I think the first thing we do is try to go work it out with the understanding that, yeah, there's uncertainty ahead for everybody, you know.  Particularly, the defendants are kind of caught in the whipsaw a little bit here and I'm sensitive to that.  I've got you and the providers kind of fighting over some things.  In the meantime, the defendants are going, Gee, we'd like to not tee off a state judge or a federal judge for that matter, okay?  So I'm sensitive to that, and we need to address that.

But I think you have to understand your discovery referee totally whiffed on this.  There was -- I mean, you have to at least address these issues.  You want to give me some supplemental authority, great, but he didn't address any of that authority.  He was very elementary in terms of his

analysis.  This is a -- something that would be discoverable in the state court case, therefore they get it.

MR. RYAN:  You'll understand if I don't comment on it, Judge.

THE COURT:  I understand.  You understand why I am, though.  Because I was just, like -- I was shocked when I read that recommendation.  It's like -- it's like the real issue in this case doesn't even exist.  It's -- I don't know if he understands it exists or if he just was ignoring it.  I don't know which one.

MR. RYAN:  I'd like to make one more point --

THE COURT:  And by the way, you defended your discovery referee.

MR. RYAN:  I'd like to make one more --

THE COURT:  Side eye.

MR. RYAN:  Judge Kleinberg is one of the finest judges that --

THE COURT:  That's what I said, you defend your discovery referee.  Is he here?

(Comments in low tones.)

THE COURT:  You might want to get a microphone if you want this on the record.  You know what?  This is my hearing.  You can disagree if you want to.  That's fine.

REFEREE KLEINBERG:  I didn't disagree with anything.  I just wanted to say I'm here.

THE COURT:  All right.  Fair enough.  And this is not -- this is not personal, but what I'm telling you is --

REFEREE KLEINBERG:  No, hang on.  Is anybody from the Bartko firm here?  Okay.  Is there anybody from Michigan Law School here?  Graduate.  Go Blue.  Okay.  I came here because -- frankly, I was confused as to why I was even invited.  Now, I've been serving as a co-ombudsperson for the Northern District of California federal court for over ten years, and I get invited by the federal judges to a number of conferences. I've been very active in that regard.  And as a lawyer, I was in federal court a lot and not just in this jurisdiction but all over the country.  Not in your court but other places.

THE COURT:  I understand there's other courts.

REFEREE KLEINBERG:  Good to hear that.  That's refreshing.  But here's --

THE COURT:  All right.  Just a minute.  Just a minute. Quiet down for a second.

REFEREE KLEINBERG:  I'm quiet.

THE COURT:  You're in my court right now.  You're not -- you are in my court right now.

REFEREE KLEINBERG:  Really?

THE COURT:  Okay.  You can have a seat.

REFEREE KLEINBERG:  It wasn't told to me this was going to be a court.

THE COURT:  You can have a seat.  You can have a seat.

I'm not kidding.  Have a seat.

REFEREE KLEINBERG:  And you're Judge --

THE COURT:  Proctor.

REFEREE KLEINBERG:  Proctor.  I want to mention one last thing.

THE COURT:  No.  You can have a seat.

REFEREE KLEINBERG:  Let me finish, Judge.  You're not in my court either.  Judge Wise -- you're making a face.

THE COURT:  No.  I am disappointed in you.  I am very disappointed in you.

REFEREE KLEINBERG:  Oh, stop it.  Judge Wise has been nominated to be on the federal bench.

THE COURT:  Yes, I understand --

REFEREE KLEINBERG:  So you may have now pretty soon -- maybe, maybe -- the fourth superior court judge to have this litigation here.

THE COURT:  Right, right.  I understand that.  And, look, I'm wishing her well with her nomination.  I know she took Judge Davila's seat for -- on the state court, right?

REFEREE KLEINBERG:  That's right.

THE COURT:  And he went onto the bench?

REFEREE KLEINBERG:  That's right.

THE COURT:  And by the way, I'm having lunch with Judge Chen, Judge Breyer, and Judge Chhabria here in a little while.

REFEREE KLEINBERG:  Good.

THE COURT:  So I do understand there are other courts. But, look, I'm not attacking you as a person.

REFEREE KLEINBERG:  No.

THE COURT:  But, look, your -- the fact of the matter is -- it's undisputed -- your recommendation did not address the issues that I have to address, and that's the only point I'm making.

REFEREE KLEINBERG:  Okay.  Very well.  Very well.

MR. RYAN:  I have one last point I'd like to make, with your permission.

THE COURT:  Please.  Let's go back to the merits.

MR. RYAN:  All Writs Act, I hear you on jurisdiction, competing class action.  When it comes to in rem jurisdiction of a federal court, the only cases I know about are where that relates to the groundment of the case about the property. It's a real property dispute, there's a piece of art in the jurisdiction.

THE COURT:  That's certainly --

MR. RYAN:  I just wanted to point that out, Your Honor.  There may be cases that support.  I just haven't --

THE COURT:  I think -- I think there are.  But again, I'm trying to avoid us litigating that issue if we can.  But, you know, there's some basic equity standpoint.

MR. RYAN:  And I hear you.  That's why I want to

negotiate --

THE COURT:  That's what I'm trying to get across is I'm trying to convince you this is something you will have to address down the road if there's not a resolution.  I think the defendants are already in a position where they know they've got to get this worked out if they can because they should for Judge Wise.  Okay?  I'm trying to do Judge Wise's -- a little bit of her heavy lifting here today and keep this off her docket to the extent we can.

The providers, though, are here and they're not in front of Judge Wise.  They are in front of me.  So that's why they're making these arguments to me.  I guess they could have intervened into this case and made objections, but I don't think they have to to the extent they contend that I've got jurisdiction over this discovery material.

And, you know, for example -- I'll direct you back to this -- in the Federal Judicial Center's manual on these matters, it talks about what happens when there's discovery materials from the MDL.  You might want to take a look at that if we get there.  I think there are some cases, though.  Judge Weinstein taking this issue up previously, some others.  But the principles are laid out and that's why I started off with the analogy that I think we're dealing with a different ride at the carnival.  But we still have, for years, since 1967 at least and probably before that, when we've had these parallel

pieces of litigation moving along, it's always better to coordinate. Okay? And that's what I'm interested in doing is coordinating before resolving. Okay?

MR. RYAN: I understand. And I'm happy to negotiate transcendent of what I think the law technically is on this issue, okay, because, you know, there can be a fair solution that transcends that.

Just on amending the protective order, just as a matter of principle, the language about competent court that can order discovery, that's what other courts saw and relied upon. It's there.

THE COURT: Yeah.

MR. RYAN: And to change it now feels odd to me because, you know, I don't know what other case is going on there, but how many other courts are relying on the fact that this court issued an order that this is a proper vehicle to obtain discovery of these materials and then I'm going to go and change it. It feels odd to me. I just --

THE COURT: Well, the reason -- the reason is, I presumed, I think, when we put that order out that -- and Judge Wise hasn't had a chance to weigh in on this, so again, not a comment there, but -- I presume a court of competent jurisdiction would take up some of these issues, for example the free-rider issue, the equity and fairness issue, the common benefit issues that are -- necessarily overlay this

dispute.  But court -- this is the quote I was going to give you from the Federal Judicial Center's "Managing Multidistrict Litigation in Product Liability Cases," which this is not a product case but the principles are the same:  Courts may direct contributions made by defendants, or by plaintiffs' counsel out of individual settlement payments received.  Fees may not be imposed by a transferee judge on attorneys with no cases in an MDL.  That's you, right?  So that's why no one suggested there would be any type of holdback or set-aside on any judgment or settlement you have.  Or attorneys with no cases in the MDL court who do not use federal discovery material.

The principle is all these cases that deal with when it's appropriate to have a holdback or a set-aside for settlement are pretty clear -- and this is what your argument is -- that, hey, we're not -- we're strangers in the MDL; we're not involved in the MDL.  But to the extent you're using federal discovery material, that's a hook where there may be an argument for a set-aside.  These lawyers aren't arguing for that now.  But what they are saying is, is we're not going to enforce our rights there if they come get our federal discovery materials, but we don't think those should be given up for free.  And that's why I said we're on a different ride at the carnival but it's still a ride at the carnival that we've got to figure out.

The other thing I would say to you is I was interested in this argument that you reasonably relied upon the protective order language that you highlighted earlier.  I don't know, if you're not in our case, that you could reasonably rely upon any of my orders.  But I just didn't understand that argument.  But --

MR. RYAN:  I was actually speaking about the courts. But when a court is evaluating whether it can order discovery from materials within another court, the first thing that they're presented with is the protective order.  And most protective orders have language that allows the parties to respond to discovery from other courts of competent jurisdiction, just like this one, and which means if they view themselves as a court of competent jurisdiction, they may order discovery of those materials without the need for that court's approval.  And if the parties in that case think it's inappropriate, they're free to take it to that court just as these parties have.

THE COURT:  Absolutely.

MR. RYAN:  But amending the protective order, this is -- if there are future cases, it feels like a strange thing to do.  And I don't think you need to do it to accomplish --

MS. JONES:  I'd like to be heard on that.

THE COURT:  Well, you don't have to.  I think it makes sense, and I think it makes sense just for this reason is if

we had -- if I had amended the protective order, I don't think we would have spent all the time and effort up to this point arguing about things that really don't move the needle on the real equities in the case.

But, look, you practice law, right?  That means you learn something in this case and you apply it in the next case.  And I think that's kind of the principle here, too, is that it seems to me I would have expected this type of process to take place, and I that's -- my friend from the JAMS has taken issue with that.  But I would have expected that that would have been something the parties would have tackled before now, and I think I have -- my order kind of forced the parties to get involved and tackle the issues now.

And I want to say I think you-all have come in perfectly in an appropriate way.  You've come in and made your arguments, and I want you to make your arguments.  What I'm trying to do is avoid having to make a decision one way or the other.  You know, if I step back, that affects the providers and the Blues.  If I weigh in, that affects you, right?  So I'm really trying to avoid either of those.  I'm trying to be modest here.

MR. RYAN:  To be clear, as a lawyer, I don't want to do anything that is unfair to anyone.

THE COURT:  Right.  And that's -- and let's be clear.  That's what's come across here.  I think you-all have come in

and said, you know, We didn't mean to go in a side door.  To the extent we did, we'll step back and figure that out.  We're not sure we have.  That's what I kind of hear right now.  But I think you've been very fair in your approach to this in this hearing and I appreciate that.

MR. RYAN:  Thank you very much.

MS. JONES:  And I would like to put on the record paragraphs 20 and 24 of the protective order, of which we are discussing, contemplate amendment, though it is not a final document in any form.

THE COURT:  Yes.

MR. OTTAUNICK:  Your Honor, if I may make one point for the Blues.  We're happy to sit down with the plaintiff groups, and you've agreed to produce some materials that the Prime plaintiffs are seeking.  There are also approximately 30 nonparties whose information is at stake here, for example, those who designated information in the expert reports.  We would need a court order to produce their materials unless they consented.  We asked them for their consent and they have not --

THE COURT:  Well, if there's consent, I'm going to give the order.  It may just be a -- the parties have consented and the Court adopts the parties' concept.  So I'll cover you on -- I'll cover everybody's bases.  Let's go work it out and we'll figure out what my order needs to look at

after that --

MR. OTTAUNICK:  Thank you, Your Honor.

THE COURT:  -- look like after that.

MS. JONES:  And the other thing we'd like to put on the record for the subscribers is we would oppose any reference to production of our expert data or our expert formula to anyone.

THE COURT:  Yes.  You line up with providers on that, but I hear my friend saying they're not interested in that.

MR. RYAN:  We don't need it.  We're doing something entirely different.

THE COURT:  Right, right.  But is yours both a provider and a subscriber claim?

MR. RYAN:  It is.

THE COURT:  Yeah, that's what I thought.

MR. RYAN:  But the subscriber claim is, you know, very small compared to --

THE COURT:  Yeah.  I was going to say it seems to me the provider claim is at least the predominant claim.

MR. RYAN:  Yes.

THE COURT:  That doesn't mean you don't have subscriber claims in there.

MR. RYAN:  That's right.  That's right.

THE COURT:  Yeah.  Okay.  All right.

You know, we've had a number of subscribers that have

opted back in.  I'm just kidding.  We have, though.  It's been -- I've never had that before where I've -- how many -- Megan, how many subscribers opted back in now?  A handful anyway.

MS. JONES:  More than a handful, Your Honor.

THE COURT:  More than a handful.

Okay.  Well, we were all surprised in June when the Supreme Court actually got to a cert petition.  I don't think we were unhappy about that, but --

MS. JONES:  No one was unhappy.

THE COURT:  Only the providers would think about those things.

Okay.  Joe, what else?

MR. WHATLEY:  We agree with what you said to do, Judge.

THE COURT:  All right.  So we have a plan.  How much time do you-all need to reverse swap to give me a joint report, including our Prime case plaintiffs?

MR. RYAN:  Well, I think we should sit down for an hour or two and -- that's what I think.

THE COURT:  Yeah, why don't we do that.  I'm all for that.  But I'm -- and you realize that you can always give me a report before the deadline.

MR. RYAN:  Oh, yes, yes.

THE COURT:  So I'm just -- what I'm wondering, what reasonable deadline I should set for a joint report.  Two

weeks out?  Three weeks out?  Four weeks out?  What are you-all thinking?

MR. RYAN:  I'm hopeful we can -- do we need more time?

MR. WHATLEY:  Yeah, I think we need more time, Judge.

THE COURT:  All right.  Why don't we say four weeks and see if we can do it in two weeks?

MR. RYAN:  Okay.  I --

THE COURT:  Just because you have permission doesn't mean you have to exercise all of it.  Well, and again, I've already complimented you for how I think you've approached this, you came in today, and I appreciate that.

All right.  What else do we need to take up for today?

And by the way, this is a court hearing.  I'm not wearing a robe, I'm not up on a bench, but we've had these status hearings spread out.  And when this case was filed 12 -- no, 11 years -- 11 1/2 years ago, when it came to me, early on --

MR. WHATLEY:  More than 12, Judge.

THE COURT:  Eventually, all the lawyers had eaten at every a barbecue joint there was in Birmingham, and they came to me and said, Judge, is there any way we could start rotating these around so we don't have to travel to Birmingham every time?  And I said that's fair.

So we've had them in New York, D.C., I think Chicago.  Craig, we've been to your place in D.C., but -- Cravath up in

New York, Tampa.  We had a Tampa one that corresponded with a conference that a number of us were attending, I think.  It was a panel hearing, actually, if I remember.  I think it was a panel hearing.  That's when I was sitting on the panel.  And now we're -- our West Coast friends catch a break.  Megan doesn't have to fly across to all those places.  So this is a court hearing, to be clear.

MR. WHATLEY:  And, Judge, I want you to know I bought this suit in San Francisco.

THE COURT:  This trip?

MR. WHATLEY:  No, no.  It was -- what was it?  About 15 years ago, Edith?

THE COURT:  Bill Pryor would be proud of you.

MR. WHATLEY:  Well, Judge, speaking of that, I wish you had been in a conversation that Miguel Estrada and I had with Judge Pryor on contempt, but -- given your comments, but that would be for a --

THE COURT:  Well, one of the very fun nights we've had in the last few years was Burke and Coogler and Axon and Marks, a bunch of judges from Alabama, were sitting poolside down in Sarasota one night at the end of a conference, district judges' workshop.  And Tom Hardiman joined us.  He was speaking at the conference.  He was head of judicial IT security at the time.  And this fellow walks over and says, Do you all mind if I smoke my cigar here?  I won't smoke if it's

going to bother you.  It was Estrada.  That's what he said. We'll give you permission to smoke a cigar, but it's got to be with us.  You've got to hang out here with us.  So we got to listen to Hardiman and Estrada talk about two hours about Supreme Court stuff that night.

MR. WHATLEY:  I think he only asks judges for permission to smoke a cigar.

THE COURT:  I don't know.  I think he was just being polite.  I'm not sure he knew who we were.

MR. WHATLEY:  I doubt that.

THE COURT:  Okay.  What else?

All right.  Thank you all.  I'm thanking -- for the record, thanking my Prime people for coming in the way they've approached this.  I do think you're right.  I think we're going to get this worked out.  I sense that spirit.

Now, I'll do you all a solid here and tell, again, my provider and subscriber friends, don't unreasonably withhold an agreement.  No hard feelings about any of this.  Let's -- let's just see if we can't not -- what's the famous saying -- don't fix the blame, fix the problem.  All right?  Fair enough?

And with that, we will be adjourned.

(Adjourned accordingly at 10:26 a.m.)

C E R T I F I C A T E


I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.

Dated:  September 4, 2024




*Pamela G. Weyant*
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter