FILED

2024 Oct-14  PM 02:04
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **IN RE:**<br>**BLUE CROSS BLUE SHIELD**<br>**ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This Document Relates to**<br>**Provider Track Cases** |

## PROVIDER PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS SETTLEMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INDEX OF EXHIBITS AND ABBREVIATIONS ...................................................... vii

I.      INTRODUCTION ...............................................................................................1

II.     OVERVIEW OF THE LITIGATION AND SETTLEMENT ...........................6

      A.      Factual and Procedural Background .......................................................6

      B.      The Settlement ........................................................................................8

              1.      The Settlement Class Membership ............................................9

              2.      Relief for the Benefit of the Settlement Class Membership .....................10

                    a.      The Settlement Fund ....................................................10

                    b.      Injunctive Relief..........................................................11

              3.      Settlement Class Release ..........................................................18

              4.      Settlement Rescission ...............................................................20

              5.      Attorneys' Fees and Expenses and Service Awards .................20

      C.      Notice Plan.............................................................................................20

      D.      Plan of Distribution...............................................................................21

III.    LEGAL STANDARD.........................................................................................23

      A.      Preliminary Class Certification..............................................................23

      B.      Preliminary Approval of the Settlement ................................................24

IV.     THE PROPOSED SETTLEMENT SATISIFES RULE 23 AND SHOULD EARN FINAL APPROVAL.............................................................................................25

      A.      Standing .................................................................................................26

      B.      Ascertainability......................................................................................27

      C.      The Rule 23(a) Requirements ................................................................28

              1.      Numerosity................................................................................28

        2.       Commonality.................................................................................................28

        3.       Typicality ...................................................................................................30

        4.       Adequacy of Representation .......................................................................31

   D.     The Rule 23(b)(3) Requirements .........................................................................32

        1.       Predominance...............................................................................................33

        2.       Superiority...................................................................................................34

   E.     Preliminary Approval of Settlement Terms .........................................................35

   F.     Plan of Distribution...............................................................................................44

   G.    CAFA Notice ........................................................................................................45

V.    CONCLUSION...................................................................................................................45

# **TABLE OF AUTHORITIES**

**Cases**

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997) ....................................................................................... 23, 27

*Behrens v. Wometco Enters., Inc.,*
    118 F.R.D. 534 (S.D. Fla. 1988) .................................................................... 42

*Bellocco v. Curd,*
    2006 WL 4693490 (M.D. Fla. Apr. 6, 2006) .................................................. 44

*Bennett v. Behring Corp.,*
    737 F.2d 982 (11th Cir. 1984) ............................................................. 36, 39, 42

*Blades v. Monsanto Co.,*
    400 F.3d 562 (8th Cir. 2005) .......................................................................... 32

*Brown v. Electrolux Home Products, Inc.,*
    817 F.3d 1225 (11th Cir. 2016) ................................................................ 24, 32

*Bussey v. Macon Cnty. Greyhound Park, Inc.,*
    562 F. App'x 782 (11th Cir. 2014) ................................................................. 26

*Camp v. City of Pelham,*
    2014 WL 1764919 (N.D. Ala. May 1, 2014) .................................................. 40

*Carriuolo v. General Motors Co.,*
    823 F.3d 977 (11th Cir. 2016) ........................................................................ 28

*Cordoba v. DIRECTV, LLC,*
    942 F.3d 1259 (11th Cir. 2019) ...................................................................... 23

*Exum v. Nat'l Tire & Battery,*
    2020 WL 1670997 (S.D. Fla. Apr. 6, 2020) ................................................... 35

*Griffin v. Dugger,*
    823 F.2d 1476 (11th Cir. 1987) ...................................................................... 25

*Hale v. Manna Pro Products, LLC,*
    2020 WL 3642490 (E.D. Cal. July 6, 2020) ................................................... 34

*Holmes v. Cont'l Can Co.,*
    706 F.2d 1144 (11th Cir. 1983) ...................................................................... 44

*In re Blue Cross Blue Shield Antitrust Litig.,*
    308 F. Supp. 3d 1241 (N.D. Ala. 2018) .......................................................... 38

*In re Checking Account Overdraft Litig.*,
      2020 WL 4586398 (S.D. Fla. Aug. 10, 2020)................................................................. 36

*In re Checking Account Overdraft*,
      275 F.R.D. 666 (S.D. Fla. 2011) ................................................................................... 29

*In re Chicken Antitrust Litig. Am. Poultry*,
      669 F.2d 228 (5th Cir. 1982) ........................................................................................ 44

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
      317 F.R.D. 675 (N.D. Ga. 2016).................................................................................... 28

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
      2020 WL 256132 (N.D. Ga. Mar. 17, 2020).................................................................. 39

*In re Mexico Money Transfer Litig.*,
      267 F.3d 743 (7th Cir. 2001) ........................................................................................ 31

*In re Sunbeam Sec. Litig.*,
      176 F. Supp. 2d 1323 (S.D. Fla. 2001) ......................................................................... 44

*In re Terazosin Hydrochloride Antitrust Litig.*,
      220 F.R.D. 672 (S.D. Fla. 2004).................................................................................... 25

*Karhu v. Vital Pharms., Inc.*,
      621 F. App'x 945 (11th Cir. 2015) ................................................................................ 26

*Kelly v. Harris*,
      331 F.3d 817 (11th Cir. 2003) ...................................................................................... 26

*Klay v. Humana, Inc.*,
      382 F.3d 1241 (11th Cir. 2004) .................................................................................... 33

*Kornberg v. Carnival Cruise Lines, Inc.*,
      741 F.2d 1332 (11th Cir. 1984), *cert. denied*, 470 U.S. 1004 (1985)........................ 29, 30

*Leverso v. SouthTrust Bank of AL., Nat. Assoc.*,
      18 F.3d 1527 (11th Cir. 1994) .................................................................................. 37, 44

*Lipuma v. American Express Co.*,
      406 F. Supp. 2d 1298 (S.D. Fla. 2005). ........................................................................ 40

*Little v. T-Mobile USA, Inc.*,
      691 F.3d 1302 (11th Cir. 2012) .................................................................................... 24

*Murray v. Auslander*,
      244 F.3d 807 (11th Cir. 2001) ...................................................................................... 28

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999) .................................................................. 23

*Parsons v. Brighthouse Networks, LLC*,
    2015 WL 13629647 (N.D. Ala. Feb. 5, 2015) .................................. 36

*Ressler v. Jacobson*,
    822 F. Supp. 1551 (M.D. Fla. 1992) ........................................... 39

*Schwartz v. TXU Corp.*,
    2005 WL 3148350 (N.D. Tex. Nov. 8, 2005) .................................. 44

*Smith v. Floor and Decor Outlets of Am., Inc.*,
    2017 WL 11495273 (N.D. Ga. Jan. 10, 2017) ................................ 44

*Sosna v. Iowa*,
    419 U.S. 393 (1975) .................................................................. 30

*Swaney v. Regions Bank*,
    2020 WL 3064945 (N.D. Ala. June 9, 2020) ............................ 34, 42

*Turner v. Murphy Oil USA, Inc.*,
    472 F. Supp. 2d 830 (E.D. La. 2007) ........................................... 34

*Valley Drug Co. v. Geneva Pharms., Inc.*,
    350 F.3d 1181 (11th Cir. 2003) .............................................. 27, 30

*Vega v. T-Mobile USA, Inc.*,
    564 F.3d 1256 (11th Cir. 2009) ........................................ 24, 27, 28

*Walmart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .................................................................. 28

*Williams v. Mohawk Industries, Inc.*,
    568 F.3d 1350 (11th Cir. 2009) .................................................. 28

**Statutes**

28 U.S.C. § 1715 ........................................................................... 44

**Other Authorities**

American Association of Medical Colleges, *Number of People per Active Physician by Specialty, 2021*, https://www.aamc.org/data-reports/workforce/data/number-people-active-physician-specialty-2021 ........................................................ 28

American Hospital Association, *Fast Facts on U.S. Hospitals, 2024*,
    https://www.aha.org/statistics/fast-facts-us-hospitals ........................ 28

Definitive Healthcare, *How many ambulatory surgery centers are in the U.S.?*,
    https://www.definitivehc.com/blog/how-many-ascs-are-in-the-us ................................. 28

MCLAUGHLIN ON CLASS ACTIONS, § 6.23 (17th ed. 2020) .......................................................... 44

Newberg on Class Actions § 7:31 ........................................................................................... 31

The Manual for Complex Litigation § 30.41 (3d ed.) ............................................................. 35

William B. Rubenstein, Newberg on Class Actions § 11:25 (4th ed.) ......................................... 35

**Rules**

Fed. R. Civ. P. 23(a) ................................................................................................ 23, 24, 31

Fed. R. Civ. P. 23(a)(1) .................................................................................................... 27

Fed. R. Civ. P. 23(a)(2) .................................................................................................... 28

Fed. R. Civ. P. 23(a)(3) .................................................................................................... 29

Fed. R. Civ. P. 23(a)(4) .................................................................................................... 30

Fed. R. Civ. P. 23(b) ........................................................................................................ 23

Fed. R. Civ. P. 23(b)(3) ............................................................................................ 32, 33, 34

Fed. R. Civ. P. 23(e) ................................................................................................... 24, 35

Fed. R. Civ. P. 23(e)(2) .............................................................................................. 24, 42

Fed. R. Civ. P. 23(e)(3) .................................................................................................... 25

Fed. R. Civ. P. 23(g)(2) .................................................................................................... 31

Fed. R. Civ. P. 23(g)(3) .................................................................................................... 31

## INDEX OF EXHIBITS AND ABBREVIATIONS

| Ex. No. | Abbreviation | Description |
|---------|--------------|-------------|
| A | Settlement Agreement | Provider Settlement Agreement dated October 4, 2024 |
| B | Co-Lead Counsel Declaration | Declaration of Provider Co-Lead Counsel Joe R. Whatley, Jr. and Edith M. Kallas |
| C | Feinberg/Biros Declaration | Declaration of Kenneth R. Feinberg and Camille S. Biros |
| D | Issacharoff Declaration | Declaration of Samuel Issacharoff |
| E | Gentle Affidavit | Affidavit of Settlement Administrator Edgar C. Gentle |

# I.       INTRODUCTION

After more than twelve years of hard-fought battles, the Provider Plaintiffs and the Defendants have reached a settlement encompassing a $2.8 billion payment and an investment of hundreds of millions of dollars in key infrastructure through which Blue Cross and Blue Shield plans work with healthcare providers. In addition to the largest-ever payment in a healthcare antitrust case, and one of the largest in any antitrust case, the Settlement will include never-before-available changes to the Blues' system and extraordinary relief for the healthcare providers who treat the Blues' members, including monitoring, compliance, and reporting processes.[1] This historic settlement is the product of nine years of painstaking, arm's-length negotiations between the parties with Special Master Edgar C. Gentle and four other mediators. It provides numerous benefits to the Settlement Class, many of which the Settlement Class would not have obtained even with a judgment in their favor:

**Monetary Relief**

The Defendants will pay $2.8 billion to the Settlement Fund, which will include distributions to the Settlement Class, Notice and Administration costs, and any Fee and Expense Award. The Defendants are not entitled to reversion of any of the Settlement Fund.

**Injunctive Relief**

Because each Blue Plan generally contracts with Providers only in that plan's Service Area, Providers must submit claims through the BlueCard Program when they treat members of another Blue Plan. For decades, Providers have complained that BlueCard is a non-transparent program that causes additional costs, inefficiencies, and frustration. The Settlement Agreement

---

[1] Capitalized terms not otherwise defined herein shall have the meaning given them in the attached Settlement Agreement.

significantly improves how Providers will be able to deal with the Blues, bringing more transparency, efficiency, and Blue Plan accountability. This relief is not something the Blues would have done on their own; the Provider Plaintiffs obtained this relief through years of litigation and negotiation, and the Blues estimate that implementing it will cost them hundreds of millions of dollars. Co-Lead Counsel Declaration ¶ 27. Providers who do not opt out of the settlement will receive relief including:

- **BlueCard Transformation.** Transformation of the BlueCard Program infrastructure through the development and implementation of a system-wide, cloud-based architecture that will increase access to critical information and allow Settlement Class Members to receive up-to-date, accurate information as if they were a contracted provider of the Control/Home Plan, directly from their Local/Host Plan. This creation of a system-wide information platform and enhanced information sharing will facilitate Settlement Class Members' access to Member benefits and eligibility verification information, pre-authorization requirements, and claims status tracking;

- **BlueCard Prompt Pay Commitment.** To address the gap in application of state prompt pay laws to BlueCard claims, a timeliness commitment for payment of fully insured Clean BlueCard Claims, with a requirement that the Blues pay interest when payment is made later than the Prompt Pay Period, as well as timely notice of defective claims and explanation for denied claims;

- **Service Level Agreements.** Implementation of Service Level Agreements, which commit the Blues to respond promptly to certain BlueCard Program-related inquiries or pay financial penalties;

- **BlueCard Executive.** Appointment of a BlueCard Executive at each Blue Plan, who will be accountable to Settlement Class Members for escalated BlueCard claims payment issues;

- **Real-Time Messaging System.** Implementation of a real-time Blues internal messaging system to reduce the time it takes for the Blues to respond to Providers' issues and disputes and enable Blue Plans to address Settlement Class Members' issues in near-real time;

- **National Executive Resolution Group.** Creation of a Blue National Executive Resolution Group, which will be supported by a Provider Liaison Committee and work to identify trends and opportunities for further improvement of the BlueCard Program over time.

Improving the BlueCard Program is not the only benefit the Settlement Agreement provides. Changes to rules governing contracts between Providers and the Blues will allow Providers' Contiguous Area Contracts to cover more Blue Plan Members, and certain hospitals will be eligible to contract with more Blue Plans than before. In addition, limits will be placed on Blue Plans' ability to rent certain of their Non-Blue-Branded Provider Networks:

- **Modifying the Contiguous Area Rule.** Currently, Providers can contract with a Blue Plan in a Contiguous Area only for Members who live or work in the Service Area where the Provider is located. The Settlement Agreement removes that requirement, so that a Provider can contract with a Blue Plan in a Contiguous Area for all of that Blue Plan's state Members.

- **Expanding Contiguous Area Contracts to Certain Affiliated Hospitals.** For the first time, the Settlement Agreement permits Blue Plans to enter into Contiguous Area

Contracts that cover not just hospitals in Contiguous Counties, but also certain of their affiliated hospitals.

- **Affiliates and All Products Clauses.** Limits on contract provisions that require Providers who contract with Blue Plans to participate in the networks of those plans' non-Blue affiliates.

Providers' day-to-day interactions with the Blues will improve as well. Co-Lead Counsel Declaration ¶ 28. With major upgrades to the Blues' technical capabilities, and commitments from the Blues to make more information available, Providers will have access to more information, and more timely information, than ever before:

- **Third-Party Information.** The Blues will identify third parties involved in determining benefit application decisions, so Settlement Class Members can better understand and predict such decisions.

- **Minimum Data Requirements.** The Blues will define minimum data requirements in response to certain eligibility and benefits inquiries, to promote consistency among Blue Plans and give certainty to Settlement Class Members that they are submitting the necessary information.

- **Blue Plan Common Appeals Form.** Settlement Class Members can use a newly developed appeals form common to all Blue Plans, so Providers do not bear the administrative expense of complying with different Blue Plan requirements for initiating an appeal related to a BlueCard claim.

- **Pre-Authorization Standards.** The Blues will promulgate guidelines to improve the

prior authorization process.

- **Telehealth Relief.** The Blues will streamline claims processing for Providers who provide telehealth or other virtual services to Blue Members.

The Settlement Agreement will also expand Providers' opportunity to enter into value-based contracts with the Blues (Co-Lead Counsel Declaration ¶ 29):

- **Minimum Level of Value-Based Care.** Each Blue Plan will have available a value-based care offering, so Providers in different parts of the country will have the option between a traditional fee-for-service model and a value-based care model for payment.

- **Best Practices for Value-Based Care.** The Blues will promulgate standards for value-based contracts in order to facilitate and advance the delivery of value-based care.

**Monitoring, Compliance, and Reporting**

The Provider Plaintiffs have made sure the commitments of the Settlement Agreement are enforceable. For a period of five years from the Effective Date of the Settlement, a Monitoring Committee comprised of members appointed by the Settling Defendants, Provider Co-Lead Counsel, and the Court will be created to oversee monitoring, compliance and reporting related to the injunctive relief. Co-Lead Counsel Declaration ¶ 30.

The Provider Plaintiffs' Settlement is a package of relief that re-shapes the Blues' systems in ways that are designed to address provider frustration with the BlueCard Program and more than meets the requirements for preliminary approval. Like the Subscriber Plaintiffs' settlement, which won final approval, the Provider Plaintiffs' Settlement changes the Blues' practices to the benefit of the Settlement Class, while providing historic monetary relief. The Settlement Class meets the requirements of Rules 23(a) and 23(b)(3)—the Provider Plaintiffs are seeking certification of a

23(b)(3) class, not a 23(b)(2) class. Moreover, the Settlement easily satisfies Rule 23(e). And, as explained in the Provider Plaintiffs' Notice Motion, the Notice Plan has been designed to achieve the best practicable notice to the Settlement Class. Co-Lead Counsel Declaration ¶ 31.

## II.    OVERVIEW OF THE LITIGATION AND SETTLEMENT

### A.    Factual and Procedural Background

The Provider track in this litigation began in 2012 when the Provider Plaintiffs' counsel filed the initial complaint in *Conway v. Blue Cross & Blue Shield of Alabama*, Case No. 12-cv-2532-RDP (N.D. Ala.). That complaint, like the operative complaint today, challenged the Blues' use of exclusive Service Areas as a restraint of trade that violates the Sherman Act. *Conway*, Doc. No. 1. Later that year, the Judicial Panel on Multidistrict Litigation centralized *Conway* and several actions by Subscriber Plaintiffs in this Court. In 2013, the Provider Plaintiffs filed a Consolidated Amended Complaint, which the Blues moved to dismiss (along with the Subscriber Plaintiffs' complaint) on numerous grounds:

- The Plaintiffs failed to allege an unlawful act because the Blues' exclusive Service Areas arose from common-law trademark rights;

- The alleged conspiracy cannot be judged by the *per se* standard;

- The Blues' practices are exempt from antitrust liability under the McCarran–Ferguson Act because they constitute the "business of insurance";

- The Plaintiffs failed to allege plausible markets; and

- Challenges to Blue Cross and Blue Shield of Michigan's rates are barred by the filed rate doctrine.

Doc. Nos. 110, 111, 120. Many of the Blues also moved to dismiss for lack of personal jurisdiction and improper venue.

6

In response to the motions to dismiss, the Provider Plaintiffs filed briefs on issues relating solely to them, and they filed briefs jointly with the Subscriber Plaintiffs on issues relating to all Plaintiffs. Doc. Nos. 148–52, 154–56. This Court largely denied the motions to dismiss, but it allowed discovery and further briefing on the Blues' challenges to jurisdiction and venue. *In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172 (N.D. Ala. 2014).

The Plaintiffs commenced nationwide discovery on the merits, jurisdiction, and venue. After consulting with the parties, in 2015 this Court streamlined the litigation by designating the Alabama cases as prioritized actions. Doc. No. 469. In 2016, the Court denied the motions to dismiss for lack of personal jurisdiction and improper venue. *In re Blue Cross*, 225 F. Supp. 3d 1269 (N.D. Ala. 2016). Over the following years, the Court ruled on several motions for summary judgment. Notably, the Court held that the "Plaintiffs have presented evidence of an aggregation of competitive restraints … which, considered together, constitute a *per se* violation of the Sherman Act." *In re Blue Cross*, 308 F. Supp. 3d 1241, 1267 (N.D. Ala. 2018), *appeal denied*, 2018 WL 7152887 (11th Cir. Dec. 12, 2018).

The work required to get to this point has been astronomical. When the Subscriber Plaintiffs moved for preliminary approval of their settlement in 2020, they stated that "[t]his litigation has been extraordinarily hard-fought over the past eight years, as reflected by the over 2,000 docket entries." Doc. No. 2610-1 at 3. This Court agreed that "[t]his litigation has been extraordinarily complex, protracted, and hard-fought over the past eight years." Doc. No. 2641 at 3. Nearly four years and more than 500 docket entries later, these statements are truer than ever. The Provider Plaintiffs litigated 26 motions to dismiss, took discovery from 37 Defendants and numerous nonparties, briefed 76 discovery motions, participated in more than 30 discovery hearings that led to 91 discovery orders, obtained and reviewed the production of 75 million pages of documents dating back to the 1920s, synthesized and analyzed terabytes of health insurance

claims data, served expert reports based on that data, participated in more than 200 depositions, defended more than 40 depositions of Provider Plaintiff class representatives and putative class members, collected and reviewed documents in response to the Defendants' requests for production from 156 Provider Plaintiffs and nonparties, filed and opposed several motions for summary judgment and moved for class certification. Co-Lead Counsel Declaration ¶ 15.

While the Provider Plaintiffs had many successes, they faced significant risks if they continued to litigate. Although the Blues' conduct prior to April 2021 would be judged by the *per se* standard, their conduct going forward would be judged by the rule of reason because the Blues eliminated the National Best Efforts rule.[2] Doc. No. 2933. The Provider Plaintiffs' group boycott claim, for which they had sought *per se* treatment, would also be judged by the rule of reason for the entire damages period. Doc. No. 2934. Additionally, in 2018 the Supreme Court decided *Ohio v. American Express Co.*, 585 U.S. 529 (2018), on which the Blues relied to argue that the Provider Plaintiffs could not show anticompetitive harm and had not presented a reliable damages model because the Blues operate a two-sided platform. While the Provider Plaintiffs strongly disagree, these issues have not been resolved. Like any complex antitrust case involving sophisticated Defendants, there were numerous other risks that remained through trial and beyond on appeal. Co-Lead Counsel Declaration ¶ 22.

### B.    The Settlement

The Provider Plaintiffs and the Blues engaged in mediation for nine years, from 2015 to 2024. Co-Lead Counsel Declaration ¶ 26. As that length of time indicates, the negotiations were hard-fought and covered in detail what would eventually become the Settlement Agreement's

---

[2] Although a positive development, elimination of the National Best Efforts rule also creates risks for Providers, as the Blues can condition participation in their Non-Blue-Branded products on participation in their Blue-Branded products. Some of the injunctive relief in the Settlement Agreement is intended to mitigate this effect. See Part II.2.b.vi below.

injunctive relief. Alongside Special Master Ed Gentle, Kip Benson, and Robert Meyer, who saw the negotiations through to completion, the parties used two additional mediators at an earlier stage: Judge Layn Phillips and Judge Gary Feess. In addition, Kenneth Feinberg and Camille Biros have served as the Providers' experts on allocation of settlement proceeds among the Settlement Class Members. During these processes, the Provider Plaintiffs assembled a Provider Work Group consisting of different types of Providers, including large hospital systems, teaching hospitals, physicians, and ancillary providers. The Provider Work Group participated in some of the mediation sessions, working with representatives of the Blue Plans and BCBSA to develop potential injunctive relief. In addition to participating in mediation sessions, members of the Provider Work Group spent countless hours giving valuable input to Settlement Class Counsel on the negotiation of the injunctive relief terms. Co-Lead Counsel Declaration ¶ 33. All told, the parties had at least dozens of in-person mediation sessions, plus countless calls and virtual meetings. The parties executed a Settlement Agreement on October 4, 2024. The Settlement's terms are detailed in the Agreement attached as Exhibit A. The following is a summary of the material terms.[3]

### 1.     The Settlement Class Members

The Settlement Agreement establishes a Settlement Class, defined as follows:

> all Providers in the U.S. (other than Excluded Providers, who are not part of the Settlement Class) who currently provide or provided healthcare services, equipment or supplies to any patient who was insured by, or who was a Member of or a beneficiary of, any plan administered by any Settling Individual Blue Plan during the Settlement Class Period.

Ex. A ¶ 1(gggg).

---

[3] All descriptions of the Settlement Agreement's terms in this brief are for summary descriptive and illustrative purposes only, and are not intended to, and shall not be deemed to, modify the Settlement Agreement in any way, or have any bearing on the meaning or interpretation of the Settlement Agreement. The Settlement Agreement should be consulted for its actual terms and conditions.

"Excluded Providers" are defined as:

(i) Providers owned or employed by any of the Settling Defendants; (ii) Providers owned or employed exclusively by Government Entities or Providers that exclusively provided services, equipment or supplies to members of or participants in Medicare, Medicaid or the Federal Employee Health Benefits Programs; (iii) Providers that have otherwise fully released their Released Claims against the Releasees prior to the Execution Date, including but not limited to Providers that were members of any of the settlement classes in *Love v. Blue Cross and Blue Shield Association*, No. 1:03-cv-21296-FAM (S.D. Fla.); or (iv) Providers that exclusively provide or provided (a) prescription drugs; (b) durable medical equipment; (c) medical devices; (d) supplies or services provided in an independent clinical laboratory; or (e) services, equipment or supplies covered by standalone dental or vision insurance. Any Provider that falls within the exclusion(s) set forth in clauses (i), (ii) or (iv) of this Paragraph 1(gg) for only a portion of the Settlement Class Period is a Settlement Class Member that may recover in the settlement as set forth in the Plan of Distribution.

*Id.* ¶ 1(gg).

The Settlement Class Period is July 24, 2008 through the Execution Date, which is October 4, 2024. *Id.* ¶ 1(jjjj). This Settlement Class tracks the Provider Class we sought to certify on April 15, 2019.

## 2.    Relief for the Benefit of the Settlement Class Members

The Settlement consists of two main components: (a) a $2.8 billion settlement fund; and (b) significant changes to Defendants' practices and improvements to the Blue system that will benefit Providers, which will be monitored for compliance with the terms of the Settlement by the Monitoring Committee for a period of five years following the Settlement Effective Date.

### a.    The Settlement Fund

The Settlement requires Defendants to establish a Settlement Fund of $2.8 billion, to be deposited into an Escrow Account for ultimate distribution. The Settlement Fund includes the Notice and Administration Fund, Fee and Expense Awards, and any Service Award(s). Ex. A ¶ 1(kkkk). Settling Defendants have agreed to transfer into the Escrow Account, within thirty calendar days of the Preliminary Approval Order, the $100 million Notice and Administration

Fund. *Id.* ¶ 32(a). Within thirty calendar days of the Court's entry of the Final Judgment and Order of Dismissal, Settling Defendants will transfer the remaining portion of the Settlement Amount into the Escrow Account. *Id.* ¶ 32(b).

The Settlement Fund will be used: (1) to pay all Settlement Class Members who are entitled to a distribution from the Net Settlement Fund ("Authorized Claimants") in accordance with a Court-approved Plan of Distribution, *id.* ¶ 36; (2) to fund a $100 million Notice and Administration Fund to pay Notice and Administration Costs (including Monitoring Fees and Expenses), *id.* ¶¶ 1(eee), 1(fff), 30; (3) to pay Court-awarded attorneys' fees and expenses, with attorneys' fees comprising no more than 25% of the Settlement Amount, *id.* ¶ 37; and to pay any Service Award(s) if permitted, *id*. Defendants have no reversionary interest in the Settlement Fund, unless the Settlement is rescinded. *Id.* ¶ 39(c).

In addition, if there is any balance remaining in the Notice and Administration Fund at the end of the Monitoring Period, it will be distributed by the Monitoring Committee to an entity or entities chosen by Provider Co-Lead Counsel and Settling Defendants, subject to approval by the Monitoring Committee. In choosing the entity or entities, the intent shall be to identify organizations that enable Providers to promote access to high-quality healthcare. *Id.*

### b.      Injunctive Relief

In addition to the $2.8 billion monetary recovery, Class Representatives and Settlement Class Counsel secured substantial injunctive relief on behalf of the Settlement Class. That relief includes significant changes to the way the Blues' rules allow Blue Plans to contract with Providers outside their Service Areas, numerous significant improvements to the Blue Plans' systems and processes, increased Blue Plan accountability, and the establishment of a Monitoring Committee. Each of these changes provides significant additional relief to the Settlement Class, allowing for new contracting opportunities for certain Providers, and reducing administrative burdens for all

Providers. To underscore the value of the relief, the Blue Plans estimate that they will spend hundreds of millions of dollars to implement it.

Key provisions of the injunctive relief, which will be available to all Class Members who do not opt out of the Settlement, include the following:

### i.     BlueCard Transformation

To further improve the functioning of the BlueCard Program, the Settling Defendants agree to develop and implement a system-wide, cloud-based architecture that will enable the delivery of the Blue System's BlueCard Claims data, including but not limited to the BlueCard Program claims processing infrastructure. Ex. A ¶ 14. This cloud-based architecture and enhanced information-sharing will increase Blue Plans'—and, by extension, Providers'—access to critical information so that the Control/Home Blue Plan is no longer the only Blue Plan with available information about Members obtaining healthcare services pursuant to the BlueCard Program. As a result, Settlement Class Members will be able to receive up-to-date, accurate information, as if they were a contracted provider of the Control/Home Plan, *directly from their Local/Host Blue Plan*, so that the Local/Host Blue Plan is better equipped to resolve issues that may arise in the administration of BlueCard Claims. This architecture will allow Blue Plans to access data including member benefits and eligibility verification information, pre-authorization requirements, and claims status tracking. *Id.* ¶ 14(a). The Settling Defendants have also agreed to create patient data exchange capabilities that will enable bidirectional data exchange between Blue Plans and Settlement Class Members, and between Blue Plans and Electronic Medical Record vendors. *Id.* ¶ 14(b).

### ii.     Prompt Pay Commitment to Participating Providers

The Provider Plaintiffs have alleged that the BlueCard Program, which all Blue Plans have agreed to use, "often result[s] in significant delays" for Providers seeking reimbursement.

Consolidated Fourth Amended Provider Complaint (Doc. No. 1083) ¶ 201. While local Blue Plans and their competitors are subject to state prompt pay laws for fully insured claims, these laws do not apply to BlueCard claims. The Settlement Agreement fills this gap by requiring the Settling Defendants to pay interest on many fully-insured Clean BlueCard Claims that are not adjudicated within the later of 30 days (or 45 days, if the claim is not submitted electronically) or a later deadline, if provided for under an applicable state's prompt payment laws. Ex. A ¶ 13(a)–(c). This provision of the Settlement Agreement also requires Blue Plans to timely provide notice of a defective claim and an explanation when a Blue Plan denies a claim. *Id.* ¶ 13(e), (f). Like state prompt pay laws, this provision does not apply to programs sponsored by state and federal entities, claims from a Provider under a documented investigation for fraud, waste, or abuse, or plans governed by ERISA. *Id.* ¶ 13(i).

### iii.     Service Level Agreements

The Settlement Agreement requires BCBSA and the individual Blue Plans to adopt Service Level Agreements ("SLAs"), which are performance commitments and standards with respect to BlueCard claims that BCBSA will require of each Blue Plan. Specifically, Blue Plans will respond to Providers' BlueCard-related inquiries into eligibility and claim status within twenty seconds (or longer for batch transactions). Blue Plans that fall below a certain threshold of compliance will pay financial penalties, which will be passed on to the affected Settlement Class Members. Ex. A ¶ 19.

### iv.     BlueCard Executive

A common Provider complaint about the BlueCard system is the difficulty in finding someone at the Local/Host Plan with the authority and responsibility for resolving issues with BlueCard claims. The Settlement Agreement creates one or more "BlueCard Executives" at each Blue Plan. The BlueCard Executive is an officer or other senior-level employee empowered to

make decisions on behalf of his or her own Blue Plan that cannot be resolved through other means. BlueCard Executives at different Blue Plans can interface with each other to ensure that issues that are escalated to them are resolved promptly and efficiently. Ex. A ¶ 16(a), (c). Issues involving larger BlueCard Claims are eligible for automatic escalation to the BlueCard Executive. *Id.* ¶ 16(b).

<strong>v.       Expansion of Contiguous Area Provider Contracting</strong>

Contiguous Area Contracting between Providers and Blue Plans has been expanded in two significant respects.

First, the Contiguous Area Rule currently limits Contiguous Area Contracts so that they cover only Members who live or work in the relevant Blue Plan's Service Area. The Settling Defendants have agreed to eliminate this limitation, so that Contiguous Area Contracts are accessible to all of the contracting Settling Individual Blue Plan's state Members, regardless of whether those Members live or work in the Blue Plan's Service Area. *Id.* ¶ 12.

Second, the Blues' rules currently permit a Provider located in an area contiguous to another Blue Plan's Service Area to contract with that Blue Plan under certain limited circumstances. The Settling Defendants have agreed to expand this right for hospital systems by allowing Settlement Class members and Blue Plans to negotiate Contiguous Area Contracts that cover not only Anchor Hospitals (which are located in Contiguous Counties), but also their Eligible Affiliates, which are affiliated hospitals located within an hour of the Anchor Hospital, in the same Service Area. Ex. A ¶¶ 1(bb), 11. For well over 500 hospitals, this provision will expand the number of Blue Plans with whom they are able to contract directly. The relief will also allow professionals exclusive to an Eligible Affiliate to enter a Contiguous Area Contract when the Eligible Affiliate enters such an agreement.

<strong>vi.       Affiliates and All Products Clauses</strong>

The Settlement Agreement limits the Blue Plans' practice of requiring Providers to

14

participate in the Blue Plans' non-Blue networks as a condition of participating in the Blue networks. Specifically, each Blue Plan will not rent Non-Blue-Branded Provider network(s) to another Blue Plan (or another Blue Plan's affiliate(s)) offering Non-Blue-Branded insurance, products or services in the renting Blue Plan's Service Area, where the network being rented is comprised primarily of Providers that are members of the Non-Blue-Branded network by virtue of a clause in a Blue-Branded network contract obligating the Provider to participate in the Blue Plan's Non-Blue-Branded offerings. Ex. A ¶ 26. The purpose of this relief is to ensure that the Blues cannot use their Non-Blue-Branded business, which was enabled in part by the Subscribers' settlement, to harm Providers.

### vii.    Third-Party Information

Providers have complained that when Blue Plans involve third parties in decisions about prior authorization or processing claims, the Providers may not know who the third party is, or what criteria the third party is using to make its benefit application decisions. The Blue Plans have agreed to inform Settlement Class Members of the identities of third parties involved in benefit application decisions, as well as the entity with ultimate responsibility for adjudicating the claim, to the extent that it is technologically feasible and permitted by the Blue Plans' contracts. Ex. A ¶ 18.

### viii.    Minimum Data Requirements

To provide clarity for Providers who submit claims through the BlueCard Program, the Blue Plans have agreed to define and apply a common set of minimum data requirements for responses to certain eligibility and benefits inquiries. Adopting these minimum data requirements will also streamline communication between Blue Plans for BlueCard claims. Ex. A. ¶ 20. In combination with the other relief in the Settlement Agreement, such as the system-wide information platform, this relief will reduce the administrative burden on Providers. Among the

data elements that will be included is identification of the Control/Home Plan, to which many Providers did not previously have access.

### ix.      Real-Time Messaging System

The Settling Defendants have agreed to implement a real-time inter-plan messaging service, which will enable Blue Plans to address Settlement Class Member and Member issues in near real-time, including by supplying prompt responses to pre-service transactions and rectifying claims issues and disputes. Ex. A ¶ 15.

### x.      National Executive Resolution Group

The Settlement Agreement provides that BCBSA will establish a "National Executive Resolution Group," whose role is to continue to improve the BlueCard Program over time, with input from Providers. The Group will operate at the BCBSA level and will be composed of executives from both BCBSA and the Blue Plans. The Group will have a Provider Liaison Committee, which will be composed of ten representatives from the Settlement Class. The Provider Liaison Committee will establish a mechanism through which Settlement Class Members and associations or organizations of Providers can communicate concerns or desired improvements to the committee, which will be permitted to raise and present such concerns to the Group twice a year, and will receive annual reports of the Group's work and recommendations. Ex. A ¶ 17.

### xi.      Blue Plan Common Appeals Form

Currently, there is no standard form for Providers to submit when appealing a decision on a BlueCard claim. Because of this lack of standardization, Providers often do not know how to initiate appeals, or what information will be required by the Blue Plan that adjudicates the claim, and thus the appeal is rejected. The Settlement Agreement creates an optional common appeals form that all Blue Plans must accept, as permitted by law, to initiate a Provider appeal. Ex. A ¶ 43; *id.* App'x D. The form gives Providers clarity by specifying the information that must be submitted

with the appeal. Providers can also continue to use a Blue Plan's individual appeal form. Providers are not required to use the new appeals form and can continue to use other appropriate forms if they prefer.

### xii.     Pre-Authorization Standards

Under the Settlement Agreement, BCBSA agrees to promulgate guidance to Blue Plans to improve the prior authorization process. That guidance will be not less than what is set out in the Consensus Statement on Improving the Prior Authorization Process issued by BCBSA, AHIP, the American Medical Association, and the American Hospital Association. The guidance will include recommendations for selective application of prior authorization, prior authorization program review and volume adjustment, transparency in communication regarding prior authorization, and automation to improve transparency and efficiency. Ex. A ¶ 25.

### xiii.     Telehealth Relief

In certain situations, Blue Plan-contracted Providers contract with individual physicians located in a different Blue Plan's Service Area to supply Virtual-Only Services to the Provider's patients. In these situations, the Blue Plans have agreed to allow Settlement Class Members to submit claims for these Virtual-Only Services directly to the Settlement Class Member's Local/Host Blue Plan, rather than to the Blue Plan where the individual physician is located. Ex. A ¶ 24.

### xiv.     Minimum Level of, and Best Practices for, Value-Based Care

Some Providers would prefer to enter into value-based reimbursement arrangements, but this has been difficult to implement because there are dozens of Blue Plans, each with its own set of information about its members. The Settlement Agreement requires each Blue Plan to have a

value-based care offering that qualifies as Category 3 or higher on the LAN APM Framework.[4]
To implement this provision, BCBSA will promulgate defined standards for value-based contracts,
covering member attribution logic, performance measurement, and data analytics and reporting.
Ex. A ¶¶ 22–23.

**xv.**      **Monitoring, Compliance, and Reporting**

The Settlement Agreement establishes a Monitoring Committee comprised of (i) two
members appointed collectively by Settling Defendants, (ii) two members appointed collectively
by Provider Co-Lead Counsel, and (iii) one member appointed by the Court, which will oversee
compliance with the Settlement for a period of five years from the Effective Date of the
Settlement.[5] Ex. A ¶ 29; *id.* App'x C ¶ 1(a). During the Monitoring Period, Settling Defendants
shall advise Provider Co-Lead Counsel and the Monitoring Committee of the fulfillment of any
requirements set forth in the Agreement relating to injunctive relief *Id.* ¶ 29. The Settlement
Agreement also sets forth a process for adjudication of eligible disputes related to the Settlement.
Ex. A, App'x C ¶ 2.

**3.**      **Settlement Class Release**

In return for the monetary and injunctive relief provided in the Settlement, upon the
Effective Date of the Settlement, Releasors (Class Representatives and Settlement Class
Members) who do not timely and validly exclude themselves) will have released claims (as
described below) against the Releasees ((i) Settling Individual Blue Plans, (ii) BCBSA, (iii)

---

[4] *See* Health Care Payment Learning & Action Network, *APM Framework*, https://hcp-lan.org/apm-framework/.
[5] Any reporting obligation and the authority of the Monitoring Committee shall cease at the conclusion of the
Monitoring Period. Ex. A ¶ 29. The Monitoring Committee's actual and reasonable fees and expenses (not including
fees for members appointed by Settling Defendants) will be paid from the Notice and Administration Fund upon
approval by the Monitoring Committee. *Id.* ¶ 30.

NASCO,[6] and (iv) Consortium Health Plans, Inc.,[7] as well as related entities). Ex. A ¶¶ 1(www), 1(xxx), 41. The releases apply to Releasors and their predecessors, successors, heirs, administrators and assigns. *Id.* ¶ 1(xxx).

The Releasors agree to release "any and all known and unknown claims … based upon, arising from, or relating in any way to: (i) the factual predicates of the Provider Actions (including but not limited to the Consolidated Amended Complaints filed in the Northern District of Alabama) including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date; (ii) any issue raised in any of the Provider Actions by pleading or motion; or (iii) mechanisms, rules or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10–26 [relating to injunctive relief] approved through the Monitoring Committee Process during the Monitoring Period and that are based on the same factual predicate of the Provider Actions and related to the injunctive relief provided by Paragraphs 10–26." *Id.* ¶ 1(vvv).

Released Claims do not include those "that arise in the ordinary course of business and are based solely on (a) claims by the Provider in the Provider's capacity as a plan sponsor or subscriber or (b) claims regarding whether a Settling Individual Blue Plan properly paid or denied a claim for a particular product, service or benefit based on the benefit plan document, Provider contract, or state or federal statutory or regulatory regimes (including state prompt pay laws)," unless those claims are based in whole or in part on the factual predicates of the Provider Actions or Released Claims. *Id.*

---

[6] NASCO is a Blue-owned healthcare technology company involved in, among other things, processing certain Blue claims.

[7] Consortium Health Plans, Inc. is a marketing company owned by several Member Plans, which provides marketing assistance regarding national accounts to BCBSA and the Member Plans.

This release is similar to the release this Court approved (and the Eleventh Circuit affirmed) in the Subscriber Settlement. In fact, this release is less restrictive than the Subscribers' release because it does not apply to or bind opt-outs at all. Doc. No. 2939.

### 4.      Settlement Rescission

The Provider Class Representatives and Settling Defendants may only rescind the Settlement under certain enumerated circumstances.

 Ex. A ¶¶ 33, 37(b), 52; In Camera Supplement¶¶ 1(rr), 50.

### 5.      Attorneys' Fees and Expenses and Service Awards

Settlement Class Counsel will apply to the Court for: (i) an award of attorneys' fees, up to 25% of $2.8 billion (i.e., $700 million), plus (ii) reimbursement of expenses and costs reasonably and actually incurred in connection with prosecuting the Provider Actions. Ex. A ¶ 37(a). The Agreement provides for a Partial Award of $75 million to be paid from the Escrow Account to Settlement Class Counsel no later than 45 days after entry of the Final Judgment and Order of Dismissal, subject to protections that ensure repayment of the Partial Award if the Fee and Expense Award is reduced below $75 million, or return of the Escrow Account is required. *Id.* ¶ 37(c). The parties' agreement with respect to attorneys' fees was reached only after the parties had resolved the other substantive terms of the Settlement. Settlement Class Counsel may seek Service Awards for Class Representatives as part of their Fee and Expense Application in accordance with Eleventh Circuit practice. *Id.* ¶ 37(d).

### C.      Notice Plan

With the assistance of the Special Master, Provider Co-Lead Counsel and counsel for Settling Defendants have selected BrownGreer PLC as the Settlement Notice Administrator, which is responsible for managing and administering the process by which Class Members are notified of the Settlement. Ex. A ¶ 1(ffff). Before selecting the Settlement Notice Administrator, the

Court's Special Master, Provider Co-Lead Counsel and counsel for Settling Defendants requested proposals from several firms. They reviewed the proposals, spoke with representatives of the firms, and made a choice that they believe will ensure the best practicable notice at a reasonable cost.

As set forth in detail in the Notice Motion, which is being filed contemporaneously with this motion, the Notice Plan developed by BrownGreer provides notice in full compliance with Rule 23.

###    D.    Plan of Distribution

The Provider Plaintiffs are finalizing a Plan of Distribution, which they will submit in advance of the preliminary approval hearing. The Settlement Agreement contemplates Court appointment of a Settlement Claims Administrator to assist in the implementation of the Plan of Distribution and to resolve any disputes concerning the claims process. Ex. A ¶ 1(cccc). Upon preliminary approval of the proposed Plan of Distribution, Provider Plaintiffs will seek Court appointment of a Settlement Claims Administrator.

An initial step in creating the Plan of Distribution was to determine a fair allocation of the Net Settlement Fund among General Acute-Care Hospitals, Other Facilities, and Medical Professionals.[8] To assist them in doing so, the Provider Plaintiffs retained Kenneth R. Feinberg and Camille S. Biros, who have designed and implemented some of the largest compensation programs in history, including the September 11th Victim Compensation Fund and the BP Deepwater Horizon Oil Spill Program. Feinberg/Biros Declaration Ex. A ("Feinberg/Biros Report") at 1. They also opined on the division of the settlement funds in the Subscriber actions in this case between fully insured plans and ASO plans. *Id.* Mr. Feinberg and Ms. Biros received information from the Provider Plaintiffs' experts regarding the results of their econometric models

---

[8] These terms are defined in the Plan of Distribution.

relating to impact on different types of providers. *Id.* at 2–3. Based on their work, the experts concluded that healthcare facilities (including General Acute-Care Hospitals and Other Facilities) suffered 92% of the impact, and Healthcare Professionals suffered 8%. *Id.* Although publicly available information indicates that 42% of commercial insurance payments in the United States go to Healthcare Professionals, the allocation was different here for two main reasons. First, the experts' data showed that the impact of the Blues' conduct on healthcare facilities was three and a half times as large as the impact on Healthcare Professionals. *Id.* at 4. Second, approximately 65% of physicians are excluded from the Settlement Class because the Court found that these physicians released their claims in *Love v. Blue Cross and Blue Shield Association*, No. 1:03-cv-21296-FAM (S.D. Fla.). *Id.* Without the *Love* releases, the Healthcare Professionals' share would have been closer to 20%. *Id.* In addition to hearing from the Provider Plaintiffs' experts, Mr. Feinberg and Ms. Biros participated in numerous sessions in which representatives of several types of providers were given an opportunity to react to the experts' results and explain any departure from those results they felt was justified, including a two-day session in New York that all participants were invited to attend in person or virtually. *Id.* at 3–5. After taking into account the concerns of everyone who participated in the process, Mr. Feinberg and Ms. Biros determined that the 92%/8% split between facilities and Healthcare Professionals was fair and recommended it for the plan of distribution. By building the settlement from the ground up, and relying on expert advice for allocation of settlement proceeds, Settlement Class Counsel avoided potential conflicts and followed a fair process. Issacharoff Declaration ¶¶ 8–16.

For all Settlement Class Members, the distribution from the Net Settlement Fund will depend on their Allowed Amounts, meaning the amounts allowed by Blue Plans for Commercial Health Benefit Products—in particular, the Allowed Amounts from July 24, 2008 to October 4,

2024. Further details about the calculation of distributions will be contained in the Plan of Distribution.

Pursuant to Paragraph 39 of the Settlement Agreement, if there is a balance remaining in the Escrow Account (other than any Fee and Expense Award, the Notice and Administration Fund, any Service Award(s), and interest earned thereon) after (i) distribution of the Net Settlement Fund to Authorized Claimants and (ii) the time for Authorized Claimants to take possession of their distributions, the Settlement Claims Administrator will, subject to Court approval, allocate the balance among Settlement Class Members in an equitable and economic fashion. If it is not economical to distribute to Settlement Class Members any such residual amounts, then any such amounts will be added to the Notice and Administration Fund unless otherwise ordered by the Court.

## III.    LEGAL STANDARD

### A.    Preliminary Class Certification

"As the Supreme Court has explained, when a plaintiff requests class certification for purposes of a settlement-only class, the court:

> need not inquire whether the case, if tried, would present intractable management problems [] for the proposal is that there is to be no trial. But other specifications of the Rule – those designed to protect absentees by blocking unwarranted or overbroad class definitions – demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848-49 (1999) ('When a district court, as here, certifies for class action settlement only, the moment of certification requires heightened attention ... to the justifications for binding the class members.') (internal quote omitted)." Doc. No. 2641 ("Subscriber Order") at 9.

"'For a class action to be certified, the named plaintiff must have standing, and the putative class must satisfy both the requirements of Federal Rule of Civil Procedure 23(a), and the requirements found in one of the subsections of Rule 23(b).' *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1267 (11th Cir. 2019). The Rule 23(a) requirements for certification of any class action are: '(1) numerosity ("a class [so large] that joinder of all members is impracticable"); (2) commonality ("questions of law or fact common to the class"); (3) typicality (named parties' claims or defenses "are typical ... of the class"); and (4) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").' *Amchem*, 521 U.S. at 613. The Federal Rules provide that a 'class action may be maintained if Rule 23(a) is satisfied and if' the provisions of Rule 23(b)(1), (b)(2), or (b)(3) are satisfied. Fed. R. Civ. P. 23(b). Thus, '[i]n addition to establishing the requirements of Rule 23(a), a plaintiff seeking class certification must also establish that the proposed class satisfies at least one of the three requirements listed in Rule 23(b).' *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012)." *Id.* at 10 (cleaned up).

"In *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256 (11th Cir. 2009), the Eleventh Circuit explained as follows:

> Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied.

*Vega*, 564 F.3d at 1265-66 (footnotes omitted). The 'party seeking class certification has the burden of proof.' *Brown v. Electrolux Home Products, Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016)." *Id.* at 10–11 (cleaned up).

### B.   Preliminary Approval of the Settlement

"If preliminary class certification under Rule 23(a) and (b) is appropriate, the court's job is not complete. It must then examine the propriety of settlement. Rule 23(e) provides that a court

may approve a proposed class action settlement 'only after a hearing and on finding that it is fair, reasonable, and adequate.' *See* Rule 23(e)(2). The 2018 amendments to Rule 23(e)(2) brought forth substantial and needed changes with respect to the early and final evaluation of class settlements. Rule 23(e) now provides that the district court may approve a settlement only after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;

> (B) the proposal was negotiated at arm's length;

> (C) the relief provided for the class is adequate, taking into account:

> (i) the costs, risks, and delay of trial and appeal;

> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

> (iv) any agreement required to be identified under Rule 23(e)(3); and

> (D) the proposal treats class members equitably relative to each other." *Id.* at 11–12 (cleaned up).

## IV.   THE PROPOSED SETTLEMENT SATISFIES RULE 23 AND SHOULD EARN FINAL APPROVAL

An antitrust action like this one, in which the defendants' uniform conduct allegedly harmed hundreds of thousands of class members through the same mechanism, is ripe for settlement class certification. When that action is settled for billions of dollars in monetary relief and significant injunctive relief, the settlement should be approved.

**A.**      **Standing**

"'It is well-settled in the Eleventh Circuit that prior to the certification of a class, and before undertaking an analysis under Rule 23, the district court must determine that at least one named class representative has Article III standing to raise each class claim.' *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 679 (S.D. Fla. 2004). Indeed, 'only after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others.' [*Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987).] 'To have standing, a plaintiff must show (1) he has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to conduct of the defendant; and (3) it is likely, not just merely speculative, that the injury will be redressed by a favorable decision.' *Kelly v. Harris*, 331 F.3d 817, 819-20 (11th Cir. 2003)." *Id.* at 12–13 (cleaned up).

The Provider Plaintiffs have presented evidence that they suffered injuries in the form of lower reimbursements and reduced choice due to the challenged conduct, and they have quantified the damages of Alabama's acute-care hospitals. *E.g.*, Doc. No. 2604 at 23–33. Their economics experts have shown that their injury is "concrete, particularized, and actual, not merely conjectural." Subscriber Order at 13; *see* Doc. No. 2798 at 21–30. This Court has already denied the Blues' motion for summary judgment that claimed that the Provider Plaintiffs' damages were time-barred and speculative, stating, "Because Providers' damages model is not speculative and is not based on guesswork, a jury could determine that it is reliable." Doc. No. 3902 at 11. Therefore, the Provider Plaintiffs have easily met the requirements for standing.

26

## B.        Ascertainability

"In addition to standing, a class plaintiff must show that the proposed class is adequately defined and clearly ascertainable. The threshold issue of 'ascertainability' relates to whether the putative class can be identified: '[a]n identifiable class exists if its members can be ascertained by reference to objective criteria.' *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014). These 'objective criteria' should be 'administratively feasible,' meaning that the identification of class members should be 'a manageable process that does not require much, if any, individual inquiries.' *Bussey*, 562 F. App'x at 787 (reversing district court decision finding the ascertainability requirement satisfied where class could not be identified by reference to objective information in the defendant's records). A plaintiff can rely upon a defendant's records to identify class members. *Karhu v. Vital Pharms.*, *Inc.*, 621 F. App'x 945, 948 (11th Cir. 2015)." Subscriber Order at 13–14 (cleaned up).

Here, the members of the Settlement Class are readily ascertainable. As explained in more detail in the Provider Plaintiffs' motion for approval of their notice plan, reliable lists of healthcare providers are commercially available. These lists can be used to provide notice. Once class members begin to submit claims, any disputes about whether a purported class member is or is not in the class can be resolved with reference to the Blues' data and other databases.[9]

---

[9] This is also true for determinations about the exclusion of certain physicians, physician groups, and physician organizations from the class under *Love v. Blue Cross and Blue Shield Association*, No. 1:03-cv-21296-FAM (S.D. Fla.). The exclusion generally applies if the physician, group, or organization provided Covered Services to any Blue Plan member up to and including January 2009. A determination of exclusion for nearly all physicians can be made by reference to the date the physician's National Provider Identifier became active. The Blues' data can also show whether a purported class member is excluded.

### C.       The Rule 23(a) Requirements

"Before certifying a class, even where a settlement is involved, a district court must analyze

the requirements of Rule 23. *Amchem*, 521 U.S. at 619-20. Pursuant to Rule 23, class certification

is appropriate if:

> (1) the class is so numerous that joinder of all members would be impracticable; (2) there are questions of fact and law common to the class; (3) the claims or defenses of the representatives are typical of the claims and defenses of the unnamed members; and (4) the named representatives will be able to represent the interests of the class adequately and fairly.

[*Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 (11th Cir. 2003)]; Fed. R. Civ. P.

23(a)(1)-(4)." Subscriber Order at 14. Here, the Settlement Class and the Class Representatives

satisfy all four requirements.

### 1.       Numerosity

"Under Rule 23(a)(1), the plaintiff must show that the settlement class is so numerous that

joinder is impracticable. See Rule 23(a)(1). The Eleventh Circuit has held that the numerosity

requirement is 'a generally low hurdle' and 'less than twenty-one is inadequate [and] more than

forty [is] adequate....' *Vega*, 564 F.3d at 1267." Subscriber Order at 15. In the United States, there

are more than 6,000 hospitals, several thousand medical facilities of other types, and hundreds of

thousands or more physicians and other professionals.[10] Therefore, the Settlement Class easily

satisfies the numerosity requirement.

### 2.       Commonality

"Rule 23(a)(2) requires that 'there are questions of law or fact common to the class.' Fed.

---

[10] American Hospital Association, *Fast Facts on U.S. Hospitals, 2024*, https://www.aha.org/statistics/fast-facts-us-hospitals (6,120 hospitals); Definitive Healthcare, *How many ambulatory surgery centers are in the U.S.?*, https://www.definitivehc.com/blog/how-many-ascs-are-in-the-us (nearly 9,600 active ambulatory surgery centers); American Association of Medical Colleges, *Number of People per Active Physician by Specialty, 2021*, https://www.aamc.org/data-reports/workforce/data/number-people-active-physician-specialty-2021 (949,658 active physicians across all specialties).

R. Civ. P. 23(a)(2). For commonality to be found, the action 'must involve issues that are susceptible to class-wide proof.' *Williams v. Mohawk Industries, Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009) (citing *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001)). Also, a plaintiff must 'demonstrate that the class members "have suffered the same injury."' *Walmart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation omitted). However, Rule 23(a)(2) 'demands only that there be questions of law or fact common to the class. This part of the rule does not require that all the questions of law and fact raised by the dispute be common.' *Vega*, 564 F.3d at 1268; *see also Carriuolo v. General Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016) ('even a single common question will' satisfy the commonality requirement). Courts in the Eleventh Circuit 'have consistently held that allegations of price-fixing, monopolization, and conspiracy by their very nature involve common questions of law or fact.' *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 694 (N.D. Ga. 2016) (citations omitted)." Subscriber Order at 15.

Like the Subscriber Plaintiffs, the Provider Plaintiffs have alleged that "Defendants engaged in a conspiracy to horizontally allocate geographic markets by agreeing to exclusive service areas where the Blue Plans do not compete with each other in combination with other anticompetitive restraints," including restraints on output in the form of the National Best Efforts rule. *Id.* at 16. This alleged conspiracy was nationwide. Therefore, the Provider Plaintiffs' claims involve several common questions of law or fact, including: (1) whether the Blues conspired to allocate markets and agreed to restrict output in violation of the Sherman Act, (2) whether the Blues agreed to fix prices and implement a group boycott through the BlueCard Program in violation of the Sherman Act, (3) whether the Blues monopsonized the relevant product markets, (4) whether the Blues paid anticompetitive reimbursements to Providers as a result of their agreements, (5) whether the Blues have procompetitive justifications that outweigh the harm to

competition for the Provider Plaintiffs' rule of reason claims, and (6) whether the Blues constitute a single entity for purposes of managing their trademarks. These common questions satisfy the commonality requirement.

### 3. Typicality

"Rule 23(a)(3) provides that class representatives may sue on behalf of the class only if the 'claims or defenses of the representative parties are typical of the claims or defenses of the class[.]' Fed. R. Civ. P. 23(a)(3). '[T]he typicality requirement is permissive; representative claims are "typical" if they are reasonably co-extensive with those of absent class members; they need not be substantially identical.' *In re Checking Account Overdraft*, 275 F.R.D. 666, 674 (S.D. Fla. 2011). Whereas commonality looks at whether class members' claims are common to each other (a horizontal comparison between members of the class), typicality is satisfied where the named plaintiffs' claims 'arise from the same event or pattern or practice and are based on the same legal theory' as the claims of the class (a vertical comparison between class members and class representatives). *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984), *cert. denied*, 470 U.S. 1004 (1985)." Subscriber Order at 16–17 (cleaned up).

"'Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice.' *In re Checking Account Overdraft Litig.*, 286 F.R.D. at 653. Typicality is not destroyed by factual variations between the class representatives and the unnamed class members. *Kornberg*, 741 F.2d at 1357." *Id.* at 17 (cleaned up).

The Class Representatives include various types of Providers, but their claims are typical of the class because they, like the Subscribers' claims, "arise from the same alleged conduct: Defendants' alleged illegal geographic market allocation and output restrictions, among other restraints." *Id.* That alleged conduct, along with the challenged price-fixing and group boycott

aspects of the BlueCard system, affected competition in the markets for the purchase of healthcare services and the sale of commercial healthcare financing services, harming the Settlement Class. *See* Doc. No. 2454-6 (Expert Report of Deborah Haas-Wilson, Ph.D., April 15, 2019) at 116–254. Moreover, the proof the Class Representatives would present to support their claims supports the claims of the Settlement Class as well. Therefore, the Class Representatives' claims are typical of the Settlement Class's claims.

### 4.      Adequacy of Representation

"Rule 23(a)(4) requires a showing that 'the representative parties will fairly and adequately protect the interests of the class.' Fed. R. Civ. P. 23(a)(4). The adequacy-of-representation requirement is satisfied when (i) the class representatives have no interests conflicting with the class; and (ii) the representatives and their attorneys will properly prosecute the case. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *Valley Drug Co.*, 350 F.3d at 1189." Subscriber Order at 18.

"'Significantly, the existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a fundamental one going to the specific issues in controversy' to preclude certification. *Valley Drug Co.*, 350 F.3d at 1189. 'A conflict is "fundamental" when, for example, some class members claim to have been harmed by the same conduct that benefitted other class members.' Newberg on Class Actions § 7:31 at 2." *Id.*

The interests of the Class Representatives and the Settlement Class are fully aligned. They all share an identical interest in proving that the Blues' agreements were unlawful, and that the Blues' agreements injured them. The law applicable here is uniform federal law; as this Court pointed out when it preliminarily approved the Subscribers' settlement, "'By relying principally on federal substantive law, the representative plaintiffs followed the pattern of antitrust and securities litigation, where nationwide classes are certified routinely even though every state has its own antitrust or securities law, and even though these state laws may differ in ways that could

prevent class treatment if they supplied the principal theories of recovery.'" *Id.* at 19 (quoting *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001)). Moreover, all Class Representatives have reviewed the Settlement Agreement and approve of its terms.

When this Court appointed interim counsel for the Plaintiffs in this case, it stated, "Particularly with respect to appointment of Interim Co-Lead Class Counsel, the court has conducted an independent review of the applicants and finds that those appointed in this Order are best suited to represent, on an interim basis, the interests of the class. Fed. R. Civ. P. 23(g)(2) & (3). The court further finds that counsel appointed to the lead roles are qualified and responsible, and that they will fairly and adequately represent the interests of the class." Doc. No. 61 at 2–3. Eleven years later, Provider Plaintiffs' counsel have vindicated the trust the Court placed in them, investing tens of thousands of hours and tens of millions of dollars prosecuting this case, with many notable successes to show for their efforts. Co-Lead Counsel Declaration ¶¶ 6–23. Therefore, the Class Representatives and their counsel will fairly and adequately protect the members of the Class.

### D.   The Rule 23(b)(3) Requirements

"When a party seeking certification has met the requirements of Rule 23(a), that does not end the court's Rule 23 inquiry. A named plaintiff must also show that the putative class meets at least one of the three requirements of Rule 23(b)." Subscriber Order at 20. Here, the Provider Plaintiffs seek certification under Rule 23(b)(3) for a class seeking damages and injunctive relief. "For a damages class under Rule 23(b)(3), the plaintiff must show that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Subscriber Order at 21–22 (cleaned up). Rule 23(b)(3) also applies to a divisible injunctive relief class. Doc. No. 2897 at 3.

### 1.      Predominance

"Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief. The predominance standard is similar to the commonality requirement of Rule 23(a), but it is more demanding and mandates particular caution where individual stakes are high and disparities among class members great. The predominance requirement tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." The Eleventh Circuit has described how the court should analyze the predominance factor as follows:

> To determine whether the requirement of predominance is satisfied, a district court must first identify the parties' claims and defenses and their elements. *See Klay*, 382 F.3d at 1254 & n. 7. The district court should then classify these issues as common questions or individual questions by predicting how the parties will prove them at trial. *See id.* at 1255. Common questions are ones where "the same evidence will suffice for each member," and individual questions are ones where the evidence will "var[y] from member to member." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005).

[*Brown v. Electrolux Home Products, Inc.*, 817 F.3d 1225, 1234 (11th Cir. 2016)]." Subscriber Order at 22 (cleaned up).

Here, the Provider Plaintiffs allege, as the Subscriber Plaintiffs did, "a nationwide conspiracy in which Defendants applied the alleged restraints in the same way in every state in which Class Members reside." *Id.* at 22; *see* Consolidated Fourth Amended Provider Complaint, Doc. No. 1083. At issue here is whether those uniform, nationwide restraints violated the Sherman Act. *See* Doc. No. 1083. The Provider Plaintiffs have submitted evidence showing that these restraints caused antitrust injury to all types of healthcare providers, and this Court denied a motion for summary judgment that claimed that Provider Plaintiffs other than hospitals had not shown antitrust injury. Doc. No. 3102. Because the Provider Plaintiffs have put forward evidence that shows all Settlement Class Members were harmed by the Blues' uniform practices, they have

satisfied the predominance requirement.

### 2. Superiority

"The superiority requirement of Rule 23(b)(3) requires the court to consider "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." [*Klay v. Humana, Inc.*, 382 F.3d 1241, 1269 (11th Cir. 2004)]. Rule 23(b)(3) contains a list of factors to consider when making a determination of superiority:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)." Subscriber Order at 23.

There are thousands of hospitals and other facilities, and hundreds of thousands of healthcare professionals in the Settlement Class, "so practically speaking a class action is the only feasible method of resolving all claims against the Settling Defendants." Subscriber Order at 24. To establish damages just for Alabama hospitals, the Provider Plaintiffs spent the better part of $100 million for their experts to collect, clean up, synthesize, and analyze data. Co-Lead Counsel Declaration ¶ 25. If an individual hospital system were to file suit against the Blues, they would need to repeat this process across every geographic market in which they allegedly sustained damages. It is not hard to imagine that the cost of bringing such a case to trial and through appeals would be a nine-figure number, not counting attorneys' fees. With dozens of large hospital systems in the country, the total cost of litigating these cases would be in the billions if they could not

proceed as a class. And for smaller healthcare providers, the cost would be prohibitive. *See* Subscriber Order at 24. Moreover, the Judicial Panel on Multidistrict Litigation consolidated the Provider Plaintiffs' cases in this MDL, where they have proceeded as a putative class action for more than a decade. Therefore, a class action is far superior to resolving Providers' claims in individual lawsuits.

Because the requirements of predominance and superiority are met here, this case may proceed as a class action under Rule 23(b)(3).

### E.    Preliminary Approval of Settlement Terms

"As noted above, 'if preliminary class certification is appropriate, the court must then examine the propriety of settlement.' [*Hale v. Manna Pro Products, LLC*], 2020 WL 3642490, at *2 [(E.D. Cal. July 6, 2020)]. 'The court may not resolve contested issues of fact or law but instead is concerned with the overall fairness, reasonableness, and adequacy of the proposed settlement as compared to the alternative of litigation.' *Swaney v. Regions Bank*, 2020 WL 3064945, at *3 (N.D. Ala. June 9, 2020) (quoting *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007))." Subscriber Order at 24–25 (cleaned up).

"Although a court need not make a final determination of the fairness, reasonableness, and adequacy of the proposed settlement at this stage of the proceedings, it must make a preliminary finding that the proposed settlement is sufficiently fair, reasonable, and adequate on its face to warrant presentation to the class members. See William B. Rubenstein, Newberg on Class Actions § 11:25 (4th ed.) (citing The Manual for Complex Litigation § 30.41 (3d ed.)) ('If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies ... the court should direct that notice under Rule 23(e) be given to the class members of a formal fairness hearing, at which arguments and evidence may be presented in support of and in opposition to the settlement.'). And, in light of the 2018 amendments to Rule 23,

the court must gather as much information about the settlement possible, and then carefully and rigorously assess it." *Id.* at 25.

"The question is 'whether [the proposed settlement] is within the range of fair, reasonable and adequate.' *Exum v. Nat'l Tire & Battery*, 2020 WL 1670997, at *7 (S.D. Fla. Apr. 6, 2020) (citing Manual for Complex Litig. § 30.41). 'Where [] the proposed settlement is the result of serious, arms-length negotiations between the parties, has no obvious deficiencies, falls within the range of possible approval, achieves favorable outcomes for plaintiffs and the class, and does not grant preferential treatment to plaintiffs or other segments of the class, courts generally grant approval." *Id.*

The Settlement includes significant monetary and non-monetary relief. In addition to a $2.8 billion Settlement Amount, the Settlement Agreement requires the Blues to make numerous changes to their operations and rules in ways that benefit Providers by remedying the effect of the challenged anticompetitive among the Blues and eliminating administrative burdens that arise from the Blues' use of service areas. For the first five years after the Settlement Agreement becomes effective, monitoring, compliance, and reporting requirements will be in place, which will be overseen by a Monitoring Committee comprising two representatives appointed by the Blues, two by Provider Co-Lead Counsel, and one by the Court. The significance of the monetary and non-monetary relief weighs heavily in favor of preliminary approval.

### 1.  The Rule 23(e)(2) and *Bennett* Factors

"The Eleventh Circuit has set forth six factors that courts are to consider in determining whether a proposed settlement is fair, adequate, and reasonable: '(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which the settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of the

proceedings at which the settlement was achieved.' *Parsons v. Brighthouse Networks, LLC*, 2015 WL 13629647, *2 (N.D. Ala. Feb. 5, 2015) (citing *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984)). Additionally, effective December 1, 2018, Rule 23(e) was amended to add a mandatory, but not exhaustive, list of similar approval factors. Because these factors overlap, it is appropriate to address them together, in combination. *See In re Checking Account Overdraft Litig.*, 2020 WL 4586398, at *9-10 (S.D. Fla. Aug. 10, 2020)." Subscriber Order at 27.

### a. Class Representatives and Class Counsel Adequately Represented the Class.

As described above, highly qualified counsel have vigorously, professionally, and successfully represented the interests of the Settlement Class for the last dozen years, and they did so in settlement negotiations for many of those years. Settlement Class Counsel and the Class Representatives have more than adequately represented the Settlement Class.

### b. There Was No Fraud or Collusion, and the Settlement Was Negotiated at Arm's Length.

"Rule 23(e)(2)(B) requires the court to determine whether a proposed settlement 'was negotiated at arm's length.' Relatedly, one of the *Bennett* factors requires the court to rule out the possibility of fraud or collusion behind the settlement. *Leverso v. SouthTrust Bank of AL., Nat. Assoc.*, 18 F.3d 1527, 1530 (11th Cir. 1994)." Subscriber Order at 28.

The scope of settlement negotiations in this case—dozens of meetings, and hundreds of calls and Zooms over the course of nine years—speaks for itself. There was no collusion whatsoever between the Blues and the Provider Plaintiffs, and every material provision of the Settlement Agreement was extensively negotiated by both sides. Co-Lead Counsel Declaration ¶¶ 26, 33. The role of the Provider Working Group ensured that input from a variety of healthcare providers would inform the settlement negotiations. The Special Master, who mediated the

negotiations for years, has attested that there was no fraud or collusion involved. Gentle Affidavit ¶¶ 1–11.

> ### c. This Settlement Will Avert Years of Highly Complex and Expensive Litigation Involving Significant Costs, Risks, and Delay.

To say that this litigation is complex is an understatement. As the Court knows, this case has involved questions of personal jurisdiction, the rule of reason, the *per se* standard, trademark law, and even precedent governing two-sided platforms that did not exist when the first Provider case was filed. If this case were to proceed to trial, numerous *Daubert* motions would need to be resolved even before the Court could certify a class of Alabama Providers. Given the inevitable appeals that would follow a decision on class certification, and the likelihood of further dispositive motions after class certification, a trial of the Alabama classes' claims is years away. For cases that would be remanded, or filed after remand, resolution is even farther away because discovery in this case did not focus specifically on other jurisdictions. Plaintiffs in other cases would presumably need to commission experts to analyze their own markets and update the data on which their models would depend. Those cases would require many years to bring to completion, in addition to years of appeals of class certification, verdicts, or decisions on the merits. Any potential future recovery must be discounted significantly to account for the immense time it would take for plaintiffs to receive any money.

Although the Provider Plaintiffs stand by their experts' work, which included a damages model that is the most complete and sophisticated model of hospital pricing ever devised, they recognize that the Blues' experts leveled numerous criticisms at those models, and the battle of the experts has not been decided. There is significant risk that the Alabama classes would not be certified. Even if they were, "certification of similar classes in other states would necessitate going through this protracted process on a nationwide basis with uncertain outcomes." Subscriber Order

at 30. For the same reason this Court preliminarily approved the Subscribers' settlement, it should approve the Provider Plaintiffs' settlement as well: "If the parties continue to litigate these cases, they would need to devote significant time and enormous resources to preparing complex damages models nationwide. There is simply no guarantee that [Provider] Plaintiffs would recover a final judgment more favorable than the considerable [$2.8] billion in monetary relief and injunctive relief secured by the [Provider] Plaintiffs in the Settlement. Thus, the costs, risks, and delay of trial and appeal support the appropriateness of a decision to settle." *Id.*

Moreover, the Provider Plaintiffs face an obstacle that the Subscriber Plaintiffs did not face when they obtained preliminary approval of their settlement: the effect of the end of the National Best Efforts rule on the standard of review. When this Court preliminarily approved the Subscriber Plaintiffs' settlement in November 2020, the National Best Efforts rule was still in effect. That rule was one of the "aggregation of competitive restraints" that justified applying the *per se* rule to the Blues' conduct. *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1267 (N.D. Ala. 2018). The Subscriber Plaintiffs' settlement agreement would have ended National Best Efforts, but the Blues went ahead and eliminated the rule in April 2021, before the settlement agreement became effective. This Court held that this change meant that the Blues' conduct would be subject to the rule of reason going forward. Doc. No. 2933. Thus, when they executed their settlement agreements, the Subscriber Plaintiffs still could have sought injunctive relief under the *per se* rule, while the Provider Plaintiffs could only do so under the rule of reason.

In fact, for most of the injunctive relief the Provider Plaintiffs have obtained through settlement, there is more than a risk that this relief would not be achieved through further litigation; there is certainty. In particular, the significant improvements to the BlueCard Program (for example, the Blues' enforceable prompt payment commitment for fully insured BlueCard claims)

are not something a court could award even if the Provider Plaintiffs were to prevail at trial. Only through settlement with all of the Blue Plans could such an outcome have been achieved.

### d.    Stage of the Proceedings/Development of the Factual Record.

"'The law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations.' *Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992). The *Bennett* factors require a court to consider whether the 'case settled at a stage of the proceedings where class counsel had sufficient knowledge of the law and facts to fairly weigh the benefits of the settlement against the potential risk of continued litigation.' *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 2020 WL 256132, at *10 (N.D. Ga. Mar. 17, 2020)." Subscriber Order at 31. The Provider Plaintiffs have litigated this case for twelve years. In that time, they have reviewed the Defendants' production of more than 75 million pages of documents; taken, defended, or attended more than 200 depositions of Defendants and nonparties; collected and reviewed documents in response to the Defendants' requests for production from 156 Provider Plaintiffs and nonparties; and defended more than 40 depositions of Provider Plaintiff class representatives and putative class members. With their experts, the Provider Plaintiffs have built a sophisticated damages model that required the production, synthesis, and analysis of many terabytes of health insurance claims data. As it was with the Subscribers' settlement, "Plaintiffs have had ample opportunity to investigate the facts and law and to obtain substantive rulings from the court. Thus, it is clear that the factual record in this matter was sufficiently developed to allow Class Counsel to make a reasoned judgment as to merits of the settlement." *Id.*

e.     **The Benefits Provided by the Settlement Are Fair, Adequate and Reasonable When Compared to the Range of Possible Recovery.**

"'The second and third Bennett factors are "easily combined and normally considered in concert.' *Camp v. City of Pelham*, 2014 WL 1764919, at *3 (N.D. Ala. May 1, 2014). 'The [c]ourt's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation[] but to evaluate the proposed settlement in its totality.' *Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005)." Subscriber Order at 31–32.

Clearly, the Settlement provides significant monetary relief to the class members. The Provider Plaintiffs believe that the $2.8 Settlement Amount represents the largest recovery in an antitrust class action that did not result from a governmental investigation, and it is larger than the Subscriber Plaintiffs' settlement fund, which this Court approved and the Eleventh Circuit affirmed. In addition, the Blues will make investments of hundreds of millions of dollars in system improvements for the benefit of class members.

The Provider Plaintiffs' experts have not calculated a nationwide damages figure for the Settlement Class. When the Provider Plaintiffs moved for class certification, their experts did estimate damages for Alabama General Acute-Care Hospitals for the period from July 24, 2008 to April 15, 2019. Their estimates ranged from $1.46 billion (if the Court held that only the Blues' market allocation agreement on contracting with Providers was unlawful) to $4.63 billion (if the Court held that the Blues' market allocation agreements on contracting with Providers and selling insurance, and price-fixing through BlueCare were all unlawful).

For several reasons, it would be a mistake to assume that these figures could be scaled up to a nationwide damages figure by extrapolating them across the United States, across a larger time period, or across a wider set of Provider types. First, the Providers' experts would have testified that Blue Cross and Blue Shield of Alabama has the highest market share (measured at

41

the state level) of any Blue Plan in the United States. Therefore, the Providers' experts would have testified that it has an outsized effect on Providers because this share not only affects the harm level but also means that where the market share is large, the Providers' proportion of revenue from that Blue is also likely higher. In California, where the market is far less concentrated and where two Blue Plans compete against each other statewide, a Provider's damages would be much lower than a similarly situated Provider located in Alabama. In other geographies the harm varies depending on, among other things, the other non-Blue competitors that compete in those markets. Second, even assuming that the Providers' experts showed that a damages class of Alabama hospitals could be certified (a proposition the Blues contest), there is no guarantee that their analysis would lead to the same result in all geographic markets. If their analysis showed that in some markets some Providers were not harmed by the Blues' conduct, that would be an impediment to certifying a damages class. Third, the COVID pandemic disrupted the healthcare and health insurance industries in 2020 and 2021, and the Providers' expert reports do not account for this. Fourth, the Blues' elimination of the National Best Efforts rule in April 2021 reduces the likelihood that the Blues' market allocation agreements on selling insurance would be found unlawful after that time, making the high end of the damages estimate less relevant for extrapolation. Fifth, the Providers' expert reports offered a damages model only for General Acute-Care Hospitals. Their subsequent work has shown that the effect of the Blues' market share on healthcare professionals is approximately three and a half times lower than the effect on healthcare facilities.

Nevertheless, a $2.8 billion recovery is fair, adequate, and reasonable by any measure, especially in light of the risks and delays associated with litigating not only the Alabama case, but also cases in every other geographic market in which Providers might bring claims. As this Court

has noted more than once, "'[a] settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery.'" *Swaney v. Regions Bank*, 2020 WL 3064945, at *4 (June 9, 2020) (quoting *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988)).

Of course, the monetary recovery is only part of the value of the Settlement. All Settlement Class Members will benefit from a comprehensive transformation of the BlueCard Program, saving administrative costs and improving their ability to recover payment for their services for years to come. The Blues will invest hundreds of millions of dollars to implement this transformation, which is extraordinary in that the Blues likely would be under no obligation to undertake it even if the Provider Plaintiffs were to prevail at trial. The Settlement also expands the ability of certain hospitals to contract with more than one Blue Plan, and it removes a significant restriction on Contiguous Areas Contracts with another Blue Plan. Moreover, it limits the ability of a Blue Plan to rent certain Non-Blue Branded Provider networks to another Blue Plan (or another Blue Plan's affiliates). Taken together, these provisions and others increase the value of the settlement far beyond the monetary relief.

### f.    The Proposed Attorneys' Fees are Reasonable.

When preliminarily approving the Subscribers' settlement, this Court noted that the issue of attorneys' fees "do[es] not fit neatly within the Rule 23(e)(2) and *Bennett* factors." Subscriber Order at 45. The Provider Plaintiffs' settlement Agreement handles attorneys' fees similarly to the Subscribers' agreement. Like the Subscribers, the Providers have committed to seek attorneys' fees of no more than 25% of the settlement fund, plus expenses and the attorneys' fees and costs associated with administering the settlement's provisions. This is the same maximum percentage that this Court preliminarily approved, and it is in line with the Eleventh Circuit's benchmarks. *See id.* at 45–46.

43

The Agreement provides for a Partial Award of $75 million to be paid from the Escrow Account to Settlement Class Counsel no later than 45 days after entry of the Final Judgment and Order of Dismissal, subject to protections that ensure repayment of the Partial Award if the Fee and Expense Award is reduced below $75 million, or return of the Escrow Account is required. *Id.* ¶ 37(c). This Court approved a provision in the Subscribers' agreement that required the payment of $75 million to class counsel even earlier, after preliminary approval: "The court recognizes the hard-fought, eight-year litigation that counsel has undertaken. Further, the early distribution does not prejudice the class members: counsel still receives the same reasonable percentage of the common fund ultimately approved by the court if final approval is granted." Subscriber Order at 46–47. The Provider Plaintiffs' "quick pay" agreement should be approved for the same reasons.

All in all, the Providers Plaintiffs' Settlement is reasonable for the same reason this Court cited when preliminarily approving the Subscribers' settlement: "Settlement Class Counsel were well-positioned to evaluate the strengths and weaknesses of Plaintiffs' claims in this case as well as the appropriate basis upon which to settle them. Because of the uncertainties surrounding continued litigation and the fact that settlement provides for certain, significant, and immediate relief, the court concludes that the recovery provided for in the Settlement Agreement is an excellent achievement." Subscriber Order at 33.

### F.    Plan of Distribution

"A plan of distribution should be approved when it allocates relief in a way that is 'fair, adequate, and reasonable.' *See In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 241 (5th Cir. 1982); *see also Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1147 (11th Cir. 1983); *Leverso*, 18 F.3d at 1530; *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1328 n.2 (S.D. Fla. 2001); *Bellocco v. Curd*, 2006 WL 4693490, at *2 (M.D. Fla. Apr. 6, 2006); *Smith v. Floor and Decor Outlets of Am., Inc.*, 2017 WL 11495273, at *5 (N.D. Ga. Jan. 10, 2017). A plan of distribution will pass

44

muster so long as 'it has a "reasonable, rational basis," particularly if "experienced and competent" class counsel support it.' MᴄLᴀᴜɢʜʟɪɴ ᴏɴ Cʟᴀss Aᴄᴛɪᴏɴs, § 6.23 (17th ed. 2020); *see also Schwartz v. TXU Corp.*, 2005 WL 3148350, at *21 (N.D. Tex. Nov. 8, 2005) (approving a plan of allocation that 'resulted in a settlement agreement that fairly and rationally allocates the proceeds of the settlement')." Subscriber Order at 49.

The proposed Plan of Distribution allocates the Net Settlement Fund in a fair, adequate, and reasonable manner. The allocation of the Net Settlement Fund to the different types of Providers—General Acute-Care Hospitals, Other Facilities, and Healthcare Professionals—is based on the relative impact of the Blues' conduct on each type of Provider, and it was recommended by Mr. Feinberg and Ms. Biros after many different types of Providers were given an opportunity to comment on the allocation. When the Provider Plaintiffs file the Plan of Distribution before the preliminary approval hearing, they will explain in more detail why it is fair, adequate, and reasonable.

## G.    CAFA Notice

When a class action settlement is proposed, the Class Action Fairness Act requires the defendants to submit certain materials to federal and state officials. 28 U.S.C. § 1715. The Settlement Agreement fulfills this requirement by requiring the Blues to carry out this requirement, at their own expense, and notify the Court when they have completed it. Ex. A ¶ 61.

## V.    CONCLUSION

After twelve years of hard-fought litigation, including nine years of arm's-length negotiations, the Provider Plaintiffs' settlement an extraordinary result for Providers. The Court should preliminarily approve the settlement, certify the Settlement Class, appoint Provider Co-Lead Counsel, and set a hearing on final approval.

Dated: October 14, 2024                    Respectfully submitted,

/s/ Edith M. Kallas                        /s/ Joe R. Whatley, Jr.
Edith M. Kallas – *Co-Lead Counsel*        Joe R. Whatley, Jr. – *Co-Lead Counsel*
WHATLEY KALLAS, LLP                        W. Tucker Brown
152 West 57th Street                       WHATLEY KALLAS, LLP
41st Floor                                 2001 Park Place North
New York, NY 10019                         1000 Park Place Tower
Tel: (212) 447-7060                        Birmingham, AL 35203
Fax: (800) 922-4851                        Tel: (205) 488-1200
Email: ekallas@whatleykallas.com           Fax: (800) 922-4851
                                           Email: jwhatley@whatleykallas.com
                                                  tbrown@whatleykallas.com


Patrick J. Sheehan                         Henry C. Quillen
WHATLEY KALLAS, LLP                        WHATLEY KALLAS, LLP
101 Federal Street                         159 Middle Street
19th Floor                                 Suite 2C
Boston, MA 10019                           Portsmouth, NH 03801
Tel: (617) 573-5118                        Tel: (603) 294-1591
Fax: (617) 371-2950                        Fax: (800) 922-4851
Email: psheehan@whatleykallas.com          Email: hquillen@whatleykallas.com

Barry Alan Ragsdale – *Plaintiffs' Liaison*   Deborah J. Winegard
*Counsel and Discovery Liaison Counsel*       WHATLEY KALLAS, LLP
Dominick Feld Hyde, PC                        1068 Virginia Avenue, NE
1130 22nd Street South Ridge Park             Atlanta, GA 30306
Suite 4000                                    Tel: (404) 607-8222
Birmingham, AL 35205                          Fax: (404) 607-8451
Tel: (205) 536-8888                           Email: dwinegard@whatleykallas.com
bragsdale@dfhlaw.com

Charles Clinton Hunter                        E. Kirk Wood, Jr. – *Local Facilitating*
HAYES HUNTER PC                               *Counsel*
4265 San Felipe, Suite 1000                   WOOD LAW FIRM LLC
Houston, TX 77027                             P. O. Box 382434
Tel: (281) 768-4731                           Birmingham, AL 35238
Fax: (713) 583-7047                           Tel: (205) 612-0243
Email: chunter@hayeshunterlaw.com             Fax: (205) 705-1223
                                              Email: kirk@woodlawfirmllc.com

Dennis Pantazis – *Plaintiffs' Steering*      Aaron S. Podhurst – *Plaintiffs' Steering*
*Committee*                                   *Committee*
Brian Clark – *Discovery Committee*           Peter Prieto – *Chair, Expert Committee*
WIGGINS CHILDS PANTAZIS FISHER                PODHURST ORSECK, P.A.
 GOLDFARB                                     One S.E. 3rd Avenue

The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel: (205) 314-0500
Fax: (205) 254-1500
Email: dgp@wigginschilds.com
  bclark@wigginschilds.com

Dennis C. Reich – *Chair, Damages Committee*
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel: (713) 622-7271
Fax: (713) 623-8724
Email: dreich@reichandbinstock.com

Nicholas B. Roth – *Chair, Discovery Committee*
Julia Smeds Roth – *Discovery Committee*
EYSTER KEY TUBB ROTH MIDDLETON & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel: (256) 353-6761
Fax: (256) 353-6767
Email: nbroth@eysterkeylaw.com
  jroth@eysterkeylaw.com

David A. Balto – *Expert Committee*
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel: (202) 789-5424
Fax: (202) 589-1819
Email: david.balto@dcantitrustlaw.com

Suite 2300
Miami, FL 33131
Tel: (305) 358-2800
Fax: (305) 358-2382
Email: apodhurst@podhurst.com
  pprieto@podhurst.com

U.W. Clemon – *Plaintiffs' Steering Committee*
U. W. Clemon, LLC
5202 Mountain Ridge Parkway
Birmingham, AL 35222
Tel: (205) 837-2898
Email: uwclemon1@gmail.com

J. Mark White – *Litigation Committee*
Augusta S. Dowd – *Chair, Litigation Committee*
Linda G. Flippo – *Discovery Committee*
WHITE ARNOLD & DOWD, P.C.
2001 Park Place North
Suite 1400
Birmingham, AL 35203
Tel: (205) 323-1888
Fax: (205) 323-8907
Email: mwhite@whitearnolddowd.com
  adowd@whitearnolddowd.com
  lflippo@whitearnolddowd.com

Van Bunch – *Chair, Class Certification Committee*
BONNETT FAIRBOURN FRIEDMAN & BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel: (602) 274-1100
Fax: (602) 274-1199
Email: vbunch@bffb.com

Joey K. James – *Litigation Committee*
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel: (256) 764-0095
Fax: (256) 767-5705
Email: joey@joeyjameslaw.com

Robert J. Axelrod – *Chair, Written Submissions Committee*
AXELROD LLP
800 Third Avenue, Suite 2800
New York, NY 10022
Tel: (646) 448-5263
Fax: (212) 840-8560
Email: raxelrod39@gmail.com

Richard S. Frankowski – *Discovery Committee*
THE FRANKOWSKI FIRM, LLC
231 22nd Street South, Suite 203
Birmingham, AL 35233
Tel: (205) 390-0399
Fax: (205) 390-1001
Email: richard@frankowskifirm.com

W. Daniel Miles, III – *Written Submissions Committee*
BEASLEY ALLEN CROW METHVIN PORTIS
 & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel: (800) 898-2034
Fax: (334) 954-7555
Email: dee.miles@beasleyallen.com

John C. Davis – *Written Submissions Committee*
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel: (850) 222-4770
Email: john@johndavislaw.net

Michael C. Dodge – *Expert Committee*
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel: (972) 419-7172
Email: mdodge@gpm-law.com

Mark K. Gray – *Discovery Committee*
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel: (502) 805-1800
Fax: (502) 618-4059
Email: mgray@grayandwhitelaw.com

Michael E. Gurley, Jr. – *Discovery Committee*
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel: (205) 908-6512
Email: mgurleyjr@yahoo.com

Stephen M. Hansen – *Class Certification Committee*
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel: (253) 302-5955
Fax: (253) 301-1147
Email: steve@stephenmhansenlaw.com

Lynn W. Jinks, III – *Expert Committee*
Christina D. Crow – *Discovery Committee*
JINKS CROW, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel: (334) 738-4225
Fax: (334) 738-4229
Email: ljinks@jinkslaw.com
    ccrow@jinkslaw.com

48

Harley S. Tropin – *Damages Committee*
Javier A. Lopez – *Discovery Committee*
KOZYAK TROPIN &
 THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508
Email: hst@kttlaw.com
        jal@kttlaw.com

Myron C. Penn – *Discovery Committee*
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel: (334) 738-4486
Fax: (334) 738-4432
Email: myronpenn28@hotmail.com

C. Wes Pittman – *Settlement Committee*
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel: (850) 784-9000
Fax: (850) 763-6787
Email: wes@pittmanfirm.com

J. Preston Strom, Jr. – *Litigation Committee*
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel: (803) 252-4800
Fax: (803) 252-4801
Email: petestrom@stromlaw.com

Robert B. Roden – *Litigation Committee*
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel: (205) 933-8383
Fax: (205) 933-8386
Email: rroden@shelbyroden.com

Thomas V. Bender – *Discovery Committee*
Dirk L. Hubbard
HORN AYLWARD & BANDY, LLC
2600 Grand Blvd., Suite 1100
Kansas City, MO 64108
Tel: (816) 421-0700
Email: tbender@hab-law.com
 dhubbard@hab-law.com

Gary E. Mason – *Class Certification
Committee*
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DC 20036
Tel: (202) 429-2290
Fax: (202) 640-1160
Email: gmason@wbmllp.com

Gregory S. Cusimano – *Litigation Committee*
CUSIMANO, ROBERTS & MILLS, LLC
153 South 9th Street
Gadsden, AL 35901
Phone: (256) 543-0400
Fax: (256) 543-0488
Email: greg@alalawyers.net

Michael L. Murphy – *Discovery Committee*
BAILEY GLASSER LLP
910 17th Street, NW, Suite 800
Washington, DC 20006
Tel: (202) 463-2101
Fax: (202) 463-2103
Email: mmurphy@baileyglasser.com

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel: (320) 289-2363
Fax: (320) 289-2369
Email: brian@wojtalewiczlawfirm.com

Lance Michael Sears

Archie C. Lamb, Jr.

SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel: (719) 471-1984
Fax: (719) 577-4356
Email: lance@searsassociates.com
Jessica Dillon
Ray R. Brown
Molly Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 200
Anchorage, AK 99501
Tel: (907) 277-5400
Fax: (907) 277-9896
Email: Jessica@dillonfindley.com
  Ray@dillonfindley.com
  Molly@dillonfindley.com

Allyson C. Dirksen
HEIDMAN LAW FIRM, P.L.L.C.
1128 Historic 4th Street
P. O. Box 3086
Sioux City, IA 51101
Tel: (712) 255-8838
Fax (712) 258-6714
Email: allyson.dirksen@heidmanlaw.com

ARCHIE LAMB & ASSOCIATES, LLC
301 19th Street North, Suite 585
The Kress Bldg.
Birmingham, AL 35203-3145
(205) 458-1210
Email: alamb@archielamb.com

Paul Lundberg
LUNDBERG LAW, PLC
600 4TH Street, Suite 906
Sioux City, IA 51101
Tel: (712) 234-3030
Fax: (712) 234-3034
Email: paul@lundberglawfirm.com

Gwen Simons
Simons & Associates Law, P.A.
P.O. Box 1238
Scarborough, ME 04070-1238
Tel: (207) 205-2045
Fax: (207) 883-7225
Email: gwen@simonsassociateslaw.com

***Counsel for Provider Plaintiffs***