FILED

2024 Oct-14 PM 12:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

IN RE:
BLUE CROSS BLUE SHIELD
ANTITRUST LITIGATION
(MDL NO. 2406)

Master File No. 2:13-CV-20000-RDP

This Document Relates to
Provider Track Cases

DECLARATION OF KENNETH R. FEINBERG AND CAMILLE S. BIROS
IN SUPPORT OF PROVIDER PLAINTIFFS'
MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT

We, Kenneth R. Feinberg and Camille S. Biros, declare as follows:

1.      We have been retained by Provider Co-Lead Counsel as Independent Expert Evaluators in this matter. In that capacity, we have recommended an allocation of settlement proceeds between Health Care Facilities and Health Care Professionals.

2.      Information about our experience is contained in the attached report (Exhibit A), and our curricula vitae (Exhibits B and C).

3.      In the attached report, we explain why we recommend an allocation of 92% of settlement proceeds to Health Care Facilities and 8% to Health Care Professionals. (Exhibit A.) In particular, the Provider Plaintiffs' experts' use of an underpayment model methodology to estimate the impact to these groups supports the fairness of the allocation.

4.      We declare under penalty of perjury that the foregoing is true and correct.

Executed on October 14, 2024.


/s/ Kenneth R. Feinberg
Kenneth R. Feinberg

/s/ Camille S. Biros
Camille S. Biros

# Exhibit A

CONFIDENTIAL
MEDIATION PRIVILEGED DOCUMENT

**To:**        **Joe Whatley & Edith Kallas**

**From:**      **Kenneth R. Feinberg & Camille S. Biros**

**Re:**        **Blue Cross Blue Shield Antitrust Litigation (MDL No. 2406)**
               **Damages Allocation for Settlement of Provider Claims**
               **Independent Expert Evaluators' Report**

**Date:**      **September 23, 2024**

**Introduction**

In your position as Provider Co-Lead Counsel ("Provider Counsel"), you have retained us as Independent Expert Evaluators in the above-referenced BCBS Antitrust Litigation (MDL No. 2406), to recommend the allocation of settlement damages between two groups of providers – the Health Care Facilities (including general acute care hospitals and other facilities), and Professionals[1] (including physicians and other professionals).

**Summary of Qualifications**

For over twenty-five years the Law Offices of Kenneth R. Feinberg PC, specifically Kenneth R. Feinberg and Camille S. Biros, have specialized in the design (including the determination of allocation formulas), implementation and administration of numerous and varied complex settlement compensation programs. Representative examples of these programs include the following.

In re: Blue Cross Blue Shield Antitrust Litigation MDL 2406 (allocation between the "Subscriber Class" and self-funded "ASO Class") (2019)

The September 11th Victim Compensation Fund of 2001. Appointed by the Attorney General of the United States. (Over $7 billion distributed to eligible claimants.)

The 2010 BP Deepwater Horizon Oil Spill Program (the "GCCF"). Appointed by President Obama. (Over $6.5 billion distributed to eligible claimants.)

Catholic Dioceses' Compensation Programs for Sexual Abuse of Minors (2016 – 2022): Retained by numerous Dioceses of the Catholic Church throughout the country to design compensation programs for victims of sexual abuse of minors. Programs were implemented for twenty-four Catholic Dioceses in multiple states throughout the country. (Approximately $500 million was distributed to eligible claimants.)

---

[1] Importantly for our purposes, the majority of physicians have been <u>excluded</u> from any Settlement Class based upon participation in the *Love*-related settlements. The last Effective Date of the *Love* related settlements occurred at the end of January 2009. There are a significant number of physicians licensed before January 31, 2009, therefore, who cannot participate in this above-referenced class settlement.

CONFIDENTIAL
MEDIATION PRIVILEGED DOCUMENT

General Motors Ignition Switch Program (2014): Retained by General Motors to design a compensation program to compensate victims of death and physical injury related to a faulty Ignition Switch in certain models of GM automobiles. (Approximately $600 million distributed to eligible claimants.)

Monsanto Roundup Compensation Program (2021 to Present):  Appointed by the United State District Court for the Northern District of California to design and administer the Independent Monsanto Roundup Compensation Program to compensate individuals alleging that the use of the Monsanto product "Roundup" caused Non-Hodgkins Lymphoma. This is an ongoing program. Approximately $20 million distributed to eligible claimants to date.

Charitable Funds: Our services were requested by numerous private charitable organizations to design allocation formulas and implement programs to distribute charitable funds to victims of various terrorist attacks. We designed and administered numerous charitable programs, on a pro bono basis, including Programs for the Boston Marathon bombing, the Pulse Nightclub shootings, the Sandy Hook shootings, Aurora Colorado shootings, the Virginia Tech shootings, etc. (Millions of dollars distributed to the victims from charitable donations to these funds from the public.)

A key element in the design of these programs is the requirement of developing allocation formulas using objective and reasonable factors for the distribution of settlement proceeds to thousands of eligible claimants. It is because of this extensive experience designing these programs that we have been asked by Provider Counsel in this case to evaluate and determine the allocation of damages proposed by the economic experts to the two groups of providers: the Healthcare Facilities and the Professionals.

**Background of the Case**

The potential settlement is on behalf of all healthcare providers who served members of commercial health plans of the Blues throughout the country. The proposed allocation is based upon the alleged underpayments made to class members and is based upon the estimated proportionate damages for each of the two Provider Groups noted above. During the settlement negotiations, Provider Counsel and the Blues developed Work Groups to be involved in settlement discussions. These Work Groups included a number of healthcare providers of various types, including class representatives and class members.

For more than 10 years, Provider Counsel have worked with some of the leading economists in the healthcare field. These economists prepared and submitted multiple lengthy expert reports to the Court. They spent tens of thousands of hours reviewing claims data that consisted of approximately 343.7 billion records. These experts developed econometric models to determine the extent of the injury and the damages to healthcare providers, starting with the development of a consistent, objective methodology capable of determining the injury and damages to healthcare providers in markets throughout the country. Their methodology started with the general acute care hospital damages model developed to determine the antitrust injury experienced by the facilities from the Blues' conduct.

**Expert Findings**

Analysis Group, the experts retained by Provider Counsel, specifically Dr. Daniel Slottje and Brian Gorin, used these econometric models, including their Underpayment Model, to estimate the proportionate

CONFIDENTIAL
MEDIATION PRIVILEGED DOCUMENT

damages for each of the two Provider Groups based on their work. According to the experts' presentation, the Underpayment Model properly isolates the impact of the Defendants' antitrust violations from the impact of other economic factors when it comes to the prices Defendants paid to Providers. The Underpayment Model is a scientific, econometrically sound method for allocation of the Net Settlement Damages Fund to Providers. Using the Underpayment Model, the experts presented expert analysis and evidence supporting a proposed methodology for allocation of net settlement damages fund to all Providers.

Analysis Group determined that, based upon the comparative antitrust injury and harm for the class period from July 24, 2008 through 2024,[2] **the allocation of damages should result in 92% of the settlement damages being allocated to the Healthcare Facilities and 8% of the settlement damages to the Professionals.** Additionally, the Analysis Group experts determined that:

1)  the econometric Underpayment Model took into consideration many variables, including whether the provider was located in a rural or urban area. They found that the Underpayment Model does not disadvantage rural facilities and that the underpayment percentages for rural and non-rural general acute care hospitals in Alabama are comparable; accordingly, a separate fund for the rural providers was unnecessary and not quantifiable; and

2)  an important key factor in arriving at this proposed allocation is that the Court has ruled that medical doctors who recovered in the prior *Love v. Blue Cross* settlement could not participate in this case. As a result of that ruling, approximately 65% of the medical doctors will not be eligible to participate in this proposed settlement.

**Evaluation Process**

We have taken the following steps in reaching our recommended allocation.

*   We have held numerous telephonic and Zoom video conference meetings and discussions with Provider Counsel to understand the history of the case.
*   On July 19, 2024, we held a Zoom video conference to introduce all participants to the process.
*   On August 12, 2024, the economic experts from Analysis Group presented to all participants in the process their proposed methodology for allocation of net settlement damages fund to providers. They also provided memoranda responding to the issues raised by the rural healthcare providers and the professional providers in their confidential meetings. We have carefully considered those materials.
*   We have also carefully reviewed the supplemental letter and attachments submitted by the Shelby Roden Law Firm dated August 26, 2024, on behalf of one of the professional class representatives. Others were invited to submit materials or ask questions of the experts.
*   We met individually with representatives of each of the Provider Groups via Zoom video conference on August 21, August 22, and August 23 to afford each group another opportunity, in confidential sessions, to raise any additional points about the proposed allocation. On August 21, we met with representatives of healthcare facilities. On August 22, we met with rural healthcare providers. On August 23, we met with independent healthcare professionals. During their meetings, the group of

---

[2] Since no claims data are available for years 2014 through 2024, the estimated injury after 2014 was determined by means of extrapolation from existing data.

CONFIDENTIAL
MEDIATION PRIVILEGED DOCUMENT

rural healthcare providers and the group of independent professionals raised separate issues about the proposed allocation resulting from the economic experts' analysis:

- o The rural healthcare providers stated that the injuries they suffered justified establishing a separate fund for such rural facilities.
- o The independent professionals objected to the allocation of just 8% of the damages for the professional claims.

The economic experts were asked to respond to these concerns and subsequently prepared memoranda responding to the specific issues raised by both groups. Those memoranda were distributed to all participants in the allocation process.

- A final round of individual Provider Group meetings was held on September 4 and 5 in New York City. Participants from each of the Provider Groups were invited to attend in person or via Zoom video conference. Analysis Group's experts participated in person during the meetings with the rural healthcare providers and the professionals to respond to any additional questions raised by the experts' presentation and supplemental memoranda:

  - o During the meeting with the rural healthcare providers, the economic experts addressed the concerns of the rural providers and explained that the econometric models expressly took into consideration many variables, including whether the provider was located in a rural or urban area, adding that based on the economic variables many rural providers fare better than urban providers under this model in terms of percentage of harm. Further, the experts noted that beyond the model they could not separately quantify the injury to rural providers and hospitals They added that the rural healthcare providers' allocation from the proposed settlement fund should be determined by the same model and processed in the same manner as the other facilities and professionals. The rural healthcare providers will be eligible to make a claim for recovery from any settlement damages fund like all other members of the class. As a result of their analysis, the experts have determined that they could not provide a principled basis for a separate fund for the rural providers.

  - o During the meeting with the professionals, counsel for one of the professionals' class representatives appeared in person and questioned the allocation in light of the fact that based on publicly available information, unsupported by data in this case, that 42% of commercial insurance payments to healthcare providers go to professionals and 58% of such commercial insurance payments go to hospitals. The Analysis Group experts responded at the meeting, and in their Memorandum, explaining that their econometric analysis, using real world data including the Blues data, showed a greater impact on facilities than professionals (approximately three and a half times greater). Additionally, they explained the effect of the *Love v. Blue Cross* settlement on the proposed allocation. If those professionals who participated in the *Love v. Blue Cross* settlement were allowed to participate in this settlement, the allocation to professionals would have been closer to 20% or more. As explained by the economic experts, when one applies the three and a half times greater impact to Shelby Roden's suggestion of a 42%/58% allocation, and the exclusion of

CONFIDENTIAL
MEDIATION PRIVILEGED DOCUMENT

approximately 65% of medical doctors due to *Love*, the 8% allocation noted in the economic experts' calculation is still the result. It should be noted that at the meeting some of the participants pointed out that many healthcare facilities including hospitals and other facilities are owned in whole or part by professionals including physicians, who benefit from payments to those facilities.

**Conclusion**

Throughout this process we have heard concerns expressed by Provider Groups representing rural healthcare facilities and professionals criticizing the existing general inequalities of the healthcare system in this country - unrelated to this litigation and the proposed settlement. For example, concerns were expressed by the rural facilities pertaining to the difficulty in hiring new doctors, unfair competition with urban facilities for equipment and doctors, etc. Similarly, the professionals expressed concerns about hospitals controlling market share by incentivizing patients to use hospital doctors, higher pay for hospital doctors encouraging them to affiliate with large hospital facilities, etc.  Although we find that these are valid concerns, they cannot be remedied through this process of allocation following the settlement of a specific antitrust class action against Blue Cross/Blue Shield. The above-described allocation recommendation deals solely with issues specific to this settlement and the Evaluators' mandated assignment to recommend the allocation of settlement damages between groups of providers based on the alleged underpayments by Blue Cross/Blue Shield due to the alleged anticompetitive conduct at issue in this litigation. It is not intended to, and cannot, attempt to address other factors of inequality in the healthcare system, as a whole, in this country.

After review of the results of the methodology and calculations included in Analysis Group's presentation, and the supplemental memoranda they provided to the participants, as well as multiple meetings with the Provider Groups and Provider Counsel, we conclude that the Underpayment Model developed by the Analysis Group's experts can be used to fairly and reasonably allocate the Net Settlement Damages Fund to all Providers covered by the Settlement. We, therefore, recommend the Allocation of the Net Settlement Damages Fund track the results of the Underpayment Model, based on underpayments in the aggregate for the period 2008 through 2024, as follows:

**Healthcare Facilities (including Rural Healthcare Providers):  92%**

**Professionals:  8%**

# Exhibit B

KENNETH R. FEINBERG
Short Form C.V.

Kenneth R. Feinberg is one of the Nation's leading experts in alternative dispute resolution. He is currently the Court-appointed Mediator in the Imerys/Cyprus talc bankruptcy in Delaware and was formerly the Court-appointed Mediator in the Hess-Honx asbestos bankruptcy in Texas. He previously served as the voluntary Mediator in the Georgia Pacific/Bestwall bankruptcy in North Carolina, was co-Mediator in the successful Owens Illinois/Paddock asbestos bankruptcy proceeding in North Carolina and was formerly the Court-ordered Estimation Expert in the Johnson & Johnson/LTL Management bankruptcy in New Jersey.

He has served as the Court-appointed Mediator in the successful resolution of the Purdue and Mallinckrodt opioid bankruptcies in the Southern District of New York and Delaware.

Mr. Feinberg has been designated by the Federal Government to serve in a variety of public compensation and related funding programs over the past 25 years. He previously served as Special Master of the 9/11 Victim Compensation Fund of 2001, the Department of Justice Victims of State-Sponsored Terrorism Fund, the Department of Justice Boeing 737 Max Crash Victim Beneficiaries Compensation Fund, the Department of the Treasury's TARP Executive Compensation Program and the Treasury's Private Multiemployer Pension Reform program.

He was also appointed by the Obama Administration to oversee compensation of victims of the Deepwater Horizon oil rig explosion and BP oil spill in the Gulf of Mexico.

In addition to his acting as Mediator and Administrator in a wide variety of federally related compensation programs, Mr. Feinberg has also served as Administrator of 24 Catholic Church Dioceses' Independent Reconciliation and Compensation Funds designed to compensate the victims of Church sexual abuse. He also served as Administrator of the One Orlando Fund following a terrorist attack at the Pulse nightclub, the General Motors Ignition Switch Compensation Program, and the One Fund Boston Compensation Program arising out of the Boston Marathon bombings. He was also the Mediator in the successful effort to return an original Chagall painting from the Museum of Modern Art in New York City to its original family owners in Europe.

He previously served as the Court-appointed Settlement Master in the Fiat/Chrysler Diesel Emissions class action settlement in San Francisco and is currently the Court-appointed Special Settlement Master in the national federal multi-district mass tort Roundup litigation.

Mr. Feinberg has been appointed mediator and arbitrator in thousands of complex disputes over the past 40 years.

# Exhibit C

**Camille S. Biros**

3150 South Street, NW
Washington, DC 20007

| | |
|---|---|
| **Professional**<br>**Background** | Director, Claims Administration<br>Law Offices of Kenneth R. Feinberg, PC |

Develop, design, implement and supervise claims administration/settlement programs, including: the development of criteria and guidelines for eligibility, evaluation, scoring, payment and reporting of all submitted claims and claim determinations. Representative Programs include the following:

**Monsanto Roundup Compensation Program**
Design and administer a Program for compensation to certain users of the Roundup Product

**Catholic Dioceses' Claims Programs for Victims of Sexual Abuse of Minors**
(Fund Administrator for Programs developed and implemented to pay compensation for victims of sexual abuse for 24 Catholic Dioceses throughout the country including the following Dioceses):

> **Archdiocese of New York**
> **Brooklyn Diocese of New York**
> **Rockville Centre Diocese of New York**
> **Various Dioceses in the States of New Jersey, Pennsylvania,**
> **California and Colorado**

**Boeing Financial Assistance Funds**
Design, implement and administer three separate related funds -- one to provide near-term financial assistance to the families of the 346 victims of the Lion Air Flight 610 and Ethiopian Air Flight 302 accidents, a second fund for contributions to family-selected charitable organizations and a third fund resulting from a Department of Justice Deferred Prosecution Agreement

**GM Ignition Compensation Claims Resolution Facility**
Deputy Administrator: design, develop and implement a Program for the resolution of claims arising from the recall of certain GM vehicles with an ignition switch defect

**DuPont Medical Monitoring Program**
Design and development of a Medical Monitoring Program for claims arising from the alleged contamination of certain water supplies attributable to releases from DuPont's Washington Works Plant in Wood County, West Virginia

**Gulf Coast Claims Facility – BP Deepwater Horizon Oil Spill**
Deputy Administrator: design, development, implementation and supervision of the process for the review and evaluation of over one million claims submitted as a result of the BP Oil Spill

**September 11th Victim Compensation Fund**
Deputy Special Master for the administration of this federal program to compensate the victims of September 11, 2001, terrorist attacks. Assisted in the creation of the program and all systems for the review and processing of victims' claims for deceased and injured in the attacks of September 11, 2001

**Hurricane Katrina Gulf Coast ADR Program**
Developed systems for an ADR Program to assist the victims of the hurricanes in the Gulf Region in conjunction with two major insurance carriers. Supervised staff

**Page 2**

offices in New Orleans, Louisiana and Biloxi, Mississippi; assisted in the design of interactive 3-step Program designed to expeditiously resolve insurance claims. (Designed and supervised a similar program for Hurricane Sandy in 2012.)

**TARP** Assisted Special Master for the Troubled Asset Relief Program ("TARP") Executive Compensation in 2009 in order to make determinations regarding the compensation structures of certain employees of TARP recipients who had received exceptional financial assistance

**Lehman Bros. Fee Examiner:** Administer the responsibilities of Fee Examiner of the Lehman Brothers bankruptcy case, examining fees and expenses charged by professionals retained during the bankruptcy process

**Zyprexa Settlement**
Administrator: Major drug company settlement
Designed, implemented and supervised the review and payment of awards to eligible claimants. Liaison for the 15 participating law firms and the 4 special masters

**Computer Associates**
Worked with economist to develop a Plan of Allocation for shareholders entitled to receive compensation from a Restitution Fund resulting from a Deferred Prosecution Agreement. Supervised claims process

**NYC - NYPD Employment Discrimination Case**
Design and development of systems and procedures for determining eligibility; developed award matrix and calculations; set up facility in NYC and supervised the processing, review and payment procedures

**Pro Bono Services**
Design and Administer Charitable Distribution Funds established by local communities to compensate victims including:
Las Vegas Victims Fund, One Fund Boston Victim Relief Fund the Pulse Nightclub in Orlando, Florida, Virginia Tech, Sandy Hook Elementary School and Aurora Colorado