FILED
2024 Oct-14 PM 12:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE:** <br> **BLUE CROSS BLUE SHIELD** <br> **ANTITRUST LITIGATION** <br> **(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP** <br><br> **This Document Relates to** <br> **Provider Track Cases** |

**DECLARATION OF SAMUEL ISSACHAROFF**
**IN SUPPORT OF PROVIDER PLAINTIFFS'**
**MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

I, Samuel Issacharoff, declare as follows:

**PURPOSE OF DECLARATION**

1.      As I will set forth below, I am a law professor at New York University School of Law. I submit this declaration in my capacity as counsel to the Plaintiffs' Steering Committee and Interim Co-Lead Counsel. I was retained in 2016 to assist Provider Plaintiffs' counsel with legal and ethical issues, and I advised them on issues surrounding the negotiations of this complex settlement. I submit this Declaration to review the legal requirements for the proper negotiation of a complex settlement and how the settlement itself was structured.

**CREDENTIALS AND BACKGROUND**

2.      I am the Reiss Professor of Constitutional Law at New York University School of Law, where I have been on the faculty since 2005. Previously I was the Harold J. Medina Professor in Procedural Jurisprudence at Columbia Law School, where I was a member of the faculty from 1999 to 2005. Before that I spent ten years as a professor of law at the University of Texas School of Law, where I held the Joseph D. Jamail Centennial Chair in Law.

3.      In my scholarship and teaching I specialize in complex litigation. I have published many articles on various aspects of complex litigation, including matters such as class actions and

attorneys' fees, which have been cited by numerous courts, including the United States Supreme Court. I routinely teach and lecture on matters of complex litigation in the United States and abroad. One of my regular academic courses is complex litigation, which I teach with my NYU colleague Arthur Miller.

4.      I have also been involved as counsel, as an expert and as a consultant in a large number of complex cases, including dozens of class actions, on behalf of both plaintiffs and defendants. In addition, I have served as special master in a mass tort class action in the Eastern District of Texas.  I have testified before the Advisory Committee on the Rules of Practice and Procedure of The Judicial Conference of the United States and the Third Circuit Task Force on the Selection of Class Counsel regarding proposed amendments to the federal class action rule and other matters pertaining to the selection and compensation of class counsel. I served as Reporter for the Project on Aggregate Litigation of the American Law Institute, which unanimously approved its proposed final report. This work was published in 2010 as *Principles of the Law of Aggregate Litigation*. I have provided a copy of my curriculum vitae as an attachment to this submission.

## INVOLVEMENT IN THE CASE

5.      I began working on this case in 2016. As Provider Plaintiffs' counsel determined that there was a realistic possibility that a global settlement could be realized in this matter, they sought my advice on issues related to the potential settlement.

6.      In the early stages of the litigation, I provided advice on the structuring and financing of the plaintiffs' efforts.  Subsequently, my attention turned to protecting the interests of the provider class in light of the severance of non-provider claims through partial settlements in the broader litigation.

7.      When the prospect of settlement of the provider claims was presented, my work in the case turned to questions of how to structure the settlement's payout structure and, specifically, on avoiding legal conflicts that had compromised prior mass harm class action settlements.  To my mind, the key issues were:

    a.      Avoiding conflicts in representation.

    b.      Avoiding intraclass allocation conflicts.

    c.      Resolving the merits of the settlement before addressing the issue of attorneys' fees.

    d.      Providing for representation for class members in the settlement process so as to promote a fair allocation of settlement proceeds among class members.

### LEGAL ISSUES

8.      ***Conflicts in Representation.*** The law governing proper settlement classes is still dominated by the Supreme Court's asbestos decisions in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). Together these cases establish that there must be "structural assurances" of fairness in the class settlement process, as defined by *Amchem*. In designing the process of settlement negotiations, the Plaintiffs' Steering Committee ("PSC") took care to ensure that all affected constituencies in the settlement had advocates and that no one with negotiating authority had either the incentive to or the ability to trade off the interests of one groups in favor of another.

9.      One of the first decisions made as the negotiations matured was not to try to create subclasses for the negotiation process. This was done for four primary reasons. First, many of the class members fall into multiple groups of providers.  In the provider healthcare market, there are many integrated healthcare systems that include hospitals, other facilities such as ambulatory surgery centers, and employed professionals such as physicians.  As I understand it, a majority of

physicians are now employed by such healthcare systems. Since there are entities that overlap among different groups of healthcare providers, subclasses would not be feasible. Classes (and subclasses) represent class members, not legal claims. The overlap of individuals across different specific claims meant that dividing them in subclasses would have some class members becoming members of multiple subclasses, a quixotic result. Second, the claims all arose from a uniform set of allegedly anticompetitive practices and were presented against the same cohort of defendants. Third, the settlement process itself would unravel if discussions were held among a growing number of subgroups, which would then likely beget further subgroups by the same logic. Fourth, the settlement process could be organized to secure the participation of all affected groups, while avoiding trade-offs among the various groups.

10. This last point was particularly significant in light of the structure of the PSC. This case was unlike the fact scenario in *Amchem*, for example, where the Supreme Court was clearly disturbed by the fact of a class being organized by lawyers who represented only a partial group of the affected population, and who sought authority to bind those with whom they had no relation, particularly as it affected future claimants. Here, by contrast, the PSC was appointed by the Court well before any settlement negotiations were undertaken, and was appointed based on the need to represent the various affected constituencies. Class counsel were thus benefitted by the Court's decision to take applications for positions on the PSC and to consider in the selection process the presence of counsel who would direct the case and that they represented diverse constituencies of claimants.

11. In deciding that the settlement process could go forward in integrated fashion with two appointed lead negotiators serving on behalf of the entire PSC, we were following the logic well addressed by the Eight Circuit in *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999):

If the objectors mean to maintain that a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement, we think that the argument is untenable. It seems to us that almost every settlement will involve different awards for various class members. Indeed, even if every class member were to receive an identical monetary award in settlement, the true compensation would still vary from member to member since risk tolerance varies from person to person (i.e., a more risk-averse class member would place a greater premium on the certainty of a settlement award than a less risk-averse class member would).

We also do not believe, as the objectors suggest, that the stark conflicts of interest that the Supreme Court discerned in *Amchem* and *Ortiz* are present here. In those cases the Court found that a conflict existed between class members who already had asbestos-related injuries (and who would want to maximize immediate payout) and class members who might develop asbestos-related injuries in the future (and who would want to maximize testing, protection from inflation, and future fund size). We note that the injuries involved in those cases were extraordinarily various, both in terms of the harm sustained and the duration endured. Our case, on the other hand, involves a discrete and identified class that has suffered a harm the extent of which has largely been ascertained.

*Id.* at 1146 (citations omitted).

12.    ***Intraclass Allocation.*** At no point in the settlement negotiations was a fixed amount of money to be distributed among rival claimants in the plaintiff class.  As revealed in the expert submissions made to Kenneth Feinberg and Camille Biros, the settlement was constructed from the ground up.  The damage models developed (at tremendous expense and over long and contested litigation) were a calculation of market effects from the challenged anticompetitive conduct.  The overall effect, and not the effect on any particular group of plaintiffs, was the basis for negotiations with the defendants.

13.    This structure of negotiation avoided two critical potential conflicts. First, it meant that there was never any claim that counsel were responsible for shifting funds from one group to another to facilitate the class resolution – something that the Supreme Court identified as a specific problem in *Ortiz*. At each point in the negotiations, Provider Work Group members and Provider Plaintiffs' counsel were drawn in to assist the negotiators in formulating the needs of their groups.

Second, the negotiators were never in the position of "robbing Peter to pay Paul" – that is, there was never a failure of representation as the negotiators sought to induce a hold-out within the settlement class to accept the offered terms by redirecting funds to that group. While the negotiators had overall responsibility for securing desirable settlement terms, there was never a breakdown in the representational integrity of PSC members, whose interests were directly aligned with the various subcomponents of the affected class of claimants.

14.    Because of the structure of settlement negotiations, it was not necessary to create subclasses, and doing so would likely have been counterproductive for the reasons described above. But in any event, subclasses were not permissible as a matter of law because many class members would have been members of multiple subclasses. For example, a hospital system may own hospitals and non-hospital facilities, while its affiliate employs physicians who work in the hospitals. If there were subclasses of hospitals, other facilities, and medical professionals, no counsel could represent a subclass for this reason.

15.    To ensure a fair allocation of settlement proceeds, the Provider Plaintiffs' counsel retained Kenneth Feinberg and Camille Biros, who have decades of experience in administering and distribution class settlements and other compensation funds. I assisted Provider Plaintiffs' counsel in setting up the allocation process. The Provider Plaintiffs' counsel also invited different types of healthcare providers to participate in discussions regarding allocation and share their concerns. I appeared in person at the final allocation session. Finally, the Provider Plaintiffs' economic experts presented their findings regarding the relative impact of the Defendants' conduct on different types of healthcare providers. I believe that this process was fair to all members of the Settlement Class. The economic experts presented a methodology for the allocation of the damages fund among various provider types in a consistent, bottom-up fashion, and the allocation experts

(Feinberg and Biros) independently adopted the economists' methodology in determining the allocation. Most notably, Class Counsel were not responsible for the intra-class allocation of damages. Instead, independent allocation experts (Feinberg and Biros) determined what the allocation would be.

## CONCLUSION

16.     Accordingly, I believe that the Court should certify the settlement classes and approve the proposed settlement. This settlement is an extraordinary achievement that realizes the great objectives behind court supervised class settlements. As well captured by Judge Anthony Scirica of the Third Circuit:

> The class action device and the concept of the private attorney general are powerful instruments of social and economic policy. Despite inherent tensions, they have proven efficacious in resolving mass claims when courts have insisted on structural, procedural, and substantive fairness. Among the goals are redress of injuries, procedural due process, efficiency, horizontal equity among injured claimants, and finality.

*Sullivan v. D.B. Investments, Inc.*, 67 F.3d 273, 340 (3d Cir. 2011) (Scirica J., concurring).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 12, 2024.

SAMUEL ISSACHAROFF