FILED

2024 Oct-17  PM 03:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD | } |
|  | } |
| ANTITRUST LITIGATION | } |
| (MDL NO.: 2406) | } |
|  | } |

Master File No.:  2:13-CV-20000-RDP

This order relates to the Provider Track

## <u>MEMORANDUM OPINION AND ORDER</u>

In 1972, four years after passage of the multidistrict litigation statute,[1] Edgar Winter brought together a group of musicians to form the Edgar Winter Group. That same year, the band released its rock 'n' roll hit, Free Ride, on the Epic label. Written by the late Dan Hartman (who was the lead vocalist on the song), and produced by Rick Derringer, the song's chorus invited listeners to do, well, just as the title says:

> Come on and take a free ride
> Free ride
> Come on and take it by my side
> Come on and take a free ride!

https://en.wikipedia.org/wiki/Free_Ride_(song) (last visited July 10, 2024). The court is now confronted with a twist on the free rider concept that is unique to multidistrict litigation.

This matter is before the court on the parties' Joint Status Report pursuant to the court's August 29, 2024 Order. (Doc. # 3183). The Joint Report was filed by Subscriber Plaintiffs, Provider Plaintiffs, Defendants, and the plaintiffs in *VHS Liquidating Trust, et al v. Blue Cross of California, et al*., Case No. RG21106609 (Cal. Superior Court, Alameda County)  ("*Prime* plaintiffs") regarding a dispute over the *Prime* plaintiffs' discovery requests, which seek from

---

[1] 28 U.S.C. § 1407.

Defendants in the *Prime* case materials from this MDL that have been designated as Confidential Material and for which the MDL Plaintiffs expended significant time, money and effort.

The *Prime* plaintiffs' initial requests for MDL materials were overly broad and posed a clear free rider issue. However, as the Joint Report details, following a hearing conducted by the court in California and after meet and confers conducted by the parties, the areas in dispute have been substantially narrowed. (Doc. # 3183 at 7). The *Prime* plaintiffs currently seek "three discrete categories of materials[:]" (1) claims data from 2008-2014 as it was produced by Optum in the MDL, (2) the Blues' own expert reports from the MDL, and (3) deposition transcripts of BCBS witnesses with exhibits. (*Id.*). This court has an interest in this issue due to ongoing MDL litigation and because the dispute implicates the court's protective orders. Furthermore, certain of these categories still raise the free rider issue.

### A.    The Free Rider Issue

This court is not the first to recognize that so-called free riders can present challenges in MDLs. "Complex aggregate litigation often raises a classic free-rider problem." *In re Gen. Motors LLC Ignition Switch Litig*., 477 F. Supp. 3d 170, 174 (S.D. N.Y. 2020). "A subset of plaintiffs' lawyers do the lion's share of the work, but that work accrues to the benefit of all plaintiffs. If those other plaintiffs were not required to pay any costs of that work, "high-quality legal work would be under-incentivized and, ultimately, under-produced." *Id.* at 174  (quoting *In re Gen. Motors LLC Ignition Switch Litig*., 2019 WL 5865112, at *1 (S.D. N.Y. Nov. 8, 2019)).

"To solve this problem, courts frequently invoke what is known as the 'common-benefit doctrine' and impose assessments on the recoveries of those who benefit from the work done for the benefit of all. *Id.* The doctrine's roots extend back to the late nineteenth century and its origins are found in the historic equity jurisdiction of federal courts. *Trustees v. Greenough*, 105

U.S. 527 (1881); *see also Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense"). *In Greenough*, the plaintiff was a bondholder of the Florida Railroad Company. *Greenough*, 105 U.S. at 528. He brought suit on behalf of himself and other bondholders against the International Improvement Fund of Florida. *Id*. The plaintiff prevailed on his claim that the Improvement Fund was depleting the fund by selling the land at nominal prices. *Id*. Because of the plaintiff's efforts, a significant part of the trust fund was preserved. *Id*. at 531. The Supreme Court recognized that the plaintiff (1) undertook the entire burden of the litigation, and (2) essentially acted as a trustee in successfully litigating on behalf of the common interest. *Id*. at 532. The American Rule on attorneys' fees generally would not have permitted the plaintiff any recovery of costs and legal fees under those circumstances. However, the Supreme Court concluded that the plaintiff was due to recover his costs and legal fees from the fund because it would otherwise be unjust, and payment of costs and fees from the fund was the most equitable way of addressing that inequity. *Id*.

Application of the common benefit doctrine has played out in other ways in various MDLs. For example, Judge Barbier of the Eastern District of Louisiana entered a set-aside order that applied to state-court cases, except those "wherein plaintiff's counsel has or had no other cases in this MDL and who have not participated in or had access to the discovery conducted in this MDL." *In re Oil Spill by the Oil Rig Deepwater Horizon*, 2011 WL 6817982, at *6 (E.D. La. Dec. 28, 2011), *amended and superseded on other grounds*, 2012 WL 161194 (E.D. La. Jan. 18, 2012). Many other courts handling MDLs have taken similar approaches. *See also*, *In re Bard IVC Filters Prods. Liab. Litig*., 603 F. Supp. 3d 822, 834 (D. Ariz. 2022), *aff'd,* 81 F.4th 897 (9th Cir. 2023) (quoting *In re Nat'l Opiate Prescription Litig*., No. 1:17-md-2804, at *2 (N.D.

Ohio May 9, 2022) ("MDL courts appear virtually unanimous on their authority to subject a recovery in a non-MDL forum to an appropriate assessment if the plaintiffs or their counsel actually used common benefit work product.")); *In re General Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 189-90 (S.D.N.Y. 2020) ("It is beyond dispute that the Court may 'establish fee structures designed to compensate [lead counsel] for their work on behalf of all plaintiffs involved in [this MDL].'"); *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2018 WL 2095729, at *6 (E.D. La. May 7, 2018) ("It is well-settled that 'an MDL court's authority to order contributions to compensate leadership counsel derives from its "managerial" power over the consolidated litigation, and, to some extent, from its inherent equitable power.'") (citation and alteration omitted); *In re Boston Sci. Corp., Pelvic Repair Sys. Prods. Liab. Litig.*, 2019 WL 385420, at *5 (S.D. W. Va. Jan. 30, 2019) ("A separate source of authority for MDL courts to assess attorneys' fees in common benefit fund cases comes from the inherent managerial power over the consolidated litigation.") (citation and quotation marks omitted); *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 617 F. App'x 136, 141 (3d Cir. 2015) (affirming district court allowing "the Steering Committee to, essentially, trade work product for a share in the recovery in cases not before the MDL."). *See also In re Ethicon Physiomesh Flexible Composite Hernia Mesh Prods. Liab. Litig.*, 2022 WL 17687425 (N.D. Ga. November 14, 2022) (ordering that nine percent (9%) assessment set forth in a previous Common Benefit Order shall be available for distribution as an award for common benefit expenses and attorney's fees and that the one percent (1%) assessment set forth in the Common Benefit Order shall be available for distribution for common benefit expenses); *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 2019 WL 7859557 (N.D. Fla. 2019) (9% common benefit award in products liability MDL involving settlement of approximately $210,467,000); *In re Guidant Corp.*

*Implantable Defibrillators Prods. Liab. Litig.*, 2008 WL 682174, *6 (D. Minn. 2008) (award of 15% common benefit attorney's fees in MDL involving settlement amount of $230,000,000 despite only eighteen months of litigation); *In re Nuvaring Prods. Liab. Litig.*, 2014 WL 7271959, at *3 (E.D. Mo. 2014) (11% attorney fee holdback out of $100 million settlement was "very reasonable" in light of the work performed and result obtained, and "well within the percentages that courts have routinely awarded in similar cases."); *In re Equifax, Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247 (11th Cir. 2021) (Eleventh Circuit approving Judge Thrash's attorney's fee award of 20.36% in case involving $380.5 million common fund); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 2000 WL 1622741, at *32 (E.D. Pa. 2000) (a 12% common benefit fee award from a $100 million total settlement fund in a nationwide medical device class action settlement found to be "modest, reasonable and in line with awards received in similar cases"); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 864-67 (E.D. La. 2007) (class action for damages arising from Hurricane Katrina) (attorneys' fee award of 17% of the $195 million common fund obtained); *In re Fresenius Granuflo/Naturalyte Dialysate Prods. Liab. Litig.*, 2017 WL 9324341, at *1 (D. Mass. 2017) (noting prior order of 11% common benefit assessment in case involving $250 million gross settlement); *In re Serzone Prods. Liab. Litig.*, 2007 WL 7701901, *3 (S.D.W. Va. 2007) (MDL court examining size of percentage fee awards in several mass tort drug and device litigations in relation to amount of benefit procured and amount of time invested by counsel ranging from 4.2% to 16% (average of 10.94%) and awarding 14.5% fee); *In re Oil Spill by the Oil Rig DH in the Gulf of Mexico, on April 20, 2010*, 2011 WL 6817982, at *6 (E.D. La. 2011), order amended, 2012 WL 37373 (E.D. La. 2012), amended and superseded, 2012 WL 161194 (E.D. La. 2012) and order amended and superseded on reconsideration, 2012 WL 161194 (E.D. La. 2012) (ordering assessments of 6% on

settlements with private claimants and 4% on settlements with state or local governments); *In re Genetically Modified Rice Litig.*, 2010 WL 716190, at *8-9 (E.D. Mo. 2010), aff'd, 764 F.3d 864 (8th Cir. 2014) (ordering fee assessments between 6% and 8% depending on the category of plaintiff); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 458, 491 (E.D. Pa. 2008), as corrected, (Apr. 9, 2008) and judgment entered, 2008 WL 2890878 (E.D. Pa. 2008) and aff'd, 582 F.3d 524 (3d Cir. 2009) (ordering assessments of 6% on federal cases and 4% on state cases).

The Federal Judicial Center, which conducts research and provides continuing education resources for the federal judicial branch, has provided the following guidance on the issue: "Courts may direct contributions to be made by defendants, or by plaintiffs' counsel out of individual settlement payments received. Fees may not be imposed by a transferee judge on attorneys with no cases in the MDL and *who do not use federal discovery material*." Fed. Judicial Ctr., Managing Multidistrict Litigation in Products Liability Cases, A Pocket Guide for Transferee Judges at 14-15 (2011) (emphasis added).

This court is <u>not</u> currently contemplating assessing state court recoveries where the attorneys have piggy-backed on the work done by the MDL parties. However, at the very least, this court recognizes that the MDL lawyers expended significant time, money, and other resources litigating a plethora of issues on behalf of two putative classes. Quite literally, tens of millions of dollars (if not more) and hundreds of thousands of hours have been invested by Plaintiffs and Defendants in conducting discovery and litigating in the MDL (on both the subscriber and Provider tracks).

**B.      The Merits of the Remaining Disputes**

The requested MDL information sought from Defendants in the *Prime* litigation falls into three categories and is subject to protective orders entered in this MDL. (Docs. # 550, 1488). The requested MDL information is also subject to the ongoing jurisdiction of this court. Defendants take no position on the dispute between MDL Plaintiffs and *Prime* plaintiffs. (Doc. # 3183 at 24). The *Prime* litigation Blues (the "*Prime* Blues") have agreed to produce the MDL Materials, provided they have written consent of the parties or third-parties whose Confidential Material is included in those documents or this court orders their production, which is required by the Amended Supplement to Qualified Protective Order (Doc. # 3171). Some of the information sought by the *Prime* plaintiffs from the *Prime* Blues are confidential materials from the MDL. Those requests raise the question of whether the *Prime* plaintiffs seek "free" discovery that they either won't have to do the work to obtain or won't have to pay for themselves.

**1.      Claims Data from 2008-2014 as Produced by Optum in the MDL**

HCCI is a non-profit organization that receives claims data from three of the four National Insurers (Aetna, Humana, and United, but not Cigna) to make the data available to researchers. (Doc. # 1040 at 2-3). HCCI uses a vendor, OptumInsight (a subsidiary of United) to collect and "de-identify" the claims data, before turning it over to HCCI to make it available to healthcare cost researchers. (*Id*. at 3). The court understands that this information is no longer available from either HCCI, OptumInsight, or the National Insurers, so it is impossible for the *Prime* plaintiffs to reproduce the data through third party discovery. The only place from which this information is available is the MDL.

The Blues and certain third parties have consented to the reproduction of the data they produced in the MDL in the *Prime* litigation. Providers object and seek payment of costs and a

portion of their legal fees they claim they incurred in generating this material in the MDL. The *Prime* plaintiffs have offered to contribute a portion of the actual hard costs paid by the parties directly to Optum for the data, but have refused to pay any additional costs or fees related to the acquisition and maintenance of the data.

If HCCI or Optum still had the information, they could reproduce what they produced in the MDL likely with vastly reduced effort and expense, but they no longer have it. The *Prime* plaintiffs cannot assemble the information from the National Insurers because they, too, no longer have the data. Frankly, the *Prime* plaintiffs' offer to share hard costs seems fair to the court. Thus, the court **ORDERS** that Defendants may produce the requested claims data from 2008-2014 as produced by Optum in the MDL if the *Prime* plaintiffs pay Provider Plaintiffs the hard costs (approximately $31,000) related to this data.

> **2.     The Blues' Own Expert Reports From The MDL and Deposition Transcripts**

The *Prime* plaintiffs, like the Opt Out Plaintiffs before this court in *Alaska Air Group, Inc. v. Anthem, Inc.*, Case No. 2:21-cv-01209-RDP, seek from Defendants their expert reports produced in the MDL. The *Prime* plaintiffs also seek the transcripts of the experts' depositions. This court ordered production of the expert reports in the Opt Out cases. (Case No. 2:21-cv-01209-RDP, Doc. # 401). The court reasoned that this was in essence fact discovery. (*Id.*) (citing *See Colonial BancGroup Inc. v. PriceWaterhouseCoopers LLP*, 2016 WL 9687001, at *2 (M.D. Ala. Jan. 22, 2016) ("the Court views the discovery of PWC's expert deposition testimony in other cases as fact discovery in this case") (citing *Parkervision Inc., v. Qualcomm Inc*. 2013 WL 3771226, at *1-2 (M.D. Fla. 2013) ("prior expert deposition transcripts and prior trial testimony transcripts . . . [are] discovery materials [which] fall within the ambit of Rule 26(b)(1) for general fact discovery")).

The *Prime* plaintiffs point out that the Provider plaintiffs did not weigh in on the dispute over these materials in the Opt Out Cases and thus have waived any privilege objections. The court is doubtful of that assertion but production of Defendants' expert reports from the MDL is nevertheless warranted. Although some of Providers' experts' opinions may indirectly be disclosed in the reports, these are Defendants' reports that were paid for by Defendants.

Provider plaintiffs' argument regarding the depositions is, however, more convincing due to the free rider issue. The *Prime* plaintiffs appear to want to piggy back on Providers' work deposing Defendants' experts. Provider plaintiffs invested substantial time, effort, and money to develop their theories of the case and prepare for and take the depositions of Defendants' experts. If the *Prime* plaintiffs do not wish to fairly compensate Provider Plaintiffs for these efforts, they can do their own work, take their own depositions, and send out their own discovery requests.

The court **ORDERS** that Defendants' may produce their MDL expert reports to the *Prime* plaintiffs. However, unless Provider plaintiffs and the *Prime* plaintiffs can reach a mutual agreement regarding fair compensation for Provider plaintiffs' work deposing those experts, the *Prime* plaintiffs will need to take their own depositions of those experts. As discussed in detail above, there is substantial authority for imposing costs on plaintiffs' counsel seeking to use other counsel's work in aid of their own clients' recovery. For these reasons, Defendants are **NOT** granted leave under the MDL protective orders to produce the deposition transcripts of their MDL experts.

### 3. Deposition Transcripts of Blue Cross and Blue Shield Witnesses with Exhibits

As with the depositions of the Defendants' experts discussed above, the *Prime* plaintiffs' request for these deposition transcripts and production of the exhibits that Provider plaintiffs

secured in discovery in the MDL is simply a naked attempt to free ride. These depositions were taken during the long course of this MDL. Literally tens of millions of dollars were expended by the Subscriber and Provider plaintiffs conducting discovery since 2013. Thousands of hours were devoted to preparing for and taking depositions in the MDL. It would be patently inequitable to allow the *Prime* plaintiffs to obtain these deposition transcripts, which were a product of significant expenditures of time and treasure, for "free" (or even at the cost of reproduction). This is even more true based on the tautological fact that Provider plaintiffs' counsel were devoting their financial and attorney resources for the common benefit of subscribers and providers, and did so at great personal risk.

Unless Plaintiffs in this MDL and the *Prime* plaintiffs can reach mutual agreement regarding fair compensation for Plaintiffs' work in obtaining production of documents in the MDL and preparing for and taking the depositions of these witnesses, the *Prime* plaintiffs will need to secure their own document productions and take their own depositions. Defendants are **NOT** granted leave under the MDL protective orders to produce the deposition transcripts of Blue Cross and Blue Shield witnesses (with exhibits) from the MDL to the *Prime* plaintiffs.

### C.    Conclusion

This court does *not* invite the *Prime* plaintiffs to come on and take a free ride. The *Prime* Blues **MAY** produce to the *Prime* plaintiffs the 2008-14 Optum claims data and their own expert reports produced in this MDL. However, absent an agreement about cost sharing, the *Prime* Blues **MAY NOT** produce position transcripts and exhibits of BCBS witnesses taken in this MDL.

**DONE** and **ORDERED** this October 17, 2024.

**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE