FILED
2024 Nov-14  PM 05:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# *In Re Blue Cross Blue Shield Antitrust Litigation,* MDL 2406

## Preliminary Approval Hearing

## November 14, 2024





## How Did We Get Here?

- Twelve years of litigation

- Countless mediation sessions both in person and virtual over the last nine years

- Numerous Work Group sessions and consultations with class representatives, associations and Class Members

- Navigating through the COVID crisis and beyond to bring us here

2

# THIS IS AN OUTSTANDING SETTLEMENT

Unprecedented Injunctive Relief

Largest Monetary Recovery in Any Healthcare Antitrust Settlement

3

# The Settlement Will Significantly Improve the BlueCard Program for All Settlement Class Members Who Do Not Opt Out

"For nearly two decades I have helped lead, through my role at HANYS, a multi-state group of hospital associations attempting to obtain meaningful reforms for hospitals and healthcare systems, including their doctors and ancillary providers, in the Blue Card Program. I have worked closely with Whatley Kallas to continue those efforts in this lawsuit and mediation. **This settlement represents a culmination of these necessary, meaningful reforms and will significantly improve the Blue Card Program for all Class Members"**

Jeff Gold, Vice President and Counsel for Managed Care and Insurance, Hospital Association of New York State.

4

# Injunctive Relief Is Transformative for Settlement Class Members Who Do Not Opt Out

"I have spent much of my professional life assisting doctors, clinicians and other healthcare professionals in addressing ongoing issues in the Blues' system. I have continued these efforts by assisting Whatley Kallas in the litigation and resolution of this lawsuit. **The injunctive relief achieved here is transformative and will result in a more transparent, efficient and accountable experience for Class Members in dealing with the Blues.**"

Matthew Katz, who has served in various organized medicine roles for decades and is currently a consultant for medical doctors, groups and other healthcare providers.



## Unprecedented Injunctive Relief

- The Blues have agreed to an unprecedented package of business practice changes that provide relief from the challenged conduct.

- The injunctive relief will transform the transparency and efficiency of the Blues' system, increase out-of-area contracting opportunities and provide accountability to Settlement Class Members.

- The injunctive relief includes changes that Providers have been attempting to obtain from the Blues for decades.

6



**Injunctive Relief Was a Critical Consideration in Reaching the Settlement**

- This injunctive relief could only be accomplished in a class case involving all the parties.

- The injunctive relief greatly exceeds what could have been achieved at trial.

- The injunctive relief will not be available to those who opt out of the Settlement.

7

# Value of Injunctive Relief

In addition to the 2.8 billion dollars in monetary relief, the Blues will be required to invest hundreds of millions of dollars to carry out the injunctive relief.

As part of the Settlement approval process, we will be presenting evidence that the value of the injunctive relief to healthcare providers far exceeds the cost to the Blues.

8

# What Is the Injunctive Relief?

 Transformation and Accountability of the BlueCard System

 Significant Changes to Encourage More Competition

 Compliance, Reporting and Monitoring

 Additional Commitments

# TRANSFORMATION AND ACCOUNTABILITY OF THE BLUECARD SYSTEM

- To resolve numerous issues with respect to submission, processing and payment of BlueCard claims, the Blues agreed to develop and implement a system-wide, cloud-based architecture that will enable the delivery of the System's inter-Plan claims data.

- This transformation, along with other information-sharing enhancements, will increase Local Plans' and Settlement Class Members' access to critical information, so that out-of-area Blues are no longer the only Blues with available information about those members. As a result, Settlement Class Members will be able to get up-to-date, accurate information, as if they were a contracted provider of the Home Plan, *directly from their Local Plan*, so that the Local/Host Plan is better equipped to resolve issues that arise during the BlueCard process.



**Transformation Facilitates Transparency, Efficiency and Accountability**

- Blues agreed that the new BlueCard system will make information available, in the same way that the Local Blue Plan currently shares its own Member's data, including:

  - ✓ Member Benefits and Eligibility Verification
  - ✓ Pre-Authorization Requirements
  - ✓ Claims Status Tracking

- Patient Data Exchange Capabilities

- Facilitation of BlueCard Program Improvements

- Implementation of Real-Time Inter-Plan Messaging Service

- Designation of BlueCard Executive

- Creation of National Executive Resolution Group

- BlueCard Prompt Pay Obligation

- Service Level Agreements ("SLAs")

11



- ✓ Member Benefits and Eligibility Verification
- ✓ Pre-Authorization Requirements
- ✓ Claims Status Tracking





# Member Benefits and Eligibility Problems

- Providers often have difficulty obtaining up-to-date information on out of state BlueCard member benefits or eligibility.

- Blues deny claims despite not providing up-to-date member benefit and eligibility information to Providers.

- Patients' out-of-pocket responsibility is often unclear.

13

# Member Benefits and Eligibility Solution

Provision of:

(i) patient-identifying information (name, member ID, date of birth, address);

(ii) whether the patient has active coverage/date ranges for eligibility;

(iii) coverage by service type and benefits (e.g., office visit, outpatient, etc.);

(iv) patient deductible information; and

(v) whether pre-authorization, pre-certification or other pre-service administrative process is required.



# Pre-Authorization Problem

- It was impossible for Providers to determine what pre-authorization or pre-certification requirements applied to a BlueCard member, resulting in frustration, delay and denied claims.



# Pre-Authorization Solution

- The Blues have agreed that the new system will offer clarity to Settlement Class Members regarding what they must do in order to obtain pre-authorization for a particular service based on the member's benefit contract.

# Claims Status Tracking

Problems:

- BlueCard claims are often difficult, if not impossible, for Providers to track.

- Many times, Providers do not even know who the real Blue Plan behind the claim is and the claim languishes.

**Solution:**

The changes to the BlueCard system allow claims tracking of all BlueCard claims providing Settlement Class Members information to allow meaningful follow-up with their local Blue.

16

# BlueCard Transformation Will Enable Other Improvements

- The new platform will enable bidirectional data exchanged between Blue Plans and Settlement Class Members that facilitate rapid supply of comprehensive clinical data to the extent available.

- The platform will also enable the Blues to roll out future BlueCard improvements at a faster pace, leading to more efficient claims processing as changes are identified in the future.



# Real-Time Messaging

A real-time messaging platform to reduce time it takes for the Blues to communicate with one another regarding Settlement Class Members' BlueCard issues

BCBS-AL:  Dr. Williams saw John Doe, dob 01/01/1949 on 12/1/2021, was Prior Authorization given?

BCBS-TX:  Yes, see PA#8765432

BCBS-AL: Thanks!



## BlueCard Executive and Escalation Process

A BlueCard executive at each plan who will be accountable for BlueCard issues for Settlement Class Members.

An automatic escalation process on larger and/or older claims.



# National Executive Resolution Group

- A National Executive Resolution Group with Settlement Class Member input to identify ways to further improve BlueCard.

- This Group will include a Provider Liaison Committee comprised of ten Settlement Class Members.



20



# BlueCard Prompt Pay Solution

- To address the gap in applicability of state prompt pay laws to BlueCard claims, the Blues have agreed to prompt pay on clean, fully insured BlueCard claims.

- Such claims must be paid within 30 days (with limited exceptions).

- If claim is pended or denied, Blues must provide additional information to the Provider so that the claims can be corrected promptly.

- Blues must notify the Provider within 30 calendar days of receiving any claim that contains any defects or error that prevents it from entering the adjudication system.

- Blues will pay 8% per annum penalty/interest on eligible claims not paid promptly.

21



# SLAs Provide Additional Accountability

Blues have agreed to performance commitments for electronic claims status and eligibility inquiries.

Failure by a Blue Plan to comply with the SLAs will result in penalties which will be paid to affected Settlement Class Members.

SLAs create accountability for the Blues with respect to claims status and eligibility inquiries.

22

# SLAs Require Rapid Response on Electronic Inquiries

## Eligibility (270/271) and Claim Status (276/277)

| Time | Event |
|---|---|
| Within 20 seconds of receipt | Respond to Settlement Class Member's BlueCard Program-related real-time transactions |
| The earlier of 72 hours or 7:00 a.m. Eastern Time the following business day | Respond to Settlement Class Member's BlueCard Program-related batch transactions so long as the batch transaction is received by 9:00 p.m. Eastern Time on a business day |

# SIGNIFICANT CHANGES TO ENCOURAGE MORE COMPETITION

Contiguous Area Relief – Expansion of Member Access and Expansion of Contracting Opportunities

Limitations on All Products Clauses

24

# Contiguous Area Relief - Expansion of Member Access

- The Blues have agreed to change their rules to allow contiguous area contracts to cover additional members.

- These changes will make contiguous area contracts more valuable and workable as they may include more members.

# Contiguous Area Rule Now - Contracts Do Not Cover Out of Area Members



# Contiguous Area Relief- Contiguous Area Contracts May Cover All In-State Members – Not Just Members that Live or Work in the Local ESA





- The Blues have agreed to expand the opportunity for contiguous area contracting to include Settlement Class Member hospitals and certain affiliated providers within a 60-minute drive time of an "Anchor Hospital" already in a contiguous area.

- These changes expand the contracting opportunity for hundreds of hospitals.

28

# Anchor Hospital Problem - Mobile Infirmary



# Anchor Hospital Solution - Mobile Infirmary



# Contiguous Area Relief Problem - Mobile Infirmary as Affiliated Hospital To Anchor Hospitals



# Contiguous Area Relief Solution - Mobile Infirmary as Affiliated Hospital To Anchor Hospitals



# Contiguous Area Relief – In Sum



# Contiguous Area Relief Problem - Wiregrass CHS Hospitals



# Contiguous Area Relief Solution - Wiregrass CHS Hospitals





## Limitations on All Products Clauses

- As part of the Settlement, the Blues have agreed not to rent certain non-Blue networks to other Blue plans operating as Greens ensuring Provider Settlement Class Members likewise see the benefit of National Best Efforts elimination.

36

# ADDITIONAL COMMITMENTS

     

Common Appeals Form

Third Party Information

Pre-Authorization

Minimum Data

Value Based Care

Telehealth

# Common Appeals Form

- There is great complexity and lack of transparency in connection with which appeals form is appropriate to use to appeal to out-of-area Blue Plan regarding a BlueCard claim.

- To resolve this difficulty, we jointly created with the Blues a Common Appeals Form that can be used by Settlement Class Members to submit appeals related to BlueCard claims across the Blues' system, ending the uncertainty and rejection of proper appeals.



38

# Third Party Information

- The Blues will identify third parties involved in determining eligibility for benefits, so Settlement Class Members can better understand and predict eligibility decisions.



39

# Pre-Authorization

- The Blue Cross Blue Shield Association agreed to provide guidance to the Blue Plans to improve the pre-authorization process, consistent with or exceeding the Consensus Statement joined by the AHA, AMA, etc.

- This guidance will include recommendations for selective application of pre-authorization, review of programs and adjustment of volume of pre-authorization, transparency regarding communications and automation of certain kinds of pre-authorization determinations.

  

  

### Consensus Statement on Improving the Prior Authorization Process

Our organizations represent health care providers (physicians, pharmacists, medical groups, and hospitals) and health plans. We have partnered to identify opportunities to improve the prior authorization process, with the goals of promoting safe, timely, and affordable access to evidence-based care for patients; enhancing efficiency; and reducing administrative burdens. The prior authorization process can be burdensome for all involved—health care providers, health plans, and patients. Yet, there is wide variation in medical practice and adherence to evidence-based treatment. Communication and collaboration can improve stakeholder understanding of the functions and challenges associated with prior authorization and lead to opportunities to improve the process, promote quality and affordable health care, and reduce unnecessary burdens.

The following five areas offer opportunities for improvement in prior authorization programs and processes that, once implemented, can achieve meaningful reform.

1. **Selective Application of Prior Authorization.** Differentiating the application of prior authorization based on provider performance on quality measures and adherence to evidence-based medicine or other contractual agreements (i.e., risk-sharing arrangements) can be helpful in targeting prior authorization requirements where they are needed most and reducing the administrative burden on health care providers. Criteria for selective application of prior authorization requirements may include, for example, ordering/prescribing patterns that align with evidence-based guidelines and historically high prior authorization approval rates.

*We agree to:*

- *Encourage the use of programs that selectively implement prior authorization requirements based on stratification of health care providers' performance and adherence to evidence-based medicine*
- *Encourage (1) the development of criteria to select and maintain health care providers in these selective prior authorization programs with the input of contracted health care providers and/or provider organizations; and (2) making these criteria transparent and easily accessible to contracted providers*

1

# Minimum Data Requirements



- Problem: transaction data provided by the Blues to Class Members was incomplete, often lacking critical details like the identity of the Home/Control Plan or a limited benefit plan for BlueCard claims.

- Under the Settlement, the Blues have agreed to minimum data standards.

- For example, for the first time, Blue Plans will be required to identify the Home Blue Plan for BlueCard claims in response to certain EDI transactions.

# Value Based Care

- Before, many Blues did not offer significant Value Based programs and there were often difficulties managing Value Based programs even for those that did due to differing approaches.

- The Blues will provide increased opportunities for Value Based Care arrangements as all Blue Plans will be required to make a minimum offering to Settlement Class Members.

- The Blues will adopt best practices for Value Based Care arrangements covering member attribution logic, performance measurement and data analytics and reporting.



# Compliance Timeline

**Settlement Class Member Grievance Received by Provider MC for evaluation***

**Defendant MC provides Action Plan to Provider MC (10 business days of MC Report)**

**Provider MC Determine Violation Dispute exists, Grievance, Violation Notice, Action Plan and Final Response submitted to full MC (30 business days of Final Response)**

**Monitoring Committee ("MC") Formed (15 days of Eff. Date)**

**Provider MC provides Notice of Violation to Defendant MC for investigation****

**Defendant MC provides Final Response to Provider MC (20 business days of Action Plan Transmittal)*****

**Full MC will address the Violation Dispute and Determine Any Additional Actions (30 business of Submission of Violation Dispute)******

*If Provider MC determines not meritorious, Grievance is dismissed.

**If Provider MC deems Dispute urgent a shorter schedule may be adopted.

*** If Provider MC is satisfied with Action Plan, no further action necessary.

**** Final and Non-Appealable

45



The Monetary Relief for the Settlement Class Is Extraordinary

- The Blues agreed to pay **$2.8 Billion** in monetary relief, even more than the Subscriber Settlement.

- "The bottom line is this: this financial settlement is one of the largest ever in history, particularly considering that this is a private enforcement action." Doc. 2931 at 40.

- The overwhelming majority of this money will go to pay damages to Settlement Class Members for past damages.

- This Settlement amount represents the largest healthcare antitrust settlement in history.

46

# Telehealth

- Before, the Blues' rules and payment methodologies for telehealth were often confusing.

- The Blues will streamline claims processing where Blue Plan-contracted Settlement Class Members contract with out-of-area individual physicians for Virtual Only Services.



# COMPLIANCE, MONITORING AND REPORTING

- The Settlement provides for a comprehensive compliance, monitoring and reporting process to ensure the Blues follow through on their commitments to Settlement Class Members.

- This process will be overseen by a five person Monitoring Committee for a period of five years from the Effective Date of the Settlement.



44

## The Monetary Relief for Settlement Class Members Is Extraordinary

- Many Class Members will recover millions of dollars from the Damages Fund.

- They will do so by settling claims that they have **NOT** brought for more than twelve years, without releasing their ordinary course business claims against Defendants.

- Almost all of these Settlement Class Members who will recover millions of dollars will do so without:

  - ✓ producing a single document or massive amounts of historical claims data in discovery;
  - ✓ having a single executive or provider give a deposition; or
  - ✓ facing any counterclaims like Plaintiff A4.

47

## The Release Does Not Include Ordinary Course of Business Claims Against the Blues

"...Nothing in this Release shall release claims, however asserted, that arise in the ordinary course of business and are based solely on (a) claims by the Provider in the Provider's capacity as a plan sponsor or subscriber or  (b) claims regarding whether a Settling Individual Blue Plan properly paid or denied a claim for a particular product, service or benefit based on the benefit plan document, Provider contract, or state or federal statutory or regulatory regimes (including state prompt pay laws)..."

Paragraph 1, xxx, Definition of Released Claims.

# WHY DOES SETTLEMENT MAKE SENSE?

After the Subscriber Settlement, the Court ruled that Rule of Reason, not the *Per Se* Rule, would apply to forward-looking claims against the Blues.

The injunctive relief is better than Provider Plaintiffs could obtain at trial.

The position of the Defendants is that the Court could not order vast majority of the injunctive relief in the Settlement even if Provider Plaintiffs prevailed at trial.

49

# Proceeding to Trial Has Significant Risks

Providers faced formidable opponents who have committed to continue to litigate aggressively at every stage.  To prevail would have taken many more years and a victory at every stage, including to:

- Certify a litigation class
- Overcome additional summary judgment motions
- Win at trial
- Prevail on post-trial motions
- Win on appeal to the 11th Circuit and a petition to the Supreme Court
- Succeed at every step of the way in multiple other jurisdictions throughout the country

50

# Proceeding to Trial Has Significant Risks

- The Court still had to consider important pre-trial issues including two-sided markets, whether the Blues' trademarks protected them from antitrust claims, and damages.

- Even if Providers proceeded to a class trial, they would have faced enormous additional risks before a verdict would have been entered.

- There was not a guarantee of victory at trial.

- Even if Providers prevailed at trial, there were risks with post-trial motions and appeals.

51



Cases Like This Can Result in Substantial Verdicts Where Class Members Never Collect Money

- *Pickett v. Tyson Fresh Meats* - $1.3 Billion Verdict – Nothing Collected

- *Healy v. Cox Cable* – $6.31 Million verdict trebled $19 Million – Nothing Collected

- *In re NFL Sunday Ticket Litigation* – $4.7 Billion Verdict – Nothing Collected

# There Is No Mandatory Rule 23(b)(2) Settlement Class

Opt Outs are not bound by the Settlement.

Opt Outs are not entitled to any of the monetary or injunctive relief.

53

# STANDARDS FOR PRELIMINARY APPROVAL



Rule 23(e)(2)

A court may approve a settlement "on finding that it is fair, reasonable, and adequate after considering whether:

(A)   the class representatives and class counsel have adequately represented the class;

(B)   the proposal was negotiated at arm's length;

(C)   the relief provided for the class is adequate, taking into account:

  (i)    the costs, risks, and delay of trial and appeal;

  (ii)   the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims;

  (iii)  the terms of any proposed award of attorney's fees, including timing of payment; and

  (iv)   any agreement required to be identified under Rule 23(e)(3); and

(D)   the proposal treats class members equitably relative to each other."

55

# Provider Plaintiffs' Counsel More Than Adequately Represented the Class

Settlement Class Counsel:

- Invested more than 500,000 hours and a hundred million dollars in expenses over twelve years of litigation

- Won many important rulings

- Consulted with and involved different types of Providers when negotiating the Settlement's injunctive relief

56

# The Settlement Was Negotiated At Arm's Length

Settlement Class Counsel engaged in nine years of hard-fought negotiations with the assistance of multiple neutral mediators

The Mediator Ed Gentle has confirmed there was no fraud or collusion

57

# The Relief for the Class Is More Than Adequate

- Injunctive relief is outstanding.

- $2.8 billion is the largest healthcare antitrust recovery in history.

- Proceeding to trial would have been incredibly costly and risky.

  - Even victory at trial would not have assured a recovery on injunctive relief.
  - It is the position of the Defendants that Providers would not have obtained any of the injunctive relief in the Settlement.
  - Thousands of trials may have been required for a complete victory.

- The plan of distribution is designed to reduce claimants' administrative burden as much as possible.

- The proposed attorney's fees are well within the Eleventh Circuit's acceptable range.

58

# The Settlement Treats Class Members Equitably to Each Other

**Each Settlement Class Member's recovery is based on its unique circumstances**

- Allowed Amount (i.e., the volume of its business with the Blues)
- Geographic location

**Mr. Feinberg and Ms. Biros decided the allocation and approved the plan of distribution**

59



*Bennett* Factors

(1)  The likelihood of success at trial;

(2)  The range of possible recovery;

(3)  The point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable;

(4)  The complexity, expense and duration of litigation;

(5)  The substance and amount of opposition to the settlement; and

(6)  The stage of proceedings at which the settlement was achieved.

*Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984)

60

# PLAN OF DISTRIBUTION:  OVERVIEW

- Allocation of Net Settlement Fund Between Facilities and Professionals

- Distribution of the Hospital/Facility Net Settlement Fund

- Distribution of the Professional Net Settlement Fund

- Review of Claims

- Balance Remaining in Net Settlement Fund



**Allocation of Net Settlement Fund**

- Two types of Providers: Health Care Facilities and Medical Professionals.

- Some Claimants (e.g., Health Systems) will submit claims on behalf of multiple Settlement Class Members, including more than one type of Provider.

# Allocation of Net Settlement Fund

- Professor Issacharoff advised Class Counsel on the allocation process.

- Based on presentations to by Providers' economic experts with responses from Providers of all types for allocation issues, Mr. Feinberg and Ms. Biros, have determined that there should be an allocation of the Net Settlement Fund as follows: (a) 92% to Health Care Facilities (the "Hospital/Facility Net Settlement Fund"), and (b) 8% to Medical Professionals (the "Professional Net Settlement Fund").

- This allocation was determined to be reasonable by Mr. Feinberg and Ms. Biros.

63

# Context for Allocation of Net Settlement Fund

- Physicians representing 65% of payments are excluded from the Settlement Class because they released their claims in *Love v. Blue Cross and Blue Shield Association*.

- Based on the analysis of the economic experts, the challenged conduct of the Blues impacted facilities approximately three and a half times more than it impacted professionals.

64



**Distribution of Hospital/Facility Net Settlement Fund**

- Two methods for calculating the Claimant's allowed amounts for the Blue Plans' Commercial Health Benefit Products ("Allowed Amounts"):

    - Option A (the "Default Method")
    - Option B (the "Alternative Method").

- Mr. Feinberg and Ms. Biros reviewed and approved of the Plan of Distribution, the Claim Forms, and the Notice.

65

# Distribution of Hospital/Facility Net Settlement Fund: Harm Coefficients

- Provider Plaintiffs' experts have analyzed the produced discovery and based on that analysis they have estimated a coefficient for each Health Care Facility representing the relative effect of Defendants' conduct on the Health Care Facility, compared to other Health Care Facilities, depending on their geographic location and other factors.

- Each Health Care Facility for which a Claimant is submitting claims will be assigned "Adjusted Allowed Amounts" equal to the product of its Allowed Amounts and this coefficient.

66

# Distribution of Hospital/Facility Net Settlement Fund: Payment Calculation

- When all claims have been submitted for Health Care Facilities, the payment associated with any given NPI or TIN will be calculated as follows:

NPI or TIN Adjusted Allowed Amounts

$\div$

Total Adjusted Allowed Amounts for All Health Care Facilities That Filed Claims

$\times$

Hospital/Facility Net Settlement Fund

67



# Distribution of Professional Net Settlement Fund

- Because medical professionals move over time and their access to their financial records may thus be more difficult, and because it is less efficient to attempt to extrapolate Allowed Amounts for medical professionals than it is for hospitals and other facilities, the distribution method for medical professionals will be streamlined to permit them to estimate their Allowed Amounts for the Settlement Class Period within certain ranges.

# Distribution of Professional Net Settlement Fund: Point System

- Claimants on behalf of medical professionals will indicate which of the following ranges reflects their Allowed Amounts for the Settlement Class Period:

| Range | Points |
|---|---|
| Less than or equal to $250,000 | 1 |
| More than $250,000, but less than or equal to $500,000 | 2 |
| More than $500,000, but less than or equal to $750,000 | 3 |
| More than $750,000, but less than or equal to $1,000,000 | 4 |
| More than $1,000,000 | 5 |

# Distribution of Professional net Settlement Fund: Harm Coefficients

- Provider Plaintiffs' experts have estimated coefficients that represent the relative effect of the Defendants' conduct on Medical Professionals, depending on their geographic locations.

- These coefficients have been grouped into ranges, with a multiplier assigned to each range, from 1.0 to 5.3.

- Each NPI or TIN for which a Claimant submits a claim will be assigned a number of "adjusted points" equal to the points that correspond to that NPI or TIN's range of Allowed Amounts, multiplied by the multiplier for the geographic area in which the Medical Professional is located.

70

# Distribution of Professional Net Settlement Fund: Payment Calculation

- When all claims have been submitted for Medical Professionals, the payment associated with any given NPI or TIN will be calculated as follows:

NPI or TIN Adjusted Points

$\div$

Total Adjusted Points for All Medical Professionals Who Filed Claims

$\times$

Professional Net Settlement Fund



# Review of Claims

- There will be opportunities for corrections of claims.

- The settlement Administrator will have discretion to seek more information from claimants and to decide disputes.

72

# Balance Remaining in Settlement Fund

- If there is a balance remaining in the Escrow Account after distribution of the Net Settlement Fund, the Settlement Claims Administrator will, subject to Court approval, allocate the balance among Settlement Class Members in an equitable and economic fashion.

- The Settlement Claims Administrator may set a minimum distribution amount to prevent the costs of distribution from depleting the remaining balance itself.

- If it is not economical to distribute any remaining balance, then it will be added to the Notice and Administration Fund unless otherwise ordered by the Court.

- There will be no reversion to the Defendants.  Any money left in the Notice and Administration Fund will be distributed to Class Members, or if the amount is not sufficient to distribute to Settlement Class Members, then it will go to an agreed upon entity that the that the Monitoring Committee will approve to enable providers to promote high quality healthcare.

# Standard for Notice

For a settlement class proposed to be certified under Rule 23(b)(3),

> "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means."

Fed. R. Civ. P. 23(c)(2)(B)

74

# Advisors on Notice Plan

Ken Feinberg and Camille Biros

Ed Gentle and Kip Benson

75



Settlement Notice Administrator

**Brown Greer PLC**

- Chosen after a rigorous bidding process overseen by the Special Master
- Directing Administrator for the National Opioid Settlement ($45 billion)
- Settlement Administrator for the Combat Arms Earplugs Settlement ($6 billion)
- Claims Administrator for the NFL Concussion Settlement ($1.3 billion)

**Signal Interactive Media**

- Placed $2.1 billion in media for notification programs
- Will assist the Settlement Notice Administrator with publication notice

76

# Direct Notice



Email:  Class Members for whom an email address is available (the majority of the class)



U.S. Mail: Class Members for whom an email address is unavailable, or email notice is undeliverable



Total Direct Notice:  All readily identifiable Class Members (the vast majority of the class)

# Publication Notice



Targeted internet advertising for auxiliary providers (e.g., mental health professionals)



Earned media (e.g., articles about the Settlement)



Settlement website



Content of the Notice

"In our opinion, the long-form notice satisfied the requirements of Rule 23(c)(2)(B) because it uses plain, easily understood language to describe the nature of the action, define the certified class, explain the Settlement Class's claims and issues, notify class members that they may enter an appearance through an attorney, explain that the Court will exclude Class Members who request exclusion, explain how to request exclusion, and describe the binding effect of a class judgment.  The long-form notice also describes the process for, and consequences of, filing a claim, not filing a claim, requesting exclusion, and objecting to the settlement."

Feinberg/Biros Declaration
(Doc. No. 3207-2) ¶ 9

79

# The Notice Plan Is the Best Practicable

- Direct notice to more than 70% of the class, plus publication notice, is "high," according to the Federal Judicial Center

"In our opinion, the postcard notice and the email notice provide sufficient information to alert Class Members that a settlement may affect their rights, and to encourage them to consult the long-form notice for more information."

Feinberg/Biros Declaration (Doc. No. 3207-2) ¶ 10

80



- The Claim Forms and accompanying Instructions will be made available on the Settlement Website and permit Settlement Class Members to efficiently submit claims and any additional required documentation through a secure electronic portal.

- The Settlement Website will also allow Settlement Class Members to view and download printable copies of the Claim Forms and Instructions.

Amended Petkauskas Declaration (Doc. No. 3207-3), at ¶ 25, Ex. 6.

# Claim Forms (cont'd)

- As stated by Mr. Feinberg and Ms. Biros, who have vast experience in running claims processes, and who have reviewed the proposed Claim forms and Instructions, they are due to be approved:

  "In our opinion, the questions on the claim forms are reasonable, and do not require more information than necessary to process claims. The claim form is no longer than it needs to be (given the complexity of this case), and it is well-designed, with clear and prominent information."

- Ed Gentle and Kip Benson have also reviewed and edited the Claim forms.

82