FILED
2024 Nov-19 PM 02:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

IN RE BLUE CROSS BLUE SHIELD      CASE NO. 2:13-cv-20000-RDP

ANTITRUST LITIGATION MDL 2406

_____

\* \* \* \* \* \* \*

**TRANSCRIPT OF MOTION FOR PRELIMINARY APPROVAL**

\* \* \* \* \* \* \*

BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES DISTRICT JUDGE, at Birmingham, Alabama, on Thursday, November 14, 2024, commencing at 9:41 a.m.

Proceedings reported by stenographic court reporter, transcript produced using computer-aided transcription.

**Transcript prepared by:**
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter

APPEARANCES:

SPECIAL MASTER:          Edgar C. Gentle III
                        Attorney at Law
                        GENTLE TURNER SEXTON & HARBISON
                        501 Riverchase Parkway East, Suite 100
                        Hoover, Alabama 35244

                        W. Tucker Brown
                        Carl Burkhalter
                        Anna Mercado Clark
                        Karin DeMasi
                        Jeff Fisher
                        Mark Gray
                        Katherine Harbison
                        Mark Hogewood
                        Craig Hoover
                        Mike Gurley
                        Elizabeth Jose
                        Edith M. Kallas
                        Lauren R. Kennedy
                        Chris Kimbro
                        Donald Knowlton
                        Kenina Lee
                        Patrick McDowell
                        Morgan Meador
                        Nikol Oyandich
                        Dennis G. Pantazis
                        Myron Penn
                        Roma Petkauskas
                        Henry Quillen
                        Barry A. Ragsdale
                        Robert Roden
                        Julia S. Roth
                        Nicholas B. Roth
                        John Schmidt
                        Todd M. Stenerson
                        Michael Velezis
                        Joe R. Whatley, Jr.
                        Mark White
                        Kirk Wood
                        Jeff Zeiger

(Proceedings commenced at 9:41 a.m. in open court:)

THE COURT:  All right.  We're here in In Re Blue Cross Blue Shield Antitrust Litigation MDL 2406.  Our case number is 13-cv-20000.  We're here for a hearing on a motion to give preliminary approval to a proposed class action settlement.

Would counsel who are going to be participating in the hearing identify yourselves for the record?  Let's start with the providers.

MS. KALLAS:  I'm Edith Kallas from Whatley Kallas.

MR. WHATLEY:  And I'm Joe Whatley.

THE COURT:  Okay.  From our Blues?

MS. DeMASI:  For the Blues, Karin DeMasi from Cravath, Swaine & Moore.

MS. KENNEDY:  And Lauren Kennedy, as well from Cravath.

THE COURT:  Okay.  Thank you.

And I think we also have a motion filed.  Who's here on -- for that?

MR. ALBRIGHT:  Your Honor, I'm Chris Albright.  I'm here on behalf of the out-of-network objectors.  We filed an objection last evening.  I'm with Porterfield, Harper, Mills, Motlow & Ireland in Birmingham.

THE COURT:  Okay.  Are you the one who's going to be presenting that?

MR. ALBRIGHT:  Yes, Your Honor.

THE COURT:  Okay.  Very well.  All right.  Thank you.

All right.  Very well.  So I guess the question is order of operation.  And we have this objection.  I'll be honest with you, Mr. Albright, what I'm -- I'm treating your motion -- or your filing as a objection to approval of the settlement, not an objection for going forward with the preliminary hearing, because we're all here.  Why wouldn't we go forward and hear from you and everyone else about all aspects?

The other thing is I think the -- I suspect the parties who oppose your position would like to file their own response to it.  I'm not writing an opinion today, I can assure you that, on this.  So what I would propose is we hear OA on it today at the appropriate time, we give a time frame for the settling parties to respond to that with a little bit more time and attention to respond in writing, but go ahead and hear whatever everyone wants me to hear today, and then we'll figure out where we are after I get it under submission. Is that acceptable to everyone?

MS. KALLAS:  Yes, Your Honor.

MS. DeMASI:  Yes, Your Honor.

THE COURT:  I mean, I hope you don't -- you're not offended if I tell everybody -- don't tell everybody just go home, even though you've taken this time to prepare all this, let's go home and I don't want to hear from you.  So your key

is you would prefer I would not -- you're urging that I not approve a preliminary settlement -- preliminarily approve a settlement, right?

MR. ALBRIGHT:  Yes, Your Honor.  We were simply seeking a 30-day continuance to better understand the terms of the settlement and perhaps work with Plaintiffs' counsel, class counsel, to be able to work through some of these issues that --

THE COURT:  Well, you'll still have that time if I'm not ruling on approval.  You're still -- you can still do anything informally you want to do.  But --

MR. ALBRIGHT:  I understand.

THE COURT:  -- I'm just not going to rule on what you presented today.  And to me, let's say I end up disagreeing with your position.  It probably doesn't make any sense to just pull the plug today and have everybody come back at another time and do what everybody's here ready to do today.  But I'm not going to -- until I deal with your filing head-on, I'm not going to approve this -- preliminarily approve the settlement --

MR. ALBRIGHT:  I understand.

THE COURT:  -- and deal with it head-on.  I've got to let them respond to it, and they've had it as long as I've had it.  I think we -- I found out about it 12:38 this morning.  So there you go.

MR. ALBRIGHT:  Understood.

THE COURT:  Okay?

MR. WHATLEY:  Judge, just to be clear, we have had three conferences with Mr. Albright's co-counsel this week --

THE COURT:  Yeah.

MR. WHATLEY:  -- Monday, Tuesday, and yesterday.  And we are perfectly prepared to continue to have those.  I'll address that issue later.

THE COURT:  Yeah.

MR. WHATLEY:  But we would suggest involvement of Special Master in that process, but we are perfectly prepared to continue those discussions with him just like we have with hundreds of other class members, including out-of-network emergency room doctors.

THE COURT:  Yeah.  Well, and I appreciate hearing that, and that doesn't surprise me in the way you've approached this case.  Also, look, I'm -- I am not predetermining what might be the appropriate thing to do after you have those.

MR. WHATLEY:  Sure.

THE COURT:  But I do note that -- particularly our friends on the Blues side know this -- when it came to the subscriber settlement, there was some work that took place after the initial preliminary approval hearing, if I recall, and there was a -- there was changes to the settlement.  And

it strengthened the settlement and we still were on track to get things done.  So I'm not saying that's what's going to happen here, but I'm just saying that we can accommodate whatever fork in the road you-all take -- end up taking in this case.

MR. WHATLEY:  I think there are a lot of -- here in this instance I think there are a lot of misunderstandings, and we're glad to try to --

THE COURT:  Yeah.  Well, that may be part of it.  It's just getting outside the Cool Hand Luke phase as what we have here is a failure to communicate.

MR. WHATLEY:  You couldn't have expressed that any better.

THE COURT:  Okay.  I'm not saying you're not communicating.  I'm just saying it just sounds like more communication probably will help.  But we're going to go forward today and then we'll figure out how we deal with this issue and some of the other things that may pop up this morning as we work our way through, okay?

MR. ALBRIGHT:  Thank you.

THE COURT:  Mr. Albright, does that satisfy you for now?

MR. ALBRIGHT:  Yes, Your Honor.

THE COURT:  Okay.  So with that said and all that fun out of the way, I guess we get on with the hearing.

So, we all understand this:  The 2018 amendments to Rule 23 indicate that we should front-load as much information to the Court on preliminary approval.  You know, I joke sometimes that I -- I handled a number of class actions in front of counsel who's not able to be here today with a health matter, but Judge Clemon, when I was practicing law and he was on the bench.  And we used to joke -- he and I would laugh about the fact that preliminary approval on those was Plaintiffs' counsel and I would walk over and sit down in his chambers, hand him the consent decree, just tell him about it.  He'd fill in the date, sign it, and we're off to the races, because -- preliminarily approved and we'd have a fairness hearing after that.

On this -- in this era, though, we're front-loading information, so as much information as everybody can give me, the better.  And that's all the more reason to hear from people who have concerns about the settlement now and not wait till later, okay?

So with that said, are we ready to proceed?

MS. KALLAS:  Yes, Your Honor.

THE COURT:  I take it you'll be presenting first?

MS. KALLAS:  Yes.

THE COURT:  Okay.  That's usually the way it works, but -- and I don't mean you personally.  I mean your side.

MS. KALLAS:  Yes.

Just waiting for the PowerPoint to -- it says no signal.

(Discussion off the record.)

THE COURT:  This is the point at which I editorialize and say just be glad I'm not running the IT.

MS. KALLAS:  Are we ready?

THE COURT:  Ready when you are.

MS. KALLAS:  Okay.  Good morning, Your Honor.  We are really pleased to be here to present this settlement for preliminary approval.  It's been a very long period of litigation.  As you know, it's been 12 years.  We've had motions to dismiss, standard of review briefing, class certification, fulsome briefing, massive discovery, expert discovery and reports both on class certification and the merits, motions for summary judgment, and the largest collection of healthcare claims data that's ever been accumulated in a case or anywhere.

We've had countless mediation sessions over the last nine years both in person and virtually, and those proceeded simultaneously with, for most of the period, with the litigation.  And those sessions were painstaking, they were thorough, and they were hard-fought.  The injunctive relief took up most of those years, and there's a lot of reasons for that.

There were five mediators involved over that time

period, and it also involved lawyers, our co-counsel, a lot of whom are here today, who have represented providers for decades and were very knowledgeable, all of us, even before the case was brought, about the issues that were facing the provider community in connection with what we believe is the core of the fix in this case, the BlueCard program, which is a program that enables the Blues to provide services nationwide.

But we didn't just rely on ourselves. We worked out -- we reached out for years to the provider community. We talked to class members. We talked to associations of providers. And I don't mean once. I mean all throughout. We talked to them about litigation issues. We talked to them about what they wanted to see in a settlement. And we talked to them as we proceeded through the settlement, pursuant to confidentiality, of course.

We had -- we involved a work group of providers that involved all different types of providers that were part of our -- that are part of our class, from large systems to rural hospitals to medical doctor representatives to all types of, you know, physical therapists and other types of providers. And they participated with us -- as well as association representatives. They participated with us in work groups that met face-to-face with counterparts at the Blues system to talk about these issues that we have seen and been dealing with and what we are talking about in the lawsuit, to talk

about the issues in detail, to try to understand one another, and to try to come up with a fix that works for everybody and ultimately the services that are provided to the patients in this country through the, you know, largest network of health plans.

So this culminated, as you're now aware through our filing, with an allocation process that was overseen by Ken Feinberg and Camille Biros, experts in allocation, where again we had the work group participate. It was not just limited to work group participants. We also had other members of the class, not just class representatives but others that we reached out, so we'd have a fulsome discussion and that Ken and Camille could hear from them on their views in addition to the experts and what they had to say about allocation, which Joe Whatley will be describing in detail for the Court in a little while.

This process went on, as I know you're aware, through COVID. We didn't stop. We kept dealing with issues. We kept having mediation sessions.

So I'm obviously going to describe all of this to you here today. I just want to pause just for a second to thank the Court and Judge Putnam and Ed Gentle, our Special Master, for everything you've done to move the case along and --

SPECIAL MASTER GENTLE:  And Kip.

MS. KALLAS:  I'm sorry?

SPECIAL MASTER GENTLE:  And Kip Harbison.

MS. KALLAS:  Well, of course, Kip.  Well, I'm going to get to Kip in a moment.  I didn't mean to leave her out.  To bring this to conclusion, and our class representatives, who worked tirelessly on this case and, of course, gave depositions and documents and gave input throughout.  The work group members I just mentioned and all of our co-counsel -- I'm so sorry that Judge Clemon couldn't be here.  His knowledge and judgment has been invaluable throughout the case.  I know, Judge Proctor, that you're aware of that.

I also wanted to mention the late Deborah Hayes, who was a member of our PSC and was an integral part of our team early on.  I want to thank Ed, Kip, and Bob, who all helped bring this settlement to closure.  We appreciate all that you've done so very much.  And I know that this is something that the class appreciates as well.  And Ken and Camille, of course, for their allocation expertise.

I also want to thank defense counsel Cravath and the Blues themselves, not just the lawyers, for participating in an intense, hard-fought negotiation for many years.  It took enormous effort for all of us to understand the issues we were dealing with and try to figure out how to fix them.  And I -- and we firmly believe that we've done that with this settlement.  We're very proud of what we've accomplished.

And here is what we've accomplished in -- at the very

high level.  We have unprecedented injunctive relief, which, Judge Proctor, I'm going to go through that first because it's quite detailed and it's probably good for everyone to still be awake.  But, of course, Joe is then going to deal with the large -- the monetary recovery, which is the largest recovery in any healthcare antitrust settlement.  And he's also going to talk after that about the legal standards and how we have satisfied those, just as you described in terms of front-loading.

So what has been the reaction of the provider community?  It has been extremely positive.  We have spoken to countless already -- countless providers throughout the class, and they are very excited about what this settlement brings to the table.

For nearly two decades, Jeff Gold, through his role at HANYS -- HANYS is the Hospital Association of New York State -- and he was also a participant in the multiple-state group of hospital associations -- attempted to obtain meaningful reforms for hospitals and healthcare systems, including their doctors and other providers in the BlueCard program.

The multistate group, by the way, is a group of hospitals -- it was even -- it even came up in our discovery in the case, so it preceded our action -- that were trying to deal with the type of BlueCard issues that we are addressing

now for a very long period of time.  And so we thought it was really important to involve Jeff.  We also interacted with that state -- multistate hospital group throughout the litigation and mediation.  We thought it was really important to get their input, and we've done that.

And Jeff's conclusion is that this settlement represents a culmination of these necessary meaningful reforms and will significantly improve the BlueCard program for all members.

And here is another example of a positive reaction, and this is a quote from Matt Katz, who has spent his professional life assisting doctors, clinicians, and other healthcare professionals in addressing ongoing issues with the BlueCard system.  He says, The injunctive relief achieved here is transformative and will result in a more transparent, efficient, and accountable experience for class members in dealing with the Blues.  This is extremely significant.  I've been dealing with Matt for years.  I knew him when he was in charge of managed care issues at the American Medical Association.  He has been working with organized medicine.  I think he was with the American Academy of Pediatrics before that.  But he's been working with organized medicine for decades, and he currently consults with medical doctors' groups and other providers.

And so what we have here is a statement from Jeff

Gold, who works with hospitals, and a statement from Matt Katz, who works with professionals.

And so now I will be addressing each item in detail. But what we got here is an unprecedented package of business practice changes that provide relief from the challenged conduct. These were never before available. It transforms the transparency and efficiency of the system, increases out-of-area contracting opportunities for all settlement class members, and finally, it includes changes that providers, as I just went through, have been attempting to obtain from the Blues for decades.

Now, because of what Jeff and Matt Katz have said and what we've heard from the provider community over the years, and because providers continue to do business with the Blues, injunctive relief was a critical consideration in us reaching an agreement, and that's why it took as long as it did. And the injunctive relief could only have been achieved in a class action like this involving all the parties. We needed all the Blues to participate, because of the way the BlueCard system operates, for the relief to work. And remember, they have a double three-quarter vote. So it was really important that they all be at the table, and they were all at the table.

The injunctive relief greatly exceeds what we could have received -- achieved at trial, and Joe will be discussing this in detail. And the injunctive relief -- it should be

clear this is a (b)(3) settlement.  The injunctive relief will not be available to those who opt out of the settlement.  The Blues will not be required to provide --

THE COURT:  So you're treating this as divisible injunctive relief.

MS. KALLAS:  It's divisible injunctive relief.  It's a (b)(3).  Everybody -- they keep their due process rights, they get notice, and they will have an opportunity to opt out if they don't wish to participate.  If they opt out, they won't get the monetary relief and -- nor the injunctive relief.  The Blues will not be required to provide it and do not intend to provide it.

And they wouldn't get -- also significant, they won't get the compliance process that would enforce a lot of this injunctive relief.  There's a lot to this, and that's what I'm going to address next.

So the value of the injunctive relief -- it should be clear, again, to set the stage, in addition to the $2.8 billion in monetary relief, the Blues will be spending hundreds of millions of dollars to carry out this injunctive relief that I'm going to describe.  We will be presenting evidence on the value to providers of that at the final approval hearing.

So what is in the injunctive relief?  There is four categories, and I'm trying to organize this as best I could

because there's a lot of detail here.  The first category deals with transformation and accountability of the system. The second are significant changes to encourage more competition.  This means more opportunities to contract.  The third are additional commitments, which are also significant that relate to the Blues system, and the fourth is compliance, reporting, and monitoring.

So now let's drill down on each of these categories, the first category being transformation and accountability.  I just want to remind the Court that BlueCard is -- those are claims submitted for services rendered to out-of-area plan members.  So using Southern Company as an example, Southern Company is based in Atlanta but it has a large number of employees here.  So when providers in Alabama provide services to those members, they have to use the BlueCard program.  So I want to -- it's not just your, you know, travelers once in a while, though those are important, too, but we're talking about, a lot of times, you know, big groups of employees in different areas.  And so that's really what we're talking about.

And the purpose of this transformation is to resolve the numerous issues with respect to, in particular, submission, processing, and the payment of BlueCard claims. The Blues have agreed to develop and implement a system-wide cloud-based architecture, that I will describe in detail in

terms of what it can accomplish, that will enable the delivery of the system's interplan claims data.

The result big picture is that this transformation will increase local plans' and settlement class members' access to critical information -- this has been a very -- an intense frustration for providers in the past -- so that out-of-area Blues are no longer the only Blues with available information about their members.  The local Blues will have the information and the settlement class members will have that information.

As a result, members will be able to get up-to-date, accurate information, as if they were contracted provider of that home plan, directly from their local plan, so that that local plan is better equipped to resolve issues that arise during the BlueCard process.

So now let's drill down on what we mean by transformation.  I'm going to give you the -- an accountability -- and I'm going to give you the specifics. Here are the specific commitments that fall within transformation.  We have -- let me sort of -- before we look at each one of these -- I'm going to talk about each one of these and -- because I think it's important for this all to be reflected in the record.  But the first five bullets that you see here are all BlueCard transformation capabilities that are electronic in nature.  It's a whole new system.

The next two are human in nature.  They're human contacts that class members will be able to communicate with. And the final two are accountability provisions, and they have penalties attached to them, so they're -- that is an important part that -- there's some teeth to this.

So I won't read the slide -- I mean, the list is all here -- because I will be going through these one by one.  But what's important about these is that these are the things that respond to decades-long complaints by providers about the lack of transparency, the lack of efficiency, and burdensomeness, and the lack of accountability.

So let's start with that new system capability, and let me explain why the relief is so important.  First of all, the platform, this new cloud, is going to include information related to these specific areas:  Member benefits and eligibility verification, preauthorization requirements, and claims tracking.

Now, the Court may remember -- and I'm going to drill down on these as well -- the Court may remember that -- remember Robby Carruba from Economics Day.  He is an office administrator for a group of doctors at St. Vincent's Hospital.  He contrasted the very good relations he has with his local plan, Blue Cross Blue Shield of Alabama, and the efficiency he has in dealing with them versus the burdensomeness, inefficiency, and what he described as lack of

accountability of dealing with out-of-area plans.

So the new capabilities will deal with and fix problems like Robby described.  The first area that I've mentioned is members' benefit and eligibility.  So here, providers would have difficulty in obtaining up-to-date information about whether member -- you know, what the members' benefits are, whether or not they're eligible for services.  This resulted in -- for providers' denied claims because they sometimes didn't know whether these members were eligible or had coverage, and also, patient out-of-pocket responsibility is often unclear.

The bottom line is, regardless of provider type, the problem has been -- is that when a patient walks in, it is impossible or extremely difficult to access information.  They don't know what -- where the information is; they don't know who to get it from.  And now this is fixed.

The settlement provides in the area of member benefits and eligibility the provision of:  Patient identifying information, whether the patient has active coverage in the date ranges for eligibility, coverage by service type and benefits, patient deductible information, and whether preauthorization, precertification, or other preservice administrative process is required.

The next capability I want to address is preauthorization.  So it was impossible for providers to

determine what -- whether preauthorization was required and what those requirements were.  As you can imagine, that results in frustration and delay and denied claims, not just for providers, it can also for patients.  So an example would be someone goes in for a CT scan.  The next thing the provider has to do is know is preauth required?  What are the requirements?  If they were dealing with their local plan, they typically, you know, found the requirements very easy to access, as these computer screens on the slide indicate.  But when they tried to find out the same information for a BlueCard patientn in this -- who was coming into the same office or hospital, they were unable to locate or it was difficult to locate.  So now these preauthorization requirements will be easily accessible.

Claims status tracking is another capability.  The problem there was providers couldn't see where their claim was in the system, so they didn't even know a lot of times who the Blue plan was behind the claim.  Now they're going to be able to see exactly where it is.  The solution is that the BlueCard system will allow claims tracking of all BlueCard claims, and this will allow class members to know where things stand and allow them to follow up as necessary.

This transformation will have other improvements as well.  There's going to be a new platform which will enable bidirectional data exchanged.  This relates to clinical-type

data like medical records.  The platform itself will also enable the Blues to roll out BlueCard improvements at a faster pace, which I think it's really important to pause and say they are clearly committed to this -- obviously the changes in the settlement, but they are working with us towards making the system better.  And it is our strong view, based on the investment they're making, that that will continue in the future, and this is a commitment that reflects that.

There's also, again staying with electronic -- finishing up, I should say, the electronic part of this, there's a real-time messaging commitment.  Now, this is really interesting.  So what this does is enables plans to communicate with other plans to provide a prompt response to the provider.  This is really important.  It's important for providers to be able to access information, but because of the way the system works, it's important for plans to be able to talk to one another.  And this is going to be a real-time system, a real-time messaging system, that reduces the time it takes for the Blues to communicate with each other when a settlement class member raises an issue.

Now, we also have commitments to allow human involvement, and this also, in addition to the other things -- transparency and efficiency -- it also establishes accountability.  For the first time, there's going to be a BlueCard executive and escalation process.  A BlueCard

executive -- this is somebody at a high level -- will be assigned at every plan and that person will be accountable for BlueCard issues that are raised by settlement class members.

I want to tell the Court what kind of issues this can involve.  It can involve pre- and postauthorization issues, medical records requirements, medical and reimbursement policies, claims submissions and processing, and payment issues raised by class members.  You know, if there's another way that they can be resolved through appeals, obviously, or dispute resolution, that's going to happen.  This is when you see it up in the cloud but you still have to -- you have issues and you don't know what to do.  You now have a person that is accountable to you, and this will also again -- it allows the plans to interface with each other because now, you know, Alabama is going to know who Florida's BlueCard executive is and they'll be able to talk to each other about these -- any issues that arise.

In addition -- and by the way, these issues are to be addressed promptly and efficiently.  In addition, there's a expedited or what we call automatic escalation process if the claim is large enough or is of a certain age, it's been around for a certain period of time, and that's all enumerated.

Another avenue for human involvement that will be ongoing and forward looking is the national executive resolution group.  This is a group that's going to be put

together by the Blues to identify ways to deal with -- you know, improve BlueCard in the future.  This is important.  I mean, there's things we can't even be envisioning right now. So this group will meet and they will specifically include a provider liaison committee.  That liaison committee will have ten settlement class members as its representatives, and also, importantly, they will be tasked with setting up a mechanism so that class members out there -- settlement class members -- and associations of providers can communicate any concern and desired improvements to them.

Now, the next area, again, in the transformation piece is what I consider to be accountability with a penalty.  So there is a BlueCard prompt pay obligation.  I just want to make sure that the Court is aware that what we're talking about here is, for years, providers have been frustrated because there are state prompt pay laws in virtually every state in the country, and there are requirements for paying those -- usually -- you know, they're clean claims -- for paying those claims in a timely fashion with deadlines and interest attached.  But the problem was -- and those apply because they're state laws to fully insured claims.  The problem was there was a loophole.  If the claim is a BlueCard claim -- you know, going back, for example, to the members who are in Alabama who have, you know, an Atlanta company, but if there's a BlueCard claim, those state prompt pay obligations

did not attach. And so this loophole was a loophole that we insisted on closing.

And so now those BlueCard fully insured claims are subject to -- and is a very -- this is just a summary. It's a -- what is set forth in our settlement agreement in paragraph 13 is an extensive set of requirements that looks a whole lot like a state prompt pay law, but suffice it to say, those claims, clean claims, will be paid within 30 days. If the claim is pended or denied, the Blues will be providing additional information so that the provider can correct it. If the Blues -- if the Blues find that a claim is not entering the system because there's some error or defect, they will notify the provider within 30 calendar days and then there's interest attached.

So remember, Your Honor, that claims tracking that we talked about?

THE COURT: Yes.

MS. KALLAS: This will help class members track for this purpose as well. So what you're going to see throughout this presentation is interrelationship with all these provisions all bringing the system to a point that is, you know, fair, efficient, and transparent to the providers.

The next area of accountability with a penalty, which helps ensure efficiency and transparency, are SLAs, which are service level agreements. And these are agreements amongst

the Blues themselves and the Blue Cross Blue Shield Association where they've agreed to performance commitments for electronic status and eligibility inquiries.  Remember, again, back to where I talked about the new cloud.  It's going to give more information about eligibility as well.

A failure to comply with these, what we call, SLAs will result in penalties, financial penalties, which will be based on compliance issues on an aggregate basis by Blue plan and go back to the affected class -- settlement class members. And so this creates accountability with respect to claims status and eligibility inquiries.  So these are the things that we talked about in the beginning about, you know, that's going to be available in that platform.  This is a way to have accountability and for it to happen efficiently as well.

So here's the specific -- here's the specific requirements:  The SLAs are going to require rapid response on -- these are inquiries and responses.  They're known as -- if it's an eligibility question, it's a 270 inquiry and a 271 response, and claims status questions are 276 with a 277 response.  And these are required -- these responses are required to be provided in 20 seconds.  If it's a batch claim -- and that means there's a lot of them -- they have -- the Blues would have until the next morning or 72 hours if it's, like, over a weekend or there's a holiday involved, whichever is earlier.  Class members, again, will have access to this

information in the cloud and now they have additional timing requirements.

The timing requirements that are on the slide are also -- will also be important to remember when we discuss the minimum data requirements, because those minimum data requirements that I'll be talking about later will talk about the kind of detail that will be provided that has not been provided before.  So now you can see how interrelated this settlement really is with the cloud, the, you know, inquiry and prompt response requirements, if you, for some reason, can't understand what's in the cloud, and then you're going to get more detail, as I mentioned.

The second area of relief -- I'm moving on now from transformation to that second big area of relief -- is contracting opportunities.  So the first area that I'm going to talk about is contiguous area relief in the form of expansion of member access and expansion of contracting opportunities.  And then I'll talk about limitations on all products clauses.

So let's first talk about the expansion of member access.  And I'm going to have a series of maps so this will all become crystal clear if it's not clear from the summary slides.  The Blues have agreed to change their rules to allow contiguous area contracts to cover additional members.  This will make the contiguous area contracts more valuable and

workable as they include more members.

So let's look at a chart that shows the current rule. This is the way it works now.  Now, if you look at Mobile Infirmary, you see that Mobile Infirmary is on a county line there with Blue Cross Blue Shield of Mississippi.  If they were to enter into a contract with Mississippi, the members that they can treat under that contract are limited, by the Blue Cross rules, to members who live or work in their area. So it's the Blue members for BlueCard, okay -- I mean for -- the Blue members show the Blues.  The red are the folks that we can't get access to right now because that's the limitation.  So you have an opportunity to contract with Blue Cross Blue Shield of Mississippi, but you can only service the patients who live or work in Alabama.

Now this has been expanded, so the contiguous area contract gives access to all of Blue Cross Blue Shield of Mississippi's members.  And so now you see all the Blue members that are available pursuant to that contract, if they were to enter into one, to Mobile Infirmary, who we're just using as an example here.  So now I want to --

THE COURT:  Go back one slide.

MS. KALLAS:  I'm sorry.  Okay.  Sure.

THE COURT:  I have a question.  Would that include these northwestern counties in Florida?

MS. KALLAS:  I'm getting to that.

THE COURT:  Okay.

MS. KALLAS:  So it's interesting you said that because --

THE COURT:  I'll let you take it in order.

MS. KALLAS:  No, I just want to say that we did have Blue members there, but it was -- we thought it would be better to go methodically to get to that point of why we do.

THE COURT:  Okay.  I don't want to break your stride.

MS. KALLAS:  Okay.  So let's go to the next area of relief so I can describe it.  In addition to the expanded members, the Blues have agreed to expand the opportunity for contiguous area contracting to include settlement class member hospitals and certain affiliated providers.  Those are within a 60-minute time of the anchor hospital.  The anchor hospital is the hospital who is eligible for that initial contiguous area contract.  And just to be clear, these changes are going to expand contracting opportunities for hundreds of hospitals.

THE COURT:  Does the language in the settlement agreement say 60-minute drive or 60 miles or --

MS. KALLAS:  60-minute drive by Google Maps.

THE COURT:  Okay.  Always have to consult Google.

MS. KALLAS:  Yes.

Okay.  So let's -- this is how -- this is a map that shows how contiguous area contracting works now.  So remember again we had Mobile Infirmary -- I already explained this --

they -- you know, they can try to contract with Mississippi. They're allowed to do that under the current rules. But their affiliates, who -- both of which, by the way, are within a 60-minute drive, are not eligible. And the reason is -- I've learned a lot about Alabama geography -- the reason is that they are in Baldwin County. They're not in a contiguous county with Mississippi. I'll get to, in a moment, your question before. They are contiguous with BCBS Florida, but we'll get to that. So right now, North Baldwin and Thomas are not eligible to attempt a contract with BCBS of Mississippi.

This slide shows -- this slide shows how the contiguous area contracting will work under our agreement. So here Mobile Infirmary becomes -- and this is the language of the settlement -- the anchor hospital, and under the agreement, North Baldwin and Thomas are affiliates within 60 minutes. Now all three will have an opportunity to contract with Mississippi. And by the way, if they have exclusive -- professionals exclusive to those hospitals, they would be eligible to participate as well.

So now let's look at -- let's look at the other county line. Here we see North Baldwin and Thomas Hospital in Baldwin County, which is contiguous with Florida. So they have an opportunity to contract with Florida, but Mobile Infirmary can't because its county is not contiguous. That's what happens now.

THE COURT:  So you've kept the contiguous area provisions but expanded those --

MS. KALLAS:  To make them available to more providers, exactly, and also to make -- to give providers access to more members.  Both are true.

Okay.  So --

THE COURT:  If Mr. Boies was here, he'd say, This benefits my class, too, the subscribers.

MS. KALLAS:  Sure.

THE COURT:  They have access now to different health professionals.

MS. KALLAS:  Absolutely.  It's good for everybody, uh-huh.  And there's more of an incentive for it to happen as well, the contracting, because there's -- because these hospitals can see more members.

THE COURT:  All right.  I think I understand that.

MS. KALLAS:  Okay.  So here is the expanded opportunity.  Under the agreement, all three have the opportunity to contract with Blue Cross of Florida, with Mobile as the affiliate, within 60 minutes.

And so here's a summary of what we are -- what you have in this particular area that we're using as an example.  You have three hospitals with contracting opportunities for two Blues, Mississippi and Florida, and you have access potentially to members in three states.  So there's quite a

lot of change there.

And I just -- I just quickly want to show that it's not -- you know, it's obviously not limited to Mobile Infirmary.  We just thought that was a good illustration to show.  Here's an example with Flowers Hospital, which is a CHS hospital.  The CHS hospital Medical Center Enterprise under the current rules would not be able to contract with Florida or Georgia but Flowers can -- or have access to those patients -- and now both of those hospitals can and they would have access to members again now in Georgia, Florida, and Alabama. So the second -- in addition to the contiguous area relief.

The second area that deals with competition is that the Blues have agreed not to rent certain non-Blue networks to other Blue plans operating as Greens.  And what this does is ensure that provider settlement class members can also see those benefits that Your Honor approved in the subscriber settlement for the National Best Efforts elimination.  What I specifically mean is that it increases competition because settlement class members will have additional contract opportunities and can negotiate directly with those Greens.

I'm now going to move on to additional commitments. These all help transparency and efficiency.  The first one is a common appeals form.  This form that you see here is one that we negotiated with input, by the way, on our side from

the provider community and I'm sure from the Blues from -- from the Blues themselves.  And what has happened over the years, another one of these problem areas, has been that the providers don't know the rules or -- I should -- let me back up.  The providers don't know where to find the way to initiate an appeal or what form to use.  I'm not saying that happens to all providers but it happens to a lot of providers.

And by the way, for those providers who don't have a problem, they don't have to use this form.  This form is an option, though, for every settlement class member to use with any Blue, so they no longer have to wonder, How do I start an appeal when I have an issue?  They can use this form and it will start the appeal.

The next item that's addressed is third-party information.  A lot of times providers don't know if there's a third party involved in making a decision about eligibility of benefits.  They wonder who's making the decision.  Now they will be identified so that providers can better understand and predict those eligibility decisions.

We have -- I pressed the wrong button -- uh-oh, Susan.  I hit -- yeah, thank you.  Thank you.

The third-party information -- okay.  So preauthorization is the next area.  So preauthorization -- I'm sure everybody has read news reports about how preauthorization is such a burden on the healthcare system,

and there has been, for a number of years, an effort by the Blue Cross Blue Shield Association, the American Medical Association, and the American Hospital Association, to -- and including a consensus statement that I've -- that we've put on the screen to improve prior authorization process. And what we have here is a commitment by the Blue Cross Blue Shield Association to provide guidance to the Blue plans to keep improving in that area, to improve the preauthorization process in a manner that is consistent with and exceeds this consensus statement. And it's going to include recommendations on all aspects of preauthorization -- it's enumerated -- that will make this better for everybody, including patients.

Okay. So the next slide deals with minimum data requirements. The problem here has been that transaction data provided by Blues to class members a lot of times was incomplete. And what we mean by that is they couldn't tell who that home/control plan is. That's that out-of-area plan. They couldn't tell if it was one of those, you know, limited benefit plans where it's a narrow network, for example.

And now, under the settlement, the Blues have agreed to minimum data standards, and these, for example, it's going to identify those home or out-of-area plans for BlueCard claims in response to certain EDI, those electronic data interchange transactions. So that gets back to -- remember

the slide on the 270-271 transactions.  When -- and those are the ones that are required to be responded to in 20 seconds or -- if they're batched the next morning, or 72 hours.  Well, those responses to a 270 inquiry about eligibility will have this kind of detail, and that was never provided before.

There are also improvements in the offerings and best practices for value-based care.  Before, they -- the Blues, they didn't all offer value-based care.  Value-based care, by the way, is a model that focuses on the quality of care, provider performance, and patient experience.  It's -- a lot of providers prefer to use that type of compensation model.  It's not -- this is obviously not required, but what this -- one aspect of this settlement is that there's going to be offerings by all the Blues for the first time.

And the other problem that there was with doing value-based care, where it was offered, was that it was hard to do it and understand what the data was from the out-of-area plan because there were not -- there was not the required consistencies of information to be able -- for the provider to be able to take on the risk.  Now there are a series of best practices enumerated that will drive that consistency.

Another area:  Telehealth.  This telehealth relief will allow an out-of-state provider who performs telehealth to bill the out-of-state plan directly.  This is really another form of out-of-area relief.  So, for example, it opens up an

opportunity for rural health -- it's not just rural health but I'm using that as an example -- to access more out-of-state hospitals. When Ivy Creek Hospital, one of our class reps in Alabama, wants to -- has -- wants to or is able to contract for virtual-only services with an out-of-state provider, an out-of-state doctor, it can do so and that doctor can submit its claim directly to Blue Cross Blue Shield of Alabama. So it streamlines the process just like the other provisions in the settlement.

Okay. So now we're up to the final piece of the injunctive relief. This is compliance, monitoring, and reporting. The settlement provides for a comprehensive process. It ensures that the Blues will follow through with their commitments to settlement class members. Importantly, it will go on for five years, and that will be five years from the effective date. It doesn't start running on preliminary approval or final approval; it runs on the effective date, which is the date that triggers the injunctive relief, so that we have everything running simultaneously. The five-person monitoring committee will be two people selected by the providers, two people selected by the Blues, and one neutral.

And I do want to take a moment, because we worked really hard on establishing an efficient process that is not going to be expensive to deal with compliance issues. And so the process will start if there's a compliance dispute. Of

course, there's reporting requirements where we're going to learn, you know, when things are implemented and all that. That will be told to class counsel. I'm talking about when there are eligible disputes. The monitoring committee gets formed 15 days after the effective date. If there's a settlement class member grievance received, the provider monitoring committee members will evaluate those. If they evaluate them and they determine they're not -- they don't have merit, then they'll be dismissed. And there will be a log kept and it will be reported to the monitoring committee. But -- and by the way, if there's some urgency to the situation, we've agreed -- we can agree to expedite. The --

THE COURT: How does that -- does that require agreement of all?

MS. KALLAS: For a shorter schedule?

THE COURT: Yeah. You say in the double-asterisk footnote if provider --

MS. KALLAS: Yes, it does, but again, subject to a neutral. And I don't --

THE COURT: So you have a neutral who could break a tie if there is a question about whether --

MS. KALLAS: Exactly, exactly, right. But we've worked -- I think you'll see from the process here we're really trying to work it out. There's opportunity here, although we keep a tight schedule because we think that's

important -- there is opportunity here for the provider representatives to talk to the Blue representatives and try to get to the bottom of what might just be a misunderstanding. That happens -- I've been involved in other compliance processes for these -- for injunctive relief settlements and that sometimes -- you know, that can be very effective.

But if the monitoring -- provider committee monitoring members believe that there is merit and that they were given notice of violation to the Blues monitoring committee members for investigation, again, this would be another opportunity for maybe something to be worked out. Then within 30 -- I'm sorry -- within ten days, the defendant monitoring committee members will give an action plan to the provider managing committee -- monitoring committee -- I'm sorry -- monitoring committee members. And they'll describe what they intend to do, and then they will -- 20 days later they will provide a final response. So again, you have 30 days in there where we could also be talking about whether it can be resolved or whoever is involved can be talking about it.

And when we get that business -- that action plan, we may be satisfied with it, you know, and then no further action. Maybe the Blues say, Yeah, they're right, we're fixing this, and no further action would be necessary. But if they don't -- if we don't think that it's sufficient, the provider monitoring committee members will file a response to

the full monitoring committee itself.  And then -- and that will happen within 30 days.  And then the monitoring committee as a whole will have 30 days to determine if any additional actions need to be taken.

So this is a really short time frame, intentionally so.  Everybody will get focused on things, resolve them, or it gets decided, so that -- and that we worked very hard to do because this will cost providers nothing extra to take advantage of this.

I think that, Your Honor, unless you have any questions about the injunctive relief, I'll let Joe --

THE COURT:  No.  That was very informative.  Thank you.

MS. KALLAS:  Okay.  Good.  Thank you.

THE COURT:  I was told by my court-appointed neutral that it would be.

All right.  Mr. Whatley, whenever you're ready.

MR. WHATLEY:  Judge, what you're about to see is that somebody who studied music performance at Julliard is a lot more creative and entertaining than somebody who studied economics in college.  And so --

THE COURT:  Which are you?

MR. WHATLEY:  Especially me, true.

I'm going to start by addressing the monetary relief. And, of course, as you already know -- and -- the first slide

is really to address the monetary relief for the class as a whole. And the monetary relief, the Blues have agreed to pay $2.8 billion, which is even more than the subscriber settlement. And what you said the bottom line was, in the subscriber settlement, on the monetary issue applies totally to this case. The bottom line is this financial settlement is one of the largest ever in history, particularly considering that this is a private enforcement action. And you can say that about this case as well.

And the -- as you'll see -- a key thing is there's no reversion here, Judge. No money will go back to the Blues. So it'll all go out in payments to carry out the settlement and its various components with an overwhelming majority of the money going to pay out of the damage funds in the settlement.

The -- now, I've talked about, in the previous slide, the relief to the class as a whole. Let's talk about class members. In this case there will be many class members who will recover millions of dollars. That's extraordinary. I don't know of many class settlements where that has been true, but that will happen here. And they will do so by settling claims that they have not brought. I think in various discussions you've made that point that there have been a lot of health -- major healthcare providers that haven't brought claims over the 12 1/2 years or so this case has been pending.

They haven't had to bring claims.  They haven't had to litigate them.  They haven't had to produce --

THE COURT:  They saved a lot of transaction costs.

MR. WHATLEY:  They saved a tremendous amount of transaction costs and they will still, many of them, recover millions of dollars.  And that in itself is extraordinary for the healthcare providers of America.

Now, what do they give up?  What do they release?  We made sure to include -- and what you see in this slide is the definition -- it is from the definition of release claims in the settlement agreement.  There are specific exclusions, and it's worth reading subpart B.  Of course, they don't release their claims as plan sponsors or subscribers either, but they don't release their claims, whether a settling individual Blue plan properly paid or denied a claim for a particular product or service or benefit based on the benefit plan document, the provider contract.  And notice it starts out with the benefit plan document, Judge.  Those apply to out-of-network providers just like they apply to in-network providers.  And it also goes on to say or state or federal statutory or regulatory regimes.  This is where the basic disputes are, not just between providers and the Blues but between the providers and health insurance companies generally, people like United Healthcare, Aetna, Cigna, Humana.  But these are the claims.

Those claims are not released.  Of course, if they

tried to go ahead and make a conspiracy claim about the Blues limiting their -- agreeing not to compete the claim in this case it would be an issue, but this only releases the claims that are at issue -- it releases claims that are relevant to this lawsuit, not all the other claims -- the ordinary business claims that are out there.

Now, right now, why does this settlement make sense? And I emphasize "this" settlement.

THE COURT:  Let me ask you a question.  Do you think you've had enough time to evaluate your claims in this case?

MR. WHATLEY:  Your Honor, I can say with -- absolutely positively no question about it, we have.

THE COURT:  You notice I saved that question for you, not Edith.

MR. WHATLEY:  I know.  And I appreciate the levity with which it was made.  But absolutely, Your Honor.

But, you know, you have now -- unlike the subscriber settlement, you have now ruled that -- when you were considering it -- you have now ruled that going forward for any claims that have injunctive relief here, we're in the rule of reason world.  Providers in America are in the rule of reason world based on your rulings.  And there is no way that we could get as much injunctive relief as we can in what Edith has described to you.  If we went to trial -- and I don't mean just one trial, because this case can't be tried in one trial,

but if we went to trial and tried this case over and over and over and over again all over America and won it every single time, we could not get the injunctive relief -- or all the injunctive relief that Edith described.  The defendants even say that we could not get the vast majority of it.  Now, whether we're -- they're right or wrong, we'll save that for another day.  If this settlement's approved, it's irrelevant whether they're right or wrong, but they are arguing about what you can get and can't get in a rule of reason case, which is clearly an issue.

Now, what are the -- what are the uncertainties and significant risks we've got?  If we were to go forward and -- to get to a point where we could get relief for the class, the settlement class here as a whole, we'd have to start out by certifying a class here in Alabama.  I mean, just -- let's just talk about Alabama for a minute.  Then to get to that -- after we got certification, the Blues have said they would intend to file more summary judgment motions.  And assuming we got past those or maybe you didn't let them file them, we'd have to go to trial.  We'd have to win before a jury.  And if we did that, I'm sure you would have posttrial motions.  I'm going to talk about those in a second.  And if we won the posttrial motions, we'd have to go to the Eleventh Circuit and have to convince the Eleventh Circuit we were correct.  And no doubt, the Blues would petition the Supreme Court if we won

there.  We would have -- and that's just Alabama.

We would have to do all of this starting from scratch, frankly, with a lot more discovery in addition, all over the country, in every service area in America if we were going to be able to get the kind of relief we've got in this case. That's a lot of risk and that's a lot of risk to evaluate. And I don't think anybody can think that you would ever succeed in every single trial all over the country in America, especially when you face the kind of formidable opposition that we would face and that you've seen from the Blues.

I mean, there are lots of issues.  I don't have to go through them.  The Blues are still talking about two-sided markets and their trademarks.  You denied summary judgment on that.  We have to go to trial on that.

And let's just talk about the posttrial motions. Frankly, Judge, this is kind of personal.  If you -- in the slide I've got up now, the first is the Pickett v. Tyson case. The second is the Cox Cable case.  I gave the final closing arguments in those two cases, and I felt really good when the jury came back with the kind of verdict they did, especially the Tyson case.  It feels great to get a $1.3 billion judgment.  In fact, I went out with a friend, Nick Roth, who's sitting in the courtroom, and had a drink or two after that. But you know what would have felt a whole lot better, Judge?

THE COURT:  Collecting on some money.

MR. WHATLEY:  Even if it was only part of that $1.3 billion, I would have felt a lot better and my clients would have felt a lot better if we had accomplished it.  So you don't have to tell us that there are risks with going to trial even when you win.  And that's -- that's where we stand and that's where the providers of America have to consider their choices in this case.

And it's not just us.  You know, Susman Godfrey firm, Steve Susman had a close connection with Alabama because he clerked for Justice Black.  And our friends at Susman Godfrey went out in Los Angeles recently and got a $4.7 billion verdict in the NFL Sunday Ticket litigation.  It's already been taken away.  They have to go up and try to get it back, but right now they got zero, and that's a danger for everybody.

Now, another important thing about this case, Judge -- and Edith touched on this already -- is there's no mandatory (b)(2) settlement here.  Opt-outs are not bound by the settlement.  And, of course, you can't have your cake and eat it, too.  Since opt-outs are not bound, they are not entitled to any of the relief, monetarily or injunctive.

Now, let's turn to the standards for preliminary approval and let's start with 23(e)(2).  And I want to start the discussion about front-loading.  And what you have in front of you is not just the preliminary approval package.

You're really in an extraordinary position.  You were in the subscriber settlement, too, by the way, but you're in the extraordinary position because you have class -- an Alabama class certification motion that's fully briefed, evidence submitted by both sides for it and against it, expert reports presented by both sides for it and against it.  In fact, you've even gotten merits expert reports on both sides submitted.  And you have all of the experience from the 12-plus years of this lawsuit pending and going forward and many motions and many hearings and many rulings.  You have all of that background that comes into your front-end-loading considerations.  So there is a vast, vast amount of stuff, and I'm going to get to some examples of how that really plays in in here.

But let's look -- and, of course, I'll turn briefly to the Bennett factors after the 23(e)(2) factors, but -- and there's so much overlap that it seems to me it's almost -- I don't really understand why you do both, but we'll do it.

On 23(e), the first is that provider plaintiffs' counsel adequately represented the class, and there can't be any question.  In reviewing it, Judge, we have -- settlement class counsel, all the provider counsel, have invested more than 500,000 hours in this litigation.  We have invested $100 million in expenses.  I'm not taking lodestar now from the 500 hours.  I'm talking about hard cash.  I'm talking about

the money spent in expenses over 12 years of litigation.

We've won many, many important rulings, and as Edith pointed out, we've consulted with all sorts of different kind of providers to make sure we were litigating in the right way and we were negotiating in the right way on important issues. But it's clear that we have adequately represented the class.

The second 23(e) factor is that we've negotiated at arm's length. Well, read what Ed and Kip said. That's all you need to do.

The relief itself is more than adequate. You've heard Edith talk about the injunctive relief. It's outstanding. It's more than we could get if we won at trial. The money, the bottom line, as you've said, is absolutely -- it's more than adequate. And of course, it's not just the 2.8 billion; it's also the hundreds of millions of dollars that it will cost to carry out the injunctive relief in addition to the 2.8 billion that's being paid into the settlement fund. And proceeding to trial would have had a huge risk. I've already covered that.

The plan of distribution, which I'm going to talk about more in a minute, and, you know, especially as it relates to the filing last night, the plan of distribution is clearly designed to be fair and reduce the administrative burden for all class -- settlement class members as much as possible. And the proposed attorneys' fees, which, of course,

you'll get to much more specifically later, is well within the Eleventh Circuit's range, which is the law of the circuit.

The settlement class treats class members equitably to each other. I mean, the recovery for everybody is based on their unique circumstances, the allowed amounts that they've been -- either received from the Blues and -- let me back up, because allowed amounts is something we're going to talk about more. What is that? You know, when a -- under the -- either the insurance policies or the employee benefit plans or the provider contracts for those that are in network, there are certain allowed amounts for various services, and that means how much in total the provider would get for the service. I say in total because it includes the patient responsibility amounts, copays and deductibles, for in-network providers. And for out-of-network providers, they can collect far more than that from patients, but that's another issue. But the allowed amounts is the amounts that they are -- that the Blues are obligated to pay plus the patient responsibility amounts.

Now, that is especially important, as you'll see as we go through this, for out-of-network providers because many Blues, including Blue Cross & Blue Shield of Alabama, have a common protocol that they don't pay out-of-network providers directly. They pay the patients. But in this settlement, we didn't just allow the out-of-network providers or any provider to credit what the Blues pay them. It's the whole allowed

amount, even if it was paid to the patient, that the out-of-network providers get credit for.

And finally, the individual circumstances are based a lot on the geographic location, and I'm going to get into that a lot more as I go through this.

To make sure there was equitable treatment among the class members, we went out and hired the best people available to do that. Mr. Feinberg and Miss Biros decided the allocation. They're the ones that approved the plan of distribution. They -- so we got the leading experts to do that, and they have submitted reports and two different declarations to you about that.

Now that we've gone through the 23(e) factors, let's look at the Bennett factors just briefly, although, as I said, there's huge overlap. Again, success wasn't guaranteed. In terms of the relief, the injunctive relief exceeds what we could have possibly gotten, and many, many providers out there believe that the injunctive relief is the most important relief we've got there. You saw the quotes at the start. We got what healthcare provider representatives, both facilities and professionals, had been trying to get for decades. The money, your bottom line statement says it all.

And here is -- you've had a lot of information. You've had expert reports. You've had summaries of -- publicly filed summaries of expert reports about potential

damages in Alabama.  And some people would say, Oh, well, you can just translate that, multiply it times 50, or consider the Alabama population and compare that to the rest of the country.  No, you can't.  No, you can't.  And here's why not. A big, big factor in their whole analysis -- there are others, too, but a big factor is what is the Blues' market share. They're combined in their -- in state their local Blues market share and the market share they get through the BlueCard program.  What is that percentage?  In Alabama, it is approximately 85 percent.

THE COURT:  That might have had to something to do with the case being transferred to this district or centralized in this district, but the litigation.

MR. WHATLEY:  Well, Judge, that's certainly what I told the MDL panel why they should send it here.  But in -- that's the highest percentage in the country.  The national -- nationally, the Blues have -- and I'm talking about commercial members now, which is what's relevant to this case, because this case doesn't involve things like Medicare damage. Nationally, the Blues percentage is 44 percent, just a little over half.  And of course, by the time you factor in what -- the 85 percent number in Alabama and some others that are high, but by the time you factor in Alabama, obviously there are many, many states in the country that are way below the 44 percent average.  But the point is the vast majority of the

states in this country have a below-50-percent market share, and that's an additional risk factor, whether you're talking about litigating this case in New York City or Miami, Florida, or wherever.  There are hugely increased market shares, and you can't just extrapolate the Alabama calculations and estimates to other states because the other states don't have the same kind of market share.

And so when you really consider the enormity of the injunctive relief, this is a hugely -- the recovery here -- even if you could get it -- represents a huge proportion of what could be recovered.  And I'll remind you, you can't get that relief in one trial.  You can't get that relief in a dozen trials.  It probably would take at least that many in Alabama alone.  You can't get that relief in a thousand -- without going through a thousand trials, and nobody -- nobody -- wins -- has a perfect record in that number of trials.

The reaction to the settlement has been very positive. If you look at -- I guess that's item 5.  Item 4, you know, I've already talked about the complexity, expense, and duration of the litigation.  You have, too.  There would be a whole lot more if we had to litigate this the whole way, and the stage at which the preceding was achieved, well, it's more than 12 years into it.

Now let's turn to the plan of distribution.  And here I'm going to hit on several points, Judge.  There's the

allocation of the net settlement fund between the facilities and the professionals.  There's the distribution of the hospital/facility net settlement fund.  There is the distribution of the professional net settlement fund.  There's potential review of the claims, and there's what happens with the balance, because there is no reversion here.

There are two types of providers, of healthcare providers:  There are facilities and there are professionals.  There are facilities.  The facilities include the general acute care hospitals, like UAB, for example, like Brookwood, like many hospitals all over, like our hospital class representative, such as Ivy Creek Hospitals.  Those are facilities.  There are also other kinds of facilities, like ambulatory surgery centers.  And in terms of medical billing, those facilities bill facility charges to account for the facility.

There are also medical professions.  There are doctors, and as you know, there are a large number of doctors who can't participate in this case, and I'll talk about that in a minute.  But there are all sorts of other medical professionals.  There are physical therapists, there are chiropractors, there are psychologists, and on and on, nurse practitioners.  Those are healthcare providers, and they bill professional claims from the medical doctor and many others. There are CPT codes that govern those that are established and

modified and approved by the AMA.

Now, what has happened in the case, though, Judge, over the course of this litigation is that you've seen a transformation of healthcare providers. You have seen -- when this litigation started, and especially if you go back in the -- earlier in the class period, most healthcare professionals, most doctors, for example, practiced in small groups. I think the figure was something like 80 percent around 2010. Over time, more and more and more doctors have gone to work with healthcare systems and other -- and organizations affiliated with hospitals. And so, now, more than 50 percent of all doctors work for those entities instead of practicing in the small groups. If you add the large medical groups to the equation, then you're up close to 80 percent in either large medical groups or working for healthcare systems or organizations affiliated with hospitals.

What that means is there are going to be claimants in the settlement who are filing both facilities claims and professional claims because they have many, many professionals working for them. Now, what does that mean -- and we went to -- we went to Professor Issacharoff, and we said, How do we handle this issue when you have the situation where you have many -- many of the class members will have both -- will have both professionals and facilities? And he said, You can't subclass; you can't subclass in that situation, because

subclasses are about people or legal entities, they're not about claims. So what you've got to do is you've got to set up a process like we've set up, with his advice, where Ken Feinberg comes in and addresses the issue independently, and that's that we did.

Now, stepping back just a second on out-of-network providers or even out-of-network providers who work in emergency rooms or emergency departments in hospitals, as our worthy opponent Craig Hoover has told us multiple times, even when we were representing out-of-network providers against some of his clients, out-of-network providers come in network and they go out of network. We have also gone to experts and said, Is that really true? Of course, I'm not saying Craig would mislead us in any way. Turns out he was absolutely correct. But out-of-network providers, they do go in network and they go out of network.

In consulting with people like Matt Katz, who spend their lives studying these issues, he says with a class period as long as you have, from 2008 to the present -- or till October the 4th of 2024 -- let's be accurate -- there are hardly any providers, any doctors, in America who have been out of network for that whole period of time. Again, you've got the subclass issue. You can't subclass if they both -- and say we've got a out-of-network group of providers to be subclass when part of the class period they were in network

and part of the class period they're out of network.  I think the objection that was filed yesterday -- last night seems to acknowledge that even they have doctors that are in network, or their affiliated groups.  And doctors do go in and out, and you can't subclass in that situation.  And that's exactly what Sam's deals with, because subclasses are different individuals, not different claims.

Now, so with that background, we went through the process after Sam advised us to set up a process.  We as class counsel weren't getting into what the interclass division of the monetary amount would be.  That would be done by the leading expert independent people, Ken Feinberg and Camille Biros.

THE COURT:  And exactly what was Mr. Feinberg's role here?  He wasn't operating under Rule 53.  He was providing a report to the Court on what he thought was a fair allocation?

MR. WHATLEY:  Yes, sir, and he did.  He did.  His report is attached to his first declaration.  And to do that, he set up this entire process.  We got large numbers of healthcare providers, both class representatives and class members, including several of the largest healthcare systems in America, to participate in this process, including academic healthcare systems.

THE COURT:  Walk me through the process.

MR. WHATLEY:  And so what we did was first we and Sam

communicated with Ken Feinberg and Camille Biros and set up the process.  The first step was --

THE COURT:  Did he give you input about what he thought the process ought to look like?  Or did you propose and he tweak?  Or was it something in door number three?

MR. WHATLEY:  Well, I would say it is door number one plus.  I would say Professor Issacharoff had a lot of input into setting up the process, number one.  But beyond that, I think Ken and Camille set up what the process would be.

THE COURT:  So you relied upon Professor Issacharoff as an ethics expert to kind of propose a process, submit it to Mr. Feinberg, and there were adjustments based upon his feedback.  Is that a fair --

MR. WHATLEY:  That's a fair -- I mean, I think the adjustments are more specifics based on Ken's vast experience, but, yeah, I don't think --

THE COURT:  Oh, I would expect he would have some suggestions based upon his experience, but I'm just -- in other words, this was not a situation where class counsel said this is the process we're going to use and gave it to Issacharoff and Feinberg and said, Let's use this?

MR. WHATLEY:  No, absolutely not.  And so --

THE COURT:  That's a more blunt instrument way to ask the question.

MR. WHATLEY:  Well, you hit the nail on the head.

The next point was there was a session held with all of the participants in which both Ken and -- we, along with Ken and Camille, described what the process would be so that everybody knew.  That was the next step.  The -- and by the way, the various participants -- there were a lot of independent counsel, inside counsel, outside counsel.  There are some provider class counsel that had close relationships with various class representatives that participated, but many of the participants had their own lawyers in the process.

And then the next step was our economic experts gave a presentation with everybody on on what the allocation -- they -- what their analysis said the allocation ought to be.

The next step was that each group of different kinds of providers had their own individual confidential sessions with Ken and Camille where they gave feedback, their reactions, to what the experts said.  And there were multiple sessions that included those.

Ken and Camille then had a -- an in-person final session to go through everything.  We -- in light of the -- you know, you had a lot of people with difficult schedules, and everybody had the option of either being in person or on by Zoom in the process.  And we had that process, and after the final session, Ken then -- Ken and Camille came back and issued their report where they said what the division should be, the 92 percent for facilities and the 8 percent for

professionals.

So that was the overall process, and there were issues raised throughout that process, a number of different issues. Ken and Camille talk about that in their report. It's filed with you and I'm sure you've seen it.

To give you some context about their allocation, physicians -- as you know, early in this case, we went to Judge Moreno because of prior rulings he had made, and before we filed claims on behalf of medical doctors who had participated in the Love settlement, we asked Judge Moreno to allow us to proceed before you, and he ruled against us. And we appealed that to the Eleventh Circuit. And after some lengthy delay, I think with Judge Tjoflat writing the decision, they ruled against us. Later on in this litigation, we came to you to try to limit the impact -- the effect of the Love rulings, and you ruled against us.

THE COURT: I see a pattern here.

MR. WHATLEY: There is. On this series of rulings we were on the wrong side. But, I mean, we were -- it's not -- we didn't accept the Love issue lying down. We tried to fight it at every single level and in every available forum, but the point is, based upon the rulings by multiple courts, including the Eleventh Circuit, 65 percent of the payments to physicians that would be calculated in the class are excluded. So that's the reason -- that is one big driver of the professional --

and, of course, physicians are the largest professional group in terms of money the Blues pay out, and that's the reason for -- the first big driver of the percentage for professionals.

The second is that the expert -- the economic experts, based on their analysis -- and they had, remember, the biggest amount of claims data ever, and this is the analysis that's in the expert reports that you've had and, you know, the executive summaries that everybody has, that the challenged conduct to the Blues affects impacted facilities approximately three and a half times as much as it affects professionals.  I can get into why that is, but it is clearly their opinion and they explained it and Ken and Camille found that to be correct and compelling.  And they ultimately reached the conclusion they did about the allocation.

And so now let me -- let's turn to the distribution of the hospital/facilities net settlement fund.  What we've done here -- there are obviously -- there are facilities and systems in this country that are highly sophisticated, very large businesses that have very capable IT departments and IT capabilities.  There are rural hospitals and perhaps other small hospitals that have very, very limited IT capabilities.  And there are other kinds of facilities, like ambulatory surgery centers, that fall in both of those categories.  We wanted to make sure we had a settlement that worked for both groups, and so we have an option A, which is available to

almost all facilities in the country, where they can rely on calculations made by our experts using their extensive analysis from all the data that was available -- and they have data through 2014 elsewhere, 2015 in Alabama -- and they then extrapolate that through October 4th, 2024, to come up with damage -- percentage damage estimates, and -- from around the country.  And a hospital that doesn't have -- that doesn't even want to do more work or doesn't have the capability of doing more work can file a claim and not submit any data with the claim and get paid based on the experts' analysis.  It's a really simple process.

On the other hand, the ones that are capable of providing more complete information, they may be able to get more money by doing that.  We think many can.  They have the option B of doing that.  So we provide a fair opportunity to do both ways regardless of what the capabilities of the facility class members are.

Now, again, why did we use allowed amounts?  There are multiple reasons, and one reason was we wanted to account for the patient responsibility amounts, which are also affected by the total allowed amounts, but a second reason is we wanted to be completely fair to the out-of-network providers.  And so an out-of-network facility, just like an out-of-network professional, would not -- under the Blues protocol in places like Alabama, would not get paid.  They would pay the patient.

But that still counts.  It counts just as much as if that provider were an in-network provider.

And so that's what's crucial is really to bring about fairness to out-of-network providers as well as to cover the -- to cover the patient responsibility amounts to get a complete picture of what those were.

And, of course, you've got to remember the out-of-network facilities aren't limited by those copays and deductibles like the contracted Blues providers are.  The out-of-network can require that their patients pay the full bill charges.

Now, I think I've described what has been done and -- by the experts, actually going through in terms of what's on slide 66, and what will happen is that every provider will have -- from the -- there will be a coefficient percentage that will be applied to their total allowed amounts.  That coefficient will then go through the formula that's on slide 67, and that will be divided into the total -- I mean you'll go into what's available from the total fund and the total fund will be paid out.  If there is any money here or in the professional fund that's left over from returned checks or anything like that, that's to be handled, too, and I'll get to that in a minute.

But what we've done here is to try to come up with a simple -- as simple a process as possible while dealing with

the -- an efficient process as possible of dealing with the claims in the case and how you handle the claims in the case.

Now, how did we deal with professionals?  And I've talked about what's happened to professionals in this country during the class period.  We also, in addition to what's happened to professionals in the class period as they have, you know -- it is going to be very difficult for a professional who left a -- was in a small group practice, let's say, in 2016 and went to work for a system, going back and being able to replicate that information will be difficult.  It would be a burden on professional providers to come up with that information.  And we've had this kind of experience in the past, so that the simpler the process is for professionals, the better it is, the more effective it is and the more -- you know, it is -- people are able to participate in it better, and it means that people are able to recover their money.  And that's true for out-of-network providers and in-network providers.

We had experience in the managed care litigation where we inherited a complex procedure for doctors and it's been a disaster.  What we were able to negotiate, for example, the one with Craig in the Anthem-Wellpoint settlement, a simple procedure that is almost just like the one we propose here and it really worked well.

So what happens is that instead of using, you know,

more individualized facility information like we did in the facilities, we allow the doctors to fall into bands, and they simply check a box.  I had this much in allowed amounts during the class period.  And they fall into categories and they get a certain number of points based on what category they're in. I have to tell you, Judge, most professionals are in the bottom three categories.  It surprised us.  We thought the numbers would be higher.  We had the experts run the numbers and extrapolate them through 2024.  Most professionals that -- overall -- of course, we don't know what the claims will bring, but most professionals are in the bottom three categories.

So you get -- but whatever category you're in, you get a certain number of points.  And then those categories are multiplied by a coefficient that is similar to the coefficient that's involved in the facility settlement but a whole lot simpler.  What we did was to develop state-by-state coefficients with the exception of where there's Blue-on-Blue competition.  And why do we do that?  The reason is that where there is Blue-on-Blue competition, the biggest Blue is always going to have a much smaller percentage than you'll see other where -- other places.  You know, for example, you won't see the kind of percentage in upstate New York by the biggest Blue that you see in Alabama ever, or in central Pennsylvania or in California or in Washington or in Idaho where there's

Blue-on-Blue competition.

There are also other states where the Blue, for historical reasons, has a very small market share, for example, Nevada. And what you have is those states and those areas that have a small market share have a smaller multiplier. Those states are areas that have high -- and to be clear, taking central Pennsylvania as an example where there's Blue competition, you have -- we have different calculations for western Pennsylvania, where you have Highmark, and southeastern Pennsylvania, where you have IVC, because you don't have the Blue-on-Blue competition there. Same is true, for example, in New York City and western New York compared to upstate New York. So we did make differences to account for the Blue-on-Blue competition. But otherwise, it's a state-by-state analysis in places like Alabama, with the highest market share coming out at the top, and places like Nevada, with a very low market share come out at the bottom. And so those are end ranges also. There's a multiple. You get a certain number of points. It is a really easy process to do for the settlement claims administrator. Adding up the number of points, you divide the number of points. You know, a point becomes worth a certain amount of money and the whole amount is paid out. And that's what, in a -- you see on slide 71.

Then we've got processes built in for review of

claims, discretion by the settlement administrator for this to be a process.  No doubt, Judge, because of the various transactions, we're going to see some conflicting claims.  Every -- by the way, every provider in the country either has what's an NPI, which is a specific number applied to the provider, or, if not that, a tax identifier, and so they would be submitting those numbers.  If there are conflicts within those identifiers, then the settlement administrator will work it out.

And finally, if there is any balance in any of the damage settlement funds -- and those should be minimal -- the first consideration will be is there enough money there to have a supplemental distribution.  And, of course, that will happen if there is.  If there's not, the money goes into the notice and administration fund.  Why does it go there?  It goes there because that's how the monitoring and compliance process is going to be paid for, and that is a crucial component of this relief.  And if there is money left over at the end of the five-year period in the notice and administration fund, if there's enough money to go out to settlement class members, that's what happens.  If there's not, then the money will go to an entity that the monitoring committee has to approve to enable providers to promote high-quality healthcare.  It does not go back to the Blues.  There is no reversion.

And now if we can turn to the standards for notice. And do we have the copies?

Judge, could I hand up the copies of things we filed yesterday?

THE COURT: You may.

MR. WHATLEY: And we're putting together one for Sally and -- I mean, you know what the standards are. We were working on, you know, trying to make sure everything is totally clear on the notices and --

THE COURT: I handed my copy off because Sally already provided me copies of all of these before the hearing. So you don't have to give her -- I've got a copy, she's got a copy.

MR. WHATLEY: Okay.

These are the -- if you've got any questions about the notices or the claims forms, there are a couple of things I want to bring to your attention about them. But, you know --

THE COURT: Well, first, they were reviewed by Feinberg and Biros?

MR. WHATLEY: Judge, first they were reviewed by Feinberg and Biros, and -- the notices, all the claim forms, of course, and they were also reviewed by Ed and Kip and --

THE COURT: That was my next question.

MR. WHATLEY: And it -- they all had edits in the process to do that.

THE COURT: Of course, reviewed by Blues counsel?

MR. WHATLEY:  They were.  And they were reviewed by -- they were reviewed by BrownGreer, who is the settlement notice administrator.

THE COURT:  Right.

MR. WHATLEY:  BrownGreer also retained, as part --

THE COURT:  Did Judge Clemon have a chance to look at them?

MR. WHATLEY:  He did.

THE COURT:  All right.

MR. WHATLEY:  By the way, Judge, you mentioned Judge Clemon not being here.  Monday night we got a call from Judge Clemon telling us things we needed to be telling you, and we incorporated all of everything he said in the presentation.  Unfortunately, he wasn't available yesterday but he did send some texts to Edith.  I think maybe Michelle wouldn't let him make phone calls, but --

THE COURT:  Now, Michelle is going to be more permissive than Barbara.

MR. WHATLEY:  Well, maybe it was Barbara.  I thought it was Michelle.  But in any event, I want you to know he was having input by text as well as late as yesterday.

THE COURT:  Fair enough.

MR. WHATLEY:  But also, the other one involved in the -- especially in the media notice is Signal and which BrownGreer had -- and by the way, Roma's here from BrownGreer

to --

THE COURT:  They stopped by and said hello this morning.

MR. WHATLEY:  And, you know, Ed has had -- Ed and Kip have had weekly Zooms with us and BrownGreer and Signal, and Roma has led their group in every single one of them.  But to speak to Signal for just a second, when we started putting the notice campaign together, the other person we talked to, of course, is Professor Issacharoff.  And Professor Issacharoff said, Look, in terms of notice, the best people I see out there are Signal; I want you to really consider using Signal.  And it turns out BrownGreer at the same time was involving them in the process.  So multiple people were involved in that.

But I want to highlight something here on this slide, because this is an all-in settlement and it's really, really important that it be efficient and cost-effective.  And working with Ed and Kip, there was a rigorous bidding process.  There are budgets.  There are caps.  There are -- all of that which we need to do to try to make sure that as much money as possible goes out to class members.  And by doing that and working closely with Ed, which we have a motion pending on, too, is -- it has ensured that that will happen.

I want to just talk about what happened yesterday as an example that's --

THE COURT:  Okay.  Let me just ask this.  We've been going two hours.  It may be time to stretch our legs for a second --

MR. WHATLEY:  Sure.

THE COURT:  -- and let you pick right back up after a 15-minute break?

MR. WHATLEY:  Sounds great.

THE COURT:  All right.  Let's take about a 15-minute recess and we'll be back.

(Recess taken at 11:33 a.m. to 11:55 a.m.)

THE COURT:  All right.  Ready to get back started?

MR. WHATLEY:  Should I proceed, Your Honor?

THE COURT:  Proceed when you're ready.

MR. WHATLEY:  Okay.  All right.  Your Honor, going back, just making sure I point out a couple of things, one is the plan of distribution, which was -- which is -- is the document that describes how the damages fund will be distributed and which -- which is the document that sets out that all the -- all professionals are going to be treated the same, all facilities are going to be treated the same, but that document which is, I guess, a subject of the -- I can't tell whether it is or not to the document filed last night -- was approved and modified by Ken and Camille and by Ed and Kip, and all of that was reviewed by all four of them and was part of -- as part of our submission and our process.  And, of

course, the issue of not being able to have subclasses, which, of course, means it's impossible to have subclass representatives, was an issue that we were advised on throughout the process by Professor Issacharoff.

Now, there's -- it's been brought to my attention that I made one mistake and that is on the issue of the -- any rever- -- if there's money left over in the notice and administration fund, in fact, that goes not out to class members and, in fact, that would go to the entity we described, and the reason is because of what I was getting to earlier, and that is we've had this -- and have a very vigorous budgeting and cost-saving efficiency process in here to make sure we're not putting more money into the notice of administration fund than we will need.  What -- and the point I was about to make is -- when we took the break -- was yesterday morning, actually -- well, to be multitasking, while I was eating breakfast, I was on the phone with Ed.  And Ed said, Look, let's put these modifications in to encourage electronic transfer of funds out of the damages fund.  That's where the money's paid out to all sorts of providers directly there, from the damages fund.  Let's put these incentives for electronic payments, and by doing so we can save --

THE COURT:  You will save a ton of money on checks, postage --

MR. WHATLEY:  $3 million was the figure Ed gave.

SPECIAL MASTER GENTLE:  Yes, sir.

MR. WHATLEY:  And that's a very important consideration to make sure that we not only have a budget but that we stay within the budget.  And that's what Ed is -- and Kip are working very hard on.

THE COURT:  And more globally on that point, my understanding is you are going to rely a lot on them, Kip and Ed, to help administer this and keep it within budgets.

MR. WHATLEY:  Well, Judge, that's why you have a motion.

THE COURT:  Yeah.  That's your proposal, though, right?

MR. WHATLEY:  Yes, sir.

THE COURT:  Yeah.

MR. WHATLEY:  That's -- but there's a motion before you on that exact point.

THE COURT:  Right.

MR. WHATLEY:  The -- in terms of the notice campaign, we have -- we have been able to find -- you know, going back to -- we talked about the front-end-loading and what's in the 2018 amendments.  There's also, in those 2018 amendments, information about notice and -- in the comments about how we've moved into the -- a new world technologically, and email notice is a real -- is a real possibility that should be considered and used.

We have been able to reach out -- we actually found both a net entity known as Definitive and also an AMA vendor where we're able to get a very significant percentage of email addresses of class members. Now, by doing that, there's some up-front cost to getting the email addresses, and Roma's been working on that. But by using the email addresses, we then save postage and we'll save future -- any kind of -- the savings will go forward in the future. So we will wind up being able to use a very significant percentage -- have email addresses and we'll gather more. That's one of the things Ken and Camille wanted to make sure we got is an email address for every claimant. We will gather more to make sure we're using email communication, which, just like all the stuff Edith showed, where we got, you know, responses in 20 seconds to whether somebody's eligible as opposed to being on the phone for God knows how long, and the savings that produces for healthcare providers. The same thing as in administration of the settlement, it produces savings.

The -- in terms of the targeted Internet advertising, there's an important point here, and that's why Signal and BrownGreer have been really important in working through the best practicable notice plan. The vast majority of dentists and opticians or optometrists are not class members -- settlement class members. They are if they provided services under the medical insurance policies, the commercial medical

insurance policies, of the Blues.  But the vast majority of, for example, dentists don't do that.  And for that reason, most dentists, including one of the class reps we had initially, or that we dealt with or maybe multiple ones, were really never in the conduct we're challenging and never in the class.  We addressed that in -- I think in our motions we filed in 2019, in our class cert motions.

But the important point here is for notice, it's -- it means if we sent a notice out to every dentist, we would create huge confusion, and a lot of them would believe they're in the class and we'd have claims that would cost extra money to deal with.  We would create expectations that were unfair.  That's not something that any of us want to do and, therefore, Signal has worked hard to have a targeted Internet campaign for class members like that, where direct mail notice really doesn't work as well.  And that's one of the things that they've been able to do.

In terms of the earned media, we have been able to get a lot of publicity about the settlement, and that's important, so people are aware.  We -- and have been in communication with provider associations, and notice efforts will go out to provider associations, the American Hospital Association, the federation and other hospital associations, state hospital associations, the AMA, ASMAC, which is the organization of medical association lawyers, state and specialty medical

associations, all sorts of other groups of providers, to make sure they're informing their members about it. And they all direct people to our website where all documents are available that have been filed related to the settlement.

Now, as soon after preliminary approval, there will be a settlement website and the documents will go there as well. And that will be another resource for all of the class members and for updates on what's available and what's happening in the case.

The content of the notice, you see the declaration from Ken and Camille on slide 79. Also, Ed and Kip approved the notice. In terms of the edits that you got as late as yesterday, the four of them had approved every single edit, even the ones that were made as late as yesterday morning we were talking about.

Clearly, the notice plan is the best practicable, and again, Ken and Camille have addressed that. Ed and Kip have addressed it. By the way, the 70 percent of the class direct notice is what's in the Federal Judicial Center documents talking about that being a high percentage. Based on everything BrownGreer and Signal are seeing, we will be well above that 70 percent high threshold for direct notice on notice to class members.

And the claim forms, again, here is -- here is the declaration from Roma. And obviously, we're going to continue

to put information on the websites and work closely with everybody, including Ed and Kip and BrownGreer, to make sure everything is -- any questions that are coming in are answered and information's available.  And, of course, Ken and Camille have also reviewed and opined on the claim forms in that process in addition to Ed and Kip doing the same thing.

The timing is something I'd like to address, Judge. And in our proposed preliminary approval order, at pages 10 and 11, we have a schedule of deadlines that we proposed that the parties have jointly agreed to.  We would obviously like to get this matter moving forward as quickly as possible.  We want you to do every bit of due diligence you think you need to do.  We have tried to do all of the front-end loading, including everything that's been filed historically in this case that satisfies the rules, but we also know that there is a time value of money and there is a time value of the injunctive relief for the settlement class.  And the sooner it gets in place, the better it will be, because it will make changes, some of which will last forever and some of which will have long-term impacts benefiting the providers that stay in this settlement class.

And so anyway, those pages we have a schedule of various dates and what we're proposing to do, including dates for a settlement claims administrator, a deadline for us filing any -- our attorneys' fee motion so that it's well in

advance of the opt-out and objection period, and so on.  But anyway, those time lines are set out on pages 10 and 11 in our proposed final approval order.

And I think, Judge, in terms of your request earlier, we would propose that our response to the objection we received last night be filed on Tuesday.  We want to move forward with things -- move things forward expeditiously, as I said.

THE COURT:  I take it you'd like to hear what counsel for the objectors has to say before you address it orally today.

MR. WHATLEY:  Yes, sir.  Yes, sir, I would.  You had asked before we got up when we would propose to file a response, and I wanted to respond to that.

THE COURT:  All right.

MR. WHATLEY:  So unless you have other questions, that concludes my presentation.

THE COURT:  I don't.

Be glad to hear from the Blues if they have anything they want to contribute at this point.

MS. DeMASI:  Good morning, Your Honor.  Karin DeMasi from Cravath for the Blues.  I'll be brief in light of the very fulsome and well-done presentation that we just saw from provider counsel.

But the question before the Court today is simply

whether Your Honor will likely be able to approve the settlement, the proposed class settlement, as fair, reasonable, and adequate, and we think the answer to that question is unequivocally yes.  I won't repeat all the points counsel made, but I do want to highlight two of the factors under Rule 23(e)(2) and Bennett.

The first one is that this settlement was negotiated at arm's length.  Your Honor has already heard a lot about that.  The parties have been engaged for years, for nearly a decade, in mediation efforts, that not only stand that time period but included fire separate neutrals.  The mediators were instrumental in getting this done.  There were many points in time where we came very close to the point of things breaking down, and it's entirely appropriate that provider counsel in particular gave credit to Special Master Gentle and Kip Benson, who were truly extraordinary in keeping us at the table and keeping us together.  The extensive negotiating history speaks for itself but it is also set forth at length in Special Master Gentle's declaration.

The second factor that I want to emphasize is what a tremendously good settlement this is for the class, thanks in part to these hard-fought negotiations.  This is not a case that Defendants were unable to litigate or were afraid to litigate.  We had and we continue to have some very strong defenses that created real risk and uncertainty for the

providers, as you already heard Mr. Whatley acknowledge. As counsel mentioned, we fought very hard and obtained a new standard of review for ESAs alone without NBE, which was eliminated in 2021, and that was really a turning point in the provider litigation.

As a result of that ruling, the Blues' system and exclusive service areas, which are the cornerstone of our system, are to be analyzed under the rule of reason and not the per se standard. And that means that providers had a significantly tougher path to victory on those claims than their subscriber counterparts did at the time of that settlement back in 2020. It also means it's highly unlikely that the providers would have received any injunctive relief through a trial on the merits even if they happened to prevail on some of their older per se claims.

But there was also real risk for providers that they were not going to prove even their per se case, and there's a few reasons for that. The first is they were not going to be able, in our view, to prove antitrust injury. As we explained to the Court both in our motion to revisit the standard of review and also in our opposition to the providers' summary judgment motion with respect to common law trademark, the Alabama plan acquired common law trademark rights to the Blue Cross & Blue Shield marks prior to the creation of service areas, and that single fact is dispositive and would have

defeated all of providers' Alabama claims. And it's worth noting that defense didn't just apply in Alabama. Were the Blues forced to go around and litigate across the country, we would have used that same defense unique to those service areas across the country to defeat additional claims as well.

The providers also would have had to overcome the single entity defense, that is, for purposes of administering the federally registered Blue Cross & Blue Shield service mark, the Blues are a single entity that are incapable of conspiring at all under Section 1 of the Sherman Act, also a dispositive defense to these claims, including per se claims.

And then even if providers overcame all of these defenses -- and we only had to be successful on one, but even if providers overcame all of these defenses, they still would have had to prove damages. And as Your Honor knows, the Blues maintain that providers were not going to be able to do that either. Their damages model did not take into account the fact that the Blues operate a two-sided transaction platform within the meaning of Ohio v. American Express, and once that is taken into account, the interplay between the subscriber and provider sides of the market, the provider damages, we believe, would have disappeared.

And so there was real risk that even if providers proved antitrust violations, the class members were not going to be able to recover meaningful relief. And that's not a

hypothetical concern.  That is precisely what happened in the Saber case, where after a victory on liability, the jury awarded $1 of damages trebeled to three because of two-sided markets.

Now, of course, we do understand and would not have settled if defendants didn't face risk, too, and so that is why we came to the table, why we negotiated so hard, why we developed what we call triple-win relief, relief that was good for the system, good for members, and, of course, good for providers, and the settlement is very good for the provider class.

Thank you, Your Honor.

THE COURT:  All right.  Thank you.

Do you have any concern if I ask the providers to provide me a copy of their visual aid slide?

MS. DeMASI:  None at all, Your Honor.

THE COURT:  Okay.  I'm going to make that request, then.

MR. WHATLEY:  Yeah, we had already planned to.  We will.

THE COURT:  All right.  Thank you.

All right.  Any further response to anything the Blues said from the providers before I take us to the next step?

MR. WHATLEY:  No, sir.

THE COURT:  All right.  Anybody here who wants to be

heard besides our friend who's already indicated he wants to be heard?

(No audible response.)

THE COURT:  All right.  Very well.

I think the floor is yours, sir.

MR. ALBRIGHT:  Thank you, Judge Proctor.

THE COURT:  You're welcome.

MR. ALBRIGHT:  Just a little background of how it came to be that I'm here today.  Due to some recent events this week --

THE COURT:  Well, first of all, you're here today.

MR. ALBRIGHT:  Absolutely.  I've enjoyed the discussion.

Earlier this week, my colleagues up in Boston -- two lawyers up there by the names of Phil Rakhunov and Barry Pollack -- they're general counsel for this group of entities that I filed the objection for.  There are 17 ER physician groups.  They do a lot of litigation for these outfits and --

THE COURT:  And these are out-of-network -- at least in terms of the way they've presented -- out-of-network ER clinics?

MR. ALBRIGHT:  That's correct, Your Honor.

Just kind of by happenstance, Phil -- I think it was Law360 -- he, just a few days ago, became privy to this settlement and --

THE COURT:  There has been a little bit of news about it.

MR. ALBRIGHT:  Yes.  And he, you know, before that point didn't really have his finger on the pulse because it's an antitrust case.  But as he began to look at the settlement information, the proposed settlement agreement, the distribution plan, it raised some concerns as to whether the plan had been -- whether out-of-network ER physician groups had been properly considered and fairly considered in the way that the distribution would work and the way that releases would work in the case.

So as we laid out in the motion, Your Honor, these attorneys attempted to contact -- I believe they spoke Mr. Whatley -- and we spoke about that briefly a few minutes ago -- but just trying to gain a little better understanding -- and these conversations literally took place over the last couple days -- they were trying to gain further insight on how the distribution plan would work for out-of-network providers, because the concern was that the allowed amounts that are anticipated don't fairly and reasonably treat out-of-state network providers that would be a part of this class.

The conversations just kind of didn't really get very far, and hence, my people felt compelled to file this, kind of, an emergency objection just to put our objection on the record, Your Honor.

THE COURT:  Now, so a couple background questions just so I understand where your clients are coming from, not just counsel but your actual clients.

MR. ALBRIGHT:  Yes.

THE COURT:  I have a -- I asked my staff to track down a copy of the complaints.  I don't think we were able to get one from the Virginia action, but there's a second action in Florida.  Are there any other lawsuits that your counsel you're working with are involved with in terms of suing any of the Blue entities other than the Florida and the Virginia cases?  I've got this Florida complaint from Broward County in state court.

MR. ALBRIGHT:  I understand that there are more lawsuits than that.

THE COURT:  Okay.

MR. ALBRIGHT:  I'm not privy to all the details, honestly, Your Honor.  They would have been here to present this today if it -- this had not come together so quickly and today was the date of this hearing.

THE COURT:  Okay.

MR. ALBRIGHT:  So at the time, you know, trying to get down here from Boston this week was tough for them.  And as you know, we filed the motion for the continuance, which I understand your honor denied, and I accept --

THE COURT:  Well, I haven't denied the motion -- you

wanted me to continue the hearing, but when I found out about that literally this morning --

MR. ALBRIGHT:  Absolutely.

THE COURT:  -- like at 12:38, I said we're not going to -- there's no reason to continue the hearing.  We can go forward with the hearing.  Now, I have to account for your position in terms -- before entering any order.  A hearing doesn't prejudice you.  Your argument is that approval of the -- preliminary approval of the settlement may, but a hearing doesn't prejudice you, right?

MR. ALBRIGHT:  That's correct, Your Honor.  And the point is we wanted to get an objection on the record because, like you said earlier, it's just a lack of communication, kind of a lack of understanding at this early juncture, and wanted to get that on the record.  And hopefully more information can come to be and hope that we can eliminate these concerns.

THE COURT:  Well, and I think I'm going to -- and I think both sides have already indicated they would like to have the opportunity to continue some discussions directly, not in the Court's -- not within the Court's administration of them but just -- you-all are going to communicate back and forth, it sounds like, about where you are, try to get a better handle on these things.  And I think what Mr. Whatley said is he would like to respond to what is in writing by Tuesday.

But Mr. Whatley, I guess my question is, I think you've indicated you would like to have some discussions with them. Do you think you can do all that and still get a filing to me by Tuesday?

MR. WHATLEY: Yes, sir, we certainly can. I -- there are a -- it is obvious that they have not read a lot of the documents in the public record, and I don't know exactly what order they want to take things in. But we are glad to have further communications. I think I said I think it would be wise to have the Special Master facilitate those communications. We want to do those promptly. But, you know, I'll wait to respond to what he said when he completes, but we are glad --

THE COURT: Yeah. But my question is a little more surgical, and it is you have indicated that you would like to have some discussions that, in your view, might educate them about the settlement and also give you the opportunity to hear from them about what concerns they still might have?

MR. WHATLEY: Yes, sir.

THE COURT: I'm just wondering about a Tuesday filing deadline, if that allows there to be any real communication about -- along those lines.

MR. WHATLEY: What about the end of next week then, Your Honor?

THE COURT: I think that's probably more feasible, but

-- so why don't we just say until we decide differently -- unless we decide differently, Friday -- next Friday, eight days from now, will be your deadline to file a response to this?

MR. WHATLEY:  Yes, sir.

THE COURT:  Okay.  Tucker, get that?  Okay.

All right.  And do you have any concerns about my asking Mr. Gentle and Ms. Harbison to kind of coordinate the discussions that you-all are having?

MR. ALBRIGHT:  Absolutely not.  I think that would be productive.

THE COURT:  You would like to have a neutral involvement in those, right?

MR. ALBRIGHT:  Absolutely.

THE COURT:  Okay.  So that solves two of the questions I had.

All right.  So my next question is this:  It seems like what I've just heard is, oftentimes, out-of-network providers, particularly over the last 12 1/2 years, go in and out of network from time to time.  Do you know whether any of these folks that you're here representing today -- and I take it these -- you've been retained by counsel who represents these folks.  I'm not sure you've actually talked to any of the actual clients.

MR. ALBRIGHT:  I have not.  And in all honesty and

candor --

TH COURT:  It's not necessary.

MR. ALBRIGHT:  -- it was yesterday afternoon, because --

THE COURT:  It wasn't necessary for you to have done that, but I'm just confirming that your marching orders are kind of coming from counsel on these things that you've identified.  Do you know whether any of these folks have gone in and out of network such that, okay, they have in-network claims that may be resolved by the settlement?

MR. ALBRIGHT:  My belief is that they have been out of network the vast majority of this time frame we're talking about here, Your Honor, but I cannot speak to that --

THE COURT:  Well, we can pin that down and figure that out.

MR. ALBRIGHT:  Yes.

THE COURT:  So let's -- conceptually, I was trying to understand this this morning as I was reading over these materials and -- and if we're dealing -- if we're dealing with somebody who is exclusively an out-of-network provider, they don't have a contract with Blue Cross Blue Shield; correct?

MR. ALBRIGHT:  That's right.

THE COURT:  What they do is they have a relationship with a patient, and the patient would have a contract with Blue Cross Blue Shield, the policy, right?

MR. ALBRIGHT:  That's correct.

THE COURT:  So what happens is you're not relying upon any agreement with Blue Cross Blue Shield about how you're paid or what services you can provide or what the terms and conditions of those things would be.  It's that a patient -- and Blue Cross Blue Shield would call them a subscriber.  A subscriber has the right to always go out of network to get the medical care they want, and the subscriber contracts with Blue Cross Blue Shield about how the Blues will treat that situation, how they're going to -- what they'll reimburse for and what they won't.  But technically, isn't the reimbursement to the subscriber that may, under contract, be paid directly or indirectly to the out-of-network provider?

MR. ALBRIGHT:  Well, Your Honor, I think, as Mr. Whatley mentioned, in Alabama that the patient is responsible for paying a hundred percent their reimbursement. But I believe that the rules are very different from state to state --

THE COURT:  That's right, because Florida has a statute that says -- that obligates insurers to make payments to out-of-network providers, as I understand it.  I'm not going to go practice law in Florida anytime soon.  But generally speaking, outside of a statutory regulatory scheme or an insurance -- state insurance department scheme, a regulatory scheme, as a general rule, out-of-network providers

don't have a contract with any insurance carriers that they provide out-of-network service to their subscribers; is that fair?

MR. ALBRIGHT:  That's fair.

THE COURT:  Okay.  So I'm wondering, absent some regulatory scheme, if -- and we've heard a lot of talk in this case about the two-sided platform.  Isn't it out-of-network services provided on the provider side of the platform, kind of, technically rather than the provider side of the platform?

MR. ALBRIGHT:  I believe some states, Your Honor, they will submit a claim to the insurance company.  I could -- I don't --

THE COURT:  Yeah.  I'm just talking about as a matter of under the policy itself.  Now, you know, under the Blue Cross Blue Shield regime -- now, again, states can pass legislation, and if you want to do business in that state as an insurance carrier, you've got to comply with their rules and requirements.  But that's a matter of statutory or regulatory framework in a particular state, not any way related to the Sherman Act or, more generally, just the principal contract between doctors and hospitals and/or -- I'm sorry -- doctors and hospitals along with the Blues.  So I'm just trying to figure out how this fits in.

Let's get slide 48 back up.  That should be a copy of the release language.  So it provides -- and for those of you

who can't see the screen, I'll try to at least get a good paraphrase -- nothing in this release shall release claims, however asserted, that arise in the ordinary course of business that are based solely on claims by the provider in the provider's capacity as a plan sponsor or subscriber, or claims regarding whether a settling individual Blue plan properly paid or denied a claim for a particular product, service, or benefit based on the benefit plan document, provider contract, or state or federal regulatory [sic] or regulatory regimes, including state prompt pay laws.

I'm just wondering, based upon what I'm looking at in this Florida complaint at least, where you've got an unjust enrichment claim, a quantum meruit claim and a claim under this fairly unique Florida statutory provision which I think you were kind of generically referring to that some states have, and in particular, it's Florida Code -- Florida statute section 627.64194 and 627.513, I'm just wondering if that wouldn't be a claim based upon a federal or state regulatory regime. And I'm sure the Blues are going to weigh in on this in a minute. I'm just trying to understand if your -- if this claim I'm looking at in this Florida claim is even released under this.

MR. ALBRIGHT: Your Honor, it's just -- there were concerns because it is fairly broad, and just out of an abundance of caution we wanted to note that until we could get

further, maybe, specificity.

THE COURT:  Well, the definition of released claims isn't fairly broad.  It's pretty specific about what's released.  And we're looking at a -- what's not released, what's expressly not released in the release that -- if this settlement is approved, that would go into effect by court order.  So that's one question I have.  I think I've stumped the band here, right?

MR. ALBRIGHT:  Yes.

THE COURT:  Mr. Whatley, any thought on that?

MR. WHATLEY:  Well, my problem, Judge, is that I have not reviewed -- I've never seen the Virginia complaint because we didn't know --

THE COURT:  Yeah, I'm not focusing on that.  I'm discussing about the Florida complaint.

MR. WHATLEY:  And I have not carefully reviewed -- I have not reviewed the Florida claim.  I've had a lot of other --

THE COURT:  So my mom's family's from Virginia.  I grew up in Florida.  Those are two totally different states.  So I get that.  I'm not asking about Virginia.  I'm asking specifically about --

MR. WHATLEY:  Judge, my problem is I haven't reviewed the Florida complaint to see what's in it.  So I mean, I -- obviously, the exception to the release language is very

important and we put it in there and I explained why we put it in there.  But in terms of reviewing their complaint --

THE COURT:  That may be a subject you-all discuss at some point.

MR. WHATLEY:  We could, Your Honor, based on, you know, a filing last night.

THE COURT:  Something tells me the Blues might want to be involved in that discussion as well.

MS. KENNEDY:  Yes, Your Honor, we would like to be involved in that conversation.

THE COURT:  Would you like to defer and answer my question kind of like the other two have, subject to those discussions?

MS. KENNEDY:  We would, Your Honor.  We only received the complaint this morning, so we haven't had a chance to evaluate it.  The only point I will add onto what Mr. Whatley said is these objectors aren't unique.  There are lots of providers around the country with what they will believe to be ordinary course business disputes, and those will have to be decided in due course in terms of whether they fall within the scope of the release or whether they do not.  And we're going to take those as they come.  And we're happy to look at this one but we haven't had a chance to do so yet.

THE COURT:  Okay.  All right.  So the first thing Houston has to figure out is do we really have a problem,

right?  Doesn't that make sense?  You know, Houston, we have a problem.  I don't know that we have a problem.  We may.

One of the correct claims -- one of the arguments you've raised in your petition is typicality under Rule 23(a), and if -- would the out-of-network -- would an out-of-network provider just generally be able to make a claim against the 8 percent of the allocation that is currently proposed in terms of the settlement fund?  I'm asking --

MR. WHATLEY:  Yes.

THE COURT:  They would?

MR. WHATLEY:  Yes, sir.

THE COURT:  Okay.  And --

MR. WHATLEY:  We told -- as early as Monday, we told his co-counsel exactly that.

THE COURT:  Okay.  So if they can make that claim, does this come down to not that we weren't fairly represented, it's just that we don't like the -- we think our client could do better?

MR. ALBRIGHT:  Yes, Your Honor.

THE COURT:  Well, then, don't we have an easy off-ramp there called opt out?  Because this is all (b)(3).

MR. ALBRIGHT:  Yes, I --

THE COURT:  This is no cram down -- you're not going to be in a mandatory injunction that you can't -- this is an escape room that you already know the way out.

MR. ALBRIGHT:  Ideally, Your Honor, they would want to be a part of the class if they can just work through some of these uncertainties and the unknowns of the current distribution plan to make sure.

THE COURT:  Okay.  So that's encouraging.  I'm sure Mr. Gentle likes hearing that.

SPECIAL MASTER GENTLE:  Yes, sir.

THE COURT:  All right.  Well, I've got a few other questions, but I'll be honest with you, in light of what I've just heard, I wonder if I ought to just hold my questions, see what the -- what comes next week, and we kind of evaluate things there, maybe have a -- at least a status conference call with the Court after Mr. Gentle tells me it's time to do that.  Fair enough?

MR. ALBRIGHT:  I think so, Judge.  That sounds like a good plan.

THE COURT:  Okay.  Now, let me ask the more interesting question maybe.  Does anybody think that the continuation -- and I realize it's early, so you can say we're not sure -- that's an appropriate answer -- the continuation of these state cases interferes with the Court's jurisdiction to consider the propriety of the settlement?  In other words, the All Writs Act question, I'm asking.  I don't think we're there yet.

So, as you know, under the All Writs Act, there's

three exceptions to the Anti-Injunction Act.  One is if Congress provides a basis for a stay of the proceedings or a basis for the injunction.  The second is if, for some reason, continued litigation in state court would undermine a judgment of the Court.  We don't -- we're not there.  The last question is, aid of jurisdiction, I have to maintain jurisdiction to determine the fairness of this before -- and I couldn't have anybody run me off the rails while I'm doing that.  I just don't sense that this is one of those situations where we have to worry about that, but maybe the parties ought to think about that, too.

MS. KENNEDY:  Your Honor, we obviously, as I mentioned, haven't reviewed the complaints yet, but we are certainly not in a position right now where we are asking you to invoke the All Writs Act at this stage.

THE COURT:  Right.  So the good news is that you're on everybody's radar now.  The bad news is you're on everybody's radar now.  So -- and you -- I don't think you're in a position -- you're not counsel in those cases, in other words, right?

MR. ALBRIGHT:  I am not, Your Honor.  Just local counsel for this motion we filed --

THE COURT:  Yeah.  You've done a fine job considering they sent you up here with two legs and two hands tied behind your back.  But could I suggest to you that it may be

appropriate for me to send a message to your colleagues through you?

MR. ALBRIGHT:  Absolutely.

THE COURT:  That if this is such an emergency, I'm surprised they didn't get here to present this themselves.

MR. ALBRIGHT:  I will pass that message to them.

THE COURT:  There's emergencies and then there's emergencies.  I'm not sure what they're saying here.

MR. ALBRIGHT:  The term "emergency" might have been strong that I used, but these developments just occurred over the last couple of days and there was -- one of them was in a deposition --

THE COURT:  Well, the good news is you have thoughtful counsel on both sides of this case that want to work with you, and the better news is you've got a neutral now that can assist all three of you in working through some of these wrinkles and see where we are.

MR. ALBRIGHT:  I appreciate the Court's assistance and I'm sure that will help us to work through these things expeditiously.

THE COURT:  Okay.  So I guess the questions I've raised are -- and some of them have been answered and some of them we still have to figure out answers -- an out-of-network provider could benefit from the settlement funds here, that tends to make me think that an out-of-network provider who

gets these funds would have some release if they stay in the class. We're not sure of the scope of the release, but there would be some release. Certainly they couldn't turn around and file a Sherman Act claim on some of -- and there may be other things that they release, there may be things they don't release. We've got to figure that out.

And I'm still interested in understanding the interplay between what is a state regulatory regime claim and how that plays out, if, in fact -- if, in fact, there is some claim that's not -- couldn't be characterized as state regulatory. Isn't that on the subscriber side of the platform where these medical care providers are -- in the absence of a state statute, are simply there to provide services to their patient, their patient's responsible for paying. So I don't understand how this settlement really affects them if that's -- that's the case. Absent some state regulatory regime, when the patient signs the I'm responsible for the finances here, that's who's responsible, right?

Now, the patient can enforce rights as to the Blues to reimburse me or pay depending what the policy language says from a out-of-service provider, but I'm not sure the out-of-service provider would have standing to say, I'm entitled to get money from the Blues. It's the patient who has that right, it seems.

So that's what I'm -- and again, I'm not answering any

of these questions.  I'm raising all these questions.

MR. ALBRIGHT:  Understood.

THE COURT:  Karin and Lauren over there are going, He finally is talking about a two-sided platform.

MS. KENNEDY:  Indeed.

MS. DeMASI:  No comment.

THE COURT:  All right.  What else?

MR. ALBRIGHT:  Nothing further from me, Your Honor. Thank you.

MS. DeMASI:  Your Honor, although this is an objection to the provider's motion, would the Court be open to take a short submission from the Blues?

THE COURT:  Oh, of course.  I invite that.  I'm sorry. I should have been explicit in that.  I just assumed that, but we know what happens when you assume.  Yeah, you have till Friday also unless for some reason the parties -- so if you get to a point where everybody is saying, you know, we're making good headway on communicating and coming up with either an understanding outside of the settlement or even an understanding within the settlement, don't hesitate to say we want a little bit more time to make a filing because we're making a progress in that -- on that separate track, okay? That will not be frowned upon by the Court in any way, shape, or form.

Okay.  It may be that I'm not asking very good

questions.  It may be that I'm asking questions that are decent but we just don't have enough information right out, and we'll figure out which it is later.

What else before we adjourn the hearing?

SPECIAL MASTER GENTLE:  Your Honor, while everybody is here, we might schedule the Zoom to discuss this with the objector.

THE COURT:  Well, let's do that off the record.

SPECIAL MASTER GENTLE:  Yes, sir, will do.

THE COURT:  But I think everybody ought to stay in the room and get with Ed and come up with a time.

MR. WHATLEY:  I have a brief response to what he's saying.

THE COURT:  I'm sorry?

MR. WHATLEY:  I have a brief response to what he's saying.

THE COURT:  Shoot.  Go for it.

MR. WHATLEY:  Judge, in terms of timing, the Law360 article that he referred to came out on October the 15th, 30 days ago.  We know that they knew about the --

THE COURT:  All right.  So I think I understand your point that you would like to have heard from them sooner than you did.

MR. WHATLEY:  Absolutely.  But when we did --

THE COURT:  But let me make sure you understand this:

That may be a -- that may have been a better argument before 2018, and the reason I'm saying that is I need to have front-loaded information.  And so whether they should have -- and that's certainly not this lawyer's responsibility.  It would be the lawyers who aren't here may or may not have a responsibility for that.  But I think we have a way to fix the problem rather than fix the blame on that, and that is the process we just agreed to.

MR. WHATLEY:  Well, Your Honor, you're right.  I just wanted to know what the timeline was, and when we --

THE COURT:  I understand the time -- look, I don't live in a ivory tower.  I saw a lot of headlines about this settlement right after it was announced on -- Columbus Day?

MR. WHATLEY:  It was.

THE COURT:  So, yeah, I get that.

MR. WHATLEY:  And we learned --

THE COURT:  Might have gotten a few phone calls about it.  I don't know.

MR. WHATLEY:  Us too, Your Honor.  When we learned that they had an issue -- and we still don't know exactly what the issue is even after reading their papers.  We learned that Monday.  We responded on Monday, told them they could file a claim and recover money under the settlement, exactly what we've told you today.  Tucker -- I mean, I happened to be visiting my mother on Tuesday and she insisted that I not be

distracted by things like this, but --

THE COURT:  Don't be distracted by a $2.8 billion settlement.

MR. WHATLEY:  Well, she said my father would have been proud, but anyway -- which was a good thing for her to say, but --

THE COURT:  Yeah.

MR. WHATLEY:  The -- Tucker -- Tucker was on with them on Tuesday, which is, no doubt, better than me being on.  And then we were both on yesterday.  So we're not ignoring them by any stretch of the imagination.

Judge, in terms of what you went through, two things are going to be correct.  Many of these doctors are going to be -- are not going to be class members because of the Love issue.  We don't know.

THE COURT:  Yeah, that's a --

MR. WHATLEY:  They haven't filed -- they haven't -- we don't even have the corporate disclosure statements that they're obligated to file under Rule 7 whatever it is, which if this is going to go forward, they should be filing.  But we don't know, but it's -- given the number of doctors that are excluded under Love, it's going to have to be that many of them are not settlement class members.

The second -- we don't know whether the entities themselves are barred under Love, but beyond that, they have

-- it is going to be extraordinary, and if there -- if these physicians -- if the question you ask, from 2008 to the present, if all or practically all of these physicians were not in network at some point in that period, it will be extraordinary.  I don't believe --

THE COURT:  That would surprise you is what you're saying?

MR. WHATLEY:  I would be shocked.  And I don't think that is correct and I don't think that is possible.

THE COURT:  Well, you'll be able to do your diligence on that.

MR. WHATLEY:  Well, I -- I can't because we don't know who the physicians are.

THE COURT:  You-all.  That was you in the plural.

MR. WHATLEY:  The issue here -- and, I mean, to highlight it, the issue, they -- and you made this point -- their rights are against the patient --

THE COURT:  Well, unless you've got this statute like in Florida where --

MR. WHATLEY:  Right.

THE COURT:  And, you know, you learn something new every day.  But you see this -- you've seen the language in the complaint about what they allege the statute provides for.

MR. WHATLEY:  Correct.  And -- but unless there is a statute like that, then that's not what they have here, but --

THE COURT:  Well, and what I want you to be thinking about and the Blues to be thinking about is, well, would that fall under the exception of payment or denial of a claim based on a state regulatory regime.

MR. WHATLEY:  We'll look at that.

THE COURT:  And I don't know the answer, but it's a good question, I think.

MR. WHATLEY:  We'll certainly look at that.  What we don't know, Judge, and certainly based on the communications we had with them, whether this is really about them trying to protect their lawsuit, which, of course, would be totally protected by an opt out, but -- or whether it's something more.  And I guess the communications we'll schedule will help ferret that out and find out --

THE COURT:  Well, you knew David Middlebrooks before I knew David Middlebrooks, and you know what he would say:  The proof will be in the pudding.

MR. WHATLEY:  That's true.  That's true, Your Honor.

THE COURT:  All right.

MR. WHATLEY:  Do you have other questions, Judge?

THE COURT:  I don't.

MR. WHATLEY:  Okay.

THE COURT:  Any other -- anything else from anyone else?

(No audible response.)

THE COURT:  All right.  Well, we had a fun morning.  I feel like I am Blued out this week between all sorts of things involving opt-outs yesterday and everything, so -- all right.  Appreciate you-all.  Appreciate the usual stellar job that I'm accustomed to in this case in terms of presentations by everyone.  And we will see where we are when I get a report from Ed.

But if you wouldn't mind checking with your folks promptly about when they could be available to get on a Zoom.

MR. ALBRIGHT:  Absolutely.  I can get on it immediately.

THE COURT:  And before we leave the courtroom, you-all get with Ed and start setting some potential dates and times as early as today or tomorrow to get that going, okay?  All right.  But tell them I missed them, okay?

Thank you.  We're adjourned.

(Adjourned accordingly at 12:49 p.m.)

C E R T I F I C A T E


        I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.

                    Dated:  November 19, 2024




*Pamela G. Weyant*
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter