FILED

2024 Dec-04  PM 04:33
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| | } | |
| **IN RE:  BLUE CROSS BLUE SHIELD** | } | |
| | } | **Master File No.:  2:13-CV-20000-RDP** |
| **ANTITRUST LITIGATION** | } | |
| **(MDL NO.: 2406)** | } | **This order relates to the Provider Track** |
| | } | |

## MEMORANDUM OPINION AND ORDER PRELIMINARILY APPROVING PROVIDER PLAINTIFFS' SETTLEMENT AND PLAN FOR NOTICE AND APPOINTMENT OF SETTLEMENT NOTICE ADMINISTRATOR AND SETTLEMENT ADMINISTRATOR

After more than twelve years of litigation and nine years of negotiations, Provider Plaintiffs and Defendants have entered into and executed a Settlement Agreement, which, if finally approved by the court, would result in the settlement of all of Provider Plaintiffs' claims against the Settling Defendants in the "Provider Actions."[1]

In full and final settlement of the claims asserted against them, the Settling Defendants have agreed to make a $2.8 billion payment, change certain of their business practices, and invest

---

[1] Unless otherwise defined in this Preliminary Approval Order, the capitalized terms used herein shall have the same meaning as in the Settlement Agreement. The Settlement Agreement is attached as Exhibit A to Provider Plaintiffs' Memorandum of Law in Support of their Motion for Preliminary Approval of Proposed Class Settlement. (Doc. # 3192-2). The term "Provider Actions" means:

"the lawsuits brought by persons and entities within the Settlement Class and consolidated in *In re Blue Cross Blue Shield Antitrust Litigation*, Case No. 13-cv-20000-RDP (MDL No. 2406), including the Consolidated Fourth Amended Provider Complaint, which is currently pending in this court; all actions that may be transferred or consolidated prior to the time Class Notice is mailed; and all actions that are otherwise based, in whole or in part, on the conduct alleged in MDL No. 2406. Appendix B lists those actions as of the Execution Date. In addition to the actions included on Appendix B, the case captioned *VHS Liquidating Tr., et al. v. Blue Cross of Calif.*, Case No. RG21106600 (Ca. Super. Ct. Alameda Cnty.) shall also be included among the "Provider Actions" so long as the plaintiffs to that action do not file timely and compliant written requests for exclusion from the Settlement Class in full accordance with the procedure set forth in the Class Notice."

(Doc. # 3192-2 at 21).

hundreds of millions of dollars in key infrastructure through which Blue Cross and Blue Shield Plans can work with healthcare providers.

This matter is before the court on (1) Provider Plaintiffs' Motion for Preliminary Approval of Proposed Class Settlement (Doc. # 3192), and (2) Provider Plaintiffs' Motion for Approval of a Plan for Notice and Appointment of Settlement Notice Administrator and Settlement Administrator (Doc. # 3194). In their first Motion, Provider Plaintiffs seek an order (1) preliminarily approving the proposed class settlement of the Provider Plaintiffs' claims against the Settling Defendants, (2) finding that the Settlement Classes are likely to be certified at final approval, (3) appointing Provider Co-Lead Counsel, (4) preliminarily approving the Plan of Distribution, and (5) setting a Final Approval Hearing. (Doc. # 3192). In their second Motion, Provider Plaintiffs seek an order (1) directing notice of the proposed Settlement Agreement reached by Provider Plaintiffs and Settling Defendants, (2) appointing BrownGreer PLC as the Settlement Notice Administrator, and (3) appointing Special Master Edgar C. Gentle, III as the Settlement Administrator. (Doc. # 3194). Provider Plaintiffs have also filed a supplemental brief in support of their motions with additional evidentiary support (Doc. # 3207) and provided the court with the proposed Notice and Claims Forms.

The court has carefully considered Provider Plaintiffs' Motion for Preliminary Approval of Proposed Class Settlement (Doc. # 3192), the Settlement Agreement (Doc. # 3192-2), and the memoranda of law and exhibits submitted in support thereof. It has also carefully considered Provider Plaintiffs' Motion for Approval of a Plan for Notice, the Memorandum of Law in Support of Motion for Approval of a Plan for Notice, and the exhibits and memorandum submitted in support thereof (Doc. # 3194), as well as Provider Plaintiffs' Supplemental Memorandum and exhibits (Doc. # 3207).

The court gave public notice of the preliminary approval hearing and provided notice of how to access the hearing via telephone for those interested persons unable to attend. (Docs. # 3198, 3208). On November 14, 2024, the court conducted a preliminary approval hearing at which it considered these materials as well as additional presentations and arguments made by counsel. The court also heard from counsel for certain nonparty out-of-network emergency medicine providers who have other pending litigation against certain Defendants and who objected to the preliminary approval of the Settlement. For the reasons discussed below, the Motions are due to be granted.

## I.    Procedural History

The first Provider Complaint was filed in this court in 2012. *Conway v. Blue Cross & Blue Shield of Alabama.* (Case No. 12-cv-2532-RDP). That Complaint, like the operative MDL Complaint today, challenged, among other things, the Blues' use of exclusive Service Areas as a restraint of trade in violation of the Sherman Act. (Case No. 12-cv-2532-RDP, Doc. # 1). Later that year, the Judicial Panel on Multidistrict Litigation centralized *Conway* and several actions filed by Subscriber Plaintiffs in this court in MDL 2406. In 2013, the Provider Plaintiffs filed a Consolidated Amended Complaint. (Doc. # 86).

The parties engaged in significant motions practice directed at the operative complaint. These motions raised numerous substantive issues, such as Defendants' common-law trademark defense, the appropriate standard of review for the alleged conspiracies, the McCarran-Ferguson Act, different states' filed rate doctrines, lack of personal jurisdiction, and improper venue. The court ruled on the merits of many of these motions and, as related to the Blues' challenges to jurisdiction and venue, the court allowed discovery and further briefing. After years of discovery on the jurisdiction and venue issues, the court ruled on those motions. The court streamlined the

litigation by designating the Alabama cases as bellwethers (not for trial, but for purposes of litigation) and the parties began discovery in earnest on the claims in those cases. Provider Plaintiffs litigated 26 motions to dismiss, took discovery from 37 Defendants and numerous nonparties, and briefed 76 discovery motions. (Doc. # 3192-3).

Discovery in this case was a massive undertaking. Although the Alabama cases were prioritized, the parties also engaged in substantial across-the-board nationwide discovery, which was masterfully managed by the Hon. Michael Putnam. The Provider Plaintiffs served discovery requests for structured data on every Defendant, and then met and conferred with each Defendant regarding that data. The Provider Plaintiffs obtained detailed information on medical claims and reimbursements from each of the Defendants, totaling many terabytes of data. With the help of their experts, the Provider Plaintiffs then vetted, synthesized, and analyzed that data, using it as an input into a highly sophisticated model for hospital reimbursement. (*Id*.).

Provider Plaintiffs also served requests for documents on each Defendant, and met and conferred with the Defendants regarding the scope of the requests. The Defendants produced 75 million pages of documents, which the Provider Plaintiffs reviewed both manually and through technology-assisted review. Manual review alone consumed approximately 134,000 hours of attorney time. The Provider Plaintiffs also responded to the Defendants' requests for discovery, which were served on 156 Provider Plaintiffs and nonparties. The Provider Plaintiffs collected, reviewed, and produced approximately 1.5 million pages of documents in response to the Blues' requests. (*Id*.).

Provider Plaintiffs participated in more than 200 depositions of Defendants and nonparties, and defended more than 40 depositions of the Provider Plaintiffs' class representatives and certain class members. (*Id*.).

The parties participated in more than 30 discovery hearings, as well as monthly status conferences, which resulted in 91 discovery orders. Along with Subscriber Plaintiffs, Provider Plaintiffs challenged Defendants' privilege designations for hundreds of thousands of documents. Special Master R. Bernard Harwood ultimately de-designated, in whole or in part, over 450,000 documents from Defendants' privilege logs. (*Id.*). He and the "Seal Team" (a group of attorneys assembled from both sides of the litigation) performed important and excellent work.

In 2016 and 2017, the parties participated in two "Economics Day" sessions with the court. During these sessions the parties prepared and presented tutorials, including expert testimony and other evidence, to educate the court about the economic theories of the case and the business structures of the Blues challenged in this litigation. (*Id.*).

In 2017, the parties filed cross motions for summary judgment on the standard of review applicable to Plaintiffs' antitrust claims. In 2018, the court ruled that Plaintiffs' claims relating to Exclusive Service Areas, along with other cumulative restraints, should be judged under the *per se* rule, and claims relating to price-fixing through the BlueCard program should be judged under the rule of reason. (Doc. # 2063). The court certified that decision for interlocutory appeal and Defendants petitioned the Eleventh Circuit to hear the appeal. (*Id.*). The Eleventh Circuit denied the petition. *In re Blue Cross Blue Shield Antitrust Litig.*, No. 18-90020, 2018 WL 7152887. (11th Cir. Dec. 12, 2018).

In 2019, Provider Plaintiffs moved to certify classes of Alabama providers, which Defendants opposed. In connection with their motion for class certification, Provider Plaintiffs submitted reports from six expert witnesses. Provider Plaintiffs defended depositions of each of their experts, and they deposed nine of Defendants' experts. Between 2019 and 2021, the parties briefed several related *Daubert* motions. (*Id.*).

Following the Blues' elimination of the National Best Efforts rule in 2021, in connection with the Subscriber Settlement, Provider Plaintiffs and Defendants engaged in another round of dispositive motions regarding the appropriate standard of review. (*Id*.). The court also required the parties to brief two-sided platform issues following the Supreme Court's 2018 decision in *Ohio v. Am. Express Co*., 585 U.S. 529 (2018). (*Id*.).

For nine years, from 2015 to 2024, Provider Plaintiffs and the Blues also engaged in mediation sessions with the able assistance of Special Master Ed Gentle and Katherine "Kip" Harbison, who oversaw the negotiations through to completion. The parties also engaged Mediator Robert Meyer in the latter stages of their negotiations. The parties participated in dozens of in-person mediation sessions and countless calls and virtual meetings. On October 4, 2024, the parties executed their Settlement Agreement, which is now before the court. (*Id*.).

## II.    Terms of the Settlement Agreement/Class Definitions

The "Settlement Class" is defined as:

"all Providers in the U.S. (other than Excluded Providers, who are not part of the Settlement Class) who currently provide or provided healthcare services, equipment or supplies to any patient who was insured by, or who was a Member of or a beneficiary of, any plan administered by any Settling Individual Blue Plan during the Settlement Class Period."

(Doc. # 3192-2 at 26). The term "Excluded Providers" means:

(i)    Providers owned or employed by any of the Settling Defendants;

(ii)    Providers owned or employed exclusively by Government Entities or Providers that exclusively provided services, equipment or supplies to members of or participants in Medicare, Medicaid or the Federal Employee Health Benefits Programs;

(iii)    Providers that have otherwise fully released their Released Claims against the Releasees prior to the Execution Date, including but not limited to Providers that were members of any of the settlement classes in *Love v. Blue Cross and Blue Shield Ass'n*, No. 1:03-cv-21296-FAM (S.D. Fla.); or

6

(iv)    Providers that exclusively provide or provided (a) prescription drugs; (b) durable medical equipment; (c) medical devices; (d) supplies or services provided in an independent clinical laboratory; or (e) services, equipment or supplies covered by standalone dental or vision insurance.

(Doc. # 3192-2 at 14). The "Settlement Class Period" is July 24, 2008, through the "Execution Date," October 4, 2024. (*Id*. at 26).

A summary of the features of the Settlement includes:

**A.    Monetary Relief**

Under the Agreement, Defendants have agreed to pay $2.8 billion to the Settlement Fund, which will include distributions to the Settlement Class, Notice and Administration costs, and any Fee and Expense Award. Defendants are not entitled to reversion of any of the Settlement Fund. (*Id.* at 25).

**B.    Injunctive Relief**

In addition to the extraordinary monetary recovery, the parties represent that the settlement will significantly improve how Providers will interact with the Blues, bringing more transparency and efficiency to their dealings, and increase Blue Plan accountability. (*Id*.). This broad relief could only have been obtained in a class case involving all parties. The injunctive relief includes changes that Providers have been attempting to secure from the Blues for decades, including:

- Transformation of the BlueCard Program infrastructure through the development and implementation of a system-wide, cloud-based architecture that will facilitate Settlement Class Members' immediate access to Member benefits and eligibility verification information, preauthorization requirements, and claims status tracking;

- BlueCard Prompt Pay Commitment requires the Blues to pay clean, fully insured claims within thirty days, provide additional information to enable claims to be corrected promptly, and assesses penalties/interest on eligible claims not paid promptly;

- Appointment of a BlueCard Executive at each Blue Plan;

- Implementation of a real-time Blues internal messaging system to reduce the time it takes for the Blues to communicate with each other regarding BlueCard issues; and

- Creation of a Blue National Executive Resolution Group to work to identify trends and opportunities for further improvement of the BlueCard Program.

(*Id.* at 35-57). To implement this injunctive relief, the Blues will be required to invest hundreds of millions of dollars. (*Id.*).

In addition, the Settlement Agreement provides for changes to rules governing contracts between Providers and the Blues that will allow Providers' Contiguous Area Contracts to cover more Blue Plan Members, and certain hospitals will be eligible to contract with more Blue Plans than before. Contiguous Area Contracts may now cover all in-state members. (*Id.*). Contiguous Area Contracting will now expand to include certain Settlement Class Member hospitals within a sixty minute drive of an Anchor Hospital already in a contiguous area, creating contracting opportunities for hundreds of hospitals. (*Id.*).

In addition, limits will be placed on Blue Plans' ability to rent certain of their non-Blue-Branded Provider Networks to other Blue Plans while the latter are operating as Greens.[2] (*Id.*).

Providers will have access to more information and be able to access that information on a more timely basis than ever before and able to enter into value-based contracts with the Blues. (*Id.*).

For a period of five years from the Effective Date of the Settlement, a Monitoring Committee comprised of members appointed by the Settling Defendants, Provider Co-Lead Counsel, and the court will be created to oversee monitoring, compliance, and reporting related to

---

[2] Greens are businesses operated by Blue entities but Greens do not use the BCBS trademark.

the injunctive relief. (*Id*.). The Monitoring Committee will also address Settlement Class Member grievances in a timely manner. (*Id*.).

Despite the fact that this Settlement provides significant injunctive relief, there is no mandatory Rule 23(b)(2) Settlement Class. Any class member may opt out. Those who opt out will, by the terms of the Settlement, opt out of all the benefits of the settlement – *i.e.*, both the monetary and the injunctive relief.

### C.    Settlement Class Release

In return for the monetary and injunctive relief discussed above and provided for in the Settlement, upon the Effective Date of the Settlement, Releasors (Class Representatives and Settlement Class Members who do not timely and validly exclude themselves) will have released claims (as described more fully below) against the Releasees ((i) Settling Individual Blue Plans, (ii) BCBSA, (iii) NASCO, and (iv) Consortium Health Plans, Inc., as well as related entities). (*Id*. at 24-25).

The Releasors agree to release:

> "any and all known and unknown claims … based upon, arising from, or relating in any way to: (i) the factual predicates of the Provider Actions (including but not limited to the Consolidated Amended Complaints filed in the Northern District of Alabama) including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date; (ii) any issue raised in any of the Provider Actions by pleading or motion; or (iii) mechanisms, rules or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10-26 [relating to injunctive relief] approved through the Monitoring Committee Process during the Monitoring Period and that are based on the same factual predicate of the Provider Actions and related to the injunctive relief provided by Paragraphs 10-26."

(*Id*. at 22-23).

Released Claims do not include those claims "that arise in the ordinary course of business and are based solely on (a) claims by the Provider in the Provider's capacity as a plan sponsor or

subscriber or (b) claims regarding whether a Settling Individual Blue Plan properly paid or denied

a claim for a particular product, service or benefit based on the benefit plan document, Provider

contract, or state or federal statutory or regulatory regimes (including state prompt pay laws),"

unless those claims are based in whole or in part on the factual predicates of the Provider Actions

or Released Claims. (*Id*. at 23).

This release is similar to the release that the court approved (and that the Eleventh Circuit

affirmed) in the Subscriber Settlement.

### D.     Attorneys' Fees and Expenses and Service Awards

The Settlement Agreement provides that Class Counsel may apply for: (i) an award of

attorneys' fees, up to 25% of $2.8 billion (*i.e*., $700 million), and (ii) reimbursement of expenses

and costs reasonably and actually incurred in connection with prosecuting the Provider Actions.

Settlement Class Counsel may seek Service Awards for Class Representatives as part of their Fee

and Expense Application in accordance with Eleventh Circuit practice. (*Id*. at 64).

The parties' agreement with respect to attorneys' fees was reached only after the parties

had resolved the other substantive terms of the Settlement.

### E.     Notice Plan

When the Parties indicated to the Special Master that settlement was imminent, he issued

confidential requests for proposal to four leading firms with extensive experience in settlement

administration. (Doc. # 3194-1 at 8). The Parties and the Special Master attended virtual meetings

with all candidates and received written proposals. (*Id*.). After evaluating the proposals, and with

the assistance of the Special Master, Provider Co-Lead Counsel and counsel for Settling

Defendants selected BrownGreer PLC as the Settlement Notice Administrator. BrownGreer will

be responsible for managing and administering the process by which Class Members are notified of the Settlement.

BrownGreer is a sophisticated firm with extensive experience in all facets of settlement administration. (Doc. # 3194-2 at 4-5). BrownGreer designs notice plans to reach class members in the best practicable manner and to inform them in clear terms of the existence of the proposed class litigation or settlement, how it affects them, their rights and obligations, the actions they may take, any deadlines for acting, and the consequences of acting or failing to act by the deadline. (*Id*.).

Because the Settlement Class in this case is limited to healthcare providers, it is possible to build a robust list of potential Class Members from commercially available databases. (*Id*. at 7). These lists generally contain Providers' contact information, and in some cases may contain validated email addresses. Within twenty-one days of entry of the Preliminary Approval Order, BrownGreer will begin to email the notices developed by the parties (Doc. # 3209) to potential Class Members with valid email addresses, data that is available for a significant portion of the Settlement Class. (Doc. # 3194-2 at 8-9).

Where an email notice proves undeliverable after two attempts, the email address will be identified as inactive or invalid, or where the email address information is unavailable, BrownGreer will send a postcard notice to the potential Class Member's mailing address. (*Id*. at 9-10). BrownGreer will re-mail all postcard notices that the USPS returns as undeliverable with a forwarding address. (*Id*. at 10). For postcard notices the USPS returns as undeliverable without a forwarding address, BrownGreer will attempt to identify an alternative mailing address through PacificEast, Dun & Bradstreet, or other data curation companies that specialize in data enhancement and address verification. (*Id*.). After the initial notice distribution, but before the

deadline to file claims, BrownGreer will send reminder notice emails and/or postcards to those Class Members who have not yet submitted a claim or opted out of the settlement. (*Id.* at 11).

The email and postcard notices will provide the settlement website address for Class Members to visit to read and download the long-form notice prepared by the Parties. (*Id.*). This website, www.BCBSprovidersettlement.com, will also be referenced in all advertising and will include the Settlement Agreement. (*Id.* at 12).

BrownGreer will coordinate with Signal Interactive Media LLC ("Signal") to implement a paid media campaign that will target ancillary healthcare providers in the United States licensed to practice after 2008. (*Id.* at 11; Doc. # 3194-3 at 7-9). This paid media program will be amplified by the distribution of a news release on PR Newswire news circuits reaching traditional media outlets (television, radio, newspapers, magazines) and national websites. (Doc. # 3194-2 at 10).

BrownGreer will provide various services to communicate with and support Class Members throughout the Notice period, including (1) a toll-free telephone number that offers information about the Program in an FAQ format; (2) a monitored email inbox with an auto-response providing FAQs and responses, with follow-up by a live program agent if requested; and (3) a settlement program post office box to receive all physical mail related to the program. (*Id.* at 13). BrownGreer and Signal estimate that this notice program will reach more than 70% of Class Members directly. (*Id.* at 14).

The notices will advise Class Members of their right to opt out of or object to the Settlement, explain the requirements to opt out or object, and explain the deadlines for doing so. (*Id.* at 13).

### F.    Proposed Settlement Administrator

Provider Plaintiffs recommend that Special Master Edgar C. Gentle, III be appointed as Settlement Administrator. (Doc. # 3194-1 at 16-17). He and his partner Kip Harbison have been intimately involved in this case since its inception, and assisted the parties in reaching the Settlement now under consideration. Gentle has comprehensive experience serving as Mediator, Special Master, Settlement Trustee, and Claims Administrator in Mass Tort Litigation. (Doc. # 3192-6 at 8). He has vast experience providing claims administration and financial advice to courts, Settling Parties, and Mass Tort Settlements. (*Id*.). He has helped create and administer over $4.5 Billion in Settlements. (*Id*.). Gentle served as the Escrow Agent for the Breast Implant MDL and was responsible for paying out $1.2 Billion in claims to 300,000 claimants. (*Id*.). The court is familiar with many other examples of Gentle's relevant experience.

The Settlement Administrator will be responsible for preparing a lifetime budget for Notice and Administration Costs for review and approval of the voting members of the Provider Plaintiffs' Steering Committee; provide quarterly financial reports comparing the budget to actual operation results; create and implement accounting internal controls; take reasonable measures to detect waste, misappropriation and fraud; and engage an outside financial auditor. Based on its familiarity working with Gentle for the last twelve years in this matter and in previous MDLs, the court is exceedingly confident that he is eminently qualified to fulfill these duties.

### G.    Plan of Distribution

An initial step in creating the Plan of Distribution was to determine a fair allocation of the Net Settlement Fund among General Acute-Care Hospitals, Other Facilities, and Medical Professionals. To assist them in doing so, the Provider Plaintiffs retained the services of Kenneth R. Feinberg and Camille S. Biros, who have designed and implemented some of the largest

compensation programs in history, including the September 11th Victim Compensation Fund and the BP Deepwater Horizon Oil Spill Program, and also served as the Allocation Mediator for the Subscriber Settlement.

### i. Intraclass Allocation

Feinberg and Biros received information from the Provider Plaintiffs' experts regarding the results of their econometric models relating to impact on different types of providers. (Doc. # 3192-4 at 5-6). Those experts concluded that healthcare facilities (including General Acute-Care Hospitals and Other Facilities) suffered 92% of the impact, and Healthcare Professionals suffered 8%. (*Id*.). Factors affecting this calculation were (1) that the experts' data showed that the impact of the Blues' conduct on healthcare facilities was three and a half times as large as the impact on Healthcare Professionals, and (2) approximately 65% of physicians were excluded from the Settlement Class because they had released their claims in *Love v. Blue Cross and Blue Shield Ass'n*, No. 1:03-cv-21296-FAM (S.D. Fla.). (*Id*. at 6-8).

In addition to hearing from the Provider Plaintiffs' experts, Feinberg and Biros participated in numerous sessions in which representatives of several types of providers were given an opportunity to react to the experts' results and explain any departure from those results they felt was justified, including a two-day session in New York that all participants were invited to attend in person or virtually. (*Id*.).

Provider Co-Lead Counsel also sought the advice of Samuel Issacharoff, a law professor at New York University School of Law and an expert in complex litigation, about how to structure the settlement's payout and avoid legal conflicts that had compromised prior mass harm class action settlements. (Doc. # 3192-5 at 2-3). Issacharoff has expressed the following views on the settlement. By building the settlement from the ground up, and relying on expert advice for

allocation of settlement proceeds, Settlement Class Counsel avoided potential conflicts and followed a fair process. (*Id*. at 6). In designing the process of settlement negotiations regarding the allocation, the Plaintiffs' Steering Committee ("PSC") took care to ensure that all affected constituencies in the settlement had advocates and that no one with negotiating authority had either the incentive or the ability to trade off the interests of one group in favor of another. (*Id*. at 4).

Issacharoff noted that one of the first decisions made was *not* to try to create subclasses for the negotiation process. (*Id*.). First, because there are many integrated healthcare systems, many of the class members fell into multiple groups of providers. (*Id*.). Therefore, subclasses were not permissible as a matter of law because many class members would have been members of multiple subclasses. (*Id*. at 5, 7). Classes (and subclasses) are designed to represent class members, not legal claims. (*Id*. at 5).[3] Second, the claims all arose from a uniform set of allegedly anticompetitive practices and were presented against the same defendants. (*Id*.). Third, the settlement process itself would have unraveled if discussions were held among a growing number of subgroups, which resulted in further subgroups. (*Id*.). Fourth, the settlement process was organized to secure the participation of all affected groups, while avoiding trade-offs among the various groups. (*Id*.).

The Intraclass Allocation recommended here was based on damage models calculating the market effects from the challenged anticompetitive conduct and was developed over time at tremendous expense during this long and hotly contested litigation. (*Id*. at 6). This negotiation

---

[3] A class that is defined by a claim rather than by class members is an improper fail-safe class. *See Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (defining a fail-safe class as "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim."). Although the Eleventh Circuit has not explicitly prohibited fail-safe classes, "lower courts in the Eleventh Circuit have cautioned against certifying [them]." *Mobley v. Cook Out, Inc*., 2023 WL 6193012, at *11 (N.D. Ga. July 28, 2023) (quoting *Etzel v. Hooters of Am., LLC*, 223 F. Supp. 3d 1306, 1315-16 (N.D. Ga. 2016)).

structure avoided two critical potential conflicts. Counsel never shifted funds from one group to another to facilitate the class resolution, and the negotiators were never in the position of "robbing Peter to pay Paul." (*Id*.). Further, the PSC members' interests were directly aligned with the various subcomponents of the affected class of claimants.

### ii.    Distribution from the Net Settlement Fund

The Settlement Fund shall be used to pay certain costs and fees prior to determining a net amount that is available for distribution to class members (the "Net Settlement Fund"). (Doc. # 3192-2 at 26-27). The fees and other costs to be deducted from the Settlement Fund include the following:

> a.    The $100 million Notice and Administration Fund. Included within the Notice and Administration Fund will be the fees and expenses associated with monitoring and compliance. If, prior to entry of the Final Judgment and Order of Dismissal, Settlement Class Counsel believes that $100 million plus interest will be insufficient to pay for Notice and Administration Costs, Settlement Class Counsel may seek approval from the Court to create a Material Loss Contingency Reserve, which shall be funded out of the Settlement Fund and will not exceed 2% of the Settlement Fund. (*Id*. at 16, 18-19).

> b.    Fee and Expense Awards to Settlement Class Counsel, including attorneys' fees not to exceed 25% of the Settlement Fund, and reimbursement of expenses and costs reasonably and actually incurred in connection with prosecuting the Provider Actions. (*Id*. at 64-66).

> c.    Service Awards to class representatives, if Eleventh Circuit precedent changes to permit such awards.

> d.    Escrow Account costs (including taxes and tax expenses). (*Id*. at 60-63).

The Plan of Distribution distinguishes between two types of Providers: Health Care Facilities and Medical Professionals. Although each Settlement Class Member will be classified as only one type of Provider, Settlement Class Counsel anticipate that some Claimants will submit Settlement Claims on behalf of multiple Settlement Class Members, including more than one type of Provider. (Doc. # 3207 at 6). As discussed above, the Net Settlement Fund will be allocated as

follows: (a) 92% to Health Care Facilities (the "Hospital/Facility Net Settlement Fund"), and (b) 8% to Medical Professionals (the "Professional Net Settlement Fund"). (*Id*.).

The Hospital/Facility Net Settlement Fund and the Professional Net Settlement Fund will be considered to be and will be treated as separate funds. (*Id*. at 7). To the extent that Claimants to a fund choose not to submit claims, that will result in increased compensation to Claimants who submit claims in that fund only, and not to all Claimants overall.

The Settlement Class Period is July 24, 2008 through the Execution Date, which is October 4, 2024. (Doc. # 3192-2 at 26). For all Settlement Class Members, the distribution from the Net Settlement Fund will depend on their "Allowed Amounts," meaning the amounts allowed by Blue Plans for Commercial Health Benefit Products from July 24, 2008 to October 4, 2024. (Doc. # 3207-1 at 7). There are two methods for calculating a Claimant's Allowed Amounts: Option A (the "Default Method") or Option B (the "Alternative Method"). (*Id*.).

Option A (Default Method): The Default Method will be available to Claimants for whom the Provider Plaintiffs' experts have data concerning Allowed Amounts for all or part of the period from 2008 to 2015. If a Claimant elects the Default Method, the Provider Plaintiffs' experts will extrapolate the Claimant's Allowed Amounts for the entire Settlement Class Period, using the Consumer Price Index for hospital and related services from 2015 to the end of the Settlement Class Period. If the Provider Plaintiffs' experts do not have sufficient information about a Claimant's Allowed Amounts to extrapolate the Allowed Amounts, the Claimant must use the Alternative Method. (*Id*.).

Option B (Alternative Method): A Claimant may submit data showing its Allowed Amounts for each year from 2015 to the end of the Settlement Class Period. If the Provider Plaintiffs' experts lack data for the Claimant's Allowed Amounts for the period from 2008 to 2014,

the Claimant may submit Allowed Amounts for this period as well. The Provider Plaintiffs' experts will work with the Settlement Claims Administrator to extrapolate or interpolate data for years in which it is unavailable, using the Consumer Price Index for hospital and related services. If the Provider Plaintiffs' experts have data for the period from 2008 to 2014, that data will be used unless of course the Claimant submits Allowed Amounts for the period from 2008 to 2014. (*Id.* at 7-8).

Due to a lack of necessary data, the Default Method is not available for Claimants located in Arizona, Iowa, Louisiana, Maryland, New Jersey, South Dakota, Virginia, the District of Columbia and Puerto Rico, as well as Claimants that were not operating prior to January 1, 2015. Claimants who submit claims using the Default Method (despite being ineligible to do so) will be given an opportunity to resubmit their claims using the Alternative Method. (*Id.* at 8). When all claims have been submitted for Health Care Facilities, the "Hospital/Facility Claim Payment" for each general acute-care hospital or other facility will be calculated. (*Id.* at 9). Claimants submitting claims on behalf of Health Care Facilities will also be provided the opportunity to review with the Settlement Claims Administrator the Allowed Amounts upon which their Claim Payment is based prior to distribution of the Net Settlement Fund. (*Id.* at 11). The Settlement Claims Administrator's determination is final. (*Id.*).

Because medical professionals move over time, their access to their financial records may be more difficult, and it is generally less efficient to attempt to extrapolate Allowed Amounts for medical professionals, the distribution method for medical professionals will be streamlined to permit them to estimate their Allowed Amounts for the Settlement Class Period within certain ranges. (*Id.* at 9). The Provider Plaintiffs' experts have used a multiple regression model that will allow them to estimate a coefficient for each Medical Professional that represents the relative effect

of the Defendants' conduct on Medical Professionals, depending on the geographic locations of those Medical Professionals. (*Id.* at 10). When all claims have been submitted for Medical Professionals, the payment will be calculated for each Medical Professional. (*Id.*).

If there is a balance remaining in the Escrow Account – other than any Fee and Expense Award, the Notice and Administration Fund, any Service Award(s), and interest earned thereon – the Settlement Claims Administrator will, subject to court approval, allocate the balance among Settlement Class Members in an equitable and economic fashion, possibly subject to a minimum distribution amount to prevent the costs of distribution from depleting the distribution itself. (*Id.* at 12).

## III.    Applicable Legal Standards

The parties have asked the court to preliminarily certify the Settlement Class and preliminarily approve the Settlement. The court briefly sets forth the relevant standards of review that apply to these requests.

### A.    Preliminary Class Certification

As the Supreme Court has explained, when a plaintiff requests class certification for purposes of a settlement-only class, the court:

> need not inquire whether the case, if tried, would present intractable management problems [] for the proposal is that there is to be no trial. But other specifications of the Rule – those designed to protect absentees by blocking unwarranted or overbroad class definitions – demand undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold.

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848-49 (1999) ("When a district court, as here, certifies for class action settlement only, the moment of certification requires heightened attention to the justifications for binding the class members.") (internal citation omitted).

"For a class action to be certified, the named plaintiff must have standing, and the putative class must satisfy both the requirements of Federal Rule of Civil Procedure 23(a), and the requirements found in one of the subsections of Rule 23(b)." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1267 (11th Cir. 2019) (internal quotations omitted) (citing *City of Hialeah v. Rojas*, 311 F.3d 1096, 1101 (11th Cir. 2002)). The Rule 23(a) requirements for certification of any class action are: "(1) numerosity ('a class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical ... of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately protect the interests of the class')." *Amchem*, 521 U.S. at 613; *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009) (same); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187-88 (11th Cir. 2003) (same). The Federal Rules provide that a "class action may be maintained if Rule 23(a) is satisfied and if" the provisions of Rule 23(b)(1), (b)(2), or (b)(3) are satisfied. Fed. R. Civ. P. 23(b). Thus, "[i]n addition to establishing the requirements of Rule 23(a), a plaintiff seeking class certification must also establish that the proposed class satisfies at least one of the three requirements listed in Rule 23(b)." *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012); *see also Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 698 (S.D. Fla. 2015); *Diamond v. Hastie*, 2019 WL 1994467, at *4 (S.D. Ala. 2019).

Provider Plaintiffs seek certification under Rule 23(b)(3) for a class seeking damages and injunctive relief. Under Rule 23(b)(3), the movant must show (1) that the questions of law or fact common to the class members predominate over any questions affecting individual members, and (2) that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

In *Vega*, the Eleventh Circuit instructed that:

> Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied. *Valley Drug Co.*, 350 F.3d 1181 at 1188 n. 15 (citing *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 2372, 72 L.Ed.2d 740 (1982)); *see Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 & n. 12, 98 S. Ct. 2454, 2458 & n. 12, 57 L.Ed.2d 351 (1978) ("[t]he class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' ... 'The more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits.'") (emphasis and citations omitted); *Huff v. N.D. Cass Co. of Ala.*, 485 F.2d 710, 714 (5th Cir. 1973) (en banc) ("It is inescapable that in some cases there will be overlap between the demands of [Rule] 23(a) and (b) and the question of whether plaintiff can succeed on the merits."); [*Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996), a*brogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 128 S. Ct. 2131 (2008)] ("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.").

*Vega*, 564 F.3d at 1265-66 (footnotes omitted). The "party seeking class certification has the burden of proof." *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016) (citing *Valley Drug Co.*, 350 F.3d at 1187).

## B.    Preliminary Approval of the Settlement

If preliminary class certification under Rule 23(a) and (b) is appropriate, the court's job is not complete. Even when Rule 23(a) and (b) are satisfied, the court "must then examine the propriety of settlement." *In re Blue Cross Blue Shield Antitrust Litig.*, 2020 WL 8256366, at *6 (N.D. Ala. Nov. 30, 2020) (quoting *Hale v. Manna Pro Prod., LLC,* 2020 WL 3642490, at *2 (E.D. Cal. July 6, 2020)). As this court explained in preliminarily approving the Subscriber Settlement:

> Rule 23(e) provides that a court may approve a proposed class action settlement "only after a hearing and on finding that it is fair, reasonable, and adequate." *See* Rule 23(e)(2). The 2018 amendments to Rule 23(e)(2) brought forth substantial and

needed changes with respect to the early and final evaluation of class settlements.[4]
Rule 23(e) now provides that the district court may approve a settlement only after
considering whether:

> (A) the class representatives and class counsel have adequately represented the
> class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the
>> class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing of
>> payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

*In re Blue Cross Blue Shield Antitrust Litig.*, 2020 WL 8256366, at *6-7 (citing *Hale*, 2020 WL

364, 2490, at *3 (quoting Fed. R. Civ. P. 23(e)(2)(A)-(D))).

## IV.    Analysis

As explained above, the motions before the court require the court to address the Rule 23(a)

and (b) requirements for class certification and consider the overall fairness, reasonableness, and

adequacy of the proposed settlement. Below, the court analyzes the propriety of class certification

and the parties' proposed settlement. But first, the court considers two preliminary matters that are

critical to certification: standing and ascertainability.

---

[4] The 2018 amendments to Rule 23 impose a heightened standard on counsel seeking preliminary approval
of a proposed settlement. Now, before notice of a proposed settlement is given to a class, counsel must provide the
court with "a solid record supporting the conclusion that the proposed settlement will likely earn final approval after
notice and an opportunity to object." Fed. R. Civ. P. 23 advisory committee's notes to 2018 amendment. Specifically,
counsel must demonstrate the proposed settlement passes procedural and substantive hurdles. Rule 23(e)(2)(A-B)
requires counsel demonstrate the proposed settlement has satisfied certain "'procedural' concerns," and Rule
23(e)(2)(C-D) requires the proposed settlement satisfy a "'substantive' review." *Id.*

### A.    Standing

"It is well-settled in the Eleventh Circuit that prior to the certification of a class, and before undertaking an analysis under Rule 23, the district court must determine that at least one named class representative has Article III standing to raise each class claim." *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 679 (S.D. Fla. 2004) (citing *Wolf Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000)); *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987) ("[A]ny analysis of class certification must begin with the issue of standing.")). Indeed, "[o]nly after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others." *Griffin*, 823 F.2d at 1482. "To have standing, a plaintiff must show (1) he has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to conduct of the defendant; and (3) it is likely, not just merely speculative, that the injury will be redressed by a favorable decision." *Kelly v. Harris*, 331 F.3d 817, 819-20 (11th Cir. 2003).

Defendants have not challenged Provider Plaintiffs' standing in this case and, further, Provider Plaintiffs easily satisfy the necessary elements of standing. Plaintiffs have presented evidence that, due to Defendants' alleged anticompetitive agreements, they have suffered injuries in the form of lack of competition in the relevant healthcare markets, including being unable to contract with Defendants in contiguous states, and receiving reduced reimbursement rates. Provider Plaintiffs have presented evidence from reputable economics experts that their injuries are concrete, particularized, and actual, not merely conjectural. There is also evidence that the injuries are traceable to agreements between Defendants, and that it is likely that the elimination

of certain challenged restraints will remedy those injuries. Accordingly, the court is satisfied the named Provider Plaintiffs have standing.

### B.    Ascertainability

In addition to standing, a class plaintiff must show that the proposed class is adequately defined and clearly ascertainable. *Little*, 691 F.3d at 1304. The threshold issue of "ascertainability" relates to whether the putative class can be identified. "An identifiable class exists if its members can be ascertained by reference to objective criteria." *Bussey v. Macon Cnty. Greyhound Park, Inc.*, 562 F. App'x 782, 787 (11th Cir. 2014) (citing *Fogarazzo v. Lehman Bros., Inc.*, 263 F.R.D. 90, 97 (S.D.N.Y. 2009)). These "objective criteria" should be "administratively feasible," meaning that the identification of class members should be "a manageable process that does not require much, if any, individual inquiries." *Id.* at 787 (citation omitted) (reversing district court decision finding the ascertainability requirement satisfied where class could not be identified by reference to objective information in the defendant's records). A plaintiff can rely upon a defendant's records to identify class members. *Karhu v. Vital Pharms., Inc.*, 621 F. App'x 945, 948 (11th Cir. 2015).

Because the Settlement Class in this case is limited to healthcare providers, the settlement administrator will be able to build a robust list of potential Class Members from commercially available databases. These databases include lists of Providers maintained by associations, such as the American Medical Association and the American Hospital Association; lists of Providers maintained by the government, such as the National Provider Identifier ("NPI") registry; and vendors such as Definitive Healthcare, a provider of commercial healthcare data and analytics. In particular, Definitive Healthcare maintains a list of individual Providers with nearly three million entries, covering not only medical doctors but many other types of providers as well. These lists generally contain Providers' contact information, and in some cases contain validated email

addresses. Based on this information, the court is satisfied that the identification of putative Class Members will be administratively feasible.

### C.    The Rule 23(a) Requirements

Before certifying a class, even where a settlement is involved, a district court must analyze the requirements of Rule 23. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 619-20 (1997). Pursuant to Rule 23, class certification is appropriate if:

> (1) the class is so numerous that joinder of all members would be impracticable; (2) there are questions of fact and law common to the class; (3) the claims or defenses of the representatives are typical of the claims and defenses of the unnamed members; and (4) the named representatives will be able to represent the interests of the class adequately and fairly.

*Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d at 1181, 1188 (11th Cir. 2003); Fed. R. Civ. P. 23(a)(1)-(4).

### 1.    Numerosity

Under Rule 23(a)(1), the plaintiff must show that the settlement class is so numerous that joinder is impracticable. *See* Rule 23(a)(1). The Eleventh Circuit has held that the numerosity requirement is "a generally low hurdle" and "less than twenty-one is inadequate [and] more than forty [is] adequate...." *Vega v. T-Mobile USA, Inc.*, 564 F.3d at 1256, 1267 (11th Cir. 2009). Based on information from the American Hospital Association and the American Association of Medical Colleges, the settling parties estimate that in the United States there are more than 6,000 hospitals, several thousand other medical facilities, and hundreds of thousands (or more) physicians and other professionals. (Doc. # 3192-1 at 36). Therefore, the proposed classes easily meet the numerosity requirement of Rule 23(a)(1).

### 2.    Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). For commonality to be found, the action "must involve issues that are

susceptible to class-wide proof." *Williams v. Mohawk Indus., Inc*., 568 F.3d 1350, 1355 (11th Cir. 2009) (citing *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001)). Also, a plaintiff must "demonstrate that the class members 'have suffered the same injury.'" *Walmart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (citation omitted). However, Rule 23(a)(2) "demands only that there be questions of law or fact common to the class. This part of the rule does not require that all the questions of law and fact raised by the dispute be common." *Vega*, 564 F.3d at 1268; *see also Carriuolo v. General Motors Co*., 823 F.3d 977, 984 (11th Cir. 2016) ("even a single common question will" satisfy the commonality requirement). Courts in the Eleventh Circuit "have consistently held that allegations of price-fixing, monopolization, and conspiracy by their very nature involve common questions of law or fact." *In re Delta/AirTran Baggage Fee Antitrust Litig*., 317 F.R.D. 675, 694 (N.D. Ga. 2016) (citations omitted).

Here, like the Subscriber Plaintiffs asserted, Provider Plaintiffs have alleged that Defendants engaged in a nationwide conspiracy to horizontally allocate geographic markets by agreeing to exclusive service areas where the Blue Plans do not compete with each other and that they have imposed other anticompetitive restraints, such as restraints on output in the form of the (now abrogated) National Best Efforts rule. Therefore, Provider Plaintiffs' claims involve several common questions of law or fact, including: (1) whether the Blues conspired to allocate markets and agreed to restrict output in violation of the Sherman Act, (2) whether the Blues agreed to fix prices and implement a group boycott through the BlueCard Program in violation of the Sherman Act, (3) whether the Blues monopsonized the relevant product markets, (4) whether the Blues paid anticompetitive reimbursements to Providers as a result of their agreements, (5) whether the Blues have procompetitive justifications that outweigh the harm to competition for the Provider Plaintiffs' rule of reason claims, and (6) whether the Blues constitute a single entity for purposes

of managing their trademarks. The Blues have denied these allegations, but it is clear that there are common issues as to all members of all proposed classes that satisfy the commonality requirement.

### 3.    Typicality

Rule 23(a)(3) provides that class representatives may sue on behalf of the class only if the "claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). "[T]he typicality requirement is permissive; representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *In re Checking Acct. Overdraft Litig.*, 275 F.R.D. 666, 674 (S.D. Fla. 2011) (citing *Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. 602, 605 (S.D. Fla. 2003)). Whereas commonality looks at whether class members' claims are common to each other (a horizontal comparison between members of the class), typicality is satisfied where the named plaintiffs' claims "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of the class (a vertical comparison between class members and class representatives). *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984), *cert. denied*, 470 U.S. 1004 (1985).

"'Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice.'" *In re Checking Acct. Overdraft Litig.*, 286 F.R.D. 645, 653 (S.D. Fla. 2012) (quoting *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 58 (3d Cir. 1994) (citation omitted)). Typicality is not destroyed by factual variations between the class representatives and the unnamed class members. *Kornberg,* 741 F.2d at 1357; *see also Williams v. Mohawk Indus., Inc.*, 568 F.3d at 1350, 1357 (11th Cir. 2009).

The Provider Class Representatives include various types of Providers, but their claims are typical of the class because they arise from the same alleged conduct: Defendants' alleged illegal geographic market allocation and output restrictions, among other restraints. That alleged conduct, along with the challenged price-fixing and group boycott aspects of the BlueCard system, affected competition in the markets for the purchase of healthcare services and the sale of commercial healthcare financing services, harming the Settlement Class. (Doc. # 2454-6 at 116-254).

The Class Representatives seek the same relief sought by absent Class Members. The proof that Provider Plaintiffs would present to support their claims directly supports the claims of the Class. Because Provider Plaintiffs' claims can be established by common proof of Defendants' application of their restrictive policies, and because the Class Representatives and Settlement Class Members appear to have suffered the same injuries and damages, the court finds that typicality is satisfied.

### 4.    Adequacy of Representation

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy-of-representation requirement is satisfied when (i) the class representatives have no interests conflicting with the class; and (ii) the representatives and their attorneys will properly prosecute the case. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *Valley Drug Co.*, 350 F.3d at 1189.

"Significantly, the existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a fundamental one going to the specific issues in controversy" to preclude certification. *Valley Drug Co.*, 350 F.3d at 1189. "A conflict is 'fundamental' when, for example, some class members claim to have been harmed by the same conduct that benefitted

28

other class members." 3 William B. Rubenstein, Newberg and Rubenstein on Class Actions § 7:31 (6th ed. 2024).

The interests of the Class Representatives and the Settlement Class are fully aligned. They all share an identical interest in proving that the Blues' agreements were unlawful, and that the Blues' agreements injured them. The applicable law is uniform federal law. "By relying principally on federal substantive law, the representative plaintiffs followed the pattern of antitrust and securities litigation, where nationwide classes are certified routinely even though every state has its own antitrust or securities law, and even though these state laws may differ in ways that could prevent class treatment if they supplied the principal theories of recovery." *In re Mex. Money Transfer Litig.*, 267 F.3d 743, 747 (7th Cir. 2001). And, Class Counsel have informed the court that all of the current Class Representatives have reviewed the Settlement Agreement and approve of its terms, as witnessed by their signatures on the Agreement. (*See* Doc. # 3192-2 at 135-53).

The court finds that neither the Class Representatives, nor their counsel, have any interests that are antagonistic to those of the absent class members. Each named Plaintiff, like each absent class member, has a strong interest in proving that Defendants' agreements were unlawful, in demonstrating the impact of that conduct, and in obtaining redress. the Class Representatives thus share the interests of the class and will properly and adequately represent the class.

In 2013, before appointing Interim Co-Lead Counsel in this case, the court conducted an independent review of the applicants and found that those appointed were best suited to represent the interests of the class. The court has become exceedingly familiar with the lawyers representing the class over the last twelve years and is fully satisfied that the named Plaintiffs and the lawyers representing them have properly and adequately prosecuted this case and well represented the class. Therefore, the adequacy-of-representation requirement is satisfied.

### D.    Rule 23(b)

Provider Plaintiffs seek certification only under Rule 23(b)(3) for a class seeking damages and injunctive relief. Therefore, Provider Plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." )." *AA Suncoast Chiropractic Clinic, P.A. v. Progressive Am. Ins. Co.*, 938 F.3d 1170, 1174 (11th Cir. 2019).

### 1.    Predominance

"Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Williams v. Mohawk, Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009). The predominance standard is similar to the commonality requirement of Rule 23(a), but it is more demanding and mandates particular caution where "individual stakes are high and disparities among class members great." *Amchem*, 521 U.S. at 623; *see Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 985 (11th Cir. 2016) (describing predominance in a similar way). The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Carriuolo*, 823 F.3d at 985 (quoting *Amchem*, 521 U.S. at 623). The Eleventh Circuit has described how the court should analyze the predominance factor as follows:

> To determine whether the requirement of predominance is satisfied, a district court must first identify the parties' claims and defenses and their elements. *See Klay*, 382 F.3d at 1254 & n.7. The district court should then classify these issues as common questions or individual questions by predicting how the parties will prove them at trial. *See id.* at 1255. Common questions are ones where "the same evidence will suffice for each member," and individual questions are ones where the evidence will "var[y] from member to member." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005).

*Brown v. Electrolux Home Prods., Inc*, 817 F.3d 1225, 1234 (11th Cir. 2016).

Provider Plaintiffs have alleged a nationwide conspiracy in which Defendants applied the alleged restraints in the same way in every state in which Class Members reside. (Doc. # 1083). At issue here is whether those uniform, nationwide restraints violated the Sherman Act. (*Id*.). Provider Plaintiffs have submitted evidence showing that these restraints caused antitrust injury to all types of healthcare providers, and the court has already denied a motion for summary judgment arguing that Provider Plaintiffs other than hospitals had not shown antitrust injury. (Doc. # 3102).

"[T]he predominance requirement is satisfied here because common questions present a significant aspect of the case and can be resolved for all Settlement Class Members in a single adjudication." *In re Checking Account Overdraft Litig*., 275 F.R.D 654, 660 (S.D. Fla. 2011) (finding predominance satisfied for settlement certification purposes where "each Settlement Class Member's claims arise from the same or similar alleged [Bank of America] policies and practices and the same legal theories" and "the relationship between Settlement Class Members and [Bank of America] is governed by substantially uniform or similar account agreement"). Here, each Class Member's claims arise from substantially similar and uniform Blue policies and practices. Therefore, the court concludes that Provider Plaintiffs have satisfied the predominance requirement.

### 2. Superiority

The superiority requirement of Rule 23(b)(3) requires the court to consider "the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1269 (11th Cir. 2004). Rule 23(b)(3) contains a list of factors to consider when making a determination of superiority:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

There are thousands of hospitals and other facilities, and hundreds of thousands of healthcare professionals in the Settlement Class. Provider Plaintiffs spent tens of millions of dollars on experts to collect, clean up, synthesize, and analyze data just to calculate the damages suffered by Alabama hospitals. (Doc. # 3192-3 at 10). If an individual hospital system were to file an individual action against the Blues, they would need to repeat this process for every geographic market in which they allegedly sustained damages. The cost of litigating these cases is exorbitant. It would be enormous for a large health care provider and, for smaller healthcare providers, the cost would simply be prohibitive. There is a substantial question whether the potential individual recovery for Settlement Class Members is large enough to warrant the burden, expense (both temporal and monetary), and risk[5] of prosecuting individual Sherman Act claims. *See Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification."). Thus, it is clear that a class action is not only superior to individual actions, but probably the only feasible method of resolving all claims against the Settling Defendants.

Having carefully considered the predominance and superiority factors, the court concludes that the proposed classes are substantially likely satisfy the relevant requirements of Rule 23(b)(3).

---

[5] A looming question that has cast its shadow over this litigation is whether a jury could be convinced that, with the skyrocketing costs of healthcare, medical providers are underpaid in their reimbursement rates.

### E.    Preliminary Approval of Settlement Terms

As noted above, "[i]f preliminary class certification is appropriate, the court must then examine the propriety of settlement." *Hale v. Manna Pro Prod., LLC*, 2020 WL 3642490, at *2 (E.D. Cal. July 6, 2020).  "The [c]ourt may not resolve contested issues of fact or law[] but instead is concerned with the overall fairness, reasonableness, and adequacy of the proposed settlement as compared to the alternative of litigation." *Swaney v. Regions Bank*, 2020 WL 3064945, at *3 (N.D. Ala. June 9, 2020) (quoting *Turner v. Murphy Oil USA, Inc*., 472 F. Supp. 2d 830, 843 (E.D. La. 2007)).

Although a court need not make a final determination of the fairness, reasonableness, and adequacy of the proposed settlement at this stage of the proceedings, it must make a preliminary finding that the proposed settlement is sufficiently fair, reasonable, and adequate on its face to warrant presentation to the class members. *See* William B. Rubenstein, Newberg on Class Actions § 11:25 (4th ed. 2002) (citing The Manual for Complex Litigation § 30.41 (3d ed. 1995)) ("If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies ... the court should direct that notice under Rule 23(e) be given to the class members of a formal fairness hearing, at which arguments and evidence may be presented in support of and in opposition to the settlement.").

A district court may only approve a settlement upon finding that it "is fair, adequate and reasonable and is not the product of collusion between the parties." *Bennett v. Behring Corp*., 737 F.2d 982, 986 (11th Cir. 1984) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)). In making this determination, district courts have traditionally considered the following factors: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate, and reasonable; (4) the

complexity, expense, and duration of the litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved." *Id.* The 2018 amendments to Rule 23(e) added a mandatory, but not exhaustive, list of similar approval factors. Because these factors overlap, it is appropriate to address them together. *See Drazen v. Pinto*, 106 F.4th 1302, 1330 (11th Cir. 2024).

Further, in considering whether the proposed settlement satisfies the "fair, adequate and reasonable" standard, "the trial court is entitled to rely upon the judgment of experienced counsel for the parties." *Cotton*, 559 F.2d at 1330.

### 1.    Class Representatives and Class Counsel Adequately Represented the Class

For the same reasons discussed above related to Rule 23(a)(4)'s adequacy of representation standard, the court preliminarily finds that the Class Representatives and Class Counsel have adequately represented the class under Rule 23(e)(2)(A). Settlement Class Counsel have vigorously, professionally, and successfully represented the interests of the Settlement Class for the last twelve years in both hard-fought litigation and intense settlement negotiations. The court is well-acquainted with their performance in this case and has no hesitation in concluding that Settlement Class Counsel and the Class Representatives have more than adequately represented the Settlement Class.

### 2.    There Was No Fraud or Collusion, and the Settlement Was Negotiated at Arm's Length

Rule 23(e)(2)(B) requires the court to determine whether a proposed settlement "was negotiated at arm's length." Relatedly, one of the *Bennett* factors requires the court to rule out the possibility of fraud or collusion behind the settlement. *Leverso v. SouthTrust Bank of AL., Nat. Assoc.*, 18 F.3d 1527, 1530 (11th Cir. 1994).

34

The scope of settlement negotiations in this case – which included scores of in-person meetings, along with hundreds of calls and Zoom conferences over the course of nine years – is a strong indication that there was no collusion and that the Settlement was negotiated at arm's length. Indeed, every material provision was extensively negotiated. (Doc. # 3192-3 at 10-13). And the court's Special Master, who acted as one of the mediators and helped finalize the Provider Settlement, has attested that there was no fraud or collusion involved. (Doc. # 3192-6).

### 3. This Settlement Will Avert Years of Highly Complex and Expensive Litigation Involving Significant Costs, Risks, and Delay

This litigation is extraordinarily complex. It has involved questions of personal jurisdiction, the appropriate antitrust standard of review (the rule of reason or the *per se* standard), trademark law, and even the concept of two-sided platforms – a body of law that did not exist when the first Provider case was filed. If this case were to proceed to trial, the court would be required to decide numerous *Daubert* motions before the court would even be in a position to address a motion to certify a class of Alabama Providers. Given the inevitable appeals (some interlocutory) of such a ruling and the likelihood of further dispositive motions practice after class certification, a trial of just the Alabama classes' claims is years away. For any cases that would be remanded to the transferor courts, or filed after remand, resolution may be even farther away. The massive discovery in this MDL did not focus on jurisdictions other than Alabama. Experts would need to be commissioned to analyze these other markets. It would take many years to complete these cases, and even when completed in the trial court, the parties undoubtedly face years of appeals of class certification decisions, verdicts, and/or decisions on the merits. Any potential future recovery must be discounted significantly to account for the immense time and expenses it would take to put plaintiffs in a position to receive any recovery.

There also exist risks that experts would be excluded and classes not certified. This process would have to be repeated in each relevant market. If the parties continue to litigate these cases, they would need to devote additional significant time and enormous resources to preparing various complex damages models. There is simply no guarantee that Provider Plaintiffs would recover a final judgment more favorable than the considerable $2.8 billion in monetary relief and extraordinary injunctive relief secured by them in the Settlement.

Moreover, when the court preliminarily approved the Subscriber Plaintiffs' settlement in November 2020, the National Best Efforts ("NBE") rule was still in effect. That rule was one of the "aggregation of competitive restraints" that justified applying the *per se* standard of review to the Blues' conduct. *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1267 (N.D. Ala. 2018). Provider Plaintiffs face an altered Blue business structure with the removal of NBE in connection with the Subscriber Settlement, and the court has held that, "for the period of time following the elimination of the NBE rule (after April 2021), the court concludes that it must apply the rule of reason analysis to Providers' Market Allocation Conspiracy claims." (Doc. # 2933 at 13). And, as to most of the injunctive relief that Provider Plaintiffs have obtained through settlement, there is more than a risk that this relief would not be achieved through further litigation. The significant improvements to the BlueCard Program may not be the type of relief a court could award even if Provider Plaintiffs were to prevail at trial. Only through settlement with all of the Blue Plans could such an outcome have been achieved.

Another critical consideration that became readily apparent through the years the Providers and the Blues were mediating the Provider Track of this MDL is that the Blues were and are interested in a complete settlement with the Providers – nothing less.[6]

---

[6] Parties are aware, for a substantial period of time the Blues prioritized a Subscriber settlement over any Provider resolution because, in the words of the previous CEO of BCBSA, they did not want to "fight with their

Thus, after careful review, the court preliminarily finds that the costs, risks, and delays of trials and appeals support the appropriateness of the decision to settle.

### 4.    Stage of the Proceedings/Development of the Factual Record

"The stage of the proceedings at which a settlement is achieved is 'evaluated to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation.'" *M.D. v. Centene Corp., Inc*., 2020 WL 7585033, at *7 (S.D. Fla. Oct. 7, 2020) (quoting *Saccoccio v. JP Morgan Chase Bank, N.A*., 297 F.R.D. 683, 693 (S.D. Fla. 2014) (in turn quoting *Lipuma v. Am. Express Co*., 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005))). "Nevertheless, early settlements are favored and 'vast formal discovery need not be taken.'" *Centene Corp*., 2020 WL 7585033, at *7 (quoting *Saccoccio*, 297 F.R.D. at 694).

Here, there is no question that this is an appropriate stage of the litigation at which to evaluate settlement. Vast discovery has been undertaken in this litigation spanning over twelve years. In that time, Provider Plaintiffs have reviewed Defendants' production of more than 75 million pages of documents; taken, defended, or attended more than 200 depositions of Defendants and nonparties; collected and reviewed documents in response to the Defendants' requests for production from 156 Provider Plaintiffs and nonparties; and defended more than 40 depositions of Provider Plaintiff class representatives and putative class members. With their experts, the Provider Plaintiffs have built a sophisticated damages model that required the production,

---

customers." So, if the individual providers were to bring their own actions, the court suspects that the Blues would litigate each one to its conclusion rather than enter into piecemeal settlements. The prospect of resolving this case on a class wide basis has produced the strongest Settlement, and achieved results that would not have been possible in individual litigation.

synthesis, and analysis of many terabytes of health insurance claims data. This would be expensive and difficult to replicate.

Thus, it is clear that the factual record in this matter was sufficiently developed to allow Class Counsel to make a reasoned judgment as to merits of the Settlement. *Swaney v. Regions Bank*, 2020 WL 3064945, at *5 (N.D. Ala. June 9, 2020) (holding that settlement was appropriate where the parties "have litigated this case for over seven years, through dispositive motions" and "have had the opportunity to investigate the facts and law, review substantive evidence relating to the claims and defenses, and brief the relevant legal issues").

### 5. The Benefits Provided by the Settlement Appear to be Fair, Adequate and Reasonable When Compared to the Range of Possible Recovery

The second and third *Bennett* factors are "easily combined and normally considered in concert." *Camp v. City of Pelham*, 2014 WL 1764919, at *3 (N.D. Ala. May 1, 2014). "The [c]ourt's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation[] but to evaluate the proposed settlement in its totality." *Lipuma*, 406 F. Supp. 2d at 1323.

Without question, the Settlement provides significant monetary relief to class members. Provider Plaintiffs believe that the $2.8 billion Settlement Amount represents the largest recovery in an antitrust class action that did not result from a governmental investigation, and it is larger than the Subscriber Plaintiffs' settlement fund, which this court approved and the Eleventh Circuit affirmed. In addition, the Blues will make investments of hundreds of millions of dollars in system improvements for the benefit of class members.

Provider Plaintiffs' experts estimated damages for Alabama General Acute-Care Hospitals for the period from July 24, 2008 to April 15, 2019. Their estimates ranged from $1.46 billion to $4.63 billion. Notably, Blue Cross and Blue Shield of Alabama has the highest market share of any Blue Plan in the United States. Thus, a similar damages estimate in other markets with greater

competition would be lower. Moreover, although Providers believe their experts showed that a damages class of Alabama hospitals could be certified (a proposition the Blues contest), there is no guarantee that their analysis would lead to the same result in all geographic markets. Providers' expert reports also offered a damages model only for General Acute-Care Hospitals. Their subsequent work has shown that the effect of the Blues' market share on healthcare professionals is approximately three and a half times lower than the effect on healthcare facilities.

Settlements reflecting even a small percentage of a potential recovery fall within the range of reasonable recoveries. *Bennett*, 737 F.2d at 986-87 n.9 (approving $675,000 settlement representing 5.6% of claims with maximum potential recovery of $12,000,000); *In re Checking Acct. Overdraft Litig*., 830 F. Supp. 2d at 1346 ("[S]tanding alone, nine percent or higher constitutes a fair settlement even absent the risks associated with prosecuting these claims."). By whatever measure, the $2.8 billion monetary settlement is more than reasonable.

Of course, the monetary recovery is only part of the value of the Settlement. Settlement Class Members will benefit from a comprehensive transformation of the BlueCard Program, saving administrative costs and improving their ability to recover payment for their services for years to come. The Blues will invest hundreds of millions of dollars to implement this transformation. The Settlement expands the ability of certain hospitals to contract with more than one Blue Plan, removes a significant restriction on Contiguous Areas Contracts with another Blue Plan, and limits the ability of a Blue Plan to rent certain Non-Blue Branded Provider networks to another Blue Plan.

Settlement Class Counsel were well-positioned to evaluate the strengths and weaknesses of the claims in this case as well as the appropriate basis on which to settle them. Because of the uncertainties surrounding continued litigation and the fact that settlement provides for certain,

significant, and immediate relief, the court concludes that the recovery provided for in the Provider Settlement Agreement is an excellent achievement.

### 6.        Opposition to the Settlement

The fifth *Bennett* factor considers the substance and amount of any opposition to the settlement. *Bennett*, 737 F.2d at 986. Class Counsel have informed the court that all of the current Class Representatives[7] have reviewed the Settlement Agreement and approve of its terms, as witnessed by their signatures on the Agreement. (*See* Doc. # 3192-2 at 135-53). The court finds that the unanimous approval of the Settlement by the current Class Representatives indicates preliminary approval is appropriate.[8]

### F.        Other Relevant Issues

At the Preliminary Approval Hearing, a number of other issues were addressed. Although they do not fit neatly within the Rule 23(e)(2) and *Bennett* factor analysis, the court finds they are relevant to the fairness, adequacy, and reasonableness of the Settlement and has considered them.

---

[7] The court previously dismissed the claims of certain Provider Class Representatives who were also members of the settlement classes in *Love v. Blue Cross and Blue Shield Ass'n, et al.*, No. 1:03-cv-21296-FAM (S.D. Fla.) ("*Love*"). The Love Providers Class Representatives were Charles H. Clark III, M.D., Robert W. Nesbitt, M.D., Luis R. Pernia, M.D., Corey Musselman, M.D., Julie McCormick, M.D., L.L.C., Harbir Makin, M.D., Hillside Family Medicine, LLC, Ear, Nose & Throat Consultants and Hearing Services, P.L.C., and Kathleen Cain, M.D. (Doc. # 2902*; Conway v. Blue Cross and Blue Shield of Ala., et al*, Case No. 2:12-cv-02532-RDP, Doc. # 457 at 559).

[8] There has been one objection to the Settlement. On the night before the preliminary approval hearing, certain Non-Party Out-Of-Network Emergency Medicine Providers ("Out-of-Network ER Groups") filed an Objection to Preliminary Approval of Proposed Class Settlement and Motion for 30-Day Continuance of Preliminary Approval Hearing. (Doc. # 3211). After meeting and conferring with the parties to the Settlement, on November 22, 2024, the Out-of-Network ER Groups filed an Amended Objection. (Doc. # 3217). Their Objection asserts that:

> all of the named class Plaintiffs are in-network providers. The proposed class definition includes, however, not just in-network providers, but also out-of-network providers, including emergency medicine services providers. As described below, the record lacks a sufficient showing of (1) typicality because of the unique rights and interests of out-of-network emergency services providers, or (2) the adequacy of the named plaintiffs to represent the interests of out-of-network emergency services providers.

(Doc. # 3217 at 2). The court has addressed this objection in a separate order of the court. (Doc. # 3224).

### 1.    Proposed Attorneys' Fees

Provider Plaintiffs' Settlement Agreement handles attorneys' fees similarly to the Subscribers' Agreement. Like Subscribers, Providers have committed to seek attorneys' fees of no more than 25% of the settlement fund, plus expenses and the attorneys' fees and costs associated with administering the settlement's provisions. This is a similar percentage to that which the court preliminarily approved for the Subscribers Settlement, and it is in line with the Eleventh Circuit's benchmarks. *See Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1243 (11th Cir. 2011) (noting "well-settled law from this court that 25% is generally recognized as a reasonable fee award in common fund cases"); *Swaney*, 2020 WL 3064945, at *7 ("In determining an award of attorney's fees in a percentage-of-fund class settlement case, the 'benchmark' percentage is 25%, which is the dead center of the 20-30% range.").

Settlement Class Members will receive notice of the proposed fee and expense request and will have an opportunity to object to any such award prior to final approval. Providers' ultimate request will of course be subject to court approval and will receive intense scrutiny.

The Agreement also provides for a Partial Award of $75 million to be paid from the Escrow Account to Settlement Class Counsel no later than 45 days after entry of the Final Judgment and Order of Dismissal, subject to protections that ensure repayment of the Partial Award if the Fee and Expense Award is reduced below $75 million, or return of the Escrow Account is required. (Doc. # 3192-2 at 64-65). The court approved a similar provision in the Subscribers' Agreement that required the payment of $75 million to class counsel even earlier – after preliminary approval. The court concludes that Provider Plaintiffs' "quick pay" agreement should be approved for the same reasons. Providers have engaged in twelve years of hard-fought litigation, and the early

distribution does not prejudice the class members because counsel will likely receive the same percentage of the common fund if final approval is granted.

Therefore, the court finds that both the proposed attorneys' fees and the parties' agreement for a "quick pay" partial payment of attorneys' fees are fair and reasonable.

### 2.    The Plan of Distribution

A plan of distribution should be approved when it allocates relief in a way that is "fair, adequate, and reasonable." *See In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 241 (5th Cir. 1982); *see also Holmes v. Cont'l Can Co*., 706 F.2d 1144, 1147 (11th Cir. 1983); *In re Sunbeam Sec. Litig*., 176 F. Supp. 2d 1323, 1328 n.2 (S.D. Fla. 2001); *Bellocco v. Curd*, 2006 WL 4693490, at *2 (M.D. Fla. Apr. 6, 2006); *Smith v. Floor and Decor Outlets of Am., Inc*., 2017 WL 11495273, at *5 (N.D. Ga. Jan. 10, 2017). A plan of distribution will pass muster so long as "it has a 'reasonable, rational basis,' particularly if 'experienced and competent' class counsel support it." MCLAUGHLIN ON CLASS ACTIONS, § 6.23 (17th ed. 2020); *see also Schwartz v. TXU Corp.*, 2005 WL 3148350, at *21 (N.D. Tex. Nov. 8, 2005) (approving a plan of allocation that "resulted in a settlement agreement that fairly and rationally allocates the proceeds of the settlement").

The allocation of the Net Settlement Fund to the different types of Providers is based on the relative impact of the Blues' conduct on each type of Provider, and it was recommended by Feinberg and Biros after many different types of Providers were given an opportunity to comment on the allocation. The use of relative harm estimates prepared by the Provider Plaintiffs' experts will result in distributions that are proportional to the alleged impact of the Defendants' conduct on each healthcare facility. And, if they prefer, these facilities can submit their own claims based on Allowed Amounts. Professionals will be permitted to estimate their Allowed Amounts within

pre-defined ranges, which will minimize the burden of submitting a claim but allow them to receive a distribution based on the magnitude of their business with the Blues.

"'[A] plan of allocation need not be perfect.'" *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 327 F.R.D. 483, 496 (S.D.N.Y. 2018) (quoting *Hart v. RCI Hosp. Holdings, Inc.*, 2015 WL 5577713, at *12 (S.D.N.Y. Sept. 22, 2015)). "Rather, '[a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel.'" *In re LIBOR-Based Fin. Instruments*, 327 F.R.D. at 496 (quoting *In re Wachovia Equity Sec. Litig.*, 2012 WL 2774969, at *5 (S.D.N.Y. June 12, 2012)); *see also In re Omnivision Techns., Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2009) ( "[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness." (quoting *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 622 (N.D. Cal. 1979)). Here, the Plan of Distribution is based on an expert damages model, was mediated before experienced allocation mediators with the input of affected class members, and was recommended by experienced and competent class counsel. Therefore, the court concludes that the proposed Plan of Distribution allocates the Net Settlement Fund in a fair, adequate, and reasonable manner.

Accordingly, based on the information presently before the court, it appears that the Plan of Distribution should be preliminarily approved as fair, reasonable, and adequate.

### 3.    Class Notice and Claim Forms

Rule 23(e) requires a court to "direct notice in a reasonable manner to all class members who would be bound" by the proposed Settlement. Fed. R. Civ. P. 23(e)(1). Rule 23(c)(2) requires a court to "direct appropriate notice to the class." Fed. R. Civ. P. 23(c)(2)(A). With regard to Rule 23(b)(3) classes, the Rule states that:

the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified

through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means. The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B). Thus, the Rule requires that "[i]ndividual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort" and that the "notice must be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-74 (1974) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co*., 339 U.S. 306, 314 (1950)). "In every case, reasonableness is a function of anticipated results, costs, and amount involved." *In re Nissan Motor Corp. Antitrust Litig*., 552 F.2d 1088, 1099 (5th Cir. 1977). Reasonableness also depends on the information available to the parties. *See id.* at 1098.

After a competitive bidding process, Settlement Class Counsel retained BrownGreer PLC as the Settlement Notice Administrator. BrownGreer has extensive experience in all aspects of notice and settlement design and implementation. The Notice Plan entails direct notice efforts and supplemental publication notice targeted to healthcare professionals. The direct notice is estimated to reach over 70% of known Class Members. After the initial notice distribution, but before the deadline to file claims, BrownGreer will send reminder notice emails and/or postcards to those Class Members who have not yet submitted a claim or opted out of the settlement. BrownGreer will also provide various services to communicate with and support Class Members throughout the Notice period.

The email and postcard Notices will provide the settlement website address, www.BCBSprovidersettlement.com, for Class Members to visit so they can read and download the long-form notice prepared by the Parties. (Doc. # 3194-2 at 10). The website will also be referenced in all advertising and will include the Settlement Agreement. (*Id*. at 12). The notices are designed to come to the attention of the class; are written in clear, concise, easily understood language; describe the nature of the action and define the class; provide specific instructions Class Members need to follow to properly exercise their rights; and contain sufficient information for a class member to make an informed decision. The notices advise Class Members of their right to opt out of or object to the Settlement, explain the requirements to opt out or object, and list the deadlines for doing so. Feinberg and Biros have reviewed the proposed claim forms and instructions for both Healthcare Facilities and Medical Professionals. They have provided their opinion that the forms are reasonable, do not require more information than necessary to process claims, and are well-designed with clear and prominent information. (Doc. # 3207-2 at 4-5).

Email notice campaigns supplemented by U.S. mail for class members who do not have an e-mail address, or when an e-mail is returned as undeliverable, is appropriate. *See, e.g., Carroll v. Macy's, Inc.*, 2020 WL 3037067 at *3 (N.D. Ala. June 5, 2020); *Aboltin v. Jeunesse, LLC*, 2018 WL 6576464, at *2 (M.D. Fla. Sept. 13, 2018) (granting preliminary approval of a Notice Plan providing for e-mail notice to all class members and postcard notice by U.S. mail if the defendant did not have an e-mail address for a certain class member or if two e-mail attempts proved unsuccessful for a certain class member).

These proposed notice methods provide adequate notice to potential class members and explain, in sufficient detail, their individual rights under the settlement. Moreover, the claim forms

are reasonable. (Doc. # 3209). Therefore, the court finds that the proposed Notice Plan is appropriate in both form and content and is due to be approved.

### 4.    CAFA Notice

The court recognizes that the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715, imposes additional notice requirements on defendants in class action lawsuits. In the Settlement Agreement, the Settling Defendants have agreed to serve or cause to be served a notice of the proposed settlement on appropriate federal and state officials in accordance with the requirements of CAFA, 28 U.S.C. § 1715(b), and notify the court that CAFA compliance has been accomplished.

## V.    Conclusion

There is a "strong judicial policy favoring settlement." *Ponzio v. Pinon*, 87 F.4th 487, 494 (11th Cir. 2023) (citing  *Bennett*, 737 F.2d at 986 and *In re U.S. Oil & Gas Litig*., 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits.")). Having carefully considered Provider Plaintiffs' Motion for Preliminary Approval of Proposed Class Settlement, the Settlement Agreement, Provider Plaintiffs' Motion for Approval of a Plan for Notice and Appointment of Settlement Notice Administrator and Settlement Administrator, the Proposed Plan of Distribution, and the Proposed Notice Plan, as well as all related matters of record, the court finds that it is likely it will certify the class for settlement purposes at final approval and that there is good cause to preliminarily approve the proposed settlement, subject to further consideration by the court after notice to the class and a fairness hearing. The court concludes that the proposed Settlement Agreement appears sufficiently fair, reasonable, and adequate to warrant submitting the proposed settlement to the Settlement Class and setting a fairness hearing. It is therefore **ORDERED** as follows:

1.      The Settlement Agreement is sufficiently within the range of reasonableness such that preliminary approval should be granted. Thus, the terms of the Settlement Agreement, including the releases contained therein, are hereby **PRELIMINARILY APPROVED** as being fair, reasonable, and adequate to the Settlement Class, subject to the Final Fairness Hearing described below.

2.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Provider Plaintiffs have shown that the court will likely be able to certify the class defined in Provider Plaintiffs' motion papers for purposes of the Settlement and Final Judgment. The court **PRELIMINARILY CERTIFIES** the following Settlement Class, for settlement purposes only: all Providers in the United States (other than Excluded Providers, who are not part of the Settlement Class) who currently provide or provided healthcare services, equipment or supplies to any patient who was insured by, or who was a Member of or a beneficiary of, any plan administered by any Settling Individual Blue Plan during the Settlement Class Period. The term "Excluded Providers" means:

(i)      Providers owned or employed by any of the Settling Defendants;

(ii)      Providers owned or employed exclusively by Government Entities or Providers that exclusively provided services, equipment or supplies to members of or participants in Medicare, Medicaid or the Federal Employee Health Benefits Programs;

(iii)      Providers that have otherwise fully released their Released Claims against the Releasees prior to the Execution Date, including but not limited to Providers that were members of any of the settlement classes in *Love v. Blue Cross and Blue Shield Association*, No. 1:03-cv-21296-FAM (S.D. Fla.); or

(iv)      Providers that exclusively provide or provided (a) prescription drugs; (b) durable medical equipment; (c) medical devices; (d) supplies or services provided in an independent clinical laboratory; or (e) services, equipment or supplies covered by standalone dental or vision insurance.

Any Provider that falls within the exclusions set forth in clauses (i), (ii) or (iv) of this Paragraph for only a portion of the Settlement Class Period is a Settlement Class Member that may recover

in the settlement as set forth in the Plan of Distribution. The "Settlement Class Period" is July 24, 2008, through the Execution Date of the Settlement Agreement, which is October 4, 2024.

3.      Solely for purposes of the Settlement set forth in the Settlement Agreement, the court **CONCLUDES** that it is likely that the requirements of Federal Rule of Civil Procedure 23(a) and 23(b)(3) will be satisfied at the time of final approval, with likely findings as follows:

(a)  the members of the Settlement Class are so numerous that joinder of all Class Members in the Action is impracticable;

(b)  there are questions of law and fact common to the Settlement Class and these common questions predominate over any individual questions;

(c)  the claims of Class Representatives are typical of the claims of the Settlement Class;

(d)  Class Representatives and Settlement Class Counsel have fairly and adequately represented and protected the interests of the Settlement Class; and

(e)  a class action is superior to other available methods for the fair and efficient adjudication of the controversy, considering (i) the interests of the members of the Settlement Class in individually controlling the prosecution of separate actions; (ii) the extent and nature of any litigation concerning the controversy already begun by members of the Settlement Class; (iii) the desirability or undesirability of concentrating the litigation of these claims in this particular forum; and (iv) the likely difficulties in managing this Action as a class action.

4.      If the Effective Date does not occur with respect to the Settlement Agreement because of the failure of a condition of the Settlement Agreement, this assessment of the likelihood of certification of the Settlement Classes **SHALL** be deemed null and void, and the Parties **SHALL** retain their rights to seek or to object to certification of this litigation as a class action under Rule 23 of the Federal Rules of Civil Procedure or under any other state or federal rule, statute, law or provision thereof, and to contest and appeal any grant or denial of certification in this litigation or in any other litigation on any other grounds.

**Class Counsel and Class Representatives**

5.      Pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, and solely for settlement purposes, Edith M. Kallas and Joe R. Whatley, Jr. of Whatley Kallas LLP are **PRELIMINARILY DESIGNATED** as Provider Co-Lead Counsel.

6.      The court **PRELIMINARILY APPOINTS** the following as class representatives: Jerry L. Conway, D.C.; InMed Group, Inc., f/k/a Crenshaw Community Hospital; Bullock County Hospital; Evergreen Medical Center, LLC; Jackson Medical Center; Ivy Creek Healthcare; Elmore Community Hospital; Georgiana Medical Center; Lake Martin Community Hospital; Joseph D. Ackerson, Ph.D.; Janine Nesin, P.T., D.P.T., O.C.S.; Roman Nation, M.D.; Neuromonitoring Services of America, Inc.; Confluent Health; ProRehab, P.C.; Texas Physical Therapy Specialists, LLC; BreakThrough Physical Therapy, Inc.; Dunn Physical Therapy, Inc.; Gaspar Physical Therapy, P.C.; Timothy H. Hendlin, D.C.; Greater Brunswick Physical Therapy, P.A.; Charles Barnwell, D.C.; Judith Kanzic, D.C.; Brian Roadhouse, D.C.; Dr. Saket K. Ambasht, M.D.; Snowden Olwan Psychological Services; Matthew Caldwell, M.D.; and Mishanta Reyes, M.D.

**Administration and CAFA Notice**

7.      BrownGreer PLC is **APPOINTED** as the Settlement Notice Administrator, with responsibility for the Notice Plan, and all other obligations of the Settlement Notice Administrator as set forth in the Settlement Agreement and the Notice Motion.

8.      Special Master Ed Gentle is **APPOINTED** as the Settlement Administrator, with the responsibilities and obligations set forth in the Settlement Agreement and the Notice Motion.

9.      In addition, Provider Plaintiffs **SHALL** move for appointment of, and the court will select, a Settlement Claims Administrator to assist in the implementation of the Plan of Distribution.

10.    The fees of the Settlement Notice Administrator, the Settlement Administrator, and the Settlement Claims Administrator, as well as all other costs and expenses associated with notice and administration, **SHALL** be paid directly from the Notice and Administration Fund.

11.    Within thirty (30) calendar days of entry of this Order, Settling Defendants **SHALL** cause the $100 million Notice and Administration Fund to be transferred into an Escrow Account. All Notice and Administration Costs are hereby authorized to be paid from the Notice and Administration Fund, subject to court approval.

12.    The Settlement Claims Administrator **MAY**, as necessary, require claimants to provide, through written, electronic, or other means, certain information to verify the claimant's status as a Settlement Class Member, eligibility for any benefits under the Settlement Agreement, and information that will allow the Settlement Claims Administrator to calculate the monetary amount to which the claimant is entitled, in addition to any other purposes consistent with the Settlement Claims Administrator's responsibilities under the Settlement Agreement.

13.    The Settling Defendants **SHALL** serve or cause to be served a notice of the proposed Settlement on appropriate federal and state officials in accordance with the requirements of CAFA, 28 U.S.C. § 1715(b). Once completed, Settling Defendants **SHALL** file with the court a status report certifying that they have proof of receipt of CAFA mailing to federal officials and officials of all U.S. states and territories.

**Notice to the Class**

14.    The Notice Plan contemplated by the Settlement Agreement and set forth in the Notice Motion, including the forms of notice and Claim Form attached as exhibits to the supplement to the Notice Motion (Doc. # 3209), satisfy the requirements of Federal Rule of Civil Procedure 23 and due process and thus are **APPROVED**. Non-material modifications to the

exhibits may be made without further order of the court, including converting and conforming the exhibits to electronic or digital formats. Advertisements for the Settlement, including internet banner advertisements, may be created without further order of the court if they contain materially identical language to the forms of notice approved in this order. The Settlement Notice Administrator is **DIRECTED** to carry out the Notice Plan pursuant to the Settlement Agreement and to perform all other tasks that the Settlement Agreement requires of the Settlement Notice Administrator.

15.     The Settlement Notice Administrator **SHALL** provide direct individual notice to members of the Settlement Class via email for whom an email address is available, and by postcard notice via USPS where an email address is unavailable, email notice proves undeliverable after two attempts, or the email address is identified as inactive or invalid.

### Exclusions from the Class

16.     Any Class Member who wishes to be excluded from the Settlement Class **SHALL** mail a written notification of their intent to be excluded to the Settlement Notice Administrator at the address provided in the long-form notice, in the notices published in the media, and on the settlement website, postmarked no later than **March 4, 2025**. The exclusion request **SHALL** include the following

a.     The Class Member's name;

b.     The name of the authorized representative submitting the Exclusion Request, if the Class Member is not an individual;

c.     The Class Member's address, email address, and telephone number;

d.     The address, email address, and telephone number of the authorized representative submitting the Exclusion Request, if the Class Member is not an individual;

e.  If the Class Member has assigned, transferred or otherwise given a financial interest in its claims against the Settling Defendants to a third party (in whole or in part), the name, address and telephone number of the third party;

f.  All National Provider Identifiers (NPI), Tax Identification Numbers (TIN), and Medicare Provider Numbers (MPN) under which the Class Member billed for services between 2008 and 2024, and the last four digits of the Class Member's Social Security Number, if applicable;

g.  A statement that the Class Member (or its authorized representative) wishes to be excluded from the Settlement Class in *In re: Blue Cross Blue Shield Antitrust Litigation*; and

h.  The personal, physical signature of the Class Member or its authorized representative. Electronic signatures, including Docusign, or PDF signatures are not permitted and will not be considered personal signatures. Requests signed solely by the Class Member's lawyer, unless employed by the Health Care System, Health Care Facility, Medical Group or Medical Organization seeking to be excluded from the Class, are not valid. Further, a Health Care System, Medical Group, or Medical Organization may not submit a single Exclusion Request on behalf of individuals who are Class Members, even if they are employees of the Health Care System, Medical Group, or Medical Organization. Each Class Member must submit his, her, or its own Exclusion Request and each Exclusion Request must be signed by the Class Member himself or herself or, in the case of a Health Care System, Health Care Facility, Medical Group or Medical Organization, by its duly authorized representative.

If the Class Member fails to provide all of the required information on or before the Opt-Out Deadline, then the attempt to opt out shall be invalid and have no legal effect, and the Settlement Class Member shall be bound by the Settlement Agreement, including the releases, if finally approved.

17.  The Settlement Notice Administrator **SHALL** provide Provider Co-Lead Counsel and Settling Defendants' counsel with electronic copies of all opt-out notifications promptly upon receipt. Settlement Class Counsel **SHALL** provide a final list of all who have timely and validly excluded themselves from the Settlement Classes in accordance with the terms of the Settlement Agreement, which **SHALL** be filed with the court before the Final Fairness Hearing.

18.     All Settlement Class Members who submit valid and timely notices of their intent to be excluded from the Settlement Class **WILL NOT** be entitled to receive any benefits from the Settlement, including entitlement to Injunctive Relief, and **WILL NOT** be bound by the terms of the Settlement Agreement. Any Settlement Class Member that does not timely and validly exclude himself or herself from the Settlement **SHALL** be bound by the terms of the Settlement Agreement and all proceedings, orders, and judgments in this matter, including but not limited to the releases set forth in the Settlement Agreement and any Final Judgment.

## Objections to the Settlement

19.     A Settlement Class Member who complies with the requirements of this Order may object to the Settlement Agreement or Settlement Class Counsel's request for fees and expenses.

20.     No Class Member will be heard, and no papers, briefs, pleadings, or other documents submitted by any Class Member will be received and considered by the court, unless the Class Member presents an objection that is mailed to the Settlement Notice Administrator, Provider Co-Lead Counsel, and Settling Defendants' counsel at the addresses listed in the long-form notice available on the Settlement website, and postmarked by no later than the objection deadline **March 4, 2025**. For the objection to be considered by the court, the objection **SHALL** be in writing and **SHALL** set forth:

    a.    The name of this Action and a description of the objections, including applicable legal authority and any supporting evidence the objector wishes to introduce;

    b.    The objector's name, address, email address, and telephone number, and the names of any Settling Defendants with which the object or had a contract with during the Class Period;

    c.    The National Provider Identifiers and/or Taxpayer Identification Numbers the objector used when submitting claims to the Blues for reimbursement (this information may be redacted in the objector's submission to the Court);

d.     Whether the objection applies only to the objector, a specific subset of the Settlement Class, or the Settlement Class as a whole;

e.     The identity of all counsel who represent the objector, including former or current counsel who may be entitled to compensation for any reason related to the objection, along with the number of times (within five years preceding the submission of the objection) that counsel has, on behalf of a client, objected to a class action, the caption of the case for each prior objection, and a copy of any relevant orders addressing the objection;

f.     Any agreements that relate to the objection or the process of objecting between the objector, his or her counsel, and/or any other person or entity;

g.     The objector's (and the objector's attorney's) signature on the written objection;

h.     A statement indicating whether the objector intends to appear at the Final Fairness Hearing (either personally or through counsel); and

i.     A declaration under penalty of perjury that the information provided by the objector and objector's counsel is true and correct.

### Plan of Distribution and Claims Process

21.     Settlement Class Counsel have submitted to the court for approval the Plan of Distribution for the Damages Class that provides for the distribution of the Net Settlement Fund and the foundation for the requested allocation. The Plan of Distribution is briefly described herein.

22.     In summary, the Plan of Distribution establishes a process for assessing and determining the validity and value of claims and a methodology for paying Settlement Class Members that submit a timely, valid Claim Form. The Plan of Distribution allows claimants to request a share of the Net Settlement Fund based in part on their Allowed Amounts during the Settlement Class Period. A claimant's share of the Net Settlement Fund will also depend on the geographic area where the Provider is located.

23.     Settlement Class Members that qualify for and wish to submit a Claim Form **SHALL** do so in accordance with the requirements and procedures specified in the notices and the

Claim Form. If the Settlement Agreement is finally approved, any and all Settlement Class Members that fail to submit a claim in accordance with the requirements and procedures specified in the notices and Claim Form **SHALL** be forever barred from receiving any portion of the Net Settlement Fund, but will in all other respects be subject to and bound by the provisions of the Settlement Agreement, including the releases included in the Settlement Agreement and any Final Judgment. Settlement Class Members are not required to submit a Claim Form in order to receive entitlement to the injunctive relief included in the Settlement Agreement.

24.      The court finds that the Proposed Plan of Distribution is within the range of reasonableness, fairness, and adequacy so that it may be sent to the members of the Settlement Classes, and it is hereby **PRELIMINARILY APPROVED**.

### Final Fairness Hearing

25.      A Final Fairness Hearing is hereby scheduled before the undersigned to be commenced on **Tuesday, July 29, 2025 at 9:30 a.m., continuing on Wednesday, July 30, and on Thursday, July 31, 2025, if necessary**, in Courtroom 8 of the Hugo L. Black United States Courthouse, 1729 5th Avenue North, Birmingham, Alabama. The date of the Final Fairness Hearing **SHALL** be set forth in the Notice to the Settlement Class, but shall be subject to adjournment by the court without further notice to the members of the Settlement Class other than that which may be posted at the court and on the settlement website. At or after the Final Fairness Hearing, the court will determine whether the Settlement Agreement and the Plan of Distribution should be finally approved.

### Summary of Deadlines

26.      The Settlement Agreement **SHALL** be administered according to its terms pending the Final Fairness Hearing. The court **APPROVES** the following timeline for the Notice Plan:

| 12/04/2024 | The Court grants preliminary approval |
| 01/03/2025 | The Settlement Notice Administrator completes Class Notice |
| 02/02/2025 | Deadline for Settlement Class Counsel to file Fee and Expense Application and move for appointment of Settlement Claims Administrator |
| 03/04/2025 | Deadline to opt out of or object to the Settlement |
| 04/23/2025 | Deadline for Settlement Class Counsel to file the Final Approval Motion |
| 07/16/2025[9] | Final Fairness Hearing and claim filing deadline |

## Other Provisions

27.     In the event the Settlement Agreement does not become final, or is otherwise rescinded or terminated, the Settlement Agreement **SHALL** be of no force or effect and any and all parts of the Settlement Fund caused to be deposited in the Escrow Account (other than Notice and Administration Costs reasonably and actually incurred up to the date of rescission or termination), along with any income accrued thereon, **SHALL** be returned to the entities that paid such amounts into the Escrow Account, in proportion to those entities' respective contributions to the Settlement Fund within ten (10) calendar days of rescission, termination, or a court's final determination denying final approval of the Agreement and/or certification of the Settlement Class, whichever occurs first.

28.     In the event the Settlement Agreement does not become final, or is otherwise rescinded or terminated, litigation of the Provider Actions against Settling Defendants **SHALL** resume in a reasonable manner to be approved by the court upon application by the Parties. The Parties expressly reserve all of their rights if this Agreement is rescinded or does not otherwise become final.

**DONE** and **ORDERED** this December 4, 2024.

_____
**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE

---

[9] This date can be set at the Court's convenience, but the Parties have agreed that it will not be earlier than 90 business days after the Opt-Out Deadline.