FILED
2025 Jan-10 PM 12:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| **IN RE:**<br>**BLUE CROSS BLUE SHIELD**<br>**ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This Document Relates to**<br>**Provider Track Cases** |

### [PROPOSED] ORDER GRANTING PROVIDER PLAINTIFFS'
### MOTION TO DISQUALIFY CYRIL SMITH AND FOR CORRECTIVE NOTICE

This matter is before the Court on Provider Plaintiffs' Motion to Disqualify Cyril Smith and for Corrective Notice. The Motion is **GRANTED**. Mr. Smith and the firm Zuckerman Spaeder LLP are disqualified from advising Providers on whether to opt out of the Provider settlement or representing them in opt-out litigation. Mr. Smith is further **ORDERED** to immediately provide a copy of this order to any firm with whom he has arranged to represent or potentially represent Provider opt-outs, and to certify that he has done so within two days. Those firms are **ORDERED TO SHOW CAUSE** within seven days of receiving a copy of this order why they should not be disqualified from soliciting Provider Plaintiffs to opt out and from representing them in opt-out litigation.

Mr. Smith is further **ORDERED** to send the corrective notice attached as Exhibit A to everyone who attended his presentation, at his own expense or the expense of his firm. Mr. Smith is **ORDERED** to certify to the Court within seven days that this notice has been sent in accordance with this order.

DONE this __ day of _____, 2025.

_____

**R. DAVID PROCTOR**
**UNITED STATES DISTRICT JUDGE**

# Exhibit A

**This letter is written at the direction of the federal Court in which there is a pending proposed class action settlement regarding antitrust claims against the Blue Cross Blue Shield association and its member Blue Plans.** The class action is styled *In re Blue Cross Blue Shield Antirust Litigation*, No. 13-cv-20000-RDP (N.D. Ala.). This letter contains important information that affects your legal rights. **This letter and its contents have been reviewed and approved by the Court.**

You are receiving this notice because one or more representatives of your organization attended a presentation by Mr. Cyril Smith of the law firm Zuckerman Spaeder LLP to members of the Massachusetts Health & Hospital Association titled "The Blue Cross Provider Settlement: What Does it Mean? What Do I Do?" Mr. Smith should not have given this presentation because he is ethically prohibited from advising healthcare providers on whether to participate in the settlement and from representing them as opt-out plaintiffs. In addition, the Court has determined that this presentation contained incorrect or misleading statements, which substantially interfere with class members' ability to make an informed decision regarding their rights. The Court has a duty to ensure that class members receive accurate, non-misleading information about the litigation and the pending settlement. This letter explains some of the Court's concerns about the presentation and what the Court is doing in response to those concerns. **Please read this letter carefully.**

Mr. Smith's Experience: Mr. Smith makes the following statements about his role in this litigation and his ability to litigate on behalf of Providers who opt out of their settlement:

"Cy Smith was appointed by the Alabama court in 2013 to oversee the Subscribers litigation against the Blues."

1

"We know where the bodies are buried, we know how the Blues work, we know a lot of tricks of the trade."

"The Subscribers" won the motion on the standard of review.

These statements are misleading. In 2013, Mr. Smith was appointed to the Subscriber Plaintiffs' Steering Committee, but he was not appointed Interim Co-Lead Counsel. He did not argue the motion for summary judgment on the standard review, which he highlights in the presentation.

Mr. Smith did have a role in the Subscribers' litigation, however, and by virtue of that role he learned confidential information about the Blues and the Providers. Mr. Smith signals his willingness to use that information to benefit Providers who opt out when he says, "We know where the bodies are buried, we know how the Blues work, we know a lot of tricks of the trade." Alabama's Rule of Professional Conduct 1.6, which binds Mr. Smith by virtue of his admission *pro hac vice* in this case, protects the confidentiality of the Providers' information: "A lawyer shall not reveal information relating to representation of a client …." A comment to the Rule emphasizes its broad scope: "The confidentiality rule applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source." So does the protective order in this case, which states that confidential material "shall be used by such persons to whom it is disclosed only for the purposes of prosecuting or defending *this Proceeding*, including appeals, and for *no other purpose*" (emphasis added). Mr. Smith is prohibited from using confidential information to benefit Provider clients.

Mr. Smith also implies that the Provider Plaintiffs played a secondary role in the litigation, and that they are not being forthcoming about the recovery that individual Providers might receive in the settlement. Although the Providers and Subscribers jointly moved for summary judgment

2

on the standard of review, Mr. Smith states that "the Subscribers" won that motion. Mr. Smith also implies that it is relatively easy to calculate the numerator and denominator in the formula for determining individual Providers' recoveries under the Plan of Distribution, and therefore the Provider Plaintiffs' Co-Lead Counsel should be expected to produce this information readily. These calculations take significant time because Provider class members must be mapped to individual National Provider Identifiers before their allowed amounts can be extrapolated and adjusted for geographic factors. The denominator is unknowable because it depends on which Providers submit claims, which will not be known until July 2025. It is possible to make assumptions about the rate of claims, but they are assumptions and not exact calculations. Despite saying that he is "happy" to estimate recoveries for individual Provider Plaintiffs, Mr. Smith is no better positioned than the Provider Plaintiffs' Co-Lead Counsel to do so. In fact, four years after the settlement of the Subscriber Plaintiffs' case, Mr. Smith and his co-counsel have not yet calculated the recoveries for individual Subscriber Plaintiffs. Co-Lead Counsel for the Providers are working with Providers who ask for an estimate, and it is no reflection on their work that they have not completed this work in the two months since settlement. The order preliminarily approving the Provider Plaintiffs' settlement states, "The court has become exceedingly familiar with the lawyers representing the class over the last twelve years and is fully satisfied that the named Plaintiffs and the lawyers representing them have properly and adequately prosecuted this case and well represented the class."

The Court's Ruling on the Standard of Review: Mr. Smith stated that the Court's ruling on the standard of review "is not quite game over but it's pretty close to it," and "[t]he odds are overwhelming that you would do better" by opting out of the settlement.

3

The Court has entered judgments specifying the standard it will apply when it reviews the Blues' rules. For the period from 2008 to April 2021, the Court will apply the *per se* standard, under which the rules will be deemed unlawful. For the period after April 2021, the Court will apply the rule of reason, which requires a comparison of the procompetitive and anticompetitive effects of the rules. Generally, it is more difficult for a plaintiff to establish liability and damages under the rule of reason than the *per se* rule. This does not mean, however, that the plaintiffs have already prevailed on their claims that will be judged under the *per se* rule. The Blues have raised defenses to the plaintiffs' claims under both standards, including defenses that they operate as a single entity and thus are incapable of conspiring with each other, and that trademark law entitles them to operate in exclusive service areas. The Court has not ruled on these defenses, and thus the plaintiffs have not yet proven the Blues' liability. If liability is proven, the plaintiffs will still have to prove their damages. On this issue the Blues also have disputed whether the Provider Plaintiffs can do so, and those disputes have not been resolved.

For these reasons and others, this Court has found that "the costs, risks, and delays of trials and appeals support the appropriateness of the decision to settle." There is no basis at this point to claim that it is close to "game over" for the Blues or that there are overwhelming odds that a plaintiffs would do better by opting out instead of participating in the settlement.

The Amount of Damages: Mr. Smith stated that "[p]reliminary estimates suggest that the Blues' refusal to compete decreased reimbursements by 5-10%, depending on the market."

During this litigation, this Court selected the Alabama market as a bellwether. Therefore, discovery and the Provider Plaintiffs' estimation of damages have focused on Providers in Alabama. Alabama is a unique market because Blue Cross and Blue Shield of Alabama has the

4

highest market share of any Blue Plan in the United States. A similar damages estimate in other markets with greater competition would be lower. This Court has stated, "Experts would need to be commissioned to analyze these other markets. It would take many years to complete these cases, and even when completed in the trial court, the parties undoubtedly face years of appeals of class certification decisions, verdicts, and/or decisions on the merits. Any potential future recovery must be discounted significantly to account for the immense time and expenses it would take to put plaintiffs in a position to receive any recovery." Mr. Smith has not performed the careful analysis that would be required to estimate damages for non-Alabama hospitals, as he states in his presentation: "We haven't done the work."

The Significance of Injunctive Relief: Mr. Smith describes the injunctive relief in the Provider Plaintiffs' settlement as "modest," and compares the hundreds of millions of dollars the Blues will spend to implement it as comparable to the amount they spend on team-building exercises.

The Court has stated, "Settlement Class Members will benefit from a comprehensive transformation of the BlueCard Program, saving administrative costs and improving their ability to recover payment for their services for years to come. The Blues will invest hundreds of millions of dollars to implement this transformation." The Court also noted that the settlement "removes a significant restriction on Contiguous Area Contracts with another Blue Plan." An attorney could, in good faith, explain the categories of injunctive relief and explain why that attorney believes they are not particularly valuable. But an attorney cannot, in good faith, cherry-pick and mock particular aspects of the injunctive relief while representing them as "the extent of the so-called injunctive

5

relief." This is misleading. Nor can an attorney falsely claim that the amount the Blues will invest in transforming their systems is comparable to the amount they spend on team-building exercises.

Availability of Injunctive Relief to Opt-Outs: Mr. Smith casts doubt on the idea that the Blue Plans can limit the availability of the settlement's injunctive relief to healthcare providers who participate in the settlement. Mr. Smith does not know, nor could he, how the Blue Plan intend to implement the injunctive relief. The settlement agreement does not obligate the Blue Plans to provide any of the injunctive relief to healthcare providers who opt out.

Reduction Provision: Mr. Smith states that if the number of opt-outs reaches a certain threshold, "there could be consequences in terms of the size of the settlement."

Some settlements contain a "reduction provision," which states that if class members opt out of the settlement, the amount the defendants must pay the remaining plaintiffs will be reduced. It is false that there is a reduction provision in the Provider Plaintiffs' settlement. In addition, the Plan of Distribution, which the Provider Plaintiffs filed with their motion for preliminary approval, does not provide for such a reduction.

Length of Time to Resolution: Mr. Smith stated that "there's no reason to think the Providers' case is going to be quicker to finish" than the case brought on behalf of the Blues' subscribers, who Mr. Smith represented.

This statement is incorrect. There is reason to think the Providers' case will finish more quickly. The Subscriber Plaintiffs' settlement took four years to resolve in part because the Subscriber Plaintiffs' counsel had to send a supplemental class notice, which created several

6

months of delay. At this point, no issues requiring supplemental class notice have been identified in the Provider Plaintiffs' settlement.

This Court has discussed the merits of the Providers Plaintiffs' settlement in its order granting preliminary approval, which is attached to this notice. Class Members should review it carefully before deciding whether to opt out of the settlement. If you have any questions about this notice, the preliminary approval order, or this class action and proposed settlement, you may contact Co-Lead Counsel for the Provider Plaintiffs, whose name and contact information are below.

Joe R. Whatley, Jr.
Whatley Kallas LLP
jwhatley@whatleykallas.com
(205) 488-1200

Edith M. Kallas
Whatley Kallas LLP
ekallas@whatleykallas.com
(205) 488-1200

7