FILED

2025 Jan-24  PM 04:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |
|---|---|
| In re: Blue Cross Blue Shield Antitrust Litigation<br><br>MDL No. 2406 | Master File No. 2:13-CV-20000-RDP<br><br>This Document Relates to Provider Track Cases |

**CY SMITH & ZUCKERMAN SPAEDER LLP'S OPPOSITION TO MOTION TO DISQUALIFY MR. SMITH AND FOR CORRECTIVE NOTICE**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

LEGAL STANDARDS ........................................................................................................... 3

ARGUMENT .......................................................................................................................... 4

I.   Disqualification Is Not Warranted. ................................................................................ 4

     A.   Provider Plaintiffs allege no misuse of confidential information..................................... 4

     B.   Mr. Smith Has No Disqualifying Conflict of Interest. ....................................................... 8

          1.   Providers and Subscribers have been predominantly aligned in this litigation. ........ 9

          2.   Each area of adversity identified by Provider Plaintiffs is speculative or non-
               existent. ....................................................................................................... 10

          3.   Even if a remote or speculative potential conflict may exist, disqualification
               would be unwarranted. ................................................................................. 14

II.  There Are No Grounds To Order Any Corrective Notice Because Mr. Smith's MHA
     Presentation Was Balanced And Truthful.......................................................................... 15

CONCLUSION....................................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Covey v. Colonial Pipeline Co.*,
   2021 WL 724600 (N.D. Ala. Feb, 24, 2021) .............................................................................. 3

*Ex parte Tiffin*,
   879 So. 2d 1160 (Ala, 2003) ...................................................................................................... 8

*In re BellSouth Corp.*,
   334 F.3d 941 (11th Cir. 2003) .................................................................................................... 3

*Longcrier v. HL-A Co.*,
   595 F. Supp. 2d 1218 (S.D. Ala. 2008) ............................................................................. 15, 22

*S. Visions, LLP v. Red Diamond, Inc.*,
   370 F. Supp. 3d 1314 (N.D. Ala. 2019) ............................................................................. 3, 14

*Thornton v. Hosp. Mgmt. Assocs., Inc.*,
   787 F. App'x 634 (11th Cir. 2019) ............................................................................................ 3

*Turner v. Orr*,
   785 F.2d 1498 (11th Cir. 1986) ............................................................................................... 10

*Vaughn v. Healthcare Authority*,
   2005 WL 8158572 (N.D. Ala. Oct. 24, 2005) ......................................................................... 8

**Rules**

Alabama Rule of Professional Conduct 1.6 .................................................................................... 7

Alabama Rule of Professional Conduct 1.7 ............................................................................ *passim*

Alabama Rules of Professional Conduct 1.9 ................................................................................. 9

Alabama Rule of Professional Conduct 1.10 ............................................................................... 15

American Bar Association Model Rule 1.7 ................................................................................... 13

Local Rule 83.1(f) .......................................................................................................................... 3

**Other Authorities**

6 *Newberg & Rubenstein on Class Actions*, § 19:24 (6th ed., 2024 update) ...................... 6, 10, 14

Catherien J. Galley, *et al.*, Cornerstone Research, *Considerations for Blow Provisions in Securities Class Action Settlements* at 3 (Sept. 11, 2024) ........................................................ 21

MHA presentation, https://www.mhalink.org/event/the-blue-cross-provider-settlement-what-does-it-mean-what-do-i-do-2/ ............................................................................................... 1, 16

## INTRODUCTION

Respondents Cy Smith and his firm, Zuckerman Spaeder LLP, have no conflict of interest, have not misused and will not misuse confidential information, and have made no misrepresentations to Provider class members.

Provider Plaintiffs' contrary assertions are not persuasive. Subscribers and Providers suing the same defendants and attacking overlapping anticompetitive conduct do not have conflicting interests. Provider Plaintiffs do not assert any actual misuse of confidential information. And Provider Plaintiffs' assertions regarding misrepresentations are based on out-of-context snippets from a 45-minute webinar presentation to the Massachusetts Health & Hospital Association ("the MHA presentation"), full statements having been edited down so as to drain their real meaning.[1] We urge the Court to view the MHA presentation, which is publicly available online. *See* https://www.mhalink.org/event/the-blue-cross-provider-settlement-what-does-it-mean-what-do-i-do-2/; *see also* Ex. 2 (Transcript); Ex. 3 (Slide Deck). The MHA presentation provided exactly the kind of informed perspective that Provider class members should have in order to make informed decisions about the opt-out decision they confront. *See generally* Ex. 4, Declaration of Professor William B. Rubenstein ("Rubenstein Decl.").

The effect of the Provider Plaintiffs' Motion is to chill the presentation of differing perspectives to class members by Respondents and also by many other similarly situated Subscriber counsel. The chilling effect occurs even as the motion is pending and the opt-out deadline approaches, precisely the time when class members most need information and counsel as they make an important decision regarding their legal rights. The Motion, which Provider

---

[1] Provider Plaintiffs also omit a critical excerpt of the Joint Prosecution Agreement on which they substantially rely: the agreement expressly "shall not . . . be used as a basis for seeking to disqualify any law firm from representing a client in any present or future proceeding." Ex. 1, Joint Prosecution Agreement, at 2.

Plaintiffs filed without advance notice to Mr. Smith despite having been preparing it for approximately a month—should be denied forthwith. Respondents respectfully ask the Court to rule as quickly as possible to assure that class members are able to make informed decisions well before the March 4 opt-out deadline.

## BACKGROUND

Respondent Cy Smith has acted as counsel to Subscribers in this MDL for over a decade. *See* Ex. 5, Declaration of Cy Smith ("Smith Decl.") at ¶ 3. Since the announcement of the proposed Provider settlement agreement, Mr. Smith has engaged in outreach to various hospitals and hospital association, including making presentations regarding the settlement agreement and the decision of whether to participate or opt out. *Id.* at ¶¶ 4, 6–7.

On December 10, 2024, Mr. Smith and one of his partners made one such presentation to the Massachusetts Health & Hospital Association ("MHA"). *See* Exs. 2–3. MHA is a former client of Zuckerman Spaeder's. Smith Decl. at ¶ 7. The MHA presentation was truthful, balanced, and informative. Throughout the presentation, Mr. Smith repeatedly encouraged hospitals to closely review the proposed settlement agreement, carefully consider their possible recovery under the agreement and the value to them of the agreement's "injunctive relief," contact Class Counsel, and make a considered opt-out decision in light of all available information concerning the benefits and drawbacks of participating in the settlement agreement versus opting out. *See generally* Exs. 2–3. The presentation indicated that Zuckerman Spaeder was interested in representing hospitals considering the possibility of opting out. *See* Ex. 2 at 18:12–19:1; Ex. 3 at Slides 10–11.

The webinar was advertised by MHA and attended by a number of its members. Providers' counsel learned of it on or near the date of presentation, but took no action in this Court until the following month.

## LEGAL STANDARDS

"Because a party is presumptively entitled to the counsel of his choice, that right may be overridden only if 'compelling reasons' exist." *In re BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003). A disqualification order "is a harsh sanction, often working substantial hardship on the client" and should therefore "be resorted to sparingly." *Thornton v. Hosp. Mgmt. Assocs., Inc.*, 787 F. App'x 634, 637 (11th Cir. 2019). "The party moving to disqualify counsel bears the burden of proving the grounds for disqualification." *In re BellSouth*, 334 F.3d at 961.

Two sources of law govern disqualification motions: "the local rules of this court and federal common law." *S. Visions, LLP v. Red Diamond, Inc.*, 370 F. Supp. 3d 1314, 1323 (N.D. Ala. 2019). Local Rule 83.1(f) provides that the conduct of attorneys appearing before this Court is governed by: (1) this Court's local rules; (2) the Alabama Rules of Professional Conduct; and (3) the American Bar Association's Model Rules of Professional Conduct (in that order, to the extent of any inconsistencies).[2]

"Upon finding a violation of an applicable ethical rule, a district court must then, considering binding and persuasive federal case law, decide whether or not the ethical lapse warrants disqualification." *S. Visions*, 370 F. Supp. 3d at 1323 (citation omitted). Even when a rule of ethics has been violated, "violations come in varying degrees of severity, but disqualification is always a drastic measure, which courts should hesitate to impose except when absolutely necessary." *Covey v. Colonial Pipeline Co.*, 2021 WL 724600, at *9 (N.D. Ala. Feb, 24, 2021).

---

[2] Although Provider Plaintiffs have preemptively sought Mr. Smith's disqualification from cases that might be filed in other jurisdictions, Mr. Smith and Zuckerman Spaeder agree with Provider Plaintiffs that their request for disqualification can be adjudicated pursuant to this Court's Local Rule 83.1(f) and the sources of law that it incorporates. *See* Mot. at 1–2.

**ARGUMENT**

## I.    Disqualification Is Not Warranted.

The Motion seeks the extraordinary remedy of disqualifying Mr. Smith and Zuckerman Spaeder, preemptively, from an entire category of possible future representations: any representation of any Provider in this litigation or in separate opt-out litigation against the Blues. *See* Mot. at 1. Under the Motion's logic, those representations would be off-limits for an entire category of law firms. As to each of the dozens of firms that have represented Subscribers (including opt-out Subscribers) in this MDL, Provider Plaintiffs could make the exact same arguments that they assert here regarding access to confidential information and supposed conflicts of interests between Providers and Subscribers.

There is no basis to disqualify Mr. Smith or his law firm. Provider Plaintiffs have not demonstrated any violation of the Rules of Professional Conduct, either relating to misuse of confidential information, *see* Mot. at 3–5, or to conflicts of interest, *see id.* at 5–8. And even if it were possible to theorize some hypothetical or marginal adversity between Providers and Subscribers (and there is none), it would not rise to the level of a Rule 1.7 violation, especially in the context of class actions and opt-out processes, where traditional legal ethical duties must be balanced to some degree in light of the inherent diversity of interests that courts rely on counsel to manage.

### A.    Provider Plaintiffs allege no misuse of confidential information.

Provider Plaintiffs' lead argument rests on Mr. Smith's supposed "misuse" of confidential information that he obtained as counsel for Subscribers in this litigation. Mot. at 5 n.3; *see generally id.* at 3–5. But nowhere does the Motion identify a single instance of Mr. Smith misusing

any confidential information. And Mr. Smith affirms that he has not done so in connection with exploring representations of prospective opt-outs (or in any other context). Smith Decl. at ¶ 4.

Nor has Mr. Smith "advertis[ed] his access to confidential information" as a selling point to prospective Provider clients. Mot. at 4. According to Provider Plaintiffs, the Court should disqualify Mr. Smith because he touted his access to non-public information when speaking to hospitals about the possibility of opting out of the settlement agreement. *See id.*; *see also id.* at 3 (charging Mr. Smith with "trading on his experience in this litigation, including his exposure to confidential information, to attempt to persuade hospitals to opt out of the Providers' settlement and hire him to pursue separate litigation").

But Mr. Smith did no such thing. During his presentation to MHA, Mr. Smith referenced his extensive knowledge of the Blues' anticompetitive practices, gleaned from 12 years of experience as Subscribers' counsel in this MDL. This is hardly "advertis[ing] his access to confidential information" as a selling point. Mot. at 4. Provider Plaintiffs latch on to Mr. Smith's comment that he "know[s] where the bodies are buried." Mot. at 3. But the context of this comment made clear that it was a reference to lessons learned about the Blues' business practices—*not* an offer to use confidential information improperly. Here are the relevant passages from Mr. Smith's presentation:

> So one thing people have asked us is, they've said, well, look, the case has been settled. Why shouldn't I simply take my check from the settlement, as opposed to the delay that happens if I go and file a separate lawsuit, even if it's alongside lots of other hospitals and even if it's critical mass and all those things? And I would say to you, we would say to you, **no question, these are complex cases. Opt-out claims could take several years to litigate, three to five years, even longer. The Blues, you know, I was against the Blues for 12 years. They are represented by tenacious attorneys. But we learned a lot during that period. We figured out where many of the bodies are buried, so to speak.**
>
>         . . .

> Just to talk a little bit about where our law firm is coming from. I mean, **I spent, as I said, 12 years appointed by the court overseeing this litigation. I don't think it's an exaggeration to say, as I just did, that we know where the bodies are buried. We know how the Blues work. We know a lot of the tricks of the trade.**

Ex. 2 at 26:16-17 (emphasis added).  Mr. Smith plainly stated that, although opt-out claims would be "complex" and "could take several years to litigate," efficiencies might be gained because of lessons learned in Subscriber litigation about "how the Blues work." *Id.*.[3]

There is nothing wrong with an attorney describing his or her experience in similar litigation against the same defendants. Indeed, one of "the *benefits* of allowing counsel to proceed" against the same defendant on behalf of different groups of plaintiffs is that "counsel may be particularly knowledgeable about . . . defendant's practices specifically." 6 *Newberg & Rubenstein on Class Actions*, § 19:24 – Simultaneous or Successive Representation of Conflicting Classes (6th ed., 2024 update); *see also* Rubenstein Decl. at ¶ 9.

Lacking evidence that Mr. Smith either misused confidential information or suggested that he would do so in the future, the Motion implies that he should be disqualified because his mere access to confidential information raises the possibility that he might misuse it. *See* Mot. at 4–5 ("Unless Mr. Smith is disqualified, there will be no way for the Court or the Provider Plaintiffs to determine what Mr. Smith reveals to clients in opt-out litigation, or whether he is complying with the protective order."). For example, the Motion twice mentions that Mr. Smith "has access" to Providers' damages expert reports, Mot. at 3; *see also id.* at 2, but makes no allegation whatsoever that Mr. Smith has misused (or even used) those reports.

---

[3] One example, well-known to this Court, is Mr. Smith's discovery and prosecution of claims related to the Blues' "cap-and-hold" policy, which violated Alabama law governing insurance rate filings. This is the sort of non-confidential "working knowledge" of the Blues that would stand a provider in good stead in opt-out litigation.

Provider Plaintiffs offer no authority for a rule that access to confidential information, in the absence of misuse, can disqualify an attorney from a subsequent, related representation. Provider Plaintiffs repeatedly reference the Protective Order in this MDL, but the Protective Order does not purport to bar or limit any attorney who received protected confidential material from undertaking any other representation thereafter. The Protective Order speaks only to how protected material may be "used," and under what circumstances it can be "disclosed." Protective Order, ECF No. 550 at ¶ 2 ("Scope of Use"); *see also id.* at ¶ 10 ("Restrictions on Use of Confidential Material").[4]

There is no authority for the idea that a standard protective order governing the handling of confidential material also silently restricts counsel's right to practice by forbidding any new related representations in which the confidential material could be relevant. Respondents do not understand counsel in this case, or the Court, to have understood the protective order to do any such thing. If the Blues' counsel had asked that the protective order in this case expressly impose a restriction to that effect, Plaintiffs' counsel would have refused, and this Court may not have accepted such an explicit restriction in any event. *Cf.* Ala. R. Prof. Conduct 5.6(b) (prohibiting term in settlement agreement restricting right to practice).

Nor does Alabama Rule of Professional Conduct 1.6 suggest that access to confidential information precludes subsequent related representations. Rule 1.6 by its terms addresses "reveal[ing]" confidential client information. Ala. R. Prof'l Conduct 1.6(a). Nowhere do Provider Plaintiffs suggest that Mr. Smith has "reveal[ed]" confidential client information or indicated that he will do so in the future.

---

[4] Provider Plaintiffs cite a superseded version of the Protective Order, *see* Mot. at 4 (citing ECF No. 145), but the language relevant here is identical in the two versions.

Even more so for the Joint Prosecution Agreement, which Provider Plaintiffs reference throughout the Motion. The Joint Prosecution Agreement prohibits "revealing or divulging" covered materials to third parties, as well as "us[ing]" such materials for any purpose other than to prepare and prosecute the MDL. Ex. 1 at 2. There is no suggestion that anyone who receives covered material pursuant to the Joint Prosecution Agreement will thereby be barred from undertaking any subsequent representation. Like the Protective Order, the Joint Prosecution Agreement does not silently restrict counsel's right to practice. Moreover, the Joint Prosecution Agreement contains the following provision that does just the opposite (and that is omitted from the Motion): "The sharing of information and materials pursuant to the Joint Prosecution Agreement *shall not . . . be used as a basis for seeking to disqualify any law firm from representing a client in any present or future proceeding*." *Id.* (emphasis added). Absent any allegation of Mr. Smith actually misusing any information, Provider Plaintiffs have offered no basis to disqualify him.[5]

### B.    Mr. Smith Has No Disqualifying Conflict of Interest.

A party's effort to disqualify opposing counsel based on an asserted conflict of interest "should be viewed with caution . . . for it can be misused as a technique of harassment." Ala. R. Prof'l Conduct 1.9, cmt. Courts are especially wary where, as here, the movant was not involved in any of the attorney-client relationships that are alleged to present a conflict. In this situation, some courts have gone as far as to say that the movant has no standing to seek disqualification. *See, e.g.*, *Vaughn v. Healthcare Authority*, 2005 WL 8158572, at *6 (N.D. Ala. Oct. 24, 2005); *see also Ex parte Tiffin*, 879 So. 2d 1160, 1165 (Ala, 2003) ("[A]s a general rule, courts do not

---

[5] The lack of any alleged misuse of information belies Provider Plaintiffs' insistence that they "are not taking the position that the Joint Prosecution Agreement itself requires Mr. Smith's disqualification," but rather are seeking disqualification based his supposed "misuse" of information obtained pursuant to the agreement. Mot. at 5 n.3.

disqualify an attorney on the grounds of conflict of interest unless the current or former *client* moves for disqualification." (citation omitted)). At the least, a movant's lack of a personal stake is good reason to question whether it seeks disqualification out of bona fide concern for the interests protected by the Rules of Professional Conduct—or for some other tactical reason.

The Alabama Rules of Professional Conduct governing conflicts of interest provide:

- <u>Rule 1.7(a)</u>: Absent informed consent, a lawyer may not undertake a representation that would be "*directly adverse* to another client." (emphasis added).

- <u>Rule 1.7(b)</u>: Absent informed consent, a lawyer may not undertake a representation that "may be *materially limited* by the lawyer's responsibilities to another client or a third person, or by the lawyer's own interests." (emphasis added).

- <u>Rule 1.9(a)</u>: Absent informed consent, a lawyer may not undertake a representation in which the client's interests are "*materially adverse*" to the interests of a former client whom the lawyer represented in "the same or a substantially related matter." (emphasis added).

- <u>Rule 1.9(b)</u>: A lawyer may not "*[u]se*," to the disadvantage of a former client, information relating to the representation of the former client. (emphasis added).

Mr. Smith has not violated any of these Rules because the interests of Providers who decide to opt out and pursue separate claims are not materially adverse to the interests of Subscribers— especially given the unique considerations at play in class-action litigation.

> *1. Providers and Subscribers have been predominantly aligned in this litigation.*

Although Providers and Subscribers interact with the Blues in different ways, they participated on the same side of this litigation, and actively collaborated with each other, because of their predominantly aligned interests. Providers and Subscribers have both been harmed by the anticompetitive conduct of a common adversary. They have both sought to establish the Blues' antitrust liability for that conduct.  Provider Plaintiffs have prominently highlighted that the practices they are challenging in this litigation harm Subscribers *as well as* Providers. *See, e.g.*, Fourth Am. Provider Complaint, ECF No. 1083, ¶ 18 ("Defendants' agreements have also harmed

competition by decreasing the options available to healthcare consumers."); *id.* ¶ 394 ("In the long run, the Blues' monopsony power gained by virtue of their unlawful agreements will harm consumers.").

Providers and Subscribers explicitly memorialized their common interests in the Joint Prosecution Agreement. *See* Ex. 1 at 1 ("Our respective clients and we believe that the clients have common interests in connection with the prosecution of the Blue Cross Antitrust Cases").

Whatever possible or theoretical divergence existed between Providers' and Subscribers' interests evaporated once the Subscribers' settlement agreement was finalized. As long as Providers and Subscribers were each actively seeking monetary recovery from the same Defendants, they had possibly conflicting interests to the extent that there was a "limited pool of funds" from which they were both seeking to recover. *See* 6 *Newberg & Rubenstein on Class Actions* § 19:24 (when an attorney represents multiple classes against the same defendant, courts "are most concerned in cases involving potentially limited funds"). But now that the Subscriber settlement agreement has been finalized, the relief for Subscribers is fixed, and cannot be affected by anything that happens in any Provider litigation. These changed circumstances eliminate even the possibility of a conflict. *See, e.g.*, *Turner v. Orr*, 785 F.2d 1498, 1505 (11th Cir. 1986) (concluding that changed circumstances eliminated any conflict).

> 2.  *Each area of adversity identified by Provider Plaintiffs is speculative or non-existent.*

Provider Plaintiffs identify three purported areas of adversity between Subscribers and prospective opt-outs, which the Alabama Bar's Office of General Counsel appears to have taken at face value based on Provider Plaintiffs' representations in issuing the opinion that is attached to

the Motion. *See* Ex. 1 to Mot. In reality, each of these areas of adversity is speculative or non-existent.

Provider Plaintiffs begin by highlighting the proposed settlement agreement's injunctive relief, much of which they say "directly benefits subscribers." Mot. at 6. They argue that any Provider choosing to opt out of the settlement would not be entitled to the injunctive relief and thus would forgo benefits that Subscribers otherwise would have received. *Id.* It is unlikely, however, that Provider opt-outs would lose the benefits of the injunctive relief, as it is doubtful that the Blues would find it cost-effective to operate two systems in parallel, discriminating among providers based on whether they participated in the settlement, or would embrace the risk of liability inherent in such an approach. Any conflict hinging on the loss of injunctive relief is therefore speculative.

More fundamentally, any Provider that chooses to opt out of the settlement agreement will necessarily believe that it can fare *better* overall in separate litigation, whether by proceeding to judgment or by negotiating a separate settlement agreement. A Provider's decision to seek better overall relief for itself is not adverse to Subscribers—let alone "directly adverse," Rule 1.7(a)—especially given the likelihood that the Provider will seek the same (or even superior) injunctive relief in any settlement agreement of its own, with Subscribers benefiting accordingly.

Next, Provider Plaintiffs strangely embrace—for purposes of this Motion only—a core position of *the Blues* that Providers themselves dispute: that Provider Plaintiffs' requested relief with respect to the Blues' anticompetitive practices will harm Subscribers. *See* Mot. at 6–7. Provider Plaintiffs acknowledge that they "have disagreed with this assertion," *id.* at 7—and it is more than that: Provider Plaintiffs have affirmatively highlighted the harms to consumers (Subscribers) of the anticompetitive practices that they challenged. *See* Fourth Am. Provider

11

Compl., ECF No. 1083, ¶ 18 (Blues' conduct reduces Provider options, harming Subscribers); *id.*
¶¶ 398–401 (Blues' conduct reduces innovation, harming Subscribers).

As Movants, Provider Plaintiffs cannot simply walk away from their actual position
regarding the anticipated impact on Subscribers of enjoining the Blues' challenged rules. Providers
attempt to avoid that problem by arguing that "this Court has not ruled on the issue," and that if a
court ultimately reaches the issue in opt-out litigation and rules in favor of the Blues, then "to the
extent [an opt-out] plaintiff seeks increased reimbursements from the Blues, those increases will
fall on Subscribers." Mot. at 7. But if the supposed conflict arises from the negative economic
effect on Subscribers of certain relief sought by Providers, then what matters for conflicts purposes
is whether that effect would *actually* occur—not what a court later concludes. And Provider
Plaintiffs have emphatically expressed their view that the economic effect of ending the Blues'
anticompetitive practices would be *positive* for Subscribers, not negative, which means that there
is no conflict in Mr. Smith representing Providers seeking that relief.

Finally, Provider Plaintiffs contend that Mr. Smith would be "materially limited" in his
ability to represent Provider opt-outs, implicating Rule 1.7(b), because he has "publicly stated"
that "the Providers' damages are relatively small" and that "the Providers' case is weaker than the
Subscribers' case." Mot at 7–8. But Provider Plaintiffs identify no actual public statement by Mr.
Smith (or explain how any such statement would limit advocacy in litigation). The only proffered
example of what Mr. Smith has "publicly stated" is a series of numerical estimates, buried on page
52 of Appendix C of one of the Subscribers' experts' reports, of the effect on reimbursements to
Alabama Providers of the Blues' anticompetitive conduct. *Id.* These estimates never made their
way into any decision of the Court of which Respondents are aware, and they were cited in support
of an opinion with which Provider Plaintiffs *agree*: "that more competition would benefit

*Subscribers.*" Mot. at 7 (emphasis added); *see also* Fourth Am. Provider Complaint, ECF No 1083, at ¶¶ 18, 394–401 (alleging that the Blues' anticompetitive practices harmed Subscribers).

These excavated Alabama-specific estimates underlying an opinion of one of the Subscribers' experts cannot be understood to demonstrate that "Mr. Smith has materially limited his ability to advocate for significant damages on behalf of Providers." Mot. at 8. Even if, in Subscriber litigation, Mr. Smith himself had directly stated that all Providers' damages are relatively low, "[o]rdinarily a lawyer may take inconsistent positions in different tribunals at different times on behalf of different clients." ABA Model Rule 1.7, cmt. [24].[6] Inconsistent positions in different cases violate Rule 1.7 only "if there is a significant risk that a lawyer's action on behalf of one client will materially limit the lawyer's effectiveness in representing another client in a different case, for example, when a decision favoring one client will create a precedent likely to seriously weaken the position taken on behalf of the other client." *Id.* All the more so given that Mr. Smith's prior "position" is actually a set of state-specific numerical estimates appended to an expert report filed by Subscribers' counsel generally.

Finally, unlike the other asserted conflict issues discussed above, here the concern is for the interests of individual prospective opt-out Provider clients—not the Subscriber class. Thus, even if Mr. Smith somehow determined that his representation of a particular Provider might be materially limited by a prior statement about Providers' damages—which is not plausible for the reasons just discussed—he would have the option of seeking the Provider client's informed consent under Rule 1.7(b)(2).

---

[6] The ABA Model Rules of Professional are expressly incorporated into this Court's local rules, to the extent they are not inconsistent with any other local rules or the Alabama Rules of Professional Conduct. Comment [24] to ABA Model Rule 1.7 is fully consistent with this Court's local rules and the Alabama Rules; indeed, Alabama Rule 1.7 has a conceptually similarly comment: "[I]t is ordinarily not improper to assert [antagonistic positions on a legal question] in cases pending in different trial courts, but it may be improper to do so in cases pending at the same time in an appellate court."

      *3. Even if a remote or speculative potential conflict may exist, disqualification would be unwarranted.*

Even if some speculative potential conflict were to exist (it does not), prevailing legal ethics standards in the class action context would still permit the representation. Mr. Smith's duties arising from his role in MDL leadership are not the sort of client duties that ordinarily could create a disqualifying conflict—especially with respect to absent class members. *See* Rubenstein Decl. at ¶ 14. And as to Mr. Smith's individual Subscriber clients, any potential conflict is vanishingly remote and could easily be addressed if it did arise. *See id.* at ¶ 14(b). More generally, absent direct adversity, Courts typically allow counsel to proceed in multiple cases against the same defendant even when the clients are conflicting classes:

> [T]he prevailing approach to this conflicts concern is that courts will warrant it **only in the presence of real, not speculative, conflict** and are most concerned in cases involving potentially limited funds. Part of courts' hesitancy to adopt a more rigid approach to the problem arises from the fact that **counsel's many cases against a single defendant could be a sign of strength, not weakness or compromise**. Such counsel may be particularly knowledgeable about the field of law at issue generally, or defendant's practices specifically. . . . For these reasons**, the benefits of permitting counsel to proceed often outweigh any conflicts, particularly if the conflict is more speculative than manifest**.

6 *Newberg & Rubenstein on Class Actions* § 19:24 (emphasis added).

Accordingly, class actions simply do not fit with the rule of *per se* disqualification that some courts have suggested may apply to conflicts of interest, at least in the paradigmatic Rule 1.7(a) scenario where a lawyer appears as opposing counsel in active litigation against a current client. *See Southern Visions, LLP v. Red Diamond, Inc.*, 370 F. Supp. 3d 1314, 1335–37 (N.D. Ala. 2019) (collecting cases). Avoiding disqualification here is particularly crucial to protecting the integrity of this class action, as Provider Plaintiffs' arguments would limit the advice and perspectives available to Providers class members who should be able to make informed decisions regarding the opt-out decision they currently confront. *See* Rubenstein Decl. at ¶¶ 2, 4–5, 7, 10.

That is true not just with respect to Mr. Smith and Zuckerman Spaeder, but also with respect to a large number of highly qualified law firms that would be barred from advising and representing prospective opt-outs. *Cf.* Ala. R. Prof'l Conduct 1.10, cmt. (stating, in the context of construing the imputation Rule, that one "consideration" under the Rules is that "[t]he rule of disqualification should not be so broadly cast as to preclude other persons from having reasonable choice of legal counsel.").

Finally, the Court should give due consideration to Provider Plaintiffs' reasons for seeking Respondents' disqualification. *See* Ala. R. Prof'l Conduct 1.7, cmt. In August 2024, in connection with an individual Provider matter, counsel for Provider Plaintiffs specifically highlighted the fact that the individual Provider's counsel had also served as counsel for Subscribers—without raising any conflict issue. *See* Provider Plaintiffs' Submission Pursuant to the Court's August 5, 2024 Order, ECF No. 3162, at 2. Now, just a few months later in a similar situation, Provider Plaintiffs are raising supposedly "serious, unwaivable conflicts." Mot. at 1. There is good cause to be skeptical that Provider Plaintiffs are genuinely motivated by concern for the relevant legal ethics issues as opposed to a tactical objective of eliminating any impediment to the settlement agreement being finalized.

## II.    There Are No Grounds To Order Any Corrective Notice Because Mr. Smith's MHA Presentation Was Balanced And Truthful.

"Although district courts are empowered to restrict communications in a class action, that power must be used sparingly because of the substantial First Amendment considerations triggered by any such restraints." *Longcrier v. HL-A Co.*, 595 F. Supp. 2d 1218, 1226 (S.D. Ala. 2008). Restrictions are appropriate only when the relevant communication "is abusive in that it threatens the proper functioning of the litigation." *Id.* at 1226–27 (citation omitted). *See* Memorandum

Opinion and Order Regarding BCBS-AL's Contacts with Putative Class Members, ECF No. 2231, at 7 (July 5, 2018).

Mr. Smith's Dec. 2024 presentation to MHA neither misled hospitals nor threatened the proper functioning of this litigation. On the contrary, the presentation educated hospitals and their in-house counsel regarding the proposed settlement agreement in a manner that was balanced, informative, and fair. Although Mr. Smith encouraged hospitals to *consider* opting out, he presented an even-handed mix of positive and negative information, acknowledged good reasons that hospitals may decide to participate in the settlement, and ultimately encouraged each hospital to make its own decision based on all available information. Mr. Smith repeatedly encouraged each hospital to closely review the terms of the settlement agreement; evaluate its expected monetary recovery and the importance to the hospital of the injunctive relief; reach out to Class Counsel for more information about what the hospital could expect to receive; and weigh the benefits and drawbacks of the relief under the settlement agreement before deciding whether to participate or opt out. Respondents again encourage the Court to view the approximately 45-minute MHA presentation, which is publicly accessible. *See* https://www.mhalink.org/event/the-blue-cross-provider-settlement-what-does-it-mean-what-do-i-do-2/; *see also* Ex. 2 (transcript); Ex. 3 (slide deck).

Provider Plaintiffs' attempts to portray the MHA presentation in a negative light involve taking statements out of context, ignoring additional commentary that provided balance, or intolerance for reasonable, good-faith disagreement:

*Mr. Smith's Role.* Provider Plaintiffs suggest that Mr. Smith exaggerated his role in the Subscriber litigation by stating that he "was appointed by the Alabama court in 2013 to oversee the Subscribers litigation against the Blues, and spent more than a decade on that task." Mot. at 9;

*see also* Ex. 3 at Slide 12. But earlier in the MHA presentation, Mr. Smith had already explained that he "served on the court-appointed, five-person Plaintiffs' Steering Committee directing the Blue Cross litigation on behalf of health insurance subscribers." Ex. 3 at Slide 2. Only by ignoring the earlier, specific description of Mr. Smith's role could Provider Plaintiffs construe the later, more general description as misleading. In any event, the integrity of this litigation is not at stake in a debate over whether "overseeing" or some other verb would best describe the Steering Committee's role in the Subscriber litigation.

*2018 Ruling on Standard of Review*. Provider Plaintiffs fault Mr. Smith for stating that "[i]n 2018, Subscribers won a key victory in court: the combination of ESAs and NBE was illegal 'per se' under federal antitrust law." Mot. at 9; Ex. 3 at Slide 4. According to Provider Plaintiffs, this statement leaves the impression "that the Subscribers alone won a key victory while the Providers sat on the sidelines." Mot. at 9. On its face, Mr. Smith's statement cannot reasonably be understood to say *anything* about Providers. And in context, it made sense for Mr. Smith to reference Subscribers because he was recounting the 2018 ruling in order to explain that it "led to settlement talks *for Subscribers*, and a deal in 2020." Ex. 3 at Slide 4 (emphasis added). Mr, Smith did not suggest that the 2018 ruling was *limited* to Subscribers; indeed, he noted that the ruling put any *providers* choosing to pursue opt-out claims in a strong position to establish the Blues' liability. *See* Mot. at 10.

*Opt-Outs' Prospects for Success*. Provider Plaintiffs argue that Mr. Smith overstated the prospect that opt-out litigation would be successful. First, Provider Plaintiffs take issue with Mr. Smith's statements that "[t]he Court's ruling on the standard of review 'is not quite game over, it's pretty close to it,'" and "'The odds are overwhelming that you would do better' by opting out." Mot. at 10. Although Mr. Smith offered a favorable assessment of opt-out claims, he repeatedly

emphasized that any opt-out recovery was not certain. *See* Ex. 2 at 24:7–10 ("And we should say there are no guarantees in life. I think we've learned that at every turn in our own lives and in the lives of hospitals."); *id.* at 30:6–8 ("And again, no guarantees in life. You could lose."). Conversely, he acknowledged that, for any hospital, choosing the relative certainty of participating in the settlement agreement would be a "perfectly reasonable business decision." *Id.* at 22:9–10; *see also* Ex. 3 at Slide 9 ("You should also consider the value of a result which – regardless of its size – will be locked in.").

Second, Provider Plaintiffs take issue with Mr. Smith's statement that "[p]reliminary estimates suggest that the Blues' refusal to compete decreased reimbursements by 5-10%, depending on the market." Mot. at 11. This preliminary estimate was *not* based on Provider Plaintiffs' data from Alabama, as they suggest, *see id.* at 11–12, but rather on separate, preliminary due diligence work that estimated anticompetitive effects nationwide. Moreover, Mr. Smith included the explicit caveat that the numbers were "just a preliminary estimate, of course, because we haven't done the work" to estimate providers' damages with any precision. Ex. 2 at 12:24–25; *see also id.* at 13:19–20  ("We'd have to do a lot of work to come up with precise numbers."). Mr. Smith was not purporting to present a damages analysis that would "survive a *Daubert* motion." Mot. at 11. He was simply discussing the order of magnitude of providers' damages to make the high-level point that, "regardless of the exact number, the settlement is clearly for a single-digit percentage of actual loss." Ex. 3 at Slide 6. Provider Plaintiffs do not take issue with that assessment.

*Significance of Injunctive Relief*. Provider Plaintiffs claim that Mr. Smith "downplay[ed] the significance of the injunctive relief," including by minimizing the "[h]undreds of millions of

18

dollars" that the Blues say it will cost. Mot. at 12; *see also id.* (claiming that Mr. Smith "cherry-pick[ed] and mock[ed] particular aspects of the injunctive relief").

To suggest that Mr. Smith "cherry-picked" or "mocked" any aspect of the injunctive relief is a major distortion of his presentation. For example, below is an excerpt from Mr. Smith's presentation—with plain text used to show the portion quoted in the Motion, and italics and bold type used to show the portion *not* mentioned in the Motion:

> ***I don't think anyone is going to be surprised to know that*** hundreds of millions of dollars is a rounding error in terms of the Blues' annual business. I mean, that's probably the cost of the team-building exercises that the Blues hold on an annual basis. ***So I'm not super impressed by the hundreds of millions of dollars, but something doesn't have to cost a lot of money to be impactful. What we encourage hospitals to do individually and collectively is to look at the list of changes that are available in the settlement documents and to apply them to your hospital and to see whether they actually provide meaningful, valuable relief to your hospital***.

Ex. 2 at 19:9–25. If Provider Plaintiffs had acknowledged what Mr. Smith actually said, they could not have argued that he mocked the injunctive relief in the settlement agreement.

Provider Plaintiffs also accuse Mr. Smith of mocking the injunctive relief by referring to it as "the so-called injunctive relief." Mot. at 12. But as the context makes abundantly clear, Mr. Smith did *not* use the phrase "so-called" to undermine or mock the injunctive relief; rather, he used it to preface a legal term, "injunctive relief," given that the audience included non-lawyers. *See* Ex. 2 at 10:5–20 ("The second part of it is what we lawyers, and I understand there's some lawyers and non-lawyers alike on this webinar, but what we lawyers call injunctive relief, which is changes in behavior, changes to the Blue business practices. . . [T]hat's the extent of the so-called injunctive relief."). Indeed, Mr. Smith used the same "so-called" formulation elsewhere in his presentation to preface his use of a legal term or legal jargon. *See* Ex. 2 at 7:16–17 ("so-called Exclusive Service Areas"); *id.* at 32:15 ("so-called default approach" for calculating each hospital's recovery).

19

*Whether Opt-Outs Will Lose the Injunctive Relief.* Provider Plaintiffs fault Mr. Smith for expressing skepticism that the Blues could, as a practical matter, limit the settlement agreement's injunctive relief to only providers who participate. Mot. at 13. Mr. Smith presented this view as a reasoned, practical analysis—and he limited it to only some pieces of the injunctive relief. *See* Ex. 2 at 21:2–8 ("It seems like that that's going to be very tough to have two separate systems in place, one for the hospitals that stayed in, one for the hospitals that stayed out. So some of the things we could see how that might work. Others we're perplexed, frankly, at that suggestion."). Provider Plaintiffs claim there is "no basis" for such skepticism, Mot. at 13, but at most they are taking issue with a reasonable alternative viewpoint—not a false or misleading statement.

*Consequences of Opt-Outs for the Settlement.* Provider Plaintiffs fault Mr. Smith for stating that it is possible that the number of opt-outs could affect the settlement amount. Mot. at 13. During the MHA presentation, in response to an audience question, Mr. Smith noted that the settlement agreement contained a so-called "upset or a blow-up provision," which provides that if the number of opt-outs exceeds a certain threshold, "there could be consequences in terms of the size of the settlement, whether it stays in place, things like that." Ex. 2 at 18:2–5. Mr. Smith added that "the practice is to keep [the provision] confidential and secret," and so "[w]e don't know what it is. So we don't know. We don't know what it is. We don't know whether the number of hospitals that might opt out is going to have an effect on it. But that could well happen." *Id.* at 18:6–11.

In responding to the audience question, Mr. Smith did not reference the settlement agreement's language, that, "there shall be no reduction of the Settlement Fund by reason of any Opt-Outs." Proposed Settlement Agreement, ECF No. 3192-2 at ¶ 51. Mr. Smith's oversight is understandable, because even where a "blow" provision on its face provides only for rescission, the practical effect of the threshold being satisfied is often to prompt a renegotiation. *See, e.g.*,

Catherien J. Galley, *et al.*, Cornerstone Research, *Considerations for Blow Provisions in Securities Class Action Settlements* at 3 (Sept. 11, 2024) (noting blow provisions' "purpose of allowing defendants to terminate *or renegotiate* a class settlement if anticipated opt-out exposure reaches an unacceptable level" (emphasis added)). Moreover, it is not realistic to suggest, as Provider Plaintiffs do, that "Mr. Smith's statement is likely to mislead providers by implying that if they opt out, money that would have gone to the class will become available to pay them instead." Mot. at 13. Mr. Smith did not state that a high number of opt-outs *would* reduce the settlement amount; he repeatedly said that "we don't know," and immediately thereafter emphasized that "you absolutely need to find our what your claim might look like," and encouraged hospitals to "use your attorneys, whether internal or external, to be asking that question." Ex. 2 at 18:14–18. No audience member could reasonably hold a mistaken view of the benefits of opting out based on Mr. Smith's statement.

*Time Until Issuance of Settlement Payments*. During the MHA presentation, Mr. Smith noted that four years passed between when the parties agreed to the Subscriber settlement and when settlement checks were issued, and "[t]here's no reason to think that the providers' case is going to be quicker to finish." Ex. 2 at 27:3–5. Provider Plaintiffs disagree, stating that "Mr. Smith has it backwards; there is no reason to think the Providers' case will take as long as the Subscribers' case." Mot. at 13–14. Again, Provider Plaintiffs are complaining about Mr. Smith expressing a reasonable and different viewpoint—not a false or misleading statement. Provider Plaintiffs wisely do not say that they know or anyone else knows when all judicial activity, including appellate review, would terminate with respect to the Provider settlement agreement if it is approved.

*    *    *

The MHA presentation bears no resemblance whatsoever to the sort of "abusive" communication with class members that "threatens the proper functioning of the litigation" and thus warrants restriction. *Longcrier*, 595 F. Supp. 2d at 1226. To the contrary, the presentation set forth an informed perspective that *added* to the integrity of the opt-out process by helping class members make fully informed decisions, armed with as much information as possible and a range of viewpoints regarding the settlement agreement.

## CONCLUSION

The Motion should be denied. Respondents respectfully ask that the Court rule promptly to allow Provider class members to make informed decisions with their chosen counsel, well in advance of the March 4, 2025 opt-out deadline.

Dated:  January 24, 2025                    Respectfully submitted,

/s/ *Joe L. Leak*_____
Joe L. Leak ASB5124A63J
Michael J. Douglas ASB2888C52D
LEAK, DOUGLAS & MORANO, PC
The John A. Hand Building
17 20th Street North, Suite 200
Birmingham, AL 35203
Phone: 205.977.7099
jleak@leakdouglas.com
mdouglas@leakdouglas.com

*Attorneys for Respondents Cy Smith and*
*Zuckerman Spaeder LLP*

## CERTIFICATE OF SERVICE

I hereby certify that, on January 24, 2025, I caused the foregoing to be served on counsel of record via the Court's electronic case filing system.

/s/Joe L. Leak
Joe L. Leak


*Counsel for Respondents Cy Smith and Zuckerman Spaeder LLP*