FILED
2025 Jan-24  PM 04:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 2

Page 1

Massachusetts Health & Hospital Association

December 2024 Webinar on BCBS Settlement

December 10, 2024

Job No.: 7128190

Pages: 1 - 40

Reviewed by: Jackie Scheer

Page 2

P R O C E E D I N G S

MS. GRANOFF:  Good afternoon, everyone, and welcome to the Blue Cross Provider Settlement webinar.  My name is Karen Granoff, and I'm the Senior Director of Managed Care at the Massachusetts Health and Hospital Association.  I want to welcome you to today's webinar, but a few logistics before we start. If you have questions during the webinar, please enter them into the chat feature, as we are in listen-only mode.  The questions will come directly to us, and we will do our best to address as many as we can at the end of the presentation.  And the presentation is being recorded, so folks who don't have an opportunity to see it today will be able to view it at a later date.

I also want to take a moment now to thank our 2024 annual sponsors and strategic partners for their support in underwriting today's webinar, which is just one of many events we offer throughout the year to connect our members with leading experts and to help address timely issues like the one today.

With that, I'm pleased to introduce our

Page 3

speakers from Zuckerman Spaeder today.  Partner Cyril, who goes by Cy Smith, and William, who goes by Bill Schultz.  Cy is a fellow of the American College of Trial Lawyers with three decades of experience in high-stakes civil litigation across industries like financial services and health care.  He played a pivotal role in exposing racial bias in the NFL Concussion Settlement Program, securing benefits for thousands of black retirees, and helped achieve a $2.6 billion settlement in the national antitrust litigation against Blue Cross Blue Shield insurers on the consumer side.  Recognized as a trailblazer by the National Law Journal, Cy also contributes to community initiatives and advocacy efforts.

Bill has extensive experience in health law, litigation, and public policy, having argued numerous cases in federal trial and appellate courts, including three before the Supreme Court.  As general counsel at HHS from 2011 to 2016, he advised two secretaries and managed an office of 500 lawyers overseeing programs like Medicare, Medicaid, and the Affordable Care Act.  Previously, he served in

Page 4

leadership roles at the FDA, Department of
Justice, and on Capitol Hill, shaping health
and regulatory policy.  A former Georgetown Law
professor, Bill is a recognized speaker and
author on health care and legal issues.

We thank you both for being here today,
and we look forward to getting to this
discussion.  And now I'm going to hand it over
to Bill to get us started.

MR. SCHULTZ:  Karen, thank you.  That's
one of the nicest introductions anyone's ever
done for me.  Thank you so much.

I just want to say a word, a couple words
about our firm, and then I'm going to turn it
over to Cy.  We're a litigation firm.  We have,
as Karen indicated, a large presence in the
health care space, and represent hospitals in
sort of many different situations.  We do a lot
of work for Johns Hopkins and UPMC, but we've
also represented the American Hospital
Association, the Essentials, WAMC, particularly
in 340B litigation, and we also represent state
hospital associations, including yours,
actually, in a number of health care cases.

But in the 340B cases, we brought the case

Page 5

challenging the Medicare cuts in about 2017, that ultimately, you know, once it went to the Supreme Court and was decided, resulted in over $10 billion of money back to 340B hospitals. Cy has been involved in the Blue Cross Blue Shield cases for more than 10 years, really, on the side of the insureds.  And as he'll tell you, those cases ended up in a settlement.  And now the attention is turning to providers, and there's some very important decisions I'm sure all of you know you'll have to make.  And what I'm going to do now is turn it over to Cy, who can kind of explain what some of the issues and considerations are.

MR. SMITH:  Okay.  Thanks, Bill.  Thanks, Karen.  Thanks to all the MHA folks, and thanks to all of you for turning out today, virtually, for this presentation.

I think, first of all, it's important for me to note my Boston ties.  I was born in Boston many years ago at what was then Boston Lying-In Hospital, and I researched it.  I understand it's now part of MGH, but my mother speaks fondly of your great hospitals.

And on a more serious note, I want to talk

Page 6

about sort of, like, where we're coming from, where our law firm is coming from, and what we want to try and accomplish here.  So at the end of the day, you know, we're going to be representing some number of hospitals and potentially other providers in what we're going to call opt-out litigation.  We'll talk about what that looks like.  But more fundamentally, we want to be, you know, an advisor to you, to MHA's members, and give you good advice about whether you should stay in this settlement or stay out.  We can certainly recognize there might be situations where a hospital might want to stay out.  But to make that decision, you need information.  Some of it you're going to hear today in this presentation, and some of it, vital information, you're going to need to get from the providers' class counsel, the people who are sponsoring the provider settlement that we're going to address.  So we are there, Bill and I are there, to advise you in making that decision, and we want to make sure that you make the best decision for your hospital.

So, with that, why don't we get started.

Page 7

Nick, could we get to the slide that is entitled, How We Got Here?

I don't know, is that up?

MR. SCHULTZ:  It is, Cy.

MR. SMITH:  It is, very good.

Okay.  So some of you may know this history.  There were class actions filed by the subscribers and the providers in 2012.  They all got consolidated down in federal court in Alabama, and they progressed for a number of years.  The reason that these cases were filed are things that you're probably very familiar with, that the Blue Cross insurers -- and there are, you know, several dozen of them around the country, consolidated and organized by their association, have set up so-called Exclusive Service Areas -- they call it ESAs -- which sharply limit their ability to compete outside of their state.  And that looked to a lot of people like a facial violation of the antitrust laws, the idea that you would refuse to compete with competitors, and that's the basis on which we filed suit in 2012.

There was also a limit known as the National Best Efforts Clause, which limited the

Page 8

amount of non-Blue business that the Blues would do nationwide.  We challenged that as well.  At the same time, there were provider cases filed, which challenged the same restrictions, but for different reasons.  As I think you can all appreciate, when the Blues agree as sellers not to compete with each other, it increases the price of insurance to subscribers.  When they agree as buyers to pay less to people like you, to providers, to hospitals, it decreases your reimbursement, and that was the contention of the case.  Next slide, please.

So in 2018 we won a big victory, and that was the decision by the court in Alabama that the combination of those restrictions was illegal per se under the federal antitrust law.  And that's a big hammer when it comes to, you know, trying to force action, force a resolution of litigation, because if something is per se illegal, there are very, very few defenses to it.  And it forecast a very grim outcome for the Blues.  That led to settlement talks, and we made a deal in 2020 which outlawed those national best-efforts clauses,

Page 9

which greatly increased Blue competition for Administrative Services Only business, or ASO business, and paid more than $2 billion to the class of subscribers that we represent.

It took a while to get through the federal courts, but in summer 2024, the Supreme Court rejected challenges to that deal.  And so our deal is done, done, done, and we're going to be, you know, sending checks to individuals, to employers, to ASO groups, and so on in the very near future.

It took the providers considerably longer, about four years longer.  Their settlement, as you probably know, was announced in October 2024.  Next slide, please.

So in the provider settlement, very big picture, you know, there's more than $2 billion gross, but when you subtract out the practitioners and the professionals who get paid, there's going to be somewhat less than $2 billion for hospitals.  Now, $2 billion is a lot of money, but it has to cover all 6,000 hospitals in the country for a 16 year period for all of the possible antitrust claims against the Blues.  And we'll talk in just a

Page 10

moment about, you know, how big are those claims and how do they compare to the amount of money in the settlement, but I think it's important to put it in perspective.

The second part of it is what we lawyers, and I understand there's some lawyers and non-lawyers alike on this webinar, what we lawyers call injunctive relief, which is changes in behavior, changes to the Blue business practices. And very big picture, and you may have read about some of these, there are some improvements to the Blue card, like having a new super Blue card executive inside Blue Cross. There are service level agreements to create minimum service levels. There are some modest changes to allow providers to contract with Blues outside of their exclusive service area. There's some miscellaneous process changes, but that's the extent of the so-called injunctive relief. Next slide, please.

So let's start with the money and how does that stack up. So normally when you're settling a class action, you know, you -- of any consequence, you would try and figure out

Page 11

how much has the class, the group of those 6,000 hospitals, the entire class, what are the damages they have suffered, and then compare that to what the settlement is to show that that settlement that you've reached is, in the words of the law, the rule that applies here, fair, adequate, and reasonable.

Now the providers' counsel, so far as we know, did something somewhat different from that.  They had estimated that hospitals in Alabama alone, which we all know from civics class has 5 and a half million people in it, for a portion of the 2008 to 2024 period that is being addressed here -- so just from 2008 to 2019, not quite the whole thing -- had suffered billions of dollars, I think as much as $4.5 billion, maybe even $5 billion, in lost Blue reimbursements.  So so far, so good.  But they also have said that they did not even calculate the total damages for all 6,000 hospitals across the entire country -- again, civics class, 330 million people -- for that entire period covered by the settlement.  This is somewhat unusual.  And so if you're looking to say, well, what were the damages calculated for

Page 12

Massachusetts or for my hospital, you're not going to get an answer to that question based on everything that we know.

So what would those numbers look like if they had been calculated for the entire group of 6,000 hospitals for that entire 2008 to '24 period before there's something we call trebling?  And we'll talk about that in a minute.  Well, we've talked to economists.  The preliminary estimates suggest that the refusal to compete that is embodied in those ESAs and that National Best Efforts Clause decreased reimbursement by some 5 to 10 percent, depending on the market.  When I say depending on the market, I think it stands to reason that in a state that is highly concentrated, where the Blues have a big chunk of the market, that's especially true down south and in some other states, that those damages are going to be higher, closer to that 10 percent figure.

When the Blues have less of the market, it's going to be lower, 5 percent, maybe even a little less than that.  Using this forecast, which is just a preliminary estimate, of course, because we haven't done the work that's

Page 13

going to be, you know, complicated but very doable, that would suggest that the damages could well be over $100 billion across the entire country before being trebled.

Trebling is just the lawyer's word for tripling.  And the reason I mention that is that under the Sherman Antitrust Act, if you prove that the defendant is liable and prove what the damages are, those damages automatically have to be tripled, or trebled. There's no -- it's not up to a judge, it's not up to a jury, it's mandatory under the law.

So when we say over $100 billion, that's before potentially that number gets tripled. But regardless of the exact number, you know, it could be 200 billion and it could be 50 billion.  The settlement is clearly for a very low percentage of the actual loss here.  Now, in Massachusetts, obviously, we'd have to do a lot of work to come up with precise numbers. But I do know from looking at the statistics, and I'm sure this is consistent with your experience, that Blue Cross has a little more than a third of the market share.  We would expect the numbers to be towards the low end of

Page 14

that 5 to 10 percent range based on that numbers, but still quite significant.  Because just think about it for a second.  If Anthem came in and competed in Massachusetts, you know, if HCSC or one of the Pennsylvania Blues or one of the New York Blues came and competed in New York, your reimbursements would go up. I mean, we think that's common sense.  Next slide, please.

So now that we know sort of what the numbers are, a lot of you have asked, we've heard many hospitals -- because we've talked to hospitals, Bill and I have talked to hospitals all over the country.  The question is, well, what is my hospital's claim worth or my, you know, health system's claim worth?  And we say, well, that's a great question.  And the answer is very complicated and a bit difficult to figure out.

So if you've done some reading in the materials, if you're familiar with the stuff that's out there, I think you may know that your hospital's recovery is determined by a fraction.  And even those of us who stayed in the legal profession and were not proficient in

Page 15

math know that a fraction has a numerator and a denominator.  And the numerator is going to be your hospital's total allowed Blue claims during that -- what we call the class period from 2008 to '24, adjusted by factors, it says in the settlement documents, such as the Blue market concentration in your area.

Now, the lawyers get suspicious when it says "such as" because we say, well, what else is there out there and we don't know.  And it doesn't say so -- doesn't say in any of the settlement documents.  But I think that's an important question.  In any event, you start with your allowed Blue claims, and I assume that most or all of you have the analytical and data systems that are sufficient to pull those together for you.  There is an option under the settlement to have the provider's counsel calculate them based on their own data for a period of time, and then to escalate it using the consumer price index for hospitals and things like that.  It gets complicated.  But you start with that number.  Say what are your allowed Blue claims.  Then that number gets adjusted by the class counsel's economist.  It

Page 16

gets adjusted maybe up if there's a lot of Blue market share in your territory.  Maybe it gets adjusted down if there's not so much, but that's where you start.  Well, that's the numerator, and that was complicated to start with.

What about the denominator?  Well, the denominator is the total amount of claims submitted by all of the hospitals who stay in the settlement.  Well, the decision to stay in the settlement or to opt out, we'll talk about this more in a moment, is due by March 2nd, 2025.  And so -- and the claims themselves are not due until later still in 2025.  So we don't actually know today which hospitals are going to stay in and stay out.  We think a fair number will opt out, but we just don't know.  We don't know how big and which ones.  And so the denominator is very tough to forecast.  It's unknowable at this point.  It might be that the providers' counsel has some estimates about what that number might be.  We have not seen them.  So both the numerator and the denominator are moving targets.

And the bottom line is, it's difficult to

say what your claim will be worth if you stay in the settlement.  But just think about the fact that there's going to be somewhat less than $2 billion to distribute.  Think about the fact there are 6,000 hospitals.  Think about your revenue, your Blue revenue over the period of time.  And, you know, the numbers, the 2 billion gets pretty small pretty fast.

But we would say this.  It's absolutely essential for you to ask the providers' attorneys, their class counsel as we call them, the firm of Whatley Kallas, is to say, like, well, what do you think my claim is going to be worth?  Right, what's my adjustment?  What's your forecast, the number of hospitals who might stay in?  So that's the sort of question that you should be asking.  And by the way, there is a question just posted by someone that said is the $2 billion number going to change if hospitals opt out, if I read that question correctly.  The answer is, it might.  There's a number that is unknown to us and only known to the Blues and the providers' counsel.  It's what we call an upset or a blow-up number that's in the settlement, which says if more

Page 18

than X percent of either hospitals or hospitals by revenue opt out of the settlement, there could be consequences in terms of the size of the settlement, whether it stays in place, things like that.  But that number has not been disclosed.  And the practice is to keep it confidential and secret.  We don't know what it is.  So we don't know.  We don't know what it is.  We don't know whether the number of hospitals that might opt out is going to have an effect on it.  But that could well happen.

Anyway, but to come back to what we think you guys should do, we say this to every hospital.  You absolutely need to find out, you know, what you think your claim might look like.  It would not be a terrible idea, you know, to use your attorneys, whether internal or external, to be asking that question, to be pushing on the question of what's my numerator, what's my denominator.  That's something that we're happy to do.  There are other people out there who could do it as well, perhaps your in-house people as well.  But that's something that you should be doing.  We think, you know, advice on that issue and counsel on that issue

Page 19

is important.  Okay, next slide, please.

All right, so that's the money.  Let's talk about the so-called injunctive relief, the changes to the business practices.  So it covers several pages of stuff in the papers that the providers' counsel put out.  They say -- the providers' counsel say that it will cost the Blues, they say, hundreds of millions of dollars to implement these changes.  I don't think anyone is going to be surprised to know that hundreds of millions of dollars is a rounding error in terms of the Blues' annual business.  I mean, that's probably the cost of the team-building exercises that the Blues hold on an annual basis.  So I'm not super impressed by the hundreds of millions of dollars, but something doesn't have to cost a lot of money to be impactful.

What we encourage hospitals to do individually and collectively is to look at the list of changes that are available in the settlement documents and to apply them to your hospital and to see whether they actually provide meaningful, valuable relief to your hospital.  Because some people have said to me

Page 20

that these changes look more like window dressing, like having a new, you know, Uber executive over the issue of the Blue Card.  Is that really going to change things?  I mean, I don't know.  You might look at that and say, like, that's really valuable to us.  It's hard for us to say, but some people would disagree.

Now, one thing about this injunctive relief is that the providers' counsel have said that if you opt out of the settlement, you're not going to get the benefit of these business process changes.  Now, we're kind of scratching our head, and a number of hospitals that we've talked to are also scratching their heads, I say as I scratch my head.  We're scratching our heads about how that is going to work exactly. It's one thing to say that we're not going to pay money to hospitals that opt out of the settlement, but it's hard to see how new Blue Card standards or data requirements or the new Blue Card executive will be fenced-off and kept away from hospitals that opt out of the settlement.  It seems to me like data requirements -- and this is what other hospitals have said to us, data requirements,

Page 21

Blue Card standards, minimum levels of service, all those sorts of things.  It seems like that that's going to be very tough to have two separate systems in place:  One for the hospitals that stayed in, one for the hospitals that stayed out.  So some of the things we could see how that might work.  Others were perplexed, frankly, at that suggestion.  Next slide, please.

Okay.  So what's a hospital to do?  And this really comes back to, you know, our overall approach to this.  So we would say to you, and we have said to everyone that we've spoken to, is that, you know, step one is for you guys, whether it's the legal people, the business people, the combination of all of them, really, to carefully analyze your claim under the settlement, and to find out what's the range of dollars, right, that you might be entitled to.  What's your numerator look like, what do the providers' counsel say the denominator might look like, to get a sense of what that might be.  And it could well be and likely is going to be in a range, right, because we don't know how many people will stay

Page 22

in the settlement.  But to look at that number and see what it is.  And does it look like a big number or a little number to you?  And then also to look at that additional so-called injunctive relief, get an understanding of whether you think it's going to be impactful, you know, for your hospital.

We have also said to hospitals, you know, that it's a perfectly reasonable business decision to say, you know, I know this number, you know, maybe -- I'm going to throw out a number of $5 million, $10 million, whatever that number might be, might be less, could be more depending on your size.  We know that number is not huge.  We know that there might be a bigger number that's out there, but it's locked in, right?  We know it's going to be out there eventually.  We don't know when exactly. We'll talk about that more in just a moment. And we didn't budget for it.  And so, you know, we're willing to take that.  It's found money in one sense.  And that's a completely reasonable decision to make.  But we also want all of you -- and this is what we've said to, again, to hospitals around the country -- we

Page 23

want you to take the second step.  And it's to compare that claim to your alternative.  The alternative is, again, this is the legal word, but it actually kind of makes sense even in the civilian world, in the non-legal world.  You have the right to opt out of the settlement.  To opt out of the settlement means that you say, you know, I appreciate, you know, what you've done, but I'm going to chart my own course.  I'm going to sue the Blues, join alongside other hospitals who are suing the Blues directly for violating the antitrust laws.  That's called opt-out litigation.  And it's not uncommon in big class action settlements, especially where the people who are in the class, the 6,000 hospitals that we have here, have very large claims that are, you know, very impactful to their business.

So if you're an opt-out, the opt-out has the right to control their own litigation, to decide what they want to settle their claims for, not be bound by something that, you know, an attorney representing 6,000 very different hospitals, very different hospitals, not be bound by that.  And not to be limited by the

Page 24

rather small -- it's no offense to providers' counsel to say it's pennies on the dollar settlement that they've offered.  And if you act alongside other hospitals, you'll maximize your leverage against the Blues and you'll maximize your chances of doing better than the settlement.  And we should say there are no guarantees in life.  I think we've learned that at every turn in our own lives and in the lives of our hospitals.  But opt-outs generally often, I should say, often do much better than plaintiffs who stay in the class.  And the reason is that they're not bound by something, a one-size-fits-all type of situation, which is what class action litigation can be, and why it can sometimes be ill-suited to a situation like this, where you've got, you know, very large institutions with a lot at stake who have a very important, you know, role to play here. Those institutions often do better by opting out.  Next slide, please.

So when do I have to decide?  Well, people asked us this question a few months ago. They've asked us, you know, even if you asked us a week ago, we would have said could be

really soon.  But now we know it's going to be very soon, because not quite a week ago on December 4th, the Alabama court granted what's called preliminary approval for the proposed settlement.  So that doesn't mean things are done, done, done.  That's a thing called final approval.  But it does mean that the clock started ticking.  And so all of you and everybody else have 90 days from that date until March 2nd, 2025, to decide whether to stay in the settlement or to opt out.  If you do decide to stay in the settlement, your claims have to be submitted by July 29th, 2025. That's also the date on which the Alabama federal court will hold a final approval hearing and will decide whether to certify and approve the settlement, which we frankly expect that the court will do.

So that's the timing.  And it's starting to get pretty real, because 90 days seems like a lot.  But as -- I think as we all know, the time kind of slips through your hands and before you know it, you've got to make that decision.  Let's go to the next slide, please.

So people have asked us, if I'm thinking

Page 26

about litigation, you know, these are some of the things that are on my mind.  And I'll talk about these and I'm sure we'll have some other questions in the chat, which we'll get to fairly soon.  So one thing people have asked us is they've said, well, look, the case has been settled.  Why shouldn't I simply take my check from the settlement as opposed to the delay that happens if I go and file a separate lawsuit, even if it's alongside lots of other hospitals, and even if it's, you know, critical mass and all those things?  And I would say to you -- we would say to you, no question, these are complex cases.  Opt-out claims could take several years to litigate, three to five years, even longer.  The Blues, you know, I was against the Blues for 12 years.  They are represented by tenacious attorneys.  But we learned a lot during that period.  We figured out where many of the bodies are buried, so to speak.

But here's the lesson or one lesson I want you to take away from that.  In our case, we reached a settlement in 2020, but there were objections.  There was an appeal to the Federal

Page 27

Court of Appeals in Georgia.  And then there was an appeal to the U.S. Supreme Court.  And that took four years to resolve.  There's no reason to think that the provider's case is going to be quicker to finish.  And that tells us that it could easily be four years before settlement checks get written and sent out to everybody in the class.  And that means that if you're thinking about litigation, it could be longer, but it might not be much longer, if at all.

A second thing people obviously want to ask is, well, what would it cost to do this litigation?  And we are in a group with two other nationally prominent law firms, and we're prepared to basically take it on on a 100 percent contingent basis.  We believe strongly in these cases.  We believe that there's a lot of merit to them.  And so whether it's in terms of hard expenses, which could be in the multiple tens of millions of dollars, the PhD economists, some of whom might actually come from Boston, are not inexpensive.  The litigation effort is costly, but that's something that we're willing to do on us.  And

Page 28

so unless we get some money for you, you know, nobody -- you don't pay anything.  And if you prevail, then obviously you'd owe us a piece of that.  So that's how we approach those.  Next slide, please.

We do know that a lot of calls have been made in the last few months.  And if I could just toot our own horn for a moment, you know, there's a lot of entreaties that have been made, a lot of proposals that have been made to hospitals.  Just to talk a little bit about where our law firm is coming from.  I mean, I spent, as I said, 12 years appointed by the court overseeing this litigation.  I don't think it's an exaggeration to say, as I just did, that we know where the bodies are buried. We know how the Blues work.  We know a lot of the tricks of the trade.  Bill, as he mentioned at the top, he and his folks did an unbelievable job on this 340B litigation, recovering $10 billion for hospitals nationwide.  You know, we think we have a pretty good idea of how to do this stuff.  And as I said, we've joined forces with two other law firms.  We've got a very deep bench.  We've

Page 29

got a lot of knowledge relevant to this. And we'd love to represent you, whether it's in advising you about your claim, making sure your claim is as big as it can be, or if you decide to opt out, in representing you in that.

So I'm going to stop there.  Bill, is there anything you would add before we go to the questions in the chat?

MR. SCHULTZ:  No, Cy, I don't have anything to add.

MR. SMITH:  Okay.  Karen, if we could start to see some of the chat questions, if you want to read them to us, or we can put them up, whatever works.

MS. GRANOFF:  I will read them to you.

MR. SMITH:  Okay.

MS. GRANOFF:  So you addressed -- you started to address this, but we have a question.  If a provider does opt out, how would one estimate their settlement outside of the class?  What are the steps you would take, and what should they be looking at, I guess?

MR. SMITH:  Yeah, so that's a great question.  It's hard to give you a precise answer, but let's come back to what I said

Page 30

about how the class action settlement is for, you know, one or two cents on the dollar, maybe as many as five cents, although we doubt it, okay.  And so the question is, will you do significantly better than that if you file your own claim?  And again, no guarantees in life. You could lose.  Remember, we've got that great ruling in our favor on the per se standard of review, which is not quite game over, but it's pretty close to it.

So the question is, can you do better than one or two or three cents on the dollar?  I think the odds are overwhelming that you would do better than that.  And without saying there's a guarantee of it, when you're starting at a pretty low baseline like that, and this is not me making it up, but the providers' counsel have said that it's okay to approve the settlement, even though it's for a very small percentage.  When you start with such a low baseline, it's not hard to do better.  And we think you could do substantially better, you know, some multiple of that.  And it's impossible to predict exactly how much, but we think it would be substantial is the best way I

Page 31

can answer that.

MS. GRANOFF:  Okay, thank you.  We have another hospital who has a contract with more than one Blue Cross organization.  They're located on the border of two states.  So they're wondering does this even apply to them?

MR. SMITH:  I think the answer is yes.  I think the -- everybody who is a hospital and has allowed Blue claims can file a claim in the settlement, and the settlement will bind you if you don't opt out.  I do think if you're on the border like that, some of the provisions of the so-called injunctive relief, the stuff about contracting in contiguous areas -- and it would require more analysis to say more than this -- some of those provisions might apply to you. And you should take a close look at those, you know, with counsel, alongside counsel, if necessary, but you should take a close look at those and see whether they are more impactful for your hospital because of its geographic location.

MS. GRANOFF:  Okay.  Well, those are the -- and you had already addressed the earlier question about the settlement with a

Page 32

decrease of their significant percentage of opt-out.  What was I going to say?

Well, first of all, if folks have additional questions, we still have about 10 minutes left in the webinar.  So I'm sure you do have more questions.

We just got one.  Please reiterate the options to get the numerator to calculate our claims worth.

MR. SMITH:  Sure.  So I'm going to oversimplify a little bit and suggest that you take a look at the settlement documents or, you know, consult with counsel, whether it's us or somebody else.  But there are two approaches to this.  One is the so-called default approach where you take the numbers that class counsel has already identified for your allowed Blue claims, and that -- those numbers go up through 2015.  And then class counsel will escalate those claims through 2024 using the hospital CPI or the healthcare CPI number.  So that's the default method.

The alternative method is for you to submit your own data on your allowed Blue claims during that 2008 to '24 period.  Again,

that's just the starting point because, remember, there's that adjustment based on the market concentration of the Blues in your area. And so that's something that you can't calculate yourself.  You need to ask class counsel what's my adjustment.  And I would be, like, a little more probing and say, like, and how is it calculated and what are the other adjustments that are out there?  Why is, you know, my hospital's number this and why is another hospital numbers that.  What's the Massachusetts adjustment and so on.  But so you start with those two alternatives and then there's the adjustment.  That's how you get to your numerator.  I hope that -- I hope that answered your question.

MS. GRANOFF:  There's not any more questions in the chat, but I have a question. And I know it's complex in detail, but in the settlement where it talks about the contractual piece of the injunctive relief.  Can you talk a little bit more about what that is versus what currently exists with the Blues?

MR. SMITH:  Karen, when you talk about contracting, you're talking about this stuff

Page 34

about the contiguous areas?

MS. GRANOFF:  Yeah, yeah, yeah.  And being contracting across state lines.

MR. SMITH:  Yeah, I have to say, I -- I found that a little -- a little hard to follow.  And that -- that's why I said if you're a hospital that is on the border, and that, you know, has patient flow or facilities, you know, that are on both sides of the border or close to the border of an ESA in whether it's, you know, Connecticut or Vermont or some other -- some other state, you really need to take a look at that and then apply it to your own situation.  Because I was having trouble understanding the value in that, but I'm not a hospital, you know, it's hard for me to put myself in one of your members situations in that -- in that context.

MS. GRANOFF:  Right.  And so that piece of the injunctive relief does not apply if you're a hospital that's not in any of those contiguous areas?  So if you're in Worcester, you can't decide to contract with, you know, Blue Cross or Vermont, for example?

MR. SMITH:  I believe that's correct,

Page 35

because I believe it's limited to contiguous areas.  We'd have to look at, you know, the specific facts of a hospital and compare it to settlement language, because it has, you know, pretty precise language about who gets the benefit of that, who does not.

MS. GRANOFF:  All right.  Any other questions that folks want to type in the chat?

MR. SMITH:  Well, let me just say we've -- this is going to be copied and left up there.

MS. GRANOFF:  We did have one more question, sorry.

MR. SMITH:  Oh, okay.  Go ahead, Karen.

MS. GRANOFF:  Was there an opt-out option for ASOs in the member settlement?  And if so, what percent opted out versus stayed in?  Any experience from that that could be applied here?

MR. SMITH:  That's a great question.  We had a number of ASOs that opted out.  I don't know the numbers by reference to, like, you know, the size of it.  I know there are, you know, dozens of them.  A lot of big employers did opt out.  And, you know, that's a result of the fact that, you know, the ASOs, employers

Page 36

are in some ways kind of like the hospitals. They've got a lot of money at stake and, you know, didn't necessarily want to be confined by a one size fits all settlement.

I see another question.

MS. GRANOFF:  Another question is about other providers, non-hospital providers, for example, physicians, and how should they proceed?

MR. SMITH:  Sure.  So physicians -- if you look at the total dollars, think of it as a pie, a very small slice of that money is going to go to physicians and other professionals. Eight percent I think is the number, 92 percent to the hospitals.  And there are two reasons for that.  And I recognize that a number of your -- a number of you, a number of your MHA members may have professional claims and practitioner claims as well.  So there are two reasons for that -- for that 8 percent number. One is that there was a case back in 2009. It's called the Love case, L-O-V-E.  And it settled claims by a large national class of practitioners against the Blues.  And it's been read to be a very expansive settlement so that

Page 37

it cuts off claims for all or most, or at least many of the licensed healthcare professionals who were alive and had licenses as of 2009. And it means that even if they suffered an injury in the future, after 2009, they're still bound by that settlement and they've released their claims in this case, okay.  And if that sounds kind of crazy, it does seem crazy, but that's what the court holding is.  And there have been estimates that not quite two-thirds of all licensed healthcare professionals in the United States were covered by that settlement.  And so that greatly shrinks the amount of relief that the professionals can get.

The other factor that affects the amount of the settlement that goes to practitioners is the fact that the -- according to providers' counsel, that the impact on professionals, on practitioners, on their reimbursement levels, they say was much, much less, like a third, the impact on hospitals.  We have not looked directly at that.  We've looked more at the hospital side of it.  But assuming that to be true, it makes sense that the settlement is, you know, in terms of a pie chart, the vast

Page 38

majority of the pie, except for that little sliver, is for hospitals.

MS. GRANOFF:  It does not look like there's any other questions.  I'm sure as folks go back and discuss it amongst themselves, there probably will be more questions.  So this is not your last bite at the apple.  You can certainly contact Cy and Bill directly.

I just see another question.  Where can I get the settlement document?

We can send that out along with -- when we send out the slides, I think.

MR. SMITH:  Yeah, I think that's a great idea, Karen.  We'll get you a full package of not just the settlement agreement, but some of the other communications that have been posted there.  We'll get you that and you can put it on your website or send it out to participants, whatever makes sense.

MS. GRANOFF:  We appreciate that.  And we appreciate your taking the time to do this. And those of you who are listening can certainly contact Zuckerman Spaeder directly if you've got more questions.  But, again, thank you all for joining us.  And there's certainly

Page 39

a lot more to come on this.  So don't hesitate to ask us your questions, and we'll do what we can to get you the answers.

MR. SMITH:  Karen, thanks so much.  And thanks to all of you, silent though you may be on this Zoom, but thanks for taking the time to listen.  And we look forward to staying in touch.

MS. GRANOFF:  Okay.  Thank you.  Take care.

MR. SCHULTZ:  Thanks, Karen.  Thanks, everybody.

MS. GRANOFF:  Buh-bye.

MR. SCHULTZ:  Bye.

(The webinar was concluded.)

Page 40

CERTIFICATE OF TRANSCRIBER

I, Jackie A. Scheer, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding; that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; and that I am neither counsel for, related to, nor employed by any of the parties to the case and have no interest, financial or otherwise, in its outcome.

JACKIE A. SCHEER

JANUARY 23, 2025

**[& - alabama]**

| & | | | |
|---|---|---|---|
| **&** 1:13 | | | |

**1**

**1** 1:24
**10** 1:15 5:4,6 12:13,20 14:1 22:12 28:21 32:4
**100** 13:3,13 27:16
**12** 26:17 28:13
**16** 9:23

**2**

**2** 9:3,17,20,21 17:4,7,19
**2.6** 3:11
**200** 13:16
**2008** 11:13,14 12:6 15:5 32:25
**2009** 36:21 37:3,5
**2011** 3:22
**2012** 7:8,23
**2015** 32:19
**2016** 3:22
**2017** 5:1
**2018** 8:14
**2019** 11:15
**2020** 8:24 26:24

**2024** 1:14,15 2:19 9:6,15 11:13 32:20
**2025** 16:13,14 25:10,13 40:17
**20692** 40:15
**23** 40:17
**24** 12:6 15:5 32:25
**29th** 25:13
**2nd** 16:12 25:10

**3**

**330** 11:22
**340b** 4:22,25 5:4 28:20

**4**

**4.5** 11:16
**40** 1:24
**4th** 25:3

**5**

**5** 11:12,17 12:13,22 14:1 22:12
**50** 13:16
**500** 3:23

**6**

**6,000** 9:22 11:2 11:20 12:6 17:5 23:16,23

**7**

**7128190** 1:23

**8**

**8** 36:20

**9**

**90** 25:9,20
**92** 36:14

**a**

**ability** 7:18 40:7
**able** 2:16
**absolutely** 17:9 18:14
**accomplish** 6:3
**accurate** 40:5
**achieve** 3:11
**act** 3:25 13:7 24:4
**action** 8:19 10:24 23:14 24:15 30:1
**actions** 7:7
**actual** 13:18
**actually** 4:24 16:15 19:23 23:4 27:22
**add** 29:7,10
**additional** 22:4 32:4
**address** 2:13 2:24 6:20 29:18

**addressed** 11:14 29:17 31:24
**adequate** 11:7
**adjusted** 15:5 15:25 16:1,3
**adjustment** 17:14 33:2,6 33:12,14
**adjustments** 33:9
**administrative** 9:2
**advice** 6:10 18:25
**advise** 6:21
**advised** 3:22
**advising** 29:3
**advisor** 6:9
**advocacy** 3:16
**affects** 37:15
**affordable** 3:25
**afternoon** 2:2
**ago** 5:21 24:23 24:25 25:2
**agree** 8:7,9
**agreement** 38:15
**agreements** 10:14
**ahead** 35:13
**alabama** 7:10 8:15 11:11 25:3,14

alike  10:7
alive  37:3
allow  10:16
allowed  15:3
  15:14,24 31:9
  32:17,24
alongside
  23:11 24:4
  26:10 31:18
alternative
  23:2,3 32:23
alternatives
  33:13
american  3:4
  4:20
amount  8:1
  10:2 16:8
  37:13,15
analysis  31:15
analytical
  15:15
analyze  21:17
announced
  9:14
annual  2:19
  19:12,15
answer  12:2
  14:17 17:21
  29:25 31:1,7
answered
  33:16
answers  39:3
anthem  14:3

antitrust  3:12
  7:20 8:17 9:24
  13:7 23:12
anyone's  4:11
anyway  18:12
appeal  26:25
  27:2
appeals  27:1
appellate  3:20
apple  38:7
applied  35:17
applies  11:6
apply  19:22
  31:6,16 34:13
  34:20
appointed
  28:13
appreciate  8:6
  23:8 38:20,21
approach
  21:12 28:4
  32:15
approaches
  32:14
approval  25:4
  25:7,15
approve  25:17
  30:18
area  10:18 15:7
  33:3
areas  7:17
  31:14 34:1,22
  35:2

argued  3:19
asked  14:11
  24:23,24,24
  25:25 26:5
asking  17:17
  18:18
aso  9:2,10
asos  35:15,20
  35:25
association
  1:13 2:7 4:21
  7:16
associations
  4:23
assume  15:14
assuming
  37:23
attention  5:9
attorney  23:23
attorneys
  17:11 18:17
  26:18
audio  40:4
author  4:5
automatically
  13:10
available  19:21

**b**

back  5:4 18:12
  21:11 29:25
  36:21 38:5
based  12:2
  14:1 15:19

33:2
baseline  30:16
  30:21
basically  27:16
basis  7:22
  19:15 27:17
bcbs  1:14
behavior  10:9
believe  27:17
  27:18 34:25
  35:1
bench  28:25
benefit  20:11
  35:6
benefits  3:10
best  2:12 6:23
  7:25 8:25
  12:12 30:25
  40:6
better  24:6,11
  24:20 30:5,11
  30:14,21,22
bias  3:8
big  8:14,18
  9:16 10:1,10
  12:17 16:18
  22:3 23:14
  29:4 35:23
bigger  22:16
bill  3:3,17 4:4,9
  5:15 6:21
  14:13 28:18
  29:6 38:8

**billion** 3:11 5:4 9:3,17,21,21 11:17,17 13:3 13:13,16,17 17:4,8,19 28:21

**billions** 11:16

**bind** 31:10

**bit** 14:18 28:11 32:11 33:22

**bite** 38:7

**black** 3:10

**blow** 17:24

**blue** 2:3 3:12 3:13 5:5,5 7:13 8:1 9:1 10:9,12 10:13,14 11:17 13:23 15:3,6 15:14,24 16:1 17:6 20:3,19 20:21 21:1 31:4,9 32:17 32:24 34:24

**blues** 8:1,6,23 9:25 10:17 12:17,21 14:5 14:6 17:23 19:8,12,14 23:10,12 24:5 26:16,17 28:17 33:3,23 36:24

**bodies** 26:20 28:16

**border** 31:5,12 34:7,9,10

**born** 5:20

**boston** 5:20,21 5:21 27:23

**bottom** 16:25

**bound** 23:22 23:25 24:13 37:5

**brought** 4:25

**budget** 22:20

**buh** 39:13

**building** 19:14

**buried** 26:20 28:16

**business** 8:1 9:2,3 10:10 19:4,13 20:11 21:16 22:9 23:18

**buyers** 8:9

**bye** 39:13,14

**c**

**c** 2:1

**calculate** 11:19 15:19 32:8 33:5

**calculated** 11:25 12:5 33:8

**call** 6:7 7:17 10:8 12:7 15:4 17:11,24

**called** 7:16 10:20 19:3 22:4 23:13 25:4,6 31:13 32:15 36:22

**calls** 28:6

**capitol** 4:2

**card** 10:12,13 20:3,20,21 21:1

**care** 2:5 3:7,25 4:5,17,24 39:10

**carefully** 21:17

**case** 4:25 8:12 26:6,23 27:4 36:21,22 37:7 40:8

**cases** 3:19 4:24 4:25 5:6,8 7:11 8:4 26:14 27:18

**cents** 30:2,3,12

**certainly** 6:12 38:8,23,25

**certificate** 40:1

**certify** 25:16 40:2

**challenged** 8:2 8:4

**challenges** 9:7

**challenging** 5:1

**chances** 24:6

**change** 17:19 20:4

**changes** 10:9,9 10:16,19 19:4 19:9,21 20:1 20:12

**chart** 23:9 37:25

**chat** 2:10 26:4 29:8,12 33:18 35:8

**check** 26:7

**checks** 9:9 27:7

**chunk** 12:17

**civics** 11:11,21

**civil** 3:5

**civilian** 23:5

**claim** 14:15,16 17:1,13 18:15 21:17 23:2 29:3,4 30:6 31:9

**claims** 9:24 10:2 15:3,14 15:24 16:8,13 23:17,21 25:13 26:14 31:9 32:9,18,20,25 36:18,19,23 37:1,7

**class** 6:18 7:7 9:4 10:24 11:1 11:2,12,22 15:4,25 17:11

23:14,16 24:12
24:15 27:8
29:21 30:1
32:16,19 33:5
36:23
**clause** 7:25
12:12
**clauses** 8:25
**clearly** 13:17
**clock** 25:7
**close** 30:10
31:17,19 34:9
**closer** 12:20
**collectively**
19:20
**college** 3:4
**combination**
8:16 21:16
**come** 2:12
13:20 18:12
27:22 29:25
39:1
**comes** 8:18
21:11
**coming** 6:1,2
28:12
**common** 14:8
**communicati...**
38:16
**community**
3:16
**compare** 10:2
11:3 23:2 35:3

**compete** 7:18
7:21 8:7 12:11
**competed** 14:4
14:6
**competition**
9:1
**competitors**
7:22
**completely**
22:22
**complex** 26:14
33:19
**complicated**
13:1 14:18
15:22 16:5
**concentrated**
12:16
**concentration**
15:7 33:3
**concluded**
39:15
**concussion** 3:9
**confidential**
18:7
**confined** 36:3
**connect** 2:22
**connecticut**
34:11
**consequence**
10:25
**consequences**
18:3
**considerably**
9:12

**considerations**
5:14
**consistent**
13:22
**consolidated**
7:9,15
**consult** 32:13
**consumer** 3:13
15:21
**contact** 38:8,23
**contention**
8:12
**context** 34:18
**contiguous**
31:14 34:1,22
35:1
**contingent**
27:17
**contract** 10:17
31:3 34:23
**contracting**
31:14 33:25
34:3
**contractual**
33:20
**contributes**
3:15
**control** 23:20
**copied** 35:10
**correct** 34:25
**correctly** 17:21
**cost** 19:8,13,17
27:13

**costly** 27:24
**counsel** 3:21
6:18 11:8
15:18 16:21
17:11,23 18:25
19:6,7 20:9
21:21 24:2
30:17 31:18,18
32:13,16,19
33:6 37:18
40:7
**counsel's** 15:25
**country** 7:15
9:23 11:21
13:4 14:14
22:25
**couple** 4:13
**course** 12:25
23:10
**court** 3:21 5:3
7:9 8:15 9:6
25:3,15,18
27:1,2 28:14
37:9
**courts** 3:20 9:6
**cover** 9:22
**covered** 11:23
37:12
**covers** 19:5
**cpi** 32:21,21
**crazy** 37:8,8
**create** 10:15
**critical** 26:11

**cross** 2:3 3:13 5:5 7:13 10:14 13:23 31:4 34:24
**currently** 33:23
**cuts** 5:1 37:1
**cy** 3:2,3,15 4:15 5:5,12 7:4 29:9 38:8
**cyril** 3:2

**d**

**d** 2:1
**damages** 11:3 11:20,25 12:19 13:2,9,9
**data** 15:16,19 20:20,23,25 32:24
**date** 2:17 25:9 25:14
**day** 6:4
**days** 25:9,20
**deal** 8:24 9:7,8
**decades** 3:5
**december** 1:14 1:15 25:3
**decide** 23:21 24:22 25:10,12 25:16 29:4 34:23
**decided** 5:3

**decision** 6:14 6:22,23 8:15 16:10 22:10,23 25:24
**decisions** 5:10
**decrease** 32:1
**decreased** 12:12
**decreases** 8:11
**deep** 28:25
**default** 32:15 32:22
**defendant** 13:8
**defenses** 8:22
**delay** 26:8
**denominator** 15:2 16:7,8,19 16:24 18:20 21:22
**department** 4:1
**depending** 12:14,14 22:14
**detail** 33:19
**determined** 14:23
**different** 4:18 8:5 11:9 23:23 23:24
**difficult** 14:18 16:25
**digital** 40:3
**directly** 2:12 23:12 37:22

38:8,23
**director** 2:5
**disagree** 20:7
**disclosed** 18:6
**discuss** 38:5
**discussion** 4:8
**distribute** 17:4
**doable** 13:2
**document** 38:10
**documents** 15:6,12 19:22 32:12
**doing** 18:24 24:6
**dollar** 24:2 30:2,12
**dollars** 11:16 19:9,11,16 21:19 27:21 36:11
**doubt** 30:3
**dozen** 7:14
**dozens** 35:23
**dressing** 20:2
**due** 16:12,14

**e**

**e** 2:1,1 36:22
**earlier** 31:25
**easily** 27:6
**economist** 15:25

**economists** 12:9 27:22
**effect** 18:11
**effort** 27:24
**efforts** 3:16 7:25 8:25 12:12
**eight** 36:14
**either** 18:1
**embodied** 12:11
**employed** 40:8
**employers** 9:10 35:23,25
**encourage** 19:19
**ended** 5:8
**enter** 2:10
**entire** 11:2,21 11:22 12:5,6 13:4
**entitled** 7:2 21:20
**entreaties** 28:9
**error** 19:12
**esa** 34:10
**esas** 7:17 12:11
**escalate** 15:20 32:19
**especially** 12:18 23:15
**essential** 17:10
**essentials** 4:21

**estimate** 12:24 29:20

**estimated** 11:10

**estimates** 12:10 16:21 37:10

**event** 15:13

**events** 2:21

**eventually** 22:18

**everybody** 25:9 27:8 31:8 39:12

**exact** 13:15

**exactly** 20:16 22:18 30:24

**exaggeration** 28:15

**example** 34:24 36:8

**except** 38:1

**exclusive** 7:16 10:17

**executive** 10:13 20:3,21

**exercises** 19:14

**exists** 33:23

**expansive** 36:25

**expect** 13:25 25:17

**expenses** 27:20

**experience** 3:5 3:17 13:23

35:17

**experts** 2:23

**explain** 5:13

**exposing** 3:8

**extensive** 3:17

**extent** 10:19

**external** 18:18

**f**

**facial** 7:20

**facilities** 34:8

**fact** 17:3,5 35:25 37:17

**factor** 37:15

**factors** 15:5

**facts** 35:3

**fair** 11:7 16:16

**fairly** 26:5

**familiar** 7:12 14:21

**far** 11:8,18

**fast** 17:8

**favor** 30:8

**fda** 4:1

**feature** 2:10

**federal** 3:19 7:9 8:17 9:5 25:15 26:25

**fellow** 3:3

**fenced** 20:21

**figure** 10:25 12:20 14:19

**figured** 26:19

**file** 26:9 30:5 31:9

**filed** 7:7,11,23 8:4

**final** 25:6,15

**financial** 3:6 40:9

**find** 18:14 21:18

**finish** 27:5

**firm** 4:14,15 6:2 17:12 28:12

**firms** 27:15 28:25

**first** 5:19 32:3

**fits** 24:14 36:4

**five** 26:15 30:3

**flow** 34:8

**folks** 2:15 5:16 28:19 32:3 35:8 38:4

**follow** 34:5

**fondly** 5:24

**force** 8:19,19

**forces** 28:24

**forecast** 8:22 12:23 16:19 17:15

**foregoing** 40:4

**former** 4:3

**forward** 4:7 39:7

**found** 22:21 34:5

**four** 9:13 27:3 27:6

**fraction** 14:24 15:1

**frankly** 21:8 25:17

**full** 38:14

**fundamentally** 6:8

**future** 9:11 37:5

**g**

**g** 2:1

**game** 30:9

**general** 3:21

**generally** 24:10

**geographic** 31:21

**georgetown** 4:3

**georgia** 27:1

**getting** 4:7

**give** 6:10 29:24

**go** 14:7 25:24 26:9 29:7 32:18 35:13 36:13 38:5

**goes** 3:2,3 37:16

**going** 4:8,14 5:12 6:4,6,15 6:17,20 9:8,20

**[going - impressed]**                                      Page 7

12:2,19,22
13:1 15:2
16:15 17:3,13
17:19 18:10
19:10 20:4,11
20:16,17 21:3
21:24 22:6,11
22:17 23:9,10
25:1 27:5 29:6
32:2,10 35:10
36:12
**good** 2:2 6:10
7:5 11:18
28:23
**granoff** 2:2,4
29:15,17 31:2
31:23 33:17
34:2,19 35:7
35:11,14 36:6
38:3,20 39:9
39:13
**granted** 25:3
**great** 5:24
14:17 29:23
30:7 35:19
38:13
**greatly** 9:1
37:13
**grim** 8:22
**gross** 9:18
**group** 11:1
12:5 27:14
**groups** 9:10

**guarantee**
30:15
**guarantees**
24:8 30:6
**guess** 29:22
**guys** 18:13
21:15

**h**

**half** 11:12
**hammer** 8:18
**hand** 4:8
**hands** 25:22
**happen** 18:11
**happens** 26:9
**happy** 18:21
**hard** 20:6,19
27:20 29:24
30:21 34:5,16
**hcsc** 14:5
**he'll** 5:7
**head** 20:13,15
**heads** 20:14,16
**health** 1:13 2:6
3:7,17 4:2,5,17
4:24 14:16
**healthcare**
32:21 37:2,11
**hear** 6:16
**heard** 14:12
**hearing** 25:16
**help** 2:23
**helped** 3:11

**hesitate** 39:1
**hhs** 3:21
**high** 3:5
**higher** 12:20
**highly** 12:16
**hill** 4:2
**history** 7:7
**hold** 19:14
25:15
**holding** 37:9
**hope** 33:15,15
**hopkins** 4:19
**horn** 28:8
**hospital** 1:13
2:6 4:20,23
5:22 6:13,24
12:1 18:14
19:23,25 21:10
22:7 31:3,8,21
32:20 33:11
34:7,16,21
35:3 36:7
37:23
**hospital's**
14:15,23 15:3
33:10
**hospitals** 4:17
5:4,24 6:5 8:11
9:21,23 11:2
11:10,20 12:6
14:12,13,13
15:21 16:9,15
17:5,15,20
18:1,1,10

19:19 20:13,18
20:22,25 21:5
21:5 22:8,25
23:11,16,24,24
24:4,10 26:11
28:11,21 36:1
36:15 37:21
38:2
**house** 18:23
**huge** 22:15
**hundreds** 19:8
19:11,16

**i**

**idea** 7:21 18:16
28:23 38:14
**identified**
32:17
**illegal** 8:17,21
**impact** 37:18
37:21
**impactful**
19:18 22:6
23:18 31:20
**implement**
19:9
**important** 5:10
5:19 10:4
15:13 19:1
24:19
**impossible**
30:24
**impressed**
19:15

**improvements** 10:12

**including** 3:20 4:23

**increased** 9:1

**increases** 8:8

**index** 15:21

**indicated** 4:16

**individually** 19:20

**individuals** 9:9

**industries** 3:6

**inexpensive** 27:23

**information** 6:15,17

**initiatives** 3:16

**injunctive** 10:8 10:20 19:3 20:8 22:5 31:13 33:21 34:20

**injury** 37:4

**inside** 10:13

**institutions** 24:18,20

**insurance** 8:8

**insureds** 5:7

**insurers** 3:13 7:13

**interest** 40:9

**internal** 18:17

**introduce** 2:25

**introductions** 4:11

**involved** 5:5

**issue** 18:25,25 20:3

**issues** 2:24 4:5 5:13

**j**

**jackie** 1:25 40:2,16

**january** 40:17

**job** 1:23 28:20

**johns** 4:19

**join** 23:10

**joined** 28:24

**joining** 38:25

**journal** 3:15

**judge** 13:11

**july** 25:13

**jury** 13:12

**justice** 4:2

**k**

**kallas** 17:12

**karen** 2:4 4:10 4:16 5:16 29:11 33:24 35:13 38:14 39:4,11

**keep** 18:6

**kept** 20:21

**kind** 5:13 20:12 23:4 25:22 36:1

37:8

**know** 5:2,11 6:4,9 7:3,6,14 8:19 9:9,14,17 10:1,24 11:9 11:11 12:3 13:1,15,21 14:5,10,16,22 15:1,10 16:15 16:17,18 17:7 18:7,8,8,9,15 18:17,24 19:10 20:2,5 21:11 21:14,25 22:7 22:8,10,10,11 22:14,15,17,18 22:20 23:8,8 23:18,22 24:17 24:19,24 25:1 25:21,23 26:1 26:11,16 28:1 28:6,8,16,17 28:17,22 30:2 30:23 31:18 32:13 33:10,19 34:8,8,11,16 34:23 35:2,4 35:21,22,22,23 35:24,25 36:3 37:25

**knowledge** 29:1 40:6

**known** 7:24 17:22

**l**

**l** 36:22

**language** 35:4 35:5

**large** 4:16 23:17 24:17 36:23

**law** 3:15,18 4:3 6:2 8:17 11:6 13:12 27:15 28:12,25

**laws** 7:21 23:13

**lawsuit** 26:10

**lawyer's** 13:5

**lawyers** 3:4,23 10:5,6,7,8 15:8

**leadership** 4:1

**leading** 2:23

**learned** 24:8 26:19

**led** 8:23

**left** 32:5 35:10

**legal** 4:5 14:25 21:15 23:3,5

**lesson** 26:22,22

**level** 10:14

**levels** 10:15 21:1 37:19

**leverage** 24:5

**liable** 13:8

**licensed** 37:2 37:11

| | | | |
|---|---|---|---|
| **licenses** 37:3 | 26:6 31:17,19 | 25:23 | **medicare** 3:24 |
| **life** 24:8 30:6 | 32:12 34:13 | **makes** 23:4 | 5:1 |
| **likely** 21:24 | 35:2 36:11 | 37:24 38:19 | **member** 35:15 |
| **limit** 7:18,24 | 38:3 39:7 | **making** 6:22 | **members** 2:23 |
| **limited** 7:25 | **looked** 7:19 | 29:3 30:17 | 6:10 34:17 |
| 23:25 35:1 | 37:21,22 | **managed** 2:5 | 36:18 |
| **line** 16:25 | **looking** 11:24 | 3:23 | **mention** 13:6 |
| **lines** 34:3 | 13:21 29:22 | **mandatory** | **mentioned** |
| **list** 19:21 | **looks** 6:8 | 13:12 | 28:18 |
| **listen** 2:11 39:7 | **lose** 30:7 | **march** 16:12 | **merit** 27:19 |
| **listening** 38:22 | **loss** 13:18 | 25:10 | **method** 32:22 |
| **litigate** 26:15 | **lost** 11:17 | **market** 12:14 | 32:23 |
| **litigation** 3:6 | **lot** 4:18 7:19 | 12:15,17,21 | **mgh** 5:23 |
| 3:12,18 4:15 | 9:22 13:20 | 13:24 15:7 | **mha** 5:16 36:17 |
| 4:22 6:7 8:20 | 14:11 16:1 | 16:2 33:3 | **mha's** 6:10 |
| 23:13,20 24:15 | 19:17 24:18 | **mass** 26:12 | **million** 11:12 |
| 26:1 27:9,14 | 25:21 26:19 | **massachusetts** | 11:22 22:12,12 |
| 27:24 28:14,20 | 27:18 28:6,9 | 1:13 2:6 12:1 | **millions** 19:8 |
| **little** 12:23 | 28:10,17 29:1 | 13:19 14:4 | 19:11,16 27:21 |
| 13:23 22:3 | 35:23 36:2 | 33:12 | **mind** 26:2 |
| 28:11 32:11 | 39:1 | **materials** | **minimum** |
| 33:7,22 34:5,5 | **lots** 26:10 | 14:21 | 10:15 21:1 |
| 38:1 | **love** 29:2 36:22 | **math** 15:1 | **minute** 12:9 |
| **lives** 24:9,9 | **low** 13:18,25 | **maximize** 24:4 | **minutes** 32:5 |
| **located** 31:5 | 30:16,20 | 24:6 | **miscellaneous** |
| **location** 31:22 | **lower** 12:22 | **mean** 14:8 | 10:18 |
| **locked** 22:17 | **lying** 5:22 | 19:13 20:4 | **mode** 2:11 |
| **logistics** 2:8 | | 25:5,7 28:12 | **modest** 10:16 |
| | **m** | **meaningful** | **moment** 2:18 |
| **longer** 9:12,13 | | 19:24 | 10:1 16:12 |
| 26:16 27:10,10 | **made** 8:24 28:7 | **means** 23:7 | 22:19 28:8 |
| **look** 4:7 12:4 | 28:10,10 | 27:8 37:4 | **money** 5:4 9:22 |
| 18:15 19:20 | **majority** 38:1 | **medicaid** 3:24 | 10:3,22 19:2 |
| 20:1,5 21:20 | **make** 5:11 6:14 | | 19:17 20:18 |
| 21:22 22:1,2,4 | 6:22,23 22:23 | | |

Massachuetts Health Youtube                     January 22, 2025

**[money - partner]**                                              Page 10

22:21 28:1 36:2,12

**months** 24:23 28:7

**mother** 5:23

**moving** 16:24

**multiple** 27:21 30:23

**n**

**n** 2:1

**name** 2:4

**national** 3:12 3:15 7:25 8:25 12:12 36:23

**nationally** 27:15

**nationwide** 8:2 28:22

**near** 9:11

**necessarily** 36:3

**necessary** 31:19

**need** 6:15,17 18:14 33:5 34:12

**neither** 40:7

**new** 10:13 14:6 14:7 20:2,19 20:20

**nfl** 3:8

**nicest** 4:11

**nick** 7:1

**non** 8:1 10:7 23:5 36:7

**normally** 10:23

**note** 5:20,25

**number** 4:24 6:5 7:10 13:14 13:15 15:23,24 16:17,22 17:15 17:19,22,24 18:5,9 20:13 22:1,3,3,10,12 22:13,15,16 32:21 33:10 35:20 36:14,16 36:17,17,20

**numbers** 12:4 13:20,25 14:2 14:11 17:7 32:16,18 33:11 35:21

**numerator** 15:1,2 16:5,23 18:19 21:20 32:8 33:15

**numerous** 3:19

**o**

**o** 2:1 36:22

**objections** 26:25

**obviously** 13:19 27:12 28:3

**october** 9:14

**odds** 30:13

**offense** 24:1

**offer** 2:22

**offered** 24:3

**office** 3:23

**oh** 35:13

**okay** 5:15 7:6 19:1 21:10 29:11,16 30:4 30:18 31:2,23 35:13 37:7 39:9

**once** 5:2

**ones** 16:18

**opportunity** 2:16

**opposed** 26:8

**opt** 6:7 16:11 16:17 17:20 18:2,10 20:10 20:18,22 23:6 23:7,13,19,19 24:10 25:11 26:14 29:5,19 31:11 32:2 35:14,24

**opted** 35:16,20

**opting** 24:20

**option** 15:17 35:14

**options** 32:8

**organization** 31:4

**organized** 7:15

**outcome** 8:23 40:10

**outlawed** 8:25

**outs** 24:10

**outside** 7:18 10:17 29:20

**overall** 21:12

**overseeing** 3:23 28:14

**oversimplify** 32:11

**overwhelming** 30:13

**owe** 28:3

**own** 15:19 23:9 23:20 24:9 28:8 30:6 32:24 34:13

**p**

**p** 2:1

**package** 38:14

**pages** 1:24 19:5

**paid** 9:3,20

**papers** 19:5

**part** 5:23 10:5

**participants** 38:18

**particularly** 4:21

**parties** 40:8

**partner** 3:1

**partners** 2:19
**patient** 34:8
**pay** 8:9 20:18
  28:2
**pennies** 24:2
**pennsylvania**
  14:5
**people** 6:19
  7:20 8:10
  11:12,22 18:21
  18:23 19:25
  20:7 21:15,16
  21:25 23:15
  24:22 25:25
  26:5 27:12
**percent** 12:13
  12:20,22 14:1
  18:1 27:17
  35:16 36:14,14
  36:20
**percentage**
  13:18 30:20
  32:1
**perfectly** 22:9
**period** 9:23
  11:13,23 12:7
  15:4,20 17:6
  26:19 32:25
**perplexed** 21:8
**perspective**
  10:4
**phd** 27:21
**physicians** 36:8
  36:10,13

**picture** 9:17
  10:10
**pie** 36:12 37:25
  38:1
**piece** 28:3
  33:21 34:19
**pivotal** 3:7
**place** 18:4 21:4
**plaintiffs** 24:12
**play** 24:19
**played** 3:7
**please** 2:10
  8:13 9:15
  10:21 14:9
  19:1 21:9
  24:21 25:24
  28:5 32:7
**pleased** 2:25
**point** 16:20
  33:1
**policy** 3:18 4:3
**portion** 11:13
**possible** 9:24
**posted** 17:18
  38:16
**potentially** 6:6
  13:14
**practice** 18:6
**practices** 10:10
  19:4
**practitioner**
  36:19
**practitioners**
  9:19 36:24

37:16,19
**precise** 13:20
  29:24 35:5
**predict** 30:24
**preliminary**
  12:10,24 25:4
**prepared** 27:16
  40:3
**presence** 4:16
**presentation**
  2:14,14 5:18
  6:16
**pretty** 17:8,8
  25:20 28:23
  30:10,16 35:5
**prevail** 28:3
**previously** 3:25
**price** 8:8 15:21
**probably** 7:12
  9:14 19:13
  38:6
**probing** 33:7
**proceed** 36:9
**proceeding**
  40:4
**proceedings**
  40:6
**process** 10:19
  20:12
**profession**
  14:25
**professional**
  36:18

**professionals**
  9:19 36:13
  37:2,11,14,18
**professor** 4:4
**proficient**
  14:25
**program** 3:9
**programs** 3:24
**progressed**
  7:10
**prominent**
  27:15
**proposals**
  28:10
**proposed** 25:4
**prove** 13:8,8
**provide** 19:24
**provider** 2:3
  6:19 8:3 9:16
  29:19
**provider's**
  15:18 27:4
**providers** 5:9
  6:6,18 7:8 8:10
  9:12 10:16
  11:8 16:21
  17:10,23 19:6
  19:7 20:9
  21:21 24:1
  30:17 36:7,7
  37:17
**provisions**
  31:12,16

Massachuetts Health Youtube

January 22, 2025

**[public - securing]**

Page 12

| | | | |
|---|---|---|---|
| **public** 3:18 | **read** 10:11 | **reimburseme...** | **review** 30:9 |
| **pull** 15:16 | 17:20 29:13,15 | 11:18 14:7 | **reviewed** 1:25 |
| **pushing** 18:19 | 36:25 | **reiterate** 32:7 | **right** 17:14 |
| **put** 10:4 19:6 | **reading** 14:20 | **rejected** 9:7 | 19:2 21:19,24 |
| 29:13 34:16 | **real** 25:20 | **related** 40:7 | 22:17 23:6,20 |
| 38:17 | **really** 5:6 20:4 | **released** 37:6 | 34:19 35:7 |
| **q** | 20:6 21:11,17 | **relevant** 29:1 | **role** 3:8 24:19 |
| **question** 12:2 | 25:1 34:12 | **relief** 10:8,20 | **roles** 4:1 |
| 14:14,17 15:13 | **reason** 7:11 | 19:3,24 20:9 | **rounding** 19:12 |
| 17:16,18,20 | 12:15 13:6 | 22:5 31:13 | **rule** 11:6 |
| 18:18,19 24:23 | 24:13 27:4 | 33:21 34:20 | **ruling** 30:8 |
| 26:13 29:19,24 | **reasonable** | 37:13 | **s** |
| 30:4,11 31:25 | 11:7 22:9,23 | **remember** 30:7 | |
| 33:16,18 35:12 | **reasons** 8:5 | 33:2 | **s** 2:1 |
| 35:19 36:5,6 | 36:15,20 | **represent** 4:17 | **saying** 30:14 |
| 38:9 | **recognize** 6:12 | 4:22 9:4 29:2 | **says** 15:5,9 |
| **questions** 2:9 | 36:16 | **represented** | 17:25 |
| 2:11 26:4 29:8 | **recognized** | 4:20 26:18 | **scheer** 1:25 |
| 29:12 32:4,6 | 3:14 4:4 | **representing** | 40:2,16 |
| 33:18 35:8 | **record** 40:5 | 6:5 23:23 29:5 | **schultz** 3:3 |
| 38:4,6,24 39:2 | **recorded** 2:15 | **require** 31:15 | 4:10 7:4 29:9 |
| **quicker** 27:5 | **recording** 40:4 | **requirements** | 39:11,14 |
| **quite** 11:15 | **recovering** | 20:20,24,25 | **scratch** 20:15 |
| 14:2 25:2 30:9 | 28:21 | **researched** | **scratching** |
| 37:10 | **recovery** 14:23 | 5:22 | 20:12,14,15 |
| **r** | **reference** 35:21 | **resolution** 8:20 | **se** 8:17,21 30:8 |
| **r** 2:1 | **refusal** 12:10 | **resolve** 27:3 | **second** 10:5 |
| **racial** 3:8 | **refuse** 7:21 | **restrictions** 8:5 | 14:3 23:1 |
| **range** 14:1 | **regardless** | 8:16 | 27:12 |
| 21:19,24 | 13:15 | **result** 35:24 | **secret** 18:7 |
| **rather** 24:1 | **regulatory** 4:3 | **resulted** 5:3 | **secretaries** |
| **reached** 11:5 | **reimbursement** | **retirees** 3:10 | 3:22 |
| 26:24 | 8:11 12:13 | **revenue** 17:6,6 | **securing** 3:9 |
| | 37:19 | 18:2 | |

**[see - standards]**                                            Page 13

| | | | |
|---|---|---|---|
| **see**  2:16 19:23 20:19 21:7 22:2 29:12 31:20 36:5 38:9 | 9:13,16 10:3 11:4,5,23 13:17 15:6,12 15:18 16:10,11 17:2,25 18:2,4 19:22 20:10,19 20:23 21:18 22:1 23:6,7 24:3,7 25:5,11 25:12,17 26:8 26:24 27:7 29:20 30:1,19 31:10,10,25 32:12 33:20 35:4,15 36:4 36:25 37:6,12 37:16,24 38:10 38:15 | **sides**  34:9 **signature** 40:15 **significant**  14:2 32:1 **significantly** 30:5 **silent**  39:5 **simply**  26:7 **situation**  24:14 24:16 34:14 **situations**  4:18 6:13 34:17 **size**  18:3 22:14 24:14 35:22 36:4 **skills**  40:6 **slice**  36:12 **slide**  7:1 8:13 9:15 10:20 14:9 19:1 21:9 24:21 25:24 28:5 | 38:13 39:4 **somebody** 32:14 **somewhat**  9:20 11:9,24 17:3 **soon**  25:1,2 26:5 **sorry**  35:12 **sort**  4:18 6:1 14:10 17:16 **sorts**  21:2 **sounds**  37:7 **south**  12:18 **space**  4:17 **spaeder**  3:1 38:23 **speak**  26:21 **speaker**  4:4 **speakers**  3:1 **speaks**  5:24 **specific**  35:3 **spent**  28:13 |
| **seem**  37:8 **seems**  20:23 21:2 25:20 **seen**  16:23 **sellers**  8:7 **send**  38:11,12 38:18 **sending**  9:9 **senior**  2:5 **sense**  14:8 21:22 22:22 23:4 37:24 38:19 **sent**  27:7 **separate**  21:4 26:9 **serious**  5:25 **served**  3:25 **service**  7:17 10:14,15,18 21:1 **services**  3:7 9:2 **set**  7:16 **settle**  23:21 **settled**  26:7 36:23 **settlement**  1:14 2:4 3:9,11 5:8 6:11,20 8:23 | **settlements** 23:15 **settling**  10:24 **several**  7:14 19:5 26:15 **shaping**  4:2 **share**  13:24 16:2 **sharply**  7:18 **sherman**  13:7 **shield**  3:13 5:6 **show**  11:4 **shrinks**  37:13 **side**  3:14 5:7 37:23 | **slides**  38:12 **slips**  25:22 **sliver**  38:2 **small**  17:8 24:1 30:19 36:12 **smith**  3:2 5:15 7:5 29:11,16 29:23 31:7 32:10 33:24 34:4,25 35:9 35:13,19 36:10 | **spoken**  21:14 **sponsoring** 6:19 **sponsors**  2:19 **stack**  10:23 **stake**  24:18 36:2 **stakes**  3:5 **standard**  30:8 **standards** 20:20 21:1 |

**[stands - ticking]**                                                  Page 14

stands  12:15
start  2:8 10:22
   15:13,23 16:4
   16:5 29:12
   30:20 33:13
started  4:9
   6:25 25:8
   29:18
starting  25:19
   30:15 33:1
state  4:22 7:19
   12:16 34:3,12
states  12:19
   31:5 37:12
statistics  13:21
stay  6:11,12,14
   16:9,10,16,16
   17:1,16 21:25
   24:12 25:11,12
stayed  14:24
   21:5,6 35:16
staying  39:7
stays  18:4
step  21:14 23:1
steps  29:21
stop  29:6
strategic  2:19
strongly  27:17
stuff  14:21
   19:5 28:23
   31:13 33:25
submit  32:24
submitted  16:9
   25:13

subscribers  7:8
   8:9 9:4
substantial
   30:25
substantially
   30:22
subtract  9:18
sue  23:10
suffered  11:3
   11:15 37:4
sufficient  15:16
suggest  12:10
   13:2 32:11
suggestion  21:8
suing  23:11
suit  7:23
suited  24:16
summer  9:6
super  10:13
   19:15
support  2:20
supreme  3:21
   5:3 9:6 27:2
sure  5:10 6:23
   13:22 26:3
   29:3 32:5,10
   36:10 38:4
surprised
   19:10
suspicious  15:8
system's  14:16
systems  15:16
   21:4

**t**

take  2:18 22:21
   23:1 26:7,14
   26:23 27:16
   29:21 31:17,19
   32:12,16 34:12
   39:9
talk  5:25 6:7
   9:25 12:8
   16:11 19:3
   22:19 26:2
   28:11 33:21,24
talked  12:9
   14:12,13 20:14
talking  33:25
talks  8:24
   33:20
targets  16:24
team  19:14
tell  5:7
tells  27:5
tenacious
   26:18
tens  27:21
terms  18:3
   19:12 27:19
   37:25
terrible  18:16
territory  16:2
thank  2:18 4:6
   4:10,12 31:2
   38:24 39:9

thanks  5:15,15
   5:16,16 39:4,5
   39:6,11,11
thing  11:15
   20:8,17 25:6
   26:5 27:12
things  7:12
   15:22 18:5
   20:4 21:2,6
   25:5 26:2,12
think  5:19 8:6
   10:3 11:16
   12:15 14:3,8
   14:22 15:12
   16:16 17:2,4,5
   17:13 18:12,15
   18:24 19:10
   22:6 24:8
   25:21 27:4
   28:15,22 30:13
   30:22,25 31:7
   31:8,11 36:11
   36:14 38:12,13
thinking  25:25
   27:9
third  13:24
   37:20
thirds  37:10
thousands  3:10
three  3:4,20
   26:15 30:12
throw  22:11
ticking  25:8

ties 5:20
time 8:3 15:20
  17:7 25:22
  38:21 39:6
timely 2:24
timing 25:19
today 2:16,24
  3:1 4:6 5:17
  6:16 16:15
today's 2:7,20
together 15:17
took 9:5,12
  27:3
toot 28:8
top 28:19
total 11:20
  15:3 16:8
  36:11
touch 39:8
tough 16:19
  21:3
towards 13:25
trade 28:18
trailblazer
  3:14
transcriber
  40:1
transcript 40:3
  40:5
trebled 13:4,10
trebling 12:8
  13:5
trial 3:4,19

tricks 28:18
tripled 13:10
  13:14
tripling 13:6
trouble 34:14
true 12:18
  37:24 40:5
try 6:3 10:25
trying 8:19
turn 4:14 5:12
  24:9
turning 5:9,17
two 3:22 21:3
  27:14 28:24
  30:2,12 31:5
  32:14 33:13
  36:15,19 37:10
type 24:14 35:8

**u**

u.s. 27:2
uber 20:2
ultimately 5:2
unbelievable
  28:20
uncommon
  23:14
under 8:17
  13:7,12 15:17
  21:18
understand
  5:23 10:6
understanding
  22:5 34:15

underwriting
  2:20
united 37:11
unknowable
  16:20
unknown
  17:22
unusual 11:24
upmc 4:19
upset 17:24
use 18:17
using 12:23
  15:20 32:20

**v**

v 36:22
valuable 19:24
  20:6
value 34:15
vast 37:25
vermont 34:11
  34:24
versus 33:22
  35:16
victory 8:14
view 2:17
violating 23:12
violation 7:20
virtually 5:17
vital 6:17

**w**

wamc 4:21
want 2:7,18
  4:13 5:25 6:3,9

6:13,22 22:23
  23:1,21 26:22
  27:12 29:13
  35:8 36:3
way 17:17
  30:25
ways 36:1
we've 4:19 12:9
  14:11,12 20:13
  21:13 22:24
  24:8 28:24,25
  28:25 30:7
  35:9 37:22
webinar 1:14
  2:4,8,9,21 10:7
  32:5 39:15
website 38:18
week 24:25
  25:2
welcome 2:3,7
went 5:2
whatley 17:12
william 3:2
willing 22:21
  27:25
window 20:1
won 8:14
wondering
  31:6
worcester
  34:22
word 4:13 13:5
  23:3

Massauchetts Health Youtube                    January 22, 2025

**[words - zuckerman]**                              Page 16

| |
|---|
| **words** 4:13 11:6 **work** 4:19 12:25 13:20 20:16 21:7 28:17 **works** 29:14 **world** 23:5,5 **worth** 14:15,16 17:1,14 32:9 **written** 27:7 |
| **x** |
| **x** 18:1 |
| **y** |
| **yeah** 29:23 34:2,2,2,4 38:13 **year** 2:22 9:23 **years** 5:6,21 7:11 9:13 26:15,15,17 27:3,6 28:13 **york** 14:6,7 |
| **z** |
| **zoom** 39:6 **zuckerman** 3:1 38:23 |