FILED

2025 Jan-24  PM 6:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 1

Page 1

1
2
3
4
5
6
7
8
9
10
11
12
13     BCBS Class Action Settlement:
14     Provider Decisions & Timing –
15     Zoom Recording December 2024
16
17
18
19
20
21
22
23
24
25

1            MARK ISENBERG:  Since this is being
2    recorded, I'll just go ahead and kick us off
3    here.  Hello, everyone, and thank you for joining
4    us today during what I know is a particularly
5    busy time of the year.  We greatly appreciate you
6    taking the time to learn more about the
7    significant class action settlement involving
8    Blue Cross and Blue Shield.
9            My name is Mark Eisenberg and I serve
10   as executive vice president of healthcare
11   advocacy at Zotec Partners and I'm joined today
12   by attorneys Barry Alexander, David King and Dan
13   Owen from Polsinelli Law Firm.  I got that right.
14   That was a little bit troubling there, the name
15   of the law firm.
16           They'll be walking us through the
17   details of the settlement, including your options
18   to opt-in or opt-out and the potential advantages
19   and disadvantages of each choice.  But before I
20   get started, I want to do a few housekeeping
21   notes.  The content shared today is not intended
22   as and does not constitute legal advice.  Zotec
23   Partners is facilitating this discussion for its
24   own clients' informational purposes only and is
25   not acting as a legal advisor in any manner.  The

Page 3

1    accuracy, completeness, adequacy or currency of

2    today's content is not warranted or guaranteed.

3    Your use of this information or material shared

4    today is at your own risk.  Please consult your

5    own legal counsel for the contents' applicability

6    to your own organizations.

7            Additionally, we will be using the

8    Zoom's Q&A function to address any questions you

9    might have during the presentation, so feel free

10   to submit them and, as time permits, we'll be

11   able to address them.  And as you probably heard,

12   this meeting is being recorded and will be made

13   available to you after the session.

14           To provide some context, on December

15   4th of this year, a U.S. district court in

16   Alabama granted preliminary approval of a

17   settlement that will be binding on every hospital

18   and healthcare provider in the U.S., including

19   physicians and physician groups of all types.

20           The lawsuit claimed that all of the

21   Blue Cross Blue Shield plans throughout the U.S.

22   had conspired to illegally lower reimbursements

23   to hospitals and other healthcare providers

24   beginning in 2008 and continuing to the present

25   date in violation of U.S. antitrust.  All

Page 4

1    hospitals and healthcare providers must decide

2    prior to March 4th of 2025 whether to accept the

3    settlement or to opt-out of the settlement.  The

4    process in this case is significantly different

5    than other class action matters where an opt-out

6    is easier to pursue.

7            Since 2016, the national law firm of

8    Polsinelli PC has been involved in this case for

9    a wide range of healthcare providers and most

10   recently advising providers as to whether they

11   should accept class action settlement or opt-out.

12   Today's presentation will come with the terms of

13   the proposed settlement and the pros and cons of

14   either accepting the settlement or opting out, as

15   well as other options to seek direct damages

16   against the applicable plans.

17           With that, I'll turn it over to turn it

18   over to the speakers to guide us through this

19   critical discussion.

20           DAVID KING:  Dan, do you want to start

21   or Barry?

22           BARRY ALEXANDER:  Yeah, Mark.  You did

23   such an excellent job covering what we do and

24   what we don't.  I'm struggling to figure out

25   where to step in before I introduce my guys.  I'm

1    a shareholder at Polsinelli, principally in

2    reimbursement, government investigation and M&A.

3    Dan who's going to speak to you is really the

4    guy.  He's in Kansas City and he has been

5    involved in this case since 2016 with multiple

6    appearances before the court and he's an

7    antitrust litigator.

8           And David King, who's also on my team

9    over here, he heads our payer dispute resolution

10   group.  If I could take a poll, I would suspect

11   everybody loves all of our payers across the

12   United States and David has pretty much litigated

13   with every major payer on a wide range of issues

14   from E&M down-coding out of network, IBR and

15   contract disputes.  You can see he's lost most of

16   his hair dealing with payers.

17          I am going to flip it over to Dan and

18   he's going to try and drive us through the case

19   and what we are, I think, Dan, not only

20   recommending, although it's not legal advice to

21   you guys to consider, but a pretty strong

22   position we have with large swath of our

23   healthcare providers.  I think we probably work

24   with 600 to 700 healthcare systems throughout the

25   country.  Anyways, Dan, it's all up to you to do

1    share screen.

2          DANIEL OWEN:  Okay.  Again, my name is

3    Dan Owen.  My job, been with the firm for 27

4    years and done -- since 2006, have focused pretty

5    much entirely on representing plaintiffs in

6    antitrust cases.  So I've represented businesses

7    that paid too much for goods.  I've represented

8    competitors that were forced out of -- kept out

9    of markets because of antitrust activity.  I've

10   represented classes of plaintiffs that were

11   injured by antitrust type activity, price fixing

12   that either drives up the price of the goods they

13   buy or drives down the price that is paid to

14   them; in this case, driving down the

15   reimbursement.  So that's what I've been at for

16   27 years.  Before that, I was an elected district

17   attorney for four years before that.  So that's

18   my background.

19          As Barry said, I've been involved in

20   this case since 2016.  The case was filed in

21   2012.  It seeks damages going back all the way

22   back to 2008.  Okay.  Because of a four-year

23   statute of limitations, it was filed in 2012.  So

24   the damages it seeks go from 2008 all the way

25   through the present day.  And that's going to be

1 important in the analysis I'm going to present to

2 you.

3    Briefly said, if you imagine the

4 underpayment, even by a few percentage points, of

5 every physician and every hospital and every

6 healthcare provider by The Blues for a 16-year

7 period from 2008 to the present, even a tiny

8 underpayment, the damages become astronomical.

9 Especially because under federal antitrust law,

10 they have to be tripled.  So there's not enough

11 money in the world probably to pay it all back.

12    As you're going to hear, that's not

13 necessarily the primary focus of the case.  The

14 primary focus is trying to get The Blues to

15 change their business practices.  But along the

16 way, they're looking at many billions of dollars

17 of damages.  I'm now going to try to share my

18 screen.  Hopefully I get this done right.  And

19 let's see here.  Okay.  That should be a screen

20 that has PowerPoint presentation on it.  Does it?

21    DAVID KING:  Yeah.

22    DANIEL OWEN:  Okay.  I'm going to go

23 through this very quickly.  There's a lot, a lot

24 of information in here about the history of the

25 case and about where we are now and about the

1    decision that needs to be made.  But I'm going to

2    kind of start at the end with the decision that

3    needs to be made.

4            This case has been running since, for

5    12 years, since 2012.  It sought a lot of damages

6    from Blue Cross, but it also sought some changes

7    in their business practice.  It didn't get either

8    of them in this settlement.  It didn't get a lot

9    of money and it didn't get the critical changes

10   in the business practices.

11           So the question will be, do physicians

12   and healthcare systems and hospitals stay in this

13   settlement or do they opt-out and not be bound by

14   the settlement.  They don't get the benefit of

15   the settlement necessarily, but they also don't

16   get bound by it.  And our ultimate -- we think

17   that many hospitals, physicians and other

18   healthcare providers will -- should choose and

19   will choose to opt-out of this for the reasons

20   I'm about to show.

21           Okay.  Let's get going.  This is about

22   the Blue Cross Blue Shield antitrust litigation.

23   And the next slide should be coming up.  There it

24   is.  Okay.  So let's talk about that key

25   question.  Why is this settlement important to

1    healthcare providers?  Well, the reason it's

2    important is it's going to be binding on every

3    healthcare provider that doesn't opt-out.  And by

4    binding, I mean that those healthcare providers

5    can no longer complain about The Blues structure

6    or The Blues reimbursement policy, at least not

7    as it relates to the antitrust laws.  So you're

8    basically, if you don't opt-out, you're

9    participating in giving The Blues a perpetual

10   immunity pill to continue to do business exactly

11   the way they're doing it now, with a few trivial

12   exceptions.

13            Okay.  Here come the details of this

14   proposed settlement that you're going to have to

15   decide to opt-in or opt-out from.  First, the

16   proposed settlement includes some monetary

17   relief.  As you'll see, the monetary relief,

18   although it sounds like a lot, is a real pittance

19   compared to the damage that would have been

20   inflicted over a 16-year period.

21            Next, it provides -- the settlement

22   provides some injunctive relief.  That means

23   changes in The Blues business practice.  And

24   again, this was the primary focus of the case,

25   not the monetary relief.  The primary focus of

1    the case was on two, really three things that

2    needed to change in The Blues business practice.

3    Number one, The Blues divided the country into

4    exclusive territories and agreed not to compete

5    against each other.  The object of the lawsuit

6    was to break up those exclusive territories.

7    Unfortunately, that didn't happen other than in a

8    couple little trivial ways I'll talk about in a

9    minute.

10           Number two, they wanted The Blues to

11   reform the way they did the national accounts

12   program and allow people to opt-out of the

13   national Accounts program or at least be paid

14   more than in-network rates for out-of-network

15   national accounts clients.  That didn't happen at

16   all.  In fact, national accounts isn't even

17   mentioned in the settlement agreement.

18           Number three, the lawsuit wanted to

19   reform the BlueCard Program along the lines of

20   reforming the national accounts program.  Allow

21   people to opt-out and bargain and maybe get paid

22   more than having to simply give in-network rates

23   to out-of-network Blue customers.  So that was

24   the injunctive relief that is part of the

25   settlement.  And as you'll see, it doesn't amount

1   to much.

2          And the third part of the settlement,

3   and the one we're so concerned about, is a

4   release of any future claims, antitrust claims

5   relating to under-reimbursements of healthcare

6   providers by Blues.  Ultimately, if you choose

7   not to pursue a claim against The Blues at all,

8   but just to opt-out and not be bound by this

9   onerous settlement agreement, that's probably the

10  best thing to do.

11          Let's talk a little bit about that

12  monetary relief.  There's a common settlement

13  fund of $2.8 billion, which sounds like a lot of

14  money.  But right off the top, $700 million goes

15  to the attorneys and $100 million goes to

16  administration.  Of the remaining $2 billion, 92

17  percent is allocated to hospitals and 8 percent

18  to other providers.  This is supposed to cover,

19  to be some compensation for 16 years of

20  under-reimbursement and it's incredibly minuscule

21  compared to the damage inflicted.

22          The class plaintiffs admitted that one

23  state out of 50, Alabama alone, had damages of

24  $4.63 billion.  Imagine what happens when you add

25  the other 49 states on.  And the class plaintiffs

Page 12

```
1    then told the court something absolutely
2    incredible.  They said the provider plaintiffs'
3    experts have not calculated a nationwide damages
4    figure for the settlement class.  They say they
5    don't know what nationwide damages are.  And as
6    an experienced plaintiffs' class action attorney,
7    I find that unbelievable, incredible and
8    appalling.  How can you settle any case, whether
9    it's a rear-end collision with $5,000 in neck and
10   back damages or a $100 billion case, how can you
11   settle any case without knowing what the total
12   damages are?  Well, they do know that the total
13   damages probably run into the hundreds of
14   billions of dollars based on the Alabama
15   calculation.  So this $2.8 billion really doesn't
16   amount to much.
17           Let's talk about the injunctive relief.
18   Now, I've taken the injunctive relief in the
19   settlement directly out of the court's order.  So
20   you see the quotation marks at the beginning.
21   This is what the court quoted as the injunctive
22   relief, that they will develop "a system-wide,
23   cloud-based architecture" to facilitate immediate
24   access to member benefits, et cetera, et cetera.
25   Big deal.  They should have done that already.
```

Page 13

1   They should have that already and it's not clear

2   how that's going to benefit providers.

3           Next, there's a promise that the

4   BlueCard will have prompt payment as long as it's

5   a "clean, fully insured claim," which of course

6   is in the eye of The Blues.  It's nice to have,

7   but it's something they should be doing anyway.

8   Here's some more injunctive relief.  Appointment

9   of a BlueCard executive at each Blue Plan.  So

10  what?   They should have done that anyway.

11          Here's more injunctive relief.

12  Implementation of a real-time Blues internal

13  messaging system to reduce the time it takes for

14  The Blues to communicate with each other

15  regarding Blue issues.  So apparently they can't

16  talk to each other in a hurry now and they'll fix

17  that.

18          So these kinds of injunctive relief is

19  just the most mere -- in our opinion, the most

20  mere window dressing and doesn't even come close

21  to what this lawsuit was supposed to do, which

22  was allow physicians and hospitals to opt-out of

23  the BlueCard Program or at least negotiate higher

24  rates.

25          Here's some more injunctive relief

Page 14

1    straight out of the court's order: "Creation of a
2    Blue national executive resolution group to work
3    to identify trends and opportunities for further
4    improvement of the BlueCard Program."  I mean,
5    big deal.  How is that some legally binding -
6    how's that some legally binding obligation to do
7    anything other than talk about stuff in a
8    committee?
9          So you have very little monetary relief
10   and you have very little injunctive relief.  I
11   mean, what I just put on the screen is exactly
12   what the court puts it in its order preliminarily
13   approving it.  There are some other things that
14   are in the settlement agreement that allow The
15   Blues to compete across their earlier exclusive
16   territory lines.  It loosens up what's called the
17   contiguous county rule, but it doesn't require
18   them to compete across those lines.  In fact, it
19   explicitly says it will be legal for them to
20   continue to compete only inside their exclusive
21   territories.  So again, it's just window
22   dressing.
23          So in exchange for this, what are you
24   giving up if you stay in the settlement class?
25   Well, you're releasing all your future claims.

1   And this is the biggest.  If you remember nothing

2   about today's presentation, remember this.  The

3   scope of this release is incredibly broad.  There

4   was one, a release that was executed in 2008 in a

5   case called Love, and it was so broad it has been

6   ruled by a court to wipe out 65 percent of the --

7   is expected to wipe out 65 percent of all the

8   physician claims in this case in 2024.  If you

9   didn't opt-out in 2008, you don't get anything in

10  2024.  And that's how broad these releases are.

11  Let me show you some of the language of the

12  release.  Go ahead, David.

13          DAVID KING:  I want to clarify that,

14  because here we have professionals.  So the Love

15  settlement probably is going to be in play here.

16  So you might talk about what the dates are, when

17  they needed to be practicing and all of that.

18          BARRY ALEXANDER:  Sure.  I'll get to

19  that in just a sec.  Let me just hitchhike on

20  that just a second.  This settlement called Love

21  basically said if you didn't opt-out -- if you

22  were receiving reimbursements for many of The

23  Blues by July of 2008, and you didn't opt-out of

24  that settlement, you don't get anything in this

25  settlement.  That's the effect of a court ruling,

1    and it's the effect of what the plaintiffs and

2    The Blues negotiated here.

3              So again, if you were receiving money

4    from The Blues by July of 2008 and you did not

5    opt-out of the Love settlement, you probably

6    don't have a claim here at all.  Did you opt-out

7    of the settlement?  Well, of course, you don't

8    remember.  So we've assembled about 400 pages,

9    single-spaced, of all the opt-outs of the

10   physicians and the groups and the hospitals and

11   everything.  And it's all just on images.  We're

12   trying to get it into a searchable form.  We're

13   trying to get it into a form that our clients can

14   search and see if they opted out or not.  But

15   those are public record, and we're happy to

16   distribute them to anyone that wants to look

17   through the 400 pages and see if they opted out.

18             David, is there anything else you want

19   me to say about the Love case before I go on?

20             DAVID KING:  No.  That was it.  Thank

21   you.

22             BARRY ALEXANDER:  All right.  Let's

23   take a look at this release that's on the screen

24   here.  The scope of the release is incredibly

25   broad.  You have to release any and all known or

Page 17

1   unknown claims, et cetera, et cetera, relating in
2   any way to what's called the factual predicates
3   of the provider action.  Okay.  Factual
4   predicates, the petition is over 100 pages long.
5   There are many hundreds of factual predicates,
6   whatever they might be.
7           You're also releasing a claim for "any
8   issue raised in any provider action by pleading
9   or motion."  You know how many pleading or
10  motions there have been since 2012?  The docket
11  sheet, that's a single-spaced document just
12  listing the motions, is 400 pages long.  That's
13  not the pleadings and motions.  There are tens of
14  thousands of pages.  But any issue raised in any
15  of those pleadings and motions, you're waiving
16  your right to ever complain about that.
17          And you're also waiving your right to
18  complain about any "mechanisms, rules or
19  regulations by the settling Blues relative to the
20  injunctive relief."
21          As crazy as this sounds, it actually
22  gets worse because further down in the settlement
23  agreement, we find that we're giving a covenant
24  not to sue "based in whole or in part, arising
25  out of or in any way connected or related to any

1   released claim."  Okay.  So now it's even

2   broader.  And then in the next paragraph, it gets

3   broader still.  Now we're releasing stuff that

4   has to do with "claims which are the subject

5   matter of the provisions of this Paragraph 42,"

6   or claims with respect to the subject matter.

7   How broad is that?  Even I have no idea.  And

8   I've been doing this for decades.

9          So an incredibly broad release for

10  really very little consideration, and that's the

11  nut of what we're here to talk about today.

12         Okay.  I'm now going to run through

13  some history of this lawsuit so you can see how

14  we got here and you can see why I believe it was

15  so inadequate.  A couple of other facts  I've

16  been involved since 2016 when six of our clients

17  got subpoenaed.  I was asked to be involved in

18  settlement negotiations.  So I know exactly what

19  the goals of the case are.  I can't say anything

20  about settlement negotiations because they're

21  confidential, but I speak from personal knowledge

22  about these things.

23         Let's talk a little bit about the

24  history of it.  Again, it was filed in 2012

25  seeking to change the structure of The Blue

1    system and change the reimbursements.  It was

2    unfortunately -- it was supposed to be a

3    nationwide class action covering all 50 states.

4    The reason we're here today is that after three

5    rounds of class action briefing and literally

6    years of fighting about it, it was clear that the

7    case was never going to be certified as a class

8    action.  It's just too sprawling.  It should have

9    been left as 38 individual actions and tried in

10   each state.  But they wanted to -- they bit off

11   more than they can chew and they tried to combine

12   it into a nationwide class action.

13          When it was clear that that wasn't

14   going to happen, they simply gave up and made the

15   best deal they could on a class-wide basis.  And

16   that's the deal I just described to you today.

17          Let's take a look at how the proposed

18   class action settlement would impact providers.

19   It's binding on providers for decades to come,

20   and it's either going to validate The Blues

21   exclusive territories or blow them up.  It's

22   either going to validate The Blues reimbursement

23   setting mechanisms or it's going to blow them up.

24   And unfortunately, the way it's now, this

25   settlement looks now, it's going to validate this

Page 20

1    stuff.  It's going to give them an immunity pill
2    that gives them perpetual immunity from this.
3              Let's go back and talk about the two
4    claims themselves.  What is the exclusive
5    territory claim?  It's called the market
6    allocation claim.  Well, the 37 Blues all had --
7    all were part of a license agreement and the
8    license agreement gave them each an exclusive
9    territory.  And Blues can't compete in the
10   exclusive territory of another Blue.  This means
11   that no Blue could offer a provider better
12   reimbursement rates than a competing Blue.  They
13   literally agreed not to compete against each
14   other.  And that has been held by the judge to be
15   per se illegal.  So any damages that flow from
16   that are basically automatic because that's been
17   ruled to be illegal.
18             But the next claim was called the price
19   fixing and boycott claim, and it had to do with
20   the BlueCard and the National Account Program.
21   All of The Blues participate in the BlueCard
22   Program and the National Account Program.  And
23   these programs require hospitals to accept lower
24   reimbursement rates, basically in-network rates,
25   rather than bill out-of-network rates.

```
 1              One of the single most disturbing facts
 2      in this case is that the BlueCard National
 3      Account Programs generated excess profits.  And
 4      the excess profits were divided up by something
 5      called the Inter-Plan Program Committee of The
 6      Blues, The Blues, under the auspices of the
 7      BCBSA, the Blue Cross Blue Shield Association.
 8      And they literally took the profits generated by
 9      these programs and divided them up on a
10      nationwide basis.  And so they were in big
11      trouble in this case for colluding in this way,
12      artificially driving down reimbursements and
13      splitting the excess profits.  Unfortunately, as
14      I've laid out, they really weren't brought to
15      task on any of this.
16              Let me talk about the injunctive relief
17      that was requested.  They requested a declaration
18      that the market allocation and price fixing
19      conspiracies violated federal antitrust law, the
20      Sherman Act.  Unfortunately, they didn't get it.
21      They requested an injunction prohibiting
22      defendants from continuing either of their
23      illegal conspiracies.  But they didn't get it.
24      They requested appropriate remedial action.  But
25      as I've laid out, the remedial action is tiny.
```

1          Let's talk about the damages claim.

2    The class period began in 2008 and monetary

3    damages were sought for under-reimbursement.

4    They were also sought -- they were sought for

5    under-reimbursement due to market allocation.

6    That's the exclusive territories.  And also due

7    to the price fixing in the BlueCard National

8    Account Program.

9          Under federal law, those damages have

10   to be tripled or trebled, as it says in the

11   statute.  Attorney fees have to be added and the

12   total damages would have been probably in the

13   hundreds of billions of dollars, plural.  You can

14   imagine what even a tiny under-reimbursement of

15   every healthcare provider in the country for 16

16   years would be, and then treble it.  So if it's

17   only 1, 2, 3 percent, it's an enormous amount of

18   money.

19          Let's talk about who's covered by this

20   settlement.  All healthcare providers who aren't

21   government entities or a couple of other

22   examples.  All healthcare providers in the United

23   States are covered, including everyone on this

24   call, as far as I know.

25          Let's talk about some considerations on

1   opting out.  One question is what is the future

2   structure of Blue Cross Blue Shield as far as

3   will they compete against each other or won't

4   they.  As I've said, this settlement doesn't do

5   much.

6           The next question is what are the

7   future reimbursement procedures.  Are they the

8   same as they were in the past or they changed in

9   a significant way?  As I've shown you, we don't

10  think they're changed in any significant way.

11  And then finally damages, how much could you get

12  for past under reimbursements?

13          And if you -- you can do the

14  calculation yourself.  If 8 percent of $2 billion

15  goes to physicians, what percentage of all Blue

16  Cross Blue Shield reimbursements in a 16-year

17  period do your reimbursements represent?  And if

18  it's pro rata, that's the share of the settlement

19  fund you would probably be entitled to.  We've

20  done the calculation for some of our larger

21  clients and hospitals and it's de minimis

22  compared to what's really at stake here.

23          Let's talk about the strategies that

24  are out there based on these facts that I've laid

25  out for you.  You could stay in the settlement

Page 24

1    class and be bound by its terms and then you

2    don't have to listen to lawyers anymore.  You can

3    just stay in the settlement class and be bound by

4    its terms.  Or we could create some kind of group

5    or structure and tell The Blues that this group

6    of people or group of companies intends to opt-

7    out.  But we're willing to discuss the problems

8    we have with the settlement first.

9              I will tell you, having been at the

10   hearing on preliminary approval, that the judge,

11   in my opinion, the judge expects number two to

12   happen.  And the reason the judge expects number

13   two to happen is that's what happened in a

14   previous settlement in this case.  You see, there

15   were two arms of the case.  The arm we're talking

16   about here today is under-reimbursement of

17   providers.

18             But there was a whole other arm

19   involving subscribers, purchasers of Blue Cross

20   insurance.  That's already been settled.  Okay.

21   It was easier to settle, less money.  But in that

22   case, the judge preliminarily approved a

23   settlement like this one.  And after it became

24   clear that a lot of big subscribers' groups were

25   opting out, there were new negotiations with The

Page 25

1   Blues and they came back to the judge with a new

2   settlement agreement that was more acceptable.

3   When the judge was hearing this, he said from the

4   bench, he alluded to the fact that this had

5   happened before and basically indicated he

6   wouldn't be surprised if it happened in this

7   case.

8            We can't force The Blues to talk to us.

9   Maybe they won't want to.  But we can sure send

10  them a letter and say we don't like this

11  settlement.  We're considering opting out.  Do

12  you want to talk?  My prediction would be that

13  they would.

14           Let's talk about your other options.

15  Number three.  You could seek what's called a

16  tolling agreement from The Blues but not file a

17  lawsuit until the negotiations were done.  You

18  could opt-out but don't immediately file a

19  lawsuit, in which case you reduce risking your

20  damage period from 16 years down to four years

21  because of the four-year statute of limitation.

22  Or you could opt-out and file an immediate

23  lawsuit.  That's a continuum of strategies going

24  all the way from doing nothing to opting out and

25  filing a lawsuit.

1          Finally, you could opt-out and never

2     file a lawsuit, but never be bound by the

3     settlement and the release which might be the

4     best option for some settlement class members.

5          Here are some inputs to your decision.

6     Calculate the amount of past under-reimbursement.

7     How do you do that?  Get a good figure for how

8     much The Blues have paid you since 2008.  And

9     then just imagine that 1 or 2 percent of that was

10    an under-reimbursement, 2 or 3 percent of that

11    was an under-reimbursement and then triple it

12    because it has to be tripled under federal

13    antitrust law.  That gives you some idea of the

14    amount of damage, monetary damage.

15          You will know and you might have an

16    idea as to whether you would benefit from future

17    structural changes in The Blues.  And you might

18    have an idea as to whether you would benefit by

19    future reimbursement changes by The Blues,

20    particularly with regard to the BlueCard Program

21    and the National Accounts Program being allowed

22    to negotiate those rates or opt-out of those if

23    you don't like the rates.  That relief is

24    probably worth more than the money you would

25    actually get in the lawsuit, at least for some of

1   the hospital systems we've looked at.

2          All right.  I'm at the last topic here.

3   I thank you for your patience.  I know I

4   presented a lot of material.  Here's the

5   procedure for opting out.  You have to provide

6   all of the following information by March 4th of

7   2025.  And because The Blues don't want you to

8   opt-out and the plaintiffs' attorneys that are

9   going to get $700 million in legal fees don't

10  want you to opt-out, they made this deliberately

11  difficult.

12         All class members shall submit written

13  notification by March 4th, including the

14  following: name.  Okay.  Authorized

15  representative, addresses and phone numbers.

16  Addresses and phone numbers of the authorized

17  representative.  If you've assigned your

18  financial interest, who you assigned it to,

19  here's the big one.  All provider, all national

20  provider identifiers, or NPIs, tax identification

21  numbers and Medicare provider numbers under which

22  the class member billed for services between 2008

23  and 2024 and last four digits of Social Security.

24  So that's going to take a while to gather up.

25         Now it may be that you don't opt-out,

1  you don't even make certain claims.  But if

2  you're going to opt-out, you've got to put all

3  this stuff in.  Then there's a statement that you

4  wish to be excluded.  And then there are a whole

5  bunch of nasty conditions.  There has to be a

6  physical signature on it.  Electronic signatures

7  won't do.  Now that's -- this is just, by the

8  way, ridiculous, the idea of there needs to be a

9  wet signature on something in this day and age,

10 but that's the requirement.

11        Then it goes on to say that the lawyers

12 can't sign them for you unless the lawyers are

13 employed by that particular medical group.  It

14 goes on to say that each of you has -- each class

15 member has to put their own exclusion request

16 signed by that class member, although if there's

17 a healthcare system, medical group, medical

18 organization, healthcare facility, they can do it

19 by representative.  And then finally it warns

20 that if you fail to provide all the required

21 information, then the attempt opt-out shall be

22 invalid.  So it's doable, but it's deliberately

23 difficult.

24        That is the end of my presentation.  I

25 hope that somebody, some of you are still with me

```
 1   and haven't given up and I hope that some of you
 2   have asked some questions.  I'll be happy to
 3   address anything that the group wants to know
 4   about.
 5              MARK ISENBERG:  Hey, Megan.  Are you
 6   available?  Can you read the questions from the
 7   chat, please?
 8              MEGAN BOYD:  Yep, yep.  So this
 9   recording will be shared.  I just saw that
10   question come through which I can answer.  So
11   there's a couple questions in the chat.  The
12   first being it says, at first blush, this seems
13   like a settlement primarily intended to get a win
14   so that the prevailing class action attorneys get
15   $700 million in fees.
16              If the settlement doesn't really help
17   providers or materially impact their harmful
18   business practices, then what's the reason
19   plaintiffs would agree to this settlement besides
20   net return to their attorneys?  Healthcare
21   providers can't receive kickbacks for referrals.
22   But I'm not sure that extends to class action
23   lawsuits between plaintiff and their attorneys.
24   Sorry, that was a long-winded question.  But it's
25   in the chat.
```

```
 1              DANIEL OWEN:  That was such a good
 2    question.  I may just add that to this
 3    presentation because you've hit the nail on the
 4    head.  This is of enormous benefit to The Blues,
 5    that take the immunity pill, that they can't be
 6    challenged on this anymore.  It's an enormous
 7    benefit to the class action attorneys who get 700
 8    million bucks and it's not much of a benefit to
 9    anybody else.
10              Now, I'm going to drop back and tell
11    you a little bit about the class action attorneys
12    because I know them well.  And the first thing
13    I'm going to say is going to come as a real
14    surprise.  They are really good people,
15    goodhearted people with good motives and they're
16    very competent and I like them.  But they got in
17    over their head here and they bit off more than
18    they can chew and they wound up having to make a
19    bad deal just to extricate themselves from it
20    after 12 years and the expenditure of $100
21    million, which is what they told the judge they
22    spent on this case.
23              Let me tell you a little bit more about
24    them.  And I want to emphasize that although I
25    said lots of bad things about this settlement,
```

Page 31

1   and I mean them all from the bottom of my heart,

2   none of that is directed in animus to the people,

3   to the class action lead counsel.  Their names

4   are Joe Whatley and Edith Kallas.  They're the

5   ones that did the Love case that settled back in

6   2008.  And they are truly, in my view, the most

7   preeminent healthcare class action attorneys in

8   this country.  They're capable of doing things

9   that others aren't.  And I really admire them.

10  And I spoke to them many times during this, the

11  pendency of this case.  I've had dinner with

12  them.  We've gone over goals for the case and how

13  we would get there and everything else.

14          But what happened to them is this.

15  After 12 years and the expenditure of $100

16  million, they were told this is never going to

17  get certified as a national class.  And what

18  we're going to do is remand all 38 cases back to

19  the district courts they came from in 2012.  And

20  now you've got to litigate all 38 of those cases,

21  each of which is a little miniature class action.

22  And faced with that, and we begin advising

23  clients based on the remand.  And then all of a

24  sudden the remand evaporated and this lousy deal

25  came up because this is their last opportunity to

1   settle it on a nationwide basis.

2           Okay.  I'm urging you to opt-out of

3   this case, this deal, because I think it's a bad

4   deal.  I don't blame Joe Whatley and Edith Kallas

5   for doing it.  I get it.  They had fought the

6   good fight, spent 100 million bucks, 12 years,

7   and now they're looking at another how many,

8   three, four, five years of litigation, 38 places.

9   They just simply gave up.  But that's how all of

10  this came about.  And the question is absolutely

11  prescient.  It doesn't really benefit anybody

12  except The Blues and the lawyers at this point.

13  Other questions?

14          MEGAN BOYD:  Next question we have is

15  how can a hospital discern if it is excluded from

16  this settlement based on accepting or opting out

17  of the 2008 settlement?

18          DANIEL OWEN:  The list of those who

19  opted out is about 400 pages long.  It's not an

20  electronic form right now.  We'll send it to

21  anybody that wants it.  It's a public record

22  available in the files of the district court down

23  in Florida where the Love settlement was created.

24  Within a couple weeks, we hope to have an

25  electronic version of that which having to be

1    scanned in and recognized so that it's easy to

2    search.  Okay.  Somewhere in your files may be a

3    record of whether you opted out or not, but who

4    knows where it is in 2008, 16 years ago.  But the

5    official record of who opted out, it's not in

6    dispute.  It's in the files of the court.  It's a

7    little more complicated than that because there

8    were actually three settlements and we're trying

9    to get to the bottom of whether the opt-out lists

10   are the same or overlap or not.  It's not

11   completely cut and dried.  But we will help you

12   get it figured out if you want us to.  What's

13   next?

14          MEGAN BOYD:  Would a physician group or

15   hospital need to have joined the class to be

16   covered by the settlement?

17          DANIEL OWEN:  No.  You're covered

18   unless you opt-out.  Okay.  You're in unless you

19   opt-out because it covered all healthcare

20   providers in the United States of America.  The

21   settlement covers all healthcare providers.

22   You're in unless you opt-out.

23          MEGAN BOYD:  Yeah.  And then next

24   question is, how about a class action lawsuit

25   versus UnitedHealthcare?

```
 1              DANIEL OWEN:  Any day of the week.  Any
 2    day of the week.  It's what I do for a living.
 3    You've got my email.  Send it.  Send it on.  And
 4    as you may not know much about the Polsinelli
 5    firm, we represent lots of hospitals and lots of
 6    providers.  The insurance companies are
 7    unfortunately the natural enemies of our client.
 8    And nothing would make me happier than to be
 9    involved in that.
10              I've spent my entire adult life
11    preparing cases and taking them in front of
12    juries for people that got ripped off in one way
13    or another.  And nothing would make me happier
14    than to rip into UnitedHealthcare.  I feel bad
15    for their executive, of course, but the anger
16    that's out there is, is palpable and, and not
17    just at United.  What's next?
18              MEGAN BOYD:  Where can they find the
19    decision and/or the list of items for opt-out?
20              DANIEL OWEN:  The decision or the list
21    of items?  Okay, the -- okay --
22              DAVID KING:  The preliminary approval I
23    think is what they're looking for, Dan.
24              DANIEL OWEN:  Yeah.  We can distribute
25    the order of preliminary approval that was
```

Page 35

1    entered by the court on December 2nd and it lists

2    the opt-out procedure.  Okay.  This order of

3    preliminary approval comes from two other

4    documents, by the way, is related to two other

5    documents.  One is the settlement agreement

6    itself and that's a public document.  And I

7    quoted from it.  Anyone that wants a copy of it,

8    we can give it to you.

9         And then there was a motion for

10   preliminary approval by the plaintiffs'

11   attorneys.  I quoted a little bit of that where

12   it said we haven't calculated nationwide damages,

13   which I don't believe, by the way.  So those

14   three documents, the order of preliminary

15   approval, the motion for preliminary approval and

16   the settlement agreement itself, those are all

17   public documents and we're happy to provide

18   copies of them to anyone that wants them.

19        MEGAN BOYD:  Thank you.  We will be

20   sharing this recording with everyone.  But if

21   we're able to share the PowerPoint from you guys,

22   we'll absolutely do that as well.  There was a

23   few questions about that.  But next question

24   relating to your presentation is what happens if

25   you don't opt-in or out?

1          DANIEL OWEN:  Well, there's no such
2     thing as opting in.  You're in unless you opt-
3     out.  So the judge ordered that this settlement
4     will be binding, assuming it's goes through final
5     approval.  But after final approval, it's binding
6     on every healthcare provider in the United States
7     of America.  There's no such thing as opting in.
8     You're already in.
9          Okay.  The question is, of course, do
10    you opt-out?  And if you opt -- if you stay in,
11    theoretically, somewhere, sometime you're going
12    to get a check.  And is it going to be $856 or
13    $85,000?  I can't tell you, but it's going to be
14    -- if you're a physician, it's going to be your
15    share of 8 percent of $2 billion pro rata somehow
16    over a 16-year period.  So you would get whatever
17    monetary compensation you're going to get, you're
18    going to get.  You're going to get to benefit
19    from these wonderful enhancements to the BlueCard
20    system that I sarcastically described where now
21    The Blues are going to talk to each other over a
22    faster communications link and there's going to
23    be a committee to improve the BlueCard system or
24    whatever.
25          Maybe your local Blues will take

```
 1    advantage of the new ability to work across their
 2    former exclusive boundaries.  Maybe they will,
 3    maybe they won't.  So you may benefit from that.
 4    But what's absolutely sure is you will not have
 5    the opportunity to make any claim or to benefit
 6    from any future claims made by others having to
 7    do with under-reimbursement because of these
 8    antitrust law violations.  And it's quite
 9    disconcerting to me because the truth is the
10    antitrust law violations are going to go on into
11    the future with immunity now and you're never
12    going to be able to do anything about it unless
13    you opt-out.
14            Okay, and let me say as an aside, I
15    think if a number, a lot of people opt-out, The
16    Blues are going to come back to the negotiating
17    table, just I think what the judge expects.
18    They're going to come back to the negotiating
19    table and go for it and we're going to either get
20    a better class action settlement that people are
21    willing to stay in.  That's one possibility.  Or
22    individual hospitals or systems or physicians
23    groups are going to be able to make their own
24    deals, like we'd like to bill in-network rates
25    plus a few percentage points on BlueCard.
```

1    They're going to make their own deals and that's

2    going to then make it worth it to be bound by the

3    settlement.  Whether it's an individual deal or,

4    or whether it's changes to the class action deal,

5    I don't know what form it's going to take.  I

6    would just like to see The Blues at the

7    negotiating table facing a bunch of opt-outs and

8    wanting to preserve some kind of national deal.

9    Next question.

10         DAVID KING:  We've got about ten

11   questions left.  I thought maybe I'll just kind

12   of rapid-fire answer some of these so we can try

13   to -- Megan, so we can try to get through the

14   questions and, Dan, chime in.  But I'm pulling

15   that up as we go.  So we're going to send around

16   the decision.  We're going to send around the

17   slides, at least send them to Zotec and they can

18   pass them around.

19         Next question.  What if you don't opt-

20   in or out?  Well, as Dan mentioned earlier,

21   you're in unless you opt-out for this case.  So

22   you're automatically in because you're within the

23   described class unless you opt-out.  Next

24   question, are the plaintiff attorneys employed by

25   Blues?  Probably a sarcastic question.  No, they

1  definitely are not.  But you know, they had

2  challenges in this case that Dan described.  So

3  yes, it primarily looks like an attorney fee

4  issue that is a big benefit here.  So we've seen

5  that in many, many other cases before.

6          There were a number of references to

7  the BlueCard Program.  What other plans or

8  products constitute the scope?  Well, it's the

9  National Accounts Program and the BlueCard

10  Program and whatever products fit within the

11  BlueCard Program, primarily commercial products.

12  But the allegations here relate to the conspiracy

13  among The Blues that yield the antitrust

14  allegations where they were able to benefit from

15  the BlueCard Program that was able to drive lower

16  reimbursement to the provider.  So that's the

17  theory of the case, generally speaking, which can

18  apply to whatever plans or programs are subject

19  to the BlueCard or the National Accounts Program.

20          If your group currently has an ongoing

21  lawsuit against Blue Cross, does opting out have

22  any impact on the current case?  I don't think

23  so.  We don't know anything about your lawsuit.

24  So we'd have to know what's happening to your

25  lawsuit.  Is there any overlap?  For example, is

Page 40

```
 1   it an antitrust lawsuit, is it a meat and
 2   potatoes in-network dispute, out-of-network
 3   dispute?  So we'd have to know more about that.
 4           DANIEL OWEN:  Let me chime in on that,
 5   David.  If it is just a meat and potatoes
 6   reimbursement dispute, it is not affected in any
 7   way by this settlement.  It goes forward and you
 8   do -- and it doesn't matter whether you opt-in or
 9   out.  Those ordinary course disputes are not
10   affected in any way by this settlement.
11           DAVID KING:  All right.  Next, has
12   Polsinelli had a role in this case up until now?
13   And I think, Dan, you may have missed this
14   earlier.  Dan described we, the firm, have
15   represented several witness parties that were
16   brought in by subpoena.  Dan was involved in
17   that.  Dan was involved in settlement
18   negotiations that we can't discuss and otherwise
19   has been monitoring the case for several clients
20   that are not technically -- well, they may be
21   participants, but they're not the name parties.
22           Would going out of network with all The
23   Blues affect our ability to litigate in the
24   future, whether or not we opt-out?  Again, just
25   going out of network and then having rate
```

Page 41

1   disputes, if all you have is a rate dispute being

2   out of network, that would be different than,

3   let's say they have a narrow network in your area

4   and you allege some sort of conspiracy with other

5   providers. So you might have some sort of a

6   potential release with that sort of language.

7   I'd have to get more input from Dan on that. So

8   it just depends on what's going on with your

9   current case.

10          You know, going out of network,

11  generally speaking, probably doesn't affect it

12  other than the politics of it. You know, The

13  Blues sometimes get their feelings hurt when you

14  sue them. And so if you opt-out, you know, they

15  could have some feedback on that, but probably

16  not technically affecting your ability to

17  prosecute your out-of-network dispute, if you

18  have one. Any addition on that, Dan?

19          DANIEL OWEN: No. I would need a lot

20  more facts to have any kind of opinion on that.

21          DAVID KING: All right. Somebody said

22  they had to take a call and miss the slides on

23  the procedure for opting out. We're going to

24  circulate the preliminary approval of the

25  settlement that has all of the opt-out

Page 42

1   procedures, very burdensome.  If you have no

2   information of opting out in the Love case, can

3   you opt-out in this case?  Yes.  I mean, you can

4   go ahead and opt-out in this case and wait for

5   The Blues to say, hey, wait a minute, you already

6   are subject to the Love case.  So they'll tell

7   you.  And so one of your strategies could be if

8   you're not sure if you opted out, you could just

9   opt-out here and see what happens.  But anything

10  to add there, Dan?

11          DANIEL OWEN:  You're no worse off by

12  opting out.  And in it -- I will tell you, a

13  court has ruled that if you didn't opt-out of the

14  Love case, you're barred on this one.  But that's

15  not necessarily the final word on it.  It's a

16  complicated legal question.  We'll just have to

17  see what it comes out to.  The conservative

18  advice for somebody like me to give is if you

19  didn't opt-out of the Love case, you're probably

20  barred here.

21          DAVID KING:  Next question --

22          BARRY ALEXANDER:  Although, Dan and

23  David, this is Barry.  Doesn't that depend also

24  on whether you were actually practicing as of

25  that date?

```
 1              DANIEL OWEN:  Oh, yeah.  If you weren't
 2      practicing as of July of 2008, you have no
 3      problem.  If you had not received reimbursements
 4      from The Blues by July of 2008, you have no
 5      problem.
 6              DAVID KING:  Next question.  Would the
 7      other big four insurers have a better claim in
 8      this case?  It seems they were harmed the most.
 9      For example, Humana abandoned the commercial
10      insurance market because they couldn't compete.
11      Dan?
12              DANIEL OWEN:  Oh, yeah.  That's a whole
13      other issue.  But you're right.  The Blues -- and
14      I could talk for an hour about this.  But the
15      thing 38 Blues got together and they did things
16      that the biggest systems, United, Cigna, you name
17      it, could not do.  And frankly, they did things
18      that are illegal under the antitrust laws.
19      That's why we have antitrust laws, so that 38
20      cannot operate as one.  And yeah, if I were
21      Humana, if anybody knows Humana, give them my
22      card.
23              DAVID KING:  Sorry, Dan.  We do not
24      represent Humana and will not.
25              DANIEL OWEN:  Yeah.  Yeah.
```

Page 44

1           DAVID KING:  We'll refer it out.
2           DANIEL OWEN:  We can't do that one.
3      Yeah, they're again, natural enemies.  But
4      certainly Humana has claimed that, you know --
5      who knows what goes into their consideration.
6           DAVID KING:  All right.  Next question.
7      If 75 percent opt-out, does this affect the
8      available funds for the remaining parties?  The
9      answer is yes.  But if 75 percent opt-out, it may
10     blow up the settlement, correct, Dan?
11          DANIEL OWEN:  Correct.  And we haven't
12     talked about the so-called blow provision.  It's
13     secret.  We can't see it.  Only the judge and the
14     plaintiffs' attorneys and The Blues can see it.
15     But at some level, if there's enough opt-outs,
16     then The Blues can blow up the settlement and say
17     we don't want to do it anymore because so many
18     people opted out, we're not getting anything for
19     it.
20          We don't know what the blow provision
21     level is.  What's interesting is a lot of times
22     in my personal experience, even if the blow
23     provision is exceeded, the defendants still won't
24     blow it up.  They still would rather have it,
25     even if they have the option to blow it up.  So

1  we know there's a blow provision.  We don't know

2  what it is.  But whoever asked the question is

3  correct.  The more opt-out, the more of that $2

4  billion is available for those that remain in.

5  Okay.  I still think it's going to be de minimis

6  for most physicians and hospital systems.  But

7  you're right, as people opt-out, the rest of that

8  -- more of that settlement fund becomes available

9  for those who stay in.

10         DAVID KING:  All right.  If a group

11  bills under one tax ID number, like an emergency

12  medical group, will the group need to submit

13  NPIs, national provider IDs, for all physicians

14  or just the group tax ID number as part of the

15  requirements to opt-out by March 4th?

16         DANIEL OWEN:  We're really going to

17  have to look at the text of that.  The way it

18  looks to me at this point is that if the claim is

19  made under a group, that's just the group, tax ID

20  number and provider number -- and you'd better

21  hope that group was not receiving money from Blue

22  Cross before July of 2008, otherwise it had

23  better opt-out.

24         Now, let's say that a group is barred,

25  but individual physicians within that group are

1  not barred by the Love settlement, then you're

2  going to need to provide the information for the

3  individual physicians that aren't barred.

4          DAVID KING:  All right.  So is it too

5  much of a reach to say you should opt-out, but it

6  may be too time consuming and expensive to opt-

7  out?  Well, it doesn't really cost much to opt-

8  out.  The expense would be if you opt-out and

9  then file your own lawsuit.

10          And so one of the strategies that Dan

11  reviewed was you opt-out and then you try to

12  negotiate something either to stay in or, just as

13  a separate, you know, I'm going to opt-out in

14  this settle, you know, pick your favorite Blue

15  and then you can negotiate.  The real expensive

16  item is if you then litigate on your own your

17  antitrust case.  Anything else to add on that,

18  Dan?

19          DANIEL OWEN:  I would expect that a lot

20  of -- some people on this call may have already

21  seen letters from plaintiffs' attorneys offering

22  to take their case on a contingent fee basis.

23  And we know that some of the big law firms in

24  this country are out trying to get contingent fee

25  cases.  They're mostly soliciting hospitals and

Page 47

 1   large healthcare systems, but they're out there
 2   trying to do it.  And of course, the plaintiffs'
 3   attorneys in the class, Joe Whatley and Edith
 4   Kallas, they sent out a nasty letter last week, a
 5   form letter that several of our clients got that
 6   said, don't go with these people.  Don't file
 7   your own lawsuit, and here's why.
 8            So there's this battle for
 9   representation of people.  Where Zotec and its
10   members fall in that, I don't know yet.  I don't
11   know yet.  But there are many strategies for
12   whether you go with a contingent lawyer or
13   whether you band together, whether you file your
14   own lawsuit, whether you tag on somebody else's.
15   Lot of different strategies out there and they're
16   beyond the scope of today's meeting.
17            DAVID KING:  All right.  To clarify, as
18   a physician group, we need a wet signature for
19   every physician in the group or just a wet
20   signature from a representative of the group?
21   Dan?
22            DANIEL OWEN:  My belief is that if the
23   group wasn't getting -- isn't bound by the Love
24   settlement, which means it wasn't getting money
25   from Blue Cross before July of '08 or it opted

Page 48

```
 1   out, then you're good to just go under the group.
 2   Okay.  However, I think a lot of groups are going
 3   to be barred, but they're going to have
 4   individual physicians in them that aren't barred.
 5   So then you've got to go by the individual
 6   physician and each individual physician has to
 7   put their own wet signature on it.
 8           DAVID KING:  Who is going to check the
 9   opt-out applications to ensure they're complete?
10   Can they potentially be rejected?  I say yes.  If
11   they've been found, for example, to fall within
12   the Love settlement, it would be rejected.  And
13   then, Dan, the plaintiffs will have somebody
14   checking these opt-outs, correct?
15           DANIEL OWEN:  Yes, David.  There's a
16   "settlement administrator" who's being paid $100
17   million, okay, to administer this settlement.
18   It's a third-party settlement administrator.
19   They do it for lots and lots of these cases and
20   they have their instructions from the court and
21   they go through and see if the opt-out was
22   correct.  If it was, they add them to the opt-out
23   list.  If it wasn't, they reject it.  And you
24   know, if they reject it in time, you could fix it
25   and send it back in.  But at any rate, the
```

Page 49

1  settlement administrator passes on all of this

2  stuff and there's some procedure for complaining

3  if you don't like what the settlement

4  administrator did.

5       DAVID KING:  Given the lack of any

6  meaningful settlement after 12 years of

7  litigation, why should we think there would be a

8  more meaningful settlement in the future?  Dan?

9       DANIEL OWEN:  That's a great question.

10  And it's because the reason that this case got

11  stuck in the mud after 12 years was because it

12  couldn't get it certified as a class.  All of

13  those issues about class do not apply to

14  individual claims brought by hospitals systems,

15  healthcare systems and physicians groups.  All of

16  the class action stuff goes away.  Now they're

17  just looking down the barrel of the original

18  claim.  Go ahead, David.  What were you going to

19  add?

20       DAVID KING:  Where would we send the

21  opt-out, if we choose to do so?  That's going to

22  be in the order we're going to circulate.  Where

23  will we be able to find these materials?  We'll

24  send stuff to Zotec and they can send them around

25  to you guys.  What happens if you can't find TINs

1    and NPIs for all group providers going back 16

2    years?  That's getting into the weeds a little

3    bit.  We'd have to talk specifically about that.

4           What if the doctors were in one group

5    in 2008 and changed to a new group practice?

6    We'd have to sort that out in more detail.  We

7    don't think we have time to sort that out now.

8    If a physician group did not opt-out of the Love

9    case, but currently consists of a large number of

10   physicians who are not in practice, can they

11   still opt-out or is this settlement foreclosed

12   from Love?  That's another in the weeds kind of a

13   question.  We might need to just talk to you

14   individually about all of that.

15          What does Polsinelli plan to do if

16   there are enough opt-outs to trip a new deal?  Is

17   there a financial incentive for Polsinelli?  Not

18   at this point.  We are at this point just

19   providing information to clients and prospective

20   clients without any arrangements.  We don't have

21   any financial arrangements with anybody at this

22   point.  Just a lot -- we have current clients are

23   probably going to opt-out, but so in the new deal

24   could be part of the settlement.  So if there's

25   enough opt-outs, especially opt-outs from key

```
 1    hospital systems, it could blow up the settlement
 2    and you could just end up with a better
 3    settlement for everybody.  That would be a nice
 4    result.  Or if you're a big hospital system that
 5    has a lot of leverage, you may be able to cut
 6    your own deal by threatening to opt-out.  And so
 7    those are several of the options here.  So it
 8    depends upon who you are, what your leverage is
 9    and that kind of says, you know, what might
10    happen with your individual case.
11             Let's see.  I think we got through
12    them.  So sorry, rapid fire there.  Just trying
13    to answer as best we can.  But if you have
14    individualized questions, especially the details
15    of opt-out, we really need to dive into the weeds
16    on that because it's very, very complicated.
17             DANIEL OWEN:  David, you and I are
18    expected at the healthcare department meeting
19    that started one minute ago and they've got my
20    sandwich ordered.  So I've got to get there.
21             MARK ISENBERG:  So thank you.  Yeah,
22    we'll go ahead and wrap it up.  And as we
23    mentioned, we'll go ahead and forward along the
24    PowerPoint presentation as well as the other
25    documents that were mentioned in this call.  And
```

Page 52

```
 1    we'll also provide you with the contact
 2    information of the presenters today too, if you
 3    want to follow up with them directly.  But we
 4    very much appreciate your time.
 5               DANIEL OWEN:  Hey, Mark, I spotted --
 6    in going through that PowerPoint presentation,
 7    which has never been given to anyone until today,
 8    I spotted a couple of typos.  I want to fix them
 9    before that presentation goes out.
10               MARK ISENBERG:  Fair enough.  Yeah.  So
11    just send us the final one and then we'll attach
12    it to the recording as well.
13               DANIEL OWEN:  Okay.
14               DAVID KING:  Thanks, everybody.
15               MARK ISENBERG:  Thank you, everyone.
16               DANIEL OWEN:  Thanks, everybody.
17               MEGAN BOYD:  Thank you.
18               BARRY ALEXANDER:  Happy holidays as
19    well.
20
21
22
23
24
25
```

Page 53

1                       C E R T I F I C A T I O N

2

3    I, Sonya Ledanski Hyde, certify that the

4    foregoing transcript is a true and accurate

5    record of the proceedings.

6

7

8    *Sonya M. Ledanski Hyde*

9

10

11   Veritext Legal Solutions

12   330 Old Country Road

13   Suite 300

14   Mineola, NY 11501

15

16   Date: January 2, 2025

17

18

19

20

21

22

23

24

25

| & | | |
|---|---|---|
| **&**   1:14 | | |

**0**

**08**   47:25

**1**

**1**   22:17 26:9
**100**   11:15 12:10
  17:4 30:20
  31:15 32:6
  48:16
**11501**   53:14
**12**   8:5 30:20
  31:15 32:6 49:6
  49:11
**12151**   53:9
**16**   7:6 9:20
  11:19 22:15
  23:16 25:20
  33:4 36:16 50:1

**2**

**2**   11:16 22:17
  23:14 26:9,10
  36:15 45:3
  53:16
**2.8**   11:13 12:15
**2006**   6:4
**2008**   3:24 6:22
  6:24 7:7 15:4,9
  15:23 16:4 22:2
  26:8 27:22 31:6
  32:17 33:4 43:2
  43:4 45:22 50:5

**2012**   6:21,23 8:5
  17:10 18:24
  31:19
**2016**   4:7 5:5
  6:20 18:16
**2024**   1:15 15:8
  15:10 27:23
**2025**   4:2 27:7
  53:16
**27**   6:3,16
**2nd**   35:1

**3**

**3**   22:17 26:10
**300**   53:13
**330**   53:12
**37**   20:6
**38**   19:9 31:18,20
  32:8 43:15,19

**4**

**4.63**   11:24
**400**   16:8,17
  17:12 32:19
**42**   18:5
**49**   11:25
**4th**   3:15 4:2
  27:6,13 45:15

**5**

**5,000**   12:9
**50**   11:23 19:3

**6**

**600**   5:24
**65**   15:6,7

**7**

**700**   5:24 11:14
  27:9 29:15 30:7
**75**   44:7,9

**8**

**8**   11:17 23:14
  36:15
**85,000**   36:13
**856**   36:12

**9**

**92**   11:16

**a**

**abandoned**   43:9
**ability**   37:1
  40:23 41:16
**able**   3:11 35:21
  37:12,23 39:14
  39:15 49:23
  51:5
**absolutely**   12:1
  32:10 35:22
  37:4
**accept**   4:2,11
  20:23
**acceptable**   25:2
**accepting**   4:14
  32:16
**access**   12:24

**account**   20:20
  20:22 21:3 22:8
**accounts**   10:11
  10:13,15,16,20
  26:21 39:9,19
**accuracy**   3:1
**accurate**   53:4
**act**   21:20
**acting**   2:25
**action**   1:13 2:7
  4:5,11 12:6 17:3
  17:8 19:3,5,8,12
  19:18 21:24,25
  29:14,22 30:7
  30:11 31:3,7,21
  33:24 37:20
  38:4 49:16
**actions**   19:9
**activity**   6:9,11
**actually**   17:21
  26:25 33:8
  42:24
**add**   11:24 30:2
  42:10 46:17
  48:22 49:19
**added**   22:11
**addition**   41:18
**additionally**   3:7
**address**   3:8,11
  29:3
**addresses**   27:15
  27:16
**adequacy**   3:1

**administer**
   48:17
**administration**
   11:16
**administrator**
   48:16,18 49:1,4
**admire**  31:9
**admitted**  11:22
**adult**  34:10
**advantage**  37:1
**advantages**  2:18
**advice**  2:22 5:20
   42:18
**advising**  4:10
   31:22
**advisor**  2:25
**advocacy**  2:11
**affect**  40:23
   41:11 44:7
**affected**  40:6,10
**affecting**  41:16
**age**  28:9
**ago**  33:4 51:19
**agree**  29:19
**agreed**  10:4
   20:13
**agreement**
   10:17 11:9
   14:14 17:23
   20:7,8 25:2,16
   35:5,16
**ahead**  2:2 15:12
   42:4 49:18
   51:22,23

**alabama**  3:16
   11:23 12:14
**alexander**  2:12
   4:22 15:18
   16:22 42:22
   52:18
**allegations**
   39:12,14
**allege**  41:4
**allocated**  11:17
**allocation**  20:6
   21:18 22:5
**allow**  10:12,20
   13:22 14:14
**allowed**  26:21
**alluded**  25:4
**america**  33:20
   36:7
**amount**  10:25
   12:16 22:17
   26:6,14
**analysis**  7:1
**anger**  34:15
**animus**  31:2
**answer**  29:10
   38:12 44:9
   51:13
**antitrust**  3:25
   5:7 6:6,9,11 7:9
   8:22 9:7 11:4
   21:19 26:13
   37:8,10 39:13
   40:1 43:18,19
   46:17

**anybody**  30:9
   32:11,21 43:21
   50:21
**anymore**  24:2
   30:6 44:17
**anyway**  13:7,10
**anyways**  5:25
**appalling**  12:8
**apparently**
   13:15
**appearances**  5:6
**applicability**
   3:5
**applicable**  4:16
**applications**
   48:9
**apply**  39:18
   49:13
**appointment**
   13:8
**appreciate**  2:5
   52:4
**appropriate**
   21:24
**approval**  3:16
   24:10 34:22,25
   35:3,10,15,15
   36:5,5 41:24
**approved**  24:22
**approving**
   14:13
**architecture**
   12:23

**area**  41:3
**arising**  17:24
**arm**  24:15,18
**arms**  24:15
**arrangements**
   50:20,21
**artificially**
   21:12
**aside**  37:14
**asked**  18:17
   29:2 45:2
**assembled**  16:8
**assigned**  27:17
   27:18
**association**  21:7
**assuming**  36:4
**astronomical**
   7:8
**attach**  52:11
**attempt**  28:21
**attorney**  6:17
   12:6 22:11 39:3
**attorneys**  2:12
   11:15 27:8
   29:14,20,23
   30:7,11 31:7
   35:11 38:24
   44:14 46:21
   47:3
**auspices**  21:6
**authorized**
   27:14,16
**automatic**  20:16

**automatically**
  38:22
**available**   3:13
  29:6 32:22 44:8
  45:4,8

**b**

**back**   6:21,22
  7:11 12:10 20:3
  25:1 30:10 31:5
  31:18 37:16,18
  48:25 50:1
**background**
  6:18
**bad**   30:19,25
  32:3 34:14
**band**   47:13
**bargain**   10:21
**barred**   42:14,20
  45:24 46:1,3
  48:3,4
**barrel**   49:17
**barry**   2:12 4:21
  4:22 6:19 15:18
  16:22 42:22,23
  52:18
**based**   12:14,23
  17:24 23:24
  31:23 32:16
**basically**   9:8
  15:21 20:16,24
  25:5
**basis**   19:15
  21:10 32:1

46:22
**battle**   47:8
**bcbs**   1:13
**bcbsa**   21:7
**began**   22:2
**beginning**   3:24
  12:20
**belief**   47:22
**believe**   18:14
  35:13
**bench**   25:4
**benefit**   8:14
  13:2 26:16,18
  30:4,7,8 32:11
  36:18 37:3,5
  39:4,14
**benefits**   12:24
**best**   11:10 19:15
  26:4 51:13
**better**   20:11
  37:20 43:7
  45:20,23 51:2
**beyond**   47:16
**big**   12:25 14:5
  21:10 24:24
  27:19 39:4 43:7
  46:23 51:4
**biggest**   15:1
  43:16
**bill**   20:25 37:24
**billed**   27:22
**billion**   11:13,16
  11:24 12:10,15
  23:14 36:15

45:4
**billions**   7:16
  12:14 22:13
**bills**   45:11
**binding**   3:17 9:2
  9:4 14:5,6 19:19
  36:4,5
**bit**   2:14 11:11
  18:23 19:10
  30:11,17,23
  35:11 50:3
**blame**   32:4
**blow**   19:21,23
  44:10,12,16,20
  44:22,24,25
  45:1 51:1
**blue**   2:8,8 3:21
  3:21 8:6,22,22
  10:23 13:9,15
  14:2 18:25
  20:10,11,12
  21:7,7 23:2,2,15
  23:16 24:19
  39:21 45:21
  46:14 47:25
**bluecard**   10:19
  13:4,9,23 14:4
  20:20,21 21:2
  22:7 26:20
  36:19,23 37:25
  39:7,9,11,15,19
**blues**   7:6,14 9:5
  9:6,9,23 10:2,3
  10:10 11:6,7

13:6,12,14
  14:15 15:23
  16:2,4 17:19
  19:20,22 20:6,9
  20:21 21:6,6
  24:5 25:1,8,16
  26:8,17,19 27:7
  30:4 32:12
  36:21,25 37:16
  38:6,25 39:13
  40:23 41:13
  42:5 43:4,13,15
  44:14,16
**blush**   29:12
**bottom**   31:1
  33:9
**bound**   8:13,16
  11:8 24:1,3 26:2
  38:2 47:23
**boundaries**   37:2
**boycott**   20:19
**boyd**   29:8 32:14
  33:14,23 34:18
  35:19 52:17
**break**   10:6
**briefing**   19:5
**briefly**   7:3
**broad**   15:3,5,10
  16:25 18:7,9
**broader**   18:2,3
**brought**   21:14
  40:16 49:14
**bucks**   30:8 32:6

**bunch** 28:5 38:7
**burdensome** 42:1
**business** 7:15 8:7,10 9:10,23 10:2 29:18
**businesses** 6:6
**busy** 2:5
**buy** 6:13

**c**

**c** 53:1,1
**calculate** 26:6
**calculated** 12:3 35:12
**calculation** 12:15 23:14,20
**call** 22:24 41:22 46:20 51:25
**called** 14:16 15:5,20 17:2 20:5,18 21:5 25:15 44:12
**capable** 31:8
**card** 43:22
**case** 4:4,8 5:5,18 6:14,20,20 7:13 7:25 8:4 9:24 10:1 12:8,10,11 15:5,8 16:19 18:19 19:7 21:2 21:11 24:14,15 24:22 25:7,19 30:22 31:5,11

31:12 32:3 38:21 39:2,17 39:22 40:12,19 41:9 42:2,3,4,6 42:14,19 43:8 46:17,22 49:10 50:9 51:10
**cases** 6:6 31:18 31:20 34:11 39:5 46:25 48:19
**certain** 28:1
**certainly** 44:4
**certified** 19:7 31:17 49:12
**certify** 53:3
**cetera** 12:24,24 17:1,1
**challenged** 30:6
**challenges** 39:2
**change** 7:15 10:2 18:25 19:1
**changed** 23:8,10 50:5
**changes** 8:6,9 9:23 26:17,19 38:4
**chat** 29:7,11,25
**check** 36:12 48:8
**checking** 48:14
**chew** 19:11 30:18

**chime** 38:14 40:4
**choice** 2:19
**choose** 8:18,19 11:6 49:21
**cigna** 43:16
**circulate** 41:24 49:22
**city** 5:4
**claim** 11:7 13:5 16:6 17:7 18:1 20:5,6,18,19 22:1 37:5 43:7 45:18 49:18
**claimed** 3:20 44:4
**claims** 11:4,4 14:25 15:8 17:1 18:4,6 20:4 28:1 37:6 49:14
**clarify** 15:13 47:17
**class** 1:13 2:7 4:5,11 11:22,25 12:4,6 14:24 19:3,5,7,12,15 19:18 22:2 24:1 24:3 26:4 27:12 27:22 28:14,16 29:14,22 30:7 30:11 31:3,7,17 31:21 33:15,24 37:20 38:4,23 47:3 49:12,13

49:16
**classes** 6:10
**clean** 13:5
**clear** 13:1 19:6 19:13 24:24
**client** 34:7
**clients** 2:24 10:15 16:13 18:16 23:21 31:23 40:19 47:5 50:19,20 50:22
**close** 13:20
**cloud** 12:23
**coding** 5:14
**collision** 12:9
**colluding** 21:11
**combine** 19:11
**come** 4:12 9:13 13:20 19:19 29:10 30:13 37:16,18
**comes** 35:3 42:17
**coming** 8:23
**commercial** 39:11 43:9
**committee** 14:8 21:5 36:23
**common** 11:12
**communicate** 13:14
**communicatio...** 36:22

**companies** 24:6
34:6
**compared** 9:19
11:21 23:22
**compensation**
11:19 36:17
**compete** 10:4
14:15,18,20
20:9,13 23:3
43:10
**competent**
30:16
**competing**
20:12
**competitors** 6:8
**complain** 9:5
17:16,18
**complaining**
49:2
**complete** 48:9
**completely**
33:11
**completeness**
3:1
**complicated**
33:7 42:16
51:16
**concerned** 11:3
**conditions** 28:5
**confidential**
18:21
**connected** 17:25
**cons** 4:13

**conservative**
42:17
**consider** 5:21
**consideration**
18:10 44:5
**considerations**
22:25
**considering**
25:11
**consists** 50:9
**conspiracies**
21:19,23
**conspiracy**
39:12 41:4
**conspired** 3:22
**constitute** 2:22
39:8
**consult** 3:4
**consuming** 46:6
**contact** 52:1
**content** 2:21 3:2
**contents** 3:5
**context** 3:14
**contiguous**
14:17
**contingent**
46:22,24 47:12
**continue** 9:10
14:20
**continuing** 3:24
21:22
**continuum**
25:23

**contract** 5:15
**copies** 35:18
**copy** 35:7
**correct** 44:10,11
45:3 48:14,22
**cost** 46:7
**counsel** 3:5 31:3
**country** 5:25
10:3 22:15 31:8
46:24 53:12
**county** 14:17
**couple** 10:8
18:15 22:21
29:11 32:24
52:8
**course** 13:5 16:7
34:15 36:9 40:9
47:2
**court** 3:15 5:6
12:1,21 14:12
15:6,25 32:22
33:6 35:1 42:13
48:20
**court's** 12:19
14:1
**courts** 31:19
**covenant** 17:23
**cover** 11:18
**covered** 22:19
22:23 33:16,17
33:19
**covering** 4:23
19:3

**covers** 33:21
**crazy** 17:21
**create** 24:4
**created** 32:23
**creation** 14:1
**critical** 4:19 8:9
**cross** 2:8 3:21
8:6,22 21:7 23:2
23:16 24:19
39:21 45:22
47:25
**currency** 3:1
**current** 39:22
41:9 50:22
**currently** 39:20
50:9
**customers** 10:23
**cut** 33:11 51:5

**d**

**damage** 9:19
11:21 25:20
26:14,14
**damages** 4:15
6:21,24 7:8,17
8:5 11:23 12:3,5
12:10,12,13
20:15 22:1,3,9
22:12 23:11
35:12
**dan** 2:12 4:20
5:3,17,19,25 6:3
34:23 38:14,20
39:2 40:13,14

40:16,17 41:7
41:18 42:10,22
43:11,23 44:10
46:10,18 47:21
48:13 49:8
**daniel**  6:2 7:22
30:1 32:18
33:17 34:1,20
34:24 36:1 40:4
41:19 42:11
43:1,12,25 44:2
44:11 45:16
46:19 47:22
48:15 49:9
51:17 52:5,13
52:16
**date**  3:25 42:25
53:16
**dates**  15:16
**david**  2:12 4:20
5:8,12 7:21
15:12,13 16:18
16:20 34:22
38:10 40:5,11
41:21 42:21,23
43:6,23 44:1,6
45:10 46:4
47:17 48:8,15
49:5,18,20
51:17 52:14
**day**  6:25 28:9
34:1,2
**de**  23:21 45:5

**deal**  12:25 14:5
19:15,16 30:19
31:24 32:3,4
38:3,4,8 50:16
50:23 51:6
**dealing**  5:16
**deals**  37:24 38:1
**decades**  18:8
19:19
**december**  1:15
3:14 35:1
**decide**  4:1 9:15
**decision**  8:1,2
26:5 34:19,20
38:16
**decisions**  1:14
**declaration**
21:17
**defendants**
21:22 44:23
**definitely**  39:1
**deliberately**
27:10 28:22
**department**
51:18
**depend**  42:23
**depends**  41:8
51:8
**described**  19:16
36:20 38:23
39:2 40:14
**detail**  50:6
**details**  2:17 9:13
51:14

**develop**  12:22
**different**  4:4
41:2 47:15
**difficult**  27:11
28:23
**digits**  27:23
**dinner**  31:11
**direct**  4:15
**directed**  31:2
**directly**  12:19
52:3
**disadvantages**
2:19
**discern**  32:15
**disconcerting**
37:9
**discuss**  24:7
40:18
**discussion**  2:23
4:19
**dispute**  5:9 33:6
40:2,3,6 41:1,17
**disputes**  5:15
40:9 41:1
**distribute**  16:16
34:24
**district**  3:15
6:16 31:19
32:22
**disturbing**  21:1
**dive**  51:15
**divided**  10:3
21:4,9

**doable**  28:22
**docket**  17:10
**doctors**  50:4
**document**  17:11
35:6
**documents**  35:4
35:5,14,17
51:25
**doing**  9:11 13:7
18:8 25:24 31:8
32:5
**dollars**  7:16
12:14 22:13
**dressing**  13:20
14:22
**dried**  33:11
**drive**  5:18 39:15
**drives**  6:12,13
**driving**  6:14
21:12
**drop**  30:10
**due**  22:5,6

**e**

**e**  53:1
**e&m**  5:14
**earlier**  14:15
38:20 40:14
**easier**  4:6 24:21
**easy**  33:1
**edith**  31:4 32:4
47:3
**effect**  15:25
16:1

**eisenberg** 2:9
**either** 4:14 6:12
  8:7 19:20,22
  21:22 37:19
  46:12
**elected** 6:16
**electronic** 28:6
  32:20,25
**else's** 47:14
**email** 34:3
**emergency**
  45:11
**emphasize**
  30:24
**employed** 28:13
  38:24
**enemies** 34:7
  44:3
**enhancements**
  36:19
**enormous** 22:17
  30:4,6
**ensure** 48:9
**entered** 35:1
**entire** 34:10
**entirely** 6:5
**entities** 22:21
**entitled** 23:19
**especially** 7:9
  50:25 51:14
**et** 12:24,24 17:1
  17:1
**evaporated**
  31:24

**everybody** 5:11
  51:3 52:14,16
**exactly** 9:10
  14:11 18:18
**example** 39:25
  43:9 48:11
**examples** 22:22
**exceeded** 44:23
**excellent** 4:23
**except** 32:12
**exceptions** 9:12
**excess** 21:3,4,13
**exchange** 14:23
**excluded** 28:4
  32:15
**exclusion** 28:15
**exclusive** 10:4,6
  14:15,20 19:21
  20:4,8,10 22:6
  37:2
**executed** 15:4
**executive** 2:10
  13:9 14:2 34:15
**expect** 46:19
**expected** 15:7
  51:18
**expects** 24:11
  24:12 37:17
**expenditure**
  30:20 31:15
**expense** 46:8
**expensive** 46:6
  46:15

**experience**
  44:22
**experienced**
  12:6
**experts** 12:3
**explicitly** 14:19
**extends** 29:22
**extricate** 30:19
**eye** 13:6

### f

**f** 53:1
**faced** 31:22
**facilitate** 12:23
**facilitating** 2:23
**facility** 28:18
**facing** 38:7
**fact** 10:16 14:18
  25:4
**facts** 18:15 21:1
  23:24 41:20
**factual** 17:2,3,5
**fail** 28:20
**fair** 52:10
**fall** 47:10 48:11
**far** 22:24 23:2
**faster** 36:22
**favorite** 46:14
**federal** 7:9
  21:19 22:9
  26:12
**fee** 39:3 46:22
  46:24

**feedback** 41:15
**feel** 3:9 34:14
**feelings** 41:13
**fees** 22:11 27:9
  29:15
**fight** 32:6
**fighting** 19:6
**figure** 4:24 12:4
  26:7
**figured** 33:12
**file** 25:16,18,22
  26:2 46:9 47:6
  47:13
**filed** 6:20,23
  18:24
**files** 32:22 33:2
  33:6
**filing** 25:25
**final** 36:4,5
  42:15 52:11
**finally** 23:11
  26:1 28:19
**financial** 27:18
  50:17,21
**find** 12:7 17:23
  34:18 49:23,25
**fire** 38:12 51:12
**firm** 2:13,15 4:7
  6:3 34:5 40:14
**firms** 46:23
**first** 9:15 24:8
  29:12,12 30:12
**fit** 39:10

**five** 32:8
**fix** 13:16 48:24
  52:8
**fixing** 6:11
  20:19 21:18
  22:7
**flip** 5:17
**florida** 32:23
**flow** 20:15
**focus** 7:13,14
  9:24,25
**focused** 6:4
**follow** 52:3
**following** 27:6
  27:14
**force** 25:8
**forced** 6:8
**foreclosed** 50:11
**foregoing** 53:4
**form** 16:12,13
  32:20 38:5 47:5
**former** 37:2
**forward** 40:7
  51:23
**fought** 32:5
**found** 48:11
**four** 6:17,22
  25:20,21 27:23
  32:8 43:7
**frankly** 43:17
**free** 3:9
**front** 34:11
**fully** 13:5

**function** 3:8
**fund** 11:13
  23:19 45:8
**funds** 44:8
**further** 14:3
  17:22
**future** 11:4
  14:25 23:1,7
  26:16,19 37:6
  37:11 40:24
  49:8

### g

**gather** 27:24
**generally** 39:17
  41:11
**generated** 21:3
  21:8
**getting** 44:18
  47:23,24 50:2
**give** 10:22 20:1
  35:8 42:18
  43:21
**given** 29:1 49:5
  52:7
**gives** 20:2 26:13
**giving** 9:9 14:24
  17:23
**go** 2:2 6:24 7:22
  15:12 16:19
  20:3 37:10,19
  38:15 42:4 47:6
  47:12 48:1,5,21
  49:18 51:22,23

**goals** 18:19
  31:12
**goes** 11:14,15
  23:15 28:11,14
  36:4 40:7 44:5
  49:16 52:9
**going** 5:3,17,18
  6:21,25 7:1,12
  7:17,22 8:1,21
  9:2,14 13:2
  15:15 18:12
  19:7,14,20,22
  19:23,25 20:1
  25:23 27:9,24
  28:2 30:10,13
  30:13 31:16,18
  36:11,12,13,14
  36:17,18,18,21
  36:22 37:10,12
  37:16,18,19,23
  38:1,2,5,15,16
  40:22,25 41:8
  41:10,23 45:5
  45:16 46:2,13
  48:2,3,8 49:18
  49:21,22 50:1
  50:23 52:6
**good** 26:7 30:1
  30:14,15 32:6
  48:1
**goodhearted**
  30:15
**goods** 6:7,12

**government** 5:2
  22:21
**granted** 3:16
**great** 49:9
**greatly** 2:5
**group** 5:10 14:2
  24:4,5,6 28:13
  28:17 29:3
  33:14 39:20
  45:10,12,12,14
  45:19,19,21,24
  45:25 47:18,19
  47:20,23 48:1
  50:1,4,5,8
**groups** 3:19
  16:10 24:24
  37:23 48:2
  49:15
**guaranteed** 3:2
**guide** 4:18
**guy** 5:4
**guys** 4:25 5:21
  35:21 49:25

### h

**hair** 5:16
**happen** 10:7,15
  19:14 24:12,13
  51:10
**happened** 24:13
  25:5,6 31:14
**happening**
  39:24

**[happens - injunctive]**    Page 62

**happens**  11:24
  35:24 42:9
  49:25
**happier**  34:8,13
**happy**  16:15
  29:2 35:17
  52:18
**harmed**  43:8
**harmful**  29:17
**head**  30:4,17
**heads**  5:9
**healthcare**  2:10
  3:18,23 4:1,9
  5:23,24 7:6 8:12
  8:18 9:1,3,4
  11:5 22:15,20
  22:22 28:17,18
  29:20 31:7
  33:19,21 36:6
  47:1 49:15
  51:18
**hear**  7:12
**heard**  3:11
**hearing**  24:10
  25:3
**heart**  31:1
**held**  20:14
**hello**  2:3
**help**  29:16
  33:11
**hey**  29:5 42:5
  52:5
**higher**  13:23

**history**  7:24
  18:13,24
**hit**  30:3
**hitchhike**  15:19
**holidays**  52:18
**hope**  28:25 29:1
  32:24 45:21
**hopefully**  7:18
**hospital**  3:17
  7:5 27:1 32:15
  33:15 45:6 51:1
  51:4
**hospitals**  3:23
  4:1 8:12,17
  11:17 13:22
  16:10 20:23
  23:21 34:5
  37:22 46:25
  49:14
**hour**  43:14
**housekeeping**
  2:20
**how's**  14:6
**humana**  43:9,21
  43:21,24 44:4
**hundreds**  12:13
  17:5 22:13
**hurry**  13:16
**hurt**  41:13
**hyde**  53:3

**i**

**ibr**  5:14

**idea**  18:7 26:13
  26:16,18 28:8
**identification**
  27:20
**identifiers**
  27:20
**identify**  14:3
**ids**  45:13
**illegal**  20:15,17
  21:23 43:18
**illegally**  3:22
**images**  16:11
**imagine**  7:3
  11:24 22:14
  26:9
**immediate**
  12:23 25:22
**immediately**
  25:18
**immunity**  9:10
  20:1,2 30:5
  37:11
**impact**  19:18
  29:17 39:22
**implementation**
  13:12
**important**  7:1
  8:25 9:2
**improve**  36:23
**improvement**
  14:4
**inadequate**
  18:15

**incentive**  50:17
**includes**  9:16
**including**  2:17
  3:18 22:23
  27:13
**incredible**  12:2
  12:7
**incredibly**
  11:20 15:3
  16:24 18:9
**indicated**  25:5
**individual**  19:9
  37:22 38:3
  45:25 46:3 48:4
  48:5,6 49:14
  51:10
**individualized**
  51:14
**individually**
  50:14
**inflicted**  9:20
  11:21
**information**  3:3
  7:24 27:6 28:21
  42:2 46:2 50:19
  52:2
**informational**
  2:24
**injunction**
  21:21
**injunctive**  9:22
  10:24 12:17,18
  12:21 13:8,11
  13:18,25 14:10

17:20 21:16
**injured** 6:11
**input** 41:7
**inputs** 26:5
**inside** 14:20
**instructions** 48:20
**insurance** 24:20
34:6 43:10
**insured** 13:5
**insurers** 43:7
**intended** 2:21
29:13
**intends** 24:6
**inter** 21:5
**interest** 27:18
**interesting** 44:21
**internal** 13:12
**introduce** 4:25
**invalid** 28:22
**investigation** 5:2
**involved** 4:8 5:5
6:19 18:16,17
34:9 40:16,17
**involving** 2:7
24:19
**isenberg** 2:1
29:5 51:21
52:10,15
**issue** 17:8,14
39:4 43:13

**issues** 5:13
13:15 49:13
**item** 46:16
**items** 34:19,21

**j**

**january** 53:16
**job** 4:23 6:3
**joe** 31:4 32:4
47:3
**joined** 2:11
33:15
**joining** 2:3
**judge** 20:14
24:10,11,12,22
25:1,3 30:21
36:3 37:17
44:13
**july** 15:23 16:4
43:2,4 45:22
47:25
**juries** 34:12

**k**

**kallas** 31:4 32:4
47:4
**kansas** 5:4
**kept** 6:8
**key** 8:24 50:25
**kick** 2:2
**kickbacks** 29:21
**kind** 8:2 24:4
38:8,11 41:20
50:12 51:9

**kinds** 13:18
**king** 2:12 4:20
5:8 7:21 15:13
16:20 34:22
38:10 40:11
41:21 42:21
43:6,23 44:1,6
45:10 46:4
47:17 48:8 49:5
49:20 52:14
**know** 2:4 12:5
12:12 17:9
18:18 22:24
26:15 27:3 29:3
30:12 34:4 38:5
39:1,23,24 40:3
41:10,12,14
44:4,20 45:1,1
46:13,14,23
47:10,11 48:24
51:9
**knowing** 12:11
**knowledge** 18:21
**known** 16:25
**knows** 33:4
43:21 44:5

**l**

**lack** 49:5
**laid** 21:14,25
23:24
**language** 15:11
41:6

**large** 5:22 47:1
50:9
**larger** 23:20
**law** 2:13,15 4:7
7:9 21:19 22:9
26:13 37:8,10
46:23
**laws** 9:7 43:18
43:19
**lawsuit** 3:20
10:5,18 13:21
18:13 25:17,19
25:23,25 26:2
26:25 33:24
39:21,23,25
40:1 46:9 47:7
47:14
**lawsuits** 29:23
**lawyer** 47:12
**lawyers** 24:2
28:11,12 32:12
**lead** 31:3
**learn** 2:6
**ledanski** 53:3
**left** 19:9 38:11
**legal** 2:22,25 3:5
5:20 14:19 27:9
42:16 53:11
**legally** 14:5,6
**letter** 25:10 47:4
47:5
**letters** 46:21
**level** 44:15,21

**[leverage - monetary]**                                          Page 64

**leverage** 51:5,8
**license** 20:7,8
**life** 34:10
**limitation** 25:21
**limitations** 6:23
**lines** 10:19
  14:16,18
**link** 36:22
**list** 32:18 34:19
  34:20 48:23
**listen** 24:2
**listing** 17:12
**lists** 33:9 35:1
**literally** 19:5
  20:13 21:8
**litigate** 31:20
  40:23 46:16
**litigated** 5:12
**litigation** 8:22
  32:8 49:7
**litigator** 5:7
**little** 2:14 10:8
  11:11 14:9,10
  18:10,23 30:11
  30:23 31:21
  33:7 35:11 50:2
**living** 34:2
**local** 36:25
**long** 13:4 17:4
  17:12 29:24
  32:19
**longer** 9:5
**look** 16:16,23
  19:17 45:17

**looked** 27:1
**looking** 7:16
  32:7 34:23
  49:17
**looks** 19:25 39:3
  45:18
**loosens** 14:16
**lost** 5:15
**lot** 7:23,23 8:5,8
  9:18 11:13
  24:24 27:4
  37:15 41:19
  44:21 46:19
  47:15 48:2
  50:22 51:5
**lots** 30:25 34:5,5
  48:19,19
**lousy** 31:24
**love** 15:5,14,20
  16:5,19 31:5
  32:23 42:2,6,14
  42:19 46:1
  47:23 48:12
  50:8,12
**loves** 5:11
**lower** 3:22
  20:23 39:15

**m**

**m&a** 5:2
**made** 3:12 8:1,3
  19:14 27:10
  37:6 45:19

**major** 5:13
**make** 28:1
  30:18 34:8,13
  37:5,23 38:1,2
**manner** 2:25
**march** 4:2 27:6
  27:13 45:15
**mark** 2:1,9 4:22
  29:5 51:21 52:5
  52:10,15
**market** 20:5
  21:18 22:5
  43:10
**markets** 6:9
**marks** 12:20
**material** 3:3
  27:4
**materially**
  29:17
**materials** 49:23
**matter** 18:5,6
  40:8
**matters** 4:5
**mean** 9:4 14:4
  14:11 31:1 42:3
**meaningful** 49:6
  49:8
**means** 9:22
  20:10 47:24
**meat** 40:1,5
**mechanisms**
  17:18 19:23
**medical** 28:13
  28:17,17 45:12

**medicare** 27:21
**meeting** 3:12
  47:16 51:18
**megan** 29:5,8
  32:14 33:14,23
  34:18 35:19
  38:13 52:17
**member** 12:24
  27:22 28:15,16
**members** 26:4
  27:12 47:10
**mentioned**
  10:17 38:20
  51:23,25
**mere** 13:19,20
**messaging**
  13:13
**million** 11:14,15
  27:9 29:15 30:8
  30:21 31:16
  32:6 48:17
**mineola** 53:14
**miniature** 31:21
**minimis** 23:21
  45:5
**minuscule** 11:20
**minute** 10:9
  42:5 51:19
**missed** 40:13
**monetary** 9:16
  9:17,25 11:12
  14:9 22:2 26:14
  36:17

**money** 7:11 8:9
  11:14 16:3
  22:18 24:21
  26:24 45:21
  47:24
**monitoring**
  40:19
**motion** 17:9
  35:9,15
**motions** 17:10
  17:12,13,15
**motives** 30:15
**mud** 49:11
**multiple** 5:5

**n**

**n** 53:1
**nail** 30:3
**name** 2:9,14 6:2
  27:14 40:21
  43:16
**names** 31:3
**narrow** 41:3
**nasty** 28:5 47:4
**national** 4:7
  10:11,13,15,16
  10:20 14:2
  20:20,22 21:2
  22:7 26:21
  27:19 31:17
  38:8 39:9,19
  45:13
**nationwide** 12:3
  12:5 19:3,12

21:10 32:1
  35:12
**natural** 34:7
  44:3
**necessarily** 7:13
  8:15 42:15
**neck** 12:9
**need** 33:15
  41:19 45:12
  46:2 47:18
  50:13 51:15
**needed** 10:2
  15:17
**needs** 8:1,3 28:8
**negotiate** 13:23
  26:22 46:12,15
**negotiated** 16:2
**negotiating**
  37:16,18 38:7
**negotiations**
  18:18,20 24:25
  25:17 40:18
**net** 29:20
**network** 5:14
  10:14,14,22,23
  20:24,25 37:24
  40:2,2,22,25
  41:2,3,10,17
**never** 19:7 26:1
  26:2 31:16
  37:11 52:7
**new** 24:25 25:1
  37:1 50:5,16,23

**nice** 13:6 51:3
**notes** 2:21
**notification**
  27:13
**npis** 27:20 45:13
  50:1
**number** 10:3,10
  10:18 24:11,12
  25:15 37:15
  39:6 45:11,14
  45:20,20 50:9
**numbers** 27:15
  27:16,21,21
**nut** 18:11
**ny** 53:14

**o**

**o** 53:1
**object** 10:5
**obligation** 14:6
**offer** 20:11
**offering** 46:21
**official** 33:5
**oh** 43:1,12
**okay** 6:2,22
  7:19,22 8:21,24
  9:13 17:3 18:1
  18:12 24:20
  27:14 32:2 33:2
  33:18 34:21,21
  35:2 36:9 37:14
  45:5 48:2,17
  52:13

**old** 53:12
**onerous** 11:9
**ones** 31:5
**ongoing** 39:20
**operate** 43:20
**opinion** 13:19
  24:11 41:20
**opportunities**
  14:3
**opportunity**
  31:25 37:5
**opt** 2:18,18 4:3
  4:5,11 8:13,19
  9:3,8,15,15
  10:12,21 11:8
  13:22 15:9,21
  15:23 16:5,6,9
  24:6 25:18,22
  26:1,22 27:8,10
  27:25 28:2,21
  32:2 33:9,18,19
  33:22 34:19
  35:2,25 36:2,10
  36:10 37:13,15
  38:7,19,21,23
  40:8,24 41:14
  41:25 42:3,4,9
  42:13,19 44:7,9
  44:15 45:3,7,15
  45:23 46:5,6,7,8
  46:11,13 48:9
  48:14,21,22
  49:21 50:8,11
  50:16,23,25,25

51:6,15
**opted**   16:14,17
 32:19 33:3,5
 42:8 44:18
 47:25
**opting**   4:14 23:1
 24:25 25:11,24
 27:5 32:16 36:2
 36:7 39:21
 41:23 42:2,12
**option**   26:4
 44:25
**options**   2:17
 4:15 25:14 51:7
**order**   12:19
 14:1,12 34:25
 35:2,14 49:22
**ordered**   36:3
 51:20
**ordinary**   40:9
**organization**
 28:18
**organizations**
 3:6
**original**   49:17
**outs**   16:9 38:7
 44:15 48:14
 50:16,25,25
**overlap**   33:10
 39:25
**owen**   2:13 6:2,3
 7:22 30:1 32:18
 33:17 34:1,20
 34:24 36:1 40:4

41:19 42:11
43:1,12,25 44:2
44:11 45:16
46:19 47:22
48:15 49:9
51:17 52:5,13
52:16
**own**   2:24 3:4,5,6
28:15 37:23
38:1 46:9,16
47:7,14 48:7
51:6

**p**

**pages**   16:8,17
17:4,12,14
32:19
**paid**   6:7,13
10:13,21 26:8
48:16
**palpable**   34:16
**paragraph**   18:2
18:5
**part**   10:24 11:2
17:24 20:7
45:14 50:24
**participants**
40:21
**participate**
20:21
**participating**
9:9
**particular**
28:13

**particularly**   2:4
26:20
**parties**   40:15,21
44:8
**partners**   2:11
2:23
**party**   48:18
**pass**   38:18
**passes**   49:1
**past**   23:8,12
26:6
**patience**   27:3
**pay**   7:11
**payer**   5:9,13
**payers**   5:11,16
**payment**   13:4
**pc**   4:8
**pendency**   31:11
**people**   10:12,21
24:6 30:14,15
31:2 34:12
37:15,20 44:18
45:7 46:20 47:6
47:9
**percent**   11:17
11:17 15:6,7
22:17 23:14
26:9,10 36:15
44:7,9
**percentage**   7:4
23:15 37:25
**period**   7:7 9:20
22:2 23:17
25:20 36:16

**permits**   3:10
**perpetual**   9:9
20:2
**personal**   18:21
44:22
**petition**   17:4
**phone**   27:15,16
**physical**   28:6
**physician**   3:19
7:5 15:8 33:14
36:14 47:18,19
48:6,6 50:8
**physicians**   3:19
8:11,17 13:22
16:10 23:15
37:22 45:6,13
45:25 46:3 48:4
49:15 50:10
**pick**   46:14
**pill**   9:10 20:1
30:5
**pittance**   9:18
**places**   32:8
**plaintiff**   29:23
38:24
**plaintiffs**   6:5,10
11:22,25 12:2,6
16:1 27:8 29:19
35:10 44:14
46:21 47:2
48:13
**plan**   13:9 21:5
50:15

**plans** 3:21 4:16 39:7,18
**play** 15:15
**pleading** 17:8,9
**pleadings** 17:13 17:15
**please** 3:4 29:7
**plural** 22:13
**plus** 37:25
**point** 32:12 45:18 50:18,18 50:22
**points** 7:4 37:25
**policy** 9:6
**politics** 41:12
**poll** 5:10
**polsinelli** 2:13 4:8 5:1 34:4 40:12 50:15,17
**position** 5:22
**possibility** 37:21
**potatoes** 40:2,5
**potential** 2:18 41:6
**potentially** 48:10
**powerpoint** 7:20 35:21 51:24 52:6
**practice** 8:7 9:23 10:2 50:5 50:10

**practices** 7:15 8:10 29:18
**practicing** 15:17 42:24 43:2
**predicates** 17:2 17:4,5
**prediction** 25:12
**preeminent** 31:7
**preliminarily** 14:12 24:22
**preliminary** 3:16 24:10 34:22,25 35:3 35:10,14,15 41:24
**preparing** 34:11
**prescient** 32:11
**present** 3:24 6:25 7:1,7
**presentation** 3:9 4:12 7:20 15:2 28:24 30:3 35:24 51:24 52:6,9
**presented** 27:4
**presenters** 52:2
**preserve** 38:8
**president** 2:10
**pretty** 5:12,21 6:4

**prevailing** 29:14
**previous** 24:14
**price** 6:11,12,13 20:18 21:18 22:7
**primarily** 29:13 39:3,11
**primary** 7:13,14 9:24,25
**principally** 5:1
**prior** 4:2
**pro** 23:18 36:15
**probably** 3:11 5:23 7:11 11:9 12:13 15:15 16:5 22:12 23:19 26:24 38:25 41:11,15 42:19 50:23
**problem** 43:3,5
**problems** 24:7
**procedure** 27:5 35:2 41:23 49:2
**procedures** 23:7 42:1
**proceedings** 53:5
**process** 4:4
**products** 39:8 39:10,11
**professionals** 15:14

**profits** 21:3,4,8 21:13
**program** 10:12 10:13,19,20 13:23 14:4 20:20,22,22 21:5 22:8 26:20 26:21 39:7,9,10 39:11,15,19
**programs** 20:23 21:3,9 39:18
**prohibiting** 21:21
**promise** 13:3
**prompt** 13:4
**proposed** 4:13 9:14,16 19:17
**pros** 4:13
**prosecute** 41:17
**prospective** 50:19
**provide** 3:14 27:5 28:20 35:17 46:2 52:1
**provider** 1:14 3:18 7:6 9:3 12:2 17:3,8 20:11 22:15 27:19,20,21 36:6 39:16 45:13,20
**providers** 3:23 4:1,9,10 5:23 8:18 9:1,4 11:6

11:18 13:2
19:18,19 22:20
22:22 24:17
29:17,21 33:20
33:21 34:6 41:5
50:1
**provides** 9:21
9:22
**providing** 50:19
**provision** 44:12
44:20,23 45:1
**provisions** 18:5
**public** 16:15
32:21 35:6,17
**pulling** 38:14
**purchasers**
24:19
**purposes** 2:24
**pursue** 4:6 11:7
**put** 14:11 28:2
28:15 48:7
**puts** 14:12

**q**

**q&a** 3:8
**question** 8:11
8:25 23:1,6
29:10,24 30:2
32:10,14 33:24
35:23 36:9 38:9
38:19,24,25
42:16,21 43:6
44:6 45:2 49:9
50:13

**questions** 3:8
29:2,6,11 32:13
35:23 38:11,14
51:14
**quickly** 7:23
**quite** 37:8
**quotation** 12:20
**quoted** 12:21
35:7,11

**r**

**r** 53:1
**raised** 17:8,14
**range** 4:9 5:13
**rapid** 38:12
51:12
**rata** 23:18 36:15
**rate** 40:25 41:1
48:25
**rates** 10:14,22
13:24 20:12,24
20:24,25 26:22
26:23 37:24
**rather** 20:25
44:24
**reach** 46:5
**read** 29:6
**real** 9:18 13:12
30:13 46:15
**really** 5:3 10:1
12:15 18:10
21:14 23:22
29:16 30:14
31:9 32:11

45:16 46:7
51:15
**rear** 12:9
**reason** 9:1 19:4
24:12 29:18
49:10
**reasons** 8:19
**receive** 29:21
**received** 43:3
**receiving** 15:22
16:3 45:21
**recently** 4:10
**recognized** 33:1
**recommending**
5:20
**record** 16:15
32:21 33:3,5
53:5
**recorded** 2:2
3:12
**recording** 1:15
29:9 35:20
52:12
**reduce** 13:13
25:19
**refer** 44:1
**references** 39:6
**referrals** 29:21
**reform** 10:11,19
**reforming** 10:20
**regard** 26:20
**regarding** 13:15
**regulations**
17:19

**reimbursement**
5:2 6:15 9:6
11:20 19:22
20:12,24 22:3,5
22:14 23:7
24:16 26:6,10
26:11,19 37:7
39:16 40:6
**reimbursements**
3:22 11:5 15:22
19:1 21:12
23:12,16,17
43:3
**reject** 48:23,24
**rejected** 48:10
48:12
**relate** 39:12
**related** 17:25
35:4
**relates** 9:7
**relating** 11:5
17:1 35:24
**relative** 17:19
**release** 11:4
15:3,4,12 16:23
16:24,25 18:9
26:3 41:6
**released** 18:1
**releases** 15:10
**releasing** 14:25
17:7 18:3
**relief** 9:17,17,22
9:25 10:24
11:12 12:17,18

12:22 13:8,11
   13:18,25 14:9
   14:10 17:20
   21:16 26:23
**remain**  45:4
**remaining**
   11:16 44:8
**remand**  31:18
   31:23,24
**remedial**  21:24
   21:25
**remember**  15:1
   15:2 16:8
**represent**  23:17
   34:5 43:24
**representation**
   47:9
**representative**
   27:15,17 28:19
   47:20
**represented**  6:6
   6:7,10 40:15
**representing**
   6:5
**request**  28:15
**requested**  21:17
   21:17,21,24
**require**  14:17
   20:23
**required**  28:20
**requirement**
   28:10
**requirements**
   45:15

**resolution**  5:9
   14:2
**respect**  18:6
**rest**  45:7
**result**  51:4
**return**  29:20
**reviewed**  46:11
**ridiculous**  28:8
**right**  2:13 7:18
   11:14 16:22
   17:16,17 27:2
   32:20 40:11
   41:21 43:13
   44:6 45:7,10
   46:4 47:17
**rip**  34:14
**ripped**  34:12
**risk**  3:4
**risking**  25:19
**road**  53:12
**role**  40:12
**rounds**  19:5
**rule**  14:17
**ruled**  15:6 20:17
   42:13
**rules**  17:18
**ruling**  15:25
**run**  12:13 18:12
**running**  8:4

**s**

**sandwich**  51:20
**sarcastic**  38:25

**sarcastically**
   36:20
**saw**  29:9
**says**  14:19 22:10
   29:12 51:9
**scanned**  33:1
**scope**  15:3
   16:24 39:8
   47:16
**screen**  6:1 7:18
   7:19 14:11
   16:23
**se**  20:15
**search**  16:14
   33:2
**searchable**
   16:12
**sec**  15:19
**second**  15:20
**secret**  44:13
**security**  27:23
**see**  5:15 7:19
   9:17 10:25
   12:20 16:14,17
   18:13,14 24:14
   38:6 42:9,17
   44:13,14 48:21
   51:11
**seek**  4:15 25:15
**seeking**  18:25
**seeks**  6:21,24
**seems**  29:12
   43:8

**seen**  39:4 46:21
**send**  25:9 32:20
   34:3,3 38:15,16
   38:17 48:25
   49:20,24,24
   52:11
**sent**  47:4
**separate**  46:13
**serve**  2:9
**services**  27:22
**session**  3:13
**setting**  19:23
**settle**  12:8,11
   24:21 32:1
   46:14
**settled**  24:20
   31:5
**settlement**  1:13
   2:7,17 3:17 4:3
   4:3,11,13,14 8:8
   8:13,14,15,25
   9:14,16,21
   10:17,25 11:2,9
   11:12 12:4,19
   14:14,24 15:15
   15:20,24,25
   16:5,7 17:22
   18:18,20 19:18
   19:25 22:20
   23:4,18,25 24:3
   24:8,14,23 25:2
   25:11 26:3,4
   29:13,16,19
   30:25 32:16,17

**[settlement - systems]** Page 70

32:23 33:16,21
35:5,16 36:3
37:20 38:3 40:7
40:10,17 41:25
44:10,16 45:8
46:1 47:24
48:12,16,17,18
49:1,3,6,8 50:11
50:24 51:1,3
**settlements** 33:8
**settling** 17:19
**several** 40:15,19
47:5 51:7
**share** 6:1 7:17
23:18 35:21
36:15
**shared** 2:21 3:3
29:9
**shareholder** 5:1
**sharing** 35:20
**sheet** 17:11
**sherman** 21:20
**shield** 2:8 3:21
8:22 21:7 23:2
23:16
**show** 8:20 15:11
**shown** 23:9
**sign** 28:12
**signature** 28:6,9
47:18,20 48:7
53:9
**signatures** 28:6
**signed** 28:16

**significant** 2:7
23:9,10
**significantly** 4:4
**simply** 10:22
19:14 32:9
**single** 16:9
17:11 21:1
**six** 18:16
**slide** 8:23
**slides** 38:17
41:22
**social** 27:23
**soliciting** 46:25
**solutions** 53:11
**somebody** 28:25
41:21 42:18
47:14 48:13
**sonya** 53:3
**sorry** 29:24
43:23 51:12
**sort** 41:4,5,6
50:6,7
**sought** 8:5,6
22:3,4,4
**sounds** 9:18
11:13 17:21
**spaced** 16:9
17:11
**speak** 5:3 18:21
**speakers** 4:18
**speaking** 39:17
41:11
**specifically** 50:3

**spent** 30:22 32:6
34:10
**splitting** 21:13
**spoke** 31:10
**spotted** 52:5,8
**sprawling** 19:8
**stake** 23:22
**start** 4:20 8:2
**started** 2:20
51:19
**state** 11:23
19:10
**statement** 28:3
**states** 5:12
11:25 19:3
22:23 33:20
36:6
**statute** 6:23
22:11 25:21
**stay** 8:12 14:24
23:25 24:3
36:10 37:21
45:9 46:12
**step** 4:25
**straight** 14:1
**strategies** 23:23
25:23 42:7
46:10 47:11,15
**strong** 5:21
**structural** 26:17
**structure** 9:5
18:25 23:2 24:5
**struggling** 4:24

**stuck** 49:11
**stuff** 14:7 18:3
20:1 28:3 49:2
49:16,24
**subject** 18:4,6
39:18 42:6
**submit** 3:10
27:12 45:12
**subpoena** 40:16
**subpoenaed**
18:17
**subscribers**
24:19,24
**sudden** 31:24
**sue** 17:24 41:14
**suite** 53:13
**supposed** 11:18
13:21 19:2
**sure** 15:18 25:9
29:22 37:4 42:8
**surprise** 30:14
**surprised** 25:6
**suspect** 5:10
**swath** 5:22
**system** 12:22
13:13 19:1
28:17 36:20,23
51:4
**systems** 5:24
8:12 27:1 37:22
43:16 45:6 47:1
49:14,15 51:1

| t |
|---|
| **t** 53:1,1 |
| **table** 37:17,19 38:7 |
| **tag** 47:14 |
| **take** 5:10 16:23 19:17 27:24 30:5 36:25 38:5 41:22 46:22 |
| **taken** 12:18 |
| **takes** 13:13 |
| **talk** 8:24 10:8 11:11 12:17 13:16 14:7 15:16 18:11,23 20:3 21:16 22:1 22:19,25 23:23 25:8,12,14 36:21 43:14 50:3,13 |
| **talked** 44:12 |
| **talking** 24:15 |
| **task** 21:15 |
| **tax** 27:20 45:11 45:14,19 |
| **team** 5:8 |
| **technically** 40:20 41:16 |
| **tell** 24:5,9 30:10 30:23 36:13 42:6,12 |
| **ten** 38:10 |

**tens** 17:13
**terms** 4:12 24:1 24:4
**territories** 10:4 10:6 14:21 19:21 22:6
**territory** 14:16 20:5,9,10
**text** 45:17
**thank** 2:3 16:20 27:3 35:19 51:21 52:15,17
**thanks** 52:14,16
**theoretically** 36:11
**theory** 39:17
**thing** 11:10 30:12 36:2,7 43:15
**things** 10:1 14:13 18:22 30:25 31:8 43:15,17
**think** 5:19,23 8:16 23:10 32:3 34:23 37:15,17 39:22 40:13 45:5 48:2 49:7 50:7 51:11
**third** 11:2 48:18
**thought** 38:11
**thousands** 17:14

**threatening** 51:6
**three** 10:1,18 19:4 25:15 32:8 33:8 35:14
**time** 2:5,6 3:10 13:12,13 46:6 48:24 50:7 52:4
**times** 31:10 44:21
**timing** 1:14
**tins** 49:25
**tiny** 7:7 21:25 22:14
**today** 2:4,11,21 3:4 18:11 19:4 19:16 24:16 52:2,7
**today's** 3:2 4:12 15:2 47:16
**together** 43:15 47:13
**told** 12:1 30:21 31:16
**tolling** 25:16
**took** 21:8
**top** 11:14
**topic** 27:2
**total** 12:11,12 22:12
**transcript** 53:4
**treble** 22:16
**trebled** 22:10

**trends** 14:3
**tried** 19:9,11
**trip** 50:16
**triple** 26:11
**tripled** 7:10 22:10 26:12
**trivial** 9:11 10:8
**trouble** 21:11
**troubling** 2:14
**true** 53:4
**truly** 31:6
**truth** 37:9
**try** 5:18 7:17 38:12,13 46:11
**trying** 7:14 16:12,13 33:8 46:24 47:2 51:12
**turn** 4:17,17
**two** 10:1,10 20:3 24:11,13 24:15 35:3,4
**type** 6:11
**types** 3:19
**typos** 52:8

| u |
|---|
| **u.s.** 3:15,18,21 3:25 |
| **ultimate** 8:16 |
| **ultimately** 11:6 |
| **unbelievable** 12:7 |

877-373-3660

800.808.4958

**under**  7:9 11:5
  11:20 21:6 22:3
  22:5,9,14 23:12
  24:16 26:6,10
  26:11,12 27:21
  37:7 43:18
  45:11,19 48:1
**underpayment**
  7:4,8
**unfortunately**
  10:7 19:2,24
  21:13,20 34:7
**united**  5:12
  22:22 33:20
  34:17 36:6
  43:16
**unitedhealthc...**
  33:25 34:14
**unknown**  17:1
**urging**  32:2
**use**  3:3
**using**  3:7

**v**

**validate**  19:20
  19:22,25
**veritext**  53:11
**version**  32:25
**versus**  33:25
**vice**  2:10
**view**  31:6
**violated**  21:19
**violation**  3:25

**violations**  37:8
  37:10

**w**

**wait**  42:4,5
**waiving**  17:15
  17:17
**walking**  2:16
**want**  2:20 4:20
  15:13 16:18
  25:9,12 27:7,10
  30:24 33:12
  44:17 52:3,8
**wanted**  10:10
  10:18 19:10
**wanting**  38:8
**wants**  16:16
  29:3 32:21 35:7
  35:18
**warns**  28:19
**warranted**  3:2
**way**  6:21,24
  7:16 9:11 10:11
  17:2,25 19:24
  21:11 23:9,10
  25:24 28:8
  34:12 35:4,13
  40:7,10 45:17
**ways**  10:8
**we've**  16:8
  23:19 27:1
  31:12 38:10
  39:4

**weeds**  50:2,12
  51:15
**week**  34:1,2
  47:4
**weeks**  32:24
**wet**  28:9 47:18
  47:19 48:7
**whatley**  31:4
  32:4 47:3
**wide**  4:9 5:13
  12:22 19:15
**willing**  24:7
  37:21
**win**  29:13
**winded**  29:24
**window**  13:20
  14:21
**wipe**  15:6,7
**wish**  28:4
**witness**  40:15
**wonderful**
  36:19
**word**  42:15
**work**  5:23 14:2
  37:1
**world**  7:11
**worse**  17:22
  42:11
**worth**  26:24
  38:2
**wound**  30:18
**wrap**  51:22
**written**  27:12

**y**

**yeah**  4:22 7:21
  33:23 34:24
  43:1,12,20,25
  43:25 44:3
  51:21 52:10
**year**  2:5 3:15
  6:22 7:6 9:20
  23:16 25:21
  36:16
**years**  6:4,16,17
  8:5 11:19 19:6
  22:16 25:20,20
  30:20 31:15
  32:6,8 33:4 49:6
  49:11 50:2
**yep**  29:8,8
**yield**  39:13

**z**

**zoom**  1:15
**zoom's**  3:8
**zotec**  2:11,22
  38:17 47:9
  49:24