FILED

2025 Jan-31  PM 03:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE:** <br> **BLUE CROSS BLUE SHIELD** <br> **ANTITRUST LITIGATION** <br> **(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP** <br><br> **This Document Relates to** <br> **Provider Track Cases** |

### DECLARATION OF MATTHEW C. KATZ

**I, Matthew C. Katz, declare:**

1.      Since 2019, I have been the Principal of MCK Health Strategies LLC and MCK Consulting LLC. In that capacity, I advise state and national medical specialty societies on health care policy, advocacy efforts, and initiatives, and work with physician practices, other clinicians and medical providers and professionals, hospitals, health systems, and medical management companies on the understanding and use of health information technologies (HIT), regulatory reforms at the state and national level and general medical practice management policies and procedures. I also help providers of medical care and health services to resolve claims coding, billing, processing, adjudication and payment disputes, including but not limited to prior authorization, prior certification, retrospective audit and reviews, downcoding and bundling, and prompt payment, along with an evaluation and analysis of value-based care and fee for service contracting.  I also assist in evaluating internal coding and billing systems to reduce the likelihood of an audit or negative audit findings from health insurers, other third-party payers, state and federal governmental agencies and employers.

2.      From 2006 to 2019, I served in various executive capacities at the Connecticut State Medical Society (CSMS). From 2012 to 2019, I was the chief executive officer (CEO) of CSMS,

along with its subsidiaries and not for profit 501(c)(3) entities. Among my other responsibilities, I coordinated the strategic development of all CSMS initiatives associated with legislation, regulation, general advocacy, education, and membership.

3.      From 1998 to 2006, I held various positions at the American Medical Association (AMA), including Director of the Practice Management Resource Center and Director of Private Payer Advocacy. At the AMA, I coordinated the development of AMA initiatives related to physician practice advocacy, most notably the AMA's prompt payment campaign and physician practice management activities, including claims processing and physician payment services.

4.      From 1994 until 1998, I worked for academic medical centers, health systems and health insurers, where I did some research and some managed care contracting, along with the American Academy of Pediatrics, where my role was specifically designed to assist pediatricians and pediatric specialists with coding and reimbursement issues tied to health insurers and governmental agencies.

5.      My CV, which discusses my professional background in more detail, is attached to this declaration as Exhibit 1.

6.      Throughout my career, I have gained extensive expertise on issues that medical providers encounter when submitting claims for payment by commercial payors, including the members of the Blue Cross Blue Shield Association (the "Blues"). In particular, the Blues use the BlueCard system, which is unique among commercial payors. Under the BlueCard system, if a patient is covered by a Blue that is different from the Blue with which the provider has a contract, the provider submits the claim to the Blue with which it has a contract, but the claim is adjudicated by the Blue that covers the patient. Based on my experience, the number of BlueCard claims has increased over time, and I expect this trend to continue.

7.  The BlueCard program has been a longstanding source of frustration for providers because they often cannot obtain accurate or real-time information directly from the Blue that will adjudicate the claim, and the covered patients have little or no information to assist in any service or claims determination. Instead, the provider may have to make multiple phone calls, emails, secure text messages and even sometimes letters, to their contracted Blue, and wait for a response, for issues like determining whether a patient is covered, obtaining prior authorization, calculating a patient's deductible or coinsurance, and finding out basic information about the medical payment policy in effect for the given patient tied to the given medical condition or medical service being provided.

8.  I have been asked by the Co-Lead Counsel for the Provider Settlement Class to assist their economics experts in calculating the value of certain aspects of the injunctive relief contained in the Settlement Agreement the Court has preliminarily approved in this case. In particular, I have been asked to help calculate the value of the provisions in Paragraph 14 of the Settlement Agreement, called "BlueCard Transformation." That paragraph requires the Blues to develop a "cloud-based platform and enhanced information-sharing among Blue Plans [that] will, individually or collectively, include and/or facilitate" several capabilities, including:

- "[T]he capability for Blue Plans to access certain administrative data pertaining to Members accessing Covered Services pursuant to the BlueCard Program and to make that data available to Settlement Class Members in the Local/Host Blue Plan's Service Area in the same way that the Local/Host Blue Plan currently shares its own Members' data," including member benefits and eligibility verification, pre-authorization requirements, and claims status tracking.

- "[P]atient data exchange capabilities that will enable bidirectional data exchange between Blue Plans and Settlement Class Members, and Blue Plans and Electronic Medical Record ("EMR") vendors for Settlement Class Members that elect to participate."

9.     To begin this assignment, I drew on my experience to identify the ways in which the injunctive relief could simplify providers' administrative processes associated with BlueCard claims on a daily basis. I also identified reports and studies that relate to the administrative burdens faced by physicians and other providers of medical services of submitting medical claims for payment in general and to Blues plans, with specific attention to BlueCard. These research studies and the associated reports were from national research entities, national medical and professional associations, and national consulting and data firms, as well as individual provider entities such as large health systems and provider groups. I had multiple discussions with counsel and with counsel's economics experts over a period of weeks, which refined the scope of data that would be required for this assignment. Ultimately, we decided to quantify sources of administrative cost savings:

- Savings resulting from fewer overall BlueCard claims requiring follow-up by the provider or the provider's administrative or clinical staff,

- Savings resulting from most BlueCard claims requiring less time for follow-up by the provider or the provider's administrative and clinical staff, and

- Savings resulting from BlueCard claims requiring less time for the provider or provider's staff to verify member eligibility and for pre-authorization.

10.     When the scope of data was determined, I researched the literature and surveyed some of my existing as well as previous clients who engage with patients who are covered under

4

the BlueCard program to obtain more detail about their administrative processes and burden under BlueCard, and how those processes are likely to change when the injunctive relief is implemented—most notably the amount of overall staff and clinician time involved in working to identify coverage as well as other medical payment policies and payment determination prior to and immediately following the provision of medical care. If implemented as intended, the improvements to the BlueCard system should reduce the administrative burden associated with BlueCard claims to a level comparable to non-BlueCard claims.

11.     I am being compensated for my work at a rate of $300 per hour. My fee is not contingent on the outcome of this litigation.

*Administrative Savings from Less Follow-up, or Quicker Follow-up*

12.     Because the economics experts had access to survey data showing the percentage of BlueCard claims that require follow-up, the percentage of those claims that are resolved in one contact with the Blues, and the percentage that are resolved in three contacts with the Blues, I investigated the administrative costs associated with these contacts with specific attention to the amount of time and staff required to resolve these claims.

13.     Based on my research and surveys, resolving a BlueCard claim in one contact with the Blues typically requires between 20 minutes and 2 hours, depending on the complexity of the claim, and resolving a claim in three contacts with the Blues typically requires between 45 minutes and 2.5 hours. For both ranges, the midpoint is a reasonable estimate of the average time.

14.     By contrast, resolving a claim with the provider's local Blue plan is quicker. Resolving such a claim typically requires 5 minutes to 30 minutes, depending on the complexity of the claim. The midpoint of this range is a reasonable estimate of the average time, reflecting many fewer calls or communications.

15. If the injunctive relief eliminates the need for the provider to follow up on a BlueCard claim, then the administrative savings associated with that claim equal the time that would have been spent following up on that claim, multiplied by the wage of the person following up.

16. If the injunctive relief does not eliminate the need for the provider to follow up on a BlueCard claim, but it reduces the time required to the amount that a claim to the local Blue plan requires, then the administrative savings associated with that claim equal the difference in the time required, multiplied by the wage of the person following up.

17. This work of following up is sometimes performed by a medical professional, such as a physician or nurse practitioner. More commonly, the work will be performed by a staff member trained as a medical assistant or in billing and medical records management. Therefore, assuming that a medical records specialist performs all of this work will yield a conservative estimate of the average hourly wage for those who perform this work. For some smaller practices, it may be a higher level administrative or clinical staff member following up because that staff member is also providing medical record support and assistance given the limited number of staff members overall in the practice.

18. It is important to note that when the settlement's injunctive relief that would save a medical provider from these administrative and often tedious tasks, this freed-up time could be used to see more patients, which would generate additional revenue for the medical providers and facilities. For many providers, who bill on a service-by-service basis for patient care, even 15 minutes of time saved per day could result in one more patient being seen. Although I have not tried to quantify the additional revenue that providers could earn, I believe it is significant,

especially in smaller clinical locations where staff are doing this work instead of their regular clinical or administrative functions (where there are no staff redundancies or overlap).

*Administrative Savings from Quicker Eligibility Verification and Pre-Authorization*

19.    Based on my research and surveys, about 60–80% of BlueCard claims require the provider to verify the member's eligibility. Doing so typically requires between 5 and 10 minutes. For local claims, verifying the member's eligibility typically requires between 30 seconds and 5 minutes, especially if there is an online portal for verification. For both ranges, the midpoint is a reasonable estimate of the average time. The administrative savings associated with verifying eligibility equal the difference in time multiplied by the wage of the person doing the work.

20.    Based on my research and surveys, about 5.25% to 16.5% of BlueCard claims require the provider to obtain pre-authorization. I conservatively estimate that doing so requires 15 minutes on average for BlueCard claims, compared to 11 minutes on average for local claims. The administrative savings associated with obtaining pre-authorization equal the difference in time multiplied by the wage of the person doing the work.

21.    As in my analysis above, assuming that all the work is performed by a medical records or billing specialist yields a conservative estimate of the average hourly wage for those who perform this work.

*Other Sources of Value to Providers*

22.    My focus on administrative savings in this declaration should not be interpreted to mean that they are the only source of value to healthcare providers in the settlement agreement. Based on my familiarity with healthcare providers and the issues they face, each of the injunctive relief provisions contained in Paragraphs 11–26 of the settlement agreement will provide substantial value to eligible providers who do not opt out of the settlement through increased

transparency, improved access to plan and patient information, and consistency and commonality of claims data available to providers for BlueCard claims, including information about eligibility, benefits, coverage, claims processing, adjudication and payment and claims denials, appeals and reprocessing.  In addition, sections of the settlement that speak to value-based care arrangements and opportunities for physicians to work with Blue plans for the benefit of their patients and share in savings highlights the very real possibility of both enhanced compensation for patient care and improved patient care outcomes.

23.    Lack of timely payments and associated interest costs providers millions of dollars annually, often forcing them to rely on costly collection agencies that charge 20–35% of the outstanding debt. The settlement's prompt payment provisions and requirements for Blues plans offer a transformative solution, reducing delays and the financial burden providers face. By ensuring payments are made more promptly, providers can not only avoid excessive collection costs but may also benefit from additional revenue if these plans previously delayed payments. The injunctive relief will also enable healthcare providers to identify, track, appeal, and reverse BlueCard claims that are denied, pended, or otherwise delayed. The result would be a significant increase in revenue for healthcare providers.

24.    Furthermore, the resolution mechanisms established by the settlement, including a designated executive within each Blue plan to handle disputes, streamline the process of resolving issues related to BlueCard claims. This ensures faster payment resolution, minimizes the need for costly legal or administrative interventions, and reduces the stress of prolonged disputes. Ultimately, these mechanisms enable providers to allocate resources more effectively while maintaining timely access to funds.

25.     The real-time messaging improvements between Blues plans under the settlement provide significant timesaving and cost-saving benefits for providers. Currently, providers spend 5–10 minutes per patient on phone calls to gather information, impacting up to 10–15% of Bluecard patients. With clinical team members such as RNs or MAs often handling these inquiries, this creates inefficiencies in patient care workflows. By enabling instant communication between host and home plans, providers can receive accurate information faster, improving decision-making on claims, coverage, medical necessity, and care delivery. This not only saves time but reduces administrative costs and burdens, allowing providers to focus more on patient care.

26.     Beyond the improvements in pre-authorization due to expanded access to data, the Blue Cross Blue Shield Association has agreed to promulgate guidance to Blue Plans to improve their prior authorization process, including recommendations for selective application of prior authorization, prior authorization program review and volume adjustment, transparency in communication regarding prior authorization, and automation to improve transparency and efficiency. That guidance will be not less than what is set out in the Consensus Statement on Improving the Prior Authorization Process that BCBSA agreed to along with AHIP, the American Medical Association and the American Hospital Association.

27.     In addition to these benefits, healthcare providers who can offer improved access to care for their patients will benefit from being relatively attractive, compared to their peers who do not participate in the settlement's injunctive relief.

*Sources of Value to Patients*

28.     Much of the injunctive relief contained in the settlement will not only benefit providers who do not opt out, but it will directly benefit those providers' patients as well.

9

29.     The settlement significantly improves pre-authorization for BlueCard claims. Paragraph 14 of the settlement agreement will allow providers to access preauthorization requirements for BlueCard claims in the same way that they do for local claims. The Real-Time Messaging System and the BlueCard Executive (Paragraphs 15 and 16) will further streamline the pre-authorization process. And if pre-authorization is initially denied, the Blue Plan Common Appeals Form (Paragraph 21) will streamline the appeal for ease of use and timeliness of determination (decision). Patients of providers who do not opt out will benefit from pre-authorizations that are more timely and less likely to be denied for administrative reasons, such as the provider not knowing what materials must be submitted with a pre-authorization request. In addition to improvements in care itself, having pre-authorization timely resolved will increase patients' trust in the healthcare delivery and health insurance systems.

30.     More timely and accurate adjudication of BlueCard claims will reduce the financial burden on patients as well. Sometimes, a service may be covered, but the patient's deductible will depend on the circumstances of that service (for example, a colonoscopy may be preventive or diagnostic). Or a benefit may be limited based on where it is provided (for example, a hospital or a physician's office). The injunctive relief in the settlement agreement, including the Minimum Data Requirements in Paragraph 20, will provide more information to providers for BlueCard claims. When insurers clearly outline how claims are processed and paid, it reduces confusion and ensures that patients are not blindsided by unexpected costs. This clarity empowers patients to make informed decisions about their healthcare, balancing medical needs with financial considerations and improving access to care because all necessary medical and benefits information will have been transmitted and received by all parties involved in the service determination, provision and payment.

31.    When payment processes are more streamlined and predictable, providers can devote more time and resources to patient care rather than administrative tasks. This allows healthcare providers to focus on building stronger relationships with their patients, fostering communication, and delivering personalized care. Over time, this shift can contribute to better health outcomes, as patients are more likely to follow treatment plans and engage in preventive care when they feel supported and valued within a transparent system where coverage and cost information is known up front and there are few to no pre- or post-care surprises.

32.    The settlement agreement also makes it easier for providers to offer telehealth services to patients outside their local area, contingent on federal and state law and regulations. (Paragraph 24.) The benefits of telehealth services and access are transformative for patients, offering convenience, improved access to care, and emotional reassurance. It provides convenience and flexibility, reducing the travel burden, saving time, and making care available outside of normal business hours. It helps bypass expensive alternatives such as the Emergency Room or even urgent care centers. In fact, in rural and underserved areas it is a tremendous benefit in improved access to care because it eliminates the need for personal and even public transportation (which often does not exist in rural locations).  Those who are mobility impaired also receive great benefit from telehealth services. Telehealth also advances and promotes better quality care through post treatment or post-surgery follow up care and check ins that often cannot be done simply through a phone call when visual information and evidence of condition and maintenance of treatment are necessary. It can also be used as a conduit and even supplement for medical specialty care that often is not readily available in rural and even some urban areas. When providers who do not opt out of the settlement improve the availability of their telehealth services,

many patients will benefit, especially those with often limited physical access to a provider because of physical or geographic considerations.

33.     There are other areas of the settlement that provide providers as well as patients some significant and ongoing benefit that may not be able to be quantified as well as some of the other areas, but are nonetheless beneficial in their own right as changes to how insurers and providers engage with each other through the BlueCard program for the benefit of patient care.

34.     The settlement's prompt payment provisions also directly benefit patients by fostering a more collaborative relationship between providers and insurers. By reducing the window between claim submission and payment determination, patients are kept out of payment disputes, which often strain their interactions with both parties. Additionally, many providers delay billing patients until they receive final payment determinations from Blue plans. With faster payment processing, patients can receive their bills sooner, avoiding weeks or months of uncertainty about their financial responsibility.

35.     The enhanced real-time messaging system between Blues plans improves the flow of critical information, ensuring faster resolution of coverage and care decisions. For patients, this means quicker access to necessary treatments and reduced delays caused by administrative bottlenecks. In cases of appeals or disputes related to care or payment, this streamlined communication benefits patients by expediting resolutions that otherwise might take weeks.

36.     The settlement's requirements for better third-party information management further protect patients by reducing errors in claims submission and billing. Coordination of Benefits (COB) information at the point of care eliminates confusion, leading to more accurate and timely claims processing. According to Change Healthcare's 2020 Revenue Cycle Denials Index, 85% of denials are preventable, with over a quarter tied to missing or inaccurate third-party

information. Addressing this issue reduces denial rates, improves claims accuracy, and prevents patients from being caught between insurers over payment responsibilities.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on January 31, 2025.

_____
Matthew C. Katz

13

# Exhibit 1

# CURRICULUM VITAE
# Matthew C. Katz, MS

10 Pequot Court
Monroe, CT 06468

## Employment/Positions

### MCK Health Strategies LLC and MCK Consulting LLC

*Principal December 2019 – Present*

Advise state and national medical specialty societies on health care policy, advocacy efforts, and initiatives, and work with physician practices, hospitals, health systems and medical management companies on the understanding and use of health information technologies. Specialized in medical practice audit review and payer dispute resolution processes, along with addressing health care implementation barriers for clients. Provide support, assistance and guidance to medical societies, device manufacturers and technology companies on AMA Current Procedural Terminology (CPT) and AMA Resourced Based Relative Value Scale Update Committee (RUC) processes. Advise physicians and other healthcare professionals and assist them in navigating the health care delivery, claims billing, processing, adjudication, payment and denial labyrinth of health insurers and other third-party payors as well as governmental agencies.

### Connecticut State Medical Society

*Executive Vice President/CEO, January 2012 – November 2019.*
*Executive Vice President, September 2008 – December 2011.*
*Executive Director, May 2006 – September 2008.*

Coordinate the strategic development of all CSMS initiatives associated with legislation, regulation, general advocacy, education, and membership. Supervise a staff of 16 full, part time and contract employees, as well as outside legal counsel, and outside lobbying staff. Facilitate and coordinate all business development related programs and services for members and the organization. Initiate all outreach and interactions with state and federal legislators, regulators, advocacy organizations and other interested parties.

### American Medical Association

*Director, Private Payer Advocacy; July 2004 - May 2006.*
*Director, Practice Management Resource Center; December 2005 - May 2006.*

Coordinated the development of AMA initiatives related to physician practice advocacy, most notably the AMA's prompt payment campaign and physician practice management activities, including claims processing and physician payment services; provided managed care litigation support and technical assistance.

*Strategy Manager, Private Sector Advocacy; June 2000 - July 2004.*

Assisted in the coordination and development of AMA activities designed to identify and address managed care and health plan unfair business practices, including those issues most closely associated with the financial stability of health insurers and physician practices, as well as physician billing practices.

*Senior Health Policy Associate, Division of Health Policy Development; July 1998 - June 2000.*

Assisted in the design and development of AMA socioeconomic policy related to physician reimbursement issues and other payment systems; provided staff support and assistance to the Council on Medical Service; facilitated the coordination of payment timeliness campaign with state and county medical associations.

### Northwestern Memorial Hospital

*Financial Analyst, Department of Managed Care; July 1997 - July 1998.*

Analyzed hospital case-mix database for managed care contracts and provided insight into the potential profitability of managed care contracts and specified services.

American Academy of Pediatrics
*Health Policy Analyst, Division of Physician Payment Systems; June 1995 - July 1997.*
Assisted in the establishment of Medicare RBRVS, managed care, and physician reimbursement policies; developed pediatric CPT and ICD-9-CM coding resources and maintained all coding and RBRVS services.

Medica Health Plans, Allina Health Systems / United Health Care Corporation
*Intern- Government Programs; June 1994 - June 1995.*
Researched and assisted in the development of Medicaid and Medicare marketing and sales strategies, as well as statistically analyzed demographic and geographic information.

University of Minnesota, Institute for Health Services Research
*Research Assistant; January 1994 - June 1994.*
Researched and analyzed Medica Provide-A-Ride Project Transportation System; compliance and rules.

## Education

University of Minnesota, Institute Health Services Research and Policy
*Master of Science, Health Services Research and Policy; September 1995 (School of Public Health).*
Academic Honors: Fellowship 1994/1995

Loyola University, Chicago
*Economics coursework, June 1993 – August 1993.*

University of Wisconsin - Madison
*Bachelor of Science, History and Sociology, August 1993.*
Academic Honors: Graduation with Distinction; Distinction in Major: History; Deans List – 1991/1992, 1992/1993; Alpha Kappa Delta Honors Fraternity in Sociology; Senior Thesis in Sociology

Brandeis University
*August 1989 – May 1990.*

## Programs

Yale School of Management
Executive Education, April 27 – 29, 2012. Connecticut State Medical Society Physician Leadership Program

Kellogg School of Management of Northwestern University
Executive Programs, April 8 – 10, 2010.  The Physicians Foundation Leadership Academy

Kellogg School of Management of Northwestern University
Executive Programs, October 26 – 28, 2008.  American Medical Association Leadership Seminar

## Associations

American Association of Medical Society Executives (AAMSE), Board member, 2010- 2013; member, 2001 – present; speaker Annual Conference, 2021, 2022, 2023 and 2024; sponsor 2022, member nominations committee 2024.

Medical Group Management Association (MGMA), member, 2004 – present; Connecticut Chapter, member, 2006- present.

2

Society of Physician Entrepreneurs (SOPE), member, 2021-present.

Digital Medicine Society, member, 2021-present

Chicago Health Executives Forum (CHEF), Treasurer, 2003, Immediate Past-President, 2002, President, 2001, Secretary/Treasurer, 1999 & 2000, life member (2003- present).

Medical Cannabis Research Advocacy Alliance (MCRAA), President, 2019- present; executive director (via management company) 2020- present.

American College of Healthcare Executives (ACHE), member, 2001 - 2006, Regent's Advisory Council (RAC) - Northern Cook County, 2003 – 2006, member, 2001 – 2008.

Connecticut Association of Healthcare Executives (CAHE), member, 2006 – 2010.

Connecticut Society of Association Executives (CSAE), member 2007- 2012.

Health Information Management Systems Society (HIMSS), member, 2002 - 2003, 2005 – 2006, 2008- 2011.


## Boards, Committees and Task Forces

American Association Medical Society Executives (AAMSE) Board member, 2010- 2013, Trends Task Force, member, 2008/2009 and 2011/2012, State Medical Society CEO Committee Co-Chair, 2011- 2013 and Chair, 2013-2015, Nominating Committee 2024.

Connecticut Health Insurance Exchange (Access Health CT) Small Business Health Options Program (SHOP) Committee, 2012 – present.

Physicians Advocacy Institute, Inc, Board member, 2006 - 2019, Data Subcommittee Chair, 2007 – 2015, Research Subcommittee Chair, 2015 - 2019.

Connecticut State Medical Society Charitable Trust, Board member, 2007 – 2019.

Connecticut Health Information Technology Advisory Committee, member, 2016 –2017.

HealthyCT, CO-OP, Founding Board member, 2011 – 2016, Compliance Committee, 2013 –2016.

CTHealthlink, Connecticut's Health Information Exchange (HIE), founding board member, 2017- 2019.

Regional Adaptation for Payer Policy Decisions (RAPiD) Advisory Board of the Comparative Effectiveness Public Advisory Council (CEPAC), (later ICER), member, 2011- 2021.

Access Health Analytics (AHA), Connecticut All Payer Claims Database (APCD) Advisory Committee, 2012 – present, Policy and Procedures Subcommittee, Chair 2014 – 2020.

Complex Care Committee of Connecticut's Council on Medical Assistance Program Oversight, 2012 – 2020, Executive Committee, member, 2012 – present, Model Design Workgroup, member, 2013 - 2020.

State of Connecticut Workers' Compensation Commission Medical Advisory Panel, member, 2013- 2019.

Connecticut State Innovation Model (SIM) Health Information Technology (HIT) Committee, member, 2014 – 2016.

3

100th Anniversary Symposium Planning Committee Connecticut Workers Compensation Commission, 2013.

Connecticut Governor's Hospital System Strategic Task Force, member, 2007 – 2008.

The South Central Connecticut Chapter of the American Red Cross, Centennial Gala Committee member, 2007 – 2008.

## Publications, Reports and Resources

Aseltine, Robert H, Jr, PhD; Wang, Wenjie, PhD; Benthian, Ross A MD, MPH; Katz, Matthew MS; Wagner, Catherine, EdD; Yan, Jun, PhD; and Lewis, Courtland, MD. Reductions in Race and Ethnic Disparities in Hospital Readmission Following Total Joint Arthroplasty from 2005 to 2015.  *Journal of Bone and Joint Surgery. Volume 101, No 22, November, 2019.*

Aseltine, Robert H, Jr, PhD; Yan, Jun, PhD; Fleischman, Steven, MD; Katz, Matthew MS; DeFrancesco, Mark, MD. Racial and Ethnic Disparities in Hospital Readmissions After Delivery.  *Obstetrics & Gynecology. Volume 126, No 5, November, 2015.*

Aseltine, Robert H, Jr, PhD; Benthien, Ross A, MD, MPH; Yan, Jun, PhD; Katz, Matthew C, MS; Wagner, Catherine, EdD; Lewis, Courtland G, MD. Race and Ethnic Disparies in Hospital Readmissions Following Total Joint Arthroplasty.  American Academy of Orthopedic Surgeons (AAOS). 2015

Aseltine, Robert H, Jr, PhD; Yan, Jun, PhD; Gruss, Claudia, MD; Katz, Matthew C, MS; Wagner, Catherine, EdD, Connecticut Hospital Readmissions Related to Chest Pain and Heart Failure; Differences by Race, Ethnicity, and Payer.  *Connecticut Medicine.  Volume 79, No. 2, February, 2015.*

Long, Theodore, MD; Katz, Matthew C, MS; Hass, David, MD, Young Physicians' Leadership Curriculum: A Novel Approach to Creating Future Physician Leaders and Health Policy Advocates.  *Connecticut Medicine.  Volume 79, No.1, January, 2015.*

Aseltine, Robert H, Jr, PhD; Lewis, Courtland G, MD; Yan, Jun, PhD; Benthien, Ross A, MD, MPH; Katz, Matthew C, MS; Race and Ethnic Disparies in Hospital Readmissions Following Total Joint Arthroplasty.  American Association of Hip and Knee Surgeons (AAHKS). *Poster board session, November 7, 2014.*

Van Hoff, Todd, MD; Katz, Matthew C, MS; Lalime, Kenneth, Using an Expanded Outcomes Framework and Continuing Education Evidence to Improve Facilitation of Patient-Centered Medical Home Recognition. *Teaching and Learning in Medicine.  January, 2014.*

Aseltine, Robert H, Jr, PhD, Katz, Matthew C, MS and Holmes, Christi, Providing medical Care to Diverse Populations; Findings from a Follow-Up Survey of Connecticut Physicians. *Connecticut Medicine.  Vol. 75, No.6, June/July 2011.*

Aseltine, Robert H, Jr, PhD, Katz, Matthew C, MS., and Honig Geragosian, Audrey, Adoption of the Medical Home in Connecticut. *Connecticut Medicine.  Vol. 74, No.10, November/December 2010.*

Aseltine, Robert H, Jr, PhD, Katz, Matthew C, MS., and Honig Geragosian, Audrey, Connecticut 2009 Primary Care Survey: Physician Satisfaction, Physician Supply and Patient Access to Medical Care. *Connecticut Medicine. Vol. 74, No.5, May 2010.*

Aseltine, Robert H, Jr, PhD, Katz, Matthew C, MS., Providing medical Care to Diverse Populations; Findings from a Survey of Connecticut Physicians. *Connecticut Medicine.  Vol. 73, No.9, October 2009.*

Aseltine, Robert H, Jr, PhD, Katz, Matthew C, MS., Connecticut Physician Workforce Survey 2008:  Initial findings on Physician Perceptions and Potential Impact on Access to Medical Care*.  Connecticut Medicine. Vol. 72, No.9, October 2008.*

4

Aseltine, Robert H, Jr, PhD, Katz, Matthew C, MS., and Honig Geragosian, Audrey. Connecticut Physician Workforce Survey 2008: Final Report on physician Perceptions and Potential Impact on Access to Medical Care. September 2008.

Hillson S.D., Katz M., Feldman N.J., "Effects of a Transportation Program for Medical Assistance Patients on Resource Use." *Clinical Research. Vol 42, No.3, October 1994*.

Hillson, Steve D, MD, MSC, Katz, Matthew, BS, Dowd, Bryan, PhD., Effects of a Transportation Program for Medicaid Patients. University of Minnesota, Institute for Health Services Research. Final Report, October, 1994.

### *Connecticut State Medical Society Resources:*
Executive Director/Executive Vice President Desk- *Connecticut Medicine* 06/2006 – 11/2019 (monthly).
Executive Director/Executive Vice President Report- *CSMS Action Newsletter* 07/2006 – 10/2019 (quarterly).

### *American Medical Association Resources:*
*The tangled web: the rental network PPO industry.* December 2005.
Read your contracts: Is your practice losing revenue through rental network PPOs? December 2005.
Medicare Advantage: What it means to you and your patients. June, 2005.
"The Aetna and CIGNA Settlements: What they mean for you." *CPTAssistant*. January/February, 2005.
What to do about Unfair Payer Practices? December, 2004.
*Understanding your health insurance policy and payment practices.* December, 2004.
*How to prepare for a health plan retrospective audit.* December, 2004.
*A guide to working with health plan representatives.* December, 2004.
How to Perform a Physician Practice Internal Billing Audit. July, 2004.
*Claims submission and processing - Wall Chart.* February, 2004.
Claims Management Resource Kit. January, 2004.
AMA HIPAA Complaint Form. December, 2003.
*How to select a billing software vendor for the physician practice?* June, 2003.
*What is a Clearinghouse?* June, 2003.
*What is an Application Service Provider?* June, 2003.
AMA National Prompt Payment Brochure. June, 2002.
Benchmark Capitation Rates: The Physicians How-to-Guide for Calculating Fee-for-Service Equivalents. December, 2001.
AMA Health Plan Complaint Form. December, 2001.
*When the Check's Not in the Mail.* June, 2000.
AMA Prompt Payment Survey Templates. October, 1998 and January, 2000.

### *American Academy of Pediatrics Resources:*
ICD-9-CM Pediatric Coding Flip Chart. February, 1997.
RBRVS: What is it and how does it affect pediatrics, vol. I & II, February 1996 & 1997..
"1997 CPT Manual Includes Orthopedic, Cardiology Coding Changes." *AAP News*. January, 1997
RBRVS Resource Kits. January, 1997.
"New Coding Procedures Established Under ICD-9-CM." *AAP News*. November, 1996.
"Dispelling Myths Surrounding Correct CPT Code Use." *AAP News*. November, 1996.
"AAP Pushes for Pediatric Specific Codes." *AAP News*. September, 1996.
"AAP Pushes Pediatric Involvement in RBRVS." *AAP News*. April, 1996.

5

## Presentations

"Physician Employment Trends Georgia."  President's Quarterly Review, Medical Association of Georgia, December 2024 (Atlanta, Georgia, live session remote, edited and posted for viewing).

"Physician Employment Trends New Mexico."  New Mexico Medical Society Legislative Session, December 2024 (Albuquerque, New Mexico, live session remote).

"Maryland Physician Employment Data."  Lunch and Learn, Medchi (Maryland State Medical Society), December 2014 (Live Session, remote).

"Connecticut Landscape:  What Has Changed, What Has Remained the Same."  Physicians For Women's Health, Women's Health Connecticut Annual Meeting, November 2024 (Berlin, Connecticut).

"Common Pitfalls in Medical Practice:  What Not to Do."  Medical Group Management Association Connecticut Best Practices Symposium, November 2024 (Mystic, Connecticut)

"Employment Perceptions and Wellbeing Nebraska."  Nebraska Medical Association educational program, September 2024 (Omaha, Nebraska, live session remote).

"Employment and Employment Perceptions Alabama."  Medical Association of the State of Alabama Board Meeting, September 2024 (Montgomery, Alabama, presentation remote).

"Employment Trends and Employment Perceptions New Mexico."  New Mexico Medical Society Board Meeting, August 2024 (Albuquerque, New Mexico, live session remote).

"Employment Trends and Employment Perceptions Iowa."  Iowa Medical Society Board Meeting, August 2024 (Des Moines, Iowa, presentation remote).

"Trends in Physician Employment and Physician's Perceptions on Employment in the US."  American Association of Medical Society Executives Annual Conference, Educational Session, Savannah, Georgia, July 2024.

 "Employment Trends and Employment Perceptions Tennessee."  Tennessee Medical Association Board Meeting, July 2024 (Nashville, Tennessee, presentation remote).

"Employment and Employment Perceptions North Carolina." North Carolina Medical Society Board Meeting, June 2024 (Raleigh, North Carolina, presentation remote).

"Medical Practice Employment and Ownership."  California Medical Association Board Meeting, Sacramento, California, April 2024.

"Medical Practice Employment and Ownership."  Hawaii Medical Association educational session, January 2024 (Honolulu, Hawaii presentation remote).

"The Changing Landscape for Virtual Care Service Provision."  The South Carolina Medical Association educational session, August 2022 (session remote).

"Trends in Physician Employment:  COVID-19's Impact on Acquisition of Physician Practices and Physician Employment 2019-2021."  American Association of Medical Society Executives Annual Conference, Austin, Texas.  July 2022.

"PRx Panel Discussion Moderation." Precision Health Virtual Summit August 31 – September 1st. Hc1 July 2021.

6

"COVID-19's Impact On Acquisitions of Physician Practices and Physician Employment 2019-2020." American Association of Medical Society Executives Annual Meeting.  June 2021 (remote).

"Medical Payment Policy and Clinical Use of Telehealth Technologies for Physical Therapists."  Kansas Physical Therapy Association (APTA Kansas Chapter), remote, February 2021.

"Understanding Revenue Loss and Expenditures COVID-19 Pandemic." AAMSE State and National Medical Specialty Society CEO Presentation, October 2020 (session remote).

"Responding to COVID-19: Telehealth Expansion and Practice Implementation." The South Carolina Medical Association educational May 2020 (session remote).

"Responding to COVID-19:  Telehealth Expansion and Practice Implementation."  Physicians Advocacy Institute, Inc educational April 2020 (session remote).

"How MCRA Came to Be."  Connecticut State Medical Society.  North Haven, Connecticut. January 2017.

"Cancer and Health Policy:  Post-Election Analysis and Implications."  Connecticut Cancer Partnership Annual Meeting. Hartford, Connecticut.  December 2016.

"From SGR to MACRA, Where We Are and Where We Are Headed." QIN-QIO, MACRA Educational Program, Wethersfield, Connecticut. December 2016.

"Medicare Reform and State Level Reform." Connecticut Ear Nose and Throat Society, Annual Meeting, November 2016.

"MACRA MIPS and APM:  What you Need to Know for 2017."  HealthyCT educational session.  November 2016.

"Federal and State Legislative and Regulatory Changes Impacting Your Practice," Connecticut Ear Nose and Throat Society, Annual Meeting, June, 2015.

"Healthcare Reform and How it Impacts Practice," Connecticut Eye Society, Annual Meeting, January, 2014.

"Healthcare Reform and the Practicing Physician," Connecticut Ear Nose and Throat Society, Annual Meeting, November, 2013.

"Healthcare Reform in Connecticut and Surgeons," Connecticut Chapter of the American College of Surgeons, Annual Meeting, November, 2013.

"The Birth of an Independent Not For Profit Health Insurer- HealthyCT."  Connecticut Urology Society Annual Meeting. September, 2013.

"Disaster Preparedness- Steady Habits Pay Off."  American Association of Medical Society Executives (AAMSE) 2013 Annual Meeting.  July, 2013

"Health Insurance Exchanges and All Payer Claims Databases: Are State Medical Societies Participating." American Association of Medical Society Executives (AAMSE) State CEO Meeting. November, 2012.

"State CEO Contracts."  American Association of Medical Society Executives (AAMSE) State CEO Meeting. November, 2012.

"Introduction of the Patient Centered Medical Home:  From Concept to Practical Application."  Connecticut Multicultural Health Partnership. June, 2012

7

"Introduction of the Patient Centered Medical Home:  From Concept to Practical Application."  Griffin Hospital Grand Rounds and Residency Training Program. February, 2012

"CSMS and CT ACS Working Together on Advocacy Initiatives."  Connecticut Chapter of the American College of Surgeons (CT ACS) Annual Meeting. November, 2011.

"Care in Context:  The Physicians' Role in Reducing Racial and Ethnic Health Care Disparities."  Connecticut State Medical Society Physician Health and Education Fund Presentation to UCONN Grand Rounds."  September, 2011.

"Health Insurance CO-Ops and other Payment Reform Models."  American Association Medical Society Executives (AAMSE) 2011 Annual Meeting Preconference presentation. July, 2011.

"Health System Reform:  Where We Are and What the Future May Hold."  Connecticut Academy of Physician Assistants Annual Meeting (ConnAPA). April, 2011.

"Health System Reform:  Where We Are and What the Future May Hold."  Waterbury Medical Association (WMA) Annual Meeting. February, 2011.

"How to Advocate for Physician Payment," Panel Discussion.  American Association Medical Society Executives (AAMSE) 2008 Annual Meeting. July, 2008.

"Physician Profiling:  The Good, the Bad and the Ugly."  The Maine Medical Association Practice Management Summit.  May, 2008.

"Private Payer Business Practices Today and Tomorrow."  Keynote Speaker.  2nd Annual Private Payer Summit.  February, 2006.

"Understanding the Claims Processing Benefits of the MDL Settlements."  California Medical Association, Santa Clara County Medical Society, and American Medical Association Meeting on Holding Health Plans Accountable under the MDL Settlements.  November, 2005

"AMA Private Sector Advocacy."
        Medical Society of the District of Columbia (MSDC) Forum for Young Physicians.  April, 2005.
        Nevada Medical Group Management Association (NMGMA) Annual Meeting.  November, 2004.
        Indiana State Medical Association (ISMA) Private Sector Advocacy Forum.  October, 2004.

Challenging Unfair Health Plan Business Practices."
        Healthcare Billing Management Association (HBMA) Fall Conference.  September, 2003.
        American Academy of Professional Coders (AAPC) 11th Annual Conference.  April, 2003.

"Physician Reimbursement:  Getting Your Contracted Rate."  21st Annual American Association of Medical Society Executives (AAMSE) Annual Conference.  July, 2002.

"AMA's Campaign to Promote Timely Payment."  American Medical Association (AMA) 6th Annual AMA RBRVS Symposium.  November, 2001.

"Dealing with State Regulators Best Practices and Strategies."  American College of Emergency Physicians (ACEP) Leadership and Legislative Conference.  May, 2001.

"AMA Prompt Payment Initiative."
        Medical Society of New Jersey (MSNJ) Physicians Conference 2001.  April, 2001.
        Greater Albuquerque Medical Association (GAMA) Membership Meeting.  May, 1999.
        AMA Advocacy Resource Center /State Legislative Conference.  January, 1999.

8

"Managed Care, Medicaid and Medicare."  Ohio State University Medical School.  January, 2001.

"AMA Advocacy Resource Center Campaign to Promote Timely Payment."  American College of Obstetricians Gynecologists (ACOG) Legislative Conference.  April, 1999.


## Professional Service Awards

American Association of Medical Society Executives (AAMSE) Certificate of Appreciation. Board of Directors 2010 – 2013.  July, 2013.

Connecticut Association of Physicians of Indian Origin (CAPI) Certificate of Achievement Award. April, 2008.

Chicago Health Executives Forum (CHEF) Lifetime Membership award. January, 2006.

American College of Healthcare Executives (ACHE) Northern Cook County Regents Advisory Council (RAC) Young Healthcare Executive of the Year Award. November, 2003.

Oregon Medical Association (OMA) Presidential Citation. April, 2001.

9