FILED

2025 Feb-02 PM 09:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **IN RE:**<br>**BLUE CROSS BLUE SHIELD**<br>**ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This Document Relates to**<br>**Provider Track Cases** |

## MEMORANDUM OF LAW IN SUPPORT OF THE PROVIDER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND EXPENSES

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 3

    I.      Summary of the Litigation ....................................................................... 3

    II.     The Settlement Agreement ...................................................................... 13

ARGUMENT ...................................................................................................................... 18

    I.      The Provider Plaintiffs' Request for 23.47 Precent of the Common Fund
          is Reasonable ........................................................................................... 18

          A.     The Request is Presumptively Reasonable ............................... 19

          B.     The *Johnson* Factors Confirm That the Request Is Reasonable ............... 20

          C.     A Lodestar Cross-Check Supports the Request as Well ........................... 26

    II.     The Court Should Approve the Provider Plaintiffs' Request for Costs and
          Expenses ................................................................................................. 26

CONCLUSION .................................................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Camden I Condominium Ass'n v. Dunkle,*
    946 F.2d 768 (11th Cir. 1991) .............................................................. 19, 20, 26

*Carter v. Forjas Taurus, S.A.,*
    701 F. App'x 759 (11th Cir. 2017) ................................................................... 12

*Columbus Drywall & Insulation, Inc. v. Masco Corp.,*
    2012 WL 12540344 (N.D. Ga. Oct. 26, 2012) .............................................. 22, 23, 24, 25

*Cotton v. Hinton,*
    559 F.2d 1326 (5th Cir. 1977) ......................................................................... 21

*Faught v. American Home Shield Corp.,*
    2010 WL 10959222 (N.D. Ala. Apr. 27, 2010) ................................................. 22

*Faught v. American Home Shield Corp.,*
    668 F.3d 1233 (11th Cir. 2011) ................................................................... 19, 23

*In re Blue Cross Blue Shield Antitrust Litig. MDL 2406,*
    85 F.4th 1070 (11th Cir. 2023) ................................................................. 19, 20, 28

*In re Blue Cross Blue Shield Antitrust Litig.,*
    26 F. Supp. 3d 1172 (N.D. Ala. 2014) ............................................................... 5

*In re Blue Cross,*
    225 F. Supp. 3d 1269 (N.D. Ala. 2016) ............................................................. 5

*In re Blue Cross,*
    308 F. Supp. 3d 1241, 1267 (N.D. Ala. 2018),
    *appeal denied*, 2018 WL 7152887 (11th Cir. Dec. 12, 2018) ...................................... 5, 9

*In re Home Depot, Inc.,*
    931 F.3d 1065n.25 (11th Cir. 2019) .................................................................. 26

*Johnson v. Georgia Highway Express, Inc.,*
    488 F.2d 714 (5th Cir. 1974) .................................................................... *passim*

*Missouri v. Jenkins,*
    491 U.S. 274 (1989) ...................................................................................... 26

*Monroe Cnty. Emps. Ret. Sys. v. Southern Co.,*
    2021 WL 451670 (N.D. Ga. Feb. 5, 2021) ......................................................... 22

*Ohio v. American Express Co.*,
    585 U.S. 529 (2018)....................................................................................... 10

*Poertner v. Gillette Co.*,
    618 F. App'x 624 (11th Cir. 2015) ............................................................... 12

**Statutes**

28 U.S.C. § 1292(b) ............................................................................................... 8, 9

**Rules**

Fed. R. Civ. P. 12(b)(6)........................................................................................... 8

Fed. R. Civ. P. 23(h) ............................................................................................ 26

## INTRODUCTION

The Provider Plaintiffs' settlement represents a groundbreaking resolution in one of the most complex and significant antitrust cases in recent history. Over twelve years of vigorous litigation and negotiations, the Providers' counsel achieved a settlement that includes $2.8 billion in monetary relief and injunctive relief valued at more than $17 billion. This result not only provides direct compensation to the class but also delivers significant changes to the Blues' system that will enhance competition and benefit healthcare providers who participate in the settlement. Such transformative outcomes are rarely seen in antitrust litigation and reflect the extraordinary efforts and skill of the Providers' counsel.

To secure these results, the Providers' counsel undertook a daunting task. From the outset, this case required navigating an intricate web of legal and factual issues, a defense mounted by some of the nation's most sophisticated and well-resourced counsel, and a monumental volume of discovery. Providers' counsel reviewed millions of documents, conducted and defended dozens of depositions, and engaged in exhaustive economic and industry analysis. These efforts required meticulous coordination among numerous teams of attorneys and experts. The legal challenges included addressing complex questions of antitrust law, such as market definition, competitive effects, and damages calculations—each requiring significant expertise and innovation. In total, Providers' counsel logged over 373,000 hours litigating this case—an effort that speaks to the enormous scope and complexity of this litigation.

The settlement's value is equally extraordinary. The $2.8 billion monetary fund is among the largest in antitrust history, ensuring substantial compensation to the class. However, the settlement's injunctive relief elevates its significance even further. This relief is transformative, addressing longstanding systemic issues that have frustrated Providers, especially with respect to the BlueCard Program. With an expert valuation of at least six times the monetary relief, this

injunctive relief ensures that the settlement's impact will be felt by healthcare providers who participate in the settlement for years to come.

This motion seeks attorneys' fees of 23.47% of the common fund, the same percentage this Court awarded the Subscribers' counsel, which the Eleventh Circuit affirmed. The requested fees reflect the immense effort, significant risks, and exceptional results achieved by the Providers' counsel. The requested fees are calculated as a percentage of the common fund, consistent with well-established Eleventh Circuit precedent. The percentage method—endorsed in *Camden I* and reaffirmed in subsequent cases—ensures a fair alignment between the interests of the class and class counsel, incentivizing efficient and effective representation. This approach has consistently been recognized as a fair and equitable method for determining attorneys' fees in complex litigation. The requested fee is especially reasonable in light of the exceptional injunctive relief contained in the settlement agreement; it amounts to just 4.3% of the monetary relief and present value of the injunctive relief.

Although further justification of the requested fee is arguably unnecessary because it falls below the benchmark rate of 25%, the *Johnson* factors and a lodestar cross-check both confirm that the fee is reasonable. The requested fees reflect the substantial risks assumed by Providers' counsel. This case was litigated entirely on a contingency basis, requiring counsel to advance significant financial resources without any guarantee of recovery. The litigation's duration and scope added to this risk, as counsel faced procedural hurdles, aggressive defense strategies, and the inherent uncertainties of antitrust litigation. Providers' counsel were tasked with navigating an evolving legal landscape, responding to novel defense arguments, and ensuring compliance with a demanding schedule of discovery and pre-trial motions. The financial and professional risks were compounded by the case's complexity, involving intricate economic theories, detailed industry

2

analyses, and a need to coordinate with experts and stakeholders across the healthcare spectrum. The ultimate settlement—achieved after years of contentious negotiation and litigation—stands as a testament to the tenacity and skill of Providers' counsel, who devoted themselves to securing justice for the Provider class despite the significant challenges.

Notably, the Court has already approved a fee award of 23.47% in the Subscriber track of this litigation, a decision upheld by the Eleventh Circuit. As the Court knows, the Providers actively litigated this case for years after the Subscribers executed their settlement agreement. If the Subscribers' fee was reasonable, then the Providers' fee is especially so.

In addition to attorneys' fees, the Providers' counsel are requesting their actual expenses of litigation, which were contemporaneously documented throughout the case and reviewed by the Special Master. Most of these expenses are related to the Providers' experts, who synthesized many sources of data to create the most comprehensive database of hospital payments ever assembled. They used this database as the foundation for sophisticated econometric models, which supported the Providers' motion for class certification, as well as their estimates of damages. Other Provider experts opined on the competitive conditions of the health insurance industry, analyzed the Blues' financial data, and set out reasons why health insurance is not a two-sided platform. The remaining expenses reflect the Providers' immense efforts in discovery and other aspects of litigation.

## BACKGROUND

### I.    Summary of the Litigation

Prior to filing the first Provider Action in this proceeding, Provider Co-Lead Counsel extensively researched potential claims against the Blues and conferred with leading healthcare antitrust economists. Provider Co-Lead Counsel and their colleagues have a long history of representing healthcare providers of all types in litigation against health insurance companies,

including the Blues. Based on that experience, they brought extensive institutional knowledge to the case.[1]

On July 24, 2012, Provider Co-Lead Counsel filed the initial complaint in *Conway v. Blue Cross & Blue Shield of Alabama*, Case No. 12-cv-2532-RPD (N.D. Ala.). That complaint, like the operative complaint today, challenged the Blues' use of exclusive Service Areas as a restraint of trade that violates the Sherman Act. *Conway*, Doc. No. 1. The Provider Plaintiffs allege that the Blues' practices result in reduced competition, reduced choices for the administration of health care benefit plans, increased costs, less innovation and efficiency, and lower reimbursement rates to Providers. Fourth Amended Complaint, Doc. No. 1083, at ¶ 12.

In 2012, Provider Co-Lead Counsel filed briefs and made oral argument before the Judicial Panel on Multidistrict Litigation for centralization of this litigation before this Court in the Northern District of Alabama. In late 2012, the JPML centralized *Conway* and several actions by Subscriber Plaintiffs in this Court. Since that time, other Provider Actions have been filed directly in this Court or have been transferred to it by the JPML.

Even prior to their appointment as Interim Co-Lead Counsel for the Provider Actions, Provider Co-Lead Counsel began working to organize the Provider Actions and counsel for the Provider Plaintiffs ("Providers' Counsel"). They completed that process after their appointment. In 2013, they filed a Consolidated Amended Complaint, Doc. No. 86, which the Blues moved to dismiss (along with the Subscriber Plaintiffs' complaint) on numerous grounds:

- The Plaintiffs failed to allege an unlawful act because the Blues' exclusive Service Areas arose from common-law trademark rights;

- The alleged conspiracy cannot be judged by the *per se* standard;

---

[1] The Background section of this memorandum is supported by the Declaration of Co-Lead Counsel, filed as Exhibit A to the Provider Plaintiffs' motion.

- The Blues' practices are exempt from antitrust liability under the McCarran-Ferguson Act because they constitute the "business of insurance";

- The Plaintiffs failed to allege plausible markets;

- Challenges to Blue Cross and Blue Shield of Michigan's rates are barred by the filed rate doctrine.

Doc. Nos. 110, 111, 120. Many of the Blues also moved to dismiss for lack of personal jurisdiction and improper venue.

In response to the motions to dismiss, Provider Co-Lead Counsel filed briefs on issues relating solely to the Provider Plaintiffs, and they worked with the Subscriber Plaintiffs on briefs on issues relating to all Plaintiffs. Doc. Nos. 148–52, 154–56. This Court largely denied the motions to dismiss, but it allowed discovery and further briefing on the Blues' challenges to jurisdiction and venue. *In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172 (N.D. Ala. 2014).

The Plaintiffs commenced discovery on the merits, jurisdiction, and venue. After consulting with the parties, in 2015 this Court streamlined the litigation by designating the Alabama cases as bellwethers. Doc. No. 469. In 2016, the Court denied the motions to dismiss for lack of personal jurisdiction and improper venue. *In re Blue Cross*, 225 F. Supp. 3d 1269 (N.D. Ala. 2016). Over the following years, the Court ruled on several motions for summary judgment. Notably, the Court held that the "Plaintiffs have presented evidence of an aggregation of competitive restraints … which, considered together, constitute a *per se* violation of the Sherman Act." *In re Blue Cross*, 308 F. Supp. 3d 1241, 1267 (N.D. Ala. 2018), *appeal denied*, 2018 WL 7152887 (11th Cir. Dec. 12, 2018). Following the Blues' abandonment of the "National Best

Efforts" rule in April 2021, this Court held that the Plaintiffs' claims would be governed by the rule of reason for the time period following April 2021. Doc. No. 2933.

## Discovery

Discovery in this case was a massive undertaking, and nationwide in scope. The Provider Plaintiffs served discovery requests for structured data on every Defendant, and then met and conferred with each Defendant regarding that data. The Provider Plaintiffs obtained detailed information on medical claims and reimbursements from each of the Defendants, totaling many terabytes of data. With the help of their experts, the Provider Plaintiffs then vetted, synthesized, and analyzed that data, using it as an input into the most sophisticated model for hospital reimbursement ever created.

Simultaneously, the Provider Plaintiffs served requests for documents on each Defendant, and met and conferred with the Defendants regarding the scope of the requests. The Defendants produced 75 million pages of documents, which the Provider Plaintiffs reviewed both manually and through technology-assisted review. Manual review alone consumed approximately 134,000 hours of attorney time. The Provider Plaintiffs also responded to the Defendants' requests for discovery, which were served on 156 Provider Plaintiffs and nonparties. The Provider Plaintiffs collected, reviewed, and produced approximately 1.5 million pages of documents in response to the Blues' requests.

The Provider Plaintiffs also participated in more than 200 depositions of Defendants and nonparties. In addition, they defended more than 40 depositions of Provider Plaintiff class representatives and class members.

Throughout discovery, the Provider Plaintiffs litigated many discovery disputes. Providers' counsel participated in more than 30 discovery hearings, which led to the issuance of 91 discovery orders. Along with the Subscriber Plaintiffs, the Provider Plaintiffs challenged the Defendants'

privilege designations for hundreds of thousands of documents. Special Master R. Bernard Harwood ultimately de-designated, in whole or in part, over 450,000 documents from Defendants' privilege logs. In addition, Providers' Counsel participated in monthly status conferences with Magistrate Judge Michael T. Putnam and the Court.

Overall, the Provider Plaintiffs have litigated 26 motions to dismiss, taken discovery from 37 Defendants and numerous nonparties, briefed 76 discovery motions, participated in more than 30 discovery hearings that led to 91 discovery orders, obtained and reviewed the production of 75 million of pages of documents dating back to the 1920s, synthesized and analyzed terabytes of structured data, served expert reports based on that data, participated in more than 200 depositions of Defendants and nonparties, defended more than 40 depositions of Provider Plaintiff class representatives and putative class members, collected and reviewed documents in response to the Defendants' requests for production from 156 Provider Plaintiffs and nonparties. This work was vital to the Provider Plaintiffs' motions for summary judgment, opposition to the Defendants' motions for summary judgment, motion for class certification, preparation for mediation, and preparation for trial.

## Jurisdiction, Merits, and Class Certification

The Defendants have filed numerous motions intended to dispose of the Provider Plaintiffs' claims in whole or in part, either for lack of jurisdiction or on the merits. In addition, the Provider Plaintiffs have moved for class certification.

Several of the Defendants moved to dismiss the Provider Plaintiffs' claims for lack of jurisdiction and improper venue in the Northern District of Alabama. The Provider Plaintiffs opposed these motions. To preserve their claims if this Court found it did not have jurisdiction, the Provider Plaintiffs also filed separate actions against some of these Defendants in other districts so the cases could be transferred to this Court by the JPML. On June 18, 2014, the Court provided

guidance on "what rule of law should be applied to determine personal jurisdiction and venue in the antitrust context" without deciding the motions. Doc. No. 204 at 24–29. Some Defendants renewed their motions to dismiss for lack of personal jurisdiction and improper venue on December 22, 2014. On May 27, 2015, the Court held that, "[d]ue to the need to develop a more complete record on these issues . . . , Plaintiffs are entitled to conduct jurisdictional discovery." Doc. No. 369 at 3.  The Court denied these Defendants' motions without prejudice and held that they "may renew those motions after jurisdictional discovery is complete."

After the Provider Plaintiffs conducted extensive jurisdictional discovery, including document discovery, interrogatories, and depositions, certain Defendants moved to dismiss for lack of personal jurisdiction and improper venue. The Court denied the motion, holding that the Court may exercise personal jurisdiction over Defendants in Alabama, and that venue is appropriate in the Northern District of Alabama. Doc. No. 925 at 63. Some Defendants moved pursuant to 28 U.S.C. § 1292(b) to amend and certify the Court's decision for immediate interlocutory appeal. On February 14, 2017, the Court denied the motion and declined to certify the order for immediate appeal. *Conway* Doc. No. 445.

The Defendants also filed two rounds of motions to dismiss the Provider Plaintiffs' claims under Rule 12(b)(6). After copious briefing and argument, these motions were largely denied in 2014 and 2017. Doc. Nos. 204, 1306.

In 2016, 2017, and 2022, the Provider Plaintiffs participated in three "Economics Day" sessions with the Court, for which the Provider Plaintiffs prepared expert testimony and other evidence to educate the Court about the economic theories of the case.

In 2017, the Provider Plaintiffs, Subscriber Plaintiffs, and Defendants filed cross-motions for summary judgment on the standard of review for the Plaintiffs' antitrust claims. The Plaintiffs

advocated for the *per se* rule, and the Blues advocated for the rule of reason. Briefing on the motions consumed hundreds of pages and cited hundreds of exhibits. In 2018, the Court ruled that the Plaintiffs' claims relating to Exclusive Service Areas and the National Best Efforts rules would be judged under the *per se* rule, and claims relating to price-fixing through the BlueCard program would be judged under the rule of reason. Doc. No. 2063. The Court certified that decision for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Doc. No. 2202. The Defendants petitioned the Eleventh Circuit to hear the appeal, and the Provider Plaintiffs opposed the petition. The Eleventh Circuit denied the petition. *In re Blue Cross Blue Shield Antitrust Litigation*, No. 18-90020 (11th Cir. Dec. 12, 2018).

In April 2021, the Defendants eliminated the National Best Efforts rule. On this basis, they moved for summary judgment that the Provider Plaintiffs' claims must all be judged under the rule of reason, including claims relating to the period before April 2021. The Provider Plaintiffs opposed this motion. The Court held that claims relating to the period before April 2021 would still be judged by the *per se* rule, while all of the Provider Plaintiffs' claims after that time, including claims for injunctive relief, would be judged by the rule of reason. Doc. No. 2933. The Provider Plaintiffs' group boycott claim, for which they had sought *per se* treatment, would also be judged by the rule of reason for the entire damages period. Doc. No. 2934.

The Provider Plaintiffs and the Defendants moved for summary judgment or partial summary judgment on several other merits issues:

- In 2017, the Defendants moved for summary judgment on the ground that they operate as a single entity with respect to management of their trademarks, and thus cannot conspire. In 2021, the Provider Plaintiffs moved for summary judgment on the same issue, on the grounds that allocating territory and restricting output can

never be the work of a single entity. The Court denied both motions. Doc. Nos. 2063, 3093.

- In 2021, the Defendants moved for summary judgment on the grounds that the Provider Plaintiffs' claims for damages were time-barred and speculative. The Court denied the motion. Doc. No. 3092.

- In 2021, the Defendants moved for summary judgment on all the Provider Plaintiffs' claims relating to Provider Plaintiffs other than hospitals, and claims relating to any Blue system rules other than Exclusive Service Areas and BlueCard. The Defendants argued that the Provider Plaintiffs had not shown injury or damages for these claims. The Court denied the motion. Doc. No. 3102.

- In 2021, the Provider Plaintiffs moved for summary judgment regarding the Defendants' common-law trademark rights, asserting that the Blues either never acquired those rights or abandoned them. The Court denied the motion. Doc. No. 3103.

In 2020, the Provider Plaintiffs moved to certify classes of Alabama providers, which Defendants opposed. Between 2019 and 2021, the parties briefed several related *Daubert* motions. Citing the Supreme Court's decision in *Ohio v. American Express Co.*, 585 U.S. 529 (2018), the Court ordered the Provider Plaintiffs and Defendants to brief whether the Blues operate a two-sided platform, which the Defendants argued would affect the Provider Plaintiffs' entitlement to class certification. Doc. No. 3006. In connection with their motion for class certification, the Provider Plaintiffs submitted reports from four expert witnesses. The Provider Plaintiffs defended depositions of each of their experts, and they deposed the Defendants' experts as well. All told, the Provider Plaintiffs' briefing related to class certification totaled more than 375 pages. The

Court had not yet ruled on class certification when the Provider Plaintiffs and the Defendants executed the Settlement Agreement.

Apart from class certification, the Provider Plaintiffs submitted expert reports directed to the merits of the case and responded to the Defendants' experts on the merits. Between class certification and the merits, the Provider Plaintiffs submitted reports from, and defended the depositions of six witnesses, and they deposed nine of the Defendants' experts.

### Mediation

While litigating the case, the Provider Plaintiffs and the Blues engaged in mediation for nine years, from 2015 to 2024. As that length of time indicates, the negotiations were hard-fought and covered what would eventually become the Settlement Agreement's injunctive relief in detail. Alongside Special Master Ed Gentle and Kip Harbison, who saw the negotiations through to completion, the parties used three mediators at different stages: Judge Layn Phillips and Judge Gary Feess in the early years, and Robert Meyer in the later years. In total, the parties had scores of in-person and virtual mediation sessions, plus countless calls relating to the mediation. On October 4, 2024, the parties executed a Settlement Agreement.

Obtaining injunctive relief to address the Provider issues at the heart of this litigation was critical to resolution. Because each Blue Plan generally contracts with Providers only in that plan's Service Area, Providers must submit claims through the BlueCard system when they treat members of another Blue Plan. For decades, Providers have complained that BlueCard is a non-transparent program that causes additional costs, inefficiencies, and frustration. The Settlement Agreement significantly improves how Providers will be able to deal with the Blues, bringing more transparency, efficiency, and Blue Plan accountability. This relief is not something the Blues would have done on their own; the Provider Plaintiffs obtained this relief through years of litigation

and negotiation, and the Blues estimate that implementing it will cost them hundreds of millions of dollars.

While mediation was ongoing, the Provider Plaintiffs assembled a Provider Work Group consisting of different types of Providers, including large hospital systems, teaching hospitals, physicians, and ancillary providers. The Provider Work Group participated in some of the mediation sessions, working with representatives of the Blue Plans and BCBSA to develop potential injunctive relief. In addition to participating in mediation sessions, members of the Provider Work Group spent countless hours giving valuable input to Settlement Class Counsel on the negotiation of the injunctive relief terms.

After reaching agreement on the terms of the settlement, the Provider Plaintiffs undertook a separate allocation process. The purpose of the allocation process was to determine a fair division of the settlement fund among the different types of healthcare providers within the settlement class. The Provider Plaintiffs selected Kenneth Feinberg, perhaps the foremost authority on the distribution of settlement funds in large, complex cases, as the allocation expert. Mr. Feinberg also advised the Subscriber Plaintiffs on the division of their settlement fund. The result of the allocation process was the division of settlement funds reflected in the Provider Plaintiffs' Plan of Distribution.[2]

Providers' Counsel have spent more than 373,000 hours litigating this case, amounting to more than $227 million of lodestar at current rates. Providers' Counsel have also incurred more

---

[2] The Settlement Agreement provides that Class Counsel may apply for an award of attorneys' fees of up to 25% of $2.8 billion. Doc. No. 3225 at 10. Such a provision is permissible under Eleventh Circuit precedent if it did not result from collusion. *Carter v. Forjas Taurus, S.A.*, 701 F. App'x 759, 766 (11th Cir. 2017); *Poertner v. Gillette Co.*, 618 F. App'x 624, 630 (11th Cir. 2015). Here, the Court has found that there was no collusion, and that "[t]he parties' agreement with respect to attorneys' fees was reached only after the parties had resolved the other substantive terms of the Settlement." Doc. No. 3225 at 10, 34–35.

than $97 million in expenses relating to the case. They have contemporaneously submitted their time and expense records to the Special Master, who has audited those records continually.

## II.    The Settlement Agreement

The result of the Provider Counsel's years of hard work and negotiation is a historic settlement that provides numerous benefits to the Settlement Class, many of which the Settlement Class would not have obtained even with a judgment in their favor:

**Monetary Relief**

The Defendants will pay $2.8 billion to the Settlement Fund, the largest settlement payment ever in a healthcare antitrust case, and one of the largest in any antitrust case. The Settlement Fund will include distributions to the Settlement Class, Notice and Administration costs, and any Fee and Expense Award. The Defendants are not entitled to reversion of any of the Settlement Fund.

**Injunctive Relief**

Because each Blue Plan generally contracts with Providers only in that plan's Service Area, Providers must submit claims through the BlueCard Program when they treat members of another Blue Plan. For decades, Providers have complained that BlueCard is a non-transparent program that causes additional costs, inefficiencies, and frustration. The Settlement Agreement significantly improves how Providers will be able to deal with the Blues, bringing more transparency, efficiency, and Blue Plan accountability. This relief is not something the Blues would have done on their own; the Provider Plaintiffs obtained this relief through years of litigation and negotiation, and the Blues estimate that implementing it will cost them hundreds of millions of dollars. Providers who do not opt out of the settlement will receive relief including:

- **BlueCard Transformation.** Transformation of the BlueCard Program infrastructure through the development and implementation of a system-wide, cloud-based architecture

that will increase access to critical information and allow Settlement Class Members to receive up-to-date, accurate information as if they were a contracted provider of the Control/Home Plan, directly from their Local/Host Plan. This creation of a system-wide information platform and enhanced information sharing will facilitate Settlement Class Members' access to Member benefits and eligibility verification information, pre-authorization requirements, and claims status tracking;

- **BlueCard Prompt Pay Commitment.** To address the gap in application of state prompt pay laws to BlueCard claims, a timeliness commitment for payment of fully insured Clean BlueCard Claims, with a requirement that the Blues pay interest when payment is made later than the Prompt Pay Period, as well as timely notice of defective claims and explanation for denied claims;

- **Service Level Agreements.** Implementation of Service Level Agreements, which commit the Blues to respond promptly to certain BlueCard Program-related inquiries or pay financial penalties;

- **BlueCard Executive.** Appointment of a BlueCard Executive at each Blue Plan, who will be accountable to Settlement Class Members for escalated BlueCard claims payment issues;

- **Real-Time Messaging System.** Implementation of a real-time Blues internal messaging system to reduce the time it takes for the Blues to respond to Providers' issues and disputes and enable Blue Plans to address Settlement Class Members' issues in near-real time;

- **National Executive Resolution Group.** Creation of a Blue National Executive Resolution Group, which will be supported by a Provider Liaison Committee and work to identify trends and opportunities for further improvement of the BlueCard Program over time.

Improving the BlueCard Program is not the only benefit the Settlement Agreement provides. Changes to rules governing contracts between Providers and the Blues will allow Providers' Contiguous Area Contracts to cover more Blue Plan Members, and certain hospitals will be eligible to contract with more Blue Plans than before. In addition, limits will be placed on Blue Plans' ability to rent certain of their Non-Blue-Branded Provider Networks:

- **Modifying the Contiguous Area Rule.** Currently, Providers can contract with a Blue Plan in a Contiguous Area only for Members who live or work in the Service Area where the Provider is located. The Settlement Agreement removes that requirement, so that a Settlement Class Member can contract with a Blue Plan in a Contiguous Area for all of that Blue Plan's state Members.

- **Expanding Contiguous Area Contracts to Certain Affiliated Hospitals.** For the first time, the Settlement Agreement permits Blue Plans to enter into Contiguous Area Contracts that cover not just Settlement Class Member hospitals in Contiguous Counties, but also certain of their affiliated hospitals.

- **Affiliates and All Products Clauses.** Limits on contract provisions that require Providers who are Settlement Class Members who contract with Blue Plans to participate in the networks of those plans' non-Blue affiliates.

Settlement Class Members' day-to-day interactions with the Blues will improve as well. With major upgrades to the Blues' technical capabilities, and commitments from the Blues to make more information available, Settlement Class Members will have access to more information, and more timely information, than ever before:

- **Third-Party Information.** The Blues will identify third parties involved in determining benefit application decisions, so Settlement Class Members can better understand and predict such decisions.

- **Minimum Data Requirements.** The Blues will define minimum data requirements in response to certain eligibility and benefits inquiries, to promote consistency among Blue Plans and give certainty to Settlement Class Members that they are submitting the necessary information.

- **Blue Plan Common Appeals Form.** Settlement Class Members can use a newly developed appeals form common to all Blue Plans, so these Providers do not bear the administrative expense of complying with different Blue Plan requirements for initiating an appeal related to a BlueCard claim.

- **Pre-Authorization Standards.** The Blues will promulgate guidelines to improve the prior authorization process.

- **Telehealth Relief.** The Blues will streamline claims processing for Settlement Class Members who provide telehealth or other virtual services to Blue Members.

The Settlement Agreement will also expand Settlement Class Members' opportunity to enter into value-based contracts with the Blues:

16

- **Minimum Level of Value-Based Care.** Each Blue Plan will have available a value-based care offering, so Settlement Class Members in different parts of the country will have the option between a traditional fee-for-service model and a value-based care model for payment.

- **Best Practices for Value-Based Care.** The Blues will promulgate standards for value-based contracts in order to facilitate and advance the delivery of value-based care.[3]

### Monitoring, Compliance, and Reporting

The Provider Plaintiffs have made sure the commitments of the Settlement Agreement are enforceable. For a period of five years from the Effective Date of the Settlement, a Monitoring Committee comprised of members appointed by the Settling Defendants, Provider Co-Lead Counsel, and the Court will be created to oversee monitoring, compliance and reporting related to the injunctive relief for Settlement Class Members.

### Valuation of Injunctive Relief

The Provider Plaintiffs have asked their economic experts Daniel Slottje and Brendan Rogers to estimate the value of two portions of the injunctive relief in particular: BlueCard Transformation and the BlueCard Prompt Pay Commitment. To do so, they identified relevant sources of data produced in discovery and publicly available information. They also worked with Matt Katz, who has decades of experience working with facility and professional healthcare providers, including at the American Medical Association, the Connecticut State Medical Society, and as a consultant. Their analysis concluded that in the first ten years of implementation of the injunctive relief, the value to Providers exceeds **$17.3 billion**. Even after discounting to present

---

[3] More detail about the injunctive relief can be found in the Settlement Agreement, Doc. No. 3192-2, and the Provider Plaintiffs' Memorandum of Law in Support of Their Motion for Preliminary Approval of Proposed Class Settlement, Doc. No. 3192-1 at 11–18.

value, these categories of injunctive relief are worth approximately **$12.5 billion**. Declarations explaining this analysis are available on the docket at Doc. No. 3253-1 (Slottje–Rogers Declaration) and Doc. No. 3253-2 (Katz Declaration). A summary of these declarations is available at Doc. No. 3254.

The experts' analysis focused first on administrative savings that will result from new systems that will provide more information to healthcare providers through BlueCard Transformation and related injunctive relief: fewer BlueCard claims will require follow-up, BlueCard claims that do require follow-up will take less time, and less time will be spent on BlueCard pre-submission tasks like member eligibility verification and pre-authorization. The economic experts also valued the potential benefit of the BlueCard Prompt Pay Commitment, which requires the Blues to pay interest on certain BlueCard claims. The experts recognized that other injunctive relief in the Settlement Agreement will create more savings for providers, additional revenue for providers, and benefits to patients, though they did not attempt to quantify these benefits.

## ARGUMENT

### I.    The Provider Plaintiffs' Request for 23.47 Percent of the Common Fund Is Reasonable.

For their work, the Provider Plaintiffs are requesting the same percentage of the common fund that was awarded to the Subscribers' counsel after their settlement: 23.47 percent. This request is below the benchmark for fees in common-fund cases in the Eleventh Circuit and thus is presumptively reasonable. And as a percentage of the total present value of the settlement, it is just 4.3 percent. Although a more searching evaluation of the request is not necessary, both the Eleventh Circuit's *Johnson* factors and a lodestar cross-check confirm that the request is reasonable.

### A.    The Request Is Presumptively Reasonable.

In *Camden I Condominium Ass'n v. Dunkle*, the Eleventh Circuit established that "attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." 946 F.2d 768, 774 (11th Cir. 1991). The percentage method ensures fairness, simplicity, and efficiency in fee determinations. Unlike the lodestar method, which requires detailed accounting of hours worked and billing rates, the percentage approach avoids unnecessary complexity and focuses on the results achieved. Courts across the Eleventh Circuit have consistently reaffirmed the appropriateness of this method in common fund cases, including the Subscriber track of this case. *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1100 (11th Cir. 2023); *see also Faught v. American Home Shield Corp.*, 668 F.3d 1233, 1242–44 (11th Cir. 2011) (affirming an award of $1.5 million plus 25% of the monetary compensation to class members).

An award of 25% of the common fund has become the benchmark for determining the reasonableness of an award of fees. *Faught*, 668 F.3d at 1243 (citing "well-settled law from this court that 25% is generally recognized as a reasonable fee award in common fund cases"); *see also* Doc. No. 2733-1 at 31–32 (citing cases); Ex. B, Declaration of Brian T. Fitzpatrick (Fitpatrick Decl.) ¶ 14. As the Eleventh Circuit held when it affirmed this Court's award of fees to the Subscriber Plaintiffs' counsel, "Courts typically award fees of 20 to 30 percent of the common fund, and view the mean of that range—25 percent—as a rough benchmark. If a fee award falls between 20 and 25 percent, it is presumptively reasonable." *In re Blue Cross*, 85 F.4th at 1100 (citations omitted).

Here, the Providers' counsel are requesting a fee award of 23.47% of the common fund— the same percentage the Subscribers' counsel requested, this Court awarded, and the Eleventh

Circuit affirmed. It would not be an abuse of discretion for this Court to grant the Providers' request based on the percentage alone. *See In re Blue Cross*, 85 F.4th at 1100 ("If the fee exceeds 25 percent, the district court must assess the reasonableness of the percentage ….").

### B.    The *Johnson* Factors Confirm That the Request Is Reasonable.

In any event, the Providers' requested fee is reasonable under the factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), which apply when the requested fee exceeds 25%, *see In re Blue Cross*, 85 F.4th at 1100. These factors are:

(1) the time and labor required;

(2) the novelty and difficulty of the questions involved;

(3) the skill requisite to perform the legal service properly;

(4) the preclusion of other employment by the attorney due to acceptance of the case;

(5) the customary fee;

(6) whether the fee is fixed or contingent;

(7) time limitations imposed by the client or the circumstances;

(8) the amount involved and the results obtained;

(9) the experience, reputation, and ability of the attorneys;

(10) the "undesirability" of the case;

(11) the nature and the length of the professional relationship with the client;

(12) awards in similar cases.

*Camden I*, 946 F.2d at 772 n.3; Fitzpatrick Decl. ¶ 14. A review of these factors shows that the Providers would have been justified in requesting *more* than 25% of the common fund.

*The time and labor required*: The time and labor required in this case were astronomical. Even compared to the Subscriber track of this litigation, which itself was one of the largest private antitrust actions of all time, the Providers spent more hours and more years, and they progressed

farther down the road to trial. Providers' Counsel spent more than 373,000 hours on this case, which amounted to more than $227 million of lodestar at their current rates. Nor was this time wasted. The Provider Co-Lead Counsel controlled the assignment of work in order to prevent duplicative or wasteful billing, and the Special Master reviewed the Providers' billing records throughout the case. He has concluded that the Providers' hours were spent efficiently. Ex. C. (Declaration of Special Master) at 4. The Providers' efforts easily justify the requested award.

*The novelty and difficulty of the questions involved*: As the Subscribers pointed out in their motion for fees, the Former Fifth Circuit stated 48 years ago, "It is common knowledge that class action suits have a well deserved reputation as being most complex." *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). That observation is no less true today, with the use of sophisticated econometric models and enormous databases to determine the anticompetitive effect of a defendant's actions. Here, the Providers spent the majority of their $100 million in litigation expenses to hire expert economists to assemble the data and build the models necessary to prove their damages.

The issues of law in this case were no less complex. The Providers had to navigate the interplay of antitrust law, complicated jurisdictional issues, trademark law, the single-entity defense. In additional, a novel doctrine—two-sided platforms—evolved while the litigation was pending. *See* Doc. No. 2932 at 3 ("The case raised novel and complex legal questions."). Through it all, the Providers defeated several motions to dismiss and motions for summary judgment, while developing a record they believe would have supported class certification. In short, the novelty and difficulty of the questions involved in this case were extraordinary.

*The skill requisite to perform the legal service properly*: Given the time and labor required to pursue this case, and the novelty and difficulty of the questions involved, it should be no surprise

that consummate skill was required to guide the case to a successful conclusion. Consummate skill would have been necessary under any circumstances, but it was crucial here because of the quality of the Blues' counsel. *See Monroe Cnty. Emps. Ret. Sys. v. Southern Co.*, 2021 WL 451670, at \*5 (N.D. Ga. Feb. 5, 2021) ("In assessing the quality of representation, courts have also looked to the quality of the opposition the Plaintiffs' attorneys faced."); *Faught v. American Home Shield Corp.*, 2010 WL 10959222, at \*4 (N.D. Ala. Apr. 27, 2010) ("This is complex class action litigation against a large national corporation represented by very talented lawyers with significant resources at their command."). The Blues were represented by some of the most elite firms in Birmingham and nationally, including Kirkland & Ellis, Hogan Lovells, Balch & Bingham; Crowell & Moring; Foley & Lardner; Shearman & Sterling; Maynard, Cooper & Gale; and Cravath, Swaine & Moore. Not just any attorneys could have taken on this group and achieved the result the Providers' counsel did.

*The preclusion of other employment by the attorney due to acceptance of the case*: In case it is not clear from number of hours counsel put into this case, the preclusion of other employment was significant. *See* Doc. No. 2932 at 4 ("This private enforcement action required a substantial commitment of time, personnel, and other resources to this case effectively precluded Subscriber Counsel from other employment."). In fact, this factor would likely support an upward departure from the 25% benchmark. In one opinion that applied the *Johnson* factors, the court awarded a one-third fee in part because the attorneys spent 26,000 hours over the course of eight years in litigation. *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 2012 WL 12540344, at \*3–4 (N.D. Ga. Oct. 26, 2012). Here, the Providers' counsel spent half again as many years and more than ten times as many hours. For the Provider Co-Lead Counsel's firm, Whatley Kallas LLP, this litigation has represented the largest commitment of resources by far every year since it was filed.

The firm would not have lacked for other hourly or contingent matters if it had not pursued this case. *See Faught*, 2010 WL 10959222, at *4 ("Class Counsel's involvement in this matter has necessarily limited the time and resources that they can devote to other matters over the period of this litigation (and that limitation will no doubt continue for at least the next two years). This factor weighs in favor of an increase of the fee from the benchmark.").

*The customary fee*: "The customary fee in class actions is a contingency fee, because it is not practical to find any individual that will pay attorneys on an hourly basis to prosecute the claims of numerous strangers and take on the significant additional expenses of fighting with the defendants over class certification." *Columbus Drywall*, 2012 WL 12540344, at *4. Fees of 30% or more are often awarded in large, complex cases, including mega-fund cases. *See* Doc. No. 2733-1 at 57–58 & nn.55–57 (listing cases); *Faught*, 2010 WL 10959222, at *4 ("Forty percent fee contracts are common for complex and difficult litigation such as this."). This factor would support an upward departure from a 25% fee.

*Whether the fee is fixed or contingent*: The fully contingent nature of the attorneys' fees supports a substantial award. *Columbus Drywall*, 2012 WL 12540344, at *5 ("[C]lass counsel prosecuted this case on an entirely contingent fee basis. In doing so, counsel assumed significant risk of investing tens of thousands of hours and millions of dollars in out-of-pocket expenses with no compensation. … Particularly in the absence of any criminal indictments or pleas, this case has always involved a high degree of risk of nonpayment. This substantial contingency risk favors the requested fee."). The Providers' counsel assumed the risk that more than a decade of litigation would be for naught.

*Time limitations imposed by the client or the circumstances*: The Provider Plaintiffs were given enough time to develop their arguments and evidence. This factor is neutral.

*The amount involved and the results obtained*: The Provider Plaintiffs obtained monetary relief of $2.8 billion, the largest figure ever in a healthcare antitrust action, and one of the largest in any antitrust action. In addition, they negotiated for an extensive set of changes to the Blues' business practices, just a subset of which the Providers' experts have valued at more than $17 billion for the first ten years after they are implemented. The amount involved and the results obtained were extraordinary, and they would support an extraordinary award. *Cf. Columbus Drywall*, 2012 WL 12540344, at *5 (awarding a one-third fee because a $75 million settlement "compares favorably to other settlements approved in class actions"); *see* Fitzpatrick Decl. ¶¶ 15–16.

*The experience, reputation, and ability of the attorneys*: Hopefully twelve years of hard-fought litigation have acquainted the Court with the experience, reputation, and ability of the Provider Plaintiffs' attorneys. The Provider Co-Lead Counsel are two of the preeminent healthcare and antitrust litigators in the country, and they assembled a powerhouse team of some of the premier litigators in Alabama and beyond. The biographies of the Plaintiffs' Steering Committee, Plaintiffs' Liaison Counsel, and Local Facilitating Counsel are attached to the Co-Lead Counsel Declaration. Several more prominent attorneys made significant contributions to the case as well.

*The "undesirability" of the case*: As the Blues told this Court many times, the main features of the Blues' agreements have been well known for decades, and they were never challenged by the United States government. A case against the Blues would have been much more desirable if the plaintiffs could have piggy-backed on a government investigation or prosecutions. *See* Doc. No. 2641 at 6 n.3 ("It is rare for historic structural relief such as that negotiated here to arise out of private enforcement actions."). Provider Co-Lead Counsel were aware when they filed the first complaint that the case could take many years and significant attorney time and expenses to

resolve, with no guarantee of a favorable outcome. *See Columbus Drywall*, 2012 WL 12540344, at *6 ("There are a limited number of firms that both possess the required skills and would undertake this representation, knowing that it would likely require expenditure of tens of thousands of hours (on a contingent basis) and the advancement of millions of dollars in out-of-pocket expenses. Class counsels' willingness to assume those risks should be reflected in the fee."). More evidence of the undesirability of this case is that no one other than Joe Whatley and Edith Kallas applied to be Interim Co-Lead Counsel for the Providers. This factor would support an upward departure from the 25% benchmark.

*The nature and the length of the professional relationship with the client*: This factor is meant to account for the fact that "[a] lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office." *Johnson*, 488 F.2d at 719. The Provider Class Representatives were generally not ones with whom Provider Co-Lead Counsel had an existing relationship. And in a case of this size, an existing relationship should make little difference because "[t]here does not seem to be any likelihood that the named plaintiffs or class members were in a position to promise future business to these attorneys that would somehow offset the tens of thousands of hours and millions of dollars in expenses that class counsel invested in this case." *Columbus Drywall*, 2012 WL 12540344, at *6. This factor does not favor an increase or decrease in the fee. *See Faught*, 2010 WL 10959222, at *6.

*Awards in similar cases*: An award of 23.47% is the same as the award in the case most similar to this one—the Subscriber track of this case. It is also within the range of awards in other cases, including antitrust class actions. Fitzpatrick Decl. ¶¶ 17–26. This factor further supports the reasonableness of the requested fee.

## C.    A Lodestar Cross-Check Supports the Request as Well.

A lodestar cross-check is not required in the Eleventh Circuit. *In re Home Depot, Inc.*, 931 F.3d 1065, 1091 n.25 (11th Cir. 2019); Doc. No. 2932 at 4 (citing *In re Home Depot*). Nevertheless, a lodestar cross-check further supports the Providers' request. At the Providers' counsel's current billing rates, the Providers' lodestar totals more than $227 million.[4] Co-Lead Counsel Decl. ¶ 32. The Providers' requested fee of 23.47% of the $2.8 billion common fund is $657,160,000, which would represent a multiplier of 2.89 of their lodestar. This figure is within the range of multipliers for settlements in excess of $1 billion, including settlements that (unlike this one) contained no significant injunctive relief. Fitzpatrick Decl. ¶ 37.

## II.    The Court Should Approve the Provider Plaintiffs' Request for Costs and Expenses.

In addition to attorneys' fees, Federal Rule of Civil Procedure 23(h) permits class counsel to recover their costs and expenses. *See* Doc. No. 2932 at 4 (awarding litigation costs and expenses to the Subscriber Plaintiffs' counsel). The Settlement Agreement entitles the Provider Plaintiffs to recover their costs and expenses, Doc. No. 3192-2 at ¶ 37, and the class notice informed Class Members that the Provider Plaintiffs' counsel would seek an award of costs and expenses, Doc. No. 3207-3 at 46, 49, 66. To date, Provider Plaintiffs have incurred more than $97.2 million in

---

[4] *See Missouri v. Jenkins*, 491 U.S. 274, 283–84 (1989) ("Clearly, compensation received several years after the services were rendered … is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings. We agree, therefore, that an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of [Section 1988].") (footnote omitted); *Camden I*, 946 F.2d 768, 775 n.7 ("[T]he Supreme Court authorized current hourly rates as a method for compensating for time delay in *Missouri v. Jenkins* …."); Fitzpatrick Decl. ¶ 37 n.43.

Shared Costs[5] and $2.1 in Held Costs.[6] Special Master Decl. at 3, Ex. B. Because Provider Plaintiffs will continue to incur expenses until the Final Fairness Hearing, they propose that they submit a final figure for the Court's approval one week before the Final Fairness Hearing. Provider Plaintiffs expect that the total will be less than $103 million.

These costs and expenses were reasonable and necessary to litigate the case. The majority of the Provider Plaintiffs' costs and expenses derive from work performed by their experts to assemble the most comprehensive database of hospital payments ever assembled. This task required assembling terabytes data from dozens of Blue Plans, in addition to third-party sources, validating it, and conforming it to common standards so it could be analyzed. Co-Lead Counsel Decl. ¶ 35. Only after undertaking this painstaking task could the Provider Plaintiffs' experts implement the econometric models that underlay the proof of liability and damages in this case.[7] Other costs and expenses allowed the Provider Plaintiffs to maintain the massive databases of documents and data collected in discovery, and to travel for the hundreds of depositions and dozens of hearings and mediation sessions that took place. *Id.*

---

[5] "Shared Costs are costs incurred for the common benefit of one of the MDL tracks as a whole, or for both MDL tracks," and include "i. Court, filing and service costs; ii. Depositions and court reporter costs; iii. Document Depository; creation, operation, staffing, equipment and administration; iv. Plaintiffs' Liaison Counsel administrative matters (e.g., expenses for equipment, technology, courier services, long distance, conference calls, telecopier, electronic service, postage, meeting expenses, travel for administrative matters, photocopy and printing, secretarial/temporary staff, etc.); v. Track leadership administration matters such as meetings and conference calls; vi. Legal and accountant fees; vii. Expert witness and consultant fees and expenses; viii. Printing, copying, coding, shipping, scanning (both in and out of house or extraordinary firm cost); ix. Research by outside third party vendors/ consultants/attorneys; x. Common witness expenses including travel; xi. Translation costs; xii. Bank or financial institution charges; xiii. Investigative services; xiv. Claims Administrator charges; and xv. Special Master charges." Doc. No. 80 at 6–8.

[6] "Held Costs are costs incurred for the global benefit of one or both tracks of the MDL. Held Costs are those that do not fall into the above Shared Costs categories but are incurred for the benefit of all claimants in general for one or both tracks[,]" and include "i. Telefax charges; ii. Postage, shipping, courier, certified mail; iii. Printing and photocopying (in-house); iv. Computer research - Lexis/Westlaw; v. Telephone - long distance (actual charges only); and vi. Travel - pursuant to Travel Limitations set fort[h] below, including travel for attorney to attend depositions, court or legislative matters a. Airfare b. Reasonable ground transportation c. Hotel d. Reasonable meals and entertainment e. Reasonable other (parking) f. Car rental, cabs, etc. g. Secretarial and clerical overtime[.]" Doc. No. 80 at 8–10.

[7] The requested expenses do not include work performed in connection with notice and administration of the settlement, which will be paid from the Notice and Administration Fund. Doc. No. 3192-2 at ¶ 1(fff), (ggg).

Throughout this litigation, the Provider Plaintiffs' counsel have followed the protocols for submitting expenses that this Court mandated in 2013. *See* Doc. No. 80. They have submitted their cost reports to the Special Master and received approval for those costs. Co-Lead Counsel Decl. ¶ 32; Special Master Decl. at 3–4. In accordance with the Court's order, the Provider Plaintiffs have not submitted individual claimant-related costs to the Special Master. *See* Doc. No. 80 at 6, 8; Co-Lead Counsel Decl. ¶ 32. The Provider Plaintiffs' costs and expenses have been meticulously documented and approved. Special Master Decl. at 3–5. In the Subscriber Plaintiffs' litigation, this Court approved an award of costs and expenses, which were subject to the same requirements for reporting and approval. Doc. No. 2932 at 4, *aff'd*, *In re Blue Cross*, 85 F.4th 1070. The Provider Plaintiffs' request for costs and expenses should likewise be approved.

## CONCLUSION

The Provider Plaintiffs' requests for an award of attorneys' fees, costs and expenses, as described herein, should be approved.

Respectfully submitted this the 2nd day of February, 2025.

| | |
|---|---|
| */s/ Edith M. Kallas* | */s/ Joe R. Whatley, Jr.* |
| Edith M. Kallas – ***Co-Lead Counsel*** | Joe R. Whatley, Jr. – ***Co-Lead Counsel*** |
| WHATLEY KALLAS, LLP | W. Tucker Brown |
| 152 West 57th Street | WHATLEY KALLAS, LLP |
| 41st Floor | 2001 Park Place North |
| New York, NY 10019 | 1000 Park Place Tower |
| Tel: (212) 447-7060 | Birmingham, AL 35203 |
| Fax: (800) 922-4851 | Tel: (205) 488-1200 |
| Email: ekallas@whatleykallas.com | Fax: (800) 922-4851 |
| | Email: jwhatley@whatleykallas.com |
| | tbrown@whatleykallas.com |

Patrick J. Sheehan
WHATLEY KALLAS, LLP
101 Federal Street
19th Floor
Boston, MA 10019
Tel: (617) 573-5118

Henry C. Quillen
WHATLEY KALLAS, LLP
159 Middle Street
Suite 2C
Portsmouth, NH 03801
Tel: (603) 294-1591

28

Fax: (617) 371-2950
Email: psheehan@whatleykallas.com

Barry Alan Ragsdale – ***Plaintiffs' Liaison Counsel and Discovery Liaison Counsel***
Dominick Feld Hyde, PC
1130 22nd Street South Ridge Park
Suite 4000
Birmingham, AL 35205
Tel: (205) 536-8888
bragsdale@dfhlaw.com

Charles Clinton Hunter
HAYES HUNTER PC
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel: (281) 768-4731
Fax: (713) 583-7047
Email: chunter@hayeshunterlaw.com

Dennis Pantazis – ***Plaintiffs' Steering Committee***
Brian Clark – ***Discovery Committee***
WIGGINS CHILDS PANTAZIS FISHER
 GOLDFARB
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel: (205) 314-0500
Fax: (205) 254-1500
Email: dgp@wigginschilds.com
        bclark@wigginschilds.com

Dennis C. Reich – ***Chair, Damages Committee***
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel: (713) 622-7271
Fax: (713) 623-8724
Email: dreich@reichandbinstock.com

Fax: (800) 922-4851
Email: hquillen@whatleykallas.com

Deborah J. Winegard
WHATLEY KALLAS, LLP
1068 Virginia Avenue, NE
Atlanta, GA 30306
Tel: (404) 607-8222
Fax: (404) 607-8451
Email: dwinegard@whatleykallas.com

E. Kirk Wood, Jr. – ***Local Facilitating Counsel***
WOOD LAW FIRM LLC
P. O. Box 382434
Birmingham, AL 35238
Tel: (205) 612-0243
Fax: (205) 705-1223
Email: kirk@woodlawfirmllc.com

Aaron S. Podhurst – ***Plaintiffs' Steering Committee***
Peter Prieto – ***Chair, Expert Committee***
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue
Suite 2300
Miami, FL 33131
Tel: (305) 358-2800
Fax: (305) 358-2382
Email: apodhurst@podhurst.com
        pprieto@podhurst.com

U.W. Clemon – ***Plaintiffs' Steering Committee***
U. W. Clemon, LLC
5202 Mountain Ridge Parkway
Birmingham, AL 35222
Tel: (205) 837-2898
Email: uwclemon1@gmail.com

Nicholas B. Roth – *Chair, Discovery Committee*
Julia Smeds Roth – *Discovery Committee*
EYSTER KEY TUBB ROTH MIDDLETON
 & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel: (256) 353-6761
Fax: (256) 353-6767
Email: nbroth@eysterkeylaw.com
        jroth@eysterkeylaw.com

David A. Balto – *Expert Committee*
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel: (202) 789-5424
Fax: (202) 589-1819
Email: david.balto@dcantitrustlaw.com

Joey K. James – *Litigation Committee*
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel: (256) 764-0095
Fax: (256) 767-5705
Email: joey@joeyjameslaw.com

Richard S. Frankowski – *Discovery Committee*
THE FRANKOWSKI FIRM, LLC
231 22nd Street South, Suite 203
Birmingham, AL 35233
Tel: (205) 390-0399
Fax: (205) 390-1001
Email: richard@frankowskifirm.com

John C. Davis – *Written Submissions Committee*
LAW OFFICE OF JOHN C. DAVIS

J. Mark White – *Litigation Committee*
Augusta S. Dowd – *Chair, Litigation Committee*
Linda G. Flippo – *Discovery Committee*
WHITE ARNOLD & DOWD, P.C.
2001 Park Place North
Suite 1400
Birmingham, AL 35203
Tel: (205) 323-1888
Fax: (205) 323-8907
Email: mwhite@whitearnolddowd.com
        adowd@whitearnolddowd.com
        lflippo@whitearnolddowd.com

Van Bunch – *Chair, Class Certification Committee*
BONNETT FAIRBOURN FRIEDMAN &
 BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel: (602) 274-1100
Fax: (602) 274-1199
Email: vbunch@bffb.com

Robert J. Axelrod – *Chair, Written Submissions Committee*
AXELROD LLP
800 Third Avenue, Suite 2800
New York, NY 10022
Tel: (646) 448-5263
Fax: (212) 840-8560
Email: raxelrod39@gmail.com

W. Daniel Miles, III – *Written Submissions Committee*
BEASLEY ALLEN CROW METHVIN
PORTIS
 & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel: (800) 898-2034
Fax: (334) 954-7555
Email: dee.miles@beasleyallen.com

Michael C. Dodge – *Expert Committee*
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500

30

623 Beard Street
Tallahassee, FL 32303
Tel: (850) 222-4770
Email: john@johndavislaw.net

Mark K. Gray – *Discovery Committee*
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel: (502) 805-1800
Fax: (502) 618-4059
Email: mgray@grayandwhitelaw.com

Stephen M. Hansen – *Class Certification Committee*
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel: (253) 302-5955
Fax: (253) 301-1147
Email: steve@stephenmhansenlaw.com

Harley S. Tropin – *Damages Committee*
Javier A. Lopez – *Discovery Committee*
KOZYAK TROPIN &
 THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508
Email: hst@kttlaw.com
        jal@kttlaw.com

C. Wes Pittman – *Settlement Committee*
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel: (850) 784-9000
Fax: (850) 763-6787
Email: wes@pittmanfirm.com

Robert B. Roden – *Litigation Committee*
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205

Dallas, TX 75254
Tel: (972) 419-7172
Email: mdodge@gpm-law.com

Michael E. Gurley, Jr. – *Discovery Committee*
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel: (205) 908-6512
Email: mgurleyjr@yahoo.com

Lynn W. Jinks, III – *Expert Committee*
Christina D. Crow – *Discovery Committee*
JINKS CROW, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel: (334) 738-4225
Fax: (334) 738-4229
Email: ljinks@jinkslaw.com
        ccrow@jinkslaw.com

Myron C. Penn – *Discovery Committee*
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel: (334) 738-4486
Fax: (334) 738-4432
Email: myronpenn28@hotmail.com

J. Preston Strom, Jr. – *Litigation Committee*
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel: (803) 252-4800
Fax: (803) 252-4801
Email: petestrom@stromlaw.com

Thomas V. Bender – *Discovery Committee*
Dirk L. Hubbard
HORN AYLWARD & BANDY, LLC
2600 Grand Blvd., Suite 1100

Tel: (205) 933-8383
Fax: (205) 933-8386
Email: rroden@shelbyroden.com

Gary E. Mason – *Class Certification Committee*
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DC 20036
Tel: (202) 429-2290
Fax: (202) 640-1160
Email: gmason@wbmllp.com

Michael L. Murphy – *Discovery Committee*
BAILEY GLASSER LLP
910 17th Street, NW, Suite 800
Washington, DC 20006
Tel: (202) 463-2101
Fax: (202) 463-2103
Email: mmurphy@baileyglasser.com

Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel: (719) 471-1984
Fax: (719) 577-4356
Email: lance@searsassociates.com

Jessica Dillon
Ray R. Brown
Molly Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 200
Anchorage, AK 99501
Tel: (907) 277-5400
Fax: (907) 277-9896
Email: Jessica@dillonfindley.com
 Ray@dillonfindley.com
 Molly@dillonfindley.com

Allyson C. Dirksen
HEIDMAN LAW FIRM, P.L.L.C.
1128 Historic 4th Street

Kansas City, MO 64108
Tel: (816) 421-0700
Email: tbender@hab-law.com
 dhubbard@hab-law.com

Gregory S. Cusimano – *Litigation Committee*
CUSIMANO, ROBERTS & MILLS, LLC
153 South 9th Street
Gadsden, AL 35901
Phone: (256) 543-0400
Fax: (256) 543-0488
Email: greg@alalawyers.net

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel: (320) 289-2363
Fax: (320) 289-2369
Email: brian@wojtalewiczlawfirm.com

Archie C. Lamb, Jr.
ARCHIE LAMB & ASSOCIATES, LLC
301 19th Street North, Suite 585
The Kress Bldg.
Birmingham, AL 35203-3145
(205) 458-1210
Email: alamb@archielamb.com

Paul Lundberg
LUNDBERG LAW, PLC
600 4TH Street, Suite 906
Sioux City, IA 51101
Tel: (712) 234-3030
Fax: (712) 234-3034
Email: paul@lundberglawfirm.com

Gwen Simons
Simons & Associates Law, P.A.
P.O. Box 1238

32

P. O. Box 3086
Sioux City, IA 51101
Tel: (712) 255-8838
Fax (712) 258-6714
Email: allyson.dirksen@heidmanlaw.com

Scarborough, ME 04070-1238
Tel: (207) 205-2045
Fax: (207) 883-7225
Email: gwen@simonsassociateslaw.com

***Counsel for Provider Plaintiffs***