FILED

2025 Feb-07  PM 08:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT B

Case 2:13-cv-20000-AMM     Document 3268-2     Filed 02/07/25     Page 1 of 7

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| IN RE:<br>BLUE CROSS BLUE SHIELD<br>ANTITRUST LITIGATION<br><br>MDL No. 2406 | Master File No. 2:13-CV-20000-RDP<br><br>This Document Relates to Provider<br>Track Cases |

**DECLARATION OF DANIEL D. OWEN**

Daniel D. Owen submits this unsworn declaration under penalty of perjury pursuant to 28 U.S.C. § 1746:

1.  I am a partner at the law firm of Polsinelli, PC.  The focus of my practice is antitrust litigation. I graduated from the University of Kansas Law School in 1990 and have been employed at Polsinelli for 28 years. I am a member of the bars of Missouri and Kansas, and I practice in many other jurisdictions across the country in association with members of the bar in those jurisdictions.

2.  I submit this Declaration in connection with Polsinelli PC's Opposition to Class Counsel's Motion to Disqualify and for Corrective Notice.

3.  Nothing herein is intended to waive either the attorney-client privilege or the work-product protection for any existing or potential client or litigation.

4.  I have closely followed the Blue Cross Blue Shield ("BCBS") antitrust litigation for almost ten years. I formed my opinions about the goals, strategies, and tactics of the providers in

this litigation by reviewing publicly available sources, speaking with relevant parties, listening in on hearings, and by preparing for and participating in a 2019 mediation session.

5. I started researching and analyzing the BCBS antitrust litigation in 2015. During my initial investigation, I read the pleadings and publicly available materials regarding the Blue Cross Blue Shield system. I also discussed the litigation with Thomas Bender, a Kansas City attorney involved in the case, and Joe Whatley, lead counsel for the provider plaintiff class. Their goals and strategy for the litigation were consistent with my conclusions about what the goals and strategy should be based on my independent investigation and analysis of the case.

6. On or about January 25, 2016, Mr. Whatley and I talked on the phone about the litigation and agreed to meet in person to discuss it further.

7. Mr. Whatley and I met in New York City on April 21, 2016. During our meeting, we discussed Class Counsel's goals and strategies for the litigation extensively, which were consistent with my own views. Mr. Whatley shared his vision for the litigation freely, and expressed his hope that one of the large health systems represented by Polsinelli would assist him in settlement negotiations with the Blues or become a class plaintiff.

8. At the time of our January 2016 telephone call and April 2016 meeting, neither Mr. Whatley nor I had requested or executed any type of confidentiality agreement, non-disclosure agreement or common interest agreement.

9. Shortly after our meeting in New York, Polsinelli proposed that Mr. Whatley and I execute a mutual confidentiality agreement. Mr. Whatley agreed, and we entered the agreement in May 2016.

10. In 2016, Polsinelli was engaged by six non-party health care providers to represent them in connection with subpoenas issued by several of the BCBS Defendants in the MDL.

11. Throughout 2016 and early 2017, I represented these clients in responding to and negotiating the scope of the Defendants' subpoenas. Several disagreements arose, including disputes about the scope of the subpoenas and Defendants' responsibility for my clients' outside attorney's fees.

12. On June 27, 2017, Defendants filed a motion with the Court to compel four of my non-party clients to produce documents responsive to their subpoenas, and to schedule depositions.

13. On July 14, 2017, my clients filed a joint opposition to the motion to compel and a motion to quash or modify Defendants' subpoenas. The filing included a declaration from me as an exhibit.

14. On July 21, 2024, Defendants filed a reply brief.

15. On July 27, 2017, I appeared at a hearing to address Defendants' motion.

16. Following the hearing, Defendants and my clients resolved their disputes concerning the subpoenas without a ruling from the court.

17. Accordingly, Polsinelli's four non-party clients are no longer before the Court.

18. Neither I nor any other Polsinelli lawyer has made a filing or otherwise appeared in the MDL since the July 27, 2017 hearing, more than seven years ago.

19. In 2019, based on our common views as to the goals and strategy for the litigation, Mr. Whatley invited me and one of Polsinelli's clients to participate in mediations for the MDL. My client and I accepted.

20.  I was intimately involved in the planning and preparation of a mediation session, which I attended on December 3, 2019. I signed a mediation confidentiality agreement in order to participate in the mediation.

21. In planning for and conducting the mediation, Mr. Whatley and I further discussed Class Counsel's goals, strategy and tactics for the MDL, which confirmed that Class Counsel's overall goals and strategy remained consistent with my own conclusions and had not changed since my initial investigation in 2016.

22. My initial investigation and analysis, experience in the mediation, conversations with Mr. Whatley, and continued review of publicly available materials regarding this litigation inform my earnestly held opinion—which Mr. Whatley once shared—that the ultimate goal of the consolidated cases in Alabama should be the certification of two nationwide classes, which were referred to in the Third Amended Consolidated Complaint as the "Nationwide Injunctive Class" and the "Nationwide Damages Class.

23. At no time have I disclosed any information in violation of the mediation confidentiality agreement or the confidentiality agreement I executed with Mr. Whatley. All of the information I disclosed about this case in my presentation came from publicly available sources, my personal experiences, or from statements made by Mr. Bender and Mr. Whatley during my initial investigation of this case, before the execution of any type of confidentiality agreement.

24.  Nothing in either agreement barred me from representing healthcare providers.

25. In early 2024, I attended an MDL hearing in which the Court discussed its intent to remand all of the cases, except the case originally filed in Alabama, to their courts of origin.

26. On October 14, 2024, I saw an ECF notice in the MDL proceeding indicating that a settlement had been reached and immediately reviewed the details of the settlement.

27. Based on my extensive personal involvement in the litigation and the events surrounding the proposed remand and subsequent settlement of the case, it was—and remains—my opinion that Class Counsel entered into a settlement that abandoned many of the most significant forms of relief they once sought.

28. Specifically, I noted that the settlement provided no relief regarding the National Accounts Program, very little relief regarding the Blue Card Program, and almost no relief regarding the exclusive territories defined by the Blues.

29. It also appeared to me that Class Counsel, after 12 years of hard work and the expenditure of $100 million dollars, decided it was no longer worthwhile to continue litigating the case following the Court's remand decision. I believe that, rather than litigate more than 30 smaller class actions, Class Counsel thought it would be easier to settle the case, on a nationwide basis, for the best deal they could get—which was, in my view, not an ideal settlement for putative class members.

30. I listened to the Court's Preliminary Approval Hearing on November 14, 2024. At that hearing, I heard the Court make statements referencing how the settlement for the subscriber class changed following preliminary approval, and suggesting that it was at least possible the same thing could happen with the provider class.

31. Based on my assessment of the settlement, and the Court's statements, I expected—and still expect—that many healthcare systems and large providers will find the proposed settlement unsatisfactory and consider opting out.

32. Zotec Partners is a consulting firm that advises healthcare providers and a longtime Polsinelli client. After the settlement went public, Zotec's management asked Polsinelli to make an informational presentation on the proposed settlement for Zotec's clients.

33. I agreed to give the presentation as a courtesy Zotec, and did not view the presentation as a marketing opportunity for the firm or intend to engage any of the attending providers as clients.

34. Zotec's client base is comprised of smaller health care providers, which Polsinelli does not typically represent in anti-trust litigation. Consistent with that practice, Polsinelli has not been engaged by any of the providers who attended the meeting.

35. I was not aware that the event would be recorded or posted online until the event was already underway.

36. I maintain that the opinions I shared at the presentation were fair and genuine, but have no intention of making any further public presentations about the proposed settlement to non-clients.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on Feb. 7, 2025

Daniel D. Owner
Partner
Polsinelli PC