FILED

2025 Feb-13 PM 01:05
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

IN RE BLUE CROSS BLUE SHIELD      CASE NO. 2:13-cv-20000-RDP

ANTITRUST LITIGATION MDL 2406

_____

\* \* \* \* \* \* \*

**TRANSCRIPT OF MOTION TO DISQUALIFY**

\* \* \* \* \* \* \*

BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES DISTRICT JUDGE, via videoconferencing, on Friday, February 7, 2025, commencing at 10:03 a.m.

Proceedings reported by stenographic court reporter, transcript produced using computer-aided transcription.

**Transcript prepared by:**
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter

APPEARANCES:

SPECIAL MASTER:              Edgar C. Gentle III
                            Attorney at Law
                            GENTLE TURNER SEXTON & HARBISON
                            501 Riverchase Parkway East, Suite 100
                            Hoover, Alabama 35244

                            Craig Alexander
                            Jared Allen
                            Adina Arith
                            Vichrist Axinn
                            Jarrod Azil
                            David Barillari
                            James Bergland
                            David Boies
                            W. Tucker Brown
                            Erin Byrne
                            Lee Carhart
                            Robert M. Cary
                            Parker Chusid
                            Anna Mercado Clark
                            U.W. Clemon
                            Abraham Cooper
                            Honor Costello
                            Alexander Delcich
                            Karin DeMasi
                            Augusta Dowd
                            David Dowd
                            Jeff Fisher
                            Linda G. Flippo
                            Alan Gardner
                            Mark Gray
                            Katherine Harbison
                            Craig Hoover
                            Hamish Hume
                            Samuel Issacharoff
                            Elizabeth Jose
                            Edith M. Kallas
                            Lauren R. Kennedy
                            Douglas Laird
                            Douglas Laning
                            Joe L. Leak
                            Carson Lee
                            Jeff Legrand
                            Victoria Lu
                            Ezra Marcus
                            Alexandra Markel
                            Hope Marshall

APPEARANCES,
Continued:

Natalie Marte
Corey Matthews
Patrick McDowell
Tyler Morales
Mary Nguyen
Decole Nicole
Daniel L. Ottaunick
Nikol Oyandich
Allen Page
Dennis G. Pantazis
Alan Peijs
Britney Piper
Paula Plaia
Aaron Podhurst
Henry Quillen
Barry A. Ragsdale
Tyler Rhoads
Nathan Rice
John Schmidt
Patrick Sheehan
Cyril V. Smith, III
Michael Smith
Nick Snavely
Todd M. Stenerson
Nick Stewart
Alan Teijs
Zachary Usey
Joe R. Whatley, Jr.
Mark White
Kirk Wood
Jeff Zeiger
Rachel Mossman Zieminski

(Proceedings commenced at 10:03 a.m. via videoconference:)

THE COURT:  All right.  The Court expedited and went ahead and determined that the best way to set oral argument would be just to do this virtually.  One, it holds down expenses.  Two, I think it makes everybody's participation easier.  But the Court set this time for oral argument on the motion to disqualify filed by the providers, and this is -- there are two motions to disqualify.  The one we're taking up today is the one to disqualify Cy Smith and Zuckerman Spaeder, which is Document No. -- our Document No. 3232, just to make sure everybody understands why we're here.  The motion's been fully briefed, as I understand it.  So we are here for the hearing.  I take it the proponent of the motion would wish to speak first.

MR. WHATLEY:  Yes, sir.  Sam will be speaking first, Your Honor.

THE COURT:  All right.  Mr. Issacharoff.

MR. ISSACHAROFF:  Yes.  Thank you, Your Honor.  I had trouble unmuting myself.

The Court has the papers before it, and we have two grounds on which we seek to disqualify Mr. Smith and Zuckerman Spaeder.  I'm going to address the first one, which, if the Court agrees, will put the second one in abeyance.  And if we need to reach the second one, which is the conflict point,

Mr. Whatley will address that.

On the disqualification point, there is ambiguity in the case law.  As the Court is aware, on the scope of the duties owed by a member of the PSC to nonclients, it is not a full fiduciary duty the way the attorney-client relationship is.  It is not a substitute for attorney-client fiduciary duties the way a class certification would be and is the -- and the way in which the Eleventh Circuit in the Oppenheim case addressed, which Your Honor is undoubtedly familiar with since you were the author of that for the Eleventh Circuit.

In the PSC context, the Courts have said that there are fiduciary-like duties that owe to all represented entities within the transferred court cases by members of the PSC even though it does not develop a direct attorney-client relationship.  This case poses the question of whether you can be a member of the PSC -- and granted there were two PSCs here, but they were working jointly through a joint prosecution agreement -- you can be a member of the PSC while at the same time trying to undercut the work of the fellow members of the PSC on the other side of the deal.  Justice Scalia once colorfully referred to this in a different context as whether you can ride with the cops but cheer for the robbers.  And we think that that is essentially what is going on here.

There is an agreement entered into by which

confidential information was exchanged in which there was access to expert reports, nonpublic material, work product, conversations that would otherwise be privileged that were made available to the two sides of the PSC vis-à-vis each other.  It is our view that what Zuckerman Spaeder and Mr. Smith have done by marketing themselves as, quote, knowing where the bodies are buried, is an attempt to monetize that inside information to the detriment of the provider side of the PSC.

We think that this is a conflict.  We think that this should disqualify them from doing this.  This has nothing to do with giving advice to current or former legal clients.  We think that our response to Mr. Boies made that very clear that there is no constraint upon the positions that one may take on behalf of current or former clients by virtue of being on a PSC.  However, the solicitation --

THE COURT:  And is that how you've distinguished the situation in A4, that A4 was a continuing client, that they were not limited from asserting a provider claim even though the firm was -- had a lawyer who was colead counsel on the subscriber side?

MR. ISSACHAROFF:  Absolutely, Your Honor.  That's exactly correct.  And that's the position that I think we took in the filing before the Court.  And --

THE COURT:  Let me ask you this.  What do you make of

this provision in the agreement, and I think it's on page 3 of the agreement:  The sharing of information and materials pursuant to the joint prosecution agreement shall not be used as a basis for seeking to disqualify any law firm from representing a client in any proceeding or future proceeding.

How does that play into your argument?

MR. ISSACHAROFF:  I think that that provision is a distillation of the experience of the lawyers on the two PSCs, having been on PSCs before.  And what it does is it says that the position that one has to take as a member of the PSC does not obligate you to counsel any client in any particular direction and does not create a conflict if you do so.

That -- that position is also consistent with the other parts of the agreement that make clear that by virtue of serving on a PSC, one does not have an attorney-client relationship with other individual clients of other firms who happen to be joined in the same MDL action.

So I see this provision as saying, consistent with what I said about the Boies representation just a minute ago, that you can take any position you want.  You can opt out. You can be in opposition.  You can do anything you want on behalf of clients.  What you cannot do is take the inside information you acquire as a member of the PSC and then market that information against other members of the PSC.  And --

THE COURT:  And what is the -- what is the record

evidence that I would look at on this motion that indicates that that's what either the individual or the firm did?

MR. ISSACHAROFF:  We submitted to the Court the transcript of the solicitation that was made.  There is a dispute, but I don't think it's a very significant one, as to whether the Massachusetts Hospitals Association is, in fact, a member of the class -- of the -- of the coordinated groups and whether it is a potential client here.

But leaving that aside, we provided a transcript of the solicitation which has the critical reference to "we know where the bodies are buried," which is, to our mind, an indication of two things:  One is that they have privileged access to the record in the case by virtue of having been on the PSC; and second, there is at least the implication that it shows the weakness of the job performed by the plaintiffs' steering committee on the providers' side, again by virtue of access to that inside information.

THE COURT:  And I guess that's one question I've had in my mind as I've worked through the papers is would this be a different situation if all -- in your view -- if all that you could point to that Mr. Smith said or did was meet with a hospital association, answer questions, and say things like, You need to just make sure this is the right deal for you; you need to ask questions of provider counsel.

There's nothing that prevents him from giving advice

like that, is there?

MR. ISSACHAROFF:  There's certainly nothing that prevents him from giving advice like that, especially if given to present or former clients.  The solicitation gets a little bit dicier.  I don't know that there's clear law on this, Judge, and we don't have a clear opinion letter from the Alabama ethics panel on this question.

But for purposes of this motion, we are not asserting at all that that would be improper.  We're asserting that the combination of encouraging opt-outs, marketing the privileged access to inside information, and then the troubling fact of coupling this with the offers of finance firms to bankroll the opt-out movement is altogether a breach of some level of fiduciary obligation that one has as a member of PSC and as a signatory to the joint prosecution agreement.

THE COURT:  So you can imagine, sitting here in a couple roles, one as a judge on the MDL that we're before -- that we're here for, and second, as chair of the third-party litigation finance subcommittee, the advisory rules committee, that got my attention when I started seeing references to third-party litigation finance.

In my capacity as chair of the subcommittee, I almost daily get people sending me things -- Hey, have you seen this, you need to look at this -- whether it's professors, lawyers, other judges.  And I did see articles related to -- and I

realize those are extrajudicial, but I did see articles related to what appears to be marketing efforts by third-party litigation financers to try to attract opt-outs or get involved in this litigation in some way.

Do you -- is it your position that Mr. Smith is working with those third-party litigation financers?  And, if so, what's the propriety of that?

MR. ISSACHAROFF:  Your Honor, I think that the best person to answer that question would be Mr. Smith.

And I apologize.  I have a dog that got hyperactive all of a sudden.

THE COURT:  No worries.

MR. ISSACHAROFF:  I think he would be better positioned to answer that than I would.  I don't think there's anybody who would seriously contest the proposition that there is litigation finance swirling all around this case at this point in a very active state in light of the looming opt-out period.

I think that the ethical rules are uncertain as to the work that finance firms do in soliciting the cause of action as opposed to financing existing causes of action.  That's a line that the common law has drawn for many centuries between barratry and maintenance.  And it's not clear where that line is today, quite frankly, Judge Proctor, and I don't -- I don't think that this case occasions this Court to try to resolve

that issue.  I think that's just a big question that has to be resolved by the Courts as a policy matter and not in any particular case.

I think for the purposes of this case, however, it accentuates the deep conflict position that one cannot basically offer to be the agent of finance firms by virtue of one's position inside the PSCs.  I think that is a much more limited proposition that we would encourage to the Court.

THE COURT:  All right.  Fair enough.  All right.  I didn't mean to get you bumped off your argument, so please pick up where you feel comfortable.

MR. ISSACHAROFF:  Judge, that's basically our argument.  We don't think it's a complicated case.  We're not seeking to stop solicitation of former clients.  We're not seeking to stop the dissemination of information.  We're not even seeking to say -- we're not even trying to say that a firm that was on the PSC could not hold itself out as a source of information for people with -- or institutions with questions about this.

What we are saying is that having signed onto the PSC and the joint prosecution agreement, you can't be both inside and outside and you can't market your inside connections as a way of soliciting opt-outs.

THE COURT:  All right.  What was your second point that you hoped the first argument was going to be a winner and

would mean that we didn't have to address?

MR. ISSACHAROFF:  Well, the second point is the conflict situation, that by virtue of being a member of the PSC and having entered into the subscriber side arrangement, that the position of encouraging opt-outs, which will diminish the scope of injunctive relief, will redound to the detriment of the subscriber class and therefore there's conflict there. That's -- the reason we think -- we think it's a serious question.

And we think -- if the Court has specific questions on it, Mr. Whatley will address those.  But we think that this is not -- this is a structural conflict that's brought before the Court, and we've got the opinion letters from the Alabama Bar on this point.  It's not our conflict that because we are not members of the subscriber settlement as such.  So we think that it's a more difficult issue.  We would prefer to rest primarily on the first argument.

If the Court has questions, Mr. Whatley should --

THE COURT:  All right.  Fair enough.  I think I will have some questions about that, but -- so one of the things that struck me, just following up on this, is some of the statements that I think the provider counsel were most concerned about, as I looked at the transcript, looked to me like, in context, they weren't as troublesome as providers might have been concerned with.  But I think you've kind of

helped me work my way through some of those points, because what I hear you saying is that you're -- the most troubling comment on your first point, on the structural conflict, is the bodies buried comment; right?

MR. ISSACHAROFF:  That's correct, Your Honor.

THE COURT:  Okay.

All right.  Mr. Whatley, do you want to pick up the argument there?  And then we'll turn it over to both Mr. Smith, the firm, and anyone else who has an interest in addressing this.

MR. WHATLEY:  Yes, sir, I do.  And as Sam said, this is our alternative and it's argument and it's an independent as well as alternative argument.

First of all, I think it's clear, Judge, but the way we got here was not in an effort to shut down communications with class members.  When we learned what Mr. Smith had done and what his communications were, we went to the general counsel of the State Bar and asked what our obligation was, and that's Exhibit 1 to the motion.  And we, of course, followed the directions of the general counsel of the State Bar.  He said either take it to the Bar or bring it to you. And we thought it was more appropriate in this situation to bring it to you and that's why we're here.

To give you some background, especially in relation to the Zuckerman firm, Judge, you may recall that early in this

litigation one of the lawyers that you had appointed on the provider side of the case joined the Zuckerman firm as a partner. And the Zuckerman firm then -- because they couldn't be on both the subscriber side and the provider side, the Zuckerman firm chose to remain on the subscriber side and the counsel you had appointed on the provider side withdrew.

Now, obviously, from that experience, the Zuckerman firm knew that there were issues about -- the same kind of issues that Sam has stated, the structural issues that he's talked about. But what happens is once we reach a settlement, then we find that they're out soliciting opt-outs from the provider settlement.

And I think the conflict issue that the general counsel addressed is now really -- is really heightened because now you have the evidence before you about the value of the injunctive relief of the settlement, how even just parts of the injunctive relief are valued at more than $17.3 billion for providers. But in the declarations that were filed, the Matt Katz declaration, which is Document 3253-2, he goes through many benefits for patients, who are subscribers, I mean starting -- it starts on paragraph 29. He starts with the prior authorization relief, which I think everybody in the country knows is a huge issue for patients and subscribers. It's a huge issue for providers. I mean, the providers bear the administrative cost of the prior

-- of prior authorization, but it is subscribers or patients who have their treatment delayed because of prior authorization. And there is a lot of relief in the -- in the settlement for -- in terms of prior authorization. It appears a number of places in the injunctive relief.

And incidentally, in his presentation, Mr. Smith, when he is really minimizing the injunctive relief, he never once mentions the prior authorization issue that's there. But there's also -- you can go through the other paragraphs, how more timely and accurate adjudications will lead to more certainty for patients and subscribers in terms of their financial issues. Administrative improvements will allow doctors to spend more time with patients. The telehealth, especially in rural areas, will mean far more access for especially specialties in rural areas. Realtime messaging and other things like BlueCard executive will accomplish things that will help patients. And as you pointed out at the hearing, at the preliminary approval hearing, the extended contiguous area contracting offers more opportunities for patients.

Now, given the fact that there are many, many benefits in the injunctive relief -- and, of course, what we have is totally a (b)(3) settlement. It's not a mandatory settlement, and it means if you opt out, you opt out of everything. And --

THE COURT: So the relief that's been negotiated is monetary, obviously, but also the nonmonetary relief is what in the subscriber side we characterize as divisible injunctive relief.

MR. WHATLEY: Yes, sir.

THE COURT: It is not going to be available to all patients; it's only going to be available to those who are participating in the settlement?

MR. WHATLEY: Yes, sir, all providers, but yes, sir.

THE COURT: That's what I'm referring to, yes.

MR. WHATLEY: Yeah.

THE COURT: But it seems like there -- as you pointed out, there may be some benefit to subscribers. Because the providers have an easier time getting claims processed, that means subscribers have an easier time getting claims processed.

MR. WHATLEY: And it improves various -- improves their -- it improves their options; it improves their -- it makes their treatment better because the doctors have more time to treat them. It is numerous other things, too, Judge, but yes.

And I started with the preauthorization point, but of course that's one specific example of it. Now -- and I point out, Judge, in terms of what is the standard on the conflict question, the general counsel of the State Bar, at the bottom

of page 2, discussed that standard. I mean -- and we would direct you to that information. And a conflict doesn't mean one client wins and the other loses; it also means one client is better and -- or one client is worse. It's -- but we would urge you to look at that standard that is there in the -- in the opinion letter that he gave us that obligated us to come before you.

Now -- so that is the source of the conflict. And I'm going to come back at the end to the Boies Schiller issue, which Sam has addressed, but there's -- I think there's more to tell you about that that frankly draws a clear distinction between Boies Schiller and Zuckerman.

What you get to next -- and frankly, the conflict was made much, much worse by Zuckerman by the statements that were made. And when you look at statements made by a lawyer out soliciting clients, you're right in Rule 7.1. And 7.1, obviously a lawyer is obligated to communicate truthfully, but that -- the way that is defined is very important. And, of course, this is a minimum standard, it's not a maximum standard. The rules are all minimum standards that lawyers are supposed to follow.

And 7.1 says a lawyer shall not make or cause to be made a false or misleading communication about the lawyer, the lawyer's services. And a communication is false or misleading if -- and you're now in subsection (a) -- if it contains a

material misrepresentation of fact or law or if it omits a fact necessary to make a statement considered as a whole not to be misleading.  And then the rule goes on to talk about creating unrealistic expectations.  But the point is material omissions are just as false under 7.1 as active misstatements, and we think you have both here.  And I'd like to talk about some of those.

I mean, the first -- the first area that really caused -- I'm just -- I'm going to give you a couple of examples from the presentation.  And the first area that causes concern is on page 8 of the transcript where Mr. Smith says, In 2018 we won a victory -- and that was the decision by the Court in Alabama -- that the combination of the restrictions was per se, and then he talks about this is a big hammer and it forces resolution because if something is per se illegal, there are very, very few defenses to it.

Now, what is it that Mr. Smith knew when he made those statements in December and that he didn't say?  Well, first of all, he knew that the same order he was referencing, the standard of review order that you entered, recognized and overruled summary judgment for plaintiff -- for the subscriber -- the subscriber plaintiffs on the -- on the single entity defense.  He knew that there was a specific defense out there from that time that he didn't mention.  He also knew because he continued after the subscribers settled.  Mr. Smith

continued to be on the service list.  He continued to be served with every document entered in the case.  He knew that you had entered orders denying summary judgment for us on the -- on the trademark defense, as an example, something he didn't mention when he was talking about how -- I think at one point he even says that a per se ruling is almost game over. So again, he didn't mention that there are orders from you recognizing that defense.

He didn't mention that there are orders from you recognizing that the two-sided platform question is still an issue and presents issues, because there's a separate order or multiple orders from you entering that.  He didn't mention that about a week before his presentation you had entered the preliminary approval order and recognized in that order the fact that there were these defenses and other risks out there. That, Your Honor, is a huge problem when you go in and start saying there are very, very few defenses and you know Judge has recognized specific ones and you don't tell people about that when you're out soliciting them to hire you to opt out of a settlement and do something else.

Now, it goes even further, because the next thing that happened that in -- that was never mentioned after the subscriber settlement was that because of relief in the subscriber settlement, there were motions, and you went back and changed the standard of review for the provider -- for the

-- the provider claims that were per se in the previous order. You ruled that starting going back in April of 2021 the standard of review was now rule of reason. And after Mr. Smith had explained the per se ruling, he never told these providers that for current purposes and damage purposes going back to April of 2021, they were in a totally rule of reason case. He never told them that in the same ruling that you made saying that the combination of practices were per se that the BlueCard claims, which are very, very important to providers, were and always have been rule of reason. He never told them that. He omitted all these points out.

Once he started to communicate about the standard of review, he was obligated to communicate, not to leave out important facts about that, but he did, and that's important. And that's a violation of the material omissions part of 7.1.

Now, the other thing we have a problem with, remember he is out there on the standard of review discussion. Remember, he is out there soliciting people to hire him and to opt out of our settlement and all of the benefits it has. And the other thing, he talks about what we did, he never mentions that the -- that the providers were also involved in the standard of review motions, briefing, and argument. He talks about what we did, and we went back and looked at the transcript. And, of course, you find David's argument and Mike's argument and lead counsel subscribers' in that -- in

that argument, but you also find the Edith-and-I argument, but you don't find one word from the part -- the "we" that Mr. -- that includes Mr. Smith.  He never said a word in that hearing.

But let's go on -- I mean, the other area I would like to talk to you about, Judge --

THE COURT:  Well, so is your point there, Joe, that you're not sure he was -- you think he was taking more credit for the per se ruling and not giving any credit to the providers' counsel for the per se ruling?

MR. WHATLEY:  That is -- that is the last point I was making, Judge.

THE COURT:  Yeah, that's what I'm saying, the point there, I said.

MR. WHATLEY:  Yes, sir, absolutely.  But remember, he is saying hire me and opt out of their settlement.

THE COURT:  Yeah.

MR. WHATLEY:  And yet he is deliberately leaving us out of all of the efforts that went on to achieve what he is taking full credit for.

THE COURT:  So I do -- just reading the transcript as a whole, he does say there were class actions filed by the subscribers and the providers in 2012.  There were provider cases filed which challenged the same restrictions but for different reasons.  And in 2018, we won a big victory.

I understand your concern that maybe he's overinflating his own participation in that, but I don't -- I don't know -- I do think he -- I think he -- the reading that I have of the transcript is that both sides challenged this and we won a victory.  But again, we might have to hear from Mr. Smith on that or his --

MR. WHATLEY:  Well, Judge, yes, sir, I get that, but the fact is, it is undisputed that he never laid out the other issues I talked about related to standard of review.

THE COURT:  Yeah, I hear you on that.  And -- so this may -- this may help the parties opposing the motion when they speak in a moment, but let me just be full cards up about one of the things that I have had a nagging concern about as I worked my way through these motions, okay?  And as I did that -- and maybe -- Karin, maybe we should have Evan Chesler on the line, but I don't think we do, because he might like to hear this.  I did come away with more of an appreciation as I looked at does a settlement benefit both sides or does a provider settlement help providers and hurt subscribers, that whole question about conflict that was raised.

And it forced me back into thinking more about this two-sided platform issue and just the nagging concern that when the rubber hits the road, I'm -- it seems to me this example pretty clearly demonstrates one of the Blues' provisions for settlement.  And by the way, the Blues can't

run back to this position; they kind of surrendered it as part of the settlement.  But they -- the Court was still going to have to deal with this two-sided platform issue and what effect that would have even on the per se -- the per se standard before 2021.  I -- and again, I don't know.

The question is, is it fair for Mr. Smith, a knowledgeable, seasoned lawyer who's participated in this case, to have been in a position to talk about that as he's discussing standard of review and, at least according to the providers, implying that this is a clear lane to the rim and a slam dunk.

MR. WHATLEY:  Judge, could -- on that point, I mean, I'm -- maybe I didn't emphasize it enough, but that is clearly one of the issues in your orders that you raised before.  It is a point that you've made in your -- it is a point that you made in the preliminary approval order.  And yet despite the fact that Mr. Smith was served with all of those documents and had them, he never once told the subscribers he's trying to solicit -- or providers he's trying to solicit that, look, there is also at least possibly a two-sided market issue that could affect you in multiple ways, including affect you in the way the case is tried in giving the Blues extra -- extra ability to try the case in a favorable way.  He doesn't go into any of those issues.  He just leaves -- I mean, he makes a representation about the standard of review and then doesn't

-- doesn't tell all these other things that are absolutely necessary for his representation not to be misleading because it omits so many important issues.

And those are -- that was -- that is really the heart of our point on that, and that exacerbates the conflict. But he did it also, Judge, on the injunctive relief. If you look in the transcript, in the paragraph that appears on page 10, he very obviously makes an effort to trivialize the injunctive relief here. I mean, he is -- he is talking about the various minimal things, and later -- later he says -- and at the end of this one paragraph where he's talking very generally about injunctive relief, he says, And that's the extent of the so-called injunctive relief. By the way, he refers to the injunctive relief as "so-called" injunctive relief at least four more times.

THE COURT: But doesn't he use "so-called" -- I'm trying to be as fair to Mr. Smith as I can here, but doesn't he use "so-called" in other contexts like the so-called exclusive service areas at page 8, the so-called default approach for calculating each hospital's recovery at page 33? I'm not sure what to read of "so-called" because he uses it in different contexts to discuss subjects that it doesn't seem like he's trying to diminish.

MR. WHATLEY: Well, he very clearly, in this paragraph, Judge, where he says and that's the extent of it,

he -- very clearly he is trying to diminish the injunctive relief. I mean, I know he didn't have, Judge -- I know he didn't have the valuation of 17.3 billion of the injunctive relief that now is in the record, but what he did have, he did have -- remember, Judge, at the preliminary approval hearing Edith took more than an hour to present the details and the comprehensive nature of the injunctive relief here, and afterwards we presented a PowerPoint. Afterwards you asked us to submit that to the Court and we did in the public record, which meant it was served on Mr. Smith. He had the PowerPoint. It's in the settlement agreement for page after page, but he also had the PowerPoint that describes the great extent of the injunctive relief before he went out and described it in the way he did in the -- in his presentation.

THE COURT: So, let me ask you this: At the time that you had your interaction with the State Bar's office about this issue and got the guidance that they thought this was a matter that should be brought either to the attention of the Bar or the Court and you followed the second branch of that, did you have a copy of the transcript of the Massachusetts Health Association presentation at that point?

MR. WHATLEY: Judge, I -- we had the video. Mr. Smith's participation was put up on YouTube. It's still there.

THE COURT: Okay.

MR. WHATLEY:  We had the video of it.

THE COURT:  Did the State Bar review the video?

MR. WHATLEY:  I don't know.  I am not the one that went to the State Bar.  I know the information in the video was presented.  I don't know.  I can get that information and get it to you, but I don't --

THE COURT:  All right.  And what portions -- so just so I'll be clear as I'm working my way through this, what portions of the video or the transcript -- may be easier to talk about the transcript so we can peg a spot that you're referring to -- show solicitation?

MR. WHATLEY:  Let me back up, Judge.  The page I was quoting from, it was page 10 about the injunctive relief.  I don't -- I did not look at the solicitation issue.  I mean, a number of times he says they're here to be available.  But let me go back.

I think early in the -- Judge, on the top of page 6, early in his introduction of himself, Mr. Smith -- he first starts talking on page 5.  At the top of page 6 he says that -- let me tell you what we want to try and accomplish here.  At the end of the day you know we're going to be representing some of the hospitals and potentially other providers and what we're going to be called -- to call opt-out litigation.  We'll talk about what that looks like.

That's in the context of his introduction.  Obviously,

he is wanting to be representing providers like the one he's presenting to in opt-out litigation.

He does go through and say, I'm offering you advice on what to do, but he makes it clear to everybody there that he's there to be hired to be an opt-out lawyer right at the outset of his presentation.

THE COURT: Well, he does say, We want to give you good advice about whether you should stay in this settlement or opt out -- or stay out.

MR. WHATLEY: Right.

THE COURT: We can certainly recognize there might be a situation where a hospital might want to stay out, but to make that decision you need information. Some of it you're going to hear today in this presentation and some of it -- vital information you're going to need to get from providers' class counsel.

MR. WHATLEY: That is all correct. But he makes it clear that they are -- they want to be engaged in opt-out litigation.

THE COURT: Right. Okay.

MR. WHATLEY: He does that at the outset of the presentation.

THE COURT: All right. I hear you.

And what -- let me ask you this, another question about the transcript. If you had to put your thumb down on

the most troubling aspect or aspects of this so I can focus in on those, what are those?

MR. WHATLEY:  Well, Judge, could I -- could I go back? I didn't fully answer your last question.  Could I do that first?

THE COURT:  Sure, sure, absolutely.

MR. WHATLEY:  If you would look at page 27 and 28, Mr. Smith talks about how he is in a group with two other nationally prominent firms.  We're prepared to basically take on the opt-out litigation on a 100 percent contingency basis.

That's clearly trying to get clients to sign up with him.  You don't -- that's not making -- that's not making advice about the settlement or, you know, whether it's trivializing the injunctive relief or not.  That is -- that is making it clear he's wanting people to sign up with him and what the terms would be.

MR. ISSACHAROFF:  Judge, if I may add one thing, if the Court looks at page 30 in the question-and-answer period, there's a pretty clear representation that the settlement is for pennies on the dollar and that one can do much better getting out of the settlement.  And I think that reinforces the point that Mr. Whatley is making.

THE COURT:  I think the odds are overwhelming that you would do better than that.

MR. ISSACHAROFF:  Yes.  Yes, Your Honor.

MR. WHATLEY:  And -- so, Judge, I mean, you asked about what is the most troubling.  I think the point -- I think it is the combination of all of it that's most troubling.  I think it's most troubling that the representations that we have talked about on the standard of review without telling all of the facts, trivializing the injunctive relief the way he did without telling all of the facts, and especially when he never told people that, look, you can get -- you can get your own injunctive relief, when he knew the standard for any claims going forward in the future would be rule of reason.  He knew you had said in your order how difficult it would be to recover the kind of injunctive relief we got.  He knew that you said in your preliminary approval order that the injunctive relief was outstanding relief for providers, and he never says a word about that even though he was served with a document saying all that.

So all of that, Judge, are important sections.  I mean, I think all of the pages we've referenced are important for you to look at carefully.  We think it's also important for you to look at the video that we attached the link to in our papers just to see exactly how Mr. Smith was presenting it.  And that, to us, is also important.

THE COURT:  All right.

MR. WHATLEY:  Judge, there's -- I promised I would address the Boies Schiller issue, too.

THE COURT:  Yes.

MR. WHATLEY:  And I want to say that.  We have no information that Boies Schiller has been out soliciting opt-outs.  We have no information that Boies Schiller has made false or incomplete statements to class members.  The fact we do know -- and your Special Master could also confirm that -- what Boies Schiller did was that they brought their longtime client to us to allow us to have discussions directly with them about the benefits of the settlement.  That, it seems to us, puts Boies Schiller in a very different setting than the Zuckerman firm.

And for those -- all of those reasons, in addition to what Sam said, we don't think there's an issue with them, and we have not brought -- the motion does not apply to them.

THE COURT:  All right.  I think -- now, let me ask you this, Mr. Boies.  You may not have a large role in this, but since you were just invoked, perhaps it would be good to let you or one of -- a member of your firm, whoever you designate, to address any concerns you have about this motion as relates to A4.  But what I'm hearing is the providers and, at this point at least, the Court doesn't have a lot of concerns about A4.

MR. BOIES:  I think that's right, Your Honor, and I do think -- I do think our situation is different.  There are times over my career when I wished I was a judge and there are

times during my career where I'm glad I'm not. This is one of those times in the latter category.

THE COURT: Another time is when you get a check.

MR. BOIES: Right, that's another time as well, Your Honor. The -- I think this is a -- I think this is a difficult and complicated issue, and I haven't gone into it enough to want to express a view to the Court about it.

THE COURT: Well, you've taken away my solution on this. I was just going to get everybody to agree to let you write the opinion on an R & R and send it to me. Just kidding. Just kidding.

MR. BOIES: This is one that I'm glad that I don't have the responsibility to deal with.

THE COURT: All right. Fair enough.

Okay. I think we are ready to go to hear those opposing the motion, and I take it that would be the Zuckerman firm and Mr. Smith. Is it Mr. Leak who is going to be speaking?

MR. LEAK: Yes. Thank you, Judge. Joe Leak.

I'm going to start probably by kicking it off to Cy a little early because it seems like their focus now is primarily on the presentation. In their response to our opposition, they initially withdrew all of their requests that certain statements be corrected in the public, and it seemed to me they were backing off anything with respect to the

presentation itself.  I'm going to let Cy address those with the Court's permission, and I know that he also wants to specifically address some of the issues with regard to the funding litigation, the companies that are out there, the solicitation allegations.

And I will say to the Court today was the first time I've heard anything with respect to 7.1 of the Alabama rules ethical code, and it sounds like a new argument is being made. And maybe I misunderstood it, but now it sounds like that based upon the violation of a solicitation rule, they now are seeking disqualification from representing opt-outs.

THE COURT:  Well, so I think two things.  I think, Mr. Leak, those are both excellent points that clarify things for us.

So first, Joe or Sam, would you please address whether you're, in fact, withdrawing any request for corrective notice.  Is that -- I saw that, too.  I just want to make sure I'm understanding that correctly, though.

MR. ISSACHAROFF:  At this time we are, Your Honor.  We think that, given the compressed time period and the difficulty of the issues being raised here, it's best to resolve whether there is a disqualification first before trying to get into the question of whether corrective notice is needed.  And we think that if the disqualification is granted, to a large extent the corrective notice issue becomes

moot.

THE COURT:  All right.  And then the second point is, is this a new argument -- maybe this is for Joe -- under Rule 7.1?

MR. WHATLEY:  Judge, it's not a new argument.  If you will look, 7.1 is cited in the motion.  It's cited in our reply.  It is not something new that's come up.  It was cited in both the motion and the reply that we filed.

THE COURT:  All right.  Very well.

MR. LEAK:  And, Judge, to that point -- and I may be misunderstanding the argument.  That's probably it.  But it seems to me that they are saying because of ethical violations of 7.1, solicitation, that the sanction they're seeking is now disqualification.

So we have -- we do have two arguments, one of which I want to address, and that's the blanket disqualification under 1.7 and 1.9.  But I do want to clarify this first before I turn it over to Cy:  Is the argument now that because there were solicitations they claim to have violated the code of ethics that the sanction should be a disqualification?  Because that has not been raised.

THE COURT:  Fair question.  I'll let Joe address that.

MR. WHATLEY:  Judge, to be clear, the sanction we have -- we have sought in our initial motion and in the reply is disqualification.  Our position is that the violations of 7.1

have made the conflict issues worse.  It's exacerbated the situation.

THE COURT:  All right.  That's what I -- that's how I read the argument to be, that in evaluating the 1.7 and 1.9 issues, the Court cannot overlook these concerns about not only what -- whether there's a structural conflict, whether they're soliciting opt-outs by a subscriber PSC member would be a positional conflict but also the -- at least what the providers contend is the incompleteness of the information provided in the -- in the attempted representation.

MR. WHATLEY:  Exactly right, Your Honor.

THE COURT:  Okay.  All right.  So, Joe, if you want to address that, that's fine.  If you want to let Cy address this, that's fine as well.  I understand we'll be coming back to you at some point either way.

MR. LEAK:  Yeah.  Judge, if we could, let's go ahead and hear from Cy as far as the presentation itself --

THE COURT:  All right.  Thank you.

MR. LEAK:  -- if that would be helpful.

THE COURT:  All right.  Hi, Cy.  Good morning.

MR. SMITH:  Good morning.  May it please the Court.

Let me answer the question that was raised early on with respect to litigation funding, because I think it's helpful perspective for the Court to have here.  As I said in my declaration, we've talked to hospitals that are -- the vast

majority of whom are present or former clients, people that we have a strong existing relationship with, people who called my partner, Bill Schultz, who is the former general counsel of the Department of Health and Human Services.  We are not a stalking horse for some litigation finance firm.  We have no agreement, no understanding with any litigation finance firm.  They have not introduced us to any hospitals or providers out there.  That's just not what we're up to.  So I hope that puts that particular issue to rest.

THE COURT:  Have you given any advice along the lines of whether someone should consider opting out or not that touches and concerns third-party litigation finance?

MR. SMITH:  Absolutely not.  Absolutely not.  We've told them that if hospitals -- sometimes hospitals have raised it, and we've said that's an issue for you guys to address, not for us.

THE COURT:  So I know there's different models for third-party litigation finance.  Some are lawyers getting the financing to finance litigation; some are clients getting the financing either to litigate the finance or as a front payment for any potential recovery.  What you're saying is you're not holding yourself out and not talked to any third-party litigation financers about financing your firm in taking on these cases?

MR. SMITH:  Not at either end of it, Your Honor.

We're not putting the hospitals in touch with litigation funders, and we ourselves have not requested litigation funding for this.

THE COURT: All right. Sounds like to me, then, the only issue I have on that is how it bears upon the subcommittee's work, just as another experience about how third-party litigation finance may or may not be interacting with federal litigation. Fair?

MR. SMITH: Yes. It's a fruitful study -- subject for study but it's not part of our involvement in this case.

THE COURT: All right.

MR. SMITH: Except there's a concern that because there has been chatter in the press and so on about this that the settlement's going to blow up because litigation funders are going to buy up hundreds and hundreds of hospital claims. I don't know about that and we're not a part of that.

THE COURT: Okay.

MR. SMITH: I do want to touch briefly on the joint prosecution agreement, which was not attached to the -- to the motion papers. We had to go dig it up and find the pertinent language, which you quoted, Your Honor. It's --

THE COURT: Obviously, I have access to it.

MR. SMITH: Yeah. Well, and it says it shall not be used to disqualify a client in any current or future proceeding. Doesn't talk about present clients at all in that

clause. And so it seems to me that it really -- that that's kind of the beginning and the end of the question. It says that you simply can't reveal or divulge information that you've gained as part of this joint prosecution agreement. And as my declaration affirms, I have not revealed and I have not divulged any such information in the context of talking to hospitals or otherwise.

If the providers wanted different language, they could have asked for it and we would have said no. There are examples of that, Your Honor, in one of the cases the Blues cite in the Deutsche Bank case. That's a patent case. That's a situation where the protective order said that because you're going to have access to business sensitive-type information, you are forbidden from representing certain clients in future litigation. So those things exist, but that's not what this joint prosecution agreement says.

I also do not understand the distinction between -- that is proffered by Mr. Issacharoff in terms of A4, the Boies Schiller claim. Boies Schiller, as I understand it, filed that case in 2020, which was after the joint prosecution agreement was entered into. And so the fact that they had a client before the provider settlement is not relevant here. So I get it that there are efforts trying to distinguish A4, but from that standpoint, our firm and Mr. Boies's firm are in exactly the same situation. We both have --

THE COURT:  Well, yes and no.  I think what Mr. Whatley said is they don't have any information that Boies Schiller or lawyers at Boies Schiller are soliciting opt-outs, trying to represent opt-outs.  They're representing someone who may end up opting out, but they were representing them in litigation before the provider settlement even was in place to opt out from.

MR. SMITH:  That is an accurate distinction, Your Honor, but it's not relevant to the argument that's being made for the joint prosecution agreement.  The argument that's being made there is that the joint prosecution agreement requires its signatories to be hands-off and not to represent people who are adverse to the -- to the other group, to the --

THE COURT:  Yeah, I'm not -- I'm not hearing the argument from the provider counsel that way.  What I'm hearing is that the joint prosecution agreement was the vehicle by which lawyers could get confidential information.  And maybe the agreement doesn't speak to disqualification, but the agreement was what was the doorway to get the confidential information.

And I'm not saying they're right on this argument; I'm just saying I think this is the argument, that once you have that confidential information, it -- you can't go take actions that hurt the subscriber class.

And their argument, as I understand it, goes something

like this:  The provider settlement actually provides indirect but substantial benefits to the subscriber class.  They kind of categorized those at the preliminary injunction hearing, but -- and I think Joe summarized those earlier in the hearing.  But using confidential information and saying we know where the bodies are buried may be improper because that is -- it's sending a signal that I'm going to use this confidential information to oppose the settlement at least in the context of advising clients they ought to opt out.

So that's my first question is, was your purpose in these meetings such as the one I've seen the transcript of -- and it sounds like providers think I need to go watch the video, but -- is the purpose of those meetings to get large providers to hire you to opt them out?

MR. SMITH:  The answer to that is yes, but let me -- let me just note one thing the Court said, because I think it's critically important for the conflict point that Joe Leak is going to address in a moment.

As you just said, Your Honor, the provider settlement creates indirect but substantial benefits to subscribers.  The keyword there is "indirect."  Yes, there are benefits, but yes, they are indirect.  And so under the most stringent rule here, which is 1.7, right, it has to be direct adversity.  So the fact that there are second order effects like that is important but -- I mean, it's of note but it doesn't create a

conflict.  And obviously, Joe is going to speak -- Joe Leak is going to speak --

THE COURT:  Well, and here's the -- and I understand that.  That is the cookie-cutter application of 1.7 and 1.9 in the usual case.  I think Sam's point, as he presented the argument initially on the potential structural conflict or the conflict with respect to this, is it's not clear what the rules of the road are in cases like this.

Now, that inures to your benefit in some ways because if it's not clear, the Court's got to be very careful about imposing disqualification, if it wasn't clear to you on the front end.  But on the other hand, I think the fact that this is a pretty unique application and not a cookie-cutter situation suggests that there's probably a blurred line between direct and indirect.  There's no question that there's a benefit to the subscriber class on the providers.  I made that finding in the preliminary injunction hearing.  I think it was important because that's another factor that the Court ought to consider, you know, public interest, fairness of the deal, those type of things.

So I hear what you're saying, but I'm just telling you that I'm in a little bit of a legal fog about exactly how that plays out here.

MR. SMITH:  Okay.  Well, let me --

THE COURT:  Full disclosure.

MR. SMITH:  Yeah, I understand.  And so let me try and get quickly through the Massachusetts Hospital presentation and let Joe get on to the main event, which is the conflict argument that was pressed in their reply.  That was the main event.

So, Your Honor, this was a lunchtime presentation.  It was about 45 minutes long.  It was -- you've got the transcript, which the providers, to the best of my knowledge, did not have until we prepared it, and we -- it was done against the backdrop of the providers' class counsel providing tons of information both in writing, in webinars, and in phone calls to class members.  In fact, they made a presentation -- I think it was actually referenced at the end of ours that they made a presentation to the same group at the Massachusetts Hospital Association.  And the idea behind this is, you're going to hear -- as a class member, you're going to hear lots of important positive information about the settlement.  You need to have some context for it.  You need to provide a balanced presentation, which is what I attempted to do.  I hope the transcript will bear that out.

In terms of the defenses, there's a claim that, you know, we minimized it in talking about the defenses.  I said several times, You could lose.  And I said, Go and ask the provider -- providers' counsel -- I'm getting an echo, Your Honor.  Are you getting a --

THE COURT:  Yeah, you are.  For a minute, I thought somebody was interjecting, but no, it was you interjecting to you.

MR. SMITH:  Yeah.

THE COURT:  No, you're back.

MR. SMITH:  Okay.  Good.  I said, Go ask the providers -- make sure you talk to them to get the entire picture, okay, as part of this balanced presentation.

As Professor Rubenstein says in his declaration, the point about the opt-out process is not to have a one-sided presentation from the people who are sponsoring this settlement, who are cheerleaders for it; it's to get some balance to it.  And that's what I attempted to provide.  And if the Court's looked at the transcript, you can make your own judgment about that.

They said, Well, you know, part of the damages are subject to rule of reason analysis.  Again, out of the 16 years in the class period, 13 years are subject to per se scrutiny.  We're talking about a 45-minute presentation to try and give people grounding on litigation that took place over a 13- -- 12- and 13-year period.  And I think that that's -- I think it was reasonable to try and summarize it in that way.

With respect to the injunctive relief, Mr. Whatley is critical of the fact that I referred to it as so-called, which I, in fact, used -- this was a lay audience, Your Honor, both

lawyers and nonlawyers, and so I tried to put it in shorthand and refer to it as the way the lawyers refer to it, so-called injunctive relief.

THE COURT:  Yeah.  To be clear, I wasn't real concerned about your use of "so-called."  I think that should have been clear from the questions I asked a moment ago.

MR. SMITH:  Very good.  Very good.

THE COURT:  But I am concerned about -- I understand you're saying -- and I'm trying to get my thumb back on the page we reviewed earlier in the hearing where you said words to the effect of, They very likely could get more if they opted out.

And I'm -- so first, I'm not so sure about that, if that's what you were saying to this group, for a couple reasons:  First, I know you weren't in on the discussions on the provider side that we had often, but one of the questions I kept pressing Mr. Whatley and Ms. Kallas on and Judge Clemon and Kirk Wood and others, is, hey, one of the -- and I think I put this in the preliminary injunction hearing -- one of the big problems is in our current healthcare system, doctors going into a jury -- going before a jury and saying, We don't make enough money on this healthcare system, or hospitals saying, We don't charge enough in this healthcare system, is problematic from the beginning.

Second, again, I'm not sure that you have been able to

follow all the developments, but particularly on the provider side and at the last Economics Day that we held in Chicago -- and, quite frankly, that Economics Day, if we were to put all the lawyers on the provider side under oath, might say that that got everybody serious about negotiating.  I think a mediation was scheduled right after that and we got some traction starting in that mediation.  But I raised the question about, okay, two-sided platform and we're going to have to get into that, and it was getting more traction at that point.

And third, I'm concerned about your -- now, you could be right about this; I don't have a crystal ball, but -- your position that if you opt out, you still might get some of this divisible injunctive relief.  Again, I could be wrong, and it's not my job to give advice to people, but I think you're -- I think you're totally wrong on that.  I think if -- my understanding of the Blues' position -- and I do have an understanding of the Blues' position -- is that if you're willing to settle with us on this deal, you'll be a most favored nation.  You will get this injunctive relief.  If you're not, then we are totally committed to running our system the way we think fits and we'll litigate this and see who wins.

So again, I won't ask Karin or Lauren to weigh in on that, but I bet they wouldn't disagree with my

characterization there.

MR. SMITH:  Certainly.

THE COURT:  Actually, I will ask them to weigh in on that.  Am I wrong?

MS. DeMASI:  You're not, Your Honor.  The Blues' position is that no provider that participates in the settlement will be eligible for the injunctive relief.

THE COURT:  And I take it your client has a structural business plan in place to provide that divisible injunctive relief to those who settle and it won't go to those who don't.

MS. DeMASI:  Our client is working on the implementation structure, and our intent is to provide the injunctive relief to all providers who participate in the settlement -- we will do that -- and not to provide it to those who don't.

THE COURT:  Okay.  So all those things are concerns I had about, you know, if I was -- now, that doesn't mean, Mr. Smith, you're not allowed to give your advice.  The providers' argument is that you've left things out in giving that advice, but I'm not -- even they said, We are not trying to squelch anybody from advising clients about whether they ought to opt out.

But in reality, I guess my question is, does the transcript I'm reading take into account those things that either you knew, should have known, or maybe didn't know?

MR. SMITH:  So I believe the answer is yes.  Let me start with the last one, okay, which is the question of injunctive relief.  And Joe Leak may have a little more to add to this.

The question here is -- let's get past this question of whether the Blues could figure out a way to not provide the noncash relief to people who opt out of the settlement; okay?  The point that we're making in our opposition papers is that any hospital that decides to opt out of the settlement has made a decision that they could do better outside the settlement after talking to the providers' counsel, after talking to us, and after talking to their regular outside counsel, as many of them are doing.  And the fact that you couldn't get the, sort of, noncash relief under the Sherman Act or under a court decree doesn't mean you couldn't get it in settlement.  And are the Blues going to fight hard about that?  Yes.  In fact, I said in my presentation the Blues are represented by tenacious attorneys, okay?  We're very familiar with that fact.

So I know the Court is not trying to pronounce a flat rule that nobody should opt out of this because --

THE COURT:  No, not at all.  That's what I just said.

MR. SMITH:  I know you're not.  And my point is that this is a decision by providers to make after looking at all of the information, not just from us but information from

providers' class counsel.  And that applies to the injunctive relief as --

THE COURT:  But -- and you -- your position is that you're not so sure this didn't change the argument and we have a new argument we're dealing with, but their position is 7.1 dovetails into these 1.7 arguments, and 7.1 requires you to be -- you're going to engage in this behavior -- this speech, this -- what otherwise would be protected.  You can't mislead.  And I guess that's the -- what I'm plumbing at is, one, is it misleading; and two, if it's not misleading, is there anything else we need to do about it?  That's what I'm really concerned about.

And again, Cy, please understand this.  I am -- I certainly didn't ask this issue to be brought to me.  Mr. Boies is right, this is when it's not fun to be a judge, but I've got to deal with what's brought to me and I'm trying to work my way through it.

MR. SMITH:  I understand.  I understand.  And so recognizing that there is a right under Rule 23 that has a constitutional dimension to opt out, nobody does that unless they think that they would do better on balance in opting out.

And the history of opt-outs is that when there is a good, decisive ruling, not an end-of-the-case ruling but a good, decisive ruling in the underlying settled case, that opt-outs can do better.  Not in every case, because as I've

said, you could lose.  There could be many years of litigation, and the Blues are represented by tenacious attorneys.  But if you're a sophisticated business entity, you ought to weigh all of that and make a decision about it.  And if you reach the conclusion that you think you could do better, then you're entitled to opt out.  And you're entitled to hear both sides of the evidence on that.  You're entitled to hear the Whatley-Kallas presentation to the Massachusetts Hospital Association, and you're also entitled to hear the presentation by Zuckerman Spaeder.  Both of those, as Professor Rubenstein says, are essential so that class members can make a reasoned decision.

And, Your Honor, there are arguments about why you might not do better.  The point you made about doctors and hospitals, Economics Day, and all those things, those are absolutely arguments.  But you also are entitled to hear the other side of it, which is that the settlement, which is entitled to preliminary approval and it may be entitled to final approval -- that the settlement does a lot of things but there might be room to improve on the dollar side of it, that -- you know, the fact that class certification would be challenging in this -- on the provider side probably was one factor that entered into the calculus.

My point is just that you're entitled to hear all of that information.  And I don't think it's misleading to paint

the other side and then say, Don't just listen to me, go and talk to the providers about that.

The last thing I want to say about this and then maybe send it back to Joe Leak is I understand the Court's questions when I said I know where the bodies are buried.  Your Honor, I spent -- it's now 13 years in this litigation, in this Court.  I take the Court's orders and decrees, as I do any Court's orders and decrees, very seriously.  I'd never violate them.  But the point I was trying to make was that we learned how the Blues operate.  For example, in that filed rate imbroglio that we brought to you back in 2016, we learned there was a subterfuge that Blue Cross of Alabama was engaged in where they were manipulating their rates, we thought, in violation of the filed rates that they had published with the Alabama insurance regulator.  And to me, that's an example of knowing that there's stuff out there, okay -- it was on the public record -- there's stuff out there, there's chicanery.  And somebody who has dealt with the Blues, dealt with this litigation, and developed a general working knowledge of it can be a good guide to that, especially, Your Honor, when, as someone said earlier, we're referring to Docket Entry 3200 or 3300, you know, we believe that we could be good guides --

THE COURT:  I promise, that's not lost on me.

MR. SMITH:  Well, that's really my point, Your Honor.  I'm not making reference to any confidential or privileged

information, and it would have little to no value, okay, in any opt-out litigation. But what I am referring to is the fact that I've spent a big part of my life in your courtroom in Birmingham and in your -- I think I'm hearing a little bit of an echo, Your Honor.

THE COURT: Yeah, we muted him. Thank you.

MR. SMITH: Okay. Thank you.

I spent a big part of my life, you know, down in Alabama, getting to know your fine city, and also Montgomery, because that's where the insurance regulator was, and that makes us, in my opinion, you know, solid, reliable guides to this because we're not going into this cold. And so we don't have to read every docket entry to have the understanding, the look and the feel of this litigation, and to be able to represent clients effectively there in the way that someone coming into it cold could not because they don't know where the bodies are buried. That's all I meant to say by that. That's the extent of it. There's no evidence here and I flatly deny any improper use or reliance of any of these materials which, as I said, would be of no use to us anyway.

So I think that -- unless the Court has other questions on the MHA thing, I think it's probably helpful for Joe Leak to finish up on the conflict point.

THE COURT: Be glad to hear from him.

MR. LEAK: Thanks, Judge. And Cy touched on a lot of

things I was going to tell you about.  I'll try not to be duplicative.

But it would seem to me that if the only thing that -- the real burr under the saddle for the provider counsel was Cy's presentation, that would be fairly easy for the Court to remedy and that would be this:  Cy, don't make another presentation.  Cy, if you make another presentation, don't mention this or mention that.  That's easy.

But if the remedy is to blanketly disqualify Cy's firm -- Cy and his firm -- on the basis of a 1.7 or 1.9 conflict, then that's going to -- that's going to apply to everyone.  That's going to apply to any subscriber counsel.

THE COURT:  Any subscriber counsel who markets opt-outs, not any --

MR. LEAK:  Not even market.  Let's set the marketing part -- set the marketing aside.  If they're asking for a blanket disqualification of Cy and his firm because there is an inherent conflict, there is a systematic conflict -- systemic conflict, between subscriber counsel and representing opt-outs -- and that's the argument they make -- on a 1.7 or 1.9, by representing an opt-out, by even counseling an opt-out, they would be violating the rules of 1.9 and 1.7 because they've taken a directly adversarial position to subscribers.

And so that's an argument that's based on the argument

that technically a provider could not get a better deal through opting out, and it would require you to actually make that factual determination, because the mere fact that there are benefits, whether we call them direct, indirect, tangential, whether or not there are benefits to that settlement that flow to subscribers, set that aside.

You would also have to find that in an opt-out situation, those subscribers could not do better, that that hospital or that doctor cannot do better. And so it would be a per se adverse. But I don't think anybody can really say that. We can look at this right now and say, well, we can see some benefits that flow to subscribers, but I don't think any of us can sit here at this point and say there's no way that a provider can be better and there's no way a provider can do better from both -- and I think if you granted their blanket motion to disqualify based on that, that's essentially what you would be saying, sort of putting your thumb on the scale and saying, no, I don't think they could do better. And it removes -- it removes an entire class of attorney -- thousands of attorneys, technically, from representing any of these opt-outs. And that, to me, is the gist of the motion is that they're asking him to be blanketly disqualified irrespective of anything he might have said in the presentation.

THE COURT: So you don't understand their argument to be that because he was a member of the PSC on the subscriber

side, had access to proprietary information by virtue of that and has quasi-fiduciary duties to the subscriber side that he represented as class counsel or subclass counsel, if you will, that that distinguishes him from the average person who represented a subscriber and is soliciting new clients to opt out?

That's what I understand their argument to be, not representing current clients who might want to opt out, not representing clients we've been representing for the last five years before the settlement ever occurred who might want to opt out, but taking steps to undermine the settlement is what I think the providers would really say as a PSC member on the subscriber side.  And that, by definition, would mean that the subscribers would lose, whether it's direct or indirect relief, that they would -- it would inure to their benefit as part of the settlement that the providers have struck.  That --

MR. LEAK:  I'm sorry.  Go ahead, Judge.

THE COURT:  That's what I understand the argument to be.

And, Sam, Joe, please color that in any way you think I've missed on.

MR. ISSACHAROFF:  Judge, I think that that's an entirely accurate statement.  And if I may, perhaps this will clarify things for Mr. Leak, because the Court referred to a

certain legal fog that exists right now. And in some ways, I feel we should apologize for bringing kind of a new legal issue and a very undeveloped legal issue to the Court. I'm sure it's the last thing in the world the Court wants to address at this stage of the litigation.

But here's how we -- here's how at least I see the legal question: You have a client. You advise the client do this, do that. That's your obligation as the lawyer. That's the position we took with regard to Mr. Boies and a client that he has. Despite his role in the class, a case in the PSC overall, he has to give the advice he has to give to a client.

At the other end of the spectrum, we have the Eleventh Circuit's opinion in Oppenheim which Your Honor wrote, and Oppenheim stands for the proposition that the fact of aggregation in a class action alters the attorney-client relationship. And so I think there's no question that if you were a class counsel, you could not then go and solicit opt-outs from the class -- a proposed class settlement when every class settlement has a blow-up provision. And so you would be acting to the detriment of some of your clients as opposed to the ones you're trying to solicit. I don't think there's any question about that.

We're in some kind of a mid zone here with a PSC through an MDL and not a class counsel situation, as described in Oppenheim. The district courts that have looked at this

have talked about this as an incipient fiduciary relationship and that there are obligations from being on the PCS.  They're not the same as class counsel obligations.  We'll concede that.  But they're not the same as just representing an individual client, as we talked about with the A4 question.

So now the question is, what's that role at this point?  To my knowledge, there is no appellate law on this question.  There are a couple of appellate decisions that speak about fiduciary-like obligations but they're not developed, they're not spelled out.  I think probably the most careful analysis of this is by Judge Furman in the GM litigation, but it's still an undeveloped area of law, and I don't know of any court in the Eleventh Circuit that has addressed it.

So our position is that when you sign up as the PSC and the PSC enters into this joint settlement agreement with the other half of the PSC, the providers and the subscriber sides together, you have obligations that are different from an individual lawyer, from any old lawyer, who wants to go and solicit clients, assuming it's done pursuant to the Bar rules, who wants to go and give advice to clients, to prior clients or to future clients.  But once you're a player in the PSC, once you've assumed that responsibility pursuant to this Court's order as to the responsibilities of the PSC over coordinating activities, coordinating discovery, coordinating

document production, once you assume those responsibilities, you're no longer a free agent in the legal market the way you were before, not quite at the level of Oppenheim but certainly not at the level of an individual lawyer.  And --

THE COURT:  So if you were to give me a rule that I were to put in my opinion and tee up to the Eleventh Circuit to take a look at that said what Mr. Smith did is foul, what Boies Schiller did is fair with an existing client, what would that rule be?

MR. ISSACHAROFF:  The rule would be that if you assume the responsibilities of acting -- of being on the PSC with the benefits -- and it's not an issue in this case, but as Your Honor knows, in most of these cases is also a financial benefit from the common benefit fund and all those things -- if you assume that role, you may not act to the detriment of any part of the consolidated cases, including the settlement here.

And I think that that -- you know, I said earlier that I like the -- Justice Scalia's aphorism that basically you can't ride with the cops and cheer for the robbers and that that's the obligation that you owe as a result of being on the PSC.  You still have to advise your clients, but you can't go out into the public arena as somebody who says, you know, again, I know where the bodies are buried, but more specifically, this is a bad deal.  There's no way to read page

30 of this transcript without saying that the solicitation was this is a bad deal, you're getting pennies on the dollar and I can get you more, don't worry about the injunctive relief, that's going to be a lay down coming forward.  And take it, I've been in this litigation, as Mr. Smith just said, for 13 years.  And that's the inside information from being on the PSC that could not be marketed in that way.

There's no evidence, and we don't make any allegation that for someone like Mr. Boies, who's just giving advice to a current client, that he's marketing his inside position to the detriment of other parts of the joint enterprise through the MDL consolidation.

THE COURT:  All right.

All right.  Mr. Leak?

MR. LEAK:  Yes.  Which begs the question, is the point that they're making that his firm can go forward with representation of clients, his firm can go forward with representation of opt-outs, he just simply can't come out and make public pronouncements with regard to his opinions on the settlement because of his position on the PSC?  That's what I'm hearing but I really can't understand.

MR. SMITH:  Can I add to that, if I might, Your Honor?

THE COURT:  You may.

MR. SMITH:  Thank you.

Your Honor, Mr. Issacharoff is trying to create an

obligation of a fiduciary nature from someone who is on the subscriber side of the case to the provider side of the case. He says that because we had this joint prosecution agreement which expressly says that it can't be used to disqualify someone, that we have an obligation not to try and undermine the provider settlement. There is no basis, no legal basis, no factual basis for that. He hasn't cited a case that even comes close to suggesting it. The cases he's talking about, which refer to the quasi-fiduciary duties, those are the quasi-fiduciary duties that run to members of your class, right. If you're on the subscriber PSC, it's the sort of duties you have to the subscriber class, not to the provider class. The joint prosecution agreement is simply a mechanism that allowed us to share documents with each other and then says there are no consequences beyond that.

The other thing about this, Your Honor, is that I hear this continuing emphasis on the difference between existing and prospective clients. It's one thing if you have an existing client. It's different to solicit a client. That distinction doesn't exist anywhere in the joint prosecution agreement and it doesn't exist anywhere in the case law.

Our obligation is to make sure that there's no direct adversity with our continuing client, the subscriber class. And Mr. Leak has spoken, I think, correctly to that in saying we recognize that, we meet that burden, there's no question

about that.

The other thing I would say, Your Honor, is that's really where the focus has to be. We all agree on our side of it that we have obligations to the subscribers and we need to make sure that we counsel them correctly so they can make good decisions about whether -- so that -- so that they are not hurt, rather, when providers make good decisions about whether to opt in or to opt out. Those impacts are indirect, but no provider is going to opt out unless they think they can do better for themselves, whether it's on preauthorization, on money, on any combination of those things, which will redound to the benefit of subscribers. If they decide to opt out, they're thinking they can do better, and they have the right to do that. But nothing in the joint prosecution agreement creates a different set of obligations, an additional set of obligations. None of it distinguishes between current clients and prospective clients. It's just not in there, and that was not the argument made in these motion papers. There's no basis for it in the case file.

THE COURT: All right. Back to Mr. Leak.

MR. LEAK: Judge, I don't think I have anything else right now.

THE COURT: All right. Are we under submission, then?

MR. LEAK: Your Honor, one thing. I do want to say that Mr. Issacharoff's last statement did tie back even the

solicitation and the existence of being on the PSC to a detriment to the consolidated parties' interests. And so I still think you would have to have -- if you granted the relief, you would still have to find as a matter of the law that acting on behalf of an opt-out would be a determined detriment to a subscriber. And that's where we think --

THE COURT: Or some other rule. That's what I'm -- and, Karin, I didn't mean to leave you out. I didn't know if there's something else you would like to add to this.

MS. DeMASI: Your Honor, there's two points -- thank you, Your Honor -- that I would like to make. First, I'm obviously tickled to hear all the discussion of two-sidedness. We think it's appropriate and this is a particularly interesting context in which it comes up.

THE COURT: Evan's getting a call after this hearing, isn't he?

MS. DeMASI: Yes, I will call-- I will dutifully call Evan and he will be tickled.

But that -- leading me to my first point I just want to make, too. My first point is -- and we discussed this at the preliminary approval hearing -- the Blues' view of the settlement relief is that it's what we call triple-win relief. It had to be good for providers, obviously, in order for us to settle. It obviously also had to be good for our members. And I think that was probably a source of frustration for the

providers, candidly, during our negotiations was that the Blues were not going to do something that was not also good for members.

The second point I want to make is that if the Court were to ask me what is the most problematic part of the statements, from our perspective, from Mr. Smith, it's the context and the full quote of which the bodies are buried sentence comes. And what he says is we know where the bodies are buried, we know how the Blues work. And the way that Mr. Smith learned that was through confidential information that he obtained and that he maintains in his -- in his mind, and that can't be used outside of his context as a subscriber lawyer.

And so he described himself as a guide, but when he goes out and seeks to represent providers, he needs to zealously represent those providers as clients, and he can't do that and maintain the confidentiality of the information that he obtained as a subscriber lawyer. And that is what the case law that we cited said. That's what the DT case that he referred to says. It says a lawyer can't give himself a lobotomy. You maintain it in your mind, and human beings can't compartmentalize information that way. And that, to us, is a real concern from a protective order perspective.

Thank you.

THE COURT: So in other words, while the joint

agreement does not -- has a provision saying this isn't going to be used for disqualification, it also has other provisions that says if you're subscriber counsel and you're discovering this information through this discovery, you can only use it on behalf of the class in the subscriber litigation.

MS. DeMASI:  It's actually two different agreements, Your Honor.  I think the first is the joint prosecution agreement, which the Blues were not a party.  That's between the plaintiff groups.  I'm referring to the protective orders, and it's not --

THE COURT:  Protective order.

MS. DeMASI:  -- it's the Blues information.  I'm concerned about that because apparently we're the bodies that are buried.  I mean, that -- the Blues information is what Mr. Smith was out soliciting with:  I know the Blues, I know their information, I know where the bodies are buried.  But it's also providers' information.  They can speak for themselves.  It's also nonparty information.  And so when a lawyer represents and obtains that confidential information as part of the class action, it can only use that -- that's -- it's paragraph two of the protective order that Your Honor entered -- he can only use that for purposes of that action. And so he's not just a guide; he is a person that is marketing himself and soliciting clients as a person with a whole bunch of information.  It's not just public information.  He

obtained a lot of really sensitive, nonpublic information from providers, from competitors, and from members. And that can't be used in connection with zealously representing another client.

THE COURT: All right. Mr. Leak, do you want to address that?

MR. LEAK: Yes. There's nothing wrong with the possession of the information, it's the potential use of the information that can violate the MDL. There is no evidence or allegation that Cy has misused information.

THE COURT: Well, other than him saying, I know where the bodies are buried.

MR. LEAK: I would say that's not even a misuse of the information. It would just simply be -- a misuse of the information would be taking something specific that he had learned. And if it is in a solicitation or an offhand statement like that, it's not technically, I would argue, Judge, misuse of that information.

THE COURT: Well, he told me earlier that the purpose of this presentation and other presentations like it was to invite and encourage others to hire him to represent them to opt out. Pretty clear about that. Appreciate his candor about that.

But when you say "bodies buried" in that presentation, aren't you just telling these potential provider opt-outs that

I have the inside information and I can use that on your behalf if you opt out?

MR. LEAK:  I think Cy has addressed that by saying he probably regrets that choice of words but that was not his intent.  But if -- if we go back to the use of the MDL protective order, there's just no authority that indicates --

(Technical interruption.)

MR. LEAK:  -- and all lawyers not to represent similar parties and similar claims in the future.  And so if you had a -- if you are now in retrospect saying, well, yeah, that is what the requirement is under that --

THE COURT:  Well, but in a standard representation, you're not getting the scope of proprietary business information as you would in a nationwide class action which some have characterized as the largest private enforcement action ever brought under the Sherman Act.  There's just all sorts of information you're getting access to that you're not going to get in the standard case and under the standard protective order.  Am I wrong?

MR. LEAK:  No, you're correct about that, Judge.  But couldn't he go forward with representation without misusing that information?

And to me, one thing I want to point out, using the cases they cited, it would appear that these are patent cases, and I think even the Deutsche Bank specifically referenced

that those cases posed a, quote, issue unique to patent law. And that's at page 1377. The protective order -- you know, that protective order in the Deutsche Bank case actually prohibited subsequent representation, which is not what we have here.

THE COURT: In 20-plus years on the bench, one of the rules I've tried to follow is to avoid any issues unique to patent law.

MR. LEAK: Well, then avoid those cases, Judge.

THE COURT: Exactly.

All right. Anything else from the Blues?

MS. DeMASI: No, Your Honor. You can review the cases. They aren't specific to patent cases, but Your Honor will see for yourself. Thank you.

MR. BOIES: Your Honor, this is David Boies. Could I be heard just for --

THE COURT: Yeah, sure.

MR. BOIES: I don't have a comment -- one thing that I --

(Technical interruption.)

MR. BOIES: There was some suggestion --

(Technical interruption.)

MR. BOISE: And there was a --

(Technical interruption.)

MR. BOISE: Alabama Bar Association.

(Technical interruption.)

MR. BOISE:  -- are represented.  And assuming you're doing that entirely consistent with the protective order and entirely consistent and not making any misrepresentations, but just the representation of an opt-out could be adverse to --

(Technical interruption.)

MR. BOISE:  The proposition is that settlement is better for the subscriber -- providers have settlement, it's better for subscribers than what might come out of an opt-out. I don't think that there is basis in law or fact for that very expansive proposition.  And I do agree with one of the things that one of the counsel said, that that operation would affect my firm's representation of the doctors' group in Michigan, because while I think that the fact that nobody's complained about our representation after the last several years probably would be a waiver of their right to seek disqualification.  It would not mean that we would not have to take that into account.

So I would urge the Court not to go as far as that suggestion was, because as I say, I do not believe that that has a basis in any of the cases that have been submitted.

MR. ISSACHAROFF:  Your Honor, just to be clear, we do not disagree with anything that Mr. Boies just said and we have not urged any position to the contrary in either our papers or our presentation today.

THE COURT:  But I think the Blues perhaps have.

MS. DeMASI:  How so, Your Honor?  I'm not sure I follow.

THE COURT:  Well, just -- I guess the question I -- what I heard from that is that Mr. Boies was responding to your view that if you're class counsel on the subscriber side and you have access to information that's proprietary under the protective agreement, you can't -- and you've agreed under that agreement and been ordered under that agreement not to use it for any purpose other than prosecuting your claims on the subscriber side that you can't then utilize that information on a -- to represent a provider in future litigation.  Now, I think that was what Mr. Boies is most concerned about.

David, am I wrong?

MR. BOIES:  Well, I would agree that I've got an obligation -- my firm has an obligation not to use stuff that's protected by the protective order without permission from the Court.  And this is something that's going to be presented by all the opt-outs.  All the opt-outs are going to be trying to figure out how much of the stuff subject to the protective order they can get access to, and A4 is in no different position in that case.

THE COURT:  Right.

MR. BOIES:  And -- but it was a suggestion that simply

the fact that I had something in my head or that one of my partners had something in their head from the representation meant that the firm could not represent opt-outs.

There's an enormous amount of stuff that's public record. I mean, to be candid, I think somebody could pick up what's in the public record and try this case as an opt-out. And I don't think that there's anything that ought to preclude -- or that could preclude somebody who was subscriber counsel from doing that.

And I agree that what was -- what was presented from the providers made clear that they were not taking that position, but there was something -- and the Blues didn't really take this position directly, but there was some ambiguity there that I just thought needed to be addressed.

THE COURT: All right. Fair enough.

MS. DeMASI: And all I'll add, Your Honor, is the point I was trying to make was not that the fact of being a subscriber lawyer precludes anyone from a representation. I have not taken a position that the provider lawyers have -- and Professor Issacharoff has capably argued their position on that issue. My point was simply the point that is in the case law, which is when Mr. Smith says to providers, I know where the bodies are buried because I know the Blues, it is going to be inevitable -- this is what the case law says -- that if he is out zealously representing another claim using information

from this case that he is not going to be able to separate cognitively that information in his brain.

And notably, I haven't seen Mr. Boies in the A4 case. We haven't seen Mr. Hume in the A4 case. And so I don't have the same concern as when Mr. Smith goes out and says, Come with me, I know all the inside information. So those are different issues in my mind, and I don't necessarily disagree with what Mr. Boies said.

MR. SMITH:  Your Honor, may I be heard briefly on this?  Because we've, I guess, gotten a couple of new developments in the last ten minutes.

THE COURT:  Sure.

MR. SMITH:  Your Honor, I completely agree with Mr. Boies that there is no conflict between somebody who is on the subscriber side of it as -- whether it's as colead counsel, as Mr. Boies was, or as a PSC member as I was, and going out and representing providers.  And the reason is that you have to have something beyond a speculative argument about adversity, about how it would harm subscribers, and there's no such argument here, because every provider who opts out thinks they can do better, and that, as you've said, Your Honor, and as everyone has said, will redound to the benefit of subscribers.

The second point is, in terms of discovery, as Mr. Boies said, A4 is going to have to deal with access to

earlier discovery like everyone else.  Well, Your Honor, that's true of every opt-out as well.  Every provider opt-out, whether it's A4 or somebody else, is going to have to figure out how to get access to the material that was produced in discovery in this earlier case.

The cases that Ms. DeMasi relies on are situations where a direct business competitor, whether it's in the patent space or an FTC investigation, gained access to that information and that was considered very troubling by the Court.  In fact, in one of those cases, there was a protective order that forbade successive representation.  But everybody who opts out is going to have to figure out how to get that information through regular discovery processes.

This protective order, you said, well, it's very expansive.  Yes, this is a big case.  There are lots of big cases out there, maybe not quite as big as this case, where people get access to confidential information, and that's never been interpreted to bar subsequent representation.  It just hasn't.  You have to deal with it in the next case and go and get that discovery.  And that's what we would have to do with opt-outs, and that's what anyone would have to do with opt-outs.  But that's what we're facing here and that's the --

THE COURT:  All right.  So here's what the general counsel of the Alabama State Bar said in its letter:  It is certainly possible that counsel for the subscriber class

obtained this type of information from members of the subscriber class.  Such information could also be disqualifying under Rule 1.9(b).

So if -- but I think, in fairness, general counsel said, We don't have enough information to know that's what's happening here.  The -- although we have not specifically described any facts that would definitively implicate Rule 1.9(b), this is a provision that typically is determinative in nonclass cases.  So that's his point is, you know, hadn't thought about this in the context of a class, but here's what might happen if it's in the context of a class.

MR. SMITH:  Judge -- can I address that, Your Honor? Because --

THE COURT:  Yes.  That's what I'm asking you to do.

MR. SMITH:  Okay.  Thank you.  I apologize.

Your Honor, when he talks about subscriber information -- so subscriber information that we obtained was things like when was your business opened?  When did you buy health insurance from the Blues?  How much did you pay the Blues for health insurance?  Did you ever seek, you know, competitive bids?  You know, what's your -- the history of your particular small group or, if you're an individual, your employment history?  That information is completely irrelevant --

THE COURT:  To any provider claim.

MR. SMITH:  I'm sorry?

THE COURT:  Completely irrelevant to any provider claim.

MR. SMITH:  Completely irrelevant.  So that's just total speculation.  It just shows that the Alabama Bar counsel, he was a prisoner of whatever assumptions he was asked to make by the unidentified person who had conversations with him or her and produced this letter.  That's obviously not correct in this case.

And there's other things in there as well, but I think the point is it's all driven by the assumptions you asked them to make and the assumption that there is a direct conflict that's not speculative and that the opt-outs couldn't do better.  You know, there's no evidence of that.  There just isn't.

THE COURT:  All right.  You've satisfied me.  I just wanted to follow up on that and see how that provision letter might connect to what -- the arguments you're making here.

MR. ISSACHAROFF:  Your Honor, if I may, I think there's one distinction which might be helpful.  There is a question about a positional conflict from the fact of being on the PSC.  And I read the Alabama Bar counsel's letter to say, I see that there may be something there; I'm not taking a position on that.

And then there's the question of whether the Court's protective orders governed the use of certain information as

within the bounds or outside the bounds of other representations. That's a common question that comes up all the time in individual cases, in class cases, all sorts of cases.

But the extent to which the information, particular information, is subject to a protective order is -- stands independent from the duties that one has as a member of the PSC, which we think create a structural or positional conflict here that is at the heart of our disqualification motion.

THE COURT: All right.

MS. KALLAS: Judge Proctor, it's Edith Kallas. Can I be heard for a couple minutes?

THE COURT: Yes. One second. How are we doing on time? You-all are okay?

Ed and Kip had a potential conflict at noon but I think you've -- keep going.

MS. KALLAS: I just -- I would just like to put this -- the injunctive relief that has been negotiated here and the enormous benefit it has to subscribers in context, because we are responding to what was minimized in a 21-second discussion of a 45-minute presentation of the injunctive relief. And also, I'm responding to Mr. Leak talking about the indirect impact of the injunctive relief if somebody opts -- if somebody opts out, that what kind of -- what kind of impact that would or wouldn't have on subscribers.

And I want to level-set by reminding the Court that from day one we sought to fix the BlueCard system.  That was what we were seeking in our injunctive relief in the case and that is what we have gotten here.  And why is that important to subscribers?  Because the BlueCard program is a program that was put together to buy the Blues to enable them to provide nationwide insurance and healthcare services to their members.  And that is the system that providers have to live with.  And every single aspect of our injunctive relief that we have attained here addresses that fix for subscribers.

And so, you know, Joe was pointing out things like, you know, preauthorization, there's eligibility issues, there's lots of things here.  But the point is, when that system, which is what happens in the settlement, is more transparent, efficient, and there's accountability, this system is going to work better and the subscribers are prime beneficiary to that.

And what happens when a provider opts out of that and doesn't get the benefits of what is in that relief?  Those patients don't have that same -- don't have the same access to it.  And the problem with what has been said here is that if you bring a litigation like the Prime litigation in California, you can't keep all of the Blues in.  And unless you get all of the Blues in, because it is a national product, into a litigation like we have through this MDL, you can't get

a fix to the BlueCard program because you need every Blue in the country to agree to the fixes.

So whatever injunctive relief everybody is talking about here, everybody needs to understand you need every Blue to be part of that agreement for that relief to fix the system in any way, shape, or form.  And that is something that has to be understood by providers.

And, yes, Cy is right, we have been out there educating people.  But the problem is if you are not telling people what it means when they opt out, what they're leaving behind, the significance of that relief, and the fact that, yes, it does hurt patients as well, who Mr. Smith has been representing for years, that is a big problem.

And I just want to -- again, I just wanted to level-set on what the BlueCard program is and what this fix does and how hard it is to obtain that kind of relief in any other setting.

MR. LEAK:  And may I speak briefly, Judge?

THE COURT:  You may.

MR. LEAK:  That may very well be true that all those benefits will flow, just as -- just as stated.  It doesn't create a conflict.  And whether it -- whether you are PSC -- on the PSC or subscriber counsel, if it does create a conflict and that conflict is absolute, then it does touch on the Boies Schiller representation and it does touch on anybody else's

representation, any of these firms, with respect to opt-outs.

If Cy is not able to -- to represent and sit down with these providers who are considering opting out, put everything before them, good and bad, exactly what was just described, they still have the right to look at all the facts, look at all the benefits on one side, the potential benefits on the other, the time value, if we get more money, would this benefit our patients more, can we benefit our patients and ourselves more than what is here, and the answer is certainly, yes, that is possible.  But you can't say that there's a blanket disqualification because that creates an automatic conflict because it doesn't.  And that's our point.

MR. STENERSON:  Your Honor, may I be heard?  Todd Stenerson --

THE COURT:  Yes.

MR. STENERSON:  -- on behalf of Blue Cross Blue Shield of Michigan.

Blue Cross Blue Shield of Michigan, Your Honor, is the only defendant in the A4 case, and I was doing everything in my power not to say anything today, and I'm going to be very short.

I have nothing to add.  We have not moved to disqualify Boies Schiller, but I just want to make sure that my silence isn't deemed as waiver, depending on how the Court goes on this.  And what may or may not happen in the future is

yet to be written.  I just didn't want to stay completely silent.

THE COURT:  All right.

MR. WHATLEY:  Judge, could I answer -- you asked us to point out places in the transcript where we would like you to look earlier.

THE COURT:  Yes.

MR. WHATLEY:  Would you look at -- also look at page 30 where Mr. Smith says that odds are overwhelming that he could do better?

THE COURT:  Is one distinction of -- between A4 in the situation that was alluded to previously was -- I think what was being suggested is that Todd and his group took A4 to you to sit down and talk about whether it was in their interest to opt out.  I thought that was pretty -- that was very professional.

Todd, I take it that was you?

MR. STENERSON:  We did not object to that.  We agreed to that.

MR. WHATLEY:  They agreed to it, but it was Boies Schiller.

THE COURT:  Okay.

MR. BARILLARI:  Your Honor, David Barillari.  That was myself that set up that meeting.

THE COURT:  Okay.  I didn't know if Todd was involved

in that, too, let's go talk about this.

MR. STENERSON:  We were not directly involved, Your Honor, but we did not object to it.

THE COURT:  The reason I'm asking -- hold on.  Hold on.  The reason I'm directing the question to Todd, obviously I know plaintiffs' counsel is the one who went and accompanied their client over, but it seems to me that that's an indication from Todd and his group that they know of the issue and worked together with the providers' counsel to see if there could be a workout of that case to get them to stay in the class.

MR. STENERSON:  We did, Your Honor.  And again, since you raise it, a little bit of history:  While the case has been pending for more than five years, it was dismissed three times by the Michigan court on claims completely unrelated to the MDL.  And the MDL claims, as you know, have really never been even started to be litigated and hopefully they never will, but it's just -- it's really premature.

THE COURT:  Yeah.  The initial complaint had two different conspiracies alleged, a hospital conspiracy and the more -- probably one that aligns a little more with my MDL, the Sherman Act conspiracy involving the Blues.  As I understand it, what Judge Berg ruled was hospital conspiracy was not properly pled in terms of showing there was actual agreement to conspire and that the state law claims really

tucked into those -- that conspiracy claim, not the other, and that's why you were down to just the -- the horizontal market division agreement not to compete claim left in that case.  Is that -- am I remembering that right?

MR. STENERSON:  Yes, Your Honor.  The vast majority of all the original claims were completely unrelated to the Blue rules and they were all dismissed by Judge Berg.  And then when all that was left was the tail of that dog, which the MDL -- we tagged it to come down to Your Honor, and that's where it sat pretty much dormant until present.

THE COURT:  Okay.  All right.  Any other -- any other argument I need to hear?

Let me do this.  Let me just put you on hold and look at my notes and make sure there's not something else I have a follow-up on, all right?

IN UNISION:  Yes, Your Honor.

(Recess taken at 12:06 p.m. to 12:23 p.m.)

THE COURT:  Hey, folks.  All right.  So the disadvantage of Zoom calls, and the reason I like to have you all come periodically to Birmingham, is so we can have breakout sessions from time to time.  I would like to have a breakout session right now, and I'd like to invite Joe and Edith, Joe Leak -- and I'm just going across my screen here -- Karin, Sam, and -- yeah, and Cy.  And who?  Lauren.  Yes, Lauren.

Does anybody have a concern if I have a breakout session just with those folks?  It's not going to be on the record.  I just have a couple questions to make sure I'm not going to misstep on something here.

MR. SMITH:  Your Honor, no objection, certainly.  Can our -- can Mike Smith, who is no relation, who is on the Zoom and is our firm's general counsel -- can he join us?

THE COURT:  Absolutely.  This is not anything double secret.  It's just that I just have some questions and I'm just trying to, before I'm creating a problem, that I'm solving a problem.

MR. SMITH:  Yes, sir.

THE COURT:  Any objection from anybody?

IN UNISON:  No objection.  None.

THE COURT:  I think those are all the principals involved in this.  All right.  So I'm letting Kip do her magic and break us into a breakout room.

(Recess taken at 12:24 p.m. to 12:48 p.m.)

THE COURT:  All right.  Folks, for those of you who weren't in the breakout session, the oral argument has really, in some ways, given me a lot to think about.  I, quite frankly, had a draft opinion that was prepared to help me get ready for oral argument and maybe to expedite the ruling, but the oral argument has substantially changed, I think, what that opinion might look like.  And quite frankly, I don't know

what I'm going to rule at this point.  I had an inclination going in, but I think I'm back to kind of 50-50 in some ways on this.

Second, it's going to take me a little while to draft an opinion now and take into account what we've discussed today in this argument.  And then third, I've asked the principals who were in the breakout room to put their heads together and see -- and I'm not trying to duck the issue here.  I'm just sitting here thinking if you can get a certain result that everybody can live with, that might be better than an uncertain result that comes from the Court.  I'm just wondering -- and I think all the principals said they were willing to do this -- to see if there's some measure short of disqualification that could remedy or at least iron out all the wrinkles that we're concerned about, okay?

With that said, I think we are finished up with the hearing today.

IN UNISON:  Thank you, Your Honor.

THE COURT:  Special Master, anything to -- brains of the operation?  That's Sally.

Okay.  All right.  Thank you all.

(Adjourned accordingly at 12:50 p.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated:  February 13, 2025

*Pamela G. Weyant*
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter