FILED
2025 Feb-25 PM 03:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

IN RE BLUE CROSS BLUE SHIELD    CASE NO. 2:13-cv-20000-RDP

ANTITRUST LITIGATION MDL 2406

_____

* * * * * * *

**TRANSCRIPT OF MOTION TO DISQUALIFY**

* * * * * * *

BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES DISTRICT JUDGE, via videoconferencing, on Friday, February 19, 2025, commencing at 2:06 p.m.

Proceedings reported by stenographic court reporter, transcript produced using computer-aided transcription.

**Transcript prepared by:**
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter

APPEARANCES:

SPECIAL MASTER:           Edgar C. Gentle III
                          Katherine Harbison
                          GENTLE, TURNER, SEXTON & HARBISON
                          501 Riverchase Parkway East, Suite 100
                          Hoover, Alabama 35244

                          Craig Alexander
                          Jared Allen
                          William Blechman
                          W. Tucker Brown
                          William Burk
                          Ady Burns
                          Carl Burkhalter
                          Travis Bustamante
                          Erin Byrne
                          Lee Carhart
                          Robert M. Cary
                          Brian Charlton
                          Anna Mercado Clark
                          U.W. Clemon
                          Sarah Cyklowski
                          Alexander Delcich
                          Karin DeMasi
                          Augusta Dowd
                          Linda G. Flippo
                          Alan Gardner
                          Mark Gray
                          Michael Gurley
                          Anne Hance
                          Des Hogan
                          Craig Hoover
                          Samuel Issacharoff
                          Edith M. Kallas
                          Lauren R. Kennedy
                          Douglas Laird
                          Lewis LeClair
                          Shriva Liu
                          Victoria Lu
                          Hope Marshall
                          Corey Matthews
                          Patrick McDowell
                          Joey Montgomery
                          Nikol Oyandich
                          Dennis G. Pantazis
                          Britney Piper
                          Aaron Podhurst
                          Henry Quillen

APPEARANCES,
Continued:

Barry A. Ragsdale
Nathan Rice
Jay Schafer
John Schmidt
Patrick Sheehan
Richard Sherburne
Todd M. Stenerson
Nick Stewart
Michael Velezis
Brian Vick
Joe R. Whatley, Jr.
Mark White
Kirk Wood
Jeff Zeiger
Rachel Mossman Zieminski

(Proceedings commenced at 2:06 p.m. via videoconference:)

THE COURT:  We're here in In Re Blue Cross Blue Shield Antitrust Litigation MDL 2406 on a motion to disqualify the Polsinelli PC firm and for a corrective notice.

Who will be speaking on behalf of the provider plaintiffs?

MR. ISSACHAROFF:  Your Honor, I will start, and I will be speaking, Sam Issacharoff.  And I will be speaking with Mr. Whatley.

THE COURT:  All right.  Thank you.

How about for Polsinelli?

MR. CARY:  Your Honor, Rob Cary for Polsinelli.

THE COURT:  All right.  Thank you.

How about will the Blues be doing any speaking?

MS. DeMASI:  Yes, Your Honor.  It's Karen DeMasi on behalf of Blue Cross Blue Shield of Alabama on behalf of the Blues, and Michael Velezis is also here on behalf of Blue Cross Blue Shield Alabama.

THE COURT:  All right.  Thank you.

Would the appropriate order be movant and the Blues first, then let Polsinelli respond, and then see if there's any replies from anyone with respect to those remarks?

MR. ISSACHAROFF:  That would be fine, Your Honor.

THE COURT:  All right.  Well, Sam, I think you're up.

MR. ISSACHAROFF:  Yes.  I will be very brief, because as the Court knows, this was originally our motion, and we filed it raising many of the same concerns as we did in the last hearing before Your Honor.  And those concerns are two-fold:  One is that someone who purports to be part of the inside of the process is marketing his or her services to try to encourage opt-outs with at least representations that they know what's going on in some fashion by virtue of the insider status.  And at the last hearing, I quoted Justice Scalia with the proposition that you can't ride with the cops and cheer for the robbers and that this is a fundamental -- not just conflict but a fundamental abrogation of the obligations to the Court.

And second, we raised the concern that, given what we are hearing -- and we cannot prove it, Your Honor, but -- what we are hearing about the attempt of litigation funders to use these ventures to try to amass a portfolio that they can leverage into this process, we are concerned that the legal representations of this sort without clear identification of who is behind it, who is organizing it, might be an invitation for mischief.

There was an objection to our raising it because in this instance -- as opposed to the Zuckerman Spaeder motion, in this instance, what we are primarily addressing is a direct conflict in representation.  And since the providers were not

represented by the Polsinelli firm, we were raising the objection in our capacity as officers of the Court and not as the grieved party.  Polsinelli took the position that we did not have standing to raise these questions.  I think that that has become moot because our motion was joined by the Blues.

And as a result, since it's most directly a violation of -- in our view, of duties owed to clients and the unacceptability of the way that this has been handled inside the Polsinelli firm, I think that it would be prudent for Miss DeMasi to take over since she more directly represents the directly grieved party here.

THE COURT:  But I have a question.  I realize there is a case or controversy question with respect to a Court's jurisdiction to adjudicate cases and controversy, but I think the Court has inherent jurisdiction whenever it becomes aware of any potential professional conduct issues and a Court need not have someone, withstanding, raise that for the Court to weigh in on whether or not there's been a violation of ethical rules.

Disagree with that proposition?

MR. ISSACHAROFF:  No, Your Honor.  I fully agree with that proposition.  In the cases where, for example, the Supreme Court has taken up the case of controversy limitation under Article III, most recently, it has looked back to common-law traditions to define the scope of anticipated

powers of the federal courts.  And the ability to police conduct in the Court goes back well before the founding of the American republic.  And so I think that this has long been treated as the inherent power of the Court to police conduct in the Court in any matter that is properly before it, and there is not an independent jurisdictional component to the motion for -- for disqualification, sanctions, what have you. And so we fully agree with Your Honor.

THE COURT:  All right.  With that, Karen?

MS. DeMASI:  Thank you, Your Honor, and good afternoon.

And I should say we fully agree with the standing proposition that Mr. Issacharoff just laid out.  Blue Cross Blue Shield of Alabama didn't join necessarily because of the standing issue but, rather, because of -- in light of the Polsinelli firm's filing, the conduct became very clear.  And so I want to speak very briefly, and I say briefly, because I think this is a very straightforward analysis.

There is no question that the Polsinelli firm is ethically conflicted from representing any plaintiff in an opt-out litigation against Blue Cross Blue Shield of Alabama and, we respectfully submit, the Blues.  That conflict arose in January of 2024 when four lawyers who represented Blue Cross Blue Shield of Alabama in this very case for a decade left their Birmingham firm and went to join the Polsinelli

firm in Birmingham.  And as soon as that happened, those now-Polsinelli lawyers were conflicted from representing or advising MDL opt-outs under Alabama Rule of Professional Conduct 1.9.  And that rule has three elements, all of which are easily met here.

The first is that the rule applies to a lawyer that formerly represented a client.  And here there's no question that the four new Polsinelli lawyers, Mr. Malatesta and his colleagues, represented Blue Cross Blue Shield of Alabama extensively in this case before Your Honor.

Second, the rule prevents such a lawyer from representing another person in a same or substantially related matter.  And again, there is no question that that's what we have here.  Any advice to opt out of the settlement, any opt-out proceeding itself is plainly the same or substantially related matter to this one, and I don't think there's any dispute about that.

And the third is that the rule applies to a matter wherever the new client's interests are materially adverse to the interests of the former client.  Here, that's Blue Cross Blue Shield of Alabama.  And again, that's plainly the case. There's no question that the interests of an opt-out plaintiff or the interests of a provider considering opting out of the settlement are materially adverse to Blue Cross Blue Shield of Alabama.  And that's true, again, of the decision to opt out

and it's true of the decision to bring a lawsuit later.

So in our view, there's no question that there's a conflict. There's no question that Blue Cross Blue Shield of Alabama has not consented. In fact, it was never even consulted. Under Alabama Rule 1.10(a), that conflict doesn't just apply to the lawyers who represented Blue Cross Blue Shield of Alabama directly; it applies to the entire Polsinelli firm. And from our perspective, that should be the end of the analysis. And notably, this is exactly how the Polsinelli firm itself analyzed it.

On January 13th of this year, in response to an outreach from Mr. Velezis, the chief operating officer of Polsinelli acknowledged the conflict, and here's what he represented, and I'm quoting him: Polsinelli PC represents that it is not currently advising or representing any clients in the MDL litigation adverse to the interests of BCBS of Alabama and will not represent any clients materially adverse to the interests of Blue Cross Blue Shield of Alabama in the MDL or any substantially related matters in the future, end quote.

So this is a case where the firm has already acknowledged the conflict and it has committed not to act adversely, and yet acting adversely to Blue Cross Blue Shield of Alabama is exactly what the Polsinelli firm has already done and it's exactly what Mr. Polsinelli [sic] did when he

gave his January response.

THE COURT:  Karen, would you back up and tell me the date of that email?

MS. DeMASI:  That was a letter that was sent from Mr. Berglund to Mr. Velezis and that was January 13th of this year.

THE COURT:  So that was a month after the webinar?

MS. DeMASI:  Correct, that was a month after the webinar, directly in response to Mr. Velezis's reaching out first to Mr. Malatesta and then having received a response from Polsinelli in early January this year.  So upon learning about that, Mr. Velezis reached out to Polsinelli and said, You can't be giving webinars like this.  We don't --

THE COURT:  But the representation made in the letter is, We have not done it and will not do it?

MS. DeMASI:  Correct.  That's correct.

If you look at the webinar, Your Honor -- and the transcript is attached as an exhibit to the providers' motion -- there are a number of statements that are directly adverse to the interests of Blue Cross Blue Shield of Alabama, which itself, and like every Blue, very much wants this settlement to proceed.

And so just to give you a couple of examples of what Mr. Owen said -- and these are in the transcript -- from pages 9 to 20 he talks about it -- he calls the settlement a

pittance, trivial, incredibly minuscule.  He mocks the injunctive relief for two pages, says it's very little monetarily.  He calls it window dressing, crazy, inadequate, calls the relief that benefits Blue Cross Blue Shield of Alabama, former client now of the firm -- he calls it a release of perpetual immunity.

And so he goes on for many, many pages with statements directly adversely -- adverse to the interests of Blue Cross Blue Shield of Alabama.  And it was directly adverse to Blue Cross Blue Shield of Alabama when Mr. Owen encouraged to opt out, he advised them with specificity how to do so.  It was adverse to Blue Cross Blue Shield of Alabama when he said on page 51 that blowing up the settlement would be a great result.

He continues to act adversely to Blue Cross Blue Shield of Alabama by continuing today, we understand, to represent a provider that is contemplating suing the Blues again to take positions directly adverse to Blue Cross Blue Shield of Alabama.  So again, these are positions where the Polsinelli firm, that has acknowledged the conflict, is asking -- is advocating in a manner directly opposed to Blue Cross Blue Shield of Alabama.

The Polsinelli firm's only answer to this is, Don't worry, we won't name Blue Cross Blue Shield of Alabama as a defendant in a subsequent lawsuit.  But, Your Honor, that

isn't enough.  First, it ignores the present and ongoing harm of Polsinelli continuing to advise any provider about its opt-out rights.  And second, even in a subsequent suit, the relevant question isn't who's named as a defendant.  The relevant question is whether the representation may cause legal or financial or other detriment to the former client. And here, any suit against any Blue on the theories that Polsinelli is contemplating and that Mr. Owen touted in his webinar will adversely affect Blue Cross Blue Shield of Alabama.  They are Section 1 conspiracy claims.  They challenge the rules and underlying business of all Blues.  And so the Polsinelli firm could sue one Blue or it could sue 30. Any lawsuit that seeks to eradicate the Blue rules and fundamentally undo the lawful business structure that the Blues have put in place is adverse to Alabama.

So the Polsinelli firm has already acted adverse, it is continuing to act adverse, and in our view, the only remedy is disqualification.  The Court has already said in the Southern Visions case that disqualification is an appropriate remedy for a straightforward violation of the Alabama Rules of Professional Conduct, and we respectfully submit that to the ruling the Court should find here.

THE COURT:  So what do you -- do you want to hold any discussion about ethical walls until you hear from Polsinelli?

MS. DeMASI:  Look, I'm happy to address it.  An

ethical screen is not a cure for a conflict in Alabama, so --

THE COURT:  How about lawyers who aren't licensed in Alabama and have no intention of filing the suit in Alabama?

MS. DeMASI:  Well, first of all, all the lawyers in Polsinelli that are now appearing before Your Honor and have appeared for several years are subject to Local Rules.  The question that we have before us here, Your Honor, is whether the conflict is eradicated by virtue of an ethical screen, and the answer to that is certainly not.  It was also set up a year too late.

So again, the Polsinelli -- the new Polsinelli lawyers that came into the firm came in in January of 2024 and the ethical screen wasn't set up until January 2025.  So we think even in jurisdictions where there may well be a provision for an ethical screen, the Polsinelli firm will have a timing problem.  So our view of the ethical screen is that it's too little too late.

THE COURT:  All right.  Thank you.

All right.  Are we ready to hear from the Polsinelli firm?

MR. CARY:  Thank you, Your Honor.  Rob Cary for the Polsinelli firm.

Mr. Owen, of the Polsinelli firm, has been accused -- I think I understood this correctly -- of riding with the cops and cheering for the robbers.  And I first want to point out

that throughout his career he's always represented providers and:  He did, in fact, participate in mediation sessions and he also made very clear he would not disclose anything from the mediation.  And there is no accusation and no record evidence that he, in fact, did so, and he did not.

I next want to address Mr. Berglund's letter.  And the firm stands by his representations and, I think, all his representations.  And I think what is missing in this analysis is choice of law.  And from where we sit, Polsinelli is a firm of over 1,100 lawyers with 24 offices in 17 states.  Their lawyers are members of 45 different state bars.  And as things stand today, they have a client who is faced with the choice of doing one of two things:  Remain an absent class member, which means not participating in Alabama, not actually participating in the lawsuit, but it's called absent class member because they're actually absent from the litigation. That's choice number one.  Or choice number two is to opt out and sue somewhere else or negotiate perhaps based on a contract that has nothing to do with Alabama, based on -- against a defendant that is not based in Alabama, based on services that have nothing to do with Alabama.  And --

THE COURT:  Well, you say it has nothing to do with Alabama, but if you -- if your client took on an opt-out, opted out of the settlement, and then went and challenged the Blues structure that's been negotiated, doesn't Alabama Blue

Cross Blue Shield lose the benefit of the bargain it struck with the provider plaintiffs as part of the settlement of this matter?

MR. CARY:  Well, if they actually filed a lawsuit, and the lawsuit is one that does not name Blue Cross Blue Shield of Alabama, my understanding is that there's no right of contribution, there would be no way that any other Blue could see contribution from Blue Cross Blue Shield of Alabama.  So our position would be that there is no harm to Blue Cross Blue Shield of Alabama --

THE COURT:  How would they not be harmed if that created a different business structure than the one that Alabama Blue Cross Blue Shield and the other Blues have negotiated with the providers?  I take it that's a necessary part of any claim, at least according to the transcript I've reviewed of Mr. Owen where he talks about the inadequate injunctive relief in his view.  So it seems to me that that right there shows there's material adversity between what Mr. -- these four lawyers' former clients' interests are going forward and what the clients his firm seeks to represent potentially are going forward.

MR. CARY:  Your Honor, my view would be that the injunctive relief would not necessarily reach to Blue Cross Blue Shield of Alabama.  And to the extent that there's some sort of indirect result from that, our view would be that that

is too remote, too distant, not -- not proximate enough to consist of material adversity.  And I say there are no cases going either way on that.

THE COURT:  Well, for example, right now, Blue Cross Blue Shield has certain rights as relates to other Blues with respect to providers and subscribers both in its -- in its geographical area; correct?

MR. CARY:  Yes, I believe that's correct.  Yes, Your Honor.

THE COURT:  All right.  So if you were to have a ruling from a court that affects that structure, even if it's not a judgment against Alabama Blue Cross Blue Shield, that would still have a material adverse effect on Alabama Blue Cross Blue Shield, would it not?

MR. CARY:  To the extent that -- I -- look, again, I can see there are no cases on point, but by technical --

THE COURT:  I'm not asking about case law.  I'm just asking --

MR. CARY:  No --

THE COURT:  Let me finish.  I'm asking a matter of logic.  Logically, if you affect the business structure that Alabama Blue Cross Blue Shield enjoys with its co-Blue entities, that's going to have an effect on Blue Cross Blue Shield and those other entities altogether, wouldn't it?

MR. CARY:  I wouldn't understand that to be the case,

Your Honor. And I would suggest it's similar if -- if a lawyer is arguing for a point of law in the state of Washington and perhaps whatever happens in the state of Washington becomes persuasive authority for what ought to happen in the rest of the United States, I don't believe that any -- any ethics rules would recognize that as the sort of conflict is a material adverse conflict, especially in a setting like this where there are providers far from Alabama who need representation from the counsel of their choice right now.

THE COURT: Okay. I got another question for you. Right now, as we sit, there's a preliminarily certified class of providers. Now, that's subject to final approval and final -- a final fairness hearing. But as of right now, you'd agree that there are -- these are no longer this putative class members; they're preliminarily approved members. I certified a class, in other words.

MR. CARY: I agree there is a preliminary class that I would class as absent class members who have not been served with process in Alabama, but I would certainly agree there is a certification, yes.

THE COURT: Well, no Rule 23 class member in an opt-out class has to agree to be. They have to opt out. That's the way Rule 23 works.

MR. CARY: Agreed, Your Honor, yes.

THE COURT:  Okay.  So I don't know if that's an important distinction or not.  But in any event, why isn't it reasonable to say that lawyers who would interact with parties that are part of a class certified by a court of competent jurisdiction sitting in Alabama whose Local Rules say lawyers operating in our court have to follow the Alabama rules to the extent they're not inconsistent with federal law and federal common law -- why wouldn't it be reasonable for them to have to comply with Rule 1.10 and Rule 1.9, among others?

MR. CARY:  Because, Your Honor, the -- these clients, or -- there's one particular client who's come to Polsinelli and they may have a claim in any other number of states.  The advice they're seeking is whether to be an absent class member.  Admittedly, there's been a preliminary ruling -- or to make the very important decision that I don't want anything to do with Alabama, I don't want to be in the Alabama court, I don't want to be bound by this Alabama settlement, what I want to do is go to the state of Washington or Illinois or Delaware and consider bringing my own case there and negotiating there.  And the very notion that somebody from one of those three states should be -- that their lawyers should be bound by Alabama ethics rules for this decision is not consistent with our notions of federalism and our notions that there are many states and they can't all be pulled into the Alabama ethics rules.  That's the argument, Your Honor.

THE COURT:  Here's what I'm struck by.  I think you're relying upon the rights of clients vis-à-vis the rights of lawyers, right?

MR. CARY:  Yes, Your Honor, yes.

THE COURT:  But here's the problem with that, seems to me.  The -- what you refer to as the absent class members I refer to as the preliminarily certified class members.  That's one thing.  There's other clients involved in this case, though, and the client that's -- that is aggrieved is Blue Cross Blue Shield of Alabama.  Blue Cross Blue Shield of Alabama comes to me and says, Judge, we had four lawyers that for nearly a decade worked substantially on our matters.  They've given me the hours.  It's thousands of hours spent by these lawyers.  And then they decamped and went to a plaintiffs' firm, and now that plaintiffs' firm is taking a position contrary to our interests without ever giving us notice and an opportunity to engage them about that.  We had to bring it to their attention, and when we did, we got this letter back saying, We're not going to do anything adverse to your interests, they haven't done it and won't do it.

That's -- I don't think we're focused on the rights -- in asking that question, the interest is not necessarily the rights of what you call absent class members.  The question is what are the rights of the defendant.

So I had a professor first year of law school that

said the answer to any legal issue should be discernible this way, if you break it down to its basic elements and go ask your grandmother what the right thing to do is, if we've crafted a correct rule of law, it should be consistent with what your grandmother says:  Oh, that's the right thing to do.

So if we go ask our grandmother -- these four lawyers represented one client for ten years, they went to another firm, there was no notice given of any ethical screen, not that Alabama recognizes that, but there was no notice given of that, and now the firm they work at is working adverse to the interests of their previous client, who's trying to wrap up a nightmare of multidistrict litigation through a settlement -- what would our grandmother say?

MR. CARY:  Yeah.  So I appreciate that question.  And I would first suggest to my grandmother that though the Blues may be aggrieved, in fact, they have not been prejudiced in this case.  And the reason they've not been prejudiced is because there's been no sharing of information from those four lawyers from the Maynard firm who have gone to the Polsinelli firm, and there's no suggestion otherwise.

And I recognize that Alabama does not recognize a screen, which is one of the reasons we're talking so much about choice of law here.  But if you wanted to explain to my grandmother where's the prejudice here, the prejudice to the Blues is minimal to nonexistent because there hasn't been any

sharing of information.

And if we go back to the timing of how this happened, the preliminary approval -- and I'm new to these proceedings, of course, but I think the preliminary approval was in December -- that was about the time that Mr. Owen made his -- did his Zoom call, which was a courtesy to a client. And the people that were the clients of Zotec, which is a consulting firm, weren't the sort of clients Polsinelli wanted. But when he did that, it came to the attention of the Blues, and because there was a preliminary approval in place, there was correspondence back and forth.

And within, I think it's, six days of it being brought to Polsinelli's attention, they put the screen in place. So before the screen, there was no sharing of information, because, by the way, the Blues were told that they were going to another firm that didn't want to represent the Blues and they wouldn't be doing any more work on the case. And that is clear and undisputed. There's no --

THE COURT: Explain that to me. I'm sorry. I lost you on that.

MR. CARY: Yeah. So when the Maynard firm -- lawyers left a little more than a year ago, they came to Polsinelli. Polsinelli was not interested in representing the Blues, and my understanding is that it was communicated to the Blues and to the dozens of lawyers that represent -- continued to

represent the Blues that these people aren't your lawyers anymore.  They didn't bill any more time in the matter, they didn't work on it, they didn't share any information, and they didn't take any documents with them.

THE COURT:  And they did not withdraw.

MR. CARY:  They did not withdraw until recently, when it was brought to their attention.  I think it's common practice -- and I notice in a number of cases where a lot of lawyers on all sides have not filed their immediate motions to withdraw, but you're right, they didn't.  But the emails didn't bounce back.  They weren't at the firm anymore.

When we realized that --

THE COURT:  So when Mr. Owen talks about having inside information, speaking from personal knowledge about these things, how do we know how to interpret that?  I'm speaking from personal knowledge because I happen to practice with four people who represent the Blues.  I have personal knowledge because I have been participating in settlement negotiations within a mediation, which I can't tell you about but I'm just going to advise you that I have inside baseball information.

And the other thing is, for someone who has such vast personal knowledge, he had a lot of things wrong in that transcript.

MR. CARY:  So how to interpret -- let me try to answer.  If I miss one of your questions, please remind me.

But to go back to how to interpret Mr. Owen, he said quite clearly he was giving his opinions. And I understand that many people who have worked hard on this settlement may have opinions that are different than Mr. Owen, but he's entitled to his opinions, and I will talk about that. I've also stated what he did is not going to happen again.

In terms of his purported inside information, he made very clear that these were his opinions, A. B, he was not able to share any confidential information, and so he may have had the conviction of his beliefs, but he certainly -- there's no accusation that he shared any confidential information inappropriately.

And then with respect to the four partners, I believe it's true -- and I'd be happy to verify this -- I don't think Mr. Owen has had any dealings at all with the four lawyers in Birmingham, Alabama. And I know, because we have submitted declarations, that those four lawyers from Alabama did not share any information with Mr. Owen or anybody else at the Polsinelli law firm. And there was no suggestion on that call that any sort of inside information came from within the Blue team. There's just -- there's zero record evidence, and we have submitted sworn declarations that it did not happen.

So to go back to my grandmother here, I'd say there's no harm, there's no prejudice, and there is a way to address this going forward without prejudicing -- and I know maybe I

started off talking about the providers out there, counsel of their choice, but I've read Your Honor's opinion in the Southern Visions case, and I've read -- but one of the things it does is prejudice someone who keeps the lawyer of their choice -- in this case, it would be the one who wants -- did leave Alabama, not going to Alabama or be included as an absent member of Alabama or a class member, and weigh that against the Blue Cross Blue Shield defendants.  And there's no accusation, no record evidence and, to the contrary, there's sworn declarations from the lawyers who came over that they've not shared any information from Blue Cross Blue Shield with anybody at Polsinelli.

THE COURT:  So this may or may not be germane to our discussion, but I'm still going to ask the question because I'm curious about this:  As I read Mr. Owen's remarks in this transcript, he seems to be saying that I telegraphed that we're going to remand these cases and, therefore, there would not be a ruling on any nationwide injunction and that scared provider counsel into settling.  Am I -- am I reading the -- at least the inference, if not the implication, he's making there correctly?

MR. CARY:  Well, I did not read it that way, Your Honor.  What I read was -- the way I inferred it -- and obviously we're going to infer his words in different ways, but my inference was that, first of all, he was very

complimentary of class counsel -- that's in there for sure -- and that he thought -- what he said was they got the best deal they could.  And he certainly suggested that there was a desire to have a nationwide class and --

THE COURT:  Well, that's my point, though, is the nationwide class was still on the table.  And I don't know if he just didn't understand that or if he was just misrepresenting that, because what happened was, when I suggested the need -- when I suggested remand may be appropriate, it was because we had a number of cases pending before me that dealt with different markets.  And I specifically told the parties -- and I think everybody on the Zoom call that was in Chicago that day will remember this -- that I can still deal with all the nationwide injunction matters with each of the cases that have been filed in Alabama because they seek nationwide injunctions.  So nationwide injunction was never off the table.  The parties reached a resolution with the understanding that nationwide injunctions were specifically still on the table.  And I was a little miffed at Mr. Owen's suggestion otherwise, particularly as someone who holds themselves out as having personal knowledge about these things.  It may not be germane to the disqualification issue, but I feel like to the extent somebody comes along and reads this, believing, we need to set the record straight on that.

MR. CARY:  So what I would say, Your Honor, is I did not infer it that way.  I obviously don't have as much knowledge as either you or Mr. Owen or anybody that's been on this --

THE COURT:  Well, wait a minute.  You didn't infer this statement that way?  When it was clear that certification of a nationwide class wasn't going to happen, provider class simply gave up and made the best deal they could.  You don't think that's saying exactly what I just said he was saying?

MR. CARY:  Well, to me, I -- lawyers and citizens and commentators reach conclusions about what they think courts are going to do and what they aren't going to do all the time.  And I can tell you that in conversations with the Polsinelli firm, we -- I had some conversations with them about what my expectations were in this hearing and how it might happen, but that's all it is.  They're just -- it's just an opinion.  And if he got too enthusiastic or didn't qualify it enough, that's -- I think that's what that is, not a -- not some sort of suggestion that he could read your mind or that he knew that something was absolutely off the table, when what I think he meant to suggest is it wasn't likely to happen.  That's the way I read it.  And if it's a poor choice of words, it was a poor choice of words.

THE COURT:  Would you characterize his remarks about the settlement in terms of the fact that I knew there was

going to be opt-outs and that's why we put the brakes on and went back and renegotiated?  Because that's not what happened either.

MR. CARY:  So as I read it -- and again, we all read things differently, but -- the language we focused on was he said, In my opinion, the Judge expects there's going to be opt-outs.  That was my takeaway.  And what I thought they were having a problem with -- and again, it's a matter of an opinion about citizens', commentators', and lawyers' attempt to read judges' minds, and he said it was his opinion.  And he also said it was a possibility that wouldn't happen.  And he also praised plaintiffs' counsel.

THE COURT:  All right.  Well, I think we've beaten that horse a little bit.

All right.  So back to what I think may be relevant to this -- well, and I asked this question to Mr. Smith and his counsel in the last hearing.  And I wear two hats when I ask the question, one hat as the judge in this case, the other hat as the current chair of the subcommittee on third-party litigation finance for the civil rules.  To what extent is the Polsinelli firm involved with third-party litigation finance in terms of trying to attract opt-outs?

MR. CARY:  My understanding is that we are not involved -- by "we," I mean the Polsinelli firm -- is not involved in that.

THE COURT: They're not in discussions with third-party financers to finance a third -- opt-out litigation?

MR. CARY: Correct.

THE COURT: Okay. All right. So what rule do you propose that I articulate in deciding the disqualification issue? Back to matters that are relevant to the disqualification issue. What's the rule?

MR. CARY: The rule should be that to the extent that -- well, I hope this is responsive. If it's not, if you'll let me know --

THE COURT: Well, I'll follow up if I've got a question.

MR. CARY: The nationwide injunction, when it's effectively a nationwide injunction and nationwide, is ineffective. To the extent Polsinelli -- it has one client now. It would like to talk to more clients if they came to them, but there's only one client they're talking to now. Polsinelli will undertake its own analysis based on the states under APA Model Opinion -- or Formal Opinion 504 and Rule 805 [sic] of the Model Rules has a number of factors they're taking into account in determining whether -- which ethics rules apply. And in a number of those cases, in states where -- there are a number of states where we think ethics rules would allow a screen to take place to advise a client on

whether or not to remain a part of the putative class, the preliminary approved class, or to choose to leave Alabama. And that's what we think the ruling will be.

THE COURT:  Well, here's what I'm struggling with. Local Rule 83.1(f) of the Northern District of Alabama provides standards for professional conduct.  It provides that attorneys appearing before this Court are governed by, first, this Court's Local Rules, second, the Alabama rules to the extent they are not inconsistent with this Court's Local Rules, and third, the American Bar Association Model Rules of Professional Conduct, ABA rules, again to the extent they are not inconsistent with the Court's Local Rules or the Alabama rules; all right?  ABA Model Rules recognize an ethical screen.  The Alabama rules do not.  So I start with the proposition that the ABA Model Rules, to the extent they prevent a model screen, would be consistent with the Alabama rules.

Now, your point is there's a bunch of lawyers at Polsinelli that are operating around the country that just aren't in Alabama and aren't bound by the Alabama rules.  The problem is the four lawyers who are screened, in your argument, are absolutely governed by the Alabama rules, which do not permit them to be screened.  Plain and simple, they can't be behind a screen.  And Alabama says to the extent that they are affected, that disqualifies every other member

partner in their firm, right, every other member of the firm.

So how can we have a screen built, even to the extent it's consistent with another state's professional rules of conduct, if the screen subjects are in a state that cannot -- that does not permit a screen of them?

MR. CARY:  Well, I would submit that the focus of the inquiry should be under ABA Rule 805 [sic] and -- which has a choice-of-law provision, which the Alabama rules don't, that one needs to decide the choice of law, which ethics rules are going to cover this particular situation, and we're dealing with one client now, but in the future there could be others depending on how the Court rules, and that that is the focus of the -- of whether a screen works or not, just not the fact that there are four lawyers in Alabama.  I don't think the Alabama rules say they cannot be screened.  I think they say that when the Alabama rules apply, a screen is not an adequate remedy.  And our view would be if we're in the state of Washington or the state of Illinois or Delaware and the rules allow for a screen there, then that screen ought to be sufficient.

THE COURT:  But how -- I understand your argument if the lawyers being screened, the lawyers who have the conflict, the lawyers who could not take a material adverse position or their firm could not take a material adverse position were outside Alabama, but these are lawyers that are being screened

in Alabama that doesn't recognize any such screen.  I think you're reversing it.  Your argument would work if these folks were practicing in some jurisdiction other than California, New York, or Alabama that permits ethical screens.  But they're in a state that doesn't and, therefore, how can they be the ones being screened if the very state they practice in, they're subject to their disciplinary rules, say you can't do that?

MR. CARY:  Because --

THE COURT:  That's not -- that doesn't relieve the conflict they have.

MR. CARY:  Because, Your Honor, our position is that the ethical rules that should apply are the ones actually doing the work on the case with the client that matters.  And by the -- when I say "the client that matters," I mean the one that is seeking advice.  And I can see that some people may not like saying "the client that matters."

The fact remains that the Blues are not prejudiced, there's no record they've been prejudiced, and they're not going to have any involvement.  And the rule of law that should govern whether Polsinelli can give advice in another state should be the rules of that state.  And the Alabama lawyers are strangers that -- the four lawyers that came over had nothing to do with it.

And maybe to illustrate -- you know, if we --

Polsinelli will not do this, but if they wanted to be cute about it, they could lay these people off until the opt-out ends.  They're not going to do that because that would be too cute.  But I think it illustrates that there is no prejudice here and that the governing law should be other clients out there have rights as well.  The Blues haven't been prejudiced. And I know I sort of started talking about those other clients, but that is something that --

THE COURT:  Well, I think your hypothetical would be this:  Before they undertook any representation, they let these lawyers go and then unconflict the representation. That's not the facts here.  The facts are, to the extent there is a screen, the screen was not erected until after the dual representation was undertaken, the previous representation of a former client by a partner at the firm or a lawyer at the firm and the current representation of a client who's materially adverse to that former client by a different lawyer at the firm.

MR. CARY:  I want to make one point that I'm afraid may be a little lost here, which is that the -- in our view, this issue did not arise until there was a preliminary approval of the class and an opt-out decision was -- was presented.  And it wasn't as if there was something that Polsinelli would have done back in January of 2024 when they came over, because there wasn't a -- there wasn't anything to

screen them from at the time.

And it is true that Mr. Owen did this courtesy Zoom call for a consulting client, but when it was brought to our attention in two-thousand- -- in early January, this screen went into place. And I understand there's no screen in Alabama, but in our view, when Polsinelli is providing services about whether to opt out Alabama in another state, it's that state's rules that govern, not Alabama's rules.

THE COURT: Well, all right. I -- anything else you would like to say? I would say I appreciate Mr. Velezis's restraint when you said "the client that matters." I think he probably thinks his client matters, but I understand your point, though.

MR. CARY: And I will clarify. All clients matter, but there has been zero prejudice to Blue Cross Blue Shield. They may not like the way it looks. I understand that a screen doesn't work in Alabama, but there has been zero prejudice. And when you weigh the prejudice to a client of Polsinelli's who doesn't want to be a part of Alabama or may not want to be a part of Alabama, the only decision they're making is whether they want to be -- I call it an absent class member -- whether they want to be a class member or not or whether they want to leave Alabama and sue elsewhere. That, I believe, is where the balance of prejudice should lie, and that's why a sweeping nationwide disqualification injunction

is not appropriate here, Your Honor.

THE COURT:  Well, I understand a party's presumptively entitled to counsel of party's choice, but that can be overridden for any number of compelling reasons, and one compelling reason is Rules of Professional Conduct.  So it's not just enough to say clients are entitled to the counsel of their choice.

We'll -- let me hear from -- let's see -- first Mr. Issacharoff and then Ms. DeMasi as to whether they have any follow-up to what you just said.

MR. ISSACHAROFF:  Yes, Your Honor.  It has long been established that lex fori, the law of the Court in which a matter sits, controls all aspects of attorney discipline and behavior before that Court.  If you go back to the Phillips Petroleum v. Shutts case, the Court again, per Justice Scalia, drew a distinction between areas where lex fori applies to areas where lex loci applies.  And in that case the Court even found that statute of limitations were subject to lex loci, meaning that it had to be part of -- it was considered part of the judicial administration of the Court processes.  And I am unaware of any authority to the contrary that courts that handle nationwide class actions, courts that are transferee courts for MDL proceedings, or as with this case, both, that either one of them is subject to lex loci and must apply the rules of foreign courts when attorneys misbehave in their

court.  And that's what's at issue here.

The rule that's being proposed here is that attorneys are free to market their knowledge of the inside workings of litigation to the detriment of their clients so long as they don't reveal documents and reveal exhibits that they obtained through confidential sources.  But the very essence of what an attorney is there for, going back to Justice Jackson's very beautiful rendition of this in Hickman v. Taylor, is that it's the party to whom you turn for advice and confidentiality and to know what's going on.  It's not just that they're not going to turn over your tax records or other private information.  It's that they're your counselor, and that has always been the understanding.  And the idea that your counselor can turn against you so long as there are no brief -- there are no documents taken out of the briefcase in the dead of night as if this were some Watergate exchange in a parking lot, that's just never been the rule.

And to invoke the ultimate legal authority in this proceeding, which is your grandmother, I think your grandmother would have a very hard time with the proposition that today someone is my lawyer and then tomorrow he or she can go over to the other side so long as they don't turn over documents or expressly waive confidentiality.  That's never been the rule.  Your counselor is your counselor.  All the rules are based upon that.

And I would submit to you that if you look at the transcript, it's not just the misrepresentations that are made, it's the opening representation on behalf of Zotec says we have brought you here, these lawyers from this law firm, because they know the insides of the dealings.  Well, the reason they know the insides of the dealings is that they hired four lawyers who were -- one of whom at least was a part of the presentation.  Under these circumstances, I don't think an ethical screen would even work under -- where that would be allowed.  But certainly under the Alabama rules, which govern in this Court, there's no question that this is impermissible. That's our view, Your Honor.

THE COURT:  So two follow-ups.  First, which lawyer was involved in the presentation, just for the record?

MR. ISSACHAROFF:  Owen.

THE COURT:  Okay.  But I thought you meant one of the four lawyers.  Maybe I misheard you.

MR. ISSACHAROFF:  No.  Owen on behalf of the firm saying --

THE COURT:  Yes, yes, right.

MR. ISSACHAROFF:  I'm sorry.  I may have --

THE COURT:  I just wanted to clarify.

Second, I fully recognize, when I run into one of your students, they're going to understand how Mr. Issacharoff provided us this novel issue by way of referring to your

grandparents.  And I don't need any attributes.

MR. ISSACHAROFF:  Well, I'm not sure I would refer to my grandparents, who never got it.

THE COURT:  Well, they had a good sense of right and wrong.

MR. ISSACHAROFF:  Yes, Your Honor, they did.

THE COURT:  Miss DeMasi?

MS. DeMASI:  First of all, on this point about prejudice, the ethics rules do not talk about prejudice in this context, and that's for good reason.  It's because the duty of loyalty to a client under the ethical rules is meant to be sacrosanct, and so there is no question about prejudice. It's about whether the action would be materially adverse to the former client.  And there's no question that seeking to have clients opt out of a settlement, seeking to blow up a settlement, the actions that the Polsinelli firm is currently taking in Alabama over an Alabama settlement, are absolutely adverse to Blue Cross Blue Shield of Alabama.

And what I hear Mr. Cary saying is Polsinelli would like forgiveness.  But the ethics rules aren't rules of forgiveness, they're rules of permission, and they didn't have permission.

It's also the case that it may be that lawyers are entitled to communicate their opinions.  Conflicted lawyers aren't.  Mr. Owen was not entitled to communicate positions

and opinions adverse to Blue Cross Blue Shield of Alabama. And so there are limits to that. This isn't a free speech issue, as the Polsinelli firm would say.

Nothing further, Your Honor.

THE COURT: All right.

MR. WHATLEY: Judge, can I say one thing?

THE COURT: Yeah, go ahead.

MR. WHATLEY: I was here to argue the alternative corrective notice issue, if you got to that point. We're fine resting on our briefs if you ever need to get to that point. I just didn't want to go and say anything by not saying it to you. I think the disqualification issue is at the heart of this, but if you do need to get to the corrective notice issue, I think the papers set it out completely.

THE COURT: All right. I'm not saying this is where we're going to end up, but hypothetically, if this was a disqualification situation, would we really need a corrective notice?

MR. WHATLEY: No, sir.

THE COURT: Okay. That's -- I thought that would be your position. But again, I'm not there. I'm just asking. Maybe it doesn't moot the issue, but it probably resolves a lot of the issues.

MR. WHATLEY: Yes, Your Honor.

THE COURT: Rob, did you want to have the last word

here?

MR. CARY:  Just very briefly, Your Honor.  It's been said that the disqualification -- well, the ethical rules are not about prejudice, the disqualification rules are about prejudice.  And it was just said now that lawyers actually switched sides, and that is not what took place.  Four lawyers joined a new law firm.  They told Blue Cross Blue Shield, We're not representing you anymore.  We're not sharing anything.  I think the prejudice to the various parties does and should weigh in your decision, Your Honor.

Thank you.

THE COURT:  So -- and that's, I guess, one question -- subissue here is in a case of this magnitude, does appearance matter, not just prejudice but appearance matter?

MR. CARY:  Well, appearance is important in our legal system.  I would concede that.  But I also think that in a case where we're close to the end of the class opt-out period and you have a client who wants to use their counsel of choice for years in another jurisdiction and the -- everybody -- at least there's no record of evidence that there's ever been any confidential information disclosed -- I would say that the prejudice would be more important than appearances.

THE COURT:  All right.  Thank you.

MS. DeMASI:  Obviously, our view is that appearances very much matter, and that is why it is with good reason that

this Court has said before where there is a conflict, where there is a violation of an ethical rule, disqualification.

Prejudice works the other way.  There is no prejudice to this client finding an unconflicted lawyer.  There isn't. It is, we are very early in the case.  They haven't even filed in a case.  They haven't been identified.  We'll never know what opt-out it is.  So no one has a problem with a provider who decides to exercise their right to opt out.  They don't have a right to a conflicted lawyer but an unconflicted one.

THE COURT:  All right.  I think I have enough to start the process of making a decision.  No ruling now.  I'll take it under submission.

Anything else we need to take up before we sign off, though?

(No audible response.)

THE COURT:  Oh, I jumped the gun on you.  Phone number (919) -- who's in area code 919 that doesn't want to give us your name?

MR. VICK:  It's Brian Vick from Blue Cross Blue Shield of North Carolina.

THE COURT:  All right.  We'll let you stay.

MR. VICK:  Thank you, Judge.

THE COURT:  That was somebody from Blue Cross Blue Shield North Carolina.

Who's the Zoom user?  I expect all hands to go up.  We

have somebody who's just -- it was obviously a plant spy.

MR. BLECHMAN:  Your Honor, this is Bill Blechman.

THE COURT:  You're good.  We have you.

MR. BLECHMAN:  Okay.  Very well.

THE COURT:  Okay.  Bill, your name is prominently displayed.

MR. CARY:  Your Honor, it's Rob Cary.  Can I make one more final point?

THE COURT:  Sure.

MR. CARY:  I just want to emphasize it.  That is, the position of the Polsinelli firm is that the conflict that needed to be resolved with a screen, the issue that needed to be resolved with a screen, did not arise until December of 2024.  When we were alerted to it on, I believe, January 3rd, 2025, we got on it and put the screen on it right away.  And there was no -- there was no -- there was no adversity until then because the opt-out decision wasn't before these clients who came to us, if that makes sense.

THE COURT:  Yeah.  But I guess the Blues' question that they would ask in response to that would be, your firm is responsible for knowing who its members are, who the lawyers are, their previous representation, even if it wasn't at your firm.  And when the decision was made let's go on the call with a consultant and give information to potential opt-outs, was the responsibility even, in a jurisdiction that permits an

ethical screen, to put the ethical screen in place before that overture is made, before that, quote, advice, end quote, is given. I think that's what the Blues would ask, but I hear your argument. I understand it.

MR. CARY: And I just want to say our position on that would be that that was not a legal representation that we undertook. It was a -- it was a courtesy Zoom call not for clients. I mean, consulting client, not a healthcare client.

THE COURT: I understand the distinction, but I don't think -- I don't think the limitation under the conflict rules, disqualification rules, is limited to undertaking representation of another party adverse. It's taking actions that are materially adverse.

MR. CARY: So, Your Honor -- oh, I'm sorry.

THE COURT: Your -- that's all right. You probably thought I was finished, but go ahead.

MR. CARY: I did, and I'm sorry.

I would suggest that if I go to the bar association or any of the lawyers on this call goes to the bar association and gives a talk or goes to a law school class and gives a talk or, you know, does something that is not signing up to be somebody's lawyer but to further the dialogue about something, I -- that is not something that would get caught in a normal law firm's ethics screening. It's just not the way it works.

THE COURT: Yeah, that's not the point I was making.

The point I was making is this:  One of these four lawyers who previously represented Blue Cross Blue Shield could not get on a Zoom call with a bunch of other people and say, This isn't a good deal and you need to opt out of it, or these lawyers are good lawyers but they did the best they can.  This Judge signaled that there was not going to be a nationwide class action and they took the best deal they could get under the circumstances.

They couldn't possibly say those things, consistent with their obligations to their former client.  And then the argument is, that means their partners can't do that either because those are -- that limitation is imputed to all the partners.

I have your argument, though, on that.  I understand.

MR. CARY:  Thank you, Your Honor.

THE COURT:  Okay.  All right.  Well, appreciate everyone being available.  We'll work as quickly as we can.  I do have a few things I want to work through in my mind.  Like I said, I've not made a decision yet.  I want to weigh out some things and see where we are.  No promises.  All right?

Take care.

(Adjourned accordingly at 3:11 p.m.)

C E R T I F I C A T E


I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.

Dated:  February 25, 2025



*Pamela G. Weyant*
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter