FILED
2025 Mar-31  PM 03:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| OWENS & MINOR, INC. and | § | |
| OWENS & MINOR FLEXIBLE | § | Case No. 3:24-cv-820 |
| BENEFITS PLAN | § | |
| | § | |
| V. | § | COMPLAINT |
| | § | |
| ANTHEM HEALTH PLANS OF | § | |
| VIRGINIA, INC. D/B/A ANTHEM | § | [Jury Trial Demanded] |
| BLUE CROSS AND BLUE SHIELD | § | |

## **PLAINTIFFS' ORIGINAL COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

    I.     Crux of the Case: A Fox in the Henhouse ........................................ 1

    II.    Employers Sponsoring Healthcare Plans for Employees Almost Universally Hire Third Party Administrators Like Defendant ........................................ 5

    III.   In Recent Years, Plaintiff Grew More Sensitive to the Threat Posed by TPA Fraud, Waste, and Abuse ................................................................. 6

    IV.   Defendant Actively Frustrated Plaintiff's Attempts to Access and Analyze the Plan's Claims Data ................................................. 8

PARTIES ................................................................................................................... 13

THE SIGNIFICANCE OF THE ADMINISTRATIVE SERVICES AGREEMENT AND THE PARTIES' RESPECTIVE CONDUCT ........................................... 13

    I.     The Administrative Services Agreement Generally .................................... 13

    II.    The Parties Are ERISA Fiduciaries ................................................. 14

        A.    By Virtue of Its Role as the Plan's TPA, Defendant Possessed and Exercised Control Over Plan Assets and Over Plan Administration and Management ........................... 15

        B.    Defendant's Discretion and Control Extended to Recovery of Monies Improperly Paid by the Plan or Otherwise Owed to the Plan ........................................................... 20

        C.    Plaintiff Owens & Minor is the Plan Sponsor and a Fiduciary With Standing to Prosecute ERISA Claims on the Plan's Behalf ........... 22

THE BLUECARD PROGRAM AND MULTIPLAN ...................................................... 23

    I.     The BlueCard Program ................................................................. 23

    II.    MultiPlan (and Other Out-of-Network Claim Processing Vendors) ............... 27

i

JURISDICTION AND VENUE ................................................................................. 27

CAUSE OF ACTION FOR ERISA VIOLATIONS ........................................................ 28

STATE LAW CAUSES OF ACTION ....................................................................... 33

 I.  Breach of Contract.................................................................... 33

 II.  Breach of Good Faith and Fair Dealing ................................... 36

 III.  Breach of Fiduciary Duty under Virginia Law .......................... 39

 IV.  Fraud........................................................................................ 43

 V.  Negligent Misrepresentation or Constructive Fraud .................. 47

TOLLING OF LIMITATIONS PERIODS .................................................................... 52

JURY DEMAND.................................................................................................... 53

PRAYER FOR RELIEF .......................................................................................... 53

Plaintiff OWENS & MINOR, INC., individually and on behalf of Plaintiff OWENS & MINOR FLEXIBLE BENEFITS PLAN,[1] files this Complaint against ANTHEM HEALTH PLANS OF VIRGINIA, INC. D/B/A ANTHEM BLUE CROSS AND BLUE SHIELD, and in support thereof states the following:

## INTRODUCTION

### I.  CRUX OF THE CASE: A FOX IN THE HENHOUSE

1.      Like many employers across the country, Plaintiff Owens & Minor, Inc. sponsors a self-funded healthcare plan to provide quality healthcare to its employees and their families. Owens & Minor engaged Defendant to administer the millions of dollars it and its employees paid into the Plan. In September 2021, Plaintiff requested its Plan data from Defendant so that it could ensure that Defendant was faithfully administering the Plan's assets. Following this request, Defendant transformed what should have been a simple transfer of the *Plan's* data to the *Plan's* sponsor, into a nearly two-year game of "hide the ball."

2.      Defendant first claimed that it *could* not provide the requested data, and then said that it *would* not. After retaining outside counsel, Defendant said that it would provide the data, only to later retract that promise. Eventually, Plaintiff had to sue Defendant to obtain its own data.[2] Now that Plaintiff has a portion of that Plan data and has had the opportunity to analyze it, it is clear why Defendant fought so hard to prevent Plaintiff from

---

[1] In this Complaint, "Plaintiff" refers to Owens & Minor, Inc. in its individual and representative capacities unless otherwise provided expressly or by context. "Owens & Minor" refers specifically to Owens & Minor, Inc. "Plan" refers specifically to Owens & Minor Flexible Benefits Plan.

[2] *Owens & Minor, Inc., et al. v. Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield*, Case No. 3:23-cv-00115-REP, E.D. Va.

accessing it. Plaintiff's analysis to date has showed tens of millions of dollars of damages to the Plan as a result of Defendant's neglect and misconduct. Plaintiff suspects the damages will grow significantly upon receipt of the remaining data which continues to be withheld.

3.  As is well known, healthcare in America is facing a severe crisis. Skyrocketing costs have made it increasingly difficult for hard-working Americans to afford essential medical care or prescription drugs.[3] As it turns out, health plan administrators—like Defendant—are at the root of the problem.

4.  Employers across the country, like Plaintiff, have hired and trusted third-party administrators to manage and safeguard the assets of their self-funded health insurance plans with the utmost care. Although these administrators are fiduciaries to the plans and the plans' beneficiaries, nationwide reports have revealed widespread misconduct. Specifically, investigations have uncovered that administrators' acts and omissions have resulted in the misappropriation and waste of billions of plan dollars. Hard-working Americans bear the cost of such misconduct in the form of ever-increasing healthcare costs and premiums.

5.  Defendant served as a fiduciary under the Employee Retirement Income Security Act (**ERISA**) with respect to funds it held, controlled, and used to pay healthcare costs for participants and beneficiaries in Plaintiff's self-funded healthcare plan. "ERISA

---

[3] Aimee Picchi, *Americans spend more on health care than any other nation. Yet almost half can't afford care.*, CBS NEWS (July 17, 2024), *available at* https://www.cbsnews.com/news/health-care-almost-half-of-americans-struggle-to-afford-medical-care/ (last accessed Nov. 15, 2024).

guarantees plan beneficiaries a fiduciary who acts solely in their interests"; thus, "a fiduciary laboring under a conflict of interest must act as if [it] is free of such a conflict." *Edmonds v. Hughes Aircraft Co.*, 145 F.3d 1324, 1998 WL 228200, at \*8 (4th Cir. 1998) (some quote omitted). "Free" in the ERISA sense is "an absolute." *Id.* ERISA therefore leaves no room for "balancing" of a fiduciary's interests against those of plan participants and beneficiaries. *Id.* "ERISA commands undivided loyalty" by Defendant. "If faithfully discharging such a duty appears especially arduous, that is because it is." *Id.* ERISA duties of care and integrity remain the highest known. *Id.*

6. Relying on Defendant's assurances that it would faithfully serve as an ERISA fiduciary, Plaintiff trusted Defendant – a purportedly reputable company with a household name – with millions of dollars intended to fund healthcare for employees of Owens & Minor, Inc. and their families enrolled in the Plan. Defendant sought out and readily accepted the responsibility of a fiduciary with respect to those funds because Defendant stood to earn significant sums in fair, transparent payment for its services. Unbeknownst to Plaintiff, Defendant wanted more than fair payment. And unbeknownst to Plaintiff, Defendant had no interest in protecting the Plan as a fiduciary must under the law.

7. Defendant willingly undertook the duty to discharge its responsibilities solely in the interests of those employees and their families.

8. Defendant willingly agreed to discharge its duties for the exclusive purpose of providing benefits to those employees and their families.

9. Defendant willingly undertook the duty to defray expenses incurred by the Plan.

10.     Defendant willingly undertook the duty to exercise the care, skill, prudence, and diligence of a reasonable fiduciary.

11.     However, Defendant's boundless avarice and neglect caused it to violate these duties on all fronts.  Reports of widespread TPA misconduct caused Plaintiff concern. Following President Reagan's oft-stated mantra, "trust but verify," Plaintiff sought to verify that Defendant executed its duties according to ERISA's unbending standards and that Plaintiff itself was not a victim of misconduct. When Plaintiff began its investigation, it quickly realized that Defendant's disclosures relating to the Plan were not sufficient to ascertain whether Defendant's performance satisfied its relevant duties. Part of the information needed was the Plan's claims data. But Defendant refused to disclose the Plan's claims data, which was essential to confirm Defendant had not wasted funds, defrauded Plaintiff, or abused Plaintiff's trust. Defendant even forced Plaintiff to sue Defendant to obtain this information—information that Defendant claimed Plaintiff had no right to view.

12.     But Plaintiff has a portion of that data now. That data reveals Defendant used Plan assets for its own purposes and is not worthy of even minimal levels of trust. Specifically, it demonstrates how Defendant used Plan funds to enrich itself and its affiliated companies and medical providers to the Plan's detriment. The data further demonstrates that Defendant sought to increase the costs of Plan administration—or simply made no effort to control Plan costs—because doing so increased Defendant's profits. Defendant acted contrary to the fiduciary standards imposed by ERISA by, among other things, (i) paying more for healthcare claims than was even billed, (ii) securing kickbacks

4

from providers, (iii) double-paying claims, and (iv) pocketing rebates belonging to Plaintiff.

13. As a result, the Plan has incurred significant losses paid for by employees of Owens & Minor and the company itself. Importantly, Defendant has continued to withhold other information from Plaintiff that would enable it to calculate the full extent of losses it has suffered as a result of Defendant's misconduct. Plaintiff anticipates that, upon reviewing that information in discovery, Defendant's misconduct and Plaintiff's losses will become fully exposed. Plaintiff files this suit to recover its losses and claw back Defendant's ill-gotten gains.

## II. EMPLOYERS SPONSORING HEALTHCARE PLANS FOR EMPLOYEES ALMOST UNIVERSALLY HIRE THIRD PARTY ADMINISTRATORS LIKE DEFENDANT.

14. Throughout the country, employers large and small provide healthcare benefits for their employees. Many employers, including Owens & Minor, provide health benefits through self-funded plans, whereby the plan funds employees' and their beneficiaries' healthcare expenses primarily from employer and employee contributions.

15. As sponsors and plan administrators of self-funded plans, employers owe fiduciary duties under ERISA to the plans and to the employees and beneficiaries covered by those plans. ERISA allows plan sponsors to delegate those fiduciary responsibilities to third parties who possess the expertise, infrastructure, and systems to manage certain aspects of those plans. Thus, to manage the plan's claims administration, employers generally hire third party administrators based on their advertised ability to manage the plan.

16. For these reasons, there is a significant and lucrative market for third party administrators (**TPAs**). TPAs specialize in the healthcare benefits business. They possess the expertise, personnel, and systems to price, administer, and process healthcare claims. TPAs like Defendant market themselves as possessing the expertise and integrity necessary to serve as fiduciary plan administrators. Thus, employers sponsoring self-funded healthcare plans generally entrust their plans' assets and the health of their employees to TPAs.

17. In 2017, Owens & Minor hired Defendant Anthem, a TPA who purports to specialize in the administration of self-funded plans and to manage healthcare claims for plans with the level of care and loyalty demanded by ERISA. In doing so, Plaintiff entrusted Plan assets and the care of its employees to Defendant. Nevertheless, as Plan sponsor, administrator, and named fiduciary, Plaintiff retained duties under ERISA to monitor Defendant, protect Plan assets, and oversee the quality of care provided to its employees and beneficiaries. Plaintiff reasonably expected Defendant to comply with the law and carry out its duties solely in the interest of the Plan's participants and beneficiaries and for the sole purpose of providing healthcare benefits to them while defraying the expenses of the Plan. Defendant, however, did just the opposite, because violating the law generates more profits for Defendant and its affiliates.

### III. IN RECENT YEARS, PLAINTIFF GREW MORE SENSITIVE TO THE THREAT POSED BY TPA FRAUD, WASTE, AND ABUSE.

18. The past few years have generated reports of wrongdoing that justify Plaintiff's efforts to investigate Defendant's management of the Plan. These reports detail

several instances where opportunistic claims administrators employed illegal or unethical means to obtain windfall profits at the expense of self-funded plans and taxpayers alike. As an example, one report claimed certain claims administrators illegally incentivized healthcare providers to report that Medicare Advantage patients are sicker than they actually are, because the insurers received more income for patients with more serious documented conditions. According to a *New York Times* report, the misconduct caused between $12 billion and $25 billion in overpayments by Medicare in 2020 alone.[4]

19. Other developments further justify Plaintiff's efforts to carefully assess Defendant's claims administration practices.[5] One report revealed that merely replacing a claims administrator saved a governmental entity such a large sum of money that there simply had to be waste or other problems in the claims administration processes.[6] The news was saturated with stories regarding the harm that TPAs can cause.[7] In fact, the American Medical Association estimates that commercial health insurers have an average claims-

---

[4] Reed Abelson and Margot Sanger-Katz, *'The Cash Monster Was Insatiable': How Insurers Exploited Medicare for Billions*, N.Y. TIMES (Oct. 8, 2022) *available at* https://www.nytimes.com/2022/10/08/upshot/medicare-advantage-fraud-allegations.html, last visited Oct. 10, 2022.

[5] *See, e.g.*, *Employer Held Liable for Service Provider's Error*, J.D. SUPRA (Dec. 31, 2020) *available at* https://web.archive.org/web/20201231211429/https://www.jdsupra.com/legalnews/employer-held-liable-for-service-89209/#expand/, last visited Nov. 17, 2024.

[6] *TRS says it will save millions on new health administrators, assures members of minimal plan impacts*, TEXAS AFT (Feb. 27, 2020), *available at* https://web.archive.org/web/20221004070344/https://www.texasaft.org/government/trs/trs-says-it-will-save-millions-on-new-health-administrators-assures-members-of-minimal-plan-impacts/, last visited Nov. 17, 2022 (Texas teacher retirement system saved hundreds of millions of dollars by replacing claims administrator).

[7] *See, e.g.*, Brendan Pierson, *Mass. Blue Cross sued for 'mismanagement' of state employee health plan*, REUTERS (Mar. 29, 2021), *available at* https://www.reuters.com/article/health-blue-cross/mass-blue-cross-sued-for-mismanagement-of-state-employee-health-plan-idUSL1N2LR2IC, last visited Nov. 17, 2024 (discussing litigation involving allegations of self-dealing).

processing error rate of 19.3 percent, which creates excess costs of $17 billion annually.[8] Another report, which comes from the nonpartisan Council on Health Care Spending and Value, opined that excess administrative costs wasted between $285 billion and $570 billion in healthcare spending in 2019 alone.[9]

20.    The information reported in those articles and similar reports demonstrates that Plaintiff's sensitivity to the risks potentially posed by its Plan's TPA was well-founded. These reports support Plaintiff's heightened efforts in 2021 to assess Defendant's performance and to ensure Defendant honored its fiduciary duties to the Plan, participants, and beneficiaries.

## IV. DEFENDANT ACTIVELY FRUSTRATED PLAINTIFF'S ATTEMPTS TO ACCESS AND ANALYZE THE PLAN'S CLAIMS DATA.

21.    In September 2021, Plaintiff requested its Plan's claims data and information from Defendant in order to assess the Plan's performance financially and with respect to the adequacy of care that Plaintiff's employees and their beneficiaries received. What should have been a simple transfer of *the Plan's* information from Defendant to Owens & Minor—the Plan sponsor, named fiduciary, and administrator—turned into a year-long trail of emails and other correspondence, littered with Defendant's excuses, arbitrary conditions, and illusory promises. For example, Defendant would agree to provide

---

[8] *AMA blasts insurers on 19.3 percent claims error rate*, HEALTHCARE IT NEWS (June 20, 2011), *available at* https://www.healthcareitnews.com/news/ama-blasts-insurers-193-percent-claims-error-rate, last visited Nov. 17, 2024.

[9] *The Role Of Administrative Waste In Excess US Health Spending*, HEALTH AFFAIRS (Oct. 6, 2022), *available at* https://www.healthaffairs.org/content/briefs/administrative-waste-excess-health-spending, last visited Nov. 17, 2024.

the information and then renege, citing some obscure, inapplicable condition in its form agreement, which Defendant had carefully crafted in an effort to illegally sidestep its fiduciary duties. Of course, to any extent Defendant's crafty contract provisions purport to relieve Defendant of its fiduciary responsibilities, ERISA invalidates those provisions.

22. Determined to obtain the Plan's information, Plaintiff patiently endured Defendant's parade of promises, delays, obfuscation, and excuses. Plaintiff even attempted to satisfy some of Defendant's arbitrary and baseless conditions. Despite Plaintiff's year-long efforts to obtain claims data belonging to the Plan it sponsors and oversees, Defendant continued to block Plaintiff from even the most basic information it needed to assess the Plan's performance.

23. For example, Plaintiff repeatedly requested that Defendant provide the most comprehensive data in Defendant's possession regarding each claim paid by the Plan, including the "Billed Amount," "Excluded Amount," and "Allowed Amount" for each claim. This basic Plan information was crucial for Plaintiff to understand whether Defendant was causing Plan funds to be spent improperly, such as causing the Plan to pay more than billed charges for medical claims. After months of requesting this information, Defendant eventually told Plaintiff that it "won't release" this basic data because it might reveal their "confidential" arrangements with providers:

From: Turner, Hannah <hannah.turner@anthem.com>
Sent: Monday, February 21, 2022 4:58 PM
To: Boykin, Timothy <Timothy.Boykin@owens-minor.com>
Cc: Jones, Chloe <Chloe.Jones@owens-minor.com>; Taylor, Charles J. <charles.taylor@anthem.com>
Subject: [EXTERNAL] RE: OMI Anthem Data Request - Medical

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. If you question any part of this email, please forward to Phishing@Owens-Minor.com

Hi Tim and a late Happy New Year! – Thanks for your outreach. I'm happy to have our data team leaders review this request. Out of the gate, I will say that we won't release both allowed and paid/billed. This would expose our confidential discounts/payment contracts aligned to each provider. Are you comfortable removing one of those before I submit to our team for review? If yes, which would you be willing to remove?

Thanks,
Hannah
Anthem, Inc.
Hannah R. Turner, *Client Executive, National Accounts*

(emphasis added).

24. After Plaintiff pushed back against Defendant's refusal to provide Plaintiff with its *own* Plan data, and only after Plaintiff and engaged outside counsel to take steps to obtain the data through the judicial process if necessary, Defendant pretended to relent. In August 2022—nearly a year after Plaintiff first started trying to obtain the Plan data—Defendant wrote that it would provide the requested data fields after all, subject to the execution of a confidentiality agreement:

> Further, we will continue to exclude DME claims for services outside of Owens & Minor, but agree to include the following data elements in the data set for the sole and permitted purpose to be stated on the DRSF:
> 1. Allowed Charges
> 2. Billed Charges
> 3. Excluded Charges
> 4. BlueCard data – related to claims detail requested in non-Anthem states
>
> I look forward to your confirmation on intended recipient of the requested data.
>
> My Best,
> Hannah
> **Hannah R. Turner**
> Client Executive, Anthem National Accounts

25.     *However*, when Defendant sent the draft confidentiality agreement and final data field list to Plaintiff for execution, it became clear that Defendant was reneging on its promise to provide all of the requested claim information. Once again, the "Billed Amount" and "Allowed Amount" data fields were removed from the list of items that Defendant said it would produce. The confidentiality agreement also included a broadly worded "Disclaimer and Exculpation" provision that purported to disclaim the accuracy of the claims information Defendant would provide, and even *release* Defendant from *all liability* related to any "erroneous, inaccurate, or incomplete information." Plaintiff rejected Defendant's attempt to walk-back its commitment to provide these data fields and to shield itself from liability.

26.     Defendant's actions hindered Plaintiff's ability to carry out its own fiduciary duties to the Plan, Plan participants, and beneficiaries as they relate to monitoring and assessing Defendant's claims management practices and performance of its fiduciary duties. In other words, only Defendant itself had the capability to determine whether it was meeting ERISA's standards.

11

27.     Plaintiff sued Defendant in 2023 to obtain access to its Plan's claims data. Now, Plaintiff has a portion of that data and has had some opportunity to analyze that data. That analysis revealed Defendant violated its ERISA duties in numerous—and costly— respects. Plaintiff now seeks recovery of Plan losses caused by Defendant's violations.

28.     Even now, Defendant continues to withhold Plan information that is necessary for Plaintiff to assess the full scope and impact of Defendant's wrongdoing. This information includes, but is not limited to the following:

(i)     Defendant's payment processing rules and claim payment methodologies applicable to the Plan, which will allow Plaintiff to determine the accuracy of certain payments Defendant caused the Plan to make;

(ii)    Defendant's agreements with providers, Pharmacy Benefit Managers and other third-parties (such as affiliated pharmacies and providers, insurance networks, and vendors) applicable to the Plan, which will enable Plaintiff to determine the accuracy of certain payments and the full extent of Defendant's self-dealing and misappropriation of Plan assets; and

(iii)   information regarding the amount of Plan funds that were actually paid to pharmacies on Plan members' pharmaceutical claims, so that the Plan can calculate how much more Defendant caused the Plan to pay out for those drugs as compared to the amount that the pharmacies actually charged.

12

## PARTIES

29.     Plaintiff Owens & Minor, Inc. is a Virginia corporation headquartered in Mechanicsville, Virginia. Plaintiff employs thousands of people across the United States. Plaintiff is the sponsor and named fiduciary for Plaintiff Owens & Minor Flexible Benefits Plan (**Plan**). The Plan is a welfare benefit plan under ERISA that provides healthcare coverage for Plaintiff's employees and their beneficiaries. The Plan is "self-funded," meaning that the Plan is primarily funded by contributions from Plaintiff Owens & Minor and Plan participants— *i.e.*, Owens & Minor's employees.

30.     Defendant Anthem Health Plans of Virginia, Inc. dba Anthem Blue Cross and Blue Shield is a Virginia corporation and may be served through its registered agent, CT Corporation System, at 4701 Cox Rd., Ste. 285, Glen Allen, VA 23060-6808.

## THE SIGNIFICANCE OF THE ADMINISTRATIVE SERVICES AGREEMENT AND THE PARTIES' RESPECTIVE CONDUCT

### I.    THE ADMINISTRATIVE SERVICES AGREEMENT GENERALLY

31.     The parties' Administrative Services Agreement (**ASA**) conclusively establishes that Defendant is a fiduciary under ERISA.

32.     Plaintiff required the services of a TPA to administer the Plan. Plaintiff is not a claims administrator and does not possess the expertise, personnel, or systems necessary to administer the Plan's claims. Based on Defendant's various representations detailed below, Plaintiff engaged Defendant as the Plan's TPA and executed the ASA, delegating much of Plaintiff's fiduciary responsibilities under the Plan to Defendant. Defendant knew Plaintiff lacked the ability to serve as the Plan's claims administrator, and Defendant knew

13

that Plaintiff relied on Defendant's assurances regarding its services and integrity. Thus, Defendant and Plaintiff agreed – through the ASA – that Defendant would serve the Plan as its fiduciary TPA.

33.     The ASA became effective on June 1, 2017, **Ex. A** at 1,[10] and Plaintiff began suffering losses immediately.[11]

34.     In the ASA, the parties acknowledged that Plaintiff "is the sponsor of a self-funded Group Health Plan . . . providing . . . health care benefits to certain eligible employees and their qualified dependents." **Ex. A** at 1. The parties agreed that Defendant would "administer certain elements of [Plaintiff's] Group Health Plan." *Id.* The ASA also identified the Plan as an ERISA plan. *Id.*

35.     Plaintiff has complied with all aspects of the ASA and other agreements that comprise the ASA and govern the relationships among the Plan, Owens & Minor, and Defendant.

## II.     THE PARTIES ARE ERISA FIDUCIARIES.

36.     Defendant and Owens & Minor are both Plan fiduciaries. Owens & Minor is a named fiduciary and the Plan's sponsor and administrator. Defendant is a functional fiduciary and has expressly assumed fiduciary duties to the Plan at issue here.

---

[10] While this ASA has been renewed and amended through the years, the relevant portions, except for certain performance guarantees and other more minor provisions, have remained static. Relevant portions of the ASA have been highlighted for ease of reference.

[11] The parties executed a tolling agreement that permits Plaintiff to recover all damages caused back to the effective date notwithstanding the statutory limitations period under ERISA and other applicable law.

37. ERISA fiduciaries are either "named" or "functional." A named fiduciary "means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly." 29 U.S.C. § 1102(a)(2). There are three general categories of functional fiduciaries defined by ERISA:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan *or* exercises any authority or control respecting management or disposition of its assets,
>
> (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, *or* has any authority or responsibility to do so, *or*
>
> (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated [as fiduciary] under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A) (emphasis added). Defendant is a "fiduciary" under one or more of these definitions.

A. **BY VIRTUE OF ITS ROLE AS THE PLAN'S TPA, DEFENDANT POSSESSED AND EXERCISED CONTROL OVER PLAN ASSETS AND OVER PLAN ADMINISTRATION AND MANAGEMENT.**

38. As noted above, the Plan is self-funded. Thus, Plan assets represent contributions by Owens & Minor, its employees, and its former employees. Those

15

contributions benefit the Plan, Plan participants, and beneficiaries by paying healthcare claims for participants and beneficiaries. Plaintiff represents to participants and beneficiaries that Owens & Minor's and the participants' contributions secure the healthcare benefits promised to them by Plaintiff. The amount of contributions is based in large part on Plan costs and expenditures each year. This is a common-sense proposition given that the Plan directly pays for healthcare claims, which Defendant administered for the Plan. Defendant assumed a fiduciary role by accepting and exercising authority, control, and discretion over plan management and assets.

39. The ASA expressly names Defendant as a Plan fiduciary with respect to key functions of the Plan and identifies Defendant as a functional fiduciary with respect to other actions:

Pursuant to Section 405(c)(1) of ERISA, *[Plaintiff] delegates to [Defendant] fiduciary authority to determine claims for benefits under the Plan* as well as the authority to act as the appropriate fiduciary under Section 503 of ERISA to determine appeals of any adverse benefit determinations under the Plan. [Defendant] shall administer complaints, appeals and requests for independent review according to [Defendant's] complaint and appeals policy, and any applicable law or regulation, unless otherwise provided in the Benefits Booklet. In carrying out this authority, *[Defendant] is delegated full discretion to determine eligibility for benefits under the Plan and to interpret the terms of the Plan*. [Defendant] shall be deemed to have properly exercised such authority unless a Member proves that [Defendant] has

16

abused its discretion or that its decision is arbitrary and capricious. [Defendant] is a fiduciary of the Plan only to the extent necessary to perform its obligations and duties as expressed in this Agreement and only to the extent that its performance of such actions constitutes fiduciary action under ERISA.

**Ex. A** at 4, art. 2.c (emphasis added).

40.     The ASA assigned Defendant the duty and right to process claims and "to determine the amount" that "is due and payable" according to *Defendant's* "medical policies and medical policy exception process, its definition of medical necessity, [and] its precertification and/or preauthorization policies." **Ex. A** at 3, art. 2.b (emphasis added). Thus, Defendant possessed authority—which it exercised during all relevant times—to unilaterally commit Plan funds to pay healthcare claims.[12]

41.     Defendant enjoyed discretion with respect to "[t]he amount charged" against the Plan. **Ex. A** at 2 ("PAID CLAIM"). For instance, the ASA purports to grant Defendant discretion to pay a vendor more than actual billed charges for a particular service or supply. *Id.* § 1. It permitted Defendant to decide the reimbursement methodology for claims without express regard to cost. *Id.* And it required the Plan to pay Defendant for claims "without regard . . . to whether such payments are increased or decreased by the . . . achievement of, or failure to achieve, certain specified goals, outcomes or standards *adopted by [Defendant]*." *Id.* (emphasis added).

---

[12] Defendant's actions to withhold Plan information from Plaintiff and claim that Plaintiff is not entitled to such information, as discussed herein, emphasize Defendant's authority over the Plan and its assets.

42.     Defendant exercised extensive control, authority, and discretion over the Plan and its assets through Defendant's contractual arrangements with providers. Both in practice and under the ASA, Defendant exercised absolute control over reimbursement arrangements with providers, which directly impacted both the amounts paid by the Plan and the quality of healthcare provided under the Plan. *See, e.g.*, **Ex. A** at 5, art. 2.s. ("[Defendant] shall have the authority, in its sole discretion, to build and maintain its Provider network on its own behalf. . . . [Defendant] shall be solely responsible for . . . negotiating rates with Providers or auditing Providers. . . ."), art. 2.o (Defendant's contracts with providers, as Defendant may amend them from time to time, will be used to administer and price claims). This control extends to pharmaceutical benefits paid with Plan assets. *See, e.g.*, **Ex. A** at 12, art. 14.a.1 ("[Defendant] shall determine, in its sole discretion, which pharmacies shall be Network Pharmacies, and the composition of Network Pharmacies may change from time to time."); art. 14.a.2 (Plan "shall" adopt the formulary that governs, among other things, the amount the Plan pays for prescription drugs).

43.     Defendant also enjoyed control and discretion over sums it retained from the difference of amounts paid by the Plan for prescription drugs and the amount actually invoiced for prescription drugs. **Ex. A** at 2, § 2.

44.     Defendant enjoyed discretion and control with respect to settling claims and other disputes that would then be charged against the Plan. **Ex. A** at 2, § 5.

45.     Defendant's control over Plan assets is extensive. Defendant, based on its control and discretion described above, unilaterally determines the amounts to be paid by the Plan for healthcare claims. *See, e.g.*, **Ex. A** at 2-3 ("PAID CLAIM"). Under the ASA,

Defendant is authorized to take control of Plan monies and apply them to amounts Defendant determines are due. Under the ASA, the Plan must pay those sums, which are not subject to dispute by Plaintiff, on a weekly basis, and the ASA authorizes Defendant to take that money from the Plan through an automated clearing house (**ACH**) "pull": "Anthem will initiate an ACH demand debit transaction that will withdraw the amount due from a designated Employer bank account no later than three (3) business days following the Invoice Due Date." **Ex. A** at 21-22, schedule A § 4.

46.     Other documents mirror these ASA provisions:

[Defendant] shall have all the powers necessary or appropriate to enable it to carry out its duties in connection with the operation of the Plan and interpretation of the Benefit Booklet. This includes, without limitation, the power to construe the Administrative Services Agreement, *to determine all questions arising under the Plan*, to resolve Member appeals and to make, establish and amend the rules, regulations and procedures with regard to the interpretation of the Benefit Booklet of the Plan. A specific limitation or exclusion will override more general benefit language. [Defendant] has complete discretion to interpret the Benefit Booklet. *The Claims Administrator's[13] determination shall be final and conclusive and may include, without limitation, determination of whether the services, treatment, or supplies are Medically Necessary, Experimental/Investigative, whether*

---

[13] "Claims administrator" refers to Defendant Anthem. **Ex. B**, 2020 SPD at 93.

19

*surgery is cosmetic, and whether charges are consistent with the Plan's Maximum Allowed Amount.*" **Ex. B**, 2020 SPD at 84. (emphasis and footnote added).[14]

47.     The SPD describes the "maximum amount of reimbursement *[Defendant]* will allow for services and supplies" and refers to Defendant's determination of the maximum allowed reimbursement for particular services. **Ex. B**, 2020 SPD at 62-63 (emphasis added).

48.     With respect to out-of-network claims, Defendant acknowledged that it established, "at its[] discretion," the fee schedule/rate for those services. **Ex. B**, 2020 SPD at 63.

49.     The Plan documents make clear that all monies committed by Defendant to fund claims belong to the Plan. For instance, Defendant has repeatedly disclaimed any obligation for payment of claims and concedes that monies Defendant applies to pay claims belong to the Plan. *See* **Ex. B**, 2020 SPD at 2, 93. Indeed, Defendant represents that it "does not assume any financial risk or obligation with respect to claims." **Ex. B**, 2020 SPD at 93. The Plan assumed all financial risk while Defendant retained control and discretion to administer the Plan and allocate its assets.

**B. DEFENDANT'S DISCRETION AND CONTROL EXTENDED TO RECOVERY OF MONIES IMPROPERLY PAID BY THE PLAN OR OTHERWISE OWED TO THE PLAN.**

50.      Defendant's control, authority, and discretion over Plan management,

---

[14] "SPD" refers to Summary Plan Description or the Medical Benefit Booklet attached as exhibit B. Relevant portions of the SPD have been highlighted for ease of reference.

administration, and assets extended beyond the value it allowed and paid on claims in the first instance. With respect to Defendant's authority to pursue recovery of sums caused by its overpayment of claims, Defendant "shall determine which recoveries it will pursue, and in no event will [Defendant] pursue a recovery if it reasonably believes that the cost of the collection is likely to exceed the recovery amount or if the recovery is prohibited by law or an agreement with a Provider or Vendor." **Ex. A** at 11, art. 13.e. With respect to overpayment discovered in Plan-initiated audits, "[a]ny errors identified as the result of the audit shall be subject to [Defendant's] review and acceptance prior to initiating any recoveries of Paid Claims." **Ex. A** at 10, art. 12.d.[15]

51.     Defendant's extensive control and discretion with respect to audits likewise evidences control and authority over Plan assets. As alleged above, even if an audit shows that claims were improperly paid, the Plan can make no recovery of its assets without "[Defendant's] review and acceptance" of the audit results. **Ex. A** at 10, art. 12.d. The ASA purports to grant Defendant extensive control over the audit process, including selection of the auditor and parameters of the audit. *See generally* **Ex. A** art. 12. To the extent Defendant recovers Plan monies through its own audit, it exercises extensive control over whether to even pursue recoveries and over the amount of those recovered monies that return to the Plan. *See* **Ex. A** arts. 13.d-e.

---

[15] Similarly, "settlements of reimbursement disputes brought by Providers do not require the approval of [Plaintiff]." **Ex. A** at 13, art. 16.e.

52.     Further, "[Defendant] may, but is not required to, readjudicate Claims or adjust [Plan participants' and beneficiaries'] cost share payments related to the recoveries made from a Provider or a Vendor." **Ex. A** at 11, art. 13.e.

## C. PLAINTIFF OWENS & MINOR IS THE PLAN SPONSOR AND A FIDUCIARY WITH STANDING TO PROSECUTE ERISA CLAIMS ON THE PLAN'S BEHALF.

53.     The ASA identifies Plaintiff as the Plan sponsor, named fiduciary, and as the party with primary discretion and authority over all aspects of the Plan. **Ex. A** at 1 and 7, art. 3.b. (acknowledging that "[Plaintiff] retains all final authority and responsibility for the Plan," which would necessarily include efforts to recover Plan losses caused by Defendant).

54.     Indeed, as the sponsor and named fiduciary of the Plan, Plaintiff is afforded discretion and control over Plan assets and management of the Plan. Plaintiff's fiduciary role extends to exercising discretion over and management of TPAs such as Defendant. Relevant here is Plaintiff's authority under the Plan—and its duty to the Plan and Plan beneficiaries and participants—to engage and monitor TPAs and seek recovery of any losses that TPAs cause to the Plan.

55.     Plaintiff's review of its Plan's claims data reveals Defendant violated its duty to manage the Plan with the requisite prudence and "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." *See* 29 U.S.C. §§ 1104(a)(1), 1105(a) and (c). Recovering losses incurred by the Plan

caused by Defendant's violations lies at the heart of Plaintiff's authority and duty as the Plan sponsor, administrator, and named fiduciary.

## THE BLUECARD PROGRAM AND MULTIPLAN

### I. THE BLUECARD PROGRAM

56.    During the time relevant to this suit, Blue Cross Blue Shield Association (**Association**) was owned in part by Defendant, its corporate parent, or both. Over thirty other entities—generally referred to as "Blues" because they use the Blue Cross Blue Shield branding—share ownership in the Association. The Blues, including Defendant and/or its parent, operate the Association primarily as the licensor and owner of Blue Cross Blue Shield branding. The Blues fund the Association in various ways.

57.    One way the Blues fund the Association—and thus, increase the value of their respective ownership interests in the Association—is through the BlueCard program. The BlueCard program also provides a way for Blues to bolster their revenue directly by overcharging self-funded health plans.

58.    Throughout the relevant period, the thirty-plus Blues that own the Association assigned themselves geographic service areas free of competition from other Blues. Each Blue then, directly or through subsidiary Blues, created a provider network in their respective service areas.  By default, members of a health plan administered by Defendant would be "out of network" if they sought medical treatment outside of Defendant's specific geographic area.  In theory, such out-of-network treatment would cost the Plan and its members more than in-network treatment with providers who have a discount arrangement with Defendant.  In reality, a different Blue controls that territory,

23

has discount arrangements with providers already in place, and extracts exorbitant fees from Defendant's administered plans.

59. According to Defendant, Owens & Minor employees residing and working outside Defendant's service area could access coverage near their respective residences and work locations even though they lived in another Blue's service area and were, thus, outside Defendant's network of providers. According to Defendant, Plaintiff and those employees would effectively enjoy in-network status through the BlueCard program so long as they remained in the network of the "host Blue" where they lived or worked. According to Defendant, the BlueCard program would eliminate excess "out-of-network" costs of healthcare for Plaintiff's remote employees and plan members. According to Defendant and BlueCard marketing efforts, self-funded health plans would save money because they and their members receive the discounts negotiated between host Blues and their in-network providers.

60. Several BlueCard pamphlets use the following hypothetical to explain how BlueCard works:

> Suppose you are an employer who provides coverage to your employees through Blue Cross Blue Shield of Tennessee. One of your out-of-state employees, Tom, sustains an injury while working in Illinois and immediately seeks medical attention from an Illinois Blue Card provider. After rendering the necessary medical services, the Illinois provider files a claim with Blue Cross and Blue Shield of Illinois, who in turn forwards the claim to Blue Cross Blue Shield of Tennessee. Under the Blue Card program,

24

Tom's "home" Plan—Blue Cross Blue Shield of Tennessee—then reimburses the Illinois provider at a rate typically based on the provider's contract with the "host" Plan—Blue Cross Blue Shield of Illinois.

61. Relevant to this case, the "home" Blue is Defendant, and the "host" Blues are those who control the service areas where Plaintiff's non-Virginia members and employees reside and work.[16] The Association manages the BlueCard program for self-funded plans including Plaintiff by (i) overseeing these inter-service-area claims; (ii) governing and monitoring fees chargeable by host Blues under the license agreements; (iii) setting claims procedures; and (iv) providing phone and online support for Plan members utilizing BlueCard. The Association therefore provides a service to the Plan—an overpriced service—but a service nonetheless.

62. The Association and the Blues that own it devised the BlueCard program to increase Blues' revenue in part through hidden fees that they would retain, distribute among the Blues, and pay to the Association. The Association requires all Blues to participate in the BlueCard program. So, in essence the *Blues* require the *Blues* to participate in the BlueCard program. The Blues serve the Association and themselves by extracting excessive fees from self-funded health plans across the country. This is a choice the Blues make—not something imposed by an unrelated third party. And because of the mandatory nature of the BlueCard program, the Association requires self-funded plans employing a Blue as a TPA to participate in the BlueCard program.

---

[16] The BlueCard program also applies to Plan members who may reside and typically work in Defendant's network but seek medical care in a host Blue's network while traveling.

63. Defendant granted host Blues complete discretion with respect to the fees they charge for each BlueCard claim by Plan members. For instance, Defendant permitted host Blues to charge the Plan more than the providers even billed for the treatment or prescription. Defendant permitted host Blues to charge the Plan excessive fees, including a "network access fee"—at the host Blue's discretion—up to $2,000 per claim. A reasonable fiduciary in Defendant's position—acting in the Plan's best interest and not in the best interest of other Blues—would have mitigated these costs to the Plan by, among other things, negotiating these fees to be a small fraction of what they are or eliminated them altogether. A reasonable fiduciary would not have granted host Blues such broad discretion in what to charge the Plan for BlueCard claims. Defendant's conduct reveals its true loyalty lies with the Blues and their parent organization—not OMI.

64. Portions of these excess payments made by the Plan and its members are then paid to the Association, retained by the respective host Blues, and paid back to Defendant, either directly or in the form of host Blues allowing Defendant to charge equally exorbitant fees to self-funded plans in those host Blue's service areas through the BlueCard program. In other words, Defendant increases its profits by charging Plaintiff exorbitant fees. And because the Blues coordinate their efforts by mutually permitting one another to charge plans in the "home" network exorbitant fees, they extract excessive fees from self-funded plans across the country in a way that serves the Blue collective and the Association.

65. Additionally, as noted above, operation of the BlueCard program at times results in the Plan paying more money for a claim than is actually paid to the provider. Rather than adjusting these claims and refunding the excess payments to the Plan,

26

Defendant and the host Blues withhold these funds in a so-called "variance account" to be used on prospective claims. While this money is held, the host Blue retains any interest earned. And upon terminating its relationship with Anthem, this money is not refunded to the Plan.

## II.    MULTIPLAN (AND OTHER OUT-OF-NETWORK CLAIM PROCESSING VENDORS)

66.    When a Plan member goes out-of-network for healthcare services, Defendant engages a third-party vendor, such as MultiPlan, to negotiate a payment amount with the providers.  For simply engaging a vendor to negotiate with these out-of-network providers, Anthem charges unreasonable fees, which can reach 50% of the difference between the amount billed and the amount determined to be the Plan's responsibility (either the negotiated amount or, if negotiations are not successful, an amount determined by a pricing tool approved by Defendant). A fiduciary in Defendant's position must act in the Plan's best interests—not its own.  But rather than mitigate these costs to the Plan, Defendant uses outside vendors, such as MultiPlan, as a mechanism to divert Plan funds to itself.

67.    Defendant's conduct results in Defendant pocketing a windfall of exorbitant, unjustified fees at the expense of the Plan. Rather than fulfill its fiduciary duties to the Plan, Defendant enters into "confidential" contractual arrangements with vendors such as Multiplan so that Defendant can take money from the Plan while maintaining opacity.

## JURISDICTION AND VENUE

68.    This is a fiduciary action brought by a plan fiduciary pursuant to ERISA. Thus, United States district courts enjoy subject matter jurisdiction over this dispute. 29

27

U.S.C. § 1132(e)(1); *see also* 28 U.S.C. § 1331 (federal question); *id.* § 1367 (supplemental jurisdiction).

69. Venue is proper in this district and division because the Plan is administered in Richmond, Virginia, the relevant breaches occurred in Richmond, Virginia, and Defendant is headquartered in Richmond, Virginia. 29 U.S.C. § 1132(e)(2); 28 U.S.C. § 1391(b); E.D. Va. Loc. Civ. R. 3(B)(4). Those same grounds support this Court's exercise of personal jurisdiction over Defendant. Moreover, this case arises from Defendant's misconduct in Virginia; from an agreement or agreements negotiated, executed, and performable in Virginia and that designate Virginia law as governing state law; and from Defendant's contacts in Virginia which are described throughout this Complaint.

## CAUSE OF ACTION FOR ERISA VIOLATIONS

70. Plaintiff incorporates all other paragraphs in this Complaint as if fully restated here.

71. Under ERISA, Defendant is a Plan fiduciary as alleged above.

72. The Plan is an ERISA welfare benefit plan subject to the protections afforded by ERISA.

73. Plaintiff Owens & Minor is a Plan fiduciary and the Plan's sponsor. Plaintiff Owens & Minor brings this claim on the Plan's behalf in Plaintiff's capacity as Plan sponsor and named fiduciary.

74. Under ERISA, Defendant must discharge its duties to the Plan solely in the interest of Plan participants and beneficiaries and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and defraying reasonable

28

expenses of administering the plan." *See* 29 U.S.C § 1104(a)(1). ERISA requires Defendant to discharge its duties with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." *Id.* § 1104(a)(2).

75. ERISA prohibits a fiduciary from dealing with assets of the plan in the fiduciary's "own interest or for [its] account." 29 U.S.C. § 1106(b). ERISA also prohibits Defendant from causing the Plan to engage in a transaction if Defendant knows or should know that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the Plan. *Id.* § 1106(a)(1)(D).

76. Defendant has violated these duties by:

(i) causing the Plan to grossly overpay claims, including payments above 100% of billed charges;

(ii) causing the Plan to pay for the same medical claims multiple times;

(iii) improperly classifying affordable generic drugs as specialty pharmaceuticals, which resulted in the Plan paying excessive prices—or receiving less return in discounts and rebates—for generic drugs prescribed to Plan participants and beneficiaries, and paid by the Plan;

(iv) withholding pharmaceutical rebates from the Plan thereby reducing assets of the Plan;

29

(v) using Plan funds to pay more for prescriptions than charged by providers—a practice called "spread pricing"—which caused the Plan to pay significantly more for prescription drugs while allowing Defendant or its affiliates to retain the excess;

(vi) steering, requiring, or otherwise encouraging Plan participants and beneficiaries to use Defendant-affiliated providers who charged more for the same or lesser quality of care and who passed on the excess of these payments to Defendant or its affiliated companies;

(vii) knowingly or negligently engaging intermediaries between Defendant and providers who required payment well in excess of providers' charges and pocketing the difference paid by the Plan;

(viii) failing to meet discount and rebate guarantees for prescription drug claims;

(ix) paying for services not actually provided, which could have been detected with reasonable prudence and effort;

(x) entering reimbursement agreements and arrangements with providers for the Plan that provide much less discounts than the discounts easily obtained in the market and less than Defendant receives for its fully insured plans;

(xi) relatedly, protecting its fully insured segment—where Defendant pays claims from its own assets—by agreeing to less favorable discount arrangements with providers in Defendant's self-funded segment in exchange for more favorable discounts in Defendant's fully insured segment;

(xii) improperly paying claims for outpatient services for inpatient patients that should not have been billed because those billed outpatient services were paid as part of inpatient services;

(xiii) paying claims that were coded incorrectly despite the fact that Defendant either knew those claims were coded incorrectly or would have known had it exercised reasonable diligence;

(xiv) paying for multiple units of specific treatments in a given day when coding rules prohibited multiple units in a given day;

(xv) paying hospice charges beyond the acceptable timeframe without recertification after the maximum hospice time period;

(xvi) failing to inform Plaintiff of these actions and the costs these actions imposed on the Plan when doing so reduced assets of the Plan while enriching Defendant and its affiliated companies;

(xvii) through the BlueCard program, with actual or constructive knowledge, transferring Plan assets to parties in interest, various host Blues and the Association,[17] in the form of overpayments for fees and services,[18] the withholding of Plan assets in "variance accounts," and the failure to return those assets to the Plan;

---

[17] A "party in interest" includes entities "providing services" to the Plan. 29 U.S.C. § 1002(14)(B). As alleged above, various host Blues and the Association provided services to Plaintiff through the BlueCard program.

[18] While ERISA permits Defendant to use Plan assets to pay for services necessary for the operation of the Plan, that compensation must be "reasonable" in order to trigger that exemption. *See* 29 U.S.C. § 1108(b)(2).

(xviii) through arrangements with MultiPlan and similar vendors as alleged above, causing the Plan to pay exorbitant, unreasonable fees to Defendant and vendors; and (xix) engaging in other conduct that fails to satisfy the strict standards imposed on fiduciaries by ERISA, including the active concealment of claims data and other information that reveals Defendant's self-dealing and other violations.

77.     With respect to prescription claims, Defendant's failure was extraordinary. For example, the Federal Supply Schedule publishes information on optimum returns on prescription costs that a TPA like Defendant can achieve in U.S. markets. Those optimum returns are approximately 26% according to that schedule. The U.S. Postal Service has published an audit of its own plan showing 29% returns to the plan for prescription costs. Through Defendant's failure to uphold its fiduciary duties, Plaintiff's Plan realized less than half of those returns on prescription claims.

78.     Whether Defendant's failures stem from negligence, conscious disregard for the Plan's interests, or even an intent to harm the Plan and enrich itself and its affiliates, Defendant's misconduct violates the duties imposed by ERISA.

79.     Defendant's self-dealing, neglect and misconduct has caused the Plan to lose at least tens of millions of dollars. Plaintiff expects its damage estimates to increase as it obtains and analyzes additional information through discovery.  Defendant also improperly collected millions in ill-gotten gains from Plan funds.

## STATE LAW CAUSES OF ACTION[19]

80.    To the extent ERISA does not preempt relevant state law claims, Plaintiff alleges the following state law causes of action.

### I.    BREACH OF CONTRACT

81.    Plaintiff incorporates all other paragraphs in this Complaint as if fully restated here.

82.    Plaintiff further incorporates the ASA, attached as exhibit A, as if fully restated here.

83.    This claim is brought by Plaintiff Owens & Minor in its individual capacity and, alternatively, on behalf of the Plan.

84.    Plaintiff and Defendant are parties to the ASA and its related schedules and amendments.

85.    Defendant expressly agreed to serve as fiduciary with respect to the Plan's claims administration and payments. Defendant also agreed to certain rebate guarantees for prescription drug claims.

86.    Defendant breached that agreement by:

 (i) causing the Plan to grossly overpay claims, including payments above 100% of
   billed charges;

(ii) causing the Plan to pay for the same medical claims multiple times;

---

[19] As noted in Article 20 of the ASA, the ASA shall be construed according to the laws of Virginia, "except to the extent preempted by ERISA or any other applicable provisions of federal law."

33

(iii) improperly classifying affordable generic drugs as specialty pharmaceuticals, which resulted in the Plan paying excessive prices—or receiving less return in discounts and rebates—for generic drugs prescribed to Plan participants and beneficiaries, and paid by the Plan;

(iv) withholding pharmaceutical rebates from the Plan thereby reducing assets of the Plan;

(v) using Plan funds to pay more for prescriptions than charged by providers—a practice called "spread pricing"—which caused the Plan to pay significantly more for prescription drugs while allowing Defendant or its affiliates to retain the excess;

(vi) steering, requiring, or otherwise encouraging Plan participants and beneficiaries to use Defendant-affiliated providers who charged more for the same or lesser quality of care and who passed on the excess of these payments to Defendant or its affiliated companies;

(vii) knowingly or negligently engaging intermediaries between Defendant and providers who required payment well in excess of providers' charges and pocketing the difference paid by the Plan;

(viii) failing to meet discount and rebate guarantees for prescription drug claims;

(ix) paying for services not actually provided, which could have been detected with reasonable prudence and effort;

(x) entering reimbursement agreements and arrangements with providers for the Plan that provide much less discounts than the discounts easily obtained in the market and less than Defendant receives for its fully insured plans;

34

(xi) relatedly, protecting its fully insured segment—where Defendant pays claims from its own assets—by agreeing to less favorable discount arrangements with providers in Defendant's self-funded segment in exchange for more favorable discounts in Defendant's fully insured segment;

(xii) improperly paying claims for outpatient services for inpatient patients that should not have been billed because those billed outpatient services were paid as part of inpatient services;

(xiii) paying claims that were coded incorrectly despite the fact that Defendant either knew those claims were coded incorrectly or would have known had it exercised reasonable diligence;

(xiv) paying for multiple units of specific treatments in a given day when coding rules prohibited multiple units in a given day;

(xv) paying hospice charges beyond the acceptable timeframe without recertification after the maximum hospice time period;

(xvi) failing to inform Plaintiff of these actions and the costs these actions imposed on the Plan when doing so reduced assets of the Plan while enriching Defendant and its affiliated companies;

(xvii) through the BlueCard program, with actual or constructive knowledge, transferring Plan assets to parties in interest, various host Blues and the Association, in the form of overpayments for fees and services, the withholding of Plan assets in "variance accounts," and the failure to return those assets to the Plan;

(xviii) through arrangements with MultiPlan and similar vendors as alleged above, causing the Plan to pay exorbitant, unreasonable fees to Defendant and vendors; and (xix) engaging in other conduct that fails to satisfy the requirements of the parties' agreements.

87. With respect to prescription claims, Defendant's failure was extraordinary. For example, the Federal Supply Schedule publishes information on optimum returns on prescription costs that a TPA like Defendant can achieve in U.S. markets. Those optimum returns are approximately 26% according to that schedule. The U.S. Postal Service has published an audit of its own plan showing 29% returns to the plan for prescription costs. Through Defendant's failure to uphold its fiduciary duties, Plaintiff's Plan realized less than half of those returns on prescription claims.

88. As a result of Defendant's breaches, Plaintiff has suffered damages of at least tens of millions of dollars, an estimate which is likely to increase significantly as Plaintiff obtains and analyzes additional information through discovery.

## II. BREACH OF GOOD FAITH AND FAIR DEALING

89. Plaintiff incorporates all other allegations in this Complaint as if fully restated here.

90. This claim is brought by Plaintiff Owens & Minor in its individual capacity and, alternatively, on behalf of the Plan.

91. Every agreement carries with it an implied duty of good faith and fair dealing. This implied duty applies even when a written contract provides the defendant discretion to perform a particular act.

36

92. Defendant expressly agreed to serve as fiduciary with respect to the Plan's claims administration and payments. But Defendant failed to serve as a fiduciary. To the extent the ASA granted Defendant discretion or control over Plan assets and Plan administration, Defendant has exercised that control and discretion dishonestly. In particular, Defendant violated these duties by:

(i) causing the Plan to grossly overpay claims, including payments above 100% of billed charges;

(ii) causing the Plan to pay for the same medical claims multiple times;

(iii) improperly classifying affordable generic drugs as specialty pharmaceuticals, which resulted in the Plan paying excessive prices—or receiving less return in discounts and rebates—for generic drugs prescribed to Plan participants and beneficiaries, and paid by the Plan;

(iv) withholding pharmaceutical rebates from the Plan thereby reducing assets of the Plan;

(v) using Plan funds to pay more for prescriptions than charged by providers—a practice called "spread pricing"—which caused the Plan to pay significantly more for prescription drugs while allowing Defendant or its affiliates to retain the excess;

(vi) steering, requiring, or otherwise encouraging Plan participants and beneficiaries to use Defendant-affiliated providers who charged more for the same or lesser quality of care and who passed on the excess of these payments to Defendant or its affiliated companies;

(vii) knowingly or negligently engaging intermediaries between Defendant and providers who required payment well in excess of providers' charges and pocketing the difference paid by the Plan;

(viii) failing to meet discount and rebate guarantees for prescription drug claims;

(ix) paying for services not actually provided, which could have been detected with reasonable prudence and effort;

(x) entering reimbursement agreements and arrangements with providers for the Plan that provide much less discounts than the discounts easily obtained in the market and less than Defendant receives for its fully insured plans;

(xi) relatedly, protecting its fully insured segment—where Defendant pays claims from its own assets—by agreeing to less favorable discount arrangements with providers in Defendant's self-funded segment in exchange for more favorable discounts in Defendant's fully insured segment;

(xii) improperly paying claims for outpatient services for inpatient patients that should not have been billed because those billed outpatient services were paid as part of inpatient services;

(xiii) paying claims that were coded incorrectly despite the fact that Defendant either knew those claims were coded incorrectly or would have known had it exercised reasonable diligence;

(xiv) paying for multiple units of specific treatments in a given day when coding rules prohibited multiple units in a given day;

(xv) paying hospice charges beyond the acceptable timeframe without recertification after the maximum hospice time period;

(xvi) failing to inform Plaintiff of these actions and the costs these actions imposed on the Plan when doing so reduced assets of the Plan while enriching Defendant and its affiliated companies;

(xvii) through the BlueCard program, with actual or constructive knowledge, transferring Plan assets to parties in interest, various host Blues and the Association, in the form of overpayments for fees and services, the withholding of Plan assets in "variance accounts," and the failure to return those assets to the Plan;

(xviii) through arrangements with MultiPlan and similar vendors as alleged above, causing the Plan to pay exorbitant, unreasonable fees to Defendant and vendors; and

(xix) engaging in other conduct that fails to satisfy the standard of good faith and fair dealing required under state law, including the active concealment of claims data and other information that reveals Defendant's self-dealing and other violations.

93. As a result of Defendant's breach of its implied duty of good faith and fair dealing, Plaintiff has suffered damages of at least tens of millions of dollars.

## III. BREACH OF FIDUCIARY DUTY

94. Plaintiff incorporates all other allegations in this Complaint as if fully restated here.

95. This claim is brought by Plaintiff Owens & Minor in its individual capacity and, alternatively, on behalf of the Plan.

39

96. Plaintiff placed trust and confidence in Defendant, which Defendant invited and accepted. Indeed, Plaintiff assigned significant discretion to Defendant to spend Plan monies comprised of contributions by Plaintiff Owens & Minor and its employees. Plaintiff also trusted Defendant with its assets and the care of Plan participants and beneficiaries.

97. Given this relationship of trust and confidence, Defendant owes a duty of full disclosure and loyalty to Plaintiff in its individual and representative capacities relating to Defendant's use of Plan assets. Defendant's duties included using Plan assets solely for the benefit of the Plan, its beneficiaries, and its participants, and recouping Plan costs through reasonable oversight and maximizing rebates and discounts from providers.

98. Defendant breached its fiduciary duties by:

(i) causing the Plan to grossly overpay claims, including payments above 100% of billed charges;

(ii) causing the Plan to pay for the same medical claims multiple times;

(iii) improperly classifying affordable generic drugs as specialty pharmaceuticals, which resulted in the Plan paying excessive prices—or receiving less return in discounts and rebates—for generic drugs prescribed to Plan participants and beneficiaries, and paid by the Plan;

(iv) withholding pharmaceutical rebates from the Plan thereby reducing assets of the Plan;

(v) using Plan funds to pay more for prescriptions than charged by providers—a practice called "spread pricing"—which caused the Plan to pay significantly more for prescription drugs while allowing Defendant or its affiliates to retain the excess;

40

(vi) steering, requiring, or otherwise encouraging Plan participants and beneficiaries to use Defendant-affiliated providers who charged more for the same or lesser quality of care and who passed on the excess of these payments to Defendant or its affiliated companies;

(vii) knowingly or negligently engaging intermediaries between Defendant and providers who required payment well in excess of providers' charges and pocketing the difference paid by the Plan;

(viii) failing to meet discount and rebate guarantees for prescription drug claims;

(ix) paying for services not actually provided, which could have been detected with reasonable prudence and effort;

(x) entering reimbursement agreements and arrangements with providers for the Plan that provide much less discounts than the discounts easily obtained in the market and less than Defendant receives for its fully insured plans;

(xi) relatedly, protecting its fully insured segment—where Defendant pays claims from its own assets—by agreeing to less favorable discount arrangements with providers in Defendant's self-funded segment in exchange for more favorable discounts in Defendant's fully insured segment;

(xii) improperly paying claims for outpatient services for inpatient patients that should not have been billed because those billed outpatient services were paid as part of inpatient services;

(xiii) paying claims that were coded incorrectly despite the fact that Defendant either knew those claims were coded incorrectly or would have known had it exercised reasonable diligence;

(xiv) paying for multiple units of specific treatments in a given day when coding rules prohibited multiple units in a given day;

(xv) paying hospice charges beyond the acceptable timeframe without recertification after the maximum hospice time period;

(xvi) failing to inform Plaintiff of these actions and the costs these actions imposed on the Plan when doing so reduced assets of the Plan while enriching Defendant and its affiliated companies;

(xvii) through the BlueCard program, with actual or constructive knowledge, transferring Plan assets to parties in interest, various host Blues and the Association, in the form of overpayments for fees and services, the withholding of Plan assets in "variance accounts," and the failure to return those assets to the Plan;

(xviii) through arrangements with MultiPlan and similar vendors as alleged above, causing the Plan to pay exorbitant, unreasonable fees to Defendant and vendors; and

(xix) engaging in other conduct that fails to satisfy the strict obligations imposed on defendant as a fiduciary under state law, including the active concealment of claims data and other information that reveals Defendant's self-dealing and other violations.

99. With respect to prescription claims, Defendant's failure was extraordinary. For example, the Federal Supply Schedule publishes information on optimum returns on

42

prescription costs that a TPA like Defendant can achieve in U.S. markets. Those optimum returns are approximately 26% according to that schedule. The U.S. Postal Service has published an audit of its own plan showing 29% returns to the plan for prescription costs. Through Defendant's failure to uphold its fiduciary duties, Plaintiff's Plan realized less than half of those returns on prescription claims.

100. As a result of these violations, Plaintiff has suffered damages of at least tens of millions of dollars.

## IV. FRAUD

101. Plaintiff incorporates all other allegations in this Complaint as if fully restated here.

102. This claim is brought by Plaintiff Owens & Minor in its individual capacity and, alternatively, on behalf of the Plan.

103. Defendant represented to Plaintiff that, while it would receive fair compensation for its work as the Plan's TPA, it would conduct its work as a fiduciary and make every reasonable effort to minimize healthcare costs to Owens & Minor and the Plan. Defendant represented that it would pass on drug rebates it received to the Plan. It represented it would properly pay rebates and discounts to the Plan for prescriptions. Defendant represented to Plaintiff that it would ensure that Plan funds were used solely to pay reasonable costs of medical care for Plan participants and beneficiaries. Defendant represented it would maximize discounts from providers and minimize costs. Defendant made these representations in an effort to induce Plaintiff to employ Defendant as the

Plan's TPA and during that relationship in an effort to induce Plaintiff to retain Defendant. Defendant did not – and never intended to – follow through on these assurances.

104.    Defendant never intended to honor these representations and overtures. To the contrary, Defendant, at all relevant times, intended to defraud Plaintiff by first inducing Plaintiff to engage and retain Defendant and then

(i) causing the Plan to grossly overpay claims, including payments above 100% of billed charges;

(ii) causing the Plan to pay for the same medical claims multiple times;

(iii) improperly classifying affordable generic drugs as specialty pharmaceuticals, which resulted in the Plan paying excessive prices—or receiving less return in discounts and rebates—for generic drugs prescribed to Plan participants and beneficiaries, and paid by the Plan;

(iv) withholding pharmaceutical rebates from the Plan thereby reducing assets of the Plan;

(v) using Plan funds to pay more for prescriptions than charged by providers—a practice called "spread pricing"—which caused the Plan to pay significantly more for prescription drugs while allowing Defendant or its affiliates to retain the excess;

(vi) steering, requiring, or otherwise encouraging Plan participants and beneficiaries to use Defendant-affiliated providers who charged more for the same or lesser quality of care and who passed on the excess of these payments to Defendant or its affiliated companies;

(vii) knowingly or negligently engaging intermediaries between Defendant and providers who required payment well in excess of providers' charges and pocketing the difference paid by the Plan;

(viii) failing to meet discount and rebate guarantees for prescription drug claims;

(ix) paying for services not actually provided, which could have been detected with reasonable prudence and effort;

(x) entering reimbursement agreements and arrangements with providers for the Plan that provide much less discounts than the discounts easily obtained in the market and less than Defendant receives for its fully insured plans;

(xi) relatedly, protecting its fully insured segment—where Defendant pays claims from its own assets—by agreeing to less favorable discount arrangements with providers in Defendant's self-funded segment in exchange for more favorable discounts in Defendant's fully insured segment;

(xii) improperly paying claims for outpatient services for inpatient patients that should not have been billed because those billed outpatient services were paid as part of inpatient services;

(xiii) paying claims that were coded incorrectly despite the fact that Defendant either knew those claims were coded incorrectly or would have known had it exercised reasonable diligence;

(xiv) paying for multiple units of specific treatments in a given day when coding rules prohibited multiple units in a given day;

45

(xv) paying hospice charges beyond the acceptable timeframe without recertification after the maximum hospice time period;

(xvi) failing to inform Plaintiff of these actions and the costs these actions imposed on the Plan when doing so reduced assets of the Plan while enriching Defendant and its affiliated companies;

(xvii) through the BlueCard program, with actual or constructive knowledge, transferring Plan assets to parties in interest, various host Blues and the Association, in the form of overpayments for fees and services, the withholding of Plan assets in "variance accounts," and the failure to return those assets to the Plan;

(xviii) through arrangements with MultiPlan and similar vendors as alleged above, causing the Plan to pay exorbitant, unreasonable fees to Defendant and vendors; and

(xix) engaging in other conduct that fails to satisfy the strict standards imposed on fiduciary status under state law, including the active concealment of claims data and other information that reveals Defendant's self-dealing and other violations.

105. Defendant retained excess payments made by Plaintiff because of Defendant's misconduct. Despite Defendant's representations, Defendant intended to overcharge Plaintiff and retain the excess payments both before serving as the Plan's TPA and during its tenure as the Plan's TPA.

106. With respect to prescription claims, Defendant's failure was extraordinary. For example, the Federal Supply Schedule publishes information on optimum returns on prescription costs that a TPA like Defendant can achieve in U.S. markets. Those optimum returns are approximately 26% according to that schedule. The U.S. Postal Service has

published an audit of its own plan showing 29% returns to the plan for prescription costs. Through Defendant's failure to uphold its fiduciary duties, Plaintiff's Plan realized less than half of those returns on prescription claims. Defendant's failure to reduce Plan costs— or to increase Plan funds—by this failure was motivated by Defendant's desire to increase its own revenue and the revenue of its affiliated companies.

107. Plaintiff reasonably relied on Defendant's misrepresentations. Before Defendant became the Plan's TPA, Plaintiff had no cause to doubt Defendant given its reputation and the lack of any way to test those representations. Nor could Plaintiff, until recently, test those representations during Defendant's tenure as TPA for the Plan. Indeed, Defendant concealed the claims data necessary to test those representations from Plaintiff and from other plans for which Defendant served as TPA. Plaintiff therefore had no reason to doubt representations made by one of the more experienced TPAs in the industry.

108. As a result of Defendant's misrepresentations, Plaintiff employed Defendant as the Plan's TPA and retained its "services" from 2017 to 2023. During that same time period, Defendant caused Plaintiff to incur tens of millions of dollars in losses by virtue of its misconduct detailed above. Defendant has also retained monies it received by virtue of its fraud.

## V. NEGLIGENT MISREPRESENTATION OR CONSTRUCTIVE FRAUD

109. Plaintiff incorporates all other allegations in this Complaint as if fully restated here.

110. This claim is brought by Plaintiff Owens & Minor in its individual capacity and, alternatively, on behalf of the Plan.

47

111. Defendant represented to Plaintiff that, while it would receive fair compensation for its role as Plan's TPA, it intended to conduct its work as a fiduciary and make every reasonable effort to minimize healthcare costs to the Plan. It represented it would properly pay rebates and discounts to the Plan for prescriptions. Defendant represented that it intended to pass on drug rebates it received to the Plan. Defendant represented to Plaintiff that it intended to ensure that Plan funds were used solely to pay reasonable costs of medical care for Plan participants and beneficiaries. During its employment as the Plan's fiduciary and TPA, Defendant continued to represent that it was actually following through on these representations and overtures. Defendant made these representations to induce Plaintiff to employ Defendant as the Plan's TPA and during that relationship in an effort to induce Plaintiff to retain Defendant. Defendant failed to disclose that it neither intended to follow through on these assurances nor actually followed through on these assurances.

112. Defendant made these representations negligently or knowingly in light of Defendant's lack of intent or desire to follow through on these representations. Defendant never intended to honor these representations and overtures. In fact, Defendant at all relevant times failed to satisfy these representations by:

(i) causing the Plan to grossly overpay claims, including payments above 100% of billed charges;

(ii) causing the Plan to pay for the same medical claims multiple times;

(iii) improperly classifying affordable generic drugs as specialty pharmaceuticals, which resulted in the Plan paying excessive prices—or receiving less return in

discounts and rebates—for generic drugs prescribed to Plan participants and beneficiaries, and paid by the Plan;

(iv) withholding pharmaceutical rebates from the Plan thereby reducing assets of the Plan;

(v) using Plan funds to pay more for prescriptions than charged by providers—a practice called "spread pricing"—which caused the Plan to pay significantly more for prescription drugs while allowing Defendant or its affiliates to retain the excess;

(vi) steering, requiring, or otherwise encouraging Plan participants and beneficiaries to use Defendant-affiliated providers who charged more for the same or lesser quality of care and who passed on the excess of these payments to Defendant or its affiliated companies;

(vii) knowingly or negligently engaging intermediaries between Defendant and providers who required payment well in excess of providers' charges and pocketing the difference paid by the Plan;

(viii) failing to meet discount and rebate guarantees for prescription drug claims;

(ix) paying for services not actually provided, which could have been detected with reasonable prudence and effort;

(x) entering reimbursement agreements and arrangements with providers for the Plan that provide much less discounts than the discounts easily obtained in the market and less than Defendant receives for its fully insured plans;

(xi) relatedly, protecting its fully insured segment—where Defendant pays claims from its own assets—by agreeing to less favorable discount arrangements with

49

providers in Defendant's self-funded segment in exchange for more favorable discounts in Defendant's fully insured segment;

(xii) improperly paying claims for outpatient services for inpatient patients that should not have been billed because those billed outpatient services were paid as part of inpatient services;

(xiii) paying claims that were coded incorrectly despite the fact that Defendant either knew those claims were coded incorrectly or would have known had it exercised reasonable diligence;

(xiv) paying for multiple units of specific treatments in a given day when coding rules prohibited multiple units in a given day;

(xv) paying hospice charges beyond the acceptable timeframe without recertification after the maximum hospice time period;

(xvi) failing to inform Plaintiff of these actions and the costs these actions imposed on the Plan when doing so reduced assets of the Plan while enriching Defendant and its affiliated companies;

(xvii) through the BlueCard program, with actual or constructive knowledge, transferring Plan assets to parties in interest, various host Blues and the Association, in the form of overpayments for fees and services, the withholding of Plan assets in "variance accounts," and the failure to return those assets to the Plan;

(xviii) through arrangements with MultiPlan and similar vendors as alleged above, causing the Plan to pay exorbitant, unreasonable fees to Defendant and vendors; and

(xix) engaging in other conduct that constitutes negligent misrepresentation and constructive fraud.

113. With respect to prescription claims, Defendant's failure was extraordinary. For example, the Federal Supply Schedule publishes information on optimum returns on prescription costs that a TPA like Defendant can achieve in U.S. markets. Those optimum returns are approximately 26% according to that schedule. The U.S. Postal Service has published an audit of its own plan showing 29% returns to the plan for prescription costs. Through Defendant's failure to uphold its fiduciary duties, Plaintiff's Plan realized less than half of those returns on prescription claims. Defendant's failure to reduce Plan costs— or to increase Plan funds—by this failure was motivated by Defendant's desire to increase its own revenue and the revenue of its affiliated companies.

114. Plaintiff reasonably relied on Defendant's misrepresentations in employing and retaining Defendant as the Plan's TPA. Before Defendant became the Plan's TPA, Plaintiff had no cause to doubt Defendant given its reputation and the lack of any way to test those representations. Nor could Plaintiff, until recently, test those representations during Defendant's tenure as TPA for the Plan. Indeed, Defendant concealed the claims data necessary to test those representations from Plaintiff and from other plans for which Defendant served as TPA. Plaintiff therefore had no reason to doubt representations made by one of the more experienced TPAs in the industry.

115. As a result of these actions, Plaintiff suffered at least tens of millions of dollars in damages. Moreover, Defendant has received and retained revenue exceeding its fair, disclosed payment for TPA services.

51

**TOLLING OF LIMITATIONS PERIODS**

116. As noted above, a contract provides that the statute of limitations for Plaintiff's claims have been tolled. The effect of that tolling agreement is that, for purposes of claims that existed as of February 13, 2023, this Complaint is treated as if it were filed February 13, 2023, for limitations purposes.

117. Further, with the exercise of reasonable diligence, Plaintiff could not have discovered the misconduct alleged and resulting losses supporting Plaintiff's claims for damages and losses until July 2024. Plaintiff's inability to discover the facts and losses supporting Plaintiff's claims for damages was caused by Defendant's fraud, concealment, and obstruction. Specifically, Defendant intentionally reported false information to Plaintiff, which generally indicated that Defendant complied with its relevant duties and managed the Plan and its assets as a loyal and prudent fiduciary. Defendant's reports to Plaintiff were designed to offer assurances to Plaintiff and to prevent Plaintiff from investigating potential misconduct and damages at issue in this case. For instance, Defendant did not report that it used Plan funds to pay duplicate claims. Defendant did not report that it used Plan funds to pay more than billed amounts for certain claims. Defendant did not report that it or its affiliates pocketed prescription rebates that the Plan should have received. Instead, Defendant repeatedly reported and represented to Plaintiff that it served as a loyal, prudent fiduciary for the plan and limited Plan costs accordingly.

118. While owing a duty to disclose its misconduct alleged in this Complaint under the ASA and by virtue of its fiduciary role, Defendant refused to disclose its misconduct or the losses sustained by that misconduct. Moreover, Defendant actively

52

concealed its misconduct and Plan losses by concealing and refusing to share the Plan's claims data to Plaintiff. The misconduct and losses at issue in this lawsuit were undetectable and unknowable to Plaintiff without the Plan's claims data. As noted above, Plaintiff began requesting the Plan's claims data from Defendant in 2021. Given the timing of Plaintiff's receipt of some of the claims data and the time and expertise necessary to analyze that data, Plaintiff could not have realized the misconduct and damages at issue until July 2024.

119. By way of example, until Plaintiff received the claims data in 2024 and had an opportunity to analyze that data, Plaintiff had no way of knowing Defendant charged the Plan more on certain claims than was billed by the relevant provider. Plaintiff had no way of knowing that Defendant withheld prescription rebates belonging to the Plan. Plaintiff's inability to uncover this and other alleged misconduct and the damages it caused existed until Plaintiff received a portion of the claims data and had a reasonable opportunity to analyze it, which did not occur before July 2024.

## JURY DEMAND

120. Plaintiff Owens & Minor, individually and on behalf of the Plan, hereby demands a trial by jury for all issues triable by jury.

## PRAYER FOR RELIEF

121. Plaintiff seeks an order requiring Defendant to pay damages caused by the misconduct described above in an amount to be proved at trial.

122.    Plaintiff seeks an order requiring Defendant to return monies Defendant received or paid by the Plan by virtue of misconduct alleged above and all other applicable equitable relief provided by ERISA.

123.    Plaintiff seeks reasonable attorney's fees and costs.

*[Signature Block on Next Page]*

Dated: November 18, 2024

Respectfully submitted,

OWENS & MINOR, INC. and
OWENS & MINOR FLEXIBLE
BENEFITS PLAN
By:
_____/s/_____
COMMONWEALTH LAW GROUP
Seth Carroll (VSB No. 74745)
Matthew Lastrapes (VSB No. 84097)
3311 West Broad Street
Richmond, VA 23230
Phone: (804) 551-9650
Facsimile: (866) 238-6415
scarroll@hurtinva.com
mlastrapes@hurtinva.com

THE LANIER LAW FIRM, P.C.
W. Mark Lanier
Texas State Bar No. 11934600
*pro hac vice forthcoming*
Benjamin Major
Texas State Bar No. 24074639
*pro hac vice forthcoming*
Ryan D. Ellis
Texas State Bar No. 24087470
*pro hac vice forthcoming*
Julian Cokic
Texas State Bar No. 24118977
*pro hac vice forthcoming*
10940 W. Sam Houston Pkwy N.
Suite 100
Houston, Texas 77064
Telephone: (713) 659-5200
Facsimile: (713) 659-2204
WML@lanierlawfirm.com
Ben.Major@lanierlawfirm.com
Ryan.Ellis@lanierlawfirm.com
Julian.Cokic@lanierlawfirm.com

PLEVIN AND GALLUCCI CO., LPA

Frank Gallucci
Ohio State Bar No. 72680
*pro hac vice forthcoming*
55 Public Square
Suite 2222
Cleveland, Ohio 44113
Telephone: (216) 861-0804
Facsimile: (216) 861-5322
FGallucci@pglawyer.com

**ATTORNEYS FOR PLAINTIFFS**