IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION (MDL No. 2406) | Master File No. 2:13-CV-20000-RDP<br><br>This document relates to the Subscriber Track. |

### MEMORANDUM OPINION AND ORDER REGARDING ANTHEM HEALTH PLANS OF VIRGINIA'S MOTION TO ENFORCE INJUNCTION

This matter is before the court on Anthem Health Plans of Virginia Inc.'s ("Anthem") Motion to Enforce the Court's Injunction. (Doc. # 3289). The Motion has been fully briefed (Docs. # 3299, 3305), and is ripe for decision.

In its Motion, Anthem requests that the court exercise its exclusive jurisdiction over the Subscriber Settlement Agreement and issue an order directing Owens & Minor, Inc. and Owens & Minor Flexible Benefits Plan (together, "OMI") to either (i) dismiss its Released Claims filed on February 7, 2025, in *Owens & Minor, Inc., et al. v. Anthem Health Plans of Virginia, Inc*., Case No. 3:24-CV-820 (E.D. Va.) (the "Virginia Action") or (ii) show cause why it should not be held in contempt for violating this court's injunction. (Doc. # 3289 at 4).

OMI responds that this court's Final Approval Order approving the Subscriber Settlement unambiguously excludes ERISA claims. (Doc. # 3299 at 5 (citing Doc. # 2931 at 76, 78 (in turn citing Doc. # 2610-2 at ¶ (uuu)))). OMI argues that Anthem's motion ignores the Settlement's language protecting ERISA claims arising in the ordinary course of business. (Doc. # 3299 at 6). OMI further points out that ERISA claims are only "Released Claims" when they are "based in whole or in part on" certain predicates. (*Id*.). OMI explains that vast majority of OMI's claims in

the Virginia Action do not even tangentially "relate to" the requisite predicates or issues raised in the Subscriber Actions. (*Id*. at 7).

In reply, Anthem notes that ERISA claims, like any other claims, are released if they "relate in any way to" the factual predicates or issues raised in the Subscriber Action. (Doc. # 3305 at 5). Anthem agrees that class members have not released claims, sounding in ERISA or otherwise, that (1) "arise in the ordinary course of business" and (2) "are based solely on" certain health benefits disputes, including "administration of claims under a benefits plan, based on either the benefit plan document or statutory law." However, it points out that the Subscriber Settlement specifically provides that claims based on "based in whole or in part on the factual predicates of the Subscriber Actions" or "any issue raised in any of the Subscriber Actions by pleading or motion" are released. (*Id*. at 6).

**I.    Background**

On October 16, 2020, the Subscriber Class Representatives, the Self-Funded Sub-Class Representative, and Settling Defendants entered into a Settlement Agreement that resolved Subscriber Plaintiffs' class-wide claims in this litigation. (Docs. # 2610-2; # 2931). In October 2021, the court conducted a multi-day Fairness Hearing and heard arguments from the parties in support of the Subscriber Settlement and from class members objecting to the Settlement. (Doc. # 2859). On August 9, 2022, the court granted final approval of the Subscriber Settlement. (Doc. # 2931). OMI did not opt out of the Settlement. (Doc. # 2812-6)/

    **A.    The Subscriber Settlement's Release Language**

The Subscriber Settlement Agreement negotiated by the settlement class members and Defendants and approved by the court contained the following relevant provisions:

> uuu. "<u>Released Claims</u>" means any and all known and unknown claims, causes of action, cross-claims, counter-claims, charges, liabilities, demands, judgments,

suits, obligations, debts, setoffs, rights of recovery, or liabilities for any obligations of any kind whatsoever (however denominated), whether class or individual, in law or equity or arising under constitution, statute, regulation, ordinance, contract, or otherwise in nature— including without limitation any and all actual or potential actions, losses, judgments, fines, debts, liabilities (including joint and several), liens, causes of action, demands, rights, damages, penalties, punitive damages, costs, expenses (including attorneys' fees and legal expenses), indemnification claims, contribution claims, obligations, compensation, and claims for damages or for equitable or injunctive relief of any nature (including but not limited to antitrust, RICO, contract, tort, conspiracy, unfair competition, or unfair trade practice claims)—known or unknown, suspected or unsuspected, asserted or unasserted, direct or derivative, *based upon, arising from, or relating in any way to: (i) the factual predicates of the Subscriber Actions* (including but not limited to the Consolidated Amended Class Action Complaints filed in the Northern District of Alabama) including each of the complaints and prior versions thereof, *or any amended complaint or other filings therein from the beginning of time through the Effective Date*; (ii) *any issue raised in any of the Subscriber Actions by pleading or motion*; or (iii) mechanisms, rules, or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10 through 18 approved through the Monitoring Committee Process during the Monitoring Period. *Nothing in this Release shall release claims, however asserted, that arise in the ordinary course of business and are based solely on (i) whether a particular product, service or benefit is covered by the terms of a particular Commercial Health Benefit Product, (ii) seeking resolution of a benefit plan's or a benefit plan participant's financial responsibility for claims, based on either the benefit plan document or statutory law, or (iii) challenging a Releasee's administration of claims under a benefit plan, based on either the benefit plan document or statutory law.* Any claim, however asserted, (i) that a product, service, or benefit should be or should have been covered, but was not covered, (ii) seeking resolution of a benefit plan's or benefit plan participant's financial responsibility for claims, or (iii) *challenging a Releasee's administration of claims under a benefit plan, based in whole or in part on the factual predicates of the Subscriber Actions or any other component of the Released Claims discussed in this Paragraph, is released*. Notwithstanding any other provision of this Agreement, a Provider who is a Settlement Class Member as defined in this Agreement does not release any claims arising from his, her or its sale or provision of health care products or services (as opposed to the purchase of a Commercial Health Benefit Product). Settling Defendants agree not to raise Providers' releases under this Agreement as a defense to Providers' claims brought in their capacity as Providers of health care products or services in MDL No. 2406. For purposes of clarity, Released Claims include, but are not limited to, claims that arise after the Effective Date.

[]

32. <u>Released Claims and Covenant Not to Sue</u>. In addition to the effect of any final judgment entered in accordance with this Agreement, upon the Effective Date as

3

set out in Paragraph 8, and in consideration of the Injunctive Relief and payment of the Settlement Amount into the Settlement Fund, and for other valuable consideration, the Releasors shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims against any and all of the Releasees. Persons or entities in both the Injunctive Relief Class and the Damages Class release all Released Claims. Persons or entities in the Injunctive Relief Class but not the Damages Class, release only claims for equitable or injunctive relief, provided that persons or entities that are within the definition of the Damages Class release any claims for damages that may be asserted by persons or entities (including dependents and beneficiaries) who claim by, for, under, or through a Damages Class member or the Commercial Health Benefit Product that a Damages Class member purchased, was covered by, or was enrolled in. *The Parties intend that the releases in this Agreement be interpreted and enforced broadly and to the fullest extent permitted by law.* Each Releasor shall be deemed to have released all Released Claims against the Releasees regardless whether any such Releasor ever seeks or obtains by any means, including without limitation through the Claim Process, any distribution from Settlement Fund. Class Representatives and Settling Defendants acknowledge, and Settlement Class Members shall be deemed by operation of the Final Judgment and Order of Dismissal to have acknowledged, that *the foregoing waivers and releases were separately bargained for and a key element of the settlement of which these releases are part.*

> a. All Releasors also covenant not to sue any Releasee with respect to any Released Claim, and agree that all Releasors shall be permanently barred and enjoined from commencing, maintaining, prosecuting, causing, cooperating with, advising to be commenced or maintained, or encouraging any action, suit, proceeding, or claim in any court, tribunal, administrative agency, regulatory body, arbitrator, or other body in any jurisdiction against any Releasee based in whole or in part upon, arising out of, or in any way connected or related to any Released Claim.
>
> b. Each Releasor may hereafter discover facts other than or different from those which he, she, or it knows or believes to be true with respect to the claims which are the subject matter of the provisions of this Paragraph 32 and Paragraph 33. Nevertheless, each Releasor hereby expressly waives and fully, finally, and forever settles and releases, upon this Agreement becoming final, any known or unknown, suspected or unsuspected, contingent or non-contingent claim with respect to the subject matter of the provisions of this Paragraph 32, whether or not concealed or hidden, without regard to the subsequent discovery or existence of such different or additional facts.

(Doc. # 2610-2 at 19-20, 48-49) (emphasis added).

Notably, paragraph 32 of the Subscriber Settlement Agreement, which defines Released Claims and Covenant Not to Sue, states that "[t]he Parties intend that the releases in this Agreement be interpreted and enforced broadly and to the fullest extent permitted by law." (Doc. # 2610-2 at 48).

The court expressly incorporated the releases set forth in Paragraphs 32 and 33 of the Subscriber Settlement Agreement, together with the Definitions contained in Paragraph 1 into its Final Order approving the Subscriber Settlement. (Doc. # 2931 at 88).

### B.   The Release's Effect on ERISA Claims

During the October 2021 Fairness Hearing, the Department of Labor raised certain concerns about whether the Settlement affected any duties employers or plan fiduciaries might have under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et. seq. (Doc. # 2866). The court addressed those concerns in its Final Approval Order as follows:

> At the Fairness Hearing, it became clear that the DOL was concerned with various hypothetical questions about whether this settlement affects any duties employers or plan fiduciaries might have under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et. seq. (Doc. # 2866). *However, as the Settlement Proponents have made clear, (1) ERISA plan rights are not affected by the Settlement and, further, (2) the Settlement Agreement does not release any claims that an ERISA plan may have against an employer. (Id. at 23, 26, 38). To be clear, all ERISA duties still apply, all ERISA fiduciaries must comply with those duties, and this Settlement does nothing to change or alter ERISA rights.* To the extent an ERISA plan does not approve of what an employer does with Settlement proceeds, the plan's right to sue the employer under ERISA is wholly unaffected by this Settlement. (*Id*. at 23).
>
> []
>
> The DOL asks whether the proposed Settlement's release is overbroad. However, there is no blanket release of ERISA claims. Indeed, the Settlement and release make clear that ERISA claims *unrelated to the issues raised in this litigation* are not released. To be sure, the parties added language that expressly excludes ERISA and related benefit claims from the Settlement's releases. *See* Doc. 2610-2 at & 1(uuu).

(Doc. # 2931 at 76, 78) (emphasis added).

5

The issue of the Release's effect on ERISA claims was not appealed. But the Eleventh Circuit made the following general points about the effect of the Settlement:

> The settlement agreement limits the release to claims arising from the factual predicates of the subscriber action. *It defines released claims as those "based upon, arising from, or relating in any way to: (i) the factual predicates of the Subscriber Actions ... (ii) any issue raised in any of the Subscriber Actions by pleading or motion*; or (iii) mechanisms, rules, or regulations by the Settling Individual Blue Plans and [the Association] within the scope of" the relief awarded to the injunctive class. This language cabins the scope of the release. *The release does not extend beyond claims arising from the common nucleus of operative fact*: all the released claims either were raised or could have been raised during the litigation that preceded the settlement. The release does not bar any claims that could not have been litigated before settlement or any claims related to conduct that was not challenged in the underlying lawsuit.

*In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1091 (11th Cir. 2023), *cert. denied sub nom. Behenna v. Blue Cross Blue Shield Ass'n*, 144 S. Ct. 2686 (2024), and *cert. denied sub nom. Home Depot U.S.A., Inc. v. Blue Cross Blue Shield Ass'n*, 144 S. Ct. 2687 (2024) (emphasis added).

### C.    OMI's Claims Against Anthem

OMI sponsors a self-funded healthcare plan for its employees and their families. (Doc. # 3289-1 at 4). OMI formerly contracted with Anthem. Under that agreement, Anthem provided certain administrative services to OMI's employee health-benefit plan under an Administrative Services Agreement. (*Id.*).

On November 18, 2024, OMI filed a Complaint against Anthem in the Eastern District of Virginia (the "Virginia Case"). (E.D. Va. Case No. 3:24-cv-00820-REP, Doc. # 1). In the Virginia Case, OMI alleges that, under the Administrative Services Agreement, Anthem served as a fiduciary for OMI's Plan under the Employee Retirement Income Security Act ("ERISA"). It further alleges that Anthem, as third-party administrator of OMI's ERISA Plan, grossly mismanaged OMI's Plan and breached its ERISA fiduciary duties in various respects. (E.D. Va.

6

Case No. 3:24-cv-00820-REP, Doc. # 1 at ¶¶ 68, 71–79; Doc. # 25 at ¶¶ 101, 104–112). OMI describes its Virginia Case as "a fiduciary action brought by a plan fiduciary pursuant to ERISA." (*See Id.*; Doc. # 3299 at 5). As OMI explains, its Virginia case "challenges [Anthem's] administration of claims under a benefit plan, based on either the benefit plan document or statutory law." (Doc. # 3299 at 6 (citing E.D. Va. Case No. 3:24-cv-00820-REP, Doc. # 25 and Doc. 2610-2 at ¶ 1(uuu)).

OMI's First Amended Complaint contains a section titled "The BlueCard Program and Multiplan," and a subsection titled "The BlueCard Program." (Doc. # 3289-1 at 27). That subsection comprises nine paragraphs:

> 56.    During the time relevant to this suit, Blue Cross Blue Shield Association (Association) was owned in part by Defendant, its corporate parent, or both. Over thirty other entities—generally referred to as "Blues" because they use the Blue Cross Blue Shield branding—share ownership in the Association. The Blues, including Defendant and/or its parent, operate the Association primarily as the licensor and owner of Blue Cross Blue Shield branding. The Blues fund the Association in various ways.
>
> 57.    One way the Blues fund the Association—and thus, increase the value of their respective ownership interests in the Association—is through the BlueCard program. The BlueCard program also provides a way for Blues to bolster their revenue directly by overcharging self-funded health plans.
>
> 58.    Throughout the relevant period, the thirty-plus Blues that own the Association assigned themselves geographic service areas free of competition from other Blues. Each Blue then, directly or through subsidiary Blues, created a provider network in their respective service areas. By default, members of a health plan administered by Defendant would be "out of network" if they sought medical treatment outside of Defendant's specific geographic area. In theory, such out-of-network treatment would cost Plaintiff and Plan participants and beneficiaries more than in-network treatment with providers who have a discount arrangement with Defendant. In reality, a different Blue controls that territory, has discount arrangements with providers already in place, and extracts exorbitant fees from Defendant's administered plans.
>
> 59.    According to Defendant, Owens & Minor employees residing and working outside Defendant's service area could access coverage near their respective residences and work locations even though they lived in another Blue's service area

and were, thus, outside Defendant's network of providers. According to Defendant, Plaintiff and those employees would effectively enjoy in-network status through the BlueCard program so long as they remained in the network of the "host Blue" where they lived or worked. According to Defendant, the BlueCard program would eliminate excess "out-of-network" costs of healthcare for Plaintiff's remote employees and plan members. According to Defendant and BlueCard marketing efforts, Plaintiff would save money because it and Plan participants and beneficiaries receive the discounts negotiated between host Blues and their in-network providers.

60. Several BlueCard pamphlets use the following hypothetical to explain how BlueCard works:

> Suppose you are an employer who provides coverage to your employees through Blue Cross Blue Shield of Tennessee. One of your out-of-state employees, Tom, sustains an injury while working in Illinois and immediately seeks medical attention from an Illinois Blue Card provider. After rendering the necessary medical services, the Illinois provider files a claim with Blue Cross and Blue Shield of Illinois, who in turn forwards the claim to Blue Cross Blue Shield of Tennessee. Under the Blue Card program, Tom's "home" Plan—Blue Cross Blue Shield of Tennessee—then reimburses the Illinois provider at a rate typically based on the provider's contract with the "host" Plan—Blue Cross Blue Shield of Illinois.

61. Relevant to this case, the "home" Blue is Defendant, and the "host" Blues are those who control the service areas where Plaintiff's non-Virginia members and employees reside and work.18 The Association manages the BlueCard program for self-funded plans including Plaintiff by (i) overseeing these inter-service-area claims; (ii) governing and monitoring fees chargeable by host Blues under the license agreements; (iii) setting claims procedures; and (iv) providing phone and online support for Plan members utilizing BlueCard. The Association therefore provides a service to Plaintiff—an overpriced service—but a service nonetheless.

62. The Association and the Blues that own it devised the BlueCard program to increase Blues' revenue in part through hidden fees that they would retain, distribute among the Blues, and pay to the Association. The Association requires all Blues to participate in the BlueCard program. So, in essence the Blues require the Blues to participate in the BlueCard program. The Blues serve the Association and themselves by extracting excessive fees from self-funded health plans across the country. This is a choice the Blues make—not something imposed by an unrelated third party. And because of the mandatory nature of the BlueCard program, the Association requires self-funded plans employing a Blue as a TPA to participate in the BlueCard program.

63. Defendant granted host Blues complete discretion with respect to the fees they charge for each BlueCard claim by Plan members. For instance, Defendant

8

permitted host Blues to charge the Plan more than the providers even billed for the treatment or prescription. Defendant permitted host Blues to charge the Plan excessive fees, including a "network access fee"—at the host Blue's discretion—up to $2,000 per claim. A reasonable fiduciary in Defendant's position—acting in the Plan's best interest and not in the best interest of other Blues—would have mitigated these costs to Plaintiff by, among other things, negotiating these fees to be a small fraction of what they are or eliminated them altogether. A reasonable fiduciary would not have granted host Blues such broad discretion in what to charge the Plan for BlueCard claims. Defendant's conduct reveals its true loyalty lies with the Blues and their parent organization—not Plaintiff.

64. Portions of these excess payments made by Plaintiff and Plan members are then paid to the Association, retained by the respective host Blues, and paid back to Defendant, either directly or in the form of host Blues allowing Defendant to charge equally exorbitant fees to self-funded plans in those host Blues' service areas through the BlueCard program. In other words, Defendant increases its profits by charging Plaintiff exorbitant fees. And because the Blues coordinate their efforts by mutually permitting one another to charge plans in the "home" network exorbitant fees, they extract excessive fees from self-funded plans across the country in a way that serves the Blue collective and the Association.

65. Additionally, as noted above, operation of the BlueCard program results in Plaintiff paying more money for a claim than is actually paid to the provider. Rather than adjusting these claims and refunding the excess payments to Plaintiff, Defendant and the host Blues withhold these funds in a so-called "variance account" to be used on prospective claims. But this variance account merely provides a way for Defendant and its affiliates to profit from Plaintiff's overpayments for healthcare and to pocket those overpayments to the detriment of the Plan. For example, while this money is held, the host Blue retains any interest earned. And upon terminating its relationship with Defendant, this money is not refunded to Plaintiff. Instead, host Blues and Defendant distribute these overpayments to themselves. No reasonable, loyal TPA or fiduciary with Plaintiff's best interests in mind would overcharge Plaintiff for services—or authorize others to overcharge—in order to profit from those overcharges or permit its affiliates to profit from overcharges. By the very nature of this practice, Defendant creates a conflict of interest whereby it is given two choices: (i) serve Plaintiff's best interests and work as a reasonably prudent TPA and fiduciary by minimizing costs to the Plan or (ii) overcharge Plaintiff so Defendant and its affiliates can profit from the return on those overpayments and pocket the principal should Plaintiff terminate Defendant. Unfortunately, Defendant chose option (ii). Defendant has defended this misconduct by pointing to contractual provisions. In essence, Defendant has argued Plaintiff has waived any complaint to this practice by contract. But that contractual provision further demonstrates that Defendant has carried out that misconduct in performing its fiduciary services for Plaintiff. Ex. A at 50 (providing that host Blues may overcharge for services and retain those overages forever). With respect to Plaintiff's claims under ERISA, this contractual waiver argument

9

fails. Defendant overpaid for BlueCard claims Plaintiff's assets and the balance of overpayments were kept in variance accounts. And because Plaintiff terminated Defendant, Defendant and its affiliates made returns on that money and failed to return that money to Plaintiff in violation of Defendant's fiduciary duties.

(Doc. # 3289-1 at 27-32).

Paragraph 98 of OMI's First Amended Complaint alleges:

98.     Through the BlueCard program, with actual or constructive knowledge, transferring Plaintiff's assets to parties in interest, various host Blues and the Association,22 in the form of overpayments for fees and services,23 the withholding of Plaintiff's assets in "variance accounts," and the failure to return those assets to Plaintiff: Defendant had unfettered discretion to (i) "determine claims for benefits under the Plan"; (ii) interpret the terms of the Plan; (iii) take control of Plaintiff's money and commit it to payments of claims; (iv) determine whether and how to identify and recoup overpayments; and (v) determine the methodology used to calculate the amount Defendant would pay a claim with Plaintiff's money. Supra ¶¶ 39, 40, 41, 43, 45, 50-52. This misconduct therefore falls within the scope of Defendant's fiduciary role. Plaintiff has alleged the relevant misconduct above. Supra ¶¶ 56-65.

(*Id*. at 52-53).

OMI's First Amended Complaint has a section titled "Cause of Action for ERISA Violations" that contains ten paragraphs, one of which, paragraph 109, has seventeen subparagraphs.[1] (*Id*. at 52-61). Subparagraph xv of paragraph 109 incorporates paragraphs 56-65 of the First Amended Complaint, which represent "The BlueCard Program" subsection of that Complaint. Subparagraph xv alleges that "Defendant violated ERISA through the following misconduct:"

---

[1] In this circuit, this type of pleading would be considered a shotgun pleading because it is unclear whether these subparagraphs are separate ERISA clams. In the Eleventh Circuit, there are four basic categories of shotgun pleadings: 1) those in which "each count adopts the allegations of all preceding counts"; 2) those that do not re-allege all preceding counts but are "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; 3) those that do not separate each cause of action or claim for relief into a different count; and 4) those that assert multiple claims against multiple defendants without specifying which applies to which. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1321-23 (11th Cir. 2015). The Eleventh Circuit has repeatedly and forcefully condemned shotgun pleadings. *See Est. of Bass v. Regions Bank, Inc*., 947 F.3d 1352, 1356 n.3 (11th Cir. 2020). The nuances of Eleventh Circuit caselaw, however, arguably do appear to apply here as this pleading was filed in the Eastern District of Virginia district court.

> Through the BlueCard program, with actual or constructive knowledge, transferring Plan assets to parties in interest, various host Blues and the Association, in the form of overpayments for fees and services, the withholding of Plan assets in "variance accounts," and the failure to return those assets to the Plan, supra ¶¶ 56-65, 98;

(*Id*. at 60).

Under a Section called "State Law Causes of Action," OMI's First Amended Complaint also contains a subsection titled "Breach of Fiduciary Duty." That subsection, in turn, contains seven paragraphs. (*Id*. at 67-71). Paragraph 141, like paragraph 109, has seventeen subparagraphs. (*Id*. at 68-71). Subparagraph xv of paragraph 141 again incorporates paragraphs 56-65 of the First Amended Complaint, "The BlueCard Program" subsection. (*Id*. at 70). Subparagraph xv alleges that "Defendant violated its fiduciary duties by:"

> Through the BlueCard program, with actual or constructive knowledge, transferring Plan assets to parties in interest, various host Blues and the Association, in the form of overpayments for fees and services, the withholding of Plan assets in "variance accounts," and the failure to return those assets to the Plan, supra ¶¶ 56-65, 98;

(*Id*. at 70).

Thus, OMI's First Amended Complaint states an ERISA claim and a breach of fiduciary duty claim that are each based, at least in part, on allegations regarding the Blues' BlueCard program and fees and variance accounts associated with that Program. (*Id*. at 27-32, 60, 70).

### D. The Factual Predicate of the Subscriber Claims in the MDL

Paragraph 5 of the Subscriber track Fourth Amended Consolidated Class Action Complaint in the MDL ("Subscriber FACCAC"), filed with the addition of self-funded ASO Plaintiffs Hibbett Sports, Inc. and A. Duie Pyle, Inc., describes the Blues' challenged conduct as follows:

> 6. Defendants have engaged and are still engaging in per se illegal market division. These market allocation agreements are reached and implemented in part through the Blue Cross and Blue Shield license agreements between each of the Individual Blue Plans and BCBSA, an association owned and controlled by all of

11

>the Individual Blue Plans, as well as through the BCBSA Membership Standards and Guidelines.

(Doc. # 2616 at 13).

The Subscriber FACCAC lists the following questions of law or fact as being common to the Classes:

>a. Whether the restrictions set forth in the BCBSA license agreements are per se violations of Sections 1 and 3 of the Sherman Act or are otherwise prohibited under Sections 1 and 3 of the Sherman Act;
>
>b. Whether, and the extent to which, premiums and ASO fees charged by the Individual Blue Plans to Class members have been supracompetitvely impacted as a result of the illegal restrictions in the BCBSA license agreements;
>
>[]
>
>e. Whether, and the extent to which, premiums and ASO fees charged by the Individual Blue Plans have been supracompetitively impacted as a result of the anticompetitive practices adopted by them.

(*Id*. at 72-73). Subscribers further allege that the Blues' participation in BlueCard provides a basis for finding that they transact business in the relevant state. (*Id*. at 17).

### E.  Issues Raised In Any of the Subscriber Actions by Pleading or Motion

In the MDL, the Blues argued that BlueCard illustrated the pro-competitive benefits of ESAs and the Blue Rules generally. (Doc. # 1353-1 at 29-33). The Blues defended the various challenged rules, including in particular BlueCard, as "facilitat[ing] the cooperation needed for Plans and BCBSA to function as an integrated national Blue System, create competitive joint products," and allow them to "compete with [the] four other national insurers." (Doc. # 1353-1 at 19-20). "Through collaboration, [they argued,] Plans can create new products by combining their complementary offerings to serve multi-state accounts and subscribers who travel." (*Id*. at 20). They explained that "BlueCard is one key element of Defendants' cooperative joint product." (*Id*. at 21).

12

In response to the Blues arguments, Subscribers denied that there was "evidence that the BlueCard program was the only way for the Plans to provide nationwide service." (Doc. # 2016-1 at 20). Subscribers argued "The challenged rules are not necessary for the provision of joint products such as BlueCard" and "exclusive service areas are not necessary for BlueCard to exist." (*Id*. at 23).

In 2017, Subscribers filed a motion seeking enlargement of time to take the depositions of the CEOs and Rule 30(b)(6) corporate representatives of Blue Cross Blue Shield of Alabama ("BCBS-AL") and the Blue Cross Blue Shield Association ("BCBSA"). (Doc. # 1065). Judge Putnam granted the Motion and allowed a total of fourteen (14) hours for each of the depositions of the BCBS-AL CEO and the BCBSA CEO. (Doc. # 1100 at 5). He reasoned that there was "good cause to allot a total of fourteen (14) hours" for those depositions because "[t]he CEOs of both BCBS-AL and the BCBSA will possess direct, personal knowledge of the rationale, operation, and effect of such policies as service area limits, most-favored-nation contract clauses, best-efforts rules, *and the BlueCard program*." (*Id*. at 4 (emphasis added)).

In its 2018 Standard of Review Opinion, this court included a section on "The Development of the BlueCard Program." (Doc. # 2063 at 15). In that section, the court acknowledged that "BlueCard was another avenue that allowed the Plans to offer nationwide coverage." (*Id*. at 16). It noted that "Under BlueCard Rules, an access fee may be charged in connection with processing BlueCard claims[.]" (*Id*.).

The court then addressed the Blues' argument that the challenged rules, including BlueCard, "facilitate the creation of new health insurance products." (Id. at 42). The court noted that, [a]ccording to Defendants, the Blue Plans require integrative mechanisms [such as BlueCard] to produce a product for large national employee groups." (*Id*.). The court rejected the argument

13

that the nationwide insurance product the Blues were able to cobble together through, among other rules, BlueCard, was a unique product. (*Id*. at 44).

## II.     Applicable Law

Anthem invokes the court's authority under the All Writs Act, 28 U.S.C. § 1651, to enforce the release of Subscriber Class Member's claims. This authority was expressly incorporated into the court's Final Order and Judgment Granting Approval of the Subscriber Class Action Settlement. (Doc. # 3289 at 4, 10 (citing Doc. # 2931 at 88)). "Federal courts may invoke the authority conferred by the All Writs Act to enjoin parties from prosecuting separate litigation to protect the integrity of a judgment entered in a class action and to avoid relitigation of issues resolved by a class action." *In re Managed Care*, 756 F.3d 1222, 1233 (11th Cir. 2014).[2]

The court expressly incorporated the releases set forth in Paragraphs 32 and 33 of the Subscriber Settlement Agreement, together with the Definitions contained in Paragraph 1 into its Final Order approving the Subscriber Settlement. (Doc. # 2931 at 88). Thus, what is at issue is a contract incorporated into an order. Therefore, the court begins with the fundamental proposition that it must construe a contract to give meaning to each word. That is, a construction of a contract that would render a clause meaningless would violate a foundational rule of contract interpretation. *See Equity Lifestyle Props., Inc. v. Fla. Mowing And Landscape Serv., Inc*., 556 F.3d 1232, 1242 (11th Cir. 2009) ("[This court] must read the contract to give meaning to each and every word it contains, and ... avoid treating a word as redundant or mere surplusage if any meaning, reasonable and consistent with other parts, can be given to it." (internal quotation omitted)).

---

[2] Even if Anthem were asking the court to enjoin a state court, an injunction would be appropriate if one of three circumstances applies: (1) it is expressly authorized by an Act of Congress, (2) it is necessary in aid of jurisdiction, or (3) it is necessary to protect or effectuate judgments. *In re Vioxx Prod. Liab. Litig*., 869 F. Supp. 2d 719, 724 (E.D. La. 2012) (citing *Smith v. Bayer Corp*., 564 U.S. 299, 305-06 (2011)). Here, such an injunction would fall under the third category.

**III.     Analysis**

Anthem argues that OMI's First Amended Complaint challenges aspects of the BlueCard Program that allow plans to charge access fees and that use variance accounts as a means of processing large volumes of claims, some of which may be paid at estimated or average prices. Anthem argues that these claims were resolved by the Subscriber Settlement and, thus, this court should enforce that Settlement's injunction and enjoin these claims. (Doc. # 3289 at 12-13).

Anthem focuses on the definition of Released Claims and whether OMI's claims relate in any way to the factual predicates of the Subscriber Actions. (Doc. # 3289 at 12-13). The ERISA claim and breach of fiduciary duty claim contained in OMI's First Amended Complaint are, at least in part, based on the BlueCard Program. On the other hand, OMI argues the factual predicate issue is not the key here. OMI contends that Anthem is focused on the wrong issue and urges the court to look to the limiting language in the Released Claims definition that protects ERISA claims arising in the ordinary course of business. (Doc. # 3299 at 6).

The court sees the relevant question as whether OMI's claims in the Virginia Action relate "in any way to: (i) the factual predicates of the Subscriber Actions" or "(ii) any issue raised in any of the Subscriber Actions by pleading or motion," because those claims are encompassed within the definition of "Released Claims" in the Subscriber Settlement Agreement. (Doc. # 2610-2 at 19 (¶ uuu)). Because of the allegations of the First Amended Complaint in the Virginia Action related to the BlueCard Program, and the fact that both an ERISA claim and a breach of fiduciary duty claim are premised at least in part on those facts, it simply cannot be the case that those claims:

> arise in the ordinary course of business and are based *solely* on (i) whether a particular product, service or benefit is covered by the terms of a particular Commercial Health Benefit Product, (ii) seeking resolution of a benefit plan's or a benefit plan participant's financial responsibility for claims, based on either the benefit plan document or statutory law, or (iii) challenging a Releasee's administration of claims under a benefit plan, based on either the benefit plan

document or statutory law.

(*Id.*). To adopt OMI's argument would render the qualifier "solely" use in the key language meaningless.

Moreover, after specifying the limited ordinary course claims that *are* allowed, the parties reiterated within the definition of "released claims' that "[a]ny claim, however asserted, challenging a Releasee's administration of claims under a benefit plan, based in whole or in part on the factual predicates of the Subscriber Actions or any other component of the Released Claims discussed in this Paragraph, *is released*." (Id. at 19-20 (emphasis added)).

The court is cognizant that the parties specifically agreed that they "intend[ed] that the releases in this Agreement be interpreted and enforced broadly and to the fullest extent permitted by law." (*Id*. at 49). Nonetheless, applying the plain language of the definition of released claims leads inexorably to the conclusion that, to the extent any of the claims in the First Amended Complaint in the Virginia Action are based in whole or in part on BlueCard (which was an issue in the Subscriber cases in the MDL), they are released. Even if any argument could be made that BlueCard was not a part of the factual predicate of the Subscribers' Claims in the MDL, as discussed above, BlueCard was clearly an "issue raised in [] the Subscriber Actions by pleading or motion." It follows that any claims asserted in the Virginia action that rely on this factual predicate from the MDL have been released.

### IV.    Conclusion

For all of the foregoing reasons, Anthem's Motion to Enforce the Court's Injunction (Doc. # 3289) is **GRANTED**. Any claims in the Virginia Action "based in any way" on BlueCard or the allegations of paragraphs 56-65 of the First Amended Complaint, including paragraphs 98, 109(xv), and 141(xv), are **RELEASED**. Under the court's authority to protect and enforce the

16

Subscriber Settlement Agreement (Doc. # 2610-2) and the court's Final Order approving the Subscriber Settlement that expressly incorporated that Agreement (Doc. # 2931 at 88), OMI is **ENJOINED** from further prosecuting claims "based in any way" on BlueCard or those paragraphs of the First Amended Complaint.

**Within fourteen (14) days** of this Order, OMI **SHALL** either (1) file an amended complaint omitting the allegations of paragraphs 56-65 of the First Amended Complaint, and any claims based on those allegations, including paragraphs 98, 109(xv), and 141(xv), or (2) file a motion asking the district court in E.D. Va. Case No. 3:24-cv-00820-REP to strike those allegations and claims.

If the allegations and claims identified above are not dismissed and/or stricken in accordance with this Order, Anthem **SHALL** notify this court of that fact. In that event, the court will decide what further action is appropriate.

**DONE** and **ORDERED** this April 22, 2025.

_____
**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE