**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE:**<br>**BLUE CROSS BLUE SHIELD**<br>**ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This Document Relates to**<br>**Provider Track Cases** |

**PROVIDER PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION FOR FINAL APPROVAL OF PROPOSED CLASS SETTLEMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... iii

INDEX OF EXHIBITS AND ABBREVIATIONS ...................................................... vi

INTRODUCTION ................................................................................................... 1

I.      PROCEDURAL HISTORY ............................................................................ 1

     A.      Overview of the Litigation and Settlement Negotiations. ....................... 1

     B.      Discovery and Motion Practice ............................................................. 3

     C.      Settlement Negotiations ....................................................................... 6

     D.      The Court's Preliminary Approval Order ............................................ 11

     E.      Notice, Education, and Processing of Claims, Opt-Outs and Objections ............. 13

II.      THE SETTLEMENT CLASS SHOULD BE CERTIFIED ................................. 14

     A.      Standing ............................................................................................. 14

     B.      Ascertainability ................................................................................. 14

     C.      The Rule 23(a) Requirements ............................................................. 15

           1.      Numerosity ............................................................................. 15

           2.      Commonality ........................................................................... 16

           3.      Typicality ................................................................................ 16

           4.      Adequacy of Representation ..................................................... 17

     D.      The Rule 23(b)(3) Requirements ........................................................ 18

           1.      Predominance .......................................................................... 18

           2.      Superiority .............................................................................. 19

III.      THE SETTLEMENT MEETS THE STANDARD FOR FINAL APPROVAL ............... 19

IV.      THE PLAN OF DISTRIBUTION SHOULD BE APPROVED ........................ 21

V.      THE OBJECTIONS TO THE SETTLEMENT SHOULD BE OVERRULED ............... 22

     A.      The Release Conforms to the Law ...................................................... 23

| | | | |
|---|---|---|---|
| | 1. | The Release Complies with the Identical Factual Predicate Doctrine | 23 |
| | 2. | The Exceptions to the Release Are Clear and Unambiguous | 25 |
| | 3. | The Caveat to the Ordinary Course of Business Exception Is Clear and Unambiguous | 28 |
| | 4. | The Objecting ER Groups Misconstrue Who Is Included in The Settlement Release | 30 |
| B. | | Settlement Class Members are Treated Equitably Under the Settlement | 32 |
| C. | | The Procedures for Opting Out are Fair and Reasonable | 35 |
| D. | | Dr. Egner's Objection Should Be Denied. | 36 |
| E. | | The Paul Hastings Conditional Objections are Moot | 39 |
| CONCLUSION | | | 40 |

## TABLE OF AUTHORITIES

**Cases**

*Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*,
211 F.R.D. 457 (S.D. Fla. 2002) ................................................................. 20

*Behrens v. Wometco Enters.*,
118 F.R.D. 534 (S.D. Fla. 1988),
*aff'd*, 899 F.2d 21 (11th Cir. 1990) .......................................................... 37

*Bennett v. Behring Corp.*,
96 F.R.D. 343 (S.D. Fla. 1982),
*aff'd*, 737 F.2d 982 (11th Cir. 1984) ......................................................... 21

*County of Monmouth, New Jersey v. Fla. Cancer Specialists, P.L.*,
2020 WL 11272690 (M.D. Fla. Feb. 21, 2020),
*report and recommendation adopted*,
2020 WL 11272691 (M.D. Fla. Mar. 17, 2020) ........................................... 28

*E.J. Brooks Co. v. Cambridge Security Seals*,
105 N.E.3d 301 (N.Y. 2018) ...................................................................... 29

*Farina v. Bastianich*,
984 N.Y.S.2d 46 (2d Dep't 2014) ............................................................... 29

*Greco v. Ginn Dev. Co., LLC*,
635 F. App'x 628 (11th Cir. 2015) ............................................................. 31

*Hill v. Bell South Telecommunications, Inc.*,
364 F.3d 1308 (11th Cir. 2004) ................................................................. 30

*In re Blue Cross Blue Shield Antitrust Litig., MDL 2406*,
85 F.4th 1070 (11th Cir. 2023) ............................................................. 24, 25

*In re Bluetooth Headset Products Liability Litig.*,
654 F.3d 935 (9th Cir. 2001) ..................................................................... 38

*In re Chicken Antitrust Litig. Am. Poultry*,
669 F.2d 228 (5th Cir. 1982) ..................................................................... 21

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
424 F. Supp. 3d 456 (E.D. La. 2020) .......................................................... 35

*In re HP Inkjet Printer Litig*,
716 F.3d 1173 (9th Cir. 2013) ................................................................... 38

*In re Managed Care Litig.*,
    2003 WL 22850070 (S.D. Fla. Oct. 24, 2003)................................................................ 33

*In re Managed Care Litig.*,
    2010 WL 6532985 (S.D. Fla. Aug. 15, 2010)................................................................ 33

*In re Oil Spill by Oil Rig Deepwater Horizon*,
    295 F.R.D. 112 (E.D. La. 2013)................................................................ 22

*In re Oil Spill by Oil Rig Deepwater Horizon*,
    910 F. Supp. 2d 891 (E.D. La. 2012)................................................................ 34

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2019 WL 6875472 (E.D.N.Y. Dec. 16, 2019),
    *judgment entered*, 2022 WL 2803352 (E.D.N.Y. July 18, 2022),
    *and aff'd sub nom. Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
    62 F.4th 704 (2d Cir. 2023) ................................................................ 34

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    2024 WL 3236614 (E.D.N.Y. June 28, 2024) ........................................ 33, 34

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
    2017 WL 5710424 (D. Mass. Nov. 27, 2017) ................................................ 27

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*,
    2015 WL 9266493 (N.D. Cal. Dec. 17, 2015) ................................................ 28

*Lipuma v. Am. Express Co.*,
    406 F. Supp. 2d 1298 (S.D. Fla. 2005) ................................................ 20

*Luevano v. Campbell*,
    93 F.R.D. 68 (D.D.C. 1981)................................................................ 35

*Matsushita Elec. Indus. Co. v. Epstein*,
    516 U.S. 367 (1996)................................................................ 24

*Parker v. Anderson*,
    667 F.2d 1204 (5th Cir.1982) ................................................................ 34

*TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.*,
    959 F.3d 1318 (11th Cir. 2020) ................................................................ 24

## Other Authorities

https://www.cms.gov/files/document/highlights.pdf ................................................ 36

## Rules

Fed R. Civ. P. 23(e) ................................................................ 3, 11

Fed. R. Civ. P. 23(a) ................................................................ 12, 14, 15, 18

Fed. R. Civ. P. 23(a)(1) ............................................................ 15

Fed. R. Civ. P. 23(a)(2) ............................................................ 16

Fed. R. Civ. P. 23(a)(3) ............................................................ 16

Fed. R. Civ. P. 23(a)(4) ............................................................ 17

Fed. R. Civ. P. 23(b) ................................................................ 18

Fed. R. Civ. P. 23(b)(3) ............................................................ passim

Fed. R. Civ. P. 23(c)(2)(B) ........................................................ 13

Fed. R. Civ. P. 23(e)(2) ............................................................ 19, 22

## INDEX OF EXHIBITS AND ABBREVIATIONS

| Exhibit | Abbreviation | Description |
|---------|--------------|-------------|
| A | Provider Co-Lead Counsel Declaration | Provider Co-Lead Counsel Joint Declaration in Support of Provider Plaintiffs' Motion for Final Approval |
| B | Petkauskas Declaration | Declaration of Roma Petkauskas on the Implementation and Adequacy of the Notice Plan and Administration |
| C | Wheatman Declaration | Declaration of Shannon R. Wheatman, Ph.D. on Implementation of the Notice Plan |
| D | Special Master Declaration | Declaration of the Special Master, Mediator, and Settlement Administrator in Support of Provider Plaintiffs' Motion for Final Approval |
| E | HCA Objection | Objection to the Provider Class Settlement Because the Release Is Unreasonably Ambiguous (submitted by North Texas Division, Inc.) |
| F | ER Group Objection | Emergency Medical Provider Groups' Objection to Class Settlement |
| G | Egner Objection | Written Objection to Proposed Settlement (submitted by Kyle Egner, DC) |
| H | Paul Hastings Objections | Objections submitted by clients of Paul Hastings LLP |
| I | Meyer Declaration | Declaration of Robert A. Meyer in Support of Provider Plaintiffs' Motion for Final Approval |
| J | Katz Declaration | Declaration of Matthew C. Katz in Support of Provider Plaintiffs' Motion for Final Approval |

**INTRODUCTION**

As described in the papers filed in support of Preliminary Approval and as further detailed below, this Settlement – the product of over 9 years of arm's-length contentious negotiations resolving hard-fought, years-long litigation – is eminently fair, reasonable and adequate and should be finally approved.[1]

The Settlement Notice Administrator has executed every aspect of the Notice Plan and Class Members have received the best notice practicable under the circumstances. Moreover, Provider Co-Lead counsel engaged in extensive outreach and education of Class Members regarding the terms of the Settlement.

The $2.8 billion monetary component of the Settlement is the largest monetary settlement of a healthcare antitrust case in history. In addition, Provider Plaintiffs' experts have estimated the injunctive relief at a minimum value of $17.3 billion.

Given the foregoing, it is not surprising that there were only 3 objections to the fairness or reasonableness of the Settlement, representing just over 0.0001% of Class Members. The remaining objections are conditional objections all filed by clients of Paul Hastings. For the reasons set forth below, the Paul Hastings objections are moot, and the remaining objections should be overruled.

## I.  PROCEDURAL HISTORY

### A.  Overview of the Litigation and Settlement Negotiations

The litigation underlying this Settlement has been ongoing for over a decade, involving complex claims under the Sherman Act against the Blue Cross Blue Shield Association (BCBSA)

---

[1] Capitalized terms not otherwise defined herein shall have the meaning given them in the Settlement Agreement. Doc. No. 3192-2. This memorandum incorporates by reference the Provider Plaintiffs' Motion for Preliminary Approval of Proposed Class Settlement, Doc. No. 3192, their Motion for Approval of a Plan for Notice and Appointment of Settlement Notice Administrator and Settlement Administrator, Doc. No. 3194, their supplement to those filings, Doc. No. 3207, along with their attachments.

and its Member Plans. The Provider Plaintiffs allege that the Blues engaged in anticompetitive conduct, including the enforcement of exclusive Service Areas and restrictions on Providers' ability to contract with multiple Blue Plans. These restraints, the Provider Plaintiffs contend, reduced competition and harmed providers nationwide.

The Provider track of this multidistrict litigation began in 2012 with the filing of the initial complaint in *Conway v. Blue Cross & Blue Shield of Alabama*, Case No. 12-cv-2532-RDP (N.D. Ala.). The case was later consolidated into *In re Blue Cross Blue Shield Antitrust Litigation*, MDL No. 2406, along with other cases filed by Provider Plaintiffs and Subscriber Plaintiffs. Preliminary Approval Order (Doc. No. 3225) at 3.

From its inception, this litigation has involved extraordinary motion practice and discovery efforts. The parties engaged in:

- Extensive dispositive motion practice, including multiple motions to dismiss and summary judgment motions;

- Massive discovery efforts, with Provider Plaintiffs obtaining millions of pages of documents and taking part in hundreds of depositions;

- Prolonged privilege disputes, resulting in the de-designation of over 450,000 documents; and

- Use of numerous experts, involving economic modeling, market analyses, and class certification briefing.

Preliminary Approval Order at 3–6.

The settlement negotiations spanned nearly a decade and were conducted under the supervision of experienced mediators, including Special Master Edgar C. Gentle and Robert A. Meyer. These discussions involved:

- More than 500 in-person, virtual, and/or telephonic mediation and negotiation sessions over the course of nine years;

- Extensive, hard fought negotiations concerning injunctive relief and, thereafter, monetary compensation;

- Significant input from the provider community, including class representatives, associations of providers and the Provider Work Group; and

- The input of neutral allocation experts Kenneth Feinberg and Camille Biros to ensure a fair and reasonable distribution plan.

Provider Plaintiffs' Memorandum of Law in Support of Their Motion for Preliminary Approval of Proposed Class Settlement (Doc. No. 3192-1) ("Preliminary Approval Brief") at 8–9, 21–22; Provider Co-Lead Counsel Declaration ¶ 4.

On October 4, 2024, the parties executed the Settlement Agreement, under which the Blues agreed to:

1.    Pay $2.8 billion in monetary relief, the vast majority of which will be distributed to Settlement Class Members;

2.    Implement substantial reforms, including to the BlueCard Program, to ensure transparency, efficiency, and accountability and to increase competition;

3.    Significant changes to encourage more competition; and

4.    Provisions to ensure compliance with, and reporting and monitoring of, the Settlement.

Preliminary Approval Order at 7–9.

On December 4, 2024, the Court granted preliminary approval, finding that the Settlement likely satisfies Rule 23(e)'s fairness criteria and directing that notice be issued to the Settlement Class. *See generally* Preliminary Approval Order. With notice now executed in accordance with the court-approved Notice Plan, the Settlement is ready for final approval.

### B.    Discovery and Motion Practice

The litigation leading to this Settlement was exceptionally complex and involved extensive discovery, motion practice, and expert analysis over the course of more than a decade. From the outset, the Provider Plaintiffs pursued comprehensive discovery into the Blues' history and alleged anticompetitive conduct. The immense amount of discovery in this case reflected the scope and importance of the Plaintiffs' claims.

The parties engaged in significant motion practice directed at the Court's jurisdiction over some of the Blues, the sufficiency of the claims, the legal standards applicable to the alleged restraints, and the viability of the Blues' defenses. The Blues sought dismissal on multiple grounds, but the Court largely denied these motions, allowing the litigation to proceed to full merits discovery. Preliminary Approval Brief at 6–7.

Discovery in this case was an extensive and complex undertaking. The Provider Plaintiffs obtained more than 75 million pages of documents from the Blues and third parties, which required manual and technology-assisted review. The Provider Plaintiffs also analyzed terabytes of structured claims data from dozens of Blue Plans, allowing their experts to develop sophisticated economic models assessing the impact of the Blues' alleged conduct on providers. Preliminary Approval Brief at 7–8. These data-driven analyses played a central role in the Provider Plaintiffs' motion for class certification and their evaluation of potential settlement terms.

The parties conducted over 200 depositions, including depositions of Blue Plan executives, economic experts, and third-party witnesses. The Provider Plaintiffs also defended more than 40 depositions of their own class representatives and expert witnesses. Preliminary Approval Brief at 7–8. Given the significance of privilege issues in this case, the parties extensively litigated privilege designations, resulting in more than 450,000 documents being de-designated for production following rulings by Special Master R. Bernard Harwood. Preliminary Approval Order at 4–5.

Class certification proceedings further underscored the complexity of the litigation. In 2019, the Provider Plaintiffs moved to certify classes of healthcare providers in Alabama, relying

on expert testimony and substantial economic evidence.[2] The Blues vigorously opposed certification, submitting expert reports and challenging the methodology underlying the Provider Plaintiffs' damages models. The parties also briefed multiple *Daubert* motions. Preliminary Approval Order at 5.

Summary judgment motions presented another major phase of the litigation. In 2018, the Court ruled on the applicable legal standard, determining that claims related to the aggregation of Exclusive Service Areas and the Blues' National Best Efforts rule should be evaluated under the *per se* rule, while claims related to price-fixing through the BlueCard Program should be assessed under the rule of reason. The Blues petitioned the Eleventh Circuit for interlocutory review, but their request was denied, allowing the litigation to proceed. Preliminary Approval Order at 5.

The Blues eliminated the National Best Efforts rule in 2021, after which the parties submitted additional briefing on the applicable legal standard. In 2022, the Court ruled that Exclusive Service Areas alone (i.e., without National Best Efforts) are due to be analyzed under the rule of reason, and that claims related to group boycott through the BlueCard Program would also be assessed under the rule of reason. As a result, by the time the parties reached a settlement, they had a fully developed evidentiary record, extensive expert analyses, and a clear understanding of the risks and benefits of continued litigation. This depth of discovery and motion practice ensured that the Settlement was negotiated based on a comprehensive factual and legal record, further supporting its fairness and adequacy.

---

[2] The Provider Plaintiffs' proposed classes included Alabama Providers that provided healthcare service, equipment or supplies other than (1) those covered by standalone dental or vision insurance, (2) prescription drugs, (3) durable medical equipment, (4) medical devices, or (5) supplies or services provided in an independent clinical laboratory. These providers were excluded because they were not impacted by the challenged Blue rules in the way alleged in the Provider Action complaints. The full class definitions can be found at Doc. No. 2604 at 1–3.

### C.     Settlement Negotiations

The Settlement is the result of nearly a decade of intensive, arm's-length negotiations between the Provider Plaintiffs and Defendants, facilitated by multiple experienced mediators. These discussions began in 2015 and continued over the next nine years, with the parties engaging in more than 500 in-person, virtual, and/or telephonic mediation and negotiation sessions under the guidance of Judge Layn Phillips, Judge Gary Feess, Special Master Edgar C. Gentle, Kip Benson, and Robert Meyer. Preliminary Approval Brief at 8–9; Provider Co-Lead Counsel Declaration ¶ 4. Members of the provider community, including the Provider Work Group, gave valuable input into this process. The negotiation process was also shaped by significant litigation developments, including the Court's rulings on dispositive motions and the applicable standard of review.

Throughout the settlement negotiations, both sides relied on extensive factual and expert evidence developed through years of discovery. The Provider Plaintiffs' damages models, constructed using data from millions of Provider claims, played a crucial role in shaping discussions about the monetary component of the Settlement. Likewise, the injunctive relief provisions were informed by the longstanding concerns raised by providers regarding the BlueCard Program.

By 2021, following the elimination of the National Best Efforts rule, the Provider Plaintiffs and Defendants continued their negotiations, focusing on injunctive relief that would create a more transparent, efficient and accountable BlueCard Program and changes that would encourage more competition. Thereafter, the parties negotiated the monetary terms of the Settlement. Separately, the Provider Plaintiffs engaged neutral allocation experts Kenneth Feinberg and Camille Biros to design a fair and reasonable method for distributing the settlement fund among class members. Preliminary Approval Brief at 9. After numerous mediation sessions, phone calls, and virtual

meetings, the parties reached a final agreement on October 4, 2024, under which the Blues agreed to provide significant monetary and injunctive relief, and a robust monitoring, compliance and reporting process. Preliminary Approval Order at 6; Preliminary Approval Br. at 1–6.

**Monetary Relief**

Defendants will pay $2.8 billion to the Settlement Fund, which will include distributions to Settlement Class Members, Notice and Administration costs, and any Fee and Expense Award. Defendants are not entitled to reversion of any of the Settlement Fund. This payment is the largest ever in a healthcare antitrust case.

**Injunctive Relief**

Because each Blue Plan generally contracts with Providers only in that plan's Service Area, Providers must submit claims through the BlueCard Program when they treat members of another Blue Plan. For decades, Providers have complained that BlueCard is a non-transparent program that causes additional costs, inefficiencies, and frustration. The Settlement Agreement significantly improves how Providers who did not opt out of the Settlement will be able to deal with the Blues, bringing more transparency, efficiency, and Blue Plan accountability.

The Provider Plaintiffs' experts prepared and filed a valuation of the injunctive relief which estimated a minimum value to Providers of approximately $17.3 billion over ten years. This figure represents the value to Providers who did not opt out of fewer BlueCard claims requiring follow-up, less time spent on follow-up for BlueCard claims, less time spent on pre-submission tasks for BlueCard claims, and a five-year commitment to pay defined Clean BlueCard claims promptly. *See* Doc. No. 3254. Other Injunctive Relief in the Settlement Agreement provides significant additional value that was not quantified. Provider Co-Lead Counsel Declaration ¶ 13.

The Provider Plaintiffs obtained this relief through years of litigation and negotiation, and the Blues estimate that implementing it will cost them hundreds of millions of dollars. As explained in detail in the Preliminary Approval Brief, Providers who did not opt out of the Settlement will receive relief including:

- **BlueCard Transformation.** Transformation of the BlueCard Program infrastructure through the development and implementation of a system-wide, cloud-based architecture that will increase access to critical information and allow Settlement Class Members to receive up-to-date, accurate information as if they were a contracted provider of the Control/Home Plan, directly from their Local/Host Plan. This creation of a system-wide information platform and enhanced information sharing will facilitate Settlement Class Members' access to Member benefits and eligibility verification information, pre-authorization requirements, and claims status tracking;

- **BlueCard Prompt Pay Commitment.** To address the gap in application of state prompt pay laws to BlueCard claims, a timeliness commitment for payment of fully insured Clean BlueCard Claims, with a requirement that the Blues pay interest when payment is made later than the Prompt Pay Period, as well as timely notice of defective claims and explanation for denied claims;

- **Service Level Agreements.** Implementation of Service Level Agreements, which commit the Blues to respond promptly to certain BlueCard Program-related inquiries or pay financial penalties;

- **BlueCard Executive.** Appointment of a BlueCard Executive at each Blue Plan, who will be accountable to Settlement Class Members for escalated BlueCard issues;

- **Real-Time Messaging System.** Implementation of a real-time Blues internal messaging

system to reduce the time it takes for the Blues to respond to Providers' issues and disputes and enable Blue Plans to address Settlement Class Members' issues in near-real time;

- **National Executive Resolution Group.** Creation of a Blue National Executive Resolution Group, which will be supported by a Provider Liaison Committee and work to identify trends and opportunities for further improvement of the BlueCard Program over time.

Improving the BlueCard Program is not the only benefit the Settlement Agreement provides. Changes to BCBSA rules will allow Providers' Contiguous Area Contracts to cover more Blue Plan Members, and certain hospitals will be eligible to contract with more Blue Plans than before. In addition, limits will be placed on Blue Plans' ability to rent certain of their Non-Blue-Branded Provider Networks:

- **Modifying the Contiguous Area Rule.** Currently, Providers can contract with a Blue Plan in a Contiguous Area only for Members who live or work in the Service Area where the Provider is located. The Settlement Agreement removes that requirement, so that a Provider can contract with a Blue Plan in a Contiguous Area for all of that Blue Plan's state Members.

- **Expanding Contiguous Area Contracts to Certain Affiliated Hospitals.** For the first time, the Settlement Agreement permits Blue Plans to enter into Contiguous Area Contracts that cover not just hospitals in Contiguous Counties, but also certain of their affiliated hospitals.

- **Affiliates and All Products Clauses.** Limits on contract provisions that require Providers who contract with Blue Plans to participate in the networks of those plans' non-Blue affiliates.

Providers' day-to-day interactions with the Blues will improve as well. With major upgrades to the Blues' technical capabilities, and commitments from the Blues to make more information available, Providers will have access to more information, and more timely information, than ever before:

- **Third-Party Information.** The Blues will identify third parties involved in determining benefit application decisions, so Settlement Class Members can better understand and predict such decisions.

- **Minimum Data Requirements.** The Blues will define minimum data requirements in response to certain eligibility and benefits inquiries, to promote consistency among Blue Plans and give certainty to Settlement Class Members that they are submitting the necessary information.

- **Blue Plan Common Appeals Form.** Settlement Class Members can use a newly developed appeals form common to all Blue Plans, so Providers do not bear the administrative expense of complying with different Blue Plan requirements for initiating an appeal related to a BlueCard claim.

- **Pre-Authorization Standards.** The Blues will promulgate guidelines to improve the prior authorization process.

- **Telehealth Relief.** The Blues will streamline claims processing for Providers who provide telehealth or other virtual services to Blue Members.

The Settlement Agreement will also expand Providers' opportunity to enter into value-based contracts with the Blues:

- **Minimum Level of Value-Based Care.** Each Blue Plan will have available a value-based care offering, so Providers in different parts of the country will have the option between

a traditional fee-for-service model and a value-based care model for payment.

- **Best Practices for Value-Based Care.** The Blues will promulgate standards for value-based contracts in order to facilitate and advance the delivery of value-based care.

### Monitoring, Compliance, and Reporting

The Provider Plaintiffs have made sure the commitments of the Settlement Agreement are enforceable. For a period of five years from the Effective Date of the Settlement, a Monitoring Committee comprised of members appointed by the Settling Defendants, Provider Co-Lead Counsel, and the Court will be created to oversee monitoring, compliance and reporting related to the injunctive relief.

### D.    The Court's Preliminary Approval Order

On December 4, 2024, the Court granted preliminary approval of the Provider Plaintiffs' Settlement, finding that it likely satisfies the requirements of Rule 23 and preliminarily determining that the proposed relief is fair, reasonable, and adequate. Preliminary Approval Order at 22–40. The Court's ruling was based on its thorough review of the record, including the extensive litigation history, the complexity of the claims, the negotiated settlement terms, and the plan for distributing relief to class members.

In granting preliminary approval, the Court determined that the proposed settlement likely meets the standards of Rule 23(e), noting that it was the result of arm's-length negotiations between experienced counsel and conducted under the supervision of respected mediators. Preliminary Approval Order at 34–40. The Court emphasized that the $2.8 billion Settlement Fund, combined with the substantial injunctive relief, provided meaningful benefits to the Settlement Class and addressed the core allegations in the case.

The Court also evaluated the proposed Settlement Class under Rule 23(a) and Rule 23(b)(3) and concluded that it was likely to be certified for settlement purposes. Specifically, the Court found:

- **Numerosity**: The class consists of thousands of healthcare providers across the country, making joinder impracticable. Preliminary Approval Order at 25.

- **Commonality**: The Court recognized that the Provider Plaintiffs raised common legal and factual issues, particularly regarding the alleged anticompetitive conduct in the BlueCard Program and provider network restrictions. *Id.* at 25–27.

- **Typicality**: The named plaintiffs' claims were deemed typical of those of the Settlement Class, as all class members were subject to the same alleged restraints on competition. *Id.* at 27–28.

- **Adequacy**: The Court found that the Provider Plaintiffs and their counsel had well represented the class, and the interests of the Class Representatives and the Settlement Class are fully aligned. *Id.* at 28–29.

The Court further held that the predominance and superiority requirements of Rule 23(b)(3) were likely satisfied. Preliminary Approval Order at 30–32. This finding was based on the significant factual and expert record developed over years of litigation, as well as the clear efficiencies gained by resolving these claims on a classwide basis.

In addition to preliminarily approving the proposed settlement terms and class certification, the Court also preliminarily approved the Plan of Distribution, which was developed with the assistance of neutral allocation experts Kenneth Feinberg and Camille Biros. Preliminary Approval Order at 42–43. The Court recognized that the Plan of Distribution provided a fair and reasonable allocation of the settlement fund among hospitals, facilities, and medical professionals and was structured to ensure equitable compensation, giving Settlement Class Members the opportunity to rely on data collected by the Provider Plaintiffs' experts or to submit their own data. *Id.*

The Court also approved the Notice Plan, finding that it satisfied the requirements of Rule 23 and due process. The direct notice campaign, combined with a targeted paid and earned media

program, was designed to reach the vast majority of class members using commercially available provider databases and verified contact information. Preliminary Approval Order at 43–46. The Court directed that notice be issued in accordance with the approved plan and set a final approval hearing to consider any objections before issuing a final ruling on the Settlement. *Id.* at 51, 55.

### E. Notice, Education, and Processing of Claims, Opt-Outs, and Objections

The Settlement Notice Administrator has executed every aspect of the Notice Plan, and Class Members have received "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(B). Nearly 90% of the identified potential Class Members were reached with direct notice, and media notice was directed toward potential Class Members who did not receive direct notice. *See generally* Petkauskas Declaration; Wheatman Declaration. Potential Class Members with questions have been able to contact the Settlement Notice Administrator by phone and email. Petkauskas Declaration ¶¶ 15–16. The Settlement Notice Administrator also created a website with links to important information about the Settlement as well as access to claim forms. *Id.* ¶ 14.

In addition, Provider Co-Lead Counsel have spent hundreds of hours educating Providers about the Settlement, through presentations and one-on-one communications. They and partners in their firm estimate that they have presented to or spoken with more than 5,757 Providers. Provider Co-Lead Counsel Declaration ¶ 9. They also created a settlement webpage and sent direct communications to Class Members. *Id.* ¶ 10. The Settlement has also received considerable media attention, including articles in widely read legal and healthcare industry publications and social media. *Id.* ¶ 12.

Since the entry of the Preliminary Approval Order, the Settlement Notice Administrator has processed claims, opt-out requests, and objections. Petkauskas Declaration ¶¶ 28–35. The deadline for submitting opt-out requests and objections was March 4, 2025, and the deadline for

submitting claims is July 29, 2025. As described below, the volume of opt-outs and objections represents a tiny fraction of the number of Class Members. The reaction to the Settlement from Class Members was overwhelmingly positive. Provider Co-Lead Counsel Declaration ¶ 9.

With notice executed, the case is now at the final approval stage. The Court's preliminary findings strongly support granting final approval, as the Settlement has already been found to be the product of extensive litigation, meaningful negotiation, and careful judicial oversight.

## II. THE SETTLEMENT CLASS SHOULD BE CERTIFIED.

Before granting final approval, the Court must confirm that the Settlement Class meets the requirements of Rule 23. This Court has preliminarily found that the proposed class satisfies Rule 23(a) and Rule 23(b)(3), ensuring that certification is appropriate for settlement purposes. Because no facts have changed to alter this conclusion, final certification of the Settlement Class is warranted.

### A. Standing

The Court has already determined that the Provider Plaintiffs have standing to pursue these claims, as they have demonstrated injury-in-fact, traceability, and redressability under Article III. Additionally, the Court found that "the elimination of certain challenged restraints will remedy those injuries." Preliminary Approval Order at 23–24. Accordingly, the Court's preliminary findings support final certification of the Settlement Class, as Provider Plaintiffs have satisfied the standing requirements necessary to proceed.

### B. Ascertainability

The Class Members are readily ascertainable here because there are robust commercially available databases of healthcare providers. Preliminary Approval Order at 24–25. The Settlement Notice Administrator used those databases to effect Class Notice, reaching the vast majority of

them through mail or email. Petkauskas Declaration ¶¶ 20–25. Thus, the Court's preliminary finding that the Class Members are readily ascertainable has proven correct.

### C.     The Rule 23(a) Requirements

To obtain final certification of the Settlement Class, Provider Plaintiffs must satisfy the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. As the Court has already found that these requirements are likely to be met, Preliminary Approval Order at 25–29, and no new facts or objections cast any doubt on the Court's conclusion, final certification is appropriate.

#### 1.     Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." While there is no strict numerical threshold, courts have found that classes consisting of thousands of members easily satisfy the numerosity requirement. Here, the Settlement Class includes hundreds of thousands or more healthcare providers across the country who contracted with one or more of the Blue Plans during the Settlement Class Period. Preliminary Approval Order at 25. These providers include hospitals, clinics, physician practices, and other medical professionals, all of whom were allegedly affected by the same anticompetitive conduct.

The impracticability of joinder is further demonstrated by the geographic dispersion of class members. Providers are located in all fifty states, D.C. and Puerto Rico. Attempting to litigate these claims through individual lawsuits would be highly inefficient and burdensome, not only for the courts but also for the providers themselves, many of whom lack the resources to pursue complex antitrust litigation on an individual basis. Given the size and scope of the class, the Court correctly found that the numerosity requirement is satisfied. *Id.*

## 2. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Commonality is satisfied when class members' claims depend on a common contention that is capable of classwide resolution, meaning that its determination will resolve an issue central to the litigation. In antitrust cases, commonality is often established when plaintiffs challenge conduct that applies uniformly to the class, such as an alleged conspiracy or anticompetitive practice.

Here, the Court found that multiple common questions exist, including: "(1) whether the Blues conspired to allocate markets and restrict output in violation of the Sherman Act, (2) whether the Blues agreed to fix prices and implement a group boycott through the BlueCard Program in violation of the Sherman Act, (3) whether the Blues monopsonized the relevant product markets, (4) whether the Blues paid anticompetitive reimbursements to Providers as a result of their agreements, (5) whether the Blues have procompetitive justifications that outweigh the harm of competition for the Provider Plaintiffs' rule of reason claims, and (6) whether the Blues constitute a single entity for the purpose of managing their trademarks." Preliminary Approval Order at 26–27. The resolution of these issues will apply to all class members, as the claims arise from the same overarching scheme of alleged anticompetitive conduct.

## 3. Typicality

Rule 23(a)(3) requires that the claims of the named plaintiffs be "typical of the claims or defenses of the class." Typicality is satisfied when the named plaintiffs' claims arise from the same course of conduct that gives rise to the claims of other class members and are based on the same legal theory. Minor factual variations among class members do not defeat typicality so long as the claims are substantially aligned.

Here, the Court found that the named Provider Plaintiffs are typical of the class because their claims arise from the same alleged conduct: the challenged restraints, which allegedly affected competition in the markets for the purchase of healthcare services and the sale of commercial healthcare financing services. Preliminary Approval Order at 28. The claims asserted by the named plaintiffs rely on the same legal theories as those of the class as a whole—namely, violations of the Sherman Act based on alleged agreements to restrain competition. Moreover, typicality is supported by the structure of the injunctive relief obtained in the Settlement: "The Class Representatives seek the same relief sought by absent Class Members." Preliminary Approval Order at 28. Because the named plaintiffs' claims are based on the same challenged conduct, the Court correctly found that typicality is met. Preliminary Approval Order at *Id.* at 27–28.

### 4.     Adequacy of Representation

Rule 23(a)(4) requires that the named plaintiffs "fairly and adequately protect the interests of the class." This inquiry focuses on whether the named plaintiffs have any conflicts of interest with other class members and whether class counsel have the qualifications, experience, and ability to conduct the litigation.

The Court found that the Provider Plaintiffs and their counsel have more than adequately represented the class throughout this litigation. Preliminary Approval Order at 29. The named plaintiffs have vigorously pursued these claims on behalf of the class for more than a decade, actively participating in discovery, depositions, and settlement negotiations. They have no conflicts with absent class members, as they seek the same relief—both monetary and injunctive—that will benefit the entire class.

Similarly, class counsel has demonstrated the necessary skill and experience to represent the class effectively. Provider Co-Lead Counsel have litigated complex antitrust cases for years and have devoted substantial resources to prosecuting this case. They engaged in extensive discovery, retained top economic experts, and successfully negotiated a settlement that provides substantial relief to providers. The settlement structure, including the allocation plan overseen by neutral experts Kenneth Feinberg and Camille Biros, further confirms that class counsel acted in the best interests of all class members.

Therefore, the Court correctly concluded that the adequacy requirement is satisfied. Preliminary Approval Order at 28–29.

### D.     The Rule 23(b)(3) Requirements

In addition to satisfying Rule 23(a), a class action must meet one of the criteria set forth in Rule 23(b). Here, Provider Plaintiffs seek final certification under Rule 23(b)(3), which requires that (1) common questions of law and fact predominate over individual issues and (2) a class action is the superior method for resolving the dispute. As the Court preliminarily found, both requirements are satisfied here. Preliminary Approval Order at 30–32.

### 1.     Predominance

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members." The core of the Provider Plaintiffs' claims is that the Blues agreed to divide Service Areas, restrict provider contracting, and enforce the BlueCard Program, which suppressed competition and reduced payments for all Providers. These allegations involve conduct that was centrally coordinated among Blue Plans and applied to all Providers in a uniform manner. Given that the core liability questions in this case apply uniformly to the class, the Court correctly determined that predominance is satisfied. Preliminary Approval Order at 30–31.

### 2. Superiority

Rule 23(b)(3) also requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The rule identifies four factors relevant to this analysis: (1) the class members' interest in individually controlling their own litigation, (2) the extent and nature of any existing litigation concerning the controversy, (3) the desirability of concentrating the litigation in one forum, and (4) the likely difficulties in managing a class action.

Here, the Court recognized that the cost of litigating individual cases would be exorbitant, requiring calculation of damages in every geographic market where a plaintiff alleged it was harmed. Therefore, the Court correctly held that "a class action is not only superior to individual actions, but probably the only feasible method of resolving all claims against the Settling Defendants." Preliminary Approval Order at 32.

## III. THE SETTLEMENT MEETS THE STANDARD FOR FINAL APPROVAL

Under Rule 23(e)(2), a court may approve a class action settlement only if it finds that the proposed settlement is "fair, reasonable, and adequate." In granting preliminary approval, the Court reviewed the settlement terms, the extensive litigation history, and the settlement negotiation process, concluding that the settlement was likely to meet this standard. Preliminary Approval Order at 33–40. In doing so, it reached six conclusions: (1) "Class Representatives and Class Counsel Adequately Represented the Class," (2) "There Was No Fraud or Collusion, and the Settlement Was Negotiated at Arm's Length," (3) "This Settlement Will Avert Years of Highly Complex and Expensive Litigation Involving Significant Costs, Risks, and Delay," (4) "this is an appropriate stage of the litigation at which to evaluate settlement" and "the factual record in this matter was sufficiently developed to allow Class Counsel to make a reasoned judgment as to merits of the Settlement," (5) "The Benefits Provided by the Settlement Appear to be Fair, Adequate and Reasonable When Compared to the Range of Possible Recovery," and (6) "the unanimous

approval of the Settlement by the current Class Representatives indicates preliminary approval is appropriate." *Id*. Now that notice has been given and the Class Members have had an opportunity to object to or exclude themselves from the Settlement, the Court's conclusions remain correct.

*Adequate Representation*: Since preliminary approval was granted, Class Counsel have ensured that notice was given in accordance with the Preliminary Approval Order and worked tirelessly to educate the Provider community about the Settlement, presenting to thousands of Providers in individual and group settings. Provider Co-Lead Counsel Declaration ¶¶ 7–9; Special Master Declaration ¶ 4; Petkauskas Declaration ¶ 32. They also protected the Settlement Class by moving to disqualify two firms that were attempting to convince Providers to opt out of the Settlement despite having what Co-Lead Counsel believe to be conflicts of interest. *See* Doc. Nos. 3232, 3245, 3285.

*Arm's-Length Settlement, Averting Litigation, Stage of Litigation, and Benefits of the Settlement*: There are only three objections out of the three million or so Class Members to any of the Court's conclusions on these factors, and they are incorrect for reasons discussed below. Therefore, these factors continue to support final approval.

*Lack of Opposition to the Settlement*: "[A] small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness." *Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002). Only three objections were filed relating to the fairness or reasonableness of the Settlement (beyond the opt-out requirements), representing just over 0.0001% of the Class Members. Such a tiny objection rate weighs in favor of final approval. *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005) (objection rate of 0.0005% was "infinitesimal" and supported final approval). Even objection rates orders of magnitude higher have not prevented final approval. *Bennett v.*

*Behring Corp.*, 96 F.R.D. 343, 353 (S.D. Fla. 1982) (approving a settlement when nearly 10% of the class objected), *aff'd*, 737 F.2d 982 (11th Cir. 1984). Overall, opposition to the settlement by is minimal. The remaining conditional opt-out objections were all filed by clients represented by the Paul Hastings firm and are moot for the reasons described below. *See infra* Part V.E.

The number of opt-outs does not detract from the overall favorability of the Settlement. The Settlement Class is a large class of most of the Providers in the country, and it was inevitable that some of them would opt out; some individual litigation had been filed against the Blues even before the Settlement was announced. The vast majority of Class Members have chosen to stay in the Settlement, which is unsurprising given its value to Providers.

In short, the small volume of objections and manageable set of opt-outs support the conclusion that the Settlement remains fair, reasonable, and adequate.

## IV.     THE PLAN OF DISTRIBUTION SHOULD BE APPROVED.

"A plan of distribution should be approved when it allocates relief in a way that is 'fair, adequate, and reasonable.'" Preliminary Approval Order at 42 (quoting *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 241 (5th Cir. 1982)). Here, the Plan of Distribution was designed to compensate class members based on the harm they suffered. The use of neutral allocation experts and an objective methodology further supports approval.

The Plan of Distribution in this case was developed with the assistance of neutral allocation experts Kenneth Feinberg and Camille Biros, who have extensive experience in designing large compensation programs. Preliminary Approval Order at 13–14. The Court has already found that the proposed Plan of Distribution is reasonable, ensuring that allocation of settlement funds "to the different types of Providers is based on the relative impact of the Blues' conduct on each type of Provider." *Id*. at 42. The Plan of Distribution was explained in the notice given to the class, and just three Class Members have objected to it. (A response to those Class Members' specific

objections is in Part V below.) When giving final approval to the Settlement, the Court should find, for the reasons it has already given, that the Plan of Distribution is fair to the Settlement Class.

## V. THE OBJECTIONS TO THE SETTLEMENT SHOULD BE OVERRULED.

Settlement Class Counsel have received three objections to final approval of the Settlement: one by North Texas Division, Inc. (an affiliate of HCA Healthcare) ("HCA"); one by Allatoona Emergency Group, PC and Alabama Emergency Physician Partners, LLC ("Objecting ER Groups"); and one by Kyle Egner DC. The Objecting ER Groups are owned by or affiliated in some fashion with SCP Health, a Louisiana-based company (which itself is owned by the private equity firm Onex Partners). Provider Co-Lead Counsel Declaration ¶ 28.[3] In addition, Settlement Class Counsel have received twenty-four conditional objections by clients of the law firm Paul Hastings LLP, which are conditioned on the rejection of those same clients' exclusion requests. As described in Part V.E below, the condition has not been met and these objections are moot.

The standard for approval of a settlement under Rule 23(e)(2) is whether it is fair, reasonable and adequate. Objections are not an opportunity to "renegotiate terms of the settlement based on individual preferences." *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 152 (E.D. La. 2013). None of the objections demonstrates that the Settlement is anything but fair, reasonable and adequate. The Settlement includes historic injunctive relief and monetary relief of $2.8 billion, the largest antitrust settlement in the history of the United States healthcare industry. This Settlement is national in scope and ends what would very likely have been a state-by-state determination of class certification and trials, all of which would have been hotly contested. This

---

[3] Onex Partners' parent company Onex has described SCP Health as a primary driver of the net gain from its private equity investments. Provider Co-Lead Counsel Declaration ¶ 28. Onex claims to have returned $4 billion to shareholders in the form of share buybacks and dividends. *Id.*

Settlement follows twelve years of exceptionally complex litigation. The objectors jeopardize what has been achieved for the Settlement Class by asking that the Settlement be scuttled in favor of more years of extremely costly and uncertain litigation in multiple forums. The Court should protect the Settlement Class and deny the objections.

## A. The Release Conforms to the Law.

The Objecting ER Groups and HCA (the "Release Objectors") object to the scope of the release in the Settlement Agreement. HCA contends that the release is "unreasonably ambiguous" and seeks clarification that its scope is cabined by the "identical factual predicate" doctrine. HCA Objection at 7–11. The Objecting ER Groups contend that the release violates the "identical factual predicate" doctrine. ER Group Objection at 4–12. For the reasons set forth below, the release is not ambiguous, it complies with the "identical factual predicate" doctrine, and the Release Objectors' objections should be denied to the extent they are based on the release.

### 1. The Release Complies with the Identical Factual Predicate Doctrine.

In exchange for $2.8 billion and transformative injunctive relief, Class Members that do not opt out of the Settlement agree to release "any and all" claims:

> based upon, arising from, or relating to in any way to: (i) the factual predicates of the Provider Actions (including but not limited to the Consolidated Amended Provider Complaints filed in the Northern District of Alabama) including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date; (ii) any issue raised in any of the Provider Actions by pleading or motion; or (iii) mechanisms, rules or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10-26 approved through the Monitoring Committee Process during the Monitoring Period and that are based on the same factual predicate of the Provider Actions and related to the injunctive relief provided by Paragraphs 10–26.

Doc. 3192-2 (Settlement Agreement) at ¶ 1(xxx).

It is well settled that a release may apply to claims "based on the identical factual predicate as that underlying the claims in the settled class action." *Matsushita Elec. Indus. Co. v. Epstein*,

516 U.S. 367, 377 (1996) (citation omitted); *see TVPX ARS, Inc. v. Genworth Life & Annuity Ins. Co.*, 959 F.3d 1318, 1325 (11th Cir. 2020) ("[R]es judicata applies not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims arising out of the same operative nucleus of fact."). The Settlement's release complies with that doctrine. Indeed, the Blues, who would be the parties asserting the release as a defense in future litigation, have stated in writing that they understand the release to conform to the "identical factual predicate" doctrine. Doc. No. 3220 at 4 ("The release conforms to a long progeny of Supreme Court and Eleventh Circuit decisions upholding the release of any and all claims 'based on the identical factual predicate as that underlying the claims in the settled class action'.") (quoting *Matsushita*); *id.* ("That is precisely what the release does here ….").

Moreover, the release is substantively identical to the release in the Subscribers' Settlement Agreement, which this Court approved and the Eleventh Circuit affirmed. Doc. No. 2931 (Subscriber Final Approval Order) at 56; *In re Blue Cross Blue Shield Antitrust Litig.*, *MDL 2406*, 85 F.4th 1070, 1091 (11th Cir. 2023). The table below compares the two releases:

| Subscriber Release[4] | Provider Release[5] |
|---|---|
| Releases "any and all" claims "based upon, arising from, or relating in any way to": | Releases "any and all" claims "based upon, arising from, or relating in any way to": |
| (i) the factual predicates of the Subscriber Actions (including but not limited to the Consolidated Amended Class Action Complaints filed in the Northern District of Alabama) including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date; | (i) the factual predicates of the Provider Actions (including but not limited to the Consolidated Amended Provider Complaints filed in the Northern District of Alabama) including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date; |
| (ii) any issue raised in any of the Subscriber Actions by pleading or motion; or | (ii) any issue raised in any of the Provider Actions by pleading or motion; or |

[4] Doc. 2610-2 (Subscriber Settlement Agreement) at ¶ 1(uuu).
[5] Doc. 3192-2 (Provider Settlement Agreement) at ¶ 1(xxx).

24

| | |
|---|---|
| (iii) mechanisms, rules, or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10 through 18 approved through the Monitoring Committee Process during the Monitoring Period. | (iii) mechanisms, rules or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10–26 approved through the Monitoring Committee Process during the Monitoring Period and that are based on the same factual predicate of the Provider Actions and related to the injunctive relief provided by Paragraphs 10–26. |

The Eleventh Circuit held that the Subscriber release did not violate the identical factual predicate doctrine. *In re Blue Cross*, 85 F.4th at 1091. Specifically, it held that this language "cabins in the scope of the release," that the "release provision permissibly releases only claims based on an identical factual predicate to the underlying litigation," and that "[t]he release does not extend beyond claims arising from the common nucleus of operative fact: all the released claims either were raised or could have been raised during the litigation that preceded the settlement." *Id.* at 1088, 1091. Given that the language of the Provider release is substantively identical to that in the Subscriber release, the Provider release does not violate the "identical factual predicate" doctrine.

Therefore, although HCA asks this Court to "cabin" the Provider release the way the Eleventh Circuit "qualified the definition of 'Released Claims' in the Subscriber Agreement," HCA Objection at 9, no such qualification is necessary. In fact, the Eleventh Circuit held that the virtually identical language of the Subscriber release already comports with the law and is sufficiently cabined.

### 2. The Exceptions to the Release Are Clear and Unambiguous.

In addition to the release language detailed above, the Provider release also contains language excluding claims that:

> arise in the ordinary course of business and are based solely on (a) claims by the Provider in the Provider's capacity as a plan sponsor or subscriber or (b) claims

> regarding whether a Settling Individual Blue Plan properly paid or denied a claim for a particular product, service or benefit based on the benefit plan document, Provider contract, or state or federal statutory or regulatory regimes (including state prompt pay laws).

Settlement Agreement at ¶ 1(xxx). HCA argues that certain language in the Subscriber release excluding claims that "arise in the ordinary course of business" was not included in the analogous exclusion in the Provider release. Therefore, HCA argues that the Provider release is "significantly less clear." HCA Objection at 2. HCA is incorrect.

It is no surprise that the language defining the types of claims that would occur "in the ordinary course of business" for Providers would be slightly different from claims that arise in the ordinary course of business for Subscribers; that does not render the language "less clear." Providers and Subscribers engage with the Blues in different ways. For example, the Subscriber Settlement Release excludes claims arising in the ordinary course of business based on whether "a particular product, service or benefit is covered," Subscriber Settlement Agreement ¶ 1(uuu), while the Provider release excludes claims arising in the ordinary course of business based on whether a Blue Plan "properly paid or denied a claim for a product, service or benefit, Settlement Agreement ¶ 1(xxx). While the Subscriber release excludes ordinary-course-of-business claims seeking resolution of "a benefit plan's or a benefit plan participant's financial responsibility for claims, based on either the benefit plan document or statutory law," Subscriber Settlement Agreement ¶ 1(uuu), the Provider release excludes-ordinary-course-of-business claims "based on the benefit plan document, Provider contract, or state or federal statutory or regulatory regimes (including state prompt pay laws)," Settlement Agreement ¶ 1(xxx). The differences in language merely reflect the different types of claims that Subscribers and Providers assert against the Blues in the ordinary course of business.

HCA also argues that because the Subscriber release excludes Providers' claims arising from the "sale or provision of health care products and services," the Provider release should have the same exclusion. HCA Objection at 8. HCA misunderstands the purpose of this exclusion in the Subscriber release: it was meant to ensure that the Providers' claims against the Settling Defendants in the Provider Track litigation were not released as part of the Subscriber Settlement. The full text of that provision makes this clear:

> Notwithstanding any other provision of this Agreement, a Provider who is a Settlement Class Member as defined in this Agreement does not release any claims arising from his, her or its sale or provision of health care products or services (as opposed to the purchase of a Commercial Health Benefit Product). **Settling Defendants agree not to raise Providers' releases under this Agreement as a defense to Providers' claims brought in their capacity as Providers of health care products or services in MDL No. 2406.**

Subscriber Settlement Agreement ¶ 1(uuu) (emphasis added). Excluding claims arising from "sale or provision health care products and services" from the Provider release would render the release useless because it would exclude the exact type of claims being settled. Instead, the Provider release has a *reciprocal* exclusion for "claims by the Provider in the Provider's capacity as a plan sponsor or subscriber," Settlement Agreement ¶ 1(xxx), so that the Provider Settlement Agreement cannot be construed to release the claims that had been asserted in the Subscriber Track litigation.

The Objecting ER Groups take issue with the ordinary-course-of-business exceptions because the Settlement Agreement does not define "ordinary course of business." However, Courts have routinely approved class settlements containing similar releases that exclude certain claims arising in the "ordinary course of business," including the Subscriber settlement. Subscriber Final Approval Order (Doc. No. 2931) at 16; *see, e.g.*, *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2017 WL 5710424, at *3 (D. Mass. Nov. 27, 2017) (granting final approval of class settlement containing release that excluded claims "arising in the ordinary course of business

…"); *County of Monmouth, New Jersey v. Fla. Cancer Specialists, P.L.*, 2020 WL 11272690, at *8 (M.D. Fla. Feb. 21, 2020), *report and recommendation adopted*, 2020 WL 11272691 (M.D. Fla. Mar. 17, 2020) (granting final approval of class settlement and noting that "the release of claims provision included in the amendment to the settlement specifically excludes 'individual claims arising in the ordinary course of business[.]'"); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2015 WL 9266493, at *3 (N.D. Cal. Dec. 17, 2015) (granting final approval of class settlement where the "release … excludes claims for product defects or personal injury or breach of contract arising in the ordinary course of business"). The Objecting ER Groups' argument regarding the ordinary-course-of-business exception should be rejected.

### 3. The Caveat to the Ordinary Course of Business Exception Is Clear and Unambiguous.

Like the Subscriber release, the Provider release reiterates that the ordinary-course-of-business exception does not apply to claims that are "based in whole or in part on the factual predicates of the Provider Actions or any other component of the Released Claims discussed in this Paragraph." Settlement Agreement ¶ 1(xxx). This language simply reiterates that any claim that arises from the same factual predicate of the Provider Actions is released even if it arises in the ordinary course of business.

HCA contends that a similar "caveat [is] not present in the Subscriber release." HCA Objection at 10. HCA is incorrect. The Subscriber release similarly states that the ordinary course of business exceptions to the release do not apply to claims "based in whole or in part on the factual predicate of the Subscriber Actions … or any other component of the Released Claims[.]" Subscriber Settlement Agreement ¶ 1(uuu).

The Release Objectors also contend that this caveat makes the release unclear. In particular, the Objecting ER Groups argue that "[n]othing in the release prevents a Blue Plan from invoking

the release by arguing, even if frivolously, that it is not in its ordinary course of business to pay for out-of-network emergency services when done at too low of a rate." ER Group Objection at 8. Such a tactic would indeed be frivolous, but if a release cannot be approved because a party could try to invoke it with an argument that is frivolous and incorrect, no release could ever be approved. Again, the language of the Provider release is substantively identical to the Subscriber release already approved by this Court and upheld by the Eleventh Circuit.

The Objecting ER Groups lodge two more objections to the "ordinary course of business" exception. They assert that the exception "on its face does not carve out common law claims such as claims for unjust enrichment or quantum meruit pending in various state court actions." ER Group Objection at 8. But the exception specifically includes "claims regarding whether a Settling Individual Blue Plan properly paid or denied a claim for a particular product, service or benefit based on the benefit plan document [or] Provider contract." Settlement Agreement ¶ 1(xxx). Under New York law, which governs the interpretation of the Settlement Agreement's terms, *id.* ¶ 66, unjust enrichment and quantum meruit are causes of action in which the court implies a contract in order to provide a remedy in the absence of an express contract. *E.J. Brooks Co. v. Cambridge Security Seals*, 105 N.E.3d 301, 312 (N.Y. 2018); *Farina v. Bastianich*, 984 N.Y.S.2d 46, 49 (2d Dep't 2014). And an out-of-network Provider's claims for quantum meruit or unjust enrichment will often be based on the benefit plan document, which governs the Blue Plan's obligation to pay for covered services provided to its members.[6] The Objecting ER Groups also assert that because the exception does not apply to "any claim … based in whole or in part on the factual predicates of the Provider Actions," Settlement Agreement ¶ 1(xxx), this "arguably undermines the carve-

---

[6] This is not meant to imply that every claim for quantum meruit or unjust enrichment is necessarily exempt from the release. To be exempt, such claims must arise in the ordinary course of business and not be "based in whole or in part on the factual predicates of the Provider Actions or any other component of the Released Claims." Settlement Agreement ¶ 1(xxx).

out language if a Blue Plan were to assert, for example, that an alleged underpayment or other claim arose from that Blue Plan's monopoly power or other anticompetitive considerations," ER Group Objection at 8. But a Blue Plan does not get to choose the basis for a plaintiff's claim; it is up to the plaintiff to decide how to plead its claim. *See Hill v. Bell South Telecommunications, Inc.*, 364 F.3d 1308, 1314 (11th Cir. 2004) ("the plaintiff is the master of the complaint"). If a plaintiff's allegations do not depend on the factual predicates of this antitrust case, then the Blues cannot transform them into antitrust allegations. The danger the Objecting ER Groups foresee does not exist.

4. **The Objecting ER Groups Misconstrue Who Is Included in the Settlement Release.**

"Releasors" are defined in the Settlement Agreement as:

> Provider Class Representatives and each and every Settlement Class Member and all of their predecessors, successors, heirs, administrators, and assigns. Releasor releases Released Claims **on behalf of itself and on behalf of any party claiming by, for, under or through the Releasor**, with such claiming parties to include any and all of Releasor's past, present, and future officers, directors, supervisors, employees, agents, stockholders, investors, members, attorneys, servants, representatives, accounts, plans, groups, parent companies, subsidiary companies, affiliated companies, divisions, affiliated partnerships, joint venturers, principals, partners, wards, heirs, assigns, beneficiaries, estates, next of kin, family members, relatives, personal representatives, administrators, agents, representatives of any kind, insurers, and all other persons, partnerships or corporations with whom any of the foregoing have been, are now or become affiliated, and the predecessors, successors, heirs, executors, administrators and assigns of any of the foregoing.

Settlement Agreement at ¶ 1(zzz) (emphasis added). The Objecting ER Groups contend that the release is overbroad because "releasors" could "appl[y] to all types of affiliates of class members." ER Group Objection at 10. Therefore, the Objecting ER Groups contend that the release could encompass parties who had no meaningful involvement in the class action. The Objecting ER Groups ignore language in the release stating that "affiliates" that are included among the releasors would only include those "claiming by, for, under or through the Releasor." For an "affiliate" of

the Objecting ER Groups to be deemed a Releasor under the Settlement Agreement, that affiliate would have to assert Released Claims *on behalf of the Objecting ER Groups*. The Providers and the Blues both explained this distinction in response to an objection to preliminary approval by the same counsel who represent the Objecting ER Groups here. Doc. No. 3220 at 5–6; Doc. No. 3221 at 8. The Objecting ER Groups do not acknowledge this explanation, let alone try to explain why it fails to address their concern.

The Objecting ER Groups also argue that Providers that have opted out of the Settlement that have corporate or contractual relationship with the Objecting ER Groups might be considered affiliates that have released their claims under the Settlement Agreement. As an initial matter, opt-outs are not included in the Settlement Class and, therefore, do not release any claims under the Settlement Agreement. If the opt-out affiliate wanted to bring claims against the Settling Defendants that would otherwise have been released had it remained in the Settlement Class, it would be free to do so because it opted out of the Settlement. If, however, that affiliate attempted to bring claims *on behalf of* the ER Group Objectors, this additional language in the release would prevent the affiliate from doing so. This language simply prevents a Settlement Class Member from circumventing the release by allowing a related entity to assert released claims on its behalf. The Objecting ER Groups' objection regarding who is included in the release should therefore be rejected.

In any event, concerns about a release expressed by an infinitesimal fraction of the class members are not reason enough to reject a settlement that is fair, reasonable, and adequate. *Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628, 635–36 (11th Cir. 2015) (affirming final approval of a class action settlement and stating, "If Greco was displeased with the consideration provided to

him under the settlement in exchange for this release, he was free … to opt out of the settlement. He chose not to do so; therefore, he is bound by the settlement.").

**B.     Settlement Class Members Are Treated Equitably Under the Settlement.**

The Objecting ER Groups argue that the Plan of Distribution treats Settlement Class Members inequitably. The Objecting ER Groups state without any evidence that out-of-network emergency providers are usually reimbursed at a higher rate than in-network providers and that the Settlement "fails … to differentiate among distinct reimbursement arrangements." ER Group Objection at 15. The Objecting ER Groups are incorrect that the Settlement fails to differentiate in this way. Any settlement payment will be based on each Settlement Class Member's Allowed Amounts, which are the amounts to which a Provider is entitled for providing goods and services. Although Allowed Amounts are usually set by contract, they are also calculated for claims submitted by out-of-network providers. If "out-of-network emergency medicine providers are entitled to higher reimbursement rates than in-network providers," as the Objecting ER Groups claim, then their Allowed Amounts will be higher, and (all other things being equal) they will recover more from the Settlement Fund. Therefore, the Plan of Distribution treats all Providers equitably by allocating funds *pro rata* based on actual data demonstrating their Allowed Amounts. Moreover, before agreeing to the Settlement, Settlement Class Counsel received extensive input from a wide variety of stakeholders, including entities that own both in-network and out-of-network providers. Provider Co-Lead Counsel Declaration ¶ 26; Meyer Declaration ¶ 5. These entities participated in mediation sessions and the Provider Work Group. Settlement Class Counsel made sure that the Settlement Agreement provided significant injunctive and monetary relief to out-of-network providers and treated them equitably in the Plan of Distribution. Provider Co-Lead Counsel Declaration ¶ 26.

Precedent supports including in-network and out-of-network Providers in the same class. At least two settlements in the *In re Managed Care Litigation* MDL included a class of in-network and out-of-network physicians; both were approved, including one to which out-of-network physicians objected. *In re Managed Care Litig.*, 2003 WL 22850070, at *6 (S.D. Fla. Oct. 24, 2003) (overruling the objection); *In re Managed Care Litig.*, 2010 WL 6532985 (S.D. Fla. Aug. 15, 2010) (holding that out-of-network physicians were bound by the settlement agreement).

While not stating so expressly in their objection, the Objecting ER Groups appear to be asking for subclasses in-network Providers and out-of-network Providers, but creating such subclasses would be impermissible. Many Providers have been both in-network and out-of-network during the class period. Katz Declaration ¶ 7. No counsel could represent a subclass when class members would be members of multiple subclasses. Doc. No. 3192-5 (Declaration of Samuel Issacharoff) ¶ 14. As this Court is aware, the Settlement Class Counsel have consulted with Professor Issacharoff through the litigation and settlement process and have taken all feasible steps to ensure that class members were treated equitably.

In support of their argument that the Settlement Class Members are being treated inequitably, the Objecting ER Group cites the ruling on a motion for preliminary approval of a Rule 23(b)(2) class. ER Group Objection at 13 (citing *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *36 (E.D.N.Y. June 28, 2024)). This case is distinguishable because it was a 23(b)(2) class where only injunctive relief sought. The Objecting ER Groups do not appear to take issue with the injunctive relief in the Settlement, but rather take issue with the monetary relief provided under the Settlement. ER Group Objection at 15 (discussing "reasonably expectable reimbursement rates"). The Court agreed with the objectors in that case because class members that paid the most in interchange fees (large merchants) would

have negotiated individual rates and would not benefit from the injunctive relief that would reduce the effective interchange rate. *Id*. at 37. That is the opposite of the situation here. Contrary to the Objecting ER Groups' contention, the Settlement does consider the providers' "reasonably expectable reimbursement rates" because settlement payments are based on Allowed Amounts.

This Settlement is more analogous to the Rule 23(b)(3) settlement in the *Payment Card* litigation, in which the class members received a "a *pro rata* share of the monetary fund based on the interchange fees attributable to their transactions during the class period." *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *3 (E.D.N.Y. Dec. 16, 2019), *judgment entered*, 2022 WL 2803352 (E.D.N.Y. July 18, 2022), *and aff'd sub nom. Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704 (2d Cir. 2023). The court noted that "[c]ourts frequently approve plans involving *pro rata* distribution" and held that the distribution of the settlement was "sufficiently equitable." *Id*. at 20, 27 (citing cases). Likewise, in this Settlement, the Settlement Class members will also receive a *pro rata* share of the monetary fund based on Allowed Amounts during the class period. Like the court that approved the Rule 23(b)(3) class settlement in the *Payment Card* litigation, this Court should also find that the Plan of Distribution is equitable.

The Objecting ER Groups' apparent belief that they could do better is not enough to sustain an objection.[7] *In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp. 2d 891, 938 (E.D. La. 2012) ("For those few objectors unhappy with the Settlement, their remedy was simple: opt out."); *see Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir.1982) ("[T]he named plaintiffs should not

---

[7] On the eve of the preliminary approval hearing, members of the Objecting ER Groups' corporate family, represented by the same law firm that represents the Objecting ER Groups, made a similar objection. Doc. No. 3211 at 5. At the hearing, when the Court asked their local counsel if his claim was that "we think our client could do better," he answered, "Yes, Your Honor." Nov. 14, 2024 Tr. at 93. Of course, if they truly thought they could do better, the two objecting groups could have opted out.

be permitted to hold the absentee class hostage by refusing to assent to an otherwise fair and adequate settlement in order to secure their individual demands.").

### C. The Procedures for Opting Out are Fair and Reasonable.

The Objecting ER Groups argue in just three sentences that the Settlement should not be approved because of the "unduly burdensome" opt-out procedures. ER Group Objection at 4. The Objecting ER Groups have failed to identify what portions of the opt-out process are unduly burdensome or why. Therefore, the objection should be deemed waived. *In re Chinese-Manufactured Drywall Prods. Liab. Litig*., 424 F. Supp. 3d 456, 491 (E.D. La. 2020) ("Courts have held that objections must be sufficiently clear and unambiguous for court consideration; otherwise the party will be deemed to have waived their objection.") (citing *Luevano v. Campbell,* 93 F.R.D. 68, 77 (D.D.C. 1981) (finding that ambiguous objections to class settlement were waived)).

Even if this objection regarding opt-out procedures is not waived, the objection should be denied because, so far as Settlement Class Counsel can discern, it is based on inaccurate information. The Objecting ER Groups contend that "the opt-out procedures impose a massive burden on provider groups, *drilling down to each provider and a history of in-network and out-of-network status* that can be difficult if not impossible to navigate." ER Group Objection at 4 (emphasis added). However, nothing in the opt-out process requires Settlement Class Members to identify whether a provider is in-network or out-of-network. Therefore, this objection should be denied.

### D. Dr. Egner's Objection Should Be Denied.

Objector Kyle Egner submitted an objection to what he describes as inequitable distribution of settlement funds, inadequate compensation for medical professionals, and excessive

administrative and legal fees. Egner Objection at 2. Dr. Egner fails to address or engage with any of the facts or arguments already presented by Settlement Class Counsel on these issues.[8] Regardless, Dr. Egner's objections should be rejected as explained below.

Dr. Egner objects to the Plan of Distribution, contending that medical professionals will receive inadequate compensation relative to healthcare facilities. He argues that professionals should receive 40% of the Net Settlement Fund as opposed to the 8% determined by the experts to be a fair allocation. Egner Objection at 6. Dr. Egner's argument is based on data from the 2023 National Health Expenditures report indicating that hospital care accounts for 30.6% of total healthcare spending, while physician and clinical services represent 20.0%.[9] *Id.* at 2. Assuming these statistics are correct, physician and clinical services would represent 39.5% of the total spending on physician and clinical services and hospital care. *Id.* Dr. Egner's objection does not account for the fact that the Plan of Distribution was meant to reflect not the share of healthcare spending for various types of Providers, but the relative impact of the Blues' conduct on each type of Provider. The Provider Plaintiffs' economic experts determined, based on the extensive data available to them, that the impact on facilities was three and a half times as large as the impact on professionals. Preliminary Approval Order at 14. Dr. Egner's objection also does not account for the fact that approximately 65% of physicians were excluded from the Settlement Class because they had released their claims in earlier litigation. *Id.* Kenneth Feinberg and Camille Biros recommended the 92%/8% allocation after reviewing this information and hearing comments from

---

[8] *See e.g.,* Doc. No. 3192-1 (Plaintiffs' Provider Plaintiffs' Memorandum of Law in Support of Their Motion for Preliminary Approval of Proposed Class Settlement) at 44–45; Doc. No. 3207 (Provider Plaintiffs' Supplement to Their Memoranda of Law in Support of Their Motion for Preliminary Approval of Proposed Class Settlement) at 1–6 and Exhibit A (detailing the plan of distribution); Doc. No. 3258-1 (Memorandum of Law in Support of Provider Plaintiffs' Motion for Attorneys' Fees and Expenses). All of these documents are available on the Provider Settlement website.

[9] This is a publication of the Centers for Medicare and Medicaid Services, available at https://www.cms.gov/files/document/highlights.pdf.

many different types of Providers, including professionals. Doc. No. 3192-4, Exhibit A (Feinberg–Biros Report) at 3–5. Dr. Egner's objection does not undermine their conclusion that this allocation is sound.

Dr. Egner also argues that the amount requested by Settlement Class Counsel to cover expenses, costs, and administration of the Settlement is excessive. However, "plaintiff's counsel is entitled to be reimbursed from the class fund for the reasonable expenses incurred in [an] action." *Behrens v. Wometco Enters.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990). Dr. Egner does not address any of Provider Plaintiffs' arguments as to why these costs and expenses were reasonable and necessary to litigate this case. *See* Doc. No. 3258-1 (Memorandum of Law in Support of Provider Plaintiffs' Motion for Attorneys' Fees and Expenses) at 27–28 (noting that a majority of the costs associated with the litigation were derived from work performed by experts necessary to "implement the econometric models that underlay the proof of liability and damages" and other costs included maintaining the massive databases of documents and data collected in discovery, as well as travel for the hundreds of depositions and dozens of hearings and mediation sessions that took place). Throughout the litigation, costs and expenses have been meticulously detailed, and Provider Plaintiffs have followed all protocols for submitting expenses to the Special Master. *Id.* at 28. The Notice and Administration Fund, which will pay for not only the administration of potentially hundreds of thousands of claims but also years of settlement monitoring, is reasonable as well. If the Notice and Administration Fund is not depleted at the end of the Monitoring Period, it will be distributed to an entity or entities chosen with an intent to identify organizations that enable Providers to promote access to high-quality healthcare; it will not revert to the Blues or Settling Class Counsel. Settlement Agreement ¶ 39(b). Dr. Egner points out that the amounts allocated for expenses, costs, and administration of the Settlement exceeds

the amount that will be allocated for medical professionals. However, this argument ignores that the expenses incurred reflect costs that were reasonable and necessary to litigate the entire case and to obtain not only $2.8 billion in monetary relief, but also non-monetary benefits, which the Provider Plaintiffs' experts have valued at over $17.3 billion. *See* Doc. 3254 (Provider Plaintiffs' Executive Summary of Expert Declarations of Daniel Slottje and Brendan Rodgers and Matthew C. Katz).

Dr. Egner argues that the attorney's fees requested are excessive as well. He objects to payment of 25% of the Settlement Fund to the Provider Plaintiffs' counsel, but the Provider Plaintiffs have requested 23.47% of the Settlement Fund, which is the same percentage awarded to the Subscriber Plaintiffs' counsel, an award the Eleventh Circuit affirmed. In any event, he fails to address any of the Provider Plaintiffs' explanation of why an award of 23.47% of the Settlement Fund for attorneys' fees is fair and reasonable. *See* Doc. 3258-1 (Memorandum of Law in Support of Provider Plaintiffs' Motion for Attorneys' Fees and Expenses) (explaining that fees are below the benchmark deemed presumptively reasonable in common fund cases, the *Johnson* factors confirm reasonableness, and the lodestar cross-check supports the fee request). Negotiations in this case were hard-fought, and there is no indication that Settlement Class Counsel accepted any less than they could have gotten for the Settlement Class, or that they colluded with the Blues on attorneys' fees. Preliminary Approval Order at 34–35; Meyer Declaration ¶ 6. The cases Dr. Egner cites in support of his argument presented very different issues. In *In re Bluetooth Headset Products Liability Litig.*, 654 F.3d 935 (9th Cir. 2001), class counsel sought approximately $800,000 in attorneys' fees when the settlement included no class payout and a *cy pres* payout of only $100,000. Here, the Settlement Class will receive one of the largest payouts in the history of antitrust litigation. Likewise, in *In re HP Inkjet Printer Litig*, 716 F.3d 1173, 1186 (9th Cir. 2013),

a case involving a coupon settlement, the Ninth Circuit held that the district court erred in awarding attorney's fees before any coupons had been issued because the district court could not yet know what the redeemed value of the coupons would be. Obviously, this Settlement is not a coupon settlement; it includes a cash payout and valuable injunctive relief worth far more than the attorneys' fees.

### E. The Paul Hastings Conditional Objections Are Moot.

Twenty-four clients of Paul Hastings filed both exclusion requests and conditional objections. Paul Hastings Objections. The objections state, "in the event that its Exclusion Request is deemed invalid, in whole or in part, or any of the provisions outlined in the Notice are interpreted to require more than what has been provided, [the objector] objects to the Agreement." *E.g.*, *id.* at 2. The objections are based on Section 14 of the Class Notice, which states in part, "A Health Care System, Medical Group, or Medical Organization cannot submit a single Exclusion Request on behalf of all its Providers. Each Class Member must submit his, her, or its own Exclusion Request, and it must be signed by the Class Member or their authorized representative." Doc. No. 3207-3 at 64. The objections state that "the requirement that [the objector] submit by mail separate, signed Exclusion Requests on behalf of each of its Class Member Providers is grossly overburdensome." E.g., Paul Hastings Objections at 2–3.

The exclusion requests at issue have been found to comply with the requirements of the Class Notice. "One who opts out of a class settlement lacks standing to object to a settlement." Doc. No. 2931 (Subscriber Final Approval Order) at 79 (citing cases). Therefore, none of the objectors have standing to object. Even if they did, their objection was conditional, and the condition was not met. Either way, their objections should be dismissed as moot.

**CONCLUSION**

For the reasons set forth above, this Court should give final approval to the Settlement.

Dated: April 23, 2025                                        Respectfully submitted,


/s/ DRAFT_____                            /s/ DRAFT_____
Edith M. Kallas – ***Co-Lead Counsel***        Joe R. Whatley, Jr. – ***Co-Lead Counsel***
WHATLEY KALLAS, LLP                            W. Tucker Brown
152 West 57th Street                           WHATLEY KALLAS, LLP
41st Floor                                     2001 Park Place North
New York, NY 10019                             1000 Park Place Tower
Tel: (212) 447-7060                            Birmingham, AL 35203
Fax: (800) 922-4851                            Tel: (205) 488-1200
Email: ekallas@whatleykallas.com               Fax: (800) 922-4851
                                               Email: jwhatley@whatleykallas.com
                                                       tbrown@whatleykallas.com


Patrick J. Sheehan                             Henry C. Quillen
WHATLEY KALLAS, LLP                            WHATLEY KALLAS, LLP
101 Federal Street                             159 Middle Street
19th Floor                                     Suite 2C
Boston, MA 10019                               Portsmouth, NH 03801
Tel: (617) 573-5118                            Tel: (603) 294-1591
Fax: (617) 371-2950                            Fax: (800) 922-4851
Email: psheehan@whatleykallas.com              Email: hquillen@whatleykallas.com


Barry Alan Ragsdale – ***Plaintiffs' Liaison   Deborah J. Winegard
Counsel and Discovery Liaison Counsel***       WHATLEY KALLAS, LLP
Dominick Feld Hyde, PC                          1068 Virginia Avenue, NE
1130 22nd Street South Ridge Park              Atlanta, GA 30306
Suite 4000                                     Tel: (404) 607-8222
Birmingham, AL 35205                           Fax: (404) 607-8451
Tel: (205) 536-8888                            Email: dwinegard@whatleykallas.com
bragsdale@dfhlaw.com


Charles Clinton Hunter                         E. Kirk Wood, Jr. – ***Local Facilitating***
HAYES HUNTER PC                                ***Counsel***
4265 San Felipe, Suite 1000                    WOOD LAW FIRM LLC
Houston, TX 77027                              P. O. Box 382434
Tel: (281) 768-4731                            Birmingham, AL 35238
Fax: (713) 583-7047                            Tel: (205) 612-0243
Email: chunter@hayeshunterlaw.com              Fax: (205) 705-1223
                                               Email: kirk@woodlawfirmllc.com

Dennis Pantazis – **Plaintiffs' Steering Committee**
Brian Clark – **Discovery Committee**
WIGGINS CHILDS PANTAZIS FISHER
 GOLDFARB
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel: (205) 314-0500
Fax: (205) 254-1500
Email: dgp@wigginschilds.com
        bclark@wigginschilds.com

Dennis C. Reich – **Chair, Damages Committee**
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel: (713) 622-7271
Fax: (713) 623-8724
Email: dreich@reichandbinstock.com

Nicholas B. Roth – **Chair, Discovery Committee**
Julia Smeds Roth – **Discovery Committee**
EYSTER KEY TUBB ROTH MIDDLETON
 & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel: (256) 353-6761
Fax: (256) 353-6767
Email: nbroth@eysterkeylaw.com
        jroth@eysterkeylaw.com

David A. Balto – **Expert Committee**
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel: (202) 789-5424
Fax: (202) 589-1819
Email: david.balto@dcantitrustlaw.com

Aaron S. Podhurst – **Plaintiffs' Steering Committee**
Peter Prieto – **Chair, Expert Committee**
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue
Suite 2300
Miami, FL 33131
Tel: (305) 358-2800
Fax: (305) 358-2382
Email: apodhurst@podhurst.com
        pprieto@podhurst.com

U.W. Clemon – **Plaintiffs' Steering Committee**
U. W. Clemon, LLC
5202 Mountain Ridge Parkway
Birmingham, AL 35222
Tel: (205) 837-2898
Email: uwclemon1@gmail.com

J. Mark White – **Litigation Committee**
Augusta S. Dowd – **Chair, Litigation Committee**
Linda G. Flippo – **Discovery Committee**
WHITE ARNOLD & DOWD, P.C.
2001 Park Place North
Suite 1400
Birmingham, AL 35203
Tel: (205) 323-1888
Fax: (205) 323-8907
Email: mwhite@whitearnolddowd.com
        adowd@whitearnolddowd.com
        lflippo@whitearnolddowd.com

Van Bunch – **Chair, Class Certification Committee**
BONNETT FAIRBOURN FRIEDMAN &
 BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel: (602) 274-1100

Fax: (602) 274-1199
Email: vbunch@bffb.com

Joey K. James – *Litigation Committee*
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel: (256) 764-0095
Fax: (256) 767-5705
Email: joey@joeyjameslaw.com

Robert J. Axelrod – *Chair, Written Submissions Committee*
AXELROD LLP
800 Third Avenue, Suite 2800
New York, NY 10022
Tel: (646) 448-5263
Fax: (212) 840-8560
Email: raxelrod39@gmail.com

Richard S. Frankowski – *Discovery Committee*
THE FRANKOWSKI FIRM, LLC
231 22nd Street South, Suite 203
Birmingham, AL 35233
Tel: (205) 390-0399
Fax: (205) 390-1001
Email: richard@frankowskifirm.com

W. Daniel Miles, III – *Written Submissions Committee*
BEASLEY ALLEN CROW METHVIN PORTIS
 & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel: (800) 898-2034
Fax: (334) 954-7555
Email: dee.miles@beasleyallen.com

John C. Davis – *Written Submissions Committee*
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel: (850) 222-4770
Email: john@johndavislaw.net

Michael C. Dodge – *Expert Committee*
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel: (972) 419-7172
Email: mdodge@gpm-law.com

Mark K. Gray – *Discovery Committee*
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel: (502) 805-1800
Fax: (502) 618-4059
Email: mgray@grayandwhitelaw.com

Michael E. Gurley, Jr. – *Discovery Committee*
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel: (205) 908-6512
Email: mgurleyjr@yahoo.com

Stephen M. Hansen – *Class Certification Committee*
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel: (253) 302-5955
Fax: (253) 301-1147

Lynn W. Jinks, III – *Expert Committee*
Christina D. Crow – *Discovery Committee*
JINKS CROW, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel: (334) 738-4225
Fax: (334) 738-4229

Email: steve@stephenmhansenlaw.com

Email: ljinks@jinkslaw.com
ccrow@jinkslaw.com

Harley S. Tropin – *Damages Committee*
Javier A. Lopez – *Discovery Committee*
KOZYAK TROPIN &
 THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel: (305) 372-1800
Fax: (305) 372-3508
Email: hst@kttlaw.com
          jal@kttlaw.com

Myron C. Penn – *Discovery Committee*
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel: (334) 738-4486
Fax: (334) 738-4432
Email: myronpenn28@hotmail.com

C. Wes Pittman – *Settlement Committee*
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel: (850) 784-9000
Fax: (850) 763-6787
Email: wes@pittmanfirm.com

J. Preston Strom, Jr. – *Litigation Committee*
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel: (803) 252-4800
Fax: (803) 252-4801
Email: petestrom@stromlaw.com

Robert B. Roden – *Litigation Committee*
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel: (205) 933-8383
Fax: (205) 933-8386
Email: rroden@shelbyroden.com

Thomas V. Bender – *Discovery Committee*
Dirk L. Hubbard
HORN AYLWARD & BANDY, LLC
2600 Grand Blvd., Suite 1100
Kansas City, MO 64108
Tel: (816) 421-0700
Email: tbender@hab-law.com
 dhubbard@hab-law.com

Gary E. Mason – *Class Certification Committee*
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DC 20036
Tel: (202) 429-2290
Fax: (202) 640-1160
Email: gmason@wbmllp.com

Gregory S. Cusimano – *Litigation Committee*
CUSIMANO, ROBERTS & MILLS, LLC
153 South 9th Street
Gadsden, AL 35901
Phone: (256) 543-0400
Fax: (256) 543-0488
Email: greg@alalawyers.net

Michael L. Murphy – *Discovery Committee*
BAILEY GLASSER LLP
910 17th Street, NW, Suite 800
Washington, DC 20006
Tel: (202) 463-2101
Fax: (202) 463-2103

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel: (320) 289-2363
Fax: (320) 289-2369

Email: mmurphy@baileyglasser.com

Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel: (719) 471-1984
Fax: (719) 577-4356
Email: lance@searsassociates.com

Jessica Dillon
Ray R. Brown
Molly Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 200
Anchorage, AK 99501
Tel: (907) 277-5400
Fax: (907) 277-9896
Email: Jessica@dillonfindley.com
        Ray@dillonfindley.com
        Molly@dillonfindley.com

Allyson C. Dirksen
HEIDMAN LAW FIRM, P.L.L.C.
1128 Historic 4th Street
P. O. Box 3086
Sioux City, IA 51101
Tel: (712) 255-8838
Fax (712) 258-6714
Email: allyson.dirksen@heidmanlaw.com

Email: brian@wojtalewiczlawfirm.com

Archie C. Lamb, Jr.
ARCHIE LAMB & ASSOCIATES, LLC
301 19th Street North, Suite 585
The Kress Bldg.
Birmingham, AL 35203-3145
(205) 458-1210
Email: alamb@archielamb.com

Paul Lundberg
LUNDBERG LAW, PLC
600 4TH Street, Suite 906
Sioux City, IA 51101
Tel: (712) 234-3030
Fax: (712) 234-3034
Email: paul@lundberglawfirm.com

Gwen Simons
Simons & Associates Law, P.A.
P.O. Box 1238
Scarborough, ME 04070-1238
Tel: (207) 205-2045
Fax: (207) 883-7225
Email: gwen@simonsassociateslaw.com

*Counsel for Provider Plaintiffs*