FILED

2025 Apr-23  PM 7:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

IN RE: BLUE CROSS BLUE SHIELD
ANTITRUST LITIGATION

) Master File No. 2:13-CV-20000-RDP
)
) MDL No. 2406
)

TO:    Blue Cross Blue Shield Provider Settlement
       Settlement Notice Administrator
       P.O. Box 26443
       Richmond, VA 23261

## OBJECTION TO THE PROVIDER CLASS SETTLEMENT BECAUSE THE RELEASE IS UNREASONBLY AMBIGUOUS

Provider Class Member North Texas Division, Inc., on behalf of itself and its affiliated HCA Provider Class Members (collectively "HCA"[1]), submits this Objection to certain portions of the Provider Class Settlement Agreement.[2] As explained more fully below, the release in the Settlement Agreement is unreasonably ambiguous.

## I.    INTRODUCTION

HCA is one of the largest providers of healthcare services in the United States, operating 190 hospitals in 20 states.

---

[1]    North Texas Division, Inc. is an affiliate of HCA Healthcare. It currently has, and at times during the Settlement Class Period (as defined in paragraph 1(llll) on page 21 of the Provider Settlement Agreement (July 24, 2008 through Oct. 4, 2024)) has had, a contractual agreement with Blue Cross and Blue Shield of Texas (Health Care Service Corporation).

[2]    HCA is serving all required information to object as required by the procedures set forth in the Court's Preliminary Approval Order. Attached as Exhibit 1 is a list of TINs (FEINs) for North Texas Division, Inc. The agreement between the objector and its counsel relating to this objection is attached as Exhibit 2. This objection applies to hospitals and facilities within the Provider Class. HCA intends to appear at the final approval hearing through counsel. The only statement of objection filed by objector's counsel within the last five years is an objection filed on behalf of certain national accounts in the BCBS Subscriber Class Action, found at ECF 2812-19; *see also* ECF 2987 (Order dated Feb. 4, 2022). By signing below, the objector and its counsel declare under penalty of perjury that the information provided in this objection and associated exhibits is true and correct to the best of their knowledge, information and belief.

HCA has a wide-ranging commercial relationship with the Provider Class Blue Defendants ("Defendants" or "Blues") and a number of ongoing disputes related to that relationship. HCA also anticipates that it will continue to have disputes with one or more of the Blues in the future. Unfortunately, the release in the Provider Class Settlement Agreement ("Provider Agreement") is unreasonably ambiguous, and HCA anticipates that the Blues will try to use it to prevent HCA from asserting claims that are substantively unrelated to the ones asserted in the Provider Class's Complaints.

As explained more fully below, HCA objects to the definition of "Released Claims" in paragraph 1(xxx) at pages 17-18 of the Provider Agreement, which is incorporated into the definition of the "Release" in paragraph 42 on pages 63-64 of the Provider Agreement.

Specifically, the "Released Claims" definition in paragraph 1(xxx) of the Provider Agreement is significantly less clear than the definition of released claims in the Subscriber Class Settlement Agreement ("Subscriber Agreement"). The Subscriber Agreement contains a significantly clearer delineation of what claims are and are not released, including: whether a "particular product … is covered;" whether a "benefit plan document or statutory law" requires the Blues to pay for services; and whether "the benefit plan document or statutory law" requires a different "administration of claims." The Subscriber Agreement also contains a clear statement that the release "does not release any claims arising from … [the] sale or provision of health care products or services." (Dkt. No. 2610-2 at 15-16.) The Provider Agreement "Released Claims" definition does not contain these terms.

Besides lacking the clarity (found in the Subscriber Agreement) about the claims not released, the Provider Agreement "Released Claims" definition appears to cover, *without temporal boundaries*, all claims if "based in whole or in part on the factual predicates of the Provider Actions

2

*or any other component* [whatever that means] of the Released Claims …." (Dkt. No. 3192-2 at 18 (emphasis added).)  This includes claims that arise after the Effective Date of the settlement. Given the scope and scale of HCA's relationship with the Blues (and that of other hospital providers) and the frequency and import of the disputes that arise routinely from that relationship, this deficiency is no small matter.

In fairness to Provider Class members, the Court should require clarity about the temporal and substantive range of Released Claims under the Provider Agreement.  If left open, the issue will lead to future disputes or chaos or mischief between Provider Class members and Defendants concerning the definition of "Released Claims."

## II.    RELEVANT PROCEDURAL HISTORY

Provider Class Counsel filed the first Provider Class Complaint in 2012, and a Consolidated Amended Complaint in 2013.  (Dkt. No. 3225 at 3.)  After years of hard-fought litigation, the challenges of which we acknowledge, the parties executed a Settlement Agreement on October 4, 2024.  On October 14, 2024, the Class moved for preliminary approval of the proposed Provider Agreement. (Dkt. No. 3192.) On November 14, 2024, this Court held a hearing on the Provider Class's Motion for Preliminary Approval of the settlement.  (Dkt. Nos. 3198, 3216.)

Among the provisions in the Provider Agreement considered by the Court at the Preliminary Approval Hearing was the definition of "Released Claims" in paragraph 1(xxx). The paragraph reads as follows:[3]

---

[3]    We break up this text into a few sections for ease of reading.  The footnotes that appear in the quoted text are *not* in the original text and were added by us for ease of reference to supply the definition of some terms that appear elsewhere in the Provider Agreement.

[A]ny and all known or unknown claims … of any kind whatsoever (however denominated) … based upon, arising from, or relating in any way to:

(i)     the factual predicates of the Provider Actions (including but not limited to the Consolidated Amended Provider Complaints filed in the Northern District of Alabama) including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date;

(ii)    any issue raised in any of the Provider Actions by pleading or motion; or

(iii)   mechanisms, rules or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10-26 [*i.e.*, the injunctive relief provisions concerning the Blues changes in conduct] approved through the Monitoring Committee Process during the Monitoring Period[4] and that are based on the same factual predicate of the Provider Actions and related to the injunctive relief provided by Paragraphs 10-26.

Nothing in this Release shall release claims, however asserted, that arise in the ordinary course of business and are based solely on: (a) claims by the Provider in the Provider's capacity as a plan sponsor or subscriber or (b) claims regarding whether a Settling Individual Blue Plan properly paid or denied a claim for a particular product, service or benefit based on the benefit plan document, Provider contract, or state or federal statutory or regulatory regimes (including state prompt pay laws).

Notwithstanding the foregoing sentence [*i.e.*, the immediately preceding ordinary course paragraph], any claim, however asserted, in clauses (a) and (b) in this Paragraph 1(xxx) [*i.e.*, the two categories of claims covered by the immediately preceding ordinary course paragraph] based in whole or in part on the factual predicates of the Provider Actions[5] or any other

---

[4]     The "Monitoring Period" is defined in paragraph 1(ccc) on page 12 as five years from the Effective Date of the Settlement Agreement.

[5]     "Provider Actions" are defined in paragraph 1(sss) on page 16 of the Provider Agreement as "the lawsuits brought by persons and entities within the Settlement Class and consolidated in *In re Blue Cross Blue Shield Antitrust Litigation*, Case No. 13-cv-20000-RDP (MDL No. 2406), including the Consolidated Fourth Amended Provider Complaint, which is currently pending in the Court; all actions that may be transferred or consolidated prior to the time Class Notice is mailed; and all actions that are otherwise based, in whole or in part, on the conduct

4

component of the Released Claims discussed in this Paragraph, is released.[6] Released Claims include, but are not limited to, claims that arise after the Effective Date.

At the preliminary approval hearing, Provider Class Counsel addressed the Court concerning the scope of the intended release. Class Counsel stated:

> Now, what do they [Provider Class members] give up? What do they release? We made sure to include – and what you see in this slide is the definition – it is from the definition of release claims in the settlement agreement. There are specific exclusions, and it's worth reading subpart B.[7] Of course, they don't release their claims as plan sponsors or subscribers either, but they don't release their claims, whether a settling individual Blue plan properly paid or denied a claim for a particular product or service or benefit based on the benefit plan document, the provider contract. And notice it starts out with the benefit plan document, Judge. Those apply to out-of-network providers just like they apply to in-network providers. And it also goes on to say or state or federal statutory or regulatory regimes. This is where the basic disputes are, not just between providers and the Blues but between the providers and health insurance companies generally, people like United Healthcare, Aetna, Cigna, Humana. But these are the claims. Those claims are not released. Of course, if they tried to go ahead and make a conspiracy claim about the Blues limiting their – agreeing not to compete the claim in this case it would be an issue, but this only releases the claims that are at issue – it releases claims that are relevant to this lawsuit, not all the other claims – the ordinary business claims that are out there.

(Dkt. No. 3216 at 41-42.)

Later in the hearing, this Court inquired as to whether "what's expressly not released in the release" would cover certain claims asserted by objectors who had filed on the eve of the

---

alleged in MDL No. 2406." This paragraph incorporates a list of those actions along with the *VHS Liquidating Trust* case in California State Court.

[6]    It is not clear whether this subparagraph is bound by the Effective Date.

[7]    "Subpart B" (denominated with a lower case "b" in the Agreement) appears to be a reference to the exception to the release in the Provider Agreement, which provides that "claims regarding whether a Settling Individual Blue Plan properly paid or denied a claim" are not released. Settlement Agreement at 18.

5

preliminary approval hearing. Counsel to the Provider Class and Defendants agreed to confer on the issue. (*Id.* at 91 (entire discussion pp. 89-93).[8])

On December 4, 2024, the Court issued an Order granting preliminarily approval of the Provider Agreement. (Dkt. No. 3225.) The Court quoted the "ordinary course of business" exception to the release and noted that exception applied unless those ordinary course claims "are based in whole or in part on the factual predicates of the Provider Action." (*Id.* at 9-10.) Further, the Court noted the similarity between this release and "the release that the court approved (and the Eleventh Circuit affirmed) in the Subscriber Settlement." (*Id.* at 10.)

III. **THE PROVIDER AGREEMENT DEFINITION OF "RELEASED CLAIMS" IS UNREASONABLY AMBIGUOUS**

HCA is involved in a variety of disputes with the Blues and other insurers. A non-exclusive and general list of the legal and factual issues in those disputes includes questions of whether hospital and physician services are bundled with or incidental to others; the import and meaning of provider manuals for coverage or treatment; whether items qualify as "implants" or "supplies" (as one may be covered and the other not); the appropriate coding of conditions that affect reimbursement rates; medical necessity and thus covered services; and the timeliness of claims when patients supply incorrect coverage information.

One specific example is the lawsuit that one HCA hospital had to file against Blue Shield of California ("Blue CA") for violating ERISA and breach of contract because of Blue CA's failure to reimburse HCA for services rendered to a Blue CA insured who required treatment in an HCA

---

[8] In briefing the objection, the Blues referenced the above argument: "As Provider Co-Lead Counsel explained at the Preliminary Approval Hearing, the release also contains an express exception for claims arising in the ordinary course of business that are unrelated to the factual predicate of the Provider Actions." (Dkt. No. 3220 at 3-4.) The Court held that the objectors' concerns about the release would not be addressed because such a ruling would constitute an advisory opinion. (Dkt. No. 3224 at 4-5.)

hospital in Texas. *Bay Area Healthcare Group, Ltd. d/b/a Corpus Christi Medical Center v. California Physicians' Service d/b/a Blue Shield of California*, Case No.: 2025-cv-21 (S.D. Tex.). HCA *has* a contract with BCBS Texas, but because the subscriber's Blue Home Plan (Blue *CA*) does not have a contract with HCA's *Texas* hospital, HCA is forced to sue the non-contracting Blue Home Plan for payment for the healthcare services that it provided. This problem arises in the ordinary course of business for HCA and occurs with increasing frequency. Were the "Released Claims" definition in the Provider Agreement to be read to extinguish these sorts of legal claims, some of which already have accrued and some of which inevitably will arise in the future, it would be incredibly unfair and prejudicial to HCA (and other hospital providers).

The Court should clear up this issue at the Fairness Hearing and ensure that Provider Class members are not prejudiced in the future.

A.      **"Released Claims" is Unreasonably Ambiguous**

All parties appear to agree that claims that arise in a Provider Class member's "capacity as plan sponsor or subscriber," and claims "regarding whether a Settling Individual Blue Plan properly paid or denied a claim," are <u>not</u> released by the Provider Agreement. (Provider Agreement at 18; Dkt. No. 3220 at 3-4 (Defendants: "the release also contains an express exception for claims arising in the ordinary course of business that are unrelated to the factual predicate of the Provider Actions").) Likewise, the parties seemingly agree that the release in the Provider Agreement is understood to be, and perhaps is, patterned upon the release in the Subscriber Agreement. (Dkt. No. 3225 at 9-10; Dkt. No. 3221 at 8 (Plaintiffs: "this release closely follows the Subscribers' release and others that won final approval.").)

However, in a critical respect, the Provider Agreement does not follow the release in the Subscriber Agreement. The Subscriber Agreement provides, in relevant part:

Nothing in this Release shall release claims, however asserted, that arise in the ordinary course of business and are based solely on (i) whether a particular product, service or benefit is covered by the terms of a particular Commercial Health Benefit Product, (ii) seeking resolution of a benefit plan's or a benefit plan participant's financial responsibility for claims, based on either the benefit plan document or statutory law, or (iii) challenging a Releasee's administration of claims under a benefit plan, based on either the benefit plan document or statutory law. Any claim, however asserted, (i) that a product, service, or benefit should be or should have been covered, but was not covered, (ii) seeking resolution of a benefit plan's or benefit plan participant's financial responsibility for claims, or (iii) challenging a Releasee's administration of claims under a benefit plan, based in whole or in part on the factual predicates of the Subscriber Actions or any other component of the Released Claims discussed in this Paragraph, is released.  Notwithstanding any other provision of this Agreement, a Provider who is a Settlement Class Member as defined in this Agreement does not release any claims arising from his, her or its sale or provision of health care products or services (as opposed to the purchase of a Commercial Health Benefit Product).  Settling Defendants agree not to raise Providers' releases under this Agreement as a defense to Providers' claims brought in their capacity as Providers of health care products or services in MDL No. 2406. For purposes of clarity, Released Claims include, but are not limited to, claims that arise after the Effective Date.

(Dkt. 2610-2 at 15-16.)

The Subscriber Agreement unequivocally and expressly excludes from the release, without temporal boundaries, any claims that allege: (i) a particular product, service or benefit is covered by the terms of a particular Commercial Health Benefit Product; (ii) the benefit plan document or statutory law create financial responsibility for claims; (iii) the benefit plan document or statutory law require alternate administration of claims; and (iv) Providers' claims arising from the "sale or provision of health care products or services."

HCA seeks clarity that these types of claims likewise are not covered by the "Released Claims" definition in the Provider Agreement.

Unfortunately, the Provider Agreement "Released Claims" definition does not provide this clarity.  It provides for an ambiguous application of the release now and in the future.  The definition reads in pertinent part:

8

Nothing in this Release shall release claims, however asserted, that arise in the ordinary course of business and are based solely on (a) claims by the Provider in the Provider's capacity as a plan sponsor or subscriber or (b) claims regarding whether a Settling Individual Blue Plan properly paid or denied a claim for a particular product, service or benefit based on the benefit plan document, Provider contract, or state or federal statutory or regulatory regimes (including state prompt pay laws). Notwithstanding the foregoing sentence, any claim, however asserted, in clauses (a) or (b) in this Paragraph 1(xxx), based in whole or in part on the factual predicates of the Provider Actions or any other component of the Released Claims discussed in this Paragraph, is released. Released Claims include, but are not limited to, claims that arise after the Effective Date.

(Dkt. 3192-2 at 18.)

The Provider Agreement definition of "Released Claims" should be clarified to cabin the release in a manner consistent with the way the Court qualified the definition of "Released Claims" in the Subscriber Agreement. In its review of this Court's Final Approval Order concerning the Subscriber Agreement, the Eleventh Circuit stated that the release in the Subscriber Agreement is limited to those claims that share an "identical factual predicate," which is to say, they "share a common nucleus of operative facts":

In its review of a settlement, "a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 377, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996) (citation and internal quotation marks omitted). Under the identical-factual-predicate doctrine, a settlement agreement may release claims that share a common nucleus of operative fact with the claims in the underlying litigation. *See Adams*, 493 F.3d at 1289. In practice, the doctrine mirrors res judicata: a release may lawfully bar later actions arising from the same cause as the settled litigation. *TVPX ARS, Inc. v. Genworth Life & Annuity Ins.*, 959 F.3d 1318, 1325 (11th Cir. 2020). We have recognized that res judicata applies not only to the precise legal theory presented in the previous litigation but to all legal theories and claims arising out of a common nucleus of fact. *Trustmark Ins. v. ESLU, Inc.*, 299 F.3d 1265, 1270 n.3 (11th Cir. 2002).

*In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1090 (11th Cir. 2023). The Eleventh Circuit held that the language in the Subscriber Agreement should be interpreted to "cabin[] the scope of the release" such that the "release does not extend beyond claims arising from the common nucleus of operative facts." *Id.* at 1091.

9

If the definition of "Released Claims" in the Provider Agreement were consistent with the definition of "Released Claims" in the Subscriber Agreement, then that would help to alleviate HCA's concern. Stated differently, the definition of "Released Claims" in the Provider Agreement should be cabined so as not to extend beyond "claims arising from the common nucleus of operative facts" in the Provider Actions.

In the Provider Agreement, however, the release provides that all explicitly reserved claims that are not released in clauses (a) and (b) may still be subject to a defense argument that such claims have been released, because they are subject to a caveat not present in the Subscriber release. Unlike the express and unconditional statement in the Subscriber Agreement, the Provider Agreement may allow the release to be used to bar "claims in the Provider's capacity as a plan sponsor" or claims regarding whether a Blue "properly paid or denied a claim" if that claim is based on factual matter or "issues" mentioned in the Provider Actions. Because the caveat is a circular reference to the Released Claims provision, and therefore includes "any issue raised in any of the Provider Action by pleading or motion," it creates the possibility that the release may be used to bar claims that share only a relevant fact, but not an identical factual predicate. *See Kouri v. Fed. Express Corp.*, 2023 WL 3431288, at *7 (C.D. Cal. Jan. 13, 2023) (rejecting settlement agreement that released claims relating to factual allegations in complaint because the release of liability "may extend beyond claims based on an identical factual predicate as the claims at issue in the operative complaint").

Thus, under the definition of "Released Claims" in the Provider Agreement, the Blues seemingly reserve the argument that a dispute over whether, for example, a cost is covered by the Blues' contract with a Provider Class member or by the Blue Card program may somehow be released. Such ambiguity is destructive to the parties' current and ongoing commercial

10

relationships in which these kinds of ordinary course disputes (unfortunately) arise with regularity. This is particularly problematic where, as here, the Settling Parties seek approval of their Agreement arguing that the only claims that are released are those that "make a conspiracy claim about the Blues … agreeing not to compete." Dkt. No. 3216 at 41-42.

If that is the sum of the release Defendants seek, then they should either fully and expressly model the Provider release (and "Released Claims" definition) after the Subscriber release and specify, without caveat, the disputes that are not released or, alternatively, unambiguously clarify on the record at the Fairness Hearing, with the concurrence of Counsel for the Provider Class and Blues, that "[n]othing in this Release shall release claims, however asserted, that arise out of the ordinary course of business and are based solely on: (i) seeking resolution of the denial, underpayment, or non-payment of any reimbursement claims for services that the hospitals provided to a Settling Defendant's member (including, but not limited to, breach of contract and ERISA claims) based on either the benefit plan document or statutory law; (ii) the applicability, permissibility, or appropriateness of payer policies (including but not limited to clinical, payment, utilization management, or quality policies), based on either the benefit plan or statutory law; or (iii) the contractual or business relationship of the parties."

## IV.  CONCLUSION

The unreasonable ambiguity in the definition of "Released Claims" in the Provider Agreement must be remedied.  Curing those deficiencies is crucial to HCA and other Provider Class members, so that they are not prejudiced in their legal rights now and in the future against the Blues.  HCA respectfully requests that the Court establish a written record on which the Parties can reasonably rely going forward that clearly and unambiguously addresses the deficiencies in the definition of "Released Claims" set forth in this Objection, along with such other and further relief that the Court may deem proper.

11

Dated: March 4, 2025

By: _____

Ronnie Midgett
CFO American Group
North Texas Division, Inc.
c/o HCA Healthcare
One Park Plaza
Nashville, Tennessee 37203
Tel.   (615) 344-9551
Email: Ronnie.Midgett@hcahealthcare.com

Respectfully submitted.

By: _____

William J. Blackman, Esquire
Michael G. Dickler, Esquire
SPERLING KENNY NACHWALTER, LLC
1441 Brickell Avenue, Suite 1100
Miami, Florida 33131
Tel:   (305) 373-1000
Fax:   (305) 372-1861
Email: wjb@sperlingkenny.com
        md@sperlingkenny.com

cc:      Edith Kallas & Joe Whatley, Whatley Kallas LLP, PO Box 10968, Birmingham, AL 35202
         Karin DeMasi & Lauren Kennedy, Cravath, 375 Ninth Ave, New York, NY 10001

**Exhibit 1**
**List of TINs (FEINs) for North Texas Division, Inc.**

North Texas Division, Inc., which contracts with Blue Cross and Blue Shield of Texas

(Health Care Service Corporation), has several FEINs for its affiliated entities, listed below:



*Note: these FEINs should be redacted in any submission to the Court.*

**SPERLING
KENNY
NACHWALTER**

FOUR SEASONS TOWER
1441 BRICKELL AVENUE, SUITE 1100
MIAMI, FLORIDA 33131
TELEPHONE: (305) 373-1000
DIRECT LINE: (305) 381-7472
FACSIMILE: (305) 372-1861
EMAIL: WBLECHMAN@SPERLINGKENNY.COM
WWW.SPERLINGKENNY.COM

March 4, 2025

Kathryn Hays, Esquire                                           *Via E-mail*
Vice President – Litigation
HCA HEALTHCARE MANAGEMENT SERVICES, LP
One Park Plaza
Nashville, TN  37203

     Re:    *In re: Blue Cross Blue Shield Provider Antitrust Litigation*
           U.S. District Court, N.D. Ala., No. 2:13-CV-20000-RDP
           (the "BCBSA Provider Class Action")

Dear Ms. Hays:

    I write to confirm, by your counter signature below, that North Texas Division, Inc., on behalf of itself and its affiliated HCA Provider Class Members, have authorized our firm to represent them in connection with the proposed settlement in the BCBSA Provider Class Action, including objecting to specific provisions in the Provider Class Settlement Agreement.

                           Very truly yours,

                           William J. Blechman

AGREED:

HCA HEALTHCARE MANAGEMENT SERVICES, LP, FOR
NORTH TEXAS DIVISION, INC.

By: _____

Its: ____VP- LITIGATION_____

Date: ____3.4.25_____

WJB:mb
679800.1

**Exhibit 2**

## CERTIFICATE OF SERVICE

I, William J. Blechman, an attorney, hereby certify on March 4, 2024, that the foregoing Memorandum in Objection to the Final Approval of the Provider Class Settlement Because the Release is Unreasonably Ambiguous and exhibits thereto were placed with the United States Postal Service for delivery, prior to the last collection time for the same, to the following recipients:

Blue Cross Blue Shield Provider Settlement
Settlement Notice Administrator
P.O. Box 26443
Richmond, VA 23261

Edith Kallas & Joe Whatley
Whatley Kallas LLP
PO Box 10968
Birmingham, AL 35202

Karin DeMasi & Lauren Kennedy
Cravath Swain & Moore
375 Ninth Ave
New York, NY 10001

/s/ William J. Blechman



CERTIFIED MAIL

9589 0710 5270 2961 8238 17



FIRST-CLASS

US POSTAGE (PITNEY BOWES)

ZIP 60654
02 7H
0006149473    MAR 04 2025

$ 009.92⁰

**SPERLING**
**KENNY**
**NACHWALTER**

321 NORTH CLARK STREET
25TH FLOOR
CHICAGO, ILLINOIS 60654

To:

**VIA CERTIFIED MAIL**

Blue Cross Blue Shield Provider Settlement
Settlement Notice Administrator
P.O. Box 26443
Richmond, VA 23261



RECEIVED
MAR 14
BrownGreer
Richmond, Va