FILED

2025 Apr-23  PM 7:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit F

**THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

|  |  |
|---|---|
| IN RE:<br>BLUE CROSS BLUE SHIELD<br>ANTITRUST LITIGATION<br>(MDL NO. 2406) | )<br>)<br>)<br>)<br>)<br>)<br>)    Master File No. 2:13-CV-20000-RDP |

**EMERGENCY MEDICAL PROVIDER GROUPS'
OBJECTION TO CLASS SETTLEMENT**

**POLLACK SOLOMON DUFFY LLP**
Barry S. Pollack (BBO#642064)
Phillip Rakhunov (BBO#663746)
31 St. James Avenue, Suite 940
Boston MA 02116
(617) 439-9800
bpollack@psdfirm.com
prakhunov@psdfirm.com

*Counsel for Allatoona Emergency Group, PC and
Alabama Emergency Physician Partners, LLC*

Putative class members emergency medicine provider groups Allatoona Emergency Group, PC, a Georgia limited liability company, NPI ID ███████ ("Allatoona") and Alabama Emergency Physician Partners, LLC, an Alabama limited liability company, NPI ID ███████, ███████, ███████ ("AEPP") (together, "Objecting ER Groups"),[1] by their undersigned counsel, pursuant to Fed R. Civ. P 23(e)(5) and the schedule set by this Court, respectfully submit this OBJECTION to the requests to approve the class action settlement between the Class Plaintiffs and Defendant health insurance plans affiliated with the Blue Cross Blue Shield Association ("Blue Plans"). The Objecting ER Groups, through undersigned counsel, intend to appear at the final fairness hearing in this action.

**Introduction**

The Court should reject the proposed settlement in this antitrust litigation, as it is fundamentally flawed due to the unduly burdensome procedures for opting out, the overbroad and vague releases that plainly violate the identical factual predicate doctrine, and the inequitable terms concerning the compensation provided to emergency room provider groups, such as Allatoona and other similarly situated groups and individuals that provide *out-of-network* emergency medical services. The settlement in this class action, which aims to resolve antitrust claims between the Blue Plans and various medical providers, improperly lumps emergency medicine providers, including *out-of-network* emergency medicine providers, with differently situated non-emergency medical providers, ignoring the critical differences between them. None of the named plaintiffs in this class action is an emergency medicine provider, let alone one that is out-of-network.

---

[1] Allatoona's contracted emergency medicine providers in Georgia are out-of-network with the pertinent Blue Plan. AEPP's contracted emergency providers in Alabama are in-network with the pertinent Blue Plan. Pursuant to the instructions in the Class Notice, the NPI IDs for these entities are redacted in this submission.

The Objecting ER Groups contract with hospitals in multiple States to staff those hospitals' emergency departments with physicians and other healthcare providers. These groups coordinate billing and provide certain administrative services for the emergency services their contracted healthcare providers deliver. These providers are typically classified as either "in-network" (reimbursed with negotiated contractual rates) or "out-of-network" (who bill based on the usual and customary rates of services provided, and reimbursed subject to applicable federal and state law provisions). The Allatoona group does not have negotiated rates with the Blue Plans, meaning its providers are considered out-of-network for the emergency services provided. AEPP's emergency medicine providers are in-network with the pertinent Blue Plan.

It is well-settled in the industry that out-of-network providers receive higher rates than in-network providers, the latter of whom typically receive lower rates but benefit from payor certainty and access to a higher volume of insured patients. The Objecting ER Groups are also distinct from non-emergency medical providers because, pursuant to the Emergency Medical Treatment and Labor Act, 42 U.S.C. 1395dd et seq. ("EMTALA") and similar applicable state laws, they are required to provide emergency services to all who walk in to the emergency department regardless of a patient's insurance status; specifically, the Objecting ER Groups' healthcare providers must provide all patients with a medical screening exam, stabilize any patients with an emergency medical condition and transfer or accept appropriate patients. Conversely, Blue Plans cannot prevent their members from seeking emergency treatment at these hospitals, even if the emergency providers are out-of-network.

The proposed class settlement here should be rejected for three independently sufficient reasons. First, the terms of the settlement create unduly burdensome procedures for opting out and for submitting claims.

Second, the vague language of the releases in the proposed settlement agreement violates the identical factual predicate in its breadth, in that Blue Plan defendant in another action could seek to interpret the releases to cover more than just the injuries for which pending antitrust claims sought relief and, instead, reach events that include claims arising out of factual predicates unrelated to the factual nucleus of antitrust claims.

Third, there indisputably were no emergency medical providers (in- or out-of-network) included as named class plaintiffs, nor represented in settlement negotiations. The named plaintiffs inadequately represented emergency medical provider groups. This omission is significant because emergency medical providers are uniquely subject to federal and state laws that mandate treatment of patients regardless of insurance status, and laws that require insurance companies like the Blue Plans to compensate such providers for emergency services at fair rates, irrespective of whether the provider is in-network or out-of-network. By virtue of being out-of-network, the rates for services rendered by providers like Allatoona's contracted healthcare professionals are reimbursed at rates governed by state and federal laws, such as the usual and customary rates for the services in the community, which are typically significantly higher than rates negotiated with in-network providers. These legal requirements create a fundamentally different set of circumstances for emergency providers, making their damages claims distinct from those of non-emergency medical providers, and in-network providers. The sweeping and generalized approach to this settlement fails to account for the unique and far more severe impact that anticompetitive practices have had on out-of-network emergency providers. By treating them as if they are comparable to other medical providers, the settlement ignores the distinct nature of claims of out-of-network emergency medical providers and the higher value of their damages.

3

**Discussion**

Under Rule 23(e), a court may grant final approval of a proposed settlement "only after a hearing and only on finding that it is *fair, reasonable, and adequate* after considering" the Rule 23(e)(2) factors. Fed. R. Civ. P. 23(e)(2) (emphasis added); *see also Charron v. Wiener*, 731 F.3d 241, 247 (2d Cir. 2013). Courts evaluating the fairness, reasonableness, and adequacy of a proposed settlement must consider the factors outlined in Rule 23(e)(2) holistically. *Moses v. New York Times Company*, 79 F.4th 235, 243 (2nd Cir. 2023).

## I.    THE PROCEDURES FOR OPTING OUT AND SUBMITTING CLAIMS ARE UNDULY BURDENSOME.

Before imposing the terms of a settlement on putative class members, the Due Process Clause prevents unduly burdensome procedures for protecting rights. Here, the opt-out procedures impose a massive burden on provider groups, drilling down to each provider and a history of in-network and out-of-network status that can be difficult if not impossible to navigate. The claims process is almost equally burdensome. Efforts have been made to coordinate with counsel of record to no avail.

## II.    THE PROPOSED RELEASE SHOULD BE REJECTED AS VIOLATING THE IDENTICAL FACTUAL PREDICATE DOCTRINE.

The releases in the proposed settlement agreement here are vague and overbroad, potentially purporting to reach claims arising out of non-antitrust factual predicates, like disputes over adequacy of reimbursement rates and affecting parties outside of the class, if deemed an "affiliate" of a class member. Although the general intent of the bargain underlying the class settlement here does not appear to require releases of such non-antitrust claims by any providers that arise from statutory rights, regulatory rights, duties implied-by-law from the subscriber-plan and surrounding circumstances, or related common law theories seeking relief for underpayments,

4

the release and carveout language here is not sufficiently clear to prevent the Blue Plans from confusing courts in other jurisdictions by raising the release as a defense in pending or future state court actions or arbitrations, as well as in efforts to enforce arbitration rights and awards for underpaid claims.

The Proposed Settlement Agreement here broadly defines "Released Claims" as follows:

xxx. "Released Claims" means any and all known and unknown claims, causes of action, cross-claims, counter-claims, charges, liabilities, demands, judgments, suits, obligations, debts, setoffs, rights of recovery, or liabilities for any obligations of any kind whatsoever (however denominated), whether class or individual, in law or equity or arising under constitution, statute, regulation, ordinance, contract or otherwise in nature— including without limitation any and all actual or potential actions, losses, judgments, fines, debts, liabilities (including joint and several), liens, causes of action, demands, rights, damages, penalties, punitive damages, costs, expenses (including attorneys' fees and legal expenses), indemnification claims, contribution claims, obligations, compensation, claims for damages or for declaratory, equitable or injunctive relief of any nature (including but not limited to antitrust, RICO, contract, tort, conspiracy, unfair competition, or unfair trade practice claims)—known or unknown, suspected or unsuspected, asserted or unasserted, direct or derivative, based upon, arising from, or relating in any way to: *(i) the factual predicates of the Provider Actions (including but not limited to the Consolidated Amended Provider Complaints filed in the Northern District of Alabama) including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date; (ii) any issue raised in any of the Provider Actions by pleading or motion*; or (iii) mechanisms, rules or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10–26 approved through the Monitoring Committee Process during the Monitoring Period and that are based on the same factual predicate of the Provider Actions and related to the injunctive relief provided by Paragraphs 10–26.

ECF 3192-2 at 18 (emphasis added).

The "Releasors" are similarly broadly defined to include:

Provider Class Representatives and each and every Settlement Class Member and all of their predecessors, successors, heirs, administrators and assigns. Each Releasor releases Released Claims *on behalf of itself and on behalf of any party claiming by, for, under or through the Releasor, with such claiming parties to include any and all of Releasor's past, present and future* officers, directors, supervisors, employees, agents, stockholders, investors, members, attorneys, servants, representatives, accounts, plans, *groups, parent companies, subsidiary*

5

*companies, affiliated companies*, divisions, affiliated partnerships, joint venturers, principals, partners, wards, heirs, assigns, beneficiaries, estates, next of kin, family members, relatives, personal representatives, administrators, agents, representatives of any kind, insurers, and *all other persons, partnerships or corporations with whom any of the foregoing have been, are now or become affiliated,* and the predecessors, successors, heirs, executors, administrators and assigns of any of the foregoing.

*Id.* (emphasis added). In addition, the Settlement Agreement carves out from its release claims:

however asserted, that *arise in the ordinary course of business* and are based solely on (a) claims by the Provider in the Provider's capacity as a plan sponsor or subscriber or (b) claims regarding whether a Settling Individual Blue Plan properly paid or denied a claim for a particular product, service or benefit based on the benefit plan document, Provider contract, or state or federal statutory or regulatory regimes (including state prompt pay laws). *Notwithstanding the foregoing sentence, any claim, however asserted, in clauses (a) or (b) in this Paragraph 1(xxx), based in whole or in part on the factual predicates of the Provider Actions or any other component of the Released Claims discussed in this Paragraph, is released.* Released Claims include, but are not limited to, claims that arise after the Effective Date.

*Id.* (emphasis added).

It is well settled that a release in a class action "must be based on the identical factual predicate as that underlying the claims in the settled class action." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir. 2011); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05MD1720MKBJO, 2019 WL 6875472, at *22 (E.D.N.Y. Dec. 16, 2019), *judgment entered*, No. 05-MD-1720 (MKB), 2022 WL 2803352 (E.D.N.Y. July 18, 2022), and *aff'd sub nom. Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704 (2d Cir. 2023) (explaining in an antitrust class action that "The law is well established in this Circuit and others that class action releases may include claims not presented and even those which could not have been presented *as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct.*" (emphasis added)); *see also Kazi v. PNC Bank, N.A.*, No. 18-

6

cv-04810-JCS, 2021 WL 965372, at *15 (N.D. Cal. 2021) (discussing the treatment of "identical factual predicate" among the circuits as equivalent to the transactional "common nucleus of operative fact"); *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1287 (9th Cir.1992); *In re TikTok, Inc., Consumer Priv. Litig.,* 713 F. Supp. 3d 470, 493-94, 501-02 (N.D. Ill. 2024) (discussing identical factual predicate doctrine and allowing claims to proceed); *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1289 (10th Cir. 2022) (Rossman, J., dissenting) ("Inevitably, courts must struggle with the uncertain consequences of ambiguous settlement agreements and judgments. The conflicting pressures are apparent, but impenetrable obscurity is likely to be resolved against preclusion.") (quoting 18A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4443 (3d ed. 2022)).

Here, the proposed settlement's ambiguous release language can be read to extend beyond antitrust-related claims, thereby violating the identical factual predicate doctrine by sweeping in claims that arise out of different factual circumstances, such as those unrelated to antitrust violations or unrelated to the defendants' conduct in the case. For example, the broad releases on their face cover more than just the injuries for which pending antitrust claims sought relief and, instead, reach events that include any topics in the thousands upon thousands of filings made to pursue the case, which could include theories and discussions that relate in a tangential way to non-antitrust theories raised in other cases. Indeed, under the proposed settlement agreement, a party could argue (albeit illogically) that the filing of this objection could give rise to a broader release of non-antitrust claims to which it refers. No one can argue for such a result in good faith.

Nor does the ambiguous carve-out provision in the release sufficiently protect the Objecting ER Groups or other out-of-network providers from pursuing non-antitrust underpayment claims against the Blue Plans, including non-statutory state common law claims

7

and other claims across the country. The carve-out provision is problematic for at least three obvious reasons. First, nothing in the proposed Settlement Agreement defines or explains what it means for a claim to arise "in the ordinary course of business." Nothing in the release prevents a Blue Plan from invoking the release by arguing, even if frivolously, that it is not in its ordinary course of business to pay for out-of-network emergency services when done at too low of a rate. Second, the carve-out provision on its face does not carve out common law claims such as claims for unjust enrichment or quantum meruit pending in various state court actions. Third, and perhaps most significantly, the "Notwithstanding the foregoing" language in the emphasized penultimate sentence of the release, arguably undermines the carve-out language if a Blue Plan were to assert, for example, that an alleged underpayment or other claim arose from that Blue Plan's monopoly power or other anticompetitive considerations.

Courts in various types of class actions have rejected class settlement agreements at the final approval stage where those agreements were overly broad and encompassed claims beyond those that were based on identical factual predicates underlying the class action. *See, e.g., Bukhari v. Senior*, 16-CV-9249, 2018 WL 559153, at *2 (S.D.N.Y. Jan. 23, 2018) (rejecting a settlement agreement where the overly broad—though facially mutual—release provision required the plaintiff to "release and forever discharge Defendants ... from any and all claims, known or unknown, asserted or unasserted, which [plaintiff] had or may have against [defendants]" including, but not limited to, claims arising under ERISA, the Civil Rights Acts of 1964 and 1991, the Sarbanes-Oxley Act of 2002, and claims sounding in "contract" or "tort."); *Hendricks v. Starkist Co*, No. 13-CV-00729-HSG, 2016 WL 692739, at *4 (N.D. Cal. Feb. 19, 2016) ("Because the Court cannot approve a settlement in which the scope of the release differs significantly from the scope of the liability alleged, the Court denies final approval on this basis as well."); *Rivera v.*

8

*SA Midtown LLC*, 16-CV-2097, 2017 WL 1378264, at *1 (S.D.N.Y. Apr. 11, 2017) (rejecting a settlement agreement that required the plaintiff to "release and forever discharge [the d]efendants ... from any and all claims, known and unknown, asserted or unasserted, which [the plaintiff] may have ... as of the date of execution of this Agreement."); *Chimbay v. Pizza Plus at Staten Island Ferry Inc.*, 15-CV-2000, 2016 WL 8290810, at *1 (S.D.N.Y. Dec. 1, 2016) (rejecting a settlement agreement because, inter alia, it "contains such an overbroad general release" which "requires Plaintiff to 'relinquish, waive, and release all of the Defendants ... from all possible claims ..., whether presently known or unknown by Plaintiffs, which may have arisen from the beginning of time through the date of their signatures on [the] Agreement."); *Zimmerman v. Zwicker & Associates, P.C.*, No. 09–3905 (RMB/JS), 2011 WL 65912, at *7 (D.N.J. Jan. 10, 2011) (rejecting settlement of an FDCPA class action finding it "troubling that the settlement requires that all present claims, lawsuits, etc. against the defendant 'arising out of or related to the same or similar circumstances, transactions or occurrences as are alleged in this case' be barred."); *Oladapo v. Smart One Energy, LLC*, No. 14-CV-7117, 2017 WL 5956907, at *15 (S.D.N.Y. Nov. 9, 2017) (taking issue with the release for using the phrase "similar conduct" and finding it unacceptable that "the proposed release would extend to all claims that arise out of or relate to 'the conduct alleged in the Complaints or similar conduct.' " (quoting the release)), *report and recommendation adopted*, 2017 WL 5956770 (S.D.N.Y. Nov. 30, 2017); *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 88 (E.D.N.Y. 2007) (expressing dismay that "[a]s written, the release would constitute a waiver of claims completely unrelated to this action that could be brought under any of the statutes or common-law theories that are alleged in the Second Amended Complaint"); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, No. 05-MD-1720 (E.D.N.Y.), 2024 WL 3236614, at *30 (E.D.N.Y. June 28, 2024) (explaining that a release can be limited by a "de-facto

9

severability clause" providing that the release extends to, but only to, the fullest extent permitted by federal law). Notably, the settlement agreement in the Provider Action does not contain any such *de facto* severability or similar limiting language as that referred to in the *Payment Card Interchange Fee* case.

In addition to the overbroad scope of *what* is released, the release language on its face is overly broad as to *who* is subject to the release, as it applies to all types of affiliates of class members, improperly extending the release to entities and providers that were not adequately represented in the class action. Affiliates, by definition, may be defined by various types of relationships and may have different legal interests, business operations, or facts at play, which could make it unjust to release their claims without independent representation or notice. This raises significant concerns about the scope of the release affecting parties who had no meaningful involvement in the class action and were not adequately represented by the class representatives.

In particular, certain out-of-network emergency provider groups that have opted-out of this settlement have either indirect corporate or contractual relationships with the Objecting ER Groups or other non-opting out providers and, therefore, could be considered "affiliates" in the context of a class action settlement. It follows, that if such opt-out groups are classified as "affiliates" under the settlement terms, they could potentially be subject to arguments by the Blue Plans that they are bound by the release of claims in the settlement, even if they opted out of the present settlement and received no consideration. This creates a significant problem, particularly regarding any potential claims of underpayment against the Blue Plans from the out-of-network groups, which are governed by EMTALA and similar applicable state laws. These statutory and regulatory schemes are entirely different than those addressed in this antitrust litigation. Despite multiple conferences with counsel involved in this litigation seeking clarification, the out-of-network ER

10

Groups have not received *any* satisfactory answers regarding how, or if, the settlement will impact their interests. The court in *McCabe v. Six Continents Hotels, Inc.*, Case No. 12-cv-04818 NC, 2015 WL 3990915, at *7 (N.D. Cal. Jun. 30, 2015), recognized the broad reach of the term "affiliates" in a class action settlement concerning defendant's alleged policy and practice of recording calls made to its call centers without giving notice to callers and instructed the parties to clarify the issue. The *McCabe* court explained:

> [T]he scope of release is broad, and releases defendant's "affiliates," "vendors," and "independent contractors," among other entities related to defendant. Dkt. No. 139–2 at ¶ 11. The Court asked the parties to clarify which defendant entities are included and to provide a plain language version of the release, accessible to the public. Dkt. No. 145. The parties submitted clarification, simplifying the release language into a shorter and more direct statement so potential class members can be informed as to the scope of the release. Dkt. No. 146. While the scope of release is broad, it is acceptable because the claims released are limited to those facts that "relate to or arise out of the alleged recording, monitoring, eavesdropping upon telephone calls made to Defendant or any other Released Parties prior to July 19, 2012.

*Id.* The putative class members here have not received the benefit of such clarity. If anything, the only certainty is the uncertainty that the opting out entities with corporate or contractual relationships with the Objecting ER Groups will face if they pursue any type of litigation against the Blue Plans. The Objecting ER Groups should not be forced to opt out of the settlement to protect claims by their indirect corporate or contractual affiliates because the settlement terms are so unclear.

Finally, the assertion that has been made by the Blue Plans that the Eleventh Circuit had previously approved identical releases in the Subscriber Action is not accurate. The differences in the language of the carve-out provisions between the two actions are significant. Unlike the carve-out in the Provider Action detailed above, the Subscriber Action settlement agreement carves out claims:

11

however asserted, that arise in the ordinary course of business and are based solely on (i) whether a particular product, service or benefit is covered by the terms of a particular Commercial Health Benefit Product, (ii) seeking resolution of a benefit plan's or a benefit plan participant's financial responsibility for claims, based on either the benefit plan document or statutory law, or (iii) challenging a Releasee's administration of claims under a benefit plan, based on either the benefit plan document or statutory law.

The differences between the carve-outs and between the two classes are obvious and significant. The carve-out in the Subscriber Action agreement has nothing to do with claims that may be brought by providers, such as out-of-network underpayment claims but focuses primarily on the scope of benefit plan administration, coverage, and financial responsibility, as it relates to Blue Plans' members related to the operation of health benefit plans. Given the stark differences in the carve-out language, there is little basis for arguing or concluding that the releases in the Subscriber Action and Provider Action should be treated as identical, as they cover different legal and factual issues.

Accordingly, the proposed Settlement Agreement's release language extends too far, potentially reaching non-antitrust claims and affecting non-class parties, including affiliates of Objecting ER Groups who were not adequately represented. Such concerns highlight the importance of ensuring that the release is appropriately tailored to the specific facts and claims at issue in the litigation, and that it does not overreach in a way that could violate class members' rights, impose litigation burdens on them later, or result in an unfair settlement. The principle of "identical factual predicate" acts as critical limits on the scope of a class action release, and any settlement that fails to adhere to this doctrine, as articulated above, is patently unfair. On the other hand, modest edits to the releases here could easily clarify the scope of the release without any prejudice to the parties or finality in the *antitrust* case.

## III.    THE SETTLEMENT SHOULD BE REJECTED DUE TO THE INEQUITABLE TREATMENT OF CLASS MEMBERS.

Rule 23(e)(2)(D) requires that class members be treated "equitably, not identically." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2024 WL 3236614, at *36. For example, in the context of injunctive relief, this "means that different class members can benefit differently from an injunction — but no matter what, they must stand to benefit (it cannot be the case that some members receive no benefit while others receive some)." *Id.* In overruling the objection to the preliminary approval of the settlement brough by certain corporate affiliates of the Objecting ER Groups, the Court specifically directed the objectors "to consider whether the settlement is fair, reasonable and adequate, and whether it treats class members equitably relative to each other, taking appropriate account of differences among their claims," citing to *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *27 (E.D.N.Y. Dec. 16, 2019). *See* ECF 3224 at 5, n.1.

The *Payment Card* court explained the principles underlying the analysis:

> In related contexts, the Supreme Court and the Second Circuit have cautioned against class certification and settlement approval where differently situated class members were treated inequitably relative to one another. In *Ortiz*, for example, the Supreme Court rejected a settlement that **treated all claimants equally, although some plaintiffs had claims that were more valuable**. *See* 527 U.S. at 857; *see also Interchange Fees II*, 827 F.3d at 232 ("A second fatal deficiency in the Ortiz settlement was that all present claimants were treated equally, notwithstanding that some had claims that were more valuable."). In *Fikes*, at least one judge took issue with a future release provision in the 2019 Settlement, which "caused class members to be treated inequitably relative to each other." 62 F.4th at 730 (Jacobs, J., concurring) ("It is arguable that the future release: (A) resulted in newer merchants receiving inadequate representation from the class representatives; (B) caused class members to be treated inequitably relative to each other; and therefore (C) should be stricken from the settlement agreement. Ordinarily, [the Second Circuit] would reject a settlement which involved ... inequitable treatment."). Inequitable treatment can arise where **differently situated class members are treated equally by a settlement.** For example, the Second Circuit rejected a settlement in which differently-situated class members (holders of liquidated and unliquidated futures contracts) received the same benefit from the settlement (*i.e.,*

13

were treated identically to holders of only liquidated contracts). *Nat'l Super Spuds*, 660 F.2d at 19. The Court noted that:

> An advantage to the class, no matter how great, **simply cannot be bought by the uncompensated sacrifice of claims of members, whether few or many**, which were not within the description of claims assertable by the class. Under the settlement a class member holding one liquidated and one unliquidated contract receives no more than another class member holding only one liquidated contract. Mere statement suffices to show how far this departs from principles of equity.

*Id.* (emphases added).

Applying these principles, the *Payment Card* Court agreed with the objectors there that the settlement there did not treat Class Members equitably relative to one another and was "akin to the inversion of pro rata distribution." Specific to the facts in that case,

> The largest merchants who pay the most in interchange fees are also the most likely to have negotiated individual rates with either their Acquirers or the Networks directly. Because these merchants do not pay posted rates, they are unlikely to receive any benefit from the "rate caps and rollbacks." Similarly, large national merchants are more likely to accept American Express and operate in states that prohibit surcharging, (*see, e.g.*, Walmart Objs. 4–7), and therefore, these merchants "gain no appreciable benefit from the [S]ettlement," while merchants "that do not take American Express and operate in states that permit surcharging ... derive a potentially substantial benefit." *Interchange Fees II*, 827 F.3d at 238. Together, these facts limit the ability of large merchants to benefit from the changes to the surcharge provisions. In addition, large national merchants are unlikely to benefit from the "merchant buying group" provisions and merchant education fund. (*See, e.g.*, Walmart Objs. 2.) Although the Court does not agree with objectors' contentions that the Settlement is "essentially worthless," (7-Eleven Objs. 26), "meaningless," (Walmart Objs. 2), or provides "no benefit," (Target Objs. 21; 7-Eleven Objs. 18), the Court finds that the benefits of the Settlement are likely to flow disproportionately and inequitably to small, local merchants like the Class Representatives.

*Id.*; *see also In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 248 (2d Cir. 2011) ("Although all class members share an interest in maximizing the collective recovery, their interests diverge as to the distribution of that recovery because each category of claim is of different strength and therefore commands a different settlement value.").

14

Likewise, the proposed settlement here risks treating all healthcare providers similarly without regard to their reasonably expectable reimbursement rates, thereby ignoring the fact that out-of-network emergency medicine providers are entitled to higher reimbursement rates than in-network providers. Out-of-network emergency providers are typically reimbursed significantly more for their services due to the absence of negotiated rates and the need to account for a broader set of costs and risks, including the lack of an established contract with insurers. Further, EMTALA requires that emergency medicine groups treat *all* patients, including Blue Plans' subscribers, regardless of health insurance status or ability to pay. The proposed settlement in this case fails, however, to differentiate among distinct reimbursement arrangements, applying a standard that, by definition, disproportionately underpays out-of-network providers. This inequitable treatment undermines the intended fairness of the settlement by failing to recognize the unique financial realities faced by Allatoona, its similarly situated affiliates, and other similarly situated class members that provide *out-of-network* emergency medical services, particularly with regard to the potentially higher costs they incur in delivering such emergency services.

In summary, a blanket treatment of medical providers that ignores the differences among their expectable reimbursement rates is not only inequitable but also counterproductive, as it fails to respect the diversity of healthcare delivery models and the financial intricacies that sustain them. As a result, the class members are treated inequitably, and the settlement unfairly diminishes out-of-network providers' compensation, even though these providers are entitled to higher rates for their critical and mandated services.

15

## Conclusion

For the foregoing reasons, the Objecting ER Groups respectfully object to the class action settlement. Counsel for the Objecting ER Groups will be present at the Final Fairness Hearing and requests to be heard.

Dated:  March 4, 2024

Respectfully submitted,

Barry S. Pollack (BBO#642064)
Phillip Rakhunov (BBO#663746)
POLLACK SOLOMON DUFFY LLP[2]
31 St. James Avenue, Suite 940
Boston MA 02116
(617) 439-9800
bpollack@psdfirm.com
prakhunov@psdfirm.com

---

[2] The undersigned counsel for the Objecting ER Groups has not objected to any class action settlements in the past five years other than lodging an objection to the preliminary settlement approval in this action on behalf of certain affiliates of the Objecting ER Groups. *See* ECF Nos. 3211, 3222.

16

## <u>Verification</u>

I, Lisha Falk, am an Authorized Representative of Allatoona Emergency Group, PC and Alabama Emergency Physician Partners, LLC. Under the pains and penalties of perjury, I declare that the facts stated in the above document are true to the best of my knowledge and belief.

Lisha Falk

17

## Certificate of Mailing

I hereby certify that on March 4, 2025, the foregoing was sent by Express Mail and First Class Mail with a copy by email to:

BLUE CROSS BLUE SHIELD
PROVIDER SETTLEMENT
Settlement Notice Administrator
P.O. Box 26443
Richmond, VA 23261
Administrator@BCBSProviderSettlement.com

Edith M. Kallas
Joe R. Whatley, Jr.
WHATLEY KALLAS, LLP
P.O. Box 10968
Birmingham, AL 35202-0968
(800) 745-8153
BCBSProviderSettlement@whatleykallas.com

Karin DeMasi
Lauren Kennedy
CRAVATH SWAINE & MOORE, LLP
375 Ninth Avenue
New York, NY 10001
(212) 474-1000
kdemasi@cravath.com

Phillip Rakhunov

18

PRESS FIRMLY TO SEAL

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.

PRESS FIRMLY TO SEAL

TYVEK® IS RECYCLABLE.
©2003, DUPONT™ AND TYVEK® ARE TRADEMARKS OF DUPONT.

Please Recycle

Retail




23261

RDC 07

U.S. POSTAGE PAID
PME
BOSTON, MA 02116
MAR 04, 2025

**$34.10**

S2324P502972-32

## UNITED STATES POSTAL SERVICE®  |  PRIORITY MAIL EXPRESS®



EJ 246 472 364 US

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)    PHONE ( 617 ) 439 9800

Phillip Rakhunov, Esq.
Pollack Solomon Duffy LLP
31 St. James Ave.; Ste. 940
Boston MA 02116

**DELIVERY OPTIONS (Customer Use Only)**
☐ SIGNATURE REQUIRED *Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.*
**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
☐ 10:30 AM Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.*

TO: (PLEASE PRINT)    PHONE ( 888 ) 452.3095

BLUE CROSS BLUE
SHIELD PROVIDER SETTLEMENT
Settlement Notice Administrator
P.O. Box 26443
Richmond, VA
ZIP + 4® (U.S. ADDRESSES ONLY)
2 3 2 6 1 - ___ ___ ___ ___

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 Insurance included.

**PEEL FROM THIS CORNER**

**PAYMENT BY ACCOUNT (if applicable)**
USPS® Corporate Acct. No. | Federal Agency Acct. No. or Postal Service™ Acct. No.

**ORIGIN (POSTAL SERVICE USE ONLY)**

| ☒ 1-Day | ☐ 2-Day | ☐ Military | ☐ DPO |
|---|---|---|---|

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage |
|---|---|---|
| 02116 | 3/5/25 | $ 34.10 |

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
|---|---|---|---|
| 3/4/25 | ☐ 10:30 AM ☒ 3:00 PM ☐ 12 NOON 6PM | $ | $ |

| Time Accepted | | 10:30 AM Delivery Fee | Return Receipt Fee | Live Animal Transportation Fee |
|---|---|---|---|---|
| 12:53 ☐ AM ☒ PM | | $ | $ | $ |

| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
|---|---|---|
| $ | $ | 34.10 |

| Weight | ☐ Flat Rate | Acceptance Employee Initials |
|---|---|---|
| 3.60 lbs. oz. | MS | $ |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |
| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
| | ☐ AM ☐ PM | |

LABEL 11-B, MARCH 2019    PSN 7690-02-000-9996

**OUR FASTEST SERVICE IN THE U.S.**    |     **SIGNATURE INCLUDED UPON REQUEST**

RECEIVED

✱ Money Back Guarantee to U.S., select APO/FPO/DPO, and select International
destinations. See DMM and IMM at pe.usps.com for complete details.
✦ Money Back Guarantee for U.S. destinations only.

MAR 0 7 2025

Brown Greer
Richmond Va

EP13C July 2013    **VISIT US AT USPS.COM®**

uPont™ Tyvek®
This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express™ shipments. Misuse may be a violation of federal law. This packaging is not for resale. EP13C © U.S. Postal Service; July 2013. All rights reserved.