FILED

2025 Apr-23  PM 07:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

IN RE: BLUE CROSS BLUE SHIELD

ANTITRUST LITIGATION

MDL 2406, N.D. Ala.

Master File No. 2:13-cv-20000-RDP

WRITTEN OBJECTION TO PROPOSED SETTLEMENT

## I. INTRODUCTION AND CLASS MEMBER INFORMATION

1. I, Kyle Egner, submit this written objection to the proposed settlement in *In re: Blue Cross Blue Shield Antitrust Litigation*. I am a healthcare provider and Settlement Class Member located at:

**619 Old Symsonia Road Suite B**

**Benton, KY 42025**

Kyle.egner@gmail.com

**270-527-3050**

2. My National Provider Identifier (NPI) used for submitting claims to Blue Plans during the Settlement Class Period is: ▮▮▮▮▮ and my Tax Identification Number (TIN) is ▮▮▮▮▮ .

## II. STANDING AND ELIGIBILITY

3. I qualify as a Settlement Class Member per Section 5 of the Settlement Notice, having continuously provided chiropractic services to Blue Plan patients from **2008 to present**, spanning the entire Settlement Class Period (July 24, 2008, to October 4, 2024).

4. My practice is located in **Marshall County, Kentucky,** where Blue Plans represent a significant portion of healthcare coverage. My practice data demonstrates **substantial Blue Plan engagement:**

- Approximately 1,400 Blue Cross Blue Shield claims processed in 2023

- Blue Plans constitute **36% of total insurance claims volume**

- Annual Blue Plan reimbursements of **$39,076.09 (2023)**

- One of **6-8 chiropractic providers** serving Marshall County

## III. SCOPE OF OBJECTION

5. This objection primarily challenges **three fundamental issues** within the proposed settlement:

- The **disproportionate distribution** of settlement funds

- **Excessive administrative and legal fees**

- **Inadequate compensation** for medical professionals

6. I am **not represented by counsel** in this matter, and my objection is submitted independently.

## IV. SPECIFIC OBJECTIONS

### A. Inequitable Distribution of Settlement Funds

7. The proposed allocation of the $2.8 billion settlement is fundamentally flawed:

- **$700 million (25%)** allocated to attorneys' fees

- **$200 million (7.14%)** allocated to expenses, costs, and administration

- Of the remaining Net Settlement Fund:

   o **92%** allocated to healthcare facilities (~$1.748 billion)

   o **8%** allocated to medical professionals (~$152 million)

8. The most concerning aspect is that the **$200 million allocated for expenses, costs, and administration exceeds the entire allocation for medical professionals** ($152 million), implying that processing the settlement is deemed **more valuable** than compensating providers for **16 years of restricted competition**.

9. Based on **national healthcare economic data from the 2023 National Health Expenditures report**, hospital care accounts for **30.6% of total healthcare spending** ($1.5 trillion), while physician and clinical services represent **20.0%** ($978 billion of the $4.9 trillion total). When considering only these two categories together, hospital care accounts for **60.5%** and physician services **39.5%** of this combined spending. The proposed allocation of only 8% to medical professionals

significantly undervalues their economic contribution and fails to reflect **actual market dynamics** or the **relative harm suffered.**

10. Additionally, this 8% allocation to medical professionals fails to acknowledge the proportional volume of claims submitted by individual providers versus facilities. In my practice alone, Blue Plans account for 36% of total insurance claims, with approximately 1,400 BCBS claims processed annually. If we extrapolate this pattern across the estimated 300,000 eligible providers, the claim volume from individual practitioners represents a substantially larger portion of the total claim universe than the 8% allocation suggests.

## B. Excessive Administrative and Legal Fees

11. The legal fees of **$700 million (25%)** are disproportionate to the actual benefit delivered to class members.

12. In *Boeing Co. v. Van Gemert*, the Supreme Court established that **attorney fees must be reasonable and proportionate** to class members' compensation. Here, **individual medical providers will receive mere pennies per affected patient encounter**, while legal fees amount to $700 million.

13. Additionally, courts have repeatedly reduced excessive attorney fees in similar class action settlements. In *In re Bluetooth Headset Products Liability Litigation* (9th Cir. 2011), the court rejected a fee award that was disproportionate to the class recovery. Similarly, in *In re HP Inkjet Printer Litigation* (9th Cir. 2013), the court emphasized that attorney fees should not dwarf the benefits to class members as appears to be the case here.

14. **Comparison of compensation:**

- **Attorney fees:** $700 million

- **Medical professionals fund:** $152 million total (for approximately 300,000 providers)

- **My estimated settlement share:** Approximately $709.87 (based on the settlement's tiered system and detailed calculations below)

- **This settlement values 16 years of my professional services at a fraction of what attorneys receive for a single case.**

## C. Inadequate Compensation for Medical Professionals

15. The **$152 million allocation** for medical professionals:

- Represents **only 5.43%** of the total settlement

- Falls below **administrative costs and expenses**

- **Fails to address** 16 years of competitive restrictions and suppressed reimbursements

- Ignores the **ongoing administrative burden** placed on providers

16. My **documented financial impact:**

- Blue Plan reimbursements in 2023: **$39,076.09**

- Estimated **16-year total claims to BCBS**: ~$625,217

- **Estimated damages due to anticompetitive practices (5%):** ~$31,260

- **Expected payout under this settlement**: $709.87, which is only 2.3% of the actual harm suffered

17. Beyond the financial impact, BCBS's anticompetitive practices have directly harmed my practice in several non-monetary ways:

- Forced compliance with restrictive contract terms that limit my ability to provide optimal patient care

- Excessive administrative requirements that divert time away from patient care

- Inability to negotiate fair reimbursement rates due to BCBS's market dominance

- Limitations on patients' provider choices within their networks

- Delays in claim processing and payment that affect practice cash flow

## D. Evidence of Reimbursement Rate Suppression (2009-2024)

18. My analysis of BCBS allowed amounts from 2009 to 2024 for common chiropractic procedure codes provides concrete evidence of reimbursement suppression:

- While cumulative inflation over this 15-year period was **48.60%**, the average change in BCBS allowed amounts across all analyzed codes was only **11.85%**, falling **36.75 percentage points below inflation**

- **Half of the analyzed procedure codes actually decreased in nominal dollar value** over this period, with some codes experiencing reductions of up to **30%**

- Only **2 out of 6 analyzed codes** kept pace with or exceeded inflation

- Specific examples demonstrating suppressed reimbursements:
  - **Examination codes** have been severely impacted:
    - **Code 99203** (New Patient, Detailed Exam): **Decreased by 30%** ($93.20 → $65.24)
    - **Code 99212** (Established Patient, Problem-Focused Exam): **Decreased by 30%** ($36.70 → $25.69)
  - Code 97140 (Manual Therapy): **Decreased by 12.88%** ($23.53 → $20.50)

19. This data provides clear, quantifiable evidence of how BCBS's anticompetitive practices have financially harmed medical professionals through systematic suppression of reimbursement rates over the Settlement Class Period. The proposed settlement amount does not adequately compensate for this documented financial harm.

## V. SETTLEMENT PAYOUT CALCULATION DETAILS

20. I have calculated my likely settlement share using the formula provided in the settlement notice:

For the current $152 million fund allocation to medical professionals:

- My practice falls in the Allowed Amounts range of $500,000-$750,000 (3 points)
- My geographic harm coefficient in Kentucky is 3.5 (per communication with Settlement Administrator)
- Points multiplier for harm coefficient 3-4 = 3.5
- My adjusted points: 3 × 3.5 = 10.5 points
- Assuming 300,000 eligible providers with an estimated average of 7 adjusted points each:
  - Total adjusted points across all claimants: 300,000 × 7 = 2,100,000 points
  - Value per point: $152,000,000 ÷ 2,100,000 = $72.38 per point
  - My estimated payout: 10.5 points × $72.38 = $709.87

For my proposed $952 million fund allocation to medical professionals:

- Same points calculation: 10.5 adjusted points
- Value per point: $952,000,000 ÷ 2,100,000 = $453.33 per point

- My estimated payout: 10.5 points × $453.33 = $4,759.97

Even with my proposed 40% allocation providing an estimated payout of $4,759.97, this amount is still only 15.2% of my estimated damages of $31,260.

## VI. PROPOSED REMEDIES

21. To ensure fairness, I propose the following **revised distribution:**

- **Administrative & Legal Fees: Maximum 15%** ($420M)

- **Healthcare Facilities: 60%** ($1.428B)

- **Medical Professionals: 40%** ($952M)

This represents a significant and necessary correction from the current inequitable distribution (92% facilities/8% professionals) to one that better reflects actual healthcare market dynamics (60% facilities/40% professionals).

22. Even with the proposed 40% payout to providers, the estimated individual compensation would still be far below the actual damages incurred:

- **Current allocation ($152M):** Estimated payout of $709.87, or just 2.3% of my estimated damages

- **Proposed allocation ($952M):** Estimated payout of $4,759.97, or only 15.2% of my estimated damages

23. This allocation better aligns with **healthcare industry benchmarks,** where **individual providers represent approximately 39.5% of healthcare service delivery.**

24. **Administrative cost controls** should be implemented:

- Cap combined fees and costs at industry-standard levels

- Require **detailed expense justifications** before final approval

- Reduce excessive **notice and claims administration costs**

## VII. CONCLUSION

25. The current settlement structure fails to fairly compensate **medical professionals,** imposes **excessive administrative costs,** and **perpetuates market inequities.** I respectfully request that the Court:

- **Reject the current distribution** structure

- **Mandate more equitable provider compensation**

- **Reduce excessive administrative and legal fees**

26. I do **not** intend to appear at the Final Fairness Hearing.

## VIII. DECLARATION

27. I declare under penalty of perjury that the information provided above is true and correct.

28. I disclose that I utilized artificial intelligence assistance in generating this objection letter, though all factual information, arguments, and opinions expressed herein are my own.

## REQUEST FOR CONFIDENTIAL TREATMENT

29. I respectfully request that my Tax Identification Number (TIN) provided in paragraph 2 of this objection be redacted or kept confidential in any public court filings to protect against identity theft and fraud. This information is provided solely to establish my standing as a class member.

**Date: March 3, 2025**

**Kyle Egner, DC**

## X. CERTIFICATE OF SERVICE

30. I certify that copies of this objection have been sent to:

Settlement Notice Administrator BLUE CROSS BLUE SHIELD PROVIDER SETTLEMENT P.O. Box 26443 Richmond, VA 23261

Plaintiffs' Co-Lead Counsel Edith M. Kallas Joe R. Whatley, Jr. WHATLEY KALLAS, LLP P.O. Box 10968 Birmingham, AL 35202-0968

Counsel for Settling Defendants Karin DeMasi Lauren Kennedy CRAVATH SWAINE & MOORE, LLP 375 Ninth Avenue New York, NY 10001