FILED

2025 Apr-23  PM 07:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit J

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE:**<br>**BLUE CROSS BLUE SHIELD**<br>**ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This Document Relates to**<br>**Provider Track Cases** |

**DECLARATION OF MATTHEW C. KATZ IN SUPPORT OF**
**PROVIDER PLAINTIFFS' MOTION FOR FINAL APPROVAL**

**I, Matthew C. Katz, declare:**

1. I have previously submitted a declaration related to the value of the injunctive relief in the Provider Plaintiffs' Settlement. Doc. No. 3253-2. I continue to believe that all of the facts and opinions expressed in that declaration are true and correct.

2. Since 2019, I have been the Principal of MCK Health Strategies LLC and MCK Consulting LLC. In that capacity, I advise state and national medical specialty societies on health care policy, advocacy efforts, and initiatives, and work with physician practices, other clinicians and medical providers and professionals, hospitals, health systems, and medical management companies on the understanding and use of health information technologies (HIT), regulatory reforms at the state and national level and general medical practice management policies and procedures. I also help providers of medical care and health services to resolve claims coding, billing, processing, adjudication and payment disputes, including but not limited to prior authorization, prior certification, retrospective audit and reviews, downcoding and bundling, and prompt payment, along with an evaluation and analysis of value-based care and fee for service contracting. I also assist in evaluating internal coding and billing systems to reduce the likelihood of an audit or negative audit findings from health insurers, other third-party payers, state and

federal governmental agencies and employers. Finally, I assist physicians, physician groups, facilities and vendors negotiate contracts with health insurers for payment of services and value-based care arrangements focused on access and quality improvements and cost reduction.

3.    From 2006 to 2019, I served in various executive capacities at the Connecticut State Medical Society (CSMS). From 2012 to 2019, I was the chief executive officer (CEO) of CSMS, along with its subsidiaries and not for profit 501(c)(3) entities. Among my other responsibilities, I coordinated the strategic development of all CSMS initiatives associated with legislation, regulation, general advocacy, education, and membership.

4.    From 1998 to 2006, I held various positions at the American Medical Association (AMA), including Director of the Practice Management Resource Center and Director of Private Payer Advocacy. At the AMA, I coordinated the development of AMA initiatives related to physician practice advocacy, most notably the AMA's prompt payment campaign and physician practice management activities, including claims processing and physician payment services, as well as health information technology adoption and implementation.

5.    From 1994 until 1998, I worked for academic medical centers, health systems and health insurers, where I did various primary and secondary research projects along with some managed care contracting, along with the American Academy of Pediatrics, where my role was specifically designed to assist pediatricians and pediatric specialists with coding and reimbursement issues tied to health insurers and governmental agencies.

6.    I have reviewed the objection to the Provider Plaintiffs' settlement agreement submitted by Allatoona Emergency Group, PC and Alabama Emergency Physician Partners, LLC, who refer to themselves as the "Objecting ER Groups." I have also reviewed the objection that related medical groups filed through the same counsel in response to the motion for preliminary

approval. This declaration addresses the Objection ER Groups' contention that the settlement is inequitable because it "risks treating all healthcare providers similarly without regard to their reasonably expectable reimbursement rates, thereby ignoring the fact that out-of-network emergency medicine providers are entitled to higher reimbursement rates than in-network providers."

7.      First, the universe cannot be divided into "out-of-network emergency medicine providers" and "in-network emergency medicine providers." It is common for emergency medicine providers to change their network status with various insurers over time. Over the sixteen-year class period in this case, in my opinion, many emergency medicine providers have changed their status, some more than once, based on their individual circumstances and their employer or employment situation with a medical group, hospital, health system or private equity entity.

8.      Second, the settlement agreement does account for differences in reimbursement rates by using Allowed Amounts as the basis for a class member's payment. Higher reimbursement rates for certain providers would translate to higher settlement payments (holding other factors equal). Therefore, the settlement does not treat all healthcare providers similarly without regard to their reasonably expectable reimbursement rates.

9.      It is unclear to me if the Objecting ER Groups also contend that the improvements to the BlueCard program and other injunctive relief in the settlement do not benefit out-of-network providers. If so, improvements to the BlueCard program make the option of going in-network more valuable to all providers, even if they ultimately choose to remain out-of-network. Increasing the value of this option benefits all providers. This option is demonstrated by the two Objecting ER Groups. Even though they are related and have a common connection with SCP Health, as

3

Objecting ER Groups. Even though they are related and have a common connection with SCP Health, as demonstrated by the fact that an official of SCP Health verified the objection for both groups, one is in-network and one is out-of-network. Given the substantial value of the injunctive relief in transforming claims processing, adjudication, and payment procedures, as well as the significant reduction in administrative burdens and barriers to service-level care delivery, this relief offers considerable benefits to all providers.

I declare under penalty of perjury that the foregoing is true, correct, and accurate.

Executed this the 23rd day of April, 2025.

_____
Matthew C. Katz