FILED

2025 Jul-30  AM 10:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 1

# *In Re Blue Cross Blue Shield Antitrust Litigation,* MDL 2406

## FINAL APPROVAL HEARING

## July 29, 2025



1

# THE SETTLEMENT IS READY FOR FINAL APPROVAL

- Preliminary approval was granted on December 4, 2024

- Notice has been provided to the Settlement Class consistent with the court- approved Notice Plan

- The Settlement Class also received extensive education about the Settlement through presentations and communications

- Only three objections (from >3 million class members)

- More than a million claims filed as of July 27

# The Settlement Is The Product of 12-Years of Hard-Fought Litigation and Contentious Arm's-Length Negotiations

- 12 years of litigation on behalf of providers

- $100 million spent to develop the largest collection of healthcare claims data in history, partnering with economists to evaluate data and develop econometric models for the case

- Numerous discovery hearings – 91 discovery orders, obtained and reviewed tens of millions of pages of documents dating back to the 1920s, and participated in more than 200 depositions, produced extensive discovery from Providers to the Blues

- Filed and briefed motions to dismiss, the antitrust standard of review, class certification and motions for summary judgment

- Countless mediation sessions both in person and virtual over the last nine years

- Numerous Work Group sessions and consultations with class representatives, associations and Class Members

3

# Two monumental outcomes for providers

**1**

**Second Largest Monetary Recovery ($2.8 billion)** in any antitrust case, and the largest in any healthcare antitrust litigation.

**2**

**Injunctive relief worth more than $17.3 billion including administrative cost savings of $7.55 per BlueCard Claim** for provider settlement class members.

4

# Overview of Injunctive Relief

 Transformation and Accountability of the BlueCard System

 Significant Changes to Encourage More Competition

 Compliance, Reporting and Monitoring

 Additional Commitments

# Transformation of the BlueCard Program

- Class Members will benefit from being able to resolve numerous issues with respect to submission, processing and payment of BlueCard claims, the Blues agreed to develop and implement a system-wide, cloud-based architecture that will enable the delivery of the System's inter-Plan claims data.

- This transformation, along with other information-sharing enhancements, will increase Local Plans' and Class Members' access to critical information, so that out-of-area Blues are no longer the only Blues with available information about those members. As a result, Class Members will be able to get up-to-date, accurate information, as if they were a contracted provider of the Home Plan, *directly from their Local Plan*, so that the Local/Host Plan is better equipped to resolve issues that arise during the BlueCard process.

6

## Transformation Facilitates Transparency, Efficiency and Accountability

- Blues agreed that the new BlueCard system will make information available, in the same way that the Local Blue Plan currently shares its own Members' data, including:

  - ✓ Member Benefits and Eligibility Verification
  - ✓ Pre-Authorization Requirements
  - ✓ Claims Status Tracking

- Patient Data Exchange Capabilities

- Facilitation of BlueCard Program Improvements

- Implementation of Real-Time Inter-Plan Messaging Service

- Designation of BlueCard Executive

- Creation of National Executive Resolution Group

- BlueCard Prompt Pay Obligation

- Service Level Agreements ("SLAs")

# The Experts' Valuation Focused on Transformation of the BlueCard Program

The $17.3 Billion Valuation consists of:

1. The expected cost savings to Providers from reducing the administrative burden of BlueCard Program-related tasks

2. The expected financial benefit from the BlueCard Prompt Pay Commitment

# SIGNIFICANT CHANGES TO ENCOURAGE MORE COMPETITION

Contiguous Area Relief – Expansion of Member Access and Expansion of Contracting Opportunities

Limitations on All Products Clauses

# ADDITIONAL COMMITMENTS








Common Appeals Form

Third Party Information

Pre-Authorization

Minimum Data

Value Based Care

Telehealth

# COMPLIANCE, MONITORING AND REPORTING

- The Settlement provides for a comprehensive compliance, monitoring and reporting process to ensure the Blues follow through on their commitments to Settlement Class Members.

- This process will be overseen by a five person Monitoring Committee for a period of five years from the Effective Date of the Settlement.



11

# Class Notice Was Effectuated

 3.3 million postcard and email notices

 Second and third attempts for undelivered notices + reminder notices

 18 million "impressions" from media campaign

 Settlement website (2,592,002 hits)

 Toll-free number (12,840 calls)

 Administrator@BCBSProviderSettlement.com (5,471 emails)

12

# In Addition to the Notice, Co-Lead Counsel Engaged in a Massive Education Campaign



More than 120 presentations to thousands of representatives of hundreds of thousands of Providers



28 webinars on filing claims to representatives of hundreds of thousands of Providers



Brochures and letters to hospital systems



Thousands of visits to Co-Lead Counsel's settlement website address



Responding to thousands of emails and calls to Whatley Kallas



Overwhelmingly positive response

13

# Positive Response to the Settlement

- Well over a million claims filed as of July 28

- Opt-Outs represent less than 1% of class members

- Only three objections

# This Settlement Meets the  Standards for Final Approval Under Rule 23(e)(2) and the *Bennett* Factors

# Rule 23(e)(2)

A court may approve a settlement "on finding that it is fair, reasonable, and adequate after considering whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other."

16

# *Bennett* Factors

(1)   The likelihood of success at trial;

(2)   The range of possible recovery;

(3)   The point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable;

(4)   The complexity, expense and duration of litigation;

(5)   The substance and amount of opposition to the settlement; and

(6)   The stage of proceedings at which the settlement was achieved.

*Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir. 1984)

17

# The Settlement Class Is Under Rule 23(b)(3) Only

- No mandatory class

- Total right to opt-out

# The Settlement Treats Class Members Equitably

Each Settlement Class Member's recovery is based on its unique circumstances

- Allowed Amount (i.e., the volume of its business with the Blues)

- Geographic location

Mr. Feinberg and Ms. Biros decided the allocation and approved the plan of distribution
(Doc. No. 3207-2)

19

# Objections

- Only three objections:

  o HCA

  o Non-Opt Out SCP ER Groups

  o Kyle Egner, DC

# Objection Checklist: HCA

| Objection | Response |
|---|---|
| The Providers' release is not limited to the "identical factual predicate" | Blues' Brief at 8–10<br>Providers' Brief at 23–25<br>Slides 22 & 28 |
| The Providers' release is ambiguous because it is not identical to the Subscribers' release | Blues' Brief (Doc. No. 3334) at 7<br>Providers' Brief (Doc. No. 3313-1) at 25–27, 28–30<br>Slides 23-27 |

# The Same Language in the Subscriber Release Was Found to Require the "Identical Factual Predicate"

- "[T]he release provision permissibly releases only claims based on an identical factual predicate to the underlying litigation."

- "This language cabins the scope of the release. **The release does not extend beyond claims arising from the common nucleus of operative fact: all the released claims either were raised or could have been raised during the litigation that preceded the settlement**. The release does not bar any claims that could not have been litigated before settlement or any claims related to conduct that was not challenged in the underlying lawsuit."

*In re Blue Cross Blue Shield Antitrust Litig.*, 85 F.4th 1070, 1088, 1091 (11th Cir. 2023).

22

# The Provider and Subscriber Release Language are Virtually Identical

| Subscriber Release (Dkt. 2610-02 ¶ A.1.uuu) | Provider Release (Dkt. 3192-02 ¶ A.1.xxx) |
|---|---|
| "'Released Claims' means any and all known and unknown claims . . . based upon, arising from or relating in any way to: (i) the factual predicates of the Subscriber Actions . . . including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date; (ii) any issue raised in any of the Subscriber Actions by pleading or motion; or (iii) mechanisms, rules, or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10 through 18 approved through the Monitoring Committee Process during the Monitoring Period." | "'Released Claims' means any and all known and unknown claims . . . based upon, arising from, or relating in any way to: (i) the factual predicates of the Provider Actions . . . including each of the complaints and any prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date; (ii) any issue raised in any of the Provider Actions by pleading or motion; or (iii) mechanisms, rules or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10–26 approved through the Monitoring Committee Process during the Monitoring Period and that are based on the same factual predicate of the Provider Actions and related to the injunctive relief provided by Paragraphs 10–26." |

Defendants' Brief In support of Final Approval of Proposed Provider Track Class Settlement, Doc. No. 3334, at 5.

23

# The Relevant Language in the "Caveat" Comes Directly From the Subscriber Agreement

Nothing in this Release shall release claims, however asserted, that arise in the ordinary course of business and are based solely on (i) whether a particular product, service or benefit is covered by the terms of a particular Commercial Health Benefit Product, (ii) seeking resolution of a benefit plan's or a benefit plan participant's financial responsibility for claims, based on either the benefit plan document or

Any claim, however asserted, (i) that a product, service, or benefit should be or should have been covered, but was not covered, (ii) seeking resolution of a benefit plan's or benefit plan participant's financial responsibility for claims, or (iii) challenging a Releasee's administration of claims under a benefit plan, **based in whole or in part on the factual predicates of the Subscriber Actions, or any other component of the Released Claims discussed in this Paragraph, is released.**

Subscriber Settlement Agreement, Doc. No. 2610-2, ¶ 1(uuu)

24

# The Provider Ordinary Business Claim Exception Uses the Same Language in the Caveat

injunctive relief provided by Paragraphs 10–26.  Nothing in this Release shall release

claims, however asserted, that arise in the ordinary course of business and are based solely

> Notwithstanding the foregoing sentence, any claim, however asserted, in clauses (a) or (b) in this Paragraph 1(xxx), **based in whole or in part on the factual predicates of the Provider Actions or any other component of the Released Claims discussed in this Paragraph, is released.**

predicates of the Provider Actions or any other component of the Released Claims

discussed in this Paragraph, is released.  Released Claims include, but are not limited to,

claims that arise after the Effective Date.

Provider Settlement Agreement, Doc. No. 3192-2, ¶ 1(uuu)

25

# Compare the Relevant Language of the Subscriber and Provider Caveats

**"based in whole or in part on the factual predicates of the Subscriber Actions, or any other component of the Released Claims discussed in this Paragraph, is released."**

Subscriber Settlement Agreement, Doc. No. 2610-2, ¶ 1(uuu)

**"based in whole or in part on the factual predicates of the Provider Actions or any other component of the Released Claims discussed in this Paragraph, is released."**

Provider Settlement Agreement, Doc. No. 3192-2, ¶ 1(xxx)

# The Subscriber Release Exception for Provider Claims Would Be Nonsensical Here

- Subscriber Release: "a Provider who is a Settlement Class Member as defined in this Agreement does not release any claims arising from his, her or its sale or provision of health care products or services (as opposed to the purchase of a Commercial Health Benefit Product)." Doc. No. 2610-2, ¶ 1(uuu).

27

# Defendants Agree That the Release Is Limited to Claims Based on the "Identical Factual Predicate"

- "Thus, *by definition*, the Release applies only to claims that share a 'common nucleus of operative fact' with those claims that were or could have been raised in this litigation." Defendants' Brief in Support of Final Approval, Doc. No. 3334, at 4.

- The release "fully complies with the identical factual predicate doctrine and should be approved." *Id.* at 5.

28

# Objection Checklist: Non-Opt Out SCP ER Groups

| Objection | Response |
|---|---|
| The procedures for opting out and submitting claims are unduly burdensome | Providers' Brief at 35<br>Slide 30 |
| The release is too ambiguous to comply with the "identical factual predicate" | Blues' Brief at 6<br>Providers' Brief at 23–25<br>Slides 22 & 28 |
| "Ordinary course of business" is not defined | Blues' Brief at 6<br>Providers' Brief at 27–28<br>Slide 31-32 |
| The "caveat" to the "ordinary course of business" exception impermissibly expands the release | Blues' Brief at 8–10<br>Providers' Brief at 28–30<br>Slide 33 |
| The release does not carve out common-law claims such as unjust enrichment and quantum meruit | Blues' Brief at 6–7<br>Providers' Brief at 29<br>Slide 34 |
| The release could bind opt-outs whose affiliates did not opt out | Blues' Brief at 10–12<br>Providers' Brief at 30-32<br>Slide 35 |
| The Plan of Distribution treats out-of-network emergency providers inequitably | Providers' Brief at 32-35<br>Slide 36 |

# 94 OF THE 96 RELATED ER GROUPS ARE ON THE VALID OPT OUT LIST, PROVING THAT THE PROCESSES ARE NOT UNDULY BURDENSOME

# The Release Does Not Include Ordinary Course of Business Claims Against the Blues

"…Nothing in this Release shall release claims, however asserted, that arise in the ordinary course of business and are based solely on (a) claims by the Provider in the Provider's capacity as a plan sponsor or subscriber or (b) claims regarding whether a Settling Individual Blue Plan properly paid or denied a claim for a particular product, service or benefit based on the benefit plan document, Provider contract, or state or federal statutory or regulatory regimes (including state prompt pay laws)…"

Paragraph 1, xxx, Definition of Released Claims.

31

# Like the Subscriber Release, the Release Excepts Ordinary Course of Business Claims

- Subscriber Release: Exception for claims "that arise in the ordinary course of business" and are based solely on questions of coverage, financial responsibility, or administration of claims under a benefit plan. Doc. No. 2610-2, ¶ 1(uuu).

- Provider Release: Exception for claims "that arise in the ordinary course of business" and are "based solely on (a) claims by the Provider in the Provider's capacity as a plan sponsor or subscriber or (b) claims regarding whether a Settling Individual Blue Plan properly paid or denied a claim for a particular product, service or benefit …." Doc. No. 3192-2, ¶ 1(xxx).

32

# Defendants Agree That the Caveat Does Not Impermissibly Expand the Release

The Objectors argue that the 'caveat' opens the door for the Blues to claim that future litigation involving claims 'unrelated to antitrust violations or unrelated to the defendants' conduct in the case' are barred by the Release. But that fear cannot be squared with the plain language of the Release, which clearly limits itself to claims that share a factual predicate with the Provider Actions." Defendants' Brief in Support of Final Approval, Doc. No. 3334, at 9 (citations omitted).

33

# Defendants Agree That Common Law Claims Are Treated No Differently Than Breach of Contract Claims

"Likewise, there is no reason for the Release to specifically identify particular common law claims by name (*e.g.*, 'unjust enrichment' or 'quantum meruit') given that it clearly excludes 'claims, however asserted, that arise in the ordinary course of business'. (Dkt. 3192-02 ¶ A.1.*xxx*.) Common law claims are not treated any differently than claims sounding in any other legal theory that are otherwise carved out from the Release." Defendants' Brief in Support of Final Approval, Doc. No. 3334, at 7.

# The Defendants Have Put The Affiliates Argument to Rest

- For any such individuals or their affiliates that opted out, the Release has no effect whatsoever on their rights." Defendants' Brief in Support of Final Approval, Doc. No. 3334, at 11.

- "[B]y limiting the release to affiliates who are 'claiming by, for, under or through the Releasor' (id. (emphasis added)), the provision ensures that claims of a Class Member that has received the benefit of the Settlement cannot be later brought by someone else." Id.

35

## Class Members Are Treated Equitably

- The Distribution was by Ken Feinberg and Camille Biros with assistance from Professor Issacharoff. It is fair and reasonable.

- If the Objecting ER Groups are correct about the facts they assert they will receive more, not less, from the Settlement.

- "For those few objectors unhappy with the Settlement, their remedy was simple: opt out." *In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp. 2d 891, 938 (E.D. La. 2012).

# Objection Checklist: Kyle Egner, DC

| Objection | Response |
|---|---|
| The allocation of funds between facilities and professionals is inequitable | Providers' Brief at 35–37<br>Slide 19, 38 |
| The requested administrative costs and attorneys' fees are disproportionately high | Providers' Brief at 37-39<br>Slide 42 |

# Egner's Objection

- Dr. Egner stated that he did not plan to attend the Fairness Hearing.

- Dr. Egner's objections have been fully addressed in our papers.

- Collectively Co-Lead Counsel and the Settlement Administrator have met with Dr. Egner on several occasions to answer his questions.

# The Court Should Grant the Motion for the Contingency Reserve

The Special Master/Settlement Administrator has developed a budget and estimated the need for a Contingency Reserve of $10 million to complete the administration of the Settlement.  Doc. No. 3337, at 1.

39

# Settlement Claims Administrator

- We will promptly be moving to appoint the Settlement Claims Administrator.

- The Settlement Administrator is in the process of vetting potential candidates and obtaining bids.

40

# Motion for Order to Show Cause Regarding Untimely Exclusion Requests

- 57 Opt Out requests postmarked after the deadline

- 14 Opt Out requests with no postmark

41

## The Fee and Expense Request Should Be Granted

- Fee award is 23.47% of Settlement Fund, identical to the fee this Court awarded and the Eleventh Circuit affirmed for the Subscribers.

- Fee award below the Eleventh Circuit benchmark.

- $102,059,478.49 in expenses actually incurred and audited.

  - Held expenses ($2,124,806.81) only go through the audit period ending September 30, 2024 as set out in the Special Master's Declaration (Doc. No. 3336-3, at 24-25)

  - Common Expenses ($99,934,671.68) are set out in the Special Master's Declaration (Doc. No. 3336-3, at 3)

- Lodestar cross-check not required, but 2.77 multiplier is well within the range for approval.