# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD | } |
| | } |
| | }    **Master File No.:  2:13-CV-20000-RDP** |
| ANTITRUST LITIGATION | } |
| (MDL NO.: 2406) | }    **This order relates to the Provider Track** |
| | } |

## FINAL ORDER AND JUDGMENT GRANTING FINAL APPROVAL OF PROVIDER CLASS ACTION SETTLEMENT

After more than twelve years of hard-fought litigation and an astounding nine years of settlement negotiations, on October 4, 2024, Provider Plaintiffs and Defendants entered into and executed a Settlement Agreement. (Docs. # 3313-2 ¶ 4; # 3192-2). As part of the Settlement, Settling Defendants[1] have agreed to monetary recovery of $2.8 billion and to grant sweeping, structural injunctive relief that benefits providers and members alike. (Docs. # 3192-2; # 3225 at 7). The extraordinary injunctive relief includes, among other things, transformative changes to the BlueCard program; modification of the Blue Rules to enhance value-based and Contiguous Area contracting; upgrades to the Blues' technical systems to make claims information more readily available to Providers; and the establishment of a Monitoring Committee to oversee Settlement compliance and address Settlement Class Member grievances. (Docs. # 3192-2; # 3225 at 8-9). Provider Plaintiffs' experts have estimated the injunctive relief to have a value in excess of $17.3 billion. (Doc. # 3254). The court preliminarily approved the Settlement on December 4, 2024. (Doc. # 3225).

---

[1] Unless otherwise defined herein, the capitalized terms used herein shall have the same meaning as in the Provider Settlement Agreement. (Doc. # 3192-2).

This matter is before the court on Provider Plaintiffs' Motion for Final Approval of Proposed Class Settlement. (Doc. # 3311). The Motion has been fully briefed (Docs. # 3311, # 3313-1, # 3334, # 3335), and on July 29, 2025, the court conducted a final fairness hearing regarding the Settlement. (Doc. # 3342).

There have been only three objections to the Settlement: one by North Texas Division, Inc. (an affiliate of HCA Healthcare) ("HCA"); one by Allatoona Emergency Group, PC and Alabama Emergency Physician Partners, LLC ("Objecting ER Groups"); and one by Kyle Egner DC.[2] (Docs. # 3311-6, # 3311-7, # 3311-8). The Settling Parties have addressed each of these objections in their briefing in support of the Motion for Final Approval of the Settlement. (Docs. # 3313-1, # 3334, # 3335). Settling Parties and the Objectors have had a full and fair opportunity to present argument on the objections at the fairness hearing. (Doc. # 3342). Therefore, Provider Plaintiffs' Motion for Final Approval is ripe for decision.

## I.      Relevant Procedural History

In the Memorandum Opinion and Order Preliminarily Approving Provider Plaintiffs' Settlement, the court detailed the inordinate time, effort, and expense the parties invested in litigating these cases for over a decade. (Doc. # 3225 at 3-6). The court also set forth the terms of the Settlement, including the Settlement Class Definition, the $2.8 billion monetary relief, and the injunctive relief. (*Id*. at 6-9).

The Provider Settlement is the result of nearly a decade of intensive, arm's-length negotiations between the Provider Plaintiffs and Defendants, facilitated by multiple experienced

---

[2] Settlement Class Counsel also received twenty-four conditional objections by clients of the law firm Paul Hastings LLP, which were conditioned on those entities' exclusion requests being rejected. (Doc. # 3311-9). Because the exclusion requests at issue have been found to comply with the Class Notice (Doc. # 3311-12), these conditional objections are moot.

mediators. These discussions began in 2015 and continued over the next nine years, with the parties engaging in more than 500 in-person, virtual, and/or telephonic mediation and negotiation sessions under the guidance of Judge Gary Fees (Ret.), Special Master Edgar C. Gentle, Kip Benson, and Robert Meyer. (Doc. # 3192-3 at ¶ 26). Members of the provider community, including the Provider Work Group, contributed valuable input into this process. (Doc. # 3311-2 at ¶ 26). The negotiation process was also shaped by significant developments in this litigation, including the court's rulings on dispositive motions and the applicable standard of review.

## II.    Settlement Terms and Class Relief

### A.    Settlement Class Members

The "Settlement Class" is defined as:

> "all Providers in the U.S. (other than Excluded Providers, who are not part of the Settlement Class) who currently provide or provided healthcare services, equipment or supplies to any patient who was insured by, or who was a Member of or a beneficiary of, any plan administered by any Settling Individual Blue Plan during the Settlement Class Period."

(Doc. # 3192-2 at 26). The term "Excluded Providers" means:

(i)     Providers owned or employed by any of the Settling Defendants;

(ii)    Providers owned or employed exclusively by Government Entities or Providers that exclusively provided services, equipment or supplies to members of or participants in Medicare, Medicaid or the Federal Employee Health Benefits Programs;

(iii)   Providers that have otherwise fully released their Released Claims against the Releasees prior to the Execution Date, including but not limited to Providers that were members of any of the settlement classes in *Love v. Blue Cross and Blue Shield Ass'n*, No. 1:03-cv-21296-FAM (S.D. Fla.); or

(iv)    Providers that exclusively provide or provided (a) prescription drugs; (b) durable medical equipment; (c) medical devices; (d) supplies or services provided in an independent clinical laboratory; or (e) services, equipment or supplies covered by standalone dental or vision insurance.

(Doc. # 3192-2 at 14). The "Settlement Class Period" is July 24, 2008, through the "Execution Date," October 4, 2024. (*Id*. at 26).

Although this Settlement provides significant injunctive relief, there is no mandatory Rule 23(b)(2) Settlement Class. (Doc. # 3192-2). All class members have had the opportunity to opt out. Those who opted out under the Settlement, are excluded from all of the benefits of the settlement, both monetary and injunctive. (Doc. # 3225 at 9).

The Settlement provides: (1) $2.8 billion in monetary relief, the vast majority of which will be distributed to Settlement Class Members; (2) substantial structural reforms, including to the BlueCard Program, which are designed to ensure transparency, efficiency, and accountability and to increase competition; (3) significant changes to encourage more competition; and (4) provisions to ensure compliance with, and reporting and monitoring of, the Settlement. (Doc. # 3192-2).

### B.     The Settlement Fund

The Settlement Fund shall be used to pay certain costs and fees prior to determining a net amount that is available for distribution to class members (the "Net Settlement Fund"). (Doc. # 3192-2 at 26-27). The fees and other costs to be deducted from the Settlement Fund include the following:

a.     The $100 million Notice and Administration Fund. Included within the Notice and Administration Fund will be the fees and expenses associated with monitoring and compliance. Because Settlement Class Counsel believe that $100 million plus interest will be insufficient to pay for the substantial Notice and Administration Costs, they have moved the court to approve a Material Loss Contingency Reserve, which shall be funded out of the Settlement Fund and will not exceed 2% of the Settlement Fund. (*Id*. at 16, 18-19; Doc. # 3337).

b.     Fee and Expense Awards to Settlement Class Counsel, including attorneys' fees not to exceed 25% of the Settlement Fund, and reimbursement of expenses and costs reasonably and actually incurred in connection with prosecuting the Provider Actions. (*Id*. at 64-66).

      c.      Service Awards to class representatives, if Eleventh Circuit precedent changes to permit such awards.

      d.      Escrow Account costs (including taxes and tax expenses). (*Id*. at 60-63).

The Settlement Class Period is July 24, 2008 through the Execution Date, which is October 4, 2024. (Doc. # 3192-2 at 26). The Plan of Distribution distinguishes between two types of Providers: Health Care Facilities and Medical Professionals. For all Settlement Class Members, the distribution from the Net Settlement Fund will depend on their "Allowed Amounts," meaning the amounts allowed by Blue Plans for Commercial Health Benefit Products from July 24, 2008 to October 4, 2024. (Doc. # 3207-1 at 7). There are two methods that (with conditions) claimants may elect to use for calculating a Claimant's Allowed Amounts: Option A (the "Default Method") or Option B (the "Alternative Method"). (*Id*.).

Option A (Default Method): The Default Method will be available to Claimants for whom the Provider Plaintiffs' experts have data concerning Allowed Amounts for all or part of the time period running from 2008 to 2015. If a Claimant elects the Default Method, the Provider Plaintiffs' experts will extrapolate the Claimant's Allowed Amounts for the entire Settlement Class Period, using the Consumer Price Index for hospital and related services from 2015 to the end of the Settlement Class Period. If the Provider Plaintiffs' experts do not have sufficient information about a Claimant's Allowed Amounts to extrapolate the Allowed Amounts, the Claimant must use the Alternative Method. (*Id*.).

Option B (Alternative Method): A Claimant may submit data showing its Allowed Amounts for each year from 2015 to the end of the Settlement Class Period. If the Provider Plaintiffs' experts lack data for the Claimant's Allowed Amounts for the period from 2008 to 2014, the Claimant may submit Allowed Amounts for this period as well. The Provider Plaintiffs' experts will work with the Settlement Claims Administrator to extrapolate or interpolate data for years in

which it is unavailable, using the Consumer Price Index for hospital and related services. If the Provider Plaintiffs' experts have data for the period from 2008 to 2014, that data will be used (unless of course the Claimant submits Allowed Amounts for the period from 2008 to 2014). (*Id.* at 7-8).

### C.    The Injunctive Relief

The goal of obtaining injunctive relief to address Provider issues has been at the heart of this litigation and was critical to the Parties' resolution. (Doc. # 3313-2 at ¶ 27). Because each Blue Plan generally contracts with Providers only in that plan's Service Area, Providers must submit claims through the BlueCard system when they treat members of another Blue Plan. (*Id.*). For decades, Providers have complained that, despite its positives, BlueCard is a non-transparent program that causes additional costs, inefficiencies, and frustration. The Settlement Agreement's injunctive relief will significantly improve Providers' experience with the BlueCard system, bring more transparency and efficiency, and lead to Blue Plan accountability. (*Id.*). Providers who have not opted out of the settlement will receive the following benefits: the BlueCard Transformation; a BlueCard Prompt Pay Commitment; Service Level Agreements; a BlueCard Executive; a Real-Time Messaging System; a National Executive Resolution Group; Modification of the Contiguous Area Rule; Expansion of Contiguous Area Contracts to Affiliated Hospitals; and protections from certain Affiliates and All Products Clauses. (*Id.*).

Providers' day-to-day interactions with the Blues will improve as well. With major upgrades to the Blues' technical capabilities, and commitments from the Blues to make additional data available, Providers will have access to more information, and more timely information, than ever before. Additions to the program will include: Third-Party Information; Minimum Data

Requirements; a Blue Plan Common Appeals Form; Pre-Authorization Standards; and Telehealth Relief. (*Id*. ¶ 28).

The Settlement Agreement's injunctive relief will also expand Providers' opportunities to enter into value-based contracts with the Blues, including Minimum Level of Value-Based Care and Best Practices for Value-Based Care. (*Id*. ¶ 29).

Finally, the Provider Plaintiffs have taken steps to ensure the commitments of the Settlement Agreement are enforceable. For a period of five years from the Effective Date of the Settlement, a Monitoring Committee comprised of members appointed by the Settling Defendants, Provider Co-Lead Counsel, and the court shall review new rules or regulations proposed by BCBSA and submitted to the Monitoring Committee, and shall adjudicate disputes related to the Injunctive Relief. (*Id*. ¶ 30).

Provider Plaintiffs' expert healthcare economists have valued the injunctive relief provided by the Settlement at $17.3 billion. There are also benefits of the Settlement for which a value has not been (or cannot be) quantified. (Doc. # 3311-5 at ¶ 5).

After reaching agreement on the terms of the settlement, the Provider Plaintiffs undertook a separate allocation process to determine a fair division of the settlement fund among the different types of healthcare providers within the settlement class. (Doc. # 3313-2 at ¶ 23). The Provider Plaintiffs selected as the allocation expert Kenneth Feinberg, perhaps the foremost authority on the distribution of settlement funds in large, complex cases,. Mr. Feinberg previously advised the Subscriber Plaintiffs on the division of their settlement fund. The result of the allocation process was the division of settlement funds reflected in the Provider Plaintiffs' Plan of Distribution. (*Id*. ¶ 32). He was ably assisted in this Provider allocation work by Camille Biros.

During the allocation process, the Provider Plaintiffs assembled a Provider Work Group consisting of different types of Providers, including large hospital systems, teaching hospitals, physicians, and ancillary providers. The Provider Work Group participated in some of the mediation sessions, working with representatives of Defendants to develop potential injunctive relief. Along with participating in mediation sessions, members of the Provider Work Group spent countless hours giving valuable input to Settlement Class Counsel on the negotiation of the injunctive relief terms. (*Id.* ¶ 33). The contributions are reflected in the work product submitted to Mr. Feinberg.

### D.      The Settlement Class Release

In return for the monetary and injunctive relief discussed above, upon the Effective Date of the Settlement, Releasors (Class Representatives and Settlement Class Members who do not timely and validly exclude themselves) will have released claims (as described more fully below) against the Releasees – (i) Settling Individual Blue Plans, (ii) BCBSA, (iii) NASCO, and (iv) Consortium Health Plans, Inc., as well as related entities. (Doc. # 3192-2 at 24-25).

The Releasors agree to release:

"any and all known and unknown claims … based upon, arising from, or relating in any way to: (i) the factual predicates of the Provider Actions (including but not limited to the Consolidated Amended Complaints filed in the Northern District of Alabama) including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date; (ii) any issue raised in any of the Provider Actions by pleading or motion; or (iii) mechanisms, rules or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10-26 [relating to injunctive relief] approved through the Monitoring Committee Process during the Monitoring Period and that are based on the same factual predicate of the Provider Actions and related to the injunctive relief provided by Paragraphs 10-26."

(*Id.* at 22-23).

8

Released Claims do not include those claims "that arise in the ordinary course of business and are based solely on (a) claims by the Provider in the Provider's capacity as a plan sponsor or subscriber or (b) claims regarding whether a Settling Individual Blue Plan properly paid or denied a claim for a particular product, service or benefit based on the benefit plan document, Provider contract, or state or federal statutory or regulatory regimes (including state prompt pay laws)," unless those claims are "based in whole or in part on the factual predicates of the Provider Actions or any other component of the Released Claims." (*Id.* at 23).

This release is similar to the release that the court approved (and that the Eleventh Circuit upheld on appeal) in the Subscriber Settlement. *See In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1090-91 (11th Cir. 2023), *cert. denied sub nom. Behenna v. Blue Cross Blue Shield Ass'n*, 144 S. Ct. 2686 (2024), and *cert. denied sub nom. Home Depot U.S.A., Inc. v. Blue Cross Blue Shield Ass'n*, 144 S. Ct. 2687 (2024).

### E.    Attorneys' Fees and Costs

In their Motion For Attorneys' Fees And Expenses (Docs. # 3258, 3336), Provider Plaintiffs have applied to this court separately for: (i) an award attorneys' fees of 23.47% of the common fund, plus (2) expenses of $99,934,671.68 in Shared Costs and $2,124,806.81 in Held Costs, for a total of $102,059,478.49. (*Id.*). The court will address this request in more detail below and by separate order.

### F.    Approval of Class Notice

#### 1.    Notice Planning

Even before the Settlement Agreement was finalized, Provider Co-Lead Counsel began collaborating with the Settlement Notice Administrator, BrownGreer PLC, to prepare for implementation of the Notice Plan. (Doc. # 3313-2 at ¶ 5).

To implement the Notice Plan, in consultation with Settlement Class Counsel and the Settlement Administrator, BrownGreer coordinated the purchase of multiple datasets containing postal and email addresses for over 3.3 million healthcare facilities and medical professionals to effectuate individual notice to potential Class Members. With guidance from Settlement Class Counsel and the Settlement Administrator, the datasets were combined and deduplicated to find the most likely current address for each identified Class Member. (Doc. # 3311-3 at ¶¶ 5, 17, 18).

The Notice Plan entailed mailing individual notice to all presumed Class Members with identifiable mailing addresses. The direct notice effort included postcard and/or email notice to all Class Members for whom BrownGreer could ascertain their mailing and/or email contact information. In total, BrownGreer sent more than 3.3 million direct notices. (*Id*. ¶ 9).

To reach potential Class Members who did not receive direct notice, and to reinforce the direct notice efforts, BrownGreer coordinated with Signal Media to employ a tailored media campaign. Through targeted and strategically placed digital banner advertisements and placements, the paid media campaign exceeded its goal to garner 13 million gross impressions and generated over 18 million gross impressions. (*Id*. ¶ 10).

Potential Class Members who did not receive individual notice but believed they should receive Settlement benefits because they meet the requirements of the Class definition, have had an opportunity to prove their eligibility by completing and submitting a Professional Claim Form and/or Facilities Claim Form online or by mail. (*Id*. ¶ 11).

BrownGreer, experts in the legal and administrative aspects of the design, approval, and implementation of notice plans, has attested to the fact that the settlement's Notice Plan as designed and implemented was the best notice practicable under the circumstances, far exceeds the requirements of due process, and was reasonably calculated, under all the circumstances, to apprise

interested parties of the pendency of the action and afford them an opportunity to present their objections. (*Id*. ¶ 12).

### 2.    Notice to the Class

BrownGreer established a dedicated Post Office Box (the "P.O. Box") for the Settlement Program on November 12, 2024. (*Id*. ¶ 13).

It developed a public website (the "Settlement Website") in consultation with Settlement Class Counsel and the Settlement Administrator that was launched on December 16, 2024. (*Id*. ¶ 14). The Settlement Website allowed visitors to view and download settlement information, and permitted Class Members to submit claims and any additional required documentation. (*Id*.). The Settlement Website allowed anyone with internet access to read, download, and print Settlement documents. (*Id*.). As of April, 18, 2025, the Settlement Website been visited more than 600,000 times and visitors had viewed documents available there, including the Long Form Notice, more than 3.6 million times. (*Id*.).

BrownGreer established a toll-free telephone number on November 11, 2024. (*Id*. ¶ 15). An automated system that provides important settlement information has been available twenty-four hours per day, and callers have been able to speak with a live agent from 9:00 a.m. ET to 5:00 p.m. ET, Monday through Friday. (*Id*.). As of April 18, 2025, the toll-free number had received 6,475 calls. (*Id*.).

On December 10, 2024, BrownGreer created a dedicated email inbox (Administrator@BCBSProviderSettlement.com) for the Settlement Program that is monitored regularly. (*Id*. ¶ 15). A live agent has been available between 9:00 a.m. ET to 5:00 p.m. ET, Monday through Friday. (*Id*.). As of April 18, 2025, the inbox had received 2,633 emails. (*Id*.).

BrownGreer assigned unique identifiers to all records in the Class Member List ("Notice ID Numbers") to track information about each Class Member's Settlement Program activity and monitor returned Notices. (*Id.* ¶ 19).

After the entry of the Preliminary Approval Order, BrownGreer, in consultation with Settlement Class Counsel and the Settlement Administrator, finalized the format and contents of the Settlement Notice to be sent by email and mail, by inserting: (a) the appropriate Notice ID Number for each potential Class Member, (b) the Settlement Website address, (c) P.O. Box address, (d) Toll-Free Number, (e) the date and time of the Final Approval Hearing, and (f) the deadlines to submit a claim for payment, opt out of the Settlement, and object to the Settlement. (*Id.* ¶ 20, pp 17-21).

BrownGreer's email campaign had a deliverability rate of 94.8% for the 1,380,852 potential Class Members to whom notice by email was sent. (*Id.* ¶ 22). Of the 71,321 emails that bounced back, BrownGreer was able to compile physical address information from the Class Member List and sent Postcard Notices to 55,876 of them. (*Id.*).

In an effort to update, validate, and standardize mailing data, before the mailing was sent, all addresses were checked against the National Change of Address ("NCOA") database maintained by the USPS and certified via the Coding Accuracy Support System ("CASS") to ensure the quality of the zip codes. (*Id.* ¶ 23).

On December 20, 2024, BrownGreer caused the Postcard Notice to be mailed to 1,944,406 potential Class Members. (*Id.* ¶ 24). Of the 1,944,406 total mailed Notices, 1,502 Notices were returned as undeliverable with a forwarding address, and  325,718 were returned as undeliverable without a forwarding address. (*Id.*). For the 325,718 Notices returned as undeliverable without a forwarding address, BrownGreer found 18,836 secondary addresses. (*Id.*). Notice was then mailed

to the 1,502 Class Members whose Notices were returned with forwarding addresses and to the 18,836 Class Members for whom a secondary mailing address was found. (*Id*.). The second-effort Postcard Notice program also included the 55,876 to potential Class Members whose emails were undeliverable, but for whom they had a mailing address. (*Id*.). The Postcard Notice program had a deliverability rate of 83.8% for the 2,000,282 potential Class Members to whom Postcard Notices were issued. (*Id*.).

Altogether, the direct Notice campaign reached 3,002,885 (89.8%) of all known potential Class Members. (*Id*. ¶ 25). BrownGreer also sent reminder email and postcard notices to potential Class Members who had not filed a claim or opted out, affording them time to submit their claims before the July 29, 2025, claims submission deadline. (*Id*. ¶ 26).

The paid media campaign's digital banner advertisements and placements was estimated to garner 13 million showings . (*Id*. ¶ 27). Digital advertisements were also placed on publishers' networks of sites or email lists owned by relevant professional associations that generated over 18 million showings. (*Id*.).

### 3.    Class Non-Participation in the Settlement

As of April 18, 2025, BrownGreer had received 15,589 requests for exclusion (opt outs) from the Settlement Class. (*Id*. ¶ 28). Almost half of these opt outs were signed by Lisha Falk of SCP Health seeking exclusion on behalf of 7,012 professionals and 88 medical groups. (*Id*. ¶ 29).

Since then, BrownGreer coordinated with Co-Lead Counsel and the Settlement Administrator to assess whether any exclusion requests required additional information. (Doc. # 3336-4 at ¶ 11). BrownGreer issued 15 Notices of Deficient Opt Out Requests to individuals who collectively submitted over 8,500 exclusion requests. Each deficiency notice described the missing or incomplete information, explained the steps necessary to cure the deficiency and provided the

requestor 45 days to respond. (*Id*.). Since issuing these notices, BrownGreer has received 1,098 responses and has updated the list of valid opt outs accordingly. (*Id*.)

Only three objections to the Settlement were received (*Id*. ¶ 12; Doc. # 3311-3 at ¶ 30), which is remarkable given the size and complexity of this settlement.

### 4.     Class Participation in the Settlement

BrownGreer and Patrick Sheehan of Whatley Kallas LLP hosted regular webinars to explain the claim filing process for facilities and professionals. (*Id*. ¶ 32). Through April 11, 2025, 3,523 potential Settlement Class Members had attended these webinars. (*Id*.).

As of April 22, 2025, three months before the claims filings deadline, 282,810 claimants had initiated a claim using the online submission feature. (*Id*. ¶ 33). Many more claims were filed either shortly before or at the claims filings deadline.

### 5.     CAFA Notice

On December 16, 2024, Settling Defendants filed a notice of compliance with the notice requirements of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1715(d). (Doc. # 3227). In compliance with § 1715, CAFA notice packages were sent on October 24, 2024 via Federal Express (Overnight), U.S. Priority Express Mail and email to one hundred thirteen (113) officials including, but not limited to, the Attorney General of the United States; the Attorneys General of each of the 50 states, the District of Columbia, Puerto Rico, Guam, American Samoa, the U.S. Virgin Islands and the Northern Mariana Islands; and the insurance regulators of each of the 50 states, the District of Columbia, Puerto Rico, Guam, American Samoa, the U.S. Virgin Islands and the Northern Mariana Islands. (Doc. # 3227-1).

### 6.    Court Approval of Notice

As discussed above, the Class has been notified of the Settlement under the plan approved by the court. Class Members have had the opportunity to be heard on all issues about the resolution and release of their claims by submitting objections to the Settlement Agreement to the court. Appropriate and sufficient notice of the Fairness Hearing and the rights of all Class Members has been provided to all people and entities entitled to such notice. In addition, under CAFA, 28 U.S.C. § 1711 et seq., notice was provided to the Attorneys General for each of the states in which a Class Member resides and to the Attorney General of the United States. (Doc. # 3227-1). Therefore, the court finds that the form and methods of notifying Class Members of the terms and conditions of the proposed Settlement Agreement constituted the best practicable notice under the circumstances and meets the requirements of Rule 23(c)(2) of the Federal Rules of Civil Procedure, any other applicable law, and due process. (*See* Doc. # 3311-5 at ¶¶ 3-4).

## III.    Applicable Legal Standards for Final Approval

Federal Rule of Civil Procedure 23(e) requires judicial approval of any class settlement. To be approved, a settlement must be fair, reasonable, and adequate. Fed.R.Civ.P. 23(e). The procedure for judicial approval is well established:

> (1) Certification of a settlement class and preliminary approval of the proposed settlement after submission to the court of a written motion for preliminary approval.

> (2) Dissemination of notice of the proposed settlement to the affected class members.

> (3) A final approval hearing, at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement are presented.

*See, e.g.*, Manual for Complex Litig. (Fed. Jud. Center, 4th ed. 2004), § 21.63.

For the reasons explained more fully below, after considering the Settlement Agreement, the arguments, and authorities presented by the parties in their motions and briefing, the three

objections to the Settlement Agreement, the arguments at the Fairness Hearing held in July 2025, and the entire record here, the court reaffirms its findings in the Preliminary Approval Order and makes a final determination that the Settlement Agreement is fair, reasonable, and adequate under Federal Rule of Civil Procedure 23.

### A.    Certification of the Classes for Settlement Purposes Under Rule 23(a) and (b)

When presented with a motion for final approval of a class action settlement, a court first evaluates whether certification of a settlement class is appropriate under Federal Rule of Civil Procedure 23(a) and (b). The Federal Rules provide that a class action may be maintained if Rule 23(a) is satisfied and if the provisions of Rule 23(b)(1), (b)(2), or (b)(3) are satisfied. Fed. R. Civ. P. 23(b). The court analyzed these Rules in detail in its Preliminary Approval Order. (Doc. # 3225). It reaffirms its findings here. Specifically, the court finds that all of the prerequisites of Rule 23(a) and the requirements of (b)(3) have been satisfied for certification of the settlement class for settlement purposes only. Because the court "frontloaded" its analysis of these factors in its Preliminary Approval Order under the 2018 amendments to Rule 23, it only summarizes those findings here.

With regard to Rule 23(a), Provider Plaintiffs easily satisfy the necessary elements of the Rule: numerosity, commonality, typicality, and adequacy of representation.

Numerosity is satisfied because the Settlement Class includes hundreds of thousands or more healthcare providers (hospitals, clinics, physician practices, and other medical professionals) across the country who contracted with one or more of the Blue Plans during the Settlement Class Period. (Doc. # 3225 at 25).

Commonality is satisfied because Provider Plaintiffs' claims involve a number of common questions of law or fact, including: (1) whether the Blues conspired to allocate markets and agreed

to restrict output in violation of the Sherman Act, (2) whether the Blues agreed to fix prices and implement a group boycott through the BlueCard Program in violation of the Sherman Act, (3) whether the Blues monopsonized the relevant product markets, (4) whether the Blues paid anticompetitive reimbursements to Providers as a result of their agreements, (5) whether the Blues have procompetitive justifications that outweigh the harm to competition for the Provider Plaintiffs' rule of reason claims, and (6) whether the Blues constitute a single entity for purposes of managing their trademarks.

Typicality is satisfied, also. The Provider Class Representatives include a range of types of Providers, but their claims are typical of the class because they arise from the same alleged conduct: Defendants' alleged illegal geographic market allocation and output restrictions, among other restraints.

Finally, Provider Plaintiffs and their counsel have more than adequately represented the class throughout this litigation. The named Plaintiffs have vigorously pursued these claims on behalf of the class, have been intimately involved in the litigation and settlement,[3] and have no conflicts with absent class members. Similarly, class counsel have demonstrated great skill and experience in representing the class effectively and have acted in the best interests of all class members.

As to Rule 23(b), Provider Plaintiffs seek final certification only under Rule 23(b)(3), which requires that (1) common questions of law and fact predominate over individual issues and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The core of the Provider Plaintiffs' claims is that the Blues agreed to divide Service

---

[3] The named Provider Plaintiffs' work has been extraordinary even though in this Circuit they are ineligible to received a service award. *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1260 (11th Cir. 2020) (holding that incentive awards to compensate class representatives for their time and reward them for bringing a lawsuit are unlawful).

Areas, restrict provider contracting, and unlawfully enforce the BlueCard Program, which suppressed competition and reduced payments for all Providers. These allegations involve conduct that was centrally coordinated among Blue Plans and applied to all Providers in a uniform manner. Given that the core liability questions in this case apply uniformly to the class, the court finds that predominance is satisfied.

Superiority requires consideration of (1) the class members' interest in individually controlling their own litigation, (2) the extent and nature of any existing litigation over the controversy, (3) the desirability of concentrating the litigation in one forum, and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3). "Generally, this inquiry requires the court to "consider the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *In re Takata Airbag Prod. Liab. Litig*., 348 F.R.D. 500, 525 (S.D. Fla. 2025) (citing *Klay v. Humana, Inc*., 382 F.3d 1241, 1269 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639 (2008)). Because of the exorbitant cost of litigating individual antitrust cases, as this court previously noted, "a class action is not only superior to individual actions, but probably the only feasible method of resolving all claims against the Settling Defendants." (Doc. # 3225 at 32). Therefore, the court finds that superiority is satisfied.

Having carefully considered the factors set forth above, the court concludes that the Settlement Class satisfies the relevant requirements of Rule 23(a) and Rule 23(b)(3).

**B.    The Settlement is Fair, Reasonable, and Adequate Under Rule 23(e)(2) and the *Bennett* Factors**

Next, the court must determine whether the proposed settlement is fair, reasonable and adequate under Rule 23(e)(2). That Rule's subparts provide as follows:

> If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> > (A) the class representatives and class counsel have adequately represented the class;
> >
> > (B) the proposal was negotiated at arm's length;
> >
> > (C) the relief provided for the class is adequate, taking into account:
> >
> > > (i) the costs, risks, and delay of trial and appeal;
> > >
> > > (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
> > >
> > > (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
> > >
> > > (iv) any agreement required to be identified under Rule 23(e)(3); and
> >
> > (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

In addition to Rule 23(e)(2), courts in the Eleventh Circuit also consider the following six *Bennett*[4] factors when assessing the fairness of a settlement: 1) the likelihood of success at trial; 2) the range of possible recovery; 3) the point on or below the range of possible recovery at which a settlement is fair, adequate, and reasonable; 4) the complexity, expense, and duration of the litigation; 5) the substance and amount of opposition to the settlement; and, 6) the stage of proceedings at which settlement was achieved. *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1273 (11th Cir. 2021); *see also Davis v. Mar-Jac Poultry, LLC*, 2024 WL 3731581, at *2 (N.D. Ala. Aug. 8, 2024)

In 2023, the Eleventh Circuit examined the effect of the 2018 amendment to Rule 23(e)(2) on the *Bennett* factors. *Ponzio v. Pinon*, 87 F.4th 487, 494 (11th Cir. 2023). The Court instructed

---

[4] *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).

that the 2018 amendment was not meant to displace the *Bennett* factors, but to "focus [] on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Ponzio*, 87 F. 4th at 495 (quoting Fed. R. Civ. Pro 23(e)(2), Advisory Committee's Note to 2018 Amendment). "[T]he *Bennett* factors can, where appropriate, complement those core concerns." *Id.* "For example, *Bennett* factors (1), (2), (4), and (6) can inform 'whether the relief provided to the class is adequate' (core concern three). And *Bennett* factors (3) and (5) can inform 'whether the proposal treats class members equitably relative to each other' (core concern four)." *Id.*

Having carefully considered these issue in the Preliminary Approval Order, the court summarizes and reaffirms its finding below.

### 1. Class Members Were Adequately Represented

The court found that class members were adequately represented when it preliminarily approved the Provider Settlement. (Doc. # 3225 at 28-29, 34). Class Counsel have since ensured that proper notice was given in accordance with the Preliminary Approval Order, and they have worked tirelessly to educate the Provider community about the benefits of the Settlement, making presentations to thousands of Providers in individual and group settings. (Docs. # 3313-2 at ¶¶ 7–9; # 3311-5 ¶ 4; # 3311-3 ¶ 32). They also protected the Settlement Class by moving to disqualify two firms that were attempting to convince Providers to opt out of the Settlement despite having what Co-Lead Counsel believe to be conflicts of interest. (Docs. # 3232, 3245, 3285). The court has no hesitation in concluding that Settlement Class Counsel and the Class Representatives have more than adequately represented the Settlement Class.

### 2. The Settlement Was Negotiated at Arm's Length

The intensity and scope of settlement negotiations in this case make clear that there was no collusion and that the Settlement was negotiated at arm's length. Indeed, every material provision

was extensively negotiated. (Doc. # 3192-3 at 10-13). And, the court's Special Master, who acted as essentially the primary mediator and helped finalize the Provider Settlement, has attested that there was no fraud or collusion involved. (Doc. # 3311-5 ¶ 5).

### 3.    The Relief Provided to the Classes Is More Than Adequate

"In a case where experienced counsel represent the class, the [c]ourt 'absent fraud, collusion, or the like, should hesitate to substitute its own judgment for that of counsel.'" *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 691 (N.D. Ga. 2001) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir.1977)). In light of Class Counsel's qualifications, which include substantial experience litigating MDLs, class actions, and other complex cases, the court "has confidence in their collective judgment that the benefits of this settlement far outweigh the delay and considerable risk of proceeding to trial." *Ingram*, 200 F.R.D. at 691. The relief secured by the Provider Plaintiffs with this Settlement—both monetary and non-monetary—reflects an excellent result for the Settlement Class and plainly falls within the range of reasonableness contemplated by these factors.

Similarly the relief provided to the class, both financial and injunctive, is obviously substantial. This settlement will avert years of highly complex and expensive litigation involving significant costs, risks, and delay. There is no question that the parties had more than adequate information gleaned from twelve years of litigation such that this was an appropriate stage of the litigation at which to evaluate settlement. And, this was the right time to settle. "If this [litigation] were to [proceed] to trial[s], the resources of the parties and the [c]ourt would only continue to hemorrhage." *Davis v. Mar-Jac Poultry, LLC*, 2024 WL 3731581, at *2 (N.D. Ala. Aug. 8, 2024).

Providers, like Subscribers, seek attorneys' fees of less than 25% of the settlement fund, plus expenses and the attorneys' fees and costs associated with administering the settlement's provisions. This is a similar percentage to that the court approved for the Subscribers Settlement,

and it is well in line with the Eleventh Circuit's benchmarks. *See Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1243 (11th Cir. 2011) (noting "well-settled law from this court that 25% is generally recognized as a reasonable fee award in common fund cases"); *Swaney v. Regions Bank*, 2020 WL 3064945, at *7 (N.D. Ala. June 9, 2020) ("In determining an award of attorney's fees in a percentage-of-fund class settlement case, the 'benchmark' percentage is 25%, which is the dead center of the 20-30% range."). Finally, the fee represents only a percentage of the class's monetary recovery; it is not in any way based on the additional value of the Settlement's significant injunctive relief obtained for the Class.

### 4.    Class Members Are Treated Equitably Relative to One Another

Under Rule 23(e)(2)(D), courts must consider "whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." *See* Fed. R. Civ. P. 23 Advisory Committee's note to 2018 amendment; *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2019 WL 6875472, at *27 (E.D.N.Y. Dec. 16, 2019). The allocation of the Net Settlement Fund to the different types of Providers is based on expert economists' estimates of the relative impact of the Blues' conduct on each type of Provider, and it was recommended by allocation mediators Feinberg and Biros after many types of Providers had a chance to comment on the allocation. The use of relative harm estimates prepared by the Provider Plaintiffs' experts will result in distributions that are proportional to the alleged impact of the Defendants' conduct on each healthcare facility. Accordingly, Class Members are treated equitable relative to each other under the Settlement.

5.    **The Proposed Settlement is Fair, Adequate, and Reasonable Under the Remaining *Bennett* Factors**

In determining whether a proposed settlement is fair, reasonable, and adequate, the reaction of the class is an important factor. *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 117-18 (2d Cir. 2005). Thus, a low percentage of objections as compared to the size of the class points to the reasonableness of a proposed settlement and supports its approval. *Bennett*, 737 F.2d at 986. Here, out of hundreds of thousands of class members, only three objections to the settlement have been lodged. As one court has held, forty-one objections based on 8,822,803 notices mailed constitutes an infinitesimal ratio (.00050%) when compared to the millions of potential class members. *Lipuma v. Am. Express Co*., 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005). Thus, the low number of objections here  points to the reasonableness of the Settlement.

Again, the Provider Settlement obtained two significant forms of relief: (1) a $2.8 billion Common Fund, and (2) an injunctive relief valued by Provider Plaintiffs' experts as being worth a minimum of $17.3 billion. Provider Plaintiffs' seek attorneys' fees in the amount of 23.47 % of the $2.8 billion Common Fund. When the value of the injunctive relief is taken into account, their fee request is 4.3 % of the Settlement's value. Importantly, this is not a settlement where class members have no ability to opt out.

There is a "strong judicial policy favoring settlement." *Ponzio*, 87 F.4th at 494 (citing *Bennett*, 737 F.2d at 986 and *In re U.S. Oil & Gas Litig*., 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits.")). Having reexamined the terms of the Provider Settlement, the court reaffirms its conclusion that it is fair, adequate, and reasonable.

Bennett factor five instructs the court to consider "the substance and amount of opposition to the settlement." *Bennett*, 737 F.2d at 986. Federal Rule of Civil Procedure 23(e)(5)(A) affords

class members who oppose a settlement the right to object. Under Rule 23(b)(3), Class Members can also register their opposition to the settlement by opting out of the settlement.

"Often times objectors play a beneficial role in opening a proposed settlement to scrutiny and identifying areas that need improvement." *In re Equifax*, 999 F.3d at 1257 (quoting David F. Herr, *Annotated Manual for Complex Litigation* § 21.643 (4th ed. 2021)) (internal quotation marks omitted)). However, objections are not an opportunity to "renegotiate terms of the settlement based on individual preferences." *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 152 (E.D. La. 2013). Here, there have been only three[5] objections to the settlement, a minuscule percentage. Thus, those participating in the settlement have registered little objection to the terms of the settlement.

The court acknowledges that there are a significant number of Class Members who have requested exclusion from the settlement. (Doc. # 3343-1). However, an exclusion request does not necessarily indicate that the settlement is not fair, adequate, and reasonable, particularly considering other circumstances the court has been made aware of in relation to at least some of the opt outs here. First, the court has been informed that there have been lawyers advising potential opt outs that they could obtain more significant relief for them in opt-out litigation than that provided for in the settlement. (Doc. # 3245-1). It appears that at least some of the lawyers encouraging Class Members to opt out have teamed up with third party litigation funders to finance that opt-out litigation. Second, the court received information that some Class Members opting out of the settlement may have been offered money up front to opt out and file separate lawsuits with third-party help. (Doc. # 3294 at 2-3).[6] Therefore, under these circumstances, where Class

---

[5] As noted previously, the twenty-four conditional objections are moot.

[6] The court attempted to inquire about "whether Class Members who have opted out of the Settlement were motivated by something other than the fairness of the Settlement, such as having exchanged a financial interest in their

Members opting out may have been motivated by something other than the actual fairness of the Settlement, this "opposition" to the settlement does not call into question its fairness, adequacy, and reasonableness.

## IV.    Objections to the Settlement

The three objections to the Settlement were from: (1) HCA (Doc. # 3311-6); (2) the Objecting ER Groups (Doc. # 3311-7); and (3) Dr. Egner (Doc. # 3311-8). The remaining aspects of their Objections, following mediation between the Objectors, the parties, and the Special Master, are addressed below.

### A.    HCA and the Objecting ER Groups Object to the Scope of the Release

In its objection, HCA argues that the Settlement's Release is unreasonably ambiguous as to whether ordinary course claims that involve the Blue Card Program are released by the settlement. (Doc. # 3311-6 at 8-9). It seeks "clarity that [certain claims] are not covered by the 'Released Claims' definition in the Provided Agreement." (*Id*. at 9). Additionally, the Objecting ER Groups contend that the release violates the "identical factual predicate" ("IFP") doctrine because the "release language can be read to extend beyond antitrust-related claims." (Doc. # 3311-7 at 9).

The Provider Plaintiffs argue that the releases are not ambiguous, and they emphasize the similarity between the Release here, and the Release approved in the Subscriber Class Settlement. (Doc. # 3313 at 33-37). They argue the release complies with the "identical factual predicate" doctrine. (*Id*. at 30-32).

The Blues contend that "the Release excludes (*i.e*., preserves) ordinary-course-of-business claims that are based on 'claims by the Provider in the Provider's capacity as a plan sponsor or

---

claims in this litigation to another party in return for a non-recourse quick payment." (Doc. # 3294 at 4). However, the responses receive by the court were less than forthcoming.

subscriber' or 'regarding whether a Settling Individual Blue Plan properly paid or denied a claim for a particular product, service or benefit based on the benefit plan document, Provider contract, or state or federal statutory or regulatory regimes (including state prompt pay laws).'" (Doc. # 3334 at 9, n.4). They say that any difference in language from the Subscriber release merely reflects the difference in claims that arise for these two types of Plaintiffs; it in no way indicates the Provider Release is "lacking the clarity" of the Subscriber Release. (*Id*. at 12).

For convenience, the court sets forth the relevant portions of the Provider Settlement's release language below.

The Settlement defines "Released Claims" as follows:

xxx. "Released Claims" means any and all known and unknown claims, causes of action, cross-claims, counter-claims, charges, liabilities, demands, judgments, suits, obligations, debts, setoffs, rights of recovery, or liabilities for any obligations of any kind whatsoever (however denominated), whether class or individual, in law or equity or arising under constitution, statute, regulation, ordinance, contract or otherwise in nature— including without limitation any and all actual or potential actions, losses, judgments, fines, debts, liabilities (including joint and several), liens, causes of action, demands, rights, damages, penalties, punitive damages, costs, expenses (including attorneys' fees and legal expenses), indemnification claims, contribution claims, obligations, compensation, and claims for damages or for declaratory, equitable or injunctive relief of any nature (including but not limited to antitrust, RICO, contract, tort, conspiracy, unfair competition, or unfair trade practice claims)—known or unknown, suspected or unsuspected, asserted or unasserted, direct or derivative, *based upon, arising from, or relating in any way to: (i) the factual predicates of the Provider Actions* (including but not limited to the Consolidated Amended Provider Complaints filed in the Northern District of Alabama) including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date; (ii) *any issue raised in any of the Provider Actions by pleading or motion*; or (iii) *mechanisms, rules or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10–26 approved through the Monitoring Committee Process during the Monitoring Period and that are based on the same factual predicate of the Provider Actions* and related to the injunctive relief provided by Paragraphs 10–26. *Nothing in this Release shall release claims, however asserted, that arise in the ordinary course of business and are based solely on* (a) claims by the Provider in the Provider's *capacity as a plan sponsor or subscriber* or (b) claims regarding *whether a Settling Individual Blue Plan properly paid or denied a claim* for a particular product, service or benefit based on the

26

benefit plan document, Provider contract, or state or federal statutory or regulatory regimes (including state prompt pay laws). Notwithstanding the foregoing sentence, *any claim, however asserted, in clauses (a) or (b) in this Paragraph 1(xxx), based in whole or in part on the factual predicates of the Provider Actions* or any other component of the Released Claims discussed in this Paragraph, *is released*. Released Claims include, but are not limited to, claims that arise after the Effective Date.

(Doc. # 3192-2 at 22-23) (emphasis added). The Settlement defines "Releasors" as follows:

zzz. "Releasors" means the Provider Class Representatives and each and every Settlement Class Member and all of their predecessors, successors, heirs, administrators and assigns. Each Releasor releases Released Claims on behalf of itself and on behalf of any party claiming by, for, under or through the Releasor, with such claiming parties to include any and all of Releasor's past, present and future officers, directors, supervisors, employees, agents, stockholders, investors, members, attorneys, servants, representatives, accounts, plans, groups, parent companies, subsidiary companies, affiliated companies, divisions, affiliated partnerships, joint venturers, principals, partners, wards, heirs, assigns, beneficiaries, estates, next of kin, family members, relatives, personal representatives, administrators, agents, representatives of any kind, insurers, and all other persons, partnerships or corporations with whom any of the foregoing have been, are now or become affiliated, and the predecessors, successors, heirs, executors, administrators and assigns of any of the foregoing.

(*Id.* at 24).

The Eleventh Circuit addressed a similar objection from Home Depot to the scope of the Subscriber release. Addressing the similar Subscriber release, that court stated:

The settlement agreement limits the release to claims arising from the factual predicates of the subscriber action. It defines released claims as those "based upon, arising from, or relating in any way to: (i) the factual predicates of the Subscriber Actions ... (ii) any issue raised in any of the Subscriber Actions by pleading or motion; or (iii) mechanisms, rules, or regulations by the Settling Individual Blue Plans and [the Association] within the scope of" the relief awarded to the injunctive class. This language cabins the scope of the release. *The release does not extend beyond claims arising from the common nucleus of operative fact*: all the released claims either were raised or could have been raised during the litigation that preceded the settlement. *The release does not bar any claims that could not have been litigated before settlement or any claims related to conduct that was not challenged in the underlying lawsuit.*

*In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1091 (11th Cir. 2023), *cert. denied sub nom. Behenna v. Blue Cross Blue Shield Ass'n*, 144 S. Ct. 2686, 219 L. Ed. 2d

1301 (2024), *and cert. denied sub nom. Home Depot U.S.A., Inc. v. Blue Cross Blue Shield Ass'n*, 144 S. Ct. 2687, 219 L. Ed. 2d 1301 (2024).

Although the Provider release is slightly different from the Subscriber release to "reflect the different types of claims that Subscribers and Providers assert against the Blues in the ordinary course of business," (Doc. # 3313-1 at 33), careful review shows the releases are substantively identical. The following claims are released: those based on (1) the factual predicates of the Provider Actions, (2) any issue raised in any of the Provider Actions by pleading or motion, and (3) mechanisms, rules, or regulations established by the injunctive relief of Paragraphs 10–26 of the settlement. (Doc. # 3192-2 at 22-23). Ordinary course of business claims, such as whether a Blue Plan properly paid or denied a claim, are not released – unless they are "based in whole or in part on the factual predicates of the Provider Actions or any other component of the Released Claims." (*Id*. at 23). As the court noted at the fairness hearing, "[j]ust because we have a dispute between a provider and a Blue entity over reimbursement under BlueCard, that does not *ipso facto* mean that that's released." (Doc. # 3342 at 46; *see also* Doc. # 3330 at 3 (a "claim is not released solely because the relevant reimbursement claim was sent from a host plan [] through the BlueCard program." (citing Doc. # 3321 at 6, n.2)). The court finds no ambiguity or overbreadth in the release language.

HCA's objection essentially asks the court to re-write the Release in what it believes is a slightly clearer manner. But, the Release language was negotiated by the parties as part of the overall Settlement, it is sufficiently clear, and it does not violate the IFP doctrine. Further, even if the court found that the Release was defective (and to be clear, it makes just the opposite finding), it could not cure it. "Although a district judge must assess a proposed settlement agreement for fairness, '[t]he judge *cannot rewrite the agreement*.'" *Drazen v. Pinto*, 106 F.4th 1302, 1330 (11th

Cir. 2024) (quoting 4 William B. Rubenstein, Newberg & Rubenstein on Class Actions § § 13:46

(6th ed. Nov. 2023 update) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)))

(emphasis added).

The objections by HCA and the Objecting ER Groups to the scope of the release language

are **OVERRULED**.

### B.    The Objecting ER Groups Argue They Were Not Adequately Represented

The Objecting ER Groups also argue that the Plan of Distribution treats Settlement Class

Members inequitably. (Doc. # 3311-7 at 15-17). They complain that, because there were no out-

of-network ER Group Provider Class Representatives, they have been treated the same as other

providers when they contend they should not be because their damages model is different. (*Id.*).

They assert that out-of-network emergency providers are usually reimbursed at a higher rate than

in-network providers and therefore their claims are more valuable. (*Id.*). By applying the same

formula to ER Providers' claims, they say, the Settlement disproportionately underpays out-of-

network ER Group Providers and is thus inequitable. (*Id.*). The court disagrees.

As Provider Plaintiffs note, "[c]ontrary to the Objecting ER Groups' contention, the

Settlement does consider the providers' 'reasonably expectable reimbursement rates' because

settlement payments are based on Allowed Amounts." (Doc. # 3313-1 at 40). That is, if "out-of-

network emergency medicine providers are entitled to higher reimbursement rates than in-network

providers," as the Objecting ER Groups claim, then their "Allowed Amounts" will be higher, and

(all other things being equal) they will recover more from the Settlement Fund. (*Id.*).

Provider Co-Lead Counsel also explained that even though there was not an out-of-network

Class Representative, out-of-network providers directly participated in the mediation:

> Before agreeing to the settlement, Settlement Class Counsel received extensive
> input from a wide variety of stakeholders, including entities that own both in-

network *and out-of-network providers*. These entities *participated in mediation* sessions and the Provider Work Group. Settlement Class Counsel *made sure that the Settlement Agreement provided significant injunctive and monetary relief to out-of-network providers and treated them equitably in the Plan of Distribution.*

(Doc. # 3313-2 ¶ 26) (emphasis added). Bob Meyer, who served as a mediator in this MDL from 2019 to 2024, confirmed that the Provider Work Group included both in-network and out-of-network participants. (Doc. # 3311-10 ¶ 5).

Matthew Katz was one Provider Plaintiffs' experts on issues related to healthcare practice management, billing, coding prompt payment and other issues. (Doc. # 3254 at 4). He is a Principal at MCK Health Strategies and MCK Consulting, LLC, where he advises state and national medical specialty societies, and works with hospitals, health systems, physician practices, and other clinicians on issues related to medical practice management, coding, claims processing, adjudication, and payment dispute issues. (*Id*.). Katz disagrees with the Objecting ER Groups that the universe can be divided into "out-of-network emergency medicine providers" and "in-network emergency medicine providers." (Doc. # 3311-11 at ¶ 7). He explained that "[i]t is common for emergency medicine providers to change their network status with various insurers over time." (*Id*.). Katz also explained that "the settlement agreement does account for differences in reimbursement rates by using Allowed Amounts as the basis for a class member's payment" so that "the settlement does not treat all healthcare providers similarly without regard to their reasonably expectable reimbursement rates." (*Id*. ¶ 8). He also noted that "improvements to the BlueCard program make the option of going in-network more valuable to all providers." (*Id*. ¶ 9).

"Courts frequently approve plans involving *pro rata* distribution" where there is a "reasonable, rational basis" for the distribution. *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig*., 2019 WL 6875472, at *20 (E.D.N.Y. Dec. 16, 2019), *judgment entered*, 2022 WL 2803352 (E.D.N.Y. July 18, 2022), *and aff'd sub nom. Fikes Wholesale, Inc. v. HSBC Bank*

*USA, N.A.*, 62 F.4th 704 (2d Cir. 2023) (citing *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 519 (E.D. N.Y. 2003)). Based on the evidence submitted in support of the Settlement, the court concludes that there is a rational, fact-based basis for the relative distributions under the Settlement.

For all of these reasons, the Objecting ER Groups' objection[7] regarding adequate representation is **OVERRULED**.

### C.    Egner's Objection to Alleged Inequitable Distribution of Settlement Funds

Egner is a Kentucky chiropractor. He objects to what he describes as inequitable distribution of settlement funds, inadequate compensation for medical professionals, and excessive administrative and legal fees. Doc. # 3311-8 at 3-5). He notes that the $2.8 billion settlement is allocated as follows: (1) $700 million to attorneys' fees; (2) $200 million to expenses, costs, and administration; $1.78 billion to healthcare facilities; and $152 million to medical professionals – which he points out is less than the amount allocated for expenses, costs, and administration. (*Id.* at 3).

Provider Plaintiffs observe that Egner's objection does not account for the fact that the Plan of Distribution was not meant to reflect the share of healthcare spending for various types of Providers, but rather the relative impact of the Blues' alleged conspiracy on each type of Provider. (Doc. # 3313-1 at 43). Providers' economic experts determined that the impact on facilities was three and a half times as large as the impact on professionals. (*Id.*). Plus, Egner does not account for the fact that approximately 65% of physicians who were potential class members were excluded

---

[7] The Objecting ER Groups also contended that the release could encompass "affiliates" who had no meaningful involvement in the class action. (Doc. # 3311-7 at 12). This argument ignore language in the release stating that "affiliates" that are included among the releasors would only include those "claiming by, for, under or through the Releasor." (Doc. # 3192-2 at 24 ¶ (zzz)). This simply ensures that a plaintiff's released claims cannot be asserted by someone else. This aspect of the objection was not pressed at the fairness hearing. Thus, it is **OVERRULED**.

from the Settlement Class because they previously released their claims in *Love v. Blue Cross and Blue Shield Association*, No. 1:03-cv-21296-FAM (S.D. Fla.). (*Id.*). Finally, neutral allocation experts Kenneth Feinberg and Camille Biros recommended the 92% - 8% allocation after reviewing the submitted evidence. (*Id.* at 43-44).

Since filing his objection, Egner has not pressed the objection and did not appear at the fairness hearing. The court finds that that there is a rational, fact-based basis for the distribution in the Settlement, that it is fair, adequate, and reasonable, and that it is fully supported by the evidence submitted in support of the Settlement. Accordingly, Dr. Egner's Objection is **OVERRULED**.

## V.    Conclusion

In accordance with all of the foregoing, it is hereby **ORDERED, ADJUDGED, AND DECREED** as follows:

1.    The court has jurisdiction over the subject matter of this Action and personal jurisdiction over the parties and the members of the Settlement Class described below.

2.    This Final Order and Judgment incorporates and makes a part hereof: (a) the Settlement Agreement; (b) the Notice Plan and Claim Form, which were each approved by the court on December 4, 2024; and (c) the Plan of Distribution, which was also approved by the court on December 4, 2024.

3.    Under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, and based on the record before the court, including the submissions in support of the Settlement and objections and responses thereto, the court hereby affirms its forecast in the Preliminary Approval Order and certifies the following Settlement Class for settlement purposes only: "all Providers in the U.S. (other than Excluded Providers, who are not part of the Settlement Class) who currently provide or provided healthcare services, equipment or supplies to any patient who was insured by,

or who was a Member of or a beneficiary of, any plan administered by any Settling Individual Blue Plan during the Settlement Class Period." The term "Excluded Providers" means:

> (i) Providers owned or employed by any of the Settling Defendants; (ii) Providers owned or employed exclusively by Government Entities or Providers that exclusively provided services, equipment or supplies to members of or participants in Medicare, Medicaid or the Federal Employee Health Benefits Programs; (iii) Providers that have otherwise fully released their Released Claims against the Releasees prior to the Execution Date, including but not limited to Providers that were members of any of the settlement classes in *Love v. Blue Cross and Blue Shield Association*, No. 1:03-cv-21296-FAM (S.D. Fla.); or (iv) Providers that exclusively provide or provided (a) prescription drugs; (b) durable medical equipment; (c) medical devices; (d) supplies or services provided in an independent clinical laboratory; or (e) services, equipment or supplies covered by standalone dental or vision insurance. Any Provider that falls within the exclusion(s) set forth in clauses (i), (ii) or (iv) of this Paragraph 1(gg) for only a portion of the Settlement Class Period is a Settlement Class Member that may recover in the settlement as set forth in the Plan of Distribution.

The "Settlement Class Period" is July 24, 2008, through the Execution Date of the Settlement Agreement, which was October 4, 2024. (Doc. # 3192-2 at 86).

4.    The court finds that the requirements of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure are satisfied solely for settlement purposes, as follows:

   a.    Under Rule 23(a)(1), the court finds that the Settlement Class members are so numerous that their joinder would be impracticable.

   b.    Under Rule 23(a)(2), the court finds that there are one or more questions of fact or law common to the Settlement Class.

   c.    Under Rule 23(a)(3), the court finds that Provider Plaintiffs' claims are typical of the claims of the Settlement Class.

   d.    Under Rule 23(a)(4), the court finds that the Provider Class Representatives have fairly and adequately protected the interests of the Settlement Class. Provider Class Representatives are certified as class representatives on behalf of their Settlement Class.

e.  Under Rule 23(b)(3), the court finds that common questions of law and fact predominate over questions affecting only individual members.

f.  Also under Rule 23(b)(3), the court finds that a class action is superior to other available methods for the fair and efficient adjudication of this Action.

**Class Counsel and Class Representatives**

5.  Under Rule 23(g) of the Federal Rules of Civil Procedure, the court appoints Joe R. Whatley, Jr. and Edith M. Kallas of the law firm Whatley Kallas LLP as Provider Co-Lead Counsel.

6.  The following individuals and entities are appointed as class representatives: Jerry L. Conway, D.C.; InMed Group, Inc., f/k/a Crenshaw Community Hospital; Bullock County Hospital; Evergreen Medical Center, LLC; Jackson Medical Center; Ivy Creek Healthcare; Elmore Community Hospital; Georgiana Medical Center; Lake Martin Community Hospital; Joseph D. Ackerson, Ph.D.; Janine Nesin, P.T., D.P.T., O.C.S.; Roman Nation, M.D.; Neuromonitoring Services of America, Inc.; Confluent Health; ProRehab, P.C.; Texas Physical Therapy Specialists, LLC; BreakThrough Physical Therapy, Inc.; Dunn Physical Therapy, Inc.; Gaspar Physical Therapy, P.C.; Timothy H. Hendlin, D.C.; Greater Brunswick Physical Therapy, P.A.; Charles Barnwell, D.C.; Judith Kanzic, D.C.; Brian Roadhouse, D.C.; Dr. Saket K. Ambasht, M.D.; Snowden Olwan Psychological Services; Matthew Caldwell, M.D.; and Mishanta Reyes, M.D.

**Notice**

7.  The court finds that the notice provisions of the Class Action Fairness Act, 28 U.S.C. § 1715, have been satisfied. (Doc. # 3227).

8.  The court finds that the dissemination of Notice: (a) was implemented in accordance with the Notice Plan Approval Order; (b) constituted the best notice practicable under the circumstances; (c) constituted notice that was reasonably calculated, under the circumstances,

to apprise the Settlement Class of (i) the pendency of the Action; (ii) the effect of the Settlement Agreement (including the releases to be provided thereunder); (iii) Settlement Class Counsel's motion for an award of attorneys' fees and reimbursement of expenses; (iv) the right to object to any aspect of the Settlement, the Plan of Distribution, and/or Class Counsel's motion for attorneys' fees and reimbursement of expenses; (v) the right to opt out of the Settlement Class; and (vi) the right to appear at the Final Fairness Hearing; (d) constitutes due, adequate, and sufficient notice to all persons and entities entitled to receive notice of the Settlement; and (e) satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure and the United States Constitution (including the Due Process Clause).

## Objections to the Settlement Agreement

9.      As explained above, the Objections filed by HCA, the Objecting ER Groups, and Kyle Egner, DC are **OVERRULED.**

10.      The conditional objections filed by the twenty-four clients of the law firm Paul Hastings LLP that are conditioned on the rejection of the exclusion requests filed by those clients are **DISMISSED AS MOOT**.

## Final Approval of the Settlement Agreement

11.      Under Rule 23(e) of the Federal Rules of Civil Procedure, the court hereby grants final approval of the Settlement Agreement in all respects (including, without limitation: the Settlement Fund amount, the releases, the Injunctive Relief, and the dismissal with prejudice of the claims asserted against Settling Defendants in the Action), and finds that the Settlement Agreement is, in all respects, fair, reasonable, and adequate to the Settlement Class. In reaching this conclusion, the court considered the factors set forth in Rule 23(e) as well as the factors set forth in *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). Moreover, the court concludes that:

a.  the Settlement Agreement was fairly and honestly negotiated by counsel with significant experience litigating class actions and is the result of vigorous arm's-length negotiations undertaken in good faith and with the assistance of several mediators, who are experienced and well-regarded mediators of complex cases;

b.  the Action involves contested issues of law and fact, such that the value of an immediate monetary recovery, along with the significant other relief provided under the Settlement Agreement (including, but not limited to, the relief described as "Injunctive Relief" under Paragraphs 10–26 of the Settlement Agreement), outweighs the mere possibility of future relief after protracted and expensive litigation;

c.  success in antitrust cases such as this one is inherently uncertain, and there is no guarantee that continued litigation would yield a superior result (particularly given the costs, risks, and delay of trial and appeal); and

d.  there is a substantial basis for Settlement Class Counsel's judgment that the Settlement Agreement is fair, reasonable and adequate.

12.  The proposed method of distributing relief to the Settlement Class is adequate, including the method of processing Damages Class member claims.

13.  The Settlement treats Class Members equitably relative to each other when considering the differences in their claims.

14.  The court further grants final approval to the Plan of Distribution, which was preliminarily approved on December 4, 2024. (Doc. # 3225 at 13-19, 42-43). The Plan of Distribution was developed and recommended by experienced class counsel, with the support of expert economic analysis. The Plan of Distribution represents an efficient and equitable means of

distributing the Net Settlement Fund to the Damages Class in a timely fashion, without overly burdening claimants, and treats members of the Damages Class equitably relative to each other. In particular, the court finds that the allocation of the Net Settlement Fund among different types of claimants is appropriate, and further finds that the Plan of Distribution's use of a default method of calculating hospital and other facility allowed amounts with an alternative option for claimants who believe they are entitled to more than the default option is reasonable based on the factors identified in the Plan. The Plan of Distribution's methodology strikes a reasonable balance between precision and efficiency.

### <u>Releases</u>

15.    On August 7, 2025, Provider Co-Lead Counsel filed an updated and revised list of facially valid exclusion requests (Opt Outs). (Doc. # 3343-1). Except as to any claim of the Opt Outs who have validly and timely requested exclusion from the Settlement Class, the MDL and the underlying Provider Actions and, all claims contained therein, as well as all of the Released Claims against any of the Releasees by Releasors, are each hereby **DISMISSED WITH PREJUDICE**.

16.    The Opt-Outs who have been identified as having filed facially valid exclusion requests (Doc. # 3343-1) are excluded from the Settlement Class under properly made requests, are not bound by the Settlement Agreements, or this Final Order and Judgment, and may not make any claim on or receive any benefit from the Settlement, whether monetary or otherwise. Said Opt-Outs may not pursue any claims released under the Settlement Agreement on behalf of those who are bound by this Final Judgment. Each Class Member not appearing in the updated and revised list of facially valid exclusion requests (Doc. # 3343-1) is bound by this Final Judgment and will remain forever bound.

17.     The releases set forth in Paragraphs 42–45 of the Settlement Agreement, together with the Definitions contained in Paragraph 1 of the Settlement Agreement relating thereto, are expressly incorporated herein in all respects. The releases are effective as of the Effective Date.

18.     Upon the Effective Date, the Releasors: (a) shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal shall have, fully, finally, and forever released, relinquished, and discharged (i) all Released Claims against any and all of the Releasees, and (ii) any rights to the protections afforded under California Civil Code § 1542 and/or any other similar, comparable, or equivalent laws; and (b) covenant not to sue any Releasee with respect to any Released Claim, and are permanently barred and enjoined from commencing, maintaining, prosecuting, causing, and except as otherwise required by law or legal process cooperating with, advising to be commenced or maintained, or encouraging any action, suit, proceeding or claim in any court, tribunal, administrative agency, regulatory body, arbitrator or other body in any jurisdiction against any Releasee based in whole or in part upon, arising out of, or in any way connected or related to any Released Claim.

19.     This Final Order and Judgment shall not affect, in any way, the right of Releasors to pursue claims, if any, outside the scope of the Released Claims.

### Monitoring Committee

20.     Based on the record before the court, including the Settlement Agreement and other submissions in support of the Settlement, the court hereby establishes a Monitoring Committee to serve, and to perform the functions specified under the Settlement Agreement, during the Monitoring Period. The Monitoring Committee shall be made up of (1) two persons appointed collectively by Settling Defendants, (2) two persons appointed collectively by Provider Co-Lead Counsel, and (3) one person appointed by the court. The particular members of the Monitoring Committee will be appointed by separate order.

### Further Matters

21.     Nothing in the Settlement Agreement, this Final Judgment and Order of Dismissal, or any and all negotiations, documents, or discussions associated with them, or any proceedings undertaken in accordance with the terms of the Settlement Agreement constitutes (i) an admission or concession by any of the Settling Defendants (or evidence thereof) in any action or proceeding, (ii) evidence of any violation of any statute or law or of any liability or wrongdoing whatsoever by any Settling Defendant, or (iii) evidence of the truth or validity of any of the claims or allegations contained in any complaint or any other pleading that Provider Class Representatives or Class Members have or could have asserted against Settling Defendants, including, without limitation, that Settling Defendants have engaged in any conduct or practice that violates any antitrust statute, or other law, regulation, or obligation. Settling Defendants expressly deny any wrongdoing or liability whatsoever for any and all such claims and allegations.

22.     Without affecting the finality of this Final Order and Judgment in any way, this court retains continuing jurisdiction over: (a) the Settlement and this Agreement, including the interpretation, administration, and consummation of this Settlement, and (b) disposition of all funds held in the Escrow Account. Settling Defendants and each Settlement Class Member have submitted to the exclusive jurisdiction of this court for any suit, action, proceeding, or dispute arising out of or relating to the Settlement Agreement or the applicability of the Settlement Agreement (except disputes described in Appendix C to the Settlement Agreement that arise during the Monitoring Period, which shall be resolved by the Monitoring Committee) to resolve any disputes or controversies, including, but not limited to, enforcement regarding Released Claims and Paragraphs 42 and 43 of the Settlement Agreement. Settling Defendants and Settlement Class Members have agreed that, in the event of such dispute, they are and shall be subject to this court's jurisdiction and that this court is a proper venue and convenient forum.

23.     If (a) the Settlement Agreement is rescinded or terminated, (b) the Settlement Agreement does not become effective under the Settlement Agreement, (c) the Effective Date does not occur, or (d) the Net Settlement Fund, or any portion thereof, is returned to Settling Defendants in accordance with the Settlement Agreement, then this Final Order and Judgment shall be rendered null and void to the extent provided by and in accordance with the Settlement Agreement and shall be vacated and, in such event, all orders entered and releases delivered in connection shall be null and void to the extent provided by and in accordance with the Settlement Agreement.

24.     If the Settlement Agreement does not become final, or is otherwise rescinded or terminated, litigation of the Provider Actions against Settling Defendants will resume in a reasonable manner to be approved by the court upon application by the Parties, and any and all parts of the Settlement Fund caused to be deposited in the Escrow Account (other than Notice and Administration Costs reasonably and actually incurred), along with any income accrued thereon, shall be returned to the entities that paid such amounts into the Escrow Account, in proportion to their respective contributions, within ten calendar days of rescission, termination, or a court's final determination denying final approval of the Agreement and/or certification of the Settlement Class, whichever occurs first.

25.     The Parties have expressly reserved all of their rights if this Agreement is rescinded or does not otherwise become final.

26.     If the Effective Date does not occur with respect to the Settlement Agreement because of the failure of a condition of the Settlement Agreement, the court's assessment of class certification of the Settlement Class shall be deemed null and void and the Parties shall retain their rights to seek or to object to certification of this litigation as a class action under Rule 23 of the Federal Rules of Civil Procedure or under any other state or federal rule, statute, law, or provision

thereof, and to contest and appeal any grant or denial of certification in this litigation or in any other litigation on any other grounds.

27.     The Parties are directed to implement the Settlement Agreement in accordance with its terms once the Settlement Agreement becomes final. Without further order of the court, the Parties may agree to reasonable extensions of time to carry out any provision in the Settlement Agreement.

### Dismissal of the Provider Actions

28.     The Provider Actions will be dismissed with prejudice by separate order, and except as provided for in the Settlement Agreement and any order of this court granting fee, expense, or service awards as contemplated under the Settlement Agreement, that dismissal will be without costs. Any dismissal with prejudice **SHALL NOT** apply to the claims of the Opt-Outs who have been identified as having filed facially valid exclusion requests. (Doc. # 3343-1).

29.     There is no just reason for delay in the entry of this Final Order and Judgment.

**DONE** and **ORDERED** this August 19, 2025.

R. DAVID PROCTOR
CHIEF U.S. DISTRICT JUDGE