FILED
2025 Sep-22  PM 05:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **IN RE:**<br>**BLUE CROSS BLUE SHIELD**<br>**ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This Document Relates to**<br>**Provider Track Cases** |
| **IN RE:**<br>**BLUE CROSS BLUE SHIELD**<br>**ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:25-MD-10000-RDP** |

## PROVIDER PLAINTIFFS' MOTION FOR AN ORDER ESCROWING PAYMENTS IN JUDGMENT OR SETTLEMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

I.      The Opt-Outs Have Already Relied on the Immense Work That Providers' Counsel
        Devoted to This Case, and They Intend to Continue Doing So ........................................ 2

        A.      The Providers' Complaint ....................................................................... 5

        B.      Market Definition .................................................................................. 5

        C.      Personal Jurisdiction ............................................................................. 6

        D.      Standard of Review ................................................................................ 7

        E.      Discovery .............................................................................................. 9

        F.      Other Substantive Rulings .................................................................... 12

        G.      Experts ................................................................................................. 13

        H.      *American Pipe* Tolling .......................................................................... 13

II.     Equity Requires an Order Setting Aside a Portion of Future Plaintiffs' Recoveries ......... 14

III.    The Set-Aside Should Apply to Cases in the MDL and Cases in Which Plaintiffs'
        Counsel Use MDL Work Product ............................................................................... 16

CONCLUSION ................................................................................................................ 17

# TABLE OF AUTHORITIES

## Cases

*American Pipe & Construction Co. v. Utah*,
    414 U.S. 538 (1974) .................................................................................................. 14

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) .............................................................................................. 2, 15

*Cent. R.R. & Banking Co. v. Pettus*,
    113 U.S. 116 (1885) .................................................................................................. 14

*In re Aggrenox Antitrust Litig.*,
    2018 WL 10705542 (D. Conn. July 19, 2018) ................................................................ 15

*In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*,
    549 F.2d 1006 (5th Cir. 1977) ........................................................................... 2, 8, 15

*In re Avandia Mktg., Sales Practices, & Prods. Liab. Litig.*,
    617 F. App'x 136 (3d Cir. 2015) ............................................................................... 16

*In re Bard IVC Filters Prods. Liability Litig.*,
    603 F. Supp. 822 (D. Ariz. 2022) ........................................................................... 8, 13

*In re Genetically Modified Rice Litigation*,
    2010 WL 716190 (E.D. Mo. Feb. 24, 2010) .................................................................. 15

*In re Lidoderm Antitrust Litig.*,
    2017 WL 3478810 (N.D. Cal. 2017) .......................................................................... 15

*In re Linerboard Antitrust Litig.*,
    292 F. Supp. 2d 644 (E.D. Pa. 2003) ...................................................................... 8, 14

*In re National Prescription Opiate Litigation*,
    No. 17-md-2804, Doc. No. 3828 (N.D. Ohio Aug. 12, 2021) ......................................... 15

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
    2022 WL 19837725 (E.D.N.Y. Aug. 3, 2022) .............................................................. 15

*In re Xyrem (Sodium Oxybate) Antitrust Litig.*,
    2024 WL 1683640 (N.D. Cal. Apr. 17, 2024) .............................................................. 15

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    2022 WL 18108387 (E.D. Va. Nov. 8, 2022) ........................................................... 8, 15

*Internal Imp. Fund Trustees v. Greenough*,
    105 U.S. 527 (1882) .................................................................................................. 14

*Sprague v. Ticonic Nat'l Bank*,
    307 U.S. 161 (1939)........................................................................................................... 14

**Statutes**

15 U.S.C. § 15b.................................................................................................................... 14

**Other Authorities**

Eldon E. Fallon,
    *Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. 371 (2014).................... 1

# INTRODUCTION

When the Provider Plaintiffs filed their first lawsuit against the Blues in 2012, they embarked on one of the largest, most complicated, and longest antitrust cases in American history. Since then, the Providers' attorneys and their staff have spent about 375,000 hours litigating the case, and they have incurred more than $100 million in expenses, including payments to expert witnesses who spent thousands of hours developing what is likely the most sophisticated model for healthcare provider pricing ever created.

Now the case has settled, and attorneys who had nothing to do with the Providers' success have encouraged putative members of the Provider settlement class members to opt out and pursue separate litigation. In doing so, they acknowledged that they plan to take advantage of the work the Providers' counsel have already done, including the immense amount of work that went into developing the evidence and arguments that supported the Providers' motion for summary judgment on the standard of review, in essence copying the Providers' homework to achieve the same grade.

This Court has previously made clear that "the issue of a common benefit assessment regarding discovery developed in the MDL is still under this court's consideration." Doc. No. 3152 at 3.[1] In situations like this, it is well established that an MDL transferee court may enter an order assessing a common benefit fee to compensate the attorneys whose work benefits all plaintiffs. *See generally* Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. 371 (2014). "Class counsel generally have the benefit of the common fund doctrine to support payment for their efforts on behalf of the class or consolidated litigants. MDL judges generally issue orders directing that defendants who settle MDL-related cases contribute a fixed percentage of the

---

[1] In this brief, "Doc. No." refers to filings in Case No. 13-cv-20000 (N.D. Ala.). "JPML Doc. No." refers to filings in MDL No. 2406 (J.P.M.L.). "Opt-Out Doc. No." refers to filings in Case No. 25-md-10000 (N.D. Ala.).

settlement to a general fund to pay national counsel." Manual for Complex Litigation § 20.312 (4th ed.). The Former Fifth Circuit has explained that an MDL court "may designate one attorney or set of attorneys to handle pre-trial activity on aspects of the case where the interests of all co-parties coincide." *In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1014 (5th Cir. 1977). This authority would be "illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation." *Id.* at 1016. The Court has acknowledged "[t]here is little question that Providers' counsel serve in the role of common benefit counsel." Doc. No. 3152 at 2. Because "persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigants' expense," *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980), this Court should order that the Defendants set aside a portion of any payment made to other Provider opt-out plaintiffs who benefit from the Providers' efforts.

## ARGUMENT

**I.    The Opt-Outs Have Already Relied on the Immense Work That Providers' Counsel Devoted to This Case, and They Intend to Continue Doing So.**

In 2012, the undersigned counsel filed an action on behalf of healthcare providers who alleged that they were harmed by restraints on competition imposed by licensees of the Blue Cross Blue Shield Association. As this Court recognized when preliminarily approving the Providers' settlement, intense litigation followed:

> The parties engaged in significant motions practice directed at the operative complaint. These motions raised numerous substantive issues, such as Defendants' common-law trademark defense, the appropriate standard of review for the alleged conspiracies … , different states' filed rate doctrines, lack of personal jurisdiction, and improper venue. The court ruled on the merits of many of these motions and, as related to the Blues' challenges to jurisdiction and venue, the court allowed discovery and further briefing. After years of discovery on the jurisdiction and venue issues, the court ruled on those motions. … Provider Plaintiffs litigated 26 motions to dismiss, took discovery from 37 Defendants and numerous nonparties, and briefed 76 discovery motions.

2

Doc. No. 3225 at 3–4. "Discovery in this case was a massive undertaking" as well:

> The Provider Plaintiffs served discovery requests for structured data on every Defendant, and then met and conferred with each Defendant regarding that data. The Provider Plaintiffs obtained detailed information on medical claims and reimbursements from each of the Defendants, totaling many terabytes of data. With the help of their experts, the Provider Plaintiffs then vetted, synthesized, and analyzed that data, using it as an input into a highly sophisticated model for hospital reimbursement.

> Provider Plaintiffs also served requests for documents on each Defendant, and met and conferred with the Defendants regarding the scope of the requests. The Defendants produced 75 million pages of documents, which the Provider Plaintiffs reviewed both manually and through technology-assisted review. Manual review alone consumed approximately 134,000 hours of attorney time. The Provider Plaintiffs also responded to the Defendants' requests for discovery, which were served on 156 Provider Plaintiffs and nonparties. The Provider Plaintiffs collected, reviewed, and produced approximately 1.5 million pages of documents in response to the Blues' requests.

> Provider Plaintiffs participated in more than 200 depositions of Defendants and nonparties, and defended more than 40 depositions of the Provider Plaintiffs' class representatives and certain class members.

> The parties participated in more than 30 discovery hearings, as well as monthly status conferences, which resulted in 91 discovery orders. Along with Subscriber Plaintiffs, Provider Plaintiffs challenged Defendants' privilege designations for hundreds of thousands of documents. Special Master R. Bernard Harwood ultimately de-designated, in whole or in part, over 450,000 documents from Defendants' privilege logs. He and the "Seal Team" (a group of attorneys assembled from both sides of the litigation) performed important and excellent work.

*Id.* at 4–5 (citations omitted). Discovery accounted for a significant fraction of all attorney time in this case.

The Providers expended extraordinary effort and expense working with their experts to turn this this discovery into usable data that could support a reliable estimate of damages. The lion's share of the nearly $100 million in Shared Costs was spent on sophisticated experts, with whom the Providers' counsel consulted intensively for years.

Using the evidence they spent years developing, the Providers (along with the Subscriber Plaintiffs) moved for summary judgment on the standard of review applicable to their claims, and they won an important ruling:

> In 2018, the court ruled that Plaintiffs' claims relating to Exclusive Service Areas, along with other cumulative restraints, should be judged under the *per se* rule, and claims relating to price-fixing through the BlueCard program should be judged under the rule of reason. The court certified that decision for interlocutory appeal and Defendants petitioned the Eleventh Circuit to hear the appeal. The Eleventh Circuit denied the petition.

*Id.* at 5 (citations omitted). The Providers also used that evidence to defeat the Defendants' summary judgment motions, which would have severely damaged the Providers' case had they been granted. Doc. Nos. 2063, 3092, 3012.

In October 2024, the Providers and the Defendants announced that they had settled the Provider Track of the litigation on a classwide basis, and the Providers moved for preliminary approval. Doc. No. 3192. The court granted preliminary approval in December 2024, Doc. No. 3225, and notice was provided to the class. Class members who did not opt out of the settlement are entitled to a share of $2.8 billion (minus attorneys' fees, expenses, and the costs of notice and administration) and valuable injunctive relief. Some class members opted out of the settlement and filed new cases against the Blue Plans (the "Opt-Outs"). The JPML ultimately transferred these cases to the MDL, stating that "the allegations in their complaints mirror those asserted in the MDL actions." JPML Doc. No. 951 at 1.

The Opt-Outs' complaints reveal little to no independent work by their counsel, and the Opt-Outs' filings with the JPML indicate that they do not intend to do independent work on issues the Providers have already litigated. Instead, the complaints are based almost entirely on work already performed by the Providers, and the JPML filings lay out a plan to take advantage of discovery and significant rulings the Providers obtained. None of the work the Opt-Outs have

copied, and none of the rulings and other work they intend to rely on, came easy or cheaply. Here are a few examples:

## A.     The Providers' Complaint

If imitation is the sincerest form of flattery, the Providers could not be more flattered by the Opt-Outs' complaints. Every one of them draws its allegations primarily from the Consolidated Fourth Amended Provider Complaint, Doc. No. 1083, which was the culmination of years of the Providers' research, discovery, and refinement of their claims through litigation. The captions of the Opt-Outs' complaints may bear the names of various hospitals and medical groups, but the facts and the legal theories are the Providers'.

While some of the Opt-Outs' counsel took the time to paraphrase and summarize the Providers' complaint, many did not even go that far. One firm lifted the majority of its complaints verbatim from the Providers' complaint, including twelve pages on the impact of the Blues' conduct in Alabama—when its cases are pending in Illinois. *E.g.*, JPML Doc. No. 668-4, at ¶¶ 308–56.

## B.     Market Definition

The Providers' complaint included allegations about the relevant markets in which the Blues allegedly harmed competition. These were not pulled from the air; they resulted from the Providers' work with their experts, and they were carefully chosen with the knowledge that the Blues' experts would attack them as incorrect, and any damages model would have to operate within their confines. Before the Opt-Outs put pen to paper, those market definitions ran the gauntlet. The Blues argued in a motion to dismiss that the market definitions were implausible; the Providers defeated the motion. Doc. No. 1306. Then, after the Providers' experts built a damages model based on these market definitions (at the cost of tens of millions of dollars and thousands

of hours of expert and attorney time), the Blues moved for summary judgment on the grounds that the modeled damages were speculative. This Court denied that motion, finding that "[b]ecause Providers' damages model is not speculative and is not based on guesswork, a jury could determine that it is reliable." Doc. No. 3092 at 11. The Opt-Outs have adopted the Providers' market definition as their own.[2]

### C.    Personal Jurisdiction

Nearly all of the Opt-Outs have asserted claims against Blue Plans in judicial districts where they have no offices. When the Providers did the same thing back in 2012, ten Blue Plans moved to dismiss for lack of personal jurisdiction. Doc. Nos. 107, 112, 113, 119, 121, 122, 125, 135, 136. Along with the Subscribers, the Providers briefed and argued the motions to dismiss. This Court determined that the record was inadequate to decide the motions and permitted the Plaintiffs to take discovery. Doc. No. 369.

What followed was a monumental effort. The Plaintiffs served requests for production on the Defendants in January 2015, and supplemental requests in July 2015. The Plaintiffs received approximately 180,000 pages of data from the Blue Plans challenging jurisdiction and reviewed each one in preparation for Rule 30(b)(6) depositions of those Blue Plans. The Plaintiffs conducted at least 15 depositions related to the personal jurisdiction motions during April and May of 2016.

---

[2] In the Consolidated Fourth Amended Provider Complaint, the Providers alleged that "[t]he purchase of goods and services from healthcare providers by commercial buyers (excluding the purchase of prescription drugs and purchases for Medicare Advantage and managed Medicaid) is a relevant product market." Doc. No. 1083, at ¶ 348. The Opt-Outs' complaints allege an identical or substantially identical market. Adventist Complaint, JPML Doc. No. 668-4, at ¶ 462; AmeriTeam Complaint, JPML Doc. No. 668-5, at ¶ 187; CommonSpirit Complaint, JPML Doc. No. 668-6, at ¶ 177; Duke Complaint, JPML Doc. No. 668-7, at ¶ 414; IES Complaint, JPML Doc. No. 668-8, at ¶ 193; Bon Secours Complaint, Doc. No. 673-3, at ¶ 338; LHHealth Complaint, JPML Doc. No. 580-8, at ¶ 152; Weill Cornell Complaint, JPML Doc. No. 584-4, at ¶ 157; Mount Nittany Complaint, JPML Doc. No. 584-3, at ¶ 155; Phoebe Putney Complaint, JPML Doc. No. 754-3 at ¶ 285; NorthBay Complaint, JPML Doc. No. 777-3, at ¶ 392; Chinese Hospital Association Complaint, Case No. 25CV113731 (Cal. Super. Ct. Alameda Cnty.), at ¶ 400; Regents Complaint, Case No. CGC-25-623019 (Cal. Super. Ct. San Francisco Cnty.), at ¶ 417; Boston Children's Complaint, Doc. No. 1, Case No. 1:25-cv-11757 (D. Mass.), at ¶ 224; State University of Iowa Complaint, JPML Doc. No. 936-4, at ¶ 411; Northwell Complaint, JPML Doc. No. 927-3, at ¶ 152.

New motions to dismiss for lack of personal jurisdiction were filed in June 2016, the Plaintiffs filed opposition briefs, and oral argument was held. The motions were denied in December 2016. More than three years separated the original motions to dismiss and the Court's final decision. As with all common issues in this case, the Opt-Outs intend to use the Providers' work rather than doing their own on this threshold issue, saving themselves years of time.

### D.    Standard of Review

Based on evidence that took years to assemble, the Providers moved for summary judgment on the standard of review that would apply to the Blues' conduct. After copious briefing and extensive argument, this court held that the aggregation of ESAs and National Best Efforts ("NBE") would be judged under the *per se* rule. Doc. No. 2063.

This ruling has become a centerpiece of the Opt-Outs' litigation. Even before the first Opt-Out complaint was filed, it was an important part of the sales pitch for attorneys and litigation funders. During a webinar with Paul Hastings attorney Ryan Phair (who represents many of the Opt-Outs), Charles Griffin of the litigation funder Burford Capital stated that the Providers' case was "litigated for quite a while by very able class counsel, who won a number of significant rulings. Among other things, the court held that the per se rule applied to the blues conduct for at least the vast majority of the damages period. And that's a very significant ruling because it really restricts the number of defenses that the Blues could raise against liability." Ex. 1 to the Declaration of Henry C. Quillen (Ex. A) at 8 (cleaned up). On another webinar, Sean Zabaneh of Duane Morris, who also represents several Opt-Outs, stated, "if you did bring an opt out claim, you would likely be able to benefit from a *per se* ruling on the conduct through 2021, and I say likely, because there's a lot that goes into an opt out claim, including the jurisdiction you file and the judges you get but certainly the rulings that have come to this point would be highly persuasive, if not potentially

controlling." Ex. 2 to the Quillen Declaration at 17. Many of the Opt-Outs cited the Court's ruling in their complaints and their motions to vacate the JPML's conditional transfer orders, identifying it as a ruling on a common issue on which they intend to rely in their own litigation.[3] In the Joint Submission Regarding Coordination, the Opt-Outs make clear they are relying extensively on those rulings achieved through the resources, hard work and discovery of the Providers, and resisting the Blues' suggestion that the standard of review for ESAs and NBE should be briefed in these new litigations. Opt-Out Doc. No. 7 (Ex. 3 to the Quillen Declaration) at 37–38.

MDL transferee courts recognize that rulings on important issues inure to the common benefit of all plaintiffs. *In re Air Crash Disaster*, 549 F.2d at 1020 ("time and effort which have been devoted to the common question of establishing liability" "inur[e] to the benefit of all claimants"); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 644, 659 (E.D. Pa. 2003) ("In the favorable rulings of this Court and the Court of Appeals on the class action motions, the tag-along plaintiffs obtained the benefit of the *imprimatur* of those courts on the theory of the case formulated by class plaintiffs and adopted in the tag-along actions."); *In re Zetia (Ezetimibe) Antitrust Litig.*, 2022 WL 18108387, at *4 (E.D. Va. Nov. 8, 2022) (crediting lead counsel's argument that "without the entry of a set-aside order, … the Tag-Along Plaintiffs will enjoy the benefits of Lead Counsel's work and litigation strategy, including the Court's motion to dismiss ruling") (cleaned up). This is true even when those rulings, and the evidence they are based on, have been made public. *In re Bard IVC Filters Prods. Liability Litig.*, 603 F. Supp. 822, 828 (D. Ariz. 2022)

---

[3] Motions to Vacate: JPML Doc. Nos. 668-1 at 2 & n.2, 673-1 at 6–7, 771-1 at 7 & n.4, 772-1 at 7 & n.4, 911-1 at 4 & n.2. Complaints: Adventist Complaint, JPML Doc. No. 668-4, at ¶ 30; Duke Complaint, JPML Doc. No. 668-7, at ¶ 30; Bon Secours Complaint, Doc. No. 673-3, at ¶ 18; Phoebe Putney Complaint, JPML Doc. No. 754-3, at ¶ 224; NorthBay Complaint, JPML Doc. No. 777-3, at ¶ 4; Chinese Hospital Association Complaint, Case No. 25CV113731 (Cal. Super. Ct. Alameda Cnty.), at ¶ 8; Regents Complaint, Case No. CGC-25-623019 (Cal. Super. Ct. San Francisco Cnty.), at ¶ 32; Boston Children's Complaint, Doc. No. 1, Case No. 1:25-cv-11757 (D. Mass.), at ¶ 15; State University of Iowa Complaint, JPML Doc. No. 936-4, at ¶ 30.

("[E]ven for materials that have been made public, lead counsel fought expensive battles that later-settling lawyers do not have to fight, including numerous *Daubert* challenges [and] multiple summary judgment motions ….").

Here, this Court's rulings will inure to Opt-Outs' benefit, even if those rulings are not binding. When this Court appointed lead counsel for the Providers and set out the scope of their common-benefit work, it directed them to "[d]etermin[e] and present[] to the court and opposing parties the position of Plaintiffs on all matters arising during pretrial proceedings, including pretrial/pre-certification motion practice," and to "[p]repar[e] and fil[e] appropriate motions, responses, and other written submissions." Doc. No. 61 at 3–4. Since then, the Providers' counsel have spent tens of thousands of hours crafting legal arguments and pursuing the discovery that supports those arguments. The Providers' briefing on the first standard-of-review motion alone included fifty paragraphs of factual allegations, nearly all of which relied on documents, interrogatory responses, and depositions obtained through discovery. Any plaintiff in a future action will benefit from not only this Court's imprimatur on the Providers' theory of the case, but also the evidence and arguments that led to the Providers' successful motion practice on the standard of review, personal jurisdiction, and the Blues' defenses. The existence of these rulings undoubtedly increases the strength of the Opt-Outs' cases.

### E.    Discovery

The Court has already acknowledged the free rider problem in the context of discovery in this case:

> Discovery in this MDL was conducted over the better part of a decade and at great expense to all parties, not the least of whom were the Provider Plaintiffs. Yet, the discovery sought from Defendants in the *Prime* case apparently does not account for the substantial cost to Providers in compiling the information. At a recent status conference in this MDL, one of the agenda items was a potential common benefit

> assessment to address "free riders" who may seek to obtain and use the work product developed in the MDL without sharing in the expense. (Doc. # 3127).

Doc. No. 3152 at 2.

Over the course of several years, the Providers' counsel obtained the production of 75 million pages of documents, and terabytes of structured data, from Defendants and nonparties. The Providers' counsel, along with the Subscribers, spent months negotiating document production protocols, data production parameters, productive orders, and the like. This work will form the basis upon which discovery will occur in the Opt-Out actions, without having to be repeated. Providers' counsel reviewed these documents, categorizing them and identifying the most important documents in an electronic format that can be made available to other counsel. With the assistance of their experts, they formatted and validated structured data from 37 Defendants and nonparties so that it could be used to establish damages. Doing so required substantial motion practice, countless meet-and-confer sessions, and more than 30 discovery hearings, which led to 91 discovery orders. In addition, the Providers' counsel took, defended, or attended more than 200 depositions of Defendants, their experts, and non-parties (including litigating the scope of discovery of numerous sophisticated third parties who did not wish to provide such evidence). Discovery was conducted nationwide, including obtaining data and documents from all the Blues, 31 depositions of the Blue Cross Blue Shield Association, and discovery from Providers and the Blues' competitors throughout the country. These efforts created a robust body of evidence that would take other counsel years of time and tens of millions of dollars to replicate, if that is even possible at this point.

The Opt-Outs have publicly represented that they intend to use the Providers' discovery to their advantage in their litigations.[4] In fact, in the Joint Proposal on Coordination, the Opt-Outs

---

[4] JPML Doc. Nos. 668-1 at 7; 673-1 at 7; 771-1 at 6; 772-1 at 6; 911-1 at 9; 936-1 at 6–7.

make clear they intend to "obtain the benefit of the existing discovery record," given that their claims are "near carbon copies" of the Fourth Amended Complaint. Opt-Out Doc. No. 7 (Ex. 3 to the Quillen Declaration) at 22, 25.[5] The Opt-Outs have been unambiguous on this issue:

> Since there are unlikely to be significant "new" legal issues in need of resolution at the motion to dismiss stage given the similarity in Provider Opt-Outs' claims against the Blues to those pleading issues already litigated by the Provider Class and ASO Opt-Outs, the propriety of such coordination should be focused on sharing existing records to maximize the efficiency of discovery.

*Id.* at 22.

If they are able to gain access to the "existing records," the benefit is obvious: they gain a significant shortcut through the litigation and save the incredible time and expense that the Providers' counsel spent on behalf of all Provider Plaintiffs. These discovery materials were created by thousands of hours of Providers' counsel's work, including drafting and serving document requests, data requests, protocols, review organizational charts, identifying custodians, drafting deposition notices, resolutions of objections (which took months in many cases), review of documents and identification of exhibits, resolution of privilege and designation issues, and ultimately taking depositions. As described above, the Opt-Outs want not just the documents and depositions themselves, but the work product underlying them. In the Joint Proposal on Coordination, the Opt-Outs requested:

- All of the Blues' written discovery requests and responses pertaining to the MDL and ASO Opt-Out discovery records;
- Any agreed-upon search terms, including custodians and/or data sources to which those search terms were applied, and all correspondence among the Blues and respective parties regarding such terms;
- Any production log(s) that identify the nature of documents contained in productions;

---

[5] In fact, Section IV.A of the Joint Proposal (and the Blues' portions as well) seem to take for granted that the Opt-Outs will simply leverage the work of Provider counsel to significantly advance discovery in the Opt-Out actions.

- Identification of specific portions of the MDL document discovery record not produced to ASO Opt-Outs, including the size and subject matter of the productions withheld;
- Rule 30(b)(6) deposition notices, objections, and communications resolving any disputes;
- All Blue deposition transcripts and exhibits previously provided to the ASO Opt-Outs or authorize the ASO Opt-Outs to release them to Provider Opt-Outs;
- All Blue affirmative and rebuttal expert reports;
-  A summary of the size, composition, and contours of all structured data produced in the MDL and ASO Opt-Out cases, including structured data from the National Warehouse Data, and identification of all fields produced, applicable data dictionaries, and all correspondence between the relevant parties related to negotiations on the scope and content of the structured data productions;
- Identification of any structured data the Blues are not willing to deem reproduced or to produce, including non-claims data, actuarial, pricing and rating data requested by MDL Subscribers; non-commercial membership data requested by MDL Subscribers, structured data on subscriber side topics (premiums, billing, member demographics, rating data, product benefit data, etc.), and pharmacy claims data. The identification should include at a minimum the production volume of such data for each Blue, or the bates numbers if the exclusion is for less than a full production volume:
- All third-party subpoenas and responses and related correspondence;
- Identification of all third-party productions and dates of production;
- Identification of any pending and unresolved subpoenas;
- Identification of all custodians, including each custodian's employer and
- Summary of total documents produced by each custodian, data sources (e-mail, shared drives, phone, hard copies, etc.), and the date(s) of production.

Opt-Out Doc. No. 7 (Ex. 3 to the Quillen Declaration) at 25–26.

Given the overlap between ASO Opt-Out counsel and the Provider Opt-Out counsel, it is clear that much of this information is already available to some Provider Opt-Out counsel and has already been leveraged in creating complaints and planning discovery.

### F.     Other Substantive Rulings

The Providers used their discovery to defeat the Defendants' motions for summary judgment on the grounds that their damages were time-barred and speculative. Doc. No. 3092. If the motion had been granted, the Providers' case would have been seriously weakened. Now, with the *imprimatur* of this ruling and an understanding of the evidence that supported them, the Opt-

Outs have a blueprint for creating similar evidence, increased leverage for settlement and a clearer path to a favorable verdict.

In addition, although the Court has not ruled on the issue, the Providers spent significant resources developing their argument that health insurance is not a two-sided platform, including the submission of an expert report and taking the deposition of the Blues' expert. Doc. Nos. 3025, 3045. In doing so, the Providers have given the Opt-Outs a roadmap to avoiding an adverse decision on this issue.

### G.    Experts

Among the common-benefit work this Court directed the Providers' counsel to perform was "[c]onsulting with and employing experts." To carry out this work, the Providers and their experts built the largest database of hospital claims ever assembled, at tremendous cost in both time and expense. The Providers coordinated with their experts on multiple reports, defended their experts' depositions, analyzed the reports of the Blues' experts, deposed the Blues' experts, and briefed numerous *Daubert* motions, both offensive and defensive. Now, any plaintiff who obtains this MDL work product can skip all this work and use it against the Blues. *See Bard*, 603 F. Supp. 3d at 828 ("The common benefit work also includes scores of depositions of general causation experts and … witnesses that do not have to be repeated in individual cases."). Plaintiffs who do not access the Providers' expert reports may still use publicly available filings to guide their own experts, benefiting from the Providers' work.

### H.    *American Pipe* Tolling

The Providers filed their first complaint on July 24, 2012. *Conway v. Blue Cross & Blue Shield of Ala.*, No. 2:12-cv-2532-RDP, Doc. No. 1. That complaint asserted claims against all the Blues on behalf of a nationwide class. *Id.* ¶ 118. From that moment, the Clayton Act's four-year

statute of limitations for putative class members was tolled. *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974); 15 U.S.C. § 15b. For the Providers' counsel, the consequence of filing first was an obligation to pursue the case, at their own risk. For absent class members, the consequence was that they could sit back and wait almost 13 years for major rulings, at no risk to themselves, knowing that they could opt out of the class later and still benefit from the tolled damages period. *Linerboard*, 292 F. Supp. 2d at 661 & n.10) (imposing a set-aside when "major entities and their counsel awaited the development of the case by designated counsel and only filed suit on the eve of the conclusion of discovery," and citing *American Pipe*).

The benefit of *American Pipe* tolling to putative class members here is exceptional. Damages will be easiest to prove for any period in which the Blues' conduct is measured by the *per se* rule. Under the Court's 2018 standard of review decision, that period runs from July 24, 2008 (four years before *Conway* was filed) to April 27, 2021, when the Blues eliminated the National Best Efforts Rule. Doc. Nos. 2735-33, 2933. Had the Providers not filed their cases, the Opt-Outs would have missed out on almost 99% of the damages available during the *per se* class period. Perhaps if the Providers had never filed their case, some of these plaintiffs would have filed earlier, but then they would have been expected to litigate at their own expense. Plaintiffs who wait for litigation to play out for more than a decade before filing their own suit get the best of both worlds: a long damages period, but much less work and risk.

## II.    Equity Requires an Order Setting Aside a Portion of Future Plaintiffs' Recoveries.

For more than 140 years, the Supreme Court has recognized the federal courts' equitable power to ensure that a party whose work benefits others is reimbursed by the ones who benefited, even if they are not parties to the litigation. *Internal Imp. Fund Trustees v. Greenough*, 105 U.S. 527 (1882); *Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939). In multidistrict litigation, this equitable power, along with a court's

inherent managerial powers, underlies a transferee court's power to appoint lead counsel and create a common fund, with provisions for their compensation. *Air Crash Disaster*, 549 F.2d at 1012–19. Orders requiring escrow of a percentage of recoveries have become widely accepted in antitrust class actions. *E.g.*, *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 2024 WL 1683640 (N.D. Cal. Apr. 17, 2024); *Zetia*, 2022 WL 18108387; *In re Lidoderm Antitrust Litig.*, 2017 WL 3478810 (N.D. Cal. 2017).

As in other antitrust class actions, the reasons for such an escrow payment are straightforward. First, "persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigants' expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). Second, even putting aside equitable concerns, "complex aggregate litigation often raises a classic free-rider problem. A subset of plaintiffs' lawyers do the lion's share of the work, but that work accrues to the benefit of all plaintiffs. If those other plaintiffs were not required to pay any costs of that work, high-quality legal work would be under-incentivized and, ultimately, under-produced." *In re General Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 174 (S.D.N.Y. 2020) (internal quotation marks omitted).

Escrow payments are typically calculated as a percentage of a plaintiff's recovery, and they have often ranged from 5.5% to 17%. *In re National Prescription Opiate Litigation*, No. 17-md-2804, Doc. No. 3828 at 16 n.4 (N.D. Ohio Aug. 12, 2021); *In re Genetically Modified Rice Litigation*, 2010 WL 716190, at *6 (E.D. Mo. Feb. 24, 2010). Within that range, antitrust class actions have typically resulted in higher percentages, with recent cases clustering between 10% and 12.5%. *Xyrem*, 2024 WL 1683640 (10%); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 2022 WL 19837725 (E.D.N.Y. Aug. 3, 2022) (12.5%); *In re Aggrenox Antitrust Litig.*, 2018 WL 10705542 (D. Conn. July 19, 2018) (10%); *Lidoderm*, 2017 WL 3478810 (10%);

*but see Zetia*, 2022 WL 18108387 (5%). In this case, a set-aside of 12.5% is easily justified. This litigation has been exceptional both in its scope and its length. Rarely does an MDL establish that the defendants' conduct was *per se* unlawful, leaving future plaintiffs only to prove their own injury and damages. The Providers' investment in this case vastly exceeds the lead counsel's investment in cases in which the set-aside was 10% or 12.5%.[6]

A 12.5% set-aside is fair to the Opt-Outs' counsel, who can accept typical contingency fees and still have room to be richly rewarded simply for proving damages. Given the typical contingency fee of 30% or more, a set-aside of 12.5% would be more than fair if the Providers' counsel saved the new plaintiffs' counsel even half of the work of litigating their case to completion.[7] 5 Newberg & Rubenstein on Class Actions § 15:116 (6th ed.) (describing this type of calculation). Through the efforts and expenses described above, the Providers' counsel have saved future counsel far more than half the work; they have been litigating this case actively for nearly twelve years. Nevertheless, if there are situations in which a 12.5% set-aside would be inappropriate, then the Court's order should provide that a plaintiff or an attorney may petition the Court to reduce the set-aside. But in the main, a 12.5% set-aside is eminently fair.[8]

III.    **The Set-Aside Should Apply to Cases in the MDL and Cases in Which Plaintiffs' Counsel Use MDL Work Product.**

Set-aside orders that apply to cases in the MDL, and cases in which the plaintiffs' counsel have signed an agreement to use MDL work product, are uncontroversial. *E.g.*, *In re Avandia Mktg., Sales Practices, & Prods. Liab. Litig.*, 617 F. App'x 136 (3d Cir. 2015). In such cases, the

---

[6] These cases settled in a fraction of the time that *In re Blue Cross* has been pending: *Xyrem* (27 months after creation of the MDL), *Restasis* (44 months), *Aggrenox* (39 months), *Lidoderm* (48 months).

[7] To be clear, the Providers are not asking that they be awarded the 12.5% set-aside at this time, only that it be placed into escrow. At the appropriate time, the Providers will ask this Court for an award, the size of which the Court will determine.

[8] In addition, if the Opt-Outs are granted access to the electronic discovery files from the MDL, they should be responsible for a proportionate share of the costs paid to Meta-E, the electronic storage vendor, retroactive to the date of their respective conditional transfer orders in the MDL.

Defendants should be ordered to set aside funds as described above.[9] Here, it is clear that the Opt-Outs fully intend to use the MDL work product.

Additionally, the set-aside order should apply to claims that settle before a complaint is filed, if plaintiffs' counsel in those cases are participants in the MDL or have signed an agreement to use MDL work product. Otherwise, plaintiffs' counsel can use the availability of the MDL work product as leverage for a settlement, potentially obtaining a windfall based almost entirely on the Providers' work. This Court is the only one positioned to prevent such free riding and unjust enrichment. *General Motors*, 477 F. Supp. 3d at 181 ("[B]y definition, there is no other court in a position to (or likely to) solve the free-rider problem with respect to [unfiled and settled] claims.").

## CONCLUSION

The Providers' work on this case over the last twelve years has been extraordinary, and it would be fundamentally unfair to allow others to swoop in and take advantage of that work without paying for it. The Court should enter a set-aside order and modify the protective order as described in the attached proposed order.

---

[9] The Providers are not, at this time, asking the Court to extend its order to cases outside the MDL (other than cases in which plaintiffs' counsel participate in the MDL, access MDL work product, and receive permission to use MDL work product outside the MDL), but the same principles that support an assessment in MDL cases support an assessment in other cases. The Court's order should include a finding that plaintiffs' counsel in cases outside the MDL would be unjustly enriched if they do not have to pay for the use of MDL work product (including reliance on this Court's rulings), and make clear that the order is without prejudice to the Providers' counsel seeking an assessment from the courts in which the other cases are pending.

Dated:  September 22, 2025

Respectfully submitted,

/s/ Edith M. Kallas
Edith M. Kallas – **Co-Lead Counsel**
WHATLEY KALLAS, LLP
152 West 57th Street
41st Floor
New York, NY  10019
Tel:  (212) 447-7060
Fax:  (800) 922-4851
Email: ekallas@whatleykallas.com

/s/ Joe R. Whatley, Jr.
Joe R. Whatley, Jr. – **Co-Lead Counsel**
W. Tucker Brown
WHATLEY KALLAS, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel:  (205) 488-1200
Fax:  (800) 922-4851
Email: jwhatley@whatleykallas.com
        tbrown@whatleykallas.com

Barry Alan Ragsdale – **Plaintiffs' Liaison
Counsel and Discovery Liaison Counsel**
Dominick Feld Hyde, PC
1130 22nd Street South Ridge Park
Suite 4000
Birmingham, AL  35205
Tel:  (205) 536-8888
bragsdale@dfhlaw.com

Patrick J. Sheehan
WHATLEY KALLAS, LLP
101 Federal Street
19th Floor
Boston, MA 10019
Tel:  (617) 573-5118
Fax:  (617) 371-2950
Email: psheehan@whatleykallas.com

Deborah J. Winegard
WHATLEY KALLAS, LLP
1068 Virginia Avenue, NE
Atlanta, GA 30306
Tel:  (404) 607-8222
Fax:  (404) 607-8451
Email: dwinegard@whatleykallas.com

Henry C. Quillen
WHATLEY KALLAS, LLP
159 Middle Street, Suite 2C
Portsmouth, NH  03801
Tel:  (603) 294-1591
Fax:  (800) 922-4851
Email: hquillen@whatleykallas.com

E. Kirk Wood, Jr. – **Local Facilitating
Counsel**
WOOD LAW FIRM LLC
P. O. Box 382434
Birmingham, AL 35238
Tel:  (205) 612-0243
Fax:  (205) 705-1223
Email: ekirkwood1@bellsouth.net

Charles Clinton Hunter
HAYES HUNTER PC
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (281) 768-4731
Fax: (713) 583-7047
Email: chunter@hayeshunterlaw.com

Aaron S. Podhurst – *Plaintiffs' Steering Committee*
Peter Prieto – *Chair, Expert Committee*
PODHURST ORSECK, P.A.
One S.E. 3rd Avenue
Suite 2300
Miami, FL  33131
Tel:  (305) 358-2800
Fax:  (305) 358-2382
Email: apodhurst@podhurst.com
        pprieto@podhurst.com

Dennis Pantazis – *Plaintiffs' Steering Committee*
Brian Clark – *Discovery Committee*
WIGGINS CHILDS PANTAZIS FISHER
  GOLDFARB
The Kress Building
301 Nineteenth Street North
Birmingham, AL 35203
Tel:  (205) 314-0500
Fax:  (205) 254-1500
Email: dgp@wcqp.com
        bclark@wcqp.com

U.W. Clemon – *Plaintiffs' Steering Committee*
U. W. Clemon, LLC
5202 Mountain Ridge Parkway
Birmingham, AL  35222
Tel: (205) 837-2898
Email: clemonu@bellsouth.net

Dennis C. Reich – *Chair, Damages Committee*
REICH & BINSTOCK, LLP
4265 San Felipe, Suite 1000
Houston, TX 77027
Tel:  (713) 622-7271
Fax:  (713) 623-8724
Email:  dreich@rbfirm.net

J. Mark White – *Litigation Committee*
Augusta S. Dowd – *Chair, Litigation Committee*
Linda G. Flippo – *Discovery Committee*
WHITE ARNOLD & DOWD, P.C.
The Massey Building
2025 Third Avenue North, Suite 500
Birmingham, AL 35203
Tel:  (205) 323-1888
Fax:  (205) 323-8907
Email: mwhite@whitearnolddowd.com
        adowd@whitearnolddowd.com
        lflippo@whitearnolddowd.com

Nicholas B. Roth – *Chair, Discovery Committee*
Julia Smeds Roth – *Discovery Committee*
EYSTER KEY TUBB ROTH MIDDLETON
   & ADAMS, LLP
402 East Moulton Street, SE
Decatur, AL 35602
Tel:  (256) 353-6761
Fax:  (256) 353-6767
Email: nbroth@eysterkey.com
          jroth@eysterkey.com

David A. Balto – *Expert Committee*
THE LAW OFFICES OF DAVID A. BALTO
1350 I Street, N.W., Suite 850
Washington, DC 20005
Tel:  (202) 789-5424
Fax:  (202) 589-1819
Email: david.balto@dcantitrustlaw.com

Joey K. James – *Litigation Committee*
BUNCH & JAMES
P. O. Box 878
Florence, AL 35631
Tel:  (256) 764-0095
Fax:  (256) 767-5705
Email: joey@bunchandjames.com

Richard S. Frankowski – *Discovery Committee*
THE FRANKOWSKI FIRM, LLC
231 22nd Street South, Suite 203
Birmingham, AL  35233
Tel:  (205) 390-0399
Fax:  (205) 390-1001
Email: richard@frankowskifirm.com

Van Bunch – *Chair, Class Certification Committee*
BONNETT FAIRBOURN FRIEDMAN &
   BALINT, P.C.
2325 E. Camelback Road, Suite 300
Phoenix, AZ 85016
Tel:  (602) 274-1100
Fax:  (602) 274-1199
Email: vbunch@bffb.com

Robert J. Axelrod – *Chair, Written Submissions Committee*
AXELROD LLP
800 Third Avenue, Suite 2800
New York, NY 10022
Tel: (646) 448-5263
Fax: (212) 840-8560
Email: rjaxelrod@axelrodllp.com

W. Daniel Miles, III – *Written Submissions Committee*
BEASLEY ALLEN CROW METHVIN PORTIS
   & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel:  (800) 898-2034
Fax:  (334) 954-7555
Email: dee.miles@beasleyallen.com

Michael C. Dodge – *Expert Committee*
GLAST PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, TX 75254
Tel:  (972) 419-7172
Email: mdodge@gpm-law.com

John C. Davis – **Written Submissions Committee**
LAW OFFICE OF JOHN C. DAVIS
623 Beard Street
Tallahassee, FL 32303
Tel:  (850) 222-4770
Email: john@johndavislaw.net

Mark K. Gray – **Discovery Committee**
GRAY & WHITE
713 E. Market Street, Suite 200
Louisville, KY 40202
Tel:  (502) 805-1800
Fax:  (502) 618-4059
Email: mgray@grayandwhitelaw.com

Stephen M. Hansen – **Class Certification Committee**
LAW OFFICE OF STEPHEN M. HANSEN
1821 Dock Street
Tacoma, WA 98402
Tel:  (253) 302-5955
Fax:  (253) 301-1147
Email: steve@stephenmhansenlaw.com

Harley S. Tropin – **Damages Committee**
Javier A. Lopez – **Discovery Committee**
KOZYAK TROPIN &
  THROCKMORTON, P.A.
2525 Ponce De Leon Boulevard, 9th Floor
Miami, FL 33134
Tel:  (305) 372-1800
Fax:  (305) 372-3508
Email: hst@kttlaw.com
        jal@kttlaw.com

Michael E. Gurley, Jr. – **Discovery Committee**
Attorney at Law
24108 Portobello Road
Birmingham, AL 35242
Tel:  (205) 908-6512
Email: mgurleyjr@yahoo.com

Lynn W. Jinks, III – **Expert Committee**
Christina D. Crow – **Discovery Committee**
JINKS CROW & DICKSON, P.C.
219 North Prairie Street
Union Springs, AL 36089
Tel:  (334) 738-4225
Fax:  (334) 738-4229
Email: ljinks@jinkslaw.com
        ccrow@jinkslaw.com

Myron C. Penn – **Discovery Committee**
PENN & SEABORN, LLC
53 Highway 110
Post Office Box 5335
Union Springs, AL 36089
Tel:  (334) 738-4486
Fax:  (334) 738-4432
Email: myronpenn28@hotmail.com

J. Preston Strom, Jr. – **Litigation Committee**
STROM LAW FIRM, LLC
2110 N. Beltline Boulevard, Suite A
Columbia, SC 29204-3905
Tel:  (803) 252-4800
Fax:  (803) 252-4801
Email: petestrom@stromlaw.com

C. Wes Pittman – *Settlement Committee*
THE PITTMAN FIRM, P.A.
432 McKenzie Avenue
Panama City, FL 32401
Tel:  (850) 784-9000
Fax:  (850) 763-6787
Email: wes@pittmanfirm.com

Robert B. Roden – *Litigation Committee*
SHELBY RODEN, LLC
2956 Rhodes Circle
Birmingham, AL 35205
Tel:  (205) 933-8383
Fax:  (205) 933-8386
Email: rroden@shelbyroden.com

Gary E. Mason – *Class Certification Committee*
WHITFIELD BRYSON & MASON, LLP
1625 Massachusetts Ave. NW, Suite 605
Washington, DC 20036
Tel:  (202) 429-2290
Fax:  (202) 640-1160
Email: gmason@wbmllp.com

Michael L. Murphy – *Discovery Committee*
BAILEY GLASSER LLP
910 17th Street, NW, Suite 800
Washington, DC  20006
Tel:  (202) 463-2101
Fax:  (202) 463-2103
Email: mmurphy@baileyglasser.com

Lance Michael Sears
SEARS & SWANSON, P.C.
First Bank Building
2 North Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Tel:  (719) 471-1984
Fax:  (719) 577-4356
Email: lance@searsassociates.com

Thomas V. Bender – *Discovery Committee*
Dirk L. Hubbard
HORN AYLWARD & BANDY, LLC
2600 Grand Blvd., Suite 1100
Kansas City, MO 64108
Tel:  (816) 421-0700
Email:  tbender@hab-law.com
          dhubbard@hab-law.com

Gregory S. Cusimano – *Litigation Committee*
CUSIMANO, ROBERTS & MILLS, LLC
153 South 9th Street
Gadsden, AL  35901
Phone: (256) 543-0400
Fax: (256) 543-0488
Email:  greg@alalawyers.net

Brian E. Wojtalewicz
WOJTALEWICZ LAW FIRM, LTD.
139 N. Miles Street
Appleton, MN 56208
Tel:  (320) 289-2363
Fax:  (320) 289-2369
Email: brian@wojtalewiczlawfirm.com

Archie C. Lamb, Jr.
ARCHIE LAMB & ASSOCIATES, LLC
301 19th Street North, Suite 585
The Kress Bldg.
Birmingham, AL 35203-3145
(205) 458-1210
Email: alamb@archielamb.com

Paul Lundberg
LUNDBERG LAW, PLC
600 4TH Street, Suite 906
Sioux City, IA  51101
Tel:  (712) 234-3030
Fax:  (712) 234-3034
Email:  paul@lundberglawfirm.com

Jessica Dillon
Ray R. Brown
Molly Brown
DILLON & FINDLEY, P.C.
1049 W. 5th Avenue, Suite 200
Anchorage, AK  99501
Tel:  (907) 277-5400
Fax:  (907) 277-9896
Email:  Jessica@dillonfindley.com
        Ray@dillonfindley.com
        Molly@dillonfindley.com

Cynthia C. Moser
HEIDMAN LAW FIRM
1128 Historic 4th Street
P. O. Box 3086
Sioux City, IA  51101
Tel:  (712) 255-8838
Fax  (712) 258-6714
Email:  Cynthia.Moser@heidmanlaw.com

Gwen Simons
Simons & Associates Law, P.A.
P.O. Box 1238
Scarborough, ME 04070-1238
Tel: (207) 205-2045
Fax: (207) 883-7225
Email: gwen@simonsassociateslaw.com

*Counsel for Provider Plaintiffs*