FILED
2025 Sep-22 PM 5:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **IN RE:**<br>**BLUE CROSS BLUE SHIELD**<br>**ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:13-CV-20000-RDP**<br><br>**This Document Relates to**<br>**Provider Track Cases** |
| **IN RE:**<br>**BLUE CROSS BLUE SHIELD**<br>**ANTITRUST LITIGATION**<br>**(MDL NO. 2406)** | **Master File No. 2:25-MD-10000-RDP** |

## <u>DECLARATION OF HENRY C. QUILLEN</u>

I, Henry C. Quillen, declare:

1.       I am a partner in the law firm Whatley Kallas LLP.

2.       I have personal knowledge of the matters set forth herein. If called upon and sworn as witnesses, I could competently testify thereto.

3.       Attached as Exhibit 1 is a transcript of a December 12, 2024 presentation by Charles Griffin and Aviva Will of Burford Capital and Ryan Phair of Paul Hastings LLP titled "How hospitals are monetizing valuable legal claims to improve liquidity." A video of the presentation is available at https://player.vimeo.com/video/1038985167.

4.       Attached as Exhibit 2 is a transcript of a November 12, 2024 presentation by Sean Zabaneh of Duane Morris LLP titled "What Hospital Leaders Need to Know Before Joining the Blues Antitrust Class Settlement.    A video of the presentation is available at https://tinyurl.com/4xn68vbj.

5.      Attached as Exhibit 3 is The Parties' Joint Submission Regarding Coordination Between the ASO Actions and Provider Opt-Out Actions, filed as Doc. No. 7 in *In re Blue Cross Blue Shield Antitrust Litigation*, No. 25-md-10000-RDP (N.D. Ala.).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 22, 2025.

*/s/ Henry C. Quillen*

Henry C. Quillen

# Exhibit 1

On behalf of the entire Burford team, I wanna welcome you to today's conversation, exploring how hospitals, CFOs, GCs, and business leaders can leverage legal finance to maximize and expedite recoveries and high stakes litigation.

We're delighted to have you join, and we hope you enjoy today's webcast.

Before we start, I'd like to go over some housekeeping items.

First and foremost, we hope you'll ask questions of our speakers.

You can do so by typing your questions into the q and a box that you should see on your screen.

Our speakers will answer your questions at the end of the webcast.

If you have any technical difficulties, you can also use the q and a box and we'll help you resolve any issues.

Now, I'll turn it over to Veeva to start the webcast.

Hi everybody, good morning to everyone, and good afternoon to those who are in afternoon zones, and welcome to, to our webcast today.

Um, I'm Aviva Will, I'm president of Burford Capital, and, um, I hope in the next hour we're gonna do a couple of things.

We're going to introduce you to Burford Capital and the world of legal finance to the extent that it is new to you.

And specifically we're gonna talk about how we work with, uh, clients like you with respect to, um, a particular case, although we'll talk more broadly as well.

And that case, of course, is the BCBS Class action provider, uh, settlement.

Um, my background, uh, is in antitrust law.

Uh, I was a big, big firm litigator for many years, and then, like you, I, like many of you today, spent, uh, uh, many years in ▯^ house, um, running, uh, an antitrust group.

Um, and today at Burford, I work with our team globally, uh, to address the financing needs of our clients.

Um, and I guess before we get started, for the meat and potatoes, I'd love to, uh, pass it to my, to my fellow presenters today to introduce themselves.

Charlie, Thanks, Eva.

Hi, everyone.

1

Uh, yeah, my name's Charlie Griffin.

I'm a, uh, vice president at Burford, uh, on the US Commercial Underwriting Team.

Um, so involved in evaluating, uh, and, and structuring potential investments, uh, for Burford and US commercial litigation, including antitrust claims, um, and have recently been, you know, very focused on the healthcare space.

Um, and so have, have a fair amount of familiarity with, uh, with the issues we'll be discussing today as like Aviva, I was, I was previously a, a big firm litigator as well.

Um, and we also have with us, uh, Ryan Fair.

Ryan, thank you very much for joining.

And, um, I'll, I'll let you introduce yourself briefly.

Uh, thank you, Charlie.

So, my name is Ryan Fair.

I'm the global co ▯^ chair of the Antitrust and Competition Practice at Paul Hastings, LLP.

Um, we have, you know, broad, broad base arus practice with mergers, litigation, and everything else.

My particular focus, however, um, and I have for the past, you know, two decades is really on the opt out space and helping clients with recoveries.

We've helped clients kind of recover over a billion dollars so far, uh, coming up close, and I hope to get to billion this year.

Um, but, uh, recently we've been spending a lot of time on in the healthcare space, um, and on e CCBs and a variety of other matters.

Um, so maybe with that, Charlie, I can get us started and, you know, just kind of table set.

I mean, one of the things that, um, I hear a lot in talking to clients that are, you know, talking about litigation finance is understanding, you know, what it is and who the players are.

So maybe we can start there and, and, um, maybe I can ask Aviva just, you know, who is Burford Capital and, and what does it do?

Sure.

And by the way, I'm hap we're happy to take questions along the way, so, and we will

2

weave them into conversation, so please feel free to put them in the q and a box as we go.

Um, so yes, some table setting.

What is, who is Burford and, and what is legal finance?

So we'll start with Burford.

Burford, Burford Capital is the largest, the world's largest legal provider, uh, sorry, provider of legal finance.

We are publicly listed.

Um, so you can find us on both the New York Stock Exchange and the London Exchange.

Um, we've been in existence for about years, um, and we have a very long track record of helping clients like you all on the phone to maximize, optimize, um, the value of their legal claims.

Um, think of us in shorthand as sort of corporate finance for law or investment banking for, for the legal department.

Um, we do a couple of things.

We provide capital to clients to cover the fees and expenses of litigations.

Uh, litigations are long and costly.

Um, and we can do that.

We can, we can say, don't spend your working capital on, on, uh, affirmative claims that you otherwise didn't have in your budget.

We can cover those, that's sort of baseline legal finance.

Um, but we do a whole lot of other things as well.

Um, we can, and this is the subject of much of what we'll talk about today.

We can provide what we call a monetization of a valuable litigation asset.

So you've got a claim and it is, um, a longstanding claim.

Um, forget BCBS for a moment.

It could be any kind of claim, and you are, um, in it for several years and you might lose.

Um, so you've got duration risk, and you've got merit risk.

3

We can today accelerate some of the value of what we think will be a winning case for you so that you can de ⍰^ risk and have working capital, which you can use for any purpose, um, um, sort of long before your case resolves.

Um, the third, and we'll talk more about exactly how that works in a minute, but the third thing that we do and is really bring insight to you.

Um, so think of us as not just capital, maybe smart capital, but hopefully also, um, advisors.

And I use that with a little a, we're not big a advisors, we're not your lawyers, but we do bring insights to clients around various different industries because we see, you know, I I I recall being in ⍰^ house and you've got your desk full with things that you're focused on right in front of you, right?

The cases that you must manage.

Um, we are looking sort of right and left and around the background to see where, where we think we can bring insights to you in the industry that you're in.

And obviously here today we're talking about healthcare.

Um, so, so I think of us as, as, um, sort of, again, your investment banking for the legal department.

Um, we'll talk more about that, but for now, maybe we can dive in for a minute.

Um, uh, to Charlie, I'm gonna ask you to talk more about sort of what a monetization is.

People have heard it, but they don't necessarily really understand how it works or, or what it means.

Sure.

So, um, I mean, the, the way I think of a monetization is really as essentially a secured financing of a specific asset.

Um, and that asset is, um, you know, a litigation claim or, or a portfolio of litigation claims.

Um, and so again, as Aviva mentioned, you know, we provide capital, uh, against the value of that specific asset or those assets in exchange for a portion, um, you know, of the recovery if and only if, uh, that litigation generates proceeds.

Um, and so, you know, a few of the features, um, of a monetization or that it's non recourse capital.

So again, our, our return comes only from the value of the claim and, and doesn't,

4

um, encumber, you know, the other assets of the business.

Um, again, it is a, it is a financing transaction.

And so the, the control of the asset, uh, remains with the counterparty.

Um, you know, it's, it's not a purchase of a claim.

It's, it's basically you have a litigation claim that you are pursuing that you know, you and we think is valuable.

We provide you with some value, uh, collateralized by that.

But control remains with you.

The attorney ⏷^ client relationship remains with you.

Um, you know, you, you direct counsel, and, um, we don't have control over it.

Um, with a monetization in contrast to the kinds of fees and expenses financing that some people, you know, typically associate with legal finance and a monetization, the capital can be used for any corporate purpose.

Um, so, you know, if, if you, um, are looking to, you know, improve your bottom line for a given year, if, you know there are sort of new initiatives that you're looking to, um, you know, pay for with additional sources of capital, um, you can sort of unlock the value of your legal claims using a monetization and take that capital and use it for those purposes.

Um, and then again, because, uh, you know, it's a, it's a flexible use of capital.

Similarly, the, the timing of deployment is flexible as well.

So, um, you know, in a fees and expenses deal, you would sort of deploy the capital over the case as it progresses, but with a monetization of a claim or a portfolio of claims, you could, um, you know, take all the money out at close.

Um, you could take some out close and some over time, depending.

It really depends on the business's cash flow needs.

And so, as Aviva said, I, I think it really is just a flexible tool that, um, you know, CFOs and, and legal departments can use to generate additional capital from their legal claims that they can, you know, then use for flexibly around the business to meet the, you know, whatever the objectives of the business is.

Can I ask you, Aviva, just to, to step in, um, you know, one of the things that I hear in talking to a lot of our healthcare clients is, you know, really kind of concretely understanding what a monetization is.

5

Um, can you gimme like, kind of like some tangible examples of, of what that would look like so that, you know, we could understand in kind of simple terms?

Sure.

Um, uh, you know, obviously we can't talk specific cases or, or name specific clients because what we, what we do is, is, is subject to confidentiality.

Um, but, but I can give you a couple of examples about how it works, right?

So most times people think about legal finance, they think, well, we don't need capital.

Why would we use legal finance and monetizations are, um, well, there's lots of reasons to use legal finance, even if you don't quote unquote need capital.

And I think monetizations sort of come in in that play, and they've been quite popular, um, um, with our corporate clients over the last couple of years.

I think candidly, that probably started around covid when clients were looking for liquidity kind of everywhere.

And I think there was what I'll call a sea change in, in sort of mindset, um, both legal departments and finance departments, where folks were willing to sort of take a look and say, well, wait a minute.

How, where can I find liquidity?

Where, how do I, how should I think about a litigation asset?

How should I think about supply chain?

How should I think about every part of my business?

And, and an openness to, to, to really rethinking how business was done.

I think that started really with covid for obvious reasons, but we've seen a real development and, and a, and a real, uh, demand in the market for monetizations, because what it allows you to do, as I said before, is really de ⏀^ risk, um, A ⏀^ A ⏀^ A ⏀^ A ⏀^ A litigation that may take an awfully long time to come to pass and may actually lose.

So we have seen clients take anywhere from, you know, million to several hundred million against, you know, million for a single small case to several hundred million for a basket of cases.

Um, and they can, as Charlie said, take it over time.

They can take it in one fell swoop, um, in, in one, in one check, um, and really use it for whatever they want, um, in the healthcare space in particular.

And, and, and let me, let me make a point, the, these are not necessarily clients who you would think are running on low margins.

These are, you know, very profitable businesses that are simply saying, Hey, wait a minute, I've got this asset.

It's sitting on a shelf for all intents and purposes from a CFO's perspective, because it, because it is a, it is a, a contingent asset that is invisible from a, from an accounting and balance sheet perspective until it actually comes to resolution.

So in all that, those years that litigation goes on, for all intents, as I say, it's an invisible asset.

So these are companies that are saying, Hey, wait a minute, I have this value.

Why not unlock it today?

Um, in the healthcare space in particular where, where margins are often razor thin, um, this is, you know, becoming quite popular.

Um, these cases, especially the, the antitrust case, the antitrust world, and in particular, um, when clients choose to opt out, you know, they're essentially making a decision that not only has this case gone on as long as it, as the class did to settle, but now there's gonna be a few more years before an optout resolves.

That's a hard decision.

If you know that you can accelerate the value of that claim, um, that becomes a, a much more interesting discussion.

Um, so we've become part of a discussion for a lot of companies around the, the very, we've become just one more factor, if you will, around opting out or not opting out.

I know we're gonna get to that in detail.

Um, um, but, but, but maybe we should step back for a minute and talk a little bit more about the case itself, um, and the BCBS case and, and where does Burford fit in, or how, how specifically can Burford fit in?

Yeah, sure.

So, um, I, I imagine many folks on, on the call are kind of familiar with the case, but just to, to go over it quickly, this is a, um, you, you know, a long running class action against the Blue Cross Blue Shield Association and its members, um, who are essentially, you know, all independent insurance companies.

Uh, and the allegation is that through the association, uh, and its rules, they've

7

sort of restricted competition amongst themselves in various ways.

Um, and, and including things like exclusive service areas, um, the, the national best efforts rule, which basically, uh, prevented the amount of business that they could do under non blue brands, uh, outside their exclusive service areas.

And then also, um, uh, something called the Blue Card Program, which sort of limited, uh, people's ability to contract with, with healthcare providers and all of those things allegedly, you know, increased blue's bargaining power against providers and, and resulted in under reimbursements.

Um, so that was, um, you know, uh, litigated for quite a while by, by very able class counsel who, who won a, a number of significant rulings.

Um, uh, among other things, the court held that the per se rule applied to the, uh, to the blues conduct, uh, for at least the, the vast majority of the damages period.

Uh, and, and that's a very significant ruling because it, it, um, really restricts the number of defenses that, that the blues could raise against liability.

Um, and so in part because of all that, um, all those very strong positive developments over the course of litigation, um, the, the parties recently announced a, uh, a $2.8 billion settlement of, of on behalf of a class of healthcare providers, um, and, and class members, uh, as I think of Eva Previewed now, sort of are facing this decision of, of whether to remain in the class or opt out.

Um, and there's a lot of, um, there's really a lot of factors that go into that decision.

Um, folks may know there was, there was a prior settlement of a, of a comparable size on, on behalf of a different class of plaintiffs called subscribers who were individuals and companies who purchased health insurance.

Um, and, and those folks faced a similar decision and, and some of them chose to opt out.

Um, so, so how does Burford fit in?

Well, um, you know, we've been having a lot of conversations with, um, folks who are interested in legal finance about, if I opt out, if I don't opt out, how does that affect my ability to, um, you know, monetize what could be a very valuable asset?

Because for many providers, particularly large hospital systems, you know, these, these claims are very, very large.

Um, and we can talk a little bit about the scale of the damages in a minute.

Um, but you, you know, this is exactly the kind of claim as, as Aviva mentioned, where we've seen a lot of interests in, um, in parties, you know, pursuing these affirmative recoveries and them potentially transacting with Burford to accelerate a

portion of the recovery, uh, to, to help their bottom line.

And, and so that's the quick overview, but Ryan, I, I know you, you are advising, you know, uh, hospital systems and, and providers on this very issue, um, which obviously, you know, has a lot of ins and outs, and you have a ton of experience, not just in this case, but previously, you know, advising, um, you know, clients on whether to opt out and how to pursue opt ⏎^ out claims.

Um, one question we get all the time is just mechanically, um, when, when do providers have to make the decision, you know, whether to opt outta the settlement or not?

Yeah, Charlie, I, I think the timing thing is, is really important.

Um, the court entered preliminary approval of the settlement, uh, last week, and it set a deadline of March 4th.

So March 4th is now the sort of drop dead deadline by which to make a decision.

Um, I, you know, I think there's a couple things to, um, you know, timing wise in relation to that March 4th date.

Um, the first is you're gonna start to see notice coming in, um, shortly.

Um, and so you're gonna get emails, you're gonna see postcards, it's gonna start generating, and we've been through this hundreds of times.

You're gonna get a lot of, um, internal discussion within the company because, you know, it's not always obvious who's gonna be receiving the emails.

And so I wanna have in place for that.

Um, second thing is that, you know, what we have been telling clients is you really kind of need to front load the decision.

In other words, you can't wait until March, you know, or even February to opt out for a variety of reasons.

Um, we've been encouraging folks that you really kind of need to make a decision, um, you know, by the end of the year, uh, would be ideal because there's, if you do decide to opt out, there's a lot of things that, uh, go into that.

Um, you know, both in terms of preparing the paperwork to opt out and preparing the complaint, all that kind of work, um, you need to kind of work backwards from the March 4th deadline.

So we've been trying to get, um, you know, encourage folks to get, um, uh, do that sooner, uh, hopefully by the end of the year so that you have time, and that time allows your, your leadership, your board, whoever, um, to, you know, review it and make a an informed and thoughtful decision as to how to proceed.

9

Got it.

Um, and so when, when you were advising these clients, you know, I, I think obviously the decision is not sort of one size fits all.

Um, and, you know, people may have different objectives in terms of how they're weighing the, the elements of the settlement consideration and how they think about, you know, the potential risks of, of opting out.

What are some of the conce the key considerations that, that you discuss, uh, you know, in, in terms of, uh, the bear on that decision for, for potential, um, uh, opt ▯^ outs?

Yeah, Charlie, I think you hit hit, hit the nail on the head there.

I mean, opting out is gonna make sense for some folks.

Uh, it's not gonna make any sense for others.

And so trying to figure out where you are, uh, in that sort of universe, um, is, you know, I think, uh, important.

Um, and to, and to do that relatively soon, the considerations, I mean, there's a whole list of considerations that, um, uh, you know, you you would wanna consider and talk through.

Um, you know, in terms of the ones that we hear a lot about, the first is obviously your relationship with the blues.

Um, there are some relationships that, um, are, are pretty good.

There are some that are, you know, terrible.

There's some that are in active litigation.

And so that's, um, tends to have, um, you know, a significant bleed.

I think some of the other things, um, is, you know, how a system views the releases.

I mean, there are some parts of the releases.

I mean, we've talked to some systems that simply because of the releases and what they think they would have to release, they, they may opt out and not even file a claim.

They just don't wanna be subject to the releases because there's perspective releases.

There's other, you know, issues that some systems may, um, be concerned about with

10

the releases.

Um, you know, that's another one.

Um, I think the, the, the system's views of the injunctive relief, um, the injunctive relief in the settlement, there's some parts of it that I think are gonna be more helpful to some systems than the others.

Particularly, you know, a lot of the provisions of the injunctive relief have to do with the Blue Card, uh, program.

And so systems that have a, um, extensive, you know, card, you know, uh, revenue, um, you know, that might be more appealing to them than others who don't.

Um, and then I think the final piece is, you know, just the monetary recovery in terms of, you know, where systems fall, look at distribution, you're saying like, you know, this is what I think I would get if I, you know, filed as a member of the class versus if I opted out.

And Ryan, that's super helpful.

Um, how, how, can I ask just a, just a follow up question on that.

How does, what does the process for, if I am, you know, one of our, one of our listeners today, and I am sort of having a internal conversation, how do I engage with someone like you or my regular counsel?

How, what, how long does that process take?

And can you maybe just be a little bit more granular about, about the timing here because, um, you know, we all, we all like to think that we can snap our fingers and lawyers can make, can, can file opt out claims.

But, um, talk a little bit more maybe about the process of getting from sort of where folks are now, where they know there's a deadline and kind of what has to happen if they choose to opt out.

Yeah, I think, you know, we, we've been doing opt 🔲^ outs for, for a long time.

I think, you know, if anyone comes to you and says, you should just opt out and it's a mindful, you know, just like, kind of a mindless decision that's automatic, you should be very, very skeptical, uh, uh, skeptical about that.

These are thoughtful, uh, strategic decisions that every healthcare system needs to make for itself.

Again, sometimes it will make sense, sometimes it will not.

Sometimes you have the legal, uh, folks think it's a good idea, but the finance folks or the relationship folks don't think it's a good idea.

11

And, and vice versa.

That process takes time to work out, I'd say at least a month.

I mean, it's in some of the conversations, sometimes even longer.

So you have to work backwards from that, you know, March 4th deadline, and then factor in like, okay, once a decision is made, if you do decide to opt out, well, you need to prepare a complaint.

I mean, the operative complaint in the case right now is it's like pages long.

Uh, you know, I, I can't, you know, like do that in a, in a day.

It, it takes, um, time.

But the folks that are doing this really well in a strategic and thoughtful way, whether the decision is to opt out or to stay in, they're building in that time so that they can make the decision, get everyone in, in the organization, you know, on board, including the CFO's office, the, you know, the, the managed care folks, um, and then get alignment on it and then execute it.

That's why we say by the end of the year is because that alignment, you know, takes time.

And then once you have alignment, if it is go or no go, um, then the lawyers need, you know, at least days, hopefully at least days, to kind of get all the paperwork together to look at the data and the analysis and figure out how this all, um, plays out.

Great, thanks.

I'm gonna interject with a question from the audience here.

Um, and I think it's a burford question, which I, which I think I can answer pretty quickly.

Um, at what point in the BCBS timeline is Burford willing to finance?

The short version to that answer is we are talking to clients actively now as part of their thinking, as part of their, um, evaluation of whether to opt out, right?

Because, because while that decision as, as Ryan has said, is really a, a business decision at the end of the day for various parts of the business to make a decision, um, sometimes the, the, the, the question of, can I, can I monetize it today?

And what's that worth is, is a, is a factor in that decision.

So we are actively in discussions with lots of hospital systems about, um, financing

or monetizing, um, opt out claims, and frankly, CLA class claims if they choose to stay in the claim.

We'll talk a little bit about that in a minute, um, right now, because it is, it is part of that, part of that ongoing internal evaluation.

Um, there's another question which, which dovetails right into where I think we wanna go next.

Um, how can you determine value claim values for a provider at this point?

Who wants to monetize claims?

And I guess, Charlie, I would ask you, 'cause we do get that question a lot, how, how do we, how do we think about, um, uh, valuing those claims?

What's, you know, what's the difference between staying in the class and opting out from a monetization perspective?

How do, how do you think about that when you're, when you're doing, um, our underwriting here at Burford?

Yeah, so it's, it's a great question and, and it's, you know, I think really the question, uh, you know, that's top of mind for a lot of folks.

Uh, Ryan obviously mentioned another number of other considerations that kind of enter into the decision, but you, you know, the, the amount of dollars at stake is, is very important to, to many people as, as an element of that.

So I, I think it, it's a tough question and it's, it's tough in part, um, because, you know, the, the distribution that class members would get from remaining in the class is, is still uncertain.

Um, and, and basically what's what's gonna happen, as I understand it, is, um, there's a process where for folks who wanna remain in the class, they provide some data, um, to the, to the, uh, class council and their experts.

And that data is essentially, um, run through a model that dictates, um, the, the size of the payout.

And, um, it's, it's a factor of, of, of a few different things.

You know, probably the most important of which is, um, is the size of the, uh, provider's reimbursements relative to other people who are, who are making claims.

Um, but just as we sort of laid out on this slide, you know, the, the headline settlement consideration is, is $2.8 billion.

Um, that's gonna be, you know, subject to a few haircuts, um, before, you know, there's a net amount that gets distributed to class members.

So one of those haircuts is, um, you know, fees and expenses for, for class counsel who, who litigated this, again, for many, many years, invested an enormous amount of money in it.

And so are, you know, entitled to, uh, a fair share of, uh, of the total amount, which is gonna be subject to approval by the court.

Um, and then there's, there's an additional amount that has to be, you know, spent on notice and administration and just the cost of running the settlement.

Um, and then when you see how much is left after that, uh, the plan distribution says, well, 92% goes to, uh, what they call healthcare facilities with the remaining 8% going to what's called healthcare professionals.

Um, and there, there are reasons for, you know, that, that, that the parties have, have submitted to the court.

So then if you're, if you're talking about if you're in the facility bucket, you know, you're splitting something like 1.75 billion among, you know, all the facilities in the country who choose to remain in the class.

Um, and so, you know, our, our very rough math suggests that maybe there's something like 6,000 hospitals in the US doesn't include, uh, other facilities, um, that may be part of the, uh, the facility bucket.

But if you just look at those 6,000 hospitals and you divide, you know, the 1.75 billion by the 6,000, you get something like, you know, slightly south of, south of grand, uh, per hospital.

So, um, you know, if you just multiply that for 20, um, by 20, if you're like a hospital system, you know, a a reasonably, uh, large system, you're looking at something kind of in the high single digit millions.

There are a few things that that doesn't account for.

I just wanna be very clear, this is rough math.

Um, so like I said, it doesn't account for the, the non ⑪ hospital facilities who will be taking a share of this, which, you know, would otherwise bring the sort of the number down for the hospital facilities.

Um, it doesn't account for the relative size of each facility's claim.

I think we, you know, our suspicion is that if you're a larger system, your hospitals tend to be larger in terms of beds, in terms of, uh, revenues that flow through them from the blues, and therefore, maybe that would be a reason why your recovery might be a little higher than grand per hospital.

Um, there's gonna be state to state variability we would expect, um, the blues have

higher market share in some states than in others.

And, you know, we, we don't know the details of the model that's gonna be used to determine the plan of distribution, but we expect that that will play a role.

And so if you're in a state like Alabama, for example, where the, the blues, you know, have over 90% market share their highest in the nation, your recovery might be higher, all else equal than if you have a lot of, you know, your, your revenue in other states.

Um, and then finally, I, you know, I thi this is really hard to estimate, but it, you know, it's sort of a circular question because, um, the, the total number of folks who this is gonna be divided among depends on how many people opt out.

Um, and so, you know, we would, we certainly expect some number of opt ��gᴬ outs.

Um, and so, you know, again, that's a reason why if you're just doing the math based on this, the number might actually be a little bit higher because some of the, some of the people are actually coming out of the class.

So that's, that's how we think about the, um, the provi.

You know, if you stay in the class, how much you might get.

Ryan, you've probably given some thought to, you know, how, how does size, um, people's claims if they opt out, which, you know, I know there are kind of different ways that lawyers who are very experienced in this space think about potential recoveries.

Um, maybe you could, um, talk about that for a moment.

Sure.

Yeah, I mean, I, I tend to think of it in terms of the value of the claim at various different stages.

Um, you know, and that sort of depends on, you know, a system or a provider's, you know, views on how they wanna approach the litigation.

I mean, some providers say, you know, look, we just wanna stay in the class.

Others are like, you know, we want to go to war.

Um, and so within that spectrum, there's gonna be different, you know, kind of, uh, valuations.

The way that I typically think of it is that there's usually metrics that we, in terms of, uh, how to measure it at this point, when you're trying to make the opt out decision, um, the key variables that we typically used are based on experience, some empirical data, um, that is out there on, uh, things like, you know, multiple

15

over class recovery.

If you, if you opt out, I mean, there's, there's a, there's a literature in the academic literature out there, um, that, you know, will, would establish, like on average, this is the average, you know, multiple, you would get over the class recovery if you opted out.

The other one that we use a lot is what we call the volume of affected commerce.

This is like a nerdy antitrust term, but basically just means like how much, you know, how much, um, commerce do you have with the blues?

And then a lot of times when we're talking on a settlement basis with some of 'em, um, or, or, uh, with a dependent in an opt ⬛^ out situation, we're usually talking about a percentage of that volume of affected commerce.

And so there are, you know, metrics and guides that we use in various different stages of the case.

And so sometimes a client would come to me and say, like, you know, we don't have the heart to go all the way to trial.

Like, but we wanna litigate medium.

We'd some say we wanna mitigate, you know, little, you know, little, and then there's d different metrics that you use at some point.

Um, when you get deeper into a case for the, you know, the, the secretary of war kind of position, um, that, um, you know, it flips from sort of like the, the settlement value of the case or the value of the case to more, um, you know, a percentage of what your damages are.

Um, so a lot of times when I talk to providers, they're like, you know, I've talked to someone and, and we think our damages is X and it's like some astronomical number, you know, to which my response is like, well, great, you got years of litigation and you know, hope you got a good trial there, right?

Because that's not likely to happen until you're very, very deep in the case.

But if, for example, you, you know, get past summary judgment and you're looking at trial, um, you can get, you know, antitrust, uh, damages are troubled under the antitrust laws.

There are examples of opt ⬛^ outs getting, you know, full single damages.

There are examples of opt ⬛^ outs getting over single damages as a settlement, but those are sort of deeper in the case.

So whoever you know, your counsel is should be, you know, counseling you just based on experience and expertise as to here's the different metrics.

16

What we usually do is we look at all the different metrics, and then we provide sort of like an aggregate of like, here's kind of the average of what they all say.

Uh, and that can be used to, um, you know, judge the, the decision to the extent that there's a monetary component of it, and then factor in all the other non ⍰^ monetary components as well.

Actually, uh, Ryan talk, you know, you, you left on the non ⍰^ monetary components.

Can we go back to the, that decision around opting out for a minute and talk about the non ⍰^ monetary relief there, and is that, you know, how should hospitals systems think about the non ⍰^ monetary relief in the context of a decision whether to stay in the class or opt out?

Yeah, I think, again, this is one of those things that's, it's gonna depend, um, on the system and, you know, do you have a big, you know, blue, um, you know, component, some of the, you know, the underlying, um, you know, conducted issue, right?

The, the, the, the way that the, uh, blue system is structured and operates the injunctive relief is, is is not gonna change that all that much, right?

It doesn't really move the needle, um, all that much.

Um, there are more changes, you know, to the blue system.

So it depends.

Different systems are gonna have different views on that.

Some of the changes, like, you know, wall Street Journal was talking about some of these changes that they're, they're, you know, um, you know, initiating on their own years ago, right?

Some of the, the cloud ⍰^ based architecture and, and, and things like that.

These are all good things, like they're moving in the right direction.

Uh, I'm not sure they're causal, um, with the, uh, with the class settlement.

Um, but, you know, I think the thing to take away is that, um, you know, that injunctive relief, um, is, um, is, is gonna be available for opt ⍰^ outs as well in, in, in my view, in, in my experience, it's like, it's not, I, I find it hard to believe that the blues would invest in this architecture and tell their largest, you know, potential systems that they work with.

Like, sorry, we're gonna give it to these guys, but not you.

Um, obviously that's an opinion.

Um, I can't, you know, represent that.

But I think just based on, you know, my two decades of experience, it does not tend to be an either or kind of thing.

Like most times it's just, you know, an all system, you know, kind of approach.

At least that's the way I think about it.

Um, thanks, Ryan.

You know, there was, there was one we got a question from, from the audience, um, related to sort of the valuing not just of the, um, the class consideration, but the, um, the opt ⦿^ out consideration and you, you mentioned some of the factors that you know, you as a, as a lawyer experience in these kinds of cases, you know, consider that, bear on that, that question.

I think there was one, one other thing we, we wanted to mention, just like when you're looking at the size of, um, the class settlement, um, and thinking about, well, you know, how, how big a percentage of my damages is this?

Um, again, it's, it's very hard to tell because we don't quite know what nationwide damages are.

And, and I'll get to some of the uncertainties there in a second.

Um, but one thing we can do is you just kind of compare it to the subscriber settlement that I mentioned.

Um, and, you know, the, the settlements themselves were roughly the same size.

You know, the, the subscriber settlement was, you know, ever so slightly smaller.

And, um, in, in the litigation, both classes, the subscriber and the provider classes, uh, you know, sponsored expert work that estimated the damages for their class in Alabama, which was the focus of the litigation.

Um, and you know, the, as you can see on the slide, basically the, the provider class damages were kind of, you know, several multiples at least higher, uh, uh, than was projected by the subscriber class.

So, um, the subscriber class then sort of extrapolated that nationwide, which, which the provider class hasn't done.

And so of course there may be kind of differences in how you would extrapolate that based on how the different markets work.

Um, but you, you know, if, if if, uh, the, the subscriber class turned out to be something like seven to 14% of, of damages, at least as their experts, um,

calculated it, you know, we, we would expect, again, that provider class settlement to be somewhere, just be somewhere south of that.

Um, and that's, I think in part because a large element of, of the, um, the consideration is, is non ⍰^ monetary.

Um, but it, it helps shed a little bit of light on, you know, how, how large, uh, the settlement consideration is relative to damages.

And I think as another reason why, you know, particularly in this case, we would expect, um, an opt ⍰^ out recovery to be, you know, sort of multiples of that.

Um, if you're just looking at the, the monetary component.

Um, and then in terms of how we think about, you know, um, um, how we would size a claim for purposes of fi of a financing, financing transaction.

Um, you know, I think there are sort of a, a number of data points, which we can kind of get to later when we talk about like, well, what is actually the process of, of working with Burford, uh, like on claims like this?

And, and that's actually a, a good question, uh, to, to segue, um, uh, maybe I could ask Aviva, how does the, the, the, the litigation finance, uh, piece of this fit into the opt out decision?

Sure.

So, so, so for systems that choose to opt out, and again, we're having conversations now as as, but we are one among many factors around whether a system ought to opt out, you know, whether they can accelerate the value.

Today is just one factor, but we are having conversations and for those that choose to opt out, we can monetize those claims today.

Um, what does that mean?

Again, it's upfront can be all upfront, can be spread over time.

Again, this is very bespoke financing, um, but it's nonrecourse capital against the value of that claim, right?

So you have a claim worth a hundred dollars, we're gonna advance to you $10 today against that claim, or $20 I'm making up the number.

And if and when that claim wins, we're gonna take our return plus, uh, you know, our investment plus a return, and you are gonna, and, and you are gonna keep the rest.

And if that claim doesn't resolve favorably, well, you've taken $10 off the table, you know, three years before the case resolves, and no harm, no foul.

19

We've lost our capital.

But that's, that's, that's the business that we're in.

Um, not to lose capital, but to take that risk.

Um, um, in this case, um, what we are seeing is, is well, or the way that we're valuing the claims, and, and we'll talk a little bit about that, although it's obviously specific to individual systems, but we think we would be able to gar, uh, to, to, um, provide more capital upfront, then you may actually be getting, if you stay in the class.

And we'd be able to do that in a way that guarantees you a minimum result if you opt out, that's probably at least as good as the class.

Now, that's not gonna be in every case.

So these are all, you know, these are sort of conceptual because we have to dive in and do our diligence and understand, um, your particular circumstances.

Um, but the idea is that you get upfront capital today instead of either waiting for the class to pay out, which is still some many months if not more away, and waiting until, uh, if you opt out that case to resolve as well.

So, so it's, it's really about, you know, accelerating the value today.

Um, and yes, you pay a return on that, but for many, um, being able to de 🗆^ risk and take and take working capital today that they can put towards their, you know, to towards, uh, the business that you're running is, is, is quite a valuable tool.

Um, and for providers who decide not to opt out, we should still love, we, we'd still love to have a conversation with you because there are still gonna be class recoveries here and in all, in, in, in all likelihood, you have other claims.

Um, you have non BCBS claims, you know, other cases where you are in a class or you have individual claims, and we mentioned earlier in the call the idea of a portfolio, we can put a basket together of value, valuable assets and and finance against that basket, um, that, you know, can be very advantageous for clients because the risk of loss to us is reduced and therefore the pricing is reduced.

So that's also a conversation that we're having with a lot of hospital systems that have not only BCBS, uh, claims, whether they're in or out, um, but also, um, broader, broader claims, um, in the space, some antitrust and, and some other, um, there was a question that, uh, um, when does a monetization then fund and close if you opt in or if you opt out?

And the answer is a simple one.

It's, it's a bespoke negotiation and we, we can fund at close.

20

We're, we're funding today clients who are choosing to opt out but haven't yet filed.

Um, we can manage for all of that timing.

Um, our goal at Burford is really to address your needs.

And so if the need is for capital before year end, that's what we're aiming for.

If the need is capital over, you know, quarter by quarter over, over a span of time, that's what we're gonna structure.

Um, I go back to my investment banking analysis because that's really kind of how we think of this is we're gonna structure a financing arrangement that really, uh, caters to your needs.

Um, we've talked a lot at sort of a high level.

Um, Charlie, can you take us sort of down a level right into how this actually works?

What, what if somebody calls us today and we've got some questions sort of about how do I do this?

What's the process and can you sort of talk, talk us through, um, how, how, how clients should think about working with us?

Yeah, absolutely.

Um, so in a ty in a typical, uh, deal, um, you know, we have a fair amount of diligence to do on kind of the, the merits of the claim here.

You know, I think that piece of it is really quite streamlined because the, the claim is very public.

We, we know a lot about it, we're very familiar with it.

We, we think it's a very strong claim.

And so really a lot of the, what we would be doing, um, as part of our initial due diligence, um, with, with a new client who was interested in this would be to sort of understand, um, as much as we can about, you know, what, what the claim is worth.

Um, so that, you know, which is obviously a, a very important factor in figuring out, you know, the appropriate size of the transaction.

Um, and it's a little tricky because, um, you know, most of the class case has been focused on Alabama.

Um, obviously there, there are plenty of people who are not in Alabama and, and may

21

not have sort of a, a fully vetted, um, expert analysis telling them what, what their damages might be.

Um, but you know, if, if we sort of understand the, the reimbursements throughout the damages period from the blues, we can start to think about, well, what are damages if, if you assume it's some percentage of those reimbursements.

Um, and what is the percentage?

Well, it, it, it's, you know, we, it's, it's hard to say, but it will depend on a few different things like the geography, um, you know, what, what the blues market share is in the different markets, um, a and all those sorts of things.

And one of the, one of the ways we get insight into that is by speaking with, uh, with counsel.

And so there, there are a lot of, um, providers who have either already engaged counsel or have been sort of preliminarily discussing with counsel this very decision of whether to opt out, how big is my claim if I do opt out?

Um, and in many cases, those, those lawyers who have been spending a lot of time thinking about the case, talking to clients about what their damages might be, um, really have a lot of insight and have even done a fair amount of sophisticated modeling to try and give people a sense of how, how big is my claim?

And so, you know, the, going back to what Ryan mentioned earlier about the timeline, um, you know, we can do a transaction kind of at, at any point in time, um, you know, before or after the opt �káros^ out deadline.

But for, for folks who, you know, are trying to accelerate this, um, a big part of our diligence is gonna involve talking to your, to your counsel about things like damages.

Um, another uh, thing, going back to something Ryan mentioned earlier is what's the litigation strategy, right?

Are, are you sort of gonna push this as aggressively as you can and, and be willing to go to trial to, to maximize your potential settlement?

Or are you interested in sort of a less adversarial approach, um, you know, that might, uh, sort of be a little bit easier, a little less disruptive commercially, and you know, that that would be another factor obviously that would affect how we think about, uh, the size of this.

And then if, you know, if once we kind of do that, which is, you know, again, can happen pretty quickly because we're so familiar with the case, you know, once we kind of, uh, propose terms and align on them, it's the kind of transaction we could, you know, close in a matter of weeks.

And so as you me, as if you even mentioned we're, we're kind of willing and able and

eager to move as, as quickly as, as clients want to get them this capital, if, if it's something they're interested in pursuing.

Yeah, and I would just highlight, uh, thanks Charlie, that was super helpful.

And I, I would just highlight, I think a really important point.

We at Burford Capital are mostly lawyers.

Charlie, myself, we have lots of background, but we're not your lawyers, right?

We are passive providers of capital with lots of good insights and I think, you know, can be quite helpful in helping you think about these issues.

But ultimately, um, we are not your counsel and we're very, very, uh, you know, it's a very important line for us that, that we're not giving you legal advice.

You and your counsel are making a, a legal decision and we're, we're, you know, we are to some degree, you know, really in the background, obviously understanding your intentions, you know, do you wanna maximize value versus, you know, do you wanna get a a, a settlement within the first year is important to us because, because we need to align at the front end of our deal.

We need to make sure that we understand what you are trying to achieve so that we can, um, value the claim and, and price it at a, in a way that facilitates your, your goals, right?

So we don't wanna put out too much capital if what your goal is, is to settle within a year.

We don't wanna be the, in the, the, the obstacle to settling because you've taken too much capital from us and it's going to be, you know, make that hard to settle.

So we get involved early on in those discussions to understand your motivations and what you want, but ultimately those decisions then, you know, once we close a deal, really lie with you and your counsel.

And if, and if we've gotten that wrong, you know, that's, that's on us.

Um, but so, so it's important to just differentiate between, as much as we know a whole lot about this case and about the healthcare industry and, and we can provide interesting insights to you that we think will be helpful.

Um, it's important to separate us from your counsel, um, because, because, um, those are two different relationships.

Um, we've got a couple of questions around, um, you know, you, you, you all talked about, uh, Charlie, you talked about financing hospital systems.

We've got a couple of questions around have you entertained financing, um, physician

23

groups or other non ▯^ hospital groups who nonetheless have claims in this space for either, um, in, in either the BCBS case or in, in other, uh, healthcare related cases?

Yeah, I mean, I think speaking more broadly, the answer is abs, absolutely.

Um, you know, um, not just hospital systems, but uh, physician groups, other kinds of healthcare providers have, have lots of different claims.

Um, you know, lots of them are against payers.

Um, they might be antitrust claims, they might just be kind of bilateral disputes.

Um, and we've, we've talked to lots of folks and are are, you know, definitely interested in, in talking about financing those in terms of the BCBS case, uh, specifically, you know, I'd be curious for, for Ryan's view, I think, you know, one data point, um, is that, you know, the way the settlement consideration is divided, it's the parties to the settlement appear to think that, you know, physician groups, um, damages are, are sort of smaller, which obviously makes, makes a transaction, um, more challenging.

And then I think there's also an issue where, you know, a number of providers, although maybe it's not exactly clear how many, but a number of providers on the physician group side may be subject of releases in a prior class settlement that that also limited, uh, you know, the extent to which they can claim damages.

Yeah, I think that's exactly right.

Um, you know, I, the, the, the, the question with the physician groups, uh, is, is just a little bit more complex given that prior settlement and evaluation.

Um, there are certainly some physician groups, um, that are going to have claims even despite that.

Um, but it's, it's, it's a little bit more complex, uh, analysis.

Uh, when you talk about the physician groups or when you get outside of sort of the, the healthcare, I mean the, the hospitals, um, you know, it's just a little bit more complex.

It doesn't mean that they don't have equally valuable claims.

What I would say is, you know, it, it's gonna depend, right?

That's a lawyerly answer, but you know, that's, you know, talk to your, you know, talk to your counsel and, and, you know, have them work through it.

There are gonna be some physician groups that I can think of off the top of my head that may have more valuable claims than even some of the hospitals do.

24

So it, it really is, uh, as Aviva said, kind of a, a bespoke, uh, analysis for each provider.

The, the one thing I would say is that in this just broader, you know, it is, it is important for providers to think about this strategically and to do the due diligence.

Um, I've had a lot of, you know, my clients over the years, you know, have talked to litigation funders partly as a check on me, right?

So I can come to them and I can say, you know, my value, this is how I value the claim.

And they're like, well, that's nice, Ryan, I'm sure you're, you know, doing a great job at this.

And you have experience, but it's very different when you have a capital provider who's willing to put their own money behind that valuation.

And so that due diligence, that is worth a conversation because a lot of times that is what, um, you know, kind of helps, like when you go to the CFO or the CEO of the system, you can say, well, this is what the lawyers think and the funders are valuing at this.

So you have kind of multiple data, data points that all support the legal departments, um, reasoning and justification.

That's super helpful.

Thank, thanks for the, the pitch on that one.

Um, um, I think we've got one, we've got time for one or two more questions that I'm, I'm gonna pull them from the q and a section.

For individuals or small businesses with high value claims, um, against, you know, BCBS or larger entities, how can they structure their claims to be most attractive to, um, a funder?

Yeah, I think there, I think there are a couple, a couple ways.

Um, number one, I think, um, you know, in including or being willing to include many, you know, different kinds of claims, um, is certainly helpful.

And it's for a couple reasons.

You know, number one, when you're thinking about the amount of capital we can provide, it's typically a function of, you know, the, the total value of the collateral.

Um, and obviously the more value you add by adding multiple claims, um, that's one

25

way to sort of, you know, increase, increase the amount of money we might be willing to, to commit.

And another reason, as Aviva mentioned, is, you know, if, if the risk is diversified, um, you know, that makes the, um, it, it obviously sort of a, a safer commitment of capital to us.

And, and you can benefit from that in terms of, you know, better terms, uh, and retaining, you know, more upside for yourself.

It's always gonna depend, I think, on exactly what the claims are and, and the different risks, uh, at issue.

But those are a couple ways that that come to mind.

I'm not sure if you think there are others.

I think that's super helpful.

I guess we are just at the end of our, and I have a couple, couple maybe last comments.

Um, uh, I hope this has been useful.

I hope this has been a, a good introduction.

Uh, there have been questions about how to get some, uh, copies of the slides.

What I would say is please reach out to us, um, if you have questions that we didn't get to.

There are a couple here if you have, um, wanna have a conversation.

We have a lot of conversations with folks that ultimately decide either, you know, not to opt out, not to take capital, um, at, at, at this point in time, um, to bring a claim, not to bring a claim.

Um, we have lots and lots of conversations that aren't always about, you know, can we close this deal in front of us?

Um, and I, you know, I would, I would encourage all of you on the call today to give us a call and, and let us sort of, you know, help you think about these issues, even if it's, you know, not in the direct service of taking a monetization.

Um, I, I hope that we bring something to the table as you, as you think about these issues, um, as you think about, you know, in the BCBS context, whether to opt out, whether or not, whether to consider a monetization.

Um, these are all things that we deal with with clients all the time and, and we're happy to have conversations.

26

If we didn't get to your questions, again, please reach out to us directly.

Um, if you'd like a copy of the slides, please reach out to us directly.

We're, we're happy to, to share, um, you know, our insights with you.

That's, that's part of what comes with, um, a relationship with Burford.

Um, and hopefully it comes with capital as well.

But that's, again, it's, it's a conversation.

Um, so thank you all for joining and hope that this has been useful and, uh, we look forward to hearing more from you.

And thank you Ryan for, for, uh, joining us today as well.

Thanks, Charlie.

Thank you very much.

Thanks everybody.

Take care.

27

# Exhibit 2

Marty Kenyon

Marty Kenyon

00:03

Good afternoon and thank you for joining us today. I'm Marty Kenyon, education program and Membership Coordinator for Hap.

And before we begin, I'd just like to mention a few things. First, st all attendee lines are muted.

There will be a question and answer session at the end of the presentation. If you have any questions, you can post them in the chat box anytime during the webinar, or when the presentation is completed, you can raise your hand, and I can give you access to unmute your line.

Now I'll turn the program over to jolene calla vice president, finance and legal affairs with Hap. Go ahead, Jolene.

Jolene Calla

Jolene Calla

00:40

Thank you so much, Marty, and welcome everybody. We're so pleased that you could be here with us today. I think you heard Marty say that I work with legal affairs and finance. And today's topic really does check both of those boxes, and we know that they are really of utmost importance to all of our members as well.

so I will let you know. This session was originally scheduled for a little later in time on the calendar, however, both Hap and Dwayne Morris have gotten so many questions from you that we decided to do this sooner rather than later.

We know that many of you are being solicited by consultants and law firms, and others saying, You know, hey, come with us, join on. You don't want to miss out, and there's a lot of pressure to act quickly. So today, we really want to take the time to give you the background, the facts, the timelines, and really allow you to be armed with information, to make the very best decision you can for your organization.

And there really are significant decisions to be made, and they have real financial implications. So with that being said, I would like to introduce our presenter, and we're very fortunate, I think, to have one of the best in the business with us today to break this down

1

and answer your questions. Welcome, Sean Zabane, who is the chair of healthcare litigation at Duane Morris.

and he's got more than 20 years of experience

now, Sean routinely works with hospital associations, health systems, physician groups, nonprofits, home care agencies. Everybody on the provider side. So he is our guy and his litigation practice routinely involves high stake, healthcare, administrative agency matters, commercial contract disputes, reimbursement, disputes which we know there are no shortage of.

And lastly, and most importantly, for today, some antitrust matters, including class actions.

So with that I won't take any more time. I will also let you know that Sean serves as counsel to the Hap board, and with that, Sean I'll turn it over to you.

Sean Zabaneh

Sean Zabaneh

02:55

Thank you. Jolene, for the warm welcome and intro it's it's nice to be speaking with all of you today. It's not often these days that we get to present to hospitals with, you know, entirely good news that will translate into more revenue for your organizations. But this really is such an occasion where you do have choices to make, but they're they're largely or entirely for the most part, good choices.

We're going to talk today specifically about these Blue Cross blue shield antitrust, reimbursement, litigation matters. And more specifically, a recent proposed 2.8 billion dollars settlement

that has come out of those matters.

We at Dwayne Morris have been following these cases very closely for a number of years in anticipation of this settlement, and that's been sort of an interdisciplinary effort on our teams. Our healthcare team and our antitrust teams

have been working together, and we've been working with economists to sort of analyze the potential damages to hospitals that are related to these claims, so that when a settlement came out which to us was

a when, not an if, but when a settlement came out, how are we going to advise hospital clients who had questions about what to do and how to address it?

2

So today we're going to talk about that.

and we're going to kind of walk you through the basics of what you need to know, to make a decision and to to move forward

first.st I just have a sort of standard disclaimer. When we do these sorts of presentations, we're not providing specific legal advice to any particular hospital today, we're just providing an overview of the situation, some key facts and information that will help guide you in making your next decisions. It is important to consult with counsel about the issues particular to your hospital or system, so that you know specifically how the law and how the rights that hospitals generally have

apply in your particular situation

with that, said for this particular webinar. I do anticipate a lot of questions, whether you ask them on the webinar today, or you think about them, and they come up later. I'm sure hospitals will have a lot of questions, so please don't be shy to load your questions in the chat, or to ask them live at the conclusion of the presentation, or, of course, to follow up with me after the presentation. If you don't get a chance to answer your question today.

So with that, let's go to the next slide.

Okay? So our presentation today is going to be roughly in 4 parts. We're going to talk a little bit just about the Blue Cross Blue Shield Association and its blue plan members for those of you sort of need a refresher on what they what that is and how it works. Exactly.

Why are we going to talk about the litigation?

What happened? What's its history, and what were the claims? And how do we get to? What will be the 3rd part of our set presentation, which is the settlement. What is this settlement? What's the eligibility to participate? What's your potential recovery?

And then, lastly, we're going to look at? What is your alternative to the settlement. What decision does the hospital have to make right now as to participating in the settlement or opting out for some type of alternative?

Let's go to the next slide.

So let's just talk a little bit about the blue plans and how they operate. Obviously, virtually every, if not every hospital in America is familiar with some blue plan member in this country that services your particular area. Basically. The way that these members work is that the Blue Cross Blue Shield trademarks are controlled by the Blue Cross Blue Shield Association.

3

that Association licenses, those trademarks to local Blue Plan members and affiliated entities.

and these independent members, which are about 36 independent companies. They sell health insurance and they're governed by the Association and, more importantly, by the rules and the bylaws adopted by the Association. That sort of govern, how they do business.

the history behind the blues and the association, how they came into existence, why, they do business this way. It's quite a long and complicated history. It goes back many, many decades. And there's a lot of different stories as to, you know, sort of why and how they came into existence, and what was the justification for them coming to an existence this way and doing business the way they do.

There were some particularly important policies and structural changes that took hold in the eighties and nineties that ended up leading to the cases that we're dealing with today. But the major point to take away just at a high level, to understand the cases that have been filed is that the way the blues do. Business, of course, as most folks know, is a little bit different than the other big payers out there.

The national payers.

So let's go to the next slide.

So

what are these particular cases about? I'll talk about the the structure and the claims and the plaintiffs who brought the cases in a moment.

But let's talk about the policies that they challenge. What is it about the way that the blues do business that these cases have challenged. Well, there's a laundry list of policies and programs and other things, but really the cases have focused on 2 particular policies. One is known as the national best efforts

rule, and that was simply a rule that stated that that required each blue plan to derive at least 67% of its revenue from blue brand plans.

The other rule is known as the exclusive service area Requirement or Esas.

and basically Esas divided the country into sections and permitted only one blue plan to compete in each section.

4

Now, that's the general rule. There are exceptions to every rule, and I know certainly in Pennsylvania some of you are are operating in in a few areas where there's might be 2 boot plans that that are that are an issue.

That is sort of an exception. You'll see that at various parts of the country. But the general rule is one plan could compete. In some instances you might see 2, but you're not going to see competition from all the blue plans in any particular area because of this exclusive service area rule.

So let's go to the next slide.

Okay, so

what are these cases about that have led to this settlement? Well, they go back a long time.

They were filed back in 2,012, and they were filed by 2 different groups of plaintiffs seeking class certification. Treatment.

The 1st

was is a class of providers, health systems, hospitals, physicians, professionals that provided services directly to Blue Plan members

in that group of plaintiffs. They allege that they were damaged by these policies. We just discussed the way the blues do business because the lack of negotiation over rates cause reimbursement to be dampened, and therefore they were damaged by reimbursement underpayments.

The other group of plaintiffs were the so-called subscriber claimants. These subscriber claims were the buyers of the blue insurance plans, including employers, for example, and there the allegation was, they were damaged through the

premium, overcharging pay too much for their policies.

and but at the at the heart of both sets of claims were the the policies we talked about, and again there were other policies that were challenged, other conduct that was challenged. But the 2 rules that we just talked about that national best efforts rule and the exclusive service area rules. Those in particular were a a major focus and particularly considered to be problematic in these cases when they were challenged so filed a long time ago.

Let's go to the next slide.

Okay? So

things came to a head in 2018, where you really saw major progress for the plaintiffs.

5

What happened in 2018? Well, there was a very strong ruling in favor of the plaintiffs from the court and just to take a step back for a moment. Many of these cases were filed, and they were basically all put in a multi-district litigation in the northern district of Alabama, being overseen by Judge Proctor there. So there becomes a conclusion from that northern district of Alabama, this Federal court there in 2018, that

concluded that the

national best efforts rule, combined with these exclusive service areas, constituted an analysis of the conduct that was under the per se rule in antitrust law.

Let me take a step back and sort of explain that at a very high level we could do a whole webinar just kind of going into the details of the antitrust laws and what the different, what a per se ruling means! But I'll try to do it very quickly, and in a very simple way. So

basically, when a court is analyzing a practice that is challenged under antitrust law, it has to determine what legal framework should be used to evaluate it, and it will determine either that the practice is per se illegal.

or that it needs further analysis under something called the rule of reason.

If a court considers a practice to be per se illegal, that means that the practice is on its face so obviously anti-competitive that there is virtually

no plausible pro competitive justification for it, and it is just considered to be per se unlawful.

If

it is not such an arrangement. The court thinks this is a type of policy that may ultimately be found to be illegal. But we need to do more. We need to look at the economic impact. We need economist analysis and expert testimony. We need to look at something called market power. And we need to balance the pro competitive justifications with the anti-competitive harm to determine whether we're going to ultimately find this illegal.

If you were a plaintiff in an antitrust case, you want a per se ruling a per se ruling is, gives you a very, very high likelihood of success in the case.

So in this instance, in 2,018, Judge Proctor found that the conduct in the subscriber case was per se illegal.

So that led to a settlement. The subscriber class settled in 2020 for 2.7 billion dollars

and an abandonment of the national best efforts rule. So

6

basically, the blues stopped that national best efforts requirement in 2021 following on this settlement.

Let's go to the next slide.

So

what did this then mean for Providers? Provider Case had at that point was moving on a slower track and they had to brief these issues before the court to go before the court and say, Well, what about our case? 1st of all, do we get the benefit of this per se treatment? For any damages incurred during the class period that goes back by the way to 2,008

through the 2,021 abandonment. And what will be the treatment of the case after 2021?

Well, in August 2022. Judge Proctor answered that question that the courts came out with an opinion. That was

largely good for the providers.

with some mixed news.

So for the 2,008 to 2021 period, while the national best effort rule was still in place. The court found that yes per se. Unlawful analysis applies here. For the providers, as it did for the subscribers. So you get that benefit. That's a very big.

powerful ruling, but

said that after the national best efforts rule was removed.

We're gonna look at this through the rule of reason because just the exclusive service areas alone that might require further analysis. So those claims are still alive, and there's still that prep strong potential for recovery. But

a little more needs to be shown than under the per se rule so

largely good, very good news, especially because the damages period goes back so far, but with a little bit of a a caveat to it.

Let's go to the next slide.

Okay.

Following that ruling, we expected there would be another settlement again. These are very difficult rulings for the defendants to have received and the consequences for letting an antitrust case go through trial. They're very high. I'm going to talk a little bit about the type of

7

damages you get in an antitrust case, and why the exposure was so high for the blues. But once you got those rulings that basically cleared the case, saying, most of the cases per se.

The remaining of it is still subject to being heard by a jury. But we're going to look at it through the rule of reason. This is going to lead to a settlement. So that's indeed what happened. And in October of 2024, it was announced that there would be a 2.8 billion dollars settlement fund plus some injunctive relief.

So there's a whole list of things that the Blues have agreed to do to sort of change their systems. And there, there! It's more than we would get into in terms of a list on this call. A lot of them are set forth in in settlement documents, and we have, publicly available a lot of these settlement documents. So anyone who needs copies of settlement documents to just let us know.

and we can get them to you. They're voluminous and somewhat complicated. So I'm gonna try to condense them here. But there were things that they have committed to for adjunctive relief that will make it easier to submit claims. One of the big things that they're they're looking at is the blue card system which is sort of the the system that all the blues have to follow. You treat a patient on a blue plan that is not your local blue plan under the blue card system they pay what your local plan agreed to pay.

Not necessarily a negotiated rate with an outside plan. That's not really going to change, as I understand it. But there's going to be a lot of things that will make it easier to get paid under the injunctive relief. They're going to sort of apply prompt pay commitments to blue card payments. There's a few other things in terms of like access and and claim processing. You know that that are looked at. But there's a list of things that they're going to change.

In addition, there is a settlement fund, a monetary fund. And that's really what I think folks want to know know the most about right now.

How much is it? How much am I gonna get? How much can I get otherwise? So that's what we're gonna really spend a little bit of time talking about.

So let's look at this fund and try to understand it as it applies to hospitals.

We start with 2.8 billion dollars. Okay, and

and what hold on one second, my free excuse, my friends, my screen froze for a second. Okay, 2.8 billion dollars.

of that, 2.8,000,000,092% is allocated to facilities.

and 8% is allocated to professionals. Good news for facilities for hospitals. Not as good news for the physicians and professionals. There's a long

explanation from the experts as to why the professionals only got 8% because the audience today is really hospitals and health systems. I'm not going to get into the details. But again, that's something. If anyone wants to hear more about it. I could. I could certainly get into into it with you. Offline.

700 million dollars is allocated to attorney's fees.

and then 100 million dollars is allocated to an Administration fund. So you know, that's going to be. It's going to be very complicated to process all the claims that will come in. And that's sort of what that that fund does. It supports those administrative fees and costs. So the 2.8 billion dollars comes down pretty fast. Ultimately, what hospitals are going to participate in approximately will be about 92% of the 2 billion.

So one thing to keep in mind, this is a proposed settlement.

So this has not yet been approved by the court, and it's not done done yet. We don't yet know when the court will approve it, and if it will approve it, although.

given what happened with the subscriber class, we think it probably will be approved.

There's a preliminary hearing for approval set for this Thursday, November 14.th We're going to be there, obviously, and we will, you know. May have some updates to come out of that. I don't know if the court will actually approve the settlement there. But it means things are moving forward toward an approval.

Let's go to the next slide.

Okay?

Who is eligible to participate.

let's see.

okay, so

basic eligibility is extremely broad. If you are a healthcare provider who is currently providing or who has ever provided healthcare services to any patient insured by a blue plan in the United States during the settlement class period. You are a potential

participant and the class period is July 24, th 2,008, through October 4, th 2024. So

very, very large class period. This is, gonna of course, apply to every single or virtually every hospital in America. At some point is treated a patient on a blue plan.

So

9

that's threshold eligibility.

But let's look at exclusions. Okay, so what? How do you get excluded from the class? Well, if you're owned by one of the settling defendants, meaning, if you're owed by the Association or the blue plans, or something like that. You're not eligible to participate

hospitals that are owned exclusively by the Federal Government, or who are paid exclusively through Federal programs are not eligible.

Hospitals that have released their claims are not eligible. What does that mean? Well, if at any point in time you've had. You've signed a settlement agreement with the Blues, or in one of your contract renewals, you've negotiated a release

that could preclude you for participation. But I will put a strong word of caution here. The language of any release really matters. So you may have had cases with the blues before that were settled, and where there was a release involved in the case. That doesn't mean you've released these claims. It depends on what the language is in your particular release.

Again, if you've had contract negotiations with the Blues renewals those sorts of things. Sometimes there may be language in there that might apply that might constitute a release. But you'd want to have your lawyer look at it to make sure that it specifically applies here before making a decision whether you're excluded or not. But the bottom line is, there are providers out there who have released these claims over time, and so they would be excluded.

There is then a list of exclusions for other. You know, types of providers like, if you exclusively provide prescription drugs or durable medical equipment, medical devices, etc. And that's the exclusive thing that you do. That could be an exclusion. So there's some of those that are listed on these slides.

Let's go to the next slide.

So what happens now is, providers have to make a decision about, what do you want to do? Do you want to try to participate in the settlement? Or do you want to opt out of the settlement and bring direct claims to potentially receive higher

compensation?

Well, just a quick note on timing, because that's always something people are interested in. The the clock has not yet started running to make this decision, but it will run from the point that the settlement gets approved. And so you'll have 90 days from the in the notice that you will get if you're an eligible provider to decide whether you want to opt out or not.

10

Not. Really a lot of time, actually, when you consider sort of the the dollars that are an issue, and we'll talk about those in a second and the level of decision you have to make. So something you want to do early. It's 1 of the reasons we're doing this webinar early. We may do a follow on webinar as things develop. If more, if like significant updates come out. But something you want to think about now and get out in front of early

Generally speaking, in very large class action settlements. It is often, but not always the case, that an absent class member would probably be entitled to larger damages if they brought their own claim than if they participate in the class

just sort of one of the things I mean natural efficiency. A class by just being an absent member of a class that participates. You're going to be in that position where you know other folks have put a lot of time and effort and resources into litigating the case, getting a settlement, and then all you've got to do is participate. So it to a point makes sense that you might not get as much. Yeah, not always the case. Certainly. There are going to be situations where a class fund may yield more for you than you might get on your own.

All sorts of reasons. But as a rule of thumb. Typically, you'd be able to get more by opting out

and you'd have more control over your case, more robust negotiation over a settlement and that sort of thing. If you were not participating in the settlement.

Let's go to the next slide.

Just a quick overview of timing here. The the timeline. Rather so. 1st step is the settlement proposal goes to the court. That's already happened.

Then the court has to approve the settlement, as I said, and then notice gets sent out to eligible providers. That's when your 90 days starts to run. You have that time to decide whether to opt out or not. And then, if you decide to opt out, you need to promptly file a claim of your own, and you can do that. Hospitals can do that. You can file your own claim, or you can file one with other hospitals sort of in a group. As well. We'll talk about that a little bit more in a second.

Okay, let's go to the next slide.

So

how are these funds going to be distributed? If you participate in the settlement. How do you figure out what you might recover? Well.

we don't know, is the short answer. If you and we have the plan of distribution available. It's a 12 page document. It's not super long, but there's a lot that's not spelled out in there. And

11

there's a lot of terms that are sort of not clearly defined in a way that would allow us to for sort of sit down with the hospital today and say, here's exactly what you can expect.

So what we're gonna do today is I'm gonna try to walk you through the the highlights. So you at least have a sense of how the formula would work, and give you a few benchmarks to do some very rough justice in estimating.

You know, Ballpark, what you might be able to expect, depending on the size of your hospital. I'm going to caveat all this with saying, and I'll probably caveat it several times as we go along, that these are a lot of the numbers are somewhat hypothetical. And they're they're sort of rough. But to give you sort of a rough sense.

give you sort of orders of magnitude. But again, everything's going to come down to the specifics of your hospital, and you really want to work with council to figure those things out as you make a decision that is is unique to your own institution. So what do you need to know about the plan of distribution. Well, first, st the class period. Again, I told you that earlier. It's July of 22,008 through October 2024

it was allocation experts hired by the plaintiffs that determined the 92% allocation to facilities was appropriate. So that's how you get the 92% of the Settlement fund that's available.

and then the plan of distribution has 2 different options for payment. Option A and option B option A is the default method, option B is called the alternative method.

What it comes down to as to which option you would pick depends on how much data the hospital has, how much historical data you have.

But the one of the problems with the the plan of distribution that we've identified at this point is on the face of the plan. It's not clear exactly what data you need to have had.

So

that's being fleshed out. I think more information will be forthcoming on that, but it's difficult to say exactly which option you might want to select. So I'm not going to go through the nitty gritty of how these each get calculated, because until we know more about the data, it's it's difficult to make it useful.

But the bottom line is out of these methods. They're going to calculate allowed amounts per participating hospital

now.

12

once, and that's going to be relative to how much blues business you did and how many claims you had. And so it's going to be a lot of claims data. I mean, we could all kind of guess what type of data they might want. But we don't know for sure.

After that happens, though you're allowed. Amounts are going to be adjusted, and they're going to be adjusted by coefficients that are developed by the plaintiffs experts. So basically, the plaintiffs experts have developed a multiple regression model that will estimate coefficients based on your territory. Basically, and what they estimate is the relative effect of the defendant's alleged conduct in the case, and how that compares to other facilities. So, for example.

Facility A and B may have the exact same allowed amounts under the threshold. Top line computation.

If facility A is assigned a coefficient of one, and facility B is assigned a coefficient of 2. That means the experts have determined that the defendant's conduct on Facility B is twice as large as the effect on facility. A.

And so how are we going to compute these coefficients? Well, it depends on variables. A big one is going to be the blues plans market share in the particular area of the facility. So

we'll have some sense of you know where we think the coefficients are going to be higher or lower. But we don't know that now, like that hasn't been disclosed in the plan of distribution, can't necessarily point to a particular hospital and say, Okay, here's the coefficient that's gonna apply to your calculation. We don't know that now, and we don't know for sure if we're gonna know that even before you have to make a decision. So

that's

a wild card to a point in terms of trying to figure out what you want to do.

So let's in both instances I should emphasize

the allowed amounts are going to be bought based on national provider identifiers, or

tax identification numbers. So it'll look at claims, data and amounts by Npi or tin for relevant services.

Let's go to the next slide.

Okay.

so this is the actual payment formula. This is simple. In a sense. Except.

13

as I said, we don't know all the inputs yet. So a simple formula is great. But if you can't come up with the exact inputs. It's value is more limited.

But here's how it's gonna work.

Your allowed amounts, as calculated by one of the 2 options will be adjust, become adjusted, allowed amounts after the coefficient is applied.

So in the fraction. That's the numerator. Your

based on Mpi or Mpi or tin adjusted allowed amounts. That's the numerator for your particular hospitals or health system.

That amount will be divided by the total adjusted, allowed amounts for all the facilities that participate in the class.

and that will create a fraction.

That's basically your percentage entitlement to the fund. And then that fraction is multiplied against all the net settlement funds that are available. So that's after you take out the attorney's fees and the Settlement Administration Fund what's left there, and the 92% you have to adjust for the what the professionals get. The 8% there.

That 92 is available. You apply your fraction to it, and then it spits out a number. And that's that's how you would get paid

under the settlement. So

how do we figure out? What kind of dollars are we talking about here? Because this is a lot of information I've given you. There's a lot of stuff that goes into the formula, and if you read the actual public documents

they'll be even more confusing, possibly, than I've been in in walking through these. So let's look at some benchmarks. Let's go to the next slide.

Okay, so this slide I'm going to say, is heavily caveated. Some of this data is hard data, but a bunch of it is hypothetical data. I have to emphasize that over and over. It's hypothetical. But what we are striving to do here is give you all sort of a sense of

if the Settlement Fund was distributed evenly. What might you expect? And of course it's not going to be distributed evenly, because you're going to have these coefficients and and other things that can be unique to particular hospitals, but this at least gives you some ballpark, I think, to work with in terms of thinking about a comparison of what might I get under the settlement versus? What might we get in an opt out claim?

14

So we start with what is pretty hard data, total staff beds in Us. Hospitals. According to the American Hospital Association, that is, over 900,000 beds. It's about 916,752 beds.

as I've stated over. Another fact we know is that 92% of approximately 2 billion dollars is going to be available to the hospitals to share it.

Now we get to some hypotheticals.

A major input here is how many hospitals are going to opt out of the settlement because that will impact the fraction. And you know how you calculate your piece.

There's no way to know this for sure. In our experience you often see large numbers of opt outs in very big settlement funds. Opt outs tend to be very low in Lower Settlement funds, but the bigger the settlement funds get, the more you might see some opt outs.

So here we're just putting up a hypothetical range. If you saw for a case like this, where we do expect there to be a number of opt outs. There were a number of opt outs in the subscriber class from earlier. So we expect that here

20 to 60%, you might see, 60% would be a lot.

20 is, you know, maybe more in the ballpark. Maybe somewhere in the middle again, we don't know. This is just sort of a gut from from experience of what we might see.

So if you have that many hospitals opting out.

then our next line looks at the hypothetical number of participating beds after you remove those opt outs. So there you might be looking at about 366,000 to about 733,000 in terms of participating beds.

If you assume that were the case, and the funds were distributed evenly, without the coefficients, without accounting for unique data issues with particular hospitals. You're looking at a range of about $2,700 per bed to about $5,400 per bed for the entire class period.

You could also use an average of those 2. It's about $4,000 a bed again. I don't know that an average is the perfect statistical number from a statistical significant standpoint. I don't know that that's the right number to pick, but it's just again giving you a rough order of magnitude to look at what the range might be.

Let's look at the next slide. So

here's some more hypotheticals just to do some illustrations to you to compare how you should be thinking about what you might do. As a hospital. So here we have

15

on the left hand side of the slide you see an approximate damages on a per bed basis for settlement of participation and possible damages for an opt out option. Now

I'll explain in a minute where the opt out number comes from. That's very hypothetical. But let's just look at the settlement participation.

On the right hand side of the slide. We have 2 examples just to sort of give you how these numbers might crunch out, depending on the size of your hospital or health system. So we use an example here of a 350 bed hospital you had. If you are doing damages on a bed per bed basis.

And you are about 4,000. That was the average from the the numbers I just gave you. You could adjust this to go to use another number in the range from the prior slide. But this is the average

350 bed hospital. You're looking at a 1.4 million dollars share approximately if it was divided evenly, which again, it's not divided evenly. But this is a rough estimate

for a thousand bed hospital. It'd be a 4 million dollar payment, 4 million $90,000 payment if it was divided evenly.

So how does this compare to opt out options. And how do we look at the opt out damages? Well.

we've spent a lot of time with this. We've worked with economists, and we have a lot of experience with a number of hospitals, and what we have seen by and large is that the blue plans do pay consistently lower reimbursement rates for the top. Cpt codes as compared to other payers. Often you'll see 7 to 12% less across the board, at least on average

which you can extrapolate across a very large time period when you're going back to 2,008. It's a very big number.

if you convert that to sort of a per bed analysis. We have seen hospitals where and again, this may not apply to your particular hospital. Your particular hospital may have very different damages. So I don't want anyone to take this as assuming this is what we're saying is going to be the case for everybody.

But we've seen examples where, for example, $320,000 per bed could be the damages we've seen. Frankly, some examples were substantially higher than that where you're approaching $400,000 or more. But this is just an example of something that could apply. Again, it's hypothetical, and this is not something we're saying is going to apply necessarily to everybody. But it is meant to illustrate the point that you definitely want to find out

16

what your hospital looks like in terms of damages. So if you had a $320,000 damages and you've got a 350 bed hospital, you're looking at 112 million in damages compared to 1.4

for a thousand bed hospital. It's 320 million damages, dollars and damages compared to 4 million and change

the other thing that's very important. It's not on this slide is that in any trust claims and a Sherman act claim, you're entitled to what is called treble damages, which means they're going to multiply your damages by 3 under the statute, so that 112 million for a 350 bed hospital that would that would expand under the trebling to

well, over 300 million like 336 million dollars for that claim the 320 million. You'd multiply that by 3. So you know, over 900 million

so you're talking about very, very, very large numbers. And then there's also an entitlement to attorneys, fees as well.

Under the settlement. You would not get triple damages, the trouble damages that are available. You would just get the payment that comes out. So here the numbers could be substantially different. Depending on what you what your particular situation is

another thing to highlight. Here is the type. Let's go to the next slide.

I largely covered this earlier, but just to remind for the hospitals, if you did bring an opt out claim, you would likely be able to benefit from a per se ruling on the the conduct

through 2021, and I say likely, because there's a lot that goes into an opt out claim, including the jurisdiction you file and the judges you get but

certainly the rulings that have come to this point would be highly persuasive, if not potentially controlling. And then, after 2021, you would still have claims that would be likely looked at by a slightly heavier burden with of the rule of reason. And again I talked about that earlier.

Let's go to the next slide.

So

what happens if you opt out? What does that look like? Well, there's a lot of different ways to approach it. And we at Dwayne Morris. We have a lot of clients represent a lot of hospitals who are analyzing this right now and looking at you know, how do we decide if we want to opt out. Or now, what do our damages look like?

If you're a hospital that has very, very high damages. And want to investigate an opt out claim.

17

You could bring a claim on your own. You could simply file suit, and you could bring it on your own. You can also join with other hospitals, and you can file suit together and oftentimes, that is, that is sort of what you know we've seen developing. The claim would be against the Blue Cross Blue Shield Association and the 36 independent blue plans.

The focus of the claim is really the Association. The association is what dictates the rules. That's what implements the the practices. So while your local blue plan would be a defendant, the focus of your case is really not on your local blue plan. That's a question I've gotten a lot from folks in terms of tone like, what would an opt out claim look like, and how focused is it on your local plan as opposed to the Association?

Really, the association is is is the is the the

the the driver of conduct here.

what are potential benefits and potential cons of doing an opt out claim? Well, benefits are potentially obvious. If your numbers shake out substantially increased monetary recovery. And

better potential future contract terms. So if you have a pending lawsuit for this, your ability to sort of renew your contracts and negotiate contract rates and those sorts of things, would be increased because you could fashion your own form of injunctive relief in a an opt out case as part of a settlement of an opt out case. And that would ultimately be the goal is that you would eventually settle the case. But you do it for better terms than you would get under a class action, participation settlement.

What are the cons? And, by the way, these are not exhausted. There's probably going to be benefits that I won't have thought of and cons that I won't have thought of either. These are just some of the big ones that pop out, that that we hear about a lot, and then, you know, we would see. So cons are certainly payment delay. You would have to file a lawsuit and wait that out to get paid. Eventually,

being an opt out claim, it would look very likely move much faster than a class action had before you, especially because of the work that had been done previously, and the fact that it's not a class action, it would likely move much faster. But it's still a new lawsuit, and there's going to be delay. It's not something where someone's gonna be able to say to you, okay. You'll have a check, you know, within 3 months or 6 months, maybe a year, but or maybe several years, it could take

administrative burden. Anytime you're involved in a lawsuit. There's going to be administrative burden. Have to deal with documents. You'll have to deal with lawyers. You'll

18

have to deal with depositions people may have to testify. So there's administrative burden that is involved in there as well. And there's other things to think about.

I think the biggest takeaway from this presentation. I'm going to be wrapping up here in just a few moments.

but I think what I would say, the thing that you want to think about here is that doing your due? Diligence is really important here. There's a lot of dollars at stake, whether you participate in the settlement or choose to opt out and sort of bring your own type of claim.

There is going to be a lot to think about, and you want to make sure you're making an informed decision. We have been working with hospitals, and we've been at no charge sort of doing an economic assessment for hospitals, doing a sort of back of the envelope. If you give us this amount of data, we can go through and analyze it with our economist to sort of give you a sense of

where you might be. Because I think that's going to be very important. You want to make a good decision. There's going to be some hospitals that have

great deals with the blues, where it turns out you, your damages may not be what other folks are. That's few and far between. We haven't seen it much. But

for the most part we're seeing strong damages claims. But you might not be in that situation. You might have some other reason why it doesn't make a lot of sense for for your particular hospital for a lot of hospitals, though it likely will make sense to opt out. If you're willing to to wait, to get the payment and to deal with the administrative burden of litigation that you would wait for that substantially higher sort of potentially transformative type of payment. In an opt out action. So

I am going to open it up for questions. Before I do that. Please don't hesitate to contact me directly after the presentation. If you had questions you didn't get to ask. If you want to know more about the cases. We're we're happy to have that discussion. I do see. There's a really good question already in the chat. If Jolene, if you if you. I don't know if you have questions first.st But I'm happy to jump on this one

Jolene Calla

Jolene Calla

46:22

I was actually just gonna read it to you for the group.

19

Just so everyone can hear it. A question came in that said, I think the proposed settlement agreement referenced providers who opted into the love settlement as an exclusion. How do they even know who opted into that? Can you address that

so, Sean.

Sean Zabaneh

Sean Zabaneh

46:48

Oh, yeah, sorry I I was looking. There's another question box. I was looking at a different question. Let me look at this one just

this one for a second. Okay, the settlement agreement.

Okay? Got it. So the love settlement that was a professional settlement. So that settlement. That's why the professional piece is only 8%,

because their position is that the overwhelming vast majority of professionals in America physicians release their claims in the love case.

So I think there's actually a big open question about that. They're applying it very broadly.

We think their way they're reading that release in that case is to say that only physicians that were licensed to practice after that case have potential claims.

whereas I think we would read it. To say it only released claims up to that date, and not new claims that came after. But that's something to be determined, but I think, for the most part for the for love. If you're not a physician, if you're a hospital or health system, it's not likely going to impact you. But

that would be on the due diligence list we would do in terms of looking at an opt out claim to see. Is there some reason you're released? Again for hospitals? It's not likely going to be from love, but it could be from something else.

Think we have a few more in the Q. And a box jolene.

Jolene Calla

Jolene Calla

48:13

Yep. Go ahead, Shawn. You keep going.

20

Sean Zabaneh

Sean Zabaneh

48:15

Okay? I see there's a question here. I I see what you're saying about the potential for opt out calculation. But if every hospital were to opt out. Doesn't this potentially dilute the amount to be distributed to each? So that's an excellent question.

there is likely in the settlement agreement what's called a blow up provision that says, if too many hospitals opt out, the whole settlement will blow up.

These are standard in these types of settlements. We don't know what the blow up threshold is because it appears to be submitted to the court in camera.

but

they know these cases very well, the defendants do. Obviously they settled one before, so they will have likely baked into the settlement amount and anticipation of a certain number of opt outs. But we don't know exactly what the amount is, and so, you know, it's hard to say. But the bottom line is, if too many opt out.

it blows up the settlement.

you can still opt out. You can still buy your case, but that's where that will be. As for the settlement, it also prevents those who do participate from getting a windfall. So let's say, every hospital in America but 2 opt out.

It's not going to be that those 2 hospitals are splitting 2 billion dollars. So you know, that's why they have the flaw provisions. So that's the answer to that.

Jolene Calla

Jolene Calla

49:34

And just Sean, just real quick for the non lawyers in camera means in private. So it's not public.

Sean Zabaneh

Sean Zabaneh

49:40

21

Yes.

okay, I'm just gonna try to go in order as the questions are coming in. Another one says I read someplace that you can only get the injunctive relief if you opt in. Is that the case? So

the the injunctive relief question is a complicated one. Because much of the injunctive relief that they're offering is systemic, and it is very hard for us to imagine how they're going to implement some of these things in a way that excludes some providers, but not others. So

it is very possible that you will get to take advantage of these things because they will just become system wide if implemented. But you may not. I think it really depends on a hospital by hospital basis. What things you care about the most in there. That is the the 1st thing

and we can sort of analyze that with you. I also think that if you opt out. You have the chance to craft your own injunctive relief to demand your own terms and things that might be more important to your hospital. So that's sort of an open question on whether you'd get to take advantage of some of the injunctive relief.

next question, does your damages calculation, contemplate a reasonable settlement range, or just the damages that would be claimed. These calculations were trying to do the damages claimed.

This is as for an estimate of what you might settle for. So if you had a hundred 1 million dollar damages claim, and you trebled that to 300 million, and those are your potential damages. What would that settle for? That's a more nuanced discussion, I think, and that's on a hospital by hospital basis, really. But you could assume you'd settle for less than your total damages, but substantially more than what you'd get under the settlement.

Okay.

I saw

after the next question, is there any statute of limitations issues with going back to 2,008 for damages. If you opt out of the settlement.

Great question. There's an old Supreme Court case called American pipe, and there's a doctrine called American Pipe tolling that says, if you are an absent class member, the Statute of Limitations is told, while the class actions pending until the settlement or the certification comes out. That's a very high level description of the case. As with everything in the law, there's always exceptions and other sorts of things, but by and large, if you're a hospital that is covered within the definition of the proposed class.

22

you'll have the benefit of American type pipe tolling, and you'll be able to go back to that earlier damages period.

Next question.

if your provider opts out, are they still able to benefit from the operational improvements. That this is the question I asked before our answer before I think. So. The answer to that one, of course, is, we don't know for sure. At this time you may get some. You may not get others. It's hospital specific.

Will the cost of this settlement be allocated across the various blue plans, or assumed entirely by the Association. Great question, do we get a lot? How are they going to pay for all of this

they can sort of allocate it. How they want, but from what we can tell, it seems pretty clear that they have got the the over a hundred 1 million dollars in reserves and substantial insurance on these claims, and I think that all the different defendants are sort of allocating when it comes to this settlement. I think they're all doing their own contributions and that sort of thing. We don't have complete transparency into that but it's it's largely there.

So there is a high likelihood of them being able to pay. And again, if you bring an opt out claim, very likely it is going to be resolved through settlement as well.

These types of antitrust claims, especially when you have conduct like this that seems so sort of facially anti-competitive. They very rarely go to juries because of the risk. If you go to a jury and you get a judgment, your damages are going to get multiplied by 3 automatically. It's that risk of that trembling of damages that makes it very likely that you're going to do a settlement. And so the question is, do you want to have a settlement sort of on your terms or on other terms.

And I think a related question to that is about like, How does a hospital fund these sorts of cases. I don't want to get too into the details of that on this call, because it's a large group, but I will say there is substantial interest from litigation funders and from law firms in terms of doing contingent fee arrangements where it's not going to cost the hospital. Anything to pursue these cases?

Certainly a hospital could pay just to pursue these cases, but most don't want to take on that kind of risk. So you're going to have financing options that will allow you to take these cases on without the risk of incurring legal fees as they go along.

Let me see here some more questions.

23

so another question here. You mentioned that if you entered into previous settlement agreement you could be excluded. This covers a long period of time, and we enter into settlement agreements for batches of claims over time. Not for payer misconduct.

Does it matter if you opt in or opt out with respect to those releases being used against us.

Okay? So

the answer is, no, it doesn't matter in this sense that if you release these claims you're going to be excluded from the settlement, and you're also not going to be able to bring an opt out claim.

If you release part of the claims, then you'd be able to participate in the settlement or opt out for the part that you didn't release. So the release is going to apply. Either way. It is very complicated to go back in time on a lot of this. And that's this challenge. Everybody's going to have

a lot of the damages. Calculations are going to be done through extrapolation. If you actually look at the plan of distribution, they're asking for data that goes back to 2015, even though your your claims can go back to 2,008, I think, expecting there's going to be a lot of hospitals that don't have data from 2,008 to 2,015 necessarily, if you do great but

there's going to be extrapolation. The same thing goes for releases and for your old agreements. You may or may not have access to everything. Then, again, there's a lot of hospitals I talked to where their provider agreement is executed in like 1999 or 2,000, and they're still operating under that agreement just with some amendments subsequently. So you know, you may have that documentation. But I think an issue everyone's gonna have is sort of going back and figuring out.

you know, if you released or not. So that's something you want to work with council on to sort of figure out? Have we settled cases before? What do we know? What don't we know? Where's our exposure? If there's a gap in information and sort of really thinking through those issues.

the, the, let me see if there's more questions.

Okay, we have just like a couple minutes.

If there's anything else.

Marty Kenyon

Marty Kenyon

56:52

24

Do have an attendee with their hand up, so let me see if she wants to ask the question.

Sean Zabaneh

Sean Zabaneh

56:59

Right.

Marty Kenyon

Marty Kenyon

57:00

Tina, you're you can unmute yourself now

if you'd like to ask a question.

Sean Zabaneh

Sean Zabaneh

57:13

And, Tina, you have your hand up. If you just unmute your your screen you'll be able to ask it.

Marty Kenyon

Marty Kenyon

57:26

No! She took her hand down.

Sean Zabaneh

Sean Zabaneh

57:28

Okay. Might have been just a a mishit.

sean.

Jolene Calla

Jolene Calla

25

57:33

One question that I've had. That maybe you could address that would help be helpful to this group. Who will the notices go to who in the organization is likely to get the notice. Once the court determines the or approves the the settlement.

Sean Zabaneh

Sean Zabaneh

57:52

So that will depend in large part on. So the the participation is dependent on your contracting party. So whoever the contracting entity is, and likely there's going to be a notice provision in that contracting entity that is, who you're going to. Who's going to receive these notices? And certainly. If you have counsel, that's something council can get involved in to help you access the notice.

And I did see. There was also a request for my contact info. Here it is on the screen. Marty, do you mind typing it into the chat? Just maybe my email address is probably the easiest thing for folks to access.

if you if you have any questions after this like I said, I'm really happy to get on a call with anybody. We can schedule a 30 min an hour if you want to. Just sort of talk through your particular situation.

I assume the vast majority of you are in Pennsylvania hospitals, but I think we invited a few folks outside. This applies nationally, this is not just Pennsylvania. So if you're a Pennsylvania health system that owns hospitals in other States. This applies to your hospitals in other States. If you don't have a presence in Pennsylvania.

it still applies to you as well. So this is really a national issue. And we can talk through how it impacts each state as we as the case may be, but if there's.

I guess we're at time now, so I don't want to keep people over. But.

Jolene Calla

Jolene Calla

59:18

Yep.

Well, thank you so much, Sean. I think this was super helpful. The one last thing I will point out for smaller hospitals with less resources. Sean did touch on the fact that there are

litigation funders. So if you fall into that category, please reach out to me or him, and we can give you more information about that, because this really does apply to everybody. And there is definite upside available

to all hospitals. So with that, thank you very much, and I hope everybody has a great rest of your day.

Sean Zabaneh

Sean Zabaneh

59:50

Thank you. Everyone.

27

# Exhibit 3

FILED

2025 Sep-10 PM 07:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| IN RE BLUE CROSS BLUE SHIELD: ANTITRUST LITIGATION | **No. 25-md-10000-RDP** |

| | |
|---|---|
| Alaska Air Group, Inc., *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>Anthem, Inc., *et al.*,<br><br>        Defendants. | **No. 2:21-cv-01209-RDP** |

| | |
|---|---|
| JetBlue Airways Corporation, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>Anthem, Inc., *et al.*,<br><br>        Defendants. | **No. 2:22-cv-00558-RDP** |

| | |
|---|---|
| Bed Bath & Beyond Inc. now known as 20230930-DK-Butterfly-1, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>Anthem, Inc., *et al.*,<br><br>        Defendants. | **No. 2:22-cv-01256-RDP** |

## THE PARTIES' JOINT SUBMISSION REGARDING COORDINATION BETWEEN THE ASO ACTIONS AND PROVIDER OPT-OUT ACTIONS

The parties to the above-captioned ASO Actions and the transferred Provider Opt-Out Actions (identified in Appendix A) (together, the "Parties") respectfully submit this Joint Report pursuant to the Court's August 8, 2025 Order regarding coordination between these cases. This report follows the Parties' August 28, 2025 meet and confer, and additional discussions and correspondence, and sets forth preliminary case management matters (Section I),

and the Parties' respective positions on coordination (Section II, the Blues; Section III, the National Account Opt-Out Subscribers; and Section IV, the Provider Opt-Out Plaintiffs).

## I. APPOINTMENT OF LEADERSHIP COUNSEL AND A SPECIAL MASTER

### A. APPOINTMENT OF LEADERSHIP COUNSEL

To facilitate communication and promote coordination between these cases, the Blues and ASO Plaintiffs have agreed to the appointment of Leadership Counsel. Leadership Counsel will serve as the spokesperson and primary point of contact for each side's respective group while these cases are pending in the Northern District of Alabama. The appointment of Leadership Counsel is not intended to, and shall not, replace necessary communications with counsel for individual parties on individual issues (*e.g.*, discovery issues unique to a specific party). The Blues propose Karin DeMasi as Leadership Counsel for the Blues. ASO Plaintiffs propose Phil Cramer as Leadership Counsel for the National Account Opt-Out Subscribers.

The Provider Opt-Out Plaintiffs respectfully submit that the appointment of Leadership Counsel is not customary in individual opt-out cases and is not necessary in this case. The term "leadership" as it is typically understood in MDL proceedings, is most often employed in representative actions, such as class actions and mass torts. The court selects a lead counsel or committee of lead attorneys to "represent" absent parties pursuant to Federal Rule of Civil Procedure 23. But this is *not* a representative action. No party is absent and they are all represented by counsel of their choice with their own separate attorney-client relationships. Each of the various health systems, hospitals, and other healthcare providers that make up the Provider Opt-Outs chose to seek individualized relief and to prosecute its claims in a separate case; each Provider Opt-Out must be able to control the strategy and litigation of its own claims.

Accordingly, there are limits to the structure an MDL transferee court can impose from a leadership perspective.

Notwithstanding the inherent differences between representative and direct actions, Provider Opt-Outs share the Court and Special Master's interest in ensuring these actions proceed efficiently. Provider Opt-Outs are therefore open to appointing liaison counsel for specific *administrative* purposes set forth in an agreed-upon court order, such as scheduling or relaying messages to or from the Court or Special Master, and coordinating with the Blues and ASO Opt-Outs where it would be efficient. The Provider Opt-Outs are willing to work together, in good faith, to first prepare a proposed order that spells out the precise responsibilities of the liaison counsel and then select appropriate liaison counsel.

### B. APPOINTMENT OF A SPECIAL MASTER

The parties to the Provider Opt-Out Actions agree to, and respectfully request the appointment of, a Special Master to assist the parties with issues relating to coordination, and to attempt to resolve informally discovery disputes, scheduling and other issues that may arise. The parties to the Provider Opt-Out Actions respectfully suggest the appointment of Edgar C. Gentle, III, of Gentle, Turner & Benson LLC, who has successfully played this role in the ASO Actions, as well as in the MDL class actions. Attached as Appendix B is a proposed order for appointment of Mr. Gentle as Special Master.

### II. BLUES' POSITION ON FURTHER COORDINATION

### A. PRELIMINARY CASE MANAGEMENT MATTERS

#### i. Status of the Federal Provider Opt-Out Cases

At present, 20 Provider Opt-Out Actions, identified in the attached Appendix A, have been transferred to this MDL for coordinated pretrial proceedings. For any additional

3

Provider-track opt-out case filed in federal court,[1] Defendants will promptly tag such action to the MDL and Provider Opt-Out Plaintiffs have agreed not to oppose transfer.  With very few exceptions, service has been waived, effectuated or is underway for all pending cases.

### ii.   **Protective Orders**

To facilitate coordination, the Blues are prepared to make substantial amounts of discovery available as soon as all necessary protective orders are in place.  As parties to the MDL, the Provider Opt-Out Plaintiffs are already bound by the MDL Protective Order (*see* MDL Dkt. 550 at 1-2).  In addition, given that the parties anticipate the exchange of meaningful structured data that includes HIPAA-protected information, Defendants have sent to Provider Opt-Out Plaintiffs a draft proposed vendor security requirements order (the "VSR").  The VSR tracks the comparable order entered by this Court in the ASO Actions, and is attached hereto as Appendix C.  Defendants respectfully request the prompt entry of this order.

### B.   <u>BLUES' PROPOSAL ON COORDINATION</u>

Throughout these proceedings, the Court has encouraged the parties to "major on the majors" and to focus on getting the "big rocks in first".  (*See, e.g.*, Apr. 21, 2017 Hr'g Tr. at 20:14-15, MDL Dkt. 1109; Mar. 13, 2024 Hr'g Tr. at 11:11-13, *Alaska Air* Dkt. 428.)  That is precisely what the Blues' proposal for coordination, set forth in more detail below, does.  The biggest "rock" in these antitrust cases is the standard of review to which the alleged restraints will be subject.  That issue determines the burdens of proof that apply, the range of defenses that can be deployed and the breadth of fact and expert discovery that the parties will exchange.  And the issue is common across the ASO and Provider Opt-Out Actions, all of which challenge the

---

[1] Provider Opt-Out Plaintiffs have informed Defendants that at least one additional federal opt-out complaint will be filed in the coming weeks.

same core Blue Rules. In the ASO Actions, standard of review is being teed up for the Court this fall: briefing will be fully submitted by November 2025. (*See Alaska Air* Dkt. 585 at 2.) The Blues' proposal, thus, prioritizes this key issue across the cases by moving quickly and efficiently through the pleading stage in the Provider Opt-Out Actions (*see infra* Section II.B.i); producing promptly to the Provider Opt-Out Plaintiffs the ample standard of review discovery already in the MDL record (*see infra* Section II.B.ii); and prioritizing standard of review briefing on a timeline that allows the Court to achieve maximum efficiency between the Provider Opt-Out Actions and the ASO Actions (*see infra* Section II.B.iii). Finally, the Blues propose a mechanism to address additional areas of overlap and coordination between the Provider Opt-Out Actions and the ASO Actions. (*See infra* Section II.B.iv.)

i.      **Provider Opt-Out Pleadings**

The Provider Opt-Out Actions comprise 20 (soon to be 21) separate complaints brought by 600+ named plaintiffs and seek damages on behalf of more than 7,000 individual providers. (*See, e.g.*, *Adventist Health Sys. Sunbelt Healthcare Corp., et al. v. Blue Cross and Blue Shield Ass'n, et al.*, No. 25-cv-2367 (N.D. Ill.), Dkts. 1 (200-page complaint), 1-01 (76-page appendix listing 2,100+ related entities on whose behalf the complaint is brought).) Responding to these complaints individually under the Federal Rules would be exceedingly burdensome; answering the complaints alone would require Defendants to collectively serve and file 660 answers.[2] Faced with such circumstances, MDL courts routinely order the plaintiffs to

---

[2] Provider Opt-Out Plaintiffs are wrong that this can be avoided through consolidated answers as to each complaint. All but two complaints name 30+ Blue Defendants and make Defendant-specific allegations; as such, each Defendant will have to answer separately. Moreover, even Provider Opt-Out Plaintiffs' approach would involve 20+ answers. Provider Opt-Out Plaintiffs' suggestion to follow the approach in the ASO Actions likewise fails: the ASO Actions are three complaints with approximately 60 plaintiffs—not dozens of complaints brought by several hundred plaintiffs comprising several thousand providers. Indeed, the experience of answering the ASO Action complaints (burdensome on its own) only confirms that a different procedure is needed here.

file consolidated complaints.  (*See, e.g.*,  *In re: MultiPlan Health Ins. Provider Litig.*, MDL 3121, No. 1:24-cv-06795 ("*MultiPlan*") (N.D. Ill.), Dkt. 161 at 2; *In re: Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, MDL 3047, No. 4:22-md-03047 (N.D. Cal.), Dkt. 111 at 2; *In re: Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Prods. Liab. Litig.*, MDL 2738, No. 3:16-md-02738 (D.N.J.), Dkt. 74 ¶ 7; *see also* MDL Dkt. 79 at 2.) This is the approach that the Special Master suggested to the parties here, and the Blues agree that consolidated complaints make sense, particularly given that the Provider Opt-Out complaints are largely copycats of each other (and of the MDL class action complaints).  Below is the Blues' specific proposal for consolidated complaints and responses in the Provider Opt-Out Actions; it ensures that the parties and the Court are not bogged down for months (or longer) in the initial pleading stage, but rather can move to substantive phases of the case where the Court and parties can maximize efficiencies on issues common with the ASO Actions.  Defendants shared this proposal as part of the Court-ordered August 28 meet and confer, but Provider Opt-Out Plaintiffs rejected it, as they set forth below.

        a.          Consolidated Master Complaints.  By **September 30, 2025,** Provider Opt-Out Plaintiffs should serve two consolidated complaints containing all common allegations:  (1) by plaintiffs that assert claims on behalf of providers that include facilities (the "Facility Complaint"); and (2) by plaintiffs that assert claims exclusively as or on behalf of physicians, physician groups or physician organizations (the "Professional Complaint") (together, the "Consolidated Complaints").[3]  Segregating the Provider Opt-Out Plaintiffs in this way will enable future efficiencies—for example, allowing early identification (before

---

[3] Each Provider Opt-Out Plaintiff would participate in only one Consolidated Complaint; any plaintiff asserting both facility and professional claims would participate in the Facility Complaint.

significant, expensive and burdensome discovery) of those professionals that have already released their antitrust claims against the Blues through the prior class action *Love* settlements.[4] (*See* MDL Dkt. 2902 at 11 ("Providers' claims in this MDL fall squarely within the scope of the *Love* releases"); *see also* MDL Dkt. 2754.)

        b.      <u>Plaintiff-Specific Short-Form Complaint</u>.  In addition to the Consolidated Complaints, by **October 30, 2025**, each individual Provider Opt-Out Plaintiff will serve a short-form complaint ("SFC") setting forth Plaintiff-specific allegations.  The SFCs will allege the "plaintiff-specific" "factual questions" that Plaintiffs claim to assert (JPML Dkt. 951 at 1; *see also* JPML Dkt. 911-1 at 5), positioning the Blues to effectively test those assertions in discovery.  Defendants' proposed form SFC is attached hereto as Appendix D.[5]  To ensure that the MDL Court's rulings on the pleadings, if any, are operative and effective in the transferee courts post-remand, the legally operative pleading for each individual plaintiff will be the combination of (i) the relevant Consolidated Complaint (Facility or Professional) and (ii) that Plaintiff's SFC; at the same time, each case should retain its individual nature, including for purposes of *Lexecon* rights, *see Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 40 (1998).  This is the approach the MDL court recently adopted in the *MultiPlan* litigation, where counsel for many of the parties are also counsel here.  (*See MultiPlan* Dkt. 179 at 2 (ordering that the consolidated pleadings "will supersede and replace all claims in any . . . action pending in this MDL" and that the consolidated complaint "combined with the Short Form

---

[4] As an example of how this would facilitate efficiency, having a Professional Complaint would allow the *Love* issue to be analyzed simultaneously with the same analysis underway as part of the Provider settlement administration.  Involving the Special Master in this parallel analysis would create substantial efficiency.

[5] Defendants shared the proposed SFC and invited Provider Opt-Out Plaintiffs to comment, but received no edits.

Complaint filed by that Plaintiff . . . shall be deemed that Plaintiff's legally operative pleading").)

          c.      <u>Responsive Pleadings</u>.  Assuming the above procedures are implemented, each Defendant agrees to respond to each of the two Consolidated Complaints by **December 1, 2025** with one of the following:  (i) a motion to compel arbitration pursuant to any applicable arbitration agreement; (ii) a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2);[6] or (iii) for any Defendant not responding pursuant to (i) or (ii) above, a single consolidated answer for each of the Consolidated Complaints that contains a general denial of the allegations in the Consolidated Complaint.[7]  To accompany the consolidated answer—and to address, on the front-end, some of the inefficiencies that the parties had to work through in the early days of the ASO Actions—Defendants agree to create a master list of all affirmative defenses and counterclaims that any Blue intends to assert (the "Defenses and Counterclaims List").  Each Defendant would agree to use the Defenses and Counterclaims List to identify each affirmative defense and/or counterclaim asserted by that Defendant, using the numbering from the common Defenses and Counterclaims List.  In agreeing to limit themselves to such responsive pleadings at this stage, Defendants would expressly preserve for appeal, as if made and decided in the MDL, any Rule 12(b) motion to dismiss argument previously made and decided in MDL No. 2406.  Defendants would also expressly preserve their right to make any appropriate motions under Rule 12(b)(1) and under Rule 12(c) of the Federal Rules of Civil Procedure on the timeframe permitted under the rules.  Defendants would prepare

---

[6] Defendants understand that the Court has already ruled on issues related to personal jurisdiction in the MDL (*see* MDL Dkts. 204, 369, 469, 925); however, unlike with the other motions, certain Defendants believe they need to move under Rule 12(b)(2) in these Actions in order to preserve this issue for appeal.

[7] For efficiency, answers would not be required as to any individual SFC, unless ordered by the Court.  (*See, e.g.*, *MultiPlan* Dkt. 179 at 6.)

8

and present a stipulation to this effect to the Court, should the Court agree with these procedures. *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 841 (6th Cir. 2020) ("[A]n MDL court has broad discretion to create efficiencies and avoid duplication—of both effort and expenditure—across cases within the MDL."); *In re Equity Funding Corp. of Am. Sec. Litig.*, 416 F. Supp. 161, 176 (C.D. Cal. 1976) ("[T]he consolidation of pleadings for pretrial purposes is within the discretionary power of the district court, particularly in the context of complex pretrial proceedings pursuant to 28 U.S.C. s 1407(a).").

## ii.      Initial Discovery Matters

Consistent with their goal of moving the Provider Opt-Out Actions expediently past the pleading stage, the Blues are proactively working to get Provider Opt-Out Plaintiffs access to relevant discovery. This is so, even though the Blues have not yet answered a single complaint (and in some cases, have not yet been served), and Provider Opt-Out Plaintiffs have not yet served a single discovery request. The status of those efforts, and proposed next steps, are set forth below.

a.      <u>MDL Unstructured Documents</u>. Defendants proposed that they make reproductions of their underlying MDL documents to Provider Opt-Out Plaintiffs, the same as they did to ASO Plaintiffs. During the meet and confer process, counsel for ASO Plaintiffs proposed an even more efficient approach: rather than require Defendants to reproduce their MDL documents yet again, ASO Plaintiffs could simply grant access to their database containing such documents to Provider Opt-Out Plaintiffs.[8] This approach makes sense for everyone for a host of reasons, including that (i) there is overlap of counsel between the Provider Opt-Out

---

[8] Despite Mr. Cramer questioning whether his participation was needed during several of the Parties' coordination meetings, the Blues found Mr. Cramer's involvement to be both necessary and affirmatively helpful.

9

Actions and the ASO Actions (indeed, Jon Corey, who has served as a spokesperson for the Provider Opt-Out Actions, is also counsel in the ASO Actions), and such counsel does not need duplicative access to the same documents; and (ii) the ASO Plaintiffs' database already contains additional relevant materials beyond those originally produced in the MDL (*e.g.*, more recent copies of Blue Rules that both sets of plaintiffs challenge). This approach affords Provider Opt-Out Plaintiffs quick access to more than 10 million documents—*without ever serving a single discovery request*. In addition, for any Defendant that did not produce the entirety of its MDL document production to ASO Plaintiffs, such Defendant would make an additional reproduction to Provider Opt-Out Plaintiffs. Attached as Appendix E is the reproduction proposal that Defendants made to Provider Opt-Out Plaintiffs, which productions would be substantially complete by **November 7, 2025**. Furthermore, Defendants have already offered to meet and confer with Provider Opt-Out Plaintiffs regarding their questions about their respective MDL document productions as part of the Rule 26(f) and Rule 16 process (*see infra*). As the Blues have explained to Provider Opt-Out Plaintiffs, many of their questions will be answered by obtaining access to the documents themselves, and most of the additional, highly detailed information Provider Opt-Out Plaintiffs seek does not exist in a form that could be readily provided by the Blues.

     b.  <u>MDL Structured Data</u>. Again, based on the Blues' proactive outreach, the parties to the Provider Opt-Out Actions are negotiating what structured data from the MDL will be reproduced in the Provider Opt-Out Actions. As set forth above, Defendants proposed a VSR to Provider Opt-Out Plaintiffs more than two weeks ago, and request that it be entered so that structured data can be reproduced.

10

c.       Additional Discovery/Rule 26 Conference.  Given the significant amount of discovery that will be made available to Provider Opt-Out Plaintiffs through the means set forth above, additional discovery of Defendants in the Provider Opt-Out Actions, if any, can and should be tailored to be non-duplicative of discovery already provided to Provider Opt-Out Plaintiffs.  (*See* JPML Dkt. 951 at 2 ("Transfer thus will eliminate the potential for duplicative discovery.").)  As Provider Opt-Out Plaintiffs make clear (*see infra* Section IV.A.), Defendants will of course need full discovery of Plaintiffs, which should begin after the Rule 26(f) conference.

Defendants have also considered how the new Proposed Rule 16.1 of the Federal Rules of Civil Procedure can assist the parties and the Court in effectively managing discovery in these Actions.  Among other things, pursuant to Proposed Rule 16.1(c)(4), Defendants will request fact sheets from each Provider Opt-Out Plaintiff in connection with early discovery to better understand the factual bases for each Provider Opt-Out Plaintiff's claims and to help the Court and the parties streamline case management.  Defendants are prepared to discuss this issue further at the upcoming September 24 status conference, so that the parties may proceed with satisfying their obligations under Rule 26(f) and Rule 16.

### iii.       Standard of Review

Among the reasons the JPML cited for its decision to transfer these cases was to "address legal questions common to the opt-out plaintiffs" and to "eliminate the potential for . . . inconsistent rulings".  (JPML Dkt. 951 at 2.)  As discussed above, the threshold legal issue in these coordinated cases is what antitrust standard of review applies to the challenged conduct.  Defendants thus maintain that setting the standard of review should be prioritized in the Provider Opt-Out Actions, as it was in the underlying MDL (*see* MDL Dkt. 1226), and the ASO Actions

11

(*see Alaska Air* Dkt. 585). Deciding this issue early and consistently across cases will help the parties to the Provider Opt-Out Actions to focus on fact discovery and to fully evaluate the relevant expert issues. (*See, e.g.*, MDL Dkt. 1226 (Discovery Order 51); *see also* Apr. 21, 2017 Hr'g Tr. at 20:14-15, 18:4-5, MDL Dkt. 1109.) Briefing the standard of review promptly will also create efficiencies for the Court, as it is already accepting standard of review briefing in the ASO Actions this fall. Because these actions challenge many of the same alleged restraints, efficiency is served by having the issues briefed before the Court as contemporaneously as possible to enable it to decide this critical issue once across all cases.

Moreover, because of Defendants' agreement to forego certain Rule 12 motions (*see supra* Section II.B.i.c) and accelerate Provider Opt-Out Plaintiffs' access to discovery (*see supra* Section II.B.ii), the parties to the Provider Opt-Out Actions are well positioned to brief this issue promptly. Indeed, many of the Provider Opt-Out Plaintiffs cite extensively to the Court's prior standard of review decisions in their complaints, confirming Plaintiffs are already well-versed in these issues. (*See, e.g.*, *Temple Univ. Health Sys., Inc., et al. v. Blue Cross Blue Shield Ass'n, et al.*, No. 2:25-cv-01156 (E.D. Pa.), Dkt. 1 ¶¶ 224, 239, 285-87; *Adventist Health Sys. Sunbelt Healthcare Corp.*, Dkt. 1 ¶ 30.) Provider Opt-Out Plaintiffs' position that standard of review briefing must await full discovery—as it supposedly did in the MDL and ASO Actions (*see infra* Section IV.C)—ignores that both cases required *new* discovery. The MDL required discovery because it was the first case where the issue was considered for the first time; and the ASO Actions required discovery because self-funded purchasers were never part of the MDL (having been added at the very end of the Subscriber MDL for settlement purposes and then filing their own, new direct actions). Provider Opt-Out Plaintiffs, in contrast, were absent class members throughout the Provider-track MDL and are now again parties to the MDL. As such,

12

they will be granted access to the full MDL standard of review discovery record that already exists. Full provider discovery on those issues has been taken and will be made available.

Indeed, Provider Opt-Out Plaintiffs' position—stated in the meet and confer and again below—is that, as parties to the MDL, they believe the Court's prior decisions setting the standard of review in this MDL (*see* MDL Dkts. 2063, 2933, 2934) already apply to them, making additional briefing on standard of review unnecessary. Defendants agree that Provider Opt-Out Plaintiffs' Price-Fixing Claims and Group Boycott Claims for the entire period (2008 to present), and their Horizontal Market Allocation Claims for the period commencing April 2021 (to present) are governed by the rule of reason, for all the reasons this Court has previously held. (*See* MDL Dkts. 2063 at 49-54; 2933; 2934.) Should the Court agree to follow its prior rulings as to these claims and time periods, the Blues agree that no further briefing on these issues is needed.

With respect to Provider Opt-Out Plaintiffs' Horizontal Market Allocation Claims for the period prior to April 2021 (*i.e.*, from 2008 to April 2021, when the National Best Efforts rule was in effect), Defendants maintain that the rule of reason also governs. This is for, among other things, the very same reasons previously identified by and discussed with this Court in connection with the ASO Actions and the underlying Provider-track MDL. (*See, e.g.*, Feb. 7, 2025 Hr'g Tr. at 23:2-5, MDL Dkt. 3272; Apr. 4, 2025 Hr'g Tr. at 115:2-3, *Alaska Air* Dkt. 578; *see also Alaska Air* Dkts. 488, 512.) The Blues therefore respectfully propose that the Provider Opt-Out Actions proceed efficiently to standard of review, so that the Court has the opportunity to consider and decide the pre-April 2021 standard of review for the alleged "Market Allocation Conspiracy"—an issue that is common to all these cases—once across both the ASO Actions and

13

the Provider Opt-Out Actions.[9]  As Defendants have already stated, they are not requesting any change to the standard of review briefing schedule in the ASO Actions, which will be completed this fall and ripe for decision; rather, Defendants submit that standard of review should be the first stage in the Provider Opt-Out Actions.  This will allow the Court to have the benefit of briefing in all coordinated actions, and will afford the MDL parties the clarity of the Court's decision on this critical issue early in discovery.  Defendants do not believe that any special provisions for, or changes in, the parties' historic filing and sealing practices (*see infra* Section III) are necessary or warranted to achieve these efficiencies.  This Court has developed the current procedures the Parties follow after more than a decade of experience with these cases; and there is no reason to change or depart from them now.

To accomplish this coordination, Defendants propose the following briefing schedule to set standard of review on the Provider Opt-Out Plaintiffs' Horizontal Market Allocation Conspiracy claims for the period prior to April 2021:  (1) opening briefs due on **January 23, 2026**; (2) opposition briefs due on **March 20, 2026**; and (3) reply briefs due by **April 17, 2026**.

### iv.  Further Matters

As part of the Rule 26(f) process described above (*see supra* Section II.B.ii.c), Defendants agree to work to identify additional areas of overlap and efficiency, so that issues that are common across the Provider Opt-Out Actions and the ASO Actions, such as certain

---

[9] Standard of review is also set to be briefed in the first of the California state court opt-out cases (*i.e.*, the *Prime* Action) by May 2026.  (*See* Case Mgmt. Order Re Schedule for Determining the Standard of Review, *VHS Liquidating Tr. v. Blue Cross of Cal.*, No. RG21-106600 ("*Prime*") (Cal. Super. Ct. – Alameda Cnty. May 21, 2025).)  Defendants maintain that this Court and the California state court (the Honorable Somnath Raj Chatterjee) should informally coordinate on standard of review to ensure consistency, in particular, for purposes of setting standard of review.  Such coordination is warranted here given not only the near identity of issues, but also the overlap of counsel: the Bartko firm is counsel in both the ASO Actions and *Prime*, and the Paul Hastings firm is counsel in certain Provider Opt-Out Actions and in an additional California state court opt-out action (*Regents*).

summary judgment motions, need only be addressed and decided by the Court once. As shown in the Venn Diagram Defendants previously submitted to the Court (reattached as Appendix F for the Court's convenience), there is ample opportunity for additional coordination between the Provider Opt-Out Actions and the ASO Actions. Defendants anticipate front-loading and expediting these common issues for decision in the Provider Opt-Out Actions—as with standard of review in order to benefit the Court and without delaying resolution of these issues in the ASO Actions.

Although the opportunities for, and benefits of, coordination are obvious, Defendants are not surprised that ASO Plaintiffs and Provider Opt-Out Plaintiffs are resisting them (*see infra* Sections III, IV.A): that is because these Plaintiffs participate on opposing sides of a two-sided platform and hold positions that are inherently at odds with each other. However, this is precisely why coordination is so important—to ensure that the rulings across these cases are not only consistent, but also reflect the market dynamics happening on both sides of the market and that inevitably affect both sets of cases.

## III. NATIONAL ACCOUNT OPT-OUT SUBSCRIBERS' POSITION ON COORDINATION

The National Account Opt-Out Subscribers understood the Court's order to direct the various parties to discuss potential avenues for coordination among the National Account Subscriber Opt-Out Actions and the Provider Opt-Out Actions. Counsel for the National Account Subscriber Opt-Outs participated in all of the meet and confers regarding coordination and offered insights from their past five years of dealings with Defendants in an effort to assist both the Blues and the Provider Opt-Outs mitigate the burdens associated with discovery. As reflected above, Defendants spent the majority of time addressing intra-Provider Opt-Out coordination as opposed to inter-ASO and Provider Opt-Out coordination. Indeed, the meet and

15

confers resembled a Rule 26(f) conference in the Provider Opt-Out cases more than an inter-action coordination call among representatives for all three groups. Counsel for the National Account Opt-Out Subscribers tried to focus the conversation regarding actual areas of coordination among the cases.

Toward that end, Counsel for the National Account Subscriber Opt-Outs offered avenues for counsel in the Provider Opt-Out Actions to benefit from the immense work undertaken by counsel in the National Account Subscriber Opt-Out actions to create a discovery record and organize it in a 30.9 (and counting) terabyte document database. This proposal would obviate Defendants' need to reproduce more than 1,000 (and growing literally every day despite the close of document discovery 9 months ago) document productions amounting to more than 20 million documents produced to the National Account Opt-Out Subscribers. Such access would relieve Provider Opt-Outs from having to construct a document database of their own. Subscriber Opt-Outs have documented the out-of-pocket costs (not including the millions of dollars in attorney, paralegal, and other professional time expended) they have incurred related to this database and worked with Provider Opt-Outs to explore a mutually-amenable solution. Subscriber Opt-Outs also offered to transfer complete deposition packages of the more than a hundred depositions taken by Subscriber Opt-Outs in their proceedings. Subscriber Opt-Outs and Provider Opt-Outs are working to refine details of an agreement for this turnkey solution.

Subscriber Opt-Outs believe that the aforementioned solution likely represents the extent to which discovery may be coordinated among the various actions given the September 26, 2025 end of fact discovery in the Subscriber Opt-Out actions. Subscriber Opt-Outs do not foresee any other meaningful or productive avenues for coordination given the different procedural postures of the cases and the Court's prior rulings in the MDL. Toward this end, the

16

Subscriber Opt-Outs engaged in productive dialogue with Defendants to ensure that the pre-trial schedules remain fully intact in the Subscriber Opt-Out cases, and, all parties have confirmed that nothing in the Provider Opt-Out cases shall cause any delay in the Subscriber Opt-Out actions, including with respect to the standard of review briefing, argument on that briefing, any decision to be rendered by the Court, the service of expert reports, and the filing of motions for summary judgment.

Defendants explained in a prior filing (*Alaska Air* Dkt. 359) that "the MDL litigation explored a wide range of issues with little-to-no connection to the ASO Plaintiffs' current claims" and expressed incredibility at how, in the context of expert reports, "*any reports from the Provider track might be relevant to their case.*" *Id*. at 2, 4. Subscriber Opt-Outs agree with the Provider Opt-Outs that there is minimal utility for coordination on non-discovery matters as the following Venn Diagram illustrates:



Subscriber Opt-Outs agree with Defendants that issues "need only be addressed and decided by the Court once." *Infra* at 14. However, Subscriber Opt-Out's experience thus far has been that

17

Defendants repeatedly seek reconsideration of the Court's decisions, including those related to the standard of review, discovery parameters, claims of two-sided market considerations, jurisdiction and venue, affirmative defenses, and motions to dismiss. Subscriber Opt-Outs welcome Defendants' indication that they will now accept this Court's prior (and future) decisions, which should streamline the forthcoming briefing on the standard of review in the Subscriber Opt-Out cases. Accordingly, the only remaining coordination on non-discovery matters that could arise as summary judgment approaches in the Subscriber Opt-Out cases (December 17, 2026) may involve certain overlapping affirmative defenses asserted by Defendants that have not yet been previously addressed by the Court and that may be presented for adjudication.

Defendants have asked that Provider Opt-Outs receive access to the standard of review briefing in the Subscriber Opt-Out cases. It is anticipated that the primary reason that any such materials would be filed under seal would be Defendants' designation of their materials under the protective order. Accordingly, Subscriber Opt-Outs suggest that within five days of the filing of any standard of review submission, each side shall identify any information from the opposing parties' filings that they request redaction, including any third-party material produced pursuant to a subpoena issued by that party. The party shall then file a public redacted version of such filing within five days thereafter. The sharing (presumably by the Blues) of any material that remains under seal may then be addressed. With respect to the parties' prior filings in response to the Court's show cause order (*Alaska Air* Dkt. # 493), the parties should identify by September 18, 2025, any information, including exhibits, they seek to remain under seal. If there are no redactions to a submission, then it shall be unsealed. If there are redactions, then the party requesting such redactions shall prepare a redacted version of the filing/submission and file it on

18

the public docket.  The National Account Opt-Out Subscribers suggest that the wholesale filing of exhibits under seal should be discouraged and only those portions of exhibits that actually contain confidential information akin to trade secrets should be redacted pursuant to the process set forth above.  This will both minimize sealing on the docket and facilitate how any material that remains under seal/redacted may then be addressed by the parties.

## IV.    PROVIDER OPT-OUTS' POSITION ON COORDINATION

### Preliminary Statement[10]

The Provider Opt-Out Plaintiffs ("Provider Opt-Outs") are a group of diverse health care providers from across the country, including well-known health systems, children's hospitals, religious non-profits, state-run university health systems, award-winning research hubs, and specialized cancer treatment centers.  The Provider Class Settlement required each provider to make a choice to remain in the class or to opt-out based on the information available to it and considering its own circumstances.  After careful consideration of its statutory and contractual obligations to its respective constituents, each Provider Opt-Out Plaintiff ultimately decided to file an exclusion request and to pursue its own claims.  Each Provider Opt-Out had its own reasons for making this important choice and selected its own counsel to represent its unique interests.  In total, the Provider Opt-Outs have filed twenty federal complaints in various jurisdictions, including several complaints in the Northern District of Illinois, the Northern District of California, and the Eastern District of Pennsylvania that have now been consolidated by the Judicial Panel on Multidistrict Litigation in this Court.[11]

---

[10] It should be noted that the Parties could not reach agreement on the order in which to present their respective positions.  While Provider Opt-Outs believe that, as Plaintiffs, their position should come first, the Blues insisted on the opposite ordering that has been implemented in this filing.

[11] This number includes the currently stayed *Anesthesia Associates of Ann Arbor* or "*A4*" action pending before the Court after transfer from the Eastern District of Michigan.  *See Anesthesia Assocs. of Ann Arbor PLLC v. Blue*

The Provider Opt-Outs intend to handle their cases efficiently, including by coordinating where possible with the other parties in the action. The Provider Opt-Outs appreciate the Court's issuance of the August 8, 2025 Order directing counsel for the Blues, Subscriber Opt-Out Plaintiffs ("ASO Opt-Outs"), and the recently consolidated Provider Opt-Outs "to meet and confer *to consider what, if any*, coordination would be appropriate between the ASO opt-out cases and the Provider opt-out cases."[12]

On August 12, 2025, Special Master Gentle hosted a conference for the Blues, ASO Opt-Outs, and Provider Opt-Outs to facilitate the Court's instruction. Special Master Gentle instructed the Parties that the joint report regarding potential coordination should focus on three topics: (1) potential liaison counsel, (2) coordination on the sharing of the existing discovery record developed in the MDL and ASO Opt-Out actions, and (3) whether consolidated pleadings should be prepared. Provider Opt-Outs have met and conferred with the Blues and ASO Opt-Outs several times and address each topic, in turn, as requested by the Special Master. Of course, since the Court ordered discussions were kicked off by Special Master Gentle, his appointment was also an inherent topic, as addressed above.

In addition to these topics specifically identified by Special Master Gentle, and inherent to the Court's directive, the Blues have insisted on premature advocacy for other complex procedural and scheduling issues regarding standard of review in the narrowly focused report requested by

---

*Cross Blue Shield of Mich.*, No. 2-23-cv-00461-RDP (N.D. Ala.), April 11, 2023 Notice of Multidistrict Litigation Transfer, Dkt. No. 71. It also includes four additional actions pending transfer by the Judicial Panel of Multidistrict Litigation pursuant to Conditional Transfer Orders issued on September 3 and 8, 2025. *See* CTO-47, JPML Dkt. No. 1010; CTO-48, JPML Dkt. No. 1012. There is at least one additional complaint that will be filed by a firm that previously filed a Provider Opt-Out complaint, which would bring the total number of complaints to 21.

[12] *Alaska Air Grp, Inc., et. al. v. Anthem, Inc., et al.*, No. 2:21-cv-01209-RDP (N.D. Ala.), Dkt. No. 613 at 2 (emphasis added); *JetBlue Airways Corp., et al., v. Anthem, Inc. et al.*, No. 2:22-cv-00558-RDP (N.D. Ala.) (emphasis added), Dkt. No. 537 at 2; *Bed Bath & Beyond, Inc., et al., v. Anthem, Inc.*, No. 2:22-cv-01256-RDP (N.D. Ala.), Dkt. No. 504 at 2 (emphasis added).

the Court and the Special Master. The Provider Opt-Outs welcome a discussion of any and all topics that would facilitate an expeditious resolution of this complex litigation and, following the upcoming status conference, anticipate the Parties doing so with the benefit of the Court's guidance. However, the additional standard of review advocacy presented by the Blues contains significant legal issues and, as such, require more discussion and consideration than a joint report can adequately address.

Nonetheless, because the Blues insisted on including such extraneous and premature advocacy, the Provider Opt-Outs have no choice but to include a very preliminary response to this additional topic at the end of this joint report. As explained in more detail below, the Provider Opt-Outs' positions on the issues raised by the Court and the Special Master, and on the Blues' extraneous requests, are as follows:

1. Leadership and liaison counsel need not be formally appointed given that the Provider Opt-Out cases are not representative or class actions, but Provider Opt-Outs have provided the Court with their view on the appropriate role of liaison counsel for administrative purposes if the Court chooses to adopt such a structure (*See* Section I (A));

2. Special Master Gentle should be appointed in the Provider Opt-Out cases (*See* Section I (B)).

3. The Parties agree that discovery should commence promptly. Provider Opt-Outs submit that a Rule 26(f) conference should be done by October 1, 2025, the Parties should submit a Rule 26(f) report fourteen days thereafter, and the Court should schedule a Rule 16 conference to occur as soon as the Court is available after receiving the Rule 26(f) report (*See* Section IV (A));

4. The Parties have already agreed that many of the prior document productions made to the ASO Opt-Outs and in the MDL generally are relevant to the Provider Opt-Out cases, and Provider Opt-Outs should gain access to those productions promptly. Provider Opt-Outs are conferring with the Blues and ASO Opt-Outs regarding the facilitation of such productions (*See* Section IV (A));

5. The Court should order the Blues to provide to Provider Opt-Outs within 30 days of the filing of this Joint Report, information regarding any prior MDL discovery

21

that the ASO Opt-Outs never received but that was previously produced in the MDL Provider Class case and the related information (*See* Section IV (B));

6. Consolidated and short form complaints are unnecessary and inefficient in this opt-out case, and the Blues should serve a consolidated responses to the Provider Opt-Out complaints within 30 days of the Rule 16 conference (*See* Section IV (B)(2)); and

7. Briefing on the standard of review in the Provider Opt-Out cases prior to the conduct of any additional discovery that is necessary for the Provider Opt-Out cases is premature (*See* Section IV (C)).

## A. <u>Coordination on Existing Discovery Record</u>

The Court instructed the Parties to consider "what, if any, coordination" would be appropriate between Provider Opt-Outs and Subscriber Opt-Outs.[13] Since there are unlikely to be significant "new" legal issues in need of resolution at the motion to dismiss stage given the similarity in Provider Opt-Outs' claims against the Blues to those pleading issues already litigated by the Provider Class and ASO Opt-Outs, the propriety of such coordination should be focused on sharing existing records to maximize the efficiency of discovery. Indeed, the Blues argued repeatedly before the Judicial Panel on Multidistrict Litigation that the Provider Opt-Outs' complaints are "near carbon copies" of one another and the Fourth Amended Consolidated Complaint filed in the MDL, which the Court has already determined properly stated a claim.[14] Accordingly, Provider Opt-Outs believe the best way to facilitate a resolution of these cases is to move into discovery in earnest, rather than slowing things down to allow the Blues to file what are essentially motions for reconsideration of issues this Court has already decided.[15] Moving directly to discovery is common practice in antitrust opt-out actions and, while the Blues should obviously

---

[13] *Alaska Air Grp, Inc.*, Dkt. No. 613 at 2; *JetBlue Airways Corp., et al.,* Dkt. No. 537 at 2; *Bed Bath & Beyond, Inc., et al.*, Dkt. No. 504 at 2.

[14] *See* Defs.' Resp. to Pl.'s Mot. to Vacate CTOs, JPML Dkt. No. 817 (May 14, 2025).

[15] To the extent the Blues believe they need to preserve their appellate rights, the Provider Opt-Outs are willing to enter into an appropriate stipulation doing so.

feel free to identify any "new" issues that need to be addressed by motion, the Court should not allow any such motions to impede efficient and orderly progress of the Provider Opt-Out cases.

Provider Opt-Outs have identified certain ways in which the Parties should leverage prior discovery, where possible, allowing these cases to move expeditiously and enabling Provider Opt-Outs to litigate their individual claims against the Blues efficiently. To that end, the Provider Opt-Outs have proposed that all of the Blues' productions in the ASO Opt-Out actions (which includes partial productions from the MDL and responses to separate discovery requests issued by the ASO Opt-Outs) be considered re-produced in the Provider Opt-Out actions. The Blues have agreed to that proposal and also proposed the production of more information (for example, complete MDL productions in some cases) via letter on September 4, 2025.

The Parties remain in discussions about the possibility for the Provider Opt-Outs to gain access to some of these prior productions via a database used by the ASO Opt-Outs. If those discussions do not bear fruit, then the Blues should be prepared to promptly reproduce copies of the relevant prior productions to the Provider Opt-Outs.[16]

Provider Opt-Outs believe their proposal to access the prior discovery is reasonable and, where possible, it should be used to avoid duplicative efforts, promote efficiencies and expeditiously advance this litigation. Even with such "access," however, further discovery must be conducted in the Provider Opt-Out cases to address significant issues not covered by the MDL Class cases or the ASO Opt-Out cases, because, for example:

   a. MDL document production ended in 2016;

---

[16] Provider Opt-Outs, ASO Opt-Outs, and the Blue Defendants still need to reach an agreement regarding any costs related to such access. By engaging in this negotiation, Provider Opt-Outs are not waiving their rights to obtain this discovery directly from the Blue Defendants or to otherwise engage in their own discovery. Nor are Provider Opt-Outs conceding that any discovery conducted in distinct ASO Opt-Out cases fall under the Common Benefit Doctrine or other legal doctrine giving the ASO Opt-Outs any rights to recovery in the Provider Opt-Out cases. It does not. Rather, Provider Opt-Outs are engaging in this process to facilitate coordination in the action as contemplated by the Court and requested by the Blue Defendants.

b. MDL depositions ended in 2017;

c. The claims at issue in the ASO Opt-Out case focus on different harm caused by the alleged anticompetitive behavior; and

d. The Court's streamlining order focused the Provider track on the Alabama market, which is not the case with the Provider Opt-Out cases. *See* Dkt. No. 469 (Oct. 30, 2015), at 4-6.

Moreover, since the discovery record closed in the Provider Track:

a. Hundreds of agreements and amendments to agreements between the Provider Opt-Outs and the Blues have been negotiated and entered into;

b. The uncompetitive reimbursement rates the Blues have forced upon many Provider Opt-Outs have actually worsened;

c. The uncompetitive reimbursement rates the Blues have forced upon many of the Provider Opt-Outs have dropped relative to other large health insurers;

d. The payment experience with the Blues, both for the local Blue claims and BlueCard claims, has deteriorated;

e. The Blues have supposedly abandoned the National Best Efforts rule;

f. The personnel with whom the Provider Opt-Outs interact at each Blue have changed;

g. Some of the Provider Opt-Outs bringing claims did not exist in 2016;

h. Almost no overlap exists between providers in the State of Alabama where the Court focused the Provider Track and the Provider Opt-Outs; and

i. Ten-plus years of damages have accrued.

More recent discovery in the ASO Opt-Out actions also does not address many key aspects of Provider Opt-Outs' claims, such as contract negotiations, reimbursement rates, payment

experience, and other interactions between the Blues and Provider Opt-Outs, which are not the focus of the ASO Opt-Out cases.

To avoid duplication and actually obtain the benefit of the existing discovery record, as Provider Opt-Outs believe the Court intends, it is essential that the Provider Opt-Outs also receive information from the Blues about the prior productions, deposition testimony, and written discovery, that would allow them to understand the exact contours and limitations of the Blues' previous productions and other discovery materials. The Blues have stated that the prior productions comprise millions of pages of documents and terabytes of data. A "document dump" of this magnitude, without further information, would not allow Provider Opt-Outs to move forward expeditiously with non-duplicative discovery requests. Providing the requested information represents a necessary first step in determining the potential scope and extent of coordination. To date, the Blues have repeatedly refused to respond to basic requests about the parameters of the existing record in these actions frustrating any ability to evaluate relevance and identify areas of potential overlap. *See* Appendix G, Provider Opt-Outs' August 12 Request for Information from the Blues Requests; Appendix H, August 21 Letter from J. Corey to K. DeMasi and Information Requests.

Provider Opt-Outs therefore propose that the Blues be ordered to provide the following information related to their prior productions within 30 days of this Report:

- All of the Blues' written discovery requests and responses pertaining to the MDL and ASO Opt-Out discovery records;[17]

- Any agreed upon search terms, including custodians and/or data sources to which those search terms were applied, and all correspondence among the Blues and respective parties regarding such terms;

---

[17] To achieve efficiency, information responsive to this and the following requests should be provided in unredacted format to the full extent allowed under the current Protective Order.

- Any production log(s) that identify the nature of documents contained in productions;

- Identification of specific portions of the MDL document discovery record not produced to ASO Opt-Outs, including the size and subject matter of the productions withheld;

- Rule 30(b)(6) deposition notices, objections, and communications resolving any disputes;

- All Blue deposition transcripts and exhibits previously provided to the ASO Opt-Outs or authorize the ASO Opt-Outs to release them to Provider Opt-Outs;

- All Blue affirmative and rebuttal expert reports;

- A summary of the size, composition, and contours of all structured data produced in the MDL and ASO Opt-Out cases, including structured data from the National Warehouse Data, and identification of all fields produced, applicable data dictionaries, and all correspondence between the relevant parties related to negotiations on the scope and content of the structured data productions;[18]

- Identification of any structured data the Blues are not willing to deem reproduced or to produce , including non-claims data, actuarial, pricing and rating data requested by MDL Subscribers; non-commercial membership data requested by MDL Subscribers, structured data on subscriber side topics (premiums, billing, member demographics, rating data, product benefit data, etc.), and pharmacy claims data. The identification should include at a minimum the production volume of such data for each Blue, or the bates numbers if the exclusion is for less than a full production volume;

- All third-party subpoenas and responses and related correspondence;

- Identification of all third-party productions and dates of production;

- Identification of any pending and unresolved subpoenas;

- Identification of all custodians, including each custodian's employer and

- Summary of total documents produced by each custodian, data sources (e-mail, shared drives, phone, hard copies, etc.), and the date(s) of production.

---

[18] The Blues have indicated a willingness to produce a substantial amount of structured data but are demanding that Provider Opt-Outs negotiate separately with counsel for each of the 35 Blues. This approach is inefficient and time consuming. In advance of these discussions, the Provider Opt-Outs will need basic information about the prior structured data productions. Not all of the structured data may be useful or necessary, so the Provider Opt-Outs need sufficient information to evaluate whether to accept prior productions or negotiate new and different productions.

26

The information Provider Opt-Outs have requested is straightforward. Provider Opt-Outs are only requesting materials that Blues already possess and can readily identify. Only after the Blues provide this basic information will Provider Opt-Outs be in a position to assess the scope of discovery taken to date, further meet and confer with the Blues to address any gaps or remaining issues and, if necessary, engage with the Special Master to help facilitate a resolution.[19]

Contrary to the Blues' assertion herein that "many of [Provider Opt-Out's] questions will be answered by obtaining access to the documents themselves," access to the documents is not a substitute for the information Provider Opt-Outs request. This is especially so in light of the Blues' assertions that any future discovery must be "tailored" and "non-duplicative." Without the basic information Provider Opt-Outs request, Provider Opt-Outs hands will be tied. As merely one such example, Provider Opt-Outs will not be able to discern search terms from prior productions. Likewise, relying on metadata to identify custodians is not a foolproof method. Ultimately, Provider Opt-Outs request basic information about the scope of prior discovery, not "highly-detailed" or burdensome information, as the Blues would have the Court believe.

To further the prompt commencement of discovery, Provider Opt-Outs also submit that a Rule 26(f) conference should be done by October 1, 2025, the Parties should submit a Rule 26(f) report fourteen days thereafter, and the Court should schedule a Rule 16 conference to occur as soon as the Court is available after receiving the Rule 26(f) report.

### B. Consolidated Pleading

#### 1. Consolidated Opt-Out Complaints Are Not Necessary or Efficient

---

[19] Provider Opt-Outs believe prioritizing the Blues' productions, testimony, discovery responses, and other materials will be the source of efficiency. After Provider Opt-Outs understand the contours of the Blues' discovery record, then a determination can be made whether discussions with Class Plaintiff Counsel and counsel in the *Prime* cases makes sense.

The Provider Opt-Outs propose following the same procedure utilized in the ASO Opt-Out actions, both because it is the established approach and because it represents the most efficient way forward.[20] While the twenty Provider Opt-Out complaints that have been filed ostensibly outnumber the three ASO Opt-Out actions, it is common for defendants in antitrust opt-out actions to file answers to each opt-out complaint, even if the number of such complaints is large. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827 (N.D. Cal.) (defendants answering over ten separate antitrust opt-out complaints filed by large corporate opt-out entities or groups); *In Re: Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917 (N.D. Cal.); *In re Xyrem Antitrust Litigation*, MDL No. 2966 (N.D. Cal.); *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, MDL No. 2724 (E.D. Pa.); *In re LIBOR-based Financial Instruments Antitrust Litig.*, MDL No. 2262 (S.D.N.Y.); *In Re: Rail Freight Fuel Surcharge Antitrust Litig.*, MDL No. 1869 (D.D.C.). The Blues should respond to the individual Provider Opt-Out complaints already on file either via a consolidated Rule 12(b) motion on any "common" issues they believe to be new, or by filing consolidated answers. If the Blues wish to pursue such motions practice, they could do so in a single filing on all common issues within 60 days of the Rule 16 conference. If the Blues choose to file such a motion, then the Provider Opt-Outs will serve a single consolidated response. If any individual Blue believes it has any unique and "new" issues to be raised by Rule 12(b) motion, then they should be permitted to file a supplemental motion, and the appropriate Provider Opt-Out(s) will respond accordingly. If the Blues opt to answer the complaints, Provider Opt-Outs propose that the Blues answer each complaint on a consolidated basis, making generalized denials of the allegations and raising all affirmative defenses and counterclaims pleaded by all or any subset of the Blues. Such answers should be filed within 30 days of the initial status conference.

28

This approach has been standard practice in antitrust opt-out actions for decades and there is no reason for this Court to depart from that practice. For example, in one of the largest series of antitrust opt-out actions on record, *In Re TFT-LCD (Flat Panel) Antitrust Litig.*, defendants either filed a motion or answered more than 10 different plaintiffs' complaints. *In Re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827 (N.D. Cal). And in the *Interchange Fee* MDL, each plaintiff (or group of plaintiffs) maintained separate pleadings throughout the MDL. *See, In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 714 F. Supp. 3d 65, 75 (E.D.N.Y. 2024) (referencing the "Home Depot Compl." Separately from the "7-Eleven Compl." And the "Target Compl."); *see also In Re: Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917 (N.D. Cal.); *In re Xyrem Antitrust Litigation*, MDL No. 2966 (N.D. Cal.); *In re Generic Pharmaceuticals Pricing Antitrust Litig.*, MDL No. 2724 (E.D. Pa.); *In re LIBOR-based Financial Instruments Antitrust Litig.*, MDL No. 2262 (S.D.N.Y.); *In Re: Rail Freight Fuel Surcharge Antitrust Litig.*, MDL No. 1869 (D.D.C.). The Provider Opt-Outs' proposal is more consistent with not only the Federal Rules and typical practice, but also the true function of an MDL. In analyzing 28 U.S.C. § 1407's application to individual "actions" that may be transferred to a single district court, the Supreme Court emphasized that cases in an MDL "retain their separate identities" and are not to be merged into "any monolithic multidistrict 'action' created by transfer." *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 (2015). "After an MDL is formed," moreover, "parties continue to be the master of their individual cases and can take positions different from the other parties ostensibly on the same side of the MDL." *Fed. Ins. Co. v. 3M Co.*, 642 F. Supp. 3d 882, 895 (D. Minn. 2022). Provider Opt-Outs' proposal to simply follow the Federal Rules also maximizes efficiency and simplicity while also minimizing burden. While the Provider Opt-Outs' proposal outlines a simple choice and timeline for either Rule 12(b)(6) motions on any new issues the Blues

29

can identify or answers, the Blues have reserved the rights to make 12(b)(1) motions on unexplained issues, appeal existing 12(b)(6) decisions for unknown reasons, and even make 12(c) motions that have not been justified. The Provider Opt-Outs' proposal minimizes both the number of motions (if the Blues choose to pursue such practice) and the number of total pleadings (if the Blues choose to answer).

Contrary to the Blues' theoretical concern about burden, following the Federal Rules would require as few as 20, not 660, consolidated answers or a single consolidated motion to dismiss. Following the Federal Rules would also be more efficient than the Blues' Frankenstein alternative, which would add months to the schedule as Provider Opt-Outs would need to prepare two consolidated complaints and hundreds of exacting short-form complaints, only for Blues to serve dozens of answers while specifically reserving the right to make unexplained motions with questionable support on the pleadings. It is telling that despite having four to six months to analyze the majority of the Provider Opt-Out complaints, the Blues have been unable to articulate their plan with respect to the filing of responsive pleadings. The Blues' claim that following such typical procedure would be "exceedingly burdensome" is not credible, as they have repeatedly stated on the record that they view the Provider Opt-Out Complaints as "substantively identical to one another and to the Master Provider Complaint in the MDL" and "near carbon copies of the coordinated cases brought by healthcare providers pending in the Northern District of Alabama as part of MDL No. 2406."[21] If so, it is difficult to see how any planned Rule 12(b) motions by the

---

[21] Defs.' Resp. to Pls.' Mots. to Vacate CTOs, JPML Dkt. No. 817 at 1; s*ee also* JPML Dkt. No. 817 at 1 ("The [Provider Opt-Out Complaints] and the Consolidated Fourth Amended Provider Complaint (Dkt. No. 580-10) (the 'Master Provider Complaint') in the MDL share Defendants, causes of action, theories of liability and the same core fact pattern."), at 1-2 ("[Provider Opt-Out] Plaintiffs cannot seriously dispute that each of their actions is nearly identical to one another and to the Master Provider Complaint. These near copy-paste complaints raise common questions of fact and law and are precisely the sort of duplicative, complex cases that are suited to consolidation in an MDL."), at 6 ("The [Provider Opt-Out Complaints] are, in all relevant respects, substantively identical to one another and to the Master Provider Complaint in the MDL: [Provider Opt-Out] Plaintiffs bring the same causes of

30

Blues would be anything other than a request for the Court to reconsider its prior rulings at the pleading stage with respect to the Master Provider Class Complaint. *See* Dkt. No. 204 (denying Defendants' motion to dismiss on the grounds that Provider Class plaintiffs failed to state Sherman Act Section 1 antitrust claims); Dkt. Nos. 1206-07 (denying Defendants' motion to dismiss on the grounds that the Provider Class plaintiffs' failed to state Sherman Act Section 1 rule of reason and Section 2 claims). This is especially so because the Blues suggested to the JPML Panel that there were no new or "unique" issues that the Court would need to consider. Dkt. No. 817 at 7 ("Plaintiffs do not and cannot show that there are 'unique' issues of substantive law or fact sufficient to overcome the substantial commonality between and among the [Provider Opt-Out Complaints] Actions and the Provider Track of the MDL."). In making these representations to the JPML Panel, the Blues were able to easily put together a chart – attached as Appendix A to their JPML filing – illustrating that alleged commonality of legal and factual issues,[22] thereby demonstrating how easy it is for them to manage the allegedly "cut and paste" complaints in a way that deals with their claimed "pervasive" common issues.

## 2. Requiring an Operative Consolidated Complaint Is Improper

The Blues' proposal for the Provider Opt-Outs to file two *operative* consolidated complaints, one for professional physician group plaintiffs exclusively and another for facilities (or health system) plaintiffs (even though some facility plaintiffs have associated professional physician groups) is improper. As discussed above, that request conflicts with the Supreme

---

action against the same defendants, based on the same theories of liability, alleging the same multilateral conspiracy. As Appendix A to this brief demonstrates, the [Provider Opt-Out] Complaints copy entire sections of the Master Provider Complaint *verbatim*.") (italics in original), and at 6 ("[T]he overlap in facts, parties and legal issues between the [Provider Opt-Out Complaints] and the [MDL] Provider litigation is pervasive and plain.").

[22] For convenience, the most updated version of Appendix A that the Defendants filed with the JPML which confirms Defendants' analysis of the Provider Opt-Out Complaints and the Master Provider Complaint in the MDL is attached hereto—also as Appendix A. That updated version was filed with JPML Dkt. No. 923, another response in opposition to a JPML CTO.

31

Court's command that cases in an MDL proceeding must "retain their separate identities." *Gelboim*, 574 U.S. at 413. The Blues' proposal would require the very melding of the individual Provider Opt-Out complaints into a single unit that the Court condemned. To be sure, consolidated complaints are authorized and common in representative actions, such as class actions and mass torts, but the Provider Opt-Out Actions are *not* representative actions. Rather, they are separate actions brought by different plaintiffs represented by varied counsel for their own unique and often-differing reasons.

A forced melding of each separate action into operative consolidated complaints would not only raise myriad due process and legal concerns, including questions regarding the right to return to the filing districts for purpose of trial under *Lexecon* and the final judgment rule (as in *Gelboim)*, but also legitimate practical concerns based on the unique circumstances of the various Provider Opt-Outs. The Provider Opt-Outs have already included necessary and unique factual allegations in their respective operative complaints. The Blues are now asking that the Court require the Provider Opt-Outs to consolidate certain common allegations and reallege individual ones.

The MDL rules authorize coordination of actions, which the Provider Opt-Outs welcome, but not the merging of all actions into an operative consolidated complaint. Indeed, it is axiomatic that each opt-out plaintiff continues to be the master of its case and, absent consent, no statute or federal rule permits a court to order opt-out plaintiffs in an MDL to file an operative consolidated complaint over their objection. *Gelboim*, 54 U.S. at 413 n.3 ("Parties may elect to file a 'master complaint' and a corresponding 'consolidated answer'"); *Home Depot USA, Inc. v. Lafarge N. Am., Inc.* 59 F.4th 55, 61 (3d Cir. 2023) ("Cases centralized in an MDL 'retain their separate identities' unless they choose to proceed on a consolidated 'master' complaint"). The Blues cite *In re National Prescription Opiate Litigation* for the unremarkable proposition that an MDL court

32

has "broad discretion" to manage its cases, neglecting the fact that the Sixth Circuit—remarkably—granted a writ of mandamus where a district court had overstepped its authority and impeded the rights of the parties in the name of efficiency. 956 F.3d 838, 844 (6th Cir. 2020) ("[T]he law governs an MDL court's decisions just as it does a court's decisions in any other case."); *see also* Committee Note, Proposed Fed. R. of Civ. P. 16.1(b)(3)(A) ("The Rules of Civil Procedure, including the pleading rules, continue to apply in all MDL proceedings.").

There are some narrow circumstances where a group of antitrust opt-out plaintiffs may want to consent to the filing of an operative consolidated amended complaint, especially when a case is in its early stages, and the opt-outs are proceeding alongside one or more classes. But this is not that situation. The Blues have relied on the *Multiplan* MDL as a model for opt-out consolidation, but in that case, the antitrust direct action plaintiffs consented to the filing of a consolidated amended complaint and separate short form complaints. *See In re: Multiplan Health Ins. Provider Litig.*, MDL No. 3121, Dkt. No. 161 (Nov. 2, 2024) (Kennelly, J. entering an order at the inception of the case agreed to by the plaintiffs that filed direct actions (not opt-out complaints) that were transferred to the *MultiPlan* MDL and requiring a very simple short-form complaint). The MDL rules do not, however, authorize a court to impose an operative consolidated complaint without such consent. Unlike *MultiPlan*, this MDL is very mature, and the Provider Opt-Out cases do not easily lend themselves to class-like treatment. The Blues cannot now seriously claim that all of the multiple, complex factors that they previously claimed "apply differently to different providers" somehow now demands the very "consolidated" treatment they previously opposed. In such circumstances the filing of a consolidated complaint is likely to take months, result in a Frankenstein-style consolidated complaint spanning hundreds of pages, impose

33

unnecessary costs on Provider Opt-Outs for no discernable benefit, and needlessly delay the progression—and, ultimately, the resolution—of the Provider Opt-Out cases.

     *i. The "Short Form" Complaints the Blues Propose Would Waste Time and Resources*

  The Blues' proposed short form complaint is clearly designed to be an unnecessary procedural roadblock to the orderly progress of this case and far beyond anything that could be considered reasonable or efficient.  As an initial matter, the Blues do not identify any legal authority for imposing such additional pleading requirements without consent and fail to offer any compelling reason why such unnecessary procedural tactics would help advance the resolution of these important cases *after* the operative complaints have already been filed.

  In addition, much of the requested information has already been provided to the Blues as part of the opt-out process and in the operative complaints.  The opt-out process itself here was demanding, requiring detailed information to properly opt-out before the complaints were even filed.  Moreover, the scope and level of detail required in the proposed short form complaint would be unprecedented in antitrust opt-out actions.  Indeed, much of what the Blues are seeking at the pleading stage via their proposed short form complaint is detailed information that goes far beyond the notice pleading requirements of Rule 8.  Certainly, if the Provider Opt-Out Complaints are "virtual copycats" of the Provider Class Complaint, then the Blues are on notice of the relevant claims. Some of the requested information, moreover, is essentially seeking the equivalent of premature contention interrogatories, which would not even be appropriate until the end of discovery.  For example, the Blues seek to compel the Provider Opt-Outs to provide detailed information regarding standing, market definition, and causation at the pleading stage, but this information is already included in the relevant complaints and the Court has previously held that

such issues are "rarely" appropriate for resolution at the pleading stage. *See In re Blue Cross Blue Shield Antitrust Litig.*, MDL No. 2406, No. 2:13-CV-20000-RDP, 2017 WL 2797267 (N.D. Al. June 28, 2017). Other information requested by the Blues was the subject of expert discovery and analysis in the Provider Class Actions and would likewise be the proper subject of Rule 702 testimony here.

To be sure, there are less than a handful of early-stage antitrust "direct actions" (essentially pre-opt-outs) where short form complaints were utilized. Only when the parties agreed to a consolidated master complaint, the "direct action" plaintiffs were proceeding alongside the class, the short-form complaints were merely brief box-checking exercises for the selection of claims, and the parties had not already provided extensive party information as part of the opt-out process. *See In re: Johnson & Johnson Talcum Powder Litig.*, MDL No. 2738, (D.N.J.); *In re: Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, MDL No. 3047 (N.D. Cal).

Finally, it is important to recognize what accepting the Blues' proposal would do to the orderly progress of these actions. If accepted, the Provider Opt-Outs would need months to compile the requisite information and then file hundreds of short form complaints. The Blues have suggested that they intend to file Rule 12(c) motions at that juncture, which would take additional months to brief. This is not a proposal that promotes efficiency. It is a proposal that seeks to impose excessive burdens, delays the orderly progress of the case needlessly, and strategically prioritize defense-friendly issues at the expense of the Federal Rules of Civil Procedure.

> ii. *The Court Should Not Allow the Blues Defendants to Use Rule 12(c) Motions as a Gimmick*

The Blues' proposal to file Rule 12(c) motions following the submission of an operative consolidated complaint and short form complaints is likewise unjustified. While the Blues are free

35

to file whatever motion they wish consistent with the Federal Rules, they have foreshadowed that they intend to forego Rule 12(b) motions and instead rely on Rule 12(c) as the primary basis to attack the pleadings. This speaks volumes about the Blues' own views about the strength of any motion to dismiss – if they thought they had a Rule 12(b) argument, they surely would make such a motion. A Rule 12(c) motion for judgment on the pleadings is limited to consideration of "the substance of the pleadings and any judicially noticed facts." *Porter Capital Corp. v. Johns Manville, Inc.*, No. 2:12-cv-00925, 2013 WL 3153519 (N.D. Ala. 2013) (Proctor, J). But the Blues have not identified any matters outside of the pleading that would warrant Rule 12(c) briefing here and, as such, it is difficult to see how their proposal does anything to advance the case.

Rule 12(c) is not a procedural gimmick that allows the Blues to essentially file an early motion for summary judgment and then preserve the opportunity to do so again later. If the court considers any matters outside the pleadings, the motion "*must* be treated as one for summary judgment under Rule 56" and all parties "must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d) (emphasis added). As a practical matter, this means that there must be an opportunity to seek discovery on anything that would be presented in a Rule 12(c) motion. This is why it is common practice in antitrust opt-out actions to proceed into discovery directly, barring any "new" or unique Rule 12 issues, so that the parties can reach the summary judgment stage expeditiously. Otherwise, the Parties end up essentially submitting two summary judgment motions, which is highly inefficient and most courts prohibit.

Simply put, if the Blues believe that there is any "new" or unique issue with the operative complaints, they should identify it and file a motion to dismiss. If not, there is no reason to depart from common practice. The Parties should proceed to coordinated discovery —as envisioned by

36

the MDL panel—and expeditiously move the case forward toward summary judgment and, ultimately, trial.

### C. **Standard of Review Briefing is Premature and Outside the Scope of Coordination**

The Blues have inappropriately insisted on discussing a premature schedule to brief notional standard of review issues applicable to the newly filed Provider Opt-Out cases alongside the forthcoming briefing in the four-year-old ASO Opt-Out cases. This topic is plainly outside the bounds of the joint report requested by the Court and Special Master Gentle. Indeed, neither the Court nor Special Master Gentle has ever suggested that now is an appropriate time for Provider Opt-Outs to brief the issue. Nor should they. There is no need for further briefing of standard of review issues applicable to providers – the Court has decided the issue, and the Blues have not cited a single new fact or law since the 2022 decision to warrant revisiting it for Provider Opt-Outs. The Blues' attempt to shoehorn this issue into what is essentially the motion to dismiss stage so severely deprives the Provider Opt-Outs of their fundamental due process rights to manage and litigate their own cases that it is difficult to take seriously. If the Court ever decided to revisit standard of review issues for Provider Opt-Outs, that question would be one only addressable on a motion for summary judgment, and it could only be addressed after Provider Opt-Outs have developed their own discovery records. It cannot be addressed based on existing Provider Class records or ASO Opt-Out records.

*First*, the Blues have not articulated to Provider Opt-Outs in any meet-and-confer or in draft joint reports a single new law or fact that supports revisiting the applicable standard of review, nor why it should be addressed, if at all, in the context of preliminary coordination.[23] To the

---

[23] Provider Opt-Outs disagree that the Court must determine a standard of review before discovery. As this Court knows, that was not required in the Alabama bellwethers nor the ASO Opt-Out cases, nor is it happening in

contrary, they admit in this report– as they must – that they have no new basis for briefing standard of review for Provider Opt-Outs. Instead, they say without specificity that it must be re-briefed for the "very same" reasons that the Blues identified in the ASO Opt-Out cases and the Provider-track MDL. That rationale makes no sense.

- When the Court previously allowed the Blues to revisit the standard of review (as to the Provider Class in 2022 and the ASOs in 2018), each new bite at the apple was tethered to some change in facts, not just the Blues' desire to reconsider the issue.

- On the ASO Opt-Out side, re-briefing made sense. The Court last addressed the appropriate standard of review for Blue subscribers in 2018. That ruling did not address whether the "ASO market may be different than the rest of the Subscriber markets in 2018 in the MDL," nor did it address that, "under the Subscriber Settlement, ASOs have become entitled to a second [B]lue bid." Order at 2, 2:22-cv-01256-RDP (Dkt. No. 402) (Dec. 3, 2024). Open, undecided issues thus existed.

- The same is not true for Provider Opt-Outs. The Blues have not identified new law or fact since the 2022 decision that would require a different holding. They certainly cannot rely on the Provider Class Settlement, as it explicitly does not provide any relief to – and thus does not alter the status quo ante of – Provider Opt-Outs.

*Second*, even if the Court were inclined to re-open this settled issue again,[24] this is not the time to do so. It is well established in antitrust actions that the decision on the appropriate standard

---

concurrent litigation in Michigan federal court or California state court. Indeed, as explained *infra*, this issue is one for summary judgment, not a motion to dismiss, and the Court need not even consider the issue now.

[24] Of course, absent the Blues identification of a new fact, law, or argument, revisiting this issue risks creating an inconsistency in the standard of review applicable to the Provider Class and Provider Opt-Outs. The Blues' purported "two-sided market" argument is not enough to pass muster. Not only is this not a two-sided market as in *Amex*, and not only is the "two-sided market" issue not new, but the Blues previously admitted that two-sided market analysis is not relevant to standard of review. Response at 6-7, 2:13-cv-20000-RDP, (Dkt. No. 2752) (Jun.

of review "is more appropriate on a motion for summary judgment." *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012). While the appropriate standard of review is a question of law, this Court itself has previously recognized that "numerous factual questions" are relevant to that analysis. As a result, this Court has previously concluded that it "cannot address the standard of review . . . until discovery takes place. And that's the Eleventh Circuit rule." April 21, 2017 Hr'g Tr., Dkt. No. 1109, 17:22-25; *see also* Motion to Dismiss Opinion, Dkt. No. 204 (denying 12(b)(6) motion on per se basis because it is "simply too early to assess…standard of review"). Summary judgment is in no way appropriate in the Provider Opt-Out cases at the pleading stage and prior to any opportunity to conduct their own discovery.

*Third*, it would violate Provider Opt-Outs' due process rights to compel them to brief standard of review in just four months based on the MDL and ASO Opt-Out records that, to date, Provider Opt-Outs have never seen. The Subscriber Class, Provider Class, and ASOs each briefed (or will brief) this issue after the close of discovery and on summary judgment.[25] As such, they all had the ability to develop a record in order to support their arguments for the applicable standard of review. Provider Opt-Outs have taken no discovery and developed no record. Although opportunities for coordination and efficiency exist, the Provider Opt-Out cases are ultimately different from prior litigations and retain their separate identities.[26] Each Provider Opt-Out will have its own theories of harm and damages. The Blues have previously argued that not just

---

21, 2021) ("*Amex* is not a standard-of-review decision . . . *Amex* [ ] spoke to *how* courts should conduct a rule-of-reason analysis, not *whether* the rule of reason applies in the first place.") (emphasis in original).

[25] Importantly, the ASOs' discovery was not limited by the MDL discovery record, nor by the Blues' desire to re-litigate standard of review issues.

[26] That said, the Provider Opt-Outs reserve their rights to dispute the depiction of overlaps and non-overlaps presented in the Venn diagrams included by Defendants and ASO Opt-Outs in their respective sections of this Joint Report.

discovery, but expert discovery, related to the Provider Class's damages model and theory of harm determines the appropriate standard of review. Defendants' Opening Brief on the Antitrust Standard of Review at 26-27, 2:13-cv-20000-RDP, (Dkt. No. 2728) (May 21, 2021). Provider Opt-Outs must have the opportunity to develop their own record on these points and litigate their own claims. *Home Depot USA, Inc. v. LaFarge N. Am.*, 59 F.4th 55 (3d Cir. 2023).

At base, the Blues want the Court to extend its prior rulings on the standard of review for Price-Fixing and Group Boycott Claims, but not for the Horizontal Market Allocation Claims.[27] Yet they cannot have their cake and eat it, too. The Blues could argue (as they do) that facts and laws relevant to standard of review have not changed, in which case they can credibly take the position that Provider Opt-Outs need no new discovery relevant to the standard of review as the entire 2022 decision should be extended. On the other hand, they can argue that facts or law have changed sufficiently to warrant revisiting standard of review, in which case the 2022 decision should not apply, and the parties must engage in discovery to address those hypothetical new facts and legal arguments (of which the Blues have articulated none). What the Blues cannot do is cherry pick prior rulings and deny Provider Opt-Outs their due process rights to litigate standard of review based on their own fully developed discovery records on a motion for summary judgment.

---

[27] Contrary to the Blues' representation, Provider Opt-Outs do not concede that the rule of reason would apply to Price-Fixing and Group Boycott Claims, nor to the Horizontal Market Allocation Claims post-dating 2021. In fact, upon completion of discovery, Provider Opt-Outs fully expect to find evidence that the Blues continued to engage in anticompetitive conduct after the Subscriber Settlement that would warrant *per se* review to the present.

Dated: September 10, 2025

Respectfully submitted,

By */s/ Karin A. DeMasi*

Karin A. DeMasi
Lauren R. Kennedy
David H. Korn
Rachel Skaistis
Lillian S. Grossbard
Rebecca J. Schindel
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Tel: (212) 474-1000
Fax: (212) 474-3700
kdemasi@cravath.com
lkennedy@cravath.com
dkorn@cravath.com
rskaistis@cravath.com
lgrossbard@cravath.com
rschindel@cravath.com

*Lead Counsel for the Blue Cross Blue Shield System; Counsel for Defendants Blue Cross Blue Shield Association; Blue Cross and Blue Shield of Alabama; Blue Cross and Blue Shield of Arizona, Inc.; GuideWell Mutual Holding Corporation; Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Kansas City; Blue Cross and Blue Shield of Massachusetts, Inc.; Blue Cross and Blue Shield of North Carolina; BlueCross BlueShield of South Carolina; BlueCross BlueShield of Tennessee, Inc.; Blue Cross Blue Shield of Wyoming; California Physicians' Service d/b/a Blue Shield of California; Capital Blue Cross; CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.; Hawaii Medical Service Association (Blue Cross and Blue Shield of Hawaii); Health Care Service Corporation, an Illinois Mutual Legal Reserve Company,*

41

*including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Wellmark of South Dakota, Inc. (Wellmark Blue Cross and Blue Shield of South Dakota); Wellmark, Inc. (Wellmark Blue Cross and Blue Shield of Iowa); Triple-S Management Corporation; Triple-S Salud, Inc.*

Craig A. Hoover
E. Desmond Hogan
Justin Bernick
Elizabeth Jose
W. David Maxwell
HOGAN LOVELLS US LLP
Columbia Square
555 13th Street, N.W.
Washington, DC  20004
Tel: (202) 637-5600
Fax: (202) 637-5910
craig.hoover@hoganlovells.com
desmond.hogan@hoganlovells.com
justin.bernick@hoganlovells.com
elizabeth.jose@hoganlovells.com
david.maxwell@hoganlovells.com

*Counsel for Elevance Health f/k/a Anthem, Inc., and all of its named subsidiaries in this action; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield; Regence*

Kimberly R. West (Liaison Counsel)
Mark M. Hogewood
WALLACE, JORDAN, RATLIFF & BRANDT, LLC
First Commercial Bank Building
800 Shades Creek Parkway, Suite 400
Birmingham, AL  35209
Tel: (205) 870-0555
Fax: (205) 871-7534
kwest@wallacejordan.com
mhogewood@wallacejordan.com

*Counsel for Defendants Blue Cross Blue Shield Association; Blue Cross and Blue Shield of Arizona, Inc.; Blue Cross and Blue Shield of Kansas City; BlueCross BlueShield of South Carolina; Blue Cross and Blue Shield of Wyoming; Capital Blue Cross; CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue*

42

*Blue Cross Blue Shield of Oregon*

John D. Martin
Lucile H. Cohen
Travis A. Bustamante
NELSON MULLINS RILEY &
SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC  29201
Tel: (803) 255-9421
Fax: (803) 256-7500
john.martin@nelsonmullins.com
lucie.cohen@nelsonmullins.com
travis.bustamante@nelsonmullins.com

*Counsel for Elevance Health f/k/a Anthem, Inc.,
and all of its named subsidiaries in this action;
Louisiana Health Service & Indemnity Company
(Blue Cross and Blue Shield of Louisiana);
BCBSM, Inc. (Blue Cross and Blue Shield of
Minnesota); BlueCross BlueShield of South
Carolina; Horizon Healthcare Services, Inc.
(Horizon Blue Cross and Blue Shield of New
Jersey); Blue Cross & Blue Shield of Rhode
Island; Cambia Health Solutions, Inc.; Regence
Blue Shield of Idaho; Regence Blue Cross Blue
Shield of Utah; Regence Blue Shield; Regence
Blue Cross Blue Shield of Oregon; Blue Cross &
Blue Shield of Mississippi, a Mutual Insurance
Company; Wellmark of South Dakota, Inc.
(Wellmark Blue Cross and Blue Shield of South
Dakota); Wellmark, Inc. (Wellmark Blue Cross
and Blue Shield of Iowa); Hawaii Medical Service
Association (Blue Cross and Blue Shield of
Hawaii); Triple-S Salud, Inc; Defendants Blue
Cross and Blue Shield of Florida, Inc.; Blue Cross
and Blue Shield of Massachusetts, Inc.; BlueCross
BlueShield of Tennessee, Inc.*

Cavender C. Kimble

*Shield of Montana; Caring for
Montanans, Inc., f/k/a Blue Cross and
Blue Shield of Montana, Inc.; Highmark
Health; Highmark Inc., f/k/a Highmark
Health Services; Highmark West Virginia
Inc.; Highmark BCBSD Inc.; California
Physicians' Service d/b/a Blue Shield of
California; Wellmark of South Dakota,
Inc. (Wellmark Blue Cross and Blue
Shield of South Dakota); Wellmark, Inc.
(Wellmark Blue Cross and Blue Shield of
Iowa); Hawaii Medical Service
Association (Blue Cross and Blue Shield
of Hawaii)*

Carl S. Burkhalter
MAYNARD NEXSEN PC
1901 6th Avenue North, Suite 2400
Regions Harbert Plaza
Birmingham, AL  35203
Tel: (205) 254-1000
Fax: (205) 254-1999
cburkhalter@maynardnexsen.com

Pamela B. Slate
HILL CARTER FRANCO COLE &
BLACK, P.C.
425 South Perry Street
Montgomery, AL  36104
Tel: (334) 834-7600
Fax: (334) 386-4381
pslate@hillhillcarter.com

*With Cravath, Swaine & Moore LLP,
counsel for Defendant Blue Cross Blue
Shield of Alabama*

Jeffrey J. Zeiger, P.C.
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza

43

BALCH & BINGHAM LLP
1901 6th Avenue North, Suite 1500
Birmingham, AL 35203-4642
Tel: (205) 226-3437
Fax: (205) 488-5860
ckimble@balch.com

*Counsel for Elevance Health f/k/a Anthem, Inc., and all of its named subsidiaries in this action; Blue Cross and Blue Shield of North Carolina; Louisiana Health Service & Indemnity Company (Blue Cross and Blue Shield of Louisiana); BCBSM, Inc. (Blue Cross and Blue Shield of Minnesota); Horizon Healthcare Services, Inc. (Horizon Blue Cross and Blue Shield of New Jersey); Blue Cross & Blue Shield of Rhode Island; Cambia Health Solutions, Inc.; Regence Blue Shield of Idaho; Regence Blue Cross Blue Shield of Utah; Regence Blue Shield; Regence Blue Cross Blue Shield of Oregon*

Gwendolyn Payton
KILPATRICK TOWNSEND & STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA  98101
Tel: (206) 626-7714
Fax: (206) 299-0414
gpayton@kilpatricktownsend.com

*Counsel for Defendant Premera Blue Cross, d/b/a Premera Blue Cross Blue Shield of Alaska*

Brian K. Norman
SHAMOUN & NORMAN, LLP
1800 Valley View Lane, Suite 200
Farmers Branch, TX  75234
Tel: (214) 987-1745
Fax: (214) 521-9033

Chicago, IL  60654
Tel: (312) 862-2000
Fax: (312) 862-2200
jzeiger@kirkland.com

*Counsel for Defendants Health Care Service Corporation, an Illinois Mutual Legal Reserve Company, including its divisions Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Texas, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, and Blue Cross and Blue Shield of Montana; Caring for Montanans, Inc., f/k/a Blue Cross and Blue Shield of Montana, Inc.; Highmark Health; Highmark Inc., f/k/a Highmark Health Services; Highmark West Virginia Inc.; Highmark BCBSD Inc.; Highmark Western and Northeastern New York Inc. (except with respect to claims by Rite Aid Corporation and its affiliates and Bed, Bath & Beyond Inc. now known as 20230930-DK-Butterfly-1, Inc. and its affiliates, and discovery to RTX Corporation and its affiliates and General Motors Company and its affiliates)*

Jonathan M. Redgrave
REDGRAVE, LLP
4800 Westfields Blvd, Suite 250
Chantilly, VA  20151
Tel: (703) 592-1155
Fax: (612) 332-8915
jredgrave@redgravellp.com

*Additional Counsel for HCSC and Highmark Defendants and California Physicians' Service d/b/a Blue Shield of*

bkn@snlegal.com

H. James Koch
ARMBRECHT JACKSON LLP
RSA Tower, 27th Floor
11 North Water Street
Mobile, AL 36602
Tel: (251) 405-1300
Fax: (251) 432-6843
hjk@ajlaw.com

*Counsel for Defendants CareFirst, Inc.; CareFirst of Maryland, Inc.; Group Hospitalization and Medical Services, Inc.; CareFirst BlueChoice, Inc.*

M. Patrick McDowell
Norman E. "Benje" Bailey, Jr.
BRUNINI, GRANTHAM, GROWER
& HEWES, PLLC
190 East Capitol Street
The Pinnacle Building, Suite 100
Jackson, MS 39201
Tel: (601) 948-3101
Fax: (601) 960-6902
pmcdowell@brunini.com
bbailey@brunini.com

Cheri D. Green
BLUE CROSS & BLUE SHIELD OF
MISSISSIPPI, A MUTUAL INSURANCE
COMPANY
P.O. Box 1043
Jackson, MS 39215
Tel: (601) 932-3704
cdgreen@bcbsms.com

*Counsel for Defendant Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company*

Alan D. Rutenberg
FOLEY & LARDNER LLP

*California*

Todd M. Stenerson
Brian C. Hauser
ALLEN OVERY SHEARMAN
STERLING US LLP
1101 New York Avenue N.W.
Washington, DC 20005
Tel: (202) 508-8000
Fax: (202) 508-8100
todd.stenerson@aoshearman.com
brian.hauser@aoshearman.com

Rachel Mossman Zieminski
ALLEN OVERY SHEARMAN
STERLING US LLP
2601 Olive Street, Suite 1700
Dallas, TX 75201
Tel: (214) 271-5777
Fax: (214) 271-5778
rachel.zieminski@aoshearman.com

Sarah L. Cylkowski
Alexandra Markel
BODMAN PLC
1901 Saint Antoine Street
6th Floor at Ford Field
Detroit, MI 48226
Tel: (313) 259-7777
Fax: (734) 930-2494
scylkowski@bodmanlaw.com
amarkel@bodmanlaw.com

Andy P. Campbell
A. Todd Campbell
Yawanna N. McDonald
CAMPBELL PARTNERS LLC
505 North 20th Street, Suite 1600
Birmingham, AL 35203
Tel: (205) 224-0750

45

3000 K Street, N.W., Suite 600
Washington, DC 20007
Tel: (202) 672-5491
Fax: (202) 672-5399
arutenberg@foley.com

Diane R. Hazel
FOLEY & LARDNER LLP
1144 15th Street, Suite 2200
Denver, CO 80202
Tel: (720) 437-2034
Fax: (720) 437-2200
dhazel@foley.com

Thomas J. Diaz
USABLE MUTUAL INSURANCE COMPANY
601 S. Gaines Street, 8th Floor
Little Rock, Arkansas 72201
Tel: (501) 378-2380
tjdiaz@arkbluecross.com

*Counsel for Defendant USAble Mutual Insurance
Company, d/b/a Arkansas Blue Cross and
Blue Shield and as BlueAdvantage Administrators
of Arkansas*

Robert R. Riley, Jr.
RILEY & JACKSON, P.C.
3530 Independence Drive
Birmingham, AL 35209
Tel: (205) 879-5000
Fax: (205) 879-5901
rob@rileyjacksonlaw.com

*Counsel for Defendants Blue Cross and Blue
Shield of Florida, Inc.; Blue Cross and Blue Shield
of Massachusetts, Inc.; BlueCross BlueShield
of Tennessee, Inc.*

Edward S. Bloomberg
John G. Schmidt Jr.
Anna Mercado Clark
PHILLIPS LYTLE LLP

Fax: (205) 224-8622
andy@campbellpartnerslaw.com
todd@campbellpartnerslaw.com
yawanna@campbellpartnerslaw.com

*Counsel for Defendants Blue Cross and
Blue Shield of Michigan; Blue Cross and
Blue Shield of Vermont*

John DeQ. Briggs
Jeny M. Maier
Kenina J. Lee
AXINN, VELTROP & HARKRIDER,
LLP
1901 L Street, N.W.
Washington, DC 20036
Tel: (202) 912-4700
Fax: (202) 912-4701
jbriggs@axinn.com
jmaier@axinn.com
klee@axinn.com

Kail J. Jethmalani
Victoria J. Lu
AXINN, VELTROP & HARKRIDER,
LLP
630 Fifth Avenue, 33rd Floor
New York, NY 10111
Tel: (212) 728-2200
Fax: (212) 728-2201
kjethmalani@axinn.com
vlu@axinn.com

Stephen A. Rowe
Aaron G. McLeod
ADAMS AND REESE LLP
1901 Sixth Avenue North, Suite 3000
Birmingham, AL 35203
Tel: (205) 250-5080
Fax: (205) 250-5034

One Canalside
125 Main Street
Buffalo, NY 14203
Tel: (716) 847-8400
Fax: (716) 852-6100
ebloomberg@phillipslytle.com
jschmidt@phillipslytle.com
aclark@phillipslytle.com

Morris Wade Richardson
(ASB-8581-S78M)
Charles T. Grimes
(ASB-3224-S77C)
RICHARDSON CLEMENT PC
22 Inverness Center Parkway, Suite 500
Birmingham, Alabama 35242
Tel: (205) 729-7000
Facsimile: (205) 905-7009
wade@richardson.law
charley@richardson.law

*Counsel for Defendant Excellus Health Plan, Inc.
d/b/a Excellus BlueCross BlueShield, and Lifetime
Healthcare Inc., as relevant*

steve.rowe@arlaw.com
aaron.mcleod@arlaw.com

*Counsel for Defendants Independence
Hospital Indemnity Plan, Inc. f/k/a
Independence Blue Cross; Independence
Health Group, Inc.*

Jay P. DeSanto
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel: (202) 624-2500
Fax: (202) 628-5116
jdesanto@crowell.com

Sarah Gilbert
Honor Costello
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Ave.
New York, NY 10001
Tel: (212) 223-4000
Fax: (212) 223-4134
sgilbert@crowell.com
hcostello@crowell.com

John M. Johnson
Brian P. Kappel
LIGHTFOOT FRANKLIN & WHITE
LLC
The Clark Building
400 20th Street North
Birmingham, AL 35203
Tel: (205) 581-0700
Fax: (205) 581-0799
jjohnson@lightfootlaw.com
bkappel@lightfootlaw.com

*Counsel for Defendants Blue Cross and*

47

*Blue Shield of Nebraska; GoodLife
Partners, Inc.; Blue Cross of Idaho
Health Service, Inc.; Blue Cross and Blue
Shield of Kansas, Inc.; Blue Cross Blue
Shield of North Dakota*

Dated: September 10, 2025

Respectfully submitted,

By: */s/ Jay M. Ezelle*
Jay M. Ezelle
H. Thomas Wells, III
Benjamin T. Presley
Starnes Davis Florie LLP
100 Brookwood Place, 7th Floor
Birmingham, AL 35209
Tel: (205) 868-6000
jezelle@starneslaw.com
twells@starneslaw.com
bpresley@starneslaw.com

*Counsel for all Plaintiffs in the Alaska Air and JetBlue cases.*

By: */s/ Paul E. Slater*
Paul E. Slater
Joseph M. Vanek
David P. Germaine
Eamon P. Kelly
SPERLING KENNY NACHWALTER,
LLC
55 West Monroe Street, Suite 3200
Chicago, Illinois 60603
Tel:    (312) 641-3200
pes@sperlingkenny.com
jvanek@sperlingkenny.com
dgermaine@sperlingkenny.com
ekelly@sperlingkenny.com

By: */s/ Phillip F. Cramer*
Phillip F. Cramer
SPERLING KENNY NACHWALTER,
LLC
1221 Broadway, Suite 2140
Nashville, TN 37203
Tel: (312) 641-3200
Fax: (312) 641-6492
pcramer@sperlingkenny.com

*Counsel for JetBlue Airways Corporation and JetBlue Airways Group Health Insurance Plan, The Kraft Heinz Company, Kraft Heinz Group Benefits*

49

*Plan, Kraft Heinz Retiree Group Benefits Plan, and North Central States Regional Council of Carpenters' Health Fund*

*Alaska Airlines, Inc.; Alaska Airlines, Inc. Welfare Benefit Plan; Alaska Air Group, Inc. Welfare Benefit Plan; Horizon Air Industries, Inc.; Horizon Air Industries, Inc. Welfare Benefit Plan; Employee Benefit Plan for Employees of Horizon Air Industries, Inc.; Employee Benefit Plan for Full-Time and Part-Time Employees Horizon Air Industries, Inc.; Big Lots, Inc.; Big Lots Associate Benefit Plan; Conagra Brands, Inc.; ConAgra Foods, Inc. Welfare Benefit Wrap Plan; The Federal Express Corporation; FedEx Freight, Inc.; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; FedEx Corporation Retiree Group Health Plan; The Federal Express Corporation Retiree Group Health Plan; The Federal Express Corporation Group Health Plan for Pilots; The Federal Express Corporation Retiree Group Health Plan for Pilots; FedEx Group Health Plan; JetBlue Airways Corporation and JetBlue Airways Group Health Insurance Plan; Kellogg Company; Kellogg Company Welfare Benefit Plan; Kellogg Company Retiree Welfare Benefit Plan; The Kraft Heinz Company, Kraft Heinz Group Benefits Plan, Kraft Heinz Retiree Group Benefits Plan; McLane Company, Inc. McLane Company, Inc. Welfare Plan; Meijer Inc. including its affiliates Meijer Great Lakes LP, Meijer Stores LP, and Town Total Health LLC; Meijer Health Benefits Plan; North Central States Regional Council of Carpenters' Health Fund; Publix Super Markets, Inc.; Publix Super Markets, Inc. Group Health Benefit Plan; United Natural Foods, Inc., including its affiliates SUPERVALU, INC.. and Unified Grocers, Inc.*

50

*("UNFI"); UNFI Health and Welfare Plan; Indiana/Kentucky/Ohio Regional Council of Carpenters Welfare Fund; Ohio Carpenters' Health Fund; SEIU Local 1 & Participating Employers Health Trust; The Local No. 1 Health Fund; Plumbers' Welfare Fund, Local 130, U.A.; The Sheet Metal Workers Local 73 Welfare Fund; Chicago Painters and Decorators Welfare Fund; The Carpenters and Joiners Welfare Fund; Heartland Health & Wellness Fund; GuideStone Financial Resources; GuideStone group Plan; GuideStone Personal Plan; Church Pension Group Services Corporation; General Board of Pension and Health Benefits of the United Methodist Church; Concordia Plan Services; Concordia Health Plan; Portico Benefits Services (the Evangelical Lutheran Church in America's benefit board); Christian Brothers Services (a church plan benefits board created by the Christian Brothers religious order); Christian Brothers Employee Benefit Trust; The Board of Pensions of the Presbyterian Church U.S.A.; The Benefits Plan of the Presbyterian Church (U.S.A.); Employee Benefits Plan of MBM Corporation; and the MBM Corporation*

By: */s/ J. Scott Hickman*
J. Scott Hickman
Eric G. Osborne
SHERRARD ROE VOIGT & HARBISON, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
Tel: (615) 742-4200
Fax: (615) 742-4539
shickman@srvhlaw.com
eosborne@srvhlaw.com

*Counsel for The Kraft Heinz Company, Kraft Heinz Group Benefits Plan, Kraft Heinz Retiree Group Benefits Plan, and*

51

*North Central States Regional Council of Carpenters' Health Fund*

*Counsel for The Boeing Company; Employee Benefits Plan Committee of The Boeing Company, as the plan administrator and named fiduciary of The Boeing Company Master Welfare Benefit Plan; Bridgestone Americas, Inc.; Bridgestone Americas, Inc. Employee Group Insurance Plan; Bridgestone Americas, Inc. Retiree Medical Plan; CHS/Community Health Systems Inc., sponsor and administrator of the Community Health Systems Group Health Plan; Dollar General Corporation; Dollar General Health Plan (a component of the Dollar General Corporation Employee Benefits Plan); The Federal Express Corporation; FedEx Freight, Inc.; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; FedEx Corporation Retiree Group Health Plan; The Federal Express Corporation Retiree Group Health Plan; The Federal Express Corporation Group Health Plan for Pilots; The Federal Express Corporation Retiree Group Health Plan for Pilots; FedEx Group Health Plan; Tractor Supply Company; Tractor Supply Medical Plan*

By: */s/ Jason A. Zweig*
Jason A. Zweig
BARTKO LLP
1 South Wacker Drive
36th Floor
Chicago, IL 60606
Tel: (415) 956-1900
Fax: (415) 956-1152
jzweig@bartkolaw.com

*Counsel for JetBlue Airways Corporation and JetBlue Airways Group Health Insurance Plan, McLane Foodservice*

52

*Distribution, Inc., and Employee Benefits Plan of MBM Corporation*

*Counsel for Alaska Airlines, Inc.; Alaska Airlines, Inc. Welfare Benefit Plan; Alaska Air Group, Inc.; Alaska Air Group, Inc. Welfare Benefit Plan; Horizon Air Industries, Inc.; Horizon Air Industries, Inc. Welfare Benefit Plan; Employee Benefit Plan for Employees of Horizon Air Industries, Inc.; Employee Benefit Plan for Full-Time and Part-Time Employees Horizon Air Industries, Inc.; American Electric Power Service Corporation; American Electric Power System Comprehensive Medical Plan; Big Lots, Inc.; Big Lots Associate Benefit Plan; Burlington Northern Santa Fe LLC (f/k/a Burlington Northern Santa Fe Corp.); Burlington Northern Santa Fe Corporation Group Benefits Plan; Burlington Northern Santa Fe Corporation Welfare Benefit Trust; FedEx Corporation; The Federal Express Corporation; FedEx Freight, Inc.; The Federal Express Corporation Group Health Plan; The FedEx Corporation Group Health Plan; FedEx Corporation Retiree Group Health Plan; The Federal Express Corporation Retiree Group Health Plan; The Federal Express Corporation Group Health Plan for Pilots; The Federal Express Corporation Retiree Group Health Plan for Pilots; FedEx Group Health Plan; McLane Company, Inc.; McLane Company, Inc. Welfare Plan; Employee Benefits Plan of MBM Corporation; and the MBM Corporation*

*/s/ William J. Blechman*
William J. Blechman
Joshua B. Gray
Elizabeth B. Honkonen
SPERLING KENNY NACHWALTER, LLC

53

Four Seasons Tower - Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
wjb@sperlingkenny.com
jgray@sperlingkenny.com
ebh@sperlingkenny.com

*Counsel for US Foods, Inc.*

*Counsel for Albertsons Companies Inc.;
New Albertsons L.P.; Albertson's LLC;
New Albertson's Inc.; Safeway Inc.;
Albertsons Companies, Inc. Health and
Welfare Plan, f/k/a Albertson's LLC
Health & Welfare Plan; New Albertson's
Inc. Health and Welfare Plan; Hy-Vee
Inc.; Hy-Vee and Affiliates Benefit Plan
and Trust; The Kroger Co.; 84.51 LLC;
Murray's Cheese LLC; The Kroger Co.
Health and Welfare Benefit Plan; 84.51
LLC Health & Welfare Plan; Walgreen
Co.; US Foods Holding Corporation; US
Foods, Inc.; US Foods Health & Welfare
Plan; Walgreen Health and Welfare Plan
(Plan No. 501) f/k/a Walgreen Major
Medical Expense Plan*

*/s/ Jon Corey*
Jon Corey
MCKOOL SMITH, PC
1999 K Street, NW
Suite 600
Washington, D.C. 20006
(213) 694-1200
jcorey@mckoolsmith.com

John Briody
James Smith
David Schiefelbein
Daniel Hendler
MCKOOL SMITH, PC
One Manhattan West
395 9th Avenue, 50th Floor
New York, New York 10001

54

(212) 402-9400
jbriody@mckoolsmith.com
jsmith@mckoolsmith.com
dschiefelbein@mckoolsmith.com
dhendler@mckoolsmith.com

Lew LeClair
Gary Cruciani
MCKOOL SMITH, PC
300 Crescent Court, Suite 1500
Dallas, Texas 75201
(214) 978-4000
lleclair@mckoolsmith.com
gcruciani@mckoolsmith.com

Brenton K. Morris
BENTON, CENTENO & MORRIS, LLP
2019 Third Avenue North
Birmingham, Alabama 35203
(205) 278-8000
bmorris@bcattys.com

*Counsel for Bed, Bath & Beyond Inc. now known as 20230930-DK-Butterfly-1, Inc.; Automobile Club of Southern California; Darling Ingredients Inc.; Griffin Industries, LLC; Dillard's, Inc.; Halliburton Energy Services, Inc.; G4S Secure Solutions (USA), Inc.; Kimberly-Clark Corporation; Lincoln National Corporation; Live Nation Entertainment, Inc.; Nestlé USA, Inc.; Perdue Farms Inc.; Pacific Gas and Electric Company; PG&E Corporation; RTX Corporation; Raytheon Company; Rockwell Collins, Inc.; Rite Aid Corporation; Rite Aid Hdqtrs. Corp.; Sterling Jewelers Inc.; Zale Corporation; Zale Delaware, Inc.; Starbucks Corporation; Tyson Foods, Inc.; SRZ Liquidating Trust; Transform Midco LLC; and General Motors LLC*

Date: September 10, 2025

Respectfully submitted,

*/s/ Kathryn A. Reilly*
Kathryn A. Reilly
Michael T. Williams
Judith P. Youngman
Galen D. Bellamy
Joel S. Neckers
Michael R. Krantz
370 17th Street, Suite 4500
Denver, CO 80202
**WHEELER TRIGG O'DONNELL LLP**
370 17th Street, Suite 4500
Denver, CO 80202
Email: reilly@wtotrial.com
Telephone: (303) 244-1918

*Attorneys for Plaintiffs Corewell Health, Iowa Health System d/b/a UnityPoint, and Hospital Sisters Health System*

*/s/ Judith A. Zahid*
Judith A. Zahid
Eric W. Buetzow
Heather T. Rankie
Sarah Van Culin
**Zelle LLP**
555 12th Street, Suite 1230
Oakland, CA 94607
Telephone: (415) 693-0700
Facsimile: (415) 693-0770
jzahid@zellelaw.com
ebuetzow@zellelaw.com
hrankie@zellelaw.com
svanculin@zellelaw.com

*Attorneys for Associated Health Services, Inc.; Duke Affiliations Network, Inc.; Duke Health Integrated Practice, Inc.; Duke University Affiliated Physicians, Inc.; Duke University Health System, Inc.; Duke University*

BRENNA BIRD
Attorney General of Iowa

*/s/ Ryan P. Phair*
Ryan P. Phair
Michael F. Murray
Carter C. Simpson
Christopher C. Brewer
Emma Hutchison
Terence Parker
Hasan Siddiqui
**PAUL HASTINGS LLP**
2050 M Street NW
Washington, DC 20036
ryanphair@paulhastings.com
michaelmurray@paulhastings.com
cartersimpson@paulhastings.com
chrisbrewer@paulhastings.com
emmahutchison@paulhastings.com
terenceparker@paulhastings.com
hasansiddiqui@paulhastings.com
Telephone: (202) 551-1751

Renato Mariotti
Michael Morrill
**Paul Hastings LLP**
71 South Wacker Drive, Suite 4500
Chicago, IL 60606
renatomariotti@paulhastings.com
michaelmorrill@paulhastings.com
Telephone: (312) 499-6000

Stephen J. McIntyre
**PAUL HASTINGS LLP**
515 South Flower Street, Fl. 25
Los Angeles, CA 90071
stephenmcintyre@paulhastings.com
Telephone: (213) 683-6110

Navi S. Dhillon
Kiaura Clark
**Paul Hastings LLP**
1999 Avenue of the Stars, Fl. 27
Los Angeles, CA 90067
navidhillon@paulhastings.com
kiauraclark@paulhastings.com
Telephone: (310) 620-5700

<u>/s/ Eric H. Wessan</u>
Eric H. Wessan
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
eric.wessan@ag.iowa.gov

*Counsel for State University of Iowa*


<u>/s/ Robert M. Cooper</u>
Robert M. Cooper
Hershel Wancjer
**KING & SPALDING LLP**
1700 Pennsylvania Avenue
NW Suite 900
Washington, DC 20006
rcooper@kslaw.com
hwancjer@kslaw.com
Telephone: (202) 737-0500


Damien Marshall
Ross E. Elfand
Marisa Manzi
Annika Burton
Alexandra Valas
**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor New York, NY 10036
dmarshall@kslaw.com
relfand@kslaw.com
mmanzi@kslaw.com
aburton@kslaw.com
lvalas@kslaw.com
Telephone: (212) 556-2100


*Attorneys for Plaintiffs NorthBay
Healthcare Corporation; ApolloMD
Business Services, LLC; Beebe Medical
Center, Inc. d/b/a Beebe Healthcare;
Covenant Health, Inc.; Kaweah Delta
Health Care District; Memorial Health
Services d/b/a MemorialCare Health
System; Mount Sinai Medical Center of
Florida, Inc.; North Broward Hospital
District d/b/a Broward Health; Ochsner*

Barry G. Sher
Avi Weitzman
**PAUL HASTINGS LLP**
200 Park Avenue
New York, NY 10166
barrysher@paulhastings.com
aviweitzman@paulhastings.com
Telephone: (212) 318-6000


*Attorneys for Adventist Health System Sunbelt
Healthcare Corporation d/b/a AdventHealth;
Adventist Health System/West; Ardent Health
Partners, Inc.; Banner Health; Christiana
Care Health Services, Inc.; City of Hope;
CHS/Community Health Systems; Corewell
Health; Duke Affiliations Network, Inc.; Duke
Health Integrated Practice, Inc.; Duke
University Affiliated Physicians, Inc.; Duke
University Health System, Inc.; Duke
University; Henry Ford Health System d/b/a
Henry Ford Health; Hospital Sisters Health
System; Inova Health Care Services; Iowa
Health System d/b/a UnityPoint Health;
Knight Health Holdings, LLC; Lifepoint
Health, Inc.; Mass General Brigham
Incorporated; Mercy Hospital, Iowa City,
Iowa, and Mercy Service Iowa City, Inc.;
Northeast Georgia Health System; Novant
Health, Inc.; Rochester Regional Health;
Sound Inpatient Physicians, Inc.; State
University of Iowa; Sutter Health; Texas
Health Resources; the University of
Wisconsin Hospitals and Clinics Authority;
Associated Health Services, Inc.*


<u>/s/ Cindy Reichline</u>
Keith Butler
Cindy Reichline
Shira Liu
Fiona Tang
Taylor Keating
Ryan Roth
**BRS LLP**
2121 Avenue of the Stars
Suite 800

*Clinic Foundation; Ochsner LSU Health System of North Louisiana; Hospital Service District No. 1 of St. Charles Parish; St. Tammany Parish Hospital Service District No. 2; Salinas Valley Memorial Healthcare System d/b/a Salinas Valley Health; Steward Health Care System LLC; Tallahassee Memorial HealthCare, Inc.; Lubbock County Hospital District; CEP America, LLC d/b/a Vituity*

/s/ Sean S. Zabaneh
Sean S. Zabaneh
Sean P. McConnell
Sarah O'Laughlin Kulik
Jessica Priselac
**DUANE MORRIS LLP**
30 South 17th Street
Philadelphia, Pennsylvania 19103
(215) 979-1000
sszabaneh@duanemorris.com
spmcconnell@duanemorris.com
sckulik@duanemorris.com
jpriselac@duanemorris.com

Rebecca Bazan
**DUANE MORRIS LLP**
901 New York Avenue N.W., Ste 700 East
Washington, D.C. 20001
(202) 766-7800
rebazan@duanemorris.com

Wilson F. Green
**Wilson F. Green LLC**
301 19th Street North, Ste. 525
Birmingham, AL 35203
(205) 722-1018
wilson@wilsongreenlaw.com

*Attorneys for Plaintiffs Temple University Health System, Inc.; The Trustees of the University of Pennsylvania; The Children's Hospital of Philadelphia; Northwell Health, Inc.; HMH Hospitals Corporation; The Nemours Foundation; Penn State*

Los Angeles, CA 90067
Tel: (310) 295-9524
kbutler@brsllp.com
creichline@brsllp.com
sliu@brsllp.com
ftang@brsllp.com
tkeating@brsllp.com
rroth@brsllp.com

*Attorneys for Plaintiffs Allina Health System; Atlantic Health System; CentraCare Health System; Fairview Health Services; Mayo Clinic; RWJ Barnabas Health, Inc.; University of Florida Health Corporation; and The University of Chicago Medical Center*

/s/ Jon Corey
Jon Corey
**MCKOOL SMITH, PC**
1717 K Street NW, Suite 1000
(202) 370-8300
jcorey@mckoolsmith.com

John Briody
James Smith
**MCKOOL SMITH, PC**
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019
(212) 402-9400
jbriody@mckoolsmith.com
jsmith@mckoolsmith.com

Lew LeClair
**MCKOOL SMITH, PC**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
(214) 978-4000
lleclair@mckoolsmith.com

*Attorneys for Plaintiffs Temple University Health System, Inc.; The Trustees of the University of Pennsylvania; The Children's Hospital of Philadelphia; Northwell Health, Inc.; HMH Hospitals Corporation; The Nemours Foundation; Penn State*

*Health; WellSpan Health; Geisinger Health; MedStar Health, Inc.; Tower Health; Doylestown Hospital; Grand View Hospital d/b/a Grand View Health; Halifax Hospital Medical Center; Hunterdon Healthcare System, Inc.; Meadville Medical Center; St. Clair Health Corporation; Penn Highlands Healthcare, Inc.; Holy Redeemer Health System; St. Luke's Health Network, Inc. d/b/a St. Luke's University Health Network; Independence Health System; Eastern Maine Healthcare Systems d/b/a Northern Light Health; LHHealth, LLC, Harvard Medical Faculty Physicians at Beth Israel Deaconess Medical Center, Inc.; Radiology Partners, Inc.; and Highlands Oncology Group, P.A.*

/s/ *Steven Sklaver*

Steven Sklaver
Glenn C. Bridgman
Molly A. Karlin
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
ssklaver@susmangodfrey.com
gbridgman@susmangodfrey.com
mkarlin@susmangodfrey.com

Tanner Laiche
**SUSMAN GODFREY L.L.P.**
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
tlaiche@susmangodfrey.com

Cyril V. Smith
csmith@zuckerman.com
**ZUCKERMAN SPAEDER LLP**
100 E Pratt Street, Suite 2440
Baltimore, MD 21202
Telephone: (410) 332-0444
Facsimile: (410) 659-0436

*Health; WellSpan Health; Geisinger Health; MedStar Health, Inc.; Tower Health; Doylestown Hospital; Grand View Hospital d/b/a Grand View Health; Halifax Hospital Medical Center; Hunterdon Healthcare System, Inc.; Meadville Medical Center; St. Clair Health Corporation; Penn Highlands Healthcare, Inc.; Holy Redeemer Health System; St. Luke's Health Network, Inc. d/b/a St. Luke's University Health Network; Independence Health System; Eastern Maine Healthcare Systems d/b/a Northern Light Health; LHHealth, LLC, Harvard Medical Faculty Physicians at Beth Israel Deaconess Medical Center, Inc.; Radiology Partners, Inc.; and Highlands Oncology Group, P.A.*

/s/ *Jennifer S. Collins*

Jennifer S. Collins
**WOMBLE BOND DICKINSON (US) LLP**
1331 Spring St. NW, Suite 1400
Atlanta, Georgia 30309
Jennifer.Collins@wbd-us.com
Telephone: (404) 879-2472

Jason C. Hicks
Ian R. Dickinson
**WOMBLE BOND DICKINSON (US) LLP**
201 E. Main Street, Suite P
Charlottesville, VA 22902
Jason.Hicks@wbd-us.com
Ian.Dickinson@wbd-us.com
Telephone: (202) 857-4536

Christos Christodoulou
**WOMBLE BOND DICKINSON (US) LLP**
2001 K Street NW
Washington, DC 20006
Christos.Christodoulou@wbd-us.com
Telephone: (202) 857-4563

Richard J.R. Raleigh, Jr.
**WOMBLE BOND DICKINSON (US) LLP**
200 Davis Cir SW
Suite 200
Huntsville, Alabama 35801

59

Christopher R. MacColl
cmaccall@zuckerman.com
**ZUCKERMAN SPAEDER LLP**
2100 L Street NW, Suite 400
Washington, D.C. 20037
Telephone: (202) 778-1800
Facsimile: (202) 822-8106

*Attorneys for Plaintiffs Memorial Hospital
for Cancer and Allied Diseases, Memorial
Sloan-Kettering Cancer Center, and South
Shore Hospital, Inc.*

*/s/ Daniel L. Warshaw*
DANIEL L. WARSHAW
dwarshaw@pwfirm.com
BOBBY POUYA
bpouya@pwfirm.com
MICHAEL H. PEARSON
mpearson@pwfirm.com
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104

*Attorneys for Plaintiffs IES Central Texas
PLLC; IES HSP Indiana LLC; IAS Arizona
PLLC; IAS Oklahoma LLC; IES Alabama
PLLC; IES Arizona PLLC; IES Colorado
PLLC; IES Carrollton PLLC; IES Florida
PLLC; Integrative Emergency Services
Physician Group -Houston, PLLC; IES HSP
Oklahoma LLC; IES Hospitalists PLLC;
IES Oklahoma LLC; IES South Carolina
LLC; Integrative Health Arizona LLC;
Integrative Care Services Florida LLC; IES
OBS Colorado PLLC; Integrative
Emergency Services Physician Group, P.A.;
IES Arkansas PLLC; IES Hsp Arkansas
PLLC; IES Missouri LLC; IES Hsp
Missouri LLC; Integrative Health Texas
PLLC, AmeriTeam Services, LLC;
Southeastern Emergency Physicians LLC;
Texas Medicine Resources, LLP;*

Richard.Raleigh@wbd-us.com
Telephone: (256) 834-8651

Attorneys for Plaintiffs Phoebe Putney
Memorial Hospital, Inc., Phoebe Sumter
Medical Center, Inc., Phoebe Worth Medical
Center, Inc., and Phoebe Physician Group,
Inc.

*/s/ Michael E. Martínez*
Michael E. Martínez (Ill. Bar No. 6275452)
Lauren Norris Donahue (Ill. Bar No.
6294505)
Victoria S. Pereira Duarte (Ill. Bar No.
6336540)
**K&L GATES LLP**
70 W. Madison St., Suite 3300
Chicago, IL 60602
Telephone: (312) 372-1121
Michael.Martinez@klgates.com
Lauren.Donahue@klgates.com
Victoria.Duarte@klgates.com

Michael J. Stortz (Cal. Bar No. 139386)
**K&L GATES LLP**
4 Embarcadero Ctr, Suite 1200
San Francisco, California 94111
Telephone: (415) 882-8200
Michael.Stortz@klgates.com

Richard W. Fields (D.C. Bar No. 418444)
Martin Cunniff (D.C. Bar No. 424219
Edward Han (D.C. Bar No. 394515)
**FIELDS HAN & CUNNIFF PLLC**
1701 Pennsylvania Avenue NW, Suite 200
Washington, D.C.
Telephone: (833) 382-9816
fields@fhcfirm.com
martincunniff@fhc.com
edhan@fhcfirm.com

*Counsel for Bon Secours Mercy Health, Inc.,
University Health Systems of Eastern
Carolina, Inc., Endeavor Health, INTEGRIS
Health, Inc., Main Line Health, Inc., Medical
University Hospital Authority, Mercy Health,*

60

*Emergency Coverage, LLC; Florida Emergency Physicians Kang & Associates, M.D., LLC; Longhorn Emergency Medicine Associates, P.A.; Mid-Ohio Emergency Services LLC; ACS Primary Care Physicians – Southeast, P.C.; Fremont Emergency Services (Scherr), Ltd.; Texas Physician Resources, LLP; InPhyNet South Broward, LLC; Paragon Contracting Services, LLC; Paragon Emergency Services LLC; ACS Primary Care Physicians Southwest, P.A.; Southeastern Emergency Physicians of Memphis, LLC; Emergency Services of Oklahoma, P.C., CommonSpirit Health; Dignity Health; Dignity Community Care; Virginia Mason Franciscan Health; Catholic Health Initiatives Colorado; St. Luke's Health System Corporation d/b/a CHI St. Luke's Health; CHI Nebraska d/b/a CHI Health; and KentuckyOne Health, Inc.*

*/s/ Harvey J. Wolkoff*
Harvey J. Wolkoff
Aliki Sofis
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
111 Huntington Avenue, Suite 520
Boston, MA 02199-3600
Tel.: (617) 712-7100
harveywolkoff@quinnemanuel.com
alikisofis@quinnemanuel.com

Adam B. Wolfson
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
865 S. Figueroa St., 10th Fl.
Los Angeles, CA 90017
Tel.: (213) 443-3000
adamwolfson@quinnemanuel.com

David LeRay
Samuel I. Waranch
Vinay S. Basti
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

*Norton Healthcare, Inc., Providence St. Joseph Health, Roper St. Francis Healthcare, Sanford, Thomas Jefferson University, The Regents of the University of Michigan on behalf of University of Michigan Health, University of North Carolina Health Care System, University of Rochester, and West Virginia United Health System, Inc.*

*/s/ William Lavery*
William Lavery
Joseph Ostoyich
Danielle Morello
Jordan Passmore
Dorothea R. Allocca
Sung Shin
**CLIFFORD CHANCE US LLP**
2001 K Street NW
Washington, DC 20006
Tel: (202) 912-5000
william.lavery@cliffordchance.com
joseph.ostoyich@cliffordchance.com
danielle.morello@cliffordchance.com
jordan.passmore@cliffordchance.com
dodi.allocca@cliffordchance.com
sung.shin@cliffordchance.com

Sanaz Payandeh
**CLIFFORD CHANCE US LLP**
Two Manhattan West
375 9th Avenue
New York, New York 10001
Tel: (212) 878-8000
sanaz.payandeh@cliffordchance.com

*Attorneys for Plaintiffs Mount Nittany Health System and Weill Cornell Medicine*

295 Fifth Ave., 9th Fl.
New York, NY 10016
Tel.: (212) 849 7100
davidleray@quinnemanuel.com
samuelwaranch@quinnemanuel.com
vinaybasti@quinnemanuel.com
*Attorneys for Plaintiffs Boston Children's
Hospital et al.*

Case 2:25-cv-00910-MVRD Document 85-1 Filed 09/02/25 Page 122 of 123

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 10th day of September, 2025, I caused the

foregoing to be electronically filed with the Clerk of Court using the CM/ECF system which will

send notification of such filing to all Counsel of record.

*/s/ Nikol A. Oydanich*
Nikol A. Oydanich