FILED

2025 Dec-22  AM 09:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 3

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **Jackson Hospital & Clinic, Inc.,** *et al.,*[1] | § | |
| | § | **Case No. 25-30256** |
| | § | |
| **Debtors.** | § | |
| | § | **Jointly Administered** |

| | | |
|---|---|---|
| **Jackson Hospital & Clinic, Inc.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Adv. No. 25-03025** |
| | § | |
| **Blue Cross and Blue Shield of Alabama,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

### PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### [This Motion Seeks Emergency/Expedited Relief]

Jackson Hospital & Clinic, Inc. ("Plaintiff," "Debtor," or "Jackson Hospital"), the debtor in the above-styled chapter 11 bankruptcy case (the "Bankruptcy Case"), files this Emergency Motion ("Motion") for Temporary Restraining Order ("TRO") and Preliminary Injunction ("Preliminary Injunction") against Blue Cross and Blue Shield of Alabama ("Defendant" or "Blue Cross Alabama"). In support thereof, Jackson Hospital respectfully shows as follows:

---

[1] The Debtors in these Chapter 11 cases are Jackson Hospital & Clinic, Inc. and JHC Pharmacy, LLC.

## PRELIMINARY STATEMENT

1.      As set forth in Jackson Hospital's Original Complaint ("Complaint"), Blue Cross Alabama has refused, and continues to refuse, to act in good faith and pay Jackson Hospital fair and reasonable reimbursement rates. Blue Cross Alabama has discriminated, and continues to discriminate, against Jackson Hospital by paying Jackson Hospital significantly less than the reimbursement rates Blue Cross Alabama pays the other hospital in Montgomery, Alabama – Baptist Medical Center ("Baptist") (upon information and belief, the reimbursement rates Blue Cross Alabama pays Jackson Hospital are approximately 30-40% *less* than the rates Blue Cross Alabama pays Baptist).

2.      Through this Motion, Jackson Hospital seeks an order providing the following emergency injunctive relief: (i) enjoining Blue Cross Alabama from refusing to pay Jackson Hospital the same reimbursement rates Blue Cross Alabama pays the other hospital in Montgomery, Alabama (*i.e.*, Baptist); and (ii) compelling Blue Cross Alabama, at a minimum, to immediately pay Jackson Hospital the same reimbursement rates Blue Cross Alabama already pays the other hospital in Montgomery, Alabama (*i.e.*, Baptist).

3.      The Complaint, filed concurrently with this Motion, contains specific facts clearly demonstrating that Blue Cross Alabama is in violation of federal antitrust laws and several contractual obligations owed to Jackson Hospital. Such specific facts set forth in the Complaint are further supported by the publicly available sources/evidence cited in the Complaint and the Declaration of John D. Quinlivan, attached hereto as "Exhibit 1." *See* Fed. R. Civ. P. 65(b)(1)(A).

4.      If Blue Cross Alabama is not *immediately* enjoined from engaging in discriminatory and anticompetitive conduct and *immediately* compelled to pay the same reimbursement rates to Jackson Hospital that Blue Cross Alabama already pays Baptist, there is a substantial and

immediate danger – and likely outcome – that Jackson Hospital will be unable to successfully emerge from bankruptcy and, instead, will be forced to close its doors and no longer provide essential care to the residents of Alabama.

5.      Pursuant to Federal Rule of Civil Procedure 65(b)(1)(B), the undersigned counsel for Jackson Hospital hereby certifies that – after filing this Motion and before the hearing on the TRO – he will attempt to inform Blue Cross Alabama that Jackson Hospital filed the above-referenced lawsuit and is seeking a TRO on an emergency basis. Moreover, given the immediate danger of irreparable harm in the absence of a TRO, including (i) Jackson Hospital being prevented from successfully emerging from bankruptcy, and (ii) Jackson Hospital being forced to close its doors and stop providing critical healthcare services to Alabamians, no further notice to Blue Cross Alabama prior to the hearing on Jackson Hospital's request for the TRO should be required.

## ARGUMENT AND AUTHORITIES

### A.      Legal Standard

6.      "Requests for emergency injunctive relief are not uncommon in federal court and sometimes involve decisions affecting life and death." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-1226 (11th Cir. 2005). To be entitled to a temporary restraining order or a preliminary injunction, a party must establish: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Id.*

7.      Typically, a temporary restraining order or preliminary injunction "is to protect the movant from irreparable injury and to preserve the status quo until the . . . court renders a meaningful decision on the merits." *Butler v. Ala. Judicial Inquiry Com'n*, 111 F. Supp. 2d 1224,

1229 (M.D. Ala. 2000) (citing *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974)). However, "[t]emporary restraining orders and preliminary injunctions also may be issued to force parties to act." *Pareto Health (AL), LLC v. WeCare TLC, LLC*, No.: 2:21-cv-00530-AMM, 2021 WL 4860760, at \*3 (N.D. Ala. Apr. 23, 2021) (citing *E.A. Renfroe & Co., Inc. v. Moran*, No. CV 06-AR-1752-S, 2006 WL 8441172, at \*6 (N.D. Ala. Dec. 8, 2006)). "When a preliminary injunction goes beyond the status quo and seeks to force one party to act, it becomes a mandatory or affirmative injunction and the burden placed on the moving party is increased." *Id.* (quoting *Mercedes-Benz U.S. Int'l, Inc. v. Cobasys, LLC*, 605 F. Supp. 2d 1189, 1196 (N.D. Ala. 2009)).

8.      For all the reasons discussed herein (and those set forth at the hearing on the TRO and the separate hearing on the Preliminary Injunction), Jackson Hospital has met its burden to obtain its requested injunctive relief, including and not limited to the mandatory or affirmative aspects of the requested injunction, against Blue Cross Alabama.

**B.      <u>Jackson Hospital is Likely to Succeed on the Merits</u>**

9.      When a party asserts multiple claims, it only needs to show a substantial likelihood of success on the merits of at least one claim to justify the requested injunctive relief. *See, e.g., Butler*, 111 F. Supp. 2d at 1230 ("It is sufficient if the law or facts support a substantial likelihood of success on at least one claim that would sustain the issuance of a temporary restraining order."). "A court accepts as true all declarations and well-pleaded factual allegations when considering a plaintiff's requested relief." *Pride v. City of Prattville, Ala.*, No. 2:24-cv-00786-RAH, 2024 WL 5011602, at \*2 (citing *Alabama v. United States Dep't of Com.*, 546 F. Supp. 3d 1057, 1063 (M.D. Ala. 2021)).

10.     Here, Jackson Hospital has established a substantial likelihood of success on the merits in connection with its Antitrust Claims[2] *and* its Breach of Contract Claim.[3]

i.   The Antitrust Claims

a.   *Applicable Standard*

11.     The Sherman Act prohibits "every contract, combination . . . or conspiracy, in restraint of trade" and any monopolization or monopsonization, attempted monopolization or monopsonization, and/or conspiracy or combination to monopolize or monopsonize. *See* 15 U.S.C. §§ 1, 2. Under the Clayton Act (*i.e.*, 15 U.S.C. §§ 12-27), parties have a private right of action and may be awarded treble damages and injunctive relief. *See* 15 U.S.C. §§ 15, 26. Section 16 of the Clayton Act specifically authorizes injunctive relief against threatened loss or damage" resulting from an antitrust violation and to issue a preliminary injunction upon "a showing that the danger of irreparable loss or damage is immediate." *See* 15 U.S.C. § 26. "To obtain injunctive relief under § 16 of the Clayton Act, that injury must be an injury "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful."

12.     "In the Eleventh Circuit, a Section 1 claim analyzed under the rule of reason requires the plaintiff to show '(1) the anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the defendant's conduct has no pro-competitive benefit or justification.'" *Leonard v. Ala. State Bd. of Pharmacy*, 591 F. Supp. 3d 1155, 1168 (M.D. Ala. 2022) (quoting *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065,

---

[2]     Jackson Hospital has brought various claims under the Sherman Act. To show entitlement to injunctive relief, Jackson Hospital may rely on each of those claims but specifically focuses herein on Counts 2 and 7 (hereinafter, the "Antitrust Claims").

[3]     Jackson Hospital has also brought a breach of contract claim against Blue Cross Alabama. In connection with such claim, Jackson Hospital further alleges that Blue Cross Alabama has breached the implied duty of good faith and fair dealing in Blue Cross Alabama's performance under the parties' agreements. Jackson Hospital's breach of contract claim, including breach of the implied duty of good faith and fair dealing, is referred to herein as the "Breach of Contract Claim."

1071 (11th Cir. 2004)). "To show an anticompetitive effect on the market, the plaintiff 'may establish either (1) that the restraint had an 'actual detrimental effect' on competition, or (2) that the restraint had the potential for genuine anticompetitive effects and that the conspirators had market power in the relevant market.'" *Id.* (quoting *Procaps S.A. v. Patheon, Inc*, 845 F.3d 1072, 1084 (11th Cir. 2016)). To show the potential for anticompetitive effects, "the plaintiff must define the relevant market and establish that the defendant[] possessed power in that market." *Id.* at 1168-1169 (quoting *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996)).

13.    Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. To establish a claim of monopolization under Section 2 of the Sherman Act, a plaintiff must show "(1) the possession [by the defendant] of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *OJ Commerce, LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1244 (11th Cir. 2022) (quoting *Spanish Broad.*, 376 F.3d at 1074). With respect to the second element, a party must also show "predatory or exclusionary acts or practices that have the effect of preventing or excluding competition within the relevant market." *Am. Proteins, Inc. v. River Valley Ingredients, LLC*, 640 F. Supp. 3d 1364, 1377 (N.D. Ga. 2022) (quoting *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1294 (11th Cir. 2004)). Like with a Section 1 claim, a Section 2 claim "require[s] harm to competition within a . . . distinct market." *Spanish Broad.*, 376 F.3d at 1074.

   b. *Jackson Hospital is Likely to Succeed on the Antitrust Claims*

14.    Jackson Hospital has shown a substantial likelihood of success on its Antitrust Claims against Blue Cross Alabama.

---

15.     First, with respect to both Count 2 (*i.e.*, Monopsonization under Section 2 of the Sherman Act) and Count 7 (*i.e.*, Claim for Threefold Damages and Interest (Market Allocation Claim) under Section 1 of the Sherman Act), Jackson Hospital has shown that Blue Cross Alabama and its affiliates[4] unlawfully agreed that Blue Cross Alabama's affiliates will not compete with Blue Cross Alabama in the sale of commercial health insurance and the sale of administrative services for healthcare plans in the State of Alabama. These unlawful, anticompetitive agreements between Blue Cross Alabama and its affiliates have ensured that each Blue Cross entity—like Blue Cross Alabama—dominates and controls its own state.

16.     To that end, with respect to both Count 2 and Count 7, Jackson Hospital has shown that Blue Cross Alabama possesses monopoly power in the commercial health-insurance market in the State of Alabama. Specifically, Blue Cross Alabama's market share is approximately 84% in the State of Alabama and approximately 89% in Montgomery, Alabama (*i.e.*, where Jackson Hospital is located). *See Am. Proteins*, 640 F. Supp. 3d at 1377 (noting that plaintiffs' allegations that the defendants "control over 90% of the relevant market, which has high barriers to entry and no readily available substitutes," showed the possession of monopoly power in that market).

17.     Further, in support of Count 2 and Count 7, Jackson Hospital has shown that Blue Cross Alabama engages in predatory and exclusionary practices that have an anticompetitive effect on the commercial health-insurance market in Alabama. Specifically, Blue Cross Alabama, knowing that it is _the_ health insurer in the State of Alabama, wields dominant buyer power over commercial hospital services in Alabama, despite that Blue Cross Alabama knows that it and its

---

[4]     Blue Cross Alabama's "affiliates," when used herein, includes, but is not limited to: Blue Cross and Blue Shield Association; Anthem, Inc. d/b/a Anthem Blue Cross Life and Health Insurance Company; Elevance Health, Inc. f/k/a Anthem, Inc.; Health Care Service Corporation; Highmark, Inc. f/k/a Highmark Health Services; Blue Cross and Blue Shield of Florida, Inc.; Blue Cross and Blue Shield of Georgia, Inc.; Blue Cross and Blue Shield of Michigan; and Blue Cross and Blue Shield of Texas

affiliates pay hospitals—like Jackson Hospital—among the lowest reimbursement rates in the country.

18.    Blue Cross Alabama *knows* that it is critical for healthcare providers like Jackson Hospital to contract with commercial insurers. Blue Cross Alabama further *knows* that Jackson Hospital has no reasonable alternative but to contract with Blue Cross Alabama because Blue Cross Alabama completely controls the commercial health-insurance market in Alabama. In addition, Blue Cross Alabama *knows* that Jackson Hospital cannot adequately replace the patient volume or revenue from commercial insurance plans from other sources like out-of-pocket payors (a group that essentially does not exist) or government programs like Medicare or Medicaid (which pay prices that are significantly lower than the prices paid for commercial health plans of private employers or groups and are largely non-negotiable). Most importantly, Blue Cross Alabama knows that Jackson Hospital cannot sustain its operations without sufficient revenue from commercial insurers like Blue Cross Alabama. Specifically, Jackson Hospital depends on payments from patients insured by Blue Cross Alabama to offset financial losses from treating uninsured patients, out-of-pocket patients, and patients covered by government programs. Replacing even a small portion of commercially insured patients with non-commercially insured patients is not a viable option, as Jackson Hospital often receives little to no compensation—and frequently incurs losses—when providing critical and needed medical care to these groups.

19.    Despite this knowledge, Blue Cross Alabama has intentionally lowered reimbursement rates and prices paid to Jackson Hospital well below competitive levels, fully knowing that Jackson Hospital has no choice but to deal with them. Indeed, in light of Blue Cross Alabama's ill-gotten market power resulting from anticompetitive agreements with its affiliates, Jackson Hospital has been faced with (and continues to face) non-negotiable, sub-competitive

reimbursement rates during contract renewal periods with Blue Cross Alabama. In these instances, Blue Cross Alabama provides no legitimate/fair alternatives to the rates it dictates, other than to terminate its agreement with Jackson Hospital or to seek out some unnamed "competitor" for help (which, as set forth below, Blue Cross Alabama would undoubtedly deem to be a breach by Jackson Hospital of the parties' own agreements). As a result, Jackson Hospital is forced to either "accept" (which, in actuality, means "deal with") the rates Blue Cross Alabama imposes or risk being put out of business, ultimately receiving lower reimbursements than Jackson Hospital would absent Blue Cross Alabama's unlawful agreements with its affiliates.

20.     Blue Cross Alabama has used its market power and dominance to refuse to pay Jackson Hospital the same reimbursement rates that Blue Cross Alabama already pays Baptist (*i.e.*, a similarly situated hospital in Montgomery, Alabama). Upon information and belief, Blue Cross Alabama pays Jackson Hospital approximately ***30-40% less*** than Blue Cross Alabama pays Baptist for similar services. Blue Cross Alabama has not denied this alleged rate disparity, and Blue Cross Alabama has failed to identify any legitimate justification for same (because there is none). Instead, Blue Cross Alabama has continued to unilaterally impose below-market, unfair, and discriminatory reimbursement rates on Jackson Hospital, with no room for negotiation.

21.     With respect to Count 2, it cannot be said that Blue Cross Alabama's gain of monopoly and monopsony power was not "willful" or is simply the result of "a superior product, business acumen, or historic accident." *See OJ Commerce*, 34 F.4th at 1244.

22.     Finally, with respect to Count 7, there is no pro-competitive justification for Blue Cross Alabama's anticompetitive conduct. There is especially no pro-competitive justification for refusing to pay Jackson Hospital the same reimbursement rates as the other hospital that operates in Montgomery, Alabama (*i.e.*, Baptist).

23.     In sum, there is no doubt Blue Cross Alabama possesses monopoly power in the commercial health-insurance market in Alabama and has used that power to engage in anticompetitive conduct with no justification. Blue Cross Alabama's anticompetitive conduct constitutes violations of Sections 1 and 2 of the Sherman Act. Accordingly, Jackson Hospital has shown a substantial likelihood of success on its Antitrust Claims.

ii.  The Breach of Contract Claim

a.  *Applicable Standard*

24.     Under Alabama law, the elements of a breach of contract claim are: "(1) the existence of a valid contract binding the parties in the action, (2) [the plaintiff's] own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *Jones v. Alfa Mut. Ins. Co.*, 875 So. 2d 1189, 1195 (Ala. 2003) (quoting *Ex parte Coleman*, 861 So.2d 1080, 1085 (Ala. 2003)).

25.     Alabama law implies a covenant of good faith and fair dealing in the performance of contracts. *See, e.g., Shoney's LLC v. MAC East, LLC*, 27 So.3d 1216, 1220 n.5 (Ala. 2009) ("[I]n every contract there exists an implied covenant of good faith and fair dealing."). "There is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Id.* "Generally, contracting parties impliedly promise not to act so as to hinder, prevent, or make more burdensome the other's performance." *Eager Beaver Buick, Inc. v. Burt*, 503 So. 2d 819, 822 (Ala. 1987), *overruled on other grounds*, *Elmore Cnty. Comm'n v. Ragona*, 540 So. 2d 720 (Ala. 1989). "A breach of this implied promise [of good faith and fair dealing] may be construed as an actual breach of the contract, thereby giving the other party a cause of action on the contract." *Lake Martin/Ala. Power*

*Licensee Ass'n, Inc. v. Ala. Power Co.*, 601 So. 2d 942, 944 (Ala. 1992) (quoting *Eager Beaver Buick*, 503 So. 2d at 822).

> b. *Jackson Hospital is Likely to Succeed on the Breach of Contract Claim*

26.     Jackson Hospital has shown a substantial likelihood of success in establishing that Blue Cross Alabama has breached the parties' agreements by failing to abide by the implied duty of good faith and fair dealing in Blue Cross Alabama's performance of same.

27.     As set forth in the Complaint, Jackson Hospital and Blue Cross Alabama are parties to certain agreements, including: (i) a Participating Hospital Contract for Prospective Payment with respect to inpatient services, effective July 1, 2003 (hereinafter, the "Inpatient Contract"),[5] and (ii) a Preferred Outpatient Facility Contract, effective January 1, 2006 (hereinafter, the "Outpatient Contract")[6] (the Inpatient Contract and Outpatient Contract, collectively, the "Contracts").

28.     Each year since the Contracts were initially executed, the parties executed letter agreements and/or amendments whereby they amended the prospective inpatient and outpatient reimbursement rates for that contract year. In connection with same, the Inpatient Contract provides that the final reimbursement rate for the prospective year "shall be agreed upon through *negotiation*." *See* Ex. A, Art. III, § 2(a)(ii)(Step 3) (emphasis added). Likewise, the Outpatient Contract contemplates that the parties amend reimbursement amounts "by mutual agreement." *See* Ex. B, Art. VII, §§ 7.1, 7.2.

---

[5]     Given the concern that Blue Cross Alabama may claim certain terms of the Inpatient Contract are confidential, a true and correct (unredacted) copy of the Inpatient Contract will be offered at the TRO hearing under seal or in camera.

[6]     Given the concern that Blue Cross Alabama may claim certain terms of the Outpatient Contract are confidential, a true and correct (unredacted) copy of the Outpatient Contract will be offered at the TRO hearing under seal or in camera.

---

29.     Jackson Hospital's need to negotiate with Blue Cross Alabama with respect to reimbursement rates is critical. Jackson Hospital *depends* on commercial insurance reimbursement payments to offset chronic government underpayment.[7] Specifically, Medicare sets allowable reimbursement rates for hospital services, whereas commercial in-network allowed amounts for those same services are, on average, much higher. The national commercial average reimbursement rates are approximately 240% of Medicare. In Alabama, however, these average rates are closer to 140% of Medicare. Blue Cross Alabama is reimbursing Jackson Hospital at approximately 120% of Medicare (*i.e.*, *significantly* below national commercial averages, and well below statewide averages). As such, Blue Cross Alabama's reimbursement levels to Jackson Hospital are—and have been for years—economically unsustainable.

30.     Even worse, Blue Cross Alabama is reimbursing Baptist (*i.e.*, the other hospital in Montgomery, Alabama) significantly more than Jackson Hospital. Upon information and belief, Blue Cross Alabama pays Baptist approximately 30–40% *more* than Jackson Hospital for comparable services. Jackson Hospital and Baptist both operate in Montgomery and both provide acute-care inpatient and outpatient hospital services in the commercial sector.

31.     In the context of recent discussions regarding potential increases in Blue Cross Alabama's reimbursement rates to Jackson Hospital for the upcoming year, Jackson Hospital specifically informed Blue Cross Alabama of the substantial and material risk (and likely outcome) that Jackson Hospital will not be able to emerge from bankruptcy and continue in operations with the 2026 rates Blue Cross Alabama intends to impose upon Jackson Hospital. Jackson Hospital further requested that – at a minimum – Blue Cross Alabama pay Jackson Hospital the same rates that Blue Cross Alabama pays Baptist Medical Center ("Baptist").

---

[7]     Specifically, government programs like Medicare or Medicaid pay prices that are significantly lower than the prices paid for commercial health plans for private employers or groups and are largely non-negotiable.

32.      Rather than negotiating in good faith and addressing Jackson Hospital's concerns, Blue Cross Alabama responded that the unfair, below market, and discriminatory rates Blue Cross Alabama intends to impose upon Jackson Hospital in 2026 are "best and final" rates for Jackson Hospital. Notably, Blue Cross Alabama did *not* deny it is paying higher reimbursement rates to Baptist. Blue Cross Alabama then disingenuously "encouraged" Jackson Hospital to "contact other payers," with which Blue Cross Alabama claims it "directly compete[s]," "to assist in Jackson [Hospital's] efforts to maintain viability."

33.      First of all, Blue Cross Alabama's monopsony and monopoly power prevent Jackson Hospital from "negotiating" with "other payers" that "compete" with Blue Cross Alabama (because Blue Cross Alabama intentionally eliminates any such competition). In fact, in Blue Cross Alabama's own contracts with Jackson Hospital (*i.e.*, the Contracts), Blue Cross Alabama attempts to prohibit Jackson Hospital from entering into a contract with any other payor based upon reimbursement rates provided by Blue Cross Alabama. Ex. A, Art. II, § 6; Ex. B, Art. III, § 3.6. Thus, Blue Cross Alabama knows Jackson Hospital cannot simply look to alleged Blue Cross Alabama competitors (because no competition exists) and Blue Cross Alabama's suggestion otherwise is nothing more than unfair and blatant gamesmanship.

34.      Importantly, in the context of these recent discussions regarding 2026 reimbursement rates, Jackson Hospital made it clear to Blue Cross Alabama that if Blue Cross Alabama refuses to – at a minimum – pay Jackson Hospital the same reimbursement rates as Baptist, it will create the substantial, material, and imminent risk of forcing Jackson Hospital to close its doors and no longer provide critical care to the community Jackson Hospital has been faithfully serving for almost 80 years. Jackson Hospital urged Blue Cross Alabama to reconsider its position and agree to match the same reimbursement rates for Jackson Hospital that Blue Cross

Alabama already pays Baptist. However, as of the date of this filing, Blue Cross Alabama has refused to do so.

35.     Blue Cross's refusal to perform its agreements with Jackson Hospital in good faith are designed to impose—and continue to impose—sub-competitive and below market rates upon Jackson Hospital. And that is exactly what has occurred.

36.     Blue Cross Alabama *knows* Jackson Hospital has no choice but to deal with the below-market, unfair, and discriminatory reimbursement rates dictated by Blue Cross Alabama (including, but not limited to, for the upcoming calendar year). And Blue Cross Alabama has chosen to weaponize its market dominance by paying one hospital in Montgomery (*i.e.*, Baptist) significantly more than the other hospital in the same city (*i.e.*, Jackson Hospital).

37.     Knowing that Jackson Hospital has no choice but to deal with the unfair, discriminatory, and well below market reimbursement rates that Blue Cross Alabama unilaterally imposes, Blue Cross Alabama has effectively removed any "negotiation" from the process. As such, Blue Cross Alabama has breached the Contracts by refusing to negotiate with Jackson Hospital in good faith and even attempt to reach a "mutual agreement" as to fair and reasonable reimbursement rates per contract year (including, but not limited to, the upcoming 2026 calendar year). Blue Cross Alabama's breaches of the Contracts further establish Blue Cross Alabama's failure to abide by the duty of good faith and fair dealing in Blue Cross Alabama's performance under same.

38.     Blue Cross Alabama's breaches of the implied duty of good faith and fair dealing in performing under the Contracts (including, but not limited to, Blue Cross Alabama's failure to negotiate and *mutually* agree upon yearly reimbursement rates paid to Jackson Hospital, as the Contracts require) is causing significant harm to Jackson Hospital. As set forth more fully below,

if Blue Cross Alabama is not *immediately* required to abide by the implied duty of good faith and fair dealing in the performance of the Contracts, Jackson Hospital faces immediate and material danger of irreparable harm – specifically, that Jackson Hospital will not be able to successfully emerge from bankruptcy and will be forced to close its doors and no longer provide essential care to Alabamians in need of same. Jackson Hospital therefore seeks injunctive relief requiring Blue Cross Alabama to comply with basic contractual obligations under Alabama law.

39.    Accordingly, Jackson Hospital has established that it has a substantial likelihood of success on its Breach of Contract Claim.

**C.    Jackson Hospital Will Suffer Irreparable Harm Absent Injunctive Relief**

40.    There is material, substantial, and immediate danger that Jackson Hospital will suffer irreparable harm if Blue Cross Alabama is not (i) immediately (and permanently thereafter) enjoined from engaging in anticompetitive conduct and breaching the parties' Contracts *and* (ii) immediately compelled to abide by the duty of good faith and fair dealing in performing and Contracts and, at a minimum, compelled to pay Jackson Hospital the same reimbursement rates Blue Cross Alabama already pays Baptist.

41.    A party will suffer irreparable harm where the injury "cannot be undone through monetary remedies." *Yorktown Sys. Grp. Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1296 (11th Cir. 2024). The "purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits." *United States v. State of Alabama*, 791 F.2d 1450, 1459 (11th Cir.1986).

42.    Courts have repeatedly found that the potential of forcing a business to shut its doors and cease operations is sufficient to establish irreparable harm. *See Leeds v. v. Bd. of Dental Examiners of Ala.*, No. 2:18-cv-01679-RDP, 2018 WL 10593812, at *1 (N.D. Ala. Oct. 16, 2018)

(finding that the plaintiff, a dental practice, was entitled to injunctive relief on its Sherman Act claim and would suffer irreparable harm absent a TRO because, otherwise, "it would effectively put [the dental practice] out of business in Alabama"); *GOS Operator, LLC v. Sebelius*, No. 12–0035–WS–N, 2012 WL 175056, at *4 (finding that the threatened termination of a provider agreement, which would have an immediate effect of a nursing home facility becoming ineligible to participate in Medicare and Medicaid, constituted irreparable harm because it "threaten[ed] the very survival of plaintiff's business, and perhaps assure[d] its failure," because the facility would be forced "to cease operations, go out of business, lose revenues and residents that could not be recovered, and lose all of the goodwill associated with operation of its business"); *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995) (concluding that a book licensor was entitled to injunctive relief in connection with a breach of contract claim because "[t]he impending loss or financial ruin of [a plaintiff's] business constitutes irreparable injury," "irreparable injury has been characterized as loss of a movant's enterprise," and the plaintiff "would be unable to operate its business and the business [would] suffer economic collapse or insolvency"); *Univ. Health Servs. v. Thompson*, 24 S.W.3d 570, 578-79 (Tex. App.—Austin 2000, no pet.) (finding that doctors were likely to suffer irreparable harm absent injunctive relief because the risks involved in closing the hospital would mean the doctors could not provide their patients with the same care they previously received and, as such, the quality of the patients' care would be compromised).

43.     Here, Blue Cross Alabama's wrongful conduct already was a proximate cause in Jackson Hospital being forced into bankruptcy. Now, absent Jackson Hospital's requested injunctive relief, there is immediate and substantial danger (and it is the likely outcome) that Jackson Hospital will be unable to successfully emerge from bankruptcy (with the current deadline

to file a Chapter 11 plan set for December 31, 2025) and forced to close its doors for good. This would result in irreparable injury. Some examples are the displacement of approximately 1,800 Jackson Hospital employees; a significant loss in available hospital beds to serve those in need of acute medical care in and around Montgomery, Alabama (which, as set forth in the Complaint, is already insufficient as it is); and the inability of Jackson Hospital to continue providing critical healthcare services to Alabamians.

44.     Blue Cross Alabama *knows* the dire consequences of its refusal to pay Jackson Hospital – at a minimum – the same rates Blue Cross Alabama already pays Baptist, yet Blue Cross Alabama still refuses to do so. Instead, Blue Cross Alabama continues its discriminatory attack on Jackson Hospital by failing to even treat Jackson Hospital the same as the other hospital in Montgomery. No monetary remedy could undo the result of Jackson Hospital being forced to shut down rather than successfully emerging from bankruptcy. Absent the immediate injunctive relief requested herein, this irreparable harm is imminent.

45.     Accordingly, Jackson Hospital has shown that it will suffer irreparable injury if Blue Cross Alabama is not enjoined as set forth herein and immediately compelled to, at a minimum, immediately pay Jackson Hospital the same reimbursement rates Blue Cross Alabama already pays other hospitals within the Montgomery, Alabama region (specifically, Baptist).

**D.     <u>The Threatened Harm to Jackson Hospital Easily Outweighs Any Potential Harm to Blue Cross Alabama</u>**

46.     If Jackson Hospital does not obtain the requested injunctive relief, the harm to Jackson Hospital *far* outweighs any potential harm to Blue Cross Alabama.

47.     At most, the "harm" Blue Cross Alabama would suffer is not being able to pocket additional revenues from its wrongful conduct. But courts have found that enjoining a defendant's wrongful conduct—especially when only the defendant's desire to make more money is at stake—

does not outweigh the imminent and irreparable harm suffered by the plaintiff as the result of that wrongful conduct. *See, e.g., United States v. Stinson*, 661 F. App'x 945, 954-55 (11th Cir. 2016) (concluding that a federal tax return preparer's potential loss of $3,000 per day in income did not outweigh the significant harm suffered by the government and the low-income customers that the defendant was effectively defrauding).

48.    Here, it is without question that Blue Cross Alabama is not strapped for cash. As set forth in the Complaint, Blue Cross Alabama has become one of the most powerful and profitable corporations in Alabama. It controls roughly 90% of Alabama's commercial health-insurance market, and—for decades—Blue Cross Alabama has wielded unchecked power to unilaterally dictate and control the amount providers such as Jackson Hospital are paid. The reimbursement rates Blue Cross Alabama pays hospitals in Alabama are pennies compared to national commercial averages, and Blue Cross Alabama does not deny that the reimbursement rates it pays Jackson Hospital are even lower than the low rates paid to other Alabama hospitals. The question of whether the irreparable harm Jackson Hospital will suffer (if the requested injunctive relief is not granted) outweighs any alleged "harm" Blue Cross Alabama may suffer (if the requested injunctive relief is granted) is not a close call.

49.    Further, if Jackson Hospital is denied its requested injunctive relief and forced to close its doors, the economic effect on Blue Cross Alabama would be the same as if Blue Cross Alabama is compelled to immediately pay the same reimbursement rates to Jackson Hospital that it pays to Baptist. The patients who Jackson Hospital serves will not disappear if Jackson Hospital does not successfully emerge from bankruptcy. In the event Jackson Hospital ceases operations, those patients would go to Baptist (because Baptist would be the only option in Montgomery). Thus, Blue Cross Alabama would end up paying the higher Baptist rates for care provided to

patients that would otherwise be treated at Jackson Hospital. It therefore will have no economic effect (or no material economic impact) on Blue Cross Alabama if it is simply compelled to pay the same rates to Jackson Hospital that it already pays Baptist.

50.    For all the reasons set forth herein, the threatened harm to Jackson Hospital is exponential and irreparable, whereas any potential "harm" to Blue Cross Alabama is nonexistent (or nominal at best). Accordingly, Jackson Hospital has established that the equities clearly weigh in favor of granting Jackson Hospital's requested injunctive relief.

**E.    <u>The Requested Injunctive Relief Would Serve the Public Interest</u>**

51.    In this case, the public interest *strongly* weighs in favor of immediately granting Jackson Hospital's requested injunctive relief.

52.    Courts have found that harm to public health, including harm to patients and access to healthcare, are highly relevant to determining whether the requested injunctive relief would serve the public interest. *See GOS Operator*, 2012 WL 175056, at *5 (finding that the public interest factor weighed in favor of issuing an emergency temporary restraining order because transferring residents of a skilled nursing facility to other facilities would pose a substantial risk of "transfer trauma" to those residents); *Tribal Health, LLC v. United States*, ___ Fed. Cl. ___, 2025 WL 3240868, at *10 (Fed. Cl. Nov. 13, 2025) (denying injunctive relief to disappointed bidder and declining to prohibit performance of the contract at issue because, among other reasons, an order halting performance would disrupt healthcare services, and "any interruption in the services at issue—emergency department management and staffing—could have catastrophic consequences for an already underserved population" and, thus, "[a]ny harm that [the bidder] may face . . . pales in comparison to . . . the public's interest in ensuring prompt access to healthcare"); *Ex parte Health Care Mgmt. Grp. Of Camden, Inc.*, 522 So.2d 280, 281-83 (Ala. 1988) (enjoining

a hospital's new management company from transferring the hospital's funds out of state and converting part of the hospital into a drug and alcohol rehabilitation facility, in part, because it would jeopardize the success of the hospital and have a negative impact on the community)

53.    Here, as set forth in the Complaint, doing what is necessary to keep Jackson Hospital open is literally a matter of life and death. If Jackson Hospital is forced to close its doors, the consequences would be far-reaching and devastating. The Montgomery region already does not have enough hospital beds to serve those in need of acute medical care, and wait times at surrounding emergency rooms would increase exponentially. Jackson Hospital provides millions of dollars worth of care to uninsured patients every year. The catastrophic result of a multitude of Alabamians (especially those in the Montgomery area) in need of indigent care not having access to critical healthcare services would become a reality in the event of Jackson Hospital's closure.

54.    Accordingly, if Jackson Hospital does not obtain the injunctive relief requested herein, the public will be significantly harmed. Jackson Hospital has therefore shown that its requested injunctive relief will undoubtedly serve the public interest.

## REQUESTED RELIEF

For these reasons, Jackson Hospital respectfully requests that the Court issue a Temporary Restraining Order, followed by a Preliminary Injunction, as follows:

(a)    Blue Cross Alabama is enjoined from refusing to pay Jackson Hospital the same reimbursement rates Blue Cross Alabama pays the other hospital in Montgomery (*i.e.*, Baptist); and

(b)    Blue Cross Alabama is compelled, at a minimum, to immediately pay Jackson Hospital the same reimbursement rates Blue Cross Alabama already pays the other hospital in Montgomery, Alabama (*i.e.*, Baptist).

Pursuant to Federal Rule of Civil Procedure 65(c), Jackson Hospital is willing to post a bond and further requests that the Court require Jackson Hospital to provide only the minimum amount of security the Court deems reasonable and necessary to pay the costs and/or damages that Blue Cross Alabama may incur in the event Blue Cross Alabama is found to have been wrongfully enjoined or restrained. For the reasons discussed above, there is effectively no risk of Blue Cross Alabama suffering any material harm if the requested injunctive relief is granted. Therefore, a nominal amount of security is appropriate here.

Further, Jackson Hospital seeks an order providing that the Court's Temporary Restraining Order remain in full force and effect pending further order regarding Jackson Hospital's request for a Preliminary Injunction. In connection with ruling on Jackson Hospital's request for a Temporary Restraining Order, Jackson Hospital requests that the Court set an in-person, evidentiary hearing on Jackson Hospital's request for a Preliminary Injunction for the earliest available date the Court and Parties are available following the hearing on the request for the Temporary Restraining (to occur no later than the day before the Court's Temporary Restraining Order expires). Jackson Hospital further requests that, at such hearing, the Court issue a Preliminary Injunction in a form similar to the Temporary Restraining Order requested herein.

Jackson Hospital further requests any additional relief to which it has shown itself to be justly entitled.

Respectfully submitted,


/s/ Chase J. Potter

**CHASE J. POTTER***
Texas Bar No. 24088245
E-Mail: potter@imcplaw.com

**JOSHUA L. SHEPHERD***
Texas State Bar No. 24058104
E-Mail: shepherd@imcplaw.com

**ANNA OLIN RICHARDSON***
Texas Bar No. 24102947
E-Mail: anna@imcplaw.com

**IACUONE MCALLISTER POTTER PLLC**
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
Telephone:     (214) 432-1536

*Admitted Pro Hac Vice*

**COUNSEL FOR JACKSON HOSPITAL & CLINIC, INC.**


## CERTIFICATE OF SERVICE

This is to certify that, on December 18, 2025, a true and correct copy of the foregoing document was filed with the Court's CM/ECF system that will provide notice to all parties receiving electronic notices in this bankruptcy case.

Moreover, the undersigned counsel certifies that – after filing this Motion and before the hearing on the TRO – the undersigned will attempt to inform Blue Cross Alabama that Jackson Hospital filed the above-referenced lawsuit and is seeking a TRO on an emergency basis.


/s/ Chase J. Potter

**CHASE J. POTTER**