FILED

2026 Jan-05 PM 06:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| IN RE: BLUE CROSS BLUE SHIELD | § | Master File No. 2:13-cv-20000-RDP |
| | § | |
| ANTITRUST LITIGATION | § | |
| (MDL NO.: 2406) | § | This document relates to the |
| | § | Provider Track |
| | § | |
| | § | OPPOSED |
| | § | |
| | § | ORAL ARGUMENT REQUESTED |

---

**JACKSON HOSPITAL & CLINIC, INC.'S MOTION FOR RELIEF FROM JUDGMENT
AND TO BELATEDLY OPT OUT OF SETTLEMENT CLASS AND
RESPONSE TO MOTION TO ENFORCE PROVIDER SETTLEMENT AND TO
ENJOIN JACKSON HOSPITAL & CLINIC, INC.'S ADVERSARY PROCEEDING
<u>AGAINST BLUE CROSS AND BLUE SHIELD OF ALABAMA</u>**

Chase J. Potter*
Texas Bar No. 24088245
E-Mail: potter@imcplaw.com

IACUONE MCALLISTER POTTER PLLC
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
Telephone:    (214) 432-1536

*Pro Hac Vice Application Forthcoming*

and

Stuart H. Memory
ASB-2214-Y36V
MEMORY MEMORY & CAUSBY, LLP
Post Office Box 4054
Montgomery, Alabama 36103
Phone: 334-834-8000
Fax: 334-834-8001
Email: smemory@memorylegal.com

COUNSEL FOR JACKSON HOSPITAL & CLINIC, INC.

i

# TABLE OF CONTENTS

SUMMARY .................................................................................................................1

RELEVANT BACKGROUND.................................................................................2

    A.  The Jackson Hospital Bankruptcy ...............................................................2

    B.  The DIP Lender and Required Consent to Release Estate Claims ..................3

    C.  The DIP Lender Did Not Provide Written Consent for Jackson Hospital to Participate in the Class Action Settlement ...............................................3

    D.  The Bankruptcy Court's Order Vacating and Setting Aside Jackson Hospital's Participation in the Class Action Settlement ...........................5

    E.  The Adversary Proceeding.............................................................................5

    F.  Current Procedural Posture ...........................................................................6

MOTION FOR RELIEF TO OPT OUT....................................................................7

    A.  Legal Standard ..............................................................................................7

    B.  The Court's Discretion to Grant Jackson Hospital's Requested Relief...........9

    C.  Jackson Hospital's Failure to Timely Opt Out Is Excusable Under the Circumstances.. 10

        i.  There is No Danger of Prejudice to BCBSAL ......................................10

        ii.  The Length of Delay Has Little, if Any, Effect on Judicial Proceedings ..............13

        iii.  The Reason for Delay is Justified .....................................................14

        iv.  Jackson Hospital Acted in Good Faith ..............................................21

RESPONSE TO BCBSAL'S MOTION TO ENFORCE SETTLEMENT ...................22

    A.  Jackson Hospital's Breach of Contract Claim Was *Not* Released ...................22

    B.  Alternatively, Jackson Hospital Should be Afforded the Opportunity to Amend...........25

CONCLUSION..........................................................................................................25

Jackson Hospital & Clinic, Inc. ("Jackson Hospital," the "Hospital," or "Movant") hereby files the following: (1) Motion for Relief from Judgment and to Belatedly Opt Out of Settlement Class ("Motion" or "Motion for Relief to Opt Out"); and (2) Response to Motion to Enforce Provider Settlement and to Enjoin Jackson Hospital's Adversary Proceeding Against Blue Cross and Blue Shield of Alabama ("Blue Cross Alabama" or "BCBSAL")[1] (Doc. 3378, hereinafter, "Motion to Enforce Settlement").

Prior to filing the instant Motion, counsel for the Parties engaged in a telephonic conference (including multiple follow-up communications) and agreed on a procedure and briefing schedule to submit the issues related to the Motion for Relief to Opt Out and Motion to Enforce Settlement (collectively, the "Motions") to this Court. The Parties do not agree on the relief requested in the respective Motions. Specifically, BCBSAL opposes Jackson Hospital's request for relief to opt out from the Class Action Settlement. Jackson Hospital, in turn, opposes BCBSAL's request to enforce the Class Action Settlement Agreement against Jackson Hospital and enjoin Jackson Hospital's pending Adversary Proceeding in the Bankruptcy Court.[2]

## SUMMARY

1.      The question of whether Jackson Hospital should be allowed to opt out of the Blue Cross Blue Shield class action settlement – despite not doing so before the March 4, 2025, opt out deadline, is an equitable determination. When the equities at play are balanced, the equitable result is clear: Jackson Hospital should be permitted to opt out.

2.      Jackson Hospital filed for chapter 11 bankruptcy protection on February 3, 2025. The deadline to opt out was less than 30 days later. The first 30 days in even the run-of-the-mill

---

[1]      Jackson Hospital and BCBSAL are collectively referred to herein as the "Parties."
[2]      The "Bankruptcy Court," when used herein, means the United States Bankruptcy Court for the Middle District of Alabama.

chapter 11 case typically includes multiple emergency filings, urgent operational/financing issues, and the like. And the Jackson Hospital bankruptcy has been far from ordinary. As outlined herein, Jackson Hospital has been fighting tooth and nail to survive – so the hospital can continue providing critical healthcare services to Alabamians in need – since before filing for bankruptcy protection. The extraordinary efforts required of Jackson Hospital to keep its doors open (especially in early 2025) prevented Jackson Hospital from being able to fully analyze whether the hospital should, or even had the ability to, opt out prior to the March 4, 2025, deadline.

3.      Blue Cross Alabama will suffer no prejudice if Jackson Hospital is permitted to opt out. No funds have been paid to Jackson Hospital from the class action settlement fund. There are approximately 20 opt-out-complaints (encompassing approximately 550 opt-out-providers), and those opt-out-lawsuits are in their early stages. However, if Jackson Hospital is not permitted to opt out and continue pursuing the claims in the Adversary Proceeding (including the requested injunctive relief seeking fair reimbursement rates moving forward from Blue Cross Alabama), it will put Jackson Hospital in imminent danger of permanently closing. For these reasons and those outlined below, Jackson Hospital respectfully requests that the Court issue the relief requested herein.

## RELEVANT BACKGROUND

### A.      The Jackson Hospital Bankruptcy

4.      On February 3, 2025 (hereinafter, the "Petition Date"), Jackson Hospital and JHC Pharmacy, LLC (collectively, "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.[3] These cases are being jointly administered under Case No. 25-30256, pending in the United States Bankruptcy Court for the Middle District of Alabama (hereinafter,

---

[3]      11 U.S.C. §§ 101, *et seq.* (West).

the "Chapter 11 Cases" or the "Bankruptcy Case"). The goal of the Bankruptcy Case is for the Debtors to confirm a Chapter 11 Plan that permits Jackson Hospital to (i) successfully emerge from Bankruptcy and (ii) continue providing medical services to Alabamians in need.

**B.      The DIP Lender and Required Consent to Release Estate Claims**

5.      On February 4, 2025, in the Bankruptcy Case, the Debtors filed a Motion (the "DIP Facility Motion") seeking approval to enter a debtor-in-possession credit facility provided by Jackson Investment Group, LLC ("JIG" or the "DIP Lender"), which would allow the Debtors to, among other things, continue day-to-day operations and maintain patient care (the "DIP Facility"). *See* Doc. 3378-1, ¶ 5. The Debtors further sought immediate entry of an interim order authorizing the DIP Facility, emphasizing that, if new-money financing was not promptly secured, the Debtors would be forced to wind down operations and transport thousands of existing patients elsewhere. *See id.* On February 6, 2025, the Bankruptcy Court entered the requested interim order, which was immediately binding on the Debtors (the "Interim Order"). *See id.*, ¶¶ 6-7.

6.      The Interim Order granted the DIP Lender perfected security interests in and liens on the "DIP Collateral" (*i.e.*, the "DIP Liens"), which includes a non-exclusive list of items belonging to the Debtors' estates. *See id.*, ¶ 8. The Interim Order also approved the terms of a "DIP Term Sheet," which further gave the DIP Lender a perfected security interest in "all rights, title and interest" in certain assets, including litigation claims (the "DIP Term Sheet"). *See id.* Moreover, pursuant to the Interim Order and the DIP Term Sheet, the DIP Lender's written consent is required for the Debtors to dispose (*e.g.*, settle or release) the Debtors' litigation claims (*e.g.*, claims against BCBSAL). *See id.*, ¶¶ 10-11.

**C.      The DIP Lender Did Not Provide Written Consent for Jackson Hospital to Participate in the Class Action Settlement**

7.      As this Court is intimately familiar, starting in 2012, healthcare providers that

3

provided services to any patient insured by health insurance plans administered by Blue Cross Blue Shield Association and/or its local member plans and affiliated entities (collectively, the "Blues"), as well as subscribers to such plans, filed class actions against the Blues alleging antitrust claims. These actions were later consolidated in the present multi-district litigation (*i.e.*, *In re Blue Cross Blue Shield Antitrust Litigation*, MDL No.: 2406, Master File No. 2:13-CV-20000-RDP) (the "BCBS Class Action" or "Class Action"), with two tracks—one for providers (the "Provider Actions") and one for subscribers (the "Subscriber Actions").

8.      On October 14, 2024, the parties in the Provider Actions entered into a Settlement Agreement (the "Class Action Settlement"). *See* Doc. 3192-2.

9.      On December 4, 2024, this Court issued a Memorandum Opinion and Order Preliminarily Approving Provider Plaintiffs' Settlement and Plan for Notice and Appointment of Settlement Notice Administrator and Settlement Administrator (the "Preliminary Approval Order"). *See* Doc. 3225. At a high level, as part of the Class Action Settlement, the Blues agreed to pay $2.8 billion into a class settlement fund and to injunctive relief in the form of structural reforms and changes intended to encourage competition. *See id.*, p. 7-8.

10.      Pursuant to the Court's preliminary approval of the Class Action Settlement, the deadline to "opt out" of the Class Action Settlement was March 4, 2025 (the "Opt-Out Deadline"). *See id.*, p. 51. Further, the deadline to file a claim form to share in the proceeds of the Class Action Settlement fund was July 29, 2025. *See id.*

11.      Jackson Hospital did not opt out of the Class Action Settlement on or before the Opt-Out Deadline. *See* Ex. 1, Wilen Decl., ¶ 21. Jackson Hospital did not obtain approval from the Bankruptcy Court or obtain the DIP Lender's written consent before declining to opt out of the Class Action Settlement. *See id.* On August 19, 2025, this Court issued a Final Order and Judgment

Granting Final Approval of Provider Class Action Settlement (hereinafter, the "Final Order and Judgment"). *See* Doc. 3346.

**D.    The Bankruptcy Court's Order Vacating and Setting Aside Jackson Hospital's Participation in the Class Action Settlement**

12.    On October 24, 2025, the DIP Lender filed an Emergency Motion to Vacate and Set Aside the Debtors' Participation in Settlement (the "Vacate Motion"). *See* Doc. 3378-1. On October 31, 2025, the Bankruptcy Court issued an order granting the DIP Lender's Motion to Vacate and Set Aside Debtors' Participation in Settlement (the "Vacate Order"), in which the Bankruptcy Judge ruled as follows:

> 2.    **Debtors' Participation in Settlement Vacated and Set Aside**.  The Court hereby vacates and sets aside (1) the Debtors' failure to opt out of the Class Action Settlement, and (2) the Debtors' submission of a claim in such Class Action Settlement.

*See* Doc. 3378-4, p. 2, ¶ 2.

**E.    The Adversary Proceeding**

13.    On December 18, 2025, following the Bankruptcy Court's issuance of the Vacate Order, Jackson Hospital commenced an Adversary Proceeding in the Bankruptcy Court, styled *Jackson Hospital & Clinic, Inc. v. Blue Cross and Blue Shield of Alabama*, Adv. No. 25-03025 (the "Adversary Proceeding"). Specifically, Jackson Hospital filed an Original Complaint (the "Adversary Complaint") asserting, among other things, claims against BCBSAL for breach of contract and various antitrust violations. *See* Doc. 3378-2. That same day, Jackson Hospital also filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunction (the "Emergency Motion"). *See* Doc. 3378-3.

14.    Jackson Hospital alleges in the Adversary Complaint and Emergency Motion, among other things, that BCBSAL is required under the Parties' contracts to negotiate and reach

a mutual agreement with Jackson Hospital regarding new prospective reimbursement rates for the next contract year. *See* Doc. 3378-2, ¶ 139; *see also* Doc. 3378-3, ¶ 28. The Adversary Complaint further alleges BCBSAL refused to negotiate in good faith with Jackson Hospital (as BCBSAL is contractually obligated to do) and that, in discussions between the Parties regarding 2026 reimbursement rates, BCBSAL did not deny that (1) BCBSAL is paying Jackson Hospital *significantly* below the national commercial average reimbursement rates, and (2) BCBSAL is reimbursing Baptist Medical Center in Montgomery ("Baptist") approximately 30-40% *more* than Jackson Hospital. *See* Doc. 3378-3, ¶¶ 29-32.

15.    Specifically, in the context of recent discussions regarding potential increases in BCBSAL's reimbursement rates to Jackson Hospital for the 2026 year, Jackson Hospital directly informed BCBSAL of the substantial and material risk (and likely outcome) that Jackson Hospital will not be able to emerge from bankruptcy and continue in operations with the 2026 rates BCBSAL intends to impose upon Jackson Hospital (thus, the Adversary Proceeding, including but not limited to the injunctive relief sought by Jackson Hospital therein related to the reimbursement rates BCBSAL will pay Jackson Hospital moving forward – has a direct and material impact on Jackson Hospital's pending bankruptcy proceeding). *See id.*, ¶ 31. Jackson Hospital further requested that – at minimum – BCBSAL pay Jackson Hospital the same rates BCBSAL already pays Baptist. *See id.* BCBSAL responded that the unfair, below market, and discriminatory rates BCBSAL intends to impose upon Jackson Hospital in 2026 are the "best and final" rates for Jackson Hospital. *See id.*, ¶ 32.

**F.    <u>Current Procedural Posture</u>**

16.    Initially, Jackson Hospital obtained a hearing on the Emergency Motion to occur before the Bankruptcy Court on December 23, 2025.

17.     On December 22, 2025, BCBSAL filed the Motion to Enforce Settlement [Doc. 3378], and this Court held a telephone conference that same day regarding both the Emergency Motion and the Motion to Enforce Settlement. The following day, counsel for the Parties conferred and ultimately reached the agreement outlined above regarding the procedure and briefing schedule to submit the issues related to the Motions to this Court.

18.     On December 30, 2025, the Parties participated in a status conference with the Bankruptcy Court and informed the Bankruptcy Court of the current procedural posture and the agreement reached between the Parties related to the procedure for presenting the issues addressed herein to this Court.

<u>**MOTION FOR RELIEF TO OPT OUT**</u>

19.     As an initial matter, the Bankruptcy Court's Vacate Order fully supports permitting Jackson Hospital to proceed with the Adversary Proceeding and all claims asserted by Jackson Hospital against BCBSAL therein. The Vacate Order states the Bankruptcy Court "hereby vacates and sets aside (1) the Debtors' failure to opt out of the Class Action Settlement, and (2) the Debtors' submission of a claim in such Class Action Settlement." Doc. 3378-4, p. 2, ¶ 2. For the reasons set forth herein, in addition to the Bankruptcy Court's Vacate Order, Jackson Hospital should be permitted to opt out of the Class Action Settlement, because Jackson Hospital's failure to opt out before the Opt-Out Deadline is excusable under the circumstances, and the equities strongly support allowing Jackson Hospital to opt out.

A.     <u>**Legal Standard**</u>

20.     "A district court has discretion under Federal Rules of Civil Procedure 6(b) and 60(b) to modify its order to allow a late opt-out from a class action." *Augst-Johnson v. Morgan Stanley & Co., Inc.*, 247 F.R.D. 25, 26 (D.D.C. 2008) (citing *In re Vitamins Antitrust Class Actions*,

7

327 F.3d 1207, 1209-10 (D.C. Cir. 2003)). Under Rule 6(b), a "court may, for good cause, extend the time [to act] on motion made after the time has expired if the party failed to act because of excusable neglect." FED. R. CIV. P. 6(b)(1)(B). Under Rule 60(b), "[o]n motion and just terms, the court may relieve a party . . . from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect . . . or (6) any other reason that justifies relief." FED. R. CIV. P. 60(b)(1), (b)(6).

21.    Courts in the Eleventh Circuit have applied Rule 60(b) to a request to belatedly opt out of a class action settlement when a final judgment has already been entered. *See Fladell v. Wells Fargo Bank, N.A.*, No. 13-60721-CIV-MORENO, 2016 WL 1054521, at *2 (S.D. Fla. Mar. 11, 2016). However, "Rules 6(b)(1)(B) and 60(b) embody the same 'excusable neglect' standard." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-CV-5450, 2019 WL 3006262, at *3 (S.D.N.Y. July 10, 2019).

22.    "Excusable neglect is an equitable determination that requires an examination into whether the moving party had a good reason for not responding timely and whether the opposing party would be prejudiced." *In re HealthSouth Corp. Sec. Litig.*, 334 F. App'x 248, 253 (11th Cir. 2009) (citing *In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1297 (11th Cir. 2003)). The Supreme Court has established four factors to evaluate in determining whether a party has satisfied "excusable neglect": (1) "the danger of prejudice" to the non-moving party; (2) "the length of the delay and its potential impact on judicial proceedings"; (3) "the reason for the delay, including whether it was within the reasonable control of the movant"; and (4) "whether the movant acted in good faith." *Pioneer Inv. Servs. v. Brunswick Assocs.*, 507 U.S. 380, 395 (1993).

23.    "Excusable neglect . . . is a somewhat elastic concept and is not limited strictly to omissions caused by circumstances beyond the control of the movant." *Id.* at 392 (internal

quotations omitted). The conclusion of what is considered "excusable" "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id.* at 395. "Cases analyzing excusable neglect confirm that the factors prescribed by *Pioneer* necessarily overlap and are not precisely defined." *MRI Assocs. of St. Pete, Inc. v. Dairyland Ins. Co.*, No. 8:11–cv–665–T–30MAP, 2014 WL 29103, *2 (M.D. Fla. Jan. 2, 2014). "The provisions of [Rule 60(b)] must be carefully interpreted to preserve the delicate balance between the sanctity of final judgments and the 'incessant command of the court's conscience that justice be done in light of *all* the facts.'" *In re Tri-State Crematory Litig.*, MDL No. 1467, 2005 WL 8165451, at *7 (N.D. Ga. Mar. 22, 2005) (emphasis in original) (quoting *Tessmer v. Walker*, 833 F.2d 925, 926 (11th Cir. 1987)).

24.     For the reasons set forth herein, the facts, equitable considerations, and *Pioneer* factors strongly weigh in favor of (i) finding the failure of Jackson Hospital to opt out prior to the Opt-Out Deadline is excusable, and (ii) permitting Jackson Hospital to opt out and proceed with the Adversary Proceeding.

**B.      The Court's Discretion to Grant Jackson Hospital's Requested Relief**

25.     This Court is within its discretion to extend the Opt-Out Deadline and/or modify same in the Class Action Settlement with respect to Jackson Hospital (and, correspondingly, grant Jackson Hospital relief from the Final Order and Judgment). Specifically, "if the court sets a deadline in a class action settlement agreement, the court retains the discretion to alter that deadline." *Valley Drug Co. v. Geneva Pharm., Inc.*, 262 F. App'x 215, 218 (11th Cir. 2008). Where a "deadline was court-ordered, and not bargained for, the district court ha[s] the authority to extend the deadline under Fed. R. Civ. P. 6(b)." *Id.*

26.    Here, in the Preliminary Approval Order, the Court ordered that the Opt-Out Deadline was March 4, 2025, and the Court further ordered the procedures for opting out pursuant to the Opt-Out Deadline. *See* Doc. 3225, p. 53-54. The Court also directed Class Settlement Members that wanted to submit a Claim Form to comply with the requirements and procedures in the Claim Form. *See id.*, p. 54-55. Accordingly, the Court is within its discretion to grant the Motion for Relief to Opt Out notwithstanding its court-ordered Opt-Out Deadline being contained within the Class Action Settlement (*i.e.*, an agreement otherwise between parties).

**C.    Jackson Hospital's Failure to Timely Opt Out Is Excusable Under the Circumstances**

27.    As set forth above, the *Pioneer* factors are utilized to make an equitable determination as to whether a party's failure to act timely was excusable. *See HealthSouth Corp.*, 334 F. App'x at 253. This necessarily requires a fact-specific analysis into the circumstances of each case. Here, each of the *Pioneer* factors (including the equities contemplated therein) weigh in favor of allowing Jackson Hospital to opt out.

i.    There is No Danger of Prejudice to BCBSAL

28.    BCBSAL would suffer no undue prejudice if Jackson Hospital is permitted to opt out from the Class Action Settlement, whereas Jackson Hospital would suffer immense prejudice if it is prohibited from pursuing the claims asserted against BCBSAL in the Adversary Proceeding.

29.    The only possible "prejudice" about which BCBSAL could complain is with respect to the finality of the Class Action Settlement. However, while "class action defendants have an interest in resolving as many claims as possible . . . the class action device does not pursue finality and a global resolution of claims at all costs." *Perrigo Institutional Inv'r Grp. v. Papa*, 150 F.4d 206, 217 (3d Cir. 2025). "The inquiry is whether prejudice results from the *delay,* not from having to continue to litigate the case." *Conn. State Dental Ass'n v. Anthem Health Plans, Inc.*, 591

10

F.3d 1337, 1357 (11th Cir. 2009). "[T]o find prejudice, courts typically require more than the fact

that the defendant will face an additional lawsuit." *In re Processed Egg Prods. Antitrust Litig.*, 130

F. Supp. 3d 945, 954 (E.D. Pa. 2015). Accordingly, a class action defendant's desire for finality is

not dispositive of the question of prejudice.

30.    Here, proceeds from the Class Action Settlement have not been finally calculated

for each class member (much less paid out).[4] Jackson Hospital has not received any recovery from

the Class Action Settlement fund. *See* Ex. 1, ¶ 23. Further, there are a substantial number of

providers that opted out of the Class Action Settlement; Jackson Hospital would simply be one of

the many opt-out-providers. Moreover, requiring BCBSAL to defend against allegations from one

more opt-out-plaintiff is no prejudice at all considering the significant number of lawsuits already

filed by other opt-out-providers, and the early procedural posture of those lawsuits.

31.    As this Court has noted, "there are a significant number of Class Members who

have requested exclusion from the settlement." Final Order & J., Doc. 3346, p. 24. Specifically,

there appear to be over 6,000 providers that opted out from the Class Action Settlement, and – as

of the date of this filing – approximately 20 opt out complaints have been filed (encompassing

approximately 550 opt-out-plaintiffs). *See* Doc. 3343-1; *see also* No. 2:25-md-10000-RDP. These

cases, which have now been consolidated into an MDL before this Court, appear to be in their

early stages (hereinafter, the "Opt-Out Litigation").[5] If the Adversary Proceeding (or any portion

of same) is consolidated into the Opt-Out Litigation (for any purpose), such consolidation will not

result in undue or unreasonable delay in the Opt-Out Litigation (and likely no delay at all).

---

[4]    *See Tri-State Crematory Litig.*, 2005 WL 8165451, at *10 (noting that prejudice weighed against a finding of excusable neglect in part because settlement payments to the class had already been calculated and paid).
[5]    Based on a review of the docket, there appear to only be some initial discovery disputes between the opt-out plaintiffs and the Provider Plaintiffs.

32.    However, if Jackson Hospital is not permitted to opt out of the Class Action Settlement, it will cause Jackson Hospital to suffer significant and irreparable prejudice. For example, if the injunctive relief requested by Jackson Hospital against BCBSAL in the Adversary Proceeding is not granted – Jackson Hospital is in immediate and substantial danger of (i) not being able to successfully emerge from bankruptcy, and (ii) being forced to cease operations. *See* Ex. 2, Quinlivan Decl., ¶ 9.

33.    If Jackson Hospital closes, it would be catastrophic: resulting in the displacement of approximately 1,800 Jackson Hospital employees and a significant loss in available hospital beds to serve those in need of acute medical care in and around Montgomery; causing wait times at surrounding emergency rooms to increase significantly (emergency rooms that are already often at capacity or staffing diversion); and severely and negatively impacting the access of Alabamians (especially those in the Montgomery area and those who are indigent) to critical healthcare services. *See id.*, ¶ 10; *see also* Ex. 1, ¶ 13. It is undeniable the shut-down of Jackson Hospital would be devastating to Montgomery and the greater region Jackson Hospital serves (specifically with respect to access to indigent healthcare services for impoverished individuals residing in the Alabama River Region). Further, a shut-down would be very complicated and costly for numerous reasons, including the complexity, urgency, and significant costs involved in the process of transporting patients to other healthcare facilities that have not only the ability, but the capacity, to provide the healthcare services needed by the impacted patients. *See* Ex. 1, ¶ 13.

34.    Accordingly, the danger of any prejudice to BCBSAL (or lack thereof) – and the clear and extreme prejudice Jackson Hospital will suffer if not permitted to opt out – weighs in favor of granting Jackson Hospital's requested relief.

ii.  The Length of Delay Has Little, if Any, Effect on Judicial Proceedings

35.    As of the date of this filing, it has been approximately ten (10) months since the Opt-Out Deadline and approximately four-and-a-half months since the Final Order and Judgment. *See* Prelim. Approval Order, Doc. 3225, p. 51; Final Order & J., Doc. 3346. In addition—and importantly—the Opt-Out Deadline was *less than thirty (30) days* after the Petition Date and the DIP Lender's initial involvement in the Bankruptcy Case. *See* Ex. 1, ¶¶ 14-15.

36.    Courts consider the length of delay in a party's failure to timely opt out of a class action settlement in combination with the other *Pioneer* factors. There is no set time period that constitutes either an excusable or inexcusable length of delay.[6] Rather, some courts have found short delays to be inexcusable when the movant fails to identify *any* reason for the delay.[7] On the other hand, when a movant identifies a reasonable explanation for its delay (*i.e.*, the third *Pioneer* factor) and/or there is no indication that the movant delayed in bad-faith or for tactical reasons (*i.e.*, the fourth *Pioneer* factor), a longer delay may nonetheless be excusable. *See, e.g., Processed Egg Prods.*, 130 F. Supp. 3d at 955 (finding that "length of delay" factor weighed in favor of excusable neglect despite the movant (i) receiving notice of a class action settlement in April 2014, (ii) having access to the final opt out list prior to final approval of the settlement in August 2014, and (iii) not seeking to belatedly opt out until January 2015 because there was no danger of

---

[6]    However, Jackson Hospital acknowledges that Rule 60(c)(1) requires a motion for relief under 60(b) to be filed no more than a year after the Final Order and Judgment (which Jackson Hospital has satisfied). *See* FED. R. CIV. P. 60(c)(1).

[7]    *See Demint v. NationsBank Corp.*, 208 F.R.D. 639, 642–43 (M.D. Fla. 2002) (explaining the *sine qua non* in every excusable neglect analysis is an explanation of the reason for delay and finding class members' twelve-day delay was not excusable when they provided no explanation, which mooted further inquiry into other factors); *Snyder v. Ocwen Loan Servicing, LLC*, No. 14 C 8461, 2019 WL 2103379, at *11 (N.D. Ill. May 14, 2019) (holding three weeks after the opt out deadline was the outer limit of excusable neglect for members who offered no explanation for their delay); *Massey v. On-Site Manager, Inc.*, No. 11 CIV. 2612 BMC, 2013 WL 3149452, at *2 (E.D.N.Y. June 19, 2013) (holding there was no excusable neglect for a delay of four months when the class member offered no explanation for his delay).

prejudice, counsel candidly admitted his errors, and the failure to opt out "was certainly not part of a 'sinister, well-conceived plan to frustrate the opponent.'").

37.     As set forth below, there are numerous, justifiable reasons for the delay in Jackson Hospital opting out of the Class Action Settlement. None of these reasons were "sinister" or to gain any tactical advantage against BCBSAL. Instead, at all relevant times in connection with the Opt-Out Deadline, Jackson Hospital was hyper-focused on doing what was necessary to keep the Hospital's doors open and continue providing critical healthcare services, which is what the exigent circumstances Jackson Hospital faced demanded.

###     iii.  The Reason for Delay is Justified

38.     Courts across the country have held that the reason for a movant's delay in timely opting out is the most important *Pioneer* factor. "[T]he starting point in every case employing an analysis of excusable neglect is an explanation of the reason for the delay." *MRI Assocs.*, 2014 WL 29103, at *2 (quoting *Demint*, 208 F.R.D. at 642). There are some commonly offered excuses that courts have consistently found to be inadequate, such as: failure to receive notice of a class action settlement (despite surrounding circumstances indicating due process was accomplished)[8]; clerical or mailing-related errors in submitting an opt out form[9]; and attorney neglect, ignorance, or mistake.[10] Jackson Hospital does not rely on any of these inadequate excuses. Instead, Jackson

---

[8]     *See, e.g., MRI Assocs.*, 2014 WL 29103, at *3 (holding that alleged lack of notice was an insufficient reason for delay because a class member is only entitled to the "best notice practicable under the circumstances," due process does not require "actual notice," and the movants did not dispute that notice was sent to the correct address).

[9]     *See, e.g., In re Terazosin Hydrochloride Antitrust Litig.*, No. 99-MDL-1317-SEITZ/KLEIN, 2005 WL 8181055, at *2-3 (S.D. Fla. July 18, 2005) (finding that the movants' reason for delay was not excusable neglect when their opt out requests were not received on time because they allotted only two business days before the deadline to mail their requests and did not utilize the most expeditious mailing method).

[10]     *See, e.g., In re Turkey Antitrust Litig.*, No. 19-C-8318, 2025 WL 1870729, at *3 (N.D. Ill. July 7, 2025) (finding that attorneys' mistake was not a valid reason for delay to opt out of a class action settlement and that "attorney error is not a sufficient reason to find excusable neglect as inattentiveness to the litigation is not excusable") (quoting *Matter of Plunkett*, 82 F.3d 738, 742 (7th Cir. 1996)); *see also Roofer's Pension Fund v. Papa*, No. 16-2805 (RMB) (LDW), 2024 WL 4205638, at *13 (D.N.J. Sept. 12, 2024) (collecting cases and noting that an attorney's failure to monitor the docket and verify a client's opt out status does not constitute excusable neglect).

Hospital contends it should be permitted to opt out because – from the time the Opt-Out Deadline was first established (December 2024) through the Opt-Out Deadline (March 4, 2025) and even through today – Jackson Hospital has been fighting to survive and continue providing critical healthcare services to the patients Jackson Hospital serves.

39.    Jackson Hospital's Motion is supported by the Declaration of Allen Wilen – Jackson Hospital's Chief Restructuring Officer ("CRO"). *See* Ex. 1. In his Declaration, Mr. Wilen testifies at length regarding the Hospital's financial difficulties leading to Bankruptcy, the flurry of activity on the eve of Jackson Hospital's Bankruptcy filing, the numerous emergency issues that arose – which threatened Jackson Hospital's viability – during the first thirty (30) days after the Petition Date, and the Hospital's efforts since then to reorganize and continue providing critical healthcare services, all the while dealing with day-to-day operational issues and urgent matters impacting the Hospital's ability to stay open. *See id.*, ¶¶ 7-19. Mr. Wilen further explains how these issues directly relate to why Jackson Hospital's delay in failing to opt out of the Class Action Settlement by the Opt-Out Deadline should be excused. *See id.*, ¶¶ 20-22.

40.    In September 2024 (*i.e.*, months before the Petition Date and even before approval of the Class Action Settlement was requested), Mr. Wilen was retained as the CRO for Jackson Hospital to begin a restructuring initiative and plan focused on revenue growth, operating efficiency, and cost-saving initiatives (all the while dealing with creditor pressure). *See id.*, ¶¶ 2-3, 9. From approximately October 2024 through January 2025 (*i.e.*, during which approval was sought and granted for the Class Action Settlement, including the Opt-Out Deadline), Mr. Wilen worked extensively in his role as CRO for Jackson Hospital, including engaging in numerous discussions with multiple parties in an effort to secure additional and much needed financing for the Hospital. *See id.*, ¶ 10. In connection with these efforts, Mr. Wilen negotiated with the

Hospital's bondholders ("Bondholders") and the City of Montgomery regarding potential rescue financing or DIP (debtor-in-possession) financing for the anticipated Chapter 11 cases. *See id.*

41.    In January 2025, on the eve of Jackson Hospital's Bankruptcy filing, there was a flurry of activity. *See id.*, ¶ 11. Due in large part to the Hospital's financial crises and the uncertainty regarding the Hospital's future as a going concern, critical vendors threatened to stop supplying necessary products (such as pacemakers and surgical supplies), and providers were canceling surgeries, making numerous demands to Mr. Wilen, and even taking PTO to look for employment elsewhere – providing the proverbial fuel for an accelerating crisis. *See id.* At the same time, the Hospital was working to put together, on an expedited basis, numerous necessary bankruptcy filings, and the Hospital's finance team (at Mr. Wilen's direction) was spending a significant amount of time working to obtain and review documents to support such filings. *See id.*, ¶ 12.

42.    Further, in early 2025, discussions continued with the City of Montgomery and Montgomery County regarding the need for financial support for the Hospital and its Chapter 11 Cases, and there were further discussions with the Bondholders regarding a DIP facility (*i.e.*, post-petition financing to fund the Hospital's operations during Bankruptcy). *See id.*, ¶ 13. Simultaneously, the Hospital was preparing an emergency shut-down plan in the event funding efforts via a DIP facility failed. *See id.* Aside from the devastating impact to Montgomery and the greater region Jackson Hospital serves (as was confirmed at the time by representatives of the City of Montgomery, Montgomery County, and the State of Alabama), the potential of an emergency shut-down of the Hospital was complicated for numerous reasons, including the complexity, urgency, and substantial associated costs (funding for which Jackson Hospital did not have)

involved in the process of transporting patients to other healthcare facilities that would have the ability and capacity to provide healthcare services needed by each patient. *See id.*

43.     As if it could not get worse, prior to the filing of the Bankruptcy case, the efforts relating to a sufficient DIP facility involving the City of Montgomery, Montgomery County, and the Bondholders fell through. *See id.*, ¶ 14. However, shortly before the Petition Date, JIG (the DIP Lender) offered the DIP Facility, which would allow the Hospital to continue day-to-day operations and minimize the impact of a Bankruptcy Case on Jackson Hospital's business. *See id.*

44.     As set forth above, Jackson Hospital filed for bankruptcy on February 3, 2025. During the next thirty (30) days (*i.e.*, the 30-day window preceding the Opt-Out Deadline), Jackson Hospital's attention was consumed with initial Bankruptcy filings and making sure the Hospital could continue to operate. Specifically, almost immediately after the Petition Date, Jackson Hospital sought and obtained interim approval of, and access to, the DIP Facility so Jackson Hospital could continue operations. *See id.*, ¶ 15. As part of the initial Bankruptcy filings, Jackson Hospital had to seek unique and urgent relief to, among other things, ensure physicians would get paid and continue providing services at the Hospital. *See id.*, ¶ 16. Further, the Hospital was faced with various time-sensitive, critical issues – including diligence and information requests, negotiations with vendors, and completion of Bankruptcy Schedules and a Statement of Financial Affairs – which were extremely important to keep Jackson Hospital open and providing critical healthcare services to its patients during the pendency of the Bankruptcy Case. *See id.*, ¶ 17.

45.     As the Bankruptcy Case continued throughout March 2025 and beyond, Jackson Hospital had to remain focused on addressing and improving operational challenges, as well as working to receive the highest value possible for a potential sale of the Hospital's assets. *See id.*, ¶¶ 18-19. For example, efforts to hire replacement employees were difficult due to the pending

Bankruptcy and corresponding concern regarding the long-term viability of the Hospital, and the Hospital's lack of capital expenditures required the Hospital to spend over $1.5 million on a new electrical switch to ensure the Hospital's electrical grid did not collapse during an Alabama summer thunderstorm. *See id.*, ¶ 18. Further, during the summer of 2025, the Hospital's legal and advisory team worked on multiple extensions to the bidding process and sale milestones in order to accommodate the needs of the Bankruptcy Case and proceed with a potential sale of the Hospital's assets. *See id.*, ¶ 19. One of these extensions was filed on July 17, 2025 (*i.e.*, shortly before the July 29, 2025, deadline to file a claim form in connection with the Class Action Settlement). *See id.* The Hospital was also working diligently on alternative plans in the event of unfavorable bids for the Hospital's assets as part of the potential sale process. *See id.* Ultimately, on August 7, 2025, Jackson Hospital moved to postpone the sale process and auction hearing indefinitely as the restructuring efforts for the Hospital shifted to focusing on a reorganization plan instead of a sale. *See id.*

46.    Jackson Hospital does not deny that – at some point before March 2025 – the Hospital was made aware of the Class Action Settlement. *See id.*, ¶ 20. In addition, the Hospital does not deny that it did not submit an opt out form before the Opt-Out Deadline. The Hospital further acknowledges, however, that it did not obtain approval from the Bankruptcy Court or written consent from the DIP Lender to forego opting out of the Class Action Settlement (or to otherwise "opt in" to the Class Action Settlement). *See id.*, ¶ 21.

47.    However, for the reasons outlined above, during the months, weeks, and days preceding the Opt-Out Deadline, Jackson Hospital's primary focus was – and was required to be (both for the survival of Jackson Hospital and the well-being of the many Alabamians the Hospital serves) – on doing what was needed to keep its doors open and continue in operation (which

required dedicating a substantial amount of attention and the Hospital's limited resources to the many time-sensitive and critical issues outlined herein). *See id.*, ¶ 22. While Jackson Hospital was aware of the Class Action Settlement and Opt-Out Deadline (prior to the Opt-Out Deadline), given the many moving parts and emergency issues relating to Jackson Hospital's Bankruptcy (and related efforts to keep the Hospital in operation and serving patients) in the months, weeks, and days leading up to the Opt-Out Deadline, Jackson Hospital – despite making efforts – did not have sufficient time to fully and properly analyze whether it would be in the best interest of Jackson Hospital and its stakeholders to opt out of the Class Action Settlement (or whether Jackson Hospital had the means to opt out and pursue litigation). *See id.* Given the unique and exigent circumstances summarized herein related to the Bankruptcy Case and Jackson Hospital needing to do what was necessary to remain open and providing critical healthcare services, it was not feasible for Jackson Hospital – prior to the Opt-Out Deadline – to fully and properly analyze and decide whether Jackson Hospital could, and/or should, opt out of the Class Action Settlement. *See id.*

48.     Based on the foregoing, Jackson Hospital respectfully submits that it demonstrated a legitimate explanation for its delay in timely opting out of the Class Action Settlement. Further, as discussed above, if Jackson Hospital is not permitted to belatedly opt out and pursue its claims against BCBSAL in the Adversary Proceeding (including the requested injunctive relief), Jackson Hospital will be in imminent danger of closing its doors permanently. Mr. Wilen testified that any closure of Jackson Hospital will be irreparable because it cannot be undone – *i.e.*, if Jackson Hospital closes, it will likely never be able to successfully reopen. *See id.*, ¶ 24. The question before this Court (*i.e.*, whether Jackson Hospital should be permitted to opt out) is an equitable determination. *See HealthSouth Corp.*, 334 F. App'x at 253. The equities weigh *strongly* in favor of granting the relief requested by Jackson Hospital.

49.    Finally, Jackson Hospital's opt out delay is excusable due to its bankruptcy having been filed less than 30 days prior to the Opt-Out Deadline. Upon the filing of a chapter 11 bankruptcy case, a debtor-in-possession such as Jackson Hospital is usually faced with a significant disruption in operations while it, and its professionals, address a myriad of administrative and procedural obligations necessitated by the filing. That certainly was the case for Jackson Hospital (as outlined herein), and courts have recognized the burdens imposed on the debtor in the early stages of its bankruptcy case.[11]

50.    Congress has also recognized the scope of these administrative burdens and the time constraints they impose upon the debtor-in-possession, as the Bankruptcy Code extends various deadlines and statutes of limitation upon the filing of the bankruptcy petition. Entitled "Extension of Time," Section 108, for example, extends various unexpired deadlines and statutes of limitation for up to two years after the bankruptcy petition is filed.[12] Section 108 was designed to preserve assets for the bankruptcy estate by providing debtors-in-possession[13] with additional time to analyze and take certain actions necessary to protect the debtor's prepetition rights.[14] This

---

[11]    See e.g. In re Timbers of Inwood Forest Assocs., Ltd., 808 F.2d 363, 373 (5th Cir. 1987), aff'd sub nom. United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 108 S. Ct. 626, 98 L. Ed. 2d 740 (1988) ("Early and ongoing judicial management of Chapter 11 cases is essential if the Chapter 11 process is to survive and if the goals of reorganizability on the one hand, and creditor protection, on the other, are to be achieved. In almost all cases the key to avoiding excessive administrative costs, which are borne by the unsecured creditors, as well as excessive interest expense, which is borne by all creditors, is early and stringent judicial management of the case.").
[12]    11 U.S.C.A. § 108 (West).
[13]    While Section 108 refers to trustees rather than debtors-in-possession, the extensions provided therein have been found to apply equally to debtors-in-possession, such as Jackson Hospital. See Roberts v. Comm'r, 175 F.3d 889, 897 (11th Cir. 1999) ("Section 108 of the Bankruptcy Code extends the time period within which a bankruptcy trustee or debtor in possession may take certain actions under 'applicable nonbankruptcy law.'"); see also 11 U.S.C.A. § 1107(a) (West).
[14]    See Stanley ex rel. Est. of Hale v. Trinchard, 579 F.3d 515, 519 (5th Cir. 2009) ("The statute's clear purpose is to afford bankruptcy trustees extra time to assess and pursue potential assets of the debtor's estate. Congress drew no distinction among the state law vehicles that govern time limits for filing suit, whether statutes of limitations or prescription, repose or peremption (stet). The language of Section 108(a) compels the conclusion that Congress expressly extended the time for pursuing any action that would otherwise be time-barred under state law."); In re Frazer, 377 B.R. 621, 631 (B.A.P. 9th Cir. 2007) (Finding that Section 108(b) is intended to provide an extension of time to take action necessary to protect the debtor's pre-petition rights; citing S.Rep. No. 95–989, 95th Cong., 2d Sess. 30, reprinted in, 1978 U.S.C.C.A.N. 5787, 5816.).

additional time is absolutely necessary due to the immense burdens faced by debtors-in-possession upon filing their bankruptcy cases. As recognized by the Bankruptcy Code, alleviating these burdens ultimately works to aid the true constituents of the bankruptcy – the debtor's creditors.

51.    In the present case, this Court should also recognize the significant burdens and time constraints that Jackson Hospital faced upon the filing of its bankruptcy case – *less than 30 days prior to the Opt-Out Deadline*. The Hospital's focus was keeping its doors open while also surviving the administrative obligations of maintaining an active chapter 11 bankruptcy case. The opt out delay was excusable, and a contrary finding will only work to the detriment of the bankruptcy's true constituents – Jackson Hospital's patients and creditors.

iv.  Jackson Hospital Has Acted in Good Faith

52.    Courts have found that the good-faith factor weighs in favor of excusable neglect when "nothing in the record suggests [the movant] failed to timely opt out to gain a tactical advantage or that its failure was intentional." *See Perrigo Institutional Inv'r Grp. v. Papa*, 150 F.4d 206, 219 (3d Cir. 2025) (internal quotations and brackets omitted); *see also MRI Assocs.*, 2014 WL 29103, at *1 (citing *Grilli v. Metro. Life Ins. Co., Inc.*, 78 F.3d 1533, 1538 (11th Cir.1996), *opinion clarified*, 92 F.3d 1074 (11th Cir.1996) and noting that a court does not err in denying a request to belatedly opt out where the failure to timely act was the "result of a tactical decision").

53.    Here, there can be no legitimate dispute that Jackson Hospital's failure to opt out of the Class Action Settlement before the Opt-Out Deadline was not to gain a "tactical advantage." Instead, given the numerous moving parts in the Bankruptcy Case between the Petition Date and the Opt-Out Deadline—as outlined above and in the Wilen Declaration—Jackson Hospital was focused on keeping its doors open so the Hospital could continue serving its patients. *See* Ex. 1,

¶¶ 15-17. These efforts continued well after the Opt-Out Deadline (and continue today). *See id.*, ¶¶ 18-19. Jackson Hospital was doing everything it could to keep the Hospital alive and, ultimately, ran out of time to fully analyze and make an informed determination with respect to the Opt-Out Deadline. *See id.*, ¶ 22.

54.    Moreover, the fact Jackson Hospital recognized the existence of the Class Action and submitted a last-minute Claim Form changes nothing. Jackson Hospital's submission of the Claim Form has already been vacated by order of the Bankruptcy Court. *See* Doc. 3378-4, p.2, ¶ 2. And the submission of the Claim Form has no impact on the reasons justifying and excusing Jackson Hospital's failure to opt out prior to the Opt-Out Deadline. In sum, Jackson Hospital's delay in opting out was not to gain any "tactical advantage." As such, Jackson Hospital has acted in good faith, and therefore the final *Pioneer* factor also weighs in favor of granting Jackson Hospital's requested relief.

### RESPONSE TO BCBSAL'S MOTION TO ENFORCE SETTLEMENT

55.    If the Court permits Jackson Hospital to opt out, then BCBSAL's Motion to Enforce Settlement should be denied in its entirety. However, even if the Court does not permit Jackson Hospital to opt out, the Motion to Enforce Settlement should still be denied, at least in part, because Jackson Hospital's breach of contract claim (*i.e.*, Count 8 in the Adversary Proceeding) was not released as part of the Class Action Settlement. Alternatively, and at a minimum, if the Court determines any aspect of Jackson Hospital's breach of contract claim is somehow covered by the Class Action Settlement, then Jackson Hospital should be given the opportunity to amend and/or clarify its breach of contract claim in the Adversary Proceeding to remedy any overlap.

A.    **Jackson Hospital's Breach of Contract Claim Was *Not* Released**

56.    Jackson Hospital's breach of contract claim against BCBSAL in the Adversary

Proceeding (*i.e.*, Count 8) was not explicitly released in the Class Action Settlement, and it further is not based upon the "factual predicates of the Provider Actions" or "any issue raised in any of the Provider Actions by pleading or motion." *See* Doc. 3192-2, p. 22-23. Accordingly, the breach of contract claim asserted in the Adversary Proceeding by Jackson Hospital is *not* part of the Released Claims and should not be enjoined (even if the Court does not permit Jackson Hospital to opt out of the Class Action Settlement).

57.    The Eleventh Circuit approved broad release language in the Subscriber Track, which is similar to that contained in the releases in the Class Action Settlement (the "Releases"). *See In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1090 (11th Cir. 2023).[15] However, the Eleventh Circuit found "[t]he release does not extend beyond claims arising from the common nucleus of operative fact: all the released claims either were raised or could have been raised during the litigation that preceded the settlement." *Id.* at 1091. Further, the Eleventh Circuit noted "[t]he release does not bar any claims that could not have been litigated before settlement or any claims related to conduct that was not challenged in the underlying lawsuit." *Id.*

58.    BCBSAL appears to argue the Provider MDL Complaint[16] and the Provider Actions somehow cover any and all allegations regarding the contention "that BCBSAL does not negotiate in good faith with Alabama hospitals"—such that BCBSAL can never again be sued by an Alabama hospital for breach of contract (and BCBSAL's corresponding duty under Alabama law to perform contractual obligations in good faith). *See* Mot. to Enforce, Doc. 3378, p. 6. BCBSAL is wrong. The Class Action Settlement does not provide BCBSAL with a license, in

---

[15]    Specifically, "[i]n its review of a settlement, 'a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 377 (1996)). "Under the identical-factual-predicate doctrine, a settlement agreement may release claims that share a common nucleus of operative fact with the claims in the underlying litigation." *Id.* (citing *Adams v. S. Farm Bureau Life Ins.*, 493 F.3d 1276, 1289 (11th. Cir. 2007)).

[16]    The "Provider MDL Complaint" refers to the Consolidated Fourth Amended Provider Complaint, Doc. 457.

perpetuity, to breach the contractual obligations BCBSAL owes provider hospitals, like Jackson Hospital, without consequence. But that would be the impact of accepting BCBSAL's untenable position and enjoining Jackson Hospital's breach of contract claim.

59.    In the Adversary Proceeding, Jackson Hospital alleges that BCBSAL is required under the Parties' contracts to negotiate and reach a *mutual* agreement with Jackson Hospital regarding new prospective reimbursement rates for the next contract year. *See* Doc. 3378-2, ¶ 139; *see also* Doc. 3378-3, ¶ 28. Jackson Hospital further alleges BCBSAL breached the Parties' contracts by failing to do just that for <u>2026</u>. Thus, Jackson Hospital's breach of contract claim (and Jackson Hospital's related request for injunctive relief in the Adversary Proceeding) necessarily could <u>not</u> have been litigated or settled in the Class Action. *See In re Blue Cross*, 85 F.4th at 1090.

60.    The Final Order and Judgment was signed before BCBSAL's refusal to negotiate 2026 reimbursement rates in good faith and its most recent breaches of the Parties' contracts. *See* Ex. 2, ¶¶ 4-6. Further, nothing in the Class Action Settlement immunizes BCBSAL from state law breach of contract claims that are not premised upon the antitrust-related allegations and wrongful conduct set forth in the Provider MDL Complaint and the Provider Actions. No monopoly or monopsony power on the part of BCBSAL is required for BCBSAL to be in material breach of its contracts with a provider like Jackson Hospital. In addition, with respect to the injunctive relief Jackson Hospital seeks in connection with its breach of contract claim, nothing in the "Class Injunctive Relief" in the Class Action Settlement mandates BCBSAL to negotiate new reimbursement rates with Jackson Hospital each year in good faith (*i.e.*, comply with its contractual obligations) or require BCBSAL to reimburse Jackson Hospital at the same rates as a similarly situated hospital in Montgomery, Alabama (*i.e.*, Baptist).

61.    Accordingly, Jackson Hospital's breach of contract claim in the Adversary Proceeding is not subject to the Releases.

**B.    <u>Alternatively, Jackson Hospital Should be Afforded the Opportunity to Amend</u>**

62.    If the Court determines any aspect of Jackson Hospital's breach of contract claim is based upon the same "factual predicates" as or was arguably raised in a pleading or motion in the Provider Actions (or is somehow subject to being enjoined by the Class Action Settlement on some other basis), Jackson Hospital requests the opportunity to amend and/or clarify the allegations in the Adversary Complaint with respect to its breach of contract claim.

<u>**CONCLUSION**</u>

For these reasons, Jackson Hospital respectfully requests that the Court grant the relief requested in its Motion and deny BCBSAL's Motion to Enforce Settlement.

Respectfully submitted,

/s/ Chase J. Potter
_____
Chase J. Potter*
Texas Bar No. 24088245
E-Mail: potter@imcplaw.com

IACUONE MCALLISTER POTTER PLLC
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
Telephone:    (214) 432-1536

*Pro Hac Vice Application Forthcoming

-and-

/s/ Stuart H. Memory
_____
Stuart H. Memory
ASB-2214-Y36V

MEMORY MEMORY & CAUSBY, LLP
Post Office Box 4054
Montgomery, Alabama 36103
Phone:  334-834-8000
Fax:  334-834-8001
Email: smemory@memorylegal.com

COUNSEL FOR JACKSON HOSPITAL & CLINIC, INC.

## CERTIFICATE OF SERVICE

This is to certify that, on January 5, 2026, a true and correct copy of the foregoing document was filed with the Court's CM/ECF system that will provide notice to all parties receiving electronic notices in this case.

/s/ Stuart H. Memory
_____
Stuart H. Memory