FILED

2026 Jan-05 PM 06:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 1

## Declaration of Allen Wilen

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: BLUE CROSS BLUE SHIELD | §<br>§ | Master File No. 2:13-cv-20000-RDP |
| ANTITRUST LITIGATION | § | |
| (MDL NO.: 2406) | §<br>§ | This document relates to the<br>Provider Track |

## DECLARATION OF ALLEN WILEN

I, Allen Wilen, hereby declare, under penalty of perjury, that the following is true and correct:

1.      My name is Allen Wilen. I am more than twenty-one years of age and am competent and otherwise qualified to make this Declaration.  Through the work I have performed in my role as the Chief Restructuring Officer ("CRO") for Jackson Hospital & Clinic, Inc. ("Jackson Hospital") and my personal experience/background in restructuring efforts related to distressed entities, including distressed entities in the healthcare industry (like Jackson Hospital), I have gained personal knowledge of the matters stated in this Declaration. I hereby affirm that the matters set forth in this Declaration are true, correct, and within my personal knowledge.

**Background and Relevant Knowledge**

2.      I am the CRO for Jackson Hospital, one of the Debtors[1] in the Chapter 11 bankruptcy cases being jointly administered under Case No. 25-30256, pending in the United States Bankruptcy Court for the Middle District of Alabama (hereinafter, the "Chapter 11 Cases," the "Bankruptcy Case," or the "Bankruptcy").

---

[1]      The Debtors in the Chapter 11 Cases are Jackson Hospital and JHC Pharmacy, LLC. There are also a number of affiliated physician practice groups that are either directly or indirectly owned by Jackson Hospital and are therefore included in the definition of "Jackson Hospital" or the "Hospital."

Page | 1

3.    On September 4, 2024, I was retained as CRO for Jackson Hospital. In such capacity, I have become familiar with Jackson Hospital's day-to-day operations, business and financial affairs, and books and records. I am also familiar with the Bankruptcy Case, including the events leading up to the Bankruptcy, Jackson Hospital's continued efforts to remain in operation throughout the pendency of the Bankruptcy, and recent events, including (but not limited to): (1) the Adversary Proceeding that Jackson Hospital filed against Blue Cross and Blue Shield of Alabama ("BCBSAL") related to the Bankruptcy Case, styled *Jackson Hospital & Clinic, Inc. v. Blue Cross and Blue Shield of Alabama*, Adv. No. 25-03025 (hereinafter, the "Adversary Proceeding"); (2) BCBSAL's efforts to enjoin the Adversary Proceeding; (3) Jackson Hospital's efforts to develop and secure Bankruptcy Court approval of a Chapter 11 reorganization plan in the Bankruptcy; and (4) necessary funding and other items needed for Jackson Hospital to obtain confirmation of a Chapter 11 reorganization plan in the Bankruptcy, successfully emerge from Bankruptcy, and successfully continue operations long-term.

4.    By way of background, I am a Partner at Eisner Advisory Group LLC ("EisnerAmper") and serve as the National Director of EisnerAmper's financial advisory services group. I have more than thirty years of financial and accounting experience, as well as extensive experience advising insolvent and troubled companies, including over 20 distressed companies in the healthcare industry, in turnaround and crisis situations and navigating such companies through turnaround, sale, and liquidation processes. During the past 24 months, I have been President and Chairperson for the Turnaround Management Association. I have frequently been involved in complex matters requiring expertise in forensic accounting and operational analysis and have been qualified as an expert in numerous state and federal courts throughout the United States.

**Jackson Hospital's History and Operations**

5.      Jackson Hospital is a 344-bed hospital located in Montgomery, Alabama. Jackson Hospital opened in September 1946 with 37 patient beds and 5 attending physicians. Today, Jackson Hospital has approximately 1,800 employees.

6.      Jackson Hospital ranks among the largest hospitals in Alabama and is widely recognized for providing excellence in care, including cardiac, cancer, neurosciences, orthopedics, and women's care, as well as 24-hour emergency care in Montgomery and the Alabama River Region. Jackson Hospital's service area includes 16 counties across central Alabama.

**Events Leading to Jackson Hospital's Bankruptcy**

7.      Jackson Hospital experienced significant financial pressures in recent years due to a variety of factors, including but not limited to unfair reimbursement rates from BCBSAL, increased operating costs, and a challenging payor mix. Due in large part to this confluence of factors, the Hospital defaulted on its secured debt in approximately April 2024.

8.      Throughout the Summer of 2024, the Hospital continued experiencing financial difficulties and needed financial restructuring.

9.      On September 4, 2024, EisnerAmper and I were retained to begin a restructuring initiative to strengthen the Hospital's financial condition. Upon our retention, EisnerAmper and I began efforts to identify and implement a comprehensive restructuring plan for Jackson Hospital focused on revenue growth, operating efficiency, and cost-saving initiatives, while dealing with creditor pressure.

10.      Over the next few months (*i.e.*, October 2024 through January 2025), I worked extensively in my role as CRO of the Hospital, including engaging in numerous discussions with multiple parties in an effort to secure additional and much needed financing for the Hospital.

Docusign Envelope ID: EC9A0925-A4F2-416D-967C-46541DDD1B3D

Specifically, I was in negotiations with the Hospital's bondholders (the "Bondholders") and the City of Montgomery regarding potential rescue financing or DIP (debtor-in-possession) financing for the anticipated Chapter 11 Cases.

11.    In January 2025, there was a flurry of activity on the eve of Jackson Hospital's Bankruptcy filing. For example, critical vendors threatened to stop supplying necessary products (such as pacemakers and surgical supplies). Moreover, due to the uncertainty related to the Hospital's future, providers were canceling surgeries, calling me with numerous demands, and even taking PTO to look for employment elsewhere – providing the proverbial fuel for an accelerating crisis.

12.    At the same time, the Hospital was working to put together, on an expedited basis, necessary bankruptcy filings, including a comprehensive Creditor Matrix for the soon-to-be-filed Chapter 11 Cases, as well as beginning the preparation of Schedules and a Statement of Financial Affairs. In order to prepare these documents, the Hospital's finance team – at my direction – was spending a significant amount of time working to obtain and review contracts, insurance documents, and numerous other materials relating to employees and vendors.

13.    Further, around this same time (*i.e.*, early 2025), I attended numerous meetings with representatives of the City of Montgomery and Montgomery County regarding financing and the need for financial support for the anticipated Chapter 11 Cases. I was also in continued negotiations with the Bondholders regarding a DIP facility (*i.e.*, post-petition financing to fund the Hospital's operations and restructuring during Bankruptcy). Simultaneously, we were preparing an emergency shut-down plan for the Hospital in the event funding efforts via a DIP facility failed. The shut-down of Jackson Hospital would be devastating to Montgomery and the greater region the Hospital serves (specifically with respect to access to indigent healthcare services for

impoverished individuals residing in the Alabama River Region) and very complicated for numerous reasons, including the complexity, urgency, and substantial costs involved in the process of shutting down and transporting patients to other healthcare facilities that have not only the ability, but the capacity, to provide the healthcare services needed by the patient. For example, the emergency rooms of both of the hospital systems in the Montgomery region are often at capacity or staffing diversion. A shutdown of Jackson Hospital would be catastrophic according to multiple parties with whom I have personally discussed the situation, including representatives of the City of Montgomery, County of Montgomery, and State of Alabama.

14.     Ultimately, prior to the filing of the Bankruptcy Case, the efforts related to securing a sufficient DIP facility involving the City, County, and Bondholders fell through. However, in close proximity to the filing of the Bankruptcy, Jackson Investment Group, LLC ("JIG" or the "DIP Lender") offered a DIP facility ("DIP Facility") that would allow the Hospital to continue day-to-day operations and minimize the impact of a Bankruptcy Case on the Debtors' business.

**The First 30 Days of Jackson Hospital's Bankruptcy**

15.     On February 3, 2025 (the "Petition Date"), the Debtors voluntarily filed the Chapter 11 Cases. Almost immediately thereafter, Jackson Hospital sought interim approval of, and access to, the DIP Facility so that Jackson Hospital could continue operations. The Bankruptcy Court granted that request on or about February 6, 2025.

16.     As part of the initial Bankruptcy filings, Jackson Hospital had to seek unique and urgent relief, which required additional time and attention. Specifically, Jackson Hospital asked the Court and the DIP Lender to allow a certain amount of the DIP Facility to be used for funding special physician deferred payroll, because physicians were still threatening to leave. In my experience, this was an abnormal and extraordinary request, as the requested payroll exceeded

statutory limits on payment of pre-petition payroll, and therefore the payment required special approval from the Bankruptcy Court.

17.     Moreover, almost immediately after the Petition Date, the Bondholders and the Creditor's Committee requested an extensive amount of information. Further, Jackson Hospital was diligently working on comprehensive Schedules and a Statement of Financial Affairs (which also required that financials be updated). A Patient Care Ombudsman ("PCO") was also appointed, which resulted in multiple diligence requests that required Jackson Hospital's prompt responses. Some of the vendor concerns continued, so the Hospital was also working and negotiating with vendors to ensure the Hospital would continue receiving critical supplies. All of these issues (which were occurring in the first 30 days following the filing of the Bankruptcy Case – *i.e.*, February and March 2025) were extremely time-sensitive and important to keep Jackson Hospital open and providing critical healthcare services to its patients throughout the pendency of the Bankruptcy Case (and, hopefully, beyond).

**March 2025 Through the Present**

18.     As the Bankruptcy Case continued, my team along with the hospital's staff began to try and improve the billing and collection function, which had become highly challenging as numerous staff members feeling the pressure on the Hospital moved to other employers. Moreover, efforts to hire replacement employees were difficult due to the pending Bankruptcy and corresponding concern regarding the long-term viability of the Hospital. In addition, the Hospital's lack of capital expenditures began causing operational challenges, including – for example – the Hospital needing to spend over $1.5 million on a new electrical switch to ensure the Hospital's electrical grid did not collapse during an Alabama summer thunderstorm.

19.    Moreover, throughout the summer of 2025, the Hospital's legal and advisory team worked on multiple extensions to the bidding process and sale milestones in order to accommodate the needs of the Bankruptcy Case and try to derive the highest possible value for a potential sale of the Hospital's assets. One of these extensions was filed on July 17, 2025, shortly before the deadline to file a claim form in connection with the Class Action Settlement discussed below. Ultimately, the Debtors moved on August 7, 2025, to postpone the sale process and auction hearing indefinitely as the restructuring efforts began to focus on a reorganization plan instead of a sale. During this time, I was in consistent contact with Jackson Hospital leadership, legal counsel, potential bidders, and others, as we navigated the sale process, while also working diligently on alternative plans in the event of unfavorable bids for the Hospital's assets as part of the potential sale process.

**The BCBS Class Action Settlement**

20.    At some point before March 2025, I was made aware – in my role as CRO of Jackson Hospital – of a class action settlement (the "Class Action Settlement") in the case styled, *In re Blue Cross Blue Shield Antitrust Litigation*, MDL No.: 2406, Master File No. 2:13-CV-20000-RDP).

21.    It is my understanding the deadline to opt out of the Class Action Settlement was March 4, 2025 (the "Opt-Out Deadline"). Jackson Hospital did not submit an opt-out form before the Opt-Out Deadline. Jackson Hospital did not obtain approval from the Bankruptcy Court or written consent from the DIP Lender to forego opting out of the Class Action Settlement (or to otherwise "opt in" to the Class Action Settlement).

22.    For the reasons outlined above, during the months, weeks, and days preceding the Opt-Out Deadline, Jackson Hospital's primary focus was on doing what was needed to keep its

doors open and continue in operation (which required dedicating a substantial amount of attention and the Hospital's limited resources to the many time-sensitive and critical issues outlined herein). While Jackson Hospital was aware of the Class Action Settlement and Opt-Out Deadline (prior to the Opt-Out Deadline), given the many moving parts and emergency issues relating to Jackson Hospital's Bankruptcy (and related efforts to keep the Hospital in operation and serving patients) in the months, weeks, and days leading up to the Opt-Out Deadline, I do not believe Jackson Hospital (despite making efforts) had sufficient time to fully and properly analyze whether it would be in the best interest of Jackson Hospital and its stakeholders to opt out of the Class Action Settlement (or whether Jackson Hospital had the means to opt-out and pursue litigation). Given the unique and exigent circumstances summarized herein related to the Bankruptcy Case and Jackson Hospital needing to do what was necessary to remain open and providing critical healthcare services, I do not believe it was feasible for Jackson Hospital – prior to the Opt-Out Deadline – to fully and properly analyze and decide whether Jackson Hospital could, and/or should, opt out.

23.    To date, Jackson Hospital has not received any recovery from the Class Action Settlement fund. Moreover, it is my understanding that a final calculation of the amount Jackson Hospital would receive under the Class Action Settlement has not been made.

24.    If Jackson Hospital is unable to pursue the Adversary Proceeding against BCBSAL (including the injunctive relief requested therein) and ultimately closes, it is my belief and opinion, based on my experience outlined herein, that such closure of Jackson Hospital will be irreparable (*i.e.*, it cannot be undone and Jackson Hospital will likely never be able to successfully reopen). The closure of Jackson Hospital would severely and negatively impact the access of Alabamians (especially those in the Montgomery region) to critical healthcare services.

Docusign Envelope ID: FC9A0925-A4F2-416D-967C-46541DDD1B3D

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 5th day of January, 2026.

Signed by:

0DE8E2090F6548E...

Allen Wilen