FILED

2026 Jan-20  PM 05:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD** | ) | **Master File No. 2:13-cv-20000-AMM** |
| | ) | |
| **ANTITRUST LITIGATION** | ) | **This document relates to the Provider** |
| **(MDL NO.: 2406)** | ) | **Track.** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**BCBSAL'S (1) OPPOSITION TO JACKSON HOSPITAL & CLINIC, INC.'S MOTION FOR RELIEF FROM JUDGMENT AND TO BELATEDLY OPT OUT; AND (2) REPLY IN SUPPORT OF ITS MOTION TO ENFORCE PROVIDER SETTLEMENT AND TO <u>ENJOIN JACKSON HOSPITAL & CLINIC, INC.'S ADVERSARY PROCEEDING</u>**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

FACTS ................................................................................................................................... 2

    I.    This Court Approves Settlement and Enters Final Judgment ............................................ 2

    II.   Jackson Hospital Decides to Participate in the Settlement Agreement............................. 3

    III.  The DIP Lender and Jackson Hospital Change their Minds................................................ 7

    IV.  Jackson Hospital Sues BCBSAL ................................................................................... 10

    V.   BCBSAL Moves to Enforce Settlement ..........................................................................11

ARGUMENT..........................................................................................................................11

    I.    Jackson Hospital Cannot Obtain Relief under Rules 6(b) and 60(b) Because It Made a Deliberate Decision Not to Opt-Out of the Settlement Class. ....................................................11

    II.   Jackson Hospital's Delay is Inexcusable. ........................................................................ 14

        A.   A Ten-Month Delay is Extraordinary............................................................................ 15

        B.   Jackson Hospital's Reason for Delay is Unjustified. ...................................................... 16

        C.   Jackson Hospital Acted Tactically, Not in Good Faith. ................................................. 19

        D.   BCBSAL Will Suffer Prejudice. ................................................................................... 20

        E.   Alleged Prejudice to Jackson Hospital is Irrelevant. ..................................................... 21

    III.  Bankruptcy Court's "Set Aside" Order is Irrelevant.......................................................... 23

    IV.  Jackson Hospital's "Breach of Contract" Claim is Precluded........................................... 23

CONCLUSION...................................................................................................................... 25

i

Blue Cross Blue Shield of Alabama ("BCBSAL") submits this brief in opposition to Jackson Hospital & Clinic, Inc.'s ("Jackson Hospital" or "Hospital") Motion for Relief from Judgment and to Belatedly Opt Out (Dkt. No. 3382, "Belated Opt-Out Motion") and in support of BCBSAL's Motion to Enforce Provider Settlement and to Enjoin Jackson Hospital's Adversary Proceeding against BCBSAL (Dkt. No. 3378, "Motion to Enforce").

## **INTRODUCTION**

Ten months after the opt-out deadline, and five months after submitting a claim form to receive compensation pursuant to the Provider Settlement Agreement (Dkt. No. 3192-2) ("Settlement Agreement"), Jackson Hospital now seeks to "belatedly opt out" of the class, claiming its failure to timely do so constitutes "excusable neglect" under Fed. R. Civ. P. 6(b) and 60(b). But Jackson Hospital skips the threshold issue: It did not "neglect" to opt-out. Rather, it made a deliberate choice to participate in the settlement. Indeed, only a month before the opt-out deadline, Jackson Hospital pledged its rights in the "Blue Cross Blue Shield *settlement*" as collateral to secure financing. DIP Term Sheet, *infra* (emphasis added). From its pre-petition financing terms in February 2025 to its formal submission of a claim form in July 2025, every action Jackson Hospital took confirmed its intent to remain a member of the settlement class. That the Hospital later changed its mind is irrelevant. Rules 6(b) and 60(b) do not exist to rescue sophisticated parties from the consequences of their own strategic decisions.

Even if a deliberate choice could somehow constitute "neglect," Jackson Hospital's delay is not "excusable." A ten-month delay is an extraordinary lapse that cannot be cured by the Hospital's hollow excuse of being "too busy" with the administrative burdens of bankruptcy. Rather than seeking relief from this Court, Jackson Hospital quietly moved for a "set aside" order in Bankruptcy Court without notice to BCBSAL, then sat on that order for two months before

springing its TRO Motion – all overtly tactical maneuvers. Allowing Jackson Hospital to opt-out at this date would shatter the finality that BCBSAL bargained for and invite other class members to disregard this Court's deadlines whenever they change their minds. Because Jackson Hospital's failure to opt out was a calculated choice, and its subsequent delay is inexcusable, the Belated Opt-Out Motion should be denied, and the advisory proceeding should be enjoined in its entirety.

## FACTS

### I.      This Court Approves Settlement and Enters Final Judgment

On December 4, 2024, the Court preliminarily certified a class for settlement purposes of "all Providers in the United States . . . who currently provide or provided healthcare services, equipment or supplies to any patient who was insured by, or who was a Member of or a beneficiary of, any plan administered by any Settling Individual Blue Plan." Order Preliminary Approving Provider Plaintiffs' Settlement (Dkt. No. 3225), at 47. The Court required any class member that wished to be excluded from the settlement to mail a written notification of its intent "no later than March 4, 2025." *Id.* at 51. The Court held that if any "Class Member fails to provide all of the required information on or before the Opt-Out Deadline, ***then the attempt to opt out shall be invalid and have no legal effect, and the Settlement Class Member shall be bound by the Settlement Agreement, including the releases, if finally approved***." *Id.* at 52 (emphasis added).

On August 19, 2025, the Court entered its Final Approval Order ("FAO") approving the Settlement Agreement. *See* FAO (Dkt. No. 3346). The FAO was a final judgment for purposes of Fed. R. Civ. P. 54. *See id.* at 41; *see also Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1289 (11th Cir. 2007) (holding that class settlements approved by final order of a court have the same "*res judicata* effect" as other final judgments and preclude class members from relitigating "not only [] the precise legal theory presented in the previous litigation, but [] all legal theories

2

and claims arising out of the same operative nucleus of fact"). The FAO effected a dismissal with prejudice of "the MDL[,] the underlying Provider Actions and [] all claims contained therein, as well as all of the Released Claims against any of the Releasees by Releasors[.]" *Id.* at 37.

Furthermore, the FAO "permanently barred and enjoined" class members "from commencing, maintaining, prosecuting [or] causing . . . any action, suit, proceeding or claim in any court, tribunal, . . . or other body in any jurisdiction against any Releasee based in whole or in part upon, arising out of, or in any way connected or related to any Released Claim." *Id.* at 38.

Finally, the FAO provided that the Court retained "exclusive" jurisdiction over "any suit, action, proceeding, or dispute arising out of or relating to the Settlement Agreement or the applicability of the Settlement Agreement . . . to resolve any disputes . . . ." *Id.* at 39.

The time to appeal the FAO expired on September 19, 2025, but no appeal was taken. Accordingly, the release became effective on September 19, 2025. *See* Settlement Agreement (Dkt. No. 3192-2), at 26–27 (providing that the "Effective Date" when the "Agreement shall become final" is the date the "time for appeal or to seek permission to appeal from the Final Judgment and Order of Dismissal expires").

## II.    Jackson Hospital Decides to Participate in the Settlement Agreement

On February 3, 2025, one month before the opt-out deadline, the Hospital filed a petition for relief under Chapter 11[1] of the Bankruptcy Code in the United States Bankruptcy Court for the Middle District of Alabama (the "Bankruptcy Court"), commencing those proceedings under the Case No. 25-30256 (the "Bankruptcy Case" or "BK Case").

On February 4, 2025, Jackson Hospital filed a motion (the "DIP Motion") seeking approval to enter a debtor-in-possession credit facility provided by Jackson Investment Group, LLC ("DIP

---

[1] 11 U.S.C. §§ 1101 *et seq.*

Lender"). [BK Case, Dkt. No. 10]. The DIP Motion attached a term sheet ("DIP Term Sheet") dated February 3, 2025, outlining the terms under which the DIP Lender was willing to provide the proposed credit facility. *See* DIP Term Sheet [BK Case, Dkt. No. 61-1], attached hereto as Exhibit 1.  On February 6, 2025, the Bankruptcy Court entered an order granting the DIP Motion on an interim basis and attaching the DIP Term Sheet to memorialize the terms of the credit facility. [BK Case, Dkt. No. 61] ("Interim Financing Order").

In the Belated Opt-Out Motion, Jackson Hospital claims that the DIP Term Sheet approved in the Bankruptcy Court's Interim Financing Order "gave the DIP lender a perfected security interest in 'all rights, title and interest' in certain assets, including litigation claims." Belated Opt-Out Motion, ¶ 6. This statement is incomplete at best and misleading at worst.

In the DIP Term Sheet – agreed to by the DIP Lender and Jackson Hospital and acknowledged by the Bankruptcy Court – the DIP Lender did not merely take a security interest in generic "litigation claims."[2] Rather, the DIP Term Sheet defines the "DIP Collateral" to include specifically "all rights, title and interest in the *'Blue Cross Blue Shield'* ***settlement*** and any related recovery." *See* DIP Term Sheet, Ex. 1, at 6 (emphasis added). The DIP Term Sheet is dated February 3, 2025, the same day that Jackson Hospital filed its bankruptcy petition. *See id.* at 1. Accordingly, when Jackson Hospital filed bankruptcy, it considered itself a party to the Settlement Agreement, and Jackson Hospital represented to the DIP Lender and the Bankruptcy Court that it was pledging its interests as a party to the Settlement Agreement, ***not*** that it was pledging any rights to sue BCBSAL as a potential opt-out claimant.

---

[2] The DIP Term Sheet refers generically to "commercial tort claims," on page 6, item 12 ("Security").

In the Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement dated March 4, 2025 (the "DIP Agreement" [BK Case, Dkt. No. 180-1], attached hereto as Exhibit 2), which was appended to the Bankruptcy Court's March 6, 2025 Order approving the DIP credit facility on a final basis [BK Case, Dkt. No. 180] ("Final Financing Order"), the DIP Lender describes its "Collateral" on page 4–5 as including a security interest in Jackson Hospital's interest in "Blue Cross Litigation," which the DIP Agreement defines on page 3 as follows:

> "Blue Cross Litigation" means all rights, title and interests of [Jackson Hospital] ***as a plaintiff*** with respect to *In Re: Blue Cross Blue Shield*, Antitrust Litigation (MDL No.: 2406), Master File No.: 2:13-CV-20000-RDP, filed in the United States Court for the Northern District of Alabama, Southern Division, ***including without limitation pursuant to the Settlement Agreement*** affecting such litigation that was preliminarily approved by the Court on December 4, 2024 (as the same may be amended, restated, supplemented, approved, or otherwise modified).

DIP Agreement, Ex. 2 (emphasis added).

Against that background, Jackson Hospital's statement that it "did not obtain approval from the Bankruptcy Court or obtain DIP Lender's written consent before declining to opt out of the Class Action Settlement" is confounding. Belated Opt-Out Motion, ¶ 11. Had the Hospital opted out of its rights "as a plaintiff" in this litigation and thereby forfeited its rights "pursuant to the Settlement Agreement" – rights that it had expressly pledged to the DIP Lender – the Hospital would have removed assets of the bankruptcy estate and breached the DIP Agreement, triggering the DIP Lender's expansive remedies and thus jeopardizing the viability of the Bankruptcy Case. That action – opting out – would have required authorization of the Bankruptcy Court and waiver by the DIP Lender of its rights. By contrast, *participating* in the Settlement Agreement required no such authorization, as it was consistent with the approved financing.

The notion that Jackson Hospital should have opted out – or that it had any interest whatsoever in opting out – is belied by Jackson Hospital's actions in letting the opt-out deadline

pass on March 4, 2025[3] without taking any action. Moreover, the DIP Lender, which clearly knew of this litigation and the Settlement Agreement, did not raise any timely objection to Jackson Hospital's purported "failure" to opt out, even though the Final Financing Order had not yet been entered by the Bankruptcy Court, and the DIP Lender could have acted to prevent that approval. Of course, the DIP Lender's silence is perfectly consistent with the DIP Term Sheet, the DIP Agreement, and the Bankruptcy Court's orders approving the DIP credit facility, each of which made clear that Jackson Hospital was going to participate in the settlement by including the settlement and any related recovery thereunder in the collateral package.

On July 29, 2025, approximately five months after the opt-out deadline, Jackson Hospital submitted a timely claim form ("Claim Form")[4] to the Settlement Administrator to participate in the Settlement Agreement and receive any proceeds to which it was entitled. *See* Dkt. No. 3378-1, ¶ 18. Obviously, the submission of the Claim Form is the strongest possible proof that Jackson Hospital and the DIP Lender made a knowing, deliberate choice to remain in the settlement class. Indeed, Jackson Hospital **had** to submit its Claim Form in order to protect the DIP Lender's security interest in Jackson Hospital's settlement rights[5] – a security interest that, as noted *supra*, is referenced in the DIP Term Sheet (dated the day the Chapter 11 petition was filed), the DIP Motion (filed the next day), and the March 4, 2025 DIP Agreement (dated on the opt-out deadline).

In short, by February 3, 2025, at the latest, Jackson Hospital had made a deliberate choice,

---

[3] Section 108(b) of the Bankruptcy Code arguably extended the opt-out deadline to 60 days after the February 3, 2025 petition date, *i.e.*, April 4, 2025. That extension is of no moment, however, because the actions – or inactions – of Jackson Hospital and the DIP Lender around this extended deadline were completely consistent with those around the March 4, 2025 deadline. Jackson Hospital made no effort to opt out, and the DIP Lender raised no objection to that inaction.

[4] Jackson Hospital's Claim Form is attached as Exhibit 3.

[5] If the Claim Form had not been filed, Jackson Hospital would have been in breach of the DIP Agreement.

acceptable to the DIP Lender, that it **would participate** in the Settlement Agreement and pledge its rights thereunder to the DIP Lender to secure the post-petition financing, and it acted consistently with that election. None of Jackson Hospital's actions or inactions was inadvertent or the product of negligence. Each was a deliberate choice made in coordination with the DIP Lender and consistent with the financing approved by the Bankruptcy Court.

### III.    The DIP Lender and Jackson Hospital Change their Minds

At some point after Jackson Hospital submitted the Claim Form, the DIP Lender (and presumably Jackson Hospital) reversed course on the desirability of participating in the Settlement Agreement. Although the Belated Opt-Out Motion provides extensive detail about Jackson Hospital's other activities during the pendency of the Bankruptcy Case, it is conspicuously silent as to when or why this change of position occurred. However, public statements by the DIP Lender's CEO provide some insight.

On November 3, 2025, Richard L. Jackson, the CEO of the DIP Lender's subsidiary Jackson Healthcare, wrote a guest column for AL.com regarding his company's efforts to turnaround Jackson Hospital.[6] Mr. Jackson stated that on "June 20, 2025, we shared our candid assessment with the Governor's office. We could not justify that scale of investment [approximately $250 - $300 million to stabilize Jackson Hospital], and we did not believe any other private party would bid." According to the article, the Governor's office responded by proposing a public-private partnership. Mr. Jackson stated that his team subsequently "drafted and presented [a] plan to local leaders and briefed City, County, State and Federal representatives." A key provision of this new plan was that "[c]ommercial payers would align reimbursement closer

---

[6] *See* Richard L. Jackson, *Why we're fighting to save Jackson Hospital*, AL.com (Nov. 03, 2025), attached hereto as Exhibit 4.

to what peer hospitals receive for the same care, closing a fairness gap that has undermined the hospital's economics." Accordingly, at some point in the latter half of 2025, the DIP Lender's turnaround plan for Jackson Hospital included attempting to compel commercial payers like BCBSAL to increase their reimbursement rates. That strategy, in turn, depended on finding ways to exert leverage over BCBSAL.

In late August 2025, unbeknownst to BCBSAL, Jackson Hospital began secretly putting this plan into action. A Jackson Hospital employee emailed BCBSAL asking to grant portal access to Jackson Hospital Assistant Vice President Keith Prutzman, noting that the hospital was undergoing a "transition" and that "a lot of people are leaving." *See* Declaration of Terra G. Hodge ("Hodge Decl."), attached hereto as Exhibit 5, ¶ 4. On September 5, 2025, Mr. Prutzman asked BCBSAL to "run a report of all paid claims for [Jackson Hospital's] employees for [the] last 12 months." *Id.* ¶ 5. Mr. Prutzman also requested that BCBSAL include in the report the claim amounts if the same claims had been paid to Baptist Hospital Montgomery over that same period. *Id.* On September 8, 2025, Mr. Prutzman asked for the same report "by employee name/individual." *Id.* ¶ 8. Mr. Prutzman again asked for additional information – a new spreadsheet column indicating "if [the] claim was at Jackson or Baptist/or other facility." *Id.* ¶ 9. Mr. Prutzman then asked for yet another report "with the diagnosis codes for each claim." *Id.* ¶ 10. Mr. Prutzman never indicated that Jackson Hospital would use any of the requested information in litigation against BCBSAL. *Id.* ¶ 12. In hindsight, it is clear that these requests were aimed at gathering information to deploy against BCBSAL.[7]

---

[7] On September 29, 2025, Jackson Hospital moved the bankruptcy court to amend the DIP Agreement, which the bankruptcy court granted on October 21, 2025. *See* Third Order Authorizing Debtors to Further Amend the DIP Credit Agreement [BK Case, Dkt. No. 1062], attached hereto as Exhibit 6. That amendment required the "re-constitution of Jackson Hospital's Board of Directors with new directors acceptable to the DIP Lender." *Id.* at 6. Accordingly, this change of

On October 24, 2025, the DIP Lender (represented by the same putative counsel for Jackson Hospital here)[8] filed its "Emergency Motion to Vacate and Set Aside the Debtors' Participation in the Settlement." *See* Dkt. No. 3378-1 (the "Set-Aside Motion"). Neither the DIP Lender nor Jackson Hospital filed any motion or other notice with this Court, which retained exclusive jurisdiction over such matters. Neither the DIP Lender nor Jackson Hospital provided any notice to BCBSAL regarding its Set-Aside Motion.

In the Set-Aside Motion, the DIP Lender made the same misleading statements regarding the provisions of the DIP Term Sheet and DIP Agreement that Jackson Hospital repeats here. The DIP Lender stated that the Bankruptcy Court "did not approve of, and the DIP Lender did not provide written consent for, the Debtors to release any claims potentially at issue in the class action settlement," and claimed that the Bankruptcy Court "did not authorize, and the DIP Lender gave no written consent, to participate *at all* in the settlement." *Id.* ¶ 2 (emphasis in original). These statements falsely imply that any approval from the Bankruptcy Court or the DIP Lender was required in order for Jackson Hospital to follow through on its pre-petition election to participate

---

mind regarding the desirability of settling and the ensuing litigation also could have been prompted by a change in control once the DIP Lender was allowed to install its preferred board members.

[8] Putative counsel for Jackson Hospital in the Belated Opt-Out Motion and the adversary proceeding (Iacuone McAllister Potter PLLC) was originally counsel for the DIP Lender in seeking to change Jackson Hospital's election in connection with this litigation and the Settlement through the Set-Aside Motion. *See* Dkt. No. 3378-1 at 10. Iacuone McAllister Potter PLLC has not yet received necessary approval from the Bankruptcy Court to represent Jackson Hospital, although an application to employ the firm has been filed by Jackson Hospital and remains pending before the Bankruptcy Court. *See* Special Counsel Application, attached hereto as Exhibit 7 [BK Case, Dkt. No. 1301] (filed December 23, 2025); *see also* 11 U.S.C. § 327 (providing that debtor may only employ attorneys "with the court's approval"). On January 16, 2026, Jackson Hospital filed a motion to authorize the DIP Lender to provide litigation funding for its adversary proceeding against BCBSAL. *See* Motion to Approve Post-Petition Financing, attached hereto as Exhibit 8 [BK Case, Dkt. No. 1355] and Joint Prosecution and Funding Agreement, attached hereto as Exhibit 9. As a condition of this funding, Jackson Hospital agreed that all "[d]ecision-making regarding strategy, settlement, and other critical aspects of the Litigation shall be shared between [DIP Lender] and [Jackson Hospital]." *See* Ex. 9, § 2.

in the settlement, as evidenced in the DIP Term Sheet and confirmed in the DIP Agreement. Indeed, the DIP Lender not only consented to Jackson Hospital's participation in the Settlement Agreement but *required* such participation on a continuing basis by taking a security interest in Jackson Hospital's rights under the Settlement Agreement. *See supra* at 4–6.

Jackson Hospital's opting-out – not its participation in the settlement – would have been unauthorized absent Bankruptcy Court and DIP Lender approval. Opting-out would have impermissibly removed property (settlement proceeds) from the estate in substitution for some speculative potential recovery against BCBSAL in costly opt-out litigation.

Unfortunately, because neither the DIP Lender nor Jackson Hospital provided any notice of the Set-Aside Motion, BCBSAL was unable to ensure that the Bankruptcy Court was fully apprised of the operative facts and history related to this litigation or to explain that the Set-Aside Motion should have been considered – and rejected – by this Court with its exclusive jurisdiction.

On October 31, 2025, the Bankruptcy Court entered its order purporting to "vacate[] and set[] aside (1) [Jackson Hospital's] failure to opt out of the Class Action Settlement, and (2) [Jackson Hospital's] submission of a claim in such Class Action Settlement." Dkt. No. 3378-4 at 2. The Bankruptcy Court did not address the standing of the DIP Lender to seek to vacate a pre-petition settlement duly-entered by a debtor, or provide its legal or jurisdictional basis for entering an order in contravention of the FAO, which is unsurprising since BCBSAL had no opportunity to raise these issues with the Bankruptcy Court.

### IV.   Jackson Hospital Sues BCBSAL

Despite obtaining the Bankruptcy Court order purportedly vacating its "failure to opt out" in late October, Jackson Hospital waited until December 18, 2025 to file its adversary proceeding complaint against BCBSAL, seeking over $250 million based on claims released in the Settlement

10

Agreement. *See* Dkt. No. 3378-2 ("AP Complaint"). Jackson Hospital simultaneously filed in the Bankruptcy Court a motion for temporary restraining order seeking to force BCBSAL to raise its reimbursement rates. *See* Dkt. No. 3378-3 ("TRO Motion"). The TRO Motion was initially set for hearing on December 23, 2025.[9]

### V.    BCBSAL Moves to Enforce Settlement

On December 22, 2025, BCBSAL filed its Motion to Enforce in this Court, seeking an injunction against the adversary proceeding.

On January 5, 2026, over ten months after the opt-out deadline, five months after Jackson Hospital submitted its claim form, four months after the FAO, and two months after filing its Set-Aside Motion in the Bankruptcy Court, Jackson Hospital filed its Belated Opt-Out Motion, seeking exclusion from the Settlement Agreement for the first time before this Court.

### <u>ARGUMENT</u>

### I.    Jackson Hospital Cannot Obtain Relief under Rules 6(b) and 60(b) Because It Made a Deliberate Decision Not to Opt-Out of the Settlement Class.

The threshold reason to deny the Belated Opt-Out Motion is that neither Rule 6(b) nor Rule 60(b) applies when the moving party seeks relief from an intentional decision – which is precisely the situation here. *See Grilli v. Metropolitan Life Ins. Co.*, 78 F.3d 1533, 1538 (11th Cir.), *opinion clarified,* 92 F.3d 1074 (11th Cir. 1996).

---

[9] Jackson Hospital seemingly calculated the timing and service of its TRO Motion to frustrate BCBSAL's ability to respond. On December 18, 2025, at or around 4:40 PM, BCBSAL's security desk informed the legal department that someone had arrived to serve a document. *See* Declaration of Shannon Ledford ("Ledford Decl."), attached hereto as Exhibit 10, ¶ 3; Declaration of Tydon Miller ("Miller Decl."), attached hereto as Exhibit 11, ¶ 5. The process server arrived just before the legal department employees left for the day, and many employees were traveling or working from home given the proximity to the Christmas holiday. *See* Ledford Decl., ¶ 5. The process server informed the BCBSAL employee that he received express instructions to serve the document between 4:00 PM and 5:00 PM. *See id.* ¶ 6; Miller Decl., ¶ 6. The process server stated that he told his client that the recipient may have already left the office for the day but that his client insisted that he serve the document at that specific time. *See* Ledford Decl., ¶ 6.

In *Grilli*, two members of a settlement class (the Coulters) decided not to file an opt-out notice on or before the district court's exclusion deadline. Instead of doing so, which would have allowed them to continue prosecuting a pending, individual lawsuit they had filed against the settling defendant, the Coulters moved to intervene in the case being settled. When the district court denied the intervention motion, the Coulters moved belatedly to opt out of the settlement. The district court denied their Rule 6(b) motion and the Eleventh Circuit affirmed.  In affirming, the Court of Appeals did not subject the Coulters' Rule 6(b) argument to an "excusable neglect" analysis, holding instead that "[b]ecause the Coulters made a tactical decision not to opt out in time, . . . we see no reason for permitting an opt-out after the expiration of the deadline." *Grilli*, 78 F.3d at 1358.  By contrast, the appellate court *did* review *other* class members' Rule 6(b) motions under the "excusable neglect" standard, ultimately denying them as well.

*Grilli* is no outlier. "[M]ost courts have held that where a party's actions are deliberate, the party's late filing cannot constitute 'excusable neglect.'" *In re Celotex Corp.*, 232 B.R. 493, 495 (M.D. Fla.) (internal quotation marks omitted), *aff'd sub nom. Sunset Vine Tower v. Celotex Corp.*, 196 F.3d 1262 (11th Cir. 1999);  *see also In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 6327368, at *3 (N.D. Fla. Aug. 19, 2021) ("Intentional strategic decisions cannot constitute 'excusable neglect.'"); *In re Ford*, 2020 WL 13349093, at *6 (M.D. Fla. Aug. 3, 2020) ("It is well established, however, that where a party's actions are deliberate, the party's late filing cannot constitute 'excusable neglect.'") (internal quotation marks omitted).

Stated differently, if Jackson Hospital's failure to opt-out was intentional, deliberate, and/or tactical, the *Pioneer* factors do not even apply.  "When a party makes a deliberate, strategic choice to settle, she cannot be relieved of such a choice merely because her assessment of the consequences was incorrect." *United States v. Bank of New York*, 14 F.3d 756, 759 (2d Cir. 1994);

12

*accord Latshaw v. Trainer Wortham & Co.*, 452 F.3d 1097, 1101 (9th Cir. 2006) ("Rule 60(b)(1) is not intended to remedy the effects of a litigation decision that a party later comes to regret."); *Eskridge v. Cook Cnty.*, 577 F.3d 806, 810 (7th Cir. 2009) ("Since counsel made a 'deliberate, strategic choice' to dismiss the federal lawsuit and proceed against Cook County in state court, counsel's incorrect assessment of the consequences of that choice did not compel relief under Rule 60(b)."); *In re Raynard*, 171 B.R. 699, 702–03 (Bankr. N.D. Ga. 1994) ("As Defendant's failure to answer was not the result of 'neglect,' it is unnecessary to proceed to the 'excusable' prong of the analysis prescribed in *Pioneer*."); *see also* 11 Wright & Miller's Fed. Prac. & Proc. § 2858 (2025 3d ed.) ("[R]elief will not be granted" for "affirmative tactical decisions.") (collecting cases).

And make no mistake: Jackson Hospital's failure to meet the opt-out deadline was deliberate and calculated.  Consider the following:

- Jackson Hospital knew about the Class Settlement and the March 4, 2025 opt-out deadline before the deadline had expired. *See* Dkt. No. 3382-1, Declaration of Jackson Hospital Chief Restructuring Officer Allen Wilen ("Wilen Decl."), ¶ 22.

- Jackson Hospital's DIP Term Sheet – dated the day of its bankruptcy petition (Feb. 3, 2025) – defines the "DIP Collateral" to include "all rights, title and interest in the *'Blue Cross Blue Shield' settlement* and any related recovery."  DIP Term Sheet, Ex. 1, at 6 (emphasis added). As this document was surely created to memorialize the agreed financing terms that were negotiated *before* the Chapter 11 petition was filed on February 3, 2025, Jackson Hospital and the DIP Lender *had to know pre-petition* that Jackson Hospital was a participant in the settlement, and that far from wanting to opt out, Jackson Hospital was using the settlement proceeds to persuade the DIP Lender to extend credit.

- The DIP Agreement (dated on March 4, 2025, the exact day of the opt-out deadline) disclosed the DIP Lender's security interest in "all rights, title and interest of [Jackson Hospital] . . . ***pursuant to the Settlement Agreement*** affecting such litigation that was preliminarily approved by the Court on December 4, 2024 (as the same may be amended, restated, supplemented, approved, or otherwise modified)."  DIP Agreement, Ex. 2 (emphasis added).

- On July 29, 2025, approximately five months after the opt-out deadline, the Hospital submitted its Claim Form in order to participate in the Settlement

Agreement and to receive proceeds therefrom. ██████████████

███████████████████████████████████████████

███████████████████████████████████████████

- Finally, the Wilen Declaration concedes that Jackson Hospital made "***efforts***" to "analyze whether it would be in the best interest of Jackson Hospital and its stakeholders to opt-out of the Class Action Settlement (or whether Jackson Hospital had the means to opt-out and pursue litigation)." Wilen Decl., ¶ 22 (emphasis added). (Mr. Wilen's assertion that the Hospital lacked "*sufficient* time to *fully and properly*" make its analysis is addressed *infra*). *Id*. (emphasis added).

In summary, "[t]here must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from." *Ackermann v. United States*, 340 U.S. 193, 198 (1950). Changing one's mind does not justify Rule 6(b) or Rule 60(b) relief. *See Gann v. Smith*, 443 F.2d 352, 353 (5th Cir. 1971) ("The problem in this case is, the action of the [movant] did not involve neglect of any kind. . . . The record reveals that the only showing made to the district judge was that the respondent changed its mind. [The court] was therefore without power to extend the time."); *Nemaizer v. Baker*, 793 F.2d 58, 62 (2d Cir. 1986) ("Mere dissatisfaction in hindsight with choices deliberately made by counsel is not grounds for finding the mistake, inadvertence, surprise or excusable neglect necessary to justify Rule 60(b)(1) relief."); *United States v. Bracy*, 2007 WL 201240, at *1 (S.D. Ala. Jan. 24, 2007) (similar) (collecting cases).

## II.    Jackson Hospital's Delay is Inexcusable.

Even if Jackson Hospital's deliberate decision to remain in the settlement could somehow be construed as "neglect," which it cannot, Jackson Hospital's ten-month delay is not "excusable." "[F]inal judgments should not 'be lightly reopened.' . . . Because the rule allows extraordinary judicial relief, it should be invoked only upon a showing of 'exceptional circumstances.'" *Larsen Co. v. Consol. Mktg., Inc.*, 148 F.R.D. 664, 666 (N.D. Ga. 1993), *aff'd sub nom. Larsen Co. v. Consol. Mktg.*, 15 F.3d 1098 (11th Cir. 1994) (citing *Nemaizer,* 793 F.2d at 61).

Courts determine whether "neglect" is "excusable" based on four factors: (1) the length of

14

the delay, (2) the reason for the delay, (3) whether the movant acted in good faith, and (4) prejudice to the non-movant. *See Advanced Estimating Sys., Inc. v. Riney*, 130 F.3d 996, 997–98 (11th Cir. 1997) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). None of these factors cuts in Jackson Hospital's favor.

### A. A Ten-Month Delay is Extraordinary.

Jackson Hospital knew in advance of the Settlement Agreement and its March 4, 2025 opt-out deadline yet waited over ten months to file the instant motion.[10] Courts routinely decline to find excusable neglect for far shorter delays. *See, e.g.*, *Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 935 (11th Cir. 2007) (delaying one month after entry of default judgment was not excusable); *S.E.C. v. Simmons*, 241 F. App'x 660, 664 (11th Cir. 2007) (delaying four months to file motion to vacate is inexcusable); *In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1298 (11th Cir. 2003) (delaying two months is inexcusable). This factor weighs strongly against Jackson Hospital.

Moreover, while the pertinent opt-out deadline ran over ten months ago, Jackson Hospital must also account for the other periods of delay noted above. *See supra* at 11. At a minimum, Jackson Hospital apparently knew it wanted relief from the final judgment as of October 24, 2025, when the DIP Lender filed its Set-Aside Motion in the Bankruptcy Court. Yet Jackson Hospital did not file *anything* in this Court – the court with exclusive jurisdiction over the Settlement Agreement and FAO – until over two months later, and then only in response to BCBSAL's Motion to Enforce. Nothing in Jackson Hospital's current motion purports to account for this period of delay. *See generally* Belated Opt-Out Motion. Any inexplicable period of delay precludes a finding of excusable neglect. *See Simmons*, 241 F. App'x at 664.

---

[10] Even applying 11 U.S.C. § 108(b) and extending this deadline to April 4, 2025, Jackson Hospital delayed over nine months to bring its Belated Opt-Out Motion. *See supra* n.3.

15

**B. Jackson Hospital's Reason for Delay is Unjustified.**

Jackson Hospital asserts that it "did not have sufficient time to fully and properly analyze whether it would be in the best interest of Jackson Hospital and its stakeholders to opt out of the Class Action settlement" in the "months, weeks, and days leading up to the Opt-Out Deadline." Belated Opt-Out Motion, ¶ 47 ("[I]t was not feasible for Jackson Hospital – prior to the Opt-Out Deadline – to fully and properly analyze and decide whether Jackson Hospital could, and/or should, opt out of the Class Action Settlement."). Jackson Hospital cites the "flurry of activity" in the month prior to filing bankruptcy and claims that "Jackson Hospital's attention was consumed with initial bankruptcy filings" in February 2025. *Id.* ¶¶ 42–44. Jackson Hospital cites events that allegedly precluded it from undertaking an analysis of its opt-out rights through "August 7, 2025." *Id.* ¶ 45.

This purported justification fails. *First*, as set forth above and as evidenced by the DIP Term Sheet, Jackson Hospital made a conscious decision to participate in the Settlement Agreement prior to filing its petition, which alone precludes a finding of "neglect." *See supra* at 11–14. The fact that it took several months for Jackson Hospital to change its mind after purportedly undertaking a more thorough analysis is irrelevant. *See Gann*, 443 F.2d at 353.

*Second*, Jackson Hospital does not cite any events after August 7, 2025 to explain its delay, meaning five months of Jackson Hospital's delay is completely unaccounted for and unjustified. *See* Belated Opt-Out Motion, ¶¶ 42–45. For that reason alone, Jackson Hospital cannot establish that its delay is excusable. *See Simmons*, 241 F. App'x at 664.

*Third*, Jackson Hospital's excuses amount to nothing more than a claim that it was too busy to make an informed opt-out decision. That assertion is dubious, particularly since Jackson Hospital and its DIP Lender plainly had sufficient time to negotiate and craft a security interest in

16

Jackson Hospital's rights under the Settlement Agreement – beginning with the February 3, 2025 DIP Term Sheet. *See supra* at 4–5. In any event, courts routinely reject claims of excusable neglect premised on the movant or its counsel being "too busy." *See, e.g.*, *Allen v. Baldwin Cnty. Comm'n*, 2007 WL 1875944, at *1 (S.D. Ala. June 28, 2007) ("The fact that counsel has a busy practice does not establish 'excusable neglect' under Rule 6(b)(2).") (quoting *McLaughlin v. City of LaGrange*, 662 F.2d 1385, 1387 (11th Cir. 1981)); *Eli Rsch., LLC v. Must Have Info Inc.*, 2015 WL 4694046, at *2 (M.D. Fla. Aug. 6, 2015) ("As grounds for the delay, Plaintiffs state that they were busy preparing for and attending depositions. . . . Clearly, this does not rise to the level of excusable neglect."); *Akridge v. City of Moultrie, Georgia*, 2005 WL 8166032, at *1 (M.D. Ga. Sept. 26, 2005) ("[A] busy schedule . . . will not rise to the level of excusable neglect."). Jackson Hospital has three firms of record in the bankruptcy proceeding, including a large multi-state firm with an extensive bankruptcy and litigation practice, and has retained EisnerAmper as its financial adviser. Surely, one of Jackson Hospital's attorneys or advisors had time to analyze the propriety of opting out in the preceding ten months. Any purported failure to seek their assistance is inexcusable.

*Fourth*, the delay here is particularly unjustified given the extraordinary damages Jackson Hospital seeks. In the AP Complaint, Jackson Hospital seeks over $250 million in damages. *See* Dkt. No. 3378-2, ¶ 12 ("Jackson Hospital anticipates requesting judgment against Blue Cross Alabama in excess of $250 million."). In light of the damages allegedly at stake, a ten-month delay is wholly inexcusable. *See Simmons*, 241 F. App'x at 664 ("Such inaction demonstrates a lack of diligence on Ehlers's part, especially when [plaintiff] alleged millions of dollars of damages in its complaint.") (quoting *Fla. Physician's Ins. Co. v. Ehlers*, 8 F.3d 780, 784 (11th Cir. 1993)).

*Fifth*, Jackson Hospital's reliance on 11 U.S.C. § 108(a) is misplaced. *See* Belated Opt-Out Motion, ¶ 50 (claiming "Congress has [] recognized the scope of these administrative burdens and

17

the time constraints they impose upon the debtor-in-possession" by extending "unexpired deadlines and statutes of limitations for up to two years after the bankruptcy petition is filed"). Jackson Hospital correctly notes that Congress recognized a debtor might need additional time to make certain determinations after a petition is filed, given the early activity associated with a new bankruptcy case and the involvement of disparate interests in the decision-making process. That said, Jackson Hospital invokes the wrong section of the Bankruptcy Code in attempting to justify its delay. Section 108(a) provides that if "applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor *may commence an action*" then such period may be extended up to two years after the filing of the petition. 11 U.S.C. § 108(a) (emphasis added). As evidenced by this plain language, Section 108(a) only applies to statutes of limitations or other limitations periods for commencing an action. It is Section 108(b) that applies to other deadlines like the opt-out deadline, *i.e.*, the "period[s] within which the debtor . . . may file any pleading, demand, notice, or proof of claim or loss, cure a default, or perform any other similar act," and it only extends such deadlines 60 days after the filing of the petition. 11 U.S.C. § 108(b); *see, e.g., In re Northington*, 876 F.3d 1302 (11th Cir. 2017) (property of estate lost where debtor fails to timely exercise rights within period allowed under § 108(b)). Applying Section 108(b), Jackson Hospital had until April 4, 2025 to opt out of the Settlement Agreement. It did not. Granting Jackson Hospital an additional nine-month extension beyond Section 108(b)'s express limits would contravene, rather than advance, the intent of Congress.

In sum, nothing in Jackson Hospital's narrative comes close to establishing a cognizable justification for its protracted delay. This factor weighs heavily against Jackson Hospital.

18

**C. Jackson Hospital Acted Tactically, Not in Good Faith.**

Jackson Hospital claims that it did not "fail[] to opt out to gain a tactical advantage or that its failure was intentional." Belated Opt-Out Motion, ¶ 52. Jackson Hospital is wrong on both counts. As set forth above, Jackson Hospital's decision to participate in the Settlement Agreement, or its "failure" to opt out, was a deliberate choice. *See supra* at 11–14. Even if Jackson Hospital's change of mind could somehow constitute neglect, its subsequent conduct has been overtly tactical, foreclosing any finding of good faith.

As discussed above, Jackson Hospital apparently changed its mind about the desirability of participating in the Settlement Agreement at some point in the latter half of 2025. *See supra* at 7–8. Rather than immediately coming to this Court and seeking relief, thereby putting BCBSAL on notice of its intentions, Jackson Hospital choose to surreptitiously attempt to gather evidence against BCBSAL in September 2025. *See supra* at 8. Once it had done so, Jackson Hospital again did not come to this Court for relief. Instead, on October 24, 2025, its DIP Lender (represented by the same putative counsel for Jackson Hospital here and in the adversary proceeding) filed the Set-Aside Motion in the Bankruptcy Court. *See supra* at 9–10. The DIP Lender and Jackson Hospital provided no notice of this motion to this Court or to BCBSAL. *See supra* at 9. The DIP Lender's Set Aside Motion contained misleading descriptions of the DIP Term Sheet and DIP Agreement, omitted the fact that the DIP Lender effectively *mandated* that Jackson Hospital remain in the Settlement Agreement by requiring a pledge of Jackson Hospital's rights under the Settlement Agreement, and failed to disclose that the Settlement Agreement had already become a final judgment as to Jackson Hospital. *See supra* at 9–10.

After the Bankruptcy Court granted the Set-Aside Motion on October 31, 2025, neither Jackson Hospital nor the DIP Lender gave any notice to this Court or BCBSAL. Indeed, Jackson

19

Hospital did not take any action at all until December 18, 2025, when it filed the AP Complaint and TRO Motion. This was the first notice BCBSAL had that Jackson Hospital intended to extricate itself from the Settlement Agreement. As set forth above, the timing and service of the TRO Motion was plainly tactical. Jackson Hospital waited almost two months after the Bankruptcy Court granted the Set-Aside Motion so that it could file its TRO Motion right before the Christmas holiday, thereby constraining BCBSAL's opportunity to respond. Worse yet, Jackson Hospital instructed its process server to wait until the last business hour of December 18, 2025, the Thursday before Christmas, to serve its TRO Motion. *See supra* at n.9. By chance, a BCBSAL employee was present to accept service, enabling BCBSAL to file its Motion to Enforce and bring this dispute to the proper forum in this Court.

If not for BCBSAL's Motion to Enforce, Jackson Hospital would never have filed its Belated Opt-Out Motion. Jackson Hospital and the DIP Lender plainly sought to circumvent this Court's exclusive jurisdiction and gain a tactical advantage over BCBSAL by filing the Set-Aside Motion in the Bankruptcy Court and failing to notify BCBSAL. *See Yang v. Bullock Fin. Grp., Inc.*, 435 F. App'x 842, 844 (11th Cir. 2011) (holding good faith determination asks whether "movant intentionally sought advantage by untimely filing"). The Court cannot find good faith in such circumstances, and this factor weighs strongly against Jackson Hospital.

### D. BCBSAL Will Suffer Prejudice.

If Jackson Hospital is permitted to change its mind and opt out ten months after the deadline, and after this Court has rendered a final judgment approving the Settlement Agreement, BCBSAL will suffer extraordinary prejudice. Courts routinely recognize prejudice to the nonmovant in such circumstances. *See, e.g.*, *MRI Assocs. of St. Pete, Inc. v. Dairyland Ins. Co.*, 2014 WL 29103, at *4 (M.D. Fla. Jan. 2, 2014) ("Defendants would be prejudiced in that they

20

would be required to litigate against entities who inexcusably failed to submit timely opt-out forms."); *Sierra v. City of New York*, 2021 WL 4443304, at \*2 (S.D.N.Y. Sept. 28, 2021) ("Defendants would undoubtedly be prejudiced by a late opt-out because they would be 'exposed to liability that [they] had every reason to think had been foreclosed by the entry of the Settlement Agreement in federal court.'"); *In re Imprelis Herbicide Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2014 WL 348593, at \*3 (E.D. Pa. Jan. 31, 2014) ("If Pilgrim Village now is allowed to litigate its claims against DuPont, DuPont will suffer prejudice insofar as it will have to defend against one more plaintiff than would be in litigation if the Court enforces the opt-out deadline against Pilgrim Village. Such prejudice has been recognized as a basis for questioning tardy opt-out efforts.").

The prejudice to BCBSAL – and the other settling defendants – is particularly acute here. By entering the Settlement Agreement, BCBSAL "bargained for security and finality to resolve as many claims against it as possible, including [Jackson Hospital's] claims. . . . Allowing [Jackson Hospital] to opt out at this late stage would jeopardize the security and finality that [BCBSAL] sought to achieve." *Roofer's Pension Fund v. Papa*, 2024 WL 4205638, at \*15 (D.N.J. Sept. 12, 2024), *aff'd sub nom. Perrigo Institutional Inv. Grp. v. Papa*, 150 F.4th 206 (3d Cir. 2025). If Jackson Hospital is permitted to change its mind and opt out at this late date, nothing would stop other settling class members from doing the same. *See Imprelis Herbicide*, 2014 WL 348593, at \*6 (finding prejudice factors weighs against movant because of the "potential for other similarly situated class members to challenge the opt-out deadline"). There would be no finality at all. Accordingly, this factor weighs against Jackson Hospital.

### E.  Alleged Prejudice to Jackson Hospital is Irrelevant.

Jackson Hospital claims that it would "suffer significant and irreparable prejudice" if it is not permitted to opt out of the Settlement Agreement. Belated Opt-Out Motion, ¶ 32. Prejudice to

21

the *movant* is not one of the factors for consideration under *Pioneer*. *See Advanced Estimating*, 130 F.3d at 997 (noting one factor is "the danger of prejudice to the **nonmovant**") (emphasis added); *Cheney v. Anchor Glass Container Corp*., 71 F.3d 848, 850 (11th Cir. 1996) (holding that the court must assess "the danger of prejudice *to the opposing party* . . .") (emphasis added and brackets omitted) (quoting *Pioneer*, 507 U.S. at 395); *In re PaineWebber Ltd. P'ships Litig*., 147 F.3d 132, 135 (2d Cir. 1998) ("A court will also consider the degree of prejudice *to the opposing party*.") (emphasis added).  The other three *Pioneer* factors focus on the movant's circumstances, and if those circumstances are inadequate to show excusable neglect, any prejudice to the movant is immaterial. If anything, Jackson Hospital's claimed prejudice undermines each of the other factors. Jackson Hospital claims that its very survival depends on suing BCBSAL. *See* Belated Opt-Out Motion, ¶ 32. If that were true, then its failure to timely opt-out is all the more inexcusable.

However, if the Court were to consider the alleged prejudice to Jackson Hospital, it should know the full story.  As seen in the Declaration of Joesph Oaks submitted herewith, BCBSAL has worked in good faith with Jackson Hospital to ameliorate its financial difficulties for years. *See* Declaration of Joesph Oaks ("Oaks Decl."), attached hereto as Exhibit 12, ¶¶ 3–23. The supposedly discriminatory reimbursement rates that undergird Jackson Hospital's claim to relief are the result of applying industry standard and objective metrics.  *See id.* ¶¶ 24–28.

Given the long-shot nature of its claim against BCBSAL, Jackson Hospital is better off remaining in the Settlement Agreement. Jackson Hospital has submitted a Claim Form[11] and will thus be entitled to receive the relief provided in the Settlement Agreement. *See Imprelis Herbicide*, 2014 WL 348593, at *6 (noting absence of prejudice to movant because movant "previously

---

[11] While the Bankruptcy Court purported to "set aside" Jackson Hospital's Claim Form, the Bankruptcy Court had no authority to do so given this Court's exclusive jurisdiction. Accordingly, Jackson Hospital continues to participate in the Settlement Agreement.

submitted a claims resolution form, [and] is entitled to participate in the Class Settlement and to recover damages through the claims resolution process").

Because each *Pioneer* factor weighs against Jackson Hospital, and because prejudice to Jackson Hospital as the movant is irrelevant, Jackson Hospital cannot establish that its delay was "excusable," even if a deliberate decision to settle could somehow constitute "neglect."

### III.    Bankruptcy Court's "Set Aside" Order is Irrelevant.

Jackson Hospital flatly asserts at the outset of its Belated Opt-Out Motion that "the Bankruptcy Court's Vacate Order fully supports permitting Jackson Hospital to proceed with the Adversary Proceeding." *See* Belated Opt-Out Motion, ¶ 19. Jackson Hospital provides no explanation whatsoever for how the Bankruptcy Court can modify the final judgment entered by this Court. Indeed, the Bankruptcy Court did not even purport to do so because the DIP Lender did not disclose that finality in its Set-Aside Motion, preventing the Bankruptcy Court from making an informed decision in light of the FAO retaining exclusive jurisdiction. *See supra* at 10.

In its Motion to Enforce, BCBSAL submitted uncontested authority rejecting the notion that opt-out requirements and procedures apply differently to class members in bankruptcy. *See*, *e.g.*, *In re Santangelo*, 325 B.R. 874 (Bankr. M.D. Fla 2005); *Love v. BCBSA*, 2008 WL 4097607 (S.D. Fla. Sept. 4, 2008); *Thomas v. BCBSA*, 333 F. App'x 414 (11th Cir. 2009) (unpublished); *In re Doctors Health Inc.*, 2008 WL 8889901 (D. Md. Mar. 28, 2008). If Jackson Hospital wanted to contest its opt-out status, it should have done so in this Court rather than seeking relief in the Bankruptcy Court that it must have known would not withstand a jurisdictional challenge.

### IV.    Jackson Hospital's "Breach of Contract" Claim is Precluded.

Jackson Hospital does not dispute that its antitrust claims, Counts 1 – 7 of the AP Complaint, must be enjoined if this Court denies the Belated Opt-Out Motion (which it should).

23

However, Jackson Hospital argues that the Court should partially deny BCBSAL's Motion to Enforce and allow Jackson Hospital to assert Count 8 of the AP Complaint – its "breach of contract" claim. Jackson Hospital argues that its "breach of contract" claim "is not based upon the 'factual predicates of the Provider Actions' or 'any issue raised in any of the Provider Actions by pleading or motion.'" Belated Opt-Out Motion, ¶ 56. Jackson Hospital hyperbolically asserts that if it is not allowed to pursue its "breach of contract" claim, then "BCBSAL can never again be sued by an Alabama hospital for breach of contract." *Id.* ¶ 58.

This argument is absurd. Of course hospitals can bring *actual* breach of contract claims against BCBSAL. For example, if Jackson Hospital alleged that BCBSAL refused to pay the reimbursement rates it agreed to pay, Jackson Hospital would be free to sue BCBSAL for that breach of contract. Here, however, Jackson Hospital is not bringing a genuine "breach of contract" claim. Jackson Hospital does not identify any provision of any contract that BCBSAL allegedly breached. *See generally* AP Complaint, Dkt. No. 3378-2, ¶¶ 136–44; TRO Motion, Dkt. No. 3378-3, at 11–15 (explaining its "breach of contract" claim). Instead, Jackson Hospital alleges that BCBSAL breached the "implied covenant of good faith and fair dealing" by using its "monopsony and monopoly power [to] prevent Jackson Hospital from 'negotiating' with 'other payers' that 'compete' with Blue Cross Alabama." TRO Motion, Dkt. No. 3378-3, at 13; *see also* Dkt. No. 3382-2, Declaration of Jackson Hospital CEO John Quinlivan, ¶ 8 ("Given Blue Cross Alabama's market dominance (and the lack of competitor commercial insurers in Alabama), Jackson Hospital does not have the ability to meaningfully 'negotiate' with Blue Cross Alabama.").

Jackson Hospital relies on the same factual allegations for its "breach of contract" claim as it does for its antitrust claims. *See* AP Complaint, Dkt. No. 3378-2, ¶ 136 (expressly incorporating all factual allegations from its antitrust claims as the basis for its "breach of contract" claim).

24

Jackson Hospital seeks the same damages and injunctive relief for its "breach of contract" claim and its antitrust claims. *See id.* at p. 41. In short, Jackson Hospital claims that BCBSAL breached the covenant of good faith and fair dealing by violating antitrust law. Calling Count 8 a "breach of contract" claim does not change the fact that it plainly arises from the same factual predicate as the released claims. *See Adams*, 493 F.3d at 1289 (class settlements bar all future "theories and claims arising out of the same operative nucleus of fact" not just "the precise legal theory presented in the previous litigation").

It should also be noted, as the Alabama Supreme Court recently reaffirmed, that "Alabama law does not recognize an independent claim for a breach" of the "implied covenant of good faith and fair dealing." *Laborde v. Citizens Bank, N.A.*, No. SC-2025-0014, 2025 WL 3684583, at *4 (Ala. Dec. 19, 2025). The "duty of good faith in connection with a contract is directive, not remedial, and [] therefore an action will not lie for breach of such a duty." *Id.* (quoting *Tanner v. Church's Fried Chicken, Inc.*, 582 So. 2d 449, 452 (Ala. 1991)). Jackson Hospital should not be permitted to invent a cause of action in order to circumvent the Settlement Agreement's release.

Jackson Hospital also should not be granted leave to "amend and/or clarify" its "breach of contract" claim. *See* Opt-Out Motion, ¶ 62. If Jackson Hospital could identify any provision of the parties' agreements that BCBSAL actually breached, it would have done so already. Leave to amend would be futile.

## CONCLUSION

For the foregoing reasons, BCBSAL respectfully requests that the Court deny Jackson Hospital's Belated Opt-Out Motion, grant BCBSAL's Motion to Enforce, and exercise its authority under the All-Writs Act to enjoin Jackson Hospital from prosecuting its AP Complaint or any other complaint seeking to bring claims released in the Settlement Agreement.

25

/s/ *Carl S. Burkhalter*

Counsel for Defendant Blue Cross and Blue
Shield of Alabama

**OF COUNSEL:**

Carl S. Burkhalter
MAYNARD NEXSEN PC
1901 Sixth Avenue North
Suite 1700
Birmingham, AL 35203
Telephone: 205-254-1000
Facsimile: 205-254-1999
cburkhalter@maynardnexsen.com

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 20th day of January, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF filing system, which will send a copy to all counsel of record.

/s/ *Carl S. Burkhalter*
OF COUNSEL