FILED
2026 Jan-20  PM 05:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 1

<u>Exhibit 1</u>

DIP Term Sheet

**February 3, 2025**

**Jackson Hospital & Clinic, Inc.**
**$24,500,000**
**Debtor-in-Possession Term Loan Facility**
**Summary of Terms and Conditions**

**This term sheet (together with the exhibits and schedules hereto, the "Term Sheet") sets forth a summary of the terms and conditions with respect to the DIP Facility (as defined below) from and after, and subject to, the entry of the Interim Order (as defined below). This Term Sheet shall be a binding agreement from and after, and subject to, the entry of the Interim Order with respect to the DIP Loans (as defined below) but does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the DIP Facility, which will be set forth in the DIP Documents (as defined below). The obligation of the DIP Lender (as defined below) to provide financing pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the parties hereto and shall be subject to the conditions precedent and other terms and conditions set forth herein. In the event of any conflict between this Term Sheet and the terms of the Interim Order or the Final Order (as defined below), the terms of the Interim Order or the Final Order, as applicable, shall govern.**

| 1. | ***Borrowers*** | • Jackson Hospital & Clinic, Inc., an Alabama corporation, *et. al.*[1] (the "**Borrower**" and together with all of the Borrower's existing and future, direct or indirect domestic or foreign subsidiaries and affiliates that become debtors and debtors-in-possession in the Chapter 11 Cases, the "**Borrowers**", each a "**Loan Party**" and collectively, the "**Loan Parties**"). The Loan Parties are expected to be debtors and debtors-in-possession in the anticipated chapter 11 cases (such cases, the "**Chapter 11 Cases**", and the Borrower and its applicable subsidiaries and affiliates shall be referred to herein under the Chapter 11 Cases, each as a "**Debtor**" and collectively, as the "**Debtors**") under chapter 11 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") to be commenced in the United States Bankruptcy Court for the Middle District of Alabama (the "**Bankruptcy Court**") on or around February 3, 2025 (the actual date of commencement, the "**Petition Date**"). |
|---|---|---|
| 2. | ***DIP Lender*** | • Jackson Investment Group, LLC and/or its designees or its assignees. |
| 3. | ***Type and Amount of the DIP Facility*** | • A non-amortizing priming, super-priority senior secured term loan facility in an aggregate principal amount not to exceed $24,500,000 in term loan commitments (the "**DIP Facility**"; the DIP Lender's commitments under the DIP Facility, the "**DIP Commitments**"; and the loans under the DIP Facility, the "**DIP Loans**").<br><br>• The borrowing of DIP Loans shall permanently decrease the DIP Commitments, and DIP Loans repaid may not be reborrowed.<br><br>• Initial net proceeds of the DIP Loans shall be funded in accordance with Budget.<br><br>• Subsequent DIP Loan proceeds to be funded into the Borrowers' DIP Bank Account maintained at Regions Bank and the Loan Parties shall |

---

[1] Additional borrowers are listed on **Schedule 1.**

US2008 31010073 4

1

| | | |
|---|---|---|
| | | obtain a satisfactory control agreement in favor of the DIP Lender to be entered into within 15 business days of the entry of the Final Order subject to a 15-day cure period if the Loan Parties are using commercially reasonable efforts to obtain a satisfactory control agreement; <u>provided</u> that the Carve-Out (as defined below) shall be funded as described in the Interim Order. The Borrowers' shall permit only the DIP Loan proceeds to be maintained in the DIP Bank Account, segregated from all other funds and utilized only in accordance with the terms and conditions of the DIP Documents. |
| 4. | *Initial Availability* | • Upon the Bankruptcy Court's entry of the Interim Order, and satisfaction of all applicable conditions precedent described in Section 15 herein, the DIP Lender shall make available an aggregate amount of $10,000,000 of the DIP Loans and the Borrowers shall be entitled to make draws of the DIP Loans as described in Section 6 below immediately upon entry of the Interim Order (the "**Initial Draws**", the date of such first Initial Draw shall be referred to herein as the "**Closing Date**"). The closing of definitive DIP Documents shall occur as soon after the first Initial Draw as reasonably possible but in any event no later than two (2) business days prior to the hearing to consider entry of the Final Order. |
| 5. | *Full Availability* | • Upon (i) the Bankruptcy Court's entry of the Final Order (as defined below) and (ii) the satisfaction of all applicable conditions described in Sections 15 and 16 herein (or, as the case may be, the other applicable DIP Documents), the full amount of the DIP Facility shall be available to the Debtors, subject to compliance with the terms, conditions, and covenants described in the DIP Documents, in additional draws in accordance with Section 6 below (each an "**Other Draw**" and collectively, the "**Other Draws**", and together with the Initial Draws, and each Other Draw, each a "**Draw**" and collectively, the "**Draws**"). |
| 6. | *Draws* | • Subject to satisfaction of the conditions precedent to the Initial Draws or Other Draws, as applicable, and availability under the DIP Commitments, the Borrowers shall be entitled to make Draws of the DIP Loans in accordance with the Budget (as defined below).<br><br>• Each Draw shall be made (in an aggregate minimum amount of $500,000 (and multiples thereof) upon two (2) business days' written notice, up to the aggregate amount of the undrawn DIP Commitments at any time prior to two (2) business days before the DIP Termination Date (as defined below); <u>provided</u> that the first Initial Draw shall be in the amount of $10,000,000 and deemed requested in accordance with the terms of this Term Sheet, and funded within one (1) business day following the entry of the Interim Order and shall not require any further advance written notice but shall require a customary notice of borrowing. |
| 7. | *Maturity and Termination* | • All DIP Obligations (as defined below) shall be due and payable in full in cash ("**Payment in Full**"[2] or such other form of consideration as the DIP Lender and the Borrowers may mutually agree) on the earliest of: |

---

[2] For purposes hereof, the term "Payment in Full" means, with respect to the DIP Obligations, the irrevocable and indefeasible payment in full in cash of all DIP Obligations, other than continuing indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall

|  |  | i. | July 31, 2025; |
|---|---|---|---|
|  |  | ii. | the effective date of any chapter 11 plan with respect to the Borrowers (a "**Plan**"); |
|  |  | iii. | the consummation of any sale or other disposition of all or substantially all of the assets of the Borrowers pursuant to section 363 of the Bankruptcy Code; |
|  |  | iv. | the date of the acceleration of the DIP Loans and the termination of the DIP Commitments following the occurrence and during the continuation of an Event of Default in accordance with the DIP Documents; |
|  |  | v. | dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code; and |
|  |  | vi. | 45 days after the Petition Date (or such later date as agreed to by the DIP Lender) or as dictated by the availability of the Bankruptcy Court, unless the Final Order has been entered by the Bankruptcy Court on or prior to such date (such earliest date, the "**DIP Termination Date**"). |
|  |  |  | • The occurrence of the DIP Termination Date shall terminate the ability of the Borrowers to borrow the Draws and shall terminate any further obligation the DIP Lender has to make any DIP Loans under the DIP Documents.· |
|  |  |  | • For the avoidance of doubt, any of the above conditions from (i) through (vi) automatically triggers the Maturity Date. |
| 8. | *Interest Rate* |  | • The DIP Loans shall bear interest at a per annum rate equal to 14% payable in cash on the first day of each month in arrears (the "**Non-Default Interest**"). |
|  |  |  | • Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default (as defined below), the DIP Loans shall bear interest at the per annum rate of 19%, in each case payable in cash, together with the Non-Default Interest, on the first day of each month in arrears. |
| 9. | *Commitment Fee, Exit Fee and Other Fees* |  | • The Borrowers shall pay to the DIP Lender a commitment fee equal to 4.0% of the total amount of the DIP Commitments (the "**Commitment Fee**"). The Commitment Fee shall be fully earned, non-refundable, and allowed upon entry of the Interim Order, and shall be payable out of the proceeds of the Initial Draw. |
|  |  |  | • The Borrowers shall pay to the DIP Lender an exit fee equal to the sum of 6.0% of (i) upon entry of the Interim Order and before entry of the Final Order, the total amount of DIP Loans then outstanding, and (ii) upon entry |

---

have irrevocably, permanently and finally expired or shall have been terminated, cancelled and discharged.

3

| | | |
|---|---|---|
| | | of the Final Order, the total amount of the DIP Commitments, which, in each case, shall be fully earned, non-refundable, and allowed upon the Bankruptcy Court's entry of the Interim Order (the "**Exit Fee**"). The Exit Fee shall be due and payable upon the earliest of (x) the DIP Termination Date, (y) Payment in Full of the DIP Obligations, and (z) on a *pro rata* basis for any Voluntary Prepayment of the DIP Obligations; <u>provided,</u> <u>however,</u> that, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lender.<br><br>• The Commitment Fee and the Exit Fee shall be approved on a final basis by the Bankruptcy Court as part of the Interim Order. If such fees are not approved on a final basis by the Bankruptcy Court, this Term Sheet shall automatically terminate and be of no further force and effect. |
| 10. | ***Use of Proceeds*** | • The proceeds of the DIP Facility shall be used only for the following purposes and, excluding payments pursuant to clauses (ii), (iii), and (iv) below, subject to the Budget and 15% permitted variances as set forth below:<br><br>  i.   working capital and other general corporate purposes of the Borrowers, and any other subsidiaries, if applicable if such subsidiaries are Loan Parties under the DIP Documents;<br><br>  ii.  professional fees and expenses of administering the Chapter 11 Cases (including fees incurred prior to the Closing Date) in accordance with the Bankruptcy Code and any orders of the Bankruptcy Court, as applicable;<br><br>  iii. fees and expenses payable under the DIP Facility, including, without limitation, the Commitment Fee, the Exit Fee and legal fees and expenses of the DIP Lender (including fees and expenses incurred prior to the Closing Date); and<br><br>  iv.  interest and other amounts payable under the DIP Facility.<br><br>• Notwithstanding any other provision of this Term Sheet, from and after the Closing Date, no DIP Loans or DIP Collateral (as defined below), or any portion of the Carve-Out, may be used directly or indirectly by any Debtor, any official committee appointed in the Chapter 11 Cases, or any trustee or examiner appointed in the Chapter 11 Cases or any successor cases, including any chapter 7 cases, or any other person, party or entity:<br><br>  i.   in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation:<br><br>    a. against the DIP Lender, or its respective predecessors-in-interest, agents, affiliates, representatives, attorneys, or advisors, or any action purporting to do the foregoing in respect of the DIP Obligations, DIP |

4

| | | Liens (as defined below), or DIP Claims (as defined below); or |
|---|---|---|
| | | b. challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the DIP Obligations and/or the liens, claims, rights, or security interests granted under the Orders (as defined below), the DIP Documents, including, in each case, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; |
| | | ii. to prevent, hinder, or otherwise delay the DIP Lender's enforcement or realization on the DIP Obligations, DIP Collateral, and the liens, claims, and rights granted to such parties under the Interim Order or the Final Order, as applicable, each in accordance with the DIP Documents and the Interim Order or the Final Order, as applicable; provided, however, that this shall not apply to (x) objections to the Final Order and (y) any challenge to whether a DIP Termination Event has occurred and/or the propriety of the DIP Lender's termination of the DIP Commitments and/or acceleration of the DIP Obligations or calculation of the amounts owed thereunder; |
| | | iii. to seek to modify any of the rights and remedies granted to the DIP Lender under the Orders (other than with the consents contemplated thereunder), or the DIP Documents, as applicable; or |
| | | iv. to apply to the Bankruptcy Court for authority to approve superpriority claims or grant liens (other than the Carve-Out and liens permitted pursuant to the DIP Documents) or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the DIP Liens, DIP Claims, unless permitted under the DIP Documents or unless all DIP Obligations and claims granted to the DIP Lender under the Interim Order or the Final Order, as applicable, have been refinanced or Paid in Full in cash or otherwise agreed to in writing by the DIP Lender. |
| 11. | *Voluntary Prepayments* | • Voluntary prepayments of the DIP Loans shall be permitted at any time, subject to (i) payment of the ratable portion of the Exit Fee due thereon, which shall be due and payable on the date of such voluntary prepayment; (ii) accrued interest on the amount prepaid; and (iii) in minimum amounts of at least $1,000,000 of principal. |
| 12. | *Security* | • As security for the DIP Obligations, subject to the Carve-Out, each Loan Party shall grant to the DIP Lender a priming first lien security interest |

("**Priming First Lien**") on all of such Loan Party's right, title and interest in, to and under all the Loan Parties' assets, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located: all assets and property of such Loan Party and its estate, real (both leasehold and fee) or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, accounts receivables (including healthcare insurance receivables), chattel paper, letters of credit and letter of credit rights, investment property (including, without limitation, all equity interests owned by any Loan Party in its current and future subsidiaries), commercial tort claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, all interests in leaseholds and real properties (including, without limitation, all right, title and interest in the real properties set forth on **Schedule 3**), all patents, copyrights, trademarks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), all rights, title and interest in the "Blue Cross Blue Shield" settlement and any related recovery together with all books and records relating to the foregoing, all rights, title and interest in the "opioid settlement" and any related recovery together with all books and records relating to the foregoing, all governmental and private grants, all claims, rights, interests, proceeds, products, accessions, additions, improvements, substitutions, rents and profits, and books and records, of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of Georgia) and (i) effective upon entry of the Interim Order, all causes of actions under section 549 of the Bankruptcy Code to recover any postpetition transfer of DIP Collateral and any proceeds thereof and (ii) effective upon entry of the Final Order, all avoidance actions, including any claims and causes of actions arising under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code and similar such claims and causes of action under applicable non-bankruptcy law, and the proceeds thereof (collectively, the "**DIP Collateral**").

- Negative pledge on all assets of the Loan Parties subject to permitted liens to be agreed upon by the Final Order.

- In addition to appropriate orders of the Bankruptcy Court granting and perfecting such liens, the Loan Parties shall take all other commercially reasonable steps (including the execution and filing of UCC financing statements, intellectual property security agreements, deposit account control agreements and leasehold mortgages) reasonably requested by DIP Lender.

| 13. | *Priority and Security* | • Subject to the Carve-Out, all obligations of the Loan Parties under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees and premiums provided for therein, and all obligations of the Loan Parties under the DIP Facility (the "**DIP Obligations**") shall be |

6

| | | |
|---|---|---|
| | | entitled to (a) senior secured priming lien and (b) superpriority claim status pursuant to section 364(c)(1) and section 364(d)(1) of the Bankruptcy Code, with priority over any and all secured liens, administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "**DIP Claims**").<br><br>• Subject to the Carve-Out and the Permitted Prior Liens (as defined in **Schedule 2**), all DIP Obligations in respect of the DIP Facility shall be:<br><br>   i.   pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral); and<br><br>   ii.   secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a valid, enforceable, fully perfected and automatic first-priority lien on the DIP Collateral; and<br><br>   iii.   senior secured priming first liens on the DIP Collateral, pursuant to section 364(d)(1) of the Bankruptcy Code.<br><br>• The liens securing the DIP Facility (the "**DIP Liens**") shall mean the liens described above and in the priority set forth in the Interim Order and Final Order, as applicable. The DIP Liens described herein shall, to the fullest extent permitted by applicable law, be effected and perfected upon entry of the Interim Order and without the necessity of the execution or filing of mortgages, landlord agreements, security agreements, pledge agreements, control agreements, financing statements, leasehold mortgages or other agreements. |
| 14. | *Remedies* | • Upon the occurrence and during the continuation of an Event of Default under the DIP Documents, all remedies customarily available in the Chapter 11 Cases including, without limitation, those remedies customarily available to a senior secured, administrative expense claim of a debtor-in-possession lender, including, without limitation:<br><br>   i.   declare that the DIP Commitments are terminated, reduced or restricted, whereupon the DIP Commitments shall be terminated, reduced, or restricted on account of any further Draws;<br><br>   ii.   declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Loan Parties;<br><br>   iii.   charge interest at the default rate under the DIP Documents;<br><br>   iv.   declare the termination, restriction, or revocation of the ability of the Debtors to use Cash Collateral (as defined in the Orders); or |

| | | |
|---|---|---|
| | | v. take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lender) permitted under the DIP Documents or by applicable law.<br><br>Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of the Orders. |
| 15 | ***Conditions Precedent to Initial Draw*** | • Subject to the availability of the Bankruptcy Court, entry of the Interim Order within 4 business days of the Petition Date, which order shall not be stayed or subject to appeal;<br><br>• Delivery of the Initial Budget acceptable to the DIP Lender in its reasonable discretion;<br><br>• All out-of-pocket costs, fees and expenses required to be paid to the DIP Lender pursuant to this Term Sheet, the DIP Documents, or the Interim Order shall have been paid (provided that the Commitment Fee and the DIP Lender's legal fees and expenses shall be paid out of or offset against the proceeds of the Initial Draw);<br><br>• The representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects);<br><br>• No Material Adverse Effect (as defined below) shall have occurred and be continuing;<br><br>• The Debtors shall be in compliance in all respects with the Interim Order;<br><br>• No Event of Default shall have occurred and be continuing under this Term Sheet;<br><br>• No order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner adverse to the DIP Lender the Interim Order; and<br><br>• The entry of the Interim Order shall constitute the borrowing notice for the Initial Draw. |
| 16. | ***Conditions Precedent to Availability of Other Draws; Milestones*** | • The Bankruptcy Court shall have entered a Final Order approving the DIP Facility not later than 45 days following the Petition Date, which Final Order shall be in the form of the Interim Order with such changes as are customary for a final order or otherwise are acceptable to the DIP Lender.<br><br>• In addition, the DIP Documents shall contain such conditions precedent as are usual and customary in loan documents for similar debtor-in-possession financings and other conditions precedent deemed by the DIP Lender appropriate to the specific transaction, including, without limitation:<br><br>   i. execution and delivery of a credit agreement (the "**DIP Credit Agreement**") and other DIP Documents evidencing and securing the DIP Facility, in each case, which shall be in form and substance substantially consistent with this Term Sheet and |

8

|  |  |  | otherwise in form and substance acceptable to the DIP Lender and the Loan Parties; |
|  |  | ii. | delivery of any Budget subsequent to the Initial Budget, acceptable to the DIP Lender in its reasonable discretion; |
|  |  | iii. | no trustee, examiner, or receiver shall have been appointed or designated with respect to the Loan Parties' business, properties or assets and no motion shall be pending seeking similar relief or any other relief, which, if granted, would result in a person other than the Loan Parties exercising control over their assets; |
|  |  | iv. | the representations and warranties of the Loan Parties under the DIP Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects); |
|  |  | v. | the Borrowers shall have delivered to the DIP Lender a customary borrowing notice; |
|  |  | vi. | the Debtors shall be in compliance in all respects with the Final Order and the Loan Parties shall be in compliance in all respects with the DIP Documents; |
|  |  | vii. | no default or event of default shall have occurred and be continuing under the DIP Documents; |
|  |  | viii. | no order has been entered reversing, amending, staying, vacating, terminating or otherwise modifying in any manner adverse to the DIP Lender the Interim Order or the Final Order, as applicable; |
|  |  | ix. | since the Petition Date, other than the Chapter 11 Cases, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Loan Parties taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the DIP Lender, or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP Document (each of the foregoing being a "**Material Adverse Effect**"); |
|  |  | x. | the Debtors shall have all insurance policies maintained by Loan Parties name the DIP Lender as additional insured; |

9

|  |  | xi. all costs, fees, expenses (including, without limitation, legal fees and expenses) set forth in the DIP Documents or otherwise to be paid to the DIP Lender shall have been paid when due; and<br><br>xii. a granting to the DIP Lender of a Priming First Lien for all DIP Obligations pursuant to section 364(d)(1) of the Bankruptcy Code.<br><br>• The DIP Documents shall contain the following milestones (the "**Milestones**") relating to the Chapter 11 Cases, which may be extended by the DIP Lender in its sole discretion, failure to comply with shall constitute an Event of Default:<br><br>  (i) Within 45 days after the Petition Date, the Debtors shall have filed a motion seeking an order the form and substance of which shall be reasonably satisfactory to the DIP Lender governing the solicitation of bids for the purchase (and an auction) of substantially all assets of the Debtors;<br><br>  (ii) Within 75 days after the Petition Date, the Bankruptcy Court shall have entered the order sought in (i) above.<br><br>  (i) within 120 days after the Petition Date, the Bankruptcy Court shall have entered a final order approving the sale of substantially all of the Debtors' assets. |
| 17. | *Documentation* | • The DIP Documents and all other definitive financing documentation (including the Orders) with respect to the DIP Facility shall be satisfactory to the DIP Lender in its sole discretion. For the avoidance of doubt, DIP Documents (other than this Term Sheet and the Interim Order) shall be documented prior to entry of the Final Order. |
| 18. | *Representations and Warranties* | • The DIP Documents shall contain representations and warranties with respect to the Loan Parties as are usual and customary in loan documents for similar debtor-in-possession financings and as acceptable to the DIP Lender, including without limitation, due organization and authorization, enforceability, financial condition, no material adverse changes, title to properties, liens, litigation, payment of taxes, compliance with laws and regulations, employee benefit liabilities, environmental liabilities, and perfection and priority of liens securing the DIP Facility.<br><br>• Each Loan Party represents and warrants that none of its assets and properties are subject to any liens, security interests or encumbrances as of the Petition Date except for liens set forth on Schedule 2 attached hereto and no Loan Party will grant or consent to liens, security interests or encumbrances on or after the Petition Date except to the extent expressly permitted by the DIP Documents. |
| 19. | *Affirmative Covenants* | • The DIP Documents shall contain affirmative covenants as are usual and customary with respect to the Loan Parties in loan documents for similar debtor-in-possession financings and as are acceptable to the DIP Lender and the Borrowers. |

10

| 20. | *Negative Covenants* | • The DIP Documents shall contain negative covenants with respect to the Loan Parties as are usual and customary in loan documents for debtor-in-possession financings and as are acceptable to the DIP Lender and the Borrowers; <u>provided</u> that the DIP Documents will permit: (i) the Debtors to continue to pursue a sale process for all or substantially all of the Borrowers' assets and consummate any sale or sales related thereto subject to Bankruptcy Court approval and provided that such sale or sales and/or related transactions, when taken in the aggregate, provide for the Payment in Full of the DIP Obligations; (ii) the ability to reject or modify contracts; (iii) postpetition employment arrangements subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; (iv) postpetition capital expenditures subject to maximum thresholds agreed upon by the DIP Lender and the Borrowers; and (v) provide for adequate protection in accordance with the Budget and reasonably acceptable to the DIP Lender. |
|---|---|---|
| 21. | *DIP Budget / Variance Reporting* | • The DIP Lender shall receive an extended weekly budget commencing with the week during which the Interim Order is entered, containing line items of sufficient detail to reflect the consolidated operating cash flow of the Debtors for the period from the Petition Date through and including the end of the thirteenth (13th) calendar week thereafter (the "**Initial Budget**") (the Initial Budget, as modified from time to time in accordance herewith, shall be the "**Budget**"). |
| | | • The Budget shall be updated and provided to the DIP Lender on the fourth Wednesday following the prior Budget's approval and every fourth Wednesday thereafter, or more frequently at the reasonable discretion of both the Borrowers and DIP Lender, with such updated Budget extending the term thereof and the DIP Lender, in its reasonable discretion, shall have the right to approve any such updates (or any amendments) by providing the Borrowers specific notice thereof within 5 business days after the delivery by the Borrowers of any such update or amendment ("**Updated Budget**") and, (ii) to the extent the DIP Lender provides written notice rejecting the updates (or any amendments), the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the DIP Lender. In the event the DIP Lender does not provide written notice of its rejection of the proposed Updated Budget within such five business day period, such Updated Budget shall become effective as the Budget. |
| | | • On a weekly basis after the delivery of the first Updated Budget, the Borrowers shall deliver to the DIP Lender a variance report for the four-week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "**Budget Variance**"), between actual net operating cash flow for such period to projected net operating cash flow for such period as set forth in the Budget on a cumulative 4 week rolling basis (each a "**Measuring Period**") and explaining in reasonable detail all material variances, it being understood that any Net Operating Variance (as defined below) solely with respect to net operating cash flow that exceeds 15% shall be material and shall constitute an Event of Default under the DIP Documents (each such report, a "**Variance Report**," which shall be in a form reasonably satisfactory to the DIP Lender). For the |

| | | |
|---|---|---|
| | | avoidance of doubt, net operating cash flow shall not include professional fees and restructuring charges (including trustee fees or other statutory fees) related to the Chapter 11 Cases. |
| | | • For purposes of each Measuring Period, the Borrowers shall calculate: the numerical difference between "net operating cash flow" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating cash flow" for such period as set forth in the Budget on a cumulative 4-week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for such period (the "**Net Operating Variance**"). For purposes herein, a "**Permitted Variance**" shall be limited to not greater than 15% for budget variances with respect to the Net Operating Variance, each as set forth in the applicable Variance Report. For the avoidance of doubt, United States Trustee fees, professional fees of the DIP Lender, and certain other administrative expenses to be agreed, shall not be included in the Net Operating Variance calculation. |
| 22. | *Interim Order* | • The interim order approving the DIP Facility, which shall be in form and substance acceptable to the DIP Lender and its counsel (the "**Interim Order**"), shall, among other things, authorize and approve:<br><br>i.   the Initial Draws;<br><br>ii.   the making of the DIP Loans;<br><br>iii.   the granting of the superpriority claims and liens against the Debtors and their assets in accordance with this Term Sheet and the DIP Documents with respect to the DIP Collateral;<br><br>iv.   the payment of all fees and expenses (including the fees and expenses of outside counsel and any financial advisors) required to be paid to the DIP Lender as described herein under the heading "Indemnification and Reimbursement of Expenses" by the Debtors;<br><br>v.   the payment of the Commitment Fee upon the Closing Date and the payment of the Exit Fee as set forth in Section 9 of this Term Sheet, which Commitment Fee payment shall not be subject to reduction, setoff or recoupment for any reason, and shall be fully earned and allowed upon entry of the Interim Order; and<br><br>vi.   upon entry of the Final Order, the Debtors' waiver of (a) any right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, and (b) the equitable doctrine of marshaling and other similar doctrines, in each case, with respect to the DIP Collateral and the DIP Obligations. |
| 23. | *Final Order* | • The final order approving the DIP Facility, which shall be substantially in the same form as the Interim Order (with such modifications as are necessary to convert the Interim Order into a final order) and otherwise in |

Case 25-30256    Doc 69-1    Filed 02/06/25    Entered 02/06/25 14:30:47    Desc Exhibit
Page 13 of 30

| | | |
|---|---|---|
| | | form and substance reasonably acceptable to the DIP Lender (the "**Final Order**" and together with the Interim Order, the "**Orders**"), shall, among other things, authorize and approve the DIP Facility on a final basis, the total amount of the DIP Commitments, and the payment of the Exit Fee, which Exit Fee payment shall not be subject to reduction, setoff or recoupment for any reason, and shall be fully earned and allowed upon entry of the Interim Order. |
| 24. | *Carve-Out* | • The liens and security interests in the DIP Collateral, and the superpriority administrative claims shall be subject in all respects to the Carve-Out, which shall be defined in the Orders and shall be on customary terms. |
| | | • The Carve-Out will include a covenant requiring the funding of a weekly segregated escrow account for professional fees (including earned transaction fees), with separate accounts for professional fees of the Debtors' professionals and Committee professionals. |
| 25. | *Events of Default* | • The DIP Documents shall contain events of default (collectively, "**Events of Default**") consistent with this Term Sheet and customary for debtor-in-possession financing facilities of this type and acceptable to the DIP Lender in its sole discretion, including, without limitation: |
| | |     i.    Non-payment, non-compliance with covenants set forth in the DIP Documents, judgements in excess of specified amounts, impairment of security interest in the DIP Collateral and other customary defaults, subject to any applicable grace and/or cure periods to be agreed for non-payment defaults only and as are customary for transactions of this nature; |
| | |     ii.    the entry of the Final Order shall have not occurred, subject to the availability of the Bankruptcy Court, within 45 days after the Petition Date; |
| | |     iii.    the failure of the Loan Parties to comply with any of the Milestones and the DIP Lender has not, in its sole discretion, extended such Milestone; |
| | |     iv.    the dismissal of any of the Chapter 11 Cases or the conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; |
| | |     v.    non-compliance, subject to any applicable grace and/or cure periods, by any Loan Party with the terms of the Interim Order or the Final Order; |
| | |     vi.    the entry of an order staying, reversing, vacating or otherwise modifying the Interim Order or the Final Order, in each case without the prior written consent of the DIP Lender; |
| | |     vii.    the entry of an order appointing a trustee, responsible officer, or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1104 of the Bankruptcy Code (other than a fee |

13

examiner) in the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the DIP Lender in its sole discretion;

viii.    the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Loan Parties, the fair market value of which, individually or in the aggregate, exceeds $500,000;

ix.    the entry of an order (a) surcharging any of the DIP Collateral under sections 105, 506(c), or any other section of the Bankruptcy Code, (b) allowing any administrative expense claim having priority over or ranking in parity with the DIP Claims or the rights of the DIP Lender (subject to the Carve-Out), or (c) otherwise adversely impacting the DIP Lender's liens and priority in the DIP Collateral as set forth in this Term Sheet;

x.    any action by any Debtor to (a) challenge the rights and remedies of the DIP Lender under the DIP Facility in any of the Chapter 11 Cases or acting in a manner inconsistent with the DIP Documents or (b) avoid or require disgorgement by the DIP Lender of any amounts received in respect of the obligations under the DIP Facility;

xi.    entry of an order without the express written consent of the DIP Lender obtaining additional financing from a party other than the DIP Lender under section 364(d) of the Bankruptcy Code except if such financing provides for the Payment in Full of the DIP Obligations;

xii.    the making of any material payments in respect of prepetition obligations other than (a) as permitted by the Interim Order or the Final Order, (b) as permitted by any "first day" or "second day" orders reasonably satisfactory to the DIP Lender, (c) as permitted by any other order of the Bankruptcy Court reasonably satisfactory to the DIP Lender, (d) as permitted under the DIP Documents in accordance with the Budget, or (e) as otherwise agreed to by the DIP Lender;

xiii.    entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the DIP Lender;

xiv.    the Debtors shall seek to, or support any other person's motion to, (a) disallow in whole or in part the DIP Obligations, (b)

14

| | | |
|---|---|---|
| | | challenge the validity and enforceability of the DIP Liens, or (c) contest any material provision of any DIP Document;<br><br>xv.    the Debtors file a Plan that is not in form and substance satisfactory to the DIP Lender in its sole discretion, it being understood that a Plan will be satisfactory to the DIP Lender if it provides for the Payment in Full of the DIP Obligations pursuant to a signed commitment acceptable to the DIP Lender to lend from a recognized lender or another source of funding sufficient to allow for the indefeasible payment in cash of the full amount of the outstanding DIP Obligations on the Plan effective date;<br><br>xvi.    the Debtors file a motion seeking to settle a controversy or claim on account of the DIP Collateral without the prior written consent of the DIP Lender;<br><br>xvii.    the Debtors file a motion for the Bankruptcy Court to approve a sale of the DIP Collateral pursuant to section 363 of the Bankruptcy Code which proposed sale is not acceptable to the DIP Lender in its sole discretion; or<br><br>xviii.    the Debtors shall fail to execute and deliver to the DIP Lender any agreement, financing statement, trademark filing, copyright filing, notices of lien or similar instruments or other documents that the DIP Lender may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Lender, subject to the time periods and terms set forth in this Term Sheet. |
| 26. | ***Indemnification and Reimbursement of Expenses*** | • The DIP Documents shall contain customary indemnification provisions for the benefit of the DIP Lender, and its related parties, including, without limitation, indemnification against losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated by the DIP Documents or the use or the proposed use of proceeds thereof.<br><br>• Subject to the DIP Documents, all documented out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of the DIP Lender, including the fees and expenses of Kilpatrick Townsend & Stockton LLP and [_____] as counsel to the DIP Lender, and Resurgence Financial Services, LLC, as financial advisor to the DIP Lender, incurred in connection with the DIP Facility and the Chapter 11 Cases shall be paid on a current basis. |
| 27. | ***Release*** | • The Orders shall include a customary release of the DIP Lender, with respect to any and all claims and causes of action arising from or related to the DIP Facility. |
| 28. | ***Waivers*** | • The Final Order shall include terms and conditions customary for final DIP financing orders and shall be reasonably acceptable to the DIP Lender, including, without limitation, waiver of the automatic stay, credit- |

| | | |
|---|---|---|
| | | bidding rights, "no marshaling" provisions and other similar doctrines, and waivers of the imposition of costs or right to surcharge the DIP Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, in each case, to the extent applicable. |
| 29. | *Press Releases* | • Neither party shall issue a press release that mentions the other party's name (or its representatives, affiliates or related parties' names) without first obtaining that party's written consent. |
| 30. | *Governing Law* | • Georgia (and to the extent applicable, the Bankruptcy Code). |

16

**IN WITNESS WHEREOF,** the parties hereto have caused this Term Sheet to be executed as of the date first set forth above.

Jackson Hospital & Clinic, Inc., as a Borrower

By: _____

    Name: Allen Wilen
    Title: Chief Restructuring Officer

Jackson Investment Group, LLC., as DIP Lender

By: _____

    Name:
    Title:

**IN WITNESS WHEREOF,** the parties hereto have caused this Term Sheet to be executed as of the date first set forth above.

Jackson Hospital & Clinic, Inc., as a Borrower


By: _____
    Name:
    Title:



Jackson Investment Group, LLC., as DIP Lender


By: _____
    Name: Richard L. Jackson
    Title:  CEO

*[Signature Page to Term Sheet]*

## Schedule 1 – Borrowers

| Borrower/Debtor | State of Organization |
| --- | --- |
| Jackson Hospital and Clinic, Inc. | Alabama |
| JHC Pharmacy, LLC | Alabama |

**Schedule 2 – Petition Date Liens**

As of the Petition Date, the Debtors' rights and interests in their respective properties and assets are subject to the liens evidenced, secured or perfected by the instruments listed below. The inclusion of any lien, claim, encumbrance, agreement or other instrument in this Schedule shall not be deemed an admission of the validity, perfection, or priority thereof, or the amount secured thereby. For purposes of this Schedule 2:

**Parties:**

"JHC" means Jackson Hospital & Clinic, Inc.
"MCB" means the Medical Clinic Board of the City of Montgomery, Alabama
"UMB" means UMB Bank, N.A.
"SF" means ServisFirst Bank

**Real Properties:**

"MTI Property" means the hospital buildings, medical office buildings, administrative office buildings, parking decks and other real property and facilities comprising the campus of Jackson Hospital.

"Hospital Buildings" means certain medical office and administrative buildings located on the campus of Jackson Hospital comprised of (i) the 1801 Pine Street Building, (ii) the Park Place Building, and (iii) the Goode Building.

"Parking Lot" means the parking lot located at the southwest corner of Mulberry Street and Park Place, on the campus of Jackson Hospital.

"Taylor Road" means approximately 29.33 acres of vacant land located on Taylor Road in Montgomery, Alabama.


A.    **Mortgages recorded in the Office of the Judge of Probate of Montgomery County, Alabama (the "Probate Office"):**

1.    Mortgage and Security Agreement dated as of December 1, 2015, by MCB and JHC in favor of UMB (as Master Trustee) relating to $84,195,000 Direct Debt Obligation, Series 2015, of JHC (the "MTI Debt"), recorded in the Probate Office in RLPY Book 4789, at Page 123, encumbering the MTI Property (the "UMBMT Accommodation First Mortgage - MTI").

2.    Mortgage, Assignment of Leases and Rents and Security Agreement dated as of November 4, 2024, by JHC in favor of UMB (as Collateral Agent) relating to $5,000,000 Senior Obligations of JHC recorded in the Probate Office in REAL Book 6215, at Page 201, encumbering the Taylor Road property, in Pari Passu with the SF PP First Mortgage – Taylor Road (the "UMBCA PP First Mortgage – Taylor Road").

3.  Mortgage, Assignment of Rents and Security Agreement dated as of September 30, 2024, by JHC in favor of SF securing a $3,500,00 loan recorded in the Probate Office in REAL Book 6198, at Page 631, encumbering the Taylor Road property, in Pari Passu with the UMBCA PP First Mortgage – Taylor Road (the "SF PP First Mortgage – Taylor Road").

4.  Second Mortgage, Assignment of Leases and Rents and Security Agreement dated as of September 30, 2024, by JHC in favor of UMB (as Master Trustee) as additional security for the MTI Debt, recorded in the Probate Office in REAL Book 6198, at Page 678, encumbering the Taylor Road property (the "UMBMT Second Mortgage – Taylor Road").

5.  Accommodation Mortgage, Assignment of Leases and Rents and Security Agreement dated as of November 4, 2024, by MCB and JHC in favor of UMB (as Collateral Agent) relating to $5,000,000 Senior Obligations of JHC recorded in the Probate Office in REAL Book 6215, at Page 178, encumbering the Hospital Buildings, in Pari Passu with the SF PP First Mortgage – Hospital Buildings, as amended by that certain Amendment to Accommodation Mortgage, Assignment of Leases and Rents and Security Agreement dated as of January 7, 2025 recorded in the Probate Office in REAL Book 6247, at Page 400 (the January Amendment to UMBCA PP Accommodation First Mortgage – Hospital Buildings and Parking Lot") (as so amended, the "UMBCA PP Accommodation First Mortgage – Hospital Buildings and Parking Lot").

6.  Accommodation Mortgage, Assignment of Leases and Security Agreement dated as of September 30, 2024 by MCB and JHC in favor of SF securing a $3,500,000 loan and a $12,000,000 loan, recorded in the Probate Office in REAL Book 6198, at Page 654, encumbering the Hospital Buildings (the "SF PP Accommodation First Mortgage – Hospital Buildings"), as amended by that certain Amendment to Accommodation Mortgage, Assignment of Leases and Security Agreement dated as of November 4, 2024 recorded in the Probate Office in REAL Book 6217, at Page 8, in Pari Passu with the UMBCA PP First Mortgage- Hospital Buildings (as amended, the "SF PP Accommodation First Mortgage – Hospital Buildings and Parking Lot").

7.  Accommodation Mortgage, Assignment of Leases and Security Agreement dated as of September 30, 2024, by MCB and JHC in favor of UMB (as Master Trustee) as additional security for the MTI Debt, recorded in the Probate Office in REAL Book 6198, at Page 696, encumbering the Hospital Buildings (the "UMBMT PP Accommodation Second Mortgage – Hospital Buildings").

8.  Accommodation Second Mortgage, Assignment of Leases and Rents and Security Agreement dated as of November 4, 2024, by MCB and JHC in favor of UMB (as Collateral Agent) relating to $5,000,000 Senior Obligations of JHC, recorded in the Probate Office in REAL Book 6215, at Page 220, encumbering the MTI Property, in Pari Passu with the SF Second Mortgage – MTI, as amended by that certain Amendment to Accommodation Second Mortgage, Assignment of Leases and Rents and Security Agreement dated as of January 7, 2025 recorded in the Probate Office in REAL Book 6247,

at Page 392 (the "January Amendment to UMBCA Accommodation Second Mortgage – MTI") (the "UMBCA PP Accommodation Second Mortgage – MTI").

9. Second Accommodation Mortgage, Assignment of Leases and Rents and Security Agreement dated as November 4, 2024, from MCB and JHC in favor or SF securing the $3,5000,000 loan and the $12,000,000 loan, recorded in the Probate Office in REAL Book 6217, at Page 13, encumbering the MTI Property, in Pari Passu with the UMBCA PP Second Mortgage – MTI (the "SF PP Accommodation Second Mortgage – MTI").

10. Accommodation Second Mortgage, Assignment of Leases and Rents and Security Agreement dated as of November 4, 2024 by MCB and JHC in favor of UMB (as Master Trustee) relating to the MTI Debt, recorded in the Probate Office in REAL Book 6215, at Page 246, encumbering the Parking Lot, in Pari Passu with the SF Second Mortgage – MTI (the "UMBMT Accommodation Second Mortgage – Parking Lot").

**B.** **UCC Fixture Filings recorded in the Probate Office:**

1. UCC Number 377048 listing JHC as debtor and UMB as secured party, recorded November 7, 2024, in the Probate Office in UCC Book 2024, at Page 3511, with respect to the Taylor Road property.

2. UCC Number 377050 listing JHC as debtor and UMB as secured party, recorded November 7, 2024, in the Probate Office in UCC Book 2024, at Page 3520, with respect to the Taylor Road property.

3. UCC Number 376731 listing JHC as debtor and SF as secured party, recorded October 10, 2024, in the Probate Office in UCC Book 2024, at Page 2763, with respect to the Hospital Buildings.

4. UCC Number 377047 listing JHC and MCB as debtors and UMB as secured party, recorded November 7, 2024, in the Probate Office in UCC Book 2024, at Page 3505, with respect to the Hospital Buildings and the Parking Lot.

5. UCC Number 376732 listing JHC as debtor and UMB as secured party, recorded October 10, 2024, in the Probate Office in UCC Book 2024, at Page 2771, with respect to the Hospital Buildings.

6. UCC Number 377046 listing JHC and MCB as debtors and UMB as secured party, recorded November 7, 2024, in the Probate Office in UCC Book 2024, at Page 3497, with respect to the MTI Property.

7. UCC Number 377049 listing JHC and MCB as debtors and UMB as secured party, recorded November 7, 2024, in the Probate Office in UCC Book 2024, at Page 3515, with respect to the Parking Lot.

**C.**     **UCC Personal Property Financing Statements**

See Schedule 2-A attached hereto and made a part hereof.

**D.**     **Permitted Prior Liens**

None.

**<u>Schedule 2-A - UCC Personal Property Financing Statements</u>**

See Attached

**JACKSON HOSPITAL & CLINIC, INC.**

| | | | | | |
|---|---|---|---|---|---|
| **JACKSON HOSPITAL & CLINIC, INC. - ALABAMA** | | | | | |
| **UCC #** | **UCC File Date** | **Debtor Name** | **Secured Party** | **Collateral** | **Comments** |
| 12-0631353 | 12/5/2012 | Jackson Hospital & Clinic, Inc.; The Medical Clinic Board of the City of Montgomery, Alabama | OptumHealth Bank, Inc. | Equiment in Omnicell Invoice Nos. 90156724 & 90156725 | Lapsed? CS - 10/24/22, but no intervening CS |
| 12-0631360 | 12/5/2012 | Jackson Hospital & Clinic, Inc.; The Medical Clinic Board of the City of Montgomery, Alabama | OptumHealth Bank, Inc. | Equiment in Omnicell Invoice Nos. 90156726 & 90156727 | Lapsed? CS - 10/24/22, but no intervening CS |
| 14-7334613 | 5/6/2014 | Jackson Hospital & Clinic, Inc. | Dell Financial Services L.L.C. | Leased computer equipment | CS - 04/04/19 & 3/27/24 |
| 17-7597565 | 11/30/2017 | Jackson Hospital & Clinic, Inc. | AmerisourceBergen Drug Corporation | All of Debtor's personal property, including Accounts, Inventory, Equipment, and General Intangibles | CS - 8/17/22 |
| 19-7344392 | 7/12/2019 | Jackson Hospital & Clinic, Inc. | ServisFirst Bank | All pledged revenues, mortgaged property, and other collateral as provided in the A&R Master Trust Indenture dated 12/1/15, as amended by Series 2019 Supplemental Indenture dated 7/12/19 | CS - 2/14/24 |
| 19-7463299 | 9/12/2019 | Jackson Hospital & Clinic, Inc.; The Medical Clinic Board of the City of Montgomery, Alabama; Jackson Surgery Center, LLC | Regions Bank | Properties and Interests in Schedule I, which are covered by the Accommodation Mortgage, Assignment of Leases and Security Agreement dated 9/11/19 | CS - 3/18/24 |
| 19-7463315 | 9/12/2019 | Jackson Hospital & Clinic, Inc.; The Medical Clinic Board of the City of Montgomery, Alabama; Jackson Imaging Center, LLC | Regions Bank | Properties and Interests in Schedule I, which are covered by the Accommodation Mortgage, Assignment of Leases and Security Agreement dated 9/11/19 | CS - 8/2/24 |
| 19-7567643 | 11/15/2019 | Jackson Hospital & Clinic, Inc. | Flex Financial, a divisions of Stryker Sales Corporation | All equipment financed or leased by SP under Short Form Lease Agmt No. 0110056670 | CS - 10/22/24 |
| 20-0126780 | 3/13/2020 | Jackson Hospital & Clinic, Inc. | De Lage Landen Public Finance LLC | All equipment financed or leased by SP under Contract No. 100-10250966 | |
| 20-7009842 | 1/8/2020 | Jackson Hospital & Clinic, Inc. | Globus Medical North America, Inc. | Exhibit A (Various Globus Equipment) | AMD - 12/4/24 - Restate Collateral as Excelsius GPS & related instrumentation |
| 20-7851494 | 12/22/2020 | Jackson Hospital & Clinic, Inc. | Flex Financial, a divisions of Stryker Sales Corporation | All equipment financed or leased by SP under Equipment Schedule 001 to MLA 2110120003 | |
| 21-0203579 | 5/3/2021 | Jackson Hospital & Clinic, Inc. | Leasing Associates of Barrington, Inc. | Specific equipment under Agreement No. 14286000 dated 12/21/20 | ASS - 8/31/21 - Assigned to Wintrust Asset Finance Inc. |
| 21-7078882 | 2/22/2021 | Jackson Hospital & Clinic, Inc. | Flex Financial, a divisions of Stryker Sales, LLC | All equipment financed or leased by SP under Equipment Schedule 003 to MLA 2110120003 | |
| 21-7292782 | 5/25/2021 | Jackson Hospital & Clinic, Inc.; The Medical Clinic Board of the City of Montgomery, Inc. | Regions Bank | Exhibit A & B (various personal property, including accounts and goods, located, situated, or affixed on or used in connection with the EX. B real property ) | TS - 12/27/24 |
| 22-0084078 | 2/22/2022 | Jackson Hospital & Clinic, Inc. | Olympus America Inc. | Equipment Listing; Master Agreement No. 0012129, Schedule 010 | |
| 22-7425924 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40431 | |
| 22-7425947 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40472 | |

| File Number | Date | Debtor | Secured Party | Collateral |
|---|---|---|---|---|
| 22-7425953 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40487 |
| 22-7425976 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40389 |
| 22-7426040 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40435 |
| 22-7426056 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40486 |
| 22-7426062 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40476 |
| 22-7426079 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40481 |
| 22-7426085 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40461 |
| 22-7426091 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40473 |
| 22-7426101 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40418 |
| 22-7426147 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40375 |
| 22-7426153 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC Reader, S/N 40465 |
| 22-7426176 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900289 |
| 22-7426182 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900448 |
| 22-7426199 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900225 |
| 22-7426221 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900421 |
| 22-7426244 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900326 |
| 22-7426273 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900314 |
| 22-7426280 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900148 |
| 22-7426306 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900490 |
| 22-7426335 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900061 |
| 22-7426341 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900300 |
| 22-7426358 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900486 |
| 22-7426364 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900322 |
| 22-7426387 | 7/18/2022 | Jackson Hospital & Clinic, Inc. | Siemens Healthcare Diag Inc. | EPOC NXS Host - US, S/N T1H12HL900360 |
| 22-7543874 | 9/14/2022 | Jackson Hospital & Clinic, Inc. | Sysmex America, Inc. | Leased equipment under Lease Agreement No. 51029257 dated 5/13/22 |
| 22-7708561 | 12/13/2022 | Jackson Hospital & Clinic, Inc. | LEAF Capital Funding LLC | Sophos Licensing |
| 23-7046679 | 2/3/2023 | Jackson Hospital & Clinic, Inc. | Xerox Financial Services | One - New Xerox MULTIPLE OTHERS 192529 |
| 24-0397113 | 11/6/2024 | Jackson Hospital & Clinic, Inc. | UMB Bank, N.A., as Collateral Agent | All assets |
| 24-0397120 | 11/6/2024 | Jackson Hospital & Clinic, Inc. | UMB Bank, N.A., as Collateral Agent | All assets |
| 24-7087286 | 2/28/2024 | Jackson Hospital & Clinic, Inc. | Spinal Elements, Inc. | All inventory of products, cash, cash equivalents, all accounts, including all operating accounts, depository accounts, and all property contained therein |
| 24-7100210 | 3/6/2024 | Jackson Hospital & Clinic, Inc. | Baycap LLC | Schaerer Coffee Art, S/N 24A0081753; NCP Optional 9 Month PM; Softener SEB Initial |

| | | | | | |
|---|---|---|---|---|---|
| 24-7140568 | 3/27/2024 | Jackson Hospital & Clinic, Inc. | Premier Imaging Medical Systems | Two (2) Insight Enhanced GE Legacy System SN: EN-5052-03 & SN: EN-5054-03 and any and all other equipment acquired with the proceeds of the Loan | |
| 24-7314280 | 6/13/2024 | Jackson Hospital & Clinic, Inc. | Regions Bank, as Master Trustee | Exhibit A ("Pledged Revenues") | |
| 24-7429659 | 8/5/2024 | Jackson Hospital & Clinic, Inc. | Med One Capital Funding, LLC | 10 Alaris System PCA Modules - 8120; 10 Guardrails Pontr-of-Care Software for PCA Modules | |
| 24-7497573 | 9/6/2024 | Jackson Hospital & Clinic | Intuitive Surgical, Inc. | 1 da Vinci Xi Surgical System with Single Console FireFly Fluorescence Imaging Enabled; 1 da Vinci Xi Integrated Table Motion upgrade | |
| 24-7558451 | 10/9/2024 | Jackson Hospital & Clinic, Inc.; The Medical Clinic Board of the City of Montgomery, Inc. | ServisFirst Bank | Exhibits A, B, and C (Project Site and Improvements, Leasehold Estate and Options, Personal Propery and Fixtures, Condemnation Awards and Insurance Proceeds, Leases and Rents, Funds, and Others - The Medical Buildings) | AMD - 11/13/24 - Added to Real Property description |
| 24-7558468 | 10/9/2024 | Jackson Hospital & Clinic, Inc.; The Medical Clinic Board of the City of Montgomery, Inc. | UMB Bank, N.A. | Exhibits A & B (personal property and fixtures related to the Medical Buildings) | |
| 24-7619489 | 11/13/2024 | Jackson Hospital & Clinic, Inc.; The Medical Clinic Board of the City of Montgomery, Inc. | ServisFirst Bank | Exhibits A (Project Site and Improvements, Leasehold Estate and Options, Personal Propery and Fixtures, Condemnation Awards and Insurance Proceeds, Leases and Rents, Funds, and Others - 12 Parcels) | |
| 25-7005521 | 1/3/2025 | Jackson Hospital & Clinic, Inc. | Capta Health Partners, LLC | Lien descried in Master Services Agreement dated April 10, 2024 | |
| | | | | | |

## <u>Schedule 3 – Real Property</u>

See Attached

| Parcel Number | Owner Name | Property Address | Type | Sq. ft. | Tax Appraisal Value | Notes |
|---|---|---|---|---|---|---|
| 090929100004000 | JACKSON HOSPITAL AND CLINIC INC | TAYLOR RD | VACANT | 1,276,308 | $ 4,395,000 | Encumbered ["Taylor Road"] |
| 090929100006000 | JACKSON HOSPITAL AND CLINIC INC | HALCYON PARK DR | VACANT | 13,068 | 104,500 | Encumbered ["Taylor Road"] |
| 1004171048005000 | JACKSON HOSPITAL AND CLINIC INC | 2117 CHESTNUT ST | VACANT | 8,732 | 30,600 | Unencumbered. |
| 1004171049012000 | JACKSON HOSPITAL AND CLINIC INC | 2019 CHESTNUT ST | VACANT | 7,500 | 11,300 | Unencumbered. |
| 1004171049013000 | JACKSON HOSPITAL AND CLINIC INC | 2023 CHESTNUT ST | VACANT | 7,500 | 11,300 | Unencumbered. |
| 1004172022002000 | JACKSON HOSPITAL AND CLINIC INC | 1812 LAKE ST | VACANT | | 8,500 | Unencumbered. |
| 1004172022003000 | JACKSON HOSPITAL AND CLINIC INC | 1800 LAKE ST | BUILDING | 8,450 | 172,600 | Unencumbered. |
| 1004173003001000 | JACKSON HOSPITAL AND CLINIC INC | FOREST AVE | PARKING LOT | 9,900 | 203,300 | Unencumbered. |
| 1004173003002000 | JACKSON HOSPITAL AND CLINIC INC | 1620 GLENN PALMER AVE | PARKING LOT | 14,433 | 115,500 | Unencumbered. |
| 1004173003003000 | JACKSON HOSPITAL AND CLINIC INC | GLENN PALMER AVE | PARKING LOT | 5,500 | 37,700 | Unencumbered. |
| 1004173003004000 | JACKSON HOSPITAL AND CLINIC INC | GLENN PALMER AVE | PARKING LOT | 12,763 | 86,800 | Unencumbered. |
| 1004171036002000 | JACKSON HOSPITAL AND CLINIC INC | 1115 MULBERRY ST | PARKING LOT | 7,500 | 37,500 | Unencumbered. |
| 1004171036004000 | JACKSON HOSPITAL AND CLINIC INC | 1127 MULBERRY ST | PARKING LOT | 7,500 | 37,500 | Unencumbered. |
| 1004174004008000 | JACKSON HOSPITAL AND CLINIC INC | 2024 CHESTNUT ST | BUILDING | 7288 | 586,500 | Unencumbered. |
| 1004173003005000 | JACKSON HOSPITAL AND CLINIC INC | FOREST AVE | VACANT | 2,970 | 23,800 | Unencumbered. |
| 1004172008010000 | JACKSON HOSPITAL AND CLINIC INC | 724 PUTNAM ST | VACANT | | 8,000 | Unencumbered. |
| 1004174004008001 | JACKSON HOSPITAL AND CLINIC INC | 2030 CHESTNUT ST | BUILDING | 5,068 | 290,500 | Unencumbered. |
| 1008344001038007 | JACKSON HOSPITAL AND CLINIC INC | 3228 MEADOW WALK LN | BUILDING | | 106,600 | Unencumbered. |
| 1004171010007000 | JACKSON HOSPITAL AND CLINIC INC | 2107 HIGHLAND AV | VACANT | | 8,000 | Unencumbered. |
| 090929100006001 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 7150 HALCYON PARK DR | BUILDING | 94,960.00 | 3,215,000 | SOLD |
| 1004171036003000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1121 MULBERRY ST | PARKING LOT | 7,500.00 | 203,600 | Unencumbered. |
| 1004171036005000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 2019 POPLAR ST | PARKING LOT | 7,500.00 | 11,300 | Unencumbered. |
| 1004171036006000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 2023 POPLAR ST | PARKING LOT | 7,470 | 11,200 | Unencumbered. |
| 1004171049009000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1223 MULBERRY ST | PARKING LOT | 7,500 | 54,700 | Unencumbered. |
| 1004171049010000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1227 MULBERRY ST | PARKING LOT | 7,500 | 54,700 | Unencumbered. |
| 1004172017004000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 821 FOREST AVE | VACANT | 29,904 | 179,400 | Unencumbered. |
| 1004172020001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1872 CHERRY ST | HELIPAD | 20,625 | 82,500 | Unencumbered. |
| 1004172021002000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1825 PARK PL | BUILDING | 77,101 | 308,400 | JIC, encumbered. |
| 1004172021007000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1833 PARK PL | VACANT | 11,525 | 57,600 | Unencumbered. |
| 1004172022001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1818 LAKE ST | VACANT | | 9,900 | Unencumbered. |
| 1004172022004000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 909 OLIVE ST | VACANT | | 3,900 | Unencumbered. |
| 1004172022005000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 915 OLIVE ST | BUILDING | | 5,800 | Unencumbered. |
| 1004172022006000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 921 OLIVE ST | BUILDING | | 10,700 | Unencumbered. |
| 1004172022007000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 920 HAMPTON ST | VACANT | 8229 | 41,400 | Unencumbered. |
| 1004172023001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1714 LAKE ST | VACANT | 13,620.00 | 81,700 | Unencumbered. |
| 1004172023004000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 926 OLIVE ST | VACANT | 7,258 | 50,800 | Unencumbered. |
| 1004172025001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | FOREST AVE | PARKING LOT | | 198,600 | Unencumbered. |
| 1004172026001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1725 PARK PL | BUILDING | 95,832.00 | 3,383,700 | JSC, encumbered. |
| 1004172027001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1110 MULBERRY ST | PARKING LOT | 62,478.00 | 462,800 | Encumbered ["Parking Lot"] |
| 1004172027004000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1801 HOLLY ST | PARKING LOT | | 24,300 | Encumbered ["Parking Lot"] |
| 1004172027005000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1805 HOLLY ST | PARKING LOT | | 24,300 | Encumbered ["Parking Lot"] |
| 1004172027006000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1809 HOLLY ST | PARKING LOT | | 34,100 | Encumbered ["Parking Lot"] |
| 1004172027007000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1813 HOLLY ST | PARKING LOT | | 34,100 | Encumbered ["Parking Lot"] |
| 1004172027008000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1138 MULBERRY ST | PARKING LOT | 8,250.00 | 82,500 | Encumbered ["Parking Lot"] |
| 1004172028001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1111 OLIVE ST | BUILDING | | 6,960,400 | Enumbered ["Park Place Building"] |
| 1004172028003000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1750 PARK PL | BUILDING | | 55,300 | Enumbered ["Park Place Building"] |
| 1004172028005000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1755 HOLLY ST | PARKING LOT | | 48,100 | Enumbered ["Park Place Building"] |
| 1004172028007000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1763 HOLLY ST | PARKING LOT | | 47,700 | Enumbered ["Park Place Building"] |
| 1004172028008000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1767 HOLLY ST | PARKING LOT | 9,750.00 | 121,700 | Enumbered ["Park Place Building"] |
| 1004172029001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1716 PARK PL | BUILDING and PARKING LOT | 70,074.00 | 482,100 | Encumbered by the mortgage securing the bonds. |
| 1004172029002000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1704 PARK PL | PARKING LOT | | 128,500 | Encumbered by the mortgage securing the bonds. |
| 1004172030001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1235 FOREST AVE | BUILDING | | 15,918,100 | Encumbered by the mortgage securing the bonds. |
| 1004172031001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1725 PINE ST | BUILDING | | 237,900 | Encumbered by the mortgage securing the bonds. |
| 1004172032001000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1202 MULBERRY ST | PARKING LOT | | 48,800 | Enumbered ["1801 Pine Street Building"] |
| 1004172032002000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1801 PINE ST | BUILDING | | 5,360,400 | Enumbered ["1801 Pine Street Building"] Jackson Clinic building |
| 1004173002007000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | PINE ST | BUILDING | | 6,292,200 | Hospital Parking Deck, encumbered by the mortgage securing the bonds. |
| 1004173002008000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1710 PINE ST | BUILDING | | 31,893,400 | Encumbered. [Includes the "Goode Building." Balance encumbered by the mortgage securing the bonds.] |
| 1004173002008001 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | FOREST AVE | BUILDING | | 937,800 | Encumbered by the mortgage securing the bonds. |
| 1004173002009000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1301 FOREST AVE | BUILDING | | 764,400 | Encumbered by the mortgage securing the bonds. |
| 1004174004013000 | THE MEDICAL CLINIC BOARD OF THE CITY OF MONTGOMERY ALABAMA | 1301 MULBERRY ST | BUILDING | 6,911 | 986,400 | Unencumbered. |
| | | | | | $ 85,185,700 | |
| | | | | | $ 21,624,200 | Unencumbered Total Not Including Goode Building |