FILED

2026 Jan-20  PM 08:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **IN RE: BLUE CROSS BLUE SHIELD** | § | **Master File No. 2:13-cv-20000-AMM** |
| | § | |
| **ANTITRUST LITIGATION** | § | |
| **(MDL NO.: 2406)** | § | **This document relates to the** |
| | § | **Provider Track** |

## BLUE CROSS BLUE SHIELD ASSOCIATION'S RESPONSE TO JACKSON HOSPITAL & CLINIC, INC.'S MOTION FOR RELIEF FROM JUDGMENT AND TO BELATEDLY OPT OUT OF SETTLEMENT CLASS AND REPLY TO MOTION TO ENFORCE PROVIDER SETTLEMENT AND TO ENJOIN ADVERSARY PROCEEDING AGAINST BLUE CROSS AND BLUE SHIELD OF ALABAMA

*Filed Under Seal — Contains Information Designated Confidential Pursuant to the Protective Order*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ......................................................................................................1

RELEVANT BACKGROUND ...................................................................................2

    I.      The Provider MDL Complaint and Allegations. .........................................2

    II.    The Provider MDL Settlement, Notice Process and Final Approval Order. ............3

    III.   The Adversary Proceeding. ..........................................................................5

ARGUMENT ..............................................................................................................6

    I.      Jackson Hospital's Motion for Relief from Judgment and To Belatedly Opt Out of Settlement Class Should Be Denied. ...............................................6

          A.    At the Very Least, Jackson Hospital Must Meet the Heavy Burden of Proving Excusable Neglect. ..........................................................6

          B.    Jackson Hospital Cannot Prove Excusable Neglect. ....................................7

    II.    BCBS-AL's Motion To Enforce Settlement Should Be Granted. ...........................18

          A.    Claims That Fall Within the Same Factual Predicate as the Provider Complaint Are Released. ................................................................18

          B.    Jackson Hospital's Claims Arise out of the Same Factual Predicate the Claims Asserted in the Provider MDL. ...................................................19

CONCLUSION ..........................................................................................................22

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. S. Farm Bureau Life Ins. Co.*,
493 F.3d 1276 (11th Cir. 2007) ........................................................................21

*Bowman v. UBS Fin. Servs., Inc.*,
No. C 04 3525 MMC, 2007 WL 1456037 (N.D. Cal. May 17, 2007).....................................11

*Cano v. Baker*,
435 F.3d 1337 (11th Cir. 2006) .........................................................................7

*Cent. Operating Co. v. Util. Workers of America, AFL-CIO*,
491 F.2d 245 (4th Cir. 1974) ..........................................................................12

*Georgine v. Amchem Prods., Inc.*,
No. CIV. A. 93-0215, 1995 WL 251402 (E.D. Pa. April 26, 1995)...........................................8

*Gonzalez v. Crosby*,
545 U.S. 524 (2005)..........................................................................................7

*Grant v. Pottinger-Gibson*,
725 F. App'x 772 (11th Cir. 2018) ...................................................................11

*Hanks v. Voya Ret. Ins. & Annuity Co.*,
No. 16-CV-6399 (PKC), 2020 WL 6538743 (S.D.N.Y. Nov. 6, 2020) ...................................7

*In re Am. Express Fin. Advisors Sec. Litig.*,
672 F.3d 113 (2d Cir. 2011)..............................................................................8

*In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*,
85 F.4th 1070 (11th Cir. 2023) ..................................................................19, 22

*In re Blue Cross Blue Shield Antitrust Litig.*,
No. 2:13-CV-20000-RDP, 2022 WL 4587618 (N.D. Ala. Aug. 9, 2022), *aff'd*, 85
F.4th 1070 (11th Cir. 2023) ...........................................................................4

*In re Celotex Corp.*,
232 B.R. 493 (M.D. Fla.), *aff'd sub nom. Sunset Vine Tower v. Celotex Corp.*, 196
F.3d 1262 (11th Cir. 1999) ..............................................................................7

*In re Diet Drugs Phentermine/Fenfluramine/Dexfenfluramine Prods. Liab. Litig.*,
92 F. App'x. 890 (3d Cir. 2004) ...................................................................9, 10

*In re Diet Drugs Phentermine/Fenfluramine/Dexfenfluramine Prods. Liab. Litig.*,
No. CIV.A. 05-25157, 2009 WL 3444763 (E.D. Pa. Oct. 23, 2009).....................................18

*In re Ford*,
    No. 19-cv-02724, 2020 WL 13349093 (M.D. Fla. Aug. 3, 2020) ............................................7

*In re Gypsum Antitrust Cases*,
    565 F.2d 1123 (9th Cir. 1977) ...............................................................................................10

*In re HealthSouth Corp. Sec. Litig.*,
    334 F. App'x. 248 (11th Cir. 2009) ..........................................................................6, 7, 10, 13

*In re Hillsborough Holdings Corp.*,
    116 F.3d. 1391 (11th Cir. 1997) ...........................................................................................15

*In re Imprelis Herbicide Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    No. 11-MD-02884, 2014 WL 348593 (E.D. Pa. Jan. 31, 2014) ............................................17

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    No. 11-md-2262 (NRB), 2019 WL 3006262 (S.D.N.Y. July 10, 2019) ...................................9

*In re M & L Bus. Mach. Co., Inc.*,
    169 B.R. 711 (D. Colo. 1994) ...............................................................................................14

*In re McMahon Books, Inc.*,
    173 B.R. 868 (Bankr. D. Del. 1994) .....................................................................................16

*In re MI Windows & Doors, Inc., Prods. Liab. Litig.*,
    860 F.3d 218 (4th Cir. 2017) ....................................................................................9, 12, 13

*In re Nat'l Football League Players' Concussion Inj. Litig.*,
    No. 14-1995, 2019 WL 95917 (E.D. Pa. Jan. 3, 2019) ...............................................10, 13, 14

*In re PaineWebber Ltd. P'ships Litig.*,
    147 F.3d 132 (2d Cir. 1998) .................................................................................................12

*In re Processed Egg Prods. Antitrust Litig.*,
    130 F. Supp. 3d 945 (E.D. Pa. 2015) ....................................................................................13

*In re Santangelo*,
    325 B.R. 874 (Bankr. M.D. Fla. 2005) .............................................................................13, 16

*In re Terazosin Hydrochloride Antitrust Litig.*,
    No. 00-1303-CIV., 2005 WL 8181055 (S.D. Fla. July 18, 2005) ..........................................14

*In re Vitamins Antitrust Class Actions*,
    327 F.3d 1207 (D.C. Cir. 2003) .............................................................................................6

*Jacobs v. Elec. Data Sys. Corp.*,
    240 F.R.D. 595 (M.D. Ala. 2007) ...........................................................................................7

*Johnson v. Hercules Inc.*,
No. CV298-102, 1999 WL 35648160 (S.D. Ga. Apr. 28, 1999) ............................................15

*Lodge v. Bill Heard Enters., Inc.*,
No. CV-08-S-1772-NE, 2008 WL 11380003 (N.D. Ala. Nov. 7, 2008) ...................................7

*Matsushita Elec. Indus. Co. v. Epstein*,
516 U.S. 367 (1996) ................................................................................................................18

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
507 U.S. 380 (1993) ................................................................................................7, 8, 12, 16

*Roofer's Pension Fund v. Papa*,
No. CV 16-2805 (RMB) (LDW), 2024 WL 4205638 (D.N.J. Sept. 12, 2024), *aff'd
sub nom. Perrigo Institutional Inv. Grp. v. Papa*, 150 F.4th 206 (3d Cir. 2025) ......................8

*Security Mutual Cas. Co. v. Century Cas. Co.*,
621 F.2d 1062 (10th Cir. 1980) ..............................................................................................12

*Silivanch v. Celebrity Cruises, Inc.*,
333 F.3d 355 (2d Cir. 2003)......................................................................................................7

*Thomas v. Blue Cross & Blue Shield Ass'n*,
333 F. App'x 414 (11th Cir. 2009) .......................................................................16, 18, 19, 22

*Travelers Cas. & Sur. Co. of Am. v. Thorington Elec. & Const. Co.*,
No. 2:09-CV-37-WKW, 2010 WL 743138 (M.D. Ala. Mar. 1, 2010)....................................12

**Statutes & Rules**

11 U.S.C. § 521(a)(1)(A) ................................................................................................................15

Fed. R. Bankr. P. 1007(a)(1)...........................................................................................................15

Fed. R. Bankr. P. 6003 ....................................................................................................................15

Fed. R. Civ. P. 6(b)(2)........................................................................................................................6

Fed. R. Civ. P. 60(b) ..........................................................................................................................6

Blue Cross Blue Shield Association ("BCBSA") respectfully submits this Response to Jackson Hospital & Clinic Inc.'s ("Jackson Hospital") Motion for Relief from Judgment and to Belatedly Opt Out of Settlement Class and Reply to Motion to Enforce Provider Settlement and to Enjoin Jackson Hospital & Clinic, Inc.'s Adversary Proceeding Against Blue Cross and Blue Shield of Alabama (the "Motion"), pursuant to the so-ordered Stipulation and Agreed Order Regarding Briefing Schedule for this matter. (*See* Dkt. 3384 at 1.) Specifically, BCBSA respectfully requests the Court issue an order denying Jackson Hospital's request to belatedly opt out of the Provider-Track settlement of MDL No. 2406 (the "Provider MDL"), and grant Blue Cross and Blue Shield of Alabama's ("BCBS-AL") motion for an injunction to prevent Jackson Hospital from prosecuting its pending adversary proceeding complaint against BCBS-AL.

## INTRODUCTION

After more than twelve years of hard-fought litigation and over nine years of negotiations, BCBSA and the Blue Cross and Blue Shield member plans (collectively, "the Blues") entered into a comprehensive settlement agreement (the "Settlement Agreement") with a broad class of providers (the "Settlement Class") that brought an end to the Provider MDL. In exchange for the fullest release allowed by law, the Blues paid $2.8 billion and agreed to implement "sweeping" and "extraordinary" injunctive relief to benefit all members of the Settlement Class. Now, nearly a year after the deadline to opt out of the settlement, Jackson Hospital seeks to undermine that hard-earned result and belatedly excuse itself from the Settlement Class. Jackson Hospital attempts to do so even though it admits it is a member of the Settlement Class; admits it had proper notice of the settlement; admits it knew the opt-out deadline; and even admits it voluntarily submitted a settlement claim *four months* after the opt-out deadline lapsed. In so doing, Jackson Hospital requests special treatment not available to millions of other class members and affirmatively prejudicial to the Blues. Because Jackson

Hospital cannot demonstrate that its failure to opt out was due to excusable neglect, its Motion should be denied. (*See infra* Argument § I.) And once its Motion is denied, Jackson Hospital's adversary proceeding against BCBS-AL cannot continue because it shares an identical factual predicate with the claims resolved by the Settlement Agreement and, thus, falls squarely within the settlement's broad release. (*See infra* Argument § II.)

## RELEVANT BACKGROUND

### I.        The Provider MDL Complaint and Allegations.

The MDL provider plaintiffs ("Providers") first brought consolidated claims against the Blues in 2013. (*See* Dkt. 86.)[1] The operative Provider MDL complaint was filed on April 18, 2017 (the "Provider Complaint"), alleging antitrust violations arising from certain Blue System rules governing the way the Blues interact, as well as other alleged anticompetitive conduct. (*See* Dkt. 1083 ¶¶ 11–17.) Among other things, the Provider Complaint alleged the Blues unlawfully agreed to allocate markets, conspired to fix prices and boycott providers, entered into anticompetitive agreements with one another and used their market power to create or maintain a monopsony, all with the alleged effect of reducing provider reimbursement rates. (*Id.* ¶¶ 3–18.)

The Provider Complaint contained extensive allegations against BCBS-AL in particular. It claimed that "BCBS-AL has taken advantage of its market power in a number of ways" (*id.* ¶ 237), including, for example, that BCBS-AL's hospital tiering program left providers "no choice but to accept lower rates" (*id.* ¶ 266); that BCBS-AL's cost reporting requirements allowed BCBS-AL to "drive provider reimbursements lower" (*id.* ¶¶ 267, 270); and that BCBS-AL overpaid its executives (*id.* ¶ 277), and maintained excessive cash reserves (*id.* ¶ 426).

---

[1] Unless otherwise noted, docket citations are to the MDL docket, No. 2:13-cv-20000-AMM (MDL No. 2406) (N.D. Ala.).

## II.    The Provider MDL Settlement, Notice Process and Final Approval Order.

In October 2025, after "more than twelve years of hard-fought litigation and an astounding nine years of settlement negotiations," Providers and the Blues entered the Settlement Agreement which, once approved, "result[ed] in the settlement of all of Provider Plaintiffs' claims against the Settlement defendants." (Dkt. 3225 at 1.)  The Blues agreed to "extraordinary monetary recovery" of $2.8 billion and to implement "sweeping" and "extraordinary" injunctive relief that benefitted both providers and Blue members, including transformative changes to its hallmark BlueCard Program, a prompt-pay commitment for certain BlueCard claims, performance service level agreements, and commitments around value-based care—among many other items of injunctive relief.  (*Id*. at 7–9, 36.)

In exchange for this substantial relief, the Blues obtained one thing:  a full release from all Settlement Class members for all claims "based upon, arising from, or relating in any way to" the Provider MDL.  (Dkt. 3192-2 at 18–19.)  Specifically, pursuant to the Settlement Agreement, all class members that did not opt out:

> covenant not to sue any Releasee[2] with respect to any Released Claim, and agree that all Releasors shall be permanently barred and enjoined from commencing, maintaining, prosecuting, causing, cooperating with, advising to be commenced or maintained, or encouraging any action, suit, proceeding or claim in any court, tribunal, administrative agency, regulatory body, arbitrator or other body in any jurisdiction against any Releasee based in whole or in part upon, arising out of, or in any way connected or related to any Released Claim.

(Dkt. 3192-2 at 64.)

The Settlement Agreement broadly defines Released Claims to include:

> any and all known and unknown claims … based upon, arising from, or relating in any way to: (i) the factual predicates of the Provider Actions (including but not limited to the Consolidated Amended Complaints filed

---

[2] All capitalized terms not separately defined herein have the meaning ascribed in the Settlement Agreement (Dkt. 3192-2).

in the Northern District of Alabama) including each of the complaints and prior versions thereof, or any amended complaint or other filings therein from the beginning of time through the Effective Date; (ii) any issue raised in any of the Provider Actions by pleading or motion; or (iii) mechanisms, rules or regulations by the Settling Individual Blue Plans and BCBSA within the scope of Paragraphs 10-26 [relating to injunctive relief] approved through the Monitoring Committee Process during the Monitoring Period and that are based on the same factual predicate of the Provider Actions and related to the injunctive relief provided by Paragraphs 10-26.

(*Id*. at 17–18.)

This release was carefully crafted and substantively identical to the one the Court approved and the Eleventh Circuit affirmed as part of a related settlement of the Subscriber-track of the same MDL. *See In re Blue Cross Blue Shield Antitrust Litig*., No. 2:13-CV-20000-RDP, 2022 WL 4587618, at *24–25 (N.D. Ala. Aug. 9, 2022), *aff'd*, 85 F.4th 1070, 1088–91 (11th Cir. 2023). Critically, the release does not turn on the type of claim asserted (antitrust, contract, etc.), but rather on whether the claim shares a "factual predicate" with the claims settled and released in the Provider MDL. (*See* Rothschild Decl. Ex. 1 at 37:3–8 ("[T]he release here, in paragraph 1xxx, is a release of all claims that share an identical factual predicate or common nucleus of fact with the settled litigation."); *id.* at 53:10–19 (Released Claims "arise out of the common nucleus of fact"); *see also* Dkt. 3309 at 15.)

On December 4, 2024, the Court entered an order preliminarily approving the Provider MDL settlement, as well as the Provider Plaintiffs' Motion for Approval of a Plan for Notice and Appointment of Settlement Notice Administrator and Settlement Administrator. (Dkt. 3225.) The Court's preliminary approval order included a detailed endorsement of Providers' plan for giving notice to all class members, as well as details about the opt-out deadline, which the MDL Court set as March 4, 2025. (*See id.* at 10–12, 51.)

4

Following preliminary approval, notice to the class, and the opportunity for class members to opt out of the settlement, the Court entered the Final Approval Order on August 19, 2025. (Dkt. 3346.) The Final Approval Order states that, "[i]n return for the monetary and injunctive relief . . . upon the Effective Date of the Settlement, Releasors (Class Representatives and Settlement Class Members who do not timely and validly exclude themselves) will have released claims (as described more fully below) against the Releasees" including "BCBSA" and "Settling Individual Blue Plans." (Dkt. 3346 at 8.)

Jackson Hospital did not opt out of the settlement, and as such became a member of the Settlement Class bound by the release. Indeed, on July 29, 2025—more than four months after the March 4, 2025 opt-out deadline—Jackson Hospital voluntarily "submitted a claim form to receive potential recovery" from the Provider MDL settlement. (Dkt. 3378-1 ¶ 18; *see also* Rothschild Decl., Ex. 2.) ██████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██ ███

### III.    The Adversary Proceeding.

On December 18, 2025—almost five months after it submitted its detailed claim form and more than four months after entry of the Court's August 2025 Final Approval Order—Jackson Hospital initiated an adversary proceeding against BCBS-AL. Jackson Hospital's

5

complaint (the "AP Complaint") seeks damages in excess of $250 million, as well as injunctive relief. (Dkt. 3378-2.)

The AP Complaint asserts numerous antitrust and other claims against BCBS-AL, all arising from the same conduct asserted in the Provider Complaint. (*Id.* ¶¶ 88–144.) Just like the Provider Complaint, the AP Complaint sets out claims under Sections 1 and 2 of the Sherman Act and Section 4 of the Clayton Act. It alleges that the Blues unlawfully colluded to divide territories (*id.* ¶ 9); that BCBS-AL's hospital tiering system and cost reporting reimbursement method are unfair (*id.* ¶¶ 30, 35); and that BCBS-AL's reserves are too high and its executives are paid too much (*id.* ¶ 3). The AP Complaint specifically alleges that BCBS-AL negotiates anticompetitive reimbursement rates (*id.* ¶ 5), and that BCBS-AL does not negotiate in good faith with Alabama hospitals (*id.* ¶¶ 77, 81). Based on the same alleged misconduct as the Provider Complaint, the AP Complaint also alleges breach of contract, claiming that BCBS-AL uses its market power to "refuse[] to negotiate in good faith with Jackson Hospital as to fair and reasonable reimbursement rates," resulting in "unfair reimbursement rates." (*Id.* ¶¶ 140, 142.)

## ARGUMENT

I. **Jackson Hospital's Motion for Relief from Judgment and To Belatedly Opt Out of Settlement Class Should Be Denied.**

A. **At the Very Least, Jackson Hospital Must Meet the Heavy Burden of Proving Excusable Neglect.**

Federal Rules of Civil Procedure 6(b)(2) and 60(b) govern requests to opt out after the applicable deadline has passed; both rules require a party prove excusable neglect. *In re Vitamins Antitrust Class Actions*, 327 F.3d 1207, 1209 (D.C. Cir. 2003); *see In re HealthSouth Corp. Sec. Litig.*, 334 F. App'x. 248, 253 (11th Cir. 2009). In determining whether a party has established excusable neglect, courts generally weigh four factors known as the "*Pioneer* factors*": "(1) the danger of prejudice, (2) the length of delay and its potential impact on the

6

proceedings, (3) the reason for the delay, and (4) whether the movant acted in good faith." *In re HealthSouth Corp.*, 334 F. App'x. at 253; *see also Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993).

A finding of excusable neglect means taking the extraordinary step of setting aside a court's binding, final judgment. *See Cano v. Baker*, 435 F.3d 1337, 1342 (11th Cir. 2006). "A movant's burden on a Rule 60(b) motion, therefore, is heavy." *Lodge v. Bill Heard Enters., Inc.*, No. CV-08-S-1772-NE, 2008 WL 11380003, at *4 (N.D. Ala. Nov. 7, 2008). Even where courts find excusable neglect, it is still in the district court's discretion whether to grant the motion. *See id.* "[S]uch relief is granted rarely and only in extraordinary circumstances." *Jacobs v. Elec. Data Sys. Corp.*, 240 F.R.D. 595, 600 (M.D. Ala. 2007) (noting the importance of "the interest in finality" and the "interest in conservation of judicial resources"); *see also Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005) (explaining that a "very strict interpretation of Rule 60(b) is essential if the finality of judgments is to be preserved"). And while the determination of whether a party should be able to opt out of a settlement class belatedly is an equitable one, "the equities will rarely if ever favor a party who fails to follow the clear dictates of a court rule." *Hanks v. Voya Ret. Ins. & Annuity Co.*, No. 16-CV-6399 (PKC), 2020 WL 6538743, at *2 (S.D.N.Y. Nov. 6, 2020) (quoting *Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366 (2d Cir. 2003)).

### B. Jackson Hospital Cannot Prove Excusable Neglect.

Because Jackson Hospital made a deliberate decision to file a claim form and recover in the settlement, the Court need not even evaluate the *Pioneer* factors, but rather may simply choose to deny Jackson Hospital's Motion outright. *See, e.g.*, *In re Celotex Corp.*, 232 B.R. 493, 496 (M.D. Fla.) ("[W]here a party's actions are deliberate, the party's late filing cannot constitute 'excusable neglect.'"), *aff'd sub nom. Sunset Vine Tower v. Celotex Corp.*, 196 F.3d 1262 (11th Cir. 1999); *see also In re Ford*, No. 19-cv-02724, 2020 WL 13349093, at *6

7

(M.D. Fla. Aug. 3, 2020) ("Ford's deliberate decision to ignore a court-imposed deadline cannot constitute 'excusable neglect.'").  This is especially so, given that Jackson Hospital ██████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████  But even if the Court proceeds to evaluate the *Pioneer* factors as Jackson Hospital requests (*see* Mot. ¶ 22), Jackson Hospital comes nowhere near satisfying the high standard necessary to prove excusable neglect.  Indeed, it cannot establish any of the four *Pioneer* factors.

### i.    A High Danger of Prejudice Falls on All Blues, Not Just BCBS-AL.

Under the first *Pioneer* factor, courts analyze "whether granting the delay will prejudice" the non-moving party.  *Pioneer Inv. Servs. Co.*, 507 U.S. at 385.  Here, all Blues—including, but not limited to, BCBS-AL—would suffer significant prejudice should Jackson Hospital be allowed to opt out of the Settlement Class nearly a year after the deadline.

Settling parties are inherently prejudiced when entities are allowed to opt out after an opt-out deadline has passed, because a defendant "would be exposed to liability that it had every reason to think had been foreclosed by the entry of the Settlement Agreement in federal court." *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 130 (2d Cir. 2011); *see also Roofer's Pension Fund v. Papa*, No. CV 16-2805 (RMB) (LDW), 2024 WL 4205638, at *14 (D.N.J. Sept. 12, 2024), *aff'd sub nom. Perrigo Institutional Inv. Grp. v. Papa*, 150 F.4th 206 (3d Cir. 2025) ("To facilitate a class action settlement, a defendant must know ahead of time the number of opt outs so it can reach a settlement to resolve as many claims as possible on terms agreeable to all parties."); *Georgine v. Amchem Prods., Inc.*, No. CIV. A. 93-0215, 1995 WL 251402, at *7 (E.D. Pa. April 26, 1995) (finding defendants would suffer prejudice if court allowed late opt

8

outs, reasoning the "financial certainty" defendants sought by agreeing to the settlement would be undermined).

That is precisely what would happen here.  Should Jackson Hospital be allowed to opt out at this point, it would no longer be bound by the Settlement Agreement's release, and would instead be able to bring a wide-range of claims (antitrust or otherwise) against each of the Blues, not simply BCBS-AL.  Each and every one of the Blues would therefore face the immense prejudice of potentially having to litigate claims that were previously and definitively resolved in exchange for significant relief.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-md-2262 (NRB), 2019 WL 3006262, at *5 (S.D.N.Y. July 10, 2019) ("Settling Defendants would indisputably suffer prejudice from reviving claims that were previously and properly released in exchange for consideration totaling $590 million.").  This prejudice is only compounded by the fact that the class here is extremely large (nearly all providers nationwide over a more-than 15-year time period) and—if Jackson Hospital were permitted to opt out late—other class members could seek to do the same.  *See, e.g.*, *In re Diet Drugs Phentermine/Fenfluramine/Dexfenfluramine Prods. Liab. Litig.*, 92 F. App'x. 890, 894 (3d Cir. 2004) ("[W]ith millions of members in the class, the potential prejudice of allowing an exception to the initial opt-out deadline could extend beyond this case and have detrimental effects on the settlement and MDL."); *In re MI Windows & Doors, Inc., Prods. Liab. Litig.*, 860 F.3d 218, 226 (4th Cir. 2017) (affirming denial of relief from the opt-out deadline where the district court "noted prejudice, stating that, if it granted an extension to one class member, other members would be incentivized to seek similar relief").

In the face of this extreme prejudice, Jackson Hospital makes three arguments—each of which misses the point of the first *Pioneer* factor.  *First*, Jackson Hospital argues that there is no

9

prejudice because, "while 'class action defendants have an interest in resolving as many claims as possible . . . the class action device does not pursue finality and a global resolution of claims at all costs.'" (Mot. ¶ 29.) But, as just explained, the prejudice to the Blues is not from Jackson Hospital exercising its opt-out right at all (a right it once had and relinquished), but from doing so *now*, more than ten months after the opt-out deadline and once the release has already taken effect. *See, e.g.*, *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1127 (9th Cir. 1977) ("[I]n the distribution of a large class action settlement fund, 'a cutoff date is essential and at some point the matter must be terminated.'"). That is especially so, given that the Settlement Agreement afforded the Blues "the right to rescind this Agreement under the terms of the *In Camera* Supplement . . . by reason of any Opt-Outs," and Jackson Hospital's belated request to opt out comes long after that decision-point has passed. (Dkt. 3192-2 at 67.) Courts have recognized that where the settlement agreement has such a rescission mechanism, allowing additional untimely opt-outs is particularly prejudicial because it deprives a party of a bargained-for right (*i.e.*, the right to determine rescission with full knowledge of the opt-out landscape). *See, e.g.*, *In re HealthSouth Corp. Sec. Litig.*, 334 F. App'x. at 253; *see also In re Diet Drugs*, 92 F. App'x. at 894; *In re Nat'l Football League Players' Concussion Inj. Litig.*, No. 14-1995, 2019 WL 95917, at *8 (E.D. Pa. Jan. 3, 2019).

*Second*, Jackson Hospital argues that there is no prejudice because "Jackson Hospital would simply be one of the many opt-out providers." (Mot. ¶ 30.) But the fact that "there are a substantial number of providers that opted out of the Class Action Settlement" (*id.*) actually cuts against Jackson Hospital—particularly because, under the rescission right discussed above, "being able to determine the total number of initial opt-outs by a certain date was essential to the deal." *In re Diet Drugs*, 92 F. App'x. at 894. This argument also ignores the substantial time,

10

resources and money that all Blues may have to spend defending Jackson Hospital's claims—claims the Blues properly considered released—if it is permitted to opt out now. *See Bowman v. UBS Fin. Servs., Inc.*, No. C-04-3525 MMC, 2007 WL 1456037, at *3 (N.D. Cal. May 17, 2007) (finding defendant would be prejudiced by belated opt-outs even absent any "suggestion that the class settlement would be affected if [movants] were permitted to opt out" since "defendant . . . will have to expend resources defending against claims that it reasonably understood were foreclosed"). That risk is especially acute, given that each of the Provider MDL opt-out cases requires significant plaintiff- and market-specific work, in addition to the common work. (*See, e.g.*, Case No. 2:21-vc-RDP, Dkt. 627 at 5.)

*Third*, Jackson Hospital claims that *it* would suffer "significant and irreparable prejudice" if it is not allowed to opt out. (*See* Mot. ¶ 32.) This argument flips the first *Pioneer* factor on its head; this factor is not about prejudice to the moving party, nor is it a balancing test. Instead, this factor asks only about prejudice to the non-moving party—in this case, BCBS-AL and the other Blues. *See Grant v. Pottinger-Gibson*, 725 F. App'x 772, 775 (11th Cir. 2018). But even if Jackson Hospital's supposed "prejudice" were relevant, there is none. If Jackson Hospital is not allowed to belatedly opt out, it will remain in the same position it is now: held to the bargain it entered by deciding not to opt out of the Provider MDL settlement, and on the verge of receiving a monetary payment under the Settlement Agreement. Indeed, this is the very decision Jackson Hospital made when it submitted a claim form. (*See* Rothschild Decl., Ex. 2.) And it is far preferable—and more consistent with Jackson Hospital's stated objective of emerging from bankruptcy and continuing operations (Mot. ¶ 32)—than engaging in protracted litigation with the Blues.

11

### ii.    Jackson Hospital Significantly Delayed Its Opt-Out Request.

The second *Pioneer* factor—"the length of the delay and its potential impact on judicial proceedings"—also weighs heavily in favor of denying the Motion. *Pioneer Inv. Servs. Co.*, 507 U.S. at 395. The opt-out deadline—which Jackson Hospital readily admits it knew (Mot. ¶ 46)—was March 4, 2025. (Dkt. 3225-00 at 56.) Jackson Hospital's Motion was filed over ten months after the opt-out deadline, and nearly five months after the Final Order and Judgment was entered on August 19, 2025. (Dkt. 3346.) Such a delay is facially unreasonable.

Indeed, courts have found shorter delays to be unreasonable. *See, e.g.*, *In re MI Windows & Doors, Inc., Prods. Liab. Litig.*, 860 F.3d at 226 (affirming denial of motion to belatedly opt out of class settlement where motion was filed "almost seven months after the opt-out deadline [and] five months after the court entered final judgment"); *Security Mutual Cas. Co. v. Century Cas. Co.*, 621 F.2d 1062, 1068 (10th Cir. 1980) (delay of over three months in bringing Rule 60(b) motion was unreasonable); *Cent. Operating Co. v. Utility Workers of America, AFL-CIO*, 491 F.2d 245, 253 (4th Cir. 1974) (delay of almost four months was unreasonable and characterized as "inexcusable dereliction"); *Travelers Cas. & Sur. Co. of Am. v. Thorington Elec. & Const. Co.*, No. 2:09-CV-37-WKW, 2010 WL 743138, at *3 (M.D. Ala. Mar. 1, 2010) ("length and reason for delay weigh heavily against" movant where Rule 60(b) motion filed less than four months after court-imposed deadline expired); *see also In re PaineWebber Ltd. P'ships Litig.*, 147 F.3d 132, 135–36 (2d Cir. 1998) (movant's failure to meet opt-out deadline due to hospitalization did not establish excusable neglect, where movant waited an additional nine months after hospitalization before attempting to opt out).

Perhaps recognizing its unreasonable delay, Jackson Hospital argues instead that "the Opt-Out Deadline was less than thirty (30) days after the Petition Date and the DIP Lender's initial involvement in the Bankruptcy Case." (Mot. ¶ 35 (emphasis omitted).) But that timeframe

12

has no bearing on the second *Pioneer* factor, which focuses on the length of time between the opt-out deadline and the belated opt-out request. *See, e.g., In re MI Windows & Doors, Inc., Prods. Liab. Litig.,* 860 F.3d at 226. Nor is Jackson Hospital saved by *In re Processed Egg Prods. Antitrust Litig.*, the lone case it cites in support of its position that "a longer delay may nonetheless be excusable." (Mot. ¶ 36.) In that case, the court found excusable neglect only because: (i) there would be no prejudice to defendants, since both parties behaved as though plaintiffs had validly opted out (*e.g.*, by engaging in significant litigation discovery work and even mediation sessions), and (ii) the applicable settlement agreement did not contain a recission mechanism. *In re Processed Egg Prods. Antitrust Litig.*, 130 F. Supp. 3d 945, 952–54 (E.D. Pa. 2015). Neither is true here: upon receiving the AP Complaint, BCBS-AL immediately flagged the adversary proceeding as improper (*see* Dkt. 3378); and the Settlement Agreement contains a rescission mechanism connected to opt outs, as discussed above (*see supra* at 10).

### iii. Jackson Hospital's Bankruptcy Does Not Justify Its Significant Delay.

The third *Pioneer* factor asks the Court to examine "the reason for the delay." *In re HealthSouth Corp. Sec. Litig.*, 334 F. App'x. at 253. Specifically, this factor looks at "'the conduct of the claimant which contributed to the delay' and to whether the notice provided contributed to the delay." *In re Nat'l Football League Players' Concussion Inj. Litig.*, 2019 WL 95917, at *8 (a court may be more likely to find excusable neglect where a party did not have proper notice of an opt-out deadline, but a "mistake" by a claimant is less likely excusable).

Jackson Hospital's reason for delay is that it was in the midst of a bankruptcy proceeding. (Mot. ¶¶ 38–39.) This does not justify Jackson Hospital's delay. Indeed, courts have found that—for purposes of whether an entity should be allowed to opt out of a settlement after the opt-out deadline—"[d]ebtors holding claims as plaintiffs, like the debtors here, must play by the same rules of procedure as any other plaintiff." *In re Santangelo*, 325 B.R. 874, 881 (Bankr.

13

M.D. Fla. 2005). Thus, a party's preoccupation with bankruptcy proceedings does not constitute the "excusable neglect" required under Rule 60(b)(6). *Id.* *Cf. In re M & L Bus. Mach. Co., Inc.*, 169 B.R. 711, 714 (D. Colo. 1994) (rejecting bankruptcy trustee's "preoccupation with other litigation" as grounds for relief to modify court's interlocutory order).

Here, moreover, there is no question that Jackson Hospital understood and evaluated its opt-out right notwithstanding the bankruptcy. For example, Jackson Hospital concedes it knew about the opt-out deadline and that it voluntarily completed and submitted a settlement claim form as a member of the Settlement Class. (Mot. ¶ 46.) *See In re Nat'l Football League Players' Concussion Inj. Litig.*, 2019 WL 95917, at *8. ("That Martin had notice of the opt-out deadline weighs against a finding of excusable neglect."); *In re Terazosin Hydrochloride Antitrust Litig.*, No. 00-1303-CIV., 2005 WL 8181055, at *2 (S.D. Fla. July 18, 2005) (plaintiffs "have long been aware of the settlement in this case, and were given ample notice of the . . . opt-out deadline"). That claim form also confirms that Jackson Hospital ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* Rothschild Decl., Ex. 2 at 7 ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Nor can Jackson Hospital prevail by arguing that there were "many moving parts and emergency issues relating to Jackson Hospital's Bankruptcy (and related efforts to keep the Hospital in operation and serving patients) in the months, weeks, and days leading up to the Opt-Out Deadline," such that it did not have "sufficient time to fully and properly analyze whether it would be in the best interest of Jackson Hospital and its stakeholders to opt out." (Dkt. 3382-1

14

¶ 22.)  As an initial matter, this excuse is belied by the fact that Jackson Hospital did not simply *miss* an affirmative opt-out deadline; it *actively* filed a claim, ███████████████████

████████████████████████████████████████████████ (Dkt. 3378-1

¶ 18; *see also* Rothschild Decl., Ex. 2.)  And its chief restructuring officer, Mr. Wilen, admits

that he was in charge of the Hospital from at least September 4, 2024 onwards (Dkt. 3382-1

¶ 3)—six months before the opt-out deadline of March 4, 2025.

Moreover, none of the "flurry" of activity that Jackson Hospital cites (*see* Mot. ¶¶ 39–

42), is unique to Jackson Hospital.  (*See* Dkt. 3382-1 ¶¶ 11-12 (declaration describing efforts "to

put together, on an expedited basis, necessary bankruptcy filings, including a comprehensive

Creditor Matrix for the soon-to-be-filed Chapter 11 Cases").  These are standard parts of any

bankruptcy proceeding.  *See, e.g.*, *In re Hillsborough Holdings Corp.*, 116 F.3d 1391, 1393

(11th Cir. 1997) (bankruptcy proceedings are inherently complex and involve multiple

simultaneous stakeholders and activities); Fed. R. Bankr. P. 6003 committee's note to rule

(2007) (describing the routine "flurry of activity during the first days of a bankruptcy case"); *see*

*also* 11 U.S.C. § 521(a)(1)(A) (debtors have a statutory obligation to file "a list of creditors");

Fed. R. Bankr. P. 1007(a)(1) ("the debtor must file with the petition a list containing the name

and address of each entity included or to be included on Schedules D, E/F, G, and H of the

Official Forms").  Under Jackson Hospital's logic, bankruptcy would be an excuse for any entity

to flout an opt-out deadline by almost a year.  That is not the law.  (*See supra* at  6-7.)  And

tellingly, other bankrupt entities managed to opt out by the governing deadline.[3]  (*See*

---

[3] If its bankruptcy proceedings were truly the reason Jackson Hospital could not properly evaluate its opt-out right— rather than an after-the-fact excuse for changing its mind about settlement participation—Jackson Hospital could and should have requested relief from the Court.  *See Johnson v. Hercules Inc.*, No. CV298-102, 1999 WL 35648160, at *6 (S.D. Ga. Apr. 28, 1999) (finding no excusable neglect where "[m]ovants filed no motion nor notified class counsel or the Court in any way that they needed more time. No representative of the Movants attended the settlement hearing, and no individual . . . Plaintiff appeared").

Complaint, *WHC Liquidating Trust v. Blue Cross of California*, No. 25CV114166 (Cal. Super.

Ct. Mar. 3, 2025); Complaint, *VHS Liquidating Trust v. Blue Cross of California*,

No. RG21106600 (Cal. Super. Ct. July 27, 2021).)

Finally, Jackson Hospital blames its failure to opt out on the fact that "it did not obtain

approval from the Bankruptcy Court or written consent from the DIP Lender to forego opting out

of the Class Action Settlement (or to otherwise 'opt in' to the Class Action Settlement)."  (Mot.

¶ 46.)  This misconstrues the law:  the decision whether to participate in a settlement class does

not require approval from the bankruptcy court.  *In re Santangelo*, 325 B.R. at 881 ("By

establishing the class action and approving the settlement, the District Court did not exercise any

control over the debtors' claims against Fairbanks or otherwise violate the automatic stay.");

*accord Thomas v. Blue Cross & Blue Shield Ass'n*, 333 F. App'x 414, 421 (11th Cir. 2009); *In re

McMahon Books, Inc*., 173 B.R. 868, 874 (Bankr. D. Del. 1994) (declining to exercise

jurisdiction over the terms of class settlement agreement because "the administration and

effectuation of the Settlement Agreement is expressly reserved to the District Court" overseeing

the settlement, not the bankruptcy court).  And to the extent there was some consent requirement

in Jackson Hospital's contract with its DIP Lender, that is a problem of its own making; the

Blues should not be prejudiced (and Jackson Hospital should not be rewarded) by Jackson

Hospital's own failure to work with its DIP Lender.

### iv.    Jackson Hospital Did Not Act in Good Faith.

The final *Pioneer* factor asks "whether the movant acted in good faith."  *Pioneer Inv.

Servs. Co.*, 507 U.S. at 395.  Jackson Hospital did not.  "'[G]ood faith' includes demonstrable

respect for the Court's case management orders, deadlines, procedures, and decisions"; in

contrast, litigants that intentionally ignore court-ordered deadlines have "demonstrated

insufficient respect in that regard and may actually stand as a problematic example for others."

16

*In re Imprelis Herbicide Mktg., Sales Pracs. & Prods. Liab. Litig.*, No. 11-MD-02884, 2014 WL 348593, at *6 (E.D. Pa. Jan. 31, 2014).

Here, Jackson Hospital had multiple opportunities to file this Motion.  For example, Jackson Hospital could have sought an extension of the known opt-out deadline a year ago.  (*See supra* at 15, n.3.)  It could have requested to opt out nearly six months ago, in July 2025, instead of "submit[ing] a claim form to receive potential recovery from the Class Action Settlement fund." (Dkt. 3378-1 ¶ 18.)  Jackson Hospital could have come to this Court in October 2025, when it received the DIP Lender's Emergency Motion to Vacate and Set Aside the Debtors' Participation in the Settlement.  (*See* Dkt. 3378-1.)  Jackson Hospital never did any of those things—in fact, it *never came to this Court at all*.  Instead, despite this Court's exclusive jurisdiction over Settlement Agreement release issues (Dkt. 3346 at 39), Jackson Hospital filed the AP Complaint in an adversary proceeding against BCBS-AL in the Bankruptcy Court for the Middle District of Alabama, along with an emergency motion seeking a temporary restraining order and preliminary injunction.  (Dkt. 3378-2; Dkt. 3378-3.)  This matter was brought to this Court only because BCBS-AL filed a motion, alerting the Court to Jackson Hospital's tactics. (*See* Dkt. 3378.)  This belies any claim of good faith.

Jackson Hospital's good faith is also called into question by its conduct in the market. Despite claiming that it is worried about its ability to emerge from bankruptcy and to continue serving Alabama citizens (*see* Mot. ¶ 32), Jackson Hospital appears to be spending hundreds of thousands of dollars on prime-time advertising against BCBS-AL over its released contracting dispute.[4]  But even if Jackson Hospital did not engage in affirmative bad faith, that is irrelevant.

---

[4] *See* Alabama Political Reporter, "Ad blitz targets BCBS amid Jackson Hospital lawsuit" (Dec. 24, 2025), https://www.alreporter.com/2025/12/24/ad-blitz-targets-bcbs-amid-jackson-hospital-lawsuit/; Grayson Everett, "Delaware dark money group reveals ties to Jackson Hospital in new ad buy, total TV spend now tops $475,000 as Alabama taxpayer bailout stacks up" (Jan. 8, 2026), https://yellowhammernews.com/delaware-dark-money-group-

17

A party can act in good faith, and still fail to establish excusable neglect. *See In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*, No. CIV.A. 05-25157, 2009 WL 3444763, at *4 (E.D. Pa. Oct. 23, 2009) (finding "no reason to doubt that plaintiff acted in good faith" but still refusing to find excusable neglect for late opt-out where danger of prejudice to defendant, and the length of, and reasons for, delay weighed against plaintiff).

## II.    BCBS-AL's Motion To Enforce Settlement Should Be Granted.

Because Jackson Hospital cannot establish excusable neglect to belatedly opt out of the Provider MDL settlement, all of it claims against BCBS-AL should be dismissed. Each of Jackson Hospital's claims asserted in the pending adversary proceeding—including its breach of contract claim—falls within the broad release contained in the Settlement Agreement.

### A. Claims That Fall Within the Same Factual Predicate as the Provider Complaint Are Released.

The Supreme Court has found that "[i]n order to achieve a comprehensive settlement that would prevent relitigation of settled questions at the core of a class action, a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 376–77 (1996) (internal quotation omitted). "An 'identical factual predicate' requires only a common nucleus of operative fact." *Thomas*, 333 F. App'x. at 417. In determining whether claims share the 'same operative nucleus of fact,' [courts] consider whether the 'primary right and duty are the same.'" *Id*.

---

reveals-ties-to-jackson-hospital-in-new-ad-buy-total-tv-spend-now-tops-475000-as-alabama-taxpayer-bailout-stacks-up/.

18

**B. Jackson Hospital's Claims Arise out of the Same Factual Predicate as the Claims Asserted in the Provider MDL.**

Jackson Hospital does not dispute that, if not permitted to opt out of the Provider MDL settlement, Jackson Hospital is a Releasor and BCBS-AL is a Releasee within the meaning of the Provider Settlement Agreement. Jackson Hospital does not dispute that this means all of its Sherman Act claims are released. It maintains, however, that its contract claim falls outside the Settlement Agreement's definition of "Released Claims." Jackson Hospital is wrong.

The release in the Settlement Agreement is deliberately broad; it defines "Released Claims" to include "any and all known and unknown claims, causes of action . . . in law or equity or arising under constitution, statute, regulation, ordinance, contract or otherwise in nature . . . based upon, arising from or relating in any way to . . . the factual predicates of the Provider Actions (including but not limited to the Consolidated Amended Provider Complaints filed in the Norther District of Alabama)." (Dkt. 3192-2 at 17–18.) As the Eleventh Circuit observed in regards to the substantially similar Subscriber settlement release, it is a release that bars "any and all causes of action . . . of whatever kind, source, or character that are related to matters addressed in the class action, including antitrust and other statutory and common law claims." *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1088 (11th Cir. 2023) (quoting *Thomas*, 594 F.3d at 822) (ellipsis in original).

Jackson Hospital's breach of contract claim is thus plainly barred as a Released Claim, because it arises from the same nucleus of operative fact as those asserted in the Provider MDL. (*See* Dkt. 3378-3 (Jackson Hospital describing its breach of contract claim as involving "Blue Cross Alabama's monopsony and monopoly power prevent[ing] Jackson Hospital from 'negotiating' with 'other payers' that 'compete' with Blue Cross Alabama (because Blue Cross

19

Alabama intentionally eliminates any such competition)").  This is confirmed by comparing the

allegations:

| Category of Allegation | Provider Complaint | AP Complaint |
|---|---|---|
| Unlawful agreements leading to lower reimbursement rates | "[A]nticompetitive agreement[s]" among the Blues "result[] in lower reimbursement rates to health care Providers."  (*Id.* ¶¶ 12, 13, 15, 41.) | Because of BCBS-AL's "unlawful agreements with its affiliates" (*i.e.*, the other Blues), Jackson Hospital's alleged damages include "receiving lower reimbursement rates from Blue Cross Alabama, being forced to 'accept' far less favorable terms and reimbursement rates than other hospitals."  (*Id.* ¶¶ 62, 100.) |
| As a result of its unlawful agreements, BCBS-AL controls the Alabama insurance market | "Blue Cross and Blue Shield of Alabama controls access to more than 90% of privately insured or administered . . . patients in the State of Alabama . . . .  As a result, healthcare providers, including Plaintiffs, are paid much less than they would be absent the BCBS Market Allocation Conspiracy."  (*Id.* ¶ 7.) | BCBS-AL "control[s] roughly 90% of Alabama's commercial health-insurance market, which gives Blue Cross Alabama unchecked power to unilaterally dictate and control the amount providers such as Jackson Hospital are paid."  (*Id.* ¶ 8.) |
| Other Blues cannot enter Alabama to increase competition | "The Blues have agreed that none of those Blues will cross the state line to sell health insurance in Alabama. The same agreement also prohibits . . . all other Blues from competing with BCBS-AL in the sale of health insurance."  (*Id.* ¶ 13.) | "Blue Cross Alabama—along with the entire Blue Cross Blue Shield network—adopted territorial limitations . . . [a]s a result, other insurers (including Highmark) could not enter the healthcare market in Alabama and compete with Blue Cross Alabama."  (*Id.* ¶ 21.) |
| Challenge to BCBS-AL's tiering program | "BCBS-AL uses its market power to extract money from providers through 'Tiering'" and "acts to affirmatively steer patients away from these hospitals by imposing higher costs on enrollees and actively pushing its enrollees to Tier 1 Hospitals."  (*Id.* ¶¶ 248, 266.) | "Blue Cross Alabama has used its hospital 'tiering' program to pressure hospitals into making financial concessions by steering patients toward higher-tier hospitals and withholding the cost calculations behind Blue Cross Alabama's tier assignments."  (*Id.* ¶ 30.) |
| Lack of good faith in contract negotiations | Providers requested injunctive relief requiring that "Blue Plan[s] shall have a good faith obligation to negotiate with [] Provider[s]."  (*Id.* ¶ 12, Request for Relief (g)(1).) | BCBS-AL "has refused to negotiate in good faith with Jackson Hospital as to fair and reasonable reimbursement rates per contract year."  (*Id.* ¶ 140.) |

20

| Category of Allegation | Provider Complaint | AP Complaint |
|---|---|---|
| Challenge to BCBS-AL's cost reporting requirements | BCBS-AL's cost "reporting requirement introduced a barrier to entry in the sense that every hospital would refrain from negotiating a contract with another insurer since the related costs and revenues would be revealed to BCBSAL. Consequently, this cost reporting requirement acts, essentially, as a barrier to entry as well as a guarantee that BCBS-AL gets the best rates from hospitals in the State of Alabama." (*Id.* ¶ 267.) | "Blue Cross Alabama's cost reporting requirements are simply another way for Blue Cross Alabama to weaponize its market power, guarantee Blue Cross Alabama will get the best rates from hospitals in Alabama, and drive provider reimbursements lower." (*Id.* ¶ 37.) |

This identity of allegations ends the analysis. (*See* Dkt. 3309 at 15 (ruling that whether OMI's claims were released by the substantially identical Subscriber-track release turned only on "whether OMI's claims in the Virginia Action relate 'in any way to: (i) the factual predicates of the Subscriber Actions' or '(ii) any issue raised in any of the Subscriber Actions by pleading or motion,' because those claims are encompassed within the definition of 'Released Claims' in the Subscriber Settlement Agreement").)  It does not matter that Jackson Hospital asserts a "state law breach of contract claim[]"; and that, in theory, "[n]o monopoly or monopsony power . . . is required for BCBSAL to be in material breach of its contracts with a provider like Jackson Hospital"; or that the settlement injunctive relief does not "mandate[] BCBSAL to negotiate new reimbursement rates with Jackson Hospital in good faith" or "to reimburse Jackson Hospital" the same as other hospitals.  (Mot. ¶ 60.)  What matters is that Jackson Hospital's contract claim—as Jackson Hospital chose to plead it—relies on the same factual predicate as the Provider Complaint.  That alone makes it a Released Claim.  *See Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1289 (11th Cir. 2007) (scope of claims that are released applies "not only to the precise legal theory presented in the previous litigation, but to all legal theories and claims

arising out of the same operative nucleus of fact" (internal quotation omitted)); *Thomas*, 594 F.3d at 822 (finding claims "related to the concerns addressed in [a prior] class action" were released and noting that "[i]t is irrelevant that the [new claims] depend on a different legal theory").

Nor does it matter that "[t]he Final Order and Judgment was signed before BCBSAL's refusal to negotiate 2026 reimbursement rates in good faith and its most recent breaches of the Parties' contracts."  (Mot. ¶ 60.)  The settlement release expressly includes "claims that arise after the Effective date" so long as they are based on the same factual predicate, as is the case here.  (Dkt. 3192-2 at 18); *see also In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th at 1088 (substantially identical release covers future actions with the same factual predicate and noting that "releases of future claims are an important part of many settlement agreements").

## CONCLUSION

For these reasons, BCBSA respectfully requests the Court deny Jackson Hospital's Motion and grant BCBS-AL's Motion.

22

23

Dated: January 20, 2026

Respectfully submitted,

By */s/ Karin A. DeMasi*

Karin A. DeMasi
Lauren R. Kennedy
David H. Korn
Lillian S. Grossbard
CRAVATH, SWAINE & MOORE LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Tel.: (212) 474-1000
Fax: (212) 474-3700
kdemasi@cravath.com
lkennedy@cravath.com
dkorn@cravath.com
lgrossbard@cravath.com

*Lead Counsel for the Blue Cross Blue Shield System; Counsel for Defendant Blue Cross Blue Shield Association*

23

24

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 20, 2026, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated:  January 20, 2026

*/s/ Karin A. DeMasi*
Karin A. DeMasi
