FILED
2026 Jan-20  PM 08:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION


IN RE BLUE CROSS BLUE SHIELD      CASE NO. 2:13-cv-20000-RDP

ANTITRUST LITIGATION MDL 2406


* * * * * * *

**TRANSCRIPT OF EVIDENTIARY HEARING
RE FINAL APPROVAL**

* * * * * * *


BEFORE THE HONORABLE R. DAVID PROCTOR, UNITED STATES

DISTRICT JUDGE, at Birmingham, Alabama, on Tuesday, July 29,

2025, commencing at 9:42 a.m.


APPEARANCES:

SPECIAL MASTER:          Edgar C. Gentle III
                         Katherine A. Benson
                         Attorney at Law
                         GENTLE, TURNER & BENSON, LLC
                         501 Riverchase Parkway East
                         Suite 100
                         Hoover, Alabama 35244

IN PERSON:               W. Tucker Brown
                         Carl Burkhalter
                         Hon. U. W. Clemon
                         Greg Cusimano
                         Michael Dickler
                         David W. Dodge
                         Michael C. Dodge
                         Michael Gurley
                         Mark Hogewood
                         Craig A. Hoover
                         Samuel Issacharoff
                         Edith M. Kallas

APPEARANCES,            Lauren R. Kennedy
CONTINUED:              Donald Knowlton
                        Patrick McDowell
                        Nikol Oydanich
                        Dennis Pantazis
                        Gwendolyn Payton
                        Myron Penn
                        Henry Quillen
                        Barry Ragsdale
                        Phillip Rakhunov
                        Dennis Reich
                        Robert Roden
                        Julia Smeds Roth
                        Nicholas B. Roth
                        Patrick Sheehan
                        Todd Stenerson
                        Joe Whatley
                        Helen Witt
                        Kirk Wood


VIA ZOOM:               Karin DeMasi


VIA TELEPHONE:          Linda Flippo
                        Maria Garcia
                        Hope Marshall
                        Clayton Schmitt
                        Terry D. Turner
                        Edward Wood

The proceedings were reported by a stenographic court reporter.

The transcript was produced using computer-aided transcription.

**Transcript prepared by:**
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter

[Pages Intentionally Omitted]

question that was being raised -- and we've had some more case law develop since I rejected the argument when Mr. Chesler made it some years ago -- about what effect on the providers in particular any two-sided platform or two-sided market or some cousin of those might have?

MR. WHATLEY:  Judge, we briefed that extensively.  As you know, I think maybe the last motion filed on that you made it clear you had had enough briefing on that.  But for --

THE COURT:  At that point.

MR. WHATLEY:  The point is that that is and was a very significant risk factor that when you're deciding, you know, whether a settlement is fair, reasonable, and adequate, you've got to take into account the risk factors that are involved in the litigation.  And even though we disagreed in the briefing -- you saw that -- I think we have to agree with you and the Blues that that is a very significant risk factor that has to be taken into account.

Did that get to your question, Judge?

THE COURT:  It did.  Of course, one of the biggest risk factors I've been asking in this case all along is just the ultimate submission of the case on the merits to a jury. I've said to you more than once, how does it play out if you get through all these hurdles and end up at trial and tell a jury, We're here under the Sherman Act because we think doctors and hospitals don't make enough money in the most

expensive healthcare system in the world, right?

MR. WHATLEY:  Judge, it is -- it is certainly --

THE COURT:  I know you were willing to take on that challenge.

MR. WHATLEY:  We were willing to take on that challenge and --

THE COURT:  But that's another thing you've got to consider.

MR. WHATLEY:  You know, Judge, you almost sounded like President Obama when you made that statement.  But --

THE COURT:  I'm not promising anybody they can keep their healthcare plan.

MR. WHATLEY:  But, Judge, it clearly -- and I also point out that we have, as an example, in the courtroom, Greg Cusimano, who is very experienced at focus groups and issues, how do you deal with issues like this in front of a jury.  And it's a factor when you've got major, you know -- major -- your class consists of major corporate entities that are healthcare systems, as an example, and litigating against major Blues that are payors.  Then where the jury comes out, it's not like representing an individual who has, you know, been injured on the -- in an accident, and it is a different dynamic and it's got to be taken into account.  Of course, we were willing to take that on, but does it create additional risk?  Absolutely.

THE COURT:  Well, it just strikes me -- and I'm

remembering some days I had in front of Judge Clemon when I was the defense lawyer in a class action, and the plaintiffs' lawyers were finally admitting to him in a hearing there are a few problems with our case.  The defense lawyer always likes to hear that, but that's why these cases resolve is there's not a clear path to the end zone for either side.

MR. WHATLEY:  Well, there's no guarantee that you're going to win in front of a jury, and if you do win in front of a jury, there's no guarantee you're going to keep it.  And for all those reasons, people are better off -- we talked about that some at preliminary approval, but -- people are better off with the certainty of a settlement, especially one as good as this is.  And so you're absolutely right.

THE COURT:  All right.  I'll quit making you walk on that glass.

MR. WHATLEY:  Well, Judge, I mean, the risk factors are important.  And, you know, if we didn't have this settlement, were we going to take this case to trial on whatever you allowed us to take to trial?  Absolutely.  But the risk factors have to be taken into account, and this settlement is better than all those risks.

Judge, there are three objections, and this may depart a little bit from our agenda but I think it's much more efficient, what I'm about to suggest.  There are three objections, and starting with the HCA objection, the HCA filed

a brief very recently.  It filed it last week.  And in that brief they really have questions and issues addressed to the Blues.

What I would suggest as a starting point now is that Ms. DeMasi now step in and address the objections and that we then follow her in discussing the objections in light of what's going on in the HCA briefing and complete the process that way.  Would that be acceptable, Your Honor?

THE COURT:  Ms. DeMasi, how does that sound to you?

MS. DEMASI:  That sounds perfectly fine to me. Thanks, Your Honor.

THE COURT:  Well, in that case, it's perfectly fine with me, too.

MR. WHATLEY:  I guess, should we take down the -- or turn off this PowerPoint, or does --

THE COURT:  Yeah.  Did the Blues have a PowerPoint they're using?  All right.  Well, let's just leave this up, because it kind of categorizes the three objections -- or nominates them.

All right.  When you're ready, Karin.

MS. DEMASI:  Thank you, Your Honor.  And thank you again for accommodating my travel woes.

So for the record, this is Karin DeMasi on behalf of the Blues, and I will be brief this morning to address the objections as the Blues believe that approval of this

settlement is straightforward.  As Your Honor knows and as the provider counsel just referenced, this settlement is the result of negotiations that lasted the better part of a decade, all while the parties were simultaneously and vigorously litigating our respective positions.

I think there are at least two things that this settlement would have -- would not have happened without.  The first is that it wouldn't have happened without Ed and Kip, without our Special Master and mediator, and they gave endless hours to seeing this through.  There were times when, I think providers would agree with me, that the parties were ready to give up, but Ed and Kip were not.  And that's a huge part of why we're here today, and so we certainly appreciate those efforts.

The second thing that this settlement wouldn't have happened without is the release.  As is typical for defendants in a class-action settlement, the Blues here get one and only one thing from the settlement and that is a broad release of all claims, which paragraph 42 of the settlement agreement says is to be interpreted and enforced broadly and to the fullest extent of the law.  As the Eleventh Circuit has observed in reviewing the nearly identical release on the subscriber side, releases are commonly approved in class-action settlements and they're intended to give the defendants total peace, the total peace that they bargained

for.

And so the Court here can and should approve the release of all claims because the release here, in paragraph 1xxx, is a release of all claims that share an identical factual predicate or common nucleus of fact with the settled litigation.  This release is expressly limited to those such claims, those with an identical factual predicate to the provider MDL action.  And as I said, it's modeled nearly verbatim.

If you look at paragraph 1xxx -- and this will get to the objections that we've heard from HCA and the ER groups -- the release is really set forth in three parts.  The first is the broad release, which says -- and now I'm on page 18 of the settlement agreement -- that it releases any and all claims whatsoever that are based upon, arising from, or relating in any way to the factual predicates of the provider action or to any issue raised in any of the provider actions by pleading or by motion.  That is the broad test on whether a claim is released.

There then, a little farther down in what I think is the second part of the release, is a ordinary course carve-out, says very clearly nothing in this release shall release claims, however asserted, that arise in the ordinary course of business and that are based solely on claims by the provider in their capacity as a sponsor or subscriber.  So it

doesn't release subscriber-side claims.  Those are dealt with in a different settlement and by different opt-outs.  Secondly, claims based solely on claims regarding whether a settling individual Blue plan properly paid or denied a claim for a particular product, service, or benefit based on the benefit plan document --

THE COURT:  So to be clear -- to be clear, this release would not operate to bar a legal claim solely because it involves a reimbursement claim that would be at issue between a Blue and a provider?

MS. DEMASI:  If it is solely based on an issue between a settling Blue plan and whether it properly paid or denied a claim to -- on a particular product to a provider, that would be within the ordinary course.

THE COURT:  All right.

MS. DEMASI:  There is a third part, Your Honor, and that is the -- what I think of as the mixed case.  And so this last part says notwithstanding any of the foregoing, any claim, however asserted, based in whole or in part on the factual predicate -- so again, taking us back to the identical factual predicate, if a claim is based in part on that identical factual predicate, that is a released claim.  And so that "solely" that you just referred to in the ordinary course release is important.  It has to be solely based on that ordinary course dispute.

And this is exactly the structure, the language, and the format of the subscriber release that this Court approved and that the Eleventh Circuit affirmed.  And so we think that this is clear, it's straightforward, and it comports with law.

In our view, and from reviewing the papers, what the objectors really seek -- and I think HCA's reply brief makes this crystal clear -- is that those providers are seeking an advisory or an advance opinion from the Court on how the release, if it's approved, would apply to specific claims of specific lawsuits.  And that -- that kind of advisory ruling would be premature and improper, as this Court has already noted in connection with the subscriber settlement.

And so going back to the Court's order from August 9th, 2022, Your Honor may recall that in the subscriber settlement hearing, another of an objector to that settlement urged the Court to opine as to what kinds of claims were in or out of the release, and the Court correctly, in our view, declined to do so.  And I would point you in particular to what Your Honor said at footnote 22 of the August 9th, 2022 final approval order in that case.  And here is what the Court said in footnote 2022 [sic]:  Whether any particular claim has an identical factual predicate and/or falls within the scope of the release is of course merely hypothetical, and currently unanswerable.  Until a particular claim is asserted, comment by the court would likely be an inappropriate advisory

opinion.  If the court is presented with such a claim, it will be in a position to make an appropriate determination.

And so that, too, applies here, Your Honor.  Although HCA has characterized claims and pointed to specific lawsuits, unless and until the release is approved and unless and until a defendant in that case, a Blue plan that is covered by the release that would then be approved, there is nothing for the Court to do to evaluate that.  If it is as clear as HCA believes that its claims are within the ordinary course exception that that's reviewed, it may be that a Blue plan never raises it at all.  And if it is disputed, under paragraph 57 of the settlement agreement, this Court has jurisdiction to hear that dispute and make a determination.

And this is exactly how the Court proceeded with respect to the recent OMI action.  There the Court applied the approved subscriber release multiple years later in the context of an actual dispute where a Blue plan actually raised and relied on the release, and the Court issued an order with respect to that, you know, with looking straight to the language of the release there.

And so our view is that is how we should proceed here. The settlement should be approved.  The release language should be approved, and any issues that relate to application should be raised in the event, and only in the event, the release is asserted.

I'm happy to take any questions, Your Honor, happy to rely on our papers with respect to other arguments --

THE COURT:  Well, I wonder if it would be appropriate, just before the plaintiffs respond, to hear from HCA somewhat out of order since we are now focused on the HCA objections.  Any objection to doing that?

MS. DEMASI:  None from the Blues.

MR. WHATLEY:  None from us, Your Honor.

THE COURT:  All right.  Why don't we -- while we have all the spotlight on your objection, why don't we hear from you.

MR. DICKLER:  Appreciate it, Your Honor.  Michael Dickler on behalf of HCA, and I appreciate the time and the consideration of our objection.

As Your Honor knows, HCA is the largest hospital group in the country.  And while it applauds and, as we said in our papers, acknowledges the hard work that got everyone here, the ambiguity between the two provisions of the release that counsel just referred to, what she called the ordinary course carve-out and the mixed case, create an untenable circumstance for HCA.

THE COURT:  Isn't that something we deal with with every major class settlement where there's going to be a broad release, that we have to wait and see?  We know what the release language says.  That's not the ambiguity.  The

question is, well, how will it apply to this hypothetical situation?  And courts never weigh in on hypotheticals or advisory rulings like that.  It -- that has to just be litigated later if there is a dispute about application of the release.

The good news, it seems to me, for HCA and the parties here is you don't have dozens of courts across the country potentially reading the release differently.  You've got one court that has maintained or would maintain exclusive jurisdiction over this.  And I've already -- we've already been invited to one of these dances with the OMI case.

So I'm struggling to understand why there's ambiguity here as opposed to maybe what I would call uncertainty about fact scenarios that are not crystal clear before the Court -- or not even presented to the Court at this point.  Help me with that.

MR. DICKLER:  So the ambiguity is in the structure of that second and third provision as applied to the BlueCard program, right?  The -- as we've heard already this morning, the BlueCard program is critical to the settlement, to the way the providers and the Blues operates its --

THE COURT:  Well, not to mention there were -- providers raised litigation issues about the BlueCard program in this litigation.

MR. DICKLER:  Exactly, Your Honor.  And as we pointed

[Pages Intentionally Omitted]

it's a payment according to the BlueCard, that's still ordinary course.  I think that's -- we appreciate Your Honor saying that.

THE COURT:  Right, right.

MR. DICKLER:  Thank you.

THE COURT:  Well, and I hope what I've said is -- I realize I couldn't fully satisfy you about future concerns.  I hope I've satisfied you about how I'm going to approach these.

MR. DICKLER:  We appreciate that, Your Honor.  Thank you.  Unless you have further questions, I have nothing further.

THE COURT:  I do not.

MR. DICKLER:  Thank you.

THE COURT:  Well, let me ask you this:  Where does that leave your objection, then?

MR. DICKLER:  I -- well, we had --

THE COURT:  This particular objection.

MR. DICKLER:  Right, right, right.  And I -- this is our only objection.  So --

THE COURT:  This particular aspect of the objection.

MR. DICKLER:  We had -- you know, this is an issue that the client is extremely interested -- this is not a "we drive" objection.  This is a client has significant dollars and lots of cases in disputes with the Blues and anticipates it.  For that reason, what we said in our brief was that our

objection would be subject to being withdrawn if the expressed clarifications that we had there were made. I don't have further instruction from the Court on that. I mean, we have made our objection. Your Honor has said you're understanding. I think that leaves it where it is. But I don't think I can withdraw it at this point.

THE COURT: That's fine. I just -- I didn't know if there was anything else I needed to address as the objection, though. I'm not asking you to say uncle. What I'm asking you, though, is to say, I hear what you're saying, Judge, but, dot dot dot.

MR. DICKLER: I hear what you're saying, but we -- the HCA certainly reads and hopes that Your Honor will read the objection and, even more importantly, the release provisions of the settlement, if you approve it, as stating that simple ordinary course claims for payment that just arise out of BlueCard do not share an identical factual predicate with the claims asserted here and are, therefore, not released.

THE COURT: Yeah. And I think I had already said that to some degree in my question to Ms. DeMasi that there's going to have to be some aspect of that claim that Venn diagrams with some aspect of this litigation for the release language to be at issue. Now, that's -- Venn diagram's not necessarily any clearer, I assume, for you, but -- why don't we do this. Why don't you say you're going to step back for a second and

we'll hear from the providers, because I think the providers' interests align with you.  They don't want to release anything that's not appropriate to release either.  But let's hear from them, and then if you still -- why don't you have a -- sit down and have a thought about anything else you want to ask me for clarification about not hypothetical situations but how the Court would go about applying the release language.

MR. DICKLER:  Appreciate that, Your Honor.  Thank you.

THE COURT:  I think that's the best I can do for you today.  But I -- and I said -- I hope you'll tell your client this -- clients this -- I do appreciate the way they've approached this.  You know, I think they support much of the settlement.  They're concerned about this one issue, and I'm glad you came in to be heard on this one issue.

MR. DICKLER:  Thank you so much, Your Honor.  Appreciate it.

THE COURT:  So, grade my homework, Mr. Whatley.

MR. WHATLEY:  Judge, I think you did very well.  I mean, I think you had said some of the same things in OMI.  And so I don't know that there is really much else to do except -- which is, I guess, really unusual for a settling party -- we very much appreciate HCA and HCA's role in this case and HCA's counsel's role in this case and the way they presented this objection.

THE COURT:  Let me ask you this.  And I appreciate

that, but just before I forget this and it leaves my mind, if this settlement is approved, there will be a monitoring committee.

MR. WHATLEY:  Yes, sir.

THE COURT:  And I take it you'll at least have input, if not service, on that monitoring committee.  You'll monitor with the monitoring committee at a minimum.

MR. WHATLEY:  At the --at a minimum, yes.

THE COURT:  If the Blues took a position in this case on the release language that was -- which was inconsistent with the release language and the monitoring committee, or at least those on the monitoring committee policing the providers' interests in this class settlement, is that something you could foresee provider counsel working with the provider to help them with?

MR. WHATLEY:  Sure.

THE COURT:  I mean, that seems to me to show that there's going to be folks -- to the extent we're concerned about how these hypothetical situations might work out, okay? We're not concerned about the formulaic process of getting to a math answer.  Really, what we'd love certainty about is what the answer is on the math test today.  That's not something I can do.  But as to the process, it seems to me I'm not the provider who is concerned about overbreadth of release defense being asserted -- an overbroad release position being

asserted, would find some comfort and consortium with the lead counsel for the providers themselves.

MR. WHATLEY:  Yes, sir.  We view that.  I mean, Judge, we think one of our -- one of our roles as well -- and we've said this to many providers -- is to help educate the class going forward.  We've had a big educational role in the past, especially since October, but to educate people on what their opportunities are and what their rights are and complying with the settlement, which we think will benefit everybody, and -- but making sure the settlement is being implemented and continuing in that role, and part of the implementation is the release isn't applied in a way that it's not supposed to be.

And I think you have given comfort here today about the specific BlueCard issue that they've raised.  Obviously, you can't answer questions about specific claims and it wouldn't be proper for you to do it.

THE COURT:  Even pending claims, because --

MR. WHATLEY:  That aren't before you.  Exactly.

THE COURT:  Now, if you tripled my pay, I might be willing to go adjudicate two other judges' dockets, but that's an "if."

MR. WHATLEY:  Well, I mean, you know, there might be a role for a private decision-maker in the future, but -- but that's -- at this point that's a hypothetical situation.

THE COURT:  Yeah.  I think -- I think if I was ever

private, I'd just acknowledge this was a great experience and keep going in the rear-view mirror.

MR. WHATLEY:  Well, you would have the absolute right to do that.

Judge, I think -- we have some slides on the HCA objection, but I think they're largely answered.  I mean, they do overlap with what's in SCP, and so we'll deal with that --

THE COURT:  Give me your three-sentence nutshell on the mixed third category.

MR. WHATLEY:  The mixed third category is this, Judge. I mean -- and I think Ms. DeMasi really addressed it when she talked about the identical factual predicate which the defendants acknowledged in their brief.  That applies.  I mean, the issue of whether that applies or as the common nucleus -- the claims have to arise out of the common nucleus of fact under the mine workers test, they have specifically acknowledged that that applies, which should also give HCA and others comfort that, in fact, that's not an issue, that's resolved.  It's stated in their brief that way.  And so now they will quote that back if there's ever an issue anybody takes a contrary position, which we don't think it will happen.  And so if you've got somebody that comes in and makes challenges that are part of that definition, then they'll be bound by the release, and if there are claims that are ordinary course business that aren't, they won't be.  And

that's the good news.  And I think that's where we're --
that's where we wind up.  And I think HCA has now gotten the
comfort from what you've said on the BlueCard program and we
should go forward.

I don't know if Ms. DeMasi wants to respond on the HCA
objection.

THE COURT:  Ms. DeMasi, anything further from the
defense?

MS. DEMASI:  Yes, please, if I could just -- if I
could just make one point of clarification, and that is with
respect to the monitoring committee's role vis-à-vis the
release.  The settlement agreement actually address this.
It's in appendix C, paragraph 2(a).  And what it says, in
fact, is that the monitoring committee is not empowered to and
shall not consider or decide disputes relating to --

THE COURT:  No.  That's my job.  That's my job.

MS. DEMASI:  -- correct -- and it's relating to the
release shall only be heard by the Court.  So, obviously, with
the help of the committee of Mr. Whatley and Miss Kallas with
respect to informal negotiations, but with respect to the
release, that is for the Court, and we very much agree with
how the Court was describing its approach.

THE COURT:  Yeah.  So I probably was -- if there's any
ambiguity here, it's probably what I was trying to communicate
in that respect, and that is the monitoring -- there may be

components of the monitoring committee, particularly the provider side components, that become aware of these disputes, not acting as a monitoring committee member but acting as -- in their capacity as lead counsel and class counsel, they may very well -- I don't think there would be anything inconsistent with their performance of the duties that the -- the agreement provides the monitoring committee can undertake, but changing hats from time to time and giving some input to a provider that's concerned about the breadth of a release. Disagree with that?

MS. DEMASI:  I don't disagree with that, Your Honor.

THE COURT:  Yeah.

MS. DEMASI:  That makes sense to me as counsel for settlement class members who are subject to the release.

THE COURT:  Right.  And I think your point's well-taken that this is outside the area code of the monitoring committee in terms of their formal responsibilities if the settlement's approved.

All right.

MS. DEMASI:  Thank you.

THE COURT:  Does that satisfy you on that concern?

MS. DEMASI:  Yes, it does.  Thank you, Your Honor.

THE COURT:  All right.

MR. WHATLEY:  And I certainly didn't mean to say anything different than that.  I wasn't --

THE COURT:  I think if anybody says something different than me inadvertently, it was me, not you.

MR. WHATLEY:  But it clearly is the Court's jurisdiction on the release.  We agree --

THE COURT:  I probably just should have left monitoring committee out of it.  You're going to keep monitoring this personally.

MR. WHATLEY:  Judge, in terms of the -- I'm trying to think how to do this in an orderly way.  The SCP has raised seven objections --

THE COURT:  Why don't we take a short break, realizing that we have a number of people here who have different biometrics going on.  Before we do that, our HCA friend's standing again and might want to be heard before we change to the nonopt-out SCP ER groups.

MR. DICKLER:  Appreciate it.  This will be quick.  I appreciate the extra time.  I took your offer to --

THE COURT:  Invitation.

MR. DICKLER:  -- invitation to think about the issue a little bit, and the only thing I would add to what I previously said is this:  We've cited three pending lawsuits to the Court on this issue, and I guess our request would be to the Blues and the Court, but I'm making it here in open court, is if the day after the settlement is approved the Blues believe that this release applies to any of them that

they promptly bring the issue to this Court while all these issues are fresh in this Court's mind so that we could have the issue resolved.

THE COURT:  I have even a better idea.  Before promptly bringing it to this Court, probably ought to have a meet and confer with the court-appointed neutral and see if there's really a dispute for the Court to decide.  I bet everybody's up for that.

MR. DICKLER:  That's a better idea, Your Honor. Appreciate it.

THE COURT:  Yeah.  And that way you -- if there's questions about that, then those can -- the meet-and-confer process might very well resolve some of those things, okay?

MR. DICKLER:  Thank you very much.

THE COURT:  And, you know, look, we've got -- the one thing I've told my colleagues around the country that are considering the prospect of becoming transferee judges is that you get the best lawyers, especially in cases like this.  And so I can't imagine -- I probably couldn't begin to count how many issues in coming up on 13 years the parties resolved with meets and confers one-on-one and then resolved with meets and confers with the court-appointed neutrals supervising those discussions.  And so that's -- that's commending both Ed and Kip but also the great lawyers we've had in this case.

So that's what I would say is that would be the

process I'd expect is that, yes, look, if we got pending litigation and they're raising release, I take it they'd have to actually raise it in the litigation to begin with, but if this is approved, as Ms. DeMasi -- I think it's paragraph 67 -- brings it back here.  That's the way it worked in managed care.  By the way, Joe remembers that's the way it worked in breast implant, and Judge Clemon might remember that, too, since I tried to fill his big shoes in that MDL.

So I think that's the process is, if it's raised, everybody get together and discuss it.  Can't resolve it, get with Ed and discuss it.  If you can't resolve it, I'm open for business.  I am Denny's.

MR. DICKLER:  Thank you, Your Honor.

THE COURT:  All right.

MR. DICKLER:  Appreciate it.

MR. WHATLEY:  Thank you very much.

Are we on a break now, Your Honor?

THE COURT:  Let's take a short break.

(Recess taken at 11:27 a.m. to 11:49 a.m.)

THE COURT:  All right.  Mr. Whatley, on to the next objection?

MR. WHATLEY:  Yes, sir.  And just to be clear, I've had some discussions with Mr. Rakhunov while we were on break, and I think that's -- we've narrowed some points and had some productive time together that --

[Pages Intentionally Omitted]

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated:  August 1, 2025

*Pamela G. Weyant*
Pamela G. Weyant, RDR, CRR, CCR
Official Court Reporter