FILED

2026 May-17  PM 11:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE:  BLUE CROSS BLUE SHIELD ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) ) ) ) | Master File No. 2:13-cv-20000-AMM |
| (MDL NO.:  2406) | | This document relates to the Provider Track |

## BCBSAL'S SUBMISSION IN ADVANCE OF
## <u>MAY 18, 2026 STATUS CONFERENCE</u>

Last Friday, May 15, 2026, Jackson Hospital & Clinic, Inc. ("Hospital" or "JHC") purported to ring an alarm.  It filed that day a "Request for Emergency Status Conference" [Doc. 3436] ("Request"), which asserted that JHC had "recently" learned some $80MM in government grants and commitments to the Hospital ("Grants") would not be funded until *after* JHC had exited bankruptcy.  This was a departure from JHC's Chapter 11 reorganization plan ("Plan"), because the Plan required payment of the government Grants as a *precondition* to JHC leaving bankruptcy.

Further, the Hospital's Request filed last Friday alleged that JHC could not exit bankruptcy (and thus could not get the $80 million) unless and until it had satisfied a different precondition to the completion of the bankruptcy process --

namely, that the Hospital "negotiate prior and future reimbursement rates with Blue Cross Blue Shield of Alabama on terms acceptable to the Debtors[.]"  Request at 2, ¶ 4.  Accordingly, said the Hospital, it had an exigent need to file a new Adversary Complaint in bankruptcy court ASAP in order to "force" BCBSAL to reimburse JHC at the same level it was reimbursing a different Montgomery, Alabama Hospital (Baptist Medical Center South) ("Baptist South").[1]  Nothing less than a BCBSAL agreement to reimburse Baptist Health and the Hospital *identically* would be "acceptable" to the Hospital and satisfy this prerequisite to exiting bankruptcy.  Moreover, the Hospital lamented that its "permanent closure" was "imminent" unless BCBSAL increased JHC's rates to those paid to Baptist South.  *Id*. at 2, ¶ 7.

As a courtesy, BCBSAL did not oppose JHC's Request seeking a status conference on short order.  But BCBSAL *does* object to the filing of a new bankruptcy complaint (alleging breach of contract) until the Court has sufficient time to decide BCBSAL's Dec. 22, 2025 Motion to Enforce Provider Settlement and to Enjoin Jackson Hospital & Clinic's Adversary Proceeding against Blue Cross and Blue Shield of Alabama [Doc. 3378], and JHC's corresponding Jan. 5, 2026 Motion for Relief from Judgment and to Belatedly Opt-Out of Settlement Class and Response to Motion to Enforce Provider Settlement [Doc. 3382].  Additionally and

---

[1] Baptist South, the other hospital in question, treats more BCBSAL subscribers, handles more difficult cases with higher acuity scores, acts as a regional hub, and meets quality metrics unmet by Jackson Hospital.

2

in all events, BCBSAL respectfully asks the Court (1) *not* to sever Count Eight (that is, the breach of contract count) in JHC's original adversary proceeding complaint against BCBSAL [Doc. 3378-2]; and (2) at the appropriate time, permit JHC to file only an exact replica of the draft adversary proceeding amended breach of contract complaint previously filed with the Court and approved by BCBSAL. *See* Doc. 3415-1 (attaching proposed new breach of contract adversary proceeding complaint).

## ARGUMENT

I.    **The Hospital's Ability to Exit Bankruptcy and Thereby Collect the Government Grants Does Not Depend on a Resolution of its Reimbursement Dispute with BCBSAL. And Even It Did, That Problem Would Be of the Hospital's Own Making.**

This is not the first time JHC has threatened to close within weeks unless BCBSAL immediately pays JHC more than it deserves. For example, on Sept. 23, 2025, JHC proposed a 2026 rate increase and other terms that BCBSAL deemed unreasonable. [Doc. 3390-12 at 4-5, ¶ 17.] (Notably, JHC's proposal did not request a reimbursement rate that matched Baptist South's rate.) Then, on Oct. 3, 2025, JHC claimed it would shut down on Oct. 31, 2025 unless BCBSAL accepted its demands. *Id*. at 5, ¶ 19. BCBSAL did not accept JHC's unilateral demands, yet the Hospital remains in business more than six months after the purported Oct. 31, 2025 deadline.

As another example, in the Dec. 18, 2025 TRO motion JHC filed in bankruptcy court, it asserted: "If Blue Cross Alabama is not . . . *immediately*

3

compelled to pay the same reimbursement rates to Jackson Hospital that Blue Cross Alabama already pays Baptist [South], there is a substantial and immediate danger . . . that Jackson Hospital . . . will be forced to close its doors . . . ." [Doc. 3378-3 at 2-3, ¶ 4 (emphasis added).] BCBSAL was not compelled to pay JHC those rates -- with good reason -- and fortunately for all considered, the Hospital's doors are still open.[2]

Consistent with JHC's history of overstating its risk of imminent closure, JHC now cites an urgent need to file and resolve its revised breach of contract claim against BCBSAL when in truth no such urgent need exists. As a reminder, JHC's Request asserts that the Hospital cannot sustain operations without "substantial commitments and grants from the State of Alabama, Montgomery County, and the City of Montgomery" (Request, ¶3), which JHC labels as "Necessary

---

[2] To be clear, BCBSAL has worked in good faith with JHC for several years to ameliorate the Hospital's financial difficulties. In 2022, the Hospital's then-CFO Ben Wells notified BCBSAL that its operating expenses had increased significantly, causing delayed contractor payments and other financial strain. [Doc. 3390-12 at 1-2, ¶¶ 4-7.] BCBSAL responded by agreeing to an off-cycle, mid-year increase of JHC's reimbursement rates. *Id.* In 2023, BCBSAL's affiliate Ninety-Degree Benefits offered JHC the opportunity to be designated an Access2Day care site, which would have funneled approximately 9,000 patients to Jackson Hospital's care facilities and would have included $2 million annual payments. *Id.* at 3 ¶ 8. Jackson Hospital declined this opportunity. *Id.*. Later in 2023, Jackson Hospital requested a $1.5 million cash advance to assist the Hospital, which BCBSAL agreed to advance. *See* Feb. 16, 2016 Adversary Proceeding Verified Complaint (attached as Exhibit 1), p. 2 ¶ 7. In 2024, Jackson Hospital's interim management groups reached out regarding the Hospital's continuing financial difficulties, and BCBSAL responded by agreeing to a significant rate increase for the 2025 contract year. [Doc. 3390-12 at 3, ¶ 10.] Most recently, in late 2025/early 2026 BCBSAL and JHC agreed to a sizeable rate increase for 2026. But none of that has been enough to satisfy the Hospital's new management group.

Commitments." JHC further states it "was recently informed that, unless there is an unforeseen change in circumstances, all the Necessary Commitments will *not* be provided unless and until the Plan becomes effective and Jackson Hospital exits bankruptcy." *Id* (emphasis in original). From there, JHC posits that the only way its reorganization Plan will become effective is if BCBSAL arbitrarily agrees to increase – for the second time in 2026 – its reimbursement rates under the Provider Agreements. *See* Request, ¶3.

It is true that the Plan, at Section 10.2, sets forth certain conditions precedent to the occurrence of the Effective Date, including Section 10.2(h), which provides that "JHC shall renegotiate prior and future reimbursement rates with Blue Cross Blue Shield of Alabama on terms acceptable to the Debtors; . . . ." It is equally true, however, that JHC unilaterally included this condition precedent in its bankruptcy Plan knowing fully well that BCBSAL had already rejected a second increase in JHC's 2026 rates.

Indeed, additional increased reimbursement from BCBSAL is not necessary for JHC to successfully exit bankruptcy. JHC seems to have acknowledged the likelihood that subsection (h) would not be satisfied, because Section 10.3 of the Plan states as follows:

> 10.3  Waiver of Conditions to Confirmation and Effective Date.
>
> The Debtors, with the consent of JHS and the DIP Lender,[3] *may waive, in whole or in part, any of the conditions to the confirmation or effectiveness of this Plan; . . . . Any such waiver of a condition may be effected at any time, without notice or leave or order of the Bankruptcy Court* and without any formal action, other than the filing of a notice of such waiver with the Bankruptcy Court.

Plan at Section 10.3 (emphasis added).

*Thus, JHC has the current right to waive the condition precedent found in Section 10.2(h) of the Plan regarding BCBSAL's rates* -- of its own accord and without need of any order from the bankruptcy court, *thereby allowing the Plan to become effective and the Hospital to receive its $80 million in Grants.*  Yet, JHC is delaying recognition of the Effective Date by insisting that BCBSAL satisfy a precondition that JHC knew would never be satisfied – a condition that JHC has the power to waive but refuses to do so, choosing instead to come before this Court in a misguided effort to blame BCBSAL for JHC's supposed "inability" to exit bankruptcy.

**Indeed, JHC has waived (or will waive)** *other* **Section 10.2 conditions precedent to the Plan becoming effective** -- most notably, the precondition in

---

[3] JHS (Jackson Hospital Services, Inc.) and the DIP Lender (Jackson Investment Group, LLC) effectively control the actions of JHC through the DIP Lender's selection of its current Board of Directors.

Section 10.2(d).  Section 10.2(d) states that the Hospital cannot exit bankruptcy unless "all authorizations, consents, regulatory approvals, rulings, or documents necessary to obtain Grant commitments from the State of Alabama, Montgomery County, and/or the City of Montgomery, Alabama, in the approximate aggregate amount of $80,000,000.00, . . . [are] in effect for the benefit of the Debtors, ***and such Grant amount shall have actually been received by the Debtors***; . . . ."  Plan at Section 10.2(d) (emphasis added).  However, according to JHC's Request, the Grant amounts will *not* be received until after "the Plan becomes effective and Jackson Hospital exits bankruptcy."  Request at ¶ 3.  The unavoidable conclusion is that JHC has waived the Section 10.2 precondition, or will do so soon.

So, to summarize, if the problem is that the Necessary Commitments will not be provided until after JHC exits bankruptcy, JHC itself caused that problem by waiving compliance with Section 10.2(d), which demanded that the funds be received before the Effective Date.  That said, JHC can solve this problem by waiving another precondition, *viz*. Section 10.2(f), thus allowing the bankruptcy process to end, but for unknown reasons JHC refuses to do so.

Moreover, the notion that a BCBSAL agreement to further increase its JHC reimbursement rates is somehow pivotal to the Hospital's survival is belied by JHC's

statements during the bankruptcy court hearing on Plan confirmation.[4]  Although JHC did remind the Bankruptcy Court generally of the pending litigation against BCBSAL in this Court (and in an unrelated adversary proceeding in the Bankruptcy Court), JHC never suggested that a resolution of either dispute was critical to the Hospital's ongoing viability or its ability to arrive at an Effective Date for the Plan.

Lastly, in order for a plan of reorganization to be confirmed, the plan must be feasible -- that is, the debtor must establish that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further reorganization, of the debtor . . . ." 11 U.S.C. § 1129(a)(11).  The Debtors' counsel who argued in support of Plan confirmation did not tell the Bankruptcy Court that a BCBSAL reimbursement rate increase was the linchpin for the Hospital's survival, or that absent an additional BCBSAL reimbursement increase *the Plan would fail and the Hospital would close*.  The declaration of JHC's Chief Restructuring Officer proffered as evidentiary support for plan confirmation also failed to make that assertion.

And when confirming the Plan, the Bankruptcy Court made specific findings about, *inter alia*, the Hospital's funding sources after emergence from bankruptcy. Paragraph 5 of the Confirmation Order states that, based on the evidence presented

---

[4] BCBSAL has ordered a transcript of the confirmation hearing but does not yet have it. BCBSAL's assertions herein about what was said at the confirmation hearing are based on the good faith recollections of its counsel who were in attendance.

at the hearing, JHC would have multiple funding avenues post-bankruptcy:

> The Debtors will receive certain grants and commitments from the State of Alabama, Montgomery County, and the City of Montgomery, in the approximate aggregate amount of $80,000,000.00, to fund hospital operations, make capital expenditures, improve hospital infrastructure, and to satisfy certain claims incurred on or after November 1, 2025. The DIP Lender will also provide an exit lending facility in the amount of $75,000,000.00, which will be used to assume $25,000,000.00 of the secured claim of the DIP Lender and all amounts advanced by JIG to the Medical Clinic Board during the Chapter 11 Cases, fund the Exit Funding Amount, and up to $50,000,000.00 for infrastructure and deferred maintenance needs of the Reorganized Debtors following exhaustion of the Grants, and as necessary fund certain Plan obligations including the cash payment in the amount of $2,500,000.00 to the Prepetition Secured Parties pursuant to the treatment of Class 3 Claims.

[Bankr. Dkt.1680, ¶5]. Notably missing from the above litany of available funds to support the Hospital's ongoing operations is any mention of BCBSAL reimbursement rates. Moreover, the findings of fact made by the Bankruptcy Judge did not suggest in any way that the Grants and commitments were contingent or conditioned in any way on any action by BCBSAL.

In summary, it is a contrivance for JHC to contend that BCBSAL's failure to reimburse it at the Baptist South rate is the reason why JHC cannot immediately exit bankruptcy and receive $80 million in government funding. Just as JHC is waiving the advance funding precondition in Section 10.2(d), it can waive Section 10.2(h) of the Plan – and if it did, it appears that the $80 million would be readily available.

As JHC well knows, BCBSAL has for years worked in good faith to address JHC's financial difficulties, efforts that will be documented as needed in the context of any AP. JHC's current demand that BCBSAL arbitrarily increase JHC's reimbursement rates to match those of another area hospital is inconsistent with industry practices and ignores the factors that are considered in setting such rates, factors that can differ greatly even among hospitals in the same city.

Because there is no compelling need for JHC to file its new contract claim immediately, or to resolve it on an expedited basis, the originally-contemplated timeline should remain unchanged. That is, a new complaint alleging breach of contract should not be filed until after the Court decides the cross motions currently before it. A ruling for BCBSAL on those motions might give guidance as to the arguments (and evidence) that are off-limits in a new, breach of contract adversary proceeding. Conversely, a ruling for the Hospital would make a new bankruptcy AP unnecessary, as the original AP complaint would be allowed to proceed.

II.     **Because the Question Whether to Enjoin JHC from Prosecuting Its Dec. 18, 2025 Adversary Complaint is *sub judice*, It Would Appear Inadvisable for the Court to Sever Count Eight of that Complaint at This Time.**

At this juncture, there is no good reason to sever away the breach of contract claim (Count Eight) found in the Hospital's original adversary complaint. The specific question of whether JHC should be enjoined from bringing Count Eight has been extensively briefed, orally argued, and fully submitted; all that awaits is Your

Honor's ruling.  Severing the breach of contract claim now might have the unintended effect of mooting the parties' dispute or (possibly) depriving the Court of subject matter jurisdiction.  A far better approach would be to leave the status quo in place pending the Court's resolution of the relevant motions.

**III.    In the Event the Court Gives JHC Leave to File a New, Proposed Adversary Complaint against BCBSAL for an Alleged Breach of Contract, Such Adversary Complaint Should be Identical to the Version JHC Filed as Doc. 3415-1.**

BCBSAL's last request is modest.  It respectfully submits that there should be no variance whatsoever between JHC's new adversary complaint (whenever it might be filed, and which JHC submitted to BCBSAL's counsel for review, as ordered by the Court) and the draft adversary complaint JHC filed at Doc. 3415-1.

**<u>CONCLUSION</u>**

For the above reasons, BCBSAL respectfully asks that the Hospital not be permitted to file a new adversary complaint for breach of contract until after the Court has ruled on whether the original adversary complaint should be enjoined, in whole or in part.  In addition, BCBSAL respectfully opposes JHC's proposal to sever Count Eight from the original adversary complaint, at least so long as Count Eight remains the subject of pending cross-motions.  Finally, the Court should insist that the new adversary complaint be identical in every sense to the version previously filed in this Court (and approved by BCBSAL).

11

        */s/Carl S. Burkhalter*
        Counsel for Defendant Blue
        Cross Blue Shield of Alabama

**OF COUNSEL:**

Carl S. Burkhalter
MAYNARD NEXSEN PC
1901 Sixth Avenue North
Suite 1700
Birmingham, AL 35203
Telephone: (205)254-1000
Facsimile: (205)254-1999
cburkhalter@maynardnexsen.com

12

## CERTIFICATE OF SERVICE

I hereby certify that this 17th day of May 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF filing system, which will send a copy to all counsel of record.

/s/Carl S. Burkhalter
OF COUNSEL

13